# 15-1815-CR

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

▶▶ ◀◀

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

ROSS WILLIAM ULBRICHT, AKA DREAD PIRATE ROBERTS, AKA SILK ROAD,
AKA SEALED DEFENDANT 1, AKA DPR,

*Defendant-Appellant.*

—————————————

*On Appeal from the United States District Court
for the Southern District of New York (New York City)*

## BRIEF FOR DEFENDANT-APPELLANT

JOSHUA L. DRATEL, P.C.
*Attorneys for Defendant-Appellant*
29 Broadway, Suite 1412
New York, New York 10006
212-732-0707

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. vii

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUES ............................................................ 1

SUMMARY OF THE ARGUMENT ...................................................... 3

STATEMENT OF THE CASE ............................................................... 8

    A.   The Charges ...................................................................... 9

    B.   Pretrial Motions ............................................................. 10

    C.   Disclosure of Force's Corruption During the Investigation ................. 11

    D.   The Trial......................................................................... 13

    E.   The Charge and Verdict ................................................ 17

    F.   Post-Trial Motions and Further Disclosure
        Regarding Corruption In the Investigation ............................ 18

    G.   Sentencing..................................................................... 18

ARGUMENT ...................................................................................... 20

POINT I

    THE COURT ABUSED ITS DISCRETION AND DENIED ULBRICHT HIS FIFTH AND SIXTH AMENDMENT RIGHTS TO DUE PROCESS, THE RIGHT TO PRESENT A DEFENSE, AND A FAIR TRIAL BY (A) PRECLUDING THE DEFENSE FROM USING AT TRIAL THE EVIDENCE RELATING TO DEA SPECIAL AGENT CARL FORCE'S CORRUPTION; (B) REFUSING TO ORDER THE GOVERNMENT TO PROVIDE ADDITIONAL DISCOVERY AND BRADY MATERIAL REGARDING CORRUPTION; AND (C) DENYING ULBRICHT'S MOTION FOR A NEW TRIAL BASED ON ADDITIONAL POST-TRIAL DISCLOSURES REGARDING FORCE AND ANOTHER CORRUPT LAW ENFORCEMENT AGENT INVOLVED IN THE SILK ROAD INVESTIGATION ......................................................... 20

i

A. The Government's Eve-of-Trial Disclosure of
Force's Corruption ...............................................................23

B. The Court's Further Preclusion at Trial of Evidence the Pretrial
Rulings Had Permitted the Defense to Use ...........................27

    1. The Post-Trial Revelation of Bridges's Corruption, and the
Additional Post-Trial Disclosures of Force's Misconduct ..........30

C. The Court Abused Its Discretion In Precluding Ulbricht from
Utilizing at Trial Information Related to Force's Corruption ..............37

    1. There Was Not Sufficient Need to Maintain Secrecy
of the Investigation of Force and Bridges to Ulbricht's
Detriment In This Case ...............................................39

    2. The Record Demonstrates That Silk Road
Investigations Were Coordinated and Combined.......................40

    3. The Information Regarding the Investigation of Force
and Bridges Is Relevant to This Case Regardless Whether
the Investigations Were Independent ...........................................46

        a. The Government's Initial Exhibit List.................................46

        b. The Importance of the First Half of
2013 Regarding the Evidence At Trial ...............................47

D. The Court Abused Its Discretion By Deviating From Its
Pretrial Ruling and Precluding Evidence That It Had
Determined Would Be Admissible .......................................48

E. The Court Abused Its Discretion In Denying Ulbricht's Motion
for a New Trial Based on the Government's Failure to Make
Complete and Accurate Pretrial Disclosure Regarding Law
Enforcement Corruption In the Government's Investigation ...............50

    1. The Principles Applicable to Exculpatory Material
and Information ..........................................................50

        a. General Principles Governing the Government's
Brady Disclosure Obligations...............................50

       b.    The Manner of the Government's Brady
            Disclosure Obligations ........................................................59

    2.    The Government Failed to Make Timely Production
        of Exculpatory Material ...............................................................60

POINT II

THE COURT ABUSED ITS DISCRETION BY CURTAILING
CROSS-EXAMINATION AND THE DEFENSE THEORY AT
TRIAL .........................................................................................63

A.    HSI SA Jared Der Yeghiayan ..............................................63

    1.    In Curtailing and Striking Cross Examination of SA
        Der-Yeghiayan, the Court Improperly Concluded There
        Was No Nexus Between the Alternative Perpetrator and
        the Specific Offenses ..................................................................66

       a.    Relevant Case Law Regarding An Alternate Perpetrator ......66

       b.    The Requisite Nexus Was Established By the
           Government Itself Through Its Direct Examination
           of SA Der-Yeghiayan ..............................................................69

    2.    The Court Also Erred by Disregarding the Untimeliness
        of the Government's Objections, Failing to Acknowledge
        That Cross Examination of SA Der-Yeghiayan Was Relevant
        to Another Proper Defense Ulbricht Was Presenting, and
        Improperly Considering Issues Regarding the Government's
        Possible Redirect .......................................................................70

    3.    The Court Abused Its Discretion by Precluding the
        Defense From Eliciting from SA Der-Yeghiayan that
        Karpeles Attempted to Exchange Immunity for the
        Identity of DPR ..........................................................................71

B.    FBI Computer Specialist Thomas Kiernan ...........................75

C.    The Court's Rulings Which Curtailed the Cross Examinations
    of SA Der-Yeghiayan and Agent Kiernan Constituted an Abuse
    of Discretion .............................................................................76

iii

POINT III

    THE COURT ABUSED ITS DISCRETION IN PRECLUDING TWO DEFENSE EXPERTS ...............................................................78

    A.   The Court's Decision Precluding the Two Defense Experts.................80

    B.   The Court Abused Its Discretion In Precluding
        the Two Defense Experts .......................................................83

POINT IV

    THE COURT ABUSED ITS DISCRETION IN PRECLUDING ADMISSION OF ANDREW JONES'S STATEMENT AGAINST PENAL INTEREST PURSUANT TO RULE 804(3)(b), FED.R.EVID., AND/OR RULE 807, FED.R.EVID. ..................................90

    A.   Pretrial Disclosure of Andrew Jones's Exculpatory Statement.............90

    B.   The Trial Proceedings.........................................................91

    C.   The Court Abused Its Discretion In Precluding Admission
        of Jones's Statement Under Either Rule 804(3)(b) or Rule 807...........92

POINT V

    THE COURT'S ERRONEOUS EVIDENTIARY RULINGS CONSTITUTED CUMULATIVE ERROR THAT DEPRIVED ULBRICHT OF DUE PROCESS AND A FAIR TRIAL.............................97

POINT VI

    THE UNLIMITED SEARCHES AND SEIZURE OF ULBRICHT'S ENTIRE LAPTOP AND GMAIL AND FACEBOOK ACCOUNTS VIOLATED THE FOURTH AMENDMENT BECAUSE THEY CONSTITUTED THE FRUIT OF (A) A WARRANT THAT LACKED ANY PARTICULARITY; AND (B) UNLAWFUL AND WARRANTLESS PEN REGISTER AND TRAP AND TRACE ORDERS...................................................................98

    A.   The Search of Ulbricht's Laptop and Gmail and Facebook
        Accounts Violated the Fourth Amendment Because the
        Warrant Authorizing the Search Lacked Any Particularity...................98

1.  The Unlimited Scope of the Warrants At Issue..........................98

2.  The Court's Rationale for Denying Ulbricht's
    Motion to Suppress..................................................100

3.  The Overriding Importance of the Particularity
    Requirement........................................................100

4.  The Warrants At Issue Are Devoid of Particularity.................102

B.  The Pen Register and Trap and Trace Orders Were Unlawful
    and Violated the Fourth Amendment Because They Required a
    Warrant and Also Failed to Adhere to Statutory Limitations.............109

1.  The Pen Register and Trap and Trace Orders Were Unlawful
    Because They Required a Warrant .........................................109

    a.  Smith v. Maryland Does Not Control the Issue Herein.....111

    b.  The Pen-Trap Devices In This Case Required a Warrant
        Because They Captured Information About Ulbricht's
        Activities In His Home .....................................118

    c.  The Pen-Trap Devices In This Case Required a Warrant
        and/or Violated the Operative Statute Because They
        Captured Prospective Data and Information ....................120

2.  The Pen Register and Trap and Trace Devices Used In
    This Case Were Unlawful Because They Exceeded
    Statutory Authority .................................................121

POINT VII

THE LIFE SENTENCE IMPOSED ON ULBRICHT WAS
PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE.........125

A.  The Life Sentence Was Procedurally Unreasonable...........................125

1.  The Court Erred In Considering the Alleged Overdose
    Deaths Based on An Entirely Subjective, Undefined, and
    Unprecedented Standard...........................................127

2.    The Court Improperly Relied on the Alleged
Overdose Deaths Purportedly Attributable to
the Silk Road Site Without Sufficient or Reliable Proof..........128

    a.    The Relevant Case Law ....................................................128

    b.    The Court Improperly Relied on "Erroneous Facts"
In Considering the Alleged Overdose Deaths That
the Defense Expert Forensic Pathologist Concluded
Was Incomplete, Unreliable, and Inaccurate ....................130

B.    The Life Sentence Was Substantively Unreasonable .........................133

CONCLUSION ..................................................................................................140

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*ACLU v. Clapper*, 785 F.3d 787 (2d Cir. 2015) ...........................................115, 117

*Alvarez v. Ercole*, 763 F.3d 223 (2d Cir. 2014)......................................................69

*Andersen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737,
    49 L.Ed.2d 627 (1976) ...................................................................................106

*Andrews v. Stegall*, 11 Fed.Appx. 394 (6th Cir. 2001)...........................................68

*In re Application*, 2006 WL 1876847 (N.D. Ind. July 5, 2006) ...........................123

*In re Application*, 396 F.Supp.2d 747 (S.D. Tex. 2005)........................................122

*In re Application of the U.S. for an Order Authorizing the Release of
    Historical Cell-Site Info.*, 809 F.Supp.2d 113 (E.D.N.Y.2011) ......................117

*In re Application of the United States for an Order Authorizing the
    Installation and Use of a Pen Register Device*, 497 F.Supp.2d 301
    (D.P.R. 2007) *with In re Application of the United States for an
    Order for Disclosure of Telecommunications Records and
    Authorizing the Use of a Pen Register and Trap and Trace*, 405
    F.Supp.2d 435 (S.D.N.Y. 2005) .....................................................................121

*In re Application of the United States for an Order Authorizing the
    Use of a Pen Register and a Trap and Trace Device on Wireless
    Telephone Bearing Telephone Number [Redacted], Subscribed to
    [Redacted], Service by [Redacted]*, No. 08 MC 0595(JO), 2008
    WL 5255815 (E.D.N.Y. Dec.16, 2008) ...........................................................123

*In re Application of the United States for an Order Authorizing the
    Use of a Pen Register With Caller Identification Device Cell Site
    Location Authority on a Cellular Telephone*, 2009 WL 159187
    (S.D.N.Y. Jan.13, 2009)...................................................................................122

*In re Application of the United States for an Order Directing a
    Provider of Electronic Communication Service to Disclose
    Records to the Government*, 534 F.Supp.2d 585 (W.D.Pa. 2008) ...................121

*In re Application of the United States for an Order for Prospective Cell Site Location Information on a Certain Cellular Telephone*, 460 F.Supp.2d 448 (S.D.N.Y. 2006) ................................................121

*In re Applications of U.S. for Orders Authorizing Disclosure of Cell Cite Info.*, 05-403, 2005 WL 3658531 (D.D.C. Oct. 26, 2005).......................123

*Authorizing Disclosure of Location-Based Servs.* No. 07-128, 2007 WL 3342243 (S.D. Tex. Nov. 7, 2007) ............................................124

*In re Authorizing the Use of a Pen Register*, 384 F.Supp.2d 562 *on reconsideration sub nom. In re Application of the U.S. for an Order (1) Authorizing the Use of a Pen Register & a Trap & Trace Device*, 396 F.Supp.2d 294 (E.D.N.Y. 2005) ....................................124

*Bowen v. Maynard*, 799 F.2d 593 (10th Cir.) ........................................70

*Bowen v. Maynard*, 799 F.3d 593 (10th Cir. 1986) ................................67

*Boyette v. LeFevre*, 246 F.3d 76 (2d Cir. 2001) ....................................66

*Brady v. Maryland*, 373 U.S. 83 (963) ............................................*passim*

*Chambers v. Mississippi*, 410 U.S. 284 (1973) ................................*passim*

*Chapman v. California*, 386 U.S. 18 (1967)..........................................77

*Cone v. Bell*, 556 U.S. 449 (2009) ............................................51, 54, 62

*Cotto v. Herbert*, 331 F.3d 217 (2d Cir. 2003) ..................................69, 71

*Crane v. Kentucky*, 476 U.S. 683 (1986) ..............................................83

*Dennis v. United States*, 384 U.S. 855 (1966) ..................................38, 56

*DiBenedetto v. Hall*, 272 F.3d 1 (1st Cir. 2001)....................................67

*Douglas Oil Co. Of California v. Petrol Stops Northwest*, 441 U.S. 211 (1979)...............................................................56

*Florida v. Jardines*, __ U.S. __, 133 S. Ct. 1409 (2013)......................120

*Gardner v. Florida*, 430 U.S. 349 (1977) (plurality opinion) ...............129

*Hein v. Cuprum, S.A., De C.V.*, 53 Fed.Appx. 134 (2d Cir. 2002)..........................84

*Horton v. California*, 496 U.S. 128 (1990)..........................................................102

*Klayman v. Obama*, 957 F.Supp.2d 1 (D.D.C. 2013), *vacated and remanded on other grounds*, 800 F.3d 559 (D.C. Cir. 2015) ..........................115

*Koon v. United States*, 518 U.S. 81 (1996)..........................................................77

*Kyles v. Whitley*, 514 U.S. 419 (1995)............................................................*passim*

*Kyllo v. United States*, 533 U.S. 27 (2001)..............................................119, 120

*Lambert v. Beard*, 537 Fed.Appx. 78 (3d Cir. 2013), *after remand by, Wetzel v. Lambert*, __ U.S. __, 132 S. Ct. 1195 (2012) ...............................52, 62

*Leka v. Portuondo*, 257 F.3d 89 (2d Cir.2001)....................................................58, 61

*Limone v. United States*, 497 F.Supp.2d `43 (D. Mass. 2007) ................................73

*Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291 (2d Cir. 1979) .........................38

*Mendez v. Artuz*, 303 F.3d 411 (2d Cir. 2002)........................................................67

*Mitchell v. United States*, 526 U.S. 314 (1999) .....................................................94

*Moore v. Illinois*, 408 U.S. 786 (1972) .................................................................51

*Muncie Aviation Corporation v. Party Doll Fleet, Inc.*, 519 F.2d 1178 (5th Cir. 1975)..........................................................................................73

*In re Order Authorizing Prospective and Continuous Release of Cell Site Location Records*, 31 F.Supp.3d 889 (S.D. Tex. 2014) ............................121

*Parsons v. Honeywell Incorporated*, 929 F.2d 901 (2d Cir. 1991) .........................73

*People of Territory of Guam v. Ignacio*, 10 F. 3d 608 (9th Cir. 1993) ..................68

*In the Matter of the Search of Information Associated with [Redacted] @mac.comthat is Stored at Premises Controlled by Apple, Inc.*, 13 F.Supp.3d 157 (D.D.C. August 8, 2014) .....................................................107

*Sherwin-Williams Co. v. New York State Teamsters Conference Pension and Retirement Fund*, 969 F.Supp. 465 (N.D. Oh. 1997) .................132

*Smith v. Maryland*, 442 U.S. 735 (1979) ........................................................*passim*

*Steinberg v. Obstetrics-Gynecological & Fertility Group, P.C.*,
260 F.Supp.2d 492 (D.Conn. 2003)...................................................73

*St. Germain v. United States*, Nos. 03 cv 8006 (CM), 99 cr 339 (CM),
2004 WL 1171403, at *18 (S.D.N.Y. May 11, 2004) ........................................58

*In re U.S. For an Order Authorizing the Disclosure of Prospective
Cell Site Info.*, 412 F.Supp.2d 947 (E.D. Wisc. 2006), *aff'd*, 06-
MISC-004, 2006 WL 2871743 (E.D. Wis. Oct. 6, 2006)................................124

*In re U.S. for an Order Authorizing the Use of a Pen Register and
Trap on [xxx] Internet Service Account/User Name
[xxxxxxx@xxx.com]*, 396 F.Supp.2d 45 (D. Mass 2005) ..................................114

*United States v. Abrams*, 615 F.3d 541 (1st Cir. 1980) ........................................105

*United States v. Agurs*, 427 U.S. 97 (1976)........................................................54, 83

*United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008) ....................................97

*United States v. Aldeen*, 792 F.3d 247 (2d Cir. 2015) ............................................134

*United States v. Bailey*, 581 F.2d 341 (3d Cir. 1978)..............................................73

*United States v. Blake*, 107 F.3d 651 (8th Cir. 1997).1 2 ......................................71

*United States v. Breit*, 767 F.2d 1084 (4th Cir. 1985)............................................59

*United States v. Bridges*, No. CR 15-319 (RS) (N.D. Cal.)....................................23

*United States v. Camacho*, 163 F.Supp.2d 287 (S.D.N.Y. 2001)............................93

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) (*en banc*) ..........................126

*United States v. Certified Environmental Services, Inc.*,
753 F.3d 72 (2d Cir. 2014) ........................................................*passim*

*United States v. Chan*, 184 F.Supp.2d 337 (S.D.N.Y. 2002) ..................................92

*United States v. Chavez*, 549 F.3d 119 (2d Cir. 2008) ............................................84

*United States v. Comprehensive Drug Testing, Inc.*,
   621 F.3d 1162 (9th Cir. 2010) (en banc) (per curiam) ....................................105

*United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001) ........................................*passim*

*United States v. Crowley*, 318 F.3d 401 (2d Cir. 2003),
   *cert. denied,* 540 U.S. 894 (2003)........................................................................76

*United States v. Davis*, 785 F.3d 498 (11th Cir. 2015) (*en banc*) ........................117

*United States v. DeSilva*, 613 F.3d 352 (2d Cir. 2010) ..........................................126

*United States v. Diallo*, 40 F.3d 31 (2d Cir. 1994)..................................................88

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999)..................................................68

*United States v. Dumeisi*, 424 F.3d 566 (7th Cir. 2005)..........................................73

*United States v. Dwyer*, 539 F.2d 924 (2d Cir. 1976) ............................................87

*United States v. Fatico*, 458 F.Supp. 388 (E.D.N.Y. 1978),
   *aff'd in part rev'd in part,* 603 F.2d 1053 (2d Cir. 1979)................................129

*United States v. Figueroa*, 548 F.3d 222 (2d Cir. 2008) ...................................71, 77

*United States v. Figueroa*, 647 F.3d 466 (2d Cir. 2011) ........................................126

*United States v. Forrester*, 512 F.3d 500 (9th Cir. 2007)......................................114

*United States v. Fucillo*, 808 F.2d 173 (1st Cir. 1987)..........................................104

*United States v. Fuller*, 149 F.Supp.2d 17 (S.D.N.Y. 2001) ...................................93

*United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013).......................................*passim*

*United States v. Ganias*, 755 F.3d 125 (2d Cir. 2014), *reh'g en banc*
   *granted*, 791 F.3d 290 (2d Cir. 2015)................................................101, 102, 103

*United States v. George*, 975 F.2d 72 (2d Cir. 1992) ............................................104

*United States v. Gil*, 297 F.3d 93 (2d Cir. 2002).........................................55, 56, 59

*United States v. Graham*, 796 F.3d 332 (4th Cir. 2015), *reh'g en banc*
   *granted,* 2015 WL 6531272 (4th Cir. Oct. 28, 2015)..............116, 117, 119, 120

*United States v. Holzman*, 871 1496, 1509 (9th Cir. 1989)....................104

*United States v. Hsia*, 24 F.Supp.2d 14 (D.D.C. 1998) .....................................*passim*

*United States v. Iaconetti*, 406 F.Supp. 554 (E.D.N.Y. 1976)................................73

*United States v. Ingram*, 721 F.3d 35 (2d Cir. 2013)
    (Calabresi, J., concurring)........................................................134

*United States v. Jones*, 132 S. Ct. 945 (2012)
    (Sotomayor, J., concurring) ...................................................117

*United States v. Karo*, 468 U.S. 705 (1984) .........................................119

*United States v. Kim*, 896 F.2d 678 (2d Cir. 1990) ................................139

*United States v. Lee*, 818 F.2d 1052 (2d Cir. 1987) ...............................128

*United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012)...........................53

*United States v. Manning*, 56 F.3d 1188 (9th Cir. 1995).........................67

*United States v. Mannino*, 635 F.2d 110 (2d Cir. 1980).........................106

*United States v. Maxwell*, 920 F.2d 1028 (D.C. Cir. 1990)....................104

*United States v. McBride*, 786 F.2d 45 (2d Cir. 1986) ...........................87

*United States v. Miller*, 425 U.S. 435 (1976) .......................................116

*United States v. Ming He*, 94 F.3d 782 (2d Cir. 1996) ..........................94

*United States v. Peter Nash*, 13 Cr. 950 (TPG) ....................................136

*United States v. Olsen*, 737 F.3d 625 (9th Cir. 2013)........................62, 63

*United States v. Onumonu*, 967 F.2d 782 (2d Cir. 1992) ..........................86, 87, 88

*United States v. Otero*, 563 F.3d 1127 (10th Cir. 2009).......................101

*United States v. Payne*, 63 F.3d 1200 (2d Cir. 1995) .............................52

*United States v. Pollack*, 534 F.2d 964 (D.C. Cir. 1976) .........................57

*United States v. Prescott*, 920 F.2d 139 (2d Cir. 1990)..........................129

*United States v. Rattoballi*, 452 F.3d 127 (2d Cir. 2006) ....................................133

*United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) ...............................................133

*United States v. Rivas*, 377 F.3d 195 (2d Cir. 2004) .................................................53

*United States v. Roche*, 614 F.2d 6 (1st Cir. 1980) ...............................................103

*United States v. Solomonyan*, 451 F.Supp.2d 626 (S.D.N.Y. 2006) .......................55

*United States v. Stifel*, 594 F.Supp. at 154....................................................67, 71, 74

*United States v. Thai*, 29 F.3d 785 (2d Cir. 1994)....................................................84

*United States v. Thomas*, 981 F.Supp.2d 229 (S.D.N.Y. 2013) ......................*passim*

*United States v. Tucker*, 404 U.S. 443 (1972) .......................................................129

*United States v. Van Brandy*, 726 F.2d 548 (9th Cir.1984)....................................54

*United States v. Vilar*, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007)....................104

*United States v. Wade*, 512 Fed.Appx. 11 (2d Cir. 2013) .......................................68

*United States v. Youngblood*, 379 F.2d 365 (2d Cir. 1967)....................................56

*United States v. Zemlyansky*, 945 F.Supp.2d 438 (S.D.N.Y. 2013) .....................108

*Voss v. Bergsgaard*, 774 F.2d 402 (10th Cir. 1985) ..............................................108

*Wade v. Mantello*, 333 F.3d 51 (2d Cir. 2003) ..................................................66, 67

*Warden v. Hayden*, 387 U.S. 294 (1967).............................................................107

*Williamson v. United States*, 512 U.S. 594 (1994) ................................................95

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,*
   571 F.3d 206 (2d Cir. 2009) .....................................................................84, 85

**State Cases**

*Commonwealth v. Augustine*, 467 Mass. 230 (2014) ...........................................120

*State v. Earls*, 214 N.J. 564 (2013) ......................................................................120

**Federal Statutes**

18 U.S.C. § 2 .................................................................................................9

18 U.S.C. § 371 .........................................................................................108

18 U.S.C. §§ 981 & 982 .............................................................................10

18 U.S.C. § 1028(f) .....................................................................................10

18 U.S.C. § 1030 (a)(2) ................................................................................8

18 U.S.C. § 1030(b) .....................................................................................10

18 U.S.C. § 1341 .........................................................................................108

18 U.S.C. § 1956(h) ............................................................................8, 9, 10

18 U.S.C. § 1960 ..........................................................................................46

18 U.S.C. §§ 2703 and 3122 ......................................................................128

18 U.S.C. § 2703(d) ...................................................................................128

18 U.S.C. §§ 3122 and 3123 ......................................................................129

18 U.S.C. § 3127 ..............................................................125, 126, 127, 128

18 U.S.C. § 3127 (3) ..................................................................................115

18 U.S.C. § 3127 (4) ..................................................................................115

18 U.S.C. § 3231 ............................................................................................1

18 U.S.C. § 3500 ...............................................................23, 59, 60, 74

18 U.S.C. § 3742(a) .......................................................................................1

21 U.S.C. §§ 812, 841(a)(1) and (b)(1)(A) .................................................9

21 U.S.C. §§ 812, 841(h) and (b)(1)(A) ....................................................10

21 U.S.C. § 841(b)(1)(A) ...........................................................................142

21 U.S.C. § 841 and § 848 .........................................................................108

21 U.S.C. § 846 ....................................................................8, 10

21 U.S.C. § 848(a) ...................................................................10

21 U.S.C. § 853 ..........................................................................10

28 U.S.C. § 1291 ..........................................................................1

28 U.S.C. § 2461 ........................................................................10

28 U.S.C. § 2703 ...................................................122, 128, 129

47 U.S.C. § 1002(a) ................................................................127

**Rules**

Rule 6(e), Fed.R.Crim.P. .................................................12, 29, 40

Rule 16, Fed.R.Crim.P. ..................................................83, 87

Rule 29, Fed.R.Crim.P. ..........................................................18

Rule 33, Fed.R.Crim.P. .....................................................*passim*

Rule 403, Fed.R.Evid. ...............................................................68

Rule 803(4), Fed.R.Evid. .............................2, 95, 100, 101

Rule 803(24), Fed.R.Evid ......................................................76

Rule 804(3), Fed.R.Evid ........................................................17

Rule 804(3)(b), Fed.R.Evid ...................................................96

Rule 804(b)(5), Fed.R.Evid ...................................................76

Rule 807, Fed.R.Evid. .........................................................*passim*

Rule 807(C), Fed.R.Evid ........................................................96

**Constitutional Provisions**

Fourth Amendment .............................................................*passim*

Fifth Amendment ................................................................*passim*

Sixth Amendment ..............................................................................*passim*

**Other Authorities**

Glenn R. Schmitt & Hyun J. Konfrst, *Life Sentences in the Federal System* , United States Sentencing Commission (February 2015) ...................134

James Cook, "The Biggest Drug Dealer on Silk Road Has Been Sentenced to 10 Years In Prison," ...................137

Kathleen Ridolfi, Tiffany M. Joslyn, and Todd H. Fries, *Material Indifference: How Courts Are Impeding Fair Disclosure In Criminal Cases* .106

Orin S. Kerr, *Searches and Seizures in a Digital World,* 119 Harv. L.Rev. 531, 569 (2005) ...................101

Patrick Howell O'Neill, "The Dark Net's Cocaine King Just Got 5 Years Behind Bars," ...................137

Spencer Ackerman, "NSA Review Panel Casts Doubt On Bulk Data Collection Claims," *The Guardian*, January 14, 2014 ...................115

# JURISDICTIONAL STATEMENT

The District Court's jurisdiction is based on 18 U.S.C. §3231. This Court's jurisdiction is based on 28 U.S.C. §1291 and 18 U.S.C. §3742(a). This appeal is from an Order of Judgment entered June 1, 2015, by the Honorable Katherine B. Forrest, United States District Judge, Southern District of New York, following defendant-appellant Ross Ulbricht's conviction after trial on seven counts charged against him in Indictment 14 Cr. 68 (KBF). A150.[1] A timely Notice of Appeal was filed June 4, 2015. A1554. Ulbricht is appealing a final order of the Court regarding his conviction and sentence. A1545.

