A conspiracy claim is premised on an agreement between two or more people to achieve an unlawful end.  The Government alleges that by designing, launching, and administering Silk Road, Ulbricht conspired with narcotics traffickers and hackers to buy and sell illegal narcotics and malicious computer software and to launder the proceeds using Bitcoin.  There is no allegation that Ulbricht conspired with anyone prior to his launch of Silk Road.  Rather, the allegations revolve around the numerous transactions that occurred on the site following its launch.

The Government alleges that Silk Road was designed to operate like eBay:  a seller would electronically post a good or service for sale; a buyer would electronically purchase the item; the seller would then ship or otherwise provide to the buyer the purchased item; the buyer would provide feedback; and the site operator (i.e., Ulbricht) would receive a portion of the seller's revenue as a commission.  Ulbricht, as the alleged site designer, made the site available only to those using Tor, software and a network that allows for anonymous, untraceable Internet browsing; he allowed payment only via Bitcoin, an anonymous and untraceable form of payment.

Following the launch of Silk Road, the site was available to sellers and buyers for transactions.  Thousands of transactions allegedly occurred over the course of nearly three years – sellers posted goods when available; buyers purchased goods when desired.  As website administrator, Ulbricht may have had some direct contact with some users of the site, and none with most.  This online marketplace thus allowed the alleged designer and operator (Ulbricht) to be

anywhere in the world with an Internet connection (he was apprehended in California), the sellers and buyers to be anywhere, the activities to occur independently from one another on different days and at different times, and the transactions to occur anonymously.

A number of legal questions arise from conspiracy claims premised on this framework.  In sum, they address whether the conduct alleged here can serve as the basis of a criminal conspiracy – and, if so, when, how, and with whom.

Question One:  Can there be a legally cognizable "agreement" between Ulbricht and one or more coconspirators to engage in narcotics trafficking, computer hacking, and money laundering by virtue of his and their conduct in relation to Silk Road?  If so, what is the difference between what Ulbricht is alleged to have done and the conduct of designers and administrators of legitimate online marketplaces through which illegal transactions may nevertheless occur?

Question Two:  As a matter of law, who are Ulbricht's alleged coconspirators and potential coconspirators?  That is, whose "minds" can have "met" with Ulbricht's in a conspiratorial agreement?  What sort of conspiratorial structure frames the allegations:  one large, single conspiracy or multiple smaller ones?

Question Three:  As a matter of law, when could any particular agreement have occurred between Ulbricht and his alleged coconspirators?  Need each coconspirator's mind have met simultaneously with Ulbricht's?  With the minds of the other coconspirators?  That is, if Ulbricht launched Silk Road on Day 1, can he be said, as a matter of law, to have entered into an agreement with the user who

joins on Day 300?  Did Ulbricht, simply by designing and launching Silk Road, make an enduring showing of intent?

Question Four:  As a matter of law, is it legally necessary, or factually possible, to pinpoint how the agreement between Ulbricht and his coconspirators was made?  In this regard, does the law recognize a conspiratorial agreement effected by an end user interacting with computer software, or do two human minds need to be simultaneously involved at the moment of agreement?

Question Five:  If Ulbricht was merely the facilitator of simple buy-sell transactions, does the "buyer-seller" rule apply, which in certain circumstances would preclude a finding of a criminal conspiracy?

*******

The defendant also raises the following additional arguments with respect to Counts One, Two, and Three:  the rule of lenity, the doctrine of constitutional avoidance, the void-for-vagueness doctrine, constitutionally defective over-breadth, and a civil immunity statute for online service providers.  The Court refers to these collectively as the "Kitchen Sink" arguments.  While this is a case of first impression as to the charged conduct, the fact that the alleged conduct constitutes cognizable crimes requires no legal contortion and is not surprising.  These arguments do not preclude criminal charges.

With regard to Count Two, the defendant alleges that, as a matter of law, his conduct cannot constitute participation in a CCE (under the so-called "kingpin" statute).  The defendant argues that the Indictment fails to allege that he had the

4

requisite managerial authority in the conspiracy and that the Indictment fails to allege a sufficient "continuing series" of predicate violations. The Court disagrees and finds that the allegations in the Indictment are sufficient.

With regard to Count Three, the defendant contends that the allegations in the Indictment are insufficient to support the type of conduct covered by a computer hacking conspiracy. The defendant confuses the requirement for establishing the violation of the underlying offense with the requirements for establishing a conspiracy to commit the underlying offense; he finds ambiguity where there is none. The Government alleges a legally cognizable claim in Count Three.

Finally, with respect to Count Four, the defendant alleges that he cannot have engaged in money laundering because all transactions occurred through the use of Bitcoin and thus there was therefore no legally cognizable "financial transaction." The Court disagrees. Bitcoins carry value – that is their purpose and function – and act as a medium of exchange. Bitcoins may be exchanged for legal tender, be it U.S. dollars, Euros, or some other currency. Accordingly, this argument fails.

I.      THE INDICTMENT

Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). It need not contain any other matter not necessary to such statement. Id. ("A count may allege that the

means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means.").

An indictment must inform the defendant of the crime with which he has been charged. United States v. Doe, 297 F.3d 76, 87 (2d Cir. 2002). "By informing the defendant of the charges he faces, the indictment protects the defendant from double jeopardy and allows the defendant to prepare his defense." Id.; United States v. Dhinsa, 243 F.3d 635, 667 (2d Cir. 2001). Rule 7(c) is intended to "eliminate prolix indictments," United States v. Carrier, 672 F.2d 300, 303 (2d Cir. 1982), and "secure simplicity in procedure." United States v. Debrow, 346 U.S. 374, 376 (1953). The Second Circuit has "consistently upheld indictments that do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Walsh, 194 F.3d 37, 44 (2d Cir. 1999) (internal quotation marks and citation omitted); see also United States v. Cohen, 518 F.2d 727, 733 (2d Cir. 1975).

Nevertheless, "[a] criminal defendant is entitled to an indictment that states the essential elements of the charge against him." United States v. Pirro, 212 F.3d 86, 91 (2d Cir. 2000). "[F]or an indictment to fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury, the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime." Id. at 93.

"An indictment must be read to include facts which are necessarily implied by the specific allegations made." United States v. Stavroulakis, 952 F.2d 686, 693

6

(2d Cir. 1992) (internal quotation marks and citations omitted).  "[C]ommon sense and reason prevail over technicalities."  United States v. Sabbeth, 262 F.3d 207, 218 (2d Cir. 2001) ("[A]n indictment need not be perfect.").  While an indictment must give a defendant "sufficient notice of the core of criminality to be proven against him," United States v. Pagan, 721 F.2d 24, 27 (2d Cir. 1983) (citation omitted), the "'core of criminality' of an offense involves the essence of the crime, in general terms," and not "the particulars of how a defendant effected the crime."  United States v. D'Amelio, 683 F.3d 412, 418 (2d Cir. 2012) (citation omitted).

As with all motions to dismiss an indictment, the Court accepts as true the allegations set forth in the charging instrument for purposes of determining the sufficiency of the charges.  See United States v. Sampson, 371 U.S. 75, 78-79 (1962); United States v. Goldberg, 756 F.2d 949, 950 (2d Cir. 1985).

The Indictment here alleges that Ulbricht designed, created, operated, and owned Silk Road, "the most sophisticated and extensive criminal marketplace on the Internet."  (Ind. ¶¶ 1-3.)  Silk Road operated using Tor, software and a network that enables users to access the Internet anonymously – it keeps users' unique identifying Internet Protocol ("IP") addresses obscured, preventing surveillance or tracking.  All purchases occurred on Silk Road using Bitcoin, an anonymous online currency.

Silk Road allegedly functioned as designed – tens of thousands of buyers and sellers are alleged to have entered into transactions using the site, violating numerous criminal laws.  Over time, thousands of kilograms of heroin and cocaine

were allegedly bought and sold, as if the purchases were occurring on eBay or any other similar website.

Count One charges that, from in or about January 2011 up to and including October 2013, the defendant engaged in a narcotics trafficking conspiracy. To wit, "the defendant . . . designed [Silk Road] to enable users across the world to buy and sell illegal drugs and other illicit goods and services anonymously and outside the reach of law enforcement." (Ind. ¶ 1.) The defendant allegedly "controlled all aspects of Silk Road, with the assistance of various paid employees whom he managed and supervised." (Ind. ¶ 3.) "It was part and object of the conspiracy" that the defendant and others "would and did deliver, distribute, and dispense controlled substances by means of the Internet" and "did aid and abet such activity" in violation of the law. (Ind. ¶ 7.) The controlled substances allegedly included heroin, cocaine, and lysergic acid diethylamide ("LSD"). (Ind. ¶ 9.) The defendant allegedly "reaped commissions worth tens of millions of dollars, generated from the illicit sales conducted through the site." (Ind. ¶ 3.) According to the Indictment, the defendant "pursued violent means, including soliciting the murder-for-hire of several individuals he believed posed a threat to that enterprise." (Ind. ¶ 4.)

Count Two depends on the conduct in Count One. Count Two alleges that Ulbricht's conduct amounted, over time, to his position as a "kingpin" in a continuing criminal enterprise (again, "CCE"). (Ind. ¶ 12.) Ulbricht is alleged to have engaged in a "continuing series of violations" in concert "with at least five other persons with respect to whom Ulbricht occupied a position of organizer, a

supervisory position, and a position of management, and from which . . . Ulbricht obtained substantial income and resources." (Id.)

Count Three charges that Ulbricht also designed Silk Road as "a platform for the purchase and sale of malicious software designed for computer hacking, such as password stealers, keyloggers, and remote access tools." (Ind. ¶ 14.) "While in operation, the Silk Road website regularly offered hundreds of listings for such products." (Id.) The object of this conspiracy was to "intentionally access computers without authorization, and thereby [to] obtain information from protected computers, for purposes of commercial advantage and financial gain." (Ind. ¶ 16.)

Count Four alleges that Ulbricht "designed Silk Road to include a Bitcoin-based payment system that served to facilitate the illegal commerce conducted on the site, including by concealing the identities and locations of the users transmitting and receiving funds through the site." (Ind. ¶ 18.) "[K]nowing that the property involved in certain financial transactions represented proceeds of some form of unlawful activity," Ulbricht and others would and did conduct financial transactions with the proceeds of specified unlawful activity, "knowing that the transactions were designed . . . to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds." (Ind. ¶ 21.)

II.   THE LAW OF CONSPIRACY

   A.   Elements of a Conspiracy

"The essence of the crime of conspiracy . . . is the agreement to commit one or more unlawful acts." United States v. Praddy, 725 F.3d 147, 153 (2d Cir. 2013)

9

(emphasis in original) (citation omitted); see also Ianelli v. United States, 420 U.S. 770, 777 (1975) ("Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act."); United States v. Falcone, 311 U.S. 205, 210 (1940); United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1191 (2d Cir. 1989) ("The gist of conspiracy is, of course, agreement."); United States v. Rosenblatt, 554 F.2d 36, 38 (2d Cir. 1977). Put differently, a conspiracy is the "'combination of minds for an unlawful purpose.'" Smith v. United States, – U.S. – , 133 S.Ct. 714, 719 (2013) (quoting United States v. Hirsch, 100 U.S. 33, 34 (1879)).[2]

  1. Agreement

  A meeting of the minds is required in order for there to be an agreement. Krulewich v. United States, 336 U.S. 440, 447-48 (1949) (Jackson, J. concurring); Rosenblatt, 554 F.2d at 38. Two people have to engage in the "act of agreeing" in order for this requirement to be met. Rosenblatt, 554 F.2d at 38 (internal quotation marks and citation omitted). The conspirators must agree to the object, or unlawful end, of the conspiracy. Id. While the coconspirators need not agree to every detail, they must agree to the "essential nature" of the plan. Blumenthal v. United States, 332 U.S. 539, 557 (1947); Praddy, 725 F.3d at 153 (internal quotation marks and

---

[2] There is no overt act requirement to establish a violation of a drug conspiracy prosecuted under 21 U.S.C. § 846. See United States v. Shabani, 513 U.S. 10, 11 (1994); United States v. Anderson, 747 F.3d 51, 60 n.7 (2d Cir. 2014). Similarly, a conviction for conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) does not require proof of an overt act in furtherance of the conspiracy. Whitfield v. United States, 543 U.S. 209, 219 (2005).

citations omitted); United States v. Geibel, 369 F.3d 682, 689 (2d Cir. 2004) (internal quotation marks and citations omitted); Rosenblatt, 554 F.2d at 38.[3]

"It is not necessary to prove that the defendant expressly agreed with other conspirators on a course of action; it is enough, rather, to show that the parties had a tacit understanding to carry out the prohibited conduct." Anderson, 747 F.3d at 61 (internal quotation marks, alteration, and citation omitted). However, "a defendant's mere presence at the scene of a crime, his general knowledge of criminal activity, or his simple association with others engaged in a crime are not, in themselves, sufficient to prove the defendant's criminal liability for conspiracy." Id. (citations omitted).

2.  Object of the Conspiracy

To be convicted of a conspiracy, a defendant must know what "'kind of criminal conduct was in fact contemplated.'" Rosenblatt, 554 F.2d at 38 (quoting United States v. Gallishaw, 428 F.2d 760, 763 n.1 (2d Cir. 1970)). That is, the defendant has to know what the "object" of the conspiracy he joined was. A "general agreement to engage in unspecified criminal conduct is insufficient to identify the essential nature of the conspiratorial plan." Rosenblatt, 544 F.2d at 39. Indeed, "[t]he government must prove that the defendant agreed to commit a particular offense and not merely a vague agreement to do something wrong." United States v. Salameh, 152 F.3d 88, 151 (2d Cir. 1998) (citation and internal quotation marks omitted) (emphasis in original). That said, "[t]he government need not show that

---

[3] In Rosenblatt, the Second Circuit overturned a conspiracy conviction on the basis that while two individuals agreed to commit offenses against the United States, they did not agree to commit the same offenses and therefore were not conspirators. 554 F.2d at 40.

the defendant knew all of the details of the conspiracy, so long as he knew its general nature and extent." United States v. Huezo, 546 F.3d 174, 180 (2d Cir. 2008) (citation and internal quotation marks omitted).[4]

> 3.   Participation

The crime of conspiracy requires that a defendant both know the object of the crime and that he knowingly and intentionally join the conspiracy. United States v. Torres, 604 F.3d 58, 66 (2d Cir. 2010). The requisite knowledge can be proven through circumstantial evidence. Id.

The quantum of proof necessary at trial to sustain a finding of knowledge varies. "A defendant's knowing and willing participation in a conspiracy may be inferred from, for example, [his] presence at critical stages of the conspiracy that could not be explained by happenstance, . . . a lack of surprise when discussing the conspiracy with others, . . . [or] evidence that the defendant participated in conversations directly related to the substance of the conspiracy; possessed items important to the conspiracy; or received or expected to receive a share of the profits from the conspiracy." United States v. Aleskerova, 300 F.3d 286, 293 (2d Cir. 2002) (citations omitted). Indeed, under the appropriate circumstances, "[a] defendant's participation in a single transaction can suffice to sustain a charge of knowing

---

[4] A defendant may also be found culpable under the conscious avoidance doctrine. Under such circumstances, a crime's "knowledge element is established if the factfinder is persuaded that the defendant consciously avoided learning [a given] fact while aware of a high probability of its existence, unless the factfinder is persuaded that the defendant actually believed the contrary." United States v. Finkelstein, 229 F.3d 90, 95 (2d Cir. 2000). "The rationale for imputing knowledge in such circumstances is that one who deliberately avoided knowing the wrongful nature of his conduct is as culpable as one who knew." Id.

12

participation in an existing conspiracy." United States v. Zabare, 871 F.2d 282, 287 (2d Cir. 1989); see also United States v. Murray, 618 F.2d 892, 903 (2d Cir. 1980).

    B.    Types of Conspiracies

Conspiracies come in myriad shapes and sizes: from a small conspiracy involving two people to achieve a limited end to a large one involving numerous participants and with an expansive scope. Similarly, a defendant may participate in a single conspiracy or multiple conspiracies. Most questions as to size and number are left to trial. Here, the Court addresses these issues only insofar as they inform whether and how the Government might ultimately prove the conspiracies alleged in the Indictment.

"Whether the government has proven the existence of the conspiracy charged in the indictment and each defendant's membership in it, or, instead, has proven several independent conspiracies is a question of fact for a properly instructed jury." United States v. Johansen, 56 F.3d 347, 350 (2d Cir. 1995); see also United States v. Barret, 824 F. Supp. 2d 419, 445 (E.D.N.Y. 2011) (citing cases); United States v. Ohle, 678 F. Supp. 2d 215, 222 (S.D.N.Y. 2010); United States v. Rajaratnam, 736 F. Supp. 2d 683 (S.D.N.Y. 2010) (citing cases). Where an indictment charges a single conspiracy and the evidence later shows multiple conspiracies, the court will only set aside a jury's guilty verdict due to the variance if the defendant can show "substantial prejudice, i.e. that the evidence proving the conspiracies in which the defendant did not participate prejudiced the case against him in the conspiracy in which he was a party." Johansen, 56 F.3d at 351 (emphasis in original).

1.    Overview of Single Conspiracies

"[A]cts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." United States v. Aracri, 968 F.2d 1512, 1518 (2d Cir. 1992) (internal quotation marks and citations omitted).  In determining whether a single conspiracy involving many people exists, the question is whether there is a "mutual dependence" among the participants. Geibel, 369 F.3d at 692 (citation omitted); United States v. Williams, 205 F.3d 23, 33 (2d Cir. 2000).  The Government must show that each alleged member of the conspiracy agreed to participate "'in what he knew to be a collective venture directed towards a common goal.'" United States v. Eppolito, 543 F.3d 25, 47 (2d Cir. 2008) (quoting United States v. Berger, 224 F.3d 107, 114 (2d Cir. 2000)); see also Geibel, 369 F.3d at 692 (explaining that when two participants do not mutually benefit from the other's participation, a finding of a single conspiracy is less likely).

A "'single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more spheres or phases of operation, so long as there is sufficient proof of mutual dependence and assistance.'" Geibel, 369 F.3d at 689 (quoting Berger, 224 F.3d at 114-15).  Neither changing membership nor different time periods of participation by various coconspirators precludes the existence of a single conspiracy, "especially where the activity of a single person was 'central to the involvement of all.'" Eppolito, 543 F.3d at 48 (quoting United States v. Langford, 990 F.2d 65, 70 (2d Cir. 1993) (citations omitted)); United States v.

Jones, 482 F.3d 60, 72 (2d Cir. 2006) ("Changes in membership, differences in time

periods, and/or shifting emphases in the location of operations do not necessarily

require a finding of more than one conspiracy.").

The Second Circuit has outlined three "hypothetical avenues" for establishing a

single conspiracy:

> 1. The scope of the agreement was broad enough to include activities by or for
> persons other than the small group of core conspirators;
> 2. The coconspirators reasonably foresaw, "as a necessary or natural
> consequence of the unlawful agreement," the participation of others; or
> 3. "Actual awareness" of the participation of others.

Geibel, 369 F.3d at 690 (citing United States v. McDermott, 245 F.3d 133, 137-38

(2d Cir. 2001); United States v. Carpenter, 791 F.2d 1024, 1036 (2d Cir. 1986)).

Alternatively, a jury may find a single conspiracy provided "'(1) that the scope of the

criminal enterprise proven fits the pattern of the single conspiracy alleged in the

indictment, and (2) that the defendant participated in the alleged enterprise with a

consciousness as to its general nature and extent.'" Eppolito, 543 F.3d at 48

(quoting United States v. Rosa, 11 F.3d 315, 340 (2d Cir. 1993) (internal citation

omitted)).

> 2.    Types of Single Conspiracies

Courts often conceptualize single conspiracies using either a "chain" or a

"hub-and-spoke" metaphor.  United States v. Borelli, 336 F.2d 376, 383 (2d Cir.

1964).

a)   <u>Chain conspiracies</u>

A chain conspiracy refers to a situation in which there are numerous conspiring individuals, each of whom has a role in a "chain" that serves the conspiracy's object.  For example, in a narcotics conspiracy, a chain may be comprised of producers, exporters, wholesalers, middlemen, and dealers.  The success of each "link" in the chain depends on the success of the others, even though each individual conspirator may play a role that is separated by great distance and time from the other individuals involved.  <u>Id.</u>; <u>United States v. Mallah</u>, 503 F.2d 971, 984 (2d Cir. 1974); <u>United States v. Agueci</u>, 310 F.2d 817, 826 (2d Cir. 1962).[5]

For a chain conspiracy to exist, the ultimate purpose of the conspiracy must be to place the "forbidden commodity into the hands of the ultimate purchaser." <u>Agueci</u>, 310 F.2d at 826 (citation omitted).  This form of conspiracy "is dictated by a division of labor at the various functional levels." <u>Id.</u>  In <u>Agueci</u>, the Second Circuit found that "the mere fact that certain members of the conspiracy deal recurrently with only one or two other conspiracy members does not exclude a finding that they were bound by a single conspiracy." <u>Id.</u>  "An individual associating himself with a 'chain' conspiracy knows that it has a 'scope' and that for its success it requires an organization wider than may be disclosed by [one's] personal participation." <u>Id.</u> at 827.  That is, to support a chain conspiracy, a participant must know that combined efforts are required.  <u>Id.</u>

---

[5] The extreme ends of such a conspiracy – for instance, numerous narcotics dealers who each obtain the narcotics they sell from a single wholesaler or middleman – may have elements of a hub-and-spoke conspiracy.  <u>Borelli</u>, 336 F.2d at 383.

b)      Hub-and-spoke conspiracies

In a hub-and-spoke (or "wheel") conspiracy, one person typically acts as a central point while others act as "spokes" by virtue of their agreement with the central actor.  See Kotteakos v. United States, 328 U.S. 750, 754-55 (1946).  Put another way, in a hub-and-spoke conspiracy, "members of a 'core' group deal with a number of contacts who are analogized to the spokes of a wheel and are connected with each other only through the core conspirators."  United States v. Manarite, 448 F.2d 583, 589 (2d Cir. 1971).

To prove a single conspiracy in such a situation, the Government must show that there was a "rim" around the spokes, such that the "spokes" became coconspirators with each other.  To do so, the Government must prove that "each defendant . . . participated in the conspiracy with the common goal or purpose of the other defendants."  United States v. Taggert, No. 09 Cr. 984 (BSJ), 2010 WL 532530, at *1 (S.D.N.Y. Feb. 11, 2010) (internal quotation marks and citation omitted).

In the absence of such a "rim," the spokes are acting independently with the hub; while there may in fact be multiple separate conspiracies, there cannot be a single conspiracy.  See Zabare, 871 F.2d at 287-88; see also Dickson v. Microsoft Corp., 309 F.3d 193, 203 (4th Cir. 2002) ("A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other

than the common defendant's involvement in each transaction." (citing Kotteakos,

328 U.S. at 755)).

    C.    The Buyer-Seller Exception

    Of course, not all narcotics transactions occur within a conspiracy.  A

conspiracy to distribute narcotics does not arise between a buyer and seller simply

because they engage in a narcotics transaction.  That is, the mere purchase and sale

of drugs does not, without more, amount to a conspiracy to distribute narcotics.

See, e.g., United States v. Parker, 554 F.3d 230, 234 (2d Cir. 2009) (explaining that

the buyer-seller rule is a narrow one).  "[I]n the typical buy-sell scenario, which

involves a casual sale of small quantities of drugs, there is no evidence that the

parties were aware of, or agreed to participate in, a larger conspiracy."  United

States v. Hawkins, 547 F.3d 66, 71-72 (2d Cir. 2008) (citations omitted); see also

United States v. Mims, 92 F.3d 461, 465 (7th Cir. 1996) (clarifying that "a buyer-

seller relationship alone is insufficient prove a conspiracy"); United States v.

Medina, 944 F.2d 60, 65 (2d Cir. 1991); United States v. Valencia, 226 F. Supp. 2d

503, 510-11 (S.D.N.Y. 2002) (Chin, J.).  "It is sometimes said that the buyer's

agreement to buy from the seller and the seller's agreement to sell to the buyer

cannot 'be the conspiracy to distribute, for it has no separate criminal object.'"

Parker, 554 F.3d at 235 (quoting United States v. Wexler, 522 F.3d 194, 208 (2d Cir.

2008) (internal alterations omitted)).

    When wholesale quantities are involved, however, the participants may be

presumed to know that they are involved in a venture, the scope of which is larger

than the particular role of any individual.  Murray, 618 F.2d at 902; see also
Valencia, 226 F. Supp. 2d at 510-11.

> D.   The Role of Middlemen

In some cases involving narcotics trafficking, defendants are alleged to have
acted as middlemen.  Middlemen may be found to have conspired with a buyer, a
seller, or both.  United States v. Bey, 725 F.3d 643, 649 (7th Cir. 2013).  "Evidence
that the middleman had a clear stake in the seller's sales is typically sufficient to
permit the jury to infer the existence of an agreement with the seller."  Id. at 650;
United States v. Colon, 549 F.3d 565, 568-70 (7th Cir. 2008) (citations omitted).
There is no legal doctrine that defines a middleman as having a lesser role than
other conspiracy members.  Indeed, there is no legal reason why someone
characterized as a middleman cannot be a powerful, motivating force behind a
conspiracy.