# STATEMENT OF THE ISSUES

I. Whether the Court abused its discretion in precluding Ulbricht's use at trial of evidence of an investigating agent's corruption directly related to the investigation and operation of the website the defendant allegedly operated, and whether the government withheld exculpatory information, regarding that corruption.

II. Whether the Court abused its discretion in curtailing the defense's cross-examination of government witnesses with respect to the defense theories of the case.

---

[1] "A" refers to the Appendix filed herewith. "S" refers to the Sealed Appendix. "T" refers to citations to the trial transcripts.

1

III.   Whether the   Court abused its discretion in precluding the testimony
       of two defense experts.

IV.    Whether the Court erred in excluding a statement by an unavailable
       witness, which qualified for admission under either Rule 803(4),
       Fed.R.Evid. (admission against penal interest) or Rule 807,
       Fed.R.Evid. (residual exception).

V.     Whether the Court's evidentiary errors, even if insufficient
       individually to warrant vacating Ulbricht's conviction, constituted
       cumulative error.

VI.    Whether the Court erred in denying Ulbricht's motions to suppress:

       A.    evidence from his laptop and social media accounts because the
             warrants to search those materials lacked any particularity.

       B.    evidence obtained via pen register and trap and trace devices
             that tracked Ulbricht's internet activity and location because
             they were implemented without a warrant.

VII.   Whether the sentence of life imprisonment imposed upon Ulbricht
       was procedurally and/or substantively unreasonable.

## SUMMARY OF THE ARGUMENT

This Brief on Appeal is filed on behalf of defendant-appellant Ross Ulbricht, who, after a four-week jury trial, was convicted on seven counts and subsequently sentenced to life without parole. The charges alleged that Ulbricht operated a website, the Silk Road, on which vendors offered for sale a wide variety of merchandise including controlled substances, computer hacking software, and false identification documents. The exclusive method of payment on the site, which existed on the TOR network on the Internet and provided anonymity for those operating, selling, and purchasing on Silk Road, was through Bitcoin, an electronic payment system also providing anonymity for participants in any transaction on Silk Road.

This appeal presents three categories of issues: (1) those that occurred at trial; (2) those related to the Court's denial of Ulbricht's motions to suppress certain evidence; and (3) those that occurred at sentencing. As detailed below, those errors, correspondingly, (1) constituted an abuse of discretion and denied Ulbricht his Fifth and Sixth Amendment rights to Due Process, a fair trial, and to present a defense; (2) violated his Fourth Amendment rights to be protected against unreasonable search and seizure, and (3) constituted an abuse of discretion and denial of Ulbricht's Fifth Amendment Due Process rights with respect to sentencing.

At trial, the Court's evidentiary rulings precluded a valid defense by excluding material exculpatory evidence of critical law enforcement corruption by two agents in the investigation itself, unreasonably curtailing cross-examination – including *post hoc* excision of questions and answers from the record – as well as precluding testimony of two experts proffered by the defense, and a crucial statement by a cooperating witness who did not testify, but which was against the penal interest of the declarant and exculpatory for Ulbricht.

The defense's principal elements were that:

(a)    Ulbricht was *not* Dread Pirate Roberts ("DPR"), the alias adopted by the operator and administrator of the Silk Road website, and that, as government investigators and persons directly involved with the site concluded, there were multiple DPR's over the course of Silk Road's existence;

(b)    that DPR framed Ulbricht, who had initially conceived of and constructed the Silk Road site, but had divested himself of it early on (as he had informed a friend who testified as a government witness); and,

(c)    that vulnerabilities inherent to the internet and digital data, such as fabrication and manipulation of files and metadata, and hacking,

rendered much of the evidence against Ulbricht inauthentic,

unattributable to him, and/or ultimately unreliable.

Yet the Court's rulings, covered in POINTs I, II, III and IV, prevented the

defense from presenting salient facts to the jury with respect to each of those issues

by precluding:

(1)　　evidence that a Drug Enforcement Administration Special Agent, Carl
M. Force, had engaged in corruption in his investigation of Silk Road,
which included his and another corrupt agent's (whose misconduct
was not disclosed to the defense until *after* trial) infiltration of the
internal operations of Silk Road's website and communications and
financial platforms;

(2)　　evidence pointing to an alternative perpetrator, Mark Karpeles, whom
the government was actively investigating with respect to Silk Road
until Ulbricht's arrest;

(3)　　evidence that DPR was paying someone claiming to be involved in
law enforcement (and who after trial was confirmed to be Force) for
information regarding the status and progress of the government's
investigation of Silk Road;

(4)　　evidence that over time there was more than one DPR;

(5)     evidence that a Silk Road administrator had reason to believe that the

person acting as DPR (whom he had never met) in September 2013

was *not* the DPR who had hired him earlier that year;   and

(6)     evidence that the integrity of communications and information

transmitted over the internet is suspect without firsthand corroboration

of the source and accuracy.

In a case in which that lack of integrity of digital information, created and

transmitted on an anonymous untraceable internet network, was of paramount

importance, and in which the government did not produce a single witness to

testify firsthand that Ulbricht authored any of the communications attributable to

DPR, and which was permeated by corruption of two law enforcement agents

participating in the investigation, the restrictions on cross-examination, and

preclusion of expert witnesses offered to overcome those restrictions, eviscerated

Ulbricht's defense and denied him a fair trial.

Also, as set forth in POINT V, even if those errors do not suffice

individually to compel reversal of Ulbricht's convictions, they constitute

cumulative error.

In addition, as detailed in POINT VI, the Court's denial of Ulbricht's

suppression motion was erroneous in two respects:   (1)   the warrants for the

search of his laptop, Facebook and Gmail accounts lacked *any* particularity;   and

(2)   the pen register and trap and trace devices implemented required a warrant because they tracked Ulbricht's internet activity and location, intruded into his conduct within his residence, and sought prospective, rather than historical, information.

Ultimately, Ulbricht was sentenced to life imprisonment.   In so doing, as set forth in POINT VII, the Court committed both procedural and substantive error. The former involved attributing to Ulbricht several alleged overdose deaths based on an undefined and unprecedented legal standard, and then applying that standard to rely on accusations (rather than the uncontroverted report of the defense's expert forensic pathologist) that did not meet even the preponderance of evidence standard.   The latter error involved imposing a demonstrably unreasonable sentence that "shocks the conscience" or at very least "stirs" it – the most severe available, reserved for a tiny fraction of the worst offenders, upon a defendant who, even if guilty, did not himself sell any drugs but merely created a neutral internet commercial platform that enabled others to do so.

Accordingly, it is respectfully submitted that Ulbricht's convictions should be vacated and a new trial ordered, particular evidence against him suppressed, or, in the alternative, the matter should be remanded for re-sentencing before a different judge.

## STATEMENT OF THE CASE

Ulbricht was arrested October 1, 2013, in San Francisco, California,
pursuant to a Criminal Complaint charging him with a narcotics trafficking
conspiracy, in violation of 21 U.S.C. §846, a computer hacking conspiracy, in
violation of 18 U.S.C. §1030 (a)(2), and a money laundering conspiracy, in
violation of 18 U.S.C. §1956(h).   A48.

The Superseding Indictment charged Ulbricht with devising and operating
Silk Road, an "underground website" allegedly "designed to enable users across
the world to buy and sell illegal drugs and other illicit goods and services
anonymously and outside the reach of law enforcement."   A150. Ulbricht is
alleged to have owned and operated the site "with the assistance of various paid
employees who he managed and supervised" from in or about January 2011
through in or about October 2013, when Silk Road was shut down by law
enforcement.   A150-51.

According to the Indictment, during the period that the Silk Road website
was operational it "emerged as the most sophisticated and extensive criminal
marketplace on the Internet" and was "used by several thousand drug dealers and
unlawful vendors to distribute hundreds of kilograms of illegal drugs and other
illicit goods and services to well over a hundred thousand buyers worldwide."   *Id*.

The website is also alleged to have been used "to launder hundreds of millions of dollars from these illegal transactions." *Id*. The Indictment further alleges Ulbricht "reaped commissions worth tens of millions of dollars" from the sales conducted on the website, and he "solicit[ed] the murder-for-hire of several individuals he believed posed a threat" to Silk Road in order to "protect his criminal enterprise and the illegal proceeds it generated." A151.

## A. *The Charges*

Ulbricht was initially indicted February 4, 2014, A87, and a Superseding Indictment was returned August 21, 2014. A150. The Superseding Indictment charged Ulbricht with: Distribution and Possession with Intent to Distribute Controlled Substances and Aiding and Abetting such Distribution and Possession with Intent to Distribute, in violation of 21 U.S.C. §§812, 841(a)(1) and (b)(1)(A), and 18 U.S.C. §2 (Count One); Distribution of Narcotics By Means of the Internet and Aiding and Abetting Such Activity, in violation of 21 U.S.C. §§812, 841(h) and (b)(1)(A) (Count Two); Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. §846 (Count Three); Continuing Criminal Enterprise, in violation of 21 U.S.C. §848(a) (Count Four); Conspiracy to Commit and Aid and Abet Computer Hacking, in violation of 18 U.S.C. §1030(b) (Count Five); Conspiracy to Traffic and to Aid and Abet Trafficking in Fraudulent Identification Documents, in violation of 18 U.S.C.

9

§1028(f) (Count Six);   and a Money Laundering Conspiracy, in violation of 18

U.S.C. §1956(h).   *Id.*

The Superseding Indictment also included forfeiture allegations pursuant to

18 U.S.C. §§981 & 982, 21 U.S.C. §853, and 28 U.S.C. §2461.   A163-65.

Ulbricht pleaded not guilty to the charges.

**B.**    ***Pretrial Motions***

Ulbricht filed pretrial motions March 28, 2014, seeking dismissal of all

charges.   *See* Docket #21.    The Court issued an Order July 9, 2014, denying

those motions in their entirety.   A99.

Ulbricht filed additional pretrial motions August 1, 2014, to suppress certain

evidence, for a Bill of Particulars, for discovery, and to strike surplusage from the

Indictment.   The suppression motions sought, *inter alia*, to suppress evidence

obtained via unlimited searches of Ulbricht's laptop and Gmail and Facebook

accounts on the grounds they violated the Fourth Amendment because the warrants

lacked the requisite particularity; the searches were the fruit of unlawful pen

register and trap and trace Orders used to obtain internet router identifying

information regarding Ulbricht's laptop, location, and internet activity.   *See*

Docket #48.

The Court denied those motions by Order dated October 10, 2014, A176, on

the grounds that (1) the Court had "no idea" whether Ulbricht had an expectation

10

of privacy in his laptop, and Facebook and Gmail accounts, but regardless the
warrants for these accounts were lawful in that they were not general warrants and
were supported by probable cause; and (2) "the type of information sought in
Pen-Trap orders 1, 2, 3, 4, and 5 was entirely appropriate for that type of order"
and "[t]he Pen-Trap Orders do not seek the content of internet communications in
any directly relevant sense."   A201, 203-04.

C.    ***Disclosure of Force's Corruption During the Investigation***

       Approximately a month prior to trial, December 1, 2014, the government
disclosed to defense counsel a November 21, 2014, letter to the Court regarding an
"ongoing federal grand jury investigation" by the U.S. Attorney's Office for the
Northern District of California, in conjunction with the Public Integrity Section of
the Criminal Division of the Department of Justice, into former Drug Enforcement
Administration ("DEA") Special Agent Carl Force, a matter under seal pursuant to
Court Order and Rule 6(e), Fed.R.Crim.P.   A649.   The letter disclosed that "[i]n
2012 and 2013, SA Force was involved as an undercover agent in an investigation
of Silk Road conducted by the U.S. Attorney's Office for the District of
Maryland."   A649.

       The Court conducted a sealed hearing December 15, 2014, regarding the
sealed December 1, 2014, disclosure to defense counsel regarding the grand jury
investigation of Force, and the government's application to preclude the defense

11

from disclosing the investigation of Force to any third party, or using it at trial.

A224.    Defense counsel moved for unsealing and disclosure of all information

regarding the government's investigation of Force.    A238; Docket#114 & #227-1.

The government submitted a supplemental letter December 17, 2014,

regarding the sealed proceeding as to Force, and the Court's endorsement of that

letter requested defense counsel submit a list of particularized discovery requests

regarding the investigation of Force to the Court by the following morning.    A662.

Defense counsel submitted this list to the Court, by letter, December 18, 2014.

A669-72.

In a December 22, 2014, Sealed Memorandum and Decision, the Court

denied Ulbricht's motions to unseal the government's November 21 2014, letter,

and for discovery regarding the Force investigation.    A675-76.   The Court also

stated that in regard to defense counsel's ability to use information from the

November 21, 2014, letter at trial, it would "over the course of the trial, entertain

specific requests to use information from the November 21, 2014 Letter on

cross-examination" and "if, during the course of the trial, the Government opens

the door to specific information or facts develop which render particularized

disclosure of facts or documents relevant, the Court will entertain a renewed

application at that time."    A700.

In light of the Court's December 22, 2014, Opinion, defense counsel submitted a letter December 30, 2014, requesting an adjournment of Ulbricht's trial until after the conclusion of the investigation – by that time already eight months old – into Force's misconduct.  A701.  The government opposed defense counsel's request and the Court denied the adjournment request that same day. A704-06.

**D.**  *The Trial*

Ulbricht's trial commenced January 13, 2015, in the Southern District of New York.  The government's theory of prosecution, described **ante**, was that Ulbricht created Silk Road and operated it throughout its existence until his arrest, and did so intentionally, and conspired, to facilitate the sale of drugs and other illicit materials (hacking software and false identification documents) by vendors and purchasers using the site, charging a commission for each transaction paid in bitcoin.

The defense theory was that while Ulbricht, at the time 26 years old, had devised Silk Road as a free-market economic experiment – as he told his friend, government witness Richard Bates, *see* **post** – he had, as he informed Bates later, divested himself of interest in Silk Road shortly after its inception.  The defense also posited that Ulbricht was not DPR, who first appeared after Ulbricht left Silk Road, that there were multiple persons successively acting as Dread Pirate Roberts

13

(much like the character of that name in the movie *The Princess Bride*), and that the DPR in 2013, who purchased and was leaked information about the government's investigation of Silk Road, framed Ulbricht to absorb the consequences.

Also encompassed within the defense theory was evidence that the government's investigation of DPR and Silk Road had been flawed, impairing its ability to apprehend and prosecute a specific alternative perpetrator, Mark Karpeles, the focus of the investigation for a considerable period of time. In addition, with pressure mounting toward the end of 2013 – because the government had access to Silk Road's computer servers overseas since July 2013, but permitted the site to continue operating while investigating the identity of DPR – the government seized on Ulbricht as DPR, thereby letting the alternative perpetrator escape justice and leave Ulbricht as the wrongfully prosecuted culprit.

The government's first witness, Chicago-based Homeland Security Investigations ("HSI") Special Agent Jared Der-Yeghiayan, who initiated an investigation of Silk Road based on intercepted mail packages from overseas arriving through Chicago. T.76-77. During SA Der-Yeghiayan cross-examination, he testified regarding an alternate perpetrator. A336. Although the government did not object to this testimony at the time elicited, and only did so subsequently at sidebar, and even though the Court had ruled at sidebar

14

January 15, 2015, that the testimony was appropriate, when trial reconvened January 20, 2015, the Court reversed its opinion, and directed the government to identify the testimony (during cross-examination) that it proposed to strike. A409-11; A441-43.

The government submitted those strikes to defense counsel during the lunch break January 20, 2015, and the Court endorsed them following the break, refusing to permit defense counsel even a brief adjournment to reconstruct its cross-examination to cover the stricken pieces in an alternative fashion.   A334; A466-73.

Following SA Der-Yeghiayan's testimony, several other law enforcement agents involved in the Silk Road investigation at various stages, including FBI Computer Specialist Thomas Kiernan, testified regarding technical and forensic computer matters, and through these witnesses the government admitted Ulbricht's laptop and items from its hard drive.   A492, 494-95.   However, when defense counsel attempted to cross-examine these witnesses as to related computer issues, the Court repeatedly curtailed or flatly denied the cross, even stating at one point in the jury's presence, "[y]ou can put somebody else on the stand to do that[,]" thus improperly placing the burden on the defense.   A506.

Yet, when defense counsel sought to call two experts during the defense case, Dr. Steven Bellovin and Andreas Antonopoulos, to respond to testimony

presented by the government's computer and forensics agents, and by former FBI Special Agent Ilhwan Yum, who testified as a lay witness but conducted a complex analysis – provided to the defense mid-trial only days prior to his testimony – of thousands of transactions regarding dozens of bitcoin wallets located on the Silk Road server and on Ulbricht's laptop, s*ee e,g.,* A532, the Court ultimately issued an Order & Opinion February 1, 2015, precluding the defense experts' testimony. A362; A380; A385.

The government also called Ulbricht's former friend, Richard Bates, who testified under a non-prosecution agreement. T.1096-97. Bates testified he provided Ulbricht with programming assistance in late 2010 and 2011, including assistance with the Silk Road website. T.1103, 1128. Bates also testified that Ulbricht told Bates, November 11, 2011, that he had sold the Silk Road website. T.1138-39.

As part of its case, the defense moved to admit a statement made to prosecutors by Andrew Jones, who had been a Silk Road administrator, was cooperating with the government, and had been a proposed government witness (until mid-trial). Jones's lawyer stated Jones would invoke his Fifth Amendment right against self-incrimination if called to testify. A563-65; A395.

The statement, detailed **post**, in POINT IV, supported the defense theory that there had been multiple persons acting as DPR, and the identity of DPR had changed in September 2013, shortly before Ulbricht's arrest.

The Court, however, denied the defense's application to admit Jones's statement as a statement against penal interest under Rule 804(3), Fed.R.Evid, or the residual exception in Rule 807, Fed.R.Evid.   A581-83, 589.

**E.**   ***The Charge and Verdict***

The government rested the afternoon of February 2, 2015, and the defense moved for a judgment of acquittal on all seven counts pursuant to Rule 29, Fed.R.Crim.P.   T.2023.   Those motions were denied.   T.2029.   The defense began presentation of its case the afternoon of February 2, 2015, and rested the next afternoon of February 3, 2015.   T.2001; 2126.   Closing argument occurred that afternoon.   T.2126.

The Court charged the jury the morning of February 4, 2015, and the jury began deliberating February 4, 2015, at 11:55 a..m.   T.2329.   The Court received a note from the jury foreperson at 3:23 p.m, that afternoon, announcing the jury had "reached a verdict."   T.2334.   Ulbricht was found guilty on all counts. T.2334-37.

**F.**   ***Post-Trial Motions and Further Disclosure***
***Regarding Corruption In the Investigation***

Ulbricht filed motions March 6, 2015, for a new trial pursuant to Rule 33,

Fed.R.Crim.P.   *See* Docket #224.   After those motions were filed, on March 25,

2015, seven weeks after trial concluded in this case, the government filed criminal

charges against Force and another participant in the Silk Road investigation,

former Secret Service Special Agent Shaun Bridges, in the Northern District of

California.   The government filed a letter March 30, 2015, notifying the Court that

the Complaint regarding the corruption investigation into these two agents, both of

whom had conducted illegal activity during the course of their investigation into

DPR and the Silk Road website, had been unsealed.   *See* Docket #226.   This was

the first time the defense (or the Court) was informed there was a second corrupt

agent involved in the Silk Road investigation.

Ulbricht filed a Reply April 16, 2015, and included motions related to the

government's inadequate and untimely disclosure of the investigations of Force

and Bridges.   *See* Docket #233; A722.   The Court issued an Opinion and Order

April 27, 2015, denying Ulbricht's Rule 33 motions in their entirety.   A876.

**G.**   ***Sentencing***

Prior to Ulbricht's sentencing, in March and April 2015 the government

provided defense counsel and the Probation Office with reports of six overdose

18

deaths for inclusion in the Pre-Sentence Report, which the government claimed resulted from drugs sold on the Silk Road website, and which it believed were relevant conduct that could be taken into account at sentencing. *See* Pre-Sentence Report ("PSR"), ¶¶61-86.

Ulbricht submitted a report from an expert forensic pathologist, Dr. Mark Taff, contesting the government's claims that the deaths were causally related to drugs sold on Silk Road, and, asserting, as a result, the alleged overdose deaths should not have been a factor at sentencing.   A903; S437.

Ulbricht's sentencing submission, including 99 letters submitted on Ulbricht's behalf, sought a sentence well "below the applicable advisory Guidelines range." A973.

At sentencing May 29, 2015, the Court ruled the overdose deaths had been properly included in the Pre-Sentence Report, and were related conduct relevant to Ulbricht's conviction.   A1472.   Ulbricht was sentenced "on Counts Two and Four . . . to a period of life imprisonment to run concurrently[,]" and on "Count Five . . . to five years' imprisonment to run concurrently; on Count Six . . . to 15 years' imprisonment also concurrent; and for money laundering in Count Seven, . . . to 20 years, also concurrent."   A1540.

The Judgment against Ulbricht was filed June 1, 2015, and Ulbricht filed his Notice of Appeal of his sentence and conviction June 4, 2015.   A1554.

## ARGUMENT

## POINT I

**THE COURT ABUSED ITS DISCRETION AND DENIED ULBRICHT HIS FIFTH AND SIXTH AMENDMENT RIGHTS TO DUE PROCESS, THE RIGHT TO PRESENT A DEFENSE, AND A FAIR TRIAL BY (A) PRECLUDING THE DEFENSE FROM USING AT TRIAL THE EVIDENCE RELATING TO DEA SPECIAL AGENT CARL FORCE'S CORRUPTION; (B) REFUSING TO ORDER THE GOVERNMENT TO PROVIDE ADDITIONAL DISCOVERY AND *BRADY* MATERIAL REGARDING CORRUPTION; AND (C) DENYING ULBRICHT'S MOTION FOR A NEW TRIAL BASED ON ADDITIONAL POST-TRIAL DISCLOSURES REGARDING FORCE AND ANOTHER CORRUPT LAW ENFORCEMENT <u>AGENT INVOLVED IN THE SILK ROAD INVESTIGATION</u>**

As set forth **ante**, at 11-13, in December 2014, approximately one month prior to trial the government informed the defense that former DEA Special Agent Carl Force ("Force") was under investigation – and had been formally for approximately eight months – for corrupt activity directly related to his participation in the investigation of the Silk Road and Dread Pirate Roberts ("DPR"). A650. Indeed, Force, as a member of the Baltimore Task Force, had allegedly engaged DPR in computer chats that resulted in a murder-for-hire plot targeting a former Silk Road employee.

The government moved to preclude the defense's use of that information at trial based on the secrecy of the grand jury investigation of Force, and because the government claimed Force's investigation of Silk Road was wholly independent of

20

the case against Ulbricht - alleged to be DPR - prosecuted in the Southern District of New York.   A663.

The Court granted the government's application.   A673.   The Court also denied Ulbricht's motion for discovery and, subsequently, to adjourn the trial until after the investigation of Force was complete.   A675; A706.   In addition, at the government's urging, during trial the Court altered its pretrial ruling and denied the defense use of information and discovery that even the government in its pretrial application (and the Court in deciding it) had agreed could be utilized at trial.