III.   DISCUSSION OF CONSPIRATORIAL AGREEMENT

The Indictment alleges that Ulbricht designed Silk Road specifically to
enable users to anonymously sell and purchase narcotics and malicious software
and to launder the resulting proceeds.  On this motion to dismiss, the Court's task
is a narrow one – it is not concerned with whether the Government will have
sufficient evidence to meet its burden of proof as to each element of the charged
conspiracies at trial.  Instead, the Court is concerned solely with whether the nature
of the alleged conduct, if proven, legally constitutes the crimes charged, and

whether the defendant has had sufficient notice of the illegality of such conduct.

See D'Amelio, 683 F.3d at 418; Pagan, 721 F.2d at 27.

The defendant argues that Counts One and Three in the Indictment are legally insufficient for failure to allege a cognizable conspiratorial agreement. (Def.'s Reply at 2-3.)  He does not make the same argument with regard to Count Four, but certain aspects of the issue apply to that Count as well.

The Court has set forth five questions that concern the potential existence of a conspiratorial agreement in this case.  Each question is now taken up in turn.

> Question One:  Can there be a legally cognizable "agreement" between Ulbricht and one or more coconspirators to engage in narcotics trafficking, computer hacking, and money laundering by virtue of his and their conduct in relation to Silk Road?  If so, what is the difference between what Ulbricht is alleged to have done and the conduct of designers and administrators of legitimate online marketplaces through which illegal transactions may nevertheless occur?

The "gist" of a conspiracy charge is that the minds of two or more people met – that they agreed in some manner to achieve an unlawful end.  For the reasons explained below, the design and operation of Silk Road can result in a legally cognizable conspiracy.

According to the Indictment, Ulbricht purposefully and intentionally designed, created, and operated Silk Road to facilitate unlawful transactions.  Silk Road was nothing more than code unless and until third parties agreed to use it. When third parties engaged in unlawful narcotics transactions on the site, however, Ulbricht's design and operation gave rise to potential conspiratorial conduct.  The subsequent sale and purchase of unlawful narcotics and software on Silk Road may,

as a matter of law, constitute circumstantial evidence of an agreement to engage in such unlawful conduct. See United States v. Svoboda, 347 F.3d 471, 477 (2d Cir. 2003) ("A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct.") (internal quotation marks and citation omitted); United States v. Miranda-Ortiz, 926 F.2d 172, 176 (2d Cir. 1991) ("The defendant's participation in a single transaction can, on an appropriate record, suffice to sustain a charge of knowing participation in an existing conspiracy.") (citations omitted); United States v. Roldan-Zapata, 916 F.2d 795, 803 (2d Cir. 1990) (affirming the conviction of a defendant based on his admitted "involvement in narcotics dealing and [ ] a pattern of trafficking," combined with other circumstantial evidence). Additionally, the Indictment charges that Ulbricht obtained significant monetary benefit in the form of commissions in exchange for the services he provided via Silk Road. He had the capacity to shut down the site at any point; he did not do so. The defendant allegedly used violence in order to protect the site and the proceeds it generated.

Ulbricht argues that his conduct was merely as a facilitator – just like eBay, Amazon, or similar websites.[6] Even were the Court to accept this characterization of the Indictment, there is no legal prohibition against such criminal conspiracy charges provided that the defendant possesses (as the Indictment alleges here) the requisite intent to join with others in unlawful activity.

---

[6] While the defendant refers to Amazon and eBay as similar, there are certain important factual differences between them. For instance, Amazon has warehouses which may fulfill certain orders. Silk Road is not alleged to have ever possessed products for fulfillment.

21

Moreover, in this case, the charges in the Indictment go further than Ulbricht acknowledges. The Indictment alleges that Ulbricht engaged in conduct that makes Silk Road different from other websites that provide a platform for individual buyers and sellers to connect and engage in transactions: Silk Road was specifically and intentionally designed for the purpose of facilitating unlawful transactions. The Indictment does not allege that Ulbricht is criminally liable simply because he is alleged to have launched a website that was – unknown to and unplanned by him – used for illicit transactions. If that were ultimately the case, he would lack the <u>mens rea</u> for criminal liability. Rather, Ulbricht is alleged to have knowingly and intentionally constructed and operated an expansive black market for selling and purchasing narcotics and malicious software and for laundering money. This separates Ulbricht's alleged conduct from the mass of others whose websites may – without their planning or expectation – be used for unlawful purposes.

It is certainly true that the principles set forth in this Opinion would apply to other third parties that engaged in conduct similar to that alleged here; but it is also true that the essential elements for (by way of example) a narcotics conspiracy would be absent if a website operator did not intend to join with another to distribute (for instance) narcotics. Thus, administrators of an eBay-like site who intend for buyers and sellers to engage in lawful transactions are unlikely to have the necessary intent to be conspirators.

Question Two:  As a matter of law, who are Ulbricht's alleged coconspirators and potential coconspirators?  That is, whose "minds" can have "met" with Ulbricht's in a conspiratorial agreement?  What sort of conspiratorial structure frames the allegations:  one large single conspiracy or multiple small conspiracies?

The Indictment charges a single conspiracy in each of Counts One, Three, and Four.  Ulbricht's alleged coconspirators are "several thousand drug dealers and other unlawful vendors."  (Ind. ¶ 2.)  If these individuals possessed the requisite intent, there is no legal reason they could not be members of the conspiracies charged in the Indictment.

A more complicated question is whether any or all of Ulbricht's coconspirators also conspired with each other, so as to create a potentially vast single conspiracy.  In this regard, the Government may argue that the conspiracy was a "chain" conspiracy or that it was a "hub-and-spoke" conspiracy (in which case it would be necessary for the Government to prove the existence of a "rim").  Each approach has its own complexities regarding the (largely anonymous) inter-conspirator relationships on the Internet.  While this is not an issue the Government need address at this stage, see D'Amelio, 683 F.3d at 418; Pagan, 721 F.2d at 27, it will be relevant as the proof comes in at trial.

Of course, ultimately, the form of the conspiracy is not as important as a determination that at least one other person joined in the alleged conspiratorial agreement with Ulbricht.  With respect to the narcotics conspiracy charge, to prove that the drug types and quantities alleged in the Indictment were the objects of a conspiracy Ulbricht knowingly and intentionally joined, the Government will have

to prove either a single such conspiratorial agreement or an aggregation of

conspiracies.[7]  While, as explained, proof of participants' intent could involve

numerous complexities, these are issues for trial and not for this stage.

> Question Three:  As a matter of law, <u>when</u> could any particular agreement
> have occurred between Ulbricht and his alleged coconspirators?  Need each
> coconspirator's mind have met simultaneously with Ulbricht's?  With the
> minds of other coconspirators?  That is, if Ulbricht launched Silk Road on
> Day 1, can he be said, as a matter of law, to have entered into an agreement
> with the user who joins on Day 300?  Did Ulbricht, simply by designing and
> launching Silk Road, make an enduring showing of intent?

The issue here is one of temporal proximity.  For the sake of illustration,

assume that Ulbricht launched Silk Road on Day 1.  A narcotics trafficker posted

illegal drugs on the site on Day 2 and another posted on Day 300.  Does the Day 2

trafficker enter into a conspiratorial agreement with Ulbricht on Day 2 and the Day

300 trafficker on Day 300?  More importantly, can Ulbricht have agreed to a

conspiracy on Day 1 with an alleged coconspirator who, at that time, had not even

contemplated engaging in an unlawful transaction, and determined to do so only on,

for example, Day 300?[8]

One way of thinking about this issue is to look to the basic contract principles

of offer and acceptance.  On Day 1, according to the Indictment, Ulbricht "offers" to

work with others to traffic illegal narcotics, engage in computer hacking, and

launder money.  He makes this offer by creating and launching a website

specifically designed and intended for such unlawful purposes.  Ulbricht's continued

---

[7] There are additional complexities when other factors such as differences in types of drugs, temporal proximity, and the roles of coconspirators are taken into account.  These too are questions for trial.
[8] As suggested in connection with Question One, another question is whether the Day 2 and the Day 300 trafficker could ever enter into a conspiracy with each other.

operation of the site evinces an enduring intent to be bound with those who "accept" his offer and utilize the site for its intended purpose.  It is as though the defendant allegedly posted a sign on a (worldwide) bulletin board that said: "I have created an anonymous, untraceable way to traffic narcotics, unlawfully access computers, and launder money.  You can use the platform as much as you would like, provided you pay me a percentage of your profits and adhere to my other terms of service."  Each time someone "signs up" and agrees to Ulbricht's standing offer, it is possible that, as a matter of law, he or she may become a coconspirator.

To put this another way, the fact that Ulbricht's active participation may occur at a different point in time from the agreement by his coconspirator(s) does not render the conspiracy charges legally defective.  Courts have long recognized that members of a conspiracy may be well removed from one another in time.  See, e.g., Borelli, 336 F.3d at 383-84.  The law has similarly recognized that coconspirators need not have been present at the outset of a conspiracy in order to be found criminally responsible; they may join at some later point.  See, e.g., id.; United States v. Nersesian, 824 F.2d 1294, 1303 (2d Cir. 1987).  A lapse in time – in particular in a narcotics chain conspiracy, where a manufacturer creates a substance months prior to a wholesale or retailer selling it, not knowing (and perhaps never knowing) who, precisely, will ultimately distribute it – does not ipso facto render the alleged conspiracy defective as a matter of law.  Similarly, the law long ago accepted that coconspirators may not know each other's identity. Blumenthal, 332 U.S. at 557-58.  The alleged conduct here is another step along

25

this established path.  The common law anticipates and accepts application to new fact patterns.

> Question Four:  As a matter of law, is it legally necessary, or factually possible, to pinpoint how the agreement between Ulbricht and his coconspirators was made?  In this regard, does the law recognize a conspiratorial agreement effected by an end user interacting with computer software, or do two human minds need to be simultaneously involved at the moment of agreement?

Another issue raised by this case is whether a conspiratorial agreement may be effected through what are primarily automated, pre-programmed processes.  This is not a situation in which Ulbricht is alleged to have himself approved or had a hand in each individual transaction that occurred on Silk Road during the nearly three-year period covered by the Indictment.  Instead, he wrote (or had others write) certain code that automated the transaction.  Yet, as a legal matter, this automation does not preclude the formation of a conspiratorial agreement.  Indeed, whether an agreement occurs electronically or otherwise is of no particular legal relevance.

It is well-established that the act of agreeing, or having a meeting of the minds, may be proven through circumstantial evidence.  United States v. Rodriguez, 394 F.3d 539, 544 (2d Cir. 2004).  There is no requirement that any words be exchanged at all in this regard, so long as the coconspirators have taken knowing and intentional actions to work together in some mutually dependent way to achieve the unlawful object.  See Diaz, 176 F.3d at 97.  In this regard, "how" any agreement between two coconspirators may be proven at trial depends solely on the evidence presented.  See Anderson, 747 F.3d at 61.  Though automation may enable

a particular transaction to take place, it is the individuals behind the transaction that take the necessary affirmative steps to utilize that automation. It is quite clear, for example, that if there were an automated telephone line that offered others the opportunity to gather together to engage in narcotics trafficking by pressing "1," this would surely be powerful evidence of the button-pusher's agreement to enter the conspiracy. Automation is effected through a human design; here, Ulbricht is alleged to have been the designer of Silk Road, and as a matter of law, that is sufficient.[9]

> Question Five: If Ulbricht was merely the facilitator of simple buy-sell transactions, does the "buyer-seller" rule apply, which in certain circumstances would preclude a finding of a criminal conspiracy?

Ulbricht is not alleged to have been a buyer or seller of narcotics or malicious software. Following the design and launch of Silk Road, his role is alleged to have been that of an intermediary. While it will be for the Government to prove the defendant's specific role vis-à-vis his alleged coconspirators at trial, one issue that may arise is whether the participation of an intermediary could itself (all other factors remaining the same) eliminate the applicability of the "buyer-seller" rule to a given narcotics transaction involving a small quantities bought and sold on the site. In other words, can mere buyers and sellers of small quantities of narcotics –

---

[9] Acceptance of the terms of service, the payment of commissions, placing Bitcoins in escrow, and other intervening steps involved in the transactions that allegedly occurred on Silk Road could, in this regard, perhaps constitute evidence that Silk Road users entered into an unlawful conspiracy with Ulbricht (and others). It will be for the Government to prove which conduct in fact occurred, and how, at trial. See, e.g., United States v. Lorenzo, 534 F.3d 153, 161 (2d Cir. 2008) (noting that "a defendant's knowing agreement to join a conspiracy must, more often than not, be proven through circumstantial evidence" and there are "cases where the circumstantial evidence considered in the aggregate demonstrates a pattern of behavior from which a rational jury could infer knowing participation") (internal quotation marks and citations omitted).

who might not otherwise legally be coconspirators if the transactions occurred in the brick-and-mortar world – become conspirators due to the interposition of a website or website administrator?  Plainly, the level of involvement in any transaction by the website would be relevant.  And there are certainly instances in which the participation of three participants renders what might otherwise be a simple purchase or sale into a conspiracy.  See, e.g., Medina, 944 F.2d at 65.  There can be no hard and fast rule that answers this question – its ongoing relevance will depend on how the proof comes in at trial.

IV.   OTHER LEGAL ISSUES RAISED WITH REGARD TO COUNT ONE

The defendant argues that while Count One charges him with conspiracy to possess with intent to distribute various controlled substances (i.e., heroin, cocaine, and LSD), Ulbricht is not alleged to have himself been a buyer, seller, or possessor of any of the controlled substances at any point during the conspiracy.  (Def.'s Mem. at 9.)[10]  And, by alleging only that he designed, launched, and operated a website, the Government has not described the conduct of a coconspirator in a narcotics conspiracy.  (Id. at 10.)  At most, argues the defendant, the Government has alleged that Ulbricht has acted in a manner akin to that of a landlord, and the law is clear that merely acting as a landlord to drug dealers is itself insufficient to make one a coconspirator in narcotics transactions occurring on the premises.  (Id. at 10-13.)

---

[10] The defendant argues that imposing criminal liability for Ulbricht's alleged conduct would constitute "an unprecedented and extraordinarily expansive theory of vicarious liability." (Def.'s Mem. at 1.)  This is incorrect.  The Government alleges direct – not indirect – participation in the crimes charged.  The law of conspiracy (see supra) has long recognized the many varied roles participants may play.

According to the defendant, the statutory violation that occurs when one "knows" his premises have been or are being used for unlawful activities is either civil forfeiture pursuant to 21 U.S.C. § 881(a)(7) or the "crack house" statute passed by Congress in 1986, 21 U.S.C. § 856.  (Id. at 11.)  The statute outlaws the knowing operation, management, or leasing of premises where crack cocaine and other illicit drugs are manufactured, distributed, or used.  21 U.S.C. § 856(a).  The defendant argues that because Silk Road is, at most, a type of "premise" for the distribution of narcotics, he should have been charged under either §§ 881 or 856, not with a narcotics conspiracy under §§ 841 or 846.  (Def.'s Mem. at 12.)  Alternatively, the defendant argues that his conduct should be analogized to that of a "steerer" in a drug transaction, not a coconspirator.[11]  (Id. at 13.)

The defendant's arguments stem from an incorrect set of assumptions:  first, that conduct may constitute only one type of statutory violation or must seek civil forfeiture relief to the exclusion of criminal liability.  While the defendant may be chargeable with a violation of the "crack house" statute, he may well be chargeable with other crimes as well.  How a defendant is charged is within the discretion of the prosecution.  United States v. Batchelder, 442 U.S. 114, 124 (1974); United States v. Stanley, 928 F.2d 575, 580-81 (2d Cir. 1991).  Additionally, no legal principle prevents the Government from seeking to impose civil forfeiture along

---

[11] Conduct demonstrating that an individual merely helps a willing buyer find a willing seller, and is therefore acting as a mere "steerer," is, without more, insufficient to establish a conspiratorial agreement.  See United States v. Tyler, 758 F.2d 66, 69 (2d Cir. 1985); United States v. Hysohion, 448 F.2d 343, 347 (2d Cir. 1971).  However, when a defendant steers buyers to sellers as part of a continuing business arrangement, or is otherwise the "conduit" for the transaction, criminal liability may attach.  See, e.g., United States v. Vargas-Nunez, 115 F. App'x 494, 495-96 (2d Cir. 2004) (discussing defendant's purported role as a "steerer" in the sentencing context); United States v. Esadaille, 769 F.2d 104, 108-09 (2d Cir. 1985).

29

with criminal liability – and it is done all the time.  Here, in addition to criminal

conspiracy, the Government has separately sought civil forfeiture under 18 U.S.C. §

982(a)(1)(A), see Case No. 13-cv-6919 (JPO), as well as in the Indictment itself.

(Ind. ¶¶ 22-24.)

Nor is the Government limited to charging a violation of the "crack house"

statute simply because facilities (whether electronic or physical) are alleged to be at

issue.  It may well be that the Government could have charged such a violation –

but that does not mean it is necessarily limited to that.  When conduct allows for

multiple charges – as is alleged here – a court does not second guess which charge is

chosen.  See Stanley, 928 F.2d at 581.

In this case, the Government has alleged that more is in play than the

conduct which is encompassed by the "crack house" statute, or in the context of a

non-conspiratorial "steerer."  The Government has alleged that the defendant set up

a platform for illicit drug transactions designed with the specific needs of his buyers

and sellers in mind.  Thus, Ulbricht's alleged conduct is not analogous to an

individual who merely steers buyers to sellers; rather, he has provided the

marketing mechanism, the procedures for the sale, and facilities for the actual

exchange.  He is alleged to know that his facilities would be used for illicit purposes

and, in fact, that he designed and operated them for that purpose.  In this regard,

he is alleged to have "intentionally and knowingly" "combine[d], conspire[d],

confederate[d], and agree[d]" with others to violate United States criminal law.

(Ind. ¶ 5.)  Ulbricht's alleged conduct is more akin to a builder who designs a house

complete with secret entrances and exits and specially designed traps to stash drugs and money; this is not an ordinary dwelling, but a drug dealer's "dream house."

The defendant argues that Count One must be dismissed because he is not alleged to have distributed or possessed any controlled substance.  No such allegation is required.  The law of conspiracy recognizes that members of a conspiracy may serve different roles.  See United States v. Santos, 541 F.3d 63, 72 (2d Cir. 2008); United States v. Garcia-Torres, 280 F.3d 1, 4 (1st Cir. 2002) ("[A] drug conspiracy may involve ancillary functions (e.g., accounting, communications, strong-arm enforcement), and one who joined with drug dealers to perform one of those functions could be deemed a drug conspirator."); United States v. Burgos, 94 F.3d 849, 859 (4th Cir. 1996) (explaining that "a variety of conduct, apart from selling narcotics, can constitute participation in a conspiracy sufficient to sustain a conviction").  There are numerous examples of participants in narcotics conspiracies who did not themselves intend physically to possess or distribute narcotics; an individual may have been a middleman, the protective muscle, the lookout, a decoy, a person with information or contacts, etc. – in any event, the individual may nonetheless be found to be part of the conspiratorial enterprise.  See, e.g., United States v. Pitre, 960 F.2d 1112, 1121-22 (2d Cir. 1992) (affirming conviction of defendant where evidence revealed that defendant was acting as a lookout and was carrying a beeper to facilitate narcotics transactions); United States v. Barnes, 604 F.2d 121, 161 (2d Cir. 1979) (explaining that defendant's "actions as a 'middleman'

in three transactions . . . constituted sufficient evidence of knowledgeable participation in the operations of the conspiracy with an expectation of benefiting from them").

Finally, Ulbricht expresses surprise that the Government states in its opposition brief that by operating Silk Road, Ulbricht "entered into a joint venture with thousands of drug dealers around the world to distribute drugs online." (Gov't Opp'n at 9.) This characterization of the defendant's alleged conduct is substantively no different than the allegation in the Indictment that several thousand drug dealers and hundreds of thousands of buyers used the site. (Ind. ¶ 2.) However, the fact that such an allegation falls within a reasonable reading of the Indictment is a separate question from whether the Government will in fact be able to prove one joint venture or single conspiracy at trial. As noted above, proving that thousands of dealers were in a single joint venture together with each other as well as with Ulbricht presents numerous challenges due to temporal and other considerations.

Count One adequately alleges both the elements of a narcotics conspiracy as well as the conduct alleged underlying the charges; the defendant is sufficiently on notice of the charges against him so as to preclude later issues of double jeopardy.

V.    OTHER LEGAL ISSUES RAISED WITH REGARD TO COUNT TWO

Count Two alleges that the defendant's conduct amounted to participation in a CCE in violation of 21 U.S.C. § 848(a). As an initial matter, a "continuing criminal enterprise" requires a determination that a provision of the Controlled

Substances Act has been violated.  Ulbricht's liability under this provision is

therefore premised on a conviction on Count One, the narcotics conspiracy.  Next,

the trier of fact will need to determine if the violation of the Controlled Substances

Act (that is, the narcotics conspiracy) was one of a series of such violations.  21

U.S.C. § 848(c).  The law has defined "a series" as constituting at least three

violations.  See United States v. Flaharty, 295 F.3d 182, 197 (2d Cir. 2002)

(explaining that the Second Circuit has "interpreted 'a continuing series' to mean at

least three felony drug violations committed over a definite period of time") (citation

omitted).

Finally, Ulbricht must have undertaken this series of violations in concert

with five or more persons with respect to whom he occupied a position of organizer,

supervisor, or manager, and he must have obtained substantial income or resources

from such conduct.  21 U.S.C. § 848(c).

Ulbricht argues (1) that the Indictment fails to allege sufficiently that he

occupied the requisite position vis-à-vis five persons, and that, in this regard, the

Government has failed to allege (and could not allege) that he acted in concert with

the buyers and sellers on the site; and (2) that the Indictment fails to enumerate a

predicate series of violations.  (Def.'s Mem. at 13.)  Ulbricht is correct that Count

Two does not explicitly identify the five individuals whom he is alleged to have

organized, managed, or supervised.  He similarly is correct that the Government

has not specified the dates, times, or transaction details of the "series" of violations.

Nonetheless, the allegations of the Indictment are sufficient.  Paragraphs 11 and 12

recite the necessary statutory language to charge a continuing criminal enterprise; and the allegations set forth in Paragraphs 1 through 4 (which are incorporated by reference into Count Two) set forth necessary factual detail.

The law is clear that the Indictment should be read to incorporate those facts that while not explicitly stated, are implicit in the existing allegations.  United States v. Silverman, 430 F.2d 106, 111 (2d Cir. 1970).  In terms of the facts alleged, here the Indictment asserts that "several thousand drug dealers" and "well over a hundred thousand buyers worldwide" used the site.  (Ind. ¶ 2.)  With the "assistance of various paid employees whom he managed and supervised" (Ind. ¶ 3), Ulbricht is alleged to have controlled all aspects of Silk Road.

From these facts, the Government argues that by owning, operating, and controlling all aspects of the operation of the site (Ind. ¶¶ 2-3), Ulbricht occupied the necessary position as organizer, manager, or supervisor of the "vendors selling drugs on the site."  (Gov't Opp'n at 15.)  Ulbricht is alleged not only to have designed the online structure which enabled and allowed transactions, but, in controlling all aspects of its operations, to have set the rules the vendors and buyers had to follow, policed accounts for rule violations, determined commission rates, and taken commissions on every transaction.  In addition, Ulbricht allegedly oversaw the efforts of others who assisted him in the administration and operation of the site.  Thus, the Government contends that it has set forth sufficient allegations of Ulbricht's occupying the requisite position as organizer, manager, or supervisor. This Court agrees.

The "continuing criminal enterprise" statute is broadly worded – and broadly intends to encompass those who are leaders of a criminal enterprise which engages in a series of violations of the narcotics laws.  See United States v. Scarpa, 913 F.2d 993, 1007 (2d Cir. 1990) (explaining that the operative words in the statute – "organize," "manage," and "supervise" – should be given their ordinary, everyday meanings) (citation omitted).  That is precisely what the Government has alleged here.  The statute does not require that Ulbricht have had a particular form of contact with each of the five or more individuals that he purportedly organized, managed, or supervised.  United States v. Cruz, 785 F.2d 399, 407 (2d Cir. 1986); see also United States v. Joyner, 201 F.3d 61, 71 (2d Cir. 2000) (affirming a conviction where a defendant sold to otherwise independent resellers but required them, inter alia, to obtain permission from him to discount their prices and sell in certain locations so that he could monitor their activity).

Here, Ulbricht also argues that he cannot have had the requisite role with respect to individuals who merely assisted him with administering the site.  (Def.'s Mem. at 15.)  This, however, is a question of fact, not law.  Whether those who assisted Ulbricht had the requisite mental state to be acting "in concert" with him is a factual inquiry.  If those who assisted Ulbricht had the requisite state of mind, there is no legal reason why they could not constitute the necessary group of "five or more."

Ulbricht argues that he cannot separately have had the requisite position vis-à-vis the buyers and sellers, as they are referred to as having "used" the site, and

not, for instance, as employees. (Ind. ¶ 2).[12]  In this regard, the defendant argues that, at most, his alleged conduct amounted to his being a conduit or facilitator for those engaging in illegal activity.  This is, again, a factual argument cast as a legal one.  There is no legal reason why one who designs, launches, and operates a website or any facility for the specific purpose of facilitating narcotics transactions that he knows will occur, and acts as the rule-maker of the site – determining the terms and conditions pursuant to which the sellers are allowed to sell and the buyers are allowed to buy, taking disciplinary actions to protect that enterprise (allegedly including murder-for-hire on more than one occasion) – could not be found to occupy the requisite position.  See Cruz, 785 F.2d at 407 (no distinction between salaried employees and independent contractors).  In this regard, the allegations amount to Ulbricht acting as a sort of "godfather" – determining the territory, the actions which may be undertaken, and the commissions he will retain; disciplining others to stay in line; and generally casting himself as a leader – and not a service provider.  Again, whether the Government can prove the facts alleged is not a question at this stage of the proceedings.