As detailed below, the Court abused its discretion, and denied Ulbricht his Fifth and Sixth Amendment rights to Due Process, a fair trial, and to prepare and present a defense, because the serial preclusion was based on faulty premises, due in large part to the government's deliberate and calculated failure to provide either the Court or the defense salient and material facts, including:

(a)     contrary to the government's representations to the Court, there was not any need to keep the grand jury investigation secret from its target, as Force was already fully aware of it, and it was nearly, if not entirely, complete by the time trial in this case began;

(b)     Force was not the only corrupt federal law enforcement agent involved in the Silk Road investigation, as a Treasury Special Agent, Shaun Bridges, was also under investigation for conduct in concert

21

with, related to, and similar to Force's (and had also been interviewed, and therefore cognizant of the investigation, prior to December 2014) – yet the government never mentioned or alluded to Bridges *at all* in its pretrial disclosures;

(c)     contrary to the government's claim, Force's (and Bridges's) corruption was not independent of the SDNY prosecution.   Rather, as demonstrated by a trove of internal law enforcement memoranda and communications produced after the Court had decided the Force issue, pursuant to 18 U.S.C. §3500 ("3500 material"), the Silk Road investigation was a coordinated, interrelated, interdependent effort by several federal districts ultimately directed and controlled by SDNY, thereby rendering the information about Force (and Bridges) relevant, exculpatory, and material; and

(d)     Force's (and Bridges's) misconduct was not limited to that revealed by the government pretrial, but rather, as established by the Criminal Complaint filed against Force and Bridges a mere seven weeks after the verdict in this case, encompassed far more.

The extent of Force's knowledge of the investigation of him, the involvement of Bridges, and the broader scope of Force's (and Bridges's) misconduct, in relation to this case, as well as the trajectory of the investigation,

22

were not known to the defense until *after* trial – indeed, until *after* post-trial

motions for new trial pursuant to Rule 33, Fed.R.Crim.P., were filed (although the

information was included in the Reply).   In fact, the full nature of Force's and

Bridges's misconduct has yet to be disclosed, as the government quickly reached

plea agreements with both, resolving their cases without any additional disclosure

to the public or the defense herein.   *See United States v. Bridges*, No. CR 15-319

(RS) (N.D. Cal.), Docket#49 & #65.

Thus, in denying Ulbricht's post-trial Rule 33 motion based on the Force and

Bridges corruption and the government's knowing failure to make full disclosure

prior to trial, the Court further abused its discretion.   As a result, Ulbricht's

convictions should be vacated, and a new trial ordered.

A.    *The Government's Eve-of-Trial Disclosure of Force's Corruption*

In its November 21, 2014, letter to the Court, subsequently provided to

defense counsel December 3, 2014, the government disclosed its ongoing

investigation of Force.   A649.[2]   According to the government's letter, the

investigation had thus far revealed that Force used his position as a DEA agent for

self-gain by leaking investigative information to the operator of Silk Road in

_____

[2]   The government's letter, along with a series of other correspondence and exhibits related to the issue, was not unsealed until the government formally charged Force (and Bridges) seven weeks after trial in this case.   *See* Docket#226.

exchange for payment, and hijacking a cooperating witness's Silk Road account to obtain $350,000 in Bitcoins.

In its November 21, 2014, letter, the government informed the Court that Force "is the undercover agent whom Ulbricht allegedly hired to arrange the murder-for-hire, as described in that indictment[,]" and that Force "is now being investigated by USAO-San Francisco for, among other things, leaking information about USAO-Baltimore's investigation to Ulbricht in exchange for payment, and otherwise corruptly obtaining proceeds from the Silk Road website and converting them to his personal use."   A649.

The government's letter added that "USAO San Francisco first began investigation into SA Force in the Spring of 2014[.]" A650.   Yet the information about the investigation was not disclosed to the defense in this case until December 3, 2014, essentially one month prior to trial.   The government also claimed that it "does not believe that the ongoing investigation of SA Force is in any way exculpatory as to Ulbricht or otherwise material to his defense[,]" but disclosed the information "in an abundance of caution[.]" A649.

Furthermore, while the government asserted that Force "played no role" in SDNY's investigation of Silk Road, the government admitted that SDNY "has been assisting USAO-San Francisco with its investigation, by sharing relevant evidence collected from this Office's investigation of Silk Road, including

24

evidence from the server used to host the Silk Road website (the 'Silk Road Server') and evidence from Ulbricht's laptop computer." A649-50.

In response, the defense submitted, in addition to sealed submissions, at S434 & A669, two sealed *ex parte* letters setting forth the defense theories, and the relationship of Force's misconduct to them and to various items produced in discovery (including some not referred to by the government in its November 21, 2014, letter).[3] The defense moved to unseal the government's November 21, 2014, letter, so the defense could perform a complete investigation, and to use at trial.

At a sealed December 15, 2014, pretrial conference, the government claimed that the grand jury investigation of Force was active, not complete, and in some respects was still in its "early steps." A227. Also, the government contended it did not "know the full extent" of Force's misconduct, but continued to "connect[] the dots" – which it had been doing for almost eight months (and continued to do) while keeping the defense in the dark. A252.

Yet the government sought to preclude the defense from launching any inquiry designed to find out the full extent of Force's misconduct in relation to the Silk Road investigation. As the Court remarked during the December 15, 2014,

---

[3] Those *ex parte* letters have not been unsealed or provided to the government because, *inter alia*, Ulbricht still faces charges in the District of Maryland. *See* Docket#281 & #283. Of course, those letters can be made available to the Court upon request.

25

pretrial conference, the government's disclosure was functionally the same as no

disclosure at all since the defense could not use it, A248 – and even that was just a

small fraction of what the government knew about Force's (and Bridges's)

misconduct.

Also, regarding the need for continued secrecy of the investigation, the

government, in a December 12, 2014, letter to the Court, maintained that "Force is

aware that he is under investigation insofar as he has been interviewed in

connection with the grand jury investigation. He is not, however, aware of the full

range of the misconduct for which he is being investigated." A659; Docket

#227-1, at 68 ("prosecutors believe that disclosure of materials taken from the case

file would threaten to reveal the full scope of the investigation and might cause

Force (as well as other potential subjects, co-conspirators, or aiders and abettors) to

flee, destroy evidence, conceal proceeds of misconduct and criminal activity, or

intimidate witnesses").

Ulbricht also submitted a detailed discovery request demanding additional

disclosure with respect to Force's misconduct. A669. The Court directed the

defense to prioritize its requests, A672, which the defense did.

The Court then denied all of the defense's discovery requests, and granted

the government's application to preclude the defense from investigating Force's

misconduct, or exploring it at trial. A673. In so doing, the Court held that

26

Ulbricht had not demonstrated a "particularized need" sufficient to outweigh the need for continued secrecy of the grand jury investigation. A687, 691-96. The Court added that "to the extent there is any information revealed or developed during the Force Investigation that is material and potentially exculpatory, the Government must disclose such information to the defense." A699.

In response, Ulbricht moved for adjournment of the trial until the government had completed its grand jury investigation of Force, and the full nature of his alleged misconduct was known and available to Ulbricht's defense. A701.[4] The Court denied that motion as well. A706.

## B.  *The Court's Further Preclusion at Trial of Evidence the Pretrial Rulings Had Permitted the Defense to Use*

During the December 15, 2014, pretrial conference, the Assistant United States Attorney, when asked by the Court to define the parameters of the prohibition imposed on the defense by Rule 6(e), Fed.R.Crim.P., answered, "What they can't reveal is that [Force] is under a grand jury investigation. . . . It's just a matter that he's being investigated for [certain activities]." A249.

The AUSA added that

> [s]o in terms of what [Rule] 6(e) prohibits, we think it
> prohibits them eliciting somehow that he's under a grand
> jury investigation. That's the basic point.  I mean, that's

---

[4]  In its opinion precluding evidence of Force's misconduct, the Court acknowledged that "it is clear that precisely what Force did (or did not do) remains unknown." A675.

> what 6(e) requires be kept secret while the investigation
> is pending.   They still have many facts in their
> possession.   They've had them in their possession long
> ago.

*Id*.  *See also* A253 ("all that is evidence that has been produced in discovery and

they are free to use it the same way that they would use other evidence").[5]

At trial, however, the government successfully moved to expand the

proscription to include those very facts, thereby preventing the defense from using

documents and information in cross-examination, or from introducing them as part

of the defense case.   For example, the government successfully prevented the

defense from cross-examining witnesses with respect to the electronic

communications between DPR and Silk Road user DeathFromAbove, who

represented himself to be a person with inside information about federal law

enforcement's investigation of Silk Road, which he was offering to sell to DPR.

---

[5]   During the December 15, 2014, pretrial conference, the Court commented on the government's inconsistent and expansive position with respect to the scope of the Rule 6(e) proscription it sought.   In response to the AUSA's remark that the "point is, we're not trying to say certain witnesses, certain evidence is off limits.   It's the fact that this is a grand jury investigation.   That's what they're prohibited from disclosing[,]" the Court replied

> [w]ell, I hear what you're saying.   And it's like ships passing in
> the night.   *Because on the one hand it's the content of the*
> *investigation*.   And what you're suggesting is it's really not the
> content, it's the fact of.

A.252-53(emphasis added).

28

A575.   Some of those communications had been included in the government's

initial Exhibit list circulated a month prior to trial.

Shortly before the government rested, it revealed in a February 1, 2015,

letter, that

> it appears that "DeathFromAbove," was controlled by
> former Special Agent Force, based on information that
> was recently obtained from USAO-San Francisco
> regarding their ongoing grand jury investigation into
> Force.   Following the defendant's first attempt to seek to
> use Defense Exhibit E [containing communications
> between DPR and DeathFromAbove] with Special Agent
> DerYeghiayan, the Government consulted with the lead
> Assistant U.S. Attorney handling the Force investigation,
> who provided evidence that Force controlled the
> "DeathFromAbove" account and sent the messages to
> Dread Pirate Roberts.

A710.

Yet the government, in its earlier submissions, and in prior sidebars, had

never identified the DeathFromAbove username/account as being controlled by

Force (and therefore its use at trial was not precluded by the Court's pretrial

ruling).   The government's letter demonstrates that during trial it used the

cross-examination of Homeland Security Investigations Special Agent Jared

Der-Yeghiayan to continue its investigation of Force, and to generate further *Brady*

material, but *without disclosing it to the defense until the eve of the defense case

itself.*   Rather, as discussed **post**, at 49, the government successfully, albeit

impermissibly, shoehorned that information into the Court's pretrial restrictions on

29

the defense's ability to explore what had been provided in discovery *and even included in the government's initial Exhibit List.* A575.

Thus, at trial the government and Court foreclosed an entire additional category of information, vital to the defense, that the pretrial ruling had left available to Ulbricht. That compounded the initial abuse of discretion manifested in the preclusion of the Force misconduct generally, and constituted a separate abuse of discretion that effectively ambushed the defense.

### 1. *The Post-Trial Revelation of Bridges's Corruption, and the Additional Post-Trial Disclosures of Force's Misconduct*

Just seven weeks after trial concluded in this case, following Ulbricht's filing of his initial papers in support of his Rule 33 motion, the government formally charged both Force and Bridges in a Criminal Complaint ("the Force/Bridges Complaint") in the Northern District of California. That Complaint also revealed information that was not previously disclosed by the government. Obviously, the most dramatic aspect was the involvement of a second federal law enforcement agent, SA Bridges, in the corrupting of the Silk Road investigation. However, there were other revelations that appeared for the first time in the Force Complaint, but which should have been disclosed to Ulbricht's counsel earlier, and even before trial.

The Force/Bridges Complaint was unsealed March 30, 2015 (while the

verdict herein was returned February 4, 2015).   A Department of Justice Press

Release, March 30, 2015, "Former Federal Agents Charged With Bitcoin Money

Laundering and Wire Fraud," available at

<http://www.justice.gov/opa/pr/former-federal-agents-charged-bitcoin-money-

laundering-and-wire-fraud>, summarized the Force/Bridge's Complaint's

allegations against Force as follows:

> Force used fake online personas, and engaged in complex
> Bitcoin transactions to steal from the government and the
> targets of the investigation.   Specifically, Force allegedly
> solicited and received digital currency as part of the
> investigation, but failed to report his receipt of the funds,
> and instead transferred the currency to his personal
> account.   In one such transaction, Force allegedly sold
> information about the government's investigation to the
> target of the investigation.

As the Force/Bridges Complaint itself notes, "[i]n late January 2013,

members of the Baltimore Silk Road Task Force, to include BRIDGES and

FORCE, gained access to a Silk Road administrator account as a result of the arrest

of a former Silk Road employee."   S453.

According to the Force/Bridge's Complaint, Force "created certain fictitious

personas" S451, and used those phony personas to "seek monetary payment,

offering in exchange not to provide the government certain information."   *Id*.

Force also created fictional characters, such as "Kevin," a supposed law

31

enforcement insider who was providing information to Nob (who was Force, in his authorized undercover role, masquerading as a drug dealer), which Nob in turn was corruptly providing to DPR.   S462.

Also, Force "stole and converted to his own personal use a sizable amount of bitcoins that DPR sent to Force . . ."   S452.   Bridges also illegally acquired Bitcoin from the Silk Road website, through an account law enforcement believed Bridges "controlled and/or had access with others to" and which "appears to have initiated sizeable bitcoin thefts," and assisted Force in his illegal endeavors. S489-97.

In describing Force's assumption of the screen name DeathFromAbove, discussed **ante**, at 30, which Force used alternately in an attempt to extort DPR and/or to provide inside law enforcement information to DPR, the Force/Bridge's Complaint concludes that Force was the source of certain information in the "LE_counterintel" file found on Ulbricht's laptop because the excerpts in that file "contain information that came from a person or persons inside law enforcement, in part because of their substance and in part because of their use of certain terminology and acronyms that are not widely known by the public." S460.

As a result, in assessing Force's activities as DeathFromAbove, the Force Complaint posits that such misconduct "demonstrates that FORCE had a history of:   (1)   creating fictitious personas that he did not memorialize in his official

reports or apprise his superiors at the DEA or the prosecutor of; (2) soliciting payments from DPR; (3) providing law-enforcement sensitive information to outside individuals when the disclosure of such information was not authorized and not memorialized in any official report." S474.

The Force/Bridges Complaint also erased any doubt that the investigation of Force and Bridges was already fully known to them when, in December 2014, the government cited secrecy in precluding Ulbricht from using the information at his trial. For example, Force resigned from the DEA May 4, 2014, "shortly after law enforcement began the current investigation." S455, 483. Days later, May 8, 2014, Force wired $235,000 to an offshore account in Panama, with the Force/Bridge's Complaint noting that he did so "presumably after learning of the government's investigation and after he had resigned[.]" S487.

In fact, Force even voluntarily submitted to an interview by law enforcement that his lawyer suggested. S488. That meeting occurred May 30, 2014, *id*., a full six months before the defense herein was notified of Force's misconduct. Similarly, Bridges was interviewed (with counsel) by law enforcement more than once, including November 13, 2014, eight days before the government wrote the Court in this case seeking to preclude the defense's use of such information, ostensibly in order to preserve its secrecy. S495-96.

33

Thus, the investigation of Bridges, too, was already fully underway by Fall 2014, and his misconduct, was known by then as well (as demonstrated by the contents of the interviews of him).   Bridges's relevance to this case is beyond obvious:   as the Force/Bridge's Complaint attests, Bridges "had been assigned to the Secret Service's Electronic Crimes Task Force."   S488.   Also, Bridges's "specialty was in computer forensics and anonymity software derived from TOR." *Id*.   Bridges was also "the Task Force's subject matter expert in Bitcoin."   *Id*. Both elements were distinctive features of Silk Road, and the subject of extensive testimony by government witnesses at trial.

Beyond Bridge's particular expertise, firmly in the wheelhouse of multiple critical aspects of this case (computer forensics, TOR, and Bitcoin), Bridges placed himself firmly in the middle of important factual issues, such as his serving as the affiant for the seizure of Mark Karpeles's accounts at a Bitcoin exchange firm (Dwolla) in May 2013.   S489.[6]   As set forth **ante**, he also controlled an account that "initiated sizeable bitcoin thefts" from the Silk Road website.   S491.

In addition, Bridges clearly worked in concert with Force.   S491, 493. Thus, Force was assisted in his illegal, unauthorized infiltration and manipulation of the Silk Road website by a computer forensics agent with expertise in

---

[6]   Karpeles's relevance to this case, as well as to Force's misconduct, is detailed **post**, at 65 (POINT II).

anonymity and Bitcoin. Yet none of this information of the site's contamination was disclosed to the defense herein until the filing of the Force/Bridges Complaint.

Force's deposits totaled at least approximately $757,000 "for the roughly year long period beginning April 2013 through May 2014." S455-56 (footnote omitted). Nor does that include other deposits made afterward. S456. Any deposits made in the first half of 2014 would of course have occurred *after* Ulbricht had been arrested (October 1, 2013), begging the question of the source of those funds.

The Force/Bridges Complaint also divulged additional misconduct by Force, shedding light on his capacity for fraud, deception, forgery, abuse of his government authority and access – including predatory and retaliatory conduct and false accusations against innocent persons – and inventing complex, layered cover stories to conceal his misdeeds.

For instance, the Force/Bridges Complaint, S477-78, in a section entitled "FORCE's Unlawful Seizure of R.P.'s Funds," details Force's series of attempts to convert the contents of an account held by "R.P.," which efforts included abuse of various criminal law enforcement privileges and false accusations against "R.P." to justify seizure of the account.

Force also misused subpoenas and in effect committed forgery by using his supervisor's stamp. S477, 481-83; S452 (Force "used his supervisor's signature

35

stamp, without authorization, on an official U.S. Department of Justice subpoena and sent the subpoena to a payments company, Venmo, directing the company to unfreeze his own personal account"). He also improperly performed queries in law enforcement criminal databases. S475.

Moreover, Force "'papered up' the seizure of the digital currency portion of" one of his victim's accounts "in such a way that he may have thought he would be covered in the event anyone ever asked any questions" about his conduct." S480; S481 (Force's documentation was an "attempt to give himself plausible deniability by memorializing the digital currency seizure . . .").

The detail in the Force/Bridges Complaint was, of course, tellingly absent from the government's description of Force's corruption in its November 21, 2014, letter in this case, as was *any* mention of Bridges, or their knowledge of the investigation(s). A649. Thus, to a significant degree the extent, and in some respects the nature, of Force's misconduct – as well as Bridges's participation altogether – was hidden by the government from the defense (and the Court) in this case until after trial.

**C.**    ***The Court Abused Its Discretion In Precluding Ulbricht
from Utilizing at Trial Information Related to Force's Corruption***

As detailed below, the Court abused its discretion in five separate respects

with respect to its preclusion of the information and documents related to Force's

corruption:

    (1)    in refusing to permit Ulbricht to use the information and documents at
trial, or even to investigate them further;

    (2)    in denying Ulbricht's discovery demands with respect to Force, which
would have compelled the government to disclose additional
information about Force's corruption – and that of Bridges altogether
– that was not revealed until after trial;

    (3)    in denying Ulbricht's request for adjournment of the trial until after
the grand jury investigation of Force - at that point underway for more
than eight months already - was complete;

    (4)    in expanding its ruling at trial by prohibiting use of evidence that the
Court's pretrial ruling had expressly permitted Ulbricht to present;
and

    (5)    in denying Ulbricht's post-trial Rule 33 motion based on the post-trial
disclosures of details of Force's (and Bridges's) misconduct.

In many respects, the Court's error was in large part the consequence of the government's purposeful failure, in its extraordinarily circumscribed pretrial account, to disclose material information about Force's corruption, and about Bridges's corruption at all, until *after* trial.

Contrary to the government's claims and the Court's decision, the evidence of Force's (and Bridges's) corruption was both material and exculpatory. Moreover, the Due Process right to *Brady* material [*Brady v. Maryland*, 373 U.S. 83 (963)] requires that it be used effectively, a principle that certainly establishes a compelling and particularized need to modify any protective order, including any issued pursuant to Rule 6(e), Fed.R.Crim.P., to permit a defense investigation, as well as use of admissible evidence at trial. *See e.g., Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 296 (2d Cir. 1979); *see also Dennis v. United States*, 384 U.S. 855, 868 (1966).

Indeed, the government claimed it could not discern any exculpatory character in the information it provided in its November 21, 2014, letter, but disclosed the Force investigation "in an abundance of caution." This, of course, begs the question:  "abundance of caution" with respect to *what*?  The answer is obvious:  with respect to the government's constitutional obligation to disclose exculpatory evidence.  Transparently, the government's nomenclature simply

sought to avoid denominating the obvious:  that the Force disclosures constituted exculpatory information.

1.    *There Was Not Sufficient Need to Maintain Secrecy of the Investigation of Force and Bridges to Ulbricht's Detriment In This Case*

As a threshold matter, the Force/Bridges Complaint reveals that the government's pretrial application in this case to keep secret the investigation of Force (or even Bridges, the investigation of whom the government concealed altogether in this case), and the information derived therein, was without foundation.   While the government acknowledged pretrial that Force had been interviewed, it did not disclose there were *two* interviews or, as evident from the Force/Bridges Complaint, that those interviews provided Force extensive knowledge about the investigation.   S.478-81, 483-88.   Also, by the time of trial in this case, the grand jury presentation regarding Force had already occurred, A660, and the charges were imminent, as demonstrated by their issuance only seven weeks after the verdict in this case.

In addition, the government inexcusably waited eight months before informing the defense of the misconduct by Force – and never did prior to trial with respect to Bridges.   As the Complaint notes, the government opened its investigation of Force May 2, 2014.   S495.   Two days later, DoJ's Public Integrity Section opened an official investigation of him.   *Id.*

39

Nor were there any facts in the Force/Bridges Complaint that were not entirely established well before the government notified the defense in this case, much less before trial herein.   The last misconduct by either Force or Bridges allegedly occurred in mid-2014.

### 2. *The Record Demonstrates That Silk Road Investigations Were Coordinated and Combined*

The government's repeated insistence that the SDNY's investigation was "independent" of that in which Force and Bridges were involved is demonstrably repudiated by the record *created by the government's investigators and prosecutors themselves*.   That record establishes that all of the federal investigations of Silk Road were coordinated and, for practical purposes, and for determining relevance to this case, combined.

By any conception of "independence," these investigations do not qualify. Rather, they were decidedly *inter*dependent because,

- the agents conducting the investigation were in continued contact with each other regarding the status of the investigation;

- supervisory law enforcement officials coordinated the investigations;

- each investigation made its fruits available to the other, and used that information from the companion investigation(s);

40

- information was entered in law enforcement databases to which all federal law enforcement enjoyed access;

- the investigations sought information about and from the same targets at the same time;   and

- ultimately, SDNY was able to dictate the distribution of federal charges in the case for *all* of the districts involved in the coordinated investigations.

The 3500 material produced for SA Der-Yeghiayan serves as a catalogue of the interaction and linkage of the various investigations of the Silk Road website. For example, a report by SA Der-Yeghiayan regarding his investigation, notes that in October 2012, "*HSI Baltimore* office provided SA Der-Yeghiayan with a file containing *all of the Undercover (UC) chats made between a UC agent and DPR*." A828.   Those were *Force*'s chats with DPR.

Similarly, in a May 22, 2013, e-mail to Lisa M. Noel, an HSI intelligence analyst with HSI Baltimore (and part of that Silk Road Task Force), SA Der-Yeghiayan wrote that "[w]e would like to examine some of the language, usage, diction, etc. with the new U/C chats from Nob."   A747.   Again, "Nob" *was Force*.

Thus, at the outset of his investigation – which the government cannot claim was "independent" of the case against Ulbricht – SA Der-Yeghiayan was provided

41

with the principal product of the Baltimore investigation, *generated by Force himself*.   Nor was there any attenuation of that direct connection; nor did the government even attempt to establish any.

Other e-mails and reports authored by SA Der-Yeghiayan describe the continued contacts between Baltimore and Chicago, which evolved into the SDNY investigation and prosecution.   In a May 15, 2013, e-mail, SA Der-Yeghiayan wrote that "[i]n early August 2012, HSI Chicago notified HSI Baltimore of the connection made [between Mark Karpeles and Silk Road] and stated that Karpeles was a target of HSI Chicago's investigation."   A748.   Also, "HSI Baltimore was provided a copy of the HSI Chicago's ROI [Report of Investigation] that highlighted all the facts of the connection."   *Id.*

In that same e-mail, SA Der-Yeghiayan memorialized the following interaction:

> HSI Chicago contacted HSI Baltimore and they
> confirmed that they shared all of HSI Chicago's
> information on KARPELES with members of their task
> force.   HSI Chicago discovered that their IRS Agent,
> DEA Agent and SS Agent all inputted KARPELES into
> their individual investigations as a target and a potential
> administrator of the Silk Road based on HSI Chicago's
> ROI/information.

*Id.*

Subsequently, in an undated report, A843, SA Der-Yeghiayan provided a lengthy chronology detailing the continued intersection of the Silk Road

investigations throughout 2013, and which was digested in Ulbricht's Rule 33

Reply, at A748-56.   Another, (seven-page) report from SA Der-Yeghiayan

regarding various investigations into Silk Road further recounts their interlocking

character (also digested in Ulbricht's Rule 33 motion).   A846.

 Among the entries in SA Der-Yeghiayan chronology were the following:

- HSI Chicago and HSI Baltimore conducted another conference call

   July 9, 2013, about the Silk Road investigation.   A852. During that

   call, neither the HSI Baltimore agents nor the D.Md. AUSA on the

   call mentioned – despite a question from SA Der-Yeghiayan whether

   there were any new developments – that another D.Md. AUSA had

   scheduled a meeting with Karpeles's attorneys.   *Id*.   That meeting

   occurred July 11, 2013.   *Id*.   During the meeting, Karpeles's attorney

   "randomly brought up the Silk Road and stated that their client was

   willing to tell them who [ Karpeles] suspects is currently running the

   website in order to relieve their client of any potential charges for [18

   U.S.C. §1960]."   *Id*.   Also, the D.Md. AUSA "proceeds to set up a

   meeting with [Karpeles] overseas."   *Id*.   HSI Chicago did not learn

   of the July 11, 2013, meeting with Karpeles's attorneys until July 16,

   2013.   *Id*.   Subsequently, one of the D.Md. AUSA's informed SA

   Der-Yeghiayan that the other D.Md. AUSA "continued to negotiate

with [Karpeles's] attorneys" – despite SA Der-Yeghiayan's objections

– and has changed the meeting location to Guam [] later on in August.