Ulbricht also argues that Count Two fails to allege the specific series of continuing violations.  The Indictment does allege thousands of separate transactions.  (Ind. ¶ 2.)  The type of specificity the defendant urges is not required.  Flaharty, 295 F.3d at 197 (granular particularity not required).  The Government need not enumerate the specific who, when, or where of the series in the

---

[12] Ulbricht also argues that he cannot have engaged in a CCE merely by aiding and abetting drug dealers.  This is not, however, the Government's allegation.  The Government contends that Ulbricht was the leader of a vast criminal enterprise.

Indictment; it is enough that it is clear from the face of the Indictment that he is alleged to have engaged in a continuing series of narcotics conspiracies punishable under 21 U.S.C. §§ 841, 843, 846.  (Ind. ¶ 12).  See United States v. Simmons, 923 F.2d 934, 952 (2d Cir. 1991).

## VI.   OTHER LEGAL ISSUES RAISED WITH REGARD TO COUNT THREE

The defendant argues that the allegations in the Indictment are insufficient to support the type of conduct covered by a computer hacking conspiracy in 18 U.S.C. § 1030 (the "Computer Fraud and Abuse Act").  (Def.'s Mem. at 21.) According to the defendant, the allegations are "only that the Silk Road website 'provided a platform for the [exchange] of malicious software.'"  (Id. (quoting a portion of the Indictment at ¶¶ 15-16).)

The Indictment in fact alleges more.  It alleges that "Silk Road . . . provided a platform for the purchase and sale of malicious software designed for computer hacking, such as password stealers, keyloggers, and remote access tools.  While in operation, the Silk Road website regularly offered hundreds of listings for such products."  (Ind. ¶ 14.)  It also alleges that the defendant conspired with others to "intentionally access computers without authorization, and thereby would and did obtain information from protected computers, for commercial advantage and private financial gain."  (Ind. ¶ 16.)

The defendant correctly states that to establish a violation of 18 U.S.C. §1030(a)(2)(C) requires "proof that the defendant intentionally accessed information from a protected computer."  United States v. Willis, 476 F.3d 1121, 1125 (10th Cir.

2007). However, the defendant incorrectly extends this to the requirements for sufficiently alleging a computer hacking <u>conspiracy</u>. At this stage, such a claim requires not proof – as the defendant argues (<u>see</u> Def.'s Mem. at 22) – but rather, only allegations that the defendant <u>agreed</u> with another to "(1) intentionally access[] a computer, (2) without authorization . . . (3) and thereby obtain[] information." <u>Willis</u>, 476 F.3d at 1125. As with any conspiracy, the actual success or failure of the venture is irrelevant. <u>See</u> <u>United States v. Perry</u>, 643 F.2d 38, 46 (2d Cir. 1981) ("It is unnecessary to show that the conspiracy actually aided any particular sale of heroin since a conspiracy can be found though its object has not been achieved.").

It is, of course, axiomatic – as set forth at length above – that to charge a conspiracy the Government must allege that two or more people agreed to achieve an unlawful end. <u>See</u> <u>Stavroulakis</u>, 952 F.2d at 690. Each conspirator must knowingly and intentionally enter the conspiracy, <u>Torres</u>, 604 F.3d at 66, though it is common for coconspirators to have different roles. <u>See, e.g.</u>, <u>United States v. Sanchez</u>, 925 F. Supp. 1004, 1013 (S.D.N.Y. 1996) ("There are many roles in a conspiracy.").

The defendant argues that the Government's charge must fail as it relies upon a concept of "transferred intent" – that is, that Ulbricht himself is not alleged to have had the intent to obtain unauthorized access, but only to have conspired with another who did. (Def.'s Reply at 13.) According to Ulbricht, he could not know the buyer's intent. (<u>Id.</u>)

As an initial matter, the law of conspiracy does not require that <u>both</u> participants intend to access a computer – but they must both intend that one of them will. Questions as to how the Government will prove its case as to the buyer's intent are reserved for trial.[13]

Ulbricht also argues that the statutory term "access without authorization" is undefined. (Def.'s Mem. at 39-41 (discussing § 1030(a)(2)(C).) Describing the 1996 amendments to the statute and the addition of the term "any" to unauthorized access of computers over the Internet, the defendant argues that the "ubiquitous use of computers, smartphones, tablets, or any other Internet-enabled device in today's world" places special emphasis on the meaning of the word "authorization" and may criminalize a broad amount of routine Internet activity. (<u>Id.</u> at 41.) The Government counters this argument only in a footnote. (Gov't Opp'n at 31 n.10.)

The defendant's argument is misplaced, or at least premature. The term "authorization" has a plain and ordinary meaning and requires no special construction. That the statute may implicate a broad swath of conduct is an issue for Congress. Whether this issue has any special significance can only be determined at trial. That is, whether Ulbricht's and his coconspirators' alleged conduct falls into the suggested grey area must await the Government's proof.

---

[13] The defendant's arguments that potentially lawful uses of malicious software also fail. There are numerous examples of lawful products put to unlawful use, resulting in criminal liability. <u>See, e.g.</u>, <u>United States v. Zambrano</u>, 776 F.2d 1091, 1092, 1096 (2d Cir. 1985); <u>United States v. Orozco-Prada</u>, 732 F.2d 1076, 1080 (2d Cir. 1984); <u>Perry</u>, 643 F.2d at 44.

VII.   THE "KITCHEN SINK" ARGUMENTS

Ulbricht also alleges that since his alleged conduct in Counts One, Two, and Three has never before been found to constitute the crimes charged, a variety of legal principles preclude criminal liability.  Those principles include the rule of lenity, the doctrine of constitutional avoidance, void-for-vagueness, and overbreadth.  In addition, the defendant argues that the presence of a civil immunity statute for online providers indicates congressional "support for a free-wheeling [I]nternet, including one in which providers or users of interactive computer services can operate without fear of civil liability for the content posted by others."  (Def.'s Mem. at 28.)  These arguments do not preclude the criminal charges here.

As an initial matter, as set forth above, the conduct charged fits within existing law.  It is certainly true that case law to date has not been applied to the type of conduct that forms the basis for the Government's charges[14] – but that is not fatal.  Throughout the history of the common law system there have been times when laws are applied to new scenarios.  At each new stage there were undoubtedly those who questioned the flexibility of the law.  But when the principles underlying a law are consistent and clear, they may accommodate new fact patterns.  See Williams v. Taylor, 529 U.S. 362, 384-85 (2000) (Opinion of Stevens, J.) ("[R]ules of law often develop incrementally as earlier decisions are applied to new factual situations."); see also, e.g., ABC, Inc. v. Aereo, Inc., – U.S. – , 2014 WL 2864485, at

---

[14] The Government argues that a conspiracy and CCE have previously been charged in the context of online marketplaces.  (Gov't Mem. at 30.)  Those cases have entirely different facts from those alleged here.

*10 (2014) (applying copyright laws customarily imposed upon cable companies to a new type of distributor).  The fact that a particular defendant is the first to be prosecuted for novel conduct under a pre-existing statutory scheme does not <u>ipso facto</u> mean that the statute is ambiguous or vague or that he has been deprived of constitutionally appropriate notice.

The defendant's Kitchen Sink arguments are also premised on a view of his alleged conduct as being sufficiently common – <u>i.e.</u>, that he is doing nothing more than that done by other designers and operators of online marketplaces – that he could not have known or been on notice of its illegality.

The Court disagrees.  Again, on a motion to dismiss an indictment, the Court accepts as true the Government's allegations; whether and how those allegations can be proven is not a question for this stage in the proceedings.

A.   <u>The Rule of Lenity and the Doctrine of Constitutional Avoidance</u>

The defendant's arguments with respect to the rule of lenity and the doctrine of constitutional avoidance are based on the incorrect premise that the statutes under which he has been charged in Counts One, Two, and Three are ambiguous when applied to his alleged conduct.

The rule of lenity provides that when a criminal statute is susceptible to two different interpretations – one more and one less favorable to the defendant – "leniency" requires that the court read it in the manner more favorable.  See <u>Rewis v. United States</u>, 401 U.S. 808, 812 (1971); <u>United States v. Ford</u>, 435 F.3d 204, 211 (2d Cir. 2006) (explaining that "restraint must be exercised in determining the

breadth of conduct prohibited by a federal criminal statute out of concerns regarding both the prerogatives of Congress and the need to give fair warning to those whose conduct is affected").

The rule of lenity is a principle of statutory construction: it comes into play only if and when there is ambiguity. United States v. Litchfield, 986 F.2d 21, 22 (2d Cir. 1993). It should not be viewed as a general principle requiring that clear statutes be applied in a lenient manner. Callanan v. United States, 364 U.S. 587, 596 (1961) (explaining that the rule of lenity, "as is true of any guide to statutory construction, only serves as an aid for resolving an ambiguity; it is not to be used to beget one").

In Skilling v. United States, 561 U.S. 358 (2010), the Court addressed the type of conduct encompassed by the ambiguous term "honest services." The Court reiterated the principle that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," and refused to agree with the Government's broad interpretation of the statute. Id. at 410. Instead, the Court limited its coverage to bribery and kickback schemes. Id. at 412. The Court noted that if "Congress desires to go further . . . it must speak more clearly than it has." Id. at 411.

Here, with regard to Counts One and Two, the defendant does not allege that a word or phrase in a statute requires construction or is susceptible to more than

one interpretation.[15]  Instead, he argues that even if the elements of, for instance, a narcotics conspiracy are well known, his particular conduct in designing and operating the website does not clearly fall within what the statute is intended to cover.  The Court disagrees.

Sections 841 and 846 are intended to cover conduct in which two or more people conspire to distribute or possess with the intent to distribute narcotics.  If the Government can prove at trial that Ulbricht has the requisite intent, then these statutory provisions clearly prohibit his conduct.  These statutory provisions do not, for instance, require that only one type of communication method be used between coconspirators (for instance, cellular telephone versus the Internet); they do not prescribe what the various roles of coconspirators must be or are limited to; and they have been applied in the past to individuals alleged to be middlemen in drug transactions.  See generally Pitre, 960 F.2d at 1121-23.  Here, there is no statutory ambiguity and thus no basis for application of the rule of lenity.

The doctrine of constitutional avoidance provides that when a "statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to accept the latter."  United States ex rel. Attorney General v. Del. & Hudson Co., 213 U.S. 366, 408 (1909); see also Jones v. United States, 526 U.S. 227, 239-40 (1999); Triestman v. United States, 124 F.3d 361, 377 (2d Cir. 1997).

---

[15] As discussed supra, the defendant does argue ambiguity with regard to aspects of § 1030; as the Court has stated, whether that alleged ambiguity (or really, breadth) plays any role here is a question for trial.

43

This doctrine is inapplicable for the same reason as the rule of lenity:  there is no ambiguity; the Court is not struggling with dueling interpretations as to whether the alleged conduct, if proven, would be covered.  Thus, there are no grave constitutional issues on either side of this question.

> B.   <u>Void-for-Vagueness and Constitutional Overbreadth</u>

The defendant also argues that the statutes, as applied to his conduct in particular, are void on the basis that they are either unconstitutionally vague or overbroad.  (Def.'s Mem. at 32-38.)  The Court disagrees.

The void-for-vagueness doctrine is inapplicable.  It addresses concerns regarding (1) fair notice and (2) arbitrary and discriminatory prosecutions.  <u>Skilling</u>, 561 U.S. at 412 (citation omitted).  To avoid a vagueness challenge, a statute must define a criminal offense in a manner that ordinary people must understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.  <u>Id.</u> at 402-03.  The question, in short, is whether an ordinary person would know that engaging in the challenged conduct could give rise to the type of criminal liability charged.

The Government argues that this prosecution is not particularly novel.  "[B]oth the narcotics conspiracy statute and continuing criminal enterprise statute have specifically been applied in a previous prosecution of defendants involved in operating online marketplaces for illegal drugs."  (Gov't Opp'n at 30.)  "[T]he computer hacking statute has previously been applied to persons involved in providing online services used by others to distribute malicious software."  (<u>Id.</u>)  The

citations by the Government in support of these assertions are, however, merely to indictments.  (Id.)  And neither case has yet resulted in a published decision which could reasonably have provided notice to the defendant, or which demonstrates an ineffectual legal challenge.

As the Supreme Court has recognized, however, "due process requirements are not designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited."  United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks and citations omitted).  Here, the charged conduct is not merely designing some benign marketplace for bath towels.  The conduct is alleged to be specific and intentional conduct to join with narcotics traffickers or computer hackers to help them sell illegal drugs or hack into computers, and to be involved in enforcing rules (including using murder-for-hire) regarding such sales and taking commissions.  No person of ordinary intelligence could believe that such conduct is somehow legal.  Indeed, no reasonable person could assume that such conduct is in any way equivalent to designing and running eBay, for example.  There is nothing vague about the application of the statute to the conduct charged.

Ulbricht also argues that his alleged conduct also constitutes protected free speech and that the imposition of criminal liability would be overbroad as applied.  (Def.'s Mem. at 35-38.)  This argument stems from an incorrect premise as to the nature of the criminal charges here.

The defendant does not explain how such conduct could amount to protected speech; even if this Court were to agree that such conduct has a speech element, the law is clear that speech which is part of a crime is not somehow immunized.  See United States v. Rahman, 189 F.3d 88, 116-17 (2d Cir. 1999).  For instance, no one would doubt that a bank robber's statement to a teller – "This is a stick up" – is not protected speech.

The thrust of the defendant's overbreadth argument appears to be similar to his vagueness, constitutional avoidance, and rule of lenity claims.  All are premised in part on the incorrect view that the challenged conduct occurs on a regular basis by many people, that therefore enforcing these criminal statutes as to Ulbricht amounts to arbitrary enforcement and that the umbrella or tent of the statutes would be stretched beyond reason in order to encompass the alleged conduct.

For all of the reasons set forth above, this is incorrect.

C.     Civil Immunity for Online Service Providers

The defendant argues that the existence of a civil statute for certain types of immunity for online service providers expresses a congressional intent to immunize conduct akin to that in which Ulbricht is alleged to have engaged.  This Court disagrees.  Even a quick reading of the statute makes it clear that it is not intended to apply to the type of intentional and criminal acts alleged to have occurred here. See 47 U.S.C. § 230.  It is inapplicable.

VIII.  COUNT FOUR

Count Four charges the defendant with participation in a money laundering conspiracy in violation of 18 U.S.C. § 1956(h).  (Ind. ¶¶ 17-21.)  The Government has alleged the requisite statutory elements.  (See Ind. ¶ 19.)  First, the Government has alleged that a conspiracy existed between the defendant and one or more others, the object of which was to engage in money laundering.  In paragraph 20, the Indictment recites the specific elements required for money laundering:

> It was a part and an object of the conspiracy that . . . the defendant, and others known and unknown, . . . knowing that the property involved in certain financial transactions represented proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit, narcotics trafficking and computer hacking . . . with the intent to promote the carrying on of such unspecified unlawful activity . . . .

(Ind. ¶ 20.)  The defendant argues that the factual allegation that Bitcoins constituted the exclusive "payment system that served to facilitate [] illegal commerce" on Silk Road cannot constitute the requisite "financial transaction."  (Def.'s Mem. at 3, 45.)  The Court disagrees.

As an initial matter, an allegation that Bitcoins are used as a payment system is insufficient in and of itself to state a claim for money laundering.  The fact that Bitcoins allow for anonymous transactions does not _ipso facto_ mean that those transactions relate to unlawful activities.  The anonymity by itself is not a crime.  Rather, Bitcoins are alleged here to be the medium of exchange – just as dollars or Euros could be – in financial transactions relating to the unlawful activities of

narcotics trafficking and computer hacking.  It is the system of payment designed specifically to shield the proceeds from third party discovery of their unlawful origin that forms the unlawful basis of the money laundering charge.

The money laundering statute defines a "financial transaction" as involving, inter alia, "the movement of funds by wire or other means, or [ ] involving one or more monetary instruments, [ ] or involving the transfer of title to any real property, vehicle, vessel, or aircraft." 18 U.S.C. § 1956(c)(4).  The term "monetary instrument" is defined as the coin or currency of a country, personal checks, bank checks, and money orders, or investment securities or negotiable instruments.  18 U.S.C. § 1956(c)(5).

The defendant argues that because Bitcoins are not monetary instruments, transactions involving Bitcoins cannot form the basis for a money laundering conspiracy.  He notes that the IRS has announced that it treats virtual currency as property and not as currency.  (Def.'s Mem. at 46-47 (citing I.R.S. Notice 2014-21, http://www.irs.gov/pub/irs-drop/n-14-21.pdf, and U.S. Dep't of Treasury, Fin. Crimes Enforcement Network ("FinCEN"), "Guidance, Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies," March 18, 2013, http://www.fincen.gov/statutes_regs/ guidance/html/FIN-2013-G001.html).)  The defendant argues that virtual currencies have some but not all of the attributes of currencies of national governments and that virtual currencies do not have legal tender status.  (See id. at 45-46.)  In fact, neither the IRS nor FinCEN purport to amend the money laundering statute (nor could they).  In any event, neither the

IRS nor FinCEN has addressed the question of whether a "financial transaction" can occur with Bitcoins.  This Court refers back to the money laundering statute itself and case law interpreting the statute.

It is clear from a plain reading of the statute that "financial transaction" is broadly defined.  See United States v. Blackman, 904 F.2d 1250, 1257 (8th Cir. 1950) (citation omitted).  It captures all movements of "funds" by any means, or monetary instruments.  "Funds" is not defined in the statute and is therefore given its ordinary meaning.  See Taniguchi v. Kan Pacific Saipan, Ltd., – U.S. – , 132 S.Ct. 1997, 2002 (2012) (citation omitted).  "Funds" are defined as "money, often money for a specific purpose."  See Cambridge Dictionaries Online, http://dictionary.cambridge.org/us/dictionary/american-english/funds?q=funds (last visited July 3, 2014).  "Money" is an object used to buy things.

Put simply, "funds" can be used to pay for things in the colloquial sense. Bitcoins can be either used directly to pay for certain things or can act as a medium of exchange and be converted into a currency which can pay for things.  See Bitcoin, https://bitcoin.org/en (last visited July 3, 2014); 8 Things You Can Buy With Bitcoins Right Now, CNN Money, http://money.cnn.com/gallery/technology/2013/ 11/25/buy-with-bitcoin/ (last visited July 3, 2014).  Indeed, the only value for Bitcoin lies in its ability to pay for things – it is digital and has no earthly form; it cannot be put on a shelf and looked at or collected in a nice display case.  Its form is digital – bits and bytes that together constitute something of value.  And they may be bought and sold using legal tender.  See How to Use Bitcoin, https://bitcoin.org/en/getting-

started (last visited July 3, 2014).  Sellers using Silk Road are not alleged to have given their narcotics and malicious software away for free – they are alleged to have sold them.[16]

The money laundering statute is broad enough to encompass use of Bitcoins in financial transactions.  Any other reading would – in light of Bitcoins' sole raison d'etre – be nonsensical.  Congress intended to prevent criminals from finding ways to wash the proceeds of criminal activity by transferring proceeds to other similar or different items that store significant value.  With respect to this case, the Government has alleged that Bitcoins have a value which may be expressed in dollars.  (Ind. ¶ 3 (alleging that Ulbricht "reaped commissions worth tens of millions of dollars, generated from the illicit sales conducted through the site").)

There is no doubt that if a narcotics transaction was paid for in cash, which was later exchanged for gold, and then converted back to cash, that would constitute a money laundering transaction.  See, e.g., United States v. Day, 700 F.3d 713, 718 (4th Cir. 2012).

One can money launder using Bitcoin.  The defendant's motion as to Count Four is therefore denied.

_____

[16] Recently, the U.S. Government auctioned off nearly 30,000 Bitcoins as part of a civil forfeiture proceeding related to Silk Road.  See Sydney Ember, After Bitcoin Auction, Winning Bidders Remain Elusive, N.Y. Times Dealbook (June 30, 2014 6:59 P.M.), http://dealbook.nytimes.com/2014/06/30/after-bitcoin-auction-winning-bidders-remain-elusive/?_php=true&_type=blogs&_r=0.

IX.   CONCLUSION

For the reasons set forth above, the defendant's motion to dismiss is DENIED

in its entirety.  The clerk of the Court is directed to terminate the motion at ECF

No. 19.


SO ORDERED.

Dated:        New York, New York
              July __, 2014


                                    _____
                                       KATHERINE B. FORREST
                                       United States District Judge

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x
                                   :
UNITED STATES OF AMERICA           :
                                   :
        - v. -                     :     SUPERSEDING INDICTMENT
                                   :
ROSS WILLIAM ULBRICHT,             :     S1 14 Cr. 68 (KBF)
    a/k/a "Dread Pirate Roberts,"  :
    a/k/a "DPR,"                   :
    a/k/a "Silk Road,"             :
                                   :
        Defendant.                 :
                                   :
- - - - - - - - - - - - - - - - - x



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: AUG 2 1 2014

## COUNT ONE
### (Narcotics Trafficking)

The Grand Jury charges:

BACKGROUND

1.   In or about January 2011, ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road," the defendant, created an underground website known as "Silk Road," designed to enable users across the world to buy and sell illegal drugs and other illicit goods and services anonymously and outside the reach of law enforcement.

2.   From in or about January 2011 through in or about October 2013, when the Silk Road website was shut down by law enforcement authorities, ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road," the defendant, owned and operated Silk Road.  During that time, Silk Road emerged as the most sophisticated and extensive criminal

marketplace on the Internet.  The website was used by several
thousand drug dealers and other unlawful vendors to distribute
hundreds of kilograms of illegal drugs and other illicit goods
and services to well over a hundred thousand buyers worldwide,
and to launder hundreds of millions of dollars derived from
these unlawful transactions.

3.   ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts,"
a/k/a "DPR," a/k/a "Silk Road," the defendant, controlled all
aspects of Silk Road, with the assistance of various paid
employees whom he managed and supervised.  Through his ownership
and operation of Silk Road, ULBRICHT reaped commissions worth
tens of millions of dollars, generated from the illicit sales
conducted through the site.

4.   In seeking to protect his criminal enterprise and the
illegal proceeds it generated, ROSS WILLIAM ULBRICHT, a/k/a
"Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road," the
defendant, pursued violent means, including soliciting the
murder-for-hire of several individuals he believed posed a
threat to that enterprise.

<u>STATUTORY ALLEGATIONS</u>

5.   From in or about January 2011, up to and including in
or about October 2013, in the Southern District of New York and
elsewhere, ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts,"
a/k/a "DPR," a/k/a "Silk Road," the defendant, distributed and

possessed with the intent to distribute controlled substances,
and aided and abetted such distribution and possession with the
intent to distribute, in violation of Title 21, United States
Code, Section 841(a)(1).

6.   The controlled substances involved in the offense
included, among others, 1 kilogram and more of mixtures and
substances containing a detectable amount of heroin, 5 kilograms
and more of mixtures and substances containing a detectable
amount of cocaine, 10 grams and more of mixtures and substances
containing a detectable amount of lysergic acid diethylamide
(LSD), and 500 grams and more of mixtures and substances
containing a detectable amount of methamphetamine, its salts,
isomers, and salts of its isomers, all in violation of Title 21,
United States Code, Section 841(b)(1)(A).

   (Title 21, United States Code, Sections 812, 841(a)(1) and
   841(b)(1)(A); and Title 18, United States Code, Section 2.)

## COUNT TWO
(Distribution of Narcotics by Means of the Internet)

The Grand Jury further charges:

7.   The allegations contained in paragraphs 1 through 4 of
this Indictment are repeated and realleged as if fully set forth
herein.

8.   From in or about January 2011, up to and including in
or about October 2013, in the Southern District of New York and
elsewhere, ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts,"

a/k/a "DPR," a/k/a "Silk Road," the defendant, delivered, distributed, and dispensed controlled substances by means of the Internet, in a manner not authorized by law, and aided and abetted such activity, in violation of Title 21, United States Code, Section 841(h).

9.   The controlled substances involved in the offense included, among others, 1 kilogram and more of mixtures and substances containing a detectable amount of heroin, 5 kilograms and more of mixtures and substances containing a detectable amount of cocaine, 10 grams and more of mixtures and substances containing a detectable amount of lysergic acid diethylamide (LSD), and 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, all in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Sections 812, 841(h)
and 841(b)(1)(A).)

**COUNT THREE**
(Narcotics Trafficking Conspiracy)

The Grand Jury further charges:

10.   The allegations contained in paragraphs 1 through 4 of this Indictment are repeated and realleged as if fully set forth herein.

11.   From in or about January 2011, up to and including in or about October 2013, in the Southern District of New York and

4

elsewhere, ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts,"
a/k/a "DPR," a/k/a "Silk Road," the defendant, and others known
and unknown, intentionally and knowingly did combine, conspire,
confederate, and agree together and with each other to violate
the narcotics laws of the United States.

12.   It was a part and an object of the conspiracy that
ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts," a/k/a
"DPR," a/k/a "Silk Road," the defendant, and others known and
unknown, would and did distribute and possess with the intent to
distribute controlled substances, in violation of Title 21,
United States Code, Section 841(a)(1).

13.   It was further a part and an object of the conspiracy
that ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts," a/k/a
"DPR," a/k/a "Silk Road," the defendant, and others known and
unknown, would and did deliver, distribute, and dispense
controlled substances by means of the Internet, in a manner not
authorized by law, and aid and abet such activity, in violation
of Title 21, United States Code, Section 841(h).