*Id*.;

- July 12, 2013, there was a "coordination meeting with HSI Chicago,

   HSI Baltimore, *FBI New York* and multiple DoJ [Department of

   Justice] attorneys and CCSIP attorneys[.]"   S852.   At that

   "coordination meeting, "HSI Chicago mentioned [Karpeles] as their

   main target."   *Id*.;

A month later, in August 2013, SA Der-Yeghiayan swore to an affidavit,

*composed by the SDNY AUSA*, in support of the SDNY search warrant application

for Karpeles's e-mail accounts.   Again, in light of this overwhelming evidence,

any claim of "independence" is contradicted by the government's own documents

and is therefore untenable.[7]

Nor was Force's investigation into Silk Road transitory or superficial in any

respect.   It began in February 2012, S470, and generated dozens of DEA-6 reports

of his (authorized) undercover activities investigating the Silk Road website (and

which were produced as discovery herein).

---

[7]   A separate question the defense asked, and which still merits an answer, is whether
any evidence related to Nob or Flush (both accounts controlled by Force) was introduced in
the grand jury that indicted Ulbricht.

In fact, as the Force/Bridges Complaint points out, information-sharing, and its impact relevant to this case, continued through the summer of 2013: "by late July 2013, the Baltimore Silk Road Task Force had been made aware that the FBI was seeking to obtain an image of the Silk Road server, and therefore FORCE may have had reason to fear that any communications between himself and DPR would be accessible to the FBI in the event the FBI was successful in imaging the server." S465-66.[8]

Even the government contradicts its naked claim of "independence." In explaining its realization (after the defense attempted to introduce certain documents provided in discovery) that DeathFromAbove was among Force's aliases, see **ante** at 30, the government states in its response to Ulbricht's Rule 33 Motion, that "former SA Force had access to law enforcement reports filed by SA Der-Yeghiayan, including reports concerning his suspicions regarding Anand Athavale, which was likely the source of the information leaked by Force through

---

[8] That would also ostensibly have provided DPR, via Force as Nob (or French Maid, or DeathFromAbove, or perhaps some other incarnation of his and/or Bridges's) with advance notice of the FBI's imaging of Silk Road's servers – consistent with the defense's position that DPR purchased and/or was provided with information that permitted him to formulate and implement – with Force's (and perhaps Bridges's) assistance – an escape plan that also incriminated Ulbricht falsely. In that context, Force also learned at least days in advance that law enforcement intended to make an arrest of DPR in late September 2013, thereby giving him ample time to warn DPR. S466. Yet Ulbricht did not assume any additional security protocols, but instead violated even the most fundamental security precepts in multiple ways.

the 'DeathFromAbove' account."   Response to Rule 33 Motion, at 14 n.4,

Dkt#230.

Ultimately, the investigations were not only interrelated and interdependent,

but their outcomes were dictated by SDNY, as SA Der-Yeghiayan reported in a

September 20, 2013, e-mail to an HSI colleague.   A854.

Thus, in light of all of the evidence set forth above, the interdependence and

continuing relationship among the investigations, including that in which Force

and Bridges participated, is indisputable.

### 3.    *The Information Regarding the Investigation of Force and Bridges Is Relevant to This Case Regardless Whether the Investigations Were Independent*

Even assuming *arguendo* the SDNY investigation was "independent" from

the District of Maryland investigation, the information and material regarding

Force and Bridges was, *as evidenced by the government's own strategy in*

*preparing for trial herein*, as well as other objective indicia, plainly relevant to this

case.

### a.    *The Government's Initial Exhibit List*

The government's initial Exhibit List was provided December 3, 2014 – two

days *after* the government's November 21, 2014, letter to the Court setting forth

information regarding the investigation of Force was disclosed to the defense.   It

contained at least 14 Government Exhibits directly relevant to Force, including in

46

his undercover capacity as "nob," and/or his unauthorized Silk Road user name "french maid," and/or to the account assigned to the user name "Flush."

Those Exhibits included GX 220, GX 225, GX 227, GX 229A, GX 229B, GX 241, GX 243, GX 250, GX 252, GX 275, GX 127D, GX 223, GX 240B, & GX 242. A434.

The government's transparently tactical removal of those proposed Exhibits from its presentation at trial does not eliminate their relevance, but merely reflects the government's recognition that they undermined the government's claim that Force's corruption was unrelated to the charges against Ulbricht, and his defenses thereto. Also, earlier, as part of discovery, the government had produced Force's DEA-6 reports, which further demonstrates the *government's* belief – prior to discovering his misconduct – that Force's investigative activities were relevant and connected to the SDNY prosecution.

**b.** ***The Importance of the First Half of 2013 Regarding the Evidence At Trial***

The relevance of the misconduct committed by Force and Bridges is also apparent from the time frame in which it is believed to have commenced and occurred – the first half of 2013. That period was critical in the context of the creation and collection of evidence used against Ulbricht at trial, and the defense's response to it.

47

A partial timeline of relevant events during that span – described only by information possessed by the defense at the time of trial (and not including reference to Force or Bridges misconduct) is set forth in Ulbricht's Rule 33 Reply. A722.

**D.** ***The Court Abused Its Discretion By Deviating From Its Pretrial Ruling and Precluding Evidence That It Had Determined Would Be Admissible***

In foreclosing the defense's use of any information or materials relating to Force and his misconduct, the government exceeded the boundaries set by the Court in its pretrial rulings on the issue, and the Court permitted the government to do so. While the embargo was supposed to cover only the information and materials generated as part of the ongoing grand jury investigation of Force, at trial in this case the government converted that into a ban on the defense's use of information and documents provided as part of discovery, which the defense had been expressly permitted to utilize at trial.

Yet the communications between DeathFromAbove and DPR were *not* mentioned in the government's November 21, 2014, letter to the Court, did not mention Force at all, and did not disclose that he was under a grand jury investigation. Also, the government's reaction at trial to the defense's efforts to introduce those communications (as Defense Exhibit E, A874), memorialized in the government's February 1, 2015, letter to the Court, A707, made it clear that the

48

government had not made the connection between Force and DeathFromAbove until the defense sought to introduce DX E.   *See* Docket#230, at 24 n.10.

Nevertheless, at trial, the Court improperly permitted the government to use the grand jury investigation of Force as a sword to preclude far more than the mere fact that Force was under investigation, employing that excuse to stymie the defense and its attempts to introduce evidence not covered by the Court's pretrial rulings.

Ultimately, the government was permitted – improperly yet repeatedly – to use its bogus rationale for precluding information about Force's (and Bridges's) corruption as both a sword and shield.[9]   As a result, Ulbricht's ability to present his defense, and his Fifth and Sixth Amendment rights incorporated therein, were gravely impaired, and he was denied a fair trial.

---

[9]   The government seized full advantage of the situation.   For instance, during summation, the AUSA disputed Ulbricht's defense theory, arguing that "[t]here were no little elves that put all of that evidence on the defendant's computer."   T.2166.   Yet, as it turns out – and which the AUSA knew all along – there were indeed *two* "little elves" – law enforcement agents investigating the Silk Road website – operating secretly, illegally, corruptly, and brazenly even inside the Silk Road website itself.

**E.** ***The Court Abused Its Discretion In Denying Ulbricht's Motion for a New Trial Based on the Government's Failure to Make Complete and Accurate Pretrial Disclosure Regarding Law Enforcement Corruption In the Government's Investigation***

The issuance of the Force/Bridges Complaint just seven weeks after trial in this case confirmed that the government had deliberately withheld from the defense and the Court a substantial volume of critical exculpatory information and material with respect to Force's corruption, and information about Bridges's corruption entirely. Indeed, the Force/Bridges Complaint indicates that even now the government has not provided a complete account of Force's and Bridges's misconduct.

In light of the government's failure to fulfill its constitutional obligation pursuant to *Brady* – in terms of both the disclosure itself, as well as the timing of the limited disclosure the government did make – the Court abused its discretion in denying Ulbricht's Rule 33 motion for a new trial.

**1.** ***The Principles Applicable to Exculpatory Material and Information***

    **a.** ***General Principles Governing the Government's* Brady *Disclosure Obligations***

As this Court explained most recently in *United States v. Certified Environmental Services, Inc.*, 753 F.3d 72 (2d Cir. 2014), "[u]nder *Brady* and its progeny, 'the Government has a constitutional duty to disclose favorable evidence

to the accused where such evidence is   material   either to guilt or to punishment.'

*Id*., at 91, *quoting United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001).

In that context,

>  [t]here are three components of a true *Brady* violation:
> (1)   The evidence at issue must be favorable to the
> accused, either because it is exculpatory or because it is
> impeaching;   (2)   that evidence must have been
> suppressed by the [Government], either willfully or
> inadvertently;   and (3)   prejudice must have ensued.
> *United States v. Jackson,* 345 F.3d 59, 71 (2d Cir. 2003),
> *quoting Strickler v. Greene,* 527 U.S. 263, 281-82
> (1999).

753 F.3d at 91.   *See also, Thomas*, 981 F.Supp.2d at 238, *citing United States v.*

*Coppa*, 267 F.3d at 140 and *Moore v. Illinois,* 408 U.S. 786, 794-95 (1972).

Regarding the prong by which *Brady* material is defined, in *Certified*

*Environmental Services* the Second Circuit pointed out that

>  "evidence is   material   within the meaning of *Brady*
> when there is a reasonable probability that, had the
> evidence been disclosed, the result of the proceeding
> would have been different,   such that the failure to
> disclose undermine[s] confidence in the verdict.   *Cone*
> *v. Bell,* 556 U.S. 449, 469-70 (2009), *quoting*, *Kyles v.*
> *Whitley,* 514 U.S. 419, 435 (1995).

753 F.3d at 91.

The standard for the inquiry regarding prejudice, as the Supreme Court

explicated in *Kyles v. Whitley*, asks   not whether the defendant would more likely

than not have received a different verdict with the evidence, but whether in its

absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. 514 U.S. at 434. *See also Lambert v. Beard*, 537 Fed.Appx. 78, 87 (3d Cir. 2013), *after remand by, Wetzel v. Lambert*, __ U.S. __, 132 S. Ct. 1195 (2012), *vacating and remanding*, 633 F.3d 126 (3d Cir. 2011).

As the Court in *Kyles* noted, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . [M]ateriality is a reasonable probability of a different result, and the adjective is important." 514 U.S. at 434 (internal citations omitted). *See also, Thomas* 981 F.Supp.2d at 242-43.

A reasonable probability of a different outcome "is not a sufficiency of evidence test," and thus, does not require that the "evidence would have rendered the evidence as a whole insufficient to support a conviction." *United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995), *quoting, Kyles*, 514 U.S. at 435.

Rather, evidence must be disclosed if it "could reasonably [have been] taken to put the whole case in such a different light as to undermine confidence in the verdict." *Coppa*, 267 F.3d at 139, *quoting Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

As this Court has held, even when evidence may be both inculpatory and exculpatory, its disclosure is not thus precluded under *Brady*. *See United States v.*

52

*Mahaffy*, 693 F.3d 113, 130 (2d Cir. 2012) ("[t]he fact that the government is able to argue that portions of the transcripts were consistent with the prosecution's theory fails to lessen the exculpatory force" of the remaining parts); *see also United States v. Rivas*, 377 F.3d 195, 199-200 (2d Cir. 2004); *United States v. Thomas*, 981 F.Supp.2d 229, 233 (S.D.N.Y. 2013) ("[w]hen *Brady* material is withheld, the Government's case is 'much stronger, and the defense case much weaker, than the full facts would have suggested'"), *citing Kyles v. Whitley,* 514 U.S. 419, 429 (1995).

In that context, even when exculpatory evidence is disclosed, a *Brady* violation can still occur if the disclosure is untimely.   As the Court in *Thomas* stated, "[e]vidence is suppressed when the prosecutor does not disclose it 'in time for its effective use at trial.'   981 F.Supp.2d at 239, *quoting Coppa,* 267 F.3d at 135 (internal citations omitted), *and citing, United States v. Avellino,* 136 F.3d 249, 255 (2d Cir. 1998).

The Court in *Certified Environmental Services* elaborated that

> [t]his aspect of *Brady* affects not only what the Government is obligated to disclose, but when it is required to do so.   Temporally,   the timing of a disclosure required by *Brady* is . . . dependent upon the anticipated remedy for a violation of the obligation to disclose:   the prosecutor must disclose . . . exculpatory and impeachment information no later than the point at which a reasonable probability will exist that the

> outcome would have been different if an earlier
> disclosure had been made.

753 F.3d at 92, *quoting Coppa,* 267 F.3d at 142.

Courts have also encouraged prosecutors to err on the side of disclosure for reasons of prudence as well as fairness. As the Court in *Cone v. Bell* cautioned, "[a]s we have often observed, the prudent prosecutor will err on the side of transparency, resolving doubtful questions in favor of disclosure." 556 U.S. at 470, *citing Kyles,* 514 U.S., at 439; *Bagley*, 473 U.S. 667, 711, n. 4 (Stevens, J., *dissenting*); *United States v. Agurs,* 427 U.S. 97, 108 (1976). *See also, United States v. Van Brandy,* 726 F.2d 548, 552 (9th Cir. 1984) ([W]here doubt exists as to the usefulness of evidence, [the prosecutor] should resolve such doubts in favor of full disclosure . . .).

As the Court in *Thomas* recognized, questions about the reliability of [ ] exculpatory information are judgment calls for [a defendant] and his counsel, not the Government; 'to allow otherwise would be to appoint the fox as henhouse guard.' 981 F.Supp.2d at 241, *quoting DiSimone v. Phillips,* 461 F.3d 181, 195 (2d Cir. 2006).

Thus, in contemplating whether and when to disclose, "[t]he government must bear in mind, however, that it has the 'affirmative duty to resolve doubtful questions in favor of disclosure,' and that 'if the sword of Damocles is hanging

54

over the head of one of the two parties, it is hanging over the head of the [government].' *United States v. Hsia*, 24 F.Supp.2d 14, 30 (D.D.C. 1998), *quoting United States v. Blackley*, 986 F.Supp. 600, 607 (D.D.C. 1997) (internal quotations omitted).

Here, though, when *Brady* becomes an issue in the pretrial context, disclosure has a broader context. Thus, when the "exculpatory character harmonize[s] with the theory of the defense case" failure to disclose that evidence constitutes a *Brady* violation. *Id*., *quoting, United State v. Triumph Capital Grp.*, 544 F.3d 149, 164 (2d Cir. 2008). That harmony with defense theories here was detailed pretrial, during trial, and in the Rule 33 motion.

Also, the timeliness requirement incorporated in the *Brady* disclosure obligation compels disclosure of materially favorable evidence in sufficient time to permit the defense the opportunity to use it effectively before trial. *Coppa*, 267 F.3d at 142 (whether the disclosure is made in a timely fashion depends on the "sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made"); *see also United States v. Solomonyan*, 451 F.Supp.2d 626, 644-645 (S.D.N.Y. 2006).

Thus, implicit in the government's *Brady* obligation is the requirement that the defense is able to use the materially favorable evidence, even if only to uncover additional exculpatory evidence. *See e.g. United States v. Gil*, 297 F.3d 93, 104

(2d Cir. 2002) (materially favorable evidence, even if not admissible itself, must be disclosed pursuant to *Brady* if it "could lead to admissible evidence"). Indeed, in *Gil*, the inclusion of critical exculpatory (and impeachment) information in boxes of documents produced pursuant to 18 U.S.C. §3500 the weekend prior to trial was deemed insufficient notice. *Id.*, at 106-07.

Consequently, although there are interests in maintaining grand jury secrecy that exist while an investigation is ongoing, unsealing was necessary here because evidence of Force's misconduct was exculpatory, and thus *Brady* material, the use of which was necessary to avoid "a possible injustice." *See generally Douglas Oil Co. Of California v. Petrol Stops Northwest*, 441 U.S. 211 (1979) (requiring a showing that "material [sought] is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed"). Certainly the right to pre-trial access to *Brady* material presents a particularized and/or compelling need for its unsealing. *See e.g. United States v. Youngblood*, 379 F.2d 365, 367 (2d Cir. 1967); *see also Dennis*, 384 U.S. at 868-70 ("disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice").

Moreover, delaying disclosure until it is contemporaneous with production of 3500 material does not absolve the government of its responsibility to disclose

exculpatory material and information in time for the defense's effective use at trial. As the Court in *Hsia* recognized, "the existence of a duty to disclose witness statements at trial pursuant to the Jencks Act, 18 U.S.C. §3500, does not eviscerate the government's *Brady* obligation to disclose witness statements well in advance of trial if portions of those statements also fall under *Brady*." 24 F.Supp.2d at 29, *citing, United States v. Tarantino,* 846 F.2d 1384, 1414 n. 11 (D.C. Cir. 1988).

As the Court in *Hsia* pointed out, "[t]his is important because the government is required to disclose *Brady* material in sufficient time for the defendant to 'use the favorable material effectively in the preparation and presentation of its case,' *United States v. Pollack,* 534 F.2d 964, 973 (D.C. Cir. 1976), while Jencks material is not required to be disclosed until after the witness has testified." 24 F.Supp.2d at 29. *See also Thomas*, 981 F.Supp.2d at 241 ("[t]he Government's argument conflates its Jencks Act and *Brady* obligations. While those responsibilities overlap at times, they are distinct legal concepts. The Jencks Act is concerned with discovery to be produced by the Government. *Brady* is concerned with fairness").

The Court in *Thomas* further recognized a reactive defense maneuver "after a late *Brady* disclosure is no substitute for thoughtful preparation and a considered strategy. *Brady* material must be provided to a defendant 'in time for its *effective* use at trial.' 981 F.Supp.2d at 242, *quoting, Coppa,* 267 F.3d at 135 (emphasis

57

supplied by Court in *Thomas*), *and citing, Grant v. Alldredge,* 498 F.2d 376, 382

(2d Cir.1974) (refusing to infer from the failure of defense counsel, when

surprised at trial, to seek time to gather other information on [the suppressed

witness], that defense counsel would have by-passed the opportunity had the

prosecutor apprised him of the [evidence] at a time when the defense was in a

reasonable pre-trial position to evaluate carefully all the implications of that

information ).

As this Court explained in *Leka v. Portuondo,* 257 F.3d 89 (2d Cir.2001),

"[t]he opportunity for use under *Brady* is the opportunity for a responsible lawyer

to use the information with some degree of calculation and forethought. *Id*., at

101-03. *See also, Thomas*, 981 F.Supp.2d at 240; *St. Germain v. United States,*

Nos. 03 cv 8006 (CM), 99 cr 339 (CM), 2004 WL 1171403, at *18 (S.D.N.Y. May

11, 2004) (defense strategies are largely formed prior to trial . . . and the necessary

predicate is that the strategies selected were chosen after careful consideration of

all constitutionally-compelled disclosure).

Consequently, as this Court realized in *Leka*,

> [w]hen such a disclosure is first made on the eve of trial,
> or when trial is under way, the opportunity to use it may
> be impaired. The defense may be unable to divert
> resources from other initiatives and obligations that are
> or may seem more pressing. And the defense may be
> unable to assimilate the information into its case.

58

257 F.3d at 101, *citing, United States v. Washington,* 294 F.Supp.2d 246, 250 (D.

Conn. 2003) (government's failure to disclose evidence impeaching the central

witness until after the first day of trial prejudiced defendant because the late

disclosure prevented defense counsel from investigating and planning overall trial

strategy).[10]

### b. *The Manner of the Government's* **Brady** *Disclosure Obligations*

In *Thomas*, the Court also emphasized "the importance of the manner of the

Government's disclosure."   981 F.Supp.2d at 240, *citing Gil,* 297 F.3d at 93

(labeling *Brady* evidence as 3500 material and producing it as part of a large 3500

production on the eve of trial constitutes suppression), and *United States v. Breit,*

767 F.2d 1084, 1090 n. 4 (4th Cir. 1985) (government may not discharge its *Brady*

obligation merely by tendering a witness without providing any indication that the

witness's testimony may be helpful to defense).

---

[10]     Indeed, even in *Certified Environmental Services*, in which this Court did not find a *Brady* violation because, *inter alia*, the notes at issue "were at best marginally helpful to the defense[,]" 753 F.3d at 93, and the undisclosed reference in the notes "was not inconsistent with [the prior] testimony[,]" *id.*, the Court nevertheless added that

> [t]his is not to suggest, however, that the prosecutors did nothing wrong in failing to disclose [the] handwritten notes along with the typewritten summaries.   To begin with, we see no reason – and the Government offers none – why the prosecutors here could not and should not have acted in favor of disclosing the *Brady* material earlier.

*Id.*, *quoting United States v. Rittweger,* 524 F.3d 171, 182 (2d Cir.2008).

In that context, "the Government cannot hide *Brady* material as an

exculpatory needle in a haystack of discovery materials."   981 F.Supp.2d at 239,

*citing United States v. Skilling,* 554 F.3d 529, 577 (5th Cir. 2009), *aff'd in part and*

*vacated in part on other grounds,* 561 U.S. 358 (2010) (suggesting that *Brady*

violations related to voluminous open file discovery depend on   what the

government does in addition to allowing access to a voluminous open file).   *See*

*also Hsia,* 24 F.Supp.2d at 29-30 ([g]overnment cannot meet its *Brady* obligations

by providing . . . 600,000 documents and then claiming that [the defendant] should

have been able to find the exculpatory information).

### 2.   *The Government Failed to Make Timely Production of Exculpatory Material*

Thus, the Court should have granted Ulbricht's Rule 33 motion because the

government failed to produce exculpatory material in a timely fashion that would

have permitted the defense effective use of the material and information at trial.

Moreover, while the government's intent is not required for a *Brady*

violation, here the government's concealment was willful and calculated.   It

provided but the tip of the iceberg of information it possessed regarding Force, and

none regarding Bridges.   That constituted material non-disclosure that was only

aggravated by the government's manipulation of the time frame to delay the formal

charging of Force and Bridges until after Ulbricht's trial had concluded.

In that regard, within the 5,000 pages of 3500 material for the government's first witness, SA Jared Der-Yeghiayan, produced less than two weeks prior to trial and after the Court had precluded any defense reference to the Force investigation and misconduct – and, in some instances, 30 months after the information was memorialized by SA Der-Yeghiayan (and in most instances, close to or more than two years after) – resided a substantial volume of exculpatory material and information.   That information was directly relevant not only to the government's claim that Force's investigative activities and misconduct were independent of the SDNY prosecution, but also to Ulbricht's defense that he was not DPR.

Ulbricht's Rule 33 motion included a catalog of the 3500 material that is exculpatory, and which was not disclosed prior to the onslaught of 3500 material serially produced in the weeks before trial.   A643.   As that list demonstrates, 70 separate documents (some consisting of multiple pages) in the 3500 material contained exculpatory material and information that was not provided to the defense at a time in which it could be used effectively at trial.

Nor can it be disputed that the information about an alternate perpetrator, discussed further **post**, constituted *Brady* material.   *See Leka v. Portuondo,* 257 F.3d at 99 (*Brady* material is of a kind that would suggest to any prosecutor that the defense would want to know about it).   *See also, Thomas* 981 F.Supp.2d at 238-39.   Indeed, in *Lambert v. Beard*, 537 Fed.Appx. 78, 81-82 (3d Cir. 2013), the

61

nondisclosure related to notes reflecting that "unbeknownst to either the defense or the jury at the time, [a critical government witness] had in fact supplied police with another perpetrator"). *See also Cone v. Bell*, 556 U.S. at 471 (undisclosed investigative reports containing information consistent with defense theory were deemed *Brady* material).

Here, as well, the cumulative effect of the untimely disclosure amplified its impact and the prejudice suffered by Ulbricht as a result. *See Cone v. Bell*, 556 U.S. at 475 ("[i]t is possible that the suppressed evidence, viewed cumulatively, may have persuaded the jury" not to impose the death sentence on the defendant) (footnote omitted); *id.*, at 471 ("both the quantity and the quality of the suppressed evidence lends support to" the defendant's position).

Judge Alex Kozinski, in dissenting from the denial of a petition for rehearing, declared that "[t]here is an epidemic of *Brady* violations abroad in the land[,] and "[o]nly judges can put a stop to it." *United States v. Olsen*, 737 F.3d 625, 626 (9th Cir. 2013), *denying reh'g*, (Kozinski, J., *dissenting*). *See also id.*, at 631 ("*Brady* violations have reached epidemic proportions in recent years, and the federal and state reporters bear testament to this unsettling trend").

As a result, in prescribing a solution, Judge Kozinski urged the courts to "send prosecutors a clear message: Betray *Brady,* give short shrift to *Giglio,* and you will lose your ill-gotten conviction." *Id.*, at 633.

Accordingly, in addition to the initial pretrial and trial errors, the Court abused its discretion in denying Ulbricht's Rule 33 motion for a new trial based on the government's failure to disclose exculpatory material and information and/or to do so in a timely manner that would have permitted the defense to make use of it.

**POINT II**

**THE COURT ABUSED ITS DISCRETION
BY CURTAILING CROSS-EXAMINATION
AND THE DEFENSE THEORY AT TRIAL**

**A.**     *HSI SA Jared Der Yeghiayan*

During cross-examination of the government's first and principal witness, SA Der-Yeghiayan – through whom the government introduced a substantial volume of Exhibits from the Silk Road website and the parameters of the government's investigation (from intercepting drugs shipped from overseas vendors to U.S. customers, to Silk Road chats, forum posts, and administrative functions) – the government began to object to inquiries about the investigation generally, in particular with respect to Mark Karpeles, on whom SA Der-Yeghiayan had focused and developed a significant amount of information by the Fall of 2013.

The Court's initial reaction was that the subject matter of the cross-examination was "highly relevant[,]" A406, and that it went to SA Der-Yeghiayan's "state of mind."   A407.   The Court added that the inquiry was

"in the heartland of the defense[,]" *id*., and was not hearsay because it was not being offered for the truth.   A411.