14.   It was further a part and an object of the conspiracy
that ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts," a/k/a
"DPR," a/k/a "Silk Road," the defendant, would and did knowingly
and intentionally use a communication facility in committing and
in causing and facilitating the commission of acts constituting
a felony under Title 21, United States Code, Sections 841, 846,

5

952, 960, and 963, in violation of Title 21, United States Code,
Section 843(b).

15.   The controlled substances that ROSS WILLIAM ULBRICHT,
a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road,"
the defendant, conspired to distribute and possess with the
intent to distribute, and to deliver, distribute, and dispense
by means of the Internet, in a manner not authorized by law, and
to aid and abet such activity, included, among others, 1
kilogram and more of mixtures and substances containing a
detectable amount of heroin, 5 kilograms and more of mixtures
and substances containing a detectable amount of cocaine, 10
grams and more of mixtures and substances containing a
detectable amount of lysergic acid diethylamide (LSD), and 500
grams and more of mixtures and substances containing a
detectable amount of methamphetamine, its salts, isomers, and
salts of its isomers, all in violation of Title 21, United
States Code, Sections 841(b)(1)(A) and 841(h).

<u>Overt Acts</u>

16.   In furtherance of the conspiracy and to effect the
illegal objects thereof, the following overt acts, among others,
were committed in the Southern District of New York and
elsewhere:

a.   In or about January 2011, ROSS WILLIAM ULBRICHT,
a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road,"

6

the defendant, created the Silk Road website, providing a platform for drug dealers around the world to sell a wide variety of controlled substances via the Internet.

        b.   On or about March 31, 2013, ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road," the defendant, in connection with operating the Silk Road website, paid a Silk Road user ("User-1") approximately $150,000 to murder another Silk Road user ("User-2") who was threatening to release the identities of thousands of users of the site.

        c.   On or about April 8, 2013, ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road," the defendant, in connection with operating the Silk Road website, paid User-1 approximately $500,000 to murder four additional persons, whom ULBRICHT believed were associated with User-2.

        d.   On or about October 1, 2013, ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road," the defendant, logged on as a site administrator to the web server hosting the Silk Road website.

        (Title 21, United States Code, Section 846.)

### COUNT FOUR
(Continuing Criminal Enterprise)

The Grand Jury further charges:

17.   The allegations contained in paragraphs 1 through 4 of this Indictment are repeated and realleged as if fully set forth herein.

18.   From in or about January 2011, up to and including in or about October 2013, in the Southern District of New York and elsewhere, ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road," the defendant, engaged in a continuing criminal enterprise, in that he knowingly and intentionally violated Title 21, United States Code, Sections 841, 843 and 846, which violations were part of a continuing series of violations of the Controlled Substances Act, Title 21, United States Code, Section 801, et seq., undertaken by ULBRICHT, in concert with at least five other persons with respect to whom ULBRICHT occupied a position of organizer, a supervisory position, and a position of management, and from which such continuing series of violations ULBRICHT obtained substantial income and resources.

(Title 21, United States Code, Section 848(a).)

<u>COUNT FIVE</u>

(Conspiracy to Commit and Aid and Abet Computer Hacking)

The Grand Jury further charges:

19.   The allegations contained in paragraphs 1 through 4 of this Indictment are repeated and realleged as if fully set forth herein.

20.   In addition to providing a platform for the purchase and sale of illegal narcotics, the Silk Road website also provided a platform for the purchase and sale of computer-hacking services and malicious software designed for computer hacking, such as password stealers, keyloggers, and remote access tools.  While in operation, the Silk Road website regularly offered hundreds of listings for such services and software.

<u>STATUTORY ALLEGATIONS</u>

21.   From in or about January 2011, up to and including in or about October 2013, in the Southern District of New York and elsewhere, ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to commit computer hacking, and to aid and abet the same, in violation of Title 18, United States Code, Sections 1030(a)(2) and 2.

22.   It was a part and an object of the conspiracy that ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts," a/k/a

"DPR," a/k/a "Silk Road," the defendant, and others known and unknown, would and did intentionally access computers without authorization, and thereby would and did obtain information from protected computers, for purposes of commercial advantage and private financial gain, and in furtherance of criminal and tortious acts in violation of the Constitution and the laws of the United States, and would and did aid and abet such unauthorized access, in violation of Title 18, United States Code, Sections 1030(a)(2) and 2.

(Title 18, United States Code, Section 1030(b).)

**COUNT SIX**

(Conspiracy to Traffic in Fraudulent Identification Documents)

The Grand Jury further charges:

23.   The allegations contained in paragraphs 1 through 4 and paragraph 20 of this Indictment are repeated and realleged as if fully set forth herein.

24.   In addition to providing a platform for the purchase and sale of illegal narcotics and computer-hacking services and software, the Silk Road website also provided a platform for the purchase and sale of fraudulent identification documents, such as fake driver's licenses and passports.  While in operation, the Silk Road website regularly offered hundreds of listings for such products.

10

STATUTORY ALLEGATIONS

25.  From in or about January 2011, up to and including in or about October 2013, in the Southern District of New York and elsewhere, ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to traffic in fraudulent identification documents, and to aid and abet the same, in violation of Title 18, United States Code, Sections 1028(a)(2).

26.  It was a part and an object of the conspiracy that ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road," the defendant, and others known and unknown, would and did knowingly transfer, in and affecting interstate and foreign commerce, false identification documents and authentication features, knowing that such documents and features were produced without lawful authority, including driver's licenses, personal identification cards, and documents that appeared to be issued by and under the authority of the United States, and would and did aid and abet such transfers, in violation of Title 18, United States Code, Sections 1028(a)(2) and 2.

(Title 18, United States Code, Section 1028(f).)

11

**COUNT SEVEN**
(Money Laundering Conspiracy)

The Grand Jury further charges:

27.  The allegations contained in paragraphs 1 through 4
and paragraphs 20 and 24 of this Indictment are repeated and
realleged as if fully set forth herein.

28.  ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts,"
a/k/a "DPR," a/k/a "Silk Road," the defendant, designed Silk
Road to include a Bitcoin-based payment system that served to
facilitate the illegal commerce conducted on the site, including
by concealing the identities and locations of the users
transmitting and receiving funds through the site.

STATUTORY ALLEGATIONS

29.  From in or about January 2011, up to and including in
or about October 2013, in the Southern District of New York and
elsewhere, ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts,"
a/k/a "DPR," a/k/a "Silk Road," the defendant, and others known
and unknown, intentionally and knowingly did combine, conspire,
confederate, and agree together and with each other to commit
money laundering, in violation of Title 18, United States Code,
Sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

30.  It was a part and an object of the conspiracy that
ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts," a/k/a
"DPR," a/k/a "Silk Road," the defendant, and others known and
unknown, in offenses involving and affecting interstate and

foreign commerce, knowing that the property involved in certain financial transactions represented proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit, narcotics trafficking, computer hacking, and identification document fraud, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Sections 1030 and 1028, respectively, with the intent to promote the carrying on of such specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

31.  It was further a part and an object of the conspiracy that ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road," the defendant, and others known and unknown, in offenses involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions represented proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit, narcotics trafficking, computer hacking, and identification document fraud, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Sections 1030 and 1028, respectively, knowing that the transactions were designed in

whole and in part to conceal and disguise the nature, the
location, the source, the ownership, and the control of the
proceeds of specified unlawful activity, in violation of Title
18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

<u>FORFEITURE ALLEGATIONS</u>

32.  As a result of committing the controlled substance
offenses alleged in Counts One through Four of this Indictment,
ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts," a/k/a
"DPR," a/k/a "Silk Road," the defendant, shall forfeit to the
United States, pursuant to Title 21, United States Code, Section
853, any property constituting, or derived from, any proceeds
the defendant obtained, directly or indirectly, as a result of
the offenses and any property used, or intended to be used, in
any manner or part, to commit, or to facilitate the commission
of, the offenses.

33.  As a result of committing the computer hacking and
identification fraud offenses alleged in Counts Five and Six of
this Indictment, ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate
Roberts," a/k/a "DPR," a/k/a "Silk Road," the defendant, shall
forfeit to the United States, pursuant to Title 18, United
States Code, Section 982(a)(2)(B), any property constituting, or
derived from, proceeds obtained directly or indirectly as a
result of the offenses.

34.   As a result of committing the money laundering offense alleged in Count Seven of this Indictment, ROSS WILLIAM ULBRICHT, a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in the offense, or any property traceable to such property.

<u>Substitute Asset Provision</u>

35.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1)   cannot be located upon the exercise of due diligence;

(2)   has been transferred or sold to, or deposited with, a third person;

(3)   has been placed beyond the jurisdiction of the Court;

(4)   has been substantially diminished in value; or

(5)   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of the defendant up to the value of the above-described forfeitable property.

```
(Title 18, United States Code, Sections 981 and 982,
     Title 21, United States Code, Section 853;
     Title 28, United States Code, Section 2461.)
```

FOREPERSON

PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

ROSS WILLIAM ULBRICHT,
a/k/a "Dread Pirate Roberts,"
a/k/a "DPR,"
a/k/a "Silk Road,"

Defendant.

---

INDICTMENT

S1 14 Cr. 68 (KBF)

(21 U.S.C. §§ 812, 841(a)(1),
841(b)(1)(A), 841(h), 846, & 848(a);
18 U.S.C. §§ 1030(b), 1028(f),
1956(h) & 2)

PREET BHARARA

Foreperson.          United States Attorney.

*[handwritten signatures]*

*8/21/14. Filed Superseding Indictment*

*Judy Greensten*

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____77_____
> DATE FILED: **OCT 0 7 2014**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X
                                                        :
UNITED STATES OF AMERICA                                :
                                                        :
            -v-                                         :         14-cr-68 (KBF)
                                                        :
ROSS WILLIAM ULBRICHT,                                  :         ORDER
      a/k/a "Dred Pirate Roberts,"                      :
      a/k/a "DPR,"                                      :
      a/k/a "Silk Road,"                                :
                                                        :
                              Defendant.                :
--------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

The Court has not received a declaration or affidavit from defendant Ross

Ulbricht, demonstrating that he had a subjective expectation of privacy in any of

the items seized and as to which his suppression motion relates.  The Court has

read his counsel's argument as to the order in which they assert that decisions

should be made.  The potential rationale for not submitting a declaration or

affidavit may, however, be different for the servers located in premises operated by

third parties, versus the wireless router located on Montgomery Street, the laptop,

the Gmail and Facebook accounts.

The Court will give Mr. Ulbricht one final opportunity to submit a

declaration or affidavit in support of his motion (which would of course need to have

sufficient specificity to establish a subjective expectation of privacy in items to

which it relates).  However, given that the defendant has had quite a long time

already to make such a submission, if he now decides to submit one, the Court must

1

be so notified by 5pm today (October 7) that one shall be forthcoming by tomorrow, and to specify the particular items it will cover.

SO ORDERED.

Dated:     New York, New York
           October 7, 2014


                                    KATHERINE B. FORREST
                                    United States District Judge

2

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK  10006
———
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL                                                                     STEVEN WRIGHT
              —                                                                                     *Office Manager*
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

October 7, 2014

**BY ECF**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:     *United States v. Ross Ulbricht*,
            14 Cr. 68 (KBF)

Dear Judge Forrest:

This letter is submitted on behalf of defendant Ross Ulbricht, in response to the government's October 6, 2014, filing pursuant to the Court's October 3, 2014, Order inviting the government to respond to the factual statements contained in the Declaration of Joshua J. Horowitz, Esq.

In response to the Court's Order, however, the government chose not to address Mr. Horowitz's Declaration, but instead to file a surreply arguing issues completely unrelated to Mr. Horowitz's Declaration, *i.e.*, standing, the *Auernheimer* case.[1]  Thus, the technical analysis and

---

[1] In response to the one issue from Mr. Horowitz's Declaration the government does address, millions of web servers worldwide run "phpmyadmin" to administrate MySQL databases.  The fact that "phpmyadmin" was installed on the Silk Road Server, and thus that the Server was using a MySQL database, does not in any way suggest, let alone corroborate, illicit activity taking place on that Server.

Moreover, the government is incorrect even in its basic premise as to how "phpmyadmin" operates:  "php" is a server-scripting language, not a database, contrary to what the government suggests in its response.  It apparently confuses "php" with MySQL, which *is* a

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
   United States District Judge
   Southern District of New York
   October 7, 2014
   Page 2 of 3

conclusions in the Horowitz Declaration remain uncontroverted.

The government's position appears to be that it can engage in criminal conduct with impunity in its pursuit of investigative objectives, and not be held accountable therefor. Yet the exclusionary rule was designed to address that very dangerous, and legally and constitutionally insupportable, attitude. For example, as the Supreme Court acknowledged in *Herring v. United States,* 555 U.S. 135, 144 (2008), "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *See also id.* ("to trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system"); *United States v. Calandra*, 414 U.S. 338, 348 (1974) (the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect").

In addition, the government's attempt to distinguish its position in *United States v. Auernheimer*, No. 13-1816 (3d Cir.), is unavailing. The government did not limit its broad construction of 18 U.SC. §1030 to someone who impersonates a unique authorized user. In fact, the quotes from the government's Brief on Appeal in *Auernheimer* demonstrate the expansiveness of the government's interpretation of §1030, which was not confined to the facts of that case. Indeed, it was the government's insistence on the breadth of §1030 that generated amicus briefs on Auernheimer's behalf in the Third Circuit.

Thus, the government posits two standards of behavior: one for private citizens, who must adhere to a strict standard of conduct construed by the government, and the other for the government, which, with its elastic ability to effect electronic intrusion, can deliberately, cavalierly, and unrepentantly transgress those same standards. Yet neither law nor the Constitution permits rank government lawlessness without consequences.

---

database.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
   United States District Judge
   Southern District of New York
   October 7, 2014
   Page 3 of 3

     Also, regarding the Court's October 7, 2014, Order, Mr. Ulbricht rests on his papers already submitted.[2]

         Respectfully submitted,

         Joshua L. Dratel

JLD/lal

cc:   Serrin Turner
     Timothy T. Howard
     Assistant United States Attorneys

---

   [2] For purposes of clarity, since the government has not challenged Mr. Ulbricht's expectation of privacy in his laptop, Google or Facebook accounts – for which his expectation of privacy is manifest – there does not appear to be an issue with respect to these categories.  If the Court requires a declaration from Mr. Ulbricht with respect to these three items it would be forthcoming, but neither the Court's October 7, 2014, Order nor the government's papers would seem to make it necessary.

Case 15-1815, Document 31-2, 01/13/2016, 1682739, Page73 of 153

**A172**

Case 1:14-cr-00068-KBF   Document 84   Filed 10/08/14   Page 1 of 3
Case 1:14-cr-00068-KBF   Document 83   Filed 10/07/14   Page 1 of 3

LAW OFFICES OF
### JOSHUA L. DRATEL, P.C.
A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL
---
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

STEVEN WRIGHT
*Office Manager*

October 7, 2014

**BY ECF**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: **OCT 0 8 2014**

Re:   *United States v. Ross Ulbricht*,
          14 Cr. 68 (KBF)

Dear Judge Forrest:

This letter is submitted on behalf of defendant Ross Ulbricht, in response to the government's October 6, 2014, filing pursuant to the Court's October 3, 2014, Order inviting the government to respond to the factual statements contained in the Declaration of Joshua J. Horowitz, Esq.

In response to the Court's Order, however, the government chose not to address Mr. Horowitz's Declaration, but instead to file a surreply arguing issues completely unrelated to Mr. Horowitz's Declaration, *i.e.*, standing, the *Auernheimer* case.[1]  Thus, the technical analysis and

---

[1]  In response to the one issue from Mr. Horowitz's Declaration the government does address, millions of web servers worldwide run "phpmyadmin" to administrate MySQL databases.  The fact that "phpmyadmin" was installed on the Silk Road Server, and thus that the Server was using a MySQL database, does not in any way suggest, let alone corroborate, illicit activity taking place on that Server.

Moreover, the government is incorrect even in its basic premise as to how "phpmyadmin" operates:  "php" is a server-scripting language, not a database, contrary to what the government suggests in its response.  It apparently confuses "php" with MySQL, which *is* a

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
October 7, 2014
Page 2 of 3

conclusions in the Horowitz Declaration remain uncontroverted.

The government's position appears to be that it can engage in criminal conduct with impunity in its pursuit of investigative objectives, and not be held accountable therefor. Yet the exclusionary rule was designed to address that very dangerous, and legally and constitutionally insupportable, attitude. For example, as the Supreme Court acknowledged in *Herring v. United States,* 555 U.S. 135, 144 (2008), "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *See also id.* ("to trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system"); *United States v. Calandra,* 414 U.S. 338, 348 (1974) (the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect").

In addition, the government's attempt to distinguish its position in *United States v. Auernheimer,* No. 13-1816 (3d Cir.), is unavailing. The government did not limit its broad construction of 18 U.SC. §1030 to someone who impersonates a unique authorized user. In fact, the quotes from the government's Brief on Appeal in *Auernheimer* demonstrate the expansiveness of the government's interpretation of §1030, which was not confined to the facts of that case. Indeed, it was the government's insistence on the breadth of §1030 that generated amicus briefs on Auernheimer's behalf in the Third Circuit.

Thus, the government posits two standards of behavior: one for private citizens, who must adhere to a strict standard of conduct construed by the government, and the other for the government, which, with its elastic ability to effect electronic intrusion, can deliberately, cavalierly, and unrepentantly transgress those same standards. Yet neither law nor the Constitution permits rank government lawlessness without consequences.

---

database.

Case 15-1815, Document 31-2, 01/22/2016, 1682739, Page75 of 153

A174

Case 1:14-cr-00068-KBF   Document 84   Filed 10/08/14   Page 3 of 3
Case 1:14-cr-00068-KBF   Document 83   Filed 10/07/14   Page 3 of 3

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
  United States District Judge
  Southern District of New York
  October 7, 2014
  Page 3 of 3


    Also, regarding the Court's October 7, 2014, Order, Mr. Ulbricht rests on his papers already submitted.[2]

                              Respectfully submitted,

                              *[signature]*

                              Joshua L. Dratel

JLD/lal

cc:   Serrin Turner
      Timothy T. Howard
      Assistant United States Attorneys

*Ordered*

*Does the Government agree that no declaration is required in this case with regard to establishing Ulbricht's privacy interest in his Facebook, gmail accounts and laptop? (Could you let me know today — "yes" or "no" will do.)*

*10/8/14        K. B. Forrest*
*                USDJ*

---

    [2] For purposes of clarity, since the government has not challenged Mr. Ulbricht's expectation of privacy in his laptop, Google or Facebook accounts – for which his expectation of privacy is manifest – there does not appear to be an issue with respect to these categories.  If the Court requires a declaration from Mr. Ulbricht with respect to these three items it would be forthcoming, but neither the Court's October 7, 2014, Order nor the government's papers would seem to make it necessary.



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

October 8, 2014

By ECF
Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re: *United States v. Ross William Ulbricht*, 14 Cr. 68 (KBF)

Dear Judge Forrest:

Given defense counsel's representation that the defendant would proffer a declaration attesting to his expectation of privacy in his laptop, email, and Facebook accounts if the Court so required, and given that the declaration would likely be uncontested by the Government since Ulbricht's expectation of privacy in these items seems clear, the Government is willing to stipulate, in the interest of efficiently resolving the defendant's motion, that the defendant has standing to move to suppress these items. However, for the reasons set forth in the Government's memorandum in opposition, the motion is meritless.

Respectfully,

PREET BHARARA
United States Attorney

By: _____
SERRIN TURNER
TIMOTHY HOWARD
Assistant United States Attorneys
Southern District of New York

cc:    Joshua Dratel, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: OCT 1 0 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                                                          :
UNITED STATES OF AMERICA                                  :
                                                          :
                 -v-                                      :          14-cr-68 (KBF)
                                                          :
ROSS WILLIAM ULBRICHT,                                    :          OPINION & ORDER
          a/k/a "Dread Pirate Roberts,"                   :
          a/k/a "DPR,"                                    :
          a/k/a "Silk Road,"                              :
                                                          :
                              Defendant.                  :
-------------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

On February 4, 2014, Ross Ulbricht ("defendant" or "Ulbricht") was indicted on four counts. (ECF No. 12.) On September 5, 2014, he was arraigned on superseding indictment S1 14 Cr. 68 (KBF) (the "Indictment"). The Indictment charges Ulbricht with the following crimes: Narcotics Trafficking (Count One), Distribution of Narcotics by Means of the Internet (Count Two), Narcotics Trafficking Conspiracy (Count Three), Continuing Criminal Enterprise ("CCE") (Count Four), Conspiracy to Commit and Aid and Abet Computer Hacking (Count Five), Conspiracy to Traffic in Fraudulent Identification Documents (Count Six), and Money Laundering Conspiracy (Count Seven). (ECF No. 52 ("Ind.").) Ulbricht's trial is scheduled to commence on November 10, 2014.

Before this Court is defendant's motion to suppress virtually all evidence in the case, for a bill of particulars, and to strike surplusage. (ECF No. 46.) For the reasons set forth below, the motion is DENIED.

I.      BACKGROUND

A.      <u>Allegations against Ulbricht</u>

Ulbricht is charged with seven separate crimes—all involving the creation, design, administration and operations of an online marketplace known as "Silk Road."  The Government alleges that Ulbricht created Silk Road (Ind. ¶ 1) and that he has been in control of all aspects of its administration and operations (Ind. ¶ 3). The Government's charges against Ulbricht are premised upon a claim that through Silk Road, defendant enabled and facilitated anonymous transactions in a variety of illicit goods and services including, <u>inter alia</u>, narcotics, fake identification documents, and materials used to hack computers, and that he conspired, participated directly in, or aided and abetted others in substantive crimes.

Silk Road is alleged to have operated on the Tor network ("Tor"). (Declaration of Christopher Tarbell ¶¶ 4-5, ECF No. 57 ("Tarbell Decl.").)  The Tor network is designed to conceal the Internet Protocol ("IP") addresses of the computers operating on it, "including servers hosting websites on Tor, such as Silk Road."  (Tarbell Decl. ¶ 4.)  The Government alleges that Silk Road also supported anonymity through its reliance on "Bitcoin" as a method of payment.[1]  (Ind. ¶ 28.) The use of Bitcoins concealed the identities and locations of users transmitting and receiving funds.  (Ind. ¶ 28.)  The Government alleges that over the period of time it was up and running, Silk Road was used by several thousand drug dealers and well over one hundred thousand buyers worldwide to purchase illegal narcotics and

_____

[1] Bitcoin is the name of an encrypted online currency.  It is managed through a private network and not through any Government, central bank or formal financial institution.  The Government does not allege that the use of Bitcoin itself is illegal.

2

illicit goods, and that it was also used to launder hundreds of millions of dollars

derived from these transactions.  (Ind. ¶ 2.)  Ulbricht himself is alleged to have

made commissions worth tens of millions of dollars from these sales.  (Ind. ¶ 3.)

      B.    <u>The Investigation of Ulbricht</u>

      The instant motion is primarily concerned with whether the Government's

methods for investigating Ulbricht violated his Fourth Amendment right to be free

from unreasonable searches and seizures.  Importantly, while the Government

alleges that Ulbricht and Silk Road are one and the same, Ulbricht has not

conceded that he created Silk Road, or that he administered or oversaw its

operations, or even that he used or accessed it at all.  Ulbricht has not submitted a

declaration or affidavit attesting to any personal privacy interest that he may have

in any of the items searched and/or seized and as to which his motion is directed.

Ulbricht's lawyer has, however, argued that his "expectation of privacy in his

laptop, Google or Facebook accounts" is "manifest" (ECF No. 83 at 2 n.2), and the

Government has stipulated to his "expectation of privacy" in those (ECF No. 85).[2]

      The Government's investigation involved, <u>inter alia</u>, the imaging and

subsequent search of a server located in Iceland (the "Icelandic server") in July

2013.  Based in large part on the results of information learned from the Icelandic

server, the Government then obtained various court orders for pen-registers and

trap and trace devices (the "Pen-Trap Orders"), and warrants to seize and then

---

[2] On October 7, 2014, the Court issued an order in which it provided the defendant a "final opportunity" to submit a declaration or affidavit establishing some privacy interest in the items searched and/or seized.  (ECF Nos. 76-77.)  By letter dated October 7, 2014, his lawyer responded that "Mr. Ulbricht rests on his papers already submitted." (ECF No. 83.)

search a number of other servers located within the United States, as well as a

laptop associated with Ulbricht and his Facebook and Gmail accounts.  In total, the

Government obtained 14 warrants and court orders over the course of its

investigation. (Declaration of Joshau L. Dratel ¶ 3(a)-(n), ECF No. 47 ("Dratel

Decl.").)  Those warrants and orders are as follows:

> Warrant No. 1:  Windstream "JTan" server #1 (Pennsylvania) (9/9/13);

> Warrant No. 2:  Windstream "JTan" server #2 (Pennsylvania) (9/9/13);

> Warrant No. 3:  Voxility server (California) (9/19/13);

> Warrant No. 4:  Windstream servers assigned host numbers 418, 420 and 421 (Pennsylvania) (10/1/13);

> Warrant No. 5:  Voxility server with IP addresses 109.163.234.40 and 109.163.234.37 (California) (10/1/13);

> Warrant No. 6:  Samsung laptop with MAC address 88-53-2E-9C-81-96 (California) (10/1/13);

> Warrant No. 7:  Premises at 235 Monterey Boulevard (California) (10/1/13);

> Warrant No. 8:  The Facebook account associated with username "rossulbricht" (California) (10/8/13);

> Warrant No. 9:  The Gmail account rossulbricht@gmail.com (10/8/13);

> Pen-Trap Order No. 1:  To Comcast re IP address 67.170.232.207 (9/16/13);

> Pen-Trap Order No. 2:  To Comcast re IP address 67.169.90.28 (9/19/2013);

> Pen-Trap Order No. 3:  Re the wireless router with IP address 67.169.90.28 located at 235 Monterey Boulevard (California) (9/20/13);

> Pen-Trap Order No. 4:  Re certain computer devices associated with MAC addresses including 88-53-2E-9C-81-96, (9/20/13); and

Pen-Trap Order No. 5:  Re the wireless router with IP address
67.169.90.28 located at 235 Monterey Boulevard (California) (9/19/13).