The Court added "I don't think it's irrelevant because if he pursued a target of this conduct and it wasn't the defendant, I think that's directly relevant to the defendant's theory of the case."   A416.   *See also* A412; *id*., at A416 ("[t]hey're trying to raise a reasonable doubt as to whether or not the defendant is the real DPR").

At that juncture, the Court adjourned for the weekend, and invited letters from both sides.   Monday morning the Court performed a complete about-face, ruling that the cross-examination was not proper for purposes of raising the prospect of an alternative perpetrator, or to challenge the competency of the investigation.   A420-441.

The Court invited the government to submit a list of questions and answers to be stricken, and granted the strikes proposed.   A441-443; A466-471.   The Court refused to afford defense counsel any time to review the stricken sections to determine whether the cross-examination could be reconstructed through questions the Court would permit.   A471-73.

Regarding the alternative perpetrator, the Court found the defense had not established a "direct connection" between Mark Karpeles and the charged offenses – essentially imposing on the defense the obligation to prove that Karpeles was

DPR. A423-30.   The Court ignored the other purpose of the questioning:   to

expose the defects in the investigation that allowed Karpeles to escape prosecution,

and instead turned attention to Ulbricht (which, in turn, also implicated Force's and

Bridges's corruption).   The Court also ruled that the cross-examination would be

curtailed because the government's redirect would be constrained ("you can't have

one side, one-hand clapping").   A428.

However, the alternative perpetrator line of inquiry should have been

permitted to continue, and the prior testimony not stricken because it was

consistent with the case law on alternate perpetrators, in some instances not

hearsay at all, and in other respects admissible under Rules 807 and 403,

Fed.R.Evid.

**1.** ***In Curtailing and Striking Cross Examination of SA Der-Yeghiayan, the Court Improperly Concluded There Was No Nexus Between the Alternative Perpetrator and the Specific Offenses***

Here, case law supports Ulbricht's right to ask SA Der-Yeghiayan further questions about alternative perpetrators, including Karpeles. The cases cited by the Court and the government, to the extent they support the broad principles asserted by the government, apply when it is the *defendant*, and not an alternative perpetrator, who is protected by constitutional as well as evidentiary rules, and in which – unlike herein – there was not any nexus between the alternative perpetrator and the specific offenses alleged.

**a.** ***Relevant Case Law Regarding An Alternate Perpetrator***

Pointing to an alternative perpetrator is a defense endorsed by the Supreme Court and other courts time and again, and the defense was utilizing evidence to that effect consistent with the rules of evidence and Ulbricht's constitutional right to present a defense (which sometimes supersedes the technical limits of those evidentiary rules). *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 449 n. 19, 453; *Boyette v. LeFevre*, 246 F.3d 76, 91 (2d Cir. 2001).

Indeed, as set forth in *Wade v. Mantello*, 333 F.3d 51, 57 (2d Cir. 2003) "the [Supreme] Court has observed on more than one occasion, ''at a minimum, ...criminal defendants have the right . . . to put before a jury evidence that might influence the determination of guilt.'' *Id., quoting, Taylor v. Illinois*, 484 U.S. 400,

66

408 (1988) (*quoting, Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)).   In that regard, "[t]he Constitution protects a criminal defendant from the arbitrary exclusion of material evidence, and evidence establishing third-party culpability is material."   *Wade*, 333 F. 3d at 58.[11]

In addition, the Court placed too high a burden on the defense with respect to evidence of an alternative perpetrator.   In each of the cases the government cited and the Court relied upon, there was a failure to establish the necessary nexus between the alleged third-party perpetrator and the crime charged.   *See Wade v. Mantello*, 333 F. 3d at 61 (testimony in murder case that third-party was involved in unrelated shoot-out with victim *weeks earlier*, was properly excluded at trial because "[w]eighed against the limited probative value of the proffered testimony were dangers that the jury could have been misled or confused by the testimony") (emphasis added);   *DiBenedetto v. Hall*, 272 F.3d 1, 7-8 (1st Cir. 2001) (absent "evidence [of] a connection between the other perpetrators and the crime, not mere speculation on the part of the defendant," Court excluded evidence in murder trial related to *another* murder, meant to establish that "third party culprits, not [the defendant] and his co-defendant, were guilty" );  *People of Territory of Guam v.*

_____

[11]*See also Mendez v. Artuz*, 303 F.3d 411, 413 (2d Cir. 2002) (noting materiality of evidence of an "alternative culprit"); *United States v. Manning*, 56 F.3d 1188, 1198 (9th Cir. 1995) (same); *Bowen v. Maynard*, 799 F.2d 593, 600–601, 610–613 (10th Cir.) (same);  *United States v. Stifel*, 594 F.Supp. at 1541 (same).

*Ignacio*, 10 F. 3d 608, 615 (9th Cir. 1993) (trial court did not abuse its discretion by

excluding evidence of third-party's suicide as evidence of third-party culpability

where defendant had not provided "substantial evidence connecting [third-party] to

the crime charged") (internal quotation omitted); *Andrews v. Stegall*, 11

Fed.Appx. 394, 396 (6th Cir. 2001) (distinguishing defendant's claim of third party

culpability in murder case involving "a vague threat [by third party] . . . made some

unknown time before the murder, to the victim's stepson," where "[the third-party]

was not shown to have been anywhere near the scene of the crime, and was not

available to testify," from *Chambers* [,410 U.S. at 300-301,] in which there was

substantial evidence directly connecting the third-party with the offense"); *United*

*States v. Diaz*, 176 F.3d 52, 82 (2d Cir. 1999) (trial court properly excluded

evidence of *another* crime – prison records showing that the murder victim had

assaulted a third-party while in prison more than a year prior – in order to suggest

motive on the part of a third party in the charged crime, because, standing alone, it

would be "creative conjecturing" and the evidence "speculative"); *United States v.*

*Wade*, 512 Fed.Appx. 11, 14 (2d Cir. 2013) ("the district court reasonably

excluded . . . testimony about [a third party's] arrest because . . . [the third party's]

December 3, 2009 sale of drugs from a mailbox was not temporally or physically

linked to the May 11, 2009 drug and firearm seizures from [the defendant's

girlfriend's] apartment that were contemporaneous with [the defendant's] arrest

68

and . . . [the] testimony [therefore] presented a risk of juror confusion and extended litigation of a collateral matter").

  **b.**  ***The Requisite Nexus Was Established By the Government Itself Through Its Direct Examination of SA Der-Yeghiayan***

   In this case, though, *the government itself*, in the person of SA Der-Yeghiayan and others, provided the requisite nexus between the alternate perpetrator and specific offenses here, via an analysis of documentary and other materials, and the defense, via cross-examination, was simply cataloguing the bases for that nexus. Ultimately, the Court's position and government's argument was about the *weight* of the evidence, which of course was for the jury to determine.

   Moreover, here, parts of the defense mirrored to a significant extent that endorsed in *Kyles v. Whitley*, in which the defense alleged the defendant had been framed by an informant "for the purposes of shifting suspicion away from himself" for the offense charged against the defendant. 514 U.S. at 429.

   This case also replicates circumstances in other cases in which this Court reversed convictions because alternative perpetrator evidence was excluded. *See Alvarez v. Ercole*, 763 F.3d 223 (2d Cir. 2014) (conviction reversed because defense counsel not permitted to cross-examine detective about police report containing information about the alternative suspect); *Cotto v. Herbert*, 331 F.3d

217, 229 (2d Cir. 2003) ("[b]y prohibiting [defense counsel] from questioning

Detective Alfred about the [police report], the trial court allowed the jury to get the

impression that the defense had nothing other than rhetoric to contradict the

prosecutor's statement in summation that the NYPD's investigation into [the

charged] murder was 'thorough'"), *citing Davis v. Washington*, 415 U.S. 308, 318

(1974) .

Thus, here the evidence regarding an alternative perpetrator is directly

related to the offenses alleged, and is neither collateral nor speculative.   Again, the

weight of such evidence, which ultimately is the government's primary concern

throughout its letter, is a matter for the jury to determine.   *Stifel*, 594 F.Supp. at

1541.

> ### 2. *The Court Also Erred by Disregarding the Untimeliness of the Government's Objections, Failing to Acknowledge That Cross Examination of SA Der-Yeghiayan Was Relevant to Another Proper Defense Ulbricht Was Presenting, and Improperly Considering Issues Regarding the Government's Possible Redirect*

In addition, the government's objections were untimely.   The government

provided 5,000 pages of material pursuant to 18 U.S.C. §3500 for SA

Der-Yeghiayan, a substantial portion of which was devoted to government's

investigation of Karpeles.   It is inconceivable that the government did not

anticipate the line of cross-examination.   Yet it did not make a motion *in limine*,

did not object to defense counsel's opening, nor during a significant portion of the cross-examination of SA Der-Yeghiayan.

Further, as noted **ante**, the questioning of SA Der-Yeghiayan was relevant to another proper defense Ulbricht was presenting – that of the conduct of the government's investigation – which the Court did not address. *See United States v. Blake*, 107 F.3d 651, 653 (8th Cir. 1997).[12]

The Court also abused its discretion in focusing on issues regarding the government's possible redirect. That simply was not a proper consideration, and therefore "cannot be located within the range of permissible decisions." *United States v. Figueroa*, 548 F.3d 222, 226 (2d Cir. 2008).

### 3. *The Court Abused Its Discretion by Precluding the Defense From Eliciting from SA Der-Yeghiayan that Karpeles Attempted to Exchange Immunity for the Identity of DPR*

Still another area of cross-examination of SA Der-Yeghiayan that the Court precluded with its ruling was eliciting from SA Der-Yeghiayan that he was told by AUSA's that Karpeles's lawyers had offered to provide the name of the person

---

[12]   In that context, due to the government's precipitous seizure of one of Karpeles's accounts in May 2013, Karpeles had notice that he was under investigation in some respect, thereby giving him ample time to cover his own tracks – a danger SA Der-Yeghiayan himself warned of in protesting not only the seizure, but also any further negotiations with Karpeles. Again, such a defense is recognized as valid and appropriate. *See Kyles v. Whitley*, 514 U.S. at 442 n. 13 (if defense had possessed the undisclosed material, "the defense could have attacked the investigation as shoddy"); *id.*, at 445-46; *Bowen v. Maynard*, 799 F.3d 593, 613 (10th Cir. 1986) ("[a] common trial tactic of defense lawyers is to discredit the caliber of the investigation . . ."); *Cotto v. Herbert*, 331 F.3d 217, 229 (2d Cir. 2003).

Karpeles – who controlled the world's primary bitcoin exchange – suspected of being DPR if the government would forego charges against Karpeles for operating unlicensed money exchanging operations.    A432-433; A341.

As a threshold matter, the government's letter seeking to prohibit that inquiry (A307), verified precisely what defense counsel sought to elicit from SA Der-Yeghiayan about the offer on cross-examination, and which was conveyed in July 2013 by Karpeles's lawyer to the government:   in return for immunity from prosecution by the U.S., Karpeles offered to provide a name of someone he suspected was operating Silk Road.   A311.   Nowhere in its letter did the government challenge the accuracy of that account.   In fact, the government *confirmed* it.

As the Court noted, the initial offer from Karpeles's attorney was not hearsay, as it was not being offered for the truth of the matter.   A405-410.   However, the exchanges between AUSA's and SA Der-Yeghiayan, while hearsay, qualified for admission under Rule 807, Fed.R.Evid., particularly in light of the government's failure to challenge their accuracy.   Thus, the analysis for purposes of Rule 807had been satisfied.

Furthermore, "exceptional circumstances" warranted application of Rule 807 here.   Karpeles is a French citizen living in Japan.   His lawyers have not been identified; nor have the AUSA's who relayed the statement to SA Der-Yeghiayan.

72

*See, e.g., Muncie Aviation Corporation v. Party Doll Fleet, Inc.*, 519 F.2d 1178,

1182-83 (5th Cir. 1975) (difficulty in finding witnesses justified admission);

*Limone v. United States*, 497 F.Supp.2d `43, `62-63 (D. Mass. 2007).   *Cf. Parsons*

*v. Honeywell Incorporated*, 929 F.2d 901, 907-08 (2d Cir. 1991) (statement not

admissible because declarant available as a witness).

The circumstances also easily meet the indicia of reliability and

trustworthiness requirements found to satisfy the Rule [and/or its predecessors,

Rule 803(24) and Rule 804(b)(5)].   For example, in *Steinberg v.*

*Obstetrics-Gynecological & Fertility Group, P.C.*, 260 F.Supp.2d 492 (D.Conn.

2003), the Court concluded that the description of the status of a case by one

attorney to another (assuming control of the case) possessed sufficient indicia of

reliability and lack of motive to misrepresent.   *Id.*, at 496.   *See also United States*

*v. Dumeisi*, 424 F.3d 566, 576-77 (7th Cir. 2005) (relying on the declarants' "duty

to accurately record their own activities"); *United States v. Bailey*, 581 F.2d 341,

349 (3d Cir. 1978) ("consideration should be given to factors bearing on the

reliability of the reporting of the hearsay by the witness"); *Muncie Aviation*

*Corporation v. Party Doll Fleet, Inc.*, 519 F.2d 1178, 1182-83 (5th Cir. 1975)

(trustworthiness established because published by government without any motive

not to tell the truth or be inaccurate); *United States v. Iaconetti*, 406 F.Supp. 554,

559 (E.D.N.Y. 1976) (admitting statement because it was testified to by a person

73

with whom it was "appropriate and even necessary [for the declarant] to communicate").

Moreover, the rules of evidence were not designed to curtail a defendant's constitutional rights, as implicated here (with respect to confrontation and the right to present a defense), and as the Supreme Court declared in *Chambers v. Mississippi*, 410 U.S. 284 (1973), "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.*, at 302.

Thus, the offer by Karpeles's lawyer was admissible pursuant to Rule 807. Concerns expressed by the Court regarding "context" and meaning of the offer are unpersuasive, and address merely the weight that should be accorded the statement – contentions appropriately directed to the jury. *See Stifel*, 594 F.Supp. 1525, 1541 (N.D. Ohio 1984) ("[t]he identity of the bomb sender was a question for the jury, and defendant should have been apprised of evidence showing that someone other than himself had equal motive, access to materials, and other surrounding circumstances implicating him as the guilty party"). *See also Kyles v. Whitley*, 514 U.S. at 451 (prosecution's factual arguments about the implications of exculpatory evidence "confuses the weight of the evidence with its favorable tendency, . . .").

**B.**     *FBI Computer Specialist Thomas Kiernan*

At the time of his testimony, Agent Thomas Kiernan had been with the FBI for 23 years and held the position of computer scientist. A491.   Through Agent Kiernan's testimony, the government introduced the entire contents of Ulbricht's laptop.   A492.   During his direct testimony, select documents from Ulbricht's hard drive were admitted in evidence and read to the jury.   *See e.g.,* A494, 495. Agent Kiernan also testified about the operation of Torchat, a computer program installed on Ulbricht's laptop at the time of his arrest, which was the vehicle for many internet chats introduced by the government, and in which the government claimed Ulbricht was a participant.   A493.

During cross-examination, however, defense counsel was precluded from asking a number of questions directly relevant to material elicited from Agent Kiernan on direct. For example, Agent Kiernan testified about a test of the Torchat program he conducted to establish that files recovered from Ulbricht's laptop were structured in the same way as files Agent Kiernan generated on his own computer. The relevant portion of Agent Kiernan's testimony is as follows:

Q.     Have you personally ever used Tor chat?

A.     I have.

Q.     Have you tested Tor chat?

A.     I have.

Q.   Have you saved the logs of Tor chats on your own computer?

A.   I have.

T.889.

The defense should have been permitted to ask Agent Kiernan whether his

Torchat program experiment was running on the same, "kernel version" as that on

Ulbricht's laptop which would have established that Agent Kiernan's conclusions

were flawed, but was denied the opportunity.   A503.   The defense was also

precluded from asking questions related to the security of BitTorrent, T.1054, and

about a particular PHP script admitted as Defense Ex. J that was recovered from

Ulbricht's laptop, both clearly within the scope of direct, and thus, fair game.[13]

A498.

**C.**   ***The Court's Rulings Which Curtailed the Cross Examinations of SA
Der-Yeghiayan and Agent Kiernan Constituted an Abuse of Discretion***

As this Court has instructed, "trial judges retain wide latitude insofar as the

Confrontation Clause is concerned to impose reasonable limits on such

cross-examination based on concerns about, among other things, harassment,

prejudice, confusion of the issues, the witness' safety, or interrogation that is

repetitive or only marginally relevant."   *United States v. Crowley*, 318 F.3d 401,

---

[13]   BitTorrent is an internet file sharing program which creates an extraordinary
vulnerability to internet intrusion by hackers when open.   During direct of Agent Kiernan, a
photo of Mr. Ulbricht's laptop screen at the time of arrest was introduced, which established that
the BitTorrent program was indeed open, thereby jeopardizing the security of the information on
Ulbricht's laptop.

417 (2d Cir. 2003), *cert. denied,* 540 U.S. 894 (2003), *citing, Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986).   An appellate court will reverse the district court's decision to restrict cross-examination "only when th[e] broad discretion [of the district court] is abused."   *Figueroa*, 548 F.3d at 226, *citing, Crowley*, 318 F.3d at 417.

The district court abuses its discretion "when (1)   its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2)   its decision – though not necessarily the product of a legal error or a clearly erroneous factual finding – cannot be located within the range of permissible decisions."   *Figueroa*, 548 F.3d at 226 (citations and footnotes omitted); *see also Koon v. United States*, 518 U.S. 81, 100 (1996).

Such error is not harmless unless appellate court finds "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained[.]" *Chapman v. California*, 386 U.S. 18, 24 (1967).

Accordingly, the Court abused its discretion in curtailing the cross-examinations of SA Der-Yeghiayan and Agent Kiernan.

## POINT III

## THE COURT ABUSED ITS DISCRETION IN PRECLUDING TWO DEFENSE EXPERTS

During the defense case, the Court precluded two defense experts, Dr. Steven Bellovin, and Andreas Antonopoulos.   The two experts were necessary to rebut:   (1)   portions of the government's case that the defense was precluded from confronting on cross-examination;   and (2)   the testimony of Ilhwan Yum, involving a lengthy spreadsheet of thousands of bitcoin transactions and a complex analysis of bitcoin wallets located on the Silk Road servers and Ulbricht's laptop, notice of which was provided to the defense only days prior.

Dr. Bellovin's testimony would have addressed a number of technical computer and internet-related issues which the defense was prevented from addressing during cross-examination.   Those matters included general principles of internet security and vulnerabilities; PHP computer programming; forensic memory analysis; general issues related to linux-based operating systems; and principles of public key cryptography.   Each of these issues was significantly implicated in the testimony of government witnesses, as well as in the evidence related to the government's forensic examination and analysis of Ulbricht's laptop.

Antonopoulos's testimony would have explained to the jury a number of technically complex and abstract concepts involving bitcoin, and countered certain

aspects of Yum's testimony, particularly the massive spreadsheet accompanying his testimony.

Yum's direct testimony involved technically complex concepts related to bitcoin and computer forensics, including the extraction of several bitcoin wallet files from Ulbricht's laptop and the Silk Road computer servers. It featured a comparative analysis of bitcoin addresses from wallets located on the Silk Road Marketplace server and Ulbricht's laptop. A532. He also explained – in some instances, incorrectly (*i.e.*, his definition of a "hot wallet," A555-556) – concepts related to bitcoin in a manner consistent with the government's theory of the case.

Antonopoulos's testimony was critical to the jury's full understanding of complex concepts related to bitcoin, and to highlight defects in Yum's forensic analysis of bitcoin addresses. Furthermore, his testimony would have defined principles of ownership, control, and access related to bitcoin and bitcoin wallets, in counterpoint to the flawed conclusions in Yum's testimony, as well as Yum's inaccurate definitions of important terminology and descriptions of bitcoin mechanics.

By precluding the defense experts, who would have countered the complex testimony regarding bitcoin presented by the government, the government witnesses' testimony essentially went unchallenged, and Ulbricht was denied his Fifth and Sixth Amendment rights to present a defense.

**A.** *The Court's Decision Precluding the Two Defense Experts*

The Court's principal stated reason for precluding both defense experts was non-compliance with Rule 16, Fed.R.Crim.P., *i.e.*, the timing of defense disclosure and the level of detail describing the experts' anticipated testimony.   A362-379.

Yet, as detailed below, the Court's rigid application of the Rule 16 disclosure requirements, and its imposition of the most extreme sanction available – preclusion altogether – contravened case law and paid insufficient heed to Ulbricht's Sixth Amendment rights, as set forth **post**.   The ruling further ignored the particular circumstances in this case, namely that the defense was attempting to address issues that had become apparent only during trial.

Thus, the Court's decision was entirely asymmetrical – while the government was able to elicit testimony for which cross-examination was precluded, and include complex, lengthy summary exhibits created mid-trial, the defense was not permitted to confront them at all.

Regarding the preclusion of Dr. Bellovin's testimony, the Court held that defense counsel's letter regarding the subject of his testimony failed to describe sufficiently his opinions and proposed topics to be covered.   A374-75.   However, the defense's letter disclosing Dr. Bellovin's proposed testimony contained detailed reasons why each subject area of his testimony was required to respond to areas the defense was precluded from exploring on cross-examination, or to meet

specific government arguments, or to augment the defense theories.   A385.   In fact, much of Dr. Bellovin's testimony was necessitated by testimony the government elicited on direct of its technical computer witnesses in areas that the defense was precluded from examining on cross.   A388-89.

   The Court's reasons for precluding Antonopoulos's testimony were similarly in conflict with the record.   While the Court stated, ". . . what analysis Antonopoulos performed and the methodology are unknown[,]" (A368), the defense's letter to the Court sufficiently outlined those subjects, and noted that further details awaited Antonopoulos's disembarkation from his trans-Atlantic flight to New York.   Counsel also made a subsequent detailed oral proffer, but to no avail.   T.1845-1851.

The Court ruled that it would be essentially unfair to make the government prepare to cross-examine expert witnesses on short notice.   A369.   Yet the Court's characterization of the defense strategy as "trial by ambush," A368, was, in fact, the exact opposite of how events unfolded at trial.

Indeed, many of the exhibits introduced during Yum's testimony were first revealed to the defense mid-trial, only three days before their introduction through Yum as a witness.   Many in the 600 series – including GX 620, a 63-page spreadsheet including and analyzing thousands of bitcoin transactions – were first turned over January 28, 2015, more than two weeks into trial, and two days prior to

81

Yum's testimony.   Nor were they contained in any previous Exhibit list; indeed, as former Special Agent Yum testified, he had, at the prosecutors' direction, commenced and completed the spreadsheet and the analysis *only after the trial had begun*.

The defense had not even been made aware of any bitcoin wallet analysis, let alone provided with related exhibits, until 10:17 p.m. the night of January 25, 2015, when a 3MB Excel spreadsheet containing the wallet analysis conducted by Yum was provided to defense counsel.   *See* Rule 33 Motion, at 14 (Docket#224). At that time the government notified defense counsel that the government intended to produce the spreadsheet as 3500 material, and was in the process of preparing a series of summary exhibits, based on the spreadsheet, to be introduced during Yum's testimony.   *Id*, at 15.[14]

Furthermore, in contrast to the inflexible standard imposed on Ulbricht, the government was permitted to elicit Yum's testimony, which included the voluminous spreadsheet and an extraordinarily complex analysis of millions of bitcoin addresses and sophisticated computer software.   The defense sought to call Antonopoulos for the purpose of countering the testimony of Yum, who admitted on cross that 60% of the work on the spreadsheet and analysis had been performed

---

[14]   A disk containing the documents that would ultimately become GX 650 and 651 was also first provided to defense counsel the night of January 25, 2015.

by a colleague with a doctorate in cryptology, who the government did not call as a witness at trial.   A553.

When defense counsel asked for a brief adjournment so that a proper cross-examination could be prepared on the materials underlying Yum's testimony, the Court refused.   Thus, it was the defense that was subject to "trial by ambush." A551.

**B.**     ***The Court Abused Its Discretion In Precluding the Two Defense Experts***

It is well established that precluding an expert witness constitutes reversible error if the proposed expert's testimony was critical to the defendant's case and could have produced a different outcome at trial.   *See e.g. Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense") (internal quotations marks and citations omitted); *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1932) (exclusion of evidence "amounts to constitutional error if it deprives the defendant of a fundamentally fair trial").   Whether exclusion of witness testimony constitutes reversible error rests on whether the omitted testimony "creates a reasonable doubt that did not otherwise exist."   *United States v. Agurs*, 427 U.S. 97, 112 (1976).

In addition, trial courts have broad discretion in fashioning a remedy for failures to comply with Rule 16.   Fed. R. Crim. P. Rule 16; *United States v.*

*Chavez*, 549 F.3d 119, 129 (2d Cir. 2008); *United States v. Thai*, 29 F.3d 785, 804 (2d Cir. 1994). The trial court's decisions in its choice of remedy is reviewed under the abuse of discretion standard, and is reversible error if it causes "substantial prejudice." *Thai*, 29 F.3d at 804; *see also Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213 (2d Cir. 2009).

Although trial courts are afforded deference in sanctioning of parties that do not comply with procedural rules, courts have noted that preclusion of evidence is an extreme remedy. *Hein v. Cuprum, S.A., De C.V.*, 53 Fed.Appx. 134, 137 (2d Cir. 2002) (commending trial judge for "appropriately us[ing] his discretion to steer a middle course between the *extreme* remedy of exclusion and the possibility of unfair prejudice to the plaintiff") (emphasis added); *Thai*, 29 F.3d at 806 (finding that "extreme sanction" of striking testimony from the record, is "the most severe remedy a court can impose short of declaring a mistrial") (quoting *United States v. Rodriguez*, 765 F.2d 1546, 1557 (11th Cir. 1985) (internal quotes omitted)).

In determining when the trial court's decision to preclude a witness constituted an abuse of discretion, four factors are considered:

> (1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to

84

> prepare to meet the new testimony; and (4) the
> possibility of a continuance.