According to defendant, virtually all of the Government's evidence stems from

the initial search of the Icelandic server in July 2013, which occurred before any of

the above warrants issued.[3]  The vast bulk of defendant's submission is concerned

with raising questions regarding how the Government obtained the information

that led it to the Icelandic server.  One of defendant's lawyers, Joshua Horowitz,

has some technical training, and he asserts that the Government's explanation of

the methods it used is implausible.  (See Declaration of Joshua J. Horowitz ¶¶ 4-8,

17-51, ECF No. 70 ("Horowitz Decl.").)  Defendant insists that this Court must

therefore hold an evidentiary hearing to determine whether the methods the

Government asserted it used and that led it to the Icelandic server were in fact its

actual methods or not.  (See Memorandum of Law in Support of Defendant Ross

Ulbricht's Pre-Trial Motions to Suppress Evidence, Order Production of Discovery,

for a Bill of Particulars, and to Strike Surplusage at 28-34, ECF No. 48 ("Def.'s

Br."); Reply Memorandum of Law in Support of Defendant Ross Ulbricht's Pre-Trial

Motions to Suppress Evidence, Order Production of Discovery, for a Bill of

Particulars, and to Strike Surplusage at 4-8, ECF No. 69 ("Def.'s Reply Br.").)

Defendant argues that if that search of the Icelandic server was only possible

---

[3] U.S. law enforcement began working with law enforcement in Iceland on this investigation as early
as February 2013.  A server—later determined to no longer be in primary use—was imaged in the
spring or early summer of 2013 ("Icelandic Server #1").  Ulbricht asserts that the process leading to
the imaging of the server may also have been constitutionally infirm.  But Icelandic Server #1 is in
all events irrelevant, as the Government has represented that it does not intend to use any evidence
obtained from that server.

because of a preceding constitutionally infirm investigation, then all subsequent
warrants and court orders based on that search constitute fruits of the poisonous
tree and must be suppressed.

In addition, defendant also asserts that the warrants relating specifically to
the servers located in Pennsylvania (nos. 1, 2 and 4) as well as the warrants
relating to Ulbricht's laptop, Facebook and Gmail accounts (nos. 6, 8 and 9) are
unconstitutional general warrants; and finally that the Pen-Trap Orders were
unlawful because a warrant was required and they failed to include appropriate
minimization procedures.  Defendant has retained experienced counsel who
certainly understand Fourth Amendment jurisprudence.  It has long been
established—indeed, it is a point as to which there can be no dispute—that (1) the
Fourth Amendment protects the constitutional right of an individual to be free from
unreasonable searches and seizures; (2) the rights conferred by the Fourth
Amendment may not be vicariously asserted; and (3) the Fourth Amendment does
not confer any general right available to anyone impacted by an investigation to
pursue potentially or actually unlawful law enforcement techniques.  The only
exception to that is extremely narrow: when law enforcement techniques are so
egregious (defined as actions such as torture, not simply unlawful conduct) as to
violate the Fifth Amendment, a court may suppress the evidence.

Defendant has not asserted a violation of the Fifth Amendment—nor could
he.  Defendant has, however, brought what he must certainly understand is a
fatally deficient motion to suppress.  He has failed to take the one step he needed to

take to allow the Court to consider his substantive claims regarding the investigation: he has failed to submit anything establishing that he has a personal privacy interest in the Icelandic server or any of the other items imaged and/or searched and/or seized.  Without this, he is in no different position than any third party would be vis-à-vis those items, and vis-à-vis the investigation that led U.S. law enforcement officers to Iceland in the first place.

There is no doubt that since defendant was indicted and charged with seven serious crimes resulting from that initial investigation and the searches that followed it, he has a "personal interest" in the Icelandic server in a colloquial sense. But longstanding Supreme Court precedent draws a stark difference between that sort of interest and what the law recognizes as necessary to establish a personal Fourth Amendment right in an object or place.  To establish the latter, defendant must show that he has a personal privacy interest in the object (e.g., a server) or premises searched, not just that the search of the specific object or premises led to his arrest.  Were this or any other court to ignore this requirement in the course of suppressing evidence, the court would undoubtedly have committed clear error.

Further, defendant could have established such a personal privacy interest by submitting a sworn statement that could not be offered against him at trial as evidence of his guilt (though it could be used to impeach him should he take the witness stand).  Yet he has chosen not to do so.

In short, despite defendant's assertions and the potential issues he and his counsel raise regarding the investigation that led to the Icelandic server, he has not

provided the Court with the minimal legal basis necessary to pursue these assertions. Thus, the declaration submitted by Joshua J. Horowitz, Esq. (ECF No. 70) along with all the arguments regarding the investigation and the warrants based on it are not properly before this Court. The only arguments that this Court must consider as a substantive matter are those concerning property and accounts as to which defendant has an arguable and cognizable (though itself not legally established) personal privacy interest: the laptop, the Gmail account, and the Facebook account.[4]

## II.  SEARCHES AND SEIZURES

### A.  The Fourth Amendment

Ulbricht's motion to suppress evidence is premised upon an assertion that the Government has, or may have, engaged in one or more unreasonable searches and seizures in violation of the Fourth Amendment of the U.S. Constitution. The Fourth Amendment protects the people against unreasonable searches and seizures. U.S. Const. amend. IV. "Ever since its inception, the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct." Terry v. Ohio, 392 U.S. 1, 12 (1968). In the absence of a warrant or the applicability of an exception, law enforcement does not have a general right to enter one's home, rifle through drawers, and take what might be found therein. See, e.g., United States v. Jenkins, 876 F.2d 1085, 1088 (2d Cir. 1989).

---

[4] For reasons the Court does not understand, Ulbricht chose not to submit a declaration claiming any personal privacy interest and expectation of privacy in the search of 235 Monterey Boulevard or the wireless router located at those premises.

Evidence seized in violation of the Fourth Amendment is subject to exclusion at trial—hence, references to "the exclusionary rule" in Fourth Amendment jurisprudence.  See, e.g., Terry, 392 U.S. at 13.  Exclusion ensures judicial integrity and protects courts from being made a party to "lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasion."  Id.  Direct and indirect evidence may be subject to preclusion: all evidence that flows directly or indirectly from unlawfully seized evidence is considered "fruit of the poisonous tree."  Wong Sun v. United States, 371 U.S. 471, 484-85 (1963) (the exclusionary rule of the Fourth Amendment extends to indirect evidence as well as direct evidence).

"[T]he Fourth Amendment protects people, not places."  Katz v. United States, 389 U.S. 347, 351 (1967).  In Katz, petitioner sought to suppress evidence of his end of a telephone call, obtained by the FBI after it placed a listening device on a public telephone booth.  Id. at 348-50.  The Supreme Court defined the issue not as one regarding whether a particular physical space was a constitutionally protected area, or whether physical penetration of a protected area was required for a Fourth Amendment violation.  Id. at 350-51.  This is important for this Court's consideration here of Ulbricht's claims.  The Supreme Court in Katz then stated that the Fourth Amendment cannot be translated into a general constitutional "right to privacy," nor does it cover some nebulous group of "constitutionally protected area[s]."  Id.  A person's general right to privacy—his right to be let alone by other people—is, like the protection of his property and his very life, left largely

9

to the law of the individual states. Id. Thus, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Id.

1.   Foreign searches and seizures.

The law has long been clear that the protections of the Fourth Amendment do not extend to searches conducted outside the United States by foreign law enforcement authorities. See, e.g., United States v. Lee, 723 F.3d 134, 139 (2d Cir. 2013) ("[T]he Fourth Amendment's exclusionary rule, which requires that evidence seized in violation of the Fourth Amendment must be suppressed, generally does not apply to evidence obtained by searches abroad conducted by foreign officials."); United States v. Busic, 592 F.2d 13, 23 (2d Cir. 1978) ("[T]he Fourth Amendment and its exclusionary rule do not apply to the law enforcement activities of foreign authorities acting in their own country."); accord United States v. Peterson, 812 F.2d 486, 490 (9th Cir. 1987).

An exception to this rule is when foreign law enforcement authorities become agents of U.S. law enforcement officials. See Lee, 723 F.3d at 140 (constitutional requirements may attach "where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials" (quoting United States v. Maturo, 982 F.2d 57, 61 (2d Cir. 1992))). If, for instance, U.S. law enforcement was able to and did command and control the efforts of foreign law enforcement, an agency relationship might be found. United States v. Getto, 729 F.3d 221, 224 (2d Cir. 2013) (holding that "ongoing collaboration between an American law enforcement agency and its foreign counterpart in the course of

10

parallel investigations does not—without American control, direction, or an intent

to evade the Constitution—give rise to a relationship sufficient to apply the

exclusionary rule to evidence obtained abroad by foreign law enforcement"). The

foreign searches must, however, be "reasonable." <u>In re Terrorist Bombings of U.S.</u>

<u>Embassies in E. Africa</u>, 552 F.3d 157, 167 (2d Cir. 2008) (holding that "foreign

searches of U.S. citizens conducted by U.S. agents are subject only to the Fourth

Amendment's requirement of reasonableness").[5] As the Supreme Court has

explained:

> The test of reasonableness under the Fourth Amendment
> is not capable of precise definition or mechanical
> application. In each case it requires a balancing of the
> need for the particular search against the invasion of
> personal rights that the search entails. Courts must
> consider the scope of the particular intrusion, the manner
> in which it is conducted, the justification for initiating it,
> and the place in which it is conducted.

<u>Bell v. Wolfish</u>, 441 U.S. 520, 559 (1979).

> 2.   <u>Personal privacy interest.</u>

Supreme Court precedent, binding on this and all courts in this land,

establishes that the "capacity to claim the protection of the Fourth Amendment

depends . . . upon whether the person who claims the protection of the [Fourth]

Amendment has a legitimate expectation of privacy in the invaded place." <u>Rakas v.</u>

<u>Illinois</u>, 439 U.S. 128, 143 (1978); <u>see also</u> <u>United States v. Watson</u>, 404 F.3d 163,

166 (2d Cir. 2005) (affirming denial of a suppression motion on the basis that the

---

[5] It is unclear whether foreign searches of objects or premises in which only non-citizens have a privacy interest are subject to the Fourth Amendment's reasonableness requirement. <u>See</u> <u>United States v. Bin Laden</u>, 126 F. Supp. 2d 264, 276 (S.D.N.Y. 2000) (collecting cases).

defendant had failed to show an expectation of privacy).   This principle derives

from the Supreme Court's holding in <u>Katz v. United States</u>, in which the Court

found that while common law trespass had long governed Fourth Amendment

analysis, the capacity to claim the protection of the Fourth Amendment depended

first and foremost on a personal expectation of privacy in the invaded place.  389

U.S. at 352-53.  The Court found that even though petitioner was located in a public

telephone booth when the search occurred, "the Government's activities in

electronically listening to and recording the petitioner's words violated the privacy

upon which he justifiably relied . . . and thus constituted a 'search and seizure'

within the meaning of the Fourth Amendment."  <u>Id.</u> at 353.

The law therefore leaves no doubt that Fourth Amendment rights are based

on a personal, subjective expectation of privacy; they are rights of a person, not

rights of a "thing"—whether that thing be a server, a car, or a building.  If a

person—a human—cannot establish a cognizable personal expectation of privacy in

the place or thing searched, there is no Fourth Amendment issue and no reason to

undertake a Fourth Amendment analysis.

How, then, is one's interest in a place or thing established?  It must be

established by a declaration or other affirmative statement of the person seeking to

vindicate his or her personal Fourth Amendment interest in the thing or place

searched.  <u>See, e.g.</u>, <u>United States v. Smith</u>, 621 F.2d 483, 487 (2d Cir. 1980)

(defendants had no legitimate expectation of privacy in trunk of car where they did

not assert ownership of car, knowledge of trunk's contents, or access to trunk);

United States v. Montoya-Echevarria, 892 F. Supp. 104, 106 (1995) ("The law is clear that the burden on the defendant to establish [Fourth Amendment] standing is met only by sworn evidence, in the form of affidavit or testimony, from the defendant or someone with personal knowledge."); United States v. Ruggiero, 824 F. Supp. 379 (S.D.N.Y. 1993) ("It is well established that in order to challenge a search, a defendant must submit an affidavit from someone with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable privacy interest in the searched premises at the time of the search.").  The Supreme Court has also established that the defendant—not the Government—bears the burden of proving that he has a legitimate expectation of privacy. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); see also Watson, 404 F.3d at 166.

The requirement that one must have a personal expectation of privacy at the time of the search in the thing or place searched is not novel and has been repeatedly litigated.  One can easily see why: even if one did not have an expectation of privacy at the time of the search, the search might lead to inculpatory evidence.  At that point, the now-defendant might certainly desire that the thing or place searched had been left alone.

In Rakas, the Supreme Court reviewed the question of whether passengers in a vehicle that was searched could move to suppress the evidence obtained thereby. 439 U.S. at 130-32.  In that case, the police received a report of a robbery and the description of a getaway car.  Id. at 130.  Shortly thereafter, an officer stopped and searched a vehicle matching that description.  Id.  The search revealed ammunition

and a firearm. Id. Petitioners had been passengers in the vehicle and were

arrested following the search. Id. Neither the car nor the evidence seized belonged

to them. Id. at 131. They moved to suppress the evidence on the basis that the

search violated their rights under the Fourth Amendment. Id. at 130-31.

The question before the Court was presented as whether petitioners had

"standing" to bring the suppression motion. Id. at 131-32. Petitioners urged the

Court to relax or broaden the rule of standing so that any criminal defendant at

whom a search was "directed" would have standing to challenge the legality of the

search. Id. at 132. The Court recognized that prior case law (including Jones v.

United States, 362 U.S. 257 (1960)) had discussed the concept of standing as

whether the individual challenging the search had been the "victim" of the search.

Petitioners in Rakas urged the Court to broaden the "victim" concept to a "target

theory" of standing for Fourth Amendment purposes. Id. at 132-33. The Supreme

Court declined to do so, reiterating that the law has long been clear that Fourth

Amendment rights were personal rights which may not be vicariously asserted. Id.

at 133-34. The Court recited numerous instances over time in which courts had

rejected defendants' assertions that they were aggrieved by unconstitutional

searches of third parties' premises or objects. Id. at 134 (collecting cases). "A

person who has been aggrieved by an illegal search and seizure only through the

introduction of damaging evidence secured by a search of a third person's premises

or property has not had any of his Fourth Amendment rights infringed." Id. "[I]t is

proper to permit only defendants whose Fourth Amendment rights have been

violated to benefit from the rule's protections." Id.  The Court stated, "[c]onferring

standing to raise vicarious Fourth Amendment claims would necessarily mean a

more widespread invocation of the exclusionary rule during criminal trials." Id. at

137.  The Court further reasoned that "[e]ach time the exclusionary rule is applied

it exacts a substantial social cost for the vindication of Fourth Amendment rights,"

in that "[r]elevant and reliable evidence is kept from the trier of fact and the search

for truth at trial is deflected." Id.

The Court also concluded that whether a defendant has the right to challenge

a search and seizure is best analyzed under "substantive Fourth Amendment

doctrine," and not standing, though the inquiry ought to be the same under either.

Id. at 139.

Rakas and the case law on which it is based and which has followed it thus

require this Court to ask whether a defendant who is challenging a search or

seizure has established a sufficient personal privacy interest in the premises or

property at issue.  A defendant may make such a showing by asserting that he

owned or leased the premises (for example, the leasing of a server would count) or

had dominion or control over them. Watson, 404 F.3d at 166; United States v.

Villegas, 899 F.2d 1324, 1333 (2d Cir. 1990).  Indeed, to a limited extent, yet to be

defined by the courts, an authorized user of a premises might have a sufficient

expectation of privacy. See Rakas, 439 U.S. at 142-43 ("[A] person can have a

legally sufficient interest in a place other than his own home so that the Fourth

Amendment protects him from unreasonable governmental intrusion into that

place."). Factual claims made in an affirmation by defendant's counsel may be an insufficient basis upon which to challenge a search if they are made without personal knowledge or are otherwise insufficiently probative. See Watson, 404 F.3d at 166-67.

There are limited situations—"extreme case[s]," United States v. Rahman, 189 F.3d 88, 131 (2d Cir. 1999) (per curiam)—in which a government practice might be "so outrageous that due process principles would absolutely bar the [G]overnment from invoking judicial processes to obtain a conviction . . . ." United States v. Russell, 411 U.S. 423, 431-32 (1973); see also United States v. Christie, 624 F.3d 558 (3d Cir. 2010) ("The pertinent question is whether the government's conduct was so outrageous or shocking that it amounted to a due process violation."); Czernicki v. United States, 270 F. Supp. 2d 391, 394-95 (S.D.N.Y. 2003). However, only conduct that "shocks the conscience" amounts to a due process violation in this context. Rahman, 189 F.3d at 131 (quoting Rochin v. California, 342 U.S. 165, 172 (1952)).

Defendant cites U.S. v. Gelbard, 408 U.S. 41 (1972), and United States v. Ghailani, 743 F. Supp. 2d 261 (S.D.N.Y. 2010), for the proposition that "a defendant is entitled to know whether a Government's investigation was predicated on illegal government conduct, and [obtain] relief therefrom." (Def.'s Reply Br. at 7.) That is only so to the extent that the issues concern a defendant's personal Fourth Amendment rights, or if "extreme conduct" is involved. Unlawful conduct alone is not enough. See, e.g., United States v. Payner, 447 U.S. 727, 729-31 (1980). In

16

Ghailani, the issue concerned whether the court would allow testimony from a cooperating witness who had been tortured.  743 F. Supp. 2d at 267.  The court ruled that it would not, id. at 287-88, but importantly, Ghailani was "not a Fourth Amendment search and seizure case," id. at 285.

A defendant seeking both to establish an interest in items seized, and to put the Government to its proof of establishing a connection, is protected to the extent that any declaration or affidavit he submits may not be offered against him at trial. Simmons v. United States, 390 U.S. 377, 393-94 (1968) ("[W]hen a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.").  This does not insulate the defendant from all risk, however.  His statement may nonetheless be used to impeach him should he take the witness stand in his own defense and, at that time, open the door to the statement.  United States v. Jaswal, 47 F.3d 539, 543 (2d Cir. 1995); United States v. Beltran-Gutierrez, 19 F.3d 1287, 1291 (9th Cir. 1994).  (Of course, perjury in a declaration or on the stand is never permitted; so there are reasons to expect consistency.)  It is certainly true, therefore, that the requirement of a statement of a personal privacy interest in an item seized requires a defendant to make choices.[6]

---

[6] The order of proof at trial is known in advance: the Government bears the burden of proof, which means the Government goes first.  If, after the Government rests, it has failed to present sufficient evidence, the defendant can move pursuant to Rule 29 of the Federal Rules of Criminal Procedure for a judgment of acquittal.  Ulbricht would not take the witness stand (if at all) until those prior steps had occurred, and so the impeachment, if any, of Ulbricht with a statement setting forth a privacy interest in the Icelandic server would not occur until that point.  (The Court recognizes that trial strategy is often cemented during open statements.)

Simply asserting a personal privacy interest in a premises or an object does not—even when a warrantless search has occurred—require a finding of a Fourth Amendment violation.  A court asks a second question: whether society is willing to recognize that this expectation is, in turn, reasonable.  California v. Ciraolo, 476 U.S. 207, 211 (1986); Katz, 389 U.S. at 360.  For instance, that an individual has taken measures to restrict third-party viewing of his activities in a space that he owns or leases does not necessarily mean that that privacy interest is one society is prepared to recognize as reasonable.  See Ciraolo, 476 U.S. at 209-10, 215 (finding no Fourth Amendment violation when aerial photographs had been taken above a property whose owner had taken fairly extensive measures to shield from view); see also Oliver v. United States, 466 U.S. 170, 182-84 (1984) (placement of "No Trespassing" signs on secluded property does not create legitimate privacy interest in marijuana fields).

Assuming a cognizable privacy interest, the court can then turn to whether the search was lawful.[7]

    3.    Warrants.

Searches not incident to arrest or exigent circumstances are generally based on a warrant.  Kentucky v. King, 131 S. Ct. 1849, 1856 (2011).  The Warrant Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon

---

[7] In the absence of a cognizable privacy interest, the Court has no basis to proceed with a suppression motion, and therefore no basis on which to hold an evidentiary hearing.  Evidentiary hearings are only necessary when a defendant makes a sufficient offer of proof with respect to his allegation that a false statement was made knowingly and intentionally, or with reckless disregard for the truth, by an affiant in a warrant affidavit, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no evidentiary hearing is required.  Franks v. Delaware, 438 U.S. 154, 171 (1978).

probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. An application for a warrant must state under penalty of perjury facts supporting probable cause. <u>See</u> U.S. Const. amend. IV (warrant may not issue unless supported by probable cause, supported by "oath or affirmation"). A magistrate judge then reviews the warrant, determines whether the showing of probable cause and particularity is sufficient, and if so, signs it. See <u>United States v. George</u>, 975 F.2d 72, 76 (2d Cir. 1992) ("The particularity requirement prevents this sort of privacy invasion and reduces the breadth of the search to that which a detached and neutral magistrate has determined is supported by probable cause."). A magistrate judge's review is based on the totality of the circumstances. <u>Illinois v. Gates</u>, 462 U.S. 213, 238-39 (1983). In later reviewing such determination on a motion to suppress, the reviewing court is to give the magistrate judge's review a high degree of deference. <u>See id.</u> at 236 ("A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" (quoting <u>Spinelli v. United States</u>, 393 U.S. 410, 419 (1969), <u>abrogated on other grounds by</u> <u>Gates</u>, 462 U.S. 213))).

In addition to its probable cause requirement, the Warrant Clause contains a prohibition against "general warrants." <u>Andresen v. Maryland</u>, 427 U.S. 463, 480 (1976). "'The problem (posed by a general warrant) is not that of intrusion Per se, but of a general, exploratory rummaging in a person's belongings . . . (the Fourth Amendment addresses the problem) by requiring a 'particular description' of the

things to be seized.'" Id. at 480 (quoting Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971)). General warrants are therefore prohibited; the particularity requirement is to ensure that nothing is left to the discretion of the officer when a warrant is being executed—if the item is described as among those to be seized, it may be seized. See Andresen, at 480; see also Stanford v. Texas, 379 U.S. 476, 485 (1965).

      B.    The Riley, Jones, and Kyllo Cases

Defendant refers to the decisions in Riley v. California, 134 S. Ct. 2473 (2014), United States v. Jones, 132 S. Ct. 945 (2012), and Kyllo v. United States, 533 U.S. 27 (2001), as supportive of his motions to suppress and as responding to the "essential privacy imperatives of the digital age." (Def.'s Reply Br. at 1, 13, 19, 21-28; see also Def.'s Br. at 3, 13-15, 17-19, 22-28, 42, 45-49, 59.) These cases do not help defendant on this motion. They are consistent, not inconsistent, with the above longstanding Fourth Amendment principles.

Riley concerned the search of data on a seized cell phone. The lawfulness of the seizure of the object itself —the cell phone—was not contested. The subsequent search of the data on the cell phone was. In Riley, the defendant was stopped for a traffic violation which resulted in his arrest on weapons charges. 134 S. Ct. at 2480. A cell phone was seized as a result of a lawful search of Riley's person incident to his arrest. Id. The arresting officer reviewed the contents of the cell phone without a warrant, and another officer conducted a subsequent and further review of those contents. Id. at 2480-81. The Supreme Court articulated the issue before it as how the requirement of "the reasonableness of a warrantless search

20

incident to a lawful arrest" applies to "modern cell phones." Id. at 2482, 2484. The Court acknowledged that the rationale of prior cases dealing with searches incident to arrest involving physical objects (such as those typically found on an arrestee's person) did not have as much force in the digital context. A "search of the information on a cell phone bears little resemblance to the type of brief, physical search considered in [United States v. Robinson, 414 U.S. 218 (1973)]." Id. at 2485. Because the data on a cell phone are generally far more extensive than the contents of physical objects and do not present the same type of safety issues, the Court determined that warrants are generally required to search the contents of cell phones. Id. at 2485-86. The Court based its decision both on the potential breadth of the information a cell phone might contain, as well as on the fact that digital data generally cannot be used as a weapon or to cause immediate physical danger. Id. Nothing in the Court's opinion in Riley suggests any departure from any of the principles regarding the need to establish a personal privacy interest, as discussed above, and as is obvious, the opinion says nothing concerning searches by foreign law enforcement officers outside the United States.