*Zerega Ave. Realty Corp.*, 571 F.3d at 213.

Applying these four factors to the facts at hand, even assuming non-compliance with procedural rules, the Court's reliance on the extreme remedy of preclusion was an abuse of discretion.

As set forth above, the testimony of Dr. Bellovin became necessary during the course of trial because the defense was precluded from cross-examining Agent Kiernan on a number of subjects well within the scope of his direct examination. *See* **ante**, at 77. These subjects included the impact of certain lines of PHP computer code; the security implications of BitTorrent software on Ulbricht's laptop; and the general operation of linux-based operating systems (also present on the laptop).

Antonopoulos's testimony was necessary to counter Yum's testimony, which involved a huge spreadsheet and complex analysis of a large number of bitcoin transactions provided to the defense mere days before his testimony. The two experts' testimony was critical given the curtailment of cross-examination of Agent Kiernan and the complexity of Yum's testimony involving bitcoin forensics, as well as the timing of its production.

Additionally, the government, fully aware of the subjects the defense experts intended to cover through numerous sidebar discussions and letters to the Court, failed to articulate specific prejudice that would have resulted if the expert testimony had been admitted – particularly if the government were granted a continuance (to which the defense would have consented).

For example, in *United States v. Onumonu*, 967 F.2d 782, 784 (2d Cir. 1992), the defense to a charge of knowingly importing heroin into the United States, was that the defendant believed he was smuggling diamonds, and therefore lacked the requisite knowledge and intent. *Id.* Defendant proffered a gemologist's expert testimony on issues including the feasibility of smuggling diamonds by swallowing them, and their value. *Id.* at 785.

In *Onumonu*, this Court held that the refusal to allow the expert testimony was reversible error because "[a]t the end of the case, all [the defendant] had been able to present was his own belief about diamonds." *Id.* at 789. Furthermore, "[a] major thrust of the prosecutor's summation was that Onumonu's story was 'ludicrous,' with the government arguing that no one would smuggle diamonds in this fashion." *Id*.[15]

---

[15] As a result of the preclusion of the experts, the government was granted similar license during closing argument in this case. T.2154.

This Court found in *Onumonu* that the exclusion of the expert testimony was not harmless error because the defendant was deprived of "fair opportunity to present his case to the jury" and the exclusion may have had a "substantial effect on the jury's verdict." *Id.*; *see also United States v. McBride*, 786 F.2d 45, 49-50 (2d Cir. 1986) (reversing the defendant's conviction because the testimony of a psychiatrist – the only witness the defendant sought to present and who would have testified to the defendant's mental capabilities at the time of the crime – was excluded, despite being "critical to [the] defense").

Similarly, in *United States v. Dwyer*, 539 F.2d 924 (2d Cir. 1976), this Court reversed the exclusion of the defense's expert psychiatric testimony related to the role of mental disease or defect in criminal responsibility. *Dwyer*, 539 F.2d at 927.

Given that the defendant had admitted the criminal conduct alleged, expert testimony supporting the assertion that defendant suffered from mental disease or defect was "vital." *Id.* Therefore, the expert opinion would have "added to the lay testimony already before the jury" and possibly "produced a different verdict." *Id.* at 927-28. This Court reasoned that because the probative value of the evidence proffered was so great, it should not have been excluded "in the absence of a showing of unfair prejudice." *Id.* at 928 (citing *United States v. Mejia*, 529 F.2d 995, 996 (9th Cir. 1975)).

87

In a case with very similar facts to *Onumonu*, the defendant, charged with importing heroin, presented the defense that he believed he was smuggling gold dust. *United States v. Diallo*, 40 F.3d 31, 33-34 (2d Cir. 1994). The defendant was precluded from presenting the testimony of a commodities consultant regarding the profitability of smuggling gold dust into the country, and on general statistics of trading of precious metals. *Id.* at 34.

In *Diallo*, because the "critical fact in issue" was whether or not the defendant "actually knew" what he was smuggling, the exclusion of the expert's testimony deprived the defendant of a fair opportunity to present his case to the jury, as it left him with only his own testimony to support his defense. *Id.* at 35 (quoting *Onumonu*, 967 F.2d at 789). Depriving the defendant of this fair opportunity had a "substantial effect on the jury's verdict," and was therefore found *not* to be harmless. *Diallo*, 40 F.3d at 35 (quoting *Onumonu*, 967 F.2d at 789).

Particularly analogous to this case was the inequitable nature of the preclusion of the defense expert in *Diallo*, because, as this Court pointed out, the government was permitted in *Diallo* to call its own expert – a DEA agent – to establish an economic motive for the defendant to have smuggled heroin and the defense expert would have testified to the economic advantages of smuggling gold dust. 40 F.3d at 35.

In the final paragraph of its opinion, this Court found that "[h]aving allowed the government to call as an expert a DEA agent, who was surely *no more qualified* as an expert in heroin than [the defense's expert witness] was in gold, the district court should have accorded the defendant the same right." *Id.* (emphasis added). As this Court concluded, "[t]urnabout is fair play, even in the federal court." *Id.*

Accordingly, the preclusion of two defense experts at trial herein denied Ulbricht his Fifth and Sixth Amendment rights to present a defense. While the government was permitted to present testimony regarding extremely complicated processes outside the ken of the average juror, Ulbricht was denied the vital opportunity to challenge that testimony and evidence, some of which was generated and provided only mid-trial shortly before its admission, and therefore, the Court's preclusion of the two defense experts was an abuse of discretion. Accordingly, Ulbricht's convictions should be vacated, and a new trial ordered.

## POINT IV

**THE COURT ABUSED ITS DISCRETION IN PRECLUDING ADMISSION OF ANDREW JONES'S STATEMENT AGAINST PENAL INTEREST PURSUANT TO RULE 804(3)(b), FED.R.EVID., AND/OR RULE 807, FED.R.EVID.**

**A.**    *Pretrial Disclosure of Andrew Jones's Exculpatory Statement*

Just two weeks before trial commenced, the government wrote defense counsel December 29, 2014, to inform of a statement made by Andrew Jones, a/k/a "inigo," an administrator of the Silk Road site for a period in 2013 until its closure, and a cooperating government witness (charged in a separate indictment):

> [a]t some point in or about August or September 2013, Jones tried to authenticate that the Silk Road user "Dread Pirate Roberts" whom he was talking to at the time (via Pidgin chat) was the same person with whom he had been communicating in the past with this username. Previously, in or about October 2012, Jones and "Dread Pirate Roberts" had agreed upon a "handshake" to use for authentication, in which Jones would provide a certain prompt and "Dread Pirate Roberts" would provide a certain response.  When, during the 2013 chat in question, Jones provided what he believed to be the designated prompt, "Dread Pirate Roberts" was unable to provide the response Jones thought they had agreed on. However, later in the chat, Jones asked "Dread Pirate Roberts" to validate himself by specifying the first job that "Dread Pirate Roberts" assigned to him (running the "DPR Book Club"), which "Dread Pirate Roberts" was able to do.

A398.

That statement substantially buttressed the defense theory that there was more than one DPR, that DPR's identity changed over time, and that there was a change very close in time to Ulbricht's arrest – all supporting Ulbricht's defense that he had been framed by the genuine DPR.

**B.**    *The Trial Proceedings*

While Jones was included in the government's witness list, the government indicated during trial it would not call him.    A563.    As a result, the defense indicated its wish to call him, but Jones's lawyer informed defense counsel that Jones would not testify, and would instead assert his Fifth Amendment privilege. A1856.

Although the government initially agreed to stipulate to Jones's statement, the night before the defense sought to finalize and introduce the stipulation the government reneged at 11:00 p.m. (even though it had, in return for the agreement to stipulate, extracted a significant concession from the defense earlier that evening).    A564.    Consequently, the defense moved for admission of Jones's statement as a statement against penal interest pursuant to Rule 803(4), Fed.R.Evid., or in the interests of justice pursuant to Rule 807, Fed.R.Evid. (the "residual exception").    A564.    Ulbricht also moved for the statement's admission pursuant to the Fifth Amendment's Due Process guarantee.    *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

The Court denied the application to introduce Jones's statement, concluding it was not against penal interest because made while Jones was cooperating with the government, it was not sufficiently corroborated, and did not possess sufficient indicia of trustworthiness.   A581-583.

## C.    *The Court Abused Its Discretion In Precluding Admission of Jones's Statement Under Either Rule 804(3)(b) or Rule 807*

Jones's unavailability was established during the colloquy with the Court, A587-88, during which defense counsel relayed a conversation with Jones's attorney confirming that Jones would be asserting his Fifth Amendment privilege. *United States v. Chan*, 184 F.Supp.2d 337, 341 (S.D.N.Y. 2002) ("[a] witness need not be physically brought into court to assert the privilege; the . . . representation that the pleading defendants' lawyers had been contacted and . . . stated that his client would assert the Fifth Amendment privilege is sufficient"), *citing, United States v. Williams*, 927 F.2d 95, 98–99 (2d Cir. 1991).

Regarding Jones's statement, the Court found it was not against his penal interest, because he "was under a cooperation agreement at the time" the statement was made.   A589.   Although the Court relied on unspecified "case law," *id*., this Court, in fact, "frequently refrain[s] from articulating the limits of the 'against penal interest' requirement and instead decide[s] cases based on the corroboration

requirement[.]"  *United States v. Camacho*, 163 F.Supp.2d 287, 299 n.10 (S.D.N.Y. 2001) (collecting cases).

Here, Jones's cooperation did *not* affect his statement's character against his penal interest.   Cooperation agreements do not provide immunity, and regarding an offense involving nationwide, and even worldwide, illegal internet activity, prosecutions could very well occur in multiple jurisdictions.   In that context, of crucial importance is that the agreements explicitly binds only the signing parties, leaving cooperators exposed to prosecution for crimes confessed over the course of cooperation in any other jurisdiction (including states).   *See United States v. Fuller*, 149 F.Supp.2d 17, 22-23 (S.D.N.Y. 2001) (cooperator's agreement with state prosecutor did not bar federal prosecution nor prohibit use of cooperator's statements in federal prosecution, as agreement "is not the equivalent of an 'immunity order,' . . . binding on both the State and Federal Government").

Consequently, a cooperation agreement does not erase Fifth Amendment protections.   Indeed, if it did, Jones's invocation of the privilege at trial – a common occurrence for witnesses, including those who have cooperated but are not called at trial, and who have pleaded guilty but are awaiting sentencing – would not have been valid.   If his Fifth Amendment privilege survived his cooperation agreement, certainly his subsequent incriminating statements were contrary to his penal interest.

In addition, even with respect to the prosecuting office that signs the agreement, the formal written terms of cooperation provide only conditional protection against subsequent prosecution. If at any point the prosecuting office determines a cooperator has been untruthful or provided incomplete information, or has committed an additional crime (even if not prosecuted), the prohibition on prosecution by that office is void. *See United States v. Ming He*, 94 F.3d 782, 790 (2d Cir. 1996) ("government was in a position to impose grave penalties" if it determined that information was "incomplete or dishonest," meaning that "a breach by defendant amounted to a waiver of [his] Fifth Amendment privilege against self-incrimination").

In addition, cooperation agreements explicitly state that all information provided is available to the Court at sentencing, and may be considered as either relevant or other conduct when calculating the appropriate Guidelines range and the applicability of departures. For the same reason that the Fifth Amendment privilege against self-incrimination survives a guilty plea, in that subsequent statements can still adversely affect sentencing exposure, statements made subject to a cooperation agreement are against penal interest. *See Mitchell v. United States*, 526 U.S. 314, 326 (1999) ("[w]here the sentence has not yet been imposed a defendant may have a legitimate fear of adverse consequences from further

testimony"). Undoubtedly then, statements made during cooperation may certainly be against the declarant's penal interest.

The Court's further assessment of Jones's statement – that "the chat itself independently and in itself doesn't carry any particular penal impact" – improperly fails to consider the context of the statement, which implicates Jones in a worldwide criminal conspiracy. *See Williamson v. United States*, 512 U.S. 594, 603-04 (1994) ("whether a statement is self-inculpatory or not can only be determined by viewing it in context . . . [e]ven statements that are on their face neutral may actually be against the declarant's interest").

Also, regarding corroboration of the reliability of both the statement and the declarant, the Court concluded it was not "aware of [anything] that indicates the trustworthiness" of the statements. However, cooperation agreements provide a compelling, even overwhelming, motivation for candor because the limited immunity granted is entirely dependent on honest and complete disclosure. *See United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 85-86 (2d Cir. 2014) ("cooperation agreements generally contain so-called truth-telling provisions, which set out promises to testify truthfully as well as penalties for failure to do so, such as prosecution for perjury and reinstatement of any charges dropped pursuant to the deal") (internal quotations omitted).

Moreover, in its December 29, 2014, letter informing the defense of Jones's statement, the government provided more than sufficient corroboration.   While the government was "unaware of any extant record of the 2013 chat described by Jones . . . [t]here is a record of an October 2012 chat between [DPR] and Jones discussing a 'handshake' in the file labeled "mbsobzvkhwx4hmjt" on the defendant's computer . . . provided to the defense in discovery."   A398.

Thus, Jones's statement was more than adequately corroborated for purposes of both Rule 803(4) and Rule 807 (requiring "equivalent circumstantial guarantees of trustworthiness").   For that reason, and because the government chose mid-trial not to call a cooperating witness who asserted his Fifth Amendment privilege, thereby depriving the defense of his testimony, and further, at the last moment refused to fulfill an agreement to stipulate, admission of Jones's statement also satisfied the "interests of justice" criterion of Rule 807(C), as well as the Fifth Amendment Due Process guarantee, consistent with *Chambers*.

In denying admission of Jones's statement, the Court further decimated Ulbricht's defense just as it did with respect to the evidentiary rulings set forth **ante** in POINTs I, II, and III.   Accordingly, Jones's statement should have been admitted pursuant to Rule 803(4) and/or Rule 807, and the Court abused its discretion in excluding it.

**POINT V**

**THE COURT'S ERRONEOUS EVIDENTIARY RULINGS
CONSTITUTED CUMULATIVE ERROR THAT DEPRIVED
ULBRICHT OF DUE PROCESS AND A FAIR TRIAL**

While each of the series of evidentiary trial errors set forth above
individually are sufficient to warrant vacating Ulbricht's convictions and granting
him a new trial, cumulatively they require it. In combination, they served to
prevent Ulbricht from presenting any meaningful defense to the charges, and
permitted the government to argue that the defense theory was unsupported by
facts.

The concept of cumulative error is well established. As this Court noted in
*United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008), "[t]he Supreme Court
has repeatedly recognized that the cumulative effect of a trial court's errors, even if
they are harmless when considered singly, may amount to a violation of due
process requiring reversal of a conviction." *United States v. Al-Moayad*, 545 F.3d
139, 178 (2d Cir. 2008), *citing, Taylor v. Kentucky*, 436 U.S. 478, 487 n. 15
(1978), and *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973).

Similarly, the "'cumulative unfairness' doctrine is also firmly embedded" in
this Circuit. *Id*., *citing, United States v. Guglielmini*, 384 F.2d 602, 607 (2d Cir.
1967) (determining that, singly, the errors at trial would not require reversal, but
that "occurring at the same trial, the total effect of the errors . . . found . . . cast

97

such a serious doubt on the fairness of the trial that the convictions must be reversed").

Accordingly, the substantial accumulation of errors, as set forth **post** and **ante**, requires reversal here.

## POINT VI

### THE UNLIMITED SEARCHES AND SEIZURE OF ULBRICHT'S ENTIRE LAPTOP AND GMAIL AND FACEBOOK ACCOUNTS VIOLATED THE FOURTH AMENDMENT BECAUSE THEY CONSTITUTED THE FRUIT OF (A) A WARRANT THAT LACKED ANY PARTICULARITY; AND (B) UNLAWFUL AND <u>WARRANTLESS PEN REGISTER AND TRAP AND TRACE ORDERS</u>

A.     *The Search of Ulbricht's Laptop and Gmail and Facebook Accounts Violated the Fourth Amendment Because the Warrant Authorizing the Search Lacked Any Particularity*

As noted **ante**, Ulbricht moved prior to trial to suppress evidence recovered from his laptop seized from him at the time of his arrest, and his Facebook and Gmail accounts.   *See* Docket#46.   The search of Ulbricht's laptop violated the Fourth Amendment because the warrant authorizing the search lacked *any* particularity, but instead expressly and purposefully sought a search without any limiting principle.

1.     *The Unlimited Scope of the Warrants At Issue*

The warrants here represent the antithesis of "particularity" not only in execution, but also in design, language, and purpose.   For example, the warrant for

the laptop sought, and received, authorization to search for the following (with

only the most patently offending paragraphs cited herein):

> 44. The SUBJECT COMPUTER is also likely to contain evidence concerning ULBRICHT relevant to the investigation of the SUBJECT OFFENSES, including evidence relevant to corroborating the identification of ULBRICHT as the Silk Road user "Dread Pirate Roberts," including but not limited to:
>
> > a. any communications or writings by Ulbricht, which may reflect linguistic patterns or idiosyncracies associated with "Dread Pirate Roberts"[] or political/economic views associated with "Dread Pirate Roberts" *(e.g.,* views associated with the Mises Institute);
> >
> > c. any evidence concerning Ulbricht's travel or patterns of movement, to allow comparison with patterns of online activity of "Dread Pirate Roberts" and any information known about his location at particular times
> >
> > h. any other evidence implicating ULBRICHT in the SUBJECT OFFENSES.

S248-49(footnote omitted).

The deliberate intention to review *everything* was further manifest from

Attachment B to the warrant, which included authority to search the laptop for

> 2. Any evidence concerning ROSS WILLIAM ULBRICHT relevant to the investigation of the SUBJECT OFFENSES, including but not limited to:
>
> > a. any communications or writings by ULBRICHT;
> >
> > c. any evidence concerning ULBRICHT'S travel or patterns of movement;

S252-53.

Moreover, the warrants for Ulbricht's gmail and Facebook accounts were similarly without boundaries.   S311; S383.   Thus, the entirety of Ulbricht's private "papers," and more (*i.e.*, his internet history, political or other associations) were expressly targeted by the government.

## 2.     *The Court's Rationale for Denying Ulbricht's Motion to Suppress*

In denying Ulbricht's suppression motions, the Court held that the warrants for the laptop and the social media accounts were lawful because they were not general warrants and were supported by probable cause, and that pen register and trap and devices did not require a warrant because "the type of information sought in Pen-Trap orders 1, 2, 3, 4, and 5 was entirely appropriate for that type of order" and "[t]he Pen-Trap Orders do not seek the content of internet communications in any directly relevant sense."   A201, 203-04.

## 3.     *The Overriding Importance of the Particularity Requirement*

The critical importance of the particularity requirement in preserving Fourth Amendment rights and protections in the digital age has recently been recognized by this court.   In *United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013), the Court observed that

> [w]here, as here, the property to be searched is a computer hard drive, the particularity requirement assumes even greater importance. As numerous courts and commentators have observed, advances in

> technology and the centrality of computers in the lives of
> average people have rendered the computer hard drive
> akin to a residence in terms of the scope and quantity of
> private information it may contain.

*Id., at 447, citing, United States v. Payton, 573 F.3d* 859, 861 62 (9th Cir.2009) (

[t]here is no question that computers are capable of storing immense amounts of

information and often contain a great deal of private information.   Searches of

computers therefore often involve a degree of intrusiveness much greater in

quantity, if not different in kind, from searches of other containers) (other citation

omitted) (footnote omitted).   *See also United States v. Otero*, 563 F.3d 1127, 1132

(10th Cir. 2009); Orin S. Kerr, *Searches and Seizures in a Digital World,* 119 Harv.

L.Rev. 531, 569 (2005).

Indeed, last Fall the Court *en banc* considered the rehearing of the panel's

opinion in *Ganias*.   *United States v. Ganias*, 755 F.3d 125, 134 (2d Cir. 2014),

*reh'g en banc granted*, 791 F.3d 290 (2d Cir. 2015).   While the specific issue

relative to particularity is distinct herein – not retention and subsequent searching,

as in *Ganias*, but rather the absence of any particularity in the warrant – the Court's

*en banc* consideration nevertheless underscores the importance of the particularity

requirement, especially in the context of computers and digital evidence.

In fact, in *Ganias* and *Galpin* this Court has twice reversed convictions and

suppressed evidence because of violations of the particularity requirement.   In

*Ganias*, the panel noted that the particularity requirement makes general searches .

. . impossible because it prevents the seizure of one thing under a warrant

describing another. 755 F.3d at 135, *quoting, Galpin*, 720 F.3d at 446 (*quoting*

*Marron v. United States,* 275 U.S. 192, 196 (1927)) (internal quotation marks

omitted). That principle restricts the government's ability to remove all of an

individual's papers for later examination because it is generally unconstitutional to

seize any item not described in the warrant. *See Horton v. California,* 496 U.S.

128, 140 (1990).

### 4. *The Warrants At Issue Are Devoid of Particularity*

Nor is the protest here directed at the initial seizure of a hard drive by

imaging it for off-site review. The panel opinion in *Ganias* has already noted that

such a procedure is "constitutionally permissible." 755 F.3d at 135. Rather, it is

the lack of any limiting standards or procedures during that review. Indeed, the

language cited above from the applications and warrants manifests the opposite

intent: a detailed review of every piece of digital information.

In the digital/computer context, the panel in *Ganias* recognized that

"computer files may contain intimate details regarding an individual's thoughts,

beliefs, and lifestyle, and they should be similarly guarded against unwarranted

Government intrusion. If anything, even greater protection is warranted." *Id*., at

135, *citing* Kerr, *Searches and Seizures in a Digital World,* 119 Harv. L.Rev. at

569 (explaining that computers have become the equivalent of postal services, playgrounds, jukeboxes, dating services, movie theaters, daily planners, shopping malls, personal secretaries, virtual diaries, and more ).

*Ganias* followed *Galpin*, which explained that the purpose of the particularity requirement "is to minimize the discretion of the executing officer . . ." 720 F.3d at 446 n.5, and pointed out that "[m]indful of that purpose, . . . other Circuits have held that even warrants that identify catchall statutory provisions, like the mail fraud or conspiracy statutes, may fail to comply with this aspect of the particularization requirement." *Id.*, *citing United States v. Leary*, 846 F.2d 592, 594 (10th Cir.1988) (warrant authorizing search of export company's business records for violation of the Arms Export Control Act, 22 U.S.C. §2778, and the Export Administration Act of 1979, 50 U.S.C. App. §2410, held overbroad); *Voss v. Bergsgaard,* 774 F.2d 402 (10th Cir. 1985) (warrant specifying 18 U.S.C. §371, the general federal conspiracy statute, held overbroad); *United States v. Roche,* 614 F.2d 6, 8 (1st Cir. 1980) (concluding that a limitation of a search to evidence relating to a violation of 18 U.S.C. §1341, the general mail fraud statute, provides no limitation at all ).

Also, here the language of the governing statutes is not sufficiently precise to provide sufficient particularity; indeed, general statutes such 21 U.S.C. §841 and §848 are so broad and general that they exacerbate the problem. *See, e.g., United*

*States v. Maxwell*, 920 F.2d 1028, 1033 (D.C. Cir. 1990) (fraud); *United States v.*

*Holzman*, 871 1496, 1509 (9th Cir. 1989) (fraud); *United States v. Fucillo*, 808 F.2d

173, 176-77 (1st Cir. 1987). *See also United States v. George*, 975 F.2d 72, 76 (2d

Cir. 1992). Regardless, the terms of the warrants imposed no limitation at all on

the parameters of the searches.

In *Galpin*, the Court recounted that it has "emphasized that 'a failure to

describe the items to be seized with as much particularity as the circumstances

reasonably allow offends the Fourth Amendment because there is no assurance that

the permitted invasion of a suspect's privacy and property are no more than

absolutely necessary.' 720 F.3d at 446, *quoting, United States v. George,* 975

F.2d 72, 76 (2d Cir. 1992). *See also United States v. Vilar*, 2007 WL 1075041, at

*22-24 (S.D.N.Y. Apr. 4, 2007) (suppression granted because warrant, *inter alia*,

included an omnibus provision permitting seizure of "all corporate records").

In language particularly germane here, the Court in *Galpin* cautioned that

"[t]he potential for privacy violations occasioned by an unbridled, exploratory

search of a hard drive is enormous[,]" and that "[t]his threat is compounded by the

nature of digital storage." 720 F.3d at 446-47.[16] *See also United States v.*

---

[16] This Circuit has thus far declined to impose the type of search protocols enumerated by Judge Kozinski in his concurring opinion in *United States v. Comprehensive Drug Testing, Inc.,* 621 F.3d 1162, 1176 (9th Cir. 2010) (en banc) (per curiam). However, the Court in *Galpin* recognized "'a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant[,]'" and that "[t]his threat demands

*Abrams*, 615 F.3d 541, 543 (1ˢᵗ Cir. 1980) (warrant failed to satisfy particularity requirement because language was so amorphous that agents' discretion was unfettered).

In that context, the Court in *Galpin* instructed that upon remand "the district court's review of the plain view issue should take into account the degree, if any, to which digital search protocols target information outside the scope of the valid portion of the warrant.   To the extent such search methods are used, the plain view exception is not available."   720 F.3d at 451.

Here, again, no such limiting principles were instituted at all, and the warrants inverted the analysis in a manner that dissolves Fourth Amendment protections.   Rather than require the government to establish probable cause in advance of reviewing categories of electronic data, they would license the government to examine *every* file to assure that probable cause to seize it did *not* exist.   Any more dramatic or patent example of the "rummaging" could not be envisioned, yet that is what the government has done in this case with respect to Ulbricht's laptop and Gmail and Facebook accounts.[17]

---

a heightened sensitivity to the particularity requirement in the context of digital searches."   720 F.3d at 447-48, *quoting Comprehensive Drug Testing*, 621 F.3d at 1176, and citing *United States v. Burgess*, 576 F.3d 1078, 1091 (10th Cir. 2009) ( If the warrant is read to allow a search of all computer records without description or limitation it would not meet the Fourth Amendment's particularity requirement").