Jones concerned the warrantless attachment of a Global-Positioning-System ("GPS") tracking device to a Jeep vehicle and the subsequent monitoring of the movements of that vehicle. 132 S. Ct. at 948. The Supreme Court examined the question of whether the physical placement of the GPS device constituted a search within the meaning of the Fourth Amendment and found that it did. There, the Supreme Court returned to age-old concepts of physical trespass and the Fourth

21

Amendment.  See id. at 949-54.  In this context, the physical attachment of the device was found to unreasonably intrude on the defendant's reasonable expectation of privacy and, "[b]y attaching to the device to the Jeep, officers encroached on a protected area."  Id. at 952.  The Court acknowledged that more nuanced cases— such as situations involving the transmission of electronic signals without trespass—were different from the case then at hand and would be subject to analysis under the factors set forth in Katz.  Id. at 953.  Jones neither alters nor extends Fourth Amendment law in light of the digital era.  Indeed, the majority opinion looks more to the past than it does to the future.

In Kyllo, the Supreme Court did find that relatively new technology— thermal imaging used on the exterior of a private residence, and which provided information as to what was occurring in that private residence—constituted a search for purposes of the Fourth Amendment.  Kyllo, 533 U.S. at 40.  The thermal imaging was performed from the exterior of the house and occurred over a span of just a few minutes.  Id. at 29-30.  Based upon the information obtained, the investigating agent drew the conclusion that the residence functioned in part as a grow-house for marijuana.  Id. at 30.  There, too, the Court applied longstanding principles of law to find that the defendant had a reasonable expectation of privacy in his residence—the sanctity of which has long been the concern of Fourth Amendment jurisprudence.  Id. at 34-40.  The Court held that "[w]here, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the

**A198**

surveillance is a 'search' and is presumptively unreasonable without a warrant." Id.

at 40.

C.    Discussion

Here, the Government obtained nine warrants and five pen-trap orders.

Ulbricht argues that all of the warrants and orders suffer from one overarching

infirmity: they are based on the cursory recitation of an "investigation" that was

only possible as the result of the search that led to the authorities to Iceland.

Ulbricht argues that how that search was conducted is unknown, and that if it was

conducted in an unlawful manner, then all of the warrants are constitutionally

defective.[8]

Ulbricht's motion is largely, therefore, directed at an investigation and search

of objects (servers) and premises in which he has carefully avoided establishing a

personal privacy interest.  As the above principles make clear, just because the

investigation eventually led to his arrest on criminal charges does not ipso facto

give him a privacy interest in any Silk Road servers.  Katz, 389 U.S. at 351 ("[T]he

Fourth Amendment protects people, not places.").

As the Court has set forth above, Ulbricht was provided ample opportunity

to establish such an interest—including an additional and specific request by this

---

[8] Ulbricht also argues that the magistrate judges who received the warrant applications failed
appropriately to inquire into how the preliminary investigation was conducted. (Def.'s Br. at 36-37.)
For all of the reasons discussed throughout this opinion, he has not established a personal privacy
interest that would allow him to pursue this argument.  Nevertheless, even if this Court were to
perform a substantive review of the merits it would find that there is no deficiency.  This Court is to
give a receiving magistrate's determination of probable cause a high degree of deference.  See Gates,
462 U.S. at 236.  It is apparent from the face of the affidavit in support of Warrant No. 1—which
contains a handwritten addition by the affiant and the initials of the reviewing magistrate—that the
application was carefully reviewed and probable cause established.

23

Court on October 7, 2014.  (ECF Nos. 76-77.)  He elected to "rest[] on his papers."
(ECF No. 83.)  This is either because he in fact has no personal privacy interest in
the Icelandic server, or because he has made a tactical decision not to reveal that he
does.

The requirement to establish a personal privacy interest might appear to
place Ulbricht in a catch-22: if the Government must prove any connection between
himself and Silk Road, requiring him to concede such a connection to establish his
standing the searches and seizures at issue could be perceived as unfair.  But as
Ulbricht surely knows, this is not the first court, nor is he the first defendant, to
raise such an issue.  See, e.g., Payner, 447 U.S. 727.  In Payner, the Government
obtained evidence against a defendant based on a "flagrantly illegal search of a
[third party's] briefcase."  Id. at 729.  The Supreme Court referenced having decided
Rakas the prior term, reaffirming the "established rule that a court may not exclude
evidence under the Fourth Amendment unless it finds that an unlawful seizure
violated the defendant's own constitutional rights."  Id. at 731 (collecting cases).
"And the defendant's Fourth Amendment rights are violated only when the
challenged conduct invaded his legitimate expectation of privacy rather than that of
a third party."  Id. (emphasis in original) (citing, inter alia, Rakas, 439 U.S. at 143.)

While the district court and the circuit court in Payner recognized this rule,
they directly stated that a federal court should use its supervisory power to
suppress evidence tainted by gross illegalities that did not infringe the defendant's
constitutional rights.  Id. at 733.  The Supreme Court disagreed—and found that

the extension of the supervisory power would "enable federal courts to exercise a standardless discretion in their application of the exclusionary rule to enforce the Fourth Amendment." Id. at 733.  The Supreme Court reiterated that it did not condone lawless behavior—but nor did lawless behavior command "the exclusion of evidence in every case of illegality." Id. at 734.  "Our cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of government rectitude would impede unacceptably the truth-finding functions of the judge and jury." Id.  The Court concluded that "the supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court." Id. at 735.

Ulbricht and other defendants seeking to both establish an interest in items seized, and put the Government to its proof of establishing a connection, are protected to the extent that any declaration or affidavit may not be offered against the defendant at trial. See Simmons, 390 U.S. at 393-94 (a defendant's sworn statements offered in support of a motion to suppress may not thereafter be admitted against him at trial on the issue of guilt unless defendant does not object). This does not insulate the defendant from all risk, however.  His statement may nonetheless be used to impeach the defendant should he take the witness stand in his own defense and, at that time, open the door to the statement on direct. United States v. Jaswal, 47 F.3d 539, 543 (2d Cir. 1995); United States v. Beltran-Gutierrez, 19 F.3d 1287, 1291 (9th Cir. 1994).  It is certainly true, therefore, that the requirement of a statement of a personal privacy interest in an item seized

requires a defendant to make hard choices.  One choice is to establish an interest if such exists to enable a court to take up important issues.  That could not or was not done here.

Here, the Court does not know whether Ulbricht made a tactical choice because he is—as they say—between a rock and a hard place, or because he truly has no personal privacy interest in the servers at issue.

It is clear, however, that this Court may not proceed with a Fourth Amendment analysis in the absence of the requisite interest.  If a third party leased a server on which the Government unlawfully intruded in the investigation that led to the Icelandic server, under <u>Katz</u>, <u>Rakas</u>, <u>Payner</u>, and a host of other case law, that is no basis for an assertion by Ulbricht that <u>his</u> Fourth Amendment rights were violated.  Thus, whatever methods used—lawful or unlawful—are beyond this Court's purview.  <u>Payner</u>, 447 U.S. at 735.  Ulbricht therefore has no basis to challenge as violations of his Fourth Amendment rights: (1) the investigation that preceded and led to the Icelandic server, (2) the imaging and search of the Icelandic server, and (3) Warrant Nos. 1, 2, 3, 4, 5, and 7.[9]

Ulbricht has not proffered a statement that he had a personal expectation of privacy in the laptop (Warrant No. 6), Facebook (Warrant No. 8) or Gmail accounts (Warrant No. 9).  While his lawyer stated that his privacy interest in the accounts and his laptop is "manifest" (ECF No. 83 at 2 n.2), the law has long held that

---

[9] Ulbricht has also argued that Warrant Nos. 1, 2, 3, 4, 5, and 7 are unlawful "general warrants." (<u>See</u> Def.'s Reply Br. at 3.)  For the same reasons that he lacks a sufficient Fourth Amendment interest to challenge the investigatory technique that underlies the probable cause recited in the warrants, so too he lacks a sufficient interest as to this argument.

statements submitted by attorneys that are merely conclusory or that do not allege personal knowledge on the part of the attorney are insufficient to create an issue of fact.  See United States v. Motley, 130 Fed. App'x 508, 510 (2d Cir. 2005) (summary order) (citing Lipton v. Nature Co., 71 F.3d 464, 469 (2d Cir. 1995); United States v. Gillette, 383 F.2d 843, 848-49 (2d Cir. 1967).  While the Court may assume based on his attorney's statement and the Government's stated intention not to contest that position that these accounts and the laptop belong to Ulbricht, that does not necessarily mean that he has a reasonable expectation of privacy as to their respective contents.  There are, of course, many ways in which users may set up the privacy settings or password protection for their Facebook and Gmail accounts, as well as access to their laptops—and these settings and protections are relevant to a Katz analysis.  See United States v. Meregildo, 883 F. Supp. 2d 523, 525 (S.D.N.Y. 2012) ("When a social media user disseminates his postings and information to the public, they are not protected by the Fourth Amendment.  However, postings using more secure privacy settings reflect the user's intent to preserve information as private and may be constitutionally protected." (citations omitted)).  It is also possible for more than one individual to have access to a single shared Facebook or Gmail account.  It also seems likely that many of Ulbricht's emails were to individuals other than himself, which could defeat an expectation of privacy in them.  See United States v. Lifshitz, 369 F.3d 173, 190 (2d Cir. 2004) (explaining that emailers generally lose a legitimate expectation of privacy in an email that has already reached its recipient (citing Guest v. Leis, 255 F.3d 325, 333 (6th Cir.

2001))).[10]  The Court has no idea whether Ulbricht had a reasonable subjective expectation that all aspects of his Facebook and Gmail accounts would be private, or none.  The Court has no idea whether his laptop was password protected or not. And that makes a difference.  The Court cannot just assume a subjective expectation of privacy.[11]

In any event, the warrants relating to these three items were lawful.  As the Court has set forth above, Ulbricht cannot challenge the initial investigation that led to the Icelandic server.  Information obtained from the search of that server led law enforcement to other servers within the United States (as to which Ulbricht similarly has no demonstrated privacy interest), and the information gathered as a result of those searches undoubtedly found its way into the probable cause analysis for Warrant Nos. 6, 8 and 9.  That probable cause supported Warrants 6, 8 and 9 was well and solidly established—even without the deference this Court must give to the reviewing magistrate judge.  See Gates, 462 U.S. at 236; United States v. Martin, 426 F.3d 68, 73 (2d Cir. 2005) (courts must afford a presumption of validity to the affidavits supporting a search warrant); United States v. Carpenter, 341 F.3d

---

[10] The Court does not here decide that Ulbricht could never have an expectation of privacy in an email he sent to a third party.

[11] It is particularly inappropriate to do so in light of published user terms for both Gmail accounts and Facebook which indicate that under certain circumstances the accounts may be turned over, without notice, to law enforcement.  See Privacy Policy, Google, http://www.google.com/policies/privacy/ (last modified Mar. 31, 2014) ("Your domain administrator may be able to . . . receive your account information in order to satisfy applicable law, regulation, legal process or enforceable government request. . . .  We will share personal information with companies, organizations or individuals outside of Google if we have a good-faith belief that . . . the information is reasonably necessary to: meet any applicable law, regulation, legal process, or enforceable governmental request."); Information for Law Enforcement Authorities, Facebook, https://www.facebook.com/safety/groups/law/guidelines/ (last visited October 9, 2014) (explaining that under certain circumstances Facebook may provide a user's information to law enforcement authorities without notice to the user).

666, 670 (8th Cir. 2003) ("[S]uppression remains an appropriate remedy where 'the issuing magistrate wholly abandoned his judicial role.'" (quoting United States v. Leon, 468 U.S. 897, 923 (1984))).  Thus, the warrants do not suffer from any probable cause deficiency.

Nor are these general warrants.  A general warrant is one that lacks particularity as to the item to be seized or as to what should be searched.  George, 975 F.2d at 75.  Here, they were specific as to both.  The warrants identified the laptop and the accounts by name.  There was no lack of specificity as to the items to be seized.  Thus, the entirety of the laptop and data on the hard drive of that laptop was seized, along with the entirety of the accounts.

The warrants were also specific, however, as to what type of evidence should be searched for.  Each of the warrants listed specific categories of items, including evidence of aliases, evidence concerning attempts to obtain fake identification, writings which can be used as stylistic comparisons for other "anonymous" writings, evidence concerning Ulbricht's travel patterns or movement, communications with co-conspirators regarding specified offenses, evidence concerning Bitcoin in connection with the specified offenses, and other evidence relating to the specified offenses.  (See Dratel Decl. exs. 11, 13, 14.)

It is certainly true that in order to search for the specified items, the Warrants sought to seize the entirety of the laptop, the Facebook account, and the Gmail account.  But this does not transform the warrants into general warrants.  Indeed, it is important not to confuse the separate concepts of the seizure of an

item—which were quite specifically identified but which were seized in their
entirety—with the search itself.  The search is plainly related to the specific
evidence sought.  It has long been perfectly appropriate to search the entirety of a
premises or object as to which a warrant has issued based on probable cause, for
specific evidence as enumerated in the warrant, which is then to be seized.  For
instance, warrants have long allowed searching a house high and low for
narcotics—indeed, it is rare that drug dealers point out the hidden trap in the
basemen—or reviewing an entire file cabinet to find files that serve as evidence of
money laundering activity, which might be intermingled with files documenting
lawful and irrelevant activity.  This case simply involves the digital equivalent of
seizing the entirety of a car to search for weapons located within it, where the
probable cause for the search is based on a possible weapons offense.

In In the Matter of a Warrant for All Content and Other Information
Associated with the Email Account at xxxxx@Gmail.com Maintained at the
Premises Controlled by Google, Inc., No. 14 Mag. 309, 2014 WL 3583529 (S.D.N.Y.
Aug. 7, 2014) ("Gmail"), Magistrate Judge Gorenstein comprehensively reviewed the
current state of the law in this area.  In that case, the Government sought a
warrant in connection with an investigation to allow it to search the entirety of a
Gmail account for specified evidence of a crime, as to which sufficient probable
cause had been demonstrated.  Id. at *1.  The warrant did not contain a particular
search protocol and did not limit the amount of time the Government could take to
review the information Google would provide in response to the warrant.  Id.  The

warrant also did not provide for later destruction of the material.  Id.  The court

reviewed Fourth Amendment principles with a particular focus on the requirement

that courts assess the "reasonableness" of a search.  Id. at *2.  The court noted that

courts in Washington, D.C. and Kansas had denied applications seeking warrants

for entire email accounts, at least without protocols in place.  Id. at *3.  The court

found that under long established precedent, when officers executing warrants

went, for instance, to a home or office, and were authorized to seize particular types

of documents, they generally were required to look into the places where any and all

documents were stored; there was no practice and certainly no requirement that

people universally applied to the organization of their documents to assist in quick

and direct location of responsive documents should they ever be the subject of a

warrant.  That was not real life.  Some latitude for searches had to be allowed; this

was particularly true with regard to electronic evidence would could be even more

voluminous and undifferentiated than paper documents.  See id. at *5.

Judge Gorenstein applied these principles to the warrant before him and

determined that because it specified the particular crimes as to which evidence was

sought—and as to which probable cause had been established—it was not

overbroad.  Id. at *7.  He noted that the Federal Rules of Criminal Procedure had

been amended in 2009 to provide for a procedure in which a warrant could

authorize the seizure of electronic storage media or the seizure or copying of

electronically stored information—and that unless the warrant otherwise requires

it, a later review of the media or information is allowed.  Id. at *6 (citing Fed. R.

Crim. P. 41(e)(2)(B)).  The decision also noted the Second Circuit's ruling in United States v. Ganias, 755 F.3d 125 (2d Cir. 2014), in which the Second Circuit held that while wholesale removal of all tangible papers from a premises was not generally acceptable, electronic media posed a different set of issues.  Gmail, 2014 WL 3583529, at *6.  In Ganias, the Court stated that "[i]n light of the significant burdens on-site review would place on both the individual and the Government, the creation of mirror images for offsite review is constitutionally permissible . . . ."  755 F.3d at 135.

This Court agrees entirely with Judge Gorenstein's rationale.  Warrants 6, 8 and 9 are substantially similar to the warrant before Judge Gorenstein, and similarly have the necessary particularity.[12]

III.  PEN-TRAP ORDERS

Defendant argues that the Pen-Trap Orders were deficient for two reasons: (1) the information obtained through the Pen-Trap Orders should have been the

---

[12] Even if this Court were to find that the magistrate judges who issued the warrants erred by approving the clauses to which Ulbricht objects as overly broad, the application of the exclusionary rule here would still be inappropriate, as the law enforcement agents who executed the searches and seizures at issue were entitled to rely in good faith upon the magistrate judges' probable cause determinations, and the warrant applications here were not so "lacking in indicia of probable cause" nor so "facially deficient" that reliance upon the warrant was "entirely unreasonable."  Id. at 921-23 (quotation omitted).

The Court further notes that while it is certainly true that there circumstances under which a warrant that authorizes a seizure of "any communications or writings" in the email account of a defendant would be overbroad, it is also true that a magistrate judge's review of a warrant application must be based on the totality of the circumstances.  Gates, 462 U.S. at 238-39.  Here, these circumstances included many steps taken by members of the alleged conspiracy to maintain their anonymity while creating, designing, administering, operating, and using the Silk Road website, and they included the use of idiosyncratic linguistic patterns by the website's administrator.  Given the high degree of deference that this Court must afford the review of the magistrate judge, see id. at 236, it is not this Court's place to second-guess their decision that the warrants were not overly broad in the context of a case where anonymity and the usage of idiosyncratic linguistic patterns are key issues.

subject of a warrant application, and (2) the orders failed to include appropriate minimization procedures.  Both arguments are meritless.

The law is clear—and there is truly no room for debate—that the type of information sought in Pen-Trap orders 1, 2, 3, 4, and 5 was entirely appropriate for that type of order.[13]  See 18 U.S.C. §§ 3121 et seq.  In Smith v. Maryland, 442 U.S. 735 (1979), the Supreme Court found that the use of a pen-register did not constitute a search for Fourth Amendment purposes, id. at 745-46.  To the extent Ulbricht wants to make novel Fourth Amendment arguments with regard to the Pen-Trap Orders,[14] he has not established the requisite privacy interest (as discussed at length above) to do so.  The Court will therefore not consider those arguments.

Ulbricht's minimization argument is similarly off-base.  Minimization refers to protocols and is used in the wiretap context to prevent investigators from listening to conversations irrelevant to their investigation.  See 28 U.S.C. § 2518 (wiretaps must be conducted "in such a way as to minimize the interception of communications not otherwise subject to interception").  Minimization is directed at content.  See United States v. Rizzo, 491 F.2d 215, 216 n.3 (2d Cir. 1974) (federal

---

[13] The information related to the IP addresses of individual packets of data sent to and from a particular IP address.  The content of the communications was not requested.  Pen-trap devices have frequently been used to obtain precisely that which was sought here.  Before the Internet became widely used, pen-trap devices were used to obtain information regarding the telephone numbers associated with incoming and outgoing telephone calls.  Smith v. Maryland, 442 U.S. 735 (1979).

[14] Defendant argues that the scope of information that can be gleaned from Internet routing information "allows for a profile of an individual's activity far more concrete and comprehensive" that what the telephone numbers associated with a telephone call would reveal.  (Def.'s Reply Br. at 25.)  He urges that as a result, Smith v. Maryland—which occurred in the context of landline telephones—is inapposite.  This Court cannot consider that argument in light of the lack of a demonstrated privacy interest.

minimization laws do not apply "to mere interception of what telephone numbers are called, as opposed to the interception of the contents of the conversations"). The Pen-Trap Orders do not seek the content of internet communications in any directly relevant sense.

## IV.    BILL OF PARTICULARS

Defendant moves for an order requiring the Government to provide a bill of particulars. (Def.'s Br. at 65-79.) Defendant argues that in the absence of additional factual detail not contained in the Indictment, he will be unable to prepare his defense and will have an insufficient basis to make double jeopardy challenges to potential future charges. (Id. at 65.) Defendant argues that the volume of discovery weighs in favor of a bill of particulars. (Id. at 65-66.)

Rule 7(f) of the Federal Rules of Criminal Procedure provides that a court may direct the Government to file a bill of particulars. Fed. R. Crim. P. 7(f). However, a bill of particulars is required "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999) (quoting United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990)).

A bill of particulars is also unnecessary when the Government has produced materials in discovery concerning the witnesses and other evidence. See id. ("[A] bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means.") In Torres, the Second Circuit affirmed the district court's denial of a bill of particulars in part because the defendants were provided with considerable evidentiary detail outside

of the indictment.  901 F.2d at 233-34; see also United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984).  Thus, in determining whether to order a bill of particulars, a court must examine the totality of the information available to defendant, both through the indictment and through pre-trial discovery.  United States v. Bin Laden, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000).  The purpose of the bill of particulars is to avoid prejudicial surprise at trial and give defendant sufficient information to meet the charges against him.  Id. (citing Torres, 901 F.2d at 234).

In Bin Laden, the court granted the defendants' motion for a bill of particulars.  Id. at 227.  There, however, the indictment charged 15 named defendants with 267 discrete criminal offenses, it charged certain defendants with 229 counts of murder, it covered a period of nearly ten years, and it alleged 144 overt acts in various countries.  Id. at 227-28.  The court noted that the "geographical scope of the conspiracies charged in the indictment is unusually vast." Id.

There is no provision in the Federal Rules of Criminal Procedure for the type of broad, sweeping discovery Ulbricht seeks here.  Neither the nature of this indictment or the produced discovery calls for a departure from these general rules. That this case has a high profile does not mean that it requires special treatment. Moreover, there can be no doubt that the Indictment here is specific enough to advise Ulbricht of the acts of which he is accused, namely creating, designing, administering and operating the Silk Road website, which allegedly served as an

online one-stop-shop for narcotics, fake identification documents, and materials used to hack computers, and which was specifically designed to rely on Bitcoin, a method of payment designed to conceal the identities and locations of users transmitting and receiving funds.  This case is unlike <u>Bin Laden</u>, which concerned hundreds of offenses associated with over one hundred alleged actions committed in far corners of the globe—it concerns a single defendant who is alleged to have run a single and clearly identified website.  Further, the Court has gone to considerable lengths to ensure that Ulbricht has access to evidentiary detail outside of the Indictment, including ensuring that a laptop preloaded with certain discovery materials was provided to Ulbricht for use at the Metropolitan Detention Center ("MDC") and particular accommodations regarding the length of time he can routinely access the information.  (ECF No. 40.)  A bill of particulars is wholly unnecessary to avoid prejudicially surprising Ulbricht at trial.

V.    SURPLUSAGE

Rule 7(d) of the Federal Rules of Criminal Procedure provides that, upon a motion by defendant, a court may strike extraneous matter or surplusage from an indictment.  Fed. R. Crim. P. 7(d).  However, "'[m]otions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory or prejudicial.'"  <u>United States v. Mulder</u>, 273 F.3d 91, 99 (2d Cir. 2001) (quoting <u>United States v. Scarpa</u>, 913 F.2d 993, 1013 (2d Cir. 1990)).

Courts have held that statements providing background are relevant and need not be struck.  <u>Id.</u> at 99-100 (in action charging extortion relating to labor

36

coalitions, upholding district court's decision not to strike background on tactics and purposes of labor coalitions).

The surplasage issues defendant has raised relating largely to the murder for hire assertions need not be fully addressed at this time.  Courts in this district routinely await the presentation of the Government's evidence at trial before ruling on a motion to strike surplusage.  See, e.g., Scarpa, 913 F.2d at 1012; United States v. Persico, 621 F. Supp. 842, 861 (S.D.N.Y. 1985); United States v. Ahmed, No. 10 CR. 131(PKC), 2011 WL 5041456, at *3 (S.D.N.Y. Oct. 21, 2011).

In Ahmed, the defendant's motion to strike surplusage related to background information regarding civil and sectarian violence in Somalia and the anti-American animus of Al Shabaab, which was designated by the Secretary of State as a "foreign terrorist organization."  Ahmed, 2011 WL 5041456, at *1-2.  The court held that it would await presentation of the Government's evidence at trial, and stated further that the Government would have some latitude to "demonstrat[e] the nexus between defendant's conduct and American interests, as well as the background of others who are members of the charged conspiracies."  Id. at *3.  The Court noted that denial of the motion without prejudice to renew might also allow the parties to reach a pre-trial stipulation, as had occurred in United States v. Yousef, No. S3 08 Cr. 1213(JFK), 2011 WL 2899244 (S.D.N.Y. June 30, 2011). Ahmed, 2011 WL 5041456, at *3.  Here, as in Ahmed, the Court will await the Government's presentation at trial.

37

VI.    CONCLUSION

For the reasons set forth above, defendant's motion to suppress, for a bill of

particulars and to strike surplusage is DENIED.

The Clerk of Court is directed to close the motion at ECF No. 46.

SO ORDERED.

Dated:      New York, New York
            October __10__, 2014

_____
        KATHERINE B. FORREST
        United States District Judge

38

A214

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:   OCT 2 4 2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                        :
UNITED STATES OF AMERICA                                :
                                                        :
              -v-                                       :          14-cr-68 (KBF)
                                                        :
ROSS WILLIAM ULBRICHT,                                  :          OPINION & ORDER
       a/k/a "Dread Pirate Roberts,"                    :
       a/k/a "DPR,"                                     :
       a/k/a "Silk Road,"                               :
                                                        :
                            Defendant.                  :
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

On February 4, 2014, a federal grand jury returned Indictment 14 Cr. 68 (the

"Original Indictment"), charging Ross Ulbricht ("defendant" or "Ulbricht") on four

counts—all stemming from the creation, administration, and operations of an online

marketplace known as "Silk Road."  (ECF No. 12 ("Orig. Ind.").)  On March 28,

2014, Ulbricht moved to dismiss the Original Indictment in its entirety.  (ECF No.