[17]   *See also* Kathleen Ridolfi, Tiffany M. Joslyn, and Todd H. Fries, *Material Indifference:   How Courts Are Impeding Fair Disclosure In Criminal Cases*, National

Nor do the warrants here permit mere "perusal" to determine relevance, as in *United States v. Mannino,* 635 F.2d 110, 115 (2d Cir. 1980) (quoting, *United States v. Ochs,* 595 F.2d 1247, 1257 n. 8 (2d Cir. 1979)), or seek merely a "cursory" review for purposes of determining relevance, as in *Andersen v. Maryland,* 427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976) ( [i]n searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized ).

Indeed, the government announced in the applications that it intended to perform various detailed analyses of the entirety of Ulbricht's communications and digital history.   That guaranteed that *every* piece of digital information would be subject to a detailed search in the absence of any probable cause to search any specific piece of electronically stored information.

Nor is the principle that a warrant can seek and seize "mere evidence" availing to the government with respect to these warrants.   *See Warden v. Hayden*, 387 U.S. 294 (1967).   *Warden* involved a discrete set of physical objects – clothing and weapons directly related to the offense charged – that were easily

---

Association of Criminal Defense Lawyers and The Veritas Initiative (Santa Clara University School of Law), November 17, 2014, at 12, available at <http://www.nacdl.org/discovery reform/materialindifference/> ("[e]ven if every nook and cranny of a digital device could *theoretically* contain evidence covered by the warrant, it does not mean that every nook and cranny may *reasonably* contain such evidence") (emphasis in original).

identifiable, not a fishing expedition into the entirety of someone's communications and research history.

Also, in *Warden* the Court cautioned that "[t]here must, of course, be a nexus – automatically provided in the case of fruits, instrumentalities or contraband – between the item to be seized and criminal behavior," in addition to the particularity requirement.   387 U.S. at 300, 309-10.

Regarding the social media accounts, in *In the Matter of the Search of Information Associated with [Redacted] @mac.comthat is Stored at Premises Controlled by Apple, Inc.*, 13 F.Supp.3d 157 (D.D.C. August 8, 2014), involving a warrant for certain emails, the Court emphasized that the particularity requirement "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."   *Id.*, at 163.

In *Apple*, the warrant was sufficiently particularized because it "[specified] in the attachments to its application the particular e-mails to be seized[,]" *id.*, at 164, and also included a precise temporal limitation.   *Id.*, at 161.   No such restrictions on the agents' discretion existed here, though.   *See United States v. Zemlyansky*, 945 F.Supp.2d 438, 457-60 (S.D.N.Y. 2013) (warrant invalid because, *inter alia*, it did not sufficiently particularize and failed to impose any temporal limitation on the items to be searched).

107

Here, because the warrants to search Ulbricht's laptop, as well as his Gmail and Facebook accounts, expressly – even deliberately – fail to adhere to the Fourth Amendment's particularity requirement, it is respectfully submitted that all evidence seized and/or searched pursuant to those warrants, and all the fruits therefrom, should be suppressed.

The Court also questioned whether Ulbricht possessed a "legally established" personal privacy interest in the laptop and the Google and Facebook accounts without a declaration of his possessory interest in the laptop and the Google and Facebook accounts.   A183.   However, not only did the government not contest Ulbricht's standing with respect to those searches, but the Court failed to cite any case law for that interpretation.   Ulbricht was in possession of the laptop at the time of his arrest and there was no factual dispute as to his possession of either the laptop, or the Facebook or Google accounts.

**B.**    ***The Pen Register and Trap and Trace Orders Were Unlawful***
***and Violated the Fourth Amendment Because They Required***
***a Warrant and Also Failed to Adhere to Statutory Limitations***

The Pen Register and Trap and Trace Orders used in this case were

implemented by court order and not by a warrant based on probable cause, and

consequently, for the reasons set forth below, they violated the Fourth Amendment

as well as the statutory framework under which they were obtained.   Accordingly,

all evidence acquired as a result of the Pen Registers and Trap and Trace devices,

and their fruits, should have been suppressed, and the Court's decision denying

Ulbricht's motion was erroneous.

**1.**    ***The Pen Register and Trap and Trace Orders***
***Were Unlawful Because They Required a Warrant***

The pen register and trap and trace Orders ("pen-trap") at issue herein

essentially requested the following:

> this Court has, upon the application of the United States
> of America, entered an Order authorizing agents of the
> Secret Service to direct COMCAST to install a trap and
> trace device to identify the source Internet protocol
> ("IP") address of any Internet communications directed
> to, and a pen register to determine the destination IP
> address of any Internet communications originating from,
> the following Internet user account controlled by
> COMCAST (the "TARGET ACCOUNT"), along with
> the date, time, duration, and port of transmission, but not
> the contents, of such communications (the "Requested
> Pen-Trap"), in connection with a criminal investigation.

S67.[18]

The pen-trap devices were used on routers, IP addresses, and MAC addresses.[19]  *See, e.g.*, S127.   Each of the Orders were for 60 days, although the full range of surveillance under the pen-trap orders lasted approximately two weeks.   The applications also claimed the pen-trap devices did not capture "content."   S85.

While ostensibly a pen-trap reveals only identifying information, these pen-traps had an ulterior purpose:   to track Ulbricht's internet activity and his physical location, in an effort to connect him with access to the administrative section of the Silk Road Servers at particular times on particular dates.   S245-46.

---

[18]   According to the applications for the pen-trap Orders,

> [a] "pen register" is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted."   18 U.S.C. § 3127(3).   A "trap and trace device" is defined as "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication."   18 U.S.C. § 3127(4).

S73.

[19]   According to the applications for the pen-trap Orders, "[e]very device on the Internet is identified by a unique number called and Internet Protocol ('IP') address.   This number is used to route information between devices, for example, between two computers.   Two computers must know each other's IP addresses to exchange even the smallest amount of information."   S128-29. A MAC address is "a unique identifier that is hard-coded into a computer that can be used to physically identify the computer (similar to a vehicle identification number of a car)."   S129-30.

That purpose extends well beyond that permissible for a pen-trap, and, because the devices were used absent a warrant based on probable cause, violates the Fourth Amendment as well as express statutory provisions.

### a. Smith v. Maryland *Does Not Control the Issue Herein*

In *Smith v. Maryland*, 442 U.S. 735 (1979), the Supreme Court held that a telephone subscriber does not have an expectation of privacy in the numbers he or she dials because the subscriber knows full well that the telephone company keeps records of that information (which the subscriber has at least tacitly "knowingly" provided to that third party). However, the pen-traps in this investigation are not the same as those at issue in *Smith* and, as a result, *Smith* should not control the outcome herein.

For example, in *Smith*, the Court noted in support of its reasoning that a pen register "does not indicate whether calls are actually completed." *Id*., at 736 n. 1, *quoting United States v. New York Tel. Co.*, 434 U.S. 159, 161 n. 1 (1977). *See also id*., at 741 ("law enforcement . . . could not even determine from a pen register whether a communication existed"). Also, the Court cited that "[n]either the purport of any communication between the caller and recipient of the call, their identities, nor whether the call was even completed is disclosed by pen registers." 442 U.S. at 741, *quoting, United States v. New York Tel. Co.*, 434 U.S. at 167.

Here, the pen-traps were implemented to do exactly what, "[g]iven a pen register's limited capabilities . . ." 442 U.S. at 742, the Supreme Court said the device could *not* constitutionally do, and thus insulated pen-traps from constituting an invasion of private communications. The pen-traps here were sought to confirm the laptop's connection to the Internet at specific times and dates, their duration, and the laptop's physical location when it logged on and off.

In *Smith*, the Court further based its decision on the fact that pen registers were "routinely used by telephone companies 'for the purpose of checking billing operations, detecting fraud, and preventing violations of law.'" 442 U.S. at 742, *quoting, New York Tel. Co.*, at 174-75. *See also, id*. (also "to check for a defective dial, or to check for overbilling") (citation omitted) (internal quotation marks omitted).

Again, the Internet provides an entirely different technical and privacy environment than a telephone circuit, particularly one in 1979. As explained by Julian Sanchez (Research Fellow at the Cato Institute and contributing editor at *Reason* magazine),

> the Internet functions quite differently from the
> traditional circuit-switched telephone network. On the
> phone network, a binary distinction between "content"
> and "metadata" works well enough: The "content" is
> what you say to the person on the other end of the call,
> and the "metadata" is the information you send to the
> phone company so they can complete the call. But the

Internet is more complicated.  On the Open Systems Connections model familiar to most techies, an Internet communication can be conceptualized as consisting of many distinct "layers," and a single layer may simultaneously be "content" relative to the layer below it and "metadata" relative to the layer above it.

*          *          *

The crucial point here is that the detailed "metadata" for a particular Internet communication, past the IP layer, typically wouldn't be processed or stored by the ISP in the way that phone numbers and other call data is stored by the phone company. From the ISP's perspective, all of that stuff is content.

*          *          *

Either way, the acquisition of "metadata" other than IP addresses from an ISP or off the backbone is pretty clearly dissimilar from the collection of call data at issue in *Smith* in every important respect. It is not information conveyed to the Internet provider for the purpose of routing the communication; it is routing information conveyed through the provider just like any other content. Nor is it information the Internet provider would otherwise normally retain for routine business purposes. Again, relative to the ISP, it's all just content.

Julian Sanchez, "Are Internet Backbone Pen Registers Constitutional?" *Just Security*, September 23, 2013, available at

<http://justsecurity.org/1042/internet-backbone-pen-registers-constitutional/>.

Courts have reached the same conclusion with respect to certain internet information that is captured by a pen-trap, particularly that employed here.  For

example, in *United States v. Forrester*, 512 F.3d 500 (9th Cir. 2007), the Court

postulated that

> [s]urveillance techniques that enable the government to
> determine not only the IP addresses that a person
> accesses but also the uniform resource locators ( URL )
> of the pages visited might be more constitutionally
> problematic.   A URL, unlike an IP address, identifies the
> particular document within a website that a person views
> and thus reveals much more information about the
> person's Internet activity.   For instance, a surveillance
> technique that captures IP addresses would show only
> that a person visited the New York Times' website at
> http://www.nytimes.com, whereas a technique that
> captures URLs would also divulge the particular articles
> the person viewed. ([I]f the user then enters a search
> phrase [in the Google search engine], that search phrase
> would appear in the URL after the first forward slash.
> This would reveal content . . . . ).

*Id.*, at 510 n. 6.   *See also, In re U.S. for an Order Authorizing the Use of a Pen*

*Register and Trap on [xxx] Internet Service Account/User Name*

*[xxxxxxx@xxx.com]*, 396 F.Supp.2d 45, 49 (D. Mass 2005)   ("[a] user may visit

the Google site. . . . [I]f the user then enters a search phrase, that search phrase

would appear in the URL after the first forward slash. This would reveal content . .

. .   The substance and meaning of the communication is that the user is conducting

a search for information on a particular topic") (internal quotation marks omitted).

Indeed, even senior government intelligence officials concede that metadata

*is* content.   *See, e.g.,* Spencer Ackerman, "NSA Review Panel Casts Doubt On

114

Bulk Data Collection Claims," *The Guardian*, January 14, 2014, available at

<http://www.theguardian.com/world/2014/jan/14/nsa-review-panel-senate-phone-d

ata-terrorism>   (quoting former Deputy CIA Director Mike Morrell's testimony

before the Senate Judiciary Committee that "[t]here is quite a bit of content in

metadata").

  That a privacy expectation in metadata is recognized by society as

reasonable is reinforced by the fact that, "in today's technologically based word, it

is virtually impossible for an ordinary citizen to avoid creating metadata about

himself on a regular basis simply by conducting his ordinary affairs[.]"   *ACLU v.

Clapper*, 785 F.3d 787, 794 (2d Cir. 2015); *see Klayman v. Obama*, 957 F.Supp.2d

1, 35-36 (D.D.C. 2013), *vacated and remanded on other grounds*, 800 F.3d 559

(D.C. Cir. 2015), *on remand*, No. CV 13-851 (RJL), 2015 WL 6873127 (D.D.C.

Nov. 9, 2015) ("the ubiquity of phones has dramatically altered the *quantity* of

information that is now available and, *more importantly*, what that information can

tell the government about people's lives. . . . it is . . . likely that these trends have

resulted in a *greater* expectation of privacy and a recognition that society views

that expectation as reasonable") (emphasis in original).   *See also Clapper*, 785

F.3d 794 ("[t]he more metadata the government collects and analyzes, . . . the

greater the capacity for such metadata to reveal ever more private and previously

unascertainable information about individuals").

115

Similarly, even more recently, in *United States v. Graham*, 796 F.3d 332

(4th Cir. 2015), *reh'g en banc granted,* 2015 WL 6531272 (4th Cir. Oct. 28, 2015),

the Fourth Circuit, responding to the government's argument that a third party's

possession (and even ownership) of the defendant's cell site location information

("CSLI"), eliminated a defendant's reasonable expectation of privacy, rejected the

argument that precedents like *Smith* and *United States v. Miller*, 425 U.S. 435

(1976), "categorically exclude third-party records from Fourth Amendment

protection." *Id*., at 354.

The Court in *Graham* explained that

> [e]xamination of a person's historical CSLI (cell site
> location information) can enable the government to trace
> the movements of the cellphone and its user across public
> and private spaces and thereby discover the private
> activities and personal habits of the user. *Cellphone
> users have an objectively reasonable expectation of
> privacy in this information*. Its inspection by the
> government, therefore, requires a warrant, unless an
> established exception to the warrant requirement applies.

*Id*., at 345 (emphasis added). *But see United States v. Davis*, 785 F.3d 498 (11th

Cir. 2015) (*en banc*).[20]

As the Court in *Graham* declared, "[w]e cannot accept the proposition that

cell phone users volunteer to convey their location information simply by choosing

---

[20]    In *Graham*, the Court nevertheless declined to suppress because the law enforcement
agents had relied in good faith on orders (rather than warrants) issued pursuant to the Stored
Communications Act (28 U.S.C. §2703).

116

to activate and use their cell phones and to carry the devices on their person." *Id*. at

356. *See also Clapper*, 785 F.3d at 822-23 ("rules that permit the government to

obtain records and other information that consumers have shared with businesses

without a warrant seem much more threatening as the extent of such information

grows"); *In re Application of the U.S. for an Order Authorizing the Release of*

*Historical Cell-Site Info*., 809 F.Supp.2d 113, 127 (E.D.N.Y.2011) ("[t]he fiction

that the vast majority of the American population consents to warrantless

government access to the records of a significant share of their movements by

'choosing' to carry a cell phone must be rejected").

More explicitly, Justice Sotomayor, in concurring in *United States v. Jones*,

132 S. Ct. 945 (2012) (Sotomayor, J., concurring), challenged the continued

vitality of the third-party records doctrine underlying *Smith*:

> [m]ore fundamentally, it may be necessary to reconsider
> the premise that an individual has no reasonable
> expectation of privacy in information voluntarily
> disclosed to third parties. *See, e.g., Smith* [*v. Maryland*]*,*
> 442 U.S. [735], 742 [(1979)]; *United States v. Miller,* 425
> U.S. 435, 443 (1976). This approach is ill suited to the
> digital age, in which people reveal a great deal of
> information about themselves to third parties in the
> course of carrying out mundane tasks.
>
> \*          \*          \*
>
> I for one doubt that people would accept without
> complaint the warrantless disclosure to the Government

> of a list of every Web site they had visited in the last
> week, or month, or year.

*Jones*, 132 S. Ct. at 957 (Sotomayor, J., concurring).

Accordingly, *Smith*, which describes a primitive methodology that bears little, if any, resemblance to what the pen-trap devices accomplished in this case, does not control the issue herein, and the information obtained here through warrantless pen-traps is protected under the Fourth Amendment, and falls within the warrant requirement.

**b.** ***The Pen-Trap Devices In This Case Required a Warrant Because They Captured Information About Ulbricht's Activities In His Home***

The pen-trap devices in this case required a warrant because they captured information about Ulbricht's activity within his residence. The devices act as a tracking device notifying law enforcement when a target is at home, and revealing when and how the target uses his computer at home. Thus, law enforcement was able to monitor Ulbricht's internet activity while in his home.

That places pen-trap devices in this case squarely within the jurisprudence of cases such as *United States v. Karo*, 468 U.S. 705 (1984) and *Kyllo v. United States*, 533 U.S. 27 (2001). In *Karo*, a beeper was used to track the movements of a chemical container to a home, and law enforcement continued to monitor the beeper inside the home. The Court found that intrusion "violate[d] the Fourth

118

Amendment rights of those who have a justifiable interest in the privacy of the residence" because it "reveal[ed] a critical fact about the interior of the premises . . . that [the government] could not have otherwise obtained without a warrant:  that a particular article is actually located at a particular time in the private residence and is in the possession of the person or persons whose residence is being watched."  468 U.S. at 715.[21]

Similarly, in *Kyllo v. United States*, 533 U.S. 27 (2001), the Court again found that the use of technology to reveal information about activity inside a private residence constituted a search under the Fourth Amendment.  The Court emphasized that "[w]here . . . the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant."  *Id*., at 40.  *See also, Florida v. Jardines*, __ U.S. __, 133 S. Ct. 1409 (2013).

In *Graham*, the Fourth Circuit employed precisely that analogy:  "[l]ike the searches challenged in *Karo* and *Kyllo*, examination of historical CSLI can allow

---

[21]    In *Karo*, the Court explained that "private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable." 468 U.S. at 714.  *See also id.*, at 716 ("[i]ndiscriminate monitoring of property that has been withdrawn from public view would present far too serious a threat to privacy interests in the home to escape entirely some sort of Fourth Amendment oversight");  *Graham*, 796 F.3d at 346, *reh'g en banc granted*, 2015 WL 6531272 (4th Cir. Oct. 28, 2015).

the government to place an individual and her personal property – specifically, her cell phone – at the person's home and other private locations at specific points in time." 796 F.3d at 346, *reh'g en banc granted*, 2015 WL 6531272 (4th Cir. Oct. 28, 2015); *State v. Earls*, 214 N.J. 564, 642 (2013); *Commonwealth v. Augustine*, 467 Mass. 230, 252-53 (2014).

**c.**    ***The Pen-Trap Devices In This Case Required a Warrant and/or Violated the Operative Statute Because They Captured Prospective Data and Information***

Another reason the pen-trap devices in this case required a warrant, and/or violated the operative statute, §3127, is because four such orders sought and obtained *prospective* data and information about Ulbricht's internet activity. *See, e.g.,* S66; S77; S92; S124.

While there has been a split among courts regarding the propriety of warrantless acquisition of prospective locating information, there is ample authority – even a likely majority – for the position that prospective information cannot be obtained absent probable cause (while the §3127 orders require only the lower standard of relevance). *Compare, e.g., In re Order Authorizing Prospective and Continuous Release of Cell Site Location Records*, 31 F.Supp.3d 889 (S.D. Tex. 2014); *In re Application of the United States for an Order Authorizing the Use of a Pen Register With Caller Identification Device Cell Site Location Authority on a Cellular Telephone*, 2009 WL 159187 (S.D.N.Y. Jan.13, 2009)

120

(denying application for prospective CSLI); *In re Application of the United States for an Order Directing a Provider of Electronic Communication Service to Disclose Records to the Government*, 534 F.Supp.2d 585 (W.D.Pa. 2008) (same); *In re Application of the United States for an Order Authorizing the Installation and Use of a Pen Register Device*, 497 F.Supp.2d 301 (D.P.R. 2007) (same) *with In re Application of the United States for an Order for Disclosure of Telecommunications Records and Authorizing the Use of a Pen Register and Trap and Trace*, 405 F.Supp.2d 435 (S.D.N.Y. 2005) (because location data is imprecise it does not necessarily implicate private space; third party doctrine applies to CSLI); *In re Application of the United States for an Order for Prospective Cell Site Location Information on a Certain Cellular Telephone*, 460 F.Supp.2d 448 (S.D.N.Y. 2006); *In re Application of the United States for an Order Authorizing the Use of a Pen Register and a Trap and Trace Device on Wireless Telephone Bearing Telephone Number [Redacted], Subscribed to [Redacted], Service by [Redacted]*, No. 08 MC 0595(JO), 2008 WL 5255815 (E.D.N.Y. Dec.16, 2008).[22]

**2.**   ***The Pen Register and Trap and Trace Devices Used In This Case Were Unlawful Because They Exceeded Statutory Authority***

Moreover, the use of the pen-trap devices to establish Ulbricht's internet activity in conjunction with his physical location is the functional equivalent of

---

[22]   The cited cases represent a sampling of decisions on both sides of the issue.

geo-locating, which could violate the Communications Assistance for Law

Enforcement Act ("CALEA"), which provides at 47 U.S.C. §1002(a), in the

context of requiring telecommunications carriers to make their equipment

accessible for government electronic surveillance, the following caveat: "with

regard to information acquired solely pursuant to the authority for pen registers and

trap and trace devices (as defined in 18 U.S.C. §3127), such call-identifying

information shall not include any information that may disclose the physical

location of the subscriber (except to the extent that the location may be determined

from the telephone number[.]"

Here, the pen-trap Orders were "hybrids," procured through a combination

of authorities – §3127 as well as 18 U.S.C. §2703(d) of the Stored

Communications Act ("SCA") – and were not authorized exclusively pursuant to

§3127.   However, that resort to the SCA constitutes mere semantics, and violates

the spirit of CALEA, which was designed to foreclose real-time locating (as

opposed to the SCA, which targets historical stored information).

Indeed, such "hybrids" have been disfavored by a number of courts.   *See,

e.g., In re Application*, 396 F.Supp.2d 747 (S.D. Tex. 2005);   *In re Application of

U.S. for Order*, 497 F.Supp.2d 301, 302 (D. Puerto Rico 2007) (rejecting

application by government for "orders under 18 U.S.C. §§2703 and 3122, . . .   for

the installation and use of pen register and trap and trace devices, Enhanced Caller

122

ID special calling features, and the capture of limited geographic or cell site

information, all for a period of sixty days from the date of the order").   *See also In*

*re Application*, 2006 WL 1876847 (N.D. Ind. July 5, 2006); *In re Authorizing the*

*Use of a Pen Register*, 384 F.Supp.2d 562, 564 *on reconsideration sub nom. In re*

*Application of the U.S. for an Order (1) Authorizing the Use of a Pen Register & a*

*Trap & Trace Device*, 396 F.Supp.2d 294 (E.D.N.Y. 2005) (initial case holds cell

site location information which the government seeks "*is* information that a pen

register or trap and trace device does, by definition, provide, but it is *not*

information that the government may lawfully obtain absent a showing of probable

cause");   *In re Applications of U.S. for Orders Authorizing Disclosure of Cell Cite*

*Info.*, 05-403, 2005 WL 3658531 (D.D.C. Oct. 26, 2005) (stating that Magistrate

Judges will not "grant applications for orders authorizing the disclosure of cell site

information pursuant to 18 U.S.C. § 2703, 18 U.S.C. §§ 3122 and 3123, or both"

absent new authority and ordering any such applications to be returned to the

attorneys).

        Also, courts have been unreceptive to applications for pen-traps used for the

purpose of ascertaining location.   *See In re U.S. for an Order: (1) Authorizing*

*Installation & Use of Pen Register & Trap & Trace Device; (2) Authorizing*

*Release of Subscriber & Other Info.*; (3) *Authorizing Disclosure of Location-Based*

*Servs.*No. 07-128, 2007 WL 3342243 (S.D. Tex. Nov. 7, 2007) (AUSA

"request[ed] an Order authorizing the [DEA] to require the [cell phone] Provider to disclose location-based data that will *assist law enforcement in determining the location of the Target Device*[,]" (emphasis added), prompting Court to conclude that "[t]he information that the Government seeks clearly attempts to identify the exact location of the Target Device (and presumably the person holding the Target Device), and thus requires a finding of probable cause"); *In re U.S. For an Order Authorizing the Disclosure of Prospective Cell Site Info.*, 412 F.Supp.2d 947, 958 (E.D. Wisc. 2006), *aff'd,* 06-MISC-004, 2006 WL 2871743 (E.D. Wis. Oct. 6, 2006) (disagreeing with a prior SDNY case, *In re Application of the United States of America for an Order for Disclosure of Telecommunications Records and Authorizing the Use of a Pen Register and Trap and Trace*, 405 F.Supp.2d 435 (S.D.N.Y.2005), that a pen-trap with some other authority like the SCA could be sufficient to allow for geo-locating, and stating that  "[t]he bottom line is that the array of statutes invoked by the issues in this case, *i.e*., the Pen/Trap Statute, the SCA, and CALEA present much more a legislative collage than a legislative mosaic.  If Congress intended to allow prospective cell site information to be obtained by means of the combined authority of the SCA and the Pen/Trap Statute, such intent is not at all apparent from the statutes themselves.").[23]

---

[23]   In addition, the applications for the pen-traps in this case did not reveal to the issuing magistrate judges the true purpose – attempting to ascertain Ulbricht's internet activity in conjunction with his physical location and administrative interaction on the Silk Road Servers –

# POINT VII

## THE LIFE SENTENCE IMPOSED ON ULBRICHT WAS PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE

**A.**     ***The Life Sentence Was Procedurally Unreasonable***

The life sentence the Court imposed on Ulbricht, including the consideration of six alleged overdose deaths as a factor at sentencing, was procedurally unreasonable and thereby violated Ulbricht's Fifth Amendment right to Due Process.