19.)  That motion became fully briefed on May 27, 2014 (ECF No. 32), and on July 9,

2014, the Court denied the motion (ECF No. 42).  On August 21, 2014, the

Government filed Superseding Indictment S1 14 Cr. 68 (KBF) (the "Superseding

Indictment") containing three additional charges.  (ECF No. 52 ("Sup. Ind.").)

Ulbricht's trial is scheduled to begin on January 5, 2015.

Pending before the Court is defendant's motion to dismiss Counts One

through Four of the Superseding Indictment, for a bill of particulars, and "for any

such other and further relief . . . which to the Court seems just and proper."  (ECF

No. 71.)  For the reasons set forth below, the motion is DENIED.

I.    THE INDICTMENTS[1]

The Original Indictment charged Ulbricht with four crimes: Narcotics Trafficking Conspiracy (Count One), Continuing Criminal Enterprise ("CCE") (Count Two), Computer Hacking Conspiracy (Count Three), and Money Laundering Conspiracy (Count Four).  (Orig. Ind. ¶¶ 1-21.)

The Superseding Indictment, filed on August 21, 2014, charges Ulbricht with seven crimes: Narcotics Trafficking (Count One), Distribution of Narcotics by Means of the Internet (Count Two), Narcotics Trafficking Conspiracy (Count Three), Continuing Criminal Enterprise (Count Four), Conspiracy to Commit and Aid and Abet Computer Hacking (Count Five), Conspiracy to Traffic in Fraudulent Identification Documents (Count Six), and Money Laundering Conspiracy (Count Seven).  (Sup. Ind. ¶¶ 1-31.)  The Superseding Indictment differs from the Original Indictment in the following three respects:

1.    The Superseding Indictment contains three new charges (Counts One, Two, and Six).

2.    Counts One, Two, Three, Five, and Six of the Superseding Indictment include an allegation that Ulbricht aided and abetted the commission of the charged crime.  (Sup. Ind. ¶¶ 5, 8, 13, 15, 21, 22, 25, 26.)

3.    Count Three of the Superseding Indictment alleges that Ulbricht paid a Silk Road user ("User-1") approximately $150,000 to murder another Silk Road user ("User-2") who was threatening to release the identities

---

[1] The Court assumes familiarity with the facts of this case, and recites only those relevant to this motion.

2

of users of the site, and approximately $500,000 to murder four additional persons believed to be associated with User-2. (Id. ¶ 16(b), (c).)

On October 2, 2014, Ulbricht filed a motion to dismiss Counts One through Four of the Superseding Indictment, for a bill of particulars, and "for any such other and further relief . . . which to the Court seems just and proper." (ECF No. 71.) That motion is the subject of this Opinion & Order.

II.   LEGAL STANDARDS

    A.   <u>Sufficiency of an Indictment</u>

Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." <u>Hamling v. United States</u>, 418 U.S. 87, 117 (1974) (citations omitted); <u>see also</u> <u>United States v. De La Pava</u>, 268 F.3d 157, 162 (2d Cir. 2001) ("An indictment must sufficiently inform the defendant of the charges against him and provide enough detail so that he may plead double jeopardy in a future prosecution based on the same set of events." (citation omitted)). "[A] facially valid indictment returned by a duly constituted grand jury" will, absent unusual circumstances, suffice "to call for a trial on the merits of the charges set forth therein." <u>United States v. Bodmer</u>,

3

342 F. Supp. 2d 176, 179 (S.D.N.Y. 2004) (citing <u>Costello v. United States</u>, 350 U.S. 359, 363 (1956)).

> B.   <u>Aiding and Abetting</u>

The law has long provided that aiders and abettors are punishable as principals.  <u>See</u> 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.").  18 U.S.C. § 2(a), the statute criminalizing aiding and abetting, "abolishe[d] the distinction between principals and accessories and [made] them all principals."  <u>Standefer v. United States</u>, 447 U.S. 10, 19 (1980) (alterations in original) (quoting <u>Hammer v. United States</u>, 271 U.S. 620, 628 (1926)) (internal quotation marks omitted); <u>see also</u> <u>id.</u> (recounting the legislative history of § 2).  As the Second Circuit has explained,

> 18 U.S.C. § 2 abolished the differentials in punishment between an accessory before the fact and a principal.  Under common law an aider and abettor had to be present at the site of the crime.  An accessory before the fact is one who, though absent, procures, counsels or commands another to commit an unlawful act.  18 U.S.C. § 2(a) combines these two classifications, making each such defendant equally as guilty as the principal.

<u>United States v. Molina</u>, 581 F.2d 56, 61 n.8 (2d Cir. 1978).  Aiding and abetting an offense "does not constitute a discrete criminal offense but only serves as a more particularized way of identifying 'persons involved.'"  <u>United States v. Smith</u>, 198 F.3d 377, 383 (2d Cir. 1999) (quoting <u>United States v. Oates</u>, 560 F.2d 45, 54 (2d Cir. 1977)) (internal quotation marks omitted).  "In fact, 'when a person is charged with aiding and abetting the commission of a substantive offense, the "crime charged" is . . . the substantive offense itself.'"  <u>Id.</u> (quoting <u>Oates</u>, 560 F.2d at 55).

Because "aiding and abetting is not a separate offense," it "may be charged in the same count as a substantive crime." Novak v. United States, No. CV-07-4361(DGT), 2009 WL 982429, at *4 (E.D.N.Y. Apr. 13, 2009); cf. United States v. Droms, 566 F.2d 361, 363 (2d Cir. 1977) (explaining that a single count may allege that "an offense has been committed in a multiplicity of ways").[2]

III.   DISCUSSION

    C.   <u>Motion to Dismiss Counts One through Four of the Superseding Indictment</u>

       In moving to dismiss Counts One through Four of the Superseding Indictment (the "narcotics counts"), Ulbricht does not dispute that the Superseding Indictment informs him of the charges against him and provides sufficient detail to enable him to plead double jeopardy in a future prosecution. See De La Pava, 268 F.3d at 162. Rather, Ulbricht seeks to dismiss the narcotics counts on the ground that these counts rest on inconsistent theories of liability. Specifically, Ulbricht argues that by charging him "on the basis that he was <u>either</u> a drug 'kingpin,' as alleged in Count Four . . . or merely aiding and abetting others in violating narcotics laws, which the government presents as a theory of liability for the offenses charged in Counts One, Two and Three," "the government has crossed [the] lines of judicial fairness by presenting irreconcilably inconsistent theories regarding Mr. Ulbricht's alleged commission of the offenses charged in Counts One through Four, and thus

_____

[2] For this reason, an indictment charging aiding and abetting in the same count as a substantive offense is not duplicitous. See United States v. Aracri, 968 F.2d 1512, 1518 (2d Cir. 1992) ("An indictment is duplicitous if it joins two or more <u>distinct</u> crimes in a single count." (emphasis added) (citation omitted)).

violating his Fifth Amendment right to due process." (Memorandum of Law in Support of Defendant Ross Ulbricht's Pre-Trial Motions Aimed at the Superseding Indictment at 3-4, ECF No. 72 ("Def.'s Mem.").) In addition, Ulbricht argues that in presenting these inconsistent theories, "the prosecution shirks it[s] 'Special Responsibilities' mandated by the ABA Model Rules and New York State Rules of Professional Conduct." (Id. at 1.) These arguments are without merit.

The Superseding Indictment does not advance any legally inconsistent theories of liability. In particular, the CCE charge in Count Four is consistent with the aiding-and-abetting allegations relating to the crimes set forth in Counts One through Three. Ulbricht's assertion that a "mere aider and abettor" cannot be a "drug 'kingpin'"[3] (Def.'s Mem. at 9) is incorrect. The law does not distinguish between principals and aiders and abettors. See Standefer, 447 U.S. at 19. One who aids and abets a federal narcotics crime is "equally as guilty as the principal" who commits it, Molina, 581 F.2d at 61, and equally susceptible to CCE liability. The law is clear that "that aiding and abetting the violation of federal narcotics laws may serve as a predicate offense in support of a CCE conviction." United States v. Joyner, 313 F.3d 40, 47 (2d Cir. 2002) (collecting cases); see also United States v. Aiello, 864 F.2d 257, 264 (2d Cir. 1988) ("We do not read our earlier opinions to shield kingpins from CCE liability solely because they are convicted as aiders and abettors rather than as principals with regard to the predicate crimes. We therefore hold that a drug felony violation based upon aiding and abetting may

---

[3] The CCE statute is sometimes referred to as the "kingpin" statute.

**A220**

qualify as a 'series' predicate where, as here, the aider and abettor is a kingpin.").[4] Therefore, as long as the remaining elements of CCE liability are alleged—that is, as long as it is alleged that a defendant aids and abets as part of a "continuing series" of federal narcotics offenses, undertaken in concert with at least five other people whom the defendant organizes, supervises, or otherwise manages, and from which he derives substantive income or resources, see Aiello, 864 F.2d at 263-64; 21 U.S.C. § 848—the Government has satisfied its pleading obligations. The Government has not "shirked" any special responsibilities (see Def.'s Mem. at 1) by alleging the Ulbricht is such a defendant, and Ulbricht does not cite any authority to the contrary.

Ulbricht's premise appears to be that an indictment cannot allege alternative theories of liability. This is incorrect. "An indictment is not defective simply because it charges a defendant with alternative offenses." Whitfield v. Ricks, No. 01 Civ. 11398 LAK, 2006 WL 3030883, at *12 (S.D.N.Y. Oct. 24, 2006).[5] In fact, the Government not only may charge a defendant based on alternative theories of liability, it may present those alternative theories to a jury. See United States v. Masotto, 73 F.3d 1233, 1241 (2d Cir. 1996) ("When the jury is properly instructed on two alternative theories of liability, as here, we must affirm when the evidence is sufficient under either of the theories." (citing, inter alia, Griffin v. United States, 502 U.S. 46 (1991))). It is not uncommon to charge aiding and abetting and

---

[4] Whether aiding and abetting a violation of federal narcotics laws may serve as a predicate offense in support of a CCE conviction—the question presented here—is an issue distinct from whether one may be convicted under the CCE statute for aiding and abetting a kingpin. The Second Circuit has answered the latter question "no." See Aiello, 864 F.2d at 264.

[5] Whitfield was a habeas corpus case, but this proposition is true more generally.

7

principal liability as alternative theories.  See, e.g., Rosemond v. United States, 134 S. Ct. 1240, 1243-44, (2014); United States v. Fitzgerald, 542 F. App'x 30, 34 (2d Cir. 2013); United States v. Huezo, 546 F.3d 174, 179 (2d Cir. 2008); United States v. Frampton, 382 F.3d 213, 224 (2d Cir. 2004).  The Second Circuit has even suggested that, when that happens, a verdict is valid if some jurors convicted on a theory of principal liability while others convicted based on an aiding-and-abetting theory.  See United States v. Ferguson, 676 F.3d 260, 279 (2d Cir. 2011); United States v. Peterson, 768 F.2d 64, 67 (2d Cir. 1985).[6]  Therefore, it is entirely proper for the Superseding Indictment to include counts alleging principal and aider-and-abettor-liability as alternative theories of liability.

Ulbricht claims that "the doctrine that a prosecutor's advancement of inconsistent irreconcilable theories denies due process has been endorsed by multiple circuits and jurisdictions."  (Def.'s Mem. at 6.)  His citations are inapposite.  In the cases he cites, the Government pursued two factually irreconcilable positions to convict two different defendants of the same crime.  See, e.g., Stumpf v. Mitchell, 367 F.3d 594, 611 (6th Cir. 2004) ("[S]everal of our sister circuits have found, or implied, that the use of inconsistent, irreconcilable theories to secure convictions against more than one defendant in prosecutions for the same crime violates the due process clause."), rev'd in part, vacated in part sub nom., Bradshaw v. Stumpf, 545 U.S. 175 (2005); In re Sakarias, 106 P.3d 931, 941-42 (Cal. 2005)

---

[6] In fact, Ferguson extended this principle even further.  See Ferguson, 676 F.3d at 279 ("Nothing limits the Peterson analysis to principal versus aiding-and-abetting liability.  The four theories[,principal, aiding and abetting, willfully causing, and Pinkerton,] are compatible—they are zones on a continuum of awareness, all of which support criminal liability.").

("[F]undamental fairness does not permit the People, without a good faith justification, to attribute to two defendants, in separate trials, a criminal act only one defendant could have committed."); see also Thompson v. Calderon, 120 F.3d 1045, 1058 (9th Cir. 1997), rev'd, 523 U.S. 538 (1998); Smith v. Groose, 205 F.3d 1045, 1054 (8th Cir. 2000); Drake v. Kemp, 762 F.2d 1449, 1478 (11th Cir. 1985) (Clark, J., concurring). The circumstances here are quite different: here, one defendant is charged with several different narcotics offenses. Contrary to Ulbricht's contention, there is nothing improper about a prosecutor seeking "multiple convictions against a single defendant in a single trial." (Def.'s Mem. at 10.)

Accordingly, Ulbricht's motion to dismiss Counts One through Four is DENIED.

D.   Request for a Bill of Particulars and Other Relief

Ulbricht seeks a bill of particulars with respect to the Superseding Indictment based on the same arguments made in support of his request for a bill of particulars with respect to the Original Indictment. For the reasons set forth in the Court's Opinion & Order dated October 10, 2014 (ECF No. 89), Ulbricht's request for a bill of particulars is DENIED. The Superseding Indictment, coupled with the Complaint and discovery produced in this case, are sufficient to put Ulbricht on notice of the charges against him and to enable him to prepare a defense.

IV.     CONCLUSION

For the reasons set forth above, defendant's motion is DENIED.  The Clerk of

the Court is directed to terminate the motion at ECF No. 71.

SO ORDERED.

Dated:        New York, New York
              October 24, 2014

_____
KATHERINE B. FORREST
United States District Judge

1

XECFAULBAps                    SEALED

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        14-cr-68 (KBF)

5   ROSS WILLIAM ULBRICHT,

6              Defendant.

7   ------------------------------x

8                                        New York, N.Y.
                                         December 15, 2014
9                                        (Sealed Excerpt)

10

    Before:
11
                   HON. KATHERINE B. FORREST
12
                                         District Judge
13

14                       APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BY:  TIMOTHY T. HOWARD, ESQ.
17       SERRIN A. TURNER, ESQ.

18  JOSHUA DRATEL, ESQ.
    LINDSAY LEWIS, ESQ.
19       Attorneys for Defendant
    Law Offices of Joshua Dratel, P.C
20       -and-
    JOSHUA HOROWITZ, ESQ.
21       Attorneys for Defendant
    Tech Law Ny
22

23
    Also Present:  Nicholas Evert
24                 Molly Rosen
                   Paralegals, U.S. Attorney's Office
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

25

XCFAULBAps                    SEALED

1       All right, folks.  So I reviewed the letters.  Here is

2  one of the issues that I think we're confronting, which is,

3  when the government presented the letter, it presented it in

4  terms of, you didn't really need to, but in an abundance of

5  caution you were going to make a disclosure.  And there are a

6  number of times when what I'm going to refer to generically as

7  *Brady*-type disclosures are made and they're not necessarily

8  even really *Brady* disclosures because they are not necessarily

9  material or exculpatory but, in an abundance of caution, the

10  government just wants to get certain things out there.  That

11  happens with relative frequency.  Here of course we have the

12  unusual situation where this could never be that kind of

13  disclosure because the defendant isn't able to use the

14  information.  So in order to obtain the protection of an "even

15  if" *Brady* disclosure, the defendant would have to be able to

16  utilize the information in some manner.  Otherwise, it's as if

17  he never told them, because his hands are completely tied.  So

18  one issue is, I just want to make sure that nobody has any case

19  law.  I've looked extensively on sealed disclosures like this

20  where the defendant can't even use the name or any of the

21  pieces, as opposed to a portion which is sealed, which happens,

22  with more frequency, and that therefore I think we need to go

23  on to -- we're going to have to grapple with the *Brady* issue, I

24  think, right now.  Because if he can't use it, then we've got

25  to be sure that the defendant is protected, and that there is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   no basis for use that's -- and he has asserted that it is --

2   there is an ex -- you know, he has asserted he would like to

3   have it unsealed because he would like to use it.  And you

4   folks have seen that letter.  And I want to be careful,

5   Mr. Dratel, not to disclose things in the ex parte letter.  I

6   must say I think you're going to need to say a little more in

7   order to get this discussion going.

8          But first, Mr. Howard, let me just ask you, do you

9   think it is not possible, from the government's point of view,

10  to disclose not the letter, which had lots of detail, but the

11  following facts:  Carl Force, who was involved in the Silk Road

12  investigation, who utilized the user name Nob, is under

13  investigation by the DOJ or however you want to phrase that,

14  *inter alia* with regard to his role in investigating Silk Road.

15  That, I think, would give the defendant an ability to use the

16  information, to use that information, and to conduct whatever

17  investigation he deems appropriate.  But from your letter this

18  morning, I understand that there is lots of sensitivity, even

19  around perhaps even that.

20         MR. HOWARD:  Yes, your Honor.  The public disclosure

21  of even the fact of the investigation would incur great damage

22  to the San Francisco investigation.  We have consulted directly

23  with them.  This would be a very high-profile investigation.

24  And we are concerned about flight, dissipation of assets, and

25  destruction of evidence at this point.  And that's what San

XCFAULBAps                    SEALED

1    Francisco affirmed to us very strongly.

2         THE COURT:  Why don't you give me a sense as to

3    whether -- you said Mr. Carl Force does know he's under

4    investigation.  He knows he's a target.

5         MR. HOWARD:  Yes, your Honor, he is aware because he

6    was interviewed.  But the scope of the investigation, he is not

7    familiar with that.  He does not know what the government or

8    the grand jury is looking at.  It's an active investigation in

9    its early steps.

10        I think what we need to focus on is, there is really

11   no basis, based on what the government is presented at trial,

12   that this could be exculpatory.  Because the only place where

13   Nob is referenced at all is with respect to the first murder

14   for hire.  And the fact is it's irrelevant whether or not he

15   stole the bitcoins.  The question is, what did Mr. Ulbricht

16   think from his point of view.

17        THE COURT:  Tell me -- and this is what I didn't get

18   from the various submissions -- as I understand it, Nob, acting

19   as Nob, was not supposed to have administrative privileges.  He

20   was supposed to be just pretending to be a user of the site and

21   then engaged in additional conduct.

22        MR. HOWARD:  That is correct, your Honor.

23        THE COURT:  But he obtained administrative privileges

24   as part of his what I'm going to call going rogue.

25        MR. HOWARD:  That is actually under investigation at

XCFAULBAps                    SEALED

1  this point.  We're not able to confirm that.  All we know is

2  that San Francisco and the grand jury is looking into that.

3  But I think the point we were trying to make in our opposition

4  is that, let's assume that that investigation reveals that in

5  fact those allegations are accurate and that he obtained the

6  access of Flush, that he got his user credentials, and he used

7  those credentials to steal bitcoins from the site.

8          THE COURT:  Could he have used those credentials to

9  have faked any other conduct of Flush, or could he have used

10 those credentials to have faked any conduct by Cimon?  I don't

11 know how you pronounce his name, C-i-m-o-n.

12         MR. HOWARD:  He had access to his account.  Cimon,

13 Cimon, was TorChat.  Those weren't communications that occurred

14 over the website.  That was over a different facility, using

15 TorChat communications, that were recovered from Mr. Ulbricht's

16 computer.

17         THE COURT:  No.  I understand.  What I'm trying to

18 figure out is the extent to which this could -- which I think

19 is part of the defendant's position -- unravel if it turns out

20 that -- I mean, just tell me if it's possible or not -- could

21 Nob, this fellow, if he did obtain some inside ability to use

22 the site, does it throw into doubt all the evidence relating to

23 that particular murder for hire?

24         MR. HOWARD:  Your Honor, we believe that it does not.

25 We have independent evidence, in terms of TorChat

XCFAULBAps                    SEALED

1    communications that did not occur over the Silk Road servers,

2    over the Silk Road messaging system -- a separate system, in

3    which he spoke with two other employees, other co-conspirators,

4    Inigo and Cimon, regarding --

5        THE COURT:  "He" being Mr. Ulbricht?

6        MR. HOWARD:  Yes, your Honor.

7        THE COURT:  But do you know that Inigo and Cimon were

8    not Nob, and they could not have been Nob?  Do you know, is

9    there enough that you would be able to show, that would satisfy

10   that Cimon and Inigo are not aliases for Nob?  He wasn't acting

11   in multiple capacities?

12       MR. HOWARD:  We would show that they were two separate

13   people, your Honor.

14       THE COURT:  All right.  So the government's, as I

15   understand it from the letter, the government's position is

16   that you're not going to introduce any evidence directly from

17   or between Nob and Mr. Ulbricht.  The references to Nob would

18   be -- the only way Nob is even going to enter the case is by

19   references in the context of Inigo and Cimon and Mr. Ulbricht's

20   separate communications.  Is that right?

21       MR. HOWARD:  That is correct, your Honor.  Even though

22   they are highly incriminated in the conversation with Nob over

23   TorChat and the private message system, we're taking a step

24   away from those chats involving Nob, given the ongoing grand

25   jury investigation, and focusing solely on the communications

XCFAULBAps                    SEALED

1   he had with others about the murder for hire.  It would be also

2   interesting to note that with respect to Cimon, there is not

3   only, in the chats directly that were excerpted as an exhibit

4   to our opposition, but previously, Cimon and Mr. Ulbricht

5   talked about whether or not Nob is actually an undercover

6   officer.  It's speaking against Nob.  He speaks against Nob's

7   purpose.  So they're not the same person.  They are two

8   different people.

9           MR. TURNER:  Can I just add one point on this thought,

10  your Honor?  This is not an issue where Nob is supposed to have

11  hacked into Flush's account, hacked into the site, anything

12  like this.  This is an undercover agent who arrested this

13  person who actually controlled a Flush account and then got

14  consent to take it over, to some extent.  And that's how he

15  would control it.  So he wouldn't have had access to other

16  people's accounts.

17          THE COURT:  No, but I understand that he apparently

18  went rogue, and when he went rogue, he apparently did certain

19  things that caused another user's account to act in a certain

20  way, as I understand it, potentially taking bitcoins and moving

21  them out of one account and into other.

22          MR. TURNER:  Still, your Honor, that's with respect to

23  the Flush account.  That was the user's account, the user that

24  he arrested.  That user happened to be an administrator.  So

25  that user had extra privileges that a normal user would not

XCFAULBAps                          SEALED

1 | have.

2 | THE COURT: Right. So could Nob, once he took over --

3 | and maybe the chronology is the answer here, I don't know what

4 | the chronology is -- but when Nob became Flush, whatever

5 | consents and agreements with people he had, when he became

6 | Flush, did he obtain Flush's administrative privileges?

7 | MR. TURNER: Yes. But those would have been limited

8 | administrative privileges.

9 | THE COURT: Could he have faked being somebody else?

10 | MR. TURNER: No, you can't do that. No. And, as

11 | Mr. Howard said, in terms of the chat to Cimon, that didn't

12 | occur on the Silk Road system. That occurred on a whole

13 | separate TorChat that's not associated with Mr. Ulbricht, not

14 | controlled by Mr. Ulbricht. There were TorChat e-mail

15 | services, that were TorChat services. It's completely

16 | different. That would be like saying, you know, you had taken

17 | somebody's AOL account and now all of a sudden you could create

18 | Gmail accounts. It is a completely different system.

19 | THE COURT: All right. Mr. Dratel.

20 | MR. DRATEL: Your Honor, first we object to that

21 | letter being filed ex parte. The Court's order did not suggest

22 | that it be ex parte. I think certainly the questions --

23 | THE COURT: Hold on. Which letter?

24 | MR. DRATEL: The letter that the Court received today,

25 | that was submitted ex parte. I don't have that.

XCFAULBAps                    SEALED

1           THE COURT:  Did I say anything that treads upon that?
2    I had not focused on the fact that it was ex parte.
3           MR. DRATEL:  I think --
4           THE COURT:  Hold on.  Let me see -- you have not seen
5    the government's letter today?
6           MR. DRATEL:  No.
7           THE COURT:  Mr. Howard and Mr. Turner, have I -- stop
8    me if I'm about to do something that's going to be a problem.
9    Have I said anything today that's a problem?  Because I was not
10   focused on the distinction.
11          MR. HOWARD:  You have not, your Honor.
12          THE COURT:  All right.  So, Mr. Dratel, it didn't
13   form -- it wasn't so important that it formed the basis of all
14   of my comments.  I had not yet realized --
15          MR. DRATEL:  They may just be not remembering, or
16   just --
17          THE COURT:  Oh, your letter was ex parte.
18          MR. DRATEL:  No, no, no.  The Court has already said,
19   in answer to one of the questions in the letter, that we
20   haven't seen it.  So regardless of what the government says, it
21   has informed the Court, in terms of what we're discussing
22   today.  The answer to the question, the answer to question 2.
23          THE COURT:  Let me see whether or not -- yes.
24          MR. DRATEL:  The answer to question 2.
25          THE COURT:  Yes.  Government has actually --

33

XCFAULBAps                    SEALED

 1          MR. DRATEL:  I didn't know that until the Court said

 2     it.

 3          THE COURT:  Well, the government has also confirmed it

 4     today.

 5          MR. DRATEL:  Well, because the Court mentioned it to

 6     them.  You know.