There were two facets to the Court's procedural error:   (1)   the Court erred in fashioning a legal standard, not apparently based on any procedural rule or precedent, "that the deaths, in some way, related to Silk Road," A1472, which required some undefined level of relationship between a criminal defendant and the harm (here, six deaths) in order to attribute that harm to the defendant as relevant conduct at sentencing;   and (2)   even if that vague standard was procedurally reasonable, the Court abused its discretion when it based its sentence, in part, on "clearly erroneous facts" – the six alleged overdose deaths that the government speculated were the result of drugs purchased on Silk Road, and which the Court found by a preponderance of the evidence were, "in some way, related to Silk Road" and therefore relevant to Ulbricht's conviction and sentence.   A1472.   *See*

---

beyond the rudimentary certification that the information sought was relevant to a criminal investigation of Ulbricht.   *See, e.g.*, S75, at ¶ 10.

*also United States v. Figueroa*, 647 F.3d 466, 469 (2d Cir. 2011), *quoting, United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) (*en banc*) (stating "[w]e review a criminal sentence for 'unreasonableness,' which 'amounts to review for abuse of discretion'"); *United States v. DeSilva,* 613 F.3d 352, 356 (2d Cir. 2010) (holding that "[p]rocedural error includes, among other things, selecting a sentence based on clearly erroneous facts").

Accordingly, Ulbricht's life sentence should be vacated and he should be remanded to a different judge for resentencing without the alleged overdose deaths as a factor at sentencing.

1. ***The Court Erred In Considering the Alleged Overdose Deaths Based on An Entirely Subjective, Undefined, and Unprecedented Standard***

At sentencing, the Court determined there was sufficient factual basis to consider as related conduct relevant to Ulbricht's sentencing, six alleged overdose deaths the government claimed resulted from drugs sold through Silk Road. A1472. Ulbricht opposed consideration of those accusations, and submitted a report by defense expert, Mark L. Taff, M.D., a Board-certified forensic pathologist, that concluded the information was utterly insufficient to attribute any of the deaths to drugs purchased from vendors on Silk Road. A904. The government did not present any rebuttal to Dr. Taff's report.

Prior to making its determination, the Court stated that "[a]ny factual determinations would be based on the standards set forth in a vast number of cases in the Second Circuit which indicate that such findings are made at sentencing proceedings or in connection with sentencing proceedings by a preponderance of the evidence." A1457. The Court then concluded that "[t]he question as to whether this information [the six alleged overdose deaths] is properly included in the PSR is whether the Court finds, by a preponderance of the evidence that the deaths, in some way, related to Silk Road. And they do." A1472.

Yet, while "preponderance of the evidence" is the established standard *of proof* for evaluating whether a disputed allegation should be included in the PSR.

127

the *legal* standard employed by the Court here– "that the deaths, in some way, related to Silk Road"– is not based on *any* established or cited precedent or procedural rule. Nor was it defined, or connected to any objective yardstick, but rather, was hopelessly vague.

As a result, the Court's invented standard does not meet the standard of procedural reasonableness, as it creates an entirely vague and subjective basis that defies meaningful consistency or review.

> **2.    The Court Improperly Relied on the Alleged
> Overdose Deaths Purportedly Attributable to
> the Silk Road Site Without Sufficient or Reliable Proof**

Moreover, even assuming *arguendo* the validity of the standard employed by the Court, the Court nonetheless abused its discretion and violated Ulbricht's Fifth Amendment right to Due Process at sentencing by relying on information regarding the alleged overdose deaths that, according to Dr. Taff's review of that information, was neither reliable nor accurate.

> **a.    The Relevant Case Law**

It is well-settled that "because sentencing is a critical stage in a criminal proceeding a convicted defendant standing before a sentencing judge still remains wrapped in his right to procedural due process . . . and may question the procedure leading to the imposition of his sentence." *United States v. Lee*, 818 F.2d 1052,

1055 (2d Cir. 1987), *citing, Mempa v. Rhay*, 389 U.S. 128 (1967); *Gardner v. Florida*, 430 U.S. 349, 358 (1977) (plurality opinion).

This Court has held that "[a]lthough the sentencing court has discretion to consider a wide range of information in arriving at an appropriate sentence, a defendant may not be sentenced on the basis of materially-untrue statements, or on misinformation or misreading of court records." *United States v. Prescott*, 920 F.2d 139, 143 (2d Cir. 1990), *citing Townsend v. Burke*, 334 U.S. 736, 741 (1948); *United States v. Tucker*, 404 U.S. 443, 446 (1972)) (internal quotations and citations omitted); *see also United States v. Lee*, 818 F.2d 1052, 1055 (2d Cir. 1987).

In order to ensure that a defendant's right to due process at sentencing is meaningful, "a sentencing court must assure itself that the information upon which it relies when fixing sentence is reliable and accurate." *Prescott*, 920 F.2d at 143, *citing, United States v. Pugliese*, 805 F.2d 1117, 1124 (2d Cir. 1986); *see also United States v. Fatico*, 458 F.Supp. 388, 397-398 (E.D.N.Y. 1978), *aff'd in part rev'd in part*, 603 F.2d 1053 (2d Cir. 1979), *citing, United States v. Malcolm*, 432 F.2d 809, 816 (2d Cir. 1970). Accordingly, the government shoulders the burden of demonstrating the reliability and accuracy of those facts alleged. *United States v. Fatico*, 603 F.2d 1053, 1057 (2d Cir. 1979).

**b.** ***The Court Improperly Relied on "Erroneous Facts"***
***In Considering the Alleged Overdose Deaths That***
***the Defense Expert Forensic Pathologist Concluded***
***Was Incomplete, Unreliable, and Inaccurate***

At Ulbricht's sentencing the Court abused its discretion when it relied on

information regarding the alleged overdose deaths that it knew, from Dr. Taff's

Expert Report, was incomplete and unreliable.

Indeed, though the Court posited that the "question is whether there is a

connection between the purchase of the drugs on Silk Road and the death . . . and

whether the ingestion of those drugs may be reasonably associated with those

deaths" and that it "c[ould] make such findings by a preponderance of the evidence

and c[ould] make reasonable inferences," the Court also admitted that Dr. Taff had

identified in his Final Report serious deficiencies in those allegations, and serious

impediments to relying on them.   A1476; S437.

The Court acknowledged that for each of the six deaths Dr. Taff "finds in

each instance information is missing regarding at least one stage of the six-stage

process."   A1475.   The Court also noted the unreliability of the alleged overdose

death evidence, referring to statements by Dr. Taff that "in some cases no autopsy

was performed and there was no cause of death that could be reliably be

determined[,]" that "without certain pieces of   information [that were missing

from the evidence presented], it is impossible for a medical examiner to render

certain types of opinions and . . . . that what are deemed overdoses may be death by suicide or other causes." A1476.

Likewise, the Court noted that based on the quality of the information presented, Dr. Taff had "opine[d] that he is unable to render opinions to a reasonable degree of medical certainty as to the cause, manner and time of death with each of the decedents except for [one]." A1476.

Yet the Court summarily dismissed these deficiencies in the information as beside the point, claiming that "Dr. Taff is asking a question which this Court does not need answered," despite receiving no contrary evidence or expert analysis from any other source. A1476. In fact, Dr. Taff's analysis establishes not only that the information was unreliable, but also that the Court's finding that the information established a "connection between the purchase of the drugs on Silk Road and the death[s]" and that "ingestion of those drugs may be reasonably associated with those deaths[]" was materially inaccurate. A1476.

In his Final Report, Dr. Taff made clear the full range of problems with the government's information, stating not only that he was "unable to render opinions to a reasonable degree of forensic medical certainty in 5 of 6 cases regarding cause, manner and time of death as well as several other forensic issues typically addressed by medical examiners investigating drug-related deaths" but also that his inability to render such opinions was due to "a) paucity of information; b)

confusing interpretations, selective/partial/incomplete diagnoses; c)   omissions;

and d)   inability to inspect original death   investigation and autopsy reports and

primary autopsy evidence."   S445.

Indeed, even the one death on which Dr. Taff was able to provide an

opinion, he "disagreed with the official version of [the] cause of death" because

"[i]n [his] opinion, the . . . forensic team failed to factor in the presence of other

drugs and a pre-existing heart condition into . . . cause of death."   A445-46.

Further, Dr. Taff noted that the fact that the decedent's "manner of death was

classified as an accident . . . indicates that local authorities had insufficient

evidence to criminally charge another person for contributing to or directly causing

[the] death."   *Id*., at A446.

Ultimately, "[u]nder the clearly erroneous standard of review . . . the

question for the reviewing court is . . . whether, on the entire record, it is left with

the definite and firm conviction that a mistake has been committed."

*Sherwin-Williams Co. v. New York State Teamsters Conference Pension and*

*Retirement Fund*, 969 F.Supp. 465, 472-473 (N.D. Oh. 1997), *citing Zenith Radio*

*Corp. v. Hazeltine Research, Inc*., 395 U.S. 100 (1969).

Here, given that even the Court acknowledged the shortcomings of the

overdose death allegations, including that certain critical information *was missing*,

the Court clearly erred by nonetheless relying on the unreliable accusations.

Accordingly, Ulbricht's sentence should be vacated, and the matter remanded for re-sentencing by a different judge untainted by the incurably prejudicial but unsubstantiated and unreliable allegations upon which the Court relied.

**B.**     ***The Life Sentence Was Substantively Unreasonable***

In assessing the substantive reasonableness of a sentence, the Court looks not only to whether "the trial court's decision can[] be located within the range of permissible decisions," but also "may consider whether a factor relied on by a sentencing court can bear the weight assigned to it . . . under the totality of circumstances in the case."   *United States v. Cavera,* 550 F.3d 180, 189 - 191 (2d Cir. 2008) (internal quotations omitted).

However, while significant deference is afforded the district court's reasoning and ultimate conclusion with respect to sentence, "several courts, including [this one] have cautioned against converting review for substantive reasonableness into a 'rubber stamp.'"   *United States v. Rigas*, 583 F.3d 108, 122 (2d Cir. 2009) (collecting cases); *see also United States v. Rattoballi*, 452 F.3d 127, 137 (2d Cir. 2006) ("[t]o the extent that the district court relied upon the history and characteristics of the defendant . . . , on this record, those considerations are neither sufficiently compelling nor present to the degree necessary to support the sentence imposed . . . [and] unjustified reliance upon any one factor is a symptom of an unreasonable sentence").

In particular, "[t]he closer a sentence comes to the boundary of the substantively reasonable, the more attentive will (and should) . . . procedural scrutiny be." *United States v. Ingram*, 721 F.3d 35, 45 (2d Cir. 2013) (Calabresi, J., concurring); *see also United States v. Aldeen*, 792 F.3d 247, 255-56 (2d Cir. 2015), as amended (July 22, 2015) (remanded "for a fuller record" because "even if [the defendant's] sentence does not *shock* the conscience, it at the very least stirs the conscience"), *citing, United States v. Ahuja*, 936 F.2d 85, 89 (2d Cir.1991) ("in cases where . . . the sentence imposed by the district court strains the bounds of reasonableness, remand for resentencing may well be warranted").

Falling squarely in the category of sentences that must be scrutinized carefully, and which certainly stir, if not shock the conscience, is the life sentence imposed here, if only because a life sentence is extremely rare in the federal system. *See e.g.* Glenn R. Schmitt & Hyun J. Konfrst, *Life Sentences in the Federal System*, United States Sentencing Commission (February 2015) (presenting collected national statistics on life sentences imposed in 2013, and noting as of January 2015, only 2.5% of all sentenced federal offenders are serving life sentences), available at <http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20150226_Life_Sentences.pdf>.

Of all federal offenders sentenced in 2013, only 153 (about 0.19%) were sentenced to life in prison, not including those who received such a lengthy sentence as to be serving a "de facto" life sentence. *See Life Sentences Report*, at 1. Of this minuscule percentage of offenders, only 17 (about 0.02% of all offenders) were subject to a Guidelines range in which life was *not* the minimum sentence prescribed. *See id*., at 9. Specifically with respect to drug trafficking cases, the number of offenders sentenced to life drops from 153 to only 64 defendants (about 0.08% of all federal offenders and less than 0.33% of all drug trafficking defendants). *See id*., at 4.

Here, the life sentence was substantively unreasonable for several reasons. The Court ignored the 99 letters on Ulbricht's behalf that apprised the Court of the positive contributions Ulbricht has made, and could make in the future if given a reasonable sentence, ignored the expertise of the forensic pathologist, and ignored the empirical and other academic and practical research presented in Ulbricht's sentencing submission, although some of that research was about Silk Road specifically, and its harm reduction effects on the drug culture. A904-910, 916-18, 929, 946, 951; A1006. Yet the Court instead defaulted to the outdated and now-failed narrative that more incarceration is the solution, which courts, politicians, and policy-makers have affirmatively abandoned. A1029-36; A1522-28. The Court relied on unsubstantiated, unquantifiable factors that

necessarily created an unwarranted – and unfair and unreasonable – disparity on a number of levels based on factors that render Ulbricht's sentence unique in its unreasonableness.

The Court's consideration of the alleged overdose deaths was substantively unreasonable as well as procedurally erroneous. In addition to ignoring the expert forensic pathologist, the Court penalized Ulbricht in a manner that even those who *sell* illegal drugs are not. The Court did not cite a single case – despite the defense's challenge to the government – in which even those who manage large tangible drug organizations are sentenced based on overdose deaths that are not part of the charges, much less any as tenuous and attenuated as those here.

Indeed, in *United States v. Peter Nash*, 13 Cr. 950 (TPG)*, the Honorable Thomas P. Griesa sentenced the defendant, Peter Nash, a/k/a Samesamebutdifferent, a forum moderator and one-time administrator on Silk Road during a time when Silk Road experienced its highest volume of sales, to "time served" – essentially a 14-month sentence. *See* Judgment, Docket#36, *United States v. Peter Nash*, 13 Cr. 950 (TPG). *See* Government's Sentencing Submission, ("Nash Sentencing Memo"), Docket#35, *United States v. Peter Nash*, 13 Cr. 950 (TPG), at 4, 7-8.

Nash pleaded guilty to conspiracy to sell drugs in an amount that made him subject to a ten-year mandatory minimum sentence pursuant to 21 U.S.C.

136

§841(b)(1)(A). *See* Nash Sentencing Memo, at 4. As a result, his base offense level was 36, just like Ulbricht's. *See id.*, at 5. *See also* PSR, ¶94. Yet even with multiple downward adjustments for his minor role and his safety valve proffer, Nash's adjusted Guidelines range was still 121-151 months. *See* Nash Sentencing Memo, at 5.

The government did not seek any enhancement for Nash for the deaths cited here, although Nash was involved with the site during a period in which five of the six deaths occurred. *See* Nash Sentencing Memo, at 4 & n.1. In fact, Nash's PSR clearly noted the drug-related deaths, as the government, in its submission, remarked that Nash involved himself with the Silk Road site with full knowledge of its activities and "with predictably harmful (and in some cases deadly) consequences, as the PSR makes clear." *Id.*, at 10.[24] Yet the Court summarily dismissed that sentence – imposed by a jurist with among the longest current active tenures.

---

[24] Two vendors on Silk Road who were the actual sellers of heroin and other drugs – one the leading seller on Silk Road and the other the largest cocaine seller on the site – have been sentenced and were also spared any liability for overdose deaths. In fact, their sentences were ten years and five years' imprisonment. Although they cooperated with the government, the disparity between their sentences and Ulbricht's cannot be rationalized by that factor alone. *See* James Cook, "The Biggest Drug Dealer on Silk Road Has Been Sentenced to 10 Years In Prison," *Business Insider*, May 29, 2015, available at <http://www.businessinsider.com/silk-road-drug-dealer-supertrips-sentenced-to-10-years-in-prison-2015-5?r=UK&IR=T>; Patrick Howell O'Neill, "The Dark Net's Cocaine King Just Got 5 Years Behind Bars," *The Daily Dot*, March 19, 2015, available at <http://bit.ly/1EyGMoN> <http://www.dailydot.com/crime/steven-sadler-silk-road-five-years-prison/>.

In addition to that dramatic disparity, Ulbricht did not sell drugs. Even assuming his guilt (for purposes of sentencing) he created an internet platform that enabled others to do so, and thus, the proper analogy would be to a landlord who knowingly leases space and collects rent and utility payments from tenants whom he knows sell drugs from the premises (and even whom he markets to). There is a federal statute punishing that conduct – 21 U.S.C. §856, the "crack house" law – and the maximum sentence is 20 years' imprisonment.

The Court also created an overwhelming disparity by its reliance on "general deterrence," which it said "plays a particularly important role" in this case, in part because the Court claimed it was unprecedented. A1532-33. Yet the Court again, without any contrary authority, dismissed all of the literature and studies presented to it on the subject – that general deterrence is illusory and should not be a factor, much less used as a basis for a life sentence. A1533.

Moreover, even if general deterrence were a proper factor in this case, it did not in any way justify a life sentence, but instead created a grotesque disparity. The Court did not provide any standard, or formula, and did not provide any gradation that would make a life sentence, as opposed to a term of years, appropriate or reasonable.

For instance, at what point does additional imprisonment for purposes of general deterrence lose its effectiveness, and become "greater than necessary"?

138

Why would a 20-year sentence not provide sufficient deterrence?   The Court

failed to perform any of that analysis.   *See United States v. Kim*, 896 F.2d 678,

685 (2d Cir. 1990).

Nor are the Court's assumptions at sentencing about general deterrence

borne out by either reality or empirical research.   The illusory nature of general

deterrence clearly holds true for internet drug sales, given that they skyrocketed

after Ulbricht's arrest and even after his conviction.   A1027-29.   Again, even if

there were some deterrent effect, the Court failed to provide any basis for a life

sentence as *necessary*.   Resort to general deterrence without any confining

principles – some standard, some comparative analysis – guarantees that it will

create disparity that is immeasurable and inequitable.

In this case, it was also unconscionable.   The life sentence imposed on

30-year old Ross Ulbricht "shocks the conscience" – or at the very least "stirs it" –

and is therefore substantively unreasonable.   Accordingly, Ulbricht should be

resentenced before a different judge to avoid the irremediable taint from the

improper factors the Court considered.

**Conclusion**

Accordingly, for all the reasons set forth above, it is respectfully submitted that Ulbricht's conviction should be vacated, and/or evidence derived from invalid warrants and pen trap orders should be suppressed, and/or Ulbricht should be remanded for resentencing before a different judge.

Dated:   12 January 2016
            New York, New York

                               Respectfully submitted,

                                 /S/ Joshua L. Dratel
                               JOSHUA L. DRATEL
                               JOSHUA L. DRATEL, P.C.
                               29 Broadway, Suite 1412
                               New York, New York 10006
                               (212) 732-0707

                               *Attorneys for Defendant Ross Ulbricht*

   – Of Counsel –

Joshua L. Dratel
Lindsay A. Lewis
Whitney G. Schlimbach
Joshua J. Horowitz

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)</u>

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 30,182 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

Respectfully submitted,

<u> /S/ Joshua L. Dratel      </u>
JOSHUA L. DRATEL
JOSHUA L. DRATEL, P.C.
29 Broadway, Suite 1412
New York, New York 10006
(212) 732-0707

*Attorneys for Defendant Ross Ulbricht*

SPECIAL APPENDIX

# **Table of Contents**

**Page**

Judgment of the United States District Court, Southern District
of New York, entered May 29, 2015, Appealed From .................  SPA1

Notice of Appeal, entered June 4, 2015 ...............................................  SPA10

SPAI

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>**v.** )<br>Ross William Ulbricht ) | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number: S1 14-cr-00068-KBF-1<br><br>USM Number: 18870-111<br><br>Joshua Dratel<br>Defendant's Attorney |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
    which was accepted by the court.

☑ was found guilty on count(s)   2,4,5,6,7
    after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21:841A=CD.F | AIDING AND ABETTING DISTRIBUTION OF DRUGS OVE | 10/31/2013 | 2 |
| 21:848.F | CONTINUING CRIMINAL ENTERPRISE | 10/31/2013 | 4 |
| 18:1030A.F | COMPUTER HACKING CONSPIRACY | 10/31/2013 | 5 |

    The defendant is sentenced as provided in pages 2 through   **9**   of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)    UNDERLYING    ☐ is  ☑ are  dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

Counts One (1) and Three (3) are vacated by the Court.

5/29/2015
Date of Imposition of Judgment

_K. B. Foe_
Signature of Judge

Katherine B. Forrest, USDJ
Name and Title of Judge

6/1/15
Date

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUN 01 2015

**SPA2**

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
             Sheet 1A

Judgment—Page ___2___ of ___9___

DEFENDANT:  Ross William Ulbricht
CASE NUMBER:  S1 14-cr-00068-KBF-1

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:1028A.F | FRAUD WITH IDENTIFICATION DOCUMENTS | 10/31/2013 | 6 |
| 18:1956-4999.F | MONEY LAUNDERING CONSPIRACY | 10/31/2013 | 7 |

**SPA3**

AO 245B   (Rev. 09/11) Judgment in Criminal Case
Sheet 2 — Imprisonment

| | |
|---|---|
| | Judgment — Page __3__ of __9__ |

DEFENDANT:  Ross William Ulbricht
CASE NUMBER:  S1 14-cr-00068-KBF-1

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

Counts Two (2) and Four (4): Life to run concurrently; Count (5): Five (5) Years to run concurrently; Count Six (6): Fifteen (15) Years to run concurrently; Count Seven (7): Twenty (20) Years to run concurrently.

☑ The court makes the following recommendations to the Bureau of Prisons:

PLEASE SEE ADDITIONAL IMPRISONMENT TERMS PAGE FOR RECOMMENDATIONS.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____  ☐ a.m.  ☐ p.m.  on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
           Sheet 2A — Imprisonment

Judgment—Page    4    of    9

DEFENDANT:  Ross William Ulbricht
CASE NUMBER:  S1 14-cr-00068-KBF-1

## ADDITIONAL IMPRISONMENT TERMS

It is respectfully recommended that the defendant be designated to FCI Petersburg I in Virginia in the event that the Bureau of Prisons waive the public safety factor with regard to sentence length. However, if the Bureau of Prisons is not inclined to waive the public safety factor, it is respectfully recommended that the defendant be designated to USP Tuscon, in Arizona, or, as a second choice, USP Coleman II, in Florida.

AO 245B     (Rev. 09/11) Judgment in a Criminal Case
            Sheet 3 — Supervised Release

Judgment—Page   5   of   9

DEFENDANT:  Ross William Ulbricht
CASE NUMBER:  S1 14-cr-00068-KBF-1

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

Life on Counts Two (2) and Four (4) to run concurrently; Three (3) Years on Counts Five (5), Six (6) and Seven (7) to run concurrently.

    The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☑ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.  *(Check, if applicable.)*

☑ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  *(Check, if applicable.)*

☑ The defendant shall cooperate in the collection of DNA as directed by the probation officer.  *(Check, if applicable.)*

☐ The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.  *(Check, if applicable.)*

☐ The defendant shall participate in an approved program for domestic violence.  *(Check, if applicable.)*

    If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

**SPA6**

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page ___6___ of ___9___

DEFENDANT:  Ross William Ulbricht
CASE NUMBER:  S1 14-cr-00068-KBF-1

## ADDITIONAL SUPERVISED RELEASE TERMS

The defendant shall submit his computer, person and place of residence to searched as deemed appropriate by the Probation Department.

SPA7

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
           Sheet 5 — Criminal Monetary Penalties

| | | | |
|---|---|---|---|
| | | Judgment — Page | 7 of 9 |

DEFENDANT:  Ross William Ulbricht
CASE NUMBER:  S1 14-cr-00068-KBF-1

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 500.00 | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**SPA8**

AO 245B   (Rev. 09/11) Judgment in a Criminal Case
Sheet 5A — Criminal Monetary Penalties
_____

Judgment—Page ___8___ of ___9___

DEFENDANT:  Ross William Ulbricht
CASE NUMBER:  S1 14-cr-00068-KBF-1

### ADDITIONAL TERMS FOR CRIMINAL MONETARY PENALTIES

Forfeiture in the amount of $183,961,921.00 is Ordered.

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
    Sheet 6 — Schedule of Payments

| | Judgment — Page | 9 | of | 9 |

DEFENDANT:  Ross William Ulbricht
CASE NUMBER:  S1 14-cr-00068-KBF-1

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☑ Lump sum payment of $ __500.00__ due immediately, balance due

   ☐ not later than _____ , or
   ☐ in accordance ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B ☐ Payment to begin immediately (may be combined with ☐C,  ☐ D, or  ☐ F below); or

C ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

   Defendant and Co-Defendant Names and Case Numbers *(including defendant number),* Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

Criminal Notice of Appeal - Form A

**NOTICE OF APPEAL**

**United States District Court**

Southern _____ District of New York _____

Caption:

United States _____
                                              v.

Ross William Ulbricht _____

Docket No.: 14 Cr. 68 (KBF) _____

Honorable Katherine B. Forrest _____
(District Court Judge)

Notice is hereby given that Ross William Ulbricht _____ appeals to the United States Court of
Appeals for the Second Circuit from the judgment ✓, other | ✓ and Preliminary Order of Forfeiture/Money Judgment
                                                                                                        (specify)
entered in this action on June 1, 2015 _____.
                                          (date)

This appeal concerns: Conviction only |____ Sentence only |____ Conviction & Sentence [ ✓ Other |____

Defendant found guilty by plea | | trial | ✓ | N/A | .

Offense occurred after November 1, 1987? Yes | ✓ ; No | N/A [

Date of sentence: May 29, 2015 _____ N/A |____ |

Bail/Jail Disposition: Committed | ✓ Not committed | | N/A |

Appellant is represented by counsel? Yes ✓ | No | If yes, provide the following information:

Defendant's Counsel: Law Offices of Joshua L. Dratel, P.C.

Counsel's Address: 29 Broadway, Suite 1412

New York, New York 10006

Counsel's Phone: (212)732-0707

Assistant U.S. Attorney: Serrin Turner

AUSA's Address: United States Attorney's Office, Southern District of New York

One Saint Andrews Plaza, New York, New York 10007

AUSA's Phone: 212-637-1946

Signature