 7          THE COURT:  All right.  Let me just ask Mr. Howard,

 8     Mr. Turner if you have a copy of your letter right there?

 9          MR. HOWARD:  Yes, your Honor.

10          THE COURT:  Are there pieces of it which can be shown

11     to defense counsel in light of the fact that the other,

12     November 21st letter was also shown?

13          MR. HOWARD:  If you can just give us a minute, your

14     Honor?

15          THE COURT:  Sure, yes.

16          (Government counsel confer)

17          MR. HOWARD:  Your Honor, at the current stage, based

18     on our consultation with the U.S. Attorney's Office in San

19     Francisco, we believe that the parsed letter could be disclosed

20     under seal in this proceeding at this time.  But what we would

21     ask not be disclosed would be paragraph 1, which references

22     certain witnesses that have appeared before the grand -- that

23     have been part of the investigation, and paragraph 4.

24          THE COURT:  All right.

25          MR. HOWARD:  But in terms of the reasons that perhaps

XCFAULBAps                    SEALED

1  would inure that were addressed more generally in the other
2  paragraphs, we believe that those may be disclosed.

3       THE COURT:  All right.  And so can you summarize for
4  Mr. Dratel, and then provide afterwards an exact copy of the
5  letter, but can you summarize for the defense the information
6  which you believe can be disclosed, under seal, in the context
7  of today's hearing?

8       MR. HOWARD:  Yes, your Honor.  I'll just read the
9  paragraphs.  Paragraph 2 says that "Carl Force is aware that
10  he's under investigation insofar as he has been interviewed in
11  connection with the grand jury investigation.  He is not,
12  however, aware of the full range of misconduct for which he is
13  being investigated."

14       Paragraph 3 reads as follows:  "USAO San Francisco
15  briefs that the ongoing grand jury investigation would be
16  harmed by public disclosure of the investigation at this time
17  for the following reasons."

18       "(a) As noted before, although Carl Force is aware
19  that he is under investigation, he is not aware of the full
20  range of misconduct that is the subject of the investigation.
21  Public disclosure of the full scope of the investigation could
22  threaten the integrity of the investigation, as it might cause
23  Mr. Force or any potential subjects, co-conspirators, or aiders
24  and abettors to flee, destroy evidence, conceal proceeds of
25  misconduct and criminal activity, or intimidate witnesses."

1          "(d) Based on the significant level of media attention

2    that the allegations against Carl Force would likely generate,

3    there is a serious risk that media report could influence the

4    information or testimony provided by witnesses, bias grand jury

5    members, or otherwise impact the integrity of the investigative

6    process.

7          "(c) The grand jury investigation is ongoing and the

8    scope of any charges the government may end up pursuing against

9    Carl Force is not yet known.  Disclosure of the investigation

10   at this juncture would risk publicly airing suspicion or

11   allegations of wrongdoing that may not ultimately be charged

12   due to lack of evidence.

13         And paragraph 5 reads, "At present, for the reasons

14   set forth above in answer no. 3, the government does not

15   believe there are any facts that could be released regarding

16   Mr. Force's conduct that may be revealed without jeopardizing

17   the grand jury investigation."

18         THE COURT:  All right.  My deputy has redacted

19   paragraphs 1 and 4, and if it meets with the government's

20   approval, we could hand that in written form to Mr. Dratel.

21         Let's go on.  Mr. Dratel, I interrupted you because I

22   wanted to resolve that issue to the extent we were able to.

23         Mr. Dratel is being handed a redacted copy of that

24   letter, with paragraphs 1 and 4 redacted.

25         MR. DRATEL:  Thank you, your Honor.

XCFAULBAps                    SEALED

1        So the Court, to some extent, has recognized a problem

2   in this sense.  We have information -- the government doesn't

3   know the full scope of what it's going to learn in the course

4   of its investigation of Mr. Force.  But we're not permitted to

5   pursue it ourselves.  That is unfair.  That is a huge problem

6   under *Brady*, under the Sixth Amendment in terms of counsel, the

7   effective of assistance of counsel.  It's a huge problem.  What

8   they're saying is, this is off limits.  So even though at the

9   end of the day -- I think right now we have enough.  But I'm

10  just focusing on what they have said --

11       THE COURT:  He's speaking about, in terms of the

12  exculpatory nature of the conduct, what could be material and

13  exculpatory about this?  Just give me -- I've given you my

14  hypotheticals.  Apparently mine don't meet the way the world

15  would work.  What is it that could be material and exculpatory?

16       MR. DRATEL:  Well, I'm not going to reveal that here

17  with the government.  I put it ex parte for a specific reason.

18  I'm very, very disciplined about not giving the government an

19  opportunity to do something it doesn't have the right to.

20       THE COURT:  I understand.  But let me tell you my

21  conundrum, OK --

22       MR. DRATEL:  And we have more, your Honor.

23       THE COURT:  -- I cannot test -- I have on the one hand

24  the government, who is making a very vigorous argument that

25  there would be prejudice if there was disclosure of the facts

XCFAULBAps                    SEALED

1   that are the subject of this hearing.  And I take that very
2   seriously.  And I don't know any more than they tell me about
3   that.  Then I have what you're saying, which they may or may
4   not agree with factually.  And I want to -- in other words, I
5   don't know whether or not --
6           MR. DRATEL:  Factually?  I mean, but they don't think
7   it's exculpatory at all.  So what's the difference in what they
8   think about what we put to the Court?  They acknowledge it,
9   they give it because it is exculpatory, and this is the way
10  *Brady* material is provided by the government, except in capital
11  cases if it's a statutory mitigating factor.  They don't say,
12  hey, this is *Brady*.  They say, oh, this is Rule 16 but we're
13  not saying what it is.  It's *Brady*.  And the fact is that at
14  the end of the day, when this investigation is concluded and
15  this guy is indicted and it all comes out and it's all
16  exculpatory and material and relevant to this case and we
17  weren't able to use it, that's not fair.
18          THE COURT:  Maybe --
19          MR. DRATEL:  It's not just about now.  By the way,
20  they can't say, we're going to put in this whole transaction
21  with Nob but you can't touch Nob, Nob is off limits.  That's
22  not fair.  That's not the way the system works.  He's in play.
23  That's number one.
24          Number two is, you have all these other screen names,
25  you have French Maid, you have Al Pacino, you have Albert

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Pacino.  You have all the Pacino derivatives.  You have more

2    than that.  There may be more.  We believe there may be more

3    screen names that he used, accounts that he took over.  And

4    this administrative-privilege thing, the government doesn't

5    know what the extent was.  And they have told you they're at

6    the beginning of stages of their investigation.  But it's off

7    limits to us and we can't use it, in a trial that's supposed to

8    start in three weeks.  They can't have it both ways.  I want

9    the information.  If I can't get the information, we should at

10   least wait until the grand jury investigation is over so I can

11   use it.  I want it.  They can't keep it from me and then have a

12   grand jury investigation, that has gone on for nine months, and

13   then say, oh, yeah, you can't use it but -- what are we going

14   to do?  Delay the trial.  I mean, that's their choice.  It's

15   not mine.  It's theirs.  We need this.

16        THE COURT:  Let me ask you -- I need to know a bit

17   about the chronology, and I also want to be very careful not to

18   reveal strategic items.  But I don't think the chronology gets

19   into that.  Can the government tell me when, approximately, Nob

20   first engaged with the defendant in the acts which resulted in

21   the murder-for-hire solicitation allegedly?

22        MR. DRATEL:  Dread Pirate Roberts, your Honor?

23        THE COURT:  For hire.  This is all about allegations.

24   I don't know.  They'll prove whatever they're going to prove.

25   But that's the allegation.  So what's the chronology, and then

XCFAULBAps                    SEALED

1    when did he allege -- what is the earliest that you could tell

2    me that this individual had access to the administrative

3    aspects, whatever limitations there were on them, of the Flush

4    world?  That chronology may help me a lot.

5          MR. HOWARD:  Your Honor, this would be the chronology.

6    As we set forth in the November 21st letter on page 3, when --

7    which was disclosed to the defense -- Mr. Green was arrested by

8    Special Agent Force and other agents on January 17th.  At this

9    point Nob was already engaged in communications with

10   Mr. Ulbricht about other matters unrelated to the murder for

11   hire.  If you look at Exhibit A, which was filed under seal in

12   conjunction with the motion to suppress -- sorry -- the motion

13   in limine filed by defense, on January 26th, about nine days

14   later, is when Inigo, over TorChat, again, a separate

15   communication system that then was provided by the Silk Road

16   site, information the defendant, or Dread Pirate Roberts, that

17   they had identified the fact that 350,000 in bitcoins had been

18   withdrawn from the site through the Flush account.  Later that

19   day, approximately six hours later, is the first time over

20   TorChat at which the defendant and Nob start discussing this

21   theft of bitcoins.  And this is where the defendant informs Nob

22   about the theft and gives him a copy of the scanned photo ID

23   that the defendant had for Flush, otherwise known as Curtis

24   Green, so that he could be identified.  At that point, that's

25   when the conversation starts about how to deal with the

40

XCFAULBAps                    SEALED

1  situation, how to deal with Green, that ultimately escalates

2  into the murder for hire solicited by the defendant.

3       THE COURT:  Green was arrested, you said, on January

4  17th.  When did the administrative privileges, so far as you

5  know, when did the special agent obtain those?

6       MR. HOWARD:  Right.  Your Honor, it would have

7  happened sometime after that.  If proven --

8       THE COURT:  Before the 26th, do you think?

9       MR. HOWARD:  That's correct, your Honor.  And let's

10  just also make sure we're clear, that he didn't receive root

11  administrator privileges.  He didn't have privileges to do

12  anything on the site.  He only had privileges to do what Flush

13  was able to do on the site.  In that way, Flush or whoever was

14  controlling the account reset vendor passwords in order to make

15  withdrawals from those vendor accounts.

16       THE COURT:  And what was the list of what Flush could

17  do?

18       MR. HOWARD:  At this point I don't think we can give

19  you a list.  But he had the ability, I believe, to review

20  customer disputes.  He had the ability to reset passwords,

21  which is how -- and PIN numbers -- which is how he was able to

22  access the funds held by certain vendors and withdraw them.

23       THE COURT:  And if he could reset passwords and PIN

24  numbers, just -- I don't know enough about the way this

25  technology, or any technology works, to understand the answer

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

41

XCFAULBAps                    SEALED

1    to the question.  Could he have utilized their accounts to have

2    sent messages through any of the messaging facilities?

3            MR. HOWARD:  We would have to look into that.  If --

4    hold on.

5            Your Honor, we would have to check into that.

6    However, the fact is that the evidence that we were looking to

7    use, again, was -- were not communications that occurred over

8    the Silk Road site.  So Flush would not have had access, or

9    whoever was controlling Flush, would not have access to the

10   TorChat accounts of Cimon, who was already -- and Inigo, who

11   were already engaged for months over the same channel and

12   communications with the defendant.  And those were recovered

13   directly from his laptop, who was seized at the time of his

14   arrest.

15           THE COURT:  Would he have been able to reset any user

16   account or password, so far as you know?  There may be

17   limitations that you don't yet know about.  But so far as

18   you're aware, could he have reset any user name and password on

19   the Silk Road account?

20           MR. HOWARD:  Certainly it appeared in terms of vendors

21   and buyers.  Beyond that we don't believe he had authority.

22   But that's something we would have to confirm and look at.  We

23   do know from the evidence, from the communications the

24   defendant had, that he had the ability to reset vendor

25   accounts.

42

XCFAULBAps                    SEALED

1          THE COURT:  All right.  How much of the government's

2    evidence at trial, putting aside the Nob murder-for-hire event,

3    how much of your evidence at trial -- and I can go back and

4    look, I've got it loaded on my machine -- but of your trial

5    exhibits, just give me a sense, because you'll be more familiar

6    with the dates than I am -- will postdate January 17th?  How

7    much of your affirmative evidence?

8          MR. HOWARD:  Your Honor, there is evidence of

9    transactions that occurred after that date.  There is evidence

10   from the defendant's arrest himself, from the commuter that he

11   possessed at the time of his arrest, and stuff recovered from

12   that.  There are communications that were recovered from the

13   Silk Road server between the defendant and other

14   co-conspirators that occurred after that date.

15          It appears that there was only a very small window of

16   time in which this was occurring.  Inigo, in the chats, does

17   indicate to the defendant that he reset Flush's access and

18   password after he realizes -- as he realized this was

19   happening, as the theft was ongoing.  So the period of time in

20   which force would have had access to the Flush account was

21   fairly limited.

22          MR. TURNER:  Your Honor, could I add one more thought

23   to that?

24          THE COURT:  Yes.

25          MR. TURNER:  If the allegation, essentially, is that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

43

XCFAULBAps                    SEALED

1   this undercover agent took over the account of DPR and was

2   running the site, then basically what that would come down to

3   is it would affect any private messages from the Silk Road

4   marketplace that were from DPR.  We actually plan to use very

5   few of those private messages.  The bulk of the statements of

6   alleged defendant will be from his own computer, the TorChat

7   messages from his own computer, and his forum posts, which were

8   not part of the Silk Road marketplace server.  That was a

9   separate server.  And moreover, the forum posts that DPR posted

10  were PGP-signed.  So that means you have to have DPR's private

11  key to sign those messages.  And that was not something you

12  would get off the Silk Road computer.  That was in fact found

13  on Ulbricht's laptop computer.  But just by taking over his

14  account, which we have absolutely no evidence occurred, by

15  taking over his private message account on the Silk Road

16  marketplace server, you could have no control over what DPR

17  said on the Silk Road forum server.

18          So if the defense theory is, this undercover agent was

19  controlling Silk Road and putting all sorts of things into

20  DPR's mouth, then you're talking about a very small number of

21  messages, private messages, that the government is actually

22  planning on introducing at trial.

23          THE COURT:  Do you need them?

24          MR. TURNER:  We would certainly like to use them, your

25  Honor.  I actually am not even certain that they postdate

44

XCFAULBAps                    SEALED

1   January 2013.  We'll have to look at it.

2          THE COURT:  Could you go back and perhaps -- you might

3   have it in a database of some sort that would be sortable --

4   and just give me a list of exhibit numbers so I've got them?  I

5   may have them in the pile that you've given me, of the exhibit

6   numbers which postdate January 17th?  Just so I can get a sense

7   of --

8          MR. TURNER:  The exhibit numbers, sure.

9          THE COURT:  Yes, the exhibit numbers that relate in

10  any way to materials from the Silk Road server.

11         MR. TURNER:  Silk Road marketplace server, which is

12  where the private message system resided.

13         THE COURT:  Versus the Silk Road --

14         MR. TURNER:  Silk Road forum server.  That's where the

15  bulk of the evidence is.

16         THE COURT:  Whatever Flush had access to.

17         MR. TURNER:  That would be the marketplace server, if

18  we're talking about resetting passwords.

19         THE COURT:  I'm just trying to figure out, just trying

20  to get a lay of the land.

21         MR. DRATEL:  That's their opinion.

22         THE COURT:  No, I understand.  I'm going to give you a

23  chance to respond.  Hold on a second.  Mr. Howard stood up.

24  And then we're going to have a chance to respond.

25         MR. HOWARD:  I just wanted to discuss the prior point.

XCFAULBAps                    SEALED

1    It's January 26, 2013 at about 3:30 in the morning when Inigo

2    starts telling the defendant about the fact that -- the

3    detective -- the fact that the Flush account was being used to

4    steal bitcoins.  On page 2 of the excerpts we have provided as

5    Exhibit A, Inigo, at 10:58 a.m., which is about ten minutes

6    after the defendant started interacting with Nob about this

7    issue, he indicates that he stopped the theft by resetting the

8    password to Flush's account.  And as soon as that happened, no

9    more bitcoins were being stolen.  So at that point, whoever was

10   controlling the Flush account, whether it be Flush or whether

11   the investigation ultimately reveals that it was Force at the

12   time, that stopped as of 10:58 a.m. on January 26, 2013.

13            THE COURT:  Let me ask you, are you going to have the

14   Inigo person, is that person somebody who you know the human

15   identity of?

16            MR. HOWARD:  Yes.  In fact Inigo has been fully

17   identified and he has been charged in a separate indictment in

18   this district.

19            THE COURT:  All right.  And he was charged in

20   connection with some of that conduct?

21            MR. HOWARD:  With his role as an administrator, an

22   employee of Mr. Ulbricht on Silk Road.

23            THE COURT:  All right.  How about Cimon, whoever the

24   person's name is, Cimon?

25            MR. HOWARD:  He has not at this point been charged.

A246

XCFAULBAps                    SEALED

1    There is a continuing investigation into that investigation.

2           THE COURT:  All right.  Now, Mr. Dratel.

3           MR. DRATEL:  All of these murder-for-hire allegations

4    are at issue here because they were on private messages.  The

5    second episode, the red-and-white episode, is a private

6    message.

7           And also, we're talking about the government's theory.

8    I am not bound by the government's theory.  That's what a trial

9    is about.  Just because they don't want to think of it in terms

10   of what his -- is capable in terms of the defense, they don't

11   even know what their investigation is going to uncover at the

12   end of the day with Mr. Force.  So I can't subpoena Mr. Force

13   to testify, which is a Sixth Amendment right that Mr. Ulbricht

14   has, which is basically being compromised here, because I can't

15   subpoena him.

16          THE COURT:  The question, the preliminary question, is

17   whether or not Mr. Force could have any material exculpatory

18   evidence.  Because as you understand, the kind of --

19          MR. DRATEL:  It's actually beyond that, though,

20   because he's relevant.  We could identify about 15 or 16

21   government exhibits that talk about him directly, that involve

22   him directly.  And whether, as Nob or as Al Pacino or -- so --

23   and there's stuff that, it's not a government exhibit.  But we

24   can use it.  And there's a ton of stuff that he's relevant to.

25   I have a right to call him.  What you're saying now, or what

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

47

XCFAULBAps                    SEALED

1   the government is saying now, I don't have a right to call him,

2   because they have a grand jury investigation.  And I understand

3   that.  But they can't have it both ways.  We have to have a

4   fair trial that's not confined to the government's theory and

5   the government's sense of what's possible, because they don't

6   know.

7           And I don't know why we waited to the eve of trial for

8   this to begin with.  I don't know what the status of the

9   investigation is in terms of, temporally, whether they're going

10  to finish in a month? two months? as soon as this trial is

11  over?  It's not fair.  They can't do that.  And there is a

12  solution.  You know, I --

13          THE COURT:  Well, there are several solutions.

14          MR. DRATEL:  Yes.  I'm saying, yes, there are several

15  solutions.  But to say that the government is in charge of my

16  investigation is not fair.  And not only is in charge.  I can't

17  even investigate at all.  It's bad enough that they are in

18  charge of it solely.  I can't even do it.  It's an impossible

19  situation to try a case in, where this guy is all over this

20  case, in many different ways.  Not just as Nob.  As Al Pacino.

21  As French Maid.  There's a lot going on here.  And to airbrush

22  him out because he's under investigation, fine.  Finish the

23  investigation.  Or let us have it.

24          THE COURT:  Mr. Howard.

25          MR. HOWARD:  Your Honor, I think the fact is, the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

XCFAULBAps                    SEALED

1    disclosure that we did provide in the November 21st letter was

2    extremely extensive regarding what we were able to disclose

3    about what the U.S. Attorney's Office in San Francisco is

4    currently aware of.  We've discussed it at length with them, if

5    there's any other allegations they're looking into with respect

6    to Nob.  And at this point they don't have that information.

7    They don't have anything -- as far as it intersects our case,

8    it's with respect to these $350,000 of bitcoins.

9              THE COURT:  But, Mr. Howard, the point that I think

10   we're struggling with is, while you disclosed it, they can't

11   use it.

12             MR. HOWARD:  Yes.

13             THE COURT:  And so it's as if the disclosure never

14   occurred.  Because in fact it's even more frustrating, because

15   they have information that's been put in their pocket, if you

16   will, so that government can say you disclosed it, but they

17   can't use any of it, that includes the most basic information,

18   which is just Carl Force under investigation.

19             MR. HOWARD:  Your Honor, first of all, we're not

20   saying that it can't use anything.  If they want it use the Nob

21   chats to prove, to show something --

22             THE COURT:  No, but they could not go out and try to

23   talk to Carl Force, because they can't use that -- they know

24   that Carl Force is under investigation.  And if they did talk

25   to Carl Force -- presumably his lawyer anyway would tell them

49

XCFAULBAps                    SEALED

1   not to talk to him, but that's a different issue, right.  But

2   they can't conduct -- they can't take any action in response to

3   your November 21st letter at all.  Right?

4           MR. TURNER:  Your Honor, no, that's not the case.

5           THE COURT:  So what -- tell me what they can do.

6           MR. TURNER:  Let's just be clear.  We released Carl

7   Force's undercover reports to them long ago.  They could have

8   reached out to him as a witness and talked to him long ago.

9   They can still do so today.  What they can't reveal is that he

10  is under a grand jury investigation.  They know, for example,

11  about the $350,000 in bitcoins.  They could ask him about that.

12  They know about the chats at issue.  They can look those up in

13  the Silk Road server.  But what they can't do -- and it's

14  really hearsay anyway -- they can't just ask somebody, is this

15  guy under investigation.  Any answer that they solicit, A, how

16  is that relevant?  It's not a proven fact that he actually did

17  these things.  It's just a matter that he's being investigated

18  for them.

19          THE COURT:  So tell me -- and I don't understand

20  exactly what you've disclosed and haven't disclosed about what

21  you've mentioned in terms of the Carl Force investigative

22  reports.  Tell me what information the government has disclosed

23  in some manner which can be used about Carl Force.  You may

24  have just recited all of it.  Is there any more?

25          MR. TURNER:  Just to be clear, when we're talking

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

50

XCFAULBAps                    SEALED

1   about "can be used," it's a question of, does 6(e) prohibit it,

2   and is it in their possession?  Then there is the next

3   question; is it relevant to anything.  So in terms of what 6(e)

4   prohibits, we think it prohibits them eliciting somehow that

5   he's under a grand jury investigation.  That's the basic point.

6   I mean, that's what 6(e) requires be kept secret while the

7   investigation is pending.  They still have many facts in their

8   possession.  They've had them in their possession long ago.

9   Now they have the additional fact --

10         THE COURT:  They have the fact that he went broke.

11         MR. TURNER:  That's what I keep getting concerned

12   about.  It is not a fact.  It is a matter under investigation.

13   And in terms of eliciting that, I don't know what they expect

14   to do.  Are they going to have an investigator investigating

15   this guy?  That is not admissible evidence.

16         THE COURT:  No, I hear your point.  It's no not, oh,

17   there was an investigator who went rogue.  That in and of

18   itself is not, I think, the point.  It's whether or not -- it

19   actually, I think, is, you folks were saying, you, Mr. Turner,

20   were saying before, what if, in the context of having gone

21   rogue, he did things which, at that point in time, and later,

22   you don't know and/or they don't know, but it could impact on

23   what you are alleging the defendant did.  What if the

24   defendant -- I think part of the issue is -- and I don't know

25   either, in terms of what is possible -- but the defendant may

XCFAULBAps                    SEALED

1   not have done certain things because you've got an investigator

2   who is inside the system doing certain things instead.

3          MR. TURNER:  I think that characterization is badly

4   overdrawn.  But in terms of what this investigator had access

5   to, again, we've provided the undercover reports.  The

6   undercover reports say that he took over this person's account,

7   that Flush provided his log-in credentials, and that gave him

8   access to that account.

9          THE COURT:  Are those --

10         MR. TURNER:  Those reports were produced, again, to

11   the defense long ago, because all of those reports have

12   statements of the defendant.

13         THE COURT:  Can you produce them to me?

14         MR. TURNER:  Absolutely, your Honor.

15         THE COURT:  All right.  Then give those to me so I can

16   understand what the scope is in my fact pattern.

17         MR. TURNER:  If they wanted to bring that out, putting

18   aside its relevance, if they want to bring that out,

19   theoretically I guess they could call Carl Force to the stand

20   and ask him whether he took over the account.  They could call

21   Curtis Green to the stand, ask him whether Agent Force took

22   over the account, and establish that, by doing so, he gained

23   certain administrative access, which was limited, by the way,

24   but he gained certain administrative access to the Silk Road

25   marketplace at the time that these chats occurred.  Agent Force

52

1    obviously might invoke his Fifth Amendment privilege.  I have
2    no idea.

3           But point is, we're not trying to say certain
4    witnesses, certain evidence is off limits.  It's the fact that
5    this is a grand jury investigation.  That's what they're
6    prohibited from disclosing.  I don't know how they would elicit
7    that in the form of admissible evidence in any event.  But
8    that's what we're saying can't be disclosed.  So I don't think
9    we're really tying their hands in any way here.

10           THE COURT:  Well, I hear what you're saying.  And it's
11   like ships passing in the night.  Because on the one hand it's
12   the content of the investigation.  And what you're suggesting
13   is it's really not the content, it's the fact of.

14           Mr. Dratel.

15           MR. DRATEL:  The reports don't say this is a guy who
16   then stole 350,000.  Besides which, we don't know what the full
17   extent of his conduct or misconduct is, because they're still
18   investigating it.  And we're not in a position, because we
19   don't have access to all that information, and it's grand jury
20   information, we're going to be hamstrung, we're going to be
21   fighting this fight, with hands tied behind our backs, with
22   respect to this guy.  So, in other words, none of the facts in
23   the letter are sealed now.  Is that what the government is
24   saying?  None of the facts.  Other than the fact he's under
25   investigation by the grand jury.  I can pursue every one of