# 15-1815-CR

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



UNITED STATES OF AMERICA,

*Appellee,*

*v.*

ROSS WILLIAM ULBRICHT, AKA DREAD PIRATE ROBERTS, AKA SILK ROAD,
AKA SEALED DEFENDANT 1, AKA DPR,

*Defendant-Appellant.*

_____

*On Appeal from the United States District Court
for the Southern District of New York (New York City)*

## APPENDIX
## VOLUME II OF VI
## Pages A262 to A514

MICHAEL A. LEVY
SERRIN A. TURNER
    ASSISTANT UNITED STATES ATTORNEYS
UNITED STATES ATTORNEY'S OFFICE FOR THE
    SOUTHERN DISTRICT OF NEW YORK
*Attorneys for Appellee*
1 Saint Andrew's Plaza
New York, New York 10007
212-637-2346

JOSHUA L. DRATEL, P.C.
*Attorneys for Defendant-Appellant*
29 Broadway, Suite 1412
New York, New York 10006
212-732-0707

## Table of Contents

**Page**

## Volume I

District Court Docket Entries ................................................................. A1

Sealed Complaint, dated September 27, 2013 ....................................... A48

    Exhibit A to Complaint -
    Printout of Silk Road Anonymous Market Search ................... A81

    Exhibit B to Complaint -
    Printout of Silk Road Anonymous Market High
    Quality #4 Heroin All Rock ...................................... A83

Indictment, entered February 4, 2014 .................................................... A87

Opinion and Order of the Honorable Katherine B. Forrest,
    dated July 9, 2014 ........................................................ A99

Superseding Indictment, entered August 21, 2014 .............................. A150

Order of the Honorable Katherine B. Forrest,
    dated October 7, 2014 .................................................... A167

Letter from Joshua L. Dratel to the Honorable
    Katherine B. Forrest, dated October 7, 2014 ................................ A169

Endorsed Letter from Joshua L. Dratel to the Honorable
    Katherine B. Forrest, dated October 8, 2014,
    with Handwritten Notes ................................................. A172

Letter from Serrin Turner to the Honorable
    Katherine B. Forrest, dated October 8, 2014 ................................ A175

Opinion and Order of the Honorable Katherine B. Forrest,
    dated October 10, 2014 ................................................... A176

Opinion and Order of the Honorable Katherine B. Forrest,
    dated October 24, 2014 ................................................... A214

**Table of Contents**
**(Continued)**

**Page**

Excerpts from the Pre-Trial Conference,
    dated December 15, 2014 ............................................................... A224

## Volume II

Opinion and Order of the Honorable Katherine B. Forrest,
    dated January 7, 2015 ................................................... A262

Letter from Serrin Turner to the Honorable
    Katherine B. Forrest, dated January 19, 2015 .............................. A307

        Exhibit A to Letter -
        Printout from Silk Road Anonymous Marketplace ................ A320

        Exhibit B to Letter -
        Email, dated March 18, 2011 .................................................. A321

        Exhibit C to Letter -
        Printout from silkroadmarket.org ............................................ A322

        Exhibit D to Letter -
        Printout from AccessData FTK Imager 3.0.0.1443 ............... A323

        Exhibit E to Letter -
        Various Emails ........................................................................ A324

Letter from Joshua L. Dratel to the Honorable
    Katherine B. Forrest, dated January 19, 2015 .............................. A326

Endorsed Letter from Serrin Turner to the Honorable
    Katherine B. Forrest, dated January 21, 2015 .............................. A334

        Annexed to Letter -
        Highlighted Excerpts of Transcript .......................................... A336

Letter from Serrin Turner to the Honorable
    Katherine B. Forrest, dated January 29, 2015 .............................. A342

## Table of Contents
### (Continued)

**Page**

Letter from Lindsay A. Lewis to Serrin Turner and
Timothy T. Howard, dated January 26, 2015 ................................ A349

Annexed to Letter -
*Curriculum Vitae* of Andreas Antonopoulos ........................... A351

Letter from Timothy T. Howard to the Honorable
Katherine B. Forrest, dated January 31, 2015 ................................ A354

Letter from Joshua L. Dratel to Serrin Turner and
Timothy T. Howard, dated January 30, 2015 ................................ A360

Opinion and Order of the Honorable Katherine B. Forrest,
dated February 1, 2015 .................................................................. A362

Letter from Joshua L. Dratel to the Honorable
Katherine B. Forrest, dated January 31, 2015 ................................ A380

Letter from Joshua L. Dratel to the Honorable
Katherine B. Forrest, dated February 1, 2015 ................................ A385

Opinion and Order of the Honorable Katherine B. Forrest,
dated January 31, 2015 .................................................................. A390

Order of the Honorable Katherine B. Forrest,
dated January 31, 2015 .................................................................. A391

Opinion and Order of the Honorable Katherine B. Forrest,
dated January 31, 2015 .................................................................. A392

Opinion and Order of the Honorable Katherine B. Forrest,
dated January 31, 2015 .................................................................. A394

Letter from Joshua L Dratel to the Honorable
Katherine B. Forrest, dated February 2, 2015 ................................ A395

Letter from Serrin Turner to Joshua L. Dratel,
dated December 29, 2014 ............................................................... A397

**Table of Contents**
**(Continued)**

**Page**

Annexed to Letter -
Proposed Stipulation ................................................................ A399

Excerpts from Trial Transcript, dated January 14, 2015
[pages 121 and 125] ....................................................... A402

Excerpts from Trial Transcript, dated January 15, 2015
[pages 347, 509, 531-537, 545-547 and 554-555] ........................ A404

Excerpts from Trial Transcript, dated January 20, 2015
[pages 562, 567-591, 594-614, 619, 642-649, 652,
656-657, 663, 669, 671, 677, 681, 684, 712, 714, 717,
719 and 723-725] ....................................................... A418

Excerpts from Trial Transcript, dated January 21, 2015
[pages 780, 844, 873, 890-891, 895 and 1017] ............................ A490

Excerpts from Trial Transcript, dated January 22, 2015
[pages 1011, 1064-1068, 1071-1073, 1084 and 1089] .................. A497

Excerpts from Trial Transcript, dated January 28, 2015
[pages 1314, 1403-1404, 1435-1436 and 1449-1450] .................. A508

### Volume III

Excerpts from Trial Transcript, dated January 29, 2015
[pages 1562, 1661-1664, 1669-1677, 1680-1687, 1690-1705,
1733-1734, 1738-1740, 1743 and 1834-1836] ............................ A515

Excerpts from Trial Transcript, dated February 2, 2015
[pages 1843, 1855-1860, 1866-1873 and 1985] ............................ A562

Excerpts from Trial Transcript, dated February 3, 2015
[pages 2050, 2052-2066 and 2084-2097] ....................................... A578

Defendant's Exhibit C -
Conversation from East India Traitor on Forum ............................ A608

**Table of Contents**
**(Continued)**

**Page**

Defendant's Exhibit J -
    Printout from Support.php ............................................................. A624

Excerpts of Notice of Motion for a New Trial,
    dated March 6, 2015 ...................................................................... A628

Memorandum of Law in Support of Motion,
    dated March 6, 2015 ...................................................................... A630

Declaration of Joshua L. Dratel, in Support of Motion,
    dated March 6, 2015 (Omitted Herein)

        Exhibit 1 to Dratel Declaration -
        3500 Material Chart ............................................................. A643

Letter from Serrin Turner to the Honorable
    Katherine B. Forrest, dated March 31, 2015 (Omitted Herein)

        Annexed to Letter -
        (i) Letter from Serrin Turner to the Honorable
        Katherine B. Forrest, dated November 21, 2014,
        with Attachment ........................................................................ A649
        (ii) Sealed Order of the Honorable Katherine B. Forrest,
        dated December 12, 2014 ......................................................... A657
        (iii) Letter from Timothy T. Howard to the Honorable
        Katherine B. Forrest, dated December 12, 2014 ...................... A659
        (iv) Endorsed Letter from Serrin Turner to the Honorable
        Katherine B. Forrest, dated December 17, 2014 ...................... A661
        (v) Letter from Timothy T. Howard to the Honorable
        Katherine B. Forrest, dated December 18, 2014 ...................... A663
        (vi) Endorsed Letter from Lindsay A. Lewis to the
        Honorable Katherine B. Forrest, dated December 18, 2014 .... A669
        (vii) Redacted Memorandum and Decision of the
        Honorable Katherine B. Forrest, dated December 22, 2014 .... A673
        (viii) Letter from Joshua L. Dratel to the Honorable
        Katherine B. Forrest, dated December 30, 2014 ...................... A701
        (ix) Endorsed Letter from Serrin Turner to the Honorable
        Katherine B. Forrest, dated December 31, 2014 ...................... A704

**Table of Contents**
**(Continued)**

**Page**

Annexed to Letter - (cont'd)
(x) Letter from Timothy T. Howard to the
Honorable Katherine B. Forrest, dated February 1, 2015,
with Exhibits ........................................................................... A707

Excerpts from Reply Memorandum of Law, dated April 16, 2015 ...... A722

**Volume IV**

Exhibit 1 to Reply Memorandum of Law -
Email from Jared DerYeghiayan to Marc Krickbaum,
dated May 29, 2013, with Attachments ................................... A769

Exhibit 2 to Reply Memorandum of Law -
Various Emails, with Attachments ........................................... A780

Exhibit 3 to Reply Memorandum of Law -
Redacted History of Anand Nathan Athavale ........................ A812

Exhibit 4 to Reply Memorandum of Law -
Immigration and Customs Enforcement (ICE)
Details of Investigation ........................................................... A823

Exhibit 5 to Reply Memorandum of Law -
Email from Jared DerYeghiayan to Phillip Osborn,
dated May 15, 2013 ................................................................ A842

Exhibit 6 to Reply Memorandum of Law -
Redacted Silk Road Investigation Report ............................... A846

Exhibit 7 to Reply Memorandum of Law -
Various Redacted Emails ......................................................... A854

Exhibit 8 to Reply Memorandum of Law -
Statement from East India Traitor on Forum ......................... A857

Exhibit 9 to Reply Memorandum of Law -
Redacted Personal History Information .................................. A874

**Table of Contents**
**(Continued)**

**Page**

Opinion and Order of the Honorable Katherine B. Forrest,
dated April 27, 2015 ....................................................... A876

Letter from Serrin Turner to the Honorable Katherine B. Forrest,
dated April 28, 2015 ....................................................... A901

Letter from Joshua L. Dratel to the Honorable
Katherine B. Forrest, dated May 15, 2015 ..................................... A903

Declaration of Lindsay A. Lewis, in Support of Defendant
Ross Ulbricht's Pre-Sentencing Submission,
entered May 15, 2015 ..................................................... A916

    Exhibit 11 to Lewis Declaration -
    Declaration of Tim Bingham, dated May 14, 2015 ................. A929

    Exhibit 12 to Lewis Declaration -
    Declaration of Dr. Fernando Caudevilla,
    dated May 14, 2015 ..................................................... A940

    Exhibit 13 to Lewis Declaration -
    Declaration of Dr. Monica J. Barratt,
    dated May 14, 2015 ..................................................... A946

    Exhibit 14 to Lewis Declaration -
    Declaration of Meghan Ralston, dated May 14, 2015 ............. A951

    Exhibit 15 to Lewis Declaration -
    *Curriculum Vitae* of Mark L. Taff, M.D. ................................ A956

Order of the Honorable Katherine B. Forrest,
dated May 20, 2015 ....................................................... A971

Letter from Joshua L. Dratel to the Honorable
Katherine B. Forrest, dated May 22, 2015 ..................................... A973

**Table of Contents**
**(Continued)**

**Page**

**Volume V**

Exhibit 1 to Letter -
Letter from Ross Ulbricht to the Honorable
Katherine B. Forrest ................................................................. A1051

Exhibit 2 to Letter -
Letters in Support of Defendant Ross Ulbricht ...................... A1054

Exhibit 3 to Letter -
Email to Joshua Dratel, dated May 21, 2015 ......................... A1291

Exhibit 4 to Letter -
Various Photographs ................................................................ A1293

**Volume VI**

Government Sentencing Submission, dated May 26, 2015 ................ A1314

Exhibit A to Sentencing Submission -
Fake Identification of Different States .................................... A1332

Exhibit B to Sentencing Submission -
Printout from The Armory ....................................................... A1340

Exhibit C to Sentencing Submission -
Photograph of Computer Printout ........................................... A1344

Exhibit D to Sentencing Submission -
Photograph of Needle and Razor ............................................ A1346

Exhibit E to Sentencing Submission -
Photograph ............................................................................. A1347

Exhibit F to Sentencing Submission -
Photograph of Insulin Syringes .............................................. A1348

Exhibit G to Sentencing Submission -
Text Messages ......................................................................... A1349

**Table of Contents**
**(Continued)**

**Page**

Exhibit H to Sentencing Submission -
Redacted Email from Ross Ulbricht,
dated February 10, 2013 .......................................................... A1351

Exhibit I to Sentencing Submission -
Printouts of the Cost of Drugs ................................................ A1352

Exhibit J to Sentencing Submission -
Printouts of the Cost of Drugs ................................................ A1360

Letter from Serrin Turner to the Honorable
Katherine B. Forrest, dated May 26, 2015 .................................... A1362

Annexed to Letter -
(i) Redacted Letter to the Honorable
Katherine B. Forrest, dated April 20, 2015 ............................ A1363
(ii) Redacted Letter to the Honorable
Katherine B. Forrest, dated April 23, 2015 ............................ A1366
(iii) Redacted Victim Impact Statement,
dated February 2013 ................................................................ A1368
(iv) Redacted Story titled "Our Perfect Life" ........................ A1372
(v) Redacted Statement of Witness, dated April 8, 2015 ........ A1379

Letter from Lindsay A. Lewis to the Honorable
Katherine B. Forrest, dated May 27, 2015 .................................... A1386

Exhibit 1 to Letter -
Weekly Report to DPR ............................................................ A1392

Exhibit 2 to Letter -
Buyer Questionnaire ................................................................ A1397

Exhibit 3 to Letter -
Vendor Questionnaire .............................................................. A1399

Exhibit 4 to Letter -
Dr. X Thread Excerpts ............................................................. A1401

## **Table of Contents**
### **(Continued)**

**Page**

Letter from Joshua L. Dratel to the Honorable
    Katherine B. Forrest, dated May 28, 2015 ................................... A1414

        Exhibit 5 to Letter -
        Statement from Michael Van Praagh,
        dated May 21, 2015 ................................................. A1428

        Exhibit 6 to Letter -
        Letter from Joseph Ernst to the Honorable
        Katherine B. Forrest ................................................ A1432

Letter from Lindsay A. Lewis to the Honorable
    Katherine B. Forrest, dated May 29, 2015 ................................... A1435

        Exhibit 1 to Letter -
        Excerpt from Torchat Log gx5 ................................ A1436

        Exhibit 2 to Letter -
        Excerpts from Torchat Log tv32 ........................... A1437

Sentencing Hearing, dated May 29, 2015 ........................................... A1447

Judgment of the United States District Court, Southern District
    of New York, entered May 29, 2015, Appealed From ................. A1545

Notice of Appeal, entered June 4, 2015 ............................................... A1554

**A262**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 01/07/2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                            :

   UNITED STATES OF AMERICA         :

                                              :

                -v-                   :        14-cr-68 (KBF)

                                              :

   ROSS WILLIAM ULBRICHT,      :       <u>OPINION & ORDER</u>
          a/k/a "Dred Pirate Roberts,"   :
          a/k/a "DPR,"                  :
          a/k/a "Silk Road,"          :

                                                :

                       Defendant.    :
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

On February 4, 2014, a federal grand jury returned Indictment 14 Cr. 68 (the "Original Indictment") against Ross Ulbricht ("defendant" or "Ulbricht"). (ECF No. 12.) On August 21, 2014, the Government filed Superseding Indictment S1 14 Cr. 68 (KBF) (the "Superseding Indictment"), charging Ulbricht with seven crimes: Narcotics Trafficking (Count One), Distribution of Narcotics by Means of the Internet (Count Two), Narcotics Trafficking Conspiracy (Count Three), Continuing Criminal Enterprise (Count Four), Conspiracy to Commit and Aid and Abet Computer Hacking (Count Five), Conspiracy to Traffic in Fraudulent Identification Documents (Count Six), and Money Laundering Conspiracy (Count Seven). (ECF No. 52.)

The charges in the Superseding Indictment stem from the Government's allegation that Ulbricht designed, launched, and supervised the administration of Silk Road—a sprawling online marketplace for illicit goods and services—under the username "Dread Pirate Roberts" ("DPR"). According to the Government, Ulbricht

THIS PAGE INTENTIONALLY LEFT BLANK

was Dread Pirate Roberts, and controlled every aspect of Silk Road, including the server infrastructure and programming code, the administrative staff responsible for assisting with the site's day-to-day operation, and the profits generated from sales.  The Government further alleges that Ulbricht was willing to resort to violence to protect Silk Road.  Trial is scheduled to begin on January 13, 2015.

On December 9 and 10, 2014, the parties filed motions in limine.  (ECF Nos. 108, 112.)  The Court orally ruled on the motions at the final pretrial conference ("FPTC") held on December 17, 2014.  The Court stated at the FPTC that it would issue a fuller, written opinion in a separate order.  This is that order.

## I.    THE MOTIONS IN LIMINE[1]

This Opinion & Order addresses the followings motions in limine[2]:

A.    Defendant's motion to preclude certain evidence regarding Silk Road product listings and transactions, including evidence of narcotics seizures at Chicago O'Hare Airport and evidence of undercover narcotics buys in Chicago and New York;

B.    Defendant's motion to preclude, and the Government's motion to allow, evidence that Ulbricht solicited six murders-for-hire, and defendant's renewed motion to strike the murder-for-hire allegations from the Superseding Indictment as surplusage;

---

[1] The Government, as is typical in motions in limine, loosely uses the term "admit" throughout its brief in connection with certain motions.  (See, e.g., Government's Motions in Limine ("Gov't Mem.") at 20 ("EVIDENCE OF SOLICITATIONS FOR MURDERS FOR HIRE SHOULD BE ADMITTED."), ECF No. 108.)  In this pre-trial context, the Court construes "admit" to mean "not preclude."  That is, granting one of the Government's motions in limine allows the Government to proceed to offer the evidence at trial.  The Court is not, of course, "admitting" anything as trial has not yet commenced.  The Court's rulings here deal only with certain issues and not with whether a proper foundation has been or could be laid as to any piece of evidence.

[2] The Court has addressed one of defendant's motions in limine—discussed at POINT V of defendant's brief (ECF No. 114)—in a separate Sealed Memorandum & Decision dated December 22, 2014.

     C.     Defendant's motion to preclude certain Government exhibits as insufficiently authenticated;

     D.     Defendant's motion to preclude, and the Government's motion to allow, evidence that Ulbricht ordered fraudulent identification documents from Silk Road;

     E.     Defendant's motion to preclude a variety of government exhibits not covered by his other motions in limine;

     F.     The Government's motion to allow evidence regarding illicit or otherwise criminally oriented goods and services sold on Silk Road not specifically referenced in the Superseding Indictment; and

     G.     The Government's motion to preclude argument or evidence regarding (a) any potential consequences of conviction, and (b) defendant's political views or other excuses.

## II.    BACKGROUND[3]

### A.    <u>The Murder-for-Hire Evidence</u>

The Government intends to offer evidence that Ulbricht solicited six murders-for-hire as part of his efforts to protect Silk Road and his interests therein. (Government's Motions in Limine ("Gov't Mem.") at 6, ECF No. 108.)  The Government is prepared to stipulate that (1) Ulbricht solicited the first murder-for-hire from an undercover Drug Enforcement Administration ("DEA") agent and, accordingly, no actual murder occurred, and (2) the Government is not currently aware of any evidence that the remaining murders-for-hire were carried out.  (<u>Id.</u> at 6 n.1.)

---

[3] The Court assumes familiarity with the facts underlying this action.  This section sets forth only those facts that are relevant to the motions in limine.

3

1.    Murder-for-Hire Solicitation No. 1

The Government intends to offer evidence that, in January 2013, as part of his efforts to protect Silk Road and his interests therein, Ulbricht solicited the murder-for-hire of a former Silk Road employee (the "Employee"), whom Ulbricht suspected of stealing approximately $350,000 worth of bitcoins from Silk Road.  (Id. at 6.)  This evidence allegedly consists of records of online conversations between Ulbricht[4] and two alleged coconspirators ("CC-1" and "CC-2"), as well as testimony from a cooperating witness.  (Id. at 7.)

The Government contends that chat records recovered from Ulbricht's laptop will show as follows:  In mid-January 2013, Ulbricht discussed with CC-1 that the Employee had gone missing and that approximately $350,000 in bitcoins had been stolen from Silk Road.  (Id. at 6.)  On January 26, 2013, CC-1 informed Ulbricht that he had determined that the Employee was responsible for the theft of bitcoins from various vendor accounts.  (Id.)  Later that day, Ulbricht told CC-1 that he knew the identity of the Employee, that the Employee had been arrested on narcotics charges, and that he (Ulbricht) had arranged for "muscle" to "get to [the Employee] quickly."  (Id.)  CC-1 assured Ulbricht that "you always have me at your disposal if you locate him and need someone to go handle it."  (Id.)  Ulbricht responded, "thanks.  I want to kick his ass myself, but let's leave it to the pros." (Id.)

---

[4] The Government contends that Ulbricht participated in these online conversations; the Court therefore uses defendant's name when discussing this evidence.  However, the Court notes that this issue is subject to proof at trial.  Defendant has not conceded that he is DPR or that he participated in any of the subject conversations.

The next day, Ulbricht told another coconspirator, CC-2, about the theft.  (Id.)
Ulbricht expressed surprise that the Employee had stolen from him given that he
had a copy of the Employee's driver's license.  (Id. at 6-7.)  Later in the conversation,
Ulbricht and CC-2 discussed the possibility that the Employee was cooperating with
law enforcement, and CC-2 remarked:

> [A]s a side note, at what point in time do we decide that we've had
> enough of someone[']s shit, and terminate them?  Like, does
> impersonating a vendor to rip off a mid-level drug lord, using our rep
> and system; follows up by stealing from our vendors and clients and
> breeding fear and mis-trust, does that come close in your opinion.

(Id. at 7.)  Ulbricht responded, "terminate? execute?" and later stated, "I would have
no problem wasting this guy."  (Id.)  CC-2 responded that he could take care of it,
and stated that he would have been surprised if Ulbricht "balked at taking the step,
of bluntly, killing [the Employee] for fucking up just a wee bit too badly."  (Id.)
Later that day, Ulbricht told CC-2 that he had solicited someone to track down the
Employee.  (Id.)

On February 5, 2013, Ulbricht reported to CC-2 that the Employee was
captured and interrogated about the stolen bitcoins.  (Id.)  A few hours later,
Ulbricht told CC-2 that the Employee had been executed.  (See id.)  On February 23,
2013, Ulbricht reported to CC-1 that he had successfully arranged the Employee's
capture and execution.  (Id.)

### 2.   Murder-for-Hire Solicitation No. 2

The Government also intends to offer evidence that, in March and April 2013,
Ulbricht, acting as DPR, solicited the murder-for-hire of a Silk Road vendor with

the username "FriendlyChemist," who was attempting to extort DPR.  (<u>Id.</u> at 8.)
This evidence consists of messages recovered from the Silk Road messaging system,
files recovered from Ulbricht's laptop, and proof that a Silk Road user was paid
1,670 bitcoins to murder FriendlyChemist.  (<u>Id.</u> at 11.)

The alleged extortion began on March 13, 2013.  (<u>See</u> <u>id.</u> at 8.)  In messages
sent over the Silk Road messaging system, FriendlyChemist threatened to publish a
list of real names and addresses of Silk Road vendors and customers unless DPR
paid him $500,000.  (<u>Id.</u>)  FriendlyChemist claimed that he had obtained the list
from hacking into the computer of another Silk Road vendor.  (<u>Id.</u>)  He indicated
that he needed the $500,000 to pay off his narcotics supplier.  (<u>Id.</u>)  In one message,
FriendlyChemist wrote to DPR:

> what do u . . . think will happen if thousands of usernames, ordr
> amounts, addresses get leaked?  all those people will leave sr and be
> scared to use it again.  those vendors will all be busted and all there
> customers will be exposed too and never go back to sr.

(<u>Id.</u>)  Later, FriendlyChemist provided to DPR a sample of the identifying
information that he claimed to possess.[5]  (<u>Id.</u>)

On March 25, 2013, user "redandwhite" sent a message to DPR revealing
that he was the supplier to whom FriendlyChemist owed money.  (<u>Id.</u>)  On March
27, 2013, DPR sent the following message to redandwhite:

> In my eyes, FriendlyChemist is a liability and I wouldn't mind if he
> was executed . . .  I'm not sure how much you already know about the
> guy, but I have the following info and am waiting on getting his
> address.

---

[5] The context of these communications could lead a rational juror to conclude that they are related to
narcotics vendors.

6

(Id.)  DPR listed FriendlyChemist's name and indicated that he lived in White Rock,

British Columbia, Canada, with "Wife + 3 kids."  (Id. at 9.)

Meanwhile, FriendlyChemist's threats continued.  On March 29, 2013,

FriendlyChemist sent a message to DPR, stating:

> u leave me no choice I want 500k usd withn 72hrs or i am going to post
> all the info i have. . . . i hate to do this but i need the money or im going
> to release it all.  over 5000 user details and about 2 dozen vender
> identities.  wats it going to be?"

(Id.)  Several hours later, DPR sent a message to redandwhite confirming that he

wanted FriendlyChemist to be murdered and asking how much redandwhite

wanted to be paid for the job.  (Id.)  After redandwhite asked what problem

FriendlyChemist was causing, DPR responded, in a message dated March 30, 2013:

> [H]e is threatening to expose the identities of thousands of my clients
> that he was able to acquire . . . .  [T]his kind of behavior is unforgivable
> to me.  Especially here on Silk Road, anonymity is sacrosanct.

(Id.)  DPR also commented that the murder "doesn't have to be clean."  (Id.)  Later

that day, redandwhite responded with a quoted price of $150,000 to $300,000

"depending on how you want it done"—"clean" or "non-clean."  (Id.)  The next day,

DPR objected to the price: "Don't want to be a pain here, but the price seems high.

Not long ago, I had a clean hit done for $80k.  Are the prices you quoted the best

you can do?"  (Id.)

Through further messages exchanged on March 31, 2013, DPR and

redandwhite agreed upon a price of 1,670 bitcoins (approximately $150,000) for the

murder-for-hire.  (Id. at 9-10.)  DPR provided a transaction record confirming the

7

transfer of the bitcoins, and redandwhite confirmed receipt of payment.  (Id. at 10.)

Approximately 24 hours later, redandwhite sent an update to DPR, stating, "[Y]our

problem has been taken care of. . . .  Rest easy though, because he won't be

blackmailing anyone again.  Ever."  (Id.)  At DPR's request, redandwhite sent DPR

a picture of the victim after the job was done.  (Id.)  Next to the victim was a piece of

paper with random numbers that DPR had supplied.  (Id.)  On April 5, 2013, DPR

wrote to redandwhite, "I've received the picture and deleted it.  Thank you again for

your swift action."  (Id.)

According to the Government, evidence recovered from Ulbricht's personal

laptop corresponds to the information in the messages retrieved from the Silk Road

messaging system.  Specifically, agents recovered from the laptop a file labeled

"log," in which Ulbricht allegedly recorded his actions in operating Silk Road

between March 20, 2013 and September 30, 2013.  (Id.)  The Government contends

that the log includes numerous references to a murder-for-hire, including:

- March 28, 2013: "being blackmailed with user info.  talking with large
  distributor (hell's angels)";

- March 29, 2013: "commissioned hit on blackmailer with angels";

- April 1, 2013: "got word that blackmailer was executed"; and

- April 4, 2013: "received visual confirmation of blackmailers execution."

(Id.)  This timeline corresponds to that of DPR's solicitation of the murder-for-hire of

FriendlyChemist as described above.

3.      Murder-for-Hire Solicitations Nos. 3–6

Finally, the Government intends to offer evidence that, in April 2013,

Ulbricht, acting as DPR, solicited redandwhite to carry out the murders-for-hire of

four other individuals associated with FriendlyChemist.  (Id. at 11.)  The

Government's evidence allegedly consists of messages recovered from the Silk Road

messaging system, as well records recovered from Ulbricht's laptop.  (Id. at 13.)  The

Government also intends to demonstrate that DPR paid redandwhite 3,000 bitcoins

for the four additional murders-for-hire.  (Id.)

According to the Government, messages recovered from the Silk Road

messaging system will show as follows:  Around the same time that redandwhite

informed DPR that FriendlyChemist had been executed, he also told DPR that his

workers had questioned FriendlyChemist and that FriendlyChemist "spilled

everything he knew."  (Id. at 11.)  In particular, redandwhite indicated that

FriendlyChemist had identified "tony76" as a Silk Road user who participated in

the blackmail scheme and who had been involved in running scams on Silk Road

"for a couple of years."  (Id.)  During the conversation, redandwhite revealed

tony76's identity to DPR and stated that tony76 lived in Surrey, British Columbia,

Canada.  (Id.)

On April 5, 2013, DPR wrote to redandwhite, "I would like to go after

[tony26]. . . .  If he is our man, then he likely has substantial assets to be recovered.

Perhaps we can hold him and question him?"  (Id. at 12.)  redandwhite responded

that he would send people to "do some recon" and report back.  (Id.)  The next day,

on April 6, 2013, redandwhite informed DPR that tony26 was a drug dealer who

"works/lives with 3 other people and they all sell product together."  (Id.)  The

following conversation ensued:

> redandwhite: Do you want to deal with this . . . guy, or do you want me
> to put the team on standby?
>
> DPR: I am confident enough that it is him to move forward.  Can we
> round up all 4 of them, separate them, and get them to out each other
> and give up their stolen money?
>
> redandwhite: As for getting all 4, it would be possible but they would
> have to get them all at once so that one does not get away.
>
> DPR: Ok, let's just hit [tony26] and leave it at that.  Try to recover the
> funds, but if not, then not.

(Id.)

On April 8, 2013, redandwhite offered to "hit [tony26] only" for $150,000 "just

like last time."  (Id.)  However, redandwhite cautioned DPR that if they murdered

only tony26, then they would be unable to "do [the hit] at their place because there

are always at least a few of them there. . . .  So we wouldn't be able to recover any of

his things."  (Id.)  redandwhite further stated that he would "prefer to do all 4" in

order to have a "chance of recovering any potential product/money he may have,"

adding, "Anything recovered would be split 50/50 with you."  (Id.)  redandwhite

quoted a price of "500k USD" to do "all 4."  (Id. at 12-13)  Later that day, DPR

responded, "hmm . . . ok, I'll defer to your better judgment and hope we can recover

some assets from them."  (Id. at 13.)  DPR confirmed that he had sent a payment of

3,000 bitcoins (approximately $500,000) to redandwhite's designated Bitcoin

address.  (Id.)

The Government contends that information recovered from Ulbricht's laptop corresponds to the evidence recovered from the Silk Road messaging system. According to the Government, chat logs from the laptop indicate that, on April 3, 2013, Ulbricht informed CC-2 that (1) he (Ulbricht) previously had been blackmailed by an individual who threatened to reveal addresses of Silk Road vendors and customers, (2) he had paid a member of the Hell's Angels "to hunt down the blackmailer," and (3) he learned that tony76 was involved in the blackmail scheme.  (Id. at 11-12.)  Ulbricht's log file allegedly contains entries further confirming his involvement in soliciting the murders-for-hire of tony26 and his three associates:

- April 6, 2013: "gave angels go ahead to find tony76";
- April 8, 2013: "sent payment to angels for hit on tony76 and his 3 associates."

(Id. at 13.)

> B.   The Fraudulent Identification Evidence

The Government intends to offer evidence that Ulbricht attempted to procure fraudulent identification documents from Silk Road in 2013.  (Gov't Mem. at 4.)

The Government contends that it will prove the following facts at trial:  On June 10, 2013, a Silk Road user "shefoundme" sent a message on the Silk Road messaging system to a vendor named "KingOfClubs," indicating that shefoundme wanted to order "a few of your highest quality IDs."  (Id. at 5.)  In subsequent messages, shefoundme ordered nine counterfeit identification documents from New

11

York, Florida, Texas, Colorado, California, South Carolina, Canada, the United

Kingdom, and Australia for $1,650 in U.S. currency.  (Id.)

On July 5, 2013, KingOfClubs confirmed that he had mailed the package

with the fraudulent identification documents and that it would be delivered to

shefoundme the following week.  (Id.)  On July 18, 2013, after shefoundme

complained that the package had not arrived, KingOfClubs provided a U.S. Postal

Service ("USPS") tracking number to shefoundme.  (Id.)  shefoundme responded

that the USPS website indicated that the package was "inbound out of customs on

the 10th."  (Id.)

On July 10, 2013—the same day that shefoundme's package was "inbound

out of customs"—federal agents with U.S. Customs and Border Protection ("CPB")

intercepted a package from Canada as part of a routine border search.  (See id. at

4.)  The package contained nine counterfeit identification documents, each of which

featured a different name and address but all of which contained a photograph of

the same person, allegedly Ulbricht—some with facial hair and others without.

(See id.; GX 402.)  The licenses stated that they were issued by New York, Florida,

Texas, Colorado, California, South Carolina, Canada, the United Kingdom, and

Australia—the same jurisdictions that shefoundme had ordered from KingOfClubs.

(See Gov't Mem. at 4.)

On or about July 26, 2013, an agent with Homeland Security Investigations

("Agent-1") performed a controlled delivery of the counterfeit driver's licenses to the

address on the package.  (See id.)  Agent-1 encountered Ulbricht at that address.

(See id.)  The Government expects Agent-1 to testify that Ulbricht produced his true government-issued Texas driver's license during this encounter, and stated, in sum and substance, that (1) "hypothetically" anyone could go onto a website called "Silk Road" and purchase any drugs or fake identity documents that he or she desired, and (2) he lived at the residence to which the delivered package was addressed under the alias "Josh."  (Id.)[6]

III.   APPLICABLE LEGAL PRINCIPLES

A.   Standard on a Motion In Limine

"The purpose of an in limine motion is 'to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'"  Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996) (quoting Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc., 652 F. Supp. 1400, 1401 (D. Md. 1987)); see also Highland Capital Mgmt., L.P., v. Schneider, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008).  "The trial court should exclude evidence on a motion in limine only when the evidence is clearly inadmissible on all potential grounds."  United States v. Ozsusamlar, 428 F. Supp. 2d 161, 164-65 (S.D.N.Y. 2006) (citations omitted).

---

[6] The Government also intends to offer evidence that Ulbricht leased servers under false identities. (Id. at 5.)  According to the Government, a Court-authorized search of Ulbricht's laptop revealed a spreadsheet listing IP addresses and descriptions of various Silk Road–related servers along with approximately 21 false identities under which each of the servers was leased and registered.  (Id.)  It is not clear that any of those 21 identities are the same as the identities in the nine fraudulent identification documents discussed herein.

In limine rulings occur pre-trial, and that fact has significance.  The evidence at trial may come in differently than anticipated, altering the solidity of the proffered basis for a pre-trial ruling.  The Court therefore invites parties who believe that the factual record as developed at trial supports a revised ruling to bring such an application in a timely manner.

B.    Relevant Evidence

Rule 401 defines relevant evidence as that which "has any tendency to make a fact more or less probable than it would be without the evidence," so long as "the fact is of consequence in determining the action."  Fed. R. Evid. 401; see also Old Chief v. United States, 519 U.S. 172, 178 (1997).  "The fact to which the evidence is directed need not be in dispute."  Old Chief, 519 U.S. at 179 (quoting Fed. R. Evid. 401 advisory committee's note) (internal quotation mark omitted).

To be relevant, evidence need not constitute conclusive proof of a fact in issue, but only have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  McKoy v. North Carolina, 494 U.S. 433, 440 (1990) (quoting New Jersey v. T.L.O., 469 U.S. 325, 345 (1985)) (internal quotation marks omitted); see also United States v. Abu-Jihaad, 630 F.3d 102, 132 (2d Cir. 2010).

C.    "Other Act" Evidence

"It is well established that evidence of uncharged criminal activity is not considered 'other crimes' evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to

complete the story of the crime on trial." United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997) (quoting United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989)) (alterations and internal quotation marks omitted); United States v. Kassir, No. 04 Cr. 356(JFK), 2009 WL 976821, at *2 (S.D.N.Y. Apr. 9, 2009).  Such evidence is direct evidence of a crime.  See Kassir, 2009 WL 976821, at *2.  A Rule 404(b) analysis is, however, prudent where it is not manifestly clear that the evidence in question is proof of the charged crime.  Id.

Rule 404(b) provides:

(1) Prohibited Uses.  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses; Notice in a Criminal Case.  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. . . .

Fed. R. Evid. 404(b).  "Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct."  Huddleston v. United States, 485 U.S. 681, 685 (1988).

The Second Circuit evaluates 404(b) evidence under an inclusionary approach that allows evidence for any purpose other than to show a defendant's criminal propensity.  United States v. McCallum, 584 F.3d 471, 475 (2d Cir. 2009); see also United States v. Paulino, 445 F.3d 211, 221 (2d Cir. 2006).  Courts therefore may allow evidence of other acts by the defendant if the evidence is relevant to an issue at trial other than the defendant's character and if the risk of unfair prejudice does

not substantially outweigh the probative value of the evidence.  United States v.

Morrison, 153 F.3d 34, 57 (2d Cir. 1998); see also United States v. Garcia, 291 F.3d

127, 136 (2d Cir. 2002).  This inclusionary approach does not, however, invite the

Government "to offer, carte blanche, any prior act of the defendant in the same

category of crime."  McCallum, 584 F.3d at 475 (quoting Garcia, 291 F.3d at 137).

In considering the admissibility of evidence pursuant to Rule 404(b), a court

must consider the following:

- Is the evidence offered for a proper purpose—that is, does it go to something other than the defendant's character or criminal propensity?

- Is the evidence relevant?

- Is the probative value of the evidence substantially outweighed by the danger of unfair prejudice?

- Has the court administered an appropriate limiting instruction?

McCallum, 584 F.3d at 475 (citation omitted).

It is well established that proving identity qualifies as a "proper purpose."

See, e.g., United States v. Gubelman, 571 F.2d 1252, 1254 (2d Cir. 1978) ("[T]he

record shows that appellant sufficiently raised the issue of mistaken identity at

trial to justify the admission of bad acts evidence relevant to that issue." (citations

omitted)).

Also among the "proper purposes" for presenting evidence of extrinsic acts are

to prove knowledge and intent.  See United States v. Teague, 93 F.3d 81, 84 (2d Cir.

1996); United States v. Caputo, 808 F.2d 963, 968 (2d Cir. 1987).  "Where a

defendant claims that his conduct has an innocent explanation, prior act evidence is

16

generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged."  United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993) (citation omitted).

Another "legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case" and can assist the jury in understanding the relationship of trust between the coconspirators.  United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996) (citations omitted); see also United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993).

Completing the story of the crimes is also a legitimate use of "other act" evidence.  See United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense.").

Once the Government has proffered a proper purpose for "other act" evidence, the Court must then determine whether the other act is in fact probative of the crimes charged.  In this regard, the Government must identify a similarity or connection between the other act and an element of a charged offense.  See United States v. Brand, 467 F.3d 179, 197 (2d Cir. 2006).  To be relevant, the other act must be sufficiently similar to the conduct at issue to permit the jury reasonably to draw an inference from the act that the state of mind of the actor is as the proponent of the evidence asserts.  United States v. Curley, 639 F.3d 50, 57 (2d Cir.

17

2011); see also United States v. Peterson, 808 F.2d 969, 974 (2d Cir. 1987).  The

court abuses its discretion if the "chain of inferences" necessary to connect the other

act with the charged crime is "unduly long."  Curley, 639 F.3d at 57.  While the

duration of elapsed time between two events can detract from the probative value of

the prior event, see Garcia, 291 F.3d at 138, "temporal remoteness of . . . acts does

not preclude their relevancy," Curley, 639 F.3d at 59.

It is, however, improper to receive evidence ostensibly as probative of

knowledge and intent when it is in reality "propensity evidence in sheep's clothing."

McCallum, 584 F.3d at 477.  The Government may not use Rule 404(b) to "parade

past the jury a litany of potentially prejudicial similar acts that have been

established or connected to the defendant only by unsubstantiated innuendo."

Huddleston, 485 U.S. at 689.  Under Rule 404(b), other act evidence is only

admissible if it is relevant, and it is only relevant "if the jury can reasonably

conclude that the act occurred and that the defendant was the actor."  Id.

D.    Rule 403

Rule 403 authorizes the exclusion of relevant evidence when "its probative

value is substantially outweighed by a danger of one or more of the following: unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or

needlessly presenting cumulative evidence."  Fed. R. Evid. 403; see also Old Chief,

519 U.S. at 180.  "[W]hat counts as the Rule 403 'probative value' of an item of

evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing

evidentiary alternatives."  Old Chief, 519 U.S. at 184.  "If an alternative were found

18

to have substantially the same or greater probative value but a lower danger of
unfair prejudice, sound judicial discretion would discount the value of the item first
offered and exclude it if its discounted probative value were substantially
outweighed by unfairly prejudicial risk." Id. at 182-83.  In making this assessment,
a court should take into consideration the "offering party's need for evidentiary
richness and narrative integrity in presenting a case." Id. at 183.

Rule 403 is concerned with "some adverse effect . . . beyond tending to prove
the fact or issue that justified its admission into evidence." United States v. Gelzer,
50 F.3d 1133, 1139 (2d Cir. 1995) (quoting United States v. Figueroa, 618 F.2d 934,
943 (2d Cir. 1980)) (internal quotation marks omitted).

Several courts have found that "other act" evidence is not unfairly prejudicial
where it is not "any more sensational or disturbing than the crimes" with which the
defendant has been charged.  United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d
Cir. 1990); see also Curley, 639 F.3d at 59 (finding that the district court did not err
in finding that the probative value of prior acts of domestic violence with similar
characteristics to the charged conduct outweighed the potential prejudicial effect
when the prior acts were no more sensational than the charged conduct); Abu-
Jihaad, 630 F.3d at 132-33 (finding that conversations referencing uncharged
support of jihad were "no more inflammatory than the charges alleged in the
indictment," id. at 133); United States v. Mercado, 573 F.3d 138, 142 (2d Cir. 2009)
(upholding a Rule 403 determination where the challenged evidence was "not
especially worse or shocking than the transactions charged" and where the district

court instructed the jury as to what inferences could properly be drawn from such evidence).

IV.    DISCUSSION

      A.      <u>Defendant's Motion to Preclude Certain Evidence Regarding Silk Road Product Listings and Transactions</u>

Defendant has moved to preclude certain evidence of Silk Road transactions, including evidence of narcotics seizures at Chicago O'Hare Airport and undercover buys of narcotics from Silk Road in Chicago and New York.  (<u>See</u> Memorandum of Law in Support of Defendant Ross Ulbricht's Motions <u>In Limine</u> ("Def. Mem.") at 3-8, ECF No. 114.)  Defendant also has moved to preclude evidence of various Silk Road product listings.  (<u>See</u> <u>id.</u>)  The challenged exhibits include, <u>inter alia</u>, photographs of contraband allegedly seized in Chicago, screenshots of Silk Road webpages allegedly showing narcotics and other contraband for sale (e.g., "BROWN HEROIN No3 0.2 GRAM!!" for 0.45 bitcoins in GX 103A), and summary charts allegedly listing undercover purchases of narcotics in Chicago and New York.

Defendant's principal argument in support of this motion is that the buy-sell transactions among Silk Road's users at most gave rise to a multitude of discrete conspiracies, rather than the "enormous, anonymous, and essentially unlimited conspiracy" (Def. Mem. at 3) charged in the Superseding Indictment.  Defendant contends that, as a result, evidence of these numerous, separate transactions necessarily implicates only buy-sell relationships and not conspiratorial behavior. Thus, according to defendant, the evidence is irrelevant to the conspiracy charge. In addition, he argues that in any event it constitutes inadmissible hearsay.

Defendant also argues that admission of such evidence (much of which is not facially tied to New York) can only tend to prove crimes committed outside of this district, rendering venue improper.  Based on this chain of logic, defendant argues that if venue is improper, allowing this evidence would similarly be improper. Finally, defendant argues that the evidence should be precluded under Rule 403.

The Government responds that defendant's attempt to preclude evidence on the basis of his view as to the adequacy of the Government's conspiracy charge simply disregards his previously denied motion to dismiss the Original Indictment. (See Memorandum of Law in Opposition to the Defendant's Motions In Limine ("Gov't Opp.") at 3, ECF No. 127.)  Defendant's argument also fundamentally elides that most of the narcotics charges against defendant are for his direct participation in substantive crimes.

<u>Discussion</u>

The Court agrees with the Government and DENIES defendant's motion as to the narcotics-related evidence.[7]  Defendant is charged with four separate counts of narcotics-related offenses, three of which are substantive charges and only one of which is a conspiracy charge: Narcotics Trafficking (Count One), Distribution of Narcotics by Means of the Internet (Count Two), Narcotics Trafficking Conspiracy (Count Three), and Continuing Criminal Enterprise (Count Four).  Plainly, to the extent the Government can tie the evidence to one of the three substantive counts,

---

[7] To the extent that some of the evidence challenged through this motion falls within the scope of the Government's motion to allow evidence of uncharged contraband, the Court's ruling on that motion, set forth in subpart F below, applies here.

defendant's conspiracy arguments are inapposite.  However, at this stage, the Court additionally finds the evidence relevant to the Government's theory of the narcotics conspiracy.  In all events, Rule 403 does not require preclusion.

The evidence plainly is relevant to the substantive narcotics charges in Counts One, Two, and Four.  Counts One and Two charge defendant with distributing or aiding and abetting the distribution of narcotics (Count One) and doing so by means of the Internet (Count Two).  Count Four charges defendant with engaging in a continuing criminal enterprise, which requires the Government to prove, inter alia, that he committed a Title 21 drug felony violation as part of a "continuing series" of Title 21 drug violations.  See United States v. Aiello, 864 F.2d 257, 263-64 (2d Cir. 1988).  Each of these substantive charges is premised on the allegation that Silk Road was an online platform for the distribution of narcotics. Evidence of seizures and undercover purchases of narcotics in New York and Chicago, as well as evidence of narcotics product listings on Silk Road, is therefore highly probative and relevant.

The challenged evidence is also relevant to Count Three, charging defendant with participating in a narcotics trafficking conspiracy.  The Government's theory is that defendant sat atop an overarching single conspiracy, which included all vendors who sold any type of narcotics on Silk Road at any time.[8]  Under this theory, any and all vendors who sold the narcotics seized or purchased in Chicago

---

[8] At the FPTC, the Government clarified that the charged narcotics conspiracy is not alleged to have included vendors who sold criminally oriented merchandise other than narcotics.

and New York, and all those (if different) who listed and advertised narcotics on Silk Road, were Ulbricht's coconspirators.[9]  Evidence of narcotics seizures and undercover purchases in New York and Chicago, as well as evidence of narcotics product listings on Silk Road, is relevant to the existence of the charged conspiracy.[10]

Do the product labels constitute inadmissible hearsay?  No.  It is certainly true that the narcotics-related product listings contain labels—such as "BROWN HEROIN" in GX 103A—suggesting that the drugs sold on Silk Road were, in fact, real narcotics.  Thus, images showing such written statements would be offered for the truth.  However, these images fall within the coconspirator exception under Rule 801(d)(2)(E) of the Federal Rules of Evidence.

The Court has considered defendant's arguments that if evidence is admitted under the coconspirator exception, and the conspiracy charge is later dismissed as overly broad, the entire trial would be irreparably infected.  This argument misconstrues the law relating to the elements necessary to make an appropriate

---

[9] The Court has previously expressed its concerns with the breadth of the Government's conspiracy theory.  However, the Government may nonetheless seek to prove such a conspiracy, and the jury will decide whether or not the Government's evidence is sufficient.  See United States v. Maldonado-Rivera, 922 F.2d 934, 962 (2d Cir. 1990) ("[W]here the proof is susceptible to the inference that there was more than one conspiracy, the question of whether one or more than one conspiracy has been established is a question of fact for a properly instructed jury." (citations omitted)); United States v. Gambino, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992) ("It is axiomatic that, in a criminal case, a defendant may not challenge a facially valid indictment prior to trial for insufficient evidence.  Instead, a defendant must await a Rule 29 proceeding or the jury's verdict before he may argue evidentiary insufficiency." (citations omitted)).

[10] Defendant's venue objection is meritless at this stage.  In a conspiracy prosecution, "venue may lie in any district in which the conspiracy was formed or in any district in which a conspirator committed an overt act in furtherance of the criminal scheme."  United States v. Rommy, 506 F.3d 108, 119 (2d Cir. 2007) (citations omitted).  It will be up to the Government to prove venue by a preponderance of the evidence.  See id.

showing under Rule 801(d)(2)(E).  In sum, evidence may be admitted pursuant to the coconspirator exception whether or not the conspiracy which such evidence is alleged to be in furtherance of is the charged conspiracy; and such rulings may survive even if the defendant is acquitted of the charged conspiracy.

The governing legal principles are as follows: in order to admit a statement under Rule 801(d)(2)(E), this Court must find by a preponderance of the evidence "(1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a) during the course of and (b) in furtherance of the conspiracy."  United States v. Tracy, 12 F.3d 1186, 1196 (2d Cir. 1993) (citations omitted); see also Bourjaily v. United States, 483 U.S. 171, 176 (1987) (holding that a "preponderance of the evidence" standard applies).  "[S]tatements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence of those four prerequisites."  Tracy, 12 F.3d at 1199 (citations omitted).  In this case, that ruling awaits a specific proffer at trial.

The standard for a judicial determination that the elements to allow admission pursuant to the coconspirator exception are met is lower than that for a criminal conviction.  Courts repeatedly have found that even an acquittal on a conspiracy count "does not destroy the admissibility of the declarations of co-conspirators on the substantive charge."  United States v. Clark, 613 F.2d 391, 403 (2d Cir. 1979) (citation omitted).

**A286**

The law also has long provided that "[t]he conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment." United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999); see also United States v. Russo, 302 F.3d 37, 45 (2d Cir. 2002).  In fact, the Second Circuit has held that it is not even necessary that the Government charge a conspiracy to take advantage of Rule 801(d)(2)(E).  United States v. DeVillio, 983 F.2d 1185, 1193 (2d Cir. 1993).  Thus, in proving the existence of a conspiracy for purposes of Rule 801(d)(2)(E) in this case, the Government is not limited to the overarching conspiracy charged in Count Three; for example, proof of multiple small conspiracies may suffice for purposes of Rule 801(d)(2)(E).

Having found that the challenged evidence is relevant, the Court turns to Rule 403.  Preclusion is not warranted under Rule 403.  The probative value of the evidence substantially outweighs any danger of unfair prejudice.  As discussed, the evidence is highly probative of the charged narcotics offenses.  Defendant points to "the sheer volume of evidence of illegal transactions by Silk Road users" (Def. Mem. at 7), but a criminal defendant is not entitled to preclude evidence simply because it is incriminating and there is a lot of it.  "All evidence which tends to prove guilt could be characterized as prejudicial," but "[o]nly unduly prejudicial evidence should be excluded under Fed. R. Evid. 403."  United States v. Del Rosario, No. S1 12 Cr. 81(KBF), 2012 WL 2354245, at *3 (S.D.N.Y. June 14, 2012) (citation omitted); see also Gelzer, 50 F.3d at 1139 ("The prejudice that Rule 403 is concerned with

25

involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" (quoting <u>Figueroa</u>, 618 F.2d at 943)).

Accordingly, defendant's motion to preclude certain evidence regarding Silk Road product listings and transactions is DENIED.

B.      <u>The Murder-for-Hire Motions</u>

The Government has affirmatively moved to allow the murder-for-hire evidence.  Defendant has moved to preclude all evidence of Ulbricht's murder-for-hire solicitations.  Defendant also has moved to strike as surplusage references to these solicitations in the Superseding Indictment.

The Government argues that evidence of Ulbricht's solicitations of six murders-for-hire is admissible as direct evidence of the crimes charged in the Superseding Indictment.  In particular, the Government argues that Ulbricht solicited the murders-for-hire in furtherance of the charged offenses—in order to protect his criminal enterprise from theft, extortion, and threats of exposure to law enforcement.  According to the Government, Ulbricht's resort to violence is akin to that of a "traditional drug dealer on the street who uses violence to protect his corner or turf from rival dealers, or to prevent informants from cooperating with law enforcement."  (Gov't Mem. at 21.)  Alternatively, the Government argues that the murder-for-hire evidence is admissible under Rule 404(b) to prove Ulbricht's criminal knowledge and intent, as well as his identity as DPR.

In contrast, defendant argues that the murder-for-hire solicitations must be precluded as irrelevant to the charged offenses, and not admissible even as

background information because they are wholly unrelated to any of the charged offenses, which are limited to nonviolent crimes. According to defendant, "[t]he government's acknowledgment that there is not any evidence that any murders, or even violence of any kind, occurred . . . reinforces the lack of relevance of the murder for hire allegations." (Def. Mem. at 12.) Defendant further argues that even if the murder-for-hire evidence is relevant, the Court should preclude it under Rule 403.

<u>Discussion</u>

For the reasons set forth below, the Court finds that the murder-for-hire evidence is relevant to the charged offenses, and would in any event be separately admissible under Rule 404(b) to prove Ulbricht's identity as DPR. Finally, Rule 403 does not require preclusion.

The murder-for-hire evidence is directly relevant to proving the elements of the narcotics offenses. First, the context of each of the alleged solicitations involves narcotics dealers, rendering the evidence probative of defendant's participation in the charged offenses. Ulbricht's alleged solicitations of the murders-for-hire revolved around narcotics and protecting Silk Road. The Government seeks to offer evidence that FriendlyChemist, a Silk Road user, was extorting DPR to pay off his narcotics supplier, and that Ulbricht solicited the supplier—another Silk Road user—to execute FriendlyChemist in order to protect the security and anonymity of Silk Road. The Government also seeks to show that DPR solicited the same supplier to execute tony26 and his three associates at least in part to recover

"potential product/money."  The supplier told Ulbricht that tony26 was a drug dealer who lived and "s[old] product" with the three associates.  These statements are all probative of the existence of the unlawful conspiracy alleged by the Government.[11]

Further, the evidence has additional relevance to the CCE charge in Count Four.  One of the elements of the CCE offense is that defendant occupied "a position of organizer, a supervisory position, or any other position of management."  Aiello, 864 F.2d at 264.  Evidence that Ulbricht solicited murders-for-hire of individuals who threatened Silk Road is relevant to show Ulbricht's supervisory role in the criminal enterprise—that he protected the criminal enterprise of which he was the leader.  The first alleged murder-for-hire solicitation is particularly probative in this regard because the target was a Silk Road employee.  Ulbricht suspected an employee of stealing approximately $350,000 worth of bitcoins from vendor accounts, and his alleged response—to solicit another Silk Road user to murder the Employee—shows that he occupied a central managerial role in the criminal enterprise.  Evidence that Ulbricht expressed surprise that the Employee stole from

---

[11] It is well established that where "the indictment contains a conspiracy charge, 'uncharged acts may be admissible as direct evidence of the conspiracy itself.'"  United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999) (quoting United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997)) (internal quotation marks omitted); see also United States v. Lopez, 572 F. App'x 1, 3 (2d Cir. 2014) (affirming the district court's decision to allow evidence of an uncharged murder as direct evidence of the existence of a conspiracy); United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994) (finding no error in the admission of evidence of a robbery that was not alleged in the indictment because the robbery, and the defendant's participation in that robbery, "were plainly acts in furtherance of the RICO conspiracy").  In particular, acts of violence may be admissible as overt acts in furtherance of a drug distribution conspiracy.  See United States v. Estrada, 320 F.3d 173, 183 (2d Cir. 2003) (noting that "the use of violence to secure the organization's drug turf" and "carrying and using firearms to enforce its control over the drug market" are overt acts of a narcotics conspiracy (internal quotation mark omitted)).

him because he had the Employee's driver's license (obtained in connection with the Employee's work on Silk Road) is further proof that Ulbricht was at the top of the Silk Road hierarchy.[12]

Finally, the murder-for-hire evidence is separately admissible under Rule 404(b) to show identity—that Ulbricht was DPR.  The Government contends that chats and other records recovered from Ulbricht's personal laptop correspond to DPR's communications about the murders-for-hire on the Silk Road messaging system.  This connection is probative of identity.

The evidence of the first solicitation allegedly consists of records of online messages between Ulbricht and two other individuals, CC1 and CC2.  In these messages, Ulbricht allegedly discussed with CC-1 and CC-2 that the Employee was responsible for the theft of $350,000 worth of bitcoins from vendor accounts; that he was arrested on narcotics charges; that he may be cooperating with law enforcement; and that Ulbricht solicited someone to murder him.  These messages were allegedly recovered from Ulbricht's personal laptop and are probative of whether Ulbricht was DPR—the leader of Silk Road who took measures to protect the criminal enterprise from threats.

In addition, DPR's conversations on the Silk Road messaging system about FriendlyChemist allegedly correspond to entries in a log file recovered from

_____

[12] Defendant emphasizes that there is no evidence that any of the murders-for-hire were carried out, but this fact is inapposite because it does not undermine the evidence that Ulbricht, acting as DPR, was willing to resort to extremely harsh, violent measures to protect his criminal enterprise.  The Government has agreed to stipulate that it has no evidence of any actual murders, effectively eliminating any danger that the jury would improperly assume that the murders were carried out.

Ulbricht's laptop.  For example, on March 27, 2013, after FriendlyChemist had threatened to publish a list of real names and addresses of Silk Road vendors and customers unless DPR paid him $500,000, DPR wrote to redandwite, "In my eyes, FriendlyChemist is a liability and I wouldn't mind if he was executed."  An entry dated March 28, 2013 in Ulbricht's log appears to refer to the extortion and DPR's communication with redandwhite: "being blackmailed with user info.  talking with large distributor (hell's angels)."  The next day, when DPR and redandwhite discussed redandwhite's fee for murdering FriendlyChemist, Ulbricht allegedly wrote in his log, "commissioned hit on blackmailer with angels."  Then, in early April, when redandwhite sent DPR a message confirming that FriendlyChemist "won't be blackmailing anyone again" and later sent DPR a picture of an allegedly dead victim, Ulbricht updated his log with the following entries: "got word that blackmailer was executed" and, later, "received visual confirmation of blackmailers execution."  The correlation between DPR's messages and entries in Ulbricht's personal log is probative of whether Ulbricht and DPR were one and the same.

Finally, evidence of the solicitations of the murders-for-hire of tony26 and his three associates is also highly probative of identity.  Around the time that redandwhite told DPR that tony76 participated in FriendlyChemist's blackmail scheme, Ulbricht allegedly told CC-2—in chats recovered from Ulbricht's laptop— that (1) he had been blackmailed by an individual who threatened to reveal addresses of Silk Road vendors and customers, (2) he had paid a member of the Hell's Angels "to hunt down the blackmailer," and (3) he learned that tony76 was

involved in the blackmail scheme.  Then, on April 6, 2013, the same day that DPR

wrote to redandwhite "Ok, let's just hit [tony26]," Ulbricht allegedly updated his log

with "gave angels go ahead to find tony76."  Two days later, on April 8, 2013, when

DPR confirmed that he had sent a payment of 3,000 bitcoins to murder tony76 and

his three associates, Ulbricht allegedly wrote in his log, "sent payment to angels for

hit on tony76 and his 3 associates."

Exclusion of the murder-for-hire evidence is not warranted under Rule 403.

Since "drug trafficking is often attended by violence," United States v. Sureff, 15

F.3d 225, 228-29 (2d Cir. 1994), courts in this Circuit repeatedly have declined to

preclude evidence of violence in narcotics cases.  See United States v. Viserto, 596

F.2d 531, 537 (2d Cir. 1979) ("We have recognized that handguns are tools of the

narcotic trade, and that possible prejudice does not outweigh the relevance.");

United States v. King, 165 F.3d 15 (2d Cir. 1998) (holding that the district court did

not abuse its discretion in admitting two handguns because "[e]xperience on the

trial and appellate benches has taught that substantial dealers in narcotics keep

firearms on their premises as tools of the trade" (citation and internal quotation

marks omitted)).

Here, the probative value of the murder-for-hire evidence is not substantially

outweighed by the dangers of unfair prejudice, confusing the issues, or wasting

time.  To be sure, the evidence is prejudicial to Ulbricht, and it does inject an

element of violence into the case.  However, the prejudicial effect is reduced by the

Government's stipulation that no actual murders were carried out.  Moreover,

prejudice alone cannot warrant exclusion because, as explained above, all incriminating evidence is prejudicial to a criminal defendant.  See Del Rosario, 2012 WL 2354245, at *3.  The inquiry, rather, is whether the murder-for-hire evidence is unfairly prejudicial and whether the danger of unfair prejudice substantially outweighs the probative value of the evidence.

As explained above, the murder-for-hire evidence is probative both as evidence of the charged offenses and to prove Ulbricht's identity as DPR—a key disputed issue in this case.  In addition, the charges in this case are extremely serious: Ulbricht is charged not with participating in a run-of-the-mill drug distribution conspiracy, but with designing and operating an online criminal enterprise of enormous scope, worldwide reach, and capacity to generate tens of millions of dollars in commissions.  Evidence that defendant sought to protect this sprawling enterprise by soliciting murders-for-hire is, in this overall context, not unduly prejudicial.  Any danger of unfair prejudice is outweighed by the substantial probative value of the evidence.  See United States v. Matera, 489 F.3d 115, 121 (2d Cir. 2007) ("When a defendant engages in a criminal enterprise which involves very serious crimes, there is a likelihood that evidence proving the existence of the enterprise through its acts will involve a considerable degree of prejudice. Nonetheless, the evidence may be of important probative value in proving the enterprise." (citation omitted)).

Accordingly, defendants' motions to preclude the murder-for-hire evidence and to strike references to the murder-for-hire solicitations from the Superseding

A294

Indictment are DENIED.  The Government's corresponding motion regarding the

murder-for-hire evidence is GRANTED.

C.    Defendant's Motion to Preclude Exhibits as Insufficiently
       Authenticated

Defendant has moved to preclude certain Government exhibits as

insufficiently authenticated under Fed. R. Evid. 901 and the Second Circuit's

decision in United States v. Vayner, 769 F.3d 125 (2d Cir. 2014).  (See Def. Mem. at

16-20.)  Defendant argues that these exhibits—including screenshots of various

websites, Silk Road forum posts, private Internet messages and chats, files

recovered from Ulbricht's laptop, etc.—are "electronic in nature" and "cannot be

verified as being what they purport to be, or by whom."  (Id. at 20.)  The

Government asserts that Vayner is inapplicable and that in all events the motion is

premature.  This Court agrees.

In Vayner, the defendant was indicted for transferring a false identification

document.  769 F.3d at 127.  One of the issues in the case was whether the e-mail

address from which the document was sent—azmadeuz@gmail.com—belonged to

the defendant.  See id. at 127-28.  To corroborate a cooperator's testimony that the

e-mail address belonged to the defendant, the Government offered into evidence a

printout of a webpage, which it claimed was the defendant's profile page from a

Russian social networking site akin to Facebook.  (See id.)  The printout contained

the defendant's name and picture, and listed "Azmadeuz" as the defendant's

address on Skype.  (Id. at 128.)  The district court admitted the printout over the

defendant's objection that the page had not been properly authenticated under Rule 901.  (Id.)

The Second Circuit held that the district court abused its discretion in admitting the printout because "[t]he government did not provide a sufficient basis on which to conclude that the proffered printout was what the government claimed it to be—[the defendant's] profile page."  Id. at 131.  The Second Circuit explained that the printout was helpful to the Government's case only if the defendant authored it, and the mere existence of a webpage with the defendant's name and photograph did not "permit a reasonable conclusion that this page was created by the defendant or on his behalf."  Id. at 132.  The panel noted that while "the contents or 'distinctive characteristics' of a document can sometimes alone provide circumstantial evidence sufficient for authentication," the information on the printout was known to the cooperator and likely others, some of whom may have had a motive to fabricate the webpage.  Id. (citation omitted).

Vayner is not a blanket prohibition on the admissibility of electronic communications.  As the Second Circuit observed, "[e]vidence may be authenticated in many ways" and "the 'type and quantum' of evidence necessary to authenticate a web page will always depend on context."  Vayner, 769 F.3d at 133.  The Second Circuit also expressed skepticism that authentication of evidence derived from the Internet required "greater scrutiny" than authentication of any other record.  Id. at 131 n.5.  Whether the Government can meet Rule 901's authentication standard

with respect to the challenged exhibits is a question best answered at trial.  There simply is no basis to prejudge the Government's ability to meet that standard.

      D.     <u>The Fraudulent Identification Evidence Motions</u>

Defendant has moved to preclude evidence that Ulbricht ordered fraudulent identification documents from Silk Road on the basis that the Government has not or cannot meet the standard to show "consciousness of guilt" necessary to argue that it is proof of flight.  However, defendant's briefing on this issue fails to address the existence of Count Six charging defendant with a conspiracy to traffic in fraudulent identification documents.  The Government has affirmatively moved to allow this evidence as direct evidence of Count Six and additionally as evidence of "consciousness of guilt."

The fraudulent identification evidence is admissible as direct evidence that Ulbricht knowingly and intentionally participated in a conspiracy to traffic in fraudulent identification documents, as charged in Count Six of the Superseding Indictment.  Specifically, evidence that Ulbricht purchased counterfeit driver's licenses from Silk Road is relevant to show that Silk Road had the capability to facilitate sales of fraudulent identification documents and that Ulbricht knowingly and intentionally exploited that capability—i.e., that the conspiracy charged in Count Six existed and included Ulbricht as a member.  The jury may infer from the evidence that Ulbricht's purchase was his "sampling the goods."  Ulbricht's statement during the controlled delivery that "hypothetically" anyone could go onto the Silk Road website and purchase any fake identity documents that he or she

desired is further evidence of the existence of a conspiracy to traffic in such documents.[13]

The Court also finds that exclusion under Rule 403 is not warranted because the probative value of the fraudulent identification evidence is not substantially outweighed by any danger of unfair prejudice.  Evidence that Ulbricht purchased counterfeit driver's licenses from Silk Road has substantial probative value as direct evidence of the charged conspiracy to traffic in fraudulent identification documents, and it is plainly not unduly prejudicial given the allegations in Count Six.

Accordingly, defendant's motion to preclude the fraudulent identification evidence is DENIED, and the Government's corresponding motion to allow such evidence is GRANTED.

E.   Defendant's Motion to Preclude Miscellaneous Government Exhibits

Defendant has objected to a number of the Government's proposed exhibits.

First, defendant objects to exhibits GX 107, 125A through O, 126A through D, 127B and C, 130, 240A through D, 241 through 243, 252, 254, 255, 258, 259, 270, 276A through F, 277A through D, 278, 281, 301 through 335, 501A through C, 700,

---

[13] The Court is not prepared to rule at this juncture whether the fraudulent identification evidence is also admissible as "flight" evidence demonstrating consciousness of guilt.  "[I]t is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself."  United States v. Steele, 390 F. App'x 6, 12 n.2 (2d Cir. 2010) (quoting United States v. Myers, 550 F.2d 1036, 1049 (5th Cir. 1977)) (internal quotation marks omitted); see also United States v. Wilson, 11 F.3d 346, 353 (2d Cir. 1993) ("[T]he use of false identification is relevant and admissible to show consciousness of guilt." (citing United States v. Morales, 577 F.2d 769, 772 (2d Cir. 1978))).  However, "[w]hile it is well-settled that flight can, in some circumstances, evidence consciousness of guilt, a satisfactory factual predicate must exist before such evidence may properly be admitted."  Steele, 390 F. App'x at 11.  Whether such a factual predicate exists in this case is a question best answered at trial.

and 803 as inadmissible hearsay.  The Government has provided its responses to these hearsay objections in an exhibit chart filed with the Court on December 10, 2014.  The Court will rule on these objections as necessary at trial.

Second, defendant objects to various photographs of narcotics seizures in Chicago and screenshots of the Silk Road website (GX 100A through 103) as lacking a foundation because the exhibits do not contain dates.  This motion is DENIED as premature.  Defendant may raise these objections at trial after the Government has laid a foundation and offered these exhibits in evidence, as appropriate.

Third, defendant objects to a number of exhibits—GX 100A through 104A, 126C, 225, 295E, 501C, 801, 801A, 802, and 802A—on the ground that they only provide evidence of a unilateral conspiracy because one of the participants is a law enforcement agent, or is operating under the direction of law enforcement, and therefore could not have formed criminal intent.  This motion is DENIED.  The Government's proposed use of these documents is not limited to the conspiracy charge.  The exhibits are separately relevant to the substantive narcotics charges in Counts One, Two, and Four because they are probative of what Silk Road was and how it operated.  In addition, as explained above, the Government intends to prove that Ulbricht was the leader of a single overarching narcotics conspiracy, which included all vendors who sold narcotics on Silk Road.  Evidence of undercover purchases and seizures from Silk Road is probative of the existence of such a conspiracy because it shows that Silk Road operated as a marketplace for narcotics. Further, statements of defendant and his coconspirators to third parties, including

37

law enforcement agents, made in furtherance of the conspiracy are admissible against defendant even if the third parties are not members of the conspiracy.  In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 93, 139 (2d Cir. 2008) ("Though [Rule 801(d)(2)(E)] requires that both the declarant and the party against whom the statement is offered be members of the conspiracy, there is no requirement that the person to whom the statement is made also be a member." (quoting United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir. 1989)) (internal quotation marks omitted)).

Fourth, defendant objects to product listings on Silk Road, and a companion website called The Armory, offering books, manuals, and "How To" guides regarding criminal activity (GX 116G, 116H, 116I, and 291C).  Defendant argues that selling these materials on Silk Road is protected First Amendment activity.  Defendant's motion is GRANTED as to these materials for the reasons set forth in subpart F below.  The books and manuals in these exhibits are irrelevant to any of the charged offenses and, even if they were, any marginal probative value is substantially outweighed by the danger of unfair prejudice to defendant.  The challenged exhibits—featuring books with titles such as "Silent but Deadly" and "Homemade C-4: A Recipe for Survival"—unnecessarily inject elements of violence and explosive devices that are not otherwise part of this case.

Defendant similarly objects to a manual recovered from his laptop (GX 271) on First Amendment grounds.  The Government argued at the FPTC that this manual—entitled The Construction & Operation of Clandestine Drug Laboratories,

Second Edition—is relevant to the charges in Counts One and Three because it supports the Government's theory that defendant clandestinely grew magic mushrooms in order to get Silk Road off the ground.  The First Amendment is not a proper basis for this objection: acts of speech may always be used as probative of participation in criminal activity.  For instance, if a defendant states, "I did it," that statement would not be precluded on First Amendment grounds.  Nevertheless, the admissibility of this manual will be determined at trial, after the Government lays a foundation.

Fifth, defendant objects to exhibits containing online chats in which defendant and coconspirators allegedly discuss potential criminal exposure for their activities on Silk Road (GX 226 and 230).  Defendant argues that these exhibits are unduly prejudicial because they can be interpreted as providing instructions on the law and could thus confuse and mislead the jury.  This motion is DENIED.  The conversations in GX 226 and 230 are highly probative of defendant's participation in the charged conspiracies and knowledge of the illegal nature of Silk Road.  Any potential prejudice from admitting these conversations can be cured by the Court's instructions.

Finally, defendant objects to exhibits relating to uncharged contraband sold on Silk Road (GX 116G, 116H, 116I, 228A, 228B, 229A, 230, 276A through F, and 227A through D).  Defendant argues that these exhibits are irrelevant to the charged offenses.  This motion is GRANTED for the reasons set forth in subpart F below.

39

F. <u>Government's Motion to Allow Evidence of Criminally Oriented Goods and Services Not Specifically Referenced in the Superseding Indictment</u>

The Government has moved to allow evidence that Silk Road was a marketplace not only for narcotics, computer hacking tools, and counterfeit identity documents—the contraband referenced in the Superseding Indictment—but also for other goods and services of interest to criminals, such as weapons, counterfeit commercial merchandise, and pirated copies of copyrighted books.  (<u>See</u> Gov't Mem. at 13-14.)  The Government also seeks to introduce evidence of The Armory—a companion website that Ulbricht allegedly set up to facilitate the sale of guns.  (<u>Id.</u> at 14.)

The Government argues that evidence of uncharged contraband is "inexorably intertwined with the charged conduct and necessary to complete the story of the crimes charged."  (<u>Id.</u> at 25.)  In the alternative, the Government argues that this evidence is admissible under Rule 404(b) as probative of Ulbricht's knowledge and criminal intent.  Defendant counters that evidence of contraband not referenced in the Superseding Indictment is irrelevant.  This Court agrees.

The Court disagrees with the Government that this evidence is "inexorably intertwined" with the charged offenses or "necessary to complete the story."  The charged offenses are limited to three types of contraband—narcotics, computer hacking materials, and fraudulent identification documents.  Evidence that other contraband—such as weapons and pirated copies of copyrighted books—was also sold on Silk Road is unrelated to, much less "inextricably intertwined" with the

charged offenses.  It is also not necessary to "complete the story": the charges in the Superseding Indictment suffice to present a story of a sprawling online marketplace where criminals all over the world could purchase a wide variety of contraband—all kinds of illegal narcotics, computer hacking tools, and fraudulent identification documents—anonymously.

The <u>Williams</u> case cited by defendant is persuasive in this regard.  In <u>Williams</u>, one of the defendants, Jackson, was charged with possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1).  <u>United States v. Williams</u>, 585 F.3d 703, 705 (2d Cir. 2009).  The Government's version of the facts was as follows: "the police responded to a report of a shooting in the building; they approached a group of people outside the building; Jackson fled; Officer Jordan saw a gun in Jackson's pocket; the police later apprehended Jackson; and an officer found the gun near where Jackson had run."  <u>Id.</u> at 707.  In addition to this evidence, the district court admitted evidence that Jackson had been present in the apartment where the shooting occurred and where police later found a cache of weapons and other contraband.  <u>See id.</u> at 706.  The Government argued, as the Government does here, that this evidence "completed the narrative and was 'inextricably intertwined with proof of the charged offense,'" <u>id.</u> at 708, but the Second Circuit held that admitting this evidence was an abuse of discretion:

> We disagree that the contraband evidence was relevant as background to the crime.  The physical evidence from the apartment was not particularly helpful to explain the crime.  The Government's version of the facts was simple and complete . . . .  The Government did not need the contraband to explain why the police were at the building, why Officer Jordan pursued Jackson, why Jackson was arrested, or why

41

> Jackson was charged with possessing a firearm. Failing to detail the contents of the apartment would not have left any gaps in the Government's case, nor have left the jury wondering about missing pieces of the story. We think the evidence more likely confused the jury than assisted its understanding of the case.

Id. at 707-08 (citation omitted).

In this case, too, evidence that contraband such as counterfeit belts was sold on Silk Road is not particularly helpful to explain the charges against defendant, all of which center around narcotics, computer hacking tools, and fraudulent identification documents. Nor does precluding this evidence leave any gaps in the Government's case: as explained above, evidence of the charged offenses suffices to paint a compelling and self-contained story of Silk Road as a sprawling criminal enterprise.

Evidence of uncharged contraband is also not probative of Ulbricht's knowledge and intent. The Government argues that evidence that Ulbricht was responsible for setting the policies governing which goods and services could be sold on Silk Road demonstrates that he knew about the illegal nature of the enterprise. (Gov't Mem. at 26.) That may be true, but the Government can present this evidence without referencing any uncharged contraband. That is, this ruling does not preclude the Government from presenting evidence that Ulbricht authored a policy that specifically allowed vendors to sell narcotics, computer hacking tools, and fraudulent identification documents on Silk Road.

Evidence of uncharged contraband also presents hearsay problems. At the FPTC, the Government has conceded that the charged narcotics conspiracy does not

include vendors who sold merchandise other than narcotics.  As a result, any label or product listing suggesting that the merchandise is counterfeit or otherwise illegal—e.g., "Fake Ray ban RB2140 Sunglasses" in GX 116C—is inadmissible hearsay in the absence of an applicable exception.  Thus, to prove that the various products were indeed counterfeit or illegal likely would require a mini-trial within the trial.[14]

Even if evidence of uncharged contraband were relevant, the Court would preclude it under Rule 403 because any marginal probative value of this evidence is substantially outweighed by the dangers of unfair prejudice, confusing the issues, and wasting time.  In particular, evidence that firearms and other weapons were sold on Silk Road and The Armory is unduly prejudicial to defendant because it unnecessarily injects elements of violence and guns into this case.  In addition, introducing evidence of uncharged contraband may mislead the jury and lead it to convict defendant for uncharged conduct.  Finally, allowing such evidence may lead to a mini-trial on collateral issues, such as whether or not the Gucci belts sold on Silk Road were counterfeit.

Accordingly, the Government's motion to allow evidence of uncharged contraband is DENIED.[15]

---

[14] While the Government is not limited to the charged conspiracies in proving the elements of the coconspirator exception, it must allege facts supporting the existence of a conspiracy between defendant and any vendor who sold uncharged contraband.  The Government has not done so here, and the Court will not allow evidence on this collateral issue at trial.

[15] As discussed at the FPTC, the admissibility of any exhibits featuring currency will be determined at trial, after the Government lays a foundation for those exhibits.  The exhibits will be precluded if offered to show that counterfeit currency was sold on Silk Road but may be allowed if offered to prove money laundering.

G.  <u>Government's Motion to Preclude Argument or Evidence Regarding
    Potential Consequences of Conviction and Defendant's Political Views</u>

The Government has moved to preclude argument and evidence on (1) the

potential consequences of defendant's conviction, and (2) defendant's political views

or other excuses for his conduct.  (<u>See</u> Gov't Mem. at 27-29.)

The defense has assured the Court that it is "well aware of the limits on

appropriate argument, and does not intend to argue the issue of Mr. Ulbricht's

potential punishment before the jury."  (Memorandum of Law in Opposition to

Government's Motions <u>In Limine</u> at 17, ECF No. 126.)  The defense also has

represented that it will not make any arguments regarding jury nullification.  (<u>Id.</u>)

This motion is therefore DENIED as moot.

V.  CONCLUSION

A.  Defendant's motion to preclude certain evidence regarding Silk Road
    product listings and transactions is DENIED, subject to the ruling in
    subpart F.

B.  Defendant's motions to preclude evidence of defendant's murder-for-
    hire solicitations and to strike references to such solicitations as
    surplusage are DENIED.  The Government's corresponding motion to
    allow the murder-for-hire evidence is GRANTED.

C.  Defendant's motion to preclude certain Government exhibits as
    insufficiently authenticated is DENIED.  Defendant can renew this
    motion as to any particular exhibit when it is offered at trial.

D.  Defendant's motion to preclude evidence that he ordered fraudulent
    identification documents from Silk Road is DENIED.  The
    Government's corresponding motion to allow this evidence is
    GRANTED.

E.  Defendant's motion to preclude a variety of government exhibits not
    covered by the other motions <u>in limine</u> is GRANTED in part and
    DENIED in part.  The specific rulings are set forth above.

44

F.    The Government's motion to allow evidence of uncharged contraband is DENIED.

G.    The Government's motions to preclude argument and evidence regarding (1) any potential consequences of conviction, and (2) defendant's political views or other excuses is DENIED as moot.

The Clerk of Court is directed to terminate the motions at ECF Nos. 108 and

112.

Dated:    New York, New York
          January 7, 2015

_____
          KATHERINE B. FORREST
          United States District Judge



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

January 19, 2015

By ECF
Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re:   *United States v. Ross William Ulbricht*, 14 Cr. 68 (KBF)

Dear Judge Forrest:

The Government respectfully submits this letter brief to address the admissibility of testimony the defense elicited on Thursday and seeks to continue eliciting from Special Agent ("SA") Jared Der-Yeghiayan concerning Mark Karpeles, formerly the owner of the Bitcoin exchange known as "MtGox," whom the defense apparently seeks to argue was the true operator of Silk Road. As set forth below, this line of questioning is impermissible on several grounds.

First, the line of questioning is improper insofar as it is focused on SA Der-Yeghiayan's state of mind during his investigation. That is, the defense seeks to have SA Der-Yeghiayan explain why he *believed* during an earlier period in time that there was reason to suspect Mr. Karpeles was involved in operating Silk Road. SA Der-Yeghiayan's beliefs are not evidence. Just as SA Der-Yeghiayan could not have testified on direct examination about his current belief that the defendant is guilty of the crimes charged and the reasons why he holds that belief, he cannot now be asked to testify on cross-examination about his previous beliefs that others were implicated in the crime or the reasons for those beliefs. Indeed, an agent's beliefs often rest on hearsay, hunches, or other information that is not in itself admissible. The defense cannot circumvent the evidentiary rules prohibiting the admission of such information by having the agent testify about what he believed at various points during the investigation or why he believed it.

Second, the defense should also be precluded from inquiring into discussions between Mr. Karpeles (through his counsel) and an Assistant U.S. Attorney from the District of Maryland concerning the possibility of Mr. Karpeles proffering information he believed could help authorities in their investigation of Silk Road. SA Der-Yeghiayan was not involved in and has no first-hand knowledge of those discussions; and the residual hearsay exception, which is meant to apply only in exceptional circumstances, does not provide a basis for SA Der-Yeghiayan to

testify about them.  The statements the defense seeks to elicit from SA Der-Yeghiayan on this issue do not bear circumstantial guarantees of trustworthiness, nor would admitting them serve the interests of justice.  Indeed, the defense seeks to use these statements for an improper purpose – to falsely suggest to the jury that Mr. Karpeles had inside knowledge about Silk Road, or sought to obtain immunity from prosecution for involvement in Silk Road, when neither suggestion is true.

Finally, to the extent the defense seeks to elicit testimony from SA Der-Yeghiayan concerning Mr. Karpeles that does not either consist of agent belief or inadmissible hearsay, the Court should allow such testimony only if the defense can show it is more probative than prejudicial. The Second Circuit has made clear that courts have an important gatekeeping role where a defendant seeks to introduce evidence of an "alternative perpetrator," as such evidence poses serious risks of confusing and misleading the jury.  In keeping with that gatekeeping role, courts allow such evidence only if the defense can proffer a substantial, direct connection – as opposed to a mere basis for suspicion – linking the "alternative perpetrator" to the crime charged. As explained below, the connections the defense seeks to draw between Mr. Karpeles and the Silk Road website are, based on what the Government ultimately learned through its investigation, neither direct nor substantial.  Accordingly, the Court should carefully evaluate the probative value of any evidence the defense seeks to introduce concerning Mr. Karpeles and exclude such evidence if its probative value is outweighed by its potential prejudicial effect.

**Factual Background**

**A.     SA Der-Yeghiayan's Investigation of Mark Karpeles**

As SA Der-Yeghiayan testified during direct examination, his investigation of Silk Road spanned approximately two years.  During that time, before certain information about the defendant was brought to his attention by IRS Special Agent Gary Alford on or about September 10, 2013, SA Der-Yeghiayan looked into several other individuals whom he thought potentially were involved in operating Silk Road.

One of the individuals SA Der-Yeghiayan considered was Mark Karpeles.  Mr. Karpeles was, at the time in question, the owner of a company based in Japan known as "MtGox" – one of the largest Bitcoin exchanges then in operation on the Internet.  SA Der-Yeghiayan's suspicion of Mr. Karpeles was based primarily on the fact that, from February 2011 to February 2012, the website "silkroadmarket.org" was hosted on a server controlled by Mr. Karpeles.  The "silkroadmarket.org" website was a simple website on the ordinary Internet that provided instructions on how to get to the real Silk Road on Tor.  (*See* Ex. A.)  SA Der-Yeghiayan looked up the "silkroadmarket.org" website on "who.is" (a public database discussed during SA Der-Yeghiayan's testimony on direct), which revealed that the website resolved to a server controlled by a certain company that SA Der-Yeghiayan traced to Mr. Karpeles.

Two other considerations led SA Der-Yeghiayan to suspect that Mr. Karpeles might be involved in Silk Road.  First, SA Der-Yeghiayan believed Mr. Karpeles had a motive for operating Silk Road – to generate a demand for Bitcoins (which were needed to make purchases on Silk Road), which would in turn drive customers to MtGox.  Second, SA Der-Yeghiayan

noticed that certain websites he believed to be associated with Mr. Karpeles were created with certain software that was also used to create certain portions of the Silk Road website.  Based on this evidence, in mid-August 2013, SA Der-Yeghiayan obtained a search warrant for certain email accounts used by Mark Karpeles so that he could review them for any evidence corroborating his suspicions.

No such evidence was found.  Instead, the evidence showed that the principal basis for having suspected Mr. Karpeles prior to obtaining the search warrant did not, in fact, establish a connection between Mr. Karepeles and Silk Road.  In particular, the evidence showed that, besides operating Mt. Gox, Mr. Karpeles also ran a webhosting service known as "Kalyhost" (also known as "AutoVPS.net"), which accepted Bitcoins among other forms of payment.  Like any webhosting service, such as "Amazon Web Services" or "GoDaddy.com," Kalyhost leased server space to its customers for them to use in setting up their own websites.  The "silkroadmarket.org" website belonged to a Kalyhost *customer*, as evidenced, for example, by an email from the customer found in the email account for Mr. Karpeles' webhosting company, seeking assistance with a customer-support question.  (*See* Ex. B)).[1]

The Kalyhost customer associated with the "silkroadmarket.org" website, the investigation ultimately revealed, was the *defendant*.  As reflected in the "who.is" information for the "silkroadmarket.org" website, the name of the website was registered by someone using the name "Richard Page."  (*See* Ex. C).  Based on an examination of the defendant's laptop subsequent to his arrest, that name is known to be an alias used by the defendant.  Specifically, a file recovered from the defendant's computer, within a folder marked "aliaces" [sic], reflects the name "Richard Page," along with a false address included in the contact information used to register the "silkroadmarket.org" domain name.  (*See* Ex. D).  The file further reflects that the information was used to rent a server from "kalyhost."  (*Id.*).

The fact that the defendant used Mr. Karpeles' webhosting service to host the "silkroadmarket.org" website turned out to be the *only* connection SA Der-Yeghiayan ever found between the website and Mr. Karpeles.  And the results of the search warrant effectively eliminated the significance of that connection.  There was no evidence that Mr. Karpeles himself created or maintained the "silkroadmarket.org" website.  Again, Mr. Karpeles controlled numerous servers, which he leased to a multitude of different customers who used Kalyhost as their webhosting provider; thus, the fact that the "silkroadmarket.org" website was hosted on a server Mr. Karpeles controlled does not imply he was responsible for its content.[2]  And of course SA Der-Yeghiayan never found that Mr. Karpeles had any connection whatsoever to the servers operating the actual Silk Road website on Tor.

---

[1] That the operator of "silkroadmarket.org" chose to use Kalyhost to host the website is not surprising.  The fact that Kalyhost accepted Bitcoins as payment made it an attractive webhosting provider for customers who wished to set up a website without having to provide identifying information in making payment.

[2] SA Der-Yeghiayan indicated as much during cross-examination.  *See* Tr. 492:14-16 ("Q:… He [Mr. Karpeles] had a lot of domain names and things like that within his control?  A: He *hosted* a lot of websites, yes.") (emphasis added).

Once the search warrant results were obtained, and it became clear that the principal basis for SA Der-Yeghiayan's suspicion – namely, the connection between Mr. Karpeles's webhosting service and the "silkroadmarket.org" website – lacked significance, the import of the other bases for SA Der-Yeghiayan's suspicions likewise appeared insignificant.  Standing alone, those other bases do not substantially implicate Mr. Karpeles in operating Silk Road.  First, although SA Der-Yeghiayan suspected Mr. Karpeles of having a motive to operate Silk Road because Mr. Karpeles ran one of the largest Bitcoin exchanges in operation at the time, any operator of a Bitcoin exchange would have had a similar theoretical motive for operating Silk Road, and of course the motive for operating Silk Road was not limited to those operating Bitcoin exchanges.  Second, as for the software commonalities observed by SA Der-Yeghiayan, the software in question was publicly available and widely used.  Thus, SA Der-Yeghiayan had noted that a website registered to Mr. Karpeles had a "wiki" page on it (*i.e.*, an FAQ page) that was created using the same version of "wiki" software – "Mediawiki" – used to create the "wiki" page on the Silk Road website.  However, Mediawiki is free, publicly available software that anyone can download.[3]  Similarly, SA Der-Yeghiayan also noticed that a discussion forum known as "bitcointalk.org" – which SA Der-Yeghiayan believed, based on information from a "confidential informant," was operated by Mr. Karpeles – was created using the same discussion forum software, known as "Simple Machines," used to create the Silk Road discussion forum.  However, again, "Simple Machines" is publicly available software that can be downloaded for free on the Internet.[4]  (Moreover, SA Der-Yeghiayan did not develop any direct evidence that Mr. Karpeles in fact operated the "bitcointalk.org" website.)  Thus, at most, this evidence shows that Mr. Karpeles used two pieces of widely available software that also happened to be used to create portions of the Silk Road website.

In short, the evidence obtained pursuant to the search warrant for Mr. Karpeles's emails, as well as the Government's investigation of the defendant, revealed no evidence that Mr. Karpeles had anything to do with operating the Silk Road website.

**B.      USAO-Baltimore's Efforts to Interview Mr. Karpeles in July 2013**

Separately from SA Der-Yeghiayan's investigation of Mr. Karpeles, in May 2013, an agent with the Baltimore office of Homeland Security Investigations obtained a warrant to seize certain U.S.-based financial accounts associated with Mr. Karpeles' Bitcoin exchange company, MtGox, as was widely reported in the press at the time.  The seizure warrant was issued pursuant to an affidavit alleging that MtGox was a money transmitting business doing business within the United States, and that Mr. Karpeles had failed to properly register the company as such with federal authorities, in violation of Title 18, United States Code, Section 1960.  The same agent was also involved in an investigation of Silk Road being conducted by the U.S. Attorney's Office for the District of Maryland ("USAO-Baltimore").

SA Der-Yeghiayan learned from others involved in USAO-Baltimore's Silk Road investigation that, following the seizure of the MtGox accounts, they were seeking to interview Mr. Karpeles to determine whether he had any information concerning the operator of Silk Road.

---

[3] *See* https://www.mediawiki.org.

[4] *See* http://www.simplemachines.org.

(According to what SA Der-Yeghiayan had been told, the investigators did not suspect Mr. Karpeles himself of operating Silk Road, but sought any tips he might have as the operator of a large Bitcoin exchange, through which Silk Road proceeds could have passed.)  In particular, according to a memo prepared by SA Der-Yeghiayan, SA Der-Yeghiayan was told in July 2013 by an AUSA in USAO-Baltimore ("AUSA-1"), that another AUSA from his office ("AUSA-2") had spoken with an attorney for Mr. Karpeles, who had told AUSA-2 that his client was willing to provide information concerning someone whom he suspected might be operating Silk Road, in exchange for immunity from any potential charges being pursued against Mr. Karpeles for operating an unlicensed money transmitting business.  SA Der-Yeghiayan subsequently learned from AUSA-1 that AUSA-2 was attempting to set up a meeting in Guam with Mr. Karpeles (who resides in Japan).

However, the meeting never materialized.  SA Der-Yeghiayan was never told what specific information Mr. Karpeles had available to provide concerning Silk Road or what the provenance of it was.

**C.      Information Provided to USAO-SDNY by Mr. Karpeles Following Ulbricht's Arrest**

Several days after the defendant's arrest on October 1, 2013, which was publicly disclosed the following day, the U.S. Attorney's Office for the Southern District of New York ("USAO-SDNY") was contacted by Mr. Karpeles' attorney.  The attorney offered to forward records associated with a certain suspicious MtGox account that he stated he had previously sent to AUSA-2 in USAO-Baltimore.  The attorney stated that MtGox had also found a different account, in the defendant's own name, which the attorney said he could supply records for as well.

Mr. Karpeles' attorney subsequently forwarded via email the information he had previously sent to AUSA-2 concerning the account MtGox deemed suspicious.  (*See* Ex. E).  As reflected in the email, the attorney explained that the forwarded information was "not information about the account in Ulbricht's name, which MtGox only identified as of interest after the Ulbricht indictment [*i.e.*, arrest]."  (*Id.* (emphasis in original)).  The forwarded information related instead to a MtGox account as to which "MtGox ha[d] suspicions may be associated with the largest bitcoin wallet that is perceived by some in the bitcoin community to be associated with Silk Road."  (*Id.*)  (Bitcoin users had long speculated about Bitcoin "wallets" or "addresses" connected to the Silk Road website, based on analyses of the Blockchain.[5]  Thus, it appeared the MtGox account in question had transactions involving these addresses.)

The email from Mr. Karpeles' attorney further explained that there was other suspicious activity connected to the account.  The account was initially opened by someone using the email address "davidmaisano@inbox.com," but later, when the customer was required to validate his

---

[5] *See, e.g.*, Forbes Magazine, *Follow The Bitcoins: How We Got Busted Buying Drugs On Silk Road's Black Market*, Sep. 5, 2013, *available at* http://www.forbes.com/sites/andygreenberg/ 2013/09/05/follow-the-bitcoins-how-we-got-busted-buying-drugs-on-silk-roads-black-market (discussing research paper identifying hundreds of thousands of Bitcoin addresses determined by the author to be linked to Silk Road).

identity, he did so using documents that reflected a different name from the one on the email account.  Moreover, the user deposited a large number of bitcoins into the account, which he converted to nearly $2 million in U.S. dollars, but the user never withdrew the funds off of MtGox's system to an external bank account.  Eventually, the money was converted back to Bitcoins and transferred out of MtGox.  However, after the transfer, the user contacted MtGox saying that he could not access the account, claiming it had been "hacked."  After MtGox told the user that it appeared his credentials had previously been changed pursuant to a valid user request, the customer did not inquire further or, as far as MtGox was aware, report the hack to law enforcement, despite the large amount of funds removed from the account.

After receiving the records for the account, investigators working with USAO-SDNY's investigation of Silk Road were able to tie the "davidmasiano@inbox.com" MtGox account to the defendant through various means.  For example, MtGox records showed the account being consistently accessed through IP addresses that traced back to the defendant.  Moreover, transactional records from the account were included as attachments to certain emails recovered from the defendant's Gmail account, which was searched pursuant to a search warrant.

## Discussion

### A.   The Defense Should Be Precluded from Questioning SA Der-Yeghiayan About His Past Beliefs Concerning Mark Karpeles, Which Are Not Themselves Evidence

As the defense has now made clear, the defense seeks to elicit certain testimony from SA Der-Yeghiayan in an attempt to argue that Mark Karpeles was the true operator of the Silk Road website.  However, the defense's questioning thus far has focused almost exclusively on SA Der-Yeghiayan's past *beliefs* concerning Mr. Karpeles, rather than any actual facts as to which SA Der-Yeghiayan has first-hand knowledge.  For example, the defense has sought to elicit, or has indicated an intention to elicit, testimony from SA Der-Yeghiayan that: (1) he at one time *believed* Mr. Karpeles was involved in operating Silk Road; (2) he at one time *believed* there was probable cause to obtain a search warrant on Mr. Karpeles' email account; and (3) he at one time *believed* that a description of the "Dread Pirate Roberts" in a Forbes Magazine article "sound[ed]" like Mr. Karpeles.  None of this testimony is competent evidence.  To the extent such testimony has been elicited already, it should be stricken from the record, and the defense should be precluded from pursuing similar lines of questioning going forward.

As the Second Circuit has repeatedly made clear, "[t]he agent's state of mind as the investigation progressed is ordinarily of little or no relevance to the question of the defendant's guilt."  *United States v. Johnson*, 529 F.3d 493, 501 (2d Cir. 2008); *Ryan v. Miller*, 303 F.3d 231, 252-53 (2d Cir. 2002); *United States v. Reyes*, 18 F.3d 65, 70-72 (2d Cir. 1994).  For this very reason, the Government cannot prove *its* case by having the investigating agent "testify to his belief that the defendant is guilty," or explain the "story of the investigation and how it progressed from suspicion to certitude."  *Johnson*, 529 F.3d at 499, 501.  Nor is such testimony rendered permissible if the agent attempts to explain the basis for his belief in the defendant's guilt, by summarizing, even at a general level, what led him to his conclusion.  Indeed, the Second Circuit has emphasized that it only makes matters worse for an agent to give, for example, the "imprecise assurance that his belief is based on 'information from other people,

6

actual physical evidence, and verification through interviewing the people who are involved." *Id.* at 499 (internal quotation marks omitted); *see also United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005) (finding it was "error to allow law enforcement witnesses to express opinions as to the defendant's culpability based on the totality of information gathered in the course of their investigations"); *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) (expressing concerns about case agents offering "sweeping conclusions about [the defendant's] activities").

The same principles apply equally to the defense. Just as the Government cannot prove its case by eliciting testimony from an agent that he believes the defendant to be guilty, the defense cannot prove its case by eliciting testimony from an agent that he at one time believed someone else was involved in the crime. An agent's beliefs about the evidence, whether favorable or unfavorable to the defendant, are simply irrelevant to what the evidence actually *is.* Moreover, an agent's beliefs about the evidence are typically the product of various sources of information, many of which may not constitute admissible evidence by themselves. Thus, allowing testimony concerning those beliefs has the effect of introducing conclusions that rest on inadmissible foundations. As one court has put it, in commenting on the impropriety of the defense cross-examining an agent concerning his decision to close the investigation of the defendant at one point due to lack of evidence:

> Whether the evidence is adequate is solely an issue for the jury, and the agent does not have any expertise, any more than anyone off the street, that would render his personal beliefs about such evidence helpful to the jury. An agent's belief about whether the evidence was sufficient a year or two before the defendant was indicted, when the agent decided to close the case, would be even more irrelevant, if something that is irrelevant can be more irrelevant. Moreover, delving into an agent's thoughts about the adequacy of the evidence is fraught with landmines. Not only does it involve delving into such soft evidence as the subjective thoughts of the agent, it also opens up the possibility of the introduction of such unreliable evidence as unsubstantiated leads and hearsay, which are the mainstay of an ongoing investigation but not the mainstay of a trial.

*United States v. Carmichael*, 373 F. Supp. 2d 1293, 1297 (M.D. Ala. 2005); *see also United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004) ("[A]ny attempt by [the defendant] to dissect an individual law enforcement agent's state of mind during the course of the investigation, or to belabor the details of the investigation's chronological development, would be irrelevant to the central question of [the defendant's] guilt or innocence, and as such, is inadmissible.").

Similarly, here, the fact that SA Der-Yeghiayan suspected for a time that Mr. Karpeles possibly was involved in operating Silk Road is not itself evidence that Mr. Karpeles actually was involved in operating Silk Road. By the same token, SA Der-Yeghiayan's belief at one point that there was probable cause to search certain email accounts used by Mr. Karpeles is, again, not itself evidence inculpating Mr. Karpeles (or exculpating the defendant). Indeed, a law enforcement agent, like any other witness, may not "present testimony in the form of legal conclusions." *United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined Number of Cans of Rainbow Foam Paint*, 34 F.3d 91, 96 (2d Cir. 1994); *accord Densberger v. United Techs. Corp.*, 297 F.3d 66, 74 (2d Cir. 2002); *cf. Rizzo v. Edison Inc.*, 419

F. Supp. 2d 338, 348 (W.D.N.Y. 2005) ("[T]he issue of whether or not probable cause . . . exists is a legal determination that is not properly the subject of expert opinion testimony.")

Nor is it proper for SA Der-Yeghiayan to testify at a general level about what types of evidence he *thought* provided probable cause for a search warrant on Mr. Karpeles' email accounts. Again, it would have been clearly impermissible for SA Der-Yeghiayan to testify on direct that he presently believes the defendant is guilty, and even more impermissible for him to have given "imprecise assurances" that this belief is based on various categories of evidence, such as evidence found on the defendant's computer, evidence found in his apartment, statements of witnesses, and so forth. *Johnson*, 529 F.3d at 499. By the same token, it would be equally impermissible for the defense to elicit "imprecise assurances" from SA Der-Yeghiayan on cross-examination that there were various categories of evidence that he believed justified his obtaining a search warrant on Mr. Karpeles' email account.

Indeed, such testimony would seriously prejudice the Government, by giving the false impression to the jury that there was a substantial body of evidence pointing to Mr. Karpeles as the operator of Silk Road, when, based on what was ultimately learned, there is no such substantial evidence. The primary evidence relied upon in SA Der-Yeghiayan's search warrant application – the link between the "silkroadmarket.org" website and Mr. Karpeles – turned out to lack significance, as the website was simply hosted on a server controlled by Mr. Karpeles' webhosting company. Moreover, some of the evidence relied upon by SA Der-Yeghiayan was hearsay, such as the information SA Der-Yeghiayan received from a "confidential informant" that Mr. Karpeles operated the "bitcointalk.org" discussion forum. The defense cannot paper over these evidentiary defects by simply having SA Der-Yeghiayan testify that his search warrant application rested on various types of evidence at a general level. Such testimony would mislead the jury about the quantity, quality, and admissibility of that evidence.

Similarly, the defense should also be precluded from questioning SA Der-Yeghiayan about an email he sent in mid-August 2013 expressing his belief that a description of the "Dread Pirate Roberts" appearing in an online magazine article "sound[ed] very much like MK [Mark Karpeles]." As an initial matter, the article itself is clearly hearsay and cannot be introduced through SA Der-Yeghiayan's testimony. The article in question purported to be an interview of the "Dread Pirate Roberts," and in it the reporter relayed that the "Dread Pirate Roberts" stated that he had bought out the previous owner of Silk Road after first gaining his trust by identifying a flaw in the site's hardware that could be used to steal Bitcoins from the site. The defense, it is clear, is seeking to offer this statement for its truth. The defense seeks to establish (a) that the "Dread Pirate Roberts" *did* buy out the previous owner of Silk Road after initially identifying a Bitcoin-related flaw in the site and (b) that Mark Karpeles sounded to SA Der-Yeghiayan like someone who could fit this description. The latter proposition is irrelevant unless the defense is seeking to establish the truth of the former.

However, the statement of "Dread Pirate Roberts" reported in the article is clearly hearsay; indeed, it is double-hearsay. The statement was initially made by the "Dread Pirate Roberts," and was then reported by a journalist. There is of course no reason to assume the reliability of the reported statement of the "Dread Pirate Roberts"; indeed, in the Government's view, it is a self-serving statement of the defendant himself. *See United States v. Marin*, 669

8

F.2d 73, 84 (2d. Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."); *Hubrecht v. Artuz*, No. 05 Civ. 5861 (RJH), 2008 WL 216315, at *15 (S.D.N.Y. Jan. 24, 2008) ("[S]elf-serving statements by a criminal defendant are routinely excluded as inadmissible hearsay."). Moreover, the admission of the statement would be doubly improper given that it was filtered through a reporter. *See F.T.C. v. Medical Billers Network, Inc*., 543 F. Supp. 2d 283, 305 (S.D.N.Y. 2008) (characterizing statements in online magazine article as "rank hearsay").

But even putting the issue of hearsay aside, whether SA Der-Yeghiayan believed at one time that the description of "Dread Pirate Roberts" in the article resembled Mr. Karpeles in some manner is irrelevant. If the defendant seeks to prove that Mr. Karpeles has extensive expertise in Bitcoin such that he was qualified to identify a Bitcoin-related flaw in Silk Road's system, then the defendant must do so through direct proof of that fact. Whether SA Der-Yeghiayan believed at a certain time, or even believes now, that Mr. Karpeles has such expertise is irrelevant and inadmissible – just as it would have been irrelevant and inadmissible for SA Der-Yeghiayan to have testified on direct that he believes the defendant has the expertise necessary to run Silk Road.

Accordingly, the defense should be precluded generally from eliciting testimony from SA Der-Yeghiayan concerning his beliefs about any evidence concerning Mr. Karpeles, or about any other subject, for that matter.

**B.     The Defense Should Be Precluded from Questioning SA Der-Yeghiayan Concerning Mark Karpeles' Offer to Provide Information to Law Enforcement Authorities**

For several reasons, the defendant should also be precluded from questioning SA Der-Yeghiayan concerning Mr. Karpeles' offer to provide information to USAO-Baltimore in exchange for immunity from being prosecuted for operating an unlicensed money transmitting business.

First, such testimony would consist of multiple layers of inadmissible hearsay. It is apparent that the defendant seeks to elicit the testimony in order to prove the (false) proposition that Mr. Karpeles had inside information about Silk Road, indicating that he must have been involved in operating the site. The chain of hearsay through which the defendant seeks to introduce in support of this proposition is as follows: SA Der-Yeghiayan heard from AUSA-1, who in turn heard from AUSA-2, that AUSA-2 had spoken with Mr. Karpeles' attorney (who impliedly had spoken with Mr. Karpeles), and that the attorney stated, on behalf of his client, that his client had information about Silk Road that he was willing to supply to law enforcement authorities in exchange for some form of immunity. The chain thus involves *quadruple* hearsay: Mr. Karpeles' implied statement to his attorney that he was willing to talk in exchange for immunity, which his attorney communicated to AUSA-2, who communicated it in turn to AUSA-1, who communicated it in turn to SA Der-Yeghiayan.

There is no basis for this compound hearsay to be admitted into evidence. In particular, the residual hearsay exception of Rule 807 affords no basis to do so. That exception allows a statement not covered by the hearsay exceptions of Rule 803 to be admitted only if: "(1) the

9

statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will serve the purposes of these rules and the interests of justice." As the Second Circuit and courts within this district have repeatedly noted, the residual hearsay exception is meant to "be used very rarely, and only in exceptional circumstances." *Parsons v. Honeywell, Inc*., 929 F.2d 901, 907 (2d Cir. 1991) (internal quotation marks omitted); *see also, e.g.*, *United States v. DeVillio*, 983 F.2d 1185, 1190 (2d Cir. 1993) (residual hearsay exception is "applied in the rarest of cases"); *Lakah v. UBS AG*, 996 F. Supp. 2d 250, 257 (S.D.N.Y. 2014) (same); *United States v. Mejia*, 948 F. Supp. 2d 311, 316 (S.D.N.Y. 2013) (same).

There are no "exceptional circumstances" that would make it appropriate to invoke the residual hearsay exception here. To the contrary, the quadruple-hearsay at issue – in essence, Mr. Karpeles' statement that he was willing to exchange information about Silk Road for some form of immunity – clearly fails to meet the thresholds of Rule 807. First, the statement does not have strong circumstantial guarantees of trustworthiness; it can easily be misconstrued and taken out of context – precisely as the defendant seeks to take it out of context here. Specifically, it is not clear from the statement, as it was reported to SA Der-Yeghiayan, what type of information Mr. Karpeles had available to provide, or where he got it from. In fact, Mr. Karpeles merely had information about a suspicious MtGox account tied to Bitcoin addresses that some believed were associated with Silk Road; and he was merely seeking immunity from being prosecuted for operating an unlicensed money transmitting business in the wake of the seizure of MtGox's U.S.-based financial accounts two months earlier. Thus, were the defense to elicit from SA Der-Yeghiayan his vague, fourth-hand understanding of the statement – that Mr. Karpeles was willing to provide information about Silk Road in exchange for immunity – the jury would be left with a highly misleading impression that the defense is clearly seeking to foster: that Mr. Karpeles had information about Silk Road as an *insider* and was seeking immunity from being prosecuted for involvement in operating the site.

Second, the quadruple-hearsay at issue is not evidence of a material fact. The fact that Mr. Karpeles was willing to provide information to authorities concerning Silk Road is not evidence that he was involved in operating Silk Road, as the true circumstances of Mr. Karpeles' offer (which may not have been known to SA Der-Yeghiayan) make clear. Likewise, the fact that Mr. Karpeles sought immunity of some kind is not evidence that he was involved in operating Silk Road. Again, the immunity he sought concerned potential prosecution for operating an unlicensed money transmitting business, not prosecution for operating Silk Road.

Third, admitting hearsay testimony concerning Mr. Karpeles' offer to talk to authorities would not serve "the interests of justice." It is abundantly clear that the defendant's objective in eliciting this testimony is to falsely implicate Mr. Karpeles in the operation of Silk Road. Were the Court to allow this hearsay testimony, the Government would be unable to fully correct this misimpression on redirect, given the limitations of SA Der-Yeghiayan's knowledge about the issue. SA Der-Yeghiayan was not involved, for example, in the exchanges between USAO-SDNY and the attorney for Mr. Karpeles, in which the attorney made clear that the information Mr. Karpeles had to offer came simply from his operation of MtGox, as opposed to any involvement in Silk Road. Hence the Government cannot elicit the facts known from these

exchanges through SA Der-Yeghiayan.  The hearsay rule exists to prevent precisely this sort of situation: the elicitation of a statement from a witness who heard it indirectly from others and who therefore is not in a position to testify about the underlying context in which it was made.

In short, the residual hearsay exception, which is intended to be very narrow in scope, affords no basis to allow SA Der-Yeghiayan to testify about discussions in which he was not involved, and had limited, fourth-hand knowledge, concerning Mr. Karpeles' apparent willingness to provide information to law enforcement authorities in connection with Silk Road.

### C.   Any Evidence the Defense Seeks to Elicit Concerning Mark Karpeles Should Be Carefully Scrutinized Under Rule 403

To the extent the defense seeks to elicit any testimony from SA Der-Yeghiayan concerning Mr. Karpeles other than agent belief or hearsay – which has been the bulk of the elicited testimony so far – the Court still must ensure that the probative value of the testimony is sufficient to outweigh any potential prejudicial effect.  Where a defendant seeks to offer evidence that an "alternative perpetrator" committed the crime charged, a court must be especially careful to guard against the danger of unfair prejudice under Rule 403, for "[t]he potential for speculation into theories of third-party culpability to open the door to tangential testimony raises serious concerns."  *Wade v. Mantello*, 333 F.3d 51, 61 (2d Cir. 2003).  As the Second Circuit explained in *Wade*:

> In the course of weighing probative value and adverse dangers, courts must be sensitive to the special problems presented by 'alternative perpetrator' evidence.  Although there is no doubt that a defendant has a right to attempt to establish his innocence by showing that someone else did the crime, a defendant still must show that his proffered evidence on the alleged alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the asserted "alternative perpetrator."  It is not sufficient for a defendant merely to offer up unsupported speculation that another person may have done the crime.  Such speculative blaming intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice.

*Id.* at 61-62 (quoting *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998) (citation omitted)); *see also DiBenedetto v. Hall*, 272 F.3d 1, 8 (1st Cir. 2001) ("Evidence that tends to prove a person other than the defendant committed a crime is relevant, but there must be evidence that there is a connection between the other perpetrators and the crime, not mere speculation on the part of the defendant."); *People of Territory of Guam v. Ignacio*, 10 F.3d 608, 615 (9th Cir. 1993) ("Evidence of third-party culpability is not admissible if it simply affords a possible ground of suspicion against such person; rather, it must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense."); *Andrews v. Stegall*, 11 Fed. Appx. 394, 396 (6th Cir. 2001) ("Generally, evidence of third party culpability is not admissible unless there is substantial evidence directly connecting that person with the offense.").

Accordingly, where evidence sought to be introduced by the defendant fails to establish a direct, substantial connection between the alleged third-party perpetrator and the crime charged, the evidence should be excluded under Rule 403.  In *Wade*, for example, the defendant sought to introduce evidence that the victim of the charged murder in the case was a member of a gang who had previously participated in a shoot-out with a third-party – who the defendant alleged was the real murderer.  333 F.3d at 54-55.  Notwithstanding that this evidence established a motive for the third-party to have committed the crime, and even possibly the opportunity to do so, the Second Circuit held that the evidence was properly excluded, because no evidence specifically linked the third-party to the murder.  *Id.* at 60-61.  Allowing the evidence, the Second Circuit found, would have "invite[d] testimony that was both distracting and inflammatory" and "posed a danger of turning attention away from issues of [defendant's] culpability."  *Id.* at 61; *see also United States v. Diaz*, 176 F.3d 52, 82 (2d Cir. 1999) (finding that claim that murder victim had assaulted inmate while in jail, which suggested motive on the part of a third party, "was creative conjecturing and the court properly exercised its discretion in excluding such speculative evidence").

Likewise, in a different Second Circuit case (also involving a party named Wade), the Second Circuit upheld the exclusion of "alternative perpetrator" evidence that the defendant sought to elicit during cross-examination of a police officer testifying for the prosecution.  *United States v. Wade*, 512 Fed. Appx. 11 (2d Cir. 2013).  Specifically, the defendant sought to elicit testimony from the police officer concerning the arrest of a third-party who had been caught dealings drugs in the same apartment building where the defendant's girlfriend lived – in whose apartment drugs alleged to have been the defendant's were seized.  *Id.* at 14.  Although the defendant argued that the arrest of the third-party established the possibility that the drugs seized in the defendant's girlfriend's apartment belonged to the third-party rather than the defendant, the Second Circuit found that the arrest of the third-party was not sufficiently linked to the seizure of drugs from the girlfriend's apartment to make the theory plausible, and that allowing the police officer to testify concerning the arrest therefore "presented a risk of juror confusion and extended litigation of a collateral matter."  *Id.* (citing *United States v. Aboumoussallem*, 726 F.2d 906, 912 (2d Cir. 1984) (upholding exclusion of defense-proffered testimony to avoid a "trial within a trial")).

For similar reasons, the Court should carefully scrutinize any "alternative perpetrator" evidence the defense seeks to introduce in this case through SA Der-Yeghiayan.  As explained, although SA Der-Yeghiayan at one time believed that Mr. Karpeles may have been involved in Silk Road, the connections he drew between Mr. Karpeles and Silk Road evaporated in the light of subsequent investigative discoveries.  In order to introduce evidence that Mr. Karpeles was the "alternative perpetrator" in this case, the defense must offer evidence of a direct and substantial connection between Mr. Karpeles and Silk Road based on *actual fact* – rather than on the incomplete impression of the evidence SA Der-Yeghiayan had at a past point in the investigation.  As the record currently stands, the defense has failed to offer a *bona fide* connection between Mr. Karpeles and Silk Road.  Absent a competent proffer of such a connection, the Court should exclude such "alternative perpetrator" evidence, as it threatens to "invite[s] testimony that [is] both distracting and inflammatory" and "pose[s] a danger of turning attention away from issues of [defendant's] culpability."  *Wade v. Mantello*, 333 F.3d at 61.

12

**<u>Conclusion</u>**

     For the reasons above, the Government respectfully requests that the Court: (1) strike any testimony elicited from SA Der-Yeghiayan concerning his beliefs about Mark Karpeles and preclude the defense from pursuing such questioning further; (2) preclude the defense from questioning SA Der-Yeghiayan concerning his understanding of Mr. Karpeles' offer to provide information concerning Silk Road to law enforcement authorities; and (3) carefully evaluate under Rule 403 any evidence the defense seeks to offer concerning Mr. Karpeles other than agent belief and hearsay.

     Respectfully,

     PREET BHARARA
     United States Attorney

By: _____
     SERRIN TURNER
     TIMOTHY HOWARD
     Assistant United States Attorneys
     Southern District of New York

cc:    Joshua Dratel, Esq.

This is not the Silk Road, but you are close...



# Silk Road
*anonymous marketplace*

## This is not the Silk Road, but you are close...

The Silk Road is an anonymous online market. Current offerings include Marijuana, Hash, Shrooms, LSD, Ecstacy, DMT, Mescaline, and more. The site uses the **Tor anonymity network**, which anonymizes all traffic to and from the site, so no one can find out who you are or who runs Silk Road. For money, we use **Bitcoin**, an anonymous digital currency.

**Accessing the site is easy:**

1. Download and install the **Tor browser bundle** (**Click here** for instructions and non-windows users)
2. Open your new Tor browser
3. Go to: **http://ianxz6zefk72ulzz.onion**

**Once inside, you will find a homepage that looks something like this:**



\* it takes about a minute for you to make the initial anonymous connection to the site, but afterward you should be able to browse more quickly.

**So what are you waiting for? Get Tor and get to Silk Road! We'll see you inside :)**

**-Silk Road staff**

**Subject:** memory upgrade
**From:** <staff@silkroadmarket.org>
**Date:** 3/18/2011 4:47 AM
**To:** <support@autovps.net>

how do I upgrade my memory for my VPS with autovps?





who.is | Search Domain name or IP address | Search by Name Server | New Features | Log In | Sign Up

## silkroadmarket.org

72.52.4.119 · Record information last updated 18 hours ago

★ Save Domain To Dashboard

Advertisement

name.com
Website Builder
Create the website you've always wanted.

Hide

### Domain Buying Options for silkroadmarket.org

| Premium | Available | Unavailable | Unavailable | Available | Available | Unavailable | Available |
|---|---|---|---|---|---|---|---|
| com | co | net | org | info | us | biz | mobi |
| $3587.00 | $12.99 | $49.95 | $49.95 | $11.00 | $10.99 | $29.95 | $10.99 |
| Available | Available | Backorder | Backorder | Available | Available | Backorder | Available |

Purchase Domains · Domain Suggestions · Premium Domains · Powered by name.com

Transfer any COM/NET domain name to Name.com for $8.25 · Transfer Now

Whois | Website Info | History | DNS Records | Diagnostics

Domain History Info for silkroadmarket.org

Want this archived information removed?

### Old Registrar Info March 12, 2011

| | |
|---|---|
| Name | 1API GmbH (R1724-LROR) |
| Status | CLIENT TRANSFER PROHIBITED, TRANSFER PROHIBITED |

**Important Dates**

| | |
|---|---|
| Expires On | February 28, 2012 |
| Registered On | February 28, 2011 |
| Updated On | February 28, 2011 |

**Name Servers**

| | |
|---|---|
| ns1.xta.net | 118.27.1.17 |
| ns2.xta.net | 178.63.62.51 |

### Registrar Info January 15, 2015

| | |
|---|---|
| Name | Webagentur.at Internet Services GmbH d/b/a domainname.at (R1304-LROR) |
| Status | OK |

**Important Dates**

| | |
|---|---|
| Expires On | May 18, 2015 |
| Registered On | May 18, 2012 |
| Updated On | May 18, 2014 |

**Name Servers**

| | |
|---|---|
| ns1.sedoparking.com | 209.200.164.69 |
| ns2.sedoparking.com | 209.200.165.74 |

### Old Raw Registrar Data March 12, 2011

```
Registrant Contact Information:
    Name: Richard Page
    Address 1: 11640 Gary St
    City: Garden Grove
    State: CA
    Zip: 92840
    Country: US
    Phone: +1.7146207320
    Email: richardpage@gawab.com

Administrative Contact Information:
    Name: Richard Page
    Address 1: 11640 Gary St
    City: Garden Grove
    State: CA
    Zip: 92840
    Country: US
    Phone: +1.7146207320
    Email: richardpage@gawab.com

Technical Contact Information:
    Name: Richard Page
    Address 1: 11640 Gary St
    City: Garden Grove
    State: CA
    Zip: 92840
    Country: US
    Phone: +1.7146207320
    Email: richardpage@gawab.com

Information Updated: Thu, 15 Jan 2015
19:51:01 UTC
```

### Raw Registrar Data January 15, 2015

```
Registrant Contact Information:
    Name: Qin Shu Tong
    City: Guangzhou
    Zip: 510623
    Country: CN
    Phone: +86.7713898523
    Email: qtong77@gmail.com

Administrative Contact Information:
    Name: Qin Shu Tong
    City: Guangzhou
    Zip: 510623
    Country: CN
    Phone: +86.7713898523
    Email: qtong77@gmail.com

Technical Contact Information:
    Name: Qin Shu Tong
    City: Guangzhou
    Zip: 510623
    Country: CN
    Phone: +86.7713898523
    Email: qtong77@gmail.com

Information Updated: Thu, 15 Jan 2015
19:51:01 UTC
```

**Turner, Serrin (USANYS)**

| | |
|---|---|
| **From:** | ████, Scott H < ████████████████████ > |
| **Sent:** | Tuesday, October 15, 2013 11:42 AM |
| **To:** | Turner, Serrin (USANYS) |
| **Subject:** | FW: MtGox – F.R.C.P. Rule 11(f) / F.R.E. 410 Communication - Bradley Information |
| **Attachments:** | Bradley - customer service dialogue.pdf; Bradley account verification materials.pdf |

Serrin,

As discussed, I am forwarding you the materials I provided to ████████ regarding an account that may have been related to a bitcoin wallet of interest to the government.  This is <u>not</u> information about the account in Ulbricht's name, which MtGox only identified as of interest after the Ulbricht indictment.  Please see the note below.

Scott

**From:** ████, Scott H
**Sent:** Wednesday, July 24, 2013 9:11 PM
**To:** ████████ @usdoj.gov
**Subject:** MtGox – F.R.C.P. Rule 11(f) / F.R.E. 410 Communication - Bradley Information

████,

This e-mail responds to your request for information relating to an individual that MtGox may have suspicions may be associated with the largest bitcoin wallet that is perceived by some in the bitcoin community to be associated with Silk Road.  Please find attached verification materials provided by a J████ Bradley.   The materials include copies of the following: (i) a copy the Federal Express airbill used to send the materials to MtGox; (ii) a copy of a California Identification Card; (iii) a California Secretary of State Apostille, completed by a notary in Alameda County, for the California Identification Card; (iv) a Comcast bill showing a Chico, California address for Mr. Bradley; and (v) a California Secretary of State Apostille, completed by a notary in Alameda County, for the Comcast bill.

The attached materials were provided by a user for a MtGox account that was originally opened using the e-mail address:  <u>davidmaisano@inbox.com</u>.  As we described to you during our meeting in Baltimore, it has been possible to open a MtGox account without providing verification materials.  Once a user met certain usage thresholds (which, as we described, have changed over time), MtGox required users to verify their identity.  The attached materials were provided to MtGox to verify the account opened using the <u>davidmaisano@inbox.com</u> e-mail address.   As you are aware, e-mail addresses are not proof of identity, and it is not uncommon for users of the internet to have e-mail addresses that are not their actual names.  Once the account was verified, MtGox regarded the account as owned and controlled by J████ Bradley.

The user deposited a large number of bitcoins into the account.  The user used the bitcoins to purchase U.S. dollars, but the account was never linked to a bank account to make a withdrawal.   The transactional records for the account are too voluminous to provide via e-mail.  I'm happy to discuss a method and format to provide the records to you.

In May 2013, the user contacted MtGox  to report that the account was "hacked." MtGox informed the user that the e-mail address associated with the account had been changed pursuant to a proper request to change the address.   A copy of the exchange with the user regarding the hack is also attached to this e-mail.  Following the exchange attached to this e-mail, the user did not communicate further with MtGox, and MtGox is not aware that the user made any report to law enforcement.

Prior to the user contacting MtGox regarding the "hack", the approximately U.S. $1.9 million had been converted to bitcoins.  The bitcoins (7393.49 BTC) were transferred to address 1AsUc3Lw1oDmwimWoGeCfBngzziS98FP5V (7393.49 BTC).  MtGox is aware that some of these bitcoin were used, and the balance (6393.49 BTC) currently remain at address 1Mh58EcGSMMscgh5qE5u4BVSL9KRd8GzQK.  MtGox believes 1000 BTC were sold on exchange btc-e.com.

Please let me know if you have questions.

Scott



Pursuant to requirements related to practice before the Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for the purposes of (i) avoiding penalties imposed under the United States Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message. Please visit ███████████████ for other important information concerning this message.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**
A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK  10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL                                                        STEVEN WRIGHT
—                                                                         *Office Manager*
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

January 19, 2015

**BY ECF**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:   *United States v. Ross Ulbricht*,
                14 Cr. 68 (KBF)

Dear Judge Forrest:

This letter is submitted in response to the government's January 19, 2015, letter seeking preclusion of certain questioning of Homeland Security Investigations Special Agent Jared Der-Yeghiayan.  For the reasons set forth below, as well as those already stated in court, the government's application should be denied in its entirety.

The government's factual arguments only support Mr. Ulbricht's right to ask SA Der-Yeghiayan further questions about alternative perpetrators, including Mark Karpeles, and the cases cited by the government, to the extent they support the broad principles asserted by the government, apply to a very different set of circumstances:  those in which it was the *defendant*, and not an alternative perpetrator, who was protected by constitutional as well as evidentiary rules, and in which – unlike herein – there was not any nexus between the alternative perpetrator and the specific offenses alleged here.

In this case, though, *the government itself*, in the person of SA Der-Yeghiayan and others, provided that nexus via an analysis of documentary and other materials, and the defense, via cross-examination, is simply cataloguing the bases for that nexus.  Ultimately, the government's argument is about the *weight* of the evidence, which of course is for the jury to determine.  As a result, the government's arguments opposing the further questioning of SA Der-Yeghiayan are without merit, and simply an attempt at circumventing Mr. Ulbricht's proffered

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
January 19, 2015
Page 2 of 8

defense.

        In addition, the government's objections are untimely.  The government provided 5,000 pages of material pursuant to 18 U.S.C. §3500 for SA Der-Yeghiayan, a substantial portion of which was devoted to government's investigation of Mr. Karpeles.  It is inconceivable that the government did not anticipate this line of cross-examination.  Yet it did not make a motion *in limine*, did not object to defense counsel's opening, and did not object during a significant portion of the cross-examination of SA Der-Yeghiayan.

        Pointing to an alternative perpetrator is a defense that has been endorsed by the Supreme Court and other courts time and again, and Mr. Ulbricht's defense is utilizing evidence to that effect consistent with the rules of evidence and Mr. Ulbricht's constitutional right to present a defense (which sometimes supersedes the technical limits of those evidentiary rules).  *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 449 n. 19, 453;  *Boyette v. LeFevre*, 246 F.3d 76, 91 (2d Cir. 2001).

        Indeed, as set forth in *Wade v. Mantello*, 333 F.3d 51, 57 (2d Cir. 2003) "the [Supreme] Court has observed on more than one occasion, ''at a minimum, ... criminal defendants have the right . . . to put before a jury evidence that might influence the determination of guilt.'' *Id, quoting Taylor v. Illinois*, 484 U.S. 400, 408 (1988) (*quoting Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)).  To this end, "[t]he Constitution protects a criminal defendant from the arbitrary exclusion of material evidence, and evidence establishing third-party culpability is material." *Wade*, 333 F. 3d at 58.  In addition, the questioning of SA Der-Yeghiayan is relevant to another proper defense Mr. Ulbricht is presenting – that of the conduct of the government's investigation.[1]

_____

        [1]  In that context, due to government's precipitous seizure of one of Mr. Karpeles's accounts in May 2013, Mr. Karpeles had notice since that event that he was under investigation in some respect, thereby giving him ample time to cover his own tracks – a danger SA Der-Yeghiayan himself warned of in protesting not only the seizure, but also any further negotiations with Mr. Karpeles.  There are also other elements of the conduct of the government's investigation that are relevant to the defense, and which will be developed through SA Der-Yeghiayan and other witnesses.  Again, such a defense is recognized as valid and appropriate. *See Kyles v. Whitley*, 514 U.S. at 442 n. 13 (if defense had possessed the undisclosed material, "the defense could have attacked the investigation as shoddy");  *id.*, at 445-46;  *Bowen v. Maynard*, 799 F.3d 593, 613 (10th Cir. 1986) ("[a] common trial tactic of defense lawyers is to discredit the caliber of the investigation . . .");  *Cotto v. Herbert*, 331 F.3d 217, 229 (2d Cir. 2003).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
January 19, 2015
Page 3 of 8

Moreover, to deny Mr. Ulbricht the right to present either defense at this stage, after the defense staked out its defense territory – of which this issue inhabits, as the Court described it, the "heartland" of the defense – would be to deny Mr. Ulbricht his Fifth Amendment right to Due Process, and to a fair trial. Accordingly, as detailed below, for all these reasons the government's application should be denied.

I.      *The Offer By Mr. Karpeles's Attorneys to the U.S.*
        *Government Is Admissible Under Rule 807, Fed.R.Evid.*

As a threshold matter, the government's letter, at 5, verifies precisely what defense counsel asked SA Der-Yeghiayan about regarding the offer conveyed in July 2013 by Mr. Karpeles's lawyer to the government:  that in return for immunity from prosecution by the U.S., Mr. Karpeles offered to provide a name of someone he suspected was operating Silk Road. Nowhere in its letter does the government challenge the accuracy of that account. In fact, the government *confirms* it.[2]

Thus, the analysis for purposes of Rule 807 has been satisfied. The government has now been afforded notice, and has yet to provide any basis for not crediting the version presented in SA Der-Yeghiayan's memorandum. In fact, the absence of any such challenge should be conclusive. Also, the statement is not "quadruple" hearsay. As the Court noted, the initial offer from Mr. Karpeles's attorney was not hearsay, as it was not being offered for the truth of the matter. The exchanges between Assistant United States Attorneys and SA Der-Yeghiayan, while hearsay, qualify for admission under Rule 807, particularly in light of the government's failure to challenge their accuracy.

Also, the "exceptional circumstances" that warrant application of Rule 807 apply here. Mr. Karpeles is a French citizen living in Japan. His lawyers have not been identified;  nor have the Assistant United States Attorneys who relayed the statement to SA Der-Yeghiayan. *See, e.g., Muncie Aviation Corporation v. Party Doll Fleet, Inc.*, 519 F.2d 1178, 1182-83 (5th Cir. 1975) (difficulty in finding witnesses justified admission). *Cf. Parsons v. Honeywell Incorporated*, 929 F.2d 901, 907-08 (2d Cir. 1991) (statement not admissible because declarant

---

[2]   Regarding another statement the defense seeks to elicit (and previewed at sidebar last Thursday), pertaining to SA Der-Yeghiayan's reaction to the August 2013 interview of Dread Pirate Roberts ("DPR") published in *Forbes*, that it "sounds very much like MK," the defense already agreed during Thursday's colloquy that it would not ask SA Der-Yeghiayan about the substance of the interview (because that would at least infer it was being offered for the truth).

LAW OFFICES OF                                    Hon. Katherine B. Forrest
**JOSHUA L. DRATEL, P.C.**                        United States District Judge
                                                   Southern District of New York
                                                   January 19, 2015
                                                   Page 4 of 8

available as a witness).[3]

The circumstances also easily match, if not exceed, the indicia of reliability and trustworthiness found to satisfy the Rule [and/or its predecessors, Rule 803(24) and Rule 804(b)(5)]. For example, in *Steinberg v. Obstetrics-Gynecological & Fertility Group, P.C.*, 260 F. Supp.2d 492 (D.Conn. 2003), the Court concluded that the description of the status of a case by one attorney to another (assuming control of the case) possessed sufficient indicia of reliability and lack of motive to misrepresent. *Id.*, at 496. *See also United States v. Dumeisi*, 424 F.3d 566, 576-77 (7th Cir. 2005) (relying on the declarants' "duty to accurately record their own activities"); *United States v. Bailey*, 581 F.2d 341, 349 (3d Cir. 1978) ("consideration should be given to factors bearing on the reliability of the reporting of the hearsay by the witness"); *Muncie Aviation Corporation v. Party Doll Fleet, Inc.*, 519 F.2d 1178, 1182-83 (5th Cir. 1975) (trustworthiness established because published by government without any motive not to tell the truth or be inaccurate); *United States v. Iaconetti*, 406 F. Supp. 554, 559 (E.D.N.Y. 1976) (admitting statement because it was testified to by a person with whom it was "appropriate and even necessary [for the declarant] to communicate").

Moreover, the rules of evidence were not designed to curtail a defendant's constitutional rights, and the Fifth Amendment Due Process and Sixth Amendment Confrontation rights are implicated herein with respect to this issue. In that context, as the Supreme Court declared in *Chambers v. Mississippi*, 410 U.S. 284 (1973), "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.*, at 302.

Thus, the offer by Mr. Karpeles's lawyer is admissible pursuant to Rule 807. The government's strained arguments regarding "context" and meaning are unpersuasive, and address merely the weight that should be accorded the statement – contentions appropriately directed to the jury. *See Stifel*, 594 F.Supp. 1525, 1541 (N.D.Ohio 1984) ("[t]he identity of the bomb sender was a question for the jury, and defendant should have been apprised of evidence showing that someone other than himself had equal motive, access to materials, and other surrounding circumstances implicating him as the guilty party"). *See also Kyles v. Whitley*, 514 U.S. at 451 (prosecution's factual arguments about the implications of exculpatory evidence "confuses the weight of the evidence with its favorable tendency, . . .").

---

[3] In addition, the timing and manner of the government's production, as part of 5,000 pages of material produced (pursuant to 18 U.S.C. §3500) for a single witness (the first witness) within two weeks of trial precludes, for all practical purposes, identifying, locating, and summoning witnesses with respect to the statement.

LAW OFFICES OF                          Hon. Katherine B. Forrest
**JOSHUA L. DRATEL, P.C.**               United States District Judge
                                         Southern District of New York
                                         January 19, 2015
                                         Page 5 of 8

## II.    *The Cross-Examination of SA Der-Yeghiayan Is Not Seeking Inadmissible Testimony*

      All of the cases the government cites, at 6-7, in its effort to preclude questioning of SA Der-Yeghiayan with respect to his investigation relate to a very different set of circumstances, in which a law enforcement agent was asked by *the prosecution* about his beliefs and conclusions regarding *the defendant's* guilt.  Thus, the government presents apples when the issue is oranges.

      Thus, the government cannot convert a doctrine designed to protect defendants from improper testimony into a shield that denies a defendant the right to pursue cross-examination (and, ultimately, a defense) regarding an alternative perpetrator.  Also, the government distorts the nature of the cross-examination.  SA Der-Yeghiayan was never asked about his opinion regarding Mr. Karpeles's guilt with respect to the Silk Road website, or for legal conclusions.  Rather, he was, and would be, asked about certain aspects of his investigation, including sources (as parsed by the Court during Thursday afternoon's sidebar) and what he *did* as a result – including swearing under oath that there was probable cause to believe that a warrant for Mr. Karpeles's e-mails would reveal evidence of criminal conduct.[4]

      Here, the government's rationale is so broad it would preclude evidence of another person being *charged* with the same crime, as long as at some point prior to the defendant's trial

---

    [4]  All of the cases the government cites with respect to a witness's "legal conclusions" are outside the criminal context entirely and involve *experts. See United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined Number of Cans of Rainbow Foam Paint* ("*Articles of Banned Substances*"), 34 F.3d 91, 96 (2d Cir. 1994) (in the context of review of a summary judgement, in a civil forfeiture case in which claimant's contention that "the test for flammability in the regulations should only be applied to sprays, and not to foam" came solely from "opinion of their expert," the Court held "[i]t is a well-established rule in this Circuit that *experts* are not permitted to present testimony in the form of legal conclusions")(emphasis added);  *Densberger v. United Technologies Corporation*, 297 F.3d 66, 74 (2d Cir. 2002) (in context of civil suit, quoting *Articles in Banned Substances* for the "well-established rule in this Circuit that *experts* are not permitted to present testimony in the form of legal conclusions" in case in which *expert* witness offered legal opinion, but nonetheless finding admission of the testimony harmless because "the trial judge properly advised the jury to follow the law, rather than the testimony of any witness") (emphasis added);  *Rizzo v. Edison Inc.,* 419 F.Supp. 2d 338, 348 (W.D.N.Y. 2005) (holding"the issue of whether or not probable cause to arrest exists is a legal determination that is not properly the subject of *expert* opinion testimony," in context of summary judgment motion, in case in which plaintiff attempted to submit two expert opinions in support of her argument that her arrest lacked probable cause) (emphasis added).

LAW OFFICES OF              Hon. Katherine B. Forrest
**JOSHUA L. DRATEL, P.C.**    United States District Judge
                                        Southern District of New York
                                        January 19, 2015
                                        Page 6 of 8

the government dropped that prosecution against the other person.  In that respect, the government would foreclose an alternative perpetrator defense altogether.

Clearly, though, the defense is recognized as valid.  *See Kyles v. Whitley*, 514 U.S. at 449 n. 19, 453.  *See also Mendez v. Artuz*, 303 F.3d 411, 413 (2d Cir. 2002) (noting materiality of evidence of an "alternative culprit");  *United States v. Manning*, 56 F.3d 1188, 1198 (9th Cir.1995) (same);  *Bowen v. Maynard*, 799 F.2d 593, 600–601, 610–613 (10th Cir.) (same); *United States v. Stifel*, 594 F.Supp. at 1541 (same).

Also, the government, in its letter at 2-4, in dictating a priority with respect to the factors linking Mr. Karpeles to Silk Road, would usurp the jury's role.  By attempting to minimize certain factors that remain and suggesting that the silkroad.org issue somehow was SA Der-Yeghiayan's only viable basis for connecting Mr. Karpeles to Silk Road, is simply one view of the evidence.  The defense, and the jury, are entitled to view that evidence differently.  Again, the question of weight is for the jury.

**III.**     ***The Cross-Examination Is Admissible Pursuant to Rule 403, Fed.R.Evid.***

The cases cited by the government for the proposition that evidence of an alternative perpetrator can be precluded all involve accusations about motive and opportunity *un*related to the offense for which the defendant was being tried, and are sufficiently attenuated from the charged conduct.[5]  Here, the requisite "nexus" is manifest, as Mr. Karpeles's alleged connection – as corroborated by the government itself through SA Der-Yeghiayan's investigation – is indisputably *to this case*, and the offenses charged herein.

Indeed, each of the cases the government cites fails to establish the necessary nexus between the alleged third-party perpetrator and the crime charged.  *See Wade v. Mantello*, 333 F. 3d at 61 (testimony in a murder case that third-party had been involved in a shoot-out with the victim *weeks earlier*, but without any connection to the charged crime, to have been properly excluded at trial as "[w]eighed against the limited probative value of the proffered testimony were dangers that the jury could have been misled or confused by the testimony") (emphasis added);  *DiBenedetto v. Hall*, 272 F.3d 1, 7-8 (1ˢᵗ Cir. 2001) (affirming trial court's exclusion of evidence in a murder trial as to *another* murder, for the purpose of establishing that "third party culprits, not [the defendant] and his co-defendant, were guilty" of the charged murder absent "evidence that there is a connection between the other perpetrators and the crime, not mere speculation on the part of the defendant");  *People of Territory of Guam v. Ignacio*, 10 F. 3d 608, 615 (9ᵗʰ Cir. 1993) (trial court did not abuse its discretion by excluding evidence that third-party

---

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
January 19, 2015
Page 7 of 8

had committed suicide as evidence of third party culpability where defendant had not provided "substantial evidence connecting [third-party] to the crime charged") (internal quotation omitted);   *Andrews v. Stegall*, 11 Fed.Appx. 394, 396 (6ᵗʰ Cir. 2001) (distinguishing defendant's claim of third party culpability in a murder case involving "a vague threat [by the third party] that was allegedly made some unknown time before the murder, to the victim's stepson," that "[the third-party] was not shown to have been anywhere near the scene of the crime, and was not available to testify" from *Chambers* [,410 U.S. at 300-301,] in which there was substantial evidence directly connecting the third-party with the offense");   *United States v. Diaz*, 176 F.3d 52, 82 (2d Cir. 1999) (trial court properly excluded evidence of *another* crime – prison records showing that the murder victim had assaulted a third-party while in prison more than a year prior – in order to suggest motive on the part of a third party in the charged crime, because, standing alone, it would be "creative conjecturing" and the evidence "speculative");   *United States v. Wade*, 512 Fed.Appx. 11, 14 (2d Cir. 2013) ("the district court reasonably excluded . . . testimony about [a third party's] arrest because . . . [the third party's] December 3, 2009 sale of drugs from a mailbox was not temporally or physically linked to the May 11, 2009 drug and firearm seizures from [the defendant's girlfriend's] apartment that were contemporaneous with [the defendant's] arrest  and . . . [the] testimony [therefore] presented a risk of juror confusion and extended litigation of a collateral matter").

Here, certain parts of the defense herein mirrors to a significant extent that endorsed in *Kyles v. Whitley*, in which the defense alleged that the defendant had been framed by an informant "for the purposes of shifting suspicion away from himself" for the offense with which the defendant had been charged.  514 U.S. at 429.

Also, in addition to Mr. Karpeles, SA Der-Yeghiayan's 3500 material includes detailed information about another suspect he investigated in 2012-2013 – a suspect whose name was provided to DPR in April 2013 via the Silk Road "marketplace"'s private message system, and therefore also had abundant opportunity to evade detection by late September 2013.  That suspect's technical expertise and background are relevant, as are certain aspects of that part of SA Der-Yeghiayan's investigation that are directly relevant to the government's investigation of and/or evidence against Mr. Ulbricht, *i.e.*, language analysis, political orientation.  Counsel intends to explore that in cross-examination of SA Der-Yeghiayan as well.

Thus, here the evidence regarding an alternative perpetrator is neither collateral nor speculative.  It is instead directly related to the offenses alleged against Mr. Ulbricht.  Again, the weight of such evidence, which ultimately is the government's primary concern throughout its letter, is a matter for the jury to determine.  *Stifel*, 594 F.Supp. at 1541.

For the Court to act as a "gatekeeper" under the circumstances of this case would be contrary to the case law as well as the Fifth Amendment's guarantee of Due Process, as

LAW OFFICES OF                          Hon. Katherine B. Forrest
**JOSHUA L. DRATEL, P.C.**              United States District Judge
                                        Southern District of New York
                                        January 19, 2015
                                        Page 8 of 8

preclusion would deny Mr. Ulbricht the right to present a defense, and in turn a fair trial. *See Alvarez v. Ercole*, 763 F.3d 223 (2d Cir. 2014) (conviction reversed because defense counsel not permitted to cross-examine detective about police report containing information about the alternative suspect); *Cotto v. Herbert*, 331 F.3d 217, 229 (2d Cir. 2003) ("[b]y prohibiting [defense counsel] from questioning Detective Alfred about the [police report], the trial court allowed the jury to get the impression that the defense had nothing other than rhetoric to contradict the prosecutor's statement in summation that the NYPD's investigation into [the charged] murder was 'thorough'"), *citing Davis v. Washington*, 415 U.S. 308, 318 (1974) .

**Conclusion**

Accordingly, for all these reasons, it is respectfully submitted that the government's application to preclude and/or circumscribe the cross-examination of SA Der-Yeghiayan should be denied in its entirety.

Respectfully submitted,

Joshua L. Dratel

JLD/
cc:     Serrin Turner
        Timothy T. Howard
        Assistant United States Attorneys



proposed excerpts of testimony to be stricken
Turner, Serrin (USANYS)
to:
ForrestNYSDChambers@nysd.uscourts.gov, Olga_Z
Joseph_Pecorino@nysd.uscourts.gov
01/20/2015 01:39 PM
Cc:
"Howard, Timothy (USANYS) 1", Joshua Dratel, "Lindsay Lewis
(llewis@joshuadratel.com)", Joshua Horowitz
Hide Details
From: "Turner, Serrin (USANYS)" <Serrin.Turner@usdoj.gov>

To: "ForrestNYSDChambers@nysd.uscourts.gov"
<ForrestNYSDChambers@nysd.uscourts.gov>, "Olga_Zverovich@nysd.uscourts.gov"
<Olga_Zverovich@nysd.uscourts.gov>, "Joseph_Pecorino@nysd.uscourts.gov"
<Joseph_Pecorino@nysd.uscourts.gov>

Cc: "Howard, Timothy (USANYS) 1" <Timothy.Howard@usdoj.gov>, Joshua Dratel
<JDratel@joshuadratel.com>, "Lindsay Lewis (llewis@joshuadratel.com)"
<llewis@joshuadratel.com>, Joshua Horowitz <joshua.horowitz@techlawny.com>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 21, 2015

*Ordered*
*Post to docket.*
*K. B. Forrest*
*USDJ*
*1/21/15*

1 Attachment

1.20.15 proposed excerpts to be stricken.pdf

Please find attached highlighted excerpts of SA Der-Yeghiayan's testimony that the Government respectfully requests be stricken from the record in accordance with the Court's ruling from this morning.  Thank you.

Serrin Turner
Assistant United States Attorney
U.S. Attorney's Office, Southern District of New York
1 St. Andrew's Plaza
New York, New York 10007
Desk: 212-637-1946

Cell: 646-660-4815
Fax: 212-637-2429
Email: serrin.turner@usdoj.gov

UNITED STATES OF AMERICA, v.
ROSS WILLIAM ULBRICHT,                                         January 15, 2015

| F1fdulb5 | Der-Yeghiayan - cross | Page 487 |
|---|---|---|

1  Q. So you wanted to know from Agent Tarbell whether they had
2     physical surveillance because you said that not logging into
3     IRC for over two days is unusual for DPR, right?
4  A. Yes.
5  Q. There is also something else. Do you recall that on the
6     29th, which is two days before, that you noticed someone with a
7     username peacelovexharmony was what you called sitting on DPR's
8     profile for a couple of hours; do you recall that?
9  A. If I could see something that would help me recollect?
10    (Pause)
11 Q. I show you what's marked 3505-00775, and just ask you,
12    again, read from the bottom to the top, essentially.
13 A. Sure.
14    (Pause)
15    I recall this.
16 Q. Thank you. So there was a period on the 29th of September,
17    2013, where someone with a username or a screen name
18    peacelovexharmony was what you called sitting on DPR's account?
19 A. Yeah. There was from the forums, on the Silk Road forums,
20    there is a way to see what users were viewing actively in the
21    forums, and what I mean by "sitting" on an account, they were
22    viewing the profile of Dread Pirate Roberts for an extended
23    period of time.
24 Q. And so you asked the people on the arrest team as to
25    whether it was any of them, essentially, right?

| F1fdulb5 | Der-Yeghiayan - cross | Page 489 |
|---|---|---|

1     watching the account on the forums as well.
2  Q. But he wasn't peacelovexharmony; we don't know who that is?
3  A. I said it to him and he said no.
4  Q. I just said, we don't know who peacelovexharmony is?
5  A. I don't know who peacelovexharmony is.
6  Q. Now, is it fair to say that the Silk Road site, that users,
7     both vendors and purchasers, were extremely security conscious?
8  A. A lot of them were, yes.
9  Q. And there was a lot of talk on the forum about keeping
10    track of law enforcement infiltration or attempts to infiltrate
11    the site?
12 A. There was discussions about that, yes.
13 Q. And they actively discussed prior arrests and what happened
14    to people and rumors and all of that kind of stuff?
15 A. There would be discussions about that regularly on the
16    forums.
17 Q. Would you say they were very motivated in finding out more
18    about what law enforcement was doing with the Silk Road?
19 A. There was a lot of discussion. If there was anyone that
20    would ever bring up something that would occur with law
21    enforcement, then they would like to discuss that a lot.
22 Q. Now, in April of 2012, you believe you had identified some
23    Silk Road bitcoin accounts, correct?
24 A. That would be correct.
25 Q. And you were working to further identify the people behind

| F1fdulb5 | Der-Yeghiayan - cross | Page 488 |
|---|---|---|

1  A. If there was anyone else that was monitoring him.
2  Q. Right. And they said no, that it was not them?
3  A. Right. The responses I got from the other agents that I
4     was working with said no.
5  Q. Right. Your conclusion was that it might be law
6     enforcement, some other law enforcement that you were unaware
7     of?
8  A. I suspected, yes.
9  Q. But it didn't have to be law enforcement, it could have
10    been anyone?
11 A. It could have been anyone, yea.
12 Q. But it was unusual, right; it wasn't typical activity that
13    someone would be monitoring that profile for that extended
14    period of time?
15 A. I didn't actually watch them for a long time. I was
16    watching his account and watching the forums more vigilantly,
17    actively for the last few days. So that's why I took notice of
18    that.
19 Q. And you had spent a fair amount of time yourself as law
20    enforcement doing that very thing, right, sort of trolling
21    through that account for periods, right?
22 A. And watching it, yes.
23 Q. While you were doing that, were other people doing it at
24    the same time? Do you recall anyone else doing it?
25 A. Generally me. I believe Special Agent Gary Alford also was

| F1fdulb5 | Der-Yeghiayan - cross | Page 490 |
|---|---|---|

1     them, right?
2  A. That is correct.
3  Q. And sometime in the summer, maybe July of 2012, you
4     believed that you had identified the person, right?
5  A. I believe that I had a good target for it, potentially.
6  Q. A good target, Mark Karpeles, right?
7  A. Karpeles and an associate of his.
8  Q. Right. Ashley Barr, correct?
9  A. Correct.
10 Q. Karpeles is K-a-r-p-e-l-e-s.
11    Mark Karpeles is a French citizen, right?
12 A. That is correct.
13 Q. He lives in Japan, right?
14 A. He does.
15 Q. He is also the owner of Mt. Gox, correct, the bitcoin
16    exchange?
17 A. That is correct.
18 Q. And he bought Mt. Gox I think in 2009?
19 A. I think it was 2010.
20 Q. OK. But you thought that -- what you had concluded there
21    was that Karpeles was essentially behind Silk Road but that his
22    associate Ashley Barr was DPR?
23 A. There was -- Karpeles' English that I could see from his --
24    the things he would write online did not match the level of
25    English skills that Dread Pirate Roberts possessed. So I

UNITED STATES OF AMERICA, v.
ROSS WILLIAM ULBRICHT,

January 15, 2015

| F1fdulb5 | Der-Yeghiayan - cross | Page 491 |
|---|---|---|

1  thought it was someone else close to him, and there was a
2  person that shared some of the same viewpoints that was working
3  for him by the name of Ashley Barr that I suspected.
4  Q. He was a Canadian, right?
5  A. He was a Canadian citizen.
6  Q. And has a degree in computer science, right?
7  A. He has computer science degrees, yes.
8  Q. And he is also Karpeles' right-hand man, or was at the
9  time, right?
10  A. He was.
11  Q. And so as a result you built up quite a large list of
12  information to lead you to that, right?
13  A. There is little bits and pieces of evidence that was
14  pointing the investigation towards them, yes.
15  Q. And -- well, did you say we had built up quite a large list
16  of information to lead us to this?
17  A. It was, yeah, a lot of little pieces, a list of exhibits.
18  It was a lot of little things that added up to it.
19  Q. The question is did you not say inside Homeland Security
20  Investigations, HSI, we had built up quite a large list of
21  information to lead us to this?
22  A. That sounds right.
23  Q. And you also didn't want anybody reaching out to Karpeles,
24  right?
25  A. There was other --

| F1fdulb5 | Der-Yeghiayan - cross | Page 492 |
|---|---|---|

1  Q. Just let me ask because I will get to that.
2  A. OK.
3  Q. I want to get to --
4  A. Other law enforcement I didn't want reaching out.
5  Q. Right. You were worried that if someone reached out or did
6  something that Karpeles might find out, it could impair the
7  investigation?
8  A. Correct.
9  Q. Right. So -- and in fact, you let people know within law
10  enforcement that Karpeles, he closely monitors everything, all
11  of his websites?
12  A. That is correct.
13  Q. And that you thought that a lot of the websites he ran --
14  and he ran a lot of websites, right? He had a lot of domain
15  names and things like that within his control?
16  A. He hosted a lot of websites, yes.
17  Q. So you advised avoiding visiting them since many of them
18  appeared to be fronts and that Karpeles is actively tracking
19  them?
20  A. That is correct.
21  Q. So that if someone went on and wasn't sufficiently
22  disguised, then he might recognize it as law enforcement and
23  then again impair the investigation?
24  A. That is correct.
25  Q. In fact, in August of 2012 you sent out an email and then

| F1fdulb5 | Der-Yeghiayan - cross | Page 493 |
|---|---|---|

1  you realized, as we all do at some point in our lives, that you
2  left out the word "not," right?
3  A. There might have been an occasion like that.
4  Q. You had to send a quick email to say not to --
5  A. Not to, I think, maybe contact --
6  Q. Right. That was an important facet of the investigation,
7  obviously, is to keep it as confidential and as close as
8  possible as you gathered more information?
9  A. That is correct.
10  Q. And at some point because -- withdrawn.
11  It came to your knowledge that there were other
12  investigations of Silk Road going on around the country, right?
13  Other agencies, other offices, I mean, were investigating Silk
14  Road, right?
15  A. That is correct.
16  Q. And you -- when I say "you," HSI, and yourself as a part of
17  HSI, were operating with or working in tandem with the U.S.
18  Attorney's Office in the Northern District of Illinois, right?
19  A. We were docketed there originally, yes.
20  Q. You did that in Chicago, right?
21  A. Right.
22  Q. So that is where you were running your investigation out
23  of. Those were the assistant U.S. attorneys that you were
24  talking to and keeping them advised of your progress?
25  A. That is correct.

| F1fdulb5 | Der-Yeghiayan - cross | Page 494 |
|---|---|---|

1  Q. And there are obviously other U.S. attorneys offices around
2  the country and other agencies that were not necessarily either
3  aware or in contact with Chicago about what they were doing?
4  A. There was, yeah, we were doing our best to try to
5  deconflict with other districts.
6  Q. At some point you learned that Baltimore had an
7  investigation, right?
8  A. That is correct.
9  Q. And, actually, you learned that from Agent Alford?
10  A. No. Baltimore, the HSI agent that originally opened the
11  case and their supervisor came to Chicago originally to talk to
12  us about their investigation and about working together.
13  It wasn't in August of 2012 that someone from the Organized
14  Crime Task Force told you that Chicago had input the same
15  information about Karpeles as a target as you had?
16  A. I was notified of that, about Karpeles, later on, but I
17  knew of their investigation long before that, though.
18  Q. And in January of 2013 you got permission to open up an
19  undercover bank account to try to move money through Mt. Gox,
20  the bitcoin exchanger, just to remind everybody, right? It is
21  the largest bitcoin exchanger, right?
22  A. It was at the time.
23  Q. It was at the time.
24  And other companies owned by Karpeles, right?
25  A. That is correct.

UNITED STATES OF AMERICA, v.
ROSS WILLIAM ULBRICHT,                                                      January 15, 2015

| F1fdulb5 | Der-Yeghiayan - cross | Page 495 |
|---|---|---|

1 Q. And so you got permission to do that?
2 A. I got permission to open up under our investigation an
3 undercover bank account, yes.
4 Q. Right. Now, Karpeles is also a computer developer systems
5 administrator, right?
6 A. That is correct.
7 Q. Self-proclaimed hacker?
8 A. That is correct.
9 Q. Who brags about his hacking in Twitter and other social
10 media.
11 A. He does.
12 Q. And he has control over hundreds of websites and companies,
13 or had at the time in 2012/2013?
14 A. He did have hosting services, yes.
15 Q. And you believed him to be the mastermind behind keeping
16 Silk Road secure and operating?
17 A. He had ties to the original silkroadmarket.org website.
18 Q. But my question is did you not say that you believed him to
19 be the mastermind behind keeping the website secure and
20 operating?
21 A. He had the credentials to do so, yes.
22 Q. But did you say that?
23 A. I would have said that, yes.
24 Q. And that Ashley Barr was acting as the voice of the website
25 under the name Dread Pirate Roberts?

| F1fdulb5 | Der-Yeghiayan - cross | Page 496 |
|---|---|---|

1 A. That's what I suspected, yes.
2 Q. Now, in April of 2013, Chicago initiated -- when I say
3 "Chicago," HSI Chicago, your office, right -- initiated an
4 undercover purchase from Silk Road using Mt. Gox and another
5 Karpeles company as the bitcoin exchange?
6 A. Yeah. We did an exchange through two different ways.
7 Q. Part of the purpose of that was to -- withdrawn.
8      You also suspected that Karpeles was running an
9 unlicensed money exchange operation, right?
10 A. I did.
11 Q. And so this could be a way of establishing jurisdiction to
12 charge him with that in Chicago?
13 A. Yes, it was.
14 Q. And in May of 2013, HSI Chicago issued a grand jury
15 subpoena to a company called Dwolla, right, D-w-o-l-l-a?
16 A. That is correct.
17 Q. And that is an online payment processing system?
18 A. Yeah. It's like an online wire transfer company.
19 Q. It is based in the United States, right?
20 A. I believe so, yes. It has service in the United States.
21 Q. It was a way that Mt. Gox used to transfer money
22 essentially in and out of the U.S.?
23 A. It was one of the ways that they offered to either withdraw
24 or deposit funds.
25 Q. And bitcoin, right? It was part of the bitcoin exchange

| F1fdulb5 | Der-Yeghiayan - cross | Page 497 |
|---|---|---|

1 process that Mt. Gox used?
2 A. It was used for just the money part of it to withdraw.
3 Q. And that was -- and the subpoena was with regard to a
4 Karpeles company called -- and I will spell it -- M-u-t-u-m,
5 new word, S-i-g-i-l-l-u-m?
6 A. Mutum Sigillum.
7 Q. Right. That was what the subpoena was for, the records for
8 that company, right?
9 A. Correct.
10 Q. And the grand jury subpoena keeps the investigation secret
11 and confidential, right?
12 A. Correct.
13 Q. Within law enforcement only?
14 A. Right.
15 Q. Then you find out the next day, May 10, 2013, that
16 Baltimore had seized the -- how do you pronounce it, the Mutum
17 Sigillum?
18 A. Mutum Sigillum.
19 Q. -- Mutum Sigillum that HSI Baltimore had seized $2 million
20 in that company's account, right?
21 A. They notified me by phone, yeah.
22 Q. Then it was apparent to Karpeles that the U.S. government
23 had him on its radar, right?
24 A. That is correct.
25 Q. This is May of 2013, right?

| F1fdulb5 | Der-Yeghiayan - cross | Page 498 |
|---|---|---|

1 A. I believe so, yes.
2 Q. May 10th.
3      In fact, there were newspaper articles about it,
4 right?
5 A. It was a large seizure at the time, yes.
6 Q. Sorry. More than $3 million was seized.
7      And it was from Mutum Sigillum's Wells Fargo account,
8 right?
9 A. Correct.
10 Q. And you were notified in advance that Baltimore was going
11 to do that?
12 A. I was told that it had already happened.
13 Q. Right. And no one even in your office had been notified in
14 advance? When I say "your office," I mean Chicago HSI.
15 A. No.
16 Q. And was that money ultimately returned to Mr. Karpeles?
17 A. I don't know its current state right now.
18 Q. And you thought that HSI Baltimore should have deferred
19 that seizure because of your criminal investigation of
20 Mr. Karpeles?
21 A. At the time, yes.
22 Q. Now, despite that and the fact that Mr. Karpeles was
23 already on notice, to a certain extent, that he was on your --
24 not your radar but the U.S. radar -- and I am not being
25 critical, I'm just talking about despite that, in terms of the

UNITED STATES OF AMERICA, v.
ROSS WILLIAM ULBRICHT,                                           January 15, 2015

| F1fdulb5 | Der-Yeghiayan - cross | Page 499 |
|---|---|---|

1  chronology, you prepared a draft affidavit of May 29, 2013 for
2  a search warrant for email of Mr. Karpeles, correct?
3  A. That is correct.
4  Q. And these search warrants would not be on notice to him,
5  correct? They would just be to the provider, and they would
6  provide the information so that he wouldn't necessarily know,
7  right?
8  A. No. The provider -- well, he wouldn't know, yes, that the
9  provider --
10 Q. So you were doing it in a way that would keep it
11 confidential. Baltimore did it in a way where it would be
12 public. You did it in a way that it was confidential, right?
13 A. Correct.
14 Q. So in your draft, which was prepared for swearing under
15 oath, right?
16 A. That is correct.
17 Q. And you said that Silk Road had been launched in March of
18 2011, right?
19 A. Correct.
20 Q. And that both the marketplace and the online forum were
21 operated by the same administrator?
22      This was your conclusion?
23 A. Yeah, that's what I assumed, yes.
24 Q. And that you had done some -- you talked yesterday about
25 whois.com, w-h-o-i-s.com?

| F1fdulb5 | Der-Yeghiayan - cross | Page 500 |
|---|---|---|

1  A. Who.is, yes.
2  Q. You talked about it yesterday for the purpose of
3  identifying IP addresses or the people behind IP addresses?
4  A. Correct.
5  Q. And in your draft affidavit you talked about the whois.com
6  for the Silk Road -- the searches that you had done for the
7  silkroadmarket.org, right?
8  A. Correct.
9  Q. And when you said before -- oh, withdrawn.
10      That the registration was March 1, 2011, and then that
11 only went through April 13, 2011. And then there was a
12 separate registration through March 30th, right, through 2012,
13 I guess, right?
14 A. There were changes in the hosting administration.
15 Q. There were changes in the postings, right?
16      And that there was something called sta.net, a
17 company, right, that was involved in -- well, withdrawn -- that
18 you concluded from your investigation was involved or connected
19 to the silkroadmarket.org?
20 A. That is correct.
21 Q. And that was registered to Mutum Sigillum?
22 A. I believe so, yes, yeah.
23 Q. Which was Karpeles' company?
24 A. It was.
25 Q. And in fact, he was the contact for Mutum Sigillum; it was

| F1fdulb5 | Der-Yeghiayan - cross | Page 501 |
|---|---|---|

1  listed to his email address, right?
2  A. That is correct.
3  Q. Ands that he was the administrative -- and that he was in
4  administrative control of Mutum Sigillum since he had acquired
5  it in 2010?
6  A. That is correct.
7  Q. And in February 11, Karpeles bought Mt. Gox, right? I
8  think -- I apologize before for having the wrong date, but
9  February 11th he bought Mt. Gox?
10 A. Around February 2011.
11 Q. If you want to see the draft, I would be happy to have
12 you -- to have it in front of you.
13 A. If I could, yeah. That would helpful. Thank you.
14      (Pause)
15      MR. DRATEL: I apologize but when it printed out, the
16 numbers cut off halfway so sometimes it is hard to tell 8's
17 from 9's. This is 3505-3085 through 3092. Yes.
18      (Handing)
19      THE WITNESS: Thank you.
20 Q. OK. So let's go back to paragraph 18, if you could look at
21 that.
22 A. OK.
23 Q. And you trace more of Mr. Karpeles' sort of electronic
24 footprint as either corporate or personal, right?
25 A. Correct.

| F1fdulb5 | Der-Yeghiayan - cross | Page 502 |
|---|---|---|

1  Q. In terms of how you link him through whois.com, other
2  companies, to sta and other companies that are affiliated --
3  that are connected, through your research and investigation,
4  connected to the silkroadmarket.org?
5  A. That is correct.
6  Q. So, in fact, if you look at 19, in February 2011,
7  Mr. Karpeles buys Mt. Gox, right?
8  A. Sorry, you said 19th?
9  Q. Yes.
10 A. It stopped at 18.
11 Q. What is the last page of that?
12 A. Page 5.
13 Q. On the bottom, 35 --
14 A. Oh, it is cut off.  03 --
15 Q. It is double-sided.
16 A. It is still cut off.  03091, 92.
17      (Pause)
18 Q. I'm sorry, paragraph 17. I apologize.
19 A. OK.
20 Q. Do you have 17 there?
21 A. I have 17, yes.
22 Q. So in February 2011 -- so paragraph 17, he buys Mt. Gox in
23 February 2011?
24 A. That is when it is shown, yes.
25 Q. That is a month before Silk Road launches, right?

UNITED STATES OF AMERICA, v.
ROSS WILLIAM ULBRICHT,                                                    January 15, 2015

| F1fdulb5 | Der-Yeghiayan - cross | Page 503 |
|---|---|---|

1 A. That is correct.
2 Q. And you note there that Mt. Gox handled perhaps as much as
3    more than 80 percent of all of the bitcoin exchange in the
4    world, right?
5 A. That is what they advertised, yes.
6 Q. And that was as of April 2013, right?
7 A. Yes.
8 Q. And, excuse me, part of your theory in terms of your
9    investigation was that Silk Road was a device for leveraging
10   the value of bitcoin, right?
11 A. It appeared so.
12 Q. Yes. In other words, that if you had cornered the market
13   on bitcoin and could create a site that only used bitcoin and
14   everybody used bitcoin, you would drive the price up?
15 A. Yes.
16 Q. And also get business as an exchange?
17 A. Right.
18 Q. Now, so based on that, in terms of an affidavit, you were
19   prepared to swear that there was probable cause that Mark
20   Karpeles was intimately involved as the head of Silk Road?
21 A. From the connections that I listed in the affidavit draft,
22   yes.
23 Q. But he had already been -- he had already had that seizure
24   of Mutum Sigillum by the time you had drafted this affidavit,
25   right?

| F1fdulb5 | Der-Yeghiayan - cross | Page 504 |
|---|---|---|

1 A. Correct.
2 Q. And he was in Japan?
3 A. He was in Japan.
4 Q. Also, around the same time, in May of 2013, you submitted
5    to Dwolla, or subpoenaed from Dwolla, the online payment
6    processing company here in the U.S., information about --
7    subscriber information for certain accounts that you thought
8    were suspicious and related to Silk Road based on the movement
9    of bitcoin or money in and out of there, right?
10 A. There was a subpoena issued for that, yes.
11 Q. And that was because -- well, you thought that there could
12   be vendors or operators that you could find with that
13   information?
14 A. Yes.
15 Q. And by "operators," you mean administrators, people who
16   were running the site?
17 A. Potentially, yes.
18 Q. And there was large movement of money -- withdrawn.
19        There were large movements of money from Mt. Gox to
20   Dwolla accounts?
21 A. It showed, yeah, movement of money moving out of Mt. Gox
22   through Dwolla.
23 Q. And, by the way, on that list I think there were 16 names
24   on that list or 16 accounts, do you recall?
25 A. I don't. If I could see the --

| F1fdulb5 | Der-Yeghiayan - cross | Page 505 |
|---|---|---|

1 Q. Sure.
2        (Pause)
3        But do you recall whether or not Mr. Ulbricht's name
4    was on that list of accounts?
5 A. I don't believe that it was.
6 Q. And ultimately you created a spreadsheet -- or received a
7    spreadsheet from Dwolla with all of the transactions relating
8    to Mr. Karpeles, is that right?
9 A. It was all the Mutum Sigillum -- I'm sorry, in the Mutum
10   Sigillum account for Dwolla for all the transactions that they
11   had received and debited, credited and debited.
12 Q. That is about a thousand pages long, that --
13 A. It was, yeah, a pretty large return.
14 Q. And do you recall whether Mr. Ulbricht's name comes up
15   there?
16 A. It did.
17 Q. Right. And there are about 20 transactions, right?
18 A. Roughly or so, yes.
19 Q. And they are all in the amount of probably like a thousand
20   dollars or around there, some less?
21 A. Around a thousand dollars. I think one was for like a few
22   hundred dollars.
23 Q. So nothing large, assuming you mean by "large" more than a
24   thousand dollars, when you are talking about large movements of
25   money, right?

| F1fdulb5 | Der-Yeghiayan - cross | Page 506 |
|---|---|---|

1 A. No. There wasn't anything that compared to the other
2    accounts, no.
3 Q. And those were spread out over a couple of years, right?
4 A. I believe so, if memory serves me right.
5 Q. In fact, even after Mr. Ulbricht's arrest you went back and
6    looked at that, right?
7 A. I did.
8 Q. Now, you also learned as part of your investigation at some
9    point in the summer of 2013 that Baltimore was trying to work
10   on an interview with Karpeles through his attorneys, right?
11 A. That is correct.
12 Q. And they wanted to ask him directly about Silk Road as well
13   as his money business, right?
14 A. Yes, they wanted to talk to him.
15 Q. And you advised against that?
16 A. We requested that they did not.
17 Q. Right. But they went ahead and met with his lawyers
18   July 11, 2013, right?
19 A. That sounds about right, yes.
20 Q. Not with him but with his lawyers?
21 A. With the lawyers.
22 Q. And then you say Karpeles' -- withdrawn.
23        Karpeles' attorneys brought up Silk Road, right?
24 A. That is what I was told.
25 Q. And they say that he was willing to tell the government who

UNITED STATES OF AMERICA, v.
ROSS WILLIAM ULBRICHT,                                                           January 15, 2015

| F1fdulb5 | Der-Yeghiayan - cross | Page 507 |
|---|---|---|

1  he thought was running Silk Road, right?
2  A.  That is correct.
3  Q.  And for that he would get a walk on his charges, right?
4  A.  I don't know what their deal was.
5  Q.  That's what he wanted?
6  A.  I don't know.  I don't know what was discussed then.
7        (Pause)
8  Q.  OK.  And during this period after this all occurred --
9  withdrawn.
10       So I am going to show you what is marked as 3505-300.
11       (Pause)
12       I am just going to bracket a point here.  Just read
13  that to yourself and then when you are done let me know.
14       (Pause)
15       During this period -- I'm sorry.  Let me know when you
16  are finished.
17       (Pause)
18  A.  OK.
19  Q.  During this period you were upset about the work -- about
20  the investigation that Baltimore was pursuing and how they were
21  pursuing it, correct?
22  A.  I was upset about it, yes.
23  Q.  And you wrote a long memo with a chronology to lay out what
24  had occurred and what the problems you saw were?
25  A.  That is correct.

| F1fdulb5 | Der-Yeghiayan - cross | Page 508 |
|---|---|---|

1  Q.  And as part of your investigation? as part of your
2  preparation and all of that, you learned that Karpeles' lawyers
3  had made this offer that they would tell the government who was
4  behind Silk Road if he would not be prosecuted for the money
5  exchange charges, which, by the way, had not been instituted,
6  right?
7  A.  I'm sorry.
8  Q.  He hadn't been charged yet with any money exchange --
9  A.  It was just the civil forfeiture, the civil seizure of the
10  money.
11  Q.  Right.  But in return for not pursuing any potential
12  charges against him, he was willing to give that name up?  That
13  was the offer that his lawyers made, that you learned during
14  your investigation?
15       MR. TURNER:  Objection.  Foundation.
16       THE COURT:  Certainly you will answer as to what you
17  know.  If you had knowledge of that fact or if your memory is
18  refreshed by something and now recollect something, then you
19  may testify to it.
20       MR. TURNER:  Objection.  Foundation.  Hearsay as well.
21       THE COURT:  Why don't you try and rephrase it,
22  Mr. Dratel, and come at it in a different angle.
23       MR. DRATEL:  Sure.
24  BY MR. DRATEL:
25  Q.  It was crucially important to you at the time to know what

| F1fdulb5 | Der-Yeghiayan - cross | Page 509 |
|---|---|---|

1  was going on with respect to other pursuits of Karpeles and
2  what was going on with other agencies investigating or other
3  U.S. Attorney's offices investigating him, right?
4  A.  Yes.
5  Q.  And as part of that you had conversations and read
6  memoranda and were in touch with people who provided to you
7  information about it so that you could pursue your own
8  investigation correctly, right?
9  A.  Be more specific.  I am sorry.
10  Q.  Sure.  That you wanted to know what was going on with
11  Baltimore, you wanted to know what was going on with the
12  meeting with Karpeles' attorneys, you wanted to know what was
13  out there because you had your own parallel independent
14  investigation of him going on that could be completely wiped
15  out by what Baltimore was doing?
16  A.  Yes.  And we had verbal agreements with the attorneys in
17  that district also about that.
18  Q.  And so in the course of this and in pursuing your
19  investigation, you learned that Karpeles' lawyers had made that
20  offer to the government?
21       MR. TURNER:  Objection.
22  Q.  You learned through people either in Baltimore or at HSI in
23  Chicago?
24       MR. TURNER:  Objection.  Hearsay.
25       THE COURT:  Sustained.

| F1fdulb5 | Der-Yeghiayan - cross | Page 510 |
|---|---|---|

1        MR. DRATEL:  I will just say Rule 807.
2        THE COURT:  You know, I think now is a good time to
3  take our mid-afternoon break so that we can take up this
4  evidentiary matter while you folks stretch your legs.
5        So let's take our mid-afternoon break.  We'll come
6  back in about -- probably about 12 minutes.  I want to remind
7  you not to talk to each other or anybody else about this case.
8  Thank you.
9        And you could take a break, too.
10       THE WITNESS:  Thank you, your Honor.
11       (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**A342**



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

January 29, 2015

By Email
Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re:     *United States v. Ross William Ulbricht*, 14 Cr. 68 (KBF)

Dear Judge Forrest:

The Government writes respectfully to move to preclude the testimony of Andreas M. Antonopoulos, a purported "expert" noticed by the defense in a letter sent to the Government on January 26, 2015 ("Defense Letter," attached as Ex. A). The subjects of testimony proffered in the notice all are either irrelevant to the case or do not require specialized knowledge, or both. In addition, the expert notice does not identify the opinions to be offered by Mr. Antonopoulos on these subjects, or the bases or reasons for those opinions, and thus does not comply with Rule 16(b)(1)(C). For all these reasons, Mr. Antonopoulos should be precluded from testifying.

## Applicable Law

A.     **Rule 702**

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The party that proffers the testimony bears the burden of showing that it is admissible. *See Bourjaily v. United States*, 483 U.S. 171, 172-73 (1987). The District Court's exclusion of

expert testimony will be affirmed unless it constitutes an abuse of discretion. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

The party seeking admission of expert testimony must demonstrate that the testimony is based on the witness's specialized knowledge. *See United States* v. *Mejia*, 545 F.3d 179, 196 (2d Cir. 2008) (district court erred in allowing expert testimony "about matters that required no specialized knowledge"). Expert testimony is inadmissible when it merely addresses "lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help." *Andrews* v. *Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989). The Second Circuit has warned against the "uncontrolled" use of expert testimony that might have the effect of providing "an additional summation by having the expert interpret the evidence." *United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir. 1987). A district court must therefore be vigilant to prevent an expert from coming "usurping the jury's function." *Id.*

**B.      Rules 401 and 403**

Rules 401 and 403 of the Federal Rules of Evidence provide that evidence is admissible when it tends to make the existence of any fact that is of consequence more or less probable than it would be without the evidence, but that the evidence may be excluded if its probative value is substantially outweighed by, among other things, the danger of unfair prejudice, confusion of the issues, and misleading the jury. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993).

**C.      Rule 16**

A defendant must "give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial." Fed. R. Crim. P. 16(b)(1)(C). "This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Id.* As the Advisory Committee notes to Rule 16 explain, the disclosure requirement "is intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." *United States v. Ferguson*, 3:06 Cr. 137 (CFD), 2007 WL 4539646, at *1 (D. Conn. Dec. 14, 2007) (citation omitted). If a defendant fails to provide disclosures in accordance with Rule 16(b)(1)(C), the district court may exclude the expert's testimony at trial. *United States v. Mahaffy*, No. 05 Cr. 613 (ILG), 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007).

**A344**

<u>Discussion</u>

**A.     The "Origins" of Bitcoin and the "Various Purposes and Uses" of Bitcoin Are Not Relevant to This Case**

According to the Defense Letter, the first two subjects that the defense intends to have Mr. Antonopoulos testify about are "the origins of Bitcoin" and "the various purposes and uses of Bitcoin." Neither topic is relevant to this case. The "origins" and "various purposes and uses" of Bitcoin are no more relevant here than the "origins" or "various purposes and uses" of cash would be relevant in a traditional drug dealing or money laundering case.

Presumably, the defense plans to elicit testimony from Mr. Antonopoulos that Bitcoin has a *legitimate* origin and *legitimate* purposes and uses. However, neither point is in dispute here. None of the Government's witnesses have testified to the effect that Bitcoin is inherently illegitimate; indeed, both Special Agent DerYeghiayan and former Special Agent Yum specifically testified, on direct, that using Bitcoins is not illegal in and of itself. (*See* Tr. 152:11-13 ("Q. And to be clear, is there anything illegal in and of itself about using bitcoins? A. No, there is not.")). Bitcoin is relevant to the case only because it was the sole means of payment on Silk Road and because it was used to launder illegal proceeds from the site. How Bitcoin may be used in other contexts, or what uses it may have been originally conceived for, are simply not at issue here. Moreover, allowing such testimony could confuse the jury into believing that "Bitcoin" is somehow "on trial" in this case and that "expert" testimony concerning its legitimacy somehow cuts against the defendant's guilt. Because this risk of prejudice outweighs any negligible potential probative value, the proffered testimony on these points should be precluded. *See United States v. Stewart*, 433 F.3d 273, 312-13 (2d Cir. 2006) (affirming district court's preclusion of expert testimony concerning the legality of a certain stock trade, given that the testimony was irrelevant to whether the defendant had lied about the trade to investors, which was the subject of the criminal charge); *see also In re Air Crash Disaster at New Orleans, Louisiana*, 795 F.2d 1230, 1233 (5th Cir.1986) (noting that "trial courts must be wary lest the expert become nothing more than an advocate of policy before the jury" and that "the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument").

In any event, the Defense Letter does not even disclose what opinions Mr. Antonopoulos plans to offer concerning the "origins" or "uses" of Bitcoins, or what the bases for these opinions are. It merely lists these subjects as general topics of discussion. The disclosure thus plainly falls short of the requirements of Rule 16(b)(1)(C), and his testimony should be precluded for this reason as well. *See United States v. Valle*, 12 Cr. 847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013) ("Merely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions."); *see also United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001) ("The Rule requires a summary of the expected testimony, not a list of topics."); *Mahaffy*, 2007 WL 1213738, at *3 (same).

**B.**     **The Exchange Value of Bitcoin Is Not a Matter Requiring Specialized Knowledge and the Causes of Fluctuation in That Value Are Not Relevant to This Case**

The Defense Letter also indicates the defense intends to have Mr. Antonopoulos testify concerning "the value of Bitcoin over time since its inception, and the cause of various increases and decreases in the value of Bitcoin at certain points in time," as well as "the dollar value of Bitcoins generated through transactions on Silk Road, at various points in time, including at the time or Mr. Ulbricht's arrest."  These topics are not proper subjects of expert testimony in this matter.

To the extent the proffered testimony simply concerns the exchange value of Bitcoin at various points in time, such testimony plainly does not require specialized knowledge.  The exchange value of Bitcoin is publicly available information that anyone can look up – just like the exchange value of foreign currency, gold, or silver, or the market price of a stock.  Indeed, the defense has already successfully offered into evidence a chart, obtained from a publicly accessible website, depicting the exchange value of Bitcoin from 2011 to 2014.  (*See* Def. Ex. B; Tr. 455).  There is no need for an "expert" to "opine" further on this issue.  See *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992) (noting that lay opinion testimony is unhelpful where the jury is in as good a position to assess the facts as the testifying witness); *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) (the district court should not admit testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help").

To the extent the defense seeks for Mr. Antonopoulos to testify concerning the "cause" of fluctuations in the Bitcoin exchange rate, such testimony would be both irrelevant and unreliable.  The Bitcoin exchange rate is relevant in this case only insofar as it concerns the dollar value of the funds that moved through Silk Road or that were otherwise involved in any specific transactions at issue in the case.  *Why* the exchange rate was what it was on any particular given day has no relevance to any issue in dispute.  Moreover, any "expert" opinion on the cause of various movements in the Bitcoin exchange rate would inevitably rest on speculation.  The Bitcoin market is highly volatile and unpredictable.  There is no generally accepted methodology or set of principles that one can apply to ascertain the reasons for its ups and downs.  *Daubert*, 509 U.S. at 592-93 (in order to determine reliability of expert testimony, judge must assess "whether the reasoning or methodology underlying the testimony is scientifically valid"); *Three Crown Ltd. Partnership v. Salomon Bros., Inc.*, 906 F.Supp. 876, 894 (S.D.N.Y. 1995) ("When the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court." (quoting *Tyger Const. Co. v. Pensacola Const. Co.*, 29 F.3d 137 (4th Cir. 1994))).

In any event, the Defense Letter does not describe what fluctuations in the Bitcoin exchange value Mr. Antonopolous will testify about, what opinions he will provide concerning those fluctuations, or what the bases for these opinions are.  It simply lists the "the cause of various increases and decreases in the value of Bitcoin at certain points in time" as a "subject" on which the witness will testify.  Again, this disclosure does not satisfy the requirements of Rule

16(b)(1)(C) and fails to give the Government sufficient notice to prepare for effective cross-examination.  The proffered testimony should therefore be precluded.[1]

**C.     How to Use Bitcoins and How to Track Transactions on the Blockchain Are Not Matters Requiring Specialized Knowledge, and Any More Technical Aspects of the Bitcoin Network Are Not Relevant to This Case**

The Defense Letter also states that the defense intends to have Mr. Antonopolous testify concerning "the mechanics of Bitcoin transactions, including explanation of Bitcoin wallets, accounts, exchanges, and the [B]lockchain," "the ability to track transactions and participants in Bitcoin transactions," and "the ability to tie Bitcoins from Silk Road to Mr. Ulbricht."  In essence, the proffered testimony amounts to testimony concerning how to use Bitcoins and how to track transactions on the Blockchain, neither of which requires specialized knowledge and both of which have already been explained in the Government's case.

The "mechanics" of Bitcoin transactions to which the Defense Letter refers – "wallets," "accounts," "exchanges," and the "[B]lockchain" – are concepts familiar to any layperson who has ever used Bitcoins and can be explained in lay terms to the jury.  Indeed, multiple Government witnesses – including Special Agent DerYeghiayan and former Special Agent Yum – testified concerning these concepts in the Government's case without being qualified as experts.  As former Special Agent Yum explained, a "wallet" is a computer file that enables a user to make transfers from his "addresses" (*i.e.*, accounts) on the Bitcoin network.   As Special Agent DerYeghiayan explained, "exchanges" are businesses that exchange real currency for Bitcoins and vice-versa.  And as both witnesses explained, the "Blockchain" is the public ledger where all Bitcoin transactions are recorded.  An "expert" is not needed to explain these concepts any more than an expert is needed to explain how to make an online payment using Paypal or how to execute a stock purchase on E*Trade.  *See United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir.1994) (district court should not admit "expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror"); *LaSalle Bank Nat. Ass'n v. CIBC Inc.*, 08 Civ. 8426 (WHP), 2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) ("[A]n expert witness may not offer testimony which merely rehashes the testimony of percipient witnesses.").

By the same token, expert testimony is not required to explain how to "track" Bitcoin transactions on the Blockchain – including how to identify transactions on the Blockchain reflecting transfers from Bitcoin addresses associated with the Silk Road servers to Bitcoin addresses associated with defendant's laptop.  Tracking Bitcoin transactions simply involves looking up a Bitcoin address on the Blockchain and seeing the transfers flowing in or out of it.  It

---

[1] Even if the defense were to provide supplemental information sufficient to provide adequate notice, the Court should hold a *Daubert* hearing to determine whether Mr. Antonopolous's opinions on the causes of fluctuations in the value of Bitcoin are reliable and would be likely to assist the jury, given the facially speculative nature of the subject matter.  *See, e.g., Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005) (holding that district courts have a screening function to evaluate the qualifications of an expert, the reliability of the expert's opinions, and the relevance of the proposed expert testimony).

is conceptually no different from looking at bank account records to check for transfers flowing from ne account to another.  Just as an expert is not required to explain that ministerial task – even if automated in some fashion – neither is one required to explain the concept in the context of Bitcoins.  *Cf. U.S. v. Baker*, 496 Fed. Appx. 201, 204 n.1 (3d Cir. 2012) (phone company representative's testimony concerning how to read cellphone location records not expert testimony); *John v. Griffen*, No. 13 Civ. 922 (RWS), 2014 WL 866277, at *14 (S.D.N.Y. Mar. 4, 2014) (same).  Again, former Special Agent Yum already testified extensively concerning this issue without being qualified as an expert.

While there are, of course, more complicated aspects of Bitcoin concerning the actual software code and cryptographic technologies on which the Bitcoin network is built, these aspects of the system are irrelevant to the case.  Just as a person does not need a technical seminar on the computer networks used by banks to understand how wire payments can be sent online or how to read records of the wires after they are sent, the jury in this case does not need an expert to explain the innards of the Bitcoin network in order to understand how transfers of Bitcoins are made or how to look such transfers up on the Blockchain.

In any event, again, the Defense Letter fails to set forth what opinions Mr. Antonopolous will give concerning these subjects or the bases for those opinions.  It only lists the subjects themselves.  For this reason as well, his testimony on these subjects should be precluded.

### D.    Bitcoin Speculation and Mining Is Not Relevant to the Case and Expert Testimony on These Subjects Cannot Substitute for Factual Evidence That These Activities Were the Source of the Bitcoins Found on the Defendant's Laptop

Lastly, the Defense Letter states that the defense intends to have Mr. Antonopoulos testify concerning the "concepts of Bitcoin speculating and Bitcoin mining."  These "concepts" are not relevant to the case.  While the defense has suggested at times that some portion of the Bitcoins on the defendant's laptop could have come from Bitcoin speculation or mining, such a defense requires *factual evidence* that these activities were the source of the Bitcoins on the defendant's laptop.  It would be an improper use of expert testimony for Mr. Antonopolous to explain the "concepts" of Bitcoin speculation and mining simply in order to invite the jury to speculate that such activities *could* have been where the defendant's Bitcoins came from.

The Second Circuit's decision in *United States v. Zafar*, 291 F. App'x 425 (2d Cir. 2008), is on point.  In that case, the Second Circuit affirmed the district court's exclusion of expert testimony the defense sought to introduce concerning the use of certain stock-selection software found on the defendant's computer in a securities-fraud case.  *Id.* at 427.  Given "the absence of evidence indicating that defendant had, in fact, used the software for stock trading at the time of the charged crimes," the court found it would have been inappropriate to allow expert testimony on "how [the] stock-selection software worked."  *Id.*  The Second Circuit explained that the true purpose of the expert testimony appeared *not* to be "to show the jury how the software worked," but rather was "to insinuate what had happened with respect to the relevant stock trades, a subject on which [the expert] was not a competent witness."  *Id.*  The same is true here: the defense cannot substitute expert testimony about how Bitcoin speculation or mining works for

factual evidence that the defendant actually engaged in these activities – and engaged in them to such an extent that could explain the millions of dollars in Bitcoins recovered from his computer.

Finally, in any event, the Defense Letter again fails to specify what opinions Mr. Antonopolous intends to offer on Bitcoin speculation and mining, or the bases for these opinions. Merely listing these topics as "concepts" on which the witness will opine in some manner does not satisfy the prerequisites of Rule 16(b)(1)(C), and for this reason as well the proffered testimony should be excluded.

## Conclusion

For the foregoing reasons, the Government respectfully requests that the proffered testimony of Mr. Antonopolous be precluded in its entirety.

Respectfully,

PREET BHARARA
United States Attorney

By: _____
SERRIN TURNER
TIMOTHY HOWARD
Assistant United States Attorneys
Southern District of New York

cc:    Joshua Dratel, Esq.

7

LAW OFFICES OF
## JOSHUA L. DRATEL, P.C.
A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL
—
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

STEVEN WRIGHT
*Office Manager*

January 26, 2015

**BY ELECTRONIC MAIL**

Serrin Turner
Timothy T. Howard
Assistant United States Attorneys
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Re:    *United States v. Ross Ulbricht*
       14 Cr. 68 (KBF)

Dear Mr. Turner and Mr. Howard:

This letter is submitted on behalf of Ross Ulbricht, providing formal notice, pursuant to Rule 16(b)(1)(C), Fed.R.Crim.P., that the defense plans to call Andreas M. Antonopoulos to provide expert opinion testimony on the following subjects:

1.    the origins of Bitcoin;

2.    the various purposes and uses of Bitcoin;

3.    the mechanics of Bitcoin transactions, including explanation of Bitcoin wallets, accounts, exchanges, and the blockchain;

4.    the ability to track transactions and participants in Bitcoin transactions;

5.    the value of Bitcoin over time since its inception, and the cause of various increases and decreases in the value of Bitcoin at certain points in time;

6.    the concepts of Bitcoin speculating and Bitcoin mining;

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Serrin Turner & Timothy T. Howard
Assistant United States Attorneys
Southern District of New York
January 26, 2015
Page 2 of 2

7.    the ability to tie Bitcoins from Silk Road to Mr. Ulbricht; and

8.    the dollar value of Bitcoins generated through transactions on Silk Road, at
       various points in time, including at the time or Mr. Ulbricht's arrest.

In addition, Mr. Antonopoulos's Curriculum Vitae is attached hereto.

Very truly yours,

Lindsay A. Lewis

LAL/
Encl.

## *CURRICULUM VITAE*
## Andreas Antonopoulos
andreas@antonopoulos.com

### EDUCATION

1991-1994    B.Sc. (Hons.) Computer Science. University College London, London, UK.
Project in distributed collaborative computing, X-Windows screen-sharing protocol.

1994-1995    M.Sc. Data Communications Networks & Distributed Systems (DCNDS). University College London, London, UK. M.Sc.
Project in cross-platform distributed data exchange framework as part of the EU (HANSA ESPRIT) funded project.

### EMPLOYMENT HISTORY

2011 – to date   RootEleven / Andreas M. Antonopoulos LLC
Founder

Consulting, advisory services in crypto-currencies for startup companies.

2003 – 2011    Nemertes Research, NY/CA
Partner, CIO, Lead Security Analyst

Developed and managed research projects, conducts strategic seminars and advised key clients as the lead analyst in Information Security, Data Center and Cloud Computing. CIO for the firm, managing a diverse cloud infrastructure supporting distributed team. Responsible for HR and legal management. Founding partner and managing director

2002-2003    ThruPoint Inc, NY
Director Security Practice

Directed a team of 70-80 network security, information security and penetration testing engineers, ensuring consistent delivery of consulting and professional services across a global delivery team. Support sales efforts as team lead and promoted standardization of deliverables. Worked on accurately predicting and accounting for work effort, profit margin and project management in sales proposals.

2001 - 2002    Greenwich Technology Partners, NY
Security Practice Lead

I led the North East security practice, covering NY, NJ and CT, supporting sales operations (SME), delivering security advice and services and leading projects, including architecting global secure financial transaction network for SWIFT.

| | |
|---|---|
| 2000 - 2001 | Managed Business Network, London, Great Britain, Founder / Consulting and Integration Services |
| 1997-2000 | Phaia Limited, London, UK Managing Director / Co-Founder |
| 1997-2000 | Learning Tree International, London, UK Instructor - Security, Networking |
| 1995-1997 | University College of London, Computer Science Department, London, UK, Research Fellow, ESPRIT-funded interactive media project. External Lecturer Lead Research Fellow, ``Distributed Application Generation'," EPSRC-funded project. |
| 1995-1997 | Athena Systems Design Limited, London, Great Britain, Consultant |
| 1993-1995 | Odey Asset Management, London, Great Britain IT Manager |
| 1991-1993 | IT Consulting |
| 1990-1991 | IBM Greece Network Support |
| 1989-1991 | Athens Greece Programming BASIC - Private Lessons |

**TEACHING/RESEARCH**

| | |
|---|---|
| 1992-1994 | University College London - Computer Lab Assistant |
| 1994-1995 | University College London - Teaching Assistant "Internet and E-Commerce" |
| 1995-1997 | University College London - Research Fellow "Distributed Systems Lab" |
| 2014-to date | University of Nicosia - Teaching Fellow "M.Sc. Digital Currencies" |

**PUBLICATIONS**

Peer-Reviewed  - Framework for Distributed Application Generation, SPEEDUP Volume 11, Number 1, pp.15-17, Scientific Journal, (Jun. 1, 1997)

More than 200 published articles and reports on Security, Data Centers, Cloud Computing and Cryptographic Currencies

**PATENTS**
System and Method for Securing Virtualized Networks
United States 61/720,343

System and Method for Dynamic Management of Network Device Data
United States 9479P001



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

_____

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

January 31, 2015

By Email
Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re:    *United States v. Ross William Ulbricht*, 14 Cr. 68 (KBF)

Dear Judge Forrest:

The Government writes respectfully to move to preclude the testimony of Steven M. Bellovin, first noticed by the defense as an expert in a letter sent to the Government last night ("Defense Letter," attached as Ex. A).

As set forth below, this expert notice, submitted in the eleventh hour, does not identify the opinions to be offered by Mr. Bellovin, or the bases or reasons for those opinions, and thus does not comply with Rule 16(b)(1)(C).  Without that required information, neither the Government nor the Court is in a position to evaluate whether Mr. Bellovin's opinions require specialized knowledge, are based upon facts or data of a type reasonably relied upon by experts, or are the product of reliable principles and methods.  Nor is there a basis to evaluate whether Mr. Bellovin's testimony would be relevant and helpful to the jury, or whether the testimony would be improperly unfairly prejudicial under Rule 403.  Compounding these deficiencies is the fact that the notice is extraordinarily late, coming on the eve of the defense case, thus leaving no time for the Government to hire its own expert in order to prepare an effective cross-examination and put on a rebuttal case.  The defense has no excuse for waiting until this stage of the proceeding to notice an expert, as the defense has had months to plan its affirmative case.

## Applicable Law

A.    **Rule 702**

Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as

an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The party that proffers the testimony bears the burden of showing that it is admissible. *See Bourjaily v. United States*, 483 U.S. 171, 172-73 (1987). The District Court's exclusion of expert testimony will be affirmed unless it constitutes an abuse of discretion. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

A threshold issue is whether the witness is "qualified as an expert" to render the proposed opinion. *See Nimley v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005). Expert testimony is admissible only if the trial court determines that it is both relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993); *see Kumho Tire Company, Inc. v. Carmichael*, 526 U.S. 137 (1999). Specifically, in *Daubert*, the Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. "*Daubert* applies to both defense and government experts." *United States v. Yousef*, 327 F.3d 56, 148 (2d Cir. 2003).

In *Joiner*, the Supreme Court explained that "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." 522 U.S. at 146. For example, in *Kumho Tire*, the Court upheld the exclusion of an expert's testimony that a defect caused a tire's tread to separate from the rest of the tire, because the expert's theories could not reliably determine the cause of the separation in the tire at issue. 526 U.S. at 154-55; *see also Amorgianos* v. *Romano Enterprises*, 303 F.3d 256, 267 (2d Cir. 2002) (district court should undertake a rigorous examination of the facts on which the expert relies, the expert's methodology, and the application of that methodology to the facts).

Applying Rule 702, the Court must determine whether the expert's reasoning and methodology underlying his testimony is valid, and whether that reasoning or methodology was applied reliably to the facts, so as to be relevant and helpful to the jury. See *Kumho Tire Co.*, 526 U.S. 137. The fact that an expert may generally possess "specialized knowledge" does not automatically render his opinions in this case reliable. *See SEC v. Lipson*, 46 F. Supp. 2d 758, 761 (N.D. Ill. 1998) (fact that witness is a certified public accountant, generally possessing the "specialized knowledge" to qualify as an expert witness, does not automatically render his opinions reliable).

Expert testimony is inadmissible when it addresses "lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help." *Andrews* v. *Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989). In addition, as a general matter, trial courts should exclude expert testimony that "expresses a legal conclusion." *Hygh* v. *Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992)." *Id.* As the Second Circuit explained, "[e]ven if a jury were not misled into adopting a legal conclusion proffered by an expert witness, the testimony would

remain objectionable by communicating a legal standard—explicit or implicit—to the jury." *Id.* at 364. Further, an expert "is not qualified to compete with the judge in the function of instructing the jury." *Id.*

The party seeking admission of expert testimony must demonstrate that the testimony is based on the witness's specialized knowledge. *See United States* v. *Mejia*, 545 F.3d 179, 196 (2d Cir. 2008) (district court erred in allowing expert testimony "about matters that required no specialized knowledge"). Expert testimony is inadmissible when it merely addresses "lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help." *Andrews* v. *Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989). The Second Circuit has warned against the "uncontrolled" use of expert testimony that might have the effect of providing "an additional summation by having the expert interpret the evidence." *United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir. 1987). A district court must therefore be vigilant to prevent an expert from coming "usurping the jury's function." *Id.*

## B.     Rule 703

Rule 703 of the Federal Rules of Evidence precludes an expert from disclosing to the jury "[f]acts or data that are otherwise inadmissible" unless the court determines that their probative value substantially outweighs their prejudicial effect, and the facts or data must be "of a type reasonably relied upon by experts in the particular field forming opinions or inferences upon the subject." Experts cannot be used as a substitute to calling witnesses to the events or facts at issue. For example, in *United States v. Zafar*, 291 Fed. Appx. 425, 427 (2d Cir. 2008), the Second Circuit affirmed the district court's exclusion of the defendant's proposed expert testimony about the use of stock-selection software found on the defendant's computer in a securities fraud case. There was no evidence that the defendant actually used that software for stock trading at the time of the charged offenses. *Id.* The Court affirmed the district court's decision, because the defense expert was not trying "to show the jury how the software worked but to insinuate what had happened with respect to the relevant stock trades, a subject on which [the expert] was not a competent witness." *Id.*

## C.     Rules 401 and 403

Rules 401 and 403 of the Federal Rules of Evidence provide that evidence is admissible when it tends to make the existence of any fact that is of consequence more or less probable than it would be without the evidence, but that the evidence may be excluded if its probative value is substantially outweighed by, among other things, the danger of unfair prejudice, confusion of the issues, and misleading the jury. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert,* 509 U.S. at 595.

## D.     Rule 16

A defendant must "give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as

3

evidence at trial." Fed. R. Crim. P. 16(b)(1)(C).  "This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Id.*  As the Advisory Committee notes to Rule 16 explain, the disclosure requirement "is intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." *United States v. Ferguson*, 3:06 Cr. 137 (CFD), 2007 WL 4539646, at *1 (D. Conn. Dec. 14, 2007) (citation omitted).  "If a defendant fails to provide disclosures in accordance with Rule 16(b)(1)(C), the district court may exclude the expert's testimony at trial."  *United States* v. *Valle*, No. 12 Cr. 847(PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013); *see also United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2011 WL 723530, at *2 (S.D.N.Y. Feb. 25, 2011) (observing that it "is apparent from the face of the text of Rule 16 . . . that the court may impose sanctions where 'a party fails to comply with th[e] rule.'" (quoting Fed. R. Crim. P. 16(d)(2)); *Ferguson*, 2007 WL 4539646, at *1 (same);.  .  "A court may preclude the testimony as a whole, or any part that it determines was not properly disclosed to the Government." *United States v. Mahaffy*, No. 05 Cr. 613, 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007)

### Discussion

### A.  Mr. Bellovin's Testimony Should Be Excluded Because the Expert Notice Fails to Comply with Rule 16(b)(1)(C)

The notice provided by the defendant regarding Mr. Bellovin is vague, open-ended, and plainly insufficient under the Federal Rules of Criminal Procedure, as it merely provides a list of topics the defense seeks for Mr. Bellovin to testify about, without indicating anything regarding the "opinions" plans to offer on those topics, or "the bases and reasons for those opinions." Fed. R. Crim. P. 16(b)(1)(C).  The notice simply lists broadly defined areas of testimony, described as: (1) "[g]eneral principles of internet security and vulnerabilities"; (2) "the operation of timestamps in UNIX-based operating systems"; (3) "the import of some lines of PHP code provided to defense counsel in discovery"; (4) "forensic memory analysis"; (5) "general principles of public-key cryptography"; and (6) "general issues related to linux-based operating systems, including security, implications of various linux kernel versions, differing methods of software installation, etc."  This notice is insufficient under Rule 16(b)(1)(C), as it is devoid of any specific information regarding the opinions of the expert regarding any of these issues, or the specific types of computer vulnerabilities, PHP code, memory analysis or Linux-related issues that will be discussed and opined upon.  *United States v. Valle*, No. 12 Cr. 847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013) ("Merely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's *actual opinions*.") (emphasis added) (citing *United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001).

As a practical matter, in order for the Government – and ultimately the Court – to evaluate whether the proposed expert testimony is "the product of reliable principles and methods" pursuant to *Daubert* and its progeny, the defendant is obligated to provide the Government with more than passing references to the types of information the proposed expert reviewed or considered in the course of preparing to testify.  *See*, *e.g.*, *Nimely* v. *City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005) (holding that district courts have a screening function

to evaluate the qualifications of an expert, the reliability of the expert's opinions, and the relevance of the proposed expert testimony); *SEC* v. *Johnson*, 525 F. Supp. 2d 70, 74 (D.D.C. 2007) ("The first prong of *Daubert* requires the trial court to assess the methodology employed by the expert as a means of ensuring evidentiary reliability."). Without proper notice, the Government is not in a position to evaluate and make any challenges to the proffered testimony, and the Court is not in a position to effectively exercise its gatekeeping functions to exclude the testimony to the extent it is improper..

Further, the insufficiency of the expert notice regarding Mr. Bellevin's testimony makes it impossible for the Government to test the merits of the proffered testimony through cross-examination. By waiting until the very last moment and by omitting any specifics regarding the opinions to be rendered, this defense has failed to give the Government any opportunity to perform its own analysis or to seek to obtain its own expert to challenge the opinions of the defense expert. The very purpose of the notice requirements of Rule 16(b)(1)(C) is to ensure that the opposing party is afforded such an opportunity, in the interest of protecting the integrity of the adversarial process.. *See, e.g., United States v. Hoffecker*, 530 F.3d 137, 187 (3d Cir. 2008) (affirming district court's preclusion of defense expert where insufficient Rule 16(b)(1)(C) notice was provided three days before jury selection, holding that "admission of this testimony would have been an affront to the public interests in the 'integrity of the adversary process,' 'the fair and efficient administration of justice,' and 'the truth-determining function of the trial process'") (quoting *Taylor v. United States*, 484 U.S. 400, 414-15 (1988)). Under the circumstances, in the event that Mr. Bellevin's testimony is not precluded, the Government may be forced to request a continuance after he testifies in order to permit an effective response, which is exactly what the notice requirements of Rule 16(b)(1)(C) were designed to prevent. *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2011 WL 723530, at *3 (S.D.N.Y. Feb. 25, 2011) ("[T]he purpose of reciprocal expert disclosures is to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.") (internal quotation marks and citation omitted); *accord United States v. Valle*, 2013 WL 440687, at *5.

There is no possible valid excuse for the defense to have waited until such a late stage of the proceeding to notice an expert. The defense has been fully cognizant of the nature of the charges against him since the defendant's arrest in October 2013, and has had access to images of his seized laptop for almost a year. The incriminatory significance of the files recovered from the defendant's computer has long been known to the defense; and many of these files were included as proposed Government exhibits that were produced to the defendant nearly five weeks before trial. The defendant has had more than ample time to develop a potential expert witness to challenge the reliability of this evidence in some fashion. Indeed, the defense *opened* with the proposition that the files on the defendant's laptop could have somehow been planted. The defense cannot now claim to have suddenly realized that it might have to support this proposition with actual evidence, such as in the form of expert opinion testimony. For this reason alone, Mr. Bellevin's testimony should be precluded.[1] *See, e.g., United States v. Causey*,

---

[1]    Defense counsel has suggested that his need to call expert witnesses has arisen from the fact that he has not been able to elicit evidence required to support the defense theory through the cross-examination of the Government's fact witnesses. *See Tr.* 1836:14-19. But the defense had no basis to assume it would be able to elicit the testimony it wanted from Government

748 F.3d 310, 318-19 (7th Cir. 2014) (finding that district court properly excluded expert testimony, where the defendant did not comply with Rule 16 notice requirements); *United States v. Blair*, 493 Fed. Appx. 38, 53 (11th Cir. 2012) (finding that the district court properly excluded expert testimony where notice was provided by the defendant on the eighth day of trial, without "sufficient justification for his untimeliness"); *United States v. Petrie*, 302 F.3d 1280, 1288 (11th Cir. 2002) (finding that district court properly excluded expert testimony "[a]s a sanction for untimely disclosure" because defendant "waited until Friday afternoon prior to the commencement of trial on Monday . . . to disclose his expert to the government."); *Hoffecker*, 530 F.3d at 187 (finding that district court properly excluded expert testimony when notice was provided by the defendant three days before jury selection); *Mahaffy*, 2007 WL 1213738, at *3 (precluding defense expert witness for which insufficient notice was provided on the day that trial commence, tardiness of notice was "particularly egregious because he has been in possession of the Superseding Indictment for over a year, ample time to determine the topics upon which his expert would testify").

### Conclusion

For the foregoing reasons, the Government respectfully requests that the proffered testimony of Mr. Bellevin be precluded in its entirety.

Respectfully,

PREET BHARARA
United States Attorney

By: _____
TIMOTHY T. HOWARD
SERRIN TURNER
Assistant United States Attorneys
Southern District of New York

cc:     Joshua Dratel, Esq.

---

witnesses – particularly not *opinion* testimony from Government *fact* witnesses, and particularly not testimony outside the scope of their direct examination. In any event, defense counsel has in fact had the opportunity to ask questions of Government fact witnesses regarding many of the topics listed in the defective notice of Mr. Bellovin's testimony. *See, e.g.,* Tr. 628:2-22 (PGP encryption); 632:7-633:5 (PGP encryption); 1070:19-1072:11 (potential computer vulnerabilities); 1095:5-1097:9 (operation of time stamps in UNIX-based operating systems); 1243:14-1250:13 (forensic memory analysis and potential computer vulnerabilities).

6

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK  10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL                                                        STEVEN WRIGHT
—                                                                        *Office Manager*
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

January 30, 2015

**BY ELECTRONIC MAIL**

Serrin Turner
Timothy T. Howard
Assistant United States Attorneys
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

        Re:   *United States v. Ross Ulbricht*
                   14 Cr. 68 (KBF)

Dear Mr. Turner & Mr. Howard:

      This letter is submitted on behalf of Ross Ulbricht, providing formal notice, pursuant to Rule 16(b)(1)(C), Fed. R. Crim. P., that the defense plans to call Steven M. Bellovin to provide expert testimony on the following subjects:

      1.     General principles of internet security and vulnerabilities;

      2.     The operation of timestamps in UNIX-based operating systems;

      3.     The import of some lines of PHP code provided to defense counsel in discovery;

      4.     Forensic memory analysis; and

      5.     General principles of public-key cryptography.

      6.     General issues related to linux-based operating systems, including security, implications of various linux kernel versions, differing methods of software installation, etc.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Dr. Bellovin's Curriculum Vitae is attached hereto.

Very truly yours,

Joshua L. Dratel

JLD/

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
                                                              :
UNITED STATES OF AMERICA                                      :
                                                              :
               -v-                                            :
                                                              :
ROSS WILLIAM ULBRICHT,                                        :
                                                              :
                              Defendant.                      :
--------------------------------------------------------------- X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: February 1, 2015 |

14-cr-68 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

Lawyers and clients make tactical decisions.  The Court cannot always understand why certain decisions are made, nor need it.  But when tactical decisions run contrary to established rules and case law, the Court's duty is clear.  The Court is duty-bound to apply the law as it exists, not as any party wishes it to be.

There have been numerous instances during the course of this trial—and, indeed, at least one similar issue arose pretrial—in which the defense has made tactical decisions that have carried consequences.  Before the trial even began, the defense made a lengthy motion to preclude evidence on the basis of a Fourth Amendment violation—but refused to provide an affidavit or declaration asserting some level of personal interest in the item(s) searched, even when the Court provided a twelfth-hour additional opportunity to do so, making clear the deficiency and inviting a fix.  The law was crystal clear—and this Court would have committed error to ignore it—that such an affidavit or declaration attesting to a personal privacy interest was required in light of defendant's positions at that time.  The

defense's decision not to submit one is particularly interesting in light of their opening statement in which they conceded that defendant Ulbricht was the creator of Silk Road.

During trial, the defense has made additional tactical decisions that have carried consequences—including choices underlying the two pending motions by the Government to preclude expert witnesses defendant now seeks to call. As background to this motion, it is obvious but worth mentioning that the evidence on which the Government has based its case-in-chief was long ago disclosed to the defense. Indeed, the appropriate disclosures occurred months and months ago. Trial was delayed at the defense's request, and all signs pointed to extensive preparations by the defense to counter the disclosed evidence. That most of the evidence in this case is based on information gleaned from servers and hard drives of the Silk Road website and Ulbricht's own personal computer has been known since the outset; that Silk Road transactions occurred in Bitcoins was known at the outset; that the Silk Road servers contained records of Bitcoin wallets was disclosed in discovery; that defendant Ulbricht's laptop contained its own Bitcoin wallets was disclosed in discovery; that timestamps were included on information on Ulbricht's laptop was disclosed in discovery; that certain PGP keys were used was disclosed in discovery; that a BitTorrent program was downloading a media file at the time of defendant's arrest was disclosed in discovery; and so on.

When asked about the expected duration of any defense case last fall, counsel for Ulbricht indicated that he expected his evidence to consume a week or two of

trial time; it was reasonable to assume that he was preparing whatever case he deemed appropriate to insure that his theory of defense was presented.  Of course, he does not bear the burden of proof in this criminal trial—the Government does.  But if he has a particular defense theory that requires evidence to support it, he must insure that he has prepared a case to get such evidence in.

Fast forward to the trial itself.  As of the start of trial, the defense had failed to disclose its intention to call any expert witness.  Proper expert disclosures are not a mere technicality with which compliance may be made or not—they are required by Rule 16 of the Federal Rules of Criminal Procedure.  Defense counsel, particularly the learned lead counsel that Ulbricht has retained in this case, Mr. Joshua L. Dratel, Esq., know the rules.  These rules are accompanied by an extensive body of case law—from the Supreme Court on down—requiring district courts to comply with the rules, and setting forth clear requirements as to the proper disclosure of expert witnesses and the trial court's role in evaluating whether expert testimony should be allowed or precluded.  These cases span decades and are consistent in their holdings.  They do not only apply to one side and not the other.  There has not been a change of law, and there is no confusion in the law as to the relevant requirements.

Trial started, and trial proceeded.  Mr. Dratel included in his opening statement an acknowledgment that defendant created Silk Road; he conceded that defendant ran it for several months; he previewed that there was some sort of "handoff" to others after those few months; and he stated that defendant was then

3

somehow lured back into Silk Road by unnamed operators—that, in effect, he was framed.  He further stated that defendant was a Bitcoin investor and trader.  He made a vague reference to what was happening to Bitcoin and the "Bitcoin market" as having some relevance to how events unfolded.  All of this was tantalizing.  In defense counsel's initial cross-examination he introduced a screenshot from defendant's laptop showing that defendant had been using BitTorrent to download a media file at the time of the arrest.  It seemed that the defense would present evidence that supported this story.

As the trial proceeded, there were various interruptions—necessary sidebars, time spent before a trial day began, during a break, or after the Court had released the jury for the day—during which the defense's increasingly plain strategy of trying to put on a case through the Government's witnesses was discussed.  On numerous occasions, defense counsel would seek to question a Government witness in a manner clearly beyond the scope of that witness's direct testimony.  After displaying some patience, the Government began to object.  It had a right to do so.  This Court sustained a number of objections as to scope.  The Court also reminded defense counsel that if he "complied with the appropriate disclosure requirements," he could call an expert and, of course, he could call his own percipient witnesses.  (Tr. at 1064:9-11.)  But the tactical choice of the defense was clear: they wanted to use the Government's witnesses as their own.  Defense counsel argued that other courts had, in other trials, allowed him to extend the scope in the manner he was attempting here to do.  Perhaps.  Perhaps not.  What other courts may have done in

4

other trials is of no concern to this Court during this trial.  But let it be said that no

ruling of this Court in this trial has applied the law in any way that is other than

routine and according to longstanding legal principles.

And now to the issue presently before the Court.  On January 26, 2015—that

is, well into the trial itself—the defense disclosed to the Government its intention to

call an expert witness, Andreas M. Antonopoulos.  (<u>See</u> ECF No. 165 ex. A.)  The

notice letter recited Rule 16.  The content of the letter listed eight subjects as to

which Antonopoulos would testify.  Then, on the night of Friday, January 30, 2015,

long after defense counsel knew that his cross-examination would be limited to that

which the rules allowed, he disclosed another potential expert, Steven M. Bellovin.

(ECF No. 170 ex. A.)  The letter disclosing Bellovin was similarly bare bones.  At the

time that the defense made its Bellovin disclosure, the defense had already received

the Government's January 29, 2015 motion to preclude Antonopolous on the basis

of, <u>inter alia</u>, inadequate disclosure (including the failure to disclose a single opinion

or basis therefore).  (ECF No. 165.)  Thus, the defense made a tactical choice to

double-down on the nature of its disclosures.

Both disclosure letters attach curricula vitae.  Lacking are any expected

opinions, lacking are the bases for such opinions.  Lacking is any description of

analysis or methodology.  Lacking also is any indication that Antonopolous has any

expertise in the areas in which he seeks to testify.  His resume lists that he has

worked as a consultant in crypto-currencies and published unnamed "articles" in

that area (not a single publication of the alleged group of "200" is listed, let alone

information sufficient to assess the seriousness or depth of such articles).  Of course, not all consultants are experts.  In contrast, Bellovin's curriculum vitae suggests that he has considerable expertise in cybersecurity.

The defense's decision to put in such belated and substantially inadequate notices of expert witnesses was a tactical choice.  It is clear that the possibility that defendant might want to call one or more expert witnesses was long known.  Indeed, as stated, defense counsel opened on a theory that somehow Ulbricht was framed in a manner involving undefined technical processes, and he opened on statements about Bitcoins and fluctuations in their value.  Defense counsel had an early focus in cross-examination on BitTorrent running on defendant's computer.  Providing deficient notices—failing, as they both do, to provide the basic information that Rule 16 on its face requires—was yet another tactical choice.

There is a deep and consistent body of case law that leaves no doubt such disclosures are inadequate.  That body of case law cites the repeated preclusion by trial judges of experts when disclosures have failed to meet the minimum requirements.  None of this is novel.

The Government has moved to preclude the testimony of both experts.  (ECF Nos. 165, 170.)  The defense has submitted two letters in opposition to the motions.  (ECF Nos. 171, 172.)  The defense's letter as to Antonopoulos—submitted at 9:07 p.m. on January 31, 2015—describes a further summary of Antonopoulos' testimony without in fact disclosing those opinions he intends to offer.  The letter indicates that "[i]ndependent defense investigation has uncovered that this number [of

Bitcoins transferred to a wallet on Ulbricht's laptop] is implausible . . . ."  (ECF No.
171 at 3.)  But <u>what</u> about the transfer is implausible is unknown, and what
analysis Antonopoulos performed and the methodology are unknown.  In other
instances, the letter refers to why Antonopoulos should be allowed to testify (that he
would rebut testimony) without indicating how he would testify.  The Government's
motion made it clear that the defense needed to do more; the law requires that the
defense do more; and it has not.  A defense preference for trial by ambush is legally
unsupportable.

As to Bellovin, the defense letter of February 1, 2015 is remarkable for what
it does not say.  While suggesting that this Court should provide yet further
opportunity for the defense to provide opinions and bases therefore <u>in futuro</u>, the
topics and descriptions of the potential testimony in the letter do not tread new
ground.  The defense opened on the theory of BitTorrent having some role in
incriminating evidence finding its way onto Ulbricht's laptop.  Bellovin would,
apparently, testify as to "the security implications of this practice."  (ECF No. 172 at
2.)  But what he would say remains unknown.  What his analysis is based on apart
from <u>ipse dixit</u> is unknown.  And of course, the defense could and should long ago
have planned and properly disclosed this very testimony.  Similarly, the role of
timestamps on UNIX-based operating systems was long ago known; the PHP code
to which Bellovin would testify was introduced <u>by defendant</u>.  Clearly, Bellovin—
long before now—could have disclosed opinions and methodology about that code.
All of the other topics described in the defense letter of February 1, 2015 were

similarly known—but in any event, even if truly offered for rebuttal, there are no disclosed opinions or disclosed methodology.

The Court has considered, however, whether even in light of the plain deficiencies there is some way of allowing certain testimony.  But there are competing considerations:

1. There are still few or no "opinions" and certainly no bases—and the defense knows the Government rests <u>tomorrow</u>.  These witnesses are therefore currently "on deck."  It would be grossly unfair to disclose opinions now which should have been disclosed long ago, and require the Government to be immediately prepared to respond.

2. There are known issues with a continuance.  As counsel are aware—and as has been discussed several times—two of the jurors in the panel of twelve have timing issues.  A continuance would potentially result in the dismissal of one or even both jurors.  The Court cannot eliminate the defense's tactical decision in this regard.

Why did the defense choose to proceed as it has?  This Court cannot know. Perhaps a tactical choice not to show the defense's hand; perhaps to try and accumulate appeal points; perhaps something else.  In any event, the outcome of these choices is that the Court hereby GRANTS the Government's motions to preclude the testimony of both experts.  (ECF Nos. 165, 170.)

I.    FURTHER DISCUSSION OF LEGAL PRINCIPLES

The admissibility of expert testimony is governed by a number of longstanding evidentiary rules, including Federal Rules of Evidence 104 (the Court

must decide preliminary questions as to qualification of a witness and competency

of evidence), 403 (the Court may exclude otherwise admissible evidence if its

probative value is substantially outweighed by the danger of confusing the issues,

misleading the jury, undue delay, wasting time, or needlessly presenting

cumulative evidence), 702 (expert testimony may be allowed if specialized

knowledge will assist the jury in understanding the evidence or determining a fact

in issue, the testimony is based on sufficient facts or data, the testimony is based on

reliable principles and methods, and the expert has reliably applied those principles

and methods), and 703 (an expert may base an opinion on facts or data that he has

been made are of or personally observed; he may base an opinion on inadmissible

facts or data such as hearsay to the extent such facts or data are reasonably relied

on by experts in the field; but if the facts or data would be inadmissible, then a Rule

403 analysis must be made).  Fed. R. Evid. 104, 403, 702-03.

In addition to these rules, the Federal Rules of Criminal Procedure contain

certain disclosure requirements for expert witnesses.  If a defendant is going to call

an expert witness, and the Government requests disclosures (which certainly

occurred here), then Rule 16 requires that the defendant <u>must</u> provide a "written

summary of any testimony that the defendant intends to use," which "must describe

the witness's opinions, the bases and reasons for those opinions, and the witness's

qualifications."  Fed. R. Crim. P. 16(b)(1)(C).

The Advisory Committee notes to Rule 16 explain that the disclosure

requirement "is intended to minimize surprise that often results from unexpected

expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination."  Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment.

Courts' application of these rules in specific cases has led to the development of a substantial and consistent body of law governing the admissibility of expert testimony.  In a criminal case, the first question is whether the appropriate Rule 16 disclosures have been made.  A failure to provide timely disclosure can result in preclusion.  See, e.g., United States v. Blair, 493 Fed. App'x 38, 53 (11th Cir. 2012) (disclosure on eighth day of trial was untimely and justified preclusion of expert's testimony); United States v. Holmes, 670 F.3d 586, 597-99 (4th Cir. 2012) (disclosure on Friday before Monday start date of trial was untimely and justified preclusion of expert's testimony); United States v. Hoffecker, 530 F.3d 137, 184-87 (3d Cir. 2008) (disclosure three business days before jury selection was untimely and justified preclusion of expert's testimony); United States v. Perry, 524 F.3d 1361, 1371-72 (D.C. Cir. 2008) (disclosure 48 hours before Daubert hearing was untimely and justified preclusion of expert's testimony); United States v. Petrie, 302 F.3d 1280, 1288 (11th Cir. 2002) (disclosure on Friday before Monday start date of trial was untimely and justified preclusion of expert's testimony); United States v. Mahaffy, No. 05 Cr. 613 (ILG), 2007 WL 1213738, at *3 (E.D.N.Y. Apr. 24, 2007) (disclosure the day before trial was untimely and justified precluding expert's testimony); United States v. Wilson, 493 F. Supp. 2d 484, 485-88 (E.D.N.Y. 2006)

(disclosure less than one week before trial was untimely and justified precluding expert's testimony).

Similarly, a failure to provide the required level of detail as to the expert's opinions and the bases, reasons, and sources of those opinions can also lead to preclusion.  For instance, preclusion is justified when the expert disclosures merely list general topics about which the expert will testify.  E.g., United States v. Concessi, 38 Fed. App'x 866, 868 (4th Cir. 2002); United States v. Valle, No. 12 Cr. 847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013); United States v. Ferguson, No. 3:06CR137 (CFD), 2007 WL 4539646, at *1 (D. Conn. Dec. 14, 2007); United States v. Mahaffy, No. 05 Cr. 613 (ILG), 2007 WL 1213738, at *3 (E.D.N.Y. Apr. 24, 2007).  Courts have also precluded expert testimony when the Rule 16 disclosures fail to specify the expert's bases, reasons, and sources for their opinions. E.g., Concessi, 38 Fed. App'x at 868; Wilson, 493 F. Supp. 2d at 487; see also United States v. Sturman, No. 96 CR 318, 1998 WL 126066 (S.D.N.Y. Mar. 20, 1998) (a "general description of possible bases" does not meet the requirements of Rule 16(b)(1)(C)).

This is both sensible and fair.  It is sensible because without the appropriate detail, a Court cannot possibly assess admissibility, an opposing party cannot prepare a response or for proper cross-examination, and a trial devolves into jungle warfare by ambush.  The various rules and the case law interpreting them are designed to avoid that outcome.

Here, the defense made a choice to delay its Rule 16 disclosures until the trial had commenced and then to delay the second by another week.  The prejudice of this delay was compounded by the total lack of adherence to the basic prescriptions of the level of content required Rule 16.  Rule 16 requires that an expert's opinions and the bases for those opinions be set forth in the disclosures.  Again, the rules do not allow trial by ambush.

The lack of any opinions in defense counsel's initial disclosures is a flagrant failure to comply with Rule 16.  Defense counsel's letters in opposition to the Government's motion to preclude do not cure this defect.  Even though the defense has now set forth at least one opinion (as opposed to a general subject) as to which Antonopoulos will testify, it has not set forth the bases, reasons, and sources with anything close to the requisite specificity—merely asserting that Antonopoulos will provide this opinion based on some unspecified method of analyzing market forces and liquidity, based on data from unspecified sources, does not suffice.  As for Bellovin, as the Court discussed above, while the defense's response contains additional high-level description of the testimony, and the Court might be able to guess as to various opinions, it contains no real opinions, no bases for opinions, no analysis, no methodology.

Defense counsel clearly understood what it intended to do with regard to Antonopolous at the outset of the case—certain theories related to his proffered testimony were included in defense counsel's <u>opening</u>.  This exposes the lack of timeliness and lack of adequate content of the disclosure as tactical, not

substantive.  This is true even with regard to the testimony regarding the evidence supporting an inference that Bitcoins on the Silk Road servers were transferred to Ulbricht's laptop.  The defense opened on a theory that the Bitcoins in Ulbricht's possession were from some sort of Bitcoin speculation (and, thus, not connected to Silk Road).  It was reasonable to expect that defendant had performed the very comparison the Government then scrambled to perform.  That the Government presented the facts of such a comparison is nothing more than meeting a defense argument.  It would have been surprising had the Government not done this.  Thus, the facts as to what Bitcoins—a highly traceable digital currency—were on the Silk Road servers, and whether there was a factual basis to infer transfer to Ulbricht's laptop, was a door the defense opened at the outset.

With respect to Bellovin, the tactical choice was, in fact, similar.  Defense counsel argues that somehow the Court's ruling that he confine his cross-examination to the scope of the direct surprised him.  How can that be so?  According to counsel, only then, when he was required to follow rules that all lawyers must follow, did he suddenly realize he would need an expert on computers.  Simply put, this defies credulity and is an argument without a scintilla of merit.  If defense counsel truly planned his trial strategy around his ability to bend the rules and examine witnesses outside of the scope of their direct, then he should have had a "Plan B" that included complying with the rules.  Defense counsel took a calculated risk.  It has been clear from the outset that this case involves various technologies.  If defense counsel had a theory of the case upon which he intended to

rely, and which required the testimony of a witness with technical expertise to explicate, it behooved him to comply with the rules and make the appropriate disclosures. Having failed to do so—for what appear to be tactical reasons—he cannot position his deficiencies as the result of unexpected necessity and ask the Court to disregard rules that apply in every case to all counsel. Had necessity been the true mother of this issue, defense counsel would have been forthcoming with the anticipated opinions and methodology.

But there is more than just a failure to comply with Rule 16 at issue here. The Supreme Court also requires that if expert testimony is proffered, a trial court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993). This requires that a trial court make a "preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and . . . can be applied to the facts in issue." Id. at 592-93. When an expert witness fails to identify the objective bases for his opinion, the district court cannot perform a proper assessment; a proffered opinion deficient in this manner fails to meet the basic requirements of the Federal Rules of Evidence. United States v. Rea, 958 F.2d 1206, 1216 (2d Cir. 1992).

Assuming that there is enough detail to assess the opinion in the first instance, the reliability of a proposed expert's testimony is determined based on whether a technique on which it is based is generally accepted in the relevant

community, whether it can be tested, and whether it has been peer reviewed. Daubert, 509 U.S. at 593–94.

This Court cannot make the necessary preliminary inquiry required by longstanding Supreme Court precedent based on the disclosures it has received.  It is unable to determine what Antonopoulos' and Bellovin's opinions are and it has received no analytical or learned basis for any opinion.  The Court cannot assess whether Antonopolous's views are relevant, within the ambit of what others in the field would accept as reasonable; nor could it do so for Bellovin.

The reliability of testimony is also assessed in light of a witness's qualifications.  A trial court must therefore also ask—as a threshold matter— whether the witness is in fact an expert at all in the area in which he intends to testify.  Fed. R. Evid 104(a).  Whether a proposed expert is qualified is a fact-based inquiry and depends on the nature and depth of their "knowledge, education, experience, or skill with the subject matter of the proffered testimony."  See United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004).  Courts have construed the inquiry into an expert's qualifications with an eye toward the "liberal thrust" of the Federal Rules and their general relaxation of traditional barriers to opinion testimony.  See Daubert, 509 U.S. at 588–89; In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has the equivalent relevant practical experience.").  That does not mean, however,

that an inquiry into adequate qualifications is unnecessary or that an expert with inadequate credentials would be allowed to testify.

It should go without saying that in order to assess whether an expert is qualified, a court must have sufficient information both as to the opinions he intends to offer, and then as to his particular knowledge and experience in the relevant areas.  Insufficient information as to either prevents this inquiry.  The Court lacks sufficient information with respect to Antonopolous, and to a lesser extent, given his qualifications, for Bellovin.

Moreover, the requirement that expert testimony be relevant to a material fact in issue finds its origins in both Rules 401 and 702 of the Federal Rules of Evidence.  Preclusion is appropriate when opinions seek to prove something other than a material fact in issue.  See United States v. Stewart, 433 F.3d 273, 311-12 (2d Cir. 2006).

Expert testimony is limited to those occasions "where the subject matter of the testimony is beyond the ken of the average juror."  United States v. Castillo, 924 F.2d 1227, 1232 (2d Cir. 1991).  Expert testimony that seeks to address lay matters, which a jury is capable of understanding without expert help, is not relevant and therefore not admissible.  United States v. Jiau, 734 F.3d 147, 154 (2d Cir. 2013). Indeed, a district court errs when it allows an expert to testify as to matters which require no specialized knowledge.  United States v. Mejia, 545 F.3d 179, 196 (2d Cir. 2008).  Even relevant expert testimony must be precluded if it usurps the

province of the jury to make factual determinations.  See United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991).

Antonopoulos' opinion regarding whether Ulbricht could have transferred from Silk Road as many Bitcoins as the Government contends he did would be relevant—but as explained above, the Court will not permit Antonopoulos to testify in light of defense counsel's deficient Rule 16 disclosures as to him, and because the Court cannot properly assess his qualifications.  As to any other opinions that would be offered by Antonopoulos, the Court cannot make the required relevance analysis because it has no idea as to what those opinions are.  It is not for this Court to engage in speculation—and then, if necessary, to speculate again as to whether Antonopoulos is qualified to offer these opinions.  As to Bellovin, the relevance of the summary descriptions as to the topics of his testimony is not in doubt.  But undoubted relevance does not trump the need to provide opinions and, particularly here, analytical or methodological bases.  Indeed, the very relevance of the high-level descriptions itself supports the importance of requiring compliance with disclosure of methodology—otherwise, the Government would be at a plain and unfair disadvantage in countering such testimony.  The rules are designed to prevent this.

Finally, without knowing the opinions and bases therefore, the Court also cannot perform the analysis that it must under Rule 403 which provides for the exclusion of otherwise relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing

the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

II.    CONCLUSION

For the reasons set forth above, the Government's motions to preclude are GRANTED.  The Clerk of Court is directed to close the motions at ECF Nos. 165 and 170.

SO ORDERED.

Dated:        New York, New York
              February 1, 2015

_____
KATHERINE B. FORREST
United States District Judge

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**
A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK  10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL                                                                    STEVEN WRIGHT
—                                                                                        *Office Manager*
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

January 31 2015

**BY ECF**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:    *United States v. Ross Ulbricht*,
                    14 Cr. 68 (KBF)

Dear Judge Forrest:

          This letter is submitted in response to the government's January 29, 2015, letter seeking preclusion of the expert testimony of proposed defense witness Andreas M. Antonopoulos. For the reasons set forth below, the government's application should be denied in its entirety.

          Pursuant to the standards of *Daubert v. Merrell Dow* Pharmaceuticals, Inc., 509 U.S. 579 (1993), as incorporated within Rule 702, Fed.R.Evid., admissibility of expert testimony requires that the testimony proffered be sufficiently reliable and that the topic of the testimony be one that is "beyond the ken of the average juror." *United States v. Tapia-Ortiz*, 23 F.3d 738, 741 (2d Cir. 1994).  The range of topics which are more than a "lay matter[] which [the trier of fact] is capable of understanding and deciding without the expert's help," is broad, varied, and sometimes counterintuitive. *See e.g. Tapia-Ortiz*, 23 F.3d 738, 741 (2d Cir. 1994) (permitting expert testimony on the "weight, purity, dosages, and prices of cocaine"); *see also United States v. Noda*, 137 F. App'x 856, 863-64 (6th Cir. 2005) (permitting expert to opine about age of child in pornography).

          Indeed, both the relevant case law and the government's arguments only support Mr. Ulbricht's right to call Mr. Antonopoulos as an expert witness to respond to testimony by government witnesses as to Bitcoin, including analysis by government witness former Special

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
January 31, 2015
Page 2 of 5

Agent Illwan Yum of the FBI cyber squad as to the Bitcoins transferred from the Silk Road website to Mr. Ulbricht.

**I.**   ***The Origins of Bitcoin and the Various Purposes and Uses of Bitcoin Are Relevant to This Case and Necessary to Bring the Concept of Bitcoin Within the Ken of the Average Juror***

The government argues, at 3 of its letter, that Mr. Antonopoulos should not be permitted to testify as to the origins and uses of Bitcoin because "[t]he 'origins' and 'various purposes and uses' of Bitcoin are no more relevant here than the 'origins' or 'various purposes and uses' of cash would be relevant in a traditional drug dealing or money laundering case." In fact, the opposite is true. Most lay people, and thus most of our jurors, have had bank accounts and are comfortable and familiar with cash transactions. But, Bitcoin is a concept outside the ken of the average juror and most, if not all, of our jurors have never conducted a single Bitcoin transaction. The defense should therefore be permitted to call an expert witness to familiarize the jury with Bitcoin, and to demystify the concept of Bitcoins. To prevent the defense from doing so could cause the jury to convict Mr Ulbricht simply based on their fear of the unknown. At the very least, expert testimony should be permitted to explain a complex and unfamiliar topic that is directly relevant to the charges in this case.

**II.**   ***The Exchange Value of Bitcoin Is a Proper Subject of Expert Testimony and Its Fluctuation Over Time Is Directly***

The government claims, at 4 of its letter, that "'the value of Bitcoin over time since its inception, and the cause of various increases and decreases in the value of Bitcoin at certain points in time,' as well as 'the dollar value of Bitcoins generated through transactions on Silk Road, at various points in time, including at the time or Mr. Ulbricht's arrest'" are "not proper subjects of expert testimony in this matter**."**

In fact, the exchange value of bitcoin and causes of fluctuation in that value are proper subjects of expert testimony in that they are directly relevant to this case. Through the testimony of former Special Agent Ilhwan Yum, the government sought to show that a total of over 700,000 bitcoins were transferred from the Silk Road bitcoin wallets to a wallets contained on Mr. Ulbricht's laptop. *See* GX 620. However, the Government seized only 144,000 bitcoins from the wallet contained on Mr. Ulbricht's laptop. *See* Trial Transcript, at 1673.

The testimony of Mr. Antonopoulos will establish that market forces inherent in the Bitcoin market during the relevant time period would have precluded a cash out from the market totaling the difference between the amount the government claims was transferred to Mr. Ulbricht's wallet and the amount actually recovered. Mr. Antonopoulos can testify about the

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
January 31, 2015
Page 3 of 5

liquidity of the bitcoin market and how a withdrawal from the market a fraction of the size of the 540,000 bitcoin discrepancy would have caused drastic fluctuations in the market price of Bitcoin during the relevant time period. This testimony is materially relevant to the defense because the government has asserted that over 700k in bitcoins were transferred to a wallet located on Mr. Ulbricht's laptop, which is suggestive to the jury that Mr. Ulbricht was able to secrete an enormous amount of Bitcoin prior to being arrested. However, this number is contested by the defense and will be attacked through the testimony of Mr. Antonopoulos.

Moreover, expert testimony as to the value of Bitcoin is a proper subject of expert testimony. Indeed, in *United States v. Romano*, 859 F. Supp. 2d 445, 460 (E.D.N.Y. 2012), in addition to permitting the government to submit a valuation chart summarizing coin values (as the defense did here), the government presented expert testimony as to value of coins based on published price guides and newsletters in a money laundering prosecution. Accordingly, the same kind of testimony should be permitted in Mr. Ulbricht's case.

### III.    *Mr. Antonopoulos Should Be Permitted to Provide Expert Testimony As to the Mechanics of Bitcoin Transactions, the Ability to Track Bitcoin Transactions, and as to the Bitcoins Transferred from Silk Road to Mr. Ulbricht's Laptop*

The government claims, at 5–6 of its letter, that Mr. Ulbricht should be precluded from calling Mr. Antonopoulos to testify as to the ability to track Bitcoin transactions, the "mechanics" of Bitcoin transactions, and seemingly also as to whether the Bitcoins from Silk Road can be tied to Mr. Ulbricht. However, the government has put on purported lay witness testimony through former Special Agent Illwan Yum of the FBI's cyber squad, that the transactions on the Blockchain can be tracked from Silk Road to Mr. Ulbricht. Former SA Yum worked alongside Matthew Edmond, a PhD in cryptology, for more than 100 hours, at a cost of $55,000 to the government, to complete his analysis of the Blockchain and provide his opinion as to the ability to track Bitcoins in this case. His testimony also required the use of complex charts and graphs. Accordingly, the integrity of the bitcoin analysis conducted by former SA Yum is clearly relevant in that it is a material fact at issue in this case. Mr. Ulbricht must be permitted to call an expert witness during the defense case to challenge the Government's assertion, admitted as evidence in GX 620, that over 700,000 bitcoins were transferred to a bitcoin wallet contained on his laptop. Independent defense investigation has uncovered that this number is implausible and the defense, through Mr. Antonopoulos, seeks to dispute this finding.

Indeed, it is well-settled that an expert witness can be called to "assess or critique another expert's substantive testimony." *See Nature's Plus Nordic A/S v. Natural Organics Inc.*, 92 F. Supp.2d 237, 239 (E.D.N.Y. 2013). *See also Stroheim & Romann, Inc. v. Allianz Ins. Co.*, No. 01 CIV. 8236 (LTS), 2003 WL 21980389, at *4 (S.D.N.Y. Aug. 14, 2003) (". . . properly supported expert testimony critiquing another expert's opinion is admissible"), *see also In re*

LAW OFFICES OF                                          Hon. Katherine B. Forrest
**JOSHUA L. DRATEL, P.C.**                  United States District Judge
                                                                 Southern District of New York
                                                                 January 31, 2015
                                                                 Page 4 of 5

*Blech Sec. Litig.*, No. 94 CIV. 7696 (RWS), 2003 WL 1610775, at *20 (S.D.N.Y. Mar. 26, 2003)
(courts often permit expert testimony "for the sole purpose of critiquing and thereby helping to
explain the work of an expert witness retained by another party").   In fact, the failure of a
defense attorney in a criminal trial to put on such rebuttal expert testimony has been deemed to
be constitutionally deficient.  *See Gerston v. Senkowski*, 299 F.Supp.2d 84, 103-105 (E.D.N.Y.
2004) (holding trial counsel's failure to consult with or call an expert to rebut the government's
expert witness on the same issue "is an independent and sufficient indication of deficiency").

        In this case, even though Mr. Yum testified as a lay witness, the nature of his testimony
was akin to that of an expert witness in that it was complex and dealt with Blockchain
transactions that are outside the ken or familiarity of the average juror.  He also drew
conclusions, based on his assessment of those Blockchain transactions, that go to the ultimate
issues in this case.  In such circumstances, it is clear, as stated above, that the defense is entitled
to call a rebuttal expert witness to address that testimony head on.

        Moreover, the "mechanics" of Bitcoin transactions are a necessary element of any
Bitcoin tracking analysis, and the defense should be permitted to put on expert testimony
regarding such "mechanics" because they are not within the knowledge of the average juror.
The government admits as much when it states, at 5, that "[t]he 'mechanics' of Bitcoin
transactions to which the Defense Letter refers – 'wallets,' 'accounts,' 'exchanges,' and the
"'[B]lockchain' – are concepts familiar to any layperson *who has ever used Bitcoins*."  As the
Court is well-aware, the vast majority of laypeople, including all of the jurors on this case, have
never used Bitcoin.  Thus, expert testimony is completely appropriate, and necessary, as to this
issue.

        Thus, Mr. Antonopoulos should not be precluded from providing relevant and material
testimony as to the mechanics of Bitcoin transactions, the ability to track transactions and
participants in Bitcoin transactions, and most critically, as to the Bitcoins transferred between
Mr. Ulbricht's laptop and the Silk Road Market server wallets.

**IV.**     *Mr. Antonopoulos Should Be Permitted to Provide Expert*
            *Testimony On the Subjects of Bitcoin Speculating and Mining*

        The government claims, at 6, that the "'concepts of Bitcoin speculating and Bitcoin
mining are not relevant to the case" and therefore that such testimony should not be permitted.
In support of this position they cite  *United States v. Zafar*, No. 06-CR-289JG, 2008 WL 123954
(E.D.N.Y. Jan. 11, 2008).  The *Zafar* case is clearly distinguishable from the circumstances of
Mr. Ulbricht's case.

        In *Zafar*, the Court concluded that because there was no independent evidence that the

LAW OFFICES OF                    Hon. Katherine B. Forrest
**JOSHUA L. DRATEL, P.C.**        United States District Judge
                                  Southern District of New York
                                  January 31, 2015
                                  Page 5 of 5

defendant used stock selection software at the time of the crimes charged, expert testimony
regarding how the software worked, which could imply to the jury that the defendant chose
stocks on the basis of recommendations made by the software, was inappropriate.  *Zafar,* No. 06-
CR-289JG, 2008 WL 123954, at *2 (E.D.N.Y. Jan. 11, 2008).  Given that trial counsel agreed
with the Court that the expert would be unable to testify whether the stock-selection software
would have led users to choose the stocks at issue in the case, that portion of his testimony
related to how the software worked was excluded because it would have been "an impermissible
substitute for evidence that the trading activity at issue . . . was the consequence of the use of this
software."  *Id.* at *2 (E.D.N.Y. Jan. 11, 2008).

Here, the factual link between Bitcoin speculating – a possible source of the Bitcoins on
Mr, Ulbricht's laptop and thus relevant to this case – and Mr. Ulbricht has been independently
established by the testimony of Richard Bates, who testified that Mr. Ulbricht was engaged in
Bitcoin speculating during the relevant time.

Accordingly, Mr. Antonopoulos should be permitted to explain the concepts of Bitcoin
mining and speculating to the jury.

### Conclusion

Accordingly, for all these reasons, it is respectfully submitted that the government's
application to preclude the expert testimony of proposed defense expert Andreas M.
Antonopoulos should be denied in its entirety.

Respectfully submitted,

Joshua L. Dratel

JLD/lal

cc:   Serrin Turner
      Timothy T. Howard
      Assistant United States Attorneys

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK  10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL                                                           STEVEN WRIGHT
— 　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*Office Manager*
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

February 1, 2015

**BY ECF**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:     *United States v. Ross Ulbricht*,
            14 Cr. 68 (KBF)

Dear Judge Forrest:

　　　This letter is submitted in response to the government's January 31, 2015, letter seeking preclusion of the expert testimony of proposed defense witness Dr. Steven Bellovin. For the reasons set forth below, the government's application should be denied in its entirety.

I.     ***The Expert Notice Provided to the Government Regarding
        Dr. Bellovin's Testimony Is Sufficient Pursuant to Rule 16
        (b)(1)(C), Fed. R. Crim. P., and His Testimony Should Not Be
        Excluded for Failure to Comply With Rule 16 (b)(1)(C), Fed.R. Crim.P.***

　　　The government claims in its letter, at 4, that the expert notice provided regarding the testimony of Dr. Bellovin is "plainly insufficient under the Federal Rules of Criminal Procedure, as it merely provides a list of topics the defense seeks for Dr. Bellovin to testify about."  While the defense disagrees with the characterization of the expert notice as to Dr. Bellovin's testimony, Dr. Bellovin's testimony should regardless not be precluded without an opportunity for defense counsel to provide further specifics as the opinions Dr. Bellovin plans to offer and the bases for those opinions.

　　　Indeed, even if a party is found to have made insufficient disclosures regarding the

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
February 1, 2015
Page 2 of 5

proposed testimony of their expert witness pursuant to Rule 16, it is appropriate for that party to be given the opportunity to correct the insufficiency before the extreme remedy of preclusion of the expert testimony is warranted. *See United States v. Mavashev*, No. 08-CR-902(DLI)(MDG), 2010 WL 234773, at *2 (E.D.N.Y. Jan. 14, 2010) (holding that the "failure to disclose must generally be complete before a court will preclude an expert witness from testifying" and that exclusion of expert was not warranted because "it cannot be asserted that the government has 'made no attempt at all' to comply with Fed.R.Crim.P. 16(a)(1)(G)"). *See also United States v. Healey*, 860 F.Supp.2d 262, 268 (S.D.N.Y. 2012) (citing Court's broad discretion to fashion a remedy, including granting discovery or a continuance).

Nor is the bar for sufficiency particularly high. *See United States v. Lesniewski*, No. 11 CR 1091, 2013 WL 3776235, at *12 (S.D.N.Y. July 12, 2013) (Court found that the "plain language" of the Rule was satisfied when the government disclosed the C.V. of its expert witness, as well as disclosing that its expert witness "was expected to offer opinions based on his training and experience and his review of certain records").

Thus, in an abundance of caution, the defense provides the following additional details regarding Dr. Bellovin's proposed expert testimony, including each subject's relationship to cross-examination that was precluded because it was held to be beyond the scope of direct examination (thereby requiring a defense witness):

      **1.**      *General Principles of Internet Security and Vulnerabilities*

On cross-examination, Special Agent Kiernan was asked about the security implications of open ports on a computer connected to the internet. (*See* Tr. at 1071 – 1074). Defense exhibit C-1 provided to the Government is the "settings" file associated with the Bit torrent client that was known to be running on Mr. Ulbricht's computer at the time of his arrest. The file demonstrates that the Bit torrent client was listening on a range of ports and the defense will elicit testimony from Dr. Bellovin as to the security implications of this practice. This is both material and relevant to the defense theory because it calls to question the source of the information recovered from Mr. Ulbricht's laptop.

      **2.**      *The Operation of Timestamps in UNIX-based Operating Systems*

One issue that has repeatedly arisen is the question of when certain files on Mr. Ulbricht's laptop were created and/or modified. (*See e.g.* Tr. at 923 "And what was the date that this file was last changed, according to the metadata?"). Special Agent Kiernan admitted on cross-examination that this type of metadata can be edited. There is a factual issue with regard to a statement made by Special Agent Kiernan on cross-examination, in which he testified that the Ext4 version of the file system records creation time for files on the Ubuntu Linux operating

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
February 1, 2015
Page 3 of 5

system.  The defense seeks to elicit testimony from Dr. Bellovin with respect to this issue, as well as the fact that timestamps can in UNIX-based operating systems can be edited using the program, "Touch."

### 3.  *The Import of Certain Lines of PHP Code Produced In Discovery*

The specific lines of code have been provided to the Government as defense exhibits C5 – C8.  These lines of PHP code in conjunction with the data provided in defense C9 demonstrate how a user logging into the Silk Road Market server could access the Mastermind page on the server.  The defense sought to question Special Agent Kiernan on the PHP code from the server controlling access to the mastermind page but was foreclosed from doing so. (*See* Tr. at 1084).  The defense seeks to elicit testimony from Dr. Bellovin on the question of whether an individual logging in on the Dread Pirate Roberts account would automatically be directed to the Mastermind page.

### 4.  *Forensic Memory Analysis*

During the testimony of Special Agent Beeson, testimony was elicited on cross-examination that Mr. Ulbricht's laptop crashed before a full capture of the system's memory could be captured.  (*See* Tr. at 1246).  The defense seeks to elicit testimony from Dr. Bellovin regarding information that is stored in RAM on a live system.  Such information includes the processes or computer programs that are running on a given system.  Such testimony is relevant because it demonstrates that without a full RAM capture, it cannot be determined with any certainty whether or not Mr. Ulbricht's laptop suffered a security breach or was compromised in any way.

### 5.  *General Issues Related to Linux-based Operating Systems, Including Security, Implications of Various Linux Kernel Versions, and Differing Methods of Software Installation*

Special Agent Kiernan testified on direct examination that the Torchat program automatically assigns the name "myself" in the log files it generates to the person using the computer.  (*See* Tr. at 890).  This testimony was the result of a test that was run by Special Agent Kiernan on a virtual computer that was setup to mimic Mr. Ulbricht's laptop.  On cross-examination, Special Agent Kiernan admitted that he did not know whether the version of the Torchat program he used for his experiment was the same version as the Torchat program on Mr. Ulbricht's laptop.  This could lead to a markedly different result.

Nor was the defense permitted to question SA Kiernan as to whether he ensured that he was using the same Linux Kernel version for his experiment as that of Mr. Ulbricht's laptop.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
February 1, 2015
Page 4 of 5

(*See* Tr. at 1091).  Varying kernel versions in the linux operating system can alter the way a system's software and hardware function.

The defense seeks to elicit testimony from Dr. Bellovin as to the varying methods of software installation in linux operating systems, which can change the way a computer program operates.  This includes varying kernel versions and software versions.  This testimony is material and highly relevant because it challenges the results of SA Kiernan's test regarding the torchat program and its logging function.

### 6.   *General Principles of Public-key Cryptography*

The defense seeks to elicit testimony from Dr. Bellovin with regard to proper storage methods of private PGP keys on a given system, as well as the ease of transferring private and public keys from one computer user to another.  The defense was foreclosed from questioning SA Kiernan about secure storage for private keys on a computer.  (*See* Tr. at 1063).

### II.   *Expert Notice as To Dr. Bellovin Is Also Timely and Appropriate, and The Government Improperly Seeks to Preclude His Testimony On Those Grounds*

The government, in its letter, at 6, and n.1, contends that the defense "has waited until such a late stage of the proceeding to notice an expert" given that the "defendant has had more than ample time to develop a potential expert" and also goes so far as to criticize defense counsel's in-court "suggest[ion]" that "his need to call expert witnesses has arisen from the fact that he has not been able to elicit evidence required to support the defense theory through the cross-examination of the Government's fact witnesses."  The government's assertions are entirely unavailing and do not warrant the preclusion of Dr. Bellovin's testimony.

In fact, the defendant has every right to assess the evidence that has come in through the government's case-in-chief before determining whether to consult and call upon an expert witness, and thus it is entirely proper for Mr. Ulbricht to provide expert notice as to Dr. Bellovin's testimony just prior to the close of the government's case when the necessity of the testimony became apparent.  *See United States v. Tin Yat Chin*, 476 F.3d 144, 146 (2d Cir. 2007) (government's rebuttal expert was permitted to testify although the prosecution did not disclose its intent to call the expert or anything about his testimony until the day before the defense rested and court permitted defense to have one day continuance to prepare for the rebuttal expert witness).

Indeed, as detailed **ante**, given the limitations placed on Mr. Ulbricht's ability to cross-examine certain witnesses, namely Special Agent Christopher Beeson and Special Agent Thomas Kiernan, as to particular areas relevant to the defense theory, and the lack of opportunity

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
February 1, 2015
Page 5 of 5

to elicit relevant evidence through subsequent government witnesses, it is neither surprising, nor untimely, nor unreasonable for the defense to consult with and to ultimately decide to call Dr. Bellovin at this stage in the trial. *See, e.g., Gersten v. Senkowski*, 426 F.3d 588, 601 (2d Cir. 2005) (finding in context of ineffective of assistance of counsel claim that "defense counsel didn't need to consult with or call expert witnesses to rebut the People's experts who were neutralized by cross-examination").

Nor are the subject matters of Dr. Bellovin's testimony a mystery to the government, or outside the scope of the discovery provided by the government – with which by now it should be sufficiently familiar – and even the government's exhibits at trial. In fact, the government's objections are a problem of its own making:  despite an Exhibit deadline of December 3, 2014, the government has throughout the trial (and the period just before trial) added dozens of exhibits, modified scores of others, and deleted dozens as well.  The government also added three witnesses and removed one (representing, in effect, a 33% change in its witness list).  The moving evidentiary target the government has created throughout trial more than amply justifies the defense's inability to assess the contours of the government's case, and, in turn, the need for a defense expert, until the government's actual case was presented.

Thus, Dr. Bellovin's testimony should be permitted by the Court as appropriate and timely.

<div align="center">

**Conclusion**

</div>

Accordingly, for all these reasons, it is respectfully submitted that the government's application to preclude the expert testimony of proposed defense expert Steven Bellovin should be denied in its entirety.

Respectfully submitted,

Joshua L. Dratel

JLD/lal

cc:   Serrin Turner
      Timothy T. Howard
      Assistant United States Attorneys

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------------- X
                                             :
UNITED STATES OF AMERICA                     :
                                             :
             -v-                             :
                                             :
ROSS WILLIAM ULBRICHT,                       :
                                             :
                          Defendant.         :
----------------------------------------------------------------- X
```

| | |
|---|---|
| USDC SDNY | |
| DOCUMENT | |
| ELECTRONICALLY FILED | |
| DOC #: _____ | |
| DATE FILED: January 31, 2015 | |

14-cr-68 (KBF)

<u>OPINION & ORDER</u>

KATHERINE B. FORREST, District Judge:

Any further submissions regarding defendant's proposed expert witness

Andreas M. Antonopoulos shall be submitted not later than 2:00 p.m. today,

January 31, 2015.  Any other motions regarding experts must be received by

4:00 p.m. today, January 31, 2015.  Any response to any such new motions shall be

submitted not later than 12:00 p.m. tomorrow, February 1, 2015.

SO ORDERED.

Dated:   New York, New York
         January 31, 2015

_____
         KATHERINE B. FORREST
         United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

UNITED STATES OF AMERICA                    :
                                            :
                    -v-                     :
                                            :          14-cr-68 (KBF)
ROSS WILLIAM ULBRICHT,                      :
          a/k/a "Dread Pirate Roberts,"     :          ORDER
          a/k/a "DPR,"                      :
          a/k/a "Silk Road,"                :
                                            :
                            Defendant.      :
----------------------------------------------------------------X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 1/31/2015 |

KATHERINE B. FORREST, District Judge:

       The defense shall disclose any exhibits it proposes to use with experts or

otherwise to the Government not later than **5 p.m. today, January 31, 2015**.

       SO ORDERED.

Dated:        New York, New York
              January 31, 2015


                                      _____
                                      KATHERINE B. FORREST
                                      United States District Judge

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                    :
UNITED STATES OF AMERICA                            :
                                                    :
                -v-                                 :
                                                    :
ROSS WILLIAM ULBRICHT,                              :
                                                    :
                           Defendant.               :
------------------------------------------------------------------ X
```

┌────────────────────────────────────┐
│ USDC SDNY                          │
│ DOCUMENT                           │
│ ELECTRONICALLY FILED               │
│ DOC #: _____             │
│ DATE FILED: January 31, 2015       │
└────────────────────────────────────┘

14-cr-68 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

At the end of the day on Thursday, January 29, 2015, the Court requested—on the record—that Mr. Dratel provide notice to the Court immediately upon his receipt of the Government's motion to preclude as to when he would be responding to that motion. The Government filed its motion shortly after the day's proceedings concluded. The Court did not receive anything from Mr. Dratel that evening or on Friday, January 30, 2015 discussing timing, nor did the Court receive anything from Mr. Dratel on the morning of Saturday, January 31, 2015.

On Saturday, January 31, 2015, the Court issued an order, which was emailed to counsel at 10:00 a.m., requiring any response by 2:00 p.m.—and only at 2:01 p.m. did the Court hear from Ms. Lewis that religious observance prevented Mr. Dratel from complying with the Court's order. Mr. Dratel should have informed the Court of this issue before—not after—the weekend began. The Court also has a schedule.

The Court intends to decide on the motion to preclude promptly. Accordingly, any legal response to the Government's motion to preclude shall be filed not later

than 8:00 p.m. tonight.  That is it.  Ms. Lewis's letter mentions "submissions" relating to Antonopolous—the only submission is the legal response to the Government's motion.  The Court assumes that defendant is not now, at this late date, considering putting in additional materials relating to Antonopolous.

The Court is unclear as to whether there is an additional expert who has been disclosed.  Any additional expert would have to have been disclosed before now—if such a disclosure has not been made by now, it is untimely and shall not be allowed.

All exhibits relating to defense witnesses shall be made **not later than 10:00 p.m.** this evening, January 31, 2015.

SO ORDERED.

Dated:      New York, New York
            January 31, 2015

_____
      KATHERINE B. FORREST
      United States District Judge

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                              :

UNITED STATES OF AMERICA             :

                              :

             -v-                   :           14-cr-68 (KBF)

                              :

ROSS WILLIAM ULBRICHT,          :      OPINION & ORDER

                              :

                Defendant.        :

------------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

        The Court has just learned that on January 30, 2015, defendant noticed an

additional expert witness, Mr. Steven M. Bellovin.  The Government has moved to

preclude Bellovin from testifying.  (ECF No. 70.)  Defendant shall respond to the

Government's motion to preclude Bellovin's testimony not later than **Sunday,**

**February 1, 2015** at **9:00 a.m.**  Today's 10:00 p.m. deadline for defendant's

response to the Government's motion to preclude the testimony of Andreas M.

Antonopoulos (ECF No. 165) remains in place.

        SO ORDERED.

Dated:      New York, New York
             January 31, 2015

                            _____
                              KATHERINE B. FORREST
                             United States District Judge

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 31, 2015

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **FEB 0 5 2015**

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**
A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL
..
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

STEVEN WRIGHT
*Office Manager*

February 2, 2015

**BY ECF**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

2/5/2015   ORDERED

Post on Docket

K__ B. Forrest

Katherine B. Forrest, USDJ

Re:   *United States v. Ross Ulbricht*,
14 Cr. 68 (KBF)

Dear Judge Forrest:

This letter is submitted in regard to the statement by Andrew Jones, a/k/a "inigo" that have been the subject of negotiations with respect to potential stipulation between the parties. Those negotiations have reached an impasse because the government seeks to include in the stipulation conclusions by Mr. Jones that deny Mr. Ulbricht his Sixth Amendment right to confrontation, are inadmissible as Mr. Jones's conclusions, and which the government could have attempted to obtain by calling Mr. Jones, who has pleaded guilty pursuant to a cooperation agreement with the government, as a witness – a decision the government has foregone.

As a result, Mr. Ulbricht moves for admission of the statement under Rule 804(3)(b), Fed.R.Evid., as a statement against penal interest, and/or under Rule 807, Fed.R.Evid.  Mr. Ulbricht also moves for the statement's admission pursuant to the Fifth Amendment's Due Process guarantee.  *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).  Mr. Ulbricht also moves for defense witness immunity pursuant to the Fifth and Sixth Amendments.

A "track changes" version of the stipulation is attached, with the changes proposed by Mr. Ulbricht (to the government's version that constituted a revision of the defendant's initial proposal).  Mr. Ulbricht's changes are explained (and were communicated to the government) as follows:

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
February 2, 2015
Page 2 of 2

(1)    in the first change in paragraph 1(c), the defense substituted the language from the government's December 29, 2014, letter, which was contemporaneous with the interview of Mr. Jones (and there being no 3500 material that depicts the conversation in any other manner), and therefore more reliable. A copy of the government's December 29, 2014, letter is attached hereto as well;  and

(2)    also in that paragraph, the defense deleted the two expressions of "belief" by Jones, both of which present confrontation issues as well as opinion testimony that should be established by stipulation.

In the interests of achieving agreement, the defense also would agree to inclusion of the information about Mr. Jones's guilty plea [in paragraph 1(a)], even though, again, that presents Sixth Amendment confrontation issues.

The government made an intentional and conscious decision, mid-trial, not to call Mr. Jones. The government should not benefit from that decision by gaining admission of information that would compromise Mr. Ulbricht's Sixth Amendment confrontation rights. In order to gain admission of such information, the government should have called Mr. Jones as a witness.

Accordingly, it is respectfully submitted that Mr. Jones's statement should be admitted pursuant to Rule 803(4) and/or Rule 807, or Mr. Jones should be granted defense witness immunity.

Respectfully submitted,

Joshua L. Dratel

JLD/lal

cc:    Serrin Turner
       Timothy T. Howard
       Assistant United States Attorneys



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

December 29, 2014

By E-mail
Joshua L. Dratel, Esq.
2 Wall Street, 3rd Floor
New York, NY 10005

### Re:    *United States v. Ross William Ulbricht*, 14 Cr. 68 (KBF)

Dear Mr. Dratel:

The Government writes concerning two discovery matters.

First, the Government writes to reiterate its requests for reciprocal discovery from the defense in this matter. In particular:

- Pursuant to Rule 16(b)(1)(A), the Government requests disclosure of any exhibits the defense intends to use in its case-in-chief at trial.

- Pursuant to Rule 16(b)(1)(B), the Government requests disclosure of any results or reports of any scientific test or experiment that the defense intends to use in its case-in-chief at trial or that relates to the testimony of any witness the defense intends to call who prepared any such report.

- Pursuant to Rule 16(b)(1)(C), the Government requests disclosure of a written summary of any expert testimony the defendant intends to use at trial.

- Pursuant to Rule 12.1(a)(2), the Government requests that the defense notify the Government of any intended alibi defense, including any alibi concerning the defendant's whereabouts at the date and time of any communication of "Dread Pirate Roberts" reflected in any the Government's exhibits produced to the defense or any such exhibit the defense intends to use at trial.

Second, although the Government does not believe that the information below is required to be disclosed under either *Brady* or *Giglio*, or their progeny, the Government advises you, in an abundance of caution, of the following information provided by Andrew Michael Jones, a/k/a "Inigo," in a recent witness interview:

At some point in or about August or September 2013, Jones tried to authenticate that the Silk Road user "Dread Pirate Roberts" whom he was talking to at the time (via Pidgin chat) was the same person with whom he had been communicating in the past with this username. Previously, in or about October 2012, Jones and "Dread Pirate Roberts" had agreed upon a "handshake" to use for authentication, in which Jones would provide a certain prompt and "Dread Pirate Roberts" would provide a certain response. When, during the 2013 chat in question, Jones provided what he believed to be the designated prompt, "Dread Pirate Roberts" was unable to provide the response Jones thought they had agreed on. However, later in the chat, Jones asked "Dread Pirate Roberts" to validate himself by specifying the first job that "Dread Pirate Roberts" assigned to him (running the "DPR Book Club"), which "Dread Pirate Roberts" was able to do.

The Government is unaware of any extant record of the 2013 chat described by Jones. There is a record of an October 2012 chat between the defendant and Jones discussing a "handshake" in the file labeled "mbsobzvkhwx4hmjt" on the defendant's computer, which has already been provided to the defense in discovery.

Sincerely,

PREET BHARARA
United States Attorney

By:

Serrin Turner
Assistant United States Attorney

Enclosures

2

7UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | |
|   -v.- | :    **STIPULATION** |
| | |
| ROSS ULBRICHT, | :    S1 14 Cr. 68 (KBF) |
|   a/k/a "Dread Pirate Roberts," | |
|   a/k/a "DPR," | : |
|   a/k/a "Silk Road," | |
| | : |
|                   Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

IT IS HEREBY STIPULATED AND AGREED by and between the United States of

America, by Preet Bharara, United States Attorney for the Southern District of New York, Serrin

Turner and Timothy Howard, Assistant United States Attorneys, of counsel, and Ross Ulbricht,

by and through his counsel, Joshua Dratel, Esq., as follows:

     1.     If called as a witness in this matter, ANDREW JONES would testify as follows:

          a.     JONES worked as a member of the Silk Road support, under the username

"Inigo," from in or about October 2012 to in or about October 2013.  As a staff member,

JONES helped resolve disputes between Silk Road customers and drug dealers and other

vendors operating on the site, among other things.  On October 2, 2014, JONES pled

guilty to conspiring to commit narcotics trafficking in violation of Title 18, United States

Code, Section 846, conspiring to commit and to aid and abet computer hacking in

violation of Title 18, United States Code, Section 1030(b), conspiring to traffic in

fraudulent identification documents in violation of Title 18, United States Code, Section

1028(f), and conspiring to commit money laundering, in violation of Title 18, United

States Code, Section 1956(h).

b.     Defense Exhibit C-1 is a true and accurate log of a chat that JONES had
with "Dread Pirate Roberts" on October 16, 2012, when JONES was initially hired.  The
log is an excerpt of a file recovered from Mr. Ulbricht's laptop following his arrest
(labeled "mbsobzvkhwx4hmjt").

b.     During the October 16, 2012 chat, "Dread Pirate Roberts" and JONES
(who was using the username "PatHenry" at the time) came up with a potential
"handshake" for JONES to use if he was ever unsure he was talking to "Dread Pirate
Roberts."  "Dread Pirate Roberts" told JONES: "how about 'can you recommend a good
book?' and I'll say 'anything by Rothbard.'"  JONES responded, "perfect!"

c.     Approximately eleven months later after this chat, in or about August or
September 2013, JONES tried to authenticate that the Silk Road user "Dread Pirate
Roberts" whom he was talking to at the time (via Pidgin chat) was the same person with
whom he had been communicating in the past with this username. JONES tried the is
handshake for the first time, asking "Dread Pirate Roberts" if he could recommend a
good book.  "Dread Pirate Roberts" did not respond by saying "anything by Rothbard."
However, later in the chat, JONES then tried a different way of confirming he was
talking to "Dread Pirate Roberts" by asking  a question that he believed only "Dread
Pirate Roberts" would know the answer to. JONES asked "Dread Pirate Roberts" if he
remembered the first job that "Dread Pirate Roberts" assigned to him when he was first
hired.  "Dread Pirate Roberts" accurately answered that question running the "DPR
Book Club"), satisfying JONES that he was talking to the same person who originally
hired him.

The above-referenced Exhibit (DX C-1) and this Stipulation (Defense Exhibit S-1) are

admissible as Defense exhibits at trial.

Dated:      New York, New York
            February___, 2015

                         PREET BHARARA
                         United States Attorney
                         Southern District of New York


By:  _____
                         SERRIN TURNER
                         TIMOTHY T. HOWARD
                         Assistant United States Attorneys



     _____
                         JOSHUA L. DRATEL
                         Counsel for the Defendant

F1EGULB1                           Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                              14 Cr. 68 (KBF)

5   ROSS WILLIAM ULBRICHT,

6              Defendant.

7   ------------------------------x

8                                         New York, N.Y.
                                          January 14, 2015
9                                         9:20 a.m.

10

11  Before:

12                  HON. KATHERINE B. FORREST,

                                          District Judge
13

14                      APPEARANCES

15

16  PREET BHARARA,
         United States Attorney for the
         Southern District of New York
17  BY:  SERRIN A. TURNER
         TIMOTHY HOWARD
18           Assistant United States Attorneys

19  JOSHUA LEWIS DRATEL
    LINDSAY LEWIS
20  JOSHUA HOROWITZ
         Attorneys for Defendant
21
             – also present –
22
    Special Agent Vincent D'Agostino
23  Molly Rosen, Government Paralegal
    Nicholas Evert, Government Paralegal
24  Sharon Kim, Government Legal Intern

25

F1EGULB1                          Trial

1    in which case, I just wanted to know that.

2              MR. TURNER:  May I speak to that briefly.  The defense

3    is required to give us notice of any expert they plan to use

4    and we have asked for any such notice.  None has been given.

5    So if any expert is sprung on us at the last minute, we will

6    object for lack of notice.

7              THE COURT:  I assume you folks are giving each other

8    all of the required notices that are necessary.  I had just

9    noted yesterday during the opening that there hadn't been a

10   preview of anything in particular, but nor is the defendant

11   required to do so.

12             MR. DRATEL:  Yes.  And we'll provide, as soon as I

13   have a firm intention to call a witness, we will provide it.

14   If it's an expert, we'll do it at the earliest possible rather

15   than at the latest.

16             THE COURT:  Terrific.  Thank you.  Then, did you,

17   Mr. Dratel, want me to give the jury an instruction on ladies

18   and gentlemen, you'll note that there are objections and there

19   will be objections by counsel for both the government and the

20   defendant from time to time, that's perfectly appropriate,

21   indeed that's expected and that's counsel doing their job and

22   you should draw no inference from the fact of objections or the

23   Court's rulings?

24             MR. DRATEL:  I have written something up but you just

25   covered it.

F1fdulb1                          Trial

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4            v.                              14 Cr. 68 (KBF)

 5   ROSS WILLIAM ULBRICHT,

 6                 Defendant.

 7   ------------------------------x

 8                                   New York, N.Y.
                                     January 15, 2015
 9                                   9:19 a.m.

10
     Before:
11
                      HON. KATHERINE B. FORREST,
12
                                           District Judge
13

14                           APPEARANCES

15
     PREET BHARARA,
16        United States Attorney for the
          Southern District of New York
17   BY:  SERRIN A. TURNER
          TIMOTHY HOWARD
18             Assistant United States Attorneys

19   JOSHUA LEWIS DRATEL
     LINDSAY LEWIS
20   JOSHUA HOROWITZ
          Attorneys for Defendant
21
             – also present –
22
     Special Agent Vincent D'Agostino
23   Molly Rosen, Government Paralegal
     Nicholas Evert, Government Paralegal
24   Sharon Kim, Government Intern

25
```

F1fdulb5                          Der-Yeghiayan – cross

 1  was going on with respect to other pursuits of Karpeles and

 2  what was going on with other agencies investigating or other

 3  U.S. Attorney's offices investigating him, right?

 4  A.  Yes.

 5  Q.  And as part of that you had conversations and read

 6  memoranda and were in touch with people who provided to you

 7  information about it so that you could pursue your own

 8  investigation correctly, right?

 9  A.  Be more specific.  I am sorry.

10  Q.  Sure.  That you wanted to know what was going on with

11  Baltimore, you wanted to know what was going on with the

12  meeting with Karpeles' attorneys, you wanted to know what was

13  out there because you had your own parallel independent

14  investigation of him going on that could be completely wiped

15  out by what Baltimore was doing?

16  A.  Yes.  And we had verbal agreements with the attorneys in

17  that district also about that.

18  Q.  And so in the course of this and in pursuing your

19  investigation, you learned that Karpeles' lawyers had made that

20  offer to the government?

21          MR. TURNER:  Objection.

22  Q.  You learned through people either in Baltimore or at HSI in

23  Chicago?

24          MR. TURNER:  Objection.  Hearsay.

25          THE COURT:  Sustained.

531
F1fgulb6                        Der-Yeghiayan - cross

1                (At the side bar)

2            THE COURT:  Let me say that I don't want to do this in

3     front of jury.  There's no inconsistent statements so the fact

4     it that he's sworn to it doesn't get you for impeachment

5     purposes to ability to put that in.

6            MR. DRATEL:  Right.  What I want to do is get the

7     basis for his conclusions of his investigations.

8            THE COURT:  Why don't you ask him?

9            MR. DRATEL:  That's fine.  And the government's

10    objection is hearsay, I have no problem that it's not for the

11    truth.  It's just for what his investigation collected that led

12    him to have probable cause to believe --

13            MR. TURNER:  But --

14            THE COURT:  What the investigation -- so you would ask

15    him, and tell me, Mr. Turner, what your view is.

16            MR. TURNER:  That sounds like it is being offered for

17    the truth of the matter; he's trying to get out what the

18    probable cause was for the affidavit.  He's trying to establish

19    that these are the facts, that show that somebody else, in

20    fact, was running Silk Road, that somebody else is the real

21    operator of the site.

22            THE COURT:  It's obviously, number one, we can all

23    agree it's obviously highly relevant, right, if the lead

24    investigator believed at one point in time in August of 2013

25    that somebody else might be a candidate, then how he arrived at

532
F1fgulb6                      Der-Yeghiayan – cross

1    how that fellow was a candidate is obviously relevant; and also

2    how he changed his mind if he changed his mind would similarly

3    be relevant.  And you could go into that to your heart's

4    content on redirect and Mr. Dratel can bring it out.

5         MR. TURNER:  I think there are two concerns I have,

6    your Honor, one is, I understand if he believed these things,

7    but it's another thing to start citing the evidence that

8    consists of hearsay from a confidential informant.  That's core

9    hearsay.

10        THE COURT:  It goes to his state of mind, though.

11        MR. TURNER:  I think it's going to be impossible for

12   the jury to segregate that out.  We're bringing out --

13        THE COURT:  I'll give them a limited instruction, but

14   I'm going to allow him to ask what was the basis for his view

15   that somebody else was an appropriate target.  That strikes me

16   as in the heartland of the defense.

17        MR. TURNER:  Another problem I have is law enforcement

18   privilege.  If we're going to start getting into statements of

19   confidential informants, these are people who have brought

20   information to the government in secrecy.

21        THE COURT:  Here's what we're going to do.  We won't

22   have him go into the content of the communications.  He can

23   simply list, and why don't you take it carefully?

24        MR. DRATEL:  Okay.

25        THE COURT:  And let's cut him off if he's going to go

F1fgulb6                          Der-Yeghaiyan - cross

1   into the content of any of those communications.  He's just

2   going to give an itemized list of these are the types of things

3   I relied on.

4           MR. TURNER:  Not only the contents but the source, the

5   identity of somebody --

6           MR. DRATEL:  The information --

7           THE COURT:  What I was going to say is, the point that

8   I think it's fair for the defense to bring out is that there

9   was information listing the sources that led the investigator

10  to believe at one point in time that there was probable cause

11  for purposes of a warrant.  That I think can be done in a way

12  that does not invoke hearsay, all right.  So do it in that way

13  that does not get us into the hearsay problem.

14          MR. DRATEL:  Tell him what information -- can I lead

15  him?

16          THE COURT:  You're on cross.

17          MR. DRATEL:  Yes, right.

18          THE COURT:  You can just say -- why don't you ask him

19  what his conclusion is if he ever reached a conclusion and what

20  the source was to give you an itemized list of the types of

21  information --

22          MR. DRATEL:  But the silkforum.org is important

23  because it's the one that some of the initial --

24          THE COURT:  You can't go into the content of what the

25  bitcoin forum was.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 15-1815, Document 32, 01/12/2016, 1682740, Page160 of 265

**A409**

534

```
F1fgulb6                        Der-Yeghiayan - cross
```

1          MR. DRATEL:  No.  To say that he was running it.

2     That's the information they had.

3          THE COURT:  That's definitely -- you're trying to get

4     that in for the truth, right?  That is exactly the truth, so

5     you can't do that.

6          MR. TURNER:  We would ask for a strong limiting

7     instruction here, your Honor.

8          THE COURT:  He's saying it's not going to go into the

9     hearsay.  I think we can do this in a way that does not suggest

10    hearsay.

11         MR. TURNER:  My concern, is this the defense that the

12    defendant wants to put on, that there was another individual

13    behind it and this is the witness that they're seeking to draw

14    that evidence out of?

15         THE COURT:  Yes.

16         MR. TURNER:  So that is being offered for the truth in

17    terms of the evidence --

18         THE COURT:  No.  Let's go through it so we're

19    absolutely clear on what the question is going to be.

20         The question is going to be did there come a point in

21    your investigation when you formed a basis for believing that

22    there was probable cause for a warrant against Mr. Karpeles?

23    Yes or no?

24         You got these in mind?

25         MR. DRATEL:  Yes.

F1fgulb6                          Der-Yeghiayan - cross

 1              THE COURT:  Then it's going to be tell me, just by

 2      source type, the type of sources that led you to that.  They

 3      were written information that I had received, it was witnesses.

 4      I can lead him through that if you want to, but you can do it.

 5              MR. DRATEL:  No.  That's okay.  If I'm running astray,

 6      you'll let me know.

 7              THE COURT:  Then what do you want to do next because

 8      those are not hearsay so far.  The fact that he did reach that

 9      conclusion is clearly something that he can testify to.

10              MR. TURNER:  I understand that.  I guess my concern

11      there is if he just says something like witnesses, then it

12      makes it sound potentially more significant than it is.

13              THE COURT:  Then you can go back on cross, but that's

14      not hearsay.  That's part of a list of items.  I can't preclude

15      him from that.  I don't think there's a basis to preclude him

16      from that.

17              MR. TURNER:  As long as it's very clear that he's not

18      saying that a witness told me that.

19              THE COURT:  No, no.  We're not going to let him go

20      into content.  He can't go into the content of the

21      communications.

22              MR. TURNER:  Then I'm not sure what he can draw out of

23      the question.  I understand that he can show -- that asking

24      this witness whether he believes someone else was the person in

25      charge of Silk Road is relevant, but beyond that, unless -- I

F1fgulb6                              Der-Yeghiayan - cross

 1    don't know what the point of going further is unless the

 2    defendant is seeking to draw that information out for the truth

 3    to show there was credible evidence that somebody else --

 4              THE COURT:  Well, he is saying this investigator

 5    reached a point of having believing there was probable cause.

 6              MR. TURNER:  I'm not even sure how that is relevant, I

 7    mean, if it's not being offered for bias --

 8              THE COURT:  It's clearly relevant; I have no problem

 9    with making a relevance ruling on this.

10              MR. TURNER:  But why, your Honor, unless if it's being

11    offered for truth.

12              THE COURT:  It's being offered for the truth of

13    probable cause.  This is not hearsay.  None of this we talked

14    about so far is hearsay.  There's no statement.

15              MR. TURNER:  Right.  My concern, again, is that the

16    effect of the testimony is going to be that there were other

17    sources --

18              THE COURT:  He can always say there were 25 sources

19    and he can always list the type.  We don't get a hearsay

20    problem as a matter of law until he goes into the content.  I

21    think the government's concern is that by implication, there

22    was content.  Of course, there's content in any communication.

23    He when he says he spoke to people, there's necessarily

24    content.  He can't say what that content was, but his

25    subsequent action led him to do something one might infer, but

F1fgulb6                          Der-Yeghiayan - cross

1     that's way people get around hearsay all the time.

2              I understand your concern.  Let's take it step by

3     step.  He clearly gets to ask about the investigator having

4     some belief.

5              MR. TURNER:  I would just, finally, I would note our

6     growing concern that there actually is no legitimate basis here

7     if the defense is not trying to show something like bias or

8     anything else that, but, instead, is trying to prove through

9     this witness the contents of other statements, statements of

10    others, of witnesses that aren't being called in to testify

11    themselves, basically the defense is trying to suggest there's

12    all this evidence out there of the person who is running Silk

13    Road.  If that's the case, then the defense can introduce that

14    evidence, but trying to get this witness to testify about that

15    evidence, particularly when it concerns statements of

16    others --

17             THE COURT:  Here's what we're going to do because I

18    think this is in the heartland of exactly what the defense

19    wants to do, and I have to say right now, my view is it seems

20    to be perfectly appropriate that this fellow says he put

21    together an investigation which identified the defendant, he

22    did it in the following way, showing that he may have put

23    together an equally strong investigation to identify somebody

24    else and that's issue:  Is this the right guy?

25             That strikes me as a defense that can be developed

Case 15-1815, Document 32, 01/12/2016, 1682740, Page164 of 265
F1fgulb6                          Trial

```
 1    the Silk Road relies on a highly complex system for processing

 2    bitcoin strongly suggests that it was designed by someone with

 3    extensive technical expertise related to bitcoin, which

 4    Karpeles, being the owner and operator of a major bitcoin

 5    exchange and bitcoin discussion forum, clearly has.

 6         He also talks a little further about based on training

 7    and experience, I believe it is likely that Karpeles has worked

 8    with others in establishing and operating the Silk Road website

 9    because the postings on the silkroadmarket.org are signed Silk

10    Road staff and written in the plural first person.

11         Then it points to some investigative stuff.  He did

12    some other subpoenas that went out.

13         THE COURT:  There's a bunch of that that you can get

14    at in a way that does not invoke any of the hearsay issues that

15    we're talking about.

16         MR. DRATEL:  That's right.  I'm just --

17         THE COURT:  I understand.

18         MR. DRATEL:  But there is one piece of hearsay that I

19    don't think it's hearsay based on my purpose, which is not with

20    respect to the affidavit because I'm trying to go through this

21    so we get all of this out of the way right now.

22         THE COURT:  Yeah.

23         MR. DRATEL:  But a little further on, in the context

24    of sort of DPR and the context of more than one DPR, there was

25    an interview done by a journalist named Andy Greenberg of DPR,
```

F1fgulb6                         Trial

 1    someone claiming to be DPR, in August 2013, right at the same

 2    time.  And in the interview, DPR says no, I bought the site

 3    from -- and I'm not going to go into that, that he bought the

 4    site from someone else and all of that, I'm not going to go

 5    into the hearsay -- but just the fact that in that interview,

 6    the person who claims to be DPR to Andy Greenberg says I'm not

 7    the first DPR, there were other DPRs before me.  And Special

 8    Agent Der-Yeghiayan says in an email that sounds very much like

 9    Karpeles.  That's what he says, that the person in that

10    interview --

11              THE COURT:  And so your point is that Der-Yeghiayan

12    reads -- that's the Bloomberg article?

13              MR. DRATEL:  Forbes.

14              THE COURT:  So Der-Yeghiayan reads the Forbes article

15    that has this statement in it, and I've actually run across

16    that, and you want to bring out that statement.

17              MR. DRATEL:  His conclusion, his conclusion that

18    sounds very much --

19              THE COURT:  You want to bring out the statement and

20    the conclusion he draws from that?

21              MR. DRATEL:  Right.

22              THE COURT:  Tell me now, give me your argument as to

23    why that's not rank hearsay.

24              MR. DRATEL:  Because it's his conclusion that it

25    sounds like Karpeles based on his investigation.  It's not

F1fgulb6                          Trial

1   whether the statement is true that there were other -- it sort

2   of informs his conclusion and it buttresses it.

3          THE COURT:  There's a way of getting at the "sounds"

4   that doesn't bring out the statement, of course, so I need to

5   understand the statement.  Because the way to get out the fact

6   that he sounds like Karpeles could be, Did you read the

7   article?  Yes.  Did it -- let me finish it so the record is

8   clear about the way it could be brought out.

9          Were there words that were reported to be by DPR?

10  Yes.  Did you draw any conclusions?  Yes.  What was your

11  conclusion?  That it sounded like Karpeles.

12         That doesn't require getting into the statement.  So

13  if you're going to get into the statement, tell me why, in

14  terms of your argument, that's not rank hearsay.

15         MR. DRATEL:  You're right.  I agree.  Playing it out,

16  that's correct.

17         THE COURT:  All right, so you could do it that way.

18         MR. DRATEL:  That's my purpose, not to get into the

19  other stuff that we got into.

20         THE COURT:  So what you'd say is was there a Forbes

21  article?  In the Forbes article that you read, did you read

22  it -- did it purport to have an interview with DPR?  And did

23  you draw any conclusions from that?  Yes.  What was your

24  conclusion?  X.

25         MR. DRATEL:  Right.

F1fgulb6                          Trial

1    to lay this out in our papers.

2           I think one is certainly hearsay issues to the extent

3    that basically what the defense is trying to draw out are

4    hearsay assertions that were proffered as support for probable

5    cause in a search warrant affidavit, that's not competent

6    evidence.

7           THE COURT:  He's not going to go into the content of

8    the communications.  He would say I have these four types; I

9    took this act.

10          MR. TURNER:  I understand.  Then our larger concern

11   is, the witness' act is irrelevant, what this witness did is

12   irrelevant.

13          THE COURT:  I don't think it's irrelevant because if

14   he pursued a target of this conduct and it wasn't the

15   defendant, I think that's directly relevant to the defendant's

16   theory of the case.

17          MR. TURNER:  My point is, your Honor, what the defense

18   is trying to prove here is not simply that this agent pursued

19   another target.  The defense is trying to argue that this other

20   target is the real DPR.

21          THE COURT:  They're trying to raise a reasonable doubt

22   as to whether or not the defendant is the real DPR.

23          MR. TURNER:  But that is the assertion they are trying

24   to prove, so that's why the hearsay concerns we have --

25          THE COURT:  How else do you do it?

F1fgulb6                        Trial

1              MR. TURNER:  -- are so acute.

2          The way the defense does it, your Honor, is by relying

3     on competent evidence.  So, for example, if they want to point

4     to the fact that the Silk Road forums were based on a certain

5     software that Mark Karpeles also used, that has nothing to do

6     with what the agent did or didn't do or whether a search

7     warrant was sworn out or not.  It's a simple fact, and this

8     agent observed that fact and can testify to it.

9          It's a completely different matter for the defense to

10    say, well, didn't you hear from some confidential informant or

11    hear from some other witness certain information that led you

12    to believe that Mark Karpeles was the person behind it and then

13    go to a judge with a search warrant sworn out?  All of that is

14    being offered to try to prove that someone else was running the

15    site and that is clear hearsay being offered for the truth of

16    the matter.

17             THE COURT:  It's an inference.  There are certain

18    facts that are being posited to draw inferences.

19          Here's what I think we should do:  We should all get

20    this transcript and read this portion of it that relates to

21    what we have just all gone over.  I think that to the extent

22    that there's any question as to whether or not the defense has

23    been building all afternoon a picture that Mr. Karpeles was, in

24    fact, at least arguably a DPR, that I think has come out in

25    spades.  I think the jury understands that that's the argument.

F1KGULB1                    Trial

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                           14 Cr. 68 (KBF)

 5   ROSS WILLIAM ULBRICHT,

 6             Defendant.

 7   ------------------------------x

 8                                    New York, N.Y.
                                      January 20, 2015
 9                                    11:00 a.m.

10
     Before:
11
                    HON. KATHERINE B. FORREST,
12
                                      District Judge
13

14                      APPEARANCES

15
     PREET BHARARA,
16        United States Attorney for the
          Southern District of New York
17   BY:  SERRIN A. TURNER
          TIMOTHY HOWARD
18            Assistant United States Attorneys

19   JOSHUA LEWIS DRATEL
     LINDSAY LEWIS
20   JOSHUA HOROWITZ
          Attorneys for Defendant
21
             – also present –
22
     Special Agent Vincent D'Agostino
23   Molly Rosen, Government Paralegal
     Nicholas Evert, Government Paralegal
24   Sharon Kim, Government Intern

25
```

1          THE COURT:  I do remember the questioning because I

2      actually had the same thought about it falling into the opening

3      of the door for these other pieces.  One of the implications

4      was that really bad things, other kinds of bad things were not

5      offered on the site, for instance, things which, to pick up on

6      a theme I think has been developed, could not harm people; that

7      as we have seen from the signature line of certain chats, the

8      drugs don't jump off the table and harm anyone.  So I think by

9      implication since those documents are in, the question of

10     whether or not guns were being sold, I suppose you could argue

11     that they don't jump off the table and hurt someone either, but

12     it's a little further afield.  It's potentially opened.

13         Why don't you tell me whether or not you'd be willing

14     to strike the line?  I would do it in a way that is very I

15     think very light, which is you may have heard testimony about

16     other goods and services that were or were not sold on the

17     site.  What's relevant to you, ladies and gentlemen, of the

18     jury is the evidence that you have and it's for you to weigh

19     that evidence as to what has been sold on the site.

20         MR. DRATEL:  Can I think about that for a little bit.

21         THE COURT:  Yes.  The other issue, was there something

22     else, Mr. Turner?

23         MR. TURNER:  There's a third issue we'd like to raise

24     at side bar.

25         THE COURT:  Right.  We have two side bar issues.  Then

1    let me deal with the issue which we have all spent I assume a

2    great deal of time on over the weekend.  And as is the case

3    with rulings like this, I have read the cases which you folks

4    have presented me with, for which I thank you, and also did

5    rather exhaustive research on our own to come up with what is

6    the right way to analyze this evidentiary issue.  And I'm

7    speaking now about the evidentiary issue left over from

8    Thursday afternoon.  I'm going to call it the MK issue for the

9    Mark Karpeles issue, but it also can relate to something more

10   generically described as an alternative perpetrator issue.

11        I have read the letters submitted by the parties.  I

12   have read the cases and I also went back and reviewed the

13   transcript of our prior proceedings.  One thing I would note is

14   that the prior transcript did convince me that there were,

15   having now decided how to analyze this issue properly, there

16   were all kinds of things to which the government probably

17   should have -- undoubtedly should have objected earlier and we

18   would have ripened this issue before it had gotten so far down

19   the road.  Part of the confusion here is trying to

20   differentiate between similar types of questions when certain

21   questions weren't objected to and then others were objected to.

22   But let's put that issue of whether there would be a waiver to

23   the side for a moment and let me tell you how I analytically

24   put this issue together.

25        I want to start from the beginning, which I think is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1KGULB1                          Trial

1    important which is asking ourselves as to any evidentiary

2    ruling what is this case really about.  This case is about

3    whether this defendant, Mr. Ross Ulbricht, engaged in the

4    conduct that is charged in the counts in the indictment.  So

5    then we get to what is relevant evidence?  Relevant evidence is

6    evidence which is probative of a fact in dispute and whether

7    the defendant is Dread Pirate Roberts or was Dread Pirate

8    Roberts at certain points in time but not other points in time

9    is a fact in dispute.

10        Then we ask what's the relevance more granularly of

11   whether the defendant was Dread Pirate Roberts?  And that is

12   because at certain points of time, there are certain pieces of

13   evidence where Dread Pirate Roberts does certain things which

14   the government has presented.  If Dread Pirate Roberts at that

15   moment is Mr. Ulbricht, then that leads to one set of possible

16   inferences; if Dread Pirate Roberts at that point in time is

17   not Mr. Ulbricht, then it leads to another.

18        Now, a question which is, I think, floating around in

19   here through this is whether or not the fact that there might

20   be – and certainly the defense is arguing – another Dread

21   Pirate Roberts, does that exculpate the defendant?  Is it

22   exculpatory, and that it may or may not.  That will be up to

23   the jury ultimately to decide.

24        First, the jury will decide whether they believe in

25   the defense theory, which it has a right to pursue as to an

A422

F1KGULB1                          Trial

1    alternative perpetrator, and the alternative perpetrator, the

2    defense alleges, is either "the" Dread Pirate Roberts or became

3    Dread Pirate Roberts and then framed Mr. Ulbricht and turned

4    over his identity to him at some point in time.

5           Now, only if the evidence relating to the Dread Pirate

6    Roberts at a particular point in time where the reasonable

7    inference can be drawn that it was not the defendant could it

8    be exculpatory; in other words, you could have the defendant be

9    Dread Pirate Roberts at one point in time, have somebody else

10   be Dread Pirate Roberts at another point in time and had to go

11   back to the defendant, that's not exculpatory except for the

12   quantum of whatever the proof is in between.

13          For instance, if the quantity of drugs, which could be

14   a very relevant issue, takes hold during the period of time

15   that the defendant was not Dread Pirate Roberts, that's one

16   thing.  Of course, if the defendant is shown to join a

17   conspiracy for narcotics distribution at any point in time, a

18   defendant is liable for all of the acts going backwards.  So as

19   a matter of law, we know this from the *Gonzalez* case, there are

20   oodles of cases from Supreme Court case law that a

21   coconspirator who joins a conspiracy is liable for the acts

22   which occurred prior to that individual joining so long as

23   those acts were reasonably foreseeable to the coconspirator.

24   So whether or not the presence of additional Dread Pirate

25   Roberts helps is a question to be determined first based upon

F1KGULB1                          Trial

1    an analysis as to whether or not there is a second - or even if

2    Mr. Ulbricht is a first - Dread Pirate Roberts.

3         Now, since Mr. Ulbricht, his counsel conceded in the

4    opening that he started Silk Road, the timing is unclear as to

5    when and whether the defendant allegedly left Silk Road and

6    whether or not there's a point in time when he becomes Dread

7    Pirate Roberts before he hands over I think according to the

8    defense theory the website.  And the evidence appears to be

9    from the government that the defendant was found at the time of

10   arrest acting as Dread Pirate Roberts at the time of arrest.

11   Whether that was for that one day or whether it had gone back

12   in time and in fact covered the entire time will be for the

13   jury to determine.  So that's sort of the relevance.

14        Now, the Court looks at relevance broadly as the

15   Second Circuit requires under the rules under 104, but the

16   Court also is mindful of balancing Rule 403, which is whether

17   or not things that require trials within trials end up being

18   unduly confusing, misleading to the jury, and so I have that in

19   mind and I've had that in mind as I have proceeded.

20        The evidence of third-party culpability and

21   alternative perpetrator is admissible if there's sufficient

22   evidence tieing a particular person or even if it's an unknown

23   person to the offense.  That's the *Wade* case, Second Circuit

24   case which you both acknowledged and cited in your papers over

25   the weekend, a 2008 case, but you do need some direct evidence

572
F1KGULB1                      Trial

1    of connection.  That's the other point that the *Wade* case makes

2    clear, because it's very possible to have suspicion as to more

3    than one person and this apparently happens as you folks know

4    all the time, whereas the investigation eventually focuses

5    primarily on one and one is primarily then tried and the other

6    may never be tried.

7            So the question ultimately boils down to whether this

8    particular defendant did the particular acts which would relate

9    to or amount to Counts One through Seven, not whether somebody

10   else also did those acts at the same time, in effect,

11   duplicating those efforts.

12           So one issue is what does the defendant have that Mark

13   Karpeles is, in fact, DPR if there's something that we're

14   leading up to versus just trying to get that information out of

15   the government's witness; in other words, whether or not there

16   is going to be other evidence offered.  I am mindful of

17   Mr. Dratel's point that the timing of the turning over of the

18   3500 material makes certain aspects of this more difficult for

19   the defendant because they simply haven't had time to develop

20   all that they would have for Mr. Karpeles, but nevertheless,

21   the defense theory has been known since at some point many

22   months ago.  It's been previewed even to the Court.  So the

23   fact of another DPR, whether it be Karpeles or somebody else,

24   is certainly something which I assume the defense has developed

25   to this point and, therefore, there may be lots of things which

F1KGULB1                          Trial

1    the defendant, if he has them, would be able to present as

2    direct evidence of that theory.  For instance, now, as we all

3    understand, it's the government's burden to show that the

4    defendant is or is not culpable of the offenses charged.  The

5    question is whether or not the defendant wants to try to rebut

6    some of that evidence in a particular way, but it's the

7    government's burden in the initial instance.

8            So, the question is whether or not the defendant has

9    this, for instance, like chats with a third party showing that

10   he's about to turn over the website, soliciting interest in

11   somebody else wanting to take over the website; in fact

12   conveying the private key, something which indicates that there

13   was a moment when it was copied from another computer to a

14   different computer.  There might be any variety of ways which

15   those of you who are more technically savvy than I am could use

16   to demonstrate that, but it's the direct evidence of another

17   DPR which is competent evidence.

18           Now, we used the term competent evidence on Thursday

19   and competent evidence, just to be clear, it needs to both be

20   relevant as a threshold hold matter, which I've already now

21   described, but it also needs to be admissible evidence under

22   the rules and not subject to an exception under the rules.  So

23   it's direct evidence of somebody taking over the website, it's

24   also circumstantial of someone taking over a website, so

25   circumstantial evidence where various dots can be placed along

F1KGULB1                    Trial

1   a line and while it's not drawn in between it, a reasonable

2   juror could draw the inference would be competent

3   circumstantial evidence.

4        It's important, and this is where the difficulty comes

5   in and it's a difficult issue for trial judges everywhere, to

6   distinguish between what is speculation and what is

7   circumstantial.  There's a difference between what is

8   circumstantial evidence and what is purely conjectural or

9   purely speculation.  There's a lot written by a lot of courts

10  on where an inference becomes conjecture or where an inference

11  is reasonably based on fact.

12        The point is that the logical inference must itself be

13  based on otherwise admissible evidence; otherwise, it does

14  become conjecture.  So there is lots of case law, which we have

15  now all had an opportunity to slow down and read, which

16  indicates that a person's subjective beliefs is simply

17  speculation.  There are certain instances where subjective

18  beliefs may be admissible.  Those are not pertinent here.  That

19  is, for instance, in certain instances not going to an ultimate

20  conclusion of a case where an expert witness can offer certain

21  opinions.

22        Indeed, lay witnesses can also offer certain opinions,

23  but they can't usurp the fact-finding role of the jury.  So

24  let's go back to our umbrella example.  It's certainly okay for

25  witnesses to discuss on the witness stand -- this is now the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:14-cr-00068-KBF   Document 202   Filed 02/25/15   Page 14 of 177     575
F1KGULB1                        Trial

1    circumstantial evidence example I raised during the early part

2    with the jury -- I saw individuals enter the courtroom with

3    raincoats, I next saw them enter with umbrellas, I saw that

4    there was water dripping off of the umbrellas.  Those are facts

5    which the witness is seeing.  The witness can't say I know it's

6    raining or I believe it's raining because that is ultimately

7    for the lawyers to argue from the various facts which are put

8    in as inferences.

9         So this is where we get to the first part of -- and

10   I'm going to give you folks a list of what's okay and what's

11   not okay, it's not all not okay and it's not all okay -- of

12   Mr. Der-Yeghiayan.  What Mr. Der-Yeghiayan thought and believed

13   it's clear to me, having now reviewed the cases very clearly

14   and analyzed from the beginning what is competent evidence and

15   what is incompetent evidence, that his thoughts and beliefs are

16   irrelevant.

17        I've also gone back through the earlier portion of the

18   transcripts and, in fact, the government stayed away from

19   thoughts and beliefs, but he's been brought into it a lot on

20   cross.  The government did not object to numerous, numerous

21   instances where he was asked about his thoughts and beliefs,

22   and I think this led to the confusion.

23        Let me just give you folks a cite of the *Johnson* case

24   at 529 F.3d 499 at pin cite 501 and also the *Garcia* case, and

25   there are a number of others which stand for this proposition.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1KGULB1                         Trial

1     This is an especially important proposition when you're talking

2     about an investigator or a special agent because the redirect

3     examination that could lead from this is clearly error and you

4     can't have one side, one-hand clapping.

5           The clear error is the following:  If allowed to say I

6     believed at one point in time that Mark Karpeles was the DPR,

7     and what did you base it on?  I based it on the following four

8     sources of information, the redirect becomes, Did there come a

9     point in time when you ceased to believe that?  Yes.  And who

10    did you become a believer in in terms of their guilt?  I

11    believed it was Ross Ulbricht.  Can you tell me now why?  Yes.

12    Because of the following 27 pieces of information, which then

13    become essentially a summary statement that the government

14    would normally do during its closing arguments.  That kind of

15    conclusory summarizing testimony as to drawing inferences for

16    the jury that the jury would be drawing usurps the jury's

17    fact-finding role and is clearly not relevant.

18          What is relevant is direct knowledge and responses to

19    that direct knowledge.  For instance, before I go into probable

20    cause, let me say that it's error for the agent to testify

21    about opinions regarding any person's culpability, particularly

22    clear with respect to the defendant, but the same principles

23    apply to third parties.  And that is true under 701 and the

24    *Garcia* case I mentioned is a Second Circuit 2005 case, the

25    *Grinage* case, another Second Circuit case; the *Dukagjini* case,

F1KGULB1                        Trial

1   a Second Circuit case.  We're not the first court to have

2   confronted this question.  And then also the *Carmichael* case

3   which is a Second Circuit case from 2005 where the Court then

4   talks about the difficulties of opening the door in that kind

5   of case.

6           Let's talk about probable cause.  In terms of probable

7   cause, there have been other instances where individuals have

8   been asked whether or not there was probable cause in their

9   view, and that has been precluded across the board on the basis

10  that it's a legal conclusion; that the concept of probable

11  cause is a legal concept.  Is there probable cause to believe a

12  crime has been or is about to be committed?  So it asks for an

13  answer to that legal conclusion, and so whether it's put into

14  the form of a statement, "I believe that there's probable

15  cause" or in terms of a physical manifestation of that, "I

16  sought a search warrant implicitly because I believed there was

17  probable cause," that is similarly based upon the legal

18  conclusion.

19          Now, with all of that said, as we all know, there are

20  a series of cases which are quite clear that the defendant is

21  entitled to present a defense theory.  There is a defense

22  theory here that's clear that the defendant is pursuing as to

23  an alternative perpetrator and he is certainly allowed to

24  present competent circumstantial and competent direct evidence

25  supportive of those theories, and I am in no way precluding the

F1KGULB1                              Trial

1    defendant from presenting a witness who may be able to suggest

2    that he or she knew the real Dread Pirate Roberts and it wasn't

3    the defendant or whatever various ways this could be shown.

4         And there are certain cases that are inapposite to

5    this case but that are supportive of it, of that principle.

6    The *Alvarez v. Ercole* case, in that case, there was a report of

7    another suspect.  The issue there was that the lead for the

8    other suspect was never pursued.  Here, that's not the issue.

9    There was an investigation that was doing whatever it was

10   doing, and it was remanded on the basis of a habeas petition

11   that they should have allowed it to be inquired into not the

12   truth of whether that other person was guilty or not, but of

13   the adequacy of the investigation.

14        In the *U.S. v. White* case, which is a 2012 case, in

15   certain instances, that case indicated that the charging

16   decisions could be admissible.  There, there were other

17   occupants of a vehicle who were charged with possessing the

18   very firearm that then the defendant was charged with

19   possessing.  It's not apposite.  And then the *Wade* case we

20   talked about, the *Wade v. Mantello* case is supportive of the

21   Court's view.  In terms of the *Arbolaez* is a case that we found

22   which is at 450 F.3d 1283 at 1290, and it's an Eleventh Circuit

23   case, 2006.  That's another case talking about probable cause

24   in connection with an investigation being inadmissible hearsay

25   and the statements only allowed -- if they were allowed in, it

1     would be only for the purpose of showing some amount of truth.

2              So here are the questions, which, based upon all of

3     these principles of law, appear to the Court to be clearly off

4     limits, and then I'm going to give you the ones which I think

5     are on limits.

6              Off limits are things such as the following, these

7     questions or reasonable derivatives of these questions:  Did

8     you suspect Mark Karpeles?  The word "suspect" is a conjectural

9     suspicion.  Now, I will say that was asked in spades with no

10    objection by the government earlier on.  It was asked two or

11    three times on Friday, but we'll get to what we do in terms of

12    the government's application in its letter to strike, which is

13    somewhat complicated.

14             But did you suspect Mark Karpeles?  There should be no

15    further questioning into that.  Did you believe Mark Karpeles

16    was DPR?  There should be no further questioning into whether

17    or not this witness believed -- the dots can be drawn, but the

18    belief he needs to stay away from.

19             Do you suspect Ross Ulbricht?  Do you believe Ross

20    Ulbricht was DPR?  Similar, the same witness can't do one, he

21    can't do the other.  Does he suspect that Mark Karpeles

22    operated Silk Road?  Does he suspect?  Does he suspect Mark

23    Karpeles did not operate Silk Road?  Both of those are equally

24    off limits.  Any descriptions of belief that he has are off

25    limits.  However, what's not off limits are things like:  Did

F1KGULB1                        Trial

1    you see X?  Did you do Y?  Did you investigate X?  Yes.  No.

2    Did you see X?  Did you see Y in connection with that work?

3         Now, the interview, this is now the Forbes interview

4    we talked about that on Friday, and that is hearsay, and I

5    don't think there's much of a debate about the content of it

6    being hearsay.  Whether or not this particular witness believed

7    it sounded like the man on the moon, it doesn't matter, or that

8    he believed it sounded like Karpeles doesn't matter because

9    that's his subjective belief.

10        Now, in terms of the offer, the offer to provide, this

11   is the Karpeles offer, through his lawyer through another AUSA

12   etc. to provide law enforcement with information as to who the

13   real DPR was is also not relevant.  The offer is the fact of

14   the offer.  That's the only point of that, because we know that

15   there was no information.  We know that Karpeles did not

16   provide, based upon the government's proffer, he never provided

17   that information.  So it's not as if there's some secret name

18   that comes out.  So the fact of the offer itself is not

19   relevant to a disputed issue of fact.  It is not a disputed

20   issue of fact relevant to this defendant's culpability whether

21   or not an offer was made by somebody else to potentially

22   divulge information.  And it's really a way of, I believe,

23   getting out whether or not Karpeles had inside information

24   about Silk Road.  If he did, he did, but that's a separate

25   question from whether or not Ross Ulbricht can be tied himself

1    through competent evidence to Silk Road in the manner the

2    government has been suggesting.

3           In terms of the 807 and whether or not that gets over

4    hearsay, first of all, I find that the fact of an offer upon

5    analysis and taking it apart as to what each segment is for is

6    irrelevant, but is it probative?  Is it more probative than

7    anything else that can be offered?  The answer is no.  It's

8    really inviting the jury to speculate.  And the other issue is

9    that Karpeles was self-interested in making any offer at the

10   time and, therefore, it's unclear whether he actually had any

11   information.  So the fact of the offer is suggestive of a fact

12   of real and potentially inferentially reliable information and

13   Karpeles -- there's no indication that he would have provided

14   that.

15          Now, what would be okay:  Any chats on the website

16   that DPR was handing off the website or that Mr. Ulbricht,

17   during the time that he was in charge of Silk Road by his own

18   admission or by his counsel's assertion, was handing off the

19   website; evidence as to whether or not, for instance, Ross

20   Ulbricht, when he was being viewed by law enforcement and they

21   were tailing him, which this information has some information

22   about, he may have limited information, but whether or not Ross

23   Ulbricht was going to work, for instance.  Was he going to an

24   office, was he doing something else, does he effectively have

25   an alibi defense?  Are there reviews of bank accounts that

F1KGULB1                         Trial

1    reveal information that indicate payroll coming in from a third

2    party?  Is there evidence that another account was receiving

3    Silk Road commissions looking at the account numbers and

4    tracing the numbers through?

5           He can challenge the recollection of the website,

6    challenge the buys, challenge the facts relating to the arrest.

7    He can also seek to introduce evidence that others were tied to

8    the servers; that there were other individuals who were leasing

9    the servers; that Mark Karpeles or somebody else was leasing

10   the servers; that Mark Karpeles did any number of things, X, Y,

11   Z; that Mark Karpeles had a website if he's able to show it

12   through a witness with competent technical evidence that the

13   website had certain aspects of its platform that were

14   replicated in the platform of Silk Road, that would be fair

15   game.  There are other questions which were asked which were

16   fairly asked, which is, was Mark Karpeles running MtGox?

17   That's perfectly appropriate.  Many of the questions that

18   Mr. Dratel asked were absolutely appropriate and are supportive

19   of the defense theory.  The questions that were not appropriate

20   were the ones that strayed into the words "belief" and

21   "conclusion," but where they were simply asking about facts,

22   they are perfectly appropriate.

23           (Continued on next page)

24

25

F1kdulb2

1                THE COURT:  So what we'll have to do -- and that's the

2      Court's ruling on this.  Much of what, as a result, the

3      defendant wanted to go into in terms of exploring the search

4      warrant application is off limits, because the very question

5      that was to be asked, which is what are the four sources of

6      information that you had, X, Y, Z, and then, based on that,

7      what did you do next.  Now having reviewed the cases -- and

8      they seem to be clear in this regard -- so long as he is able

9      to present the witness -- the defendant is able to present

10     direct evidence of his own defense of another perpetrator,

11     getting the speculation of a third party, even the

12     investigator, is an improper way to proceed.

13                So those questions, in that way, are off limits.  But

14     the other questions of direct evidence through this witness,

15     who had a lot to do with the Silk Road website, so if he

16     happened to look at all the chats and looked at all the chats

17     of DPR and/or any account associated with this witness, he can

18     be crossed on whether or not there is clear evidence of a

19     handoff.  And the jury will then be given the opportunity to

20     draw its inference as to whether there was or was not a

21     handoff.  This witness cannot say whether there was or was not

22     a handoff, but he could certainly present evidence in that

23     regard; there is no doubt about that.

24                What we should do, I think, is there are some

25     questions.  I've got a whole bunch of them that are flagged

F1kdulb2

1    here.  I am happy to hand over my copy of the transcript to

2    counsel for everybody to review.  You need to figure out, to

3    the extent anybody wants to go back on certain Q and A's and to

4    the "belief" questions and the "conclusion" questions, which

5    were allowed to go, I don't want to just do a global strike

6    because many of the questions were fine.  So the question is

7    going to be which ones do you want to strike and does the

8    government have a view as to how to do this without creating

9    more problems?

10           So I'm not going to do it when the jury first comes

11   out.  I will take it up at another time.  And I would like it

12   to be very specific and have you folks confer on it.  But when

13   I flagged things, I flagged things which I think are also

14   appropriate.  You will see, based upon what I just said, what

15   will jump out as you as unobjected-to questions that, based

16   upon the Court's review of all the case law, I now believe

17   would have had appropriate objections sustained but they were

18   let go.  So let's take it step-by-step because I don't want to

19   eliminate things which the defendant elicited fairly, and we

20   have to be careful as we proceed now that we do have a live

21   objection.

22           All right.  Mr. Dratel, I know you don't agree with my

23   ruling, but do you understand the parameters that I have set?

24           MR. DRATEL:  I think so.  I have to say, though, that

25   with respect to the offer by the attorney, it is not about --

585

F1kdulb2

 1    it is not about whether he actually had information.  It is the

 2    fact that someone who is under investigation is offering to

 3    implicate someone else in return for immunity from all charges

 4    that the government could bring against them -- money,

 5    business, or whatever.  And also, we don't have to prove

 6    anything, and all the cases are not about proving --

 7           THE COURT:  You don't have to prove anything.  But if

 8    you want to rebut something through cross-examination, there

 9    are limits.  This is part of what comes up in the 30 cases

10    which you all cited to me and my own research.  You know, of

11    course, there are limits to cross-examination when we start to

12    get too far afield.  Because the next question will be, well,

13    what was the outcome of the interview?  And this is a witness

14    who doesn't have that.

15           MR. DRATEL:  This is his own question --

16           THE COURT:  No.  No.  No.  The government will have to

17    be able to get that.  And it is too far afield.  So you can

18    show that there was another perpetrator.  I am by no means

19    foreclosing your, you know, your attempt to build that defense

20    theory by showing that your client, or whomever had certain

21    user names, whatever the user names are, handed off

22    administrative capabilities to somebody else to take over that

23    role for some period of time.

24           MR. DRATEL:  But that is not the standard in these

25    other cases, and the reversals and Ercole, Alvarez v. Ercole is

Case 1:14-cr-00068-KBF   Document 202   Filed 02/25/15   Page 25 of 177      586

Flkdulb2

```
 1   a perfect example and --

 2           THE COURT:  Mr. Dratel, I have read those cases, and I

 3   believe that they are squarely distinguishable.  I mean the

 4   Ercole case, as you know, was a very particular kind of case

 5   where not only had somebody else been implicated but somebody

 6   else had been essentially shown to be likely to be the guy.

 7   And they just didn't -- they had the name.  They had the phone

 8   number, or the contact information.  I can't remember how it

 9   was.  And then they just failed to follow up.  It is different.

10           MR. DRATEL:  But it's only different as a matter of

11   degree.  If the failure to -- it was the refusal to permit

12   cross-examination as to that issue which was the basis for the

13   reversal.  And it was not -- and it is not a question of I have

14   to have a photograph of DPR and it is not Mr. Ulbricht.  I can

15   establish it by inference.  And just the way the government is

16   establishing its case by inference.

17           THE COURT:  You could certainly establish it by

18   inference, but that is why I want to differentiate between

19   you've got to have some information that Karpeles in fact

20   either had information on DPR or that's reliable, and/or if you

21   are going to build Karpeles up as -- is it your view that

22   Karpeles was not the real DPR, or is it your view that he was

23   the real DPR?

24           MR. DRATEL:  My view is that he could be the real DPR.

25           THE COURT:  Do you have any information, other what
```

A439

F1kdulb2

1    you brought out and what is in the 3500 material, that you can

2    proffer that draws the connection that the Wade case and the

3    other caress say you have to have before we go off on this

4    road?

5              MR. DRATEL:  I can do cross-examination.  I'm not

6    required to have a witness who comes up and does that.  We have

7    other information about the fact that there are multiple --

8    just so it is clear what our theory is.  Our theory is that

9    Mr. Ulbricht created the website, got out a couple of month

10   later, did not come back in at any point until the very end,

11   was not in at the very end.  He was not in a conspiracy, and he

12   was not operating the website.  The fact that he had -- what

13   the evidence shows about what was on his laptop, fine, we will

14   explain.

15             THE COURT:  OK.

16             MR. DRATEL:  But --

17             THE COURT:  All of that, of course, you are welcome to

18   explain, and you are certainly welcome to cross-examine this

19   witness.  I'll tell you.  I feel very comfortable in a

20   careful -- and with the Ercole case, it is a 2014 case.  It is

21   an unusual case because it is a reversal of a state court case.

22   There is a remand on habeas.  I read it a couple of times.  But

23   I'm comfortable.  I've also read the Kiley v. White case more

24   than once in the context of this and other cases.  I'm

25   comfortable with my ruling.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1kdulb2

1          My question to you right now, so we can get going, is

2     do you understand the parameters of what you can ask?

3          MR. DRATEL:  I think so.  But I just need to complete

4     the record just to preserve it, because with respect to <u>Kyles</u>

5     <u>v. Whitley</u>, the Supreme Court case, Beany, the alleged

6     alternative perpetrator, they didn't have proof.  They did it

7     all through the police investigation.  They didn't have

8     additional witnesses.  They had the police.

9          And this is combined with the police investigation

10    issue.  They are inextricable in many respects, and it is not

11    about -- it is not just about whether it was shoddy but it is

12    about other things that I'll get into on cross with this

13    witness that I don't think are objectionable at all because

14    they go to motivations and other things in terms of the

15    investigation.  So that's all part of the same piece.  And I

16    can build that by inference.  I am permitted to do that by

17    cross and by inference.

18          THE COURT:  You are permitted to do that through

19    competence evidence through cross and through inference.  The

20    question is going to be what is appropriate for this witness to

21    speak to, and it will be things that he perceived with one of

22    his senses, as witnesses do, as opposed to what he may have

23    held as a belief at one point in time.

24          MR. DRATEL:  I understand that part.

25          THE COURT:  I am not going to let them ask did you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Flkdulb2

1    believe Ulbricht did it, tell me.  And then, yes, by the way,

2    tell me the 27 reasons why.  That would be --

3              MR. DRATEL:  That would be his direct.

4              THE COURT:  That would be his redirect.

5              MR. DRATEL:  I am saying that would be his direct.

6              THE COURT:  No.  Well, you are talking about those are

7    inferences versus his conclusions.

8              All right.  So if you have any questions about a

9    particular issue that you want to raise that I am not letting

10   you raise, then present it to me, but otherwise we'll proceed

11   with this.  I'm not right now striking any of the testimony

12   that came in.  Frankly, a huge amount came in on Thursday.  It

13   will be up to really the government's burden to figure out what

14   portions they believe are appropriately struck and then to

15   discuss whether the defense agrees not as to whether or not

16   they agree with the evidentiary ruling but given the Court's

17   parameters, and if the defense does not agree with any of it,

18   then I will just make a ruling.

19             MR. DRATEL:  There is also a waiver aspect of it.

20             THE COURT:  There is a waiver aspect of it.  We

21   haven't talked about that or briefed it.  That is why I don't

22   want to do that right now.  It is complicated because it is

23   interspersed.  There are completely unobjectionable pieces

24   interspersed with objectionable.  You will be able to say

25   Karpeles was out there.  He had the computer expertise.  He

Flkdulb2

```
 1   owns Mt. Gox.  There are going to be certain things that are

 2   still going to be, I believe, in the record.  We'll have to

 3   take a look at how the Q and A's come out ultimately, but there

 4   will be facts.

 5              All right.  Let's take up the two sidebar issues.

 6              Mr. Turner.

 7              MR. TURNER:  Your Honor, I just wanted to make clear.

 8              In terms of -- we can look at the transcript and come

 9   up with proposed areas to strike.  I just want to be able to do

10   that before redirect, because if certain testimony is not

11   stricken, then we would want to potentially redirect the

12   witness a certain way to cure testimony that did come in.

13              THE COURT:  Can you have some of your colleagues help

14   you with highlighting what you think?

15              MR. TURNER:  Yes, your Honor.

16              THE COURT:  And as little as possible.

17              MR. TURNER:  Yes, your Honor.

18              THE COURT:  I mean, there is one way of doing it which

19   is, ladies and gentlemen, you heard the witness talking about

20   his belief and views and suspicions about an individual.  You

21   should disregard those comments because his beliefs and views

22   and suspicions are not relevant.  It will be for you to decide.

23   You are going to be presented with the evidence here as to this

24   defendant and anything else that's important for you to

25   consider, and you can decide whether or not that is sufficient
```

F1kdulb2

1   to draw those conclusions yourself.

2          That would be one way of doing it.  And then we would

3   have to, for purposes of later on, determine if we have

4   questions later for the jury to have read back, whether or not

5   some of those pieces are then excised.

6          MR. TURNER:  OK.  So we'll take a look -- we'll have

7   somebody on our team take a look at that and see if we can

8   offer specific testimony to excise before redirect.

9          THE COURT:  All right.  If I understand it, there are

10  two matters`at the sidebar?

11         MR. TURNER:  Yes, your Honor.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

**A444**

Xf1kdulbs1                    S E A L E D

1           THE COURT:  OK.  All right.  What is your issue number
2    two?
3           MR. TURNER:  Your Honor's ruling may resolve this so
4    it may not be necessary to get at it now.  But the defense's
5    submission last night in terms of the additional private
6    messages that the defendant talked about introducing that
7    involved another suspect that Agent Der-Yeghiayan looked at, it
8    is becoming clear to the government that the intent of
9    introducing the Mark Karpeles information and information about
10   this other suspect is that information about both suspects was
11   leaked to DPR.  In other words, there are chats where from this
12   second suspect information was passed to DPR.
13          And the implication was, hey, I know who you are.  You
14   have to pay me $250,000 if it looks like something that Carl
15   Force would be investigated for.  Similarly, the Mark Karpeles,
16   we know that Mr. Force is under investigation for thinking that
17   Mr. Karpeles was interested in talking to authorities, that
18   that fact was leaked to DPR in exchange for an offer of
19   payment.  That was the French-maid issue that came up in the
20   course of investigation.  So it seems to complement that this
21   is a backdoor attempt to try to inject Carl Force into the
22   case, and that heightens the 403 concerns that we have already
23   raised.
24          I think that your Honor's ruling probably is going to
25   avoid these issues, but, nonetheless, we wanted to bring that

**A445**

595

Xflkdulbs1                    S E A L E D

1    issue to your Honor's attention so that your Honor was fully
2    informed about the background of our concerns.
3                THE COURT:  Let me find out.  Are you planning on
4    doing any of this?
5                MR. DRATEL:  A couple of things.  One is in the letter
6    yesterday -- is this sealed or not sealed?
7                THE COURT:  It will be sealed.
8                MR. DRATEL:  I was extremely careful, knowing that it
9    was going on ECF, not to allude to anything that would be about
10   this.  But the fact is that what I was talking about in the
11   letter yesterday was an account by a user that they haven't
12   identified as Carl Force.  It is a different account.  And it
13   is not about Karpeles, it is about the other person, Anad
14   Athavale, and that that name was provided to DPR in April of
15   2013.  This is someone who they were actively investigating at
16   the time.
17               Karpeles was also part of it.  They can't whitewash
18   discovery by bringing in Force.  That is their problem that
19   they've created.  I am allowed to use what they have given me
20   that is not under seal.  None of that stuff is under seal.
21               THE COURT:  To the extent that what you folks are
22   talking about are written documents which show that DPR had
23   leaked to him, from whoever --
24               MR. DRATEL:  And I didn't use the word "leaked."  I
25   said provided.  He --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

A446

Xf1kdulbs1              S E A L E D

 1              THE COURT:  He had available to him from some unknown
 2      source the fact the government was conducting an investigation
 3      pursuing to certain leads, that will be fair game.  And I take
 4      it there is no reason that you have to tie that in any way to
 5      Carl Force.
 6              MR. DRATEL:  No.
 7              THE COURT:  But the point is that the defense theory
 8      is that DPR becomes aware that there is heat and he takes
 9      evasive measures.
10              MR. TURNER:  No, your Honor.  I mean, that is not how
11      it plays out and we can go over this, and it is going to come
12      out in the questioning.
13              THE COURT:  Is it going to come out with this fellow
14      here, Der-Yeghiayan?
15              MR. DRATEL:  Only -- I will develop the facts of the
16      investigation of this other person -- no beliefs -- just what
17      he learned about this other person through his investigation
18      and what he did in this part of his investigation.  Part of it
19      is about to contrast Ulbricht, and it is not just about this
20      person is under investigation.  Because he does an entire
21      analysis -- language analysis of that person, very extensive,
22      and they can do one word with Ulbricht.  So I want to show that
23      six pages and one word.  One word doesn't mean anything.  They
24      have six pages of one guy and one word of Ulbricht to make it
25      seem like it is some sort of, aha, some sort of an "aha" moment

Xf1kdulbs1          S E A L E D

1   that they have one word with Ulbricht that they are going to
2   say ties him to the DPR posts.  So in that context, I am going
3   to develop that.
4            I am going to ask him if he is aware of the private --
5            THE COURT:  Let me ask you.  Does Der-Yeghiayan, did
6   he perform that analysis.
7            MR. DRATEL:  Yes.  Yes.  There is a whole memorandum
8   of it, and he sends it to a college professor.  I am not going
9   to ask him what the college professor said.  I am going to say,
10  you sent it to a professor?
11           MR. TURNER:  Your Honor, I can fully address the
12  facts.
13           MR. DRATEL:  There is one other aspect of it, just to
14  complete it.  I don't want to leave it out.
15           In terms of the -- I'm going to ask him if he has
16  reviewed the private message system from Silk Road.  And if he
17  has, I am going to ask him whether he is familiar with the
18  posts that puts this guy's name in DPR's hands in April of
19  2013.  In other words, that DPR is aware that this person Anad
20  Athavale is on the radar potentially as DPR.  And then I would
21  put that post in if he is aware of it.
22           THE COURT:  OK.  Mr. Turner.
23           MR. TURNER:  Oh, your Honor, I am preparing to fully
24  explain the facts, just as I did with the Karpeles issue,
25  because this is another issue where there is great potential

Xf1kdulbs1                    S E A L E D

1   for prejudice and no potential to draw any concrete, specific
2   bona fide link between anybody else and DPR.
3         So to the first issue about language analysis, Agent
4   Der-Yeghiayan is not a linguistic expert.  And if you look at
5   the linguistic parallels, it is things like he spelled Anad
6   without a space in it.  Basically, what happened is he, as you
7   saw yesterday, DPR's public profile had a link to mises.org on
8   it.  Agent Der-Yeghiayan found somebody on mises.org that
9   posted a lot with many posts, and then he noticed similarities
10  that were not that remarkable at the end of the day but he
11  thought they were from him.  But this is another example of it
12  puts it in a different light for the defense to ask him you
13  were investigating this guy because you saw all of these
14  parallels instead of just simply putting the parallels before
15  the jury and letting them judge for themselves.  That is
16  problem number one.
17        THE COURT:  Hold on.  I want to see whether or not
18  what you are suggesting is in part that it is perfectly
19  appropriate for the defendant to put, for instance, the private
20  message in that says his name, Athavale, whatever it was, was
21  potentially a subtarget.  And, also, the defendant, Mr. Dratel
22  could use various posts of that individual and ask the witness,
23  "Mr. Der-Yeghiayan, did you in fact analyze these?"  "Yes."
24  And then, "Did you find certain -- did you note similarities in
25  the following words?"  "Yes."

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

A449

599

Xf1kdulbs1                    S E A L E D

1              He can do that, right?
2              MR. TURNER:  No.  There are a number of problems.
3              First, let's just take what's being analyzed.  We're
4    talking about the mises posts on a discussion forum.  This is
5    the classic Vayner issue.  I mean, instead of asking did you
6    see some of this language written by Anad Athavale and then
7    compare it to DPR, first what postings are you talking about?
8    Let's put them before the jury.  Where did they come from?  The
9    foundation.  If that's done, then we are talking about posts on
10   a website, mises.org, that have not been authenticated in any
11   way.  We don't know who posts these.  All we know is that there
12   are posts on a Web page.  We don't even know if --
13             THE COURT:  Hold on.
14             MR. TURNER:  This is an example of sort of glossing
15   over the evidentiary issues with the underlying evidence that
16   Jared -- that Special Agent Der-Yeghiayan relied on in reaching
17   his conclusions.  The defense should be focusing on the
18   underlying evidence, not what the agent did or what he thought
19   or that sort of thing.
20             If the defense theory is there is this individual out
21   there with all these posts on mises.org and it sounds like DPR,
22   they should put those posts before the jury, not through the
23   lens of Special Agent Der-Yeghiayan's analysis but just the
24   posts themselves.  If they want to point out the similarities,
25   they can do that themselves.  If they want to call a linguistic

A450

Xf1kdulbs1                   S E A L E D

1  expert who has some special expertise to add, they can do that.
2  But special Agent Der-Yeghiayan's opinion about how strong the
3  ties were is irrelevant.
4          So that is problem number one.
5          Problem number two is the -- let me just explain what
6  happens when Special Agent Der-Yeghiayan identifies a suspect.
7  He puts it into the system, the Agent's HSI system.  Other
8  agents in HSI and DEA can then look at those names.  There were
9  competing investigations going on.  Chicago is investigating.
10  Baltimore is investigating.  So what you have here is the
11  possibility of a Baltimore agent, Carl Force, sees this name
12  pop up as a target of a suspect that Agent Der-Yeghiayan is
13  looking at.  Then he sends messages to DPR saying I know who
14  you are.  You are Anad Athavale.  Then he told him 250,000.
15  Then you have the possibility of this agent taking that name
16  and leaking it to DPR, getting the payment.
17          Here are the posts at issue.  If your Honor wanted to
18  take a moment?  You can see.  These are two from DPR and its
19  user from above.
20          THE COURT:  Mm-hmm, and --
21          MR. TURNER:  The information goes here.  You'll see
22  Dread Pirate Roberts responds, "Leave me alone."  If you look
23  at the logs that we found on Mr. Ulbricht's computer, this
24  comes up.  He says --
25          (Pause)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
Xf1kdulbs1              S E A L E D
```

1         Hold on, your Honor.  Here it is.  OK.
2         So in the log on Ulbricht's computer, he says, "Got
3    death threat someone, death from above, claiming to know I was
4    involved with Curtis' disappearance and death" -- this is from
5    the first murder for hire.  And then a little while later,
6    after he passes this individual's name, Anad Athavale, he says,
7    "Guy blackmailing, saying he has my id is bogus."  OK.  So it
8    is not Anad Athavale.
9         The effect of introducing this, the prejudicial effect
10   is several fold.  One is it potentially suggests to the jury
11   that Agent Der-Yeghiayan has messaged DPR with this information
12   about this targeting and he is seeking $250,000.  Another is to
13   suggest that Anad Athavale is somehow involved in some -- in
14   the conspiracy somehow, when, again, there is no specific link.
15   This is just hearsay and there is no specific link being drawn
16   based on any competent evidence.
17        So to introduce all of this -- thirdly, it implicates
18   potentially an ongoing range of the investigation of Carl
19   Force.  It fits the pattern that the investigation has already
20   seen.
21        THE COURT:  Let's be clear.  The fact of the Grand
22   Jury investigation is not going to come in.  Whether or not
23   other evidence disclosed during the course of this case that
24   we're trying now can come in is separate and apart from the
25   Grand Jury investigation.  Nobody is going to draw a connection

```
Xflkdulbs1              S E A L E D
```

1   to the Grand Jury investigation.  That is going to be off
2   limits.  I think we all understand that.
3            The question is whether or not this somehow gets taken
4   out of the pile.  And I'm still confused about what you want to
5   do with it.
6            MR. DRATEL:  We see that all as a red herring, the
7   posts.  It is really about what this agent did, not about the
8   posts.  It's about the comparisons that his did in his
9   investigation and the memorandum that he wrote and sending it
10  to a college professor.  That's what important in contrasting
11  it with what they did with Mr. Ulbricht.
12           Now, the second part is --
13           THE COURT:  Let's just take that one piece.
14           As part of this witness' investigation, he took
15  certain steps where he looked to certain posts and he analyzed
16  and circled language.  Is that the "yea," the y-e-a?
17           MR. DRATEL:  No.  That is for Mr. Ulbricht.
18           MR. TURNER:  Which we don't plan to introduce.
19           MR. DRATEL:  They are smart.
20           MR. TURNER:  Just as a backup.
21           THE COURT:  So you are not going to do the links,
22  which is particular thing?
23           MR. TURNER:  No, your Honor.
24           THE COURT:  So what are you needing on the direct
25  examination if they are not going to do the linguistic?

                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

Xf1kdulbs1                S E A L E D

1              MR. DRATEL:  Because he did a comparison of this guy
2      with six pages of similarities of language between this guy and
3      DPR.  And, you know, this is probably a game timing decision by
4      the government not to put that in now.  And I want to put in
5      that in the warrant for Ulbricht they wanted to go after all of
6      his writings to analyze it the same way.  It is not about
7      probable cause.  It's not this.  It is about what they did in
8      their investigation.  That if they want to come back with
9      "yeah," that's OK.  If I've opened the door to that, that's
10     fine.
11             But the other issue is with respect to these messages,
12     it is not about whether they are true or not.  It is not
13     about -- it is not where they come from.  I'm not talking about
14     the truth, but I will stipulate it is not him.  I will ask him,
15     if you want.  You didn't do that, did you?  I don't have any
16     intention.  I --
17             THE COURT:  The government is nodding their head, no,
18     that they don't want you to do that.
19             MR. DRATEL:  I have no intention of insinuating in any
20     respect that he is the person who leaked it, but the fact is
21     DPR was given this information.  Part of our defense is that
22     DPR had ample time between April of 2013 and, with respect to
23     Karpeles, May of 2013, when his money gets seized, to devise
24     and implement a plan designed to put Mr. Ulbricht in the
25     crosshairs.  We don't acknowledge the veracity of that.  We do

Xflkdulbs1          S E A L E D

1    not acknowledge that that is Mr. Ulbricht's writing.
2            THE COURT:  I understand.  In terms of this page, this
3    is the one that you say Mr. Turner has a Vayner issue?
4            MR. TURNER:  No, your Honor.
5            THE COURT:  Are there going to be any of the documents
6    introduced, Mr. Dratel, that are from the mises.org?
7            MR. DRATEL:  No.
8            MR. TURNER:  That's precisely the problem, your Honor,
9    is that it is wrong.  It's not permissible to simply ask the
10   witness could you look at a bunch of pages on mises.org and did
11   it sound like the defendant.
12           THE COURT:  You can't ask that.
13           MR. DRATEL:  No.  It is postings -- no, not the
14   defendant.  No.  The posts by this guy Athavale, he took all of
15   his posts on mises.org.  He took his posts, and he examined
16   them with respect to DPR.  Did an extensive analysis, and sent
17   it to a college professor of English to analyze.  I am not
18   asking for the conclusion.
19           The conclusion, by the way, was that they could very
20   well be the same person, but I am not going to ask that based
21   on the Court's ruling, and it is hearsay, anyway, so I won't
22   ask it.  But the point is that it is a comparison.  It is the
23   way they went about the investigation that is relevant.  It is
24   not the mises.org.
25           THE COURT:  Let me understand that.  Hold on.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

605

Xf1kdulbs1          S E A L E D

1       MR. DRATEL:  By the way, mises.org is something they
2   tried to connect the defendant to as well.
3       THE COURT:  I understand.  You have mises.org and a
4   series of posts.
5       MR. DRATEL:  Yes.  And the guy is also a computer
6   expert and all the other things.
7       THE COURT:  Hold on.  Then we have another series of
8   DPR posts.  Those posts, the DPR posts, are part and parcel of
9   what Der-Yeghiayan has brought in already?
10      MR. DRATEL:  Correct.
11      MR. TURNER:  No.
12      MR. DRATEL:  It is everything.
13      MR. TURNER:  That is not correct, your Honor.  Agent
14  Der-Yeghiayan only brought in public posts of DPR.  DPR also
15  had private messages.  These came from the server that the FBI
16  seized.  Agent Der-Yeghiayan didn't have access to those.  He
17  didn't testify about them.
18      THE COURT:  He didn't have access to them?
19      MR. TURNER:  No.  He testified about the private
20  messages that DPR sent to him that he has located, and had
21  access to DPR's private messages.
22      MR. DRATEL:  No.  He is mixing apples and oranges.
23      I am talking about those.  We are talking about
24  Athavale and what he did to compare to Athavale were all the
25  forum posts that he had everything that DPR wrote on the forum.

          SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

606

Xf1kdulbs1                    S E A L E D

 1              THE COURT:  Let me see if I can get this.  Hold it.  I
 2     am trying to understand it.
 3              So we have the mises.org posts, and we have some forum
 4     posts from this AA fellow, right?
 5              MR. DRATEL:  Yes.
 6              THE COURT:  Those forum posts are in the record?  Are
 7     they currently in the record?
 8              MR. TURNER:  Let me see how to make it clear.
 9              So there are mises memo posts of Anad Athavale.  That
10     is the agent's conclusion.  In terms of how he knows they go
11     back to Anad Athavale, that raises a Vayner issue.  All he sees
12     are posts on a screen that are --
13              THE COURT:  Hold on.  So is it the case that the
14     mises.org posts are not tied directly to Anad -- to AA?  I'm
15     shortening his name?  That the only way they're connected is
16     through the agent's subjective belief?
17              MR. TURNER:  His investigation.
18              MR. DRATEL:  Subjective belief?  It is the guy's
19     account.
20              THE COURT:  Mises.org is his account?
21              MR. DRATEL:  Yes.
22              THE COURT:  Did it have his name?
23              MR. DRATEL:  It is his account.  He posted it under
24     his account.
25              MR. TURNER:  That's precisely the fact in Vayner, your
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

Xf1kdulbs1                    S E A L E D

1    Honor.
2         MR. DRATEL:  DPR should go out because it is not
3    necessarily Mr. Ulbricht, it is just DPR.  This is what's good
4    for the goose is good for the gander, and it is not about the
5    mises.org posts.  It is about what he did in the investigation.
6    It is what he did.
7         MR. TURNER:  OK, your Honor, if I could explain?  So
8    what the agent did is irrelevant.
9         THE COURT:  Can you get me Vayner?
10        MR. TURNER:  You could have someone testify off the
11   street:  Hey, I found something interesting.  I found a bunch
12   of posts on this website.  It reminded me of DPR.  I could
13   swear it is the same language.  That is not evidence.
14        If what they want to do is to show there was another
15   person who posts a bunch of things on a website and that it
16   matches DPR based on, you know, concrete, very distinctive
17   linguistics, they don't need Agent Der-Yeghiayan to do that.
18   They can properly authenticate the posts as being attributable
19   to someone else, and then they can show to the jury that those
20   posts match the linguistic patterns of DPR.  They do not need
21   Agent Der-Yeghiayan to do that, and it is improper to use Agent
22   Der-Yeghiayan to do that because it injects all that he knows
23   from his investigation that may not be admissible by itself.
24   He can't just say, oh, yeah, those are Anad's posts.  There has
25   to be proper authentication.  The document has to be shown to

A458

608

Xf1kdulbs1                    S E A L E D

1   the witness.  The document has to be properly authenticated by
2   someone from mises.org who can show that there is subscriber
3   information that goes back to someone else.
4           That's what Vayner stands for.  You can't just take a
5   Web page off the Internet and just assume that, oh, yeah,
6   because it says Anad Athavale, that's where it is from.
7           MR. DRATEL:  I'm not looking --
8           MR. TURNER:  This goes back to the point, this
9   whole --
10          MR. DRATEL:  I don't care about the mises.org posts
11  themselves.  I only care about what he did with them and his
12  analysis and the investigation and the way the investigation
13  proceeded in a way that ultimately gave DPR knowledge that this
14  guy was -- and, you know -- look, I know the difference
15  between, you know, Vayner and what I'm trying to do.  I got
16  sent emails alleging to be from Karpeles on a death threat.  I
17  know that I can't authenticate that.  There are no headers.  I
18  don't know whether it is true or not.  So I don't know.
19          This is he says by himself it was Athavale.  The agent
20  satisfied himself.  So all of a sudden now we've got a brick
21  wall between what he did and did for two years and
22  cross-examination.  Yeah, I could bring somebody on to do it,
23  no reason.  That doesn't mean I can't do it through him.  Just
24  because I could do it another way doesn't mean I can't do it
25  through their witness.  They put him on.  They opened all these

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

**A459**

Xflkdulbs1                    S E A L E D

1    things up.
2              THE COURT:  They didn't put him on for purposes of the
3    AA posts, though.  If they had, then the work he had done to
4    further investigate the AA posts would be one thing.  Here,
5    I've got multiple concerns.
6              One is it has taken so long for me to even figure out
7    what we are doing that I am concerned about misleading the jury
8    and having this devolve into sort of trials within trials of
9    who did it.  As I said before, the real issue here is whether
10   or not this fellow can be tied, and if he can't be tied, then
11   he should be acquitted.
12             MR. DRATEL:  He tied him.  He tied him.
13             THE COURT:  What we are talking about now is not
14   whether or not -- the AA posts are not whether or not Ulbricht
15   is tied, it's whether or not AA is tied.
16             MR. DRATEL:  The agent satisfied himself that it was
17   legitimate.
18             THE COURT:  He can pursue multiple suspects.  It
19   doesn't matter ultimately.
20             Let me ask it this way.  Is there any other evidence
21   that could be put forward that would indicate that at one point
22   in time DPR received information indicating that law
23   enforcement was on to him?
24             MR. DRATEL:  Yes.  It is all over the place.
25             THE COURT:  That is the point you want to make?

**A460**

610

Xf1kdulbs1                    S E A L E D

1              MR. DRATEL:  Also, this specific person, too.  They
2       just want me to be abstract, and then they will say at the end
3       in their rebuttal, oh, there is nobody, there is nobody --
4              THE COURT:  You can put up a witness who can go on to
5       the mises.org website and pull this stuff up.
6              MR. DRATEL:  That is not the issue.  It is really
7       overbearing.  It is a red herring.
8              THE COURT:  Then you can say that mises.org requires
9       certain kinds of password protection and blah, blah, blah, and
10      this is this guy, and I am an expert in linguistics, or
11      whatever, and I can connect the language as similar, and then
12      it is up to the jury to decide if it is in fact the same
13      person.
14             MR. DRATEL:  But it is not the purpose of cross.
15             THE COURT:  The purpose of the cross is to build up
16      the possibility that another person is DPR.  But you're trying
17      to do it by showing a website that we don't know if he has any
18      basis --
19             MR. DRATEL:  He did the investigation.
20             THE COURT:  We are in the "belief" and speculation.
21             MR. DRATEL:  He established that it was legitimate,
22      that those were his posts.  I have to go back over the 3500 to
23      look at it, but he didn't just pick it out of the air and
24      say --
25             THE COURT:  None of this AA fellow was brought up on

611

Xflkdulbs1                    S E A L E D

1    direct.
2              MR. DRATEL:  I understand.
3              THE COURT:  And it is also outside the scope.
4              MR. DRATEL:  Well, I will call him back --
5              THE COURT:  Give us more time to think about it, then.
6    We will.  We'll see how it goes.
7              MR. DRATEL:  It is within the scope of the direct
8    examination.
9              THE COURT:  It is not within the scope of the direct.
10             MR. DRATEL:  The inferences to be drawn from all of
11   this are not exclusively the government's province to define.
12   I get to define them, too, for the jury.
13             THE COURT:  I certainly understand that.  Through
14   competent evidence, as I've said, you can put together the dots
15   and then you could argue to your heart's content during
16   closings about what the proper inferences are, and then the
17   jury will either believe you or not.
18             MR. DRATEL:  I would like to prove everything that
19   they can't tie directly to Ross Ulbricht, which is basically
20   their entire evidence, all their DPR.  They don't have it
21   coming from his computer.  They don't have any of it.
22             It is completely Vayner.  Every DPR post, they don't
23   have any evidence that it's Ross Ulbricht because they don't
24   have anything connected like mises.org.  It is the same thing.
25   It's the same principle.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

Xf1kdulbs1          S E A L E D

1          THE COURT: I am going to leave open the possibility
2    that this witness will be called back on the defense case, and
3    there will be an opportunity then to have you brief what you
4    want to bring out for him on direct. It will be your own
5    examination. And we'll cross that bridge when we come to it.
6          Right now my determination is that it is outside the
7    scope of the direct examination right now because it is dealing
8    with a whole nother issue that we never have gone into. It is
9    also confusing -- certainly confusing to me and I would think
10   the jury -- and potentially misleading, and so for those
11   reasons at this point in time I am not going to allow it on the
12   cross-examination of this witness, but whether or not you can
13   bring it up on a direct that you yourself construct, we'll
14   cross that bridge when we come to it.
15         MR. DRATEL: Your Honor, the confusion is with DPR,
16   and I am allowed to exploit that. Any confusion that the jury
17   has about who is DPR, that is legitimate. This notion that it
18   is prejudicial is -- of course, all evidence is prejudicial,
19   right? It's not unfairly prejudicial. It is precisely what
20   our defense is and we are allowed to do. And it is not fair to
21   let the government put in a ton of evidence that they cannot
22   connect to Mr. Ulbricht directly, that no one is going to come
23   in and say he wrote that, he wrote that, he wrote that. There
24   is no connection of electronics that is going to show that he
25   wrote it. And then to say that something that he satisfied --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

613

Xf1kdulbs1            S E A L E D
1   that their agent satisfies himself was the guy, not for the
2   purpose of validating those posts but showing what he did in
3   his investigation.  That's all.
4           And then this guy's name gets provided to DPR.  I
5   mean, and, you know -- and, also, the fact that, to the extent
6   it implicates Force, it's only because of a problem that
7   they're making one hundred percent, one hundred percent.
8           THE COURT:  In any event, my ruling is what it is.
9           So we will proceed in the manner that I suggested,
10  which is at the moment I don't find that this evidence is going
11  to come in for the reasons that I have stated, and whether or
12  not it can come in on the defense case remains to be determined
13  and we'll proceed and look at all the issues.
14          MR. DRATEL:  So about Athavale entirely or about just
15  these posts?
16          THE COURT:  What was described to me was something of
17  simply the mises.org linguistic comparison to AA through the
18  other piece.  I don't know that there is any -- that that's the
19  ruling that I make.
20          And is there anything else?
21          MR. DRATEL:  OK.
22          MR. TURNER:  Your Honor, I just ask that the exact
23  record be placed under seal, that this transcript be placed
24  under seal following the discussion of Mr. Ulbricht talking to
25  his family.

**A464**

614

Xf1kdulbs1          S E A L E D

1          THE COURT:  Well, the only issue I have is depending
2    upon what is your view, Mr. Dratel?
3          MR. DRATEL:  Well, the Force thing is implicated
4    throughout, I suspect.
5          THE COURT:  Then it is under seal -- thank you -- the
6    portion following that relates to everything except for the
7    initial portion relating to Mr. Ulbricht's family.
8          Let's bring out the jury.  Can I bring out the jury?
9          (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

F1kdulb2                         Der-Yeghiayan - cross

1   were able to monitor?

2           THE COURT:  I will allow it.  Overruled.

3   A.  I believe there was.

4           On the forums you are asking?

5   Q.  No.  Between DPR and Scout on the Silk Road system in one

6   form or another.

7   A.  Later on I learned of that there was discussion between

8   them.

9   Q.  And that was one of the reasons for a falling out between

10  DPR and Scout?

11          MR. TURNER:  Objection.  Foundation.

12          THE COURT:  Yes.  So that is sustained.

13  A.  That --

14          THE COURT:  No.  That was sustained.  So he will ask

15  another question.

16          THE WITNESS:  Sorry.

17  BY MR. DRATEL:

18  Q.  But there was talk between Scout and DPR about whether

19  Mr. Wonderful was law enforcement, correct?

20          MR. TURNER:  Objection.  Foundation.

21          THE COURT:  Well, I think that the issue is did you

22  actually review the communications between Scout and

23  Mr. Wonderful?

24          MR. DRATEL:  No, between Scout and DPR, your Honor.

25          THE COURT:  Did you review the communications between

F1kgulb3                          Trial

1              I have received from the government an email that was

2     copied to counsel, all counsel, that has their proposal as to

3     excerpts to be stricken based upon the Court's prior ruling.

4              Mr. Dratel had mentioned before that the Court had not

5     yet entertained arguments as to waiver, and that is correct, or

6     any other arguments other than rearguing the Court's

7     evidentiary ruling.  Also I need to know how soon we're going

8     to have to deal with this when the redirect is likely to begin.

9              Mr. Dratel, let's take the last question first.  How

10    much more on cross do you have of Mr. Der-Yeghiayan?

11             MR. DRATEL:  With the exception of one question that

12    I'll ask the Court, which is whether I'm going to go at all

13    into the second person, I'm not sure whether I'm allowed to go

14    at all into the second alternative suspect, whether that's

15    something --

16             THE COURT:  The main issue that we had dealt with was

17    with the mises.org piece.

18             MR. DRATEL:  Right.

19             THE COURT:  If there are other aspects of it that I'm

20    unaware of, we can take it step by step and see.

21             MR. DRATEL:  So, between an hour, an hour and-a-half I

22    guess.

23             THE COURT:  So probably then, it's likely to be a time

24    for break, but do you want to now preview your waiver argument?

25    I think I understand just with the word "waiver" possibly the

F1kgulb3                          Trial

 1   contour of what you're getting at, but I'd like to give you a

 2   chance to state it for the record.  We can do it at the break

 3   if you'd rather not do it right now.

 4           MR. DRATEL:  I can do it at the break in a way

 5   that -- the waiver is really three parts:  One is, they didn't

 6   object, and you can't put that genie back this the bottle in

 7   any respects.  The second is, they're not objectionable in many

 8   respects even under the Court's ruling.  And the third would be

 9   that, you know, it changes the whole nature of how an

10   examination proceeds and that's one of the reasons why you have

11   to object contemporaneously because then you can't go back and

12   reconstruct it in a manner that then undoes things that you

13   could have changed.

14           So all of that is a factor in the waiver argument and

15   the Court said on Thursday that it was out there already, so,

16   you know, --

17           THE COURT:  The fact that Mark Karpeles exists as a

18   potential individual as to whom there is some evidence that

19   people can draw inferences from, that would not be gone from

20   the case.  Even with the government's suggestions, there is

21   lots of evidence in terms of questions that you asked that was

22   perfectly appropriate in that regard.

23           MR. DRATEL:  Yes.  And I think all appropriate in the

24   context of -- not only in the context of alternative suspect,

25   but also in the context of the conduct of the investigation,

F1kgulb3                              Trial

1    because at the end of the day, we're going to have a comparison

2    with the investigation of Mr. Ulbricht and the conclusions that

3    were drawn and the investigations of at least two other people

4    and the conclusion that were drawn, and at the end of the day,

5    the only thing that's going to be a factor for the government

6    is something that no one can trust.  That's part of the whole

7    defense, and that's part of what these questions are about.

8             And it's perfectly appropriate to ask an agent and a

9    law enforcement officer about the conduct of his investigation

10   and how it proceeded and even --

11            THE COURT:  I don't want to reargue the evidence.

12            MR. DRATEL:  I know, I'm just saying, the notion that

13   now that there's no waiver when these things come in and is

14   just -- I mean, there has to be some notion of waiver in the

15   context of a trial in the sense of what it means to have a

16   contemporaneous objection and what it means not to have a

17   contemporaneous objection.

18            THE COURT:  Mr. Turner.

19            MR. TURNER:  Your Honor, the trial has gone fast.  You

20   wish you had all the law at your fingertips.  I think the Court

21   was inclined to think a lot of the testimony was admissible,

22   which after further review is now clearly inadmissible.

23            It's not too late for the defendant in that we're not

24   past cross.  We're still in the middle of cross.  If the

25   defense has further inquiry that's admissible that's proper

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1kgulb3                        Trial

1    about Mr. Karpeles, the defense can still pursue that, so

2    there's no prejudice to striking the prior testimony.

3              And the problem with leaving it in is there's very

4    clear circuit law that if hearsay like that comes in, the

5    curative admissibility doctrine applies and the government can

6    get equivalent hearsay in on redirect.  So the government

7    certainly would inquire of Special Agent Der-Yeghiayan in the

8    same fashion that the defense inquired on cross about all the

9    reasons that he now believes the defendant is guilty, and that

10   would certainly be appropriate.  And I think that was what your

11   Honor wanted to avoid by striking the testimony that's

12   objectionable that came in on Thursday.

13             THE COURT:  So here is what we're going to do --

14             MR. DRATEL:  Just one other thing.

15             THE COURT:  Yes.

16             MR. DRATEL:  They knew full well what was in the 3500.

17   They cannot -- it cannot be that this was not on the radar for

18   them, then to sit by and let it all come in and then completely

19   eviscerate the defense after the fact is unfair, and that's a

20   waiver.

21             They knew better than anyone what was in the context

22   of my questions and what was in the context of Agent

23   Der-Yeghiayan's answers.

24             THE COURT:  Mr. Turner.

25             MR. TURNER:  I would say never in a million years

F1kgulb3                          Trial

1   would I have imagined that the defense would be trying to

2   allege that Mark Karpeles framed Dread Pirate Roberts.  I don't

3   think that was clear from the opening and that was not apparent

4   to the government until the questioning came in that way.  So

5   the government I don't think was put on notice by the opening

6   alone.

7          THE COURT:  My basis for my ruling is not that the

8   government should not have anticipated; that they may well have

9   anticipated it.  They should have objected, but they didn't.

10  We are now where we are.

11         We have had an objection that we have now talked about

12  extensively, and I will strike the testimony that is indicated

13  in the government's email to the Court, but not right now.  I

14  say that to you folks so that you can plan the remainder of

15  your cross and the government can plan its redirect as

16  appropriate.

17         I do not, however, plan to point the jury to the

18  specific Q and A's that I'm striking, unless you folks make

19  arguments that that's what I should do.

20         My intent, which I intend to do not right now, is to

21  give the jury a general instruction about suspicions and

22  conclusions that the agent reached are struck from the record

23  and then to provide clear indication by line to the court

24  reporter and to everyone here as to what is struck from the

25  record, but I don't think it stands in anyone's interest to

**A471**

F1kgulb3                    Trial

1     have it be put on to the screen in terms of exactly what's

2     struck from the record.  That seems to indicate taking away and

3     giving more weight to it all at the same time.  So I think it

4     actually has issues where it compounds the problem.

5            But we can deal with that, the method, at another

6     time.  And when I say another time, it won't be a long time,

7     but in terms of being able to understand what to proceed with

8     right now, people should proceed with that view and to

9     construct the remainder of your cross.

10           If it goes on longer than you were anticipating,

11    Mr. Dratel, as a result, then I understand.

12           MR. DRATEL:  I don't know that I'm prepared to do it

13    for this reason:  First of all, there are facts here and

14    factual answers and factual questions that the government has

15    included that should not be stricken under any circumstances.

16           THE COURT:  I have reviewed them and I do believe that

17    what they indicated they would strike is consistent with my

18    ruling.  There are pieces that are around it, and I assume

19    you've got the same shaded portions that I have --

20           MR. DRATEL:  Yes.

21           THE COURT:  -- that are not struck and appropriately

22    so, and that would remain in terms of MtGox and Mark Karpeles.

23    I mean, he's not eliminated from the record.  And you'll

24    certainly be able to argue whatever inferences you think you

25    can argue.

F1kgulb3                        Trial

1          MR. DRATEL:  But there are other aspects of this that

2     are simply not -- that are factual, such as citizenship, such

3     as the part on page 506 and 507, which is about the conduct of

4     the investigation.  It has nothing to do with --

5          THE COURT:  I believe the government has, consistent

6     with my lengthy ruling this morning, cabined the material

7     appropriately.  So I'll look at each of the individual Q and

8     A's again, but you should proceed right now as if those pieces

9     are going to be struck from the record.

10          MR. DRATEL:  I'm not sure I can proceed on this level

11     because now I have to go back and reconstruct all this material

12     that was unobjected to.  I have to go back and look at parts of

13     the cross that were already finished and done and then

14     reconstruct it.  I can go on with my cross right now, but then

15     I'd like a break until tomorrow.

16          THE COURT:  No.  I'm done with this issue.  If the

17     government had objected timely at the first Q and A, we

18     wouldn't be having this issue right now because it would have

19     been highlighted on the basis of suspicion, conjecture and

20     belief right then as opposed to going on.

21          MR. DRATEL:  And I would have rephrased the question.

22          THE COURT:  I'm saying go back and you can rephrase at

23     the questions right now.

24          MR. DRATEL:  But I need time to look at this.  This is

25     seven or eight different pieces.

F1kgulb3                          Trial

1          THE COURT:  We have been dealing with the possibility

2    that this very information could be struck since Thursday

3    night.

4          MR. DRATEL:  No.  They didn't identify this until 20

5    minutes ago.

6          THE COURT:  No.  It was obvious to me and it should

7    have been obvious to you folks that when we were dealing with

8    an objection about a type of testimony, that one potential

9    result, particularly in light of the government's letter when

10   they made an application to strike, is that certain things

11   would be struck.  The only question was what.

12         And therefore, this should not be a big shock in terms

13   of what's being struck.  I'm not suggesting that you should

14   like it or agree with it, but it's how we're going to proceed.

15         MR. DRATEL:  I want the equivalent so that -- I just

16   want it to be equivalent, that's all, so that they can sit on

17   their hands after providing all the 3500 material knowing

18   exactly where the examination is going, they don't have to do

19   that and now on the fly I have to do this.  I don't think

20   that's equivalent, your Honor.  I'm sorry.

21         THE COURT:  I think we have the way we're going to

22   proceed in mind.

23         Do we have a full jury?

24         THE DEPUTY CLERK:  We do.

25         THE COURT:  Let's bring out the jury.  Let's get

F1kgulb3                          Der-Yeghiayan – cross

1    don't know it, you're conjecturing.  And let us know that, all

2    right?

3              THE WITNESS:  Okay.

4    Q.  So it's based upon your investigation, correct?

5    A.  Yeah, based upon my investigation, I saw that there was a

6    later on falling out between them, that they weren't as close

7    as I originally thought they were.

8    Q.  But initially, your investigation established that he was a

9    right-hand man to Mr. Karpeles, right?

10             MR. TURNER:  Objection, your Honor.

11             THE COURT:  Sustained.

12   Q.  On the type of information that you would rely on in your

13   investigation, that's the type of information you had

14   establishing that he was Karpeles' right-hand man, correct?

15             MR. TURNER:  Objection; form and foundation.

16             THE COURT:  Sustained.

17             Let me ask it this way:

18             Do you have any independent information that this

19   person, Barr, is a right hand or close associate of

20   Mr. Karpeles?

21             THE WITNESS:  I don't.

22             THE COURT:  All right.  I take it you never spoke to

23   this associate?

24             THE WITNESS:  I never did, no.

25             THE COURT:  All right.  Move on.

1           (At the side bar)

2           THE COURT:  I don't want to revisit everything we've

3     been through.  I know that the defense does not agree with my

4     rulings and so I understand that.  What I would like you to do

5     is, you can make a proffer during a break or in a letter as to

6     what you would ask that you understand I'm precluding you from

7     asking so I'll confirm it, so you've got it preserved for

8     appellate purposes.

9           But right now, my ruling is you can't use this witness

10    about what he's read on the open Internet to confirm that

11    certain kinds of expertise were or were not within the -- were

12    not held by Mr. Barr or Mr. Karpeles.

13          This witness is reviewing things on LinkedIn and he

14    can't then say he was an expert in Linux.  He can't.  He can,

15    you know, the most that he can do, and you'd never be able to

16    rely upon it, to state he was an expert --

17          MR. DRATEL:  I'm fine with the notion that everything

18    that's on the Internet is unreliable and that goes for

19    everyone, and that goes for all their evidence, too.  And I'm

20    going to move to strike all of their evidence because it's all

21    Internet.

22          THE COURT:  What you need to do is you need to go

23    back, because there's a difference between something appearing

24    on an Internet where we've gone through each of the evidentiary

25    issues, for instance, a page that says brown heroin and

F1kgulb3                        Der-Yeghiayan - cross

1   something where we're extrapolating from a LinkedIn page which,

2   by the way, has got all kinds of *Vayner* issues, that he is in

3   fact an expert in Linux.  I have no idea who put that there,

4   whether he put that there or somebody else put that there, he

5   being Mr. Barr.

6          MR. DRATEL:  It's not a *Vayner* issue because *Vayner*

7   was about the website itself.  The Russian version of Facebook

8   had not been established.  If it was Facebook, they would have

9   let it in.

10          THE COURT:  I don't know enough about LinkedIn.  I'm

11   not a LinkedIn user myself, so as to the indicia of reliability

12   of who can edit, I don't know whether or not this person is or

13   is not an expert in Linux.  I have no idea.  You can call Barr

14   and find out what his expertise is.  I don't know where this

15   fellow lives.

16          MR. DRATEL:  He's Canadian.  I have no subpoena power

17   over him.

18          THE COURT:  I don't know where he's located.  If he's

19   in New York City, he can be down the street for all I know.

20          MR. DRATEL:  He's in Japan.

21          THE COURT:  My point is, you can't get that kind of

22   thing in.  What other things are we likely to confront so we

23   don't have back and forth that gets heated in front of a jury?

24          MR. DRATEL:  Talking about Karpeles' credentials?

25          THE COURT:  You can get in that there may have been

 1              THE COURT:  All right.  So I think that you can go on.

 2    BY MR. DRATEL:

 3    Q.  Did you swear in an affidavit that "Based on my training

 4    and experience, this platform is not widely used by forum

 5    administrators?"

 6    A.  It was something through the course that I learned --

 7    Q.  Did you not swear to that?  That is the question.  Did you

 8    not swear under oath in an affidavit that, based on your

 9    training and experience, the Wiki 1.17, the MediaWiki 1.17

10    version is not commonly used by forum administrators?

11    A.  That was in my affidavit.  Yes, I swore to that.

12    Q.  Also, you found that the forum, and a company controlled by

13    Mr. Karpeles, also ran something called simple machine -- I'm

14    sorry, the Silk Road forum, and something called -- and Mutum

15    Sigillum, Mr. Karpeles' company, ran something called Simple

16    Machines, right, the software?

17    A.  It was the bitcoin talk forums and the Silk Road forums

18    both ran on Simple Machines forum software.

19    Q.  And that wasn't common either?

20    A.  That was one that I wasn't familiar with, no.

21    Q.  Now, you investigated Mr. Karpeles' background, correct?

22    A.  I did.

23    Q.  And his professional background, right?

24    A.  I did.

25    Q.  And what kind of sources did you use?

F1kdulb4                              Der-Yeghiayan - cross

1    involvement and associations with Silk Road?

2              MR. TURNER:  Objection.  Form.

3              THE COURT:  Sustained.

4    Q.  Did you review notes from Mr. Ulbricht's computer?

5    A.  I did.

6    Q.  Did you find any inferences of Mr. Karpeles' involvement

7    and association with Silk Road?

8              MR. TURNER:  Objection.  Form.  Foundation.  Hearsay.

9              THE COURT:  Sustained.

10             MR. DRATEL:  Foundation is --

11             THE COURT:  No, you can do it, but you can't ask him

12   were there any differences.  You can show him different things.

13   The jury is the body that will draw inferences.  That's the way

14   it is.

15   BY MR. DRATEL:

16   Q.  Did you find inferences --

17             THE COURT:  I'm not going to allow finding inferences.

18   If you want to ask him about certain facts he saw on the

19   website, you can.

20             MR. DRATEL:  Could we have a sidebar, your Honor?

21             THE COURT:  I am not going to do a sidebar on this

22   one.

23   BY MR. DRATEL:

24   Q.  When you reviewed Mr. Ulbricht's notes, or what were on --

25   withdrawn.

F1kdulb4                        Der-Yeghiayan - cross

```
 1                MR. TURNER:  Objection.  It calls for speculation.

 2                THE COURT:  Sustained.

 3   Q.  If it had been hacked.

 4                THE COURT:  No.  He is not an expert witness to talk

 5   about the evidence of hacking.

 6   Q.  You never saw Mr. Karpeles' laptop, correct?

 7   A.  No, I've never seen his laptop or computers.

 8   Q.  Mr. Karpeles also controls a lot of websites, correct?

 9   A.  He was a hosting provider, yes.

10   Q.  And part of the your investigation in terms of trying to

11   keep the integrity of your investigation intact, you advised

12   other agents and other agencies not to go on Karpeles' websites

13   because he tracked them, correct?

14                MR. TURNER:  Objection.  Relevance and foundation.

15                THE COURT:  I will allow it.

16                (Pause)

17                There is a form issue with the word "integrity."  Why

18   don't you re-ask the question in a form that I will allow.

19                MR. DRATEL:  We are beyond that.  It is the next

20   question which is about --

21                THE COURT:  No.  The question you had was in part of

22   your investigation --

23                MR. DRATEL:  I'm sorry.

24   Q.  So in part of your investigation, in order to keep it

25   confidential, to keep targets from being advised of the fact
```

F1kdulb4                        Der-Yeghiayan - cross

1      BY MR. DRATEL:

2      Q.  And this, again, was in the latter part of 2012, correct,

3      like November 2012?

4      A.  Correct.

5      Q.  And, by the way, Vancouver is in the Pacific Time Zone,

6      right?

7      A.  Yes, it is.

8      Q.  And at some point have you reviewed any private messages on

9      the Silk Road service that existed -- on the Silk Road websites

10     or servers or anything on Silk Road, have you reviewed any

11     private messages that had the name Anand Athavale in them?

12             MR. TURNER:  Objection, your Honor.

13             THE COURT:  Give me one more word.

14             MR. TURNER:  403.

15             THE COURT:  I will allow this question.  You may

16     answer.

17     A.  Looking for his name on the servers?

18     Q.  Have you seen any entries in the universe of Silk Road on

19     the servers that has his name?

20     A.  If there is something to help me recollect my memory?

21     Q.  Private messages.  Someone named "deathfromabove"?

22             MR. TURNER:  Objection, your Honor.

23             THE COURT:  Sustained.

24             MR. DRATEL:  He wanted me to help him.

25             THE COURT:  I know.  But you are connecting that, the

1    testify to it, but don't speculate if you weren't given a

2    number.

3              THE WITNESS:  It was given to the Baltimore office.

4              MR. TURNER:  Objection.  Foundation.

5              THE COURT:  That is struck since it is not your

6    personal knowledge.

7              Did you learn of that through a communication with

8    somebody, through an A.U.S.A. in Baltimore?

9              THE WITNESS:  Through the U.S. attorneys.

10             THE COURT:  The fact of it, that he received that

11   information, is OK, but you can't get the truth of the account

12   number if you are not going to connect the dots.

13             MR. DRATEL:  I would move it under 807.

14   Q.  So you were told that by an assistant United States

15   attorney?

16             MR. TURNER:  Objection.  Hearsay.            .

17             THE COURT:  Sustained.

18   Q.  And Karpeles was still under investigation at the time,

19   correct?

20             THE COURT:  Can we get the timeframe.

21   Q.  October 12, 2013, eleven days after Mr. Ulbricht's arrest,

22   right?

23   A.  We were still looking at him for money service business

24   service charges, yes.

25   Q.  Now, going back to Mr. Karpeles, you never saw his laptop,

F1kdulb4                          Der-Yeghiayan - cross

1   A.   There was discussions that he had where he brought up a

2   possible lead in connections to Bates.

3   Q.   Right.  He had certain things in common not only with

4   Mr. Ulbricht but also with DPR?

5            MR. TURNER:  Objection.  Again, hearsay.

6            THE COURT:  Sustained.

7   Q.   Some of the things were about his political views, right?

8            MR. TURNER:  Objection.

9            THE COURT:  Sustained.

10           (Pause)

11  Q.   Did you look into Mr. Bates at all?

12  A.   No, I did not.

13  Q.   Now, before lunch we were talking about bitcoins and the

14  accounts that you had identified -- that Homeland Security had

15  identified as being part of Silk Road, do you remember?

16  A.   Yes.

17  Q.   So in August of 2012, you had identified several bitcoin

18  accounts associated with Silk Road that had the equivalent of

19  over -- talking about bitcoins in terms of value at that

20  time -- of over $5 million dollars, U.S. dollars, right?

21  A.   Yes.

22  Q.   And that that had gone up from May of that year, right?  In

23  May -- withdrawn.

24           In May of that year, there was only about $2 million

25  worth of bitcoins in the account, correct?

Case 15-1815, Document 32, 01/13/2016, 1682740, Page234 of 265

1   September, right?

2   A.  It did.

3   Q.  All the while, the FBI had the image of the servers and the

4   IP address for the servers, right?

5   A.  They did.

6   Q.  So there was a lot of pressure to get to the point to get

7   to the point to take down the site entirely, wasn't there?

8   A.  There was -- there was pressure from our management and

9   from, yeah, from basically our management and from the people

10  that are working with the U.S. Attorney's Office; yes.

11  Q.  And nobody was comfortable with the FBI having all this

12  information and this website selling drugs all over the world

13  continuing to operate, right?

14          MR. TURNER:  Objection; form.

15          THE COURT:  Sustained.

16          You can ask him a little bit differently as opposed to

17  everybody, your comfort level for everybody.

18  Q.  Were you comfortable with having all this information and

19  the site continuing to run unimpeded?

20  A.  It's not a call for me to make.  It's something that it's

21  for the U.S. Attorney's Office to make.

22  Q.  I'm not talking about the call.  I'm talking about your

23  comfort level with continuing to let the site operate.

24          MR. TURNER:  Objection; relevance.

25          THE COURT:  Sustained on those grounds.

Case 15-1815, Document 32, 01/13/2016, 1682740, Page235 of 265

1    down the site.  If -- especially with like a Tor site, you

2    would have to have ownership of it.  You would have to have a

3    key over it.  If you don't have full control over it, someone

4    can just pop it back up again on another server somewhere else.

5    And if you don't arrest the person that's running it, then --

6    there, too, they can just reopen the site again and you let on

7    your hand, you let on your investigation and you didn't really

8    solve anything then at that point.

9    Q.  In fact, Silk Road 2.0 was up and running by early November

10   of 2013, right?

11   A.  Silk Road -- there was a Silk Road 2.0; yes.

12   Q.  And virtually identical service as Silk Road that was

13   operated on those other servers, right?

14   A.  It was very similar to Silk Road 1, yes.

15   Q.  Now, with respect to closing the site down, there was

16   discussion among law enforcement about doing it as early as

17   May or June, right?

18   A.  If there's a document you're referring to to help me

19   recollect.

20   Q.  Sure.  It's marked as 3505-3004.  I'd ask you to read the

21   highlighted parts.  You can read the rest of it if you want,

22   but let me know when you're finished.

23   A.  Okay.

24   Q.  So, you had been told at one point that the FBI said it

25   would take the site down in May or June of 2013, right?

F1kgulb5                          Der-Yeghiayan - cross

1                MR. TURNER:  Objection; relevance.

2                THE COURT:  Sustained.

3    Q.  Well, the differences in how to proceed between Chicago and

4    Baltimore were so dramatic that there had to be a meeting,

5    right, to try to resolve it?

6                MR. TURNER:  Objection; relevance.

7                THE COURT:  Sustained.

8    Q.  There was a meeting between Chicago and Baltimore about the

9    direction of the investigation and splitting responsibility

10   responsibilities, right?

11   A.  Can you be more specific on a time frame?

12   Q.  Sure.  February 2012, February 1, 2012?

13   A.  That was -- the initial meeting that we had I believe with

14   or around about the time -- February, you said 2012?

15   Q.  Yes, uh-huh.

16   A.  I believe that might have been a coordination meeting among

17   multiple agencies.

18   Q.  And Baltimore said at that meeting that it was shutting

19   down Silk Road soon, right?

20               MR. TURNER:  Objection; relevance and hearsay.

21               MR. DRATEL:  Goes to the investigation.

22               THE COURT:  Hold on.  Let me think about it.  I'll

23   allow a few more of these.  I think I know where you're going

24   and it's not offered for the truth, so I'll allow it.

25               MR. DRATEL:  Right.

Case 15-1815, Document 32, 01/13/2016, 1682740, Page237 of 265

F1kgulb5                        Der-Yeghiayan - cross

1    Q.  And another source of difference of opinion was whether or

2    not Baltimore should meet with Mr. Karpeles' lawyers or meet

3    with him?

4              MR. TURNER:  Objection.

5              THE COURT:  Sustained.

6    Q.  You were frustrated a fair amount of the time by these

7    problems, right?

8              MR. TURNER:  Objection; relevance.

9              THE COURT:  Sustained.

10   Q.  Now, you were also worried that the New York office, the

11   law enforcement in New York would somehow tip off the

12   investigation of Silk Road, right?

13   A.  Is there a particular time frame?

14   Q.  Yes.  August of 2012?

15   A.  There was multiple -- a lot of things were going on with

16   multiple agencies, there was a long period of time, and in

17   between that at different points in time, different

18   representatives from multiple agencies would contact me and

19   contact us in a variety of ways and it wouldn't always come

20   from just one source within the agency.  It would come from

21   other people from different locations.

22             So there was always concerns based upon what those

23   particular agencies are doing when they're getting involved how

24   far along their investigation is in compared to ours.  So there

25   was time periods along the way that we would have -- we would

F1kgulb5                         Der-Yeghiayan - cross

 1              (At the side bar)

 2              THE COURT:  I just wanted to get a sense of the

 3     relevance.  I have in my mind where I think you could be going,

 4     but I also think I may be wrong.  Otherwise, I don't see how

 5     it's relevant.

 6              MR. DRATEL:  It's about the progress of the

 7     investigation and the fact that at a certain critical point,

 8     once Mr. Ulbricht was on the radar of the Southern District of

 9     New York, that everyone else had to fall in line or else they

10     would not be permitted to participate, and that ultimately --

11     and this is all in the 3500 -- he says to his supervisor or his

12     whoever he is talking to, he says and these -- he's talking

13     about Baltimore -- he said basically unless people do it the

14     way the Southern District wants, that they can whine all they

15     want, but it won't stop SDNY from prosecuting all of them

16     without any of us.

17              THE COURT:  My ruling is that's irrelevant.  I had a

18     different version.   That's not where I thought you were going.

19              MR. DRATEL:  It is relevant.

20              THE COURT:  It's not relevant.  It's not relevant.

21              MR. DRATEL:  Once Mr. Ulbricht came on the radar,

22     everything else was shunt to the side because the Southern

23     District was going to get its way and these people had to --

24              THE COURT:  My ruling is that's not relevant.  I had a

25     different version or view.

F1kgulb5                          Der-Yeghiayan - cross

1              MR. DRATEL:  Which is?

2              THE COURT:  I'm not going to give you your

3     relevance --

4              MR. DRATEL:  Conspiracy theories?

5              THE COURT:  It was about ten questions ago, I thought

6     you were going someplace else, so I allowed this but that's not

7     relevant.

8              MR. TURNER:  There's also a reference to Mark Karpeles

9     to the document shown to him and I'm worried about defense

10    counsel asking questions about how Mark Karpeles was stalling

11    the investigation, how they were going to Mark Karpeles again.

12             THE COURT:  We're going to leave this line of

13    questioning.  Thank you.

14             MR. DRATEL:  You said "this line of questioning."  I

15    also was going to ask him because subsequently to all of this

16    at the end of the September, he is invited by the Southern

17    District to participate in the arrest of Mr. Ulbricht, it's

18    basically like a largess by the Southern District and he

19    recognizes that a hundred percent.

20             THE COURT:  Also irrelevant.

21             MR. DRATEL:  I think it is.

22             (Continued on next page)

23

24

25

```
 1               (In open court; jury present)
 2   BY MR. DRATEL:
 3   Q.  Now, with regard to competition -- withdrawn.
 4               With regard to agencies and the arrest of
 5   Mr. Ulbricht, afterwards wasn't HSI Chicago concerned about
 6   having the HSI banner be on the seizure at some point?
 7               MR. TURNER:  Objection; form and relevance.
 8               THE COURT:  Sustained.
 9   Q.  Now, you spent thousands of hours on Silk Road you said,
10   right?
11   A.  I did.
12   Q.  As a supposed buyer, right:  In other words, utilizing
13   buyer accounts, utilizing seller accounts?
14   A.  I did.
15   Q.  As an administrator?
16   A.  I did.
17   Q.  And the first time you heard Ross Ulbricht's name was
18   either September 10 or September 11 of 2013, right?
19   A.  Around that time frame.
20   Q.  You had been investigating the site for two years, right?
21   A.  Yes.
22   Q.  And many of these accounts that you took over were from
23   back of 2012, right, or the ones that you even started, many of
24   them go back to 2012, right?
25   A.  Some of them do, but I mean, if there were accounts taken
```

F11dulb1                    Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   --------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                              14 Cr. 68 (KBF)

5   ROSS WILLIAM ULBRICHT,

6              Defendant.

7   --------------------------------x

8                                             New York, N.Y.
                                              January 21, 2015
9                                             9:22 a.m.

10
    Before:
11
                         HON. KATHERINE B. FORREST,
12
                                              District Judge
13

14                              APPEARANCES

15
    PREET BHARARA,
16       United States Attorney for the
         Southern District of New York
17  BY:  SERRIN A. TURNER
         TIMOTHY HOWARD
18           Assistant United States Attorneys

19  JOSHUA LEWIS DRATEL
    LINDSAY LEWIS
20  JOSHUA HOROWITZ
         Attorneys for Defendant
21
             - also present -
22
    Special Agent Vincent D'Agostino
23  Molly Rosen, Government Paralegal
    Nicholas Evert, Government Paralegal
24  Sharon Kim, Government Intern

25

 1              (In open court; jury present)

 2              THE COURT:  Mr. Kiernan, I'm going to ask you to

 3    remain standing and I'll have my deputy swear you in.

 4              (Witness sworn)

 5              THE COURT:  Thank you, Mr. Kiernan.  Please be seated,

 6    sir.

 7              THE WITNESS:  Thank you.

 8              THE COURT:  There's water there and I see you have a

 9    bottle of water also on the side.

10              It will be important for you to pull yourself up to

11    the mic. and speak clearly and directly into the mic.

12              Mr. Howard.

13     THOMAS KIERNAN,

14        called as a witness by the Government,

15        having been duly sworn, testified as follows:

16    DIRECT EXAMINATION

17    BY MR. HOWARD:

18    Q.  Good morning.

19    A.  Good morning.

20    Q.  Who do you work for?

21    A.  The FBI, the Federal Bureau of Investigations.

22    Q.  And how long have you worked with the FBI?

23    A.  Twenty-three years.

24    Q.  And what is your position at the FBI?

25    A.  I'm currently a computer scientist with the FBI.

F11dulb3                          Kiernan - direct

1    codes that match on this.

2            MR. HOWARD:  The government offers Government Exhibit

3    500.

4            MR. DRATEL:  Your Honor, I think that has to be

5    subject to connection.

6            THE COURT:  Let me ask, that is the hard drive that

7    you understand was provided to you from Beeson?

8            THE WITNESS:  Correct.

9            THE COURT:  All right.

10           All right.  It is received.

11           (Government's Exhibit 500 received in evidence)

12   BY MR. HOWARD:

13   Q.  Now, what did you do after obtaining this hard drive?

14   A.  After obtaining this hard drive, I made a staging copy of

15   it.  So what I do is I take the drive from Beeson that has the

16   image on it.  I plug this into a write locker, just a device, a

17   piece of hardware that connects to the hard drive.  And I take

18   the images that were there and I copied them to a drive, or a

19   NAS drive that I have with me.

20   Q.  So you create a staging -- what is a staging copy?

21   A.  A staging copy.  It is a copy that I can work on without

22   working on this one.

23   Q.  And you indicated that you plugged it into a write locker.

24   What is a write locker?

25   A.  A write locker just takes -- makes this so I cannot write

F1LGULB4                          Kiernan - direct

1              THE COURT:  Why don't you ask the same question,

2    Mr. Howard, in terms of "myself."  I'm unclear whether it's a

3    name you designate for yourself or whether it's an automatic

4    name given.

5    Q.  Mr. Kiernan, is "myself" something that you choose for

6    yourself as a user of Tor chat, or is it automatically selected

7    to you by the program?

8    A.  The program gives you that user account, the username and

9    the log as "myself."

10   Q.  And the name of the other party in the conversation, is

11   that automatically selected for you?

12   A.  No.  You can assign that a name.

13   Q.  Could it be assigned anything the user wants?

14   A.  Yes.

15   Q.  So, for example, if you're chatting with your mother, you

16   can label it "mom" if you want, right?

17   A.  Correct, because the usernames in Tor chat are long,

18   tough-to-read names.  You can see, as a matter of fact, from

19   that log file it's the actual name of the user on there.  So to

20   make it human-readable, you give it an easier-to-use name like

21   "mom."

22   Q.  So if we could please look at Government Exhibit 222 in

23   your binder, please.  Do you recognize what this exhibit is?

24   A.  I do.

25   Q.  What is this exhibit?

F1LGULB4                          Kiernan - direct

1    A.  This is a log file from that Tor chat directory.

2    Q.  This is from the defendant's computer?

3    A.  From the defendant's computer; yes.

4    Q.  And did you extract this file?

5    A.  I did.

6          MR. HOWARD:  The government offers Government

7    Exhibit 222.

8          MR. DRATEL:  No objection.

9          THE COURT:  Received.

10         (Government's Exhibit 222 received in evidence)

11         MR. HOWARD:  Ms. Rosen, can you please publish

12   Government Exhibit 222, please.  Zoom in on the first few lines

13   there.

14   Q.  Is this what a Tor chat log looks like, Mr. Kiernan?

15   A.  It is.

16   Q.  So let me just describe the very top line it says "This log

17   file is not signed and has no cogency of proof."

18         Are you familiar with what that is?

19   A.  I am.

20   Q.  What is that?

21   A.  That's, again, a default setting when the log file starts

22   getting created, it puts that in there.

23   Q.  So in other words, all Tor chat log files automatically

24   include that at the top, correct?

25   A.  They'll put it in there, yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1LGULB4                          Kiernan - direct

1              Whose computer was this chat recovered from?

2    A.  The defendant's.

3    Q.  Mr. Kiernan, I want you to take your time and look through

4    what's been marked in your exhibit binder as 222A all the way

5    through 232E, and let me know when you're done.  Look at them

6    generally and let me know.

7    A.  I'm sorry.  222A to?

8    Q.  To 232E.

9    A.  Okay.

10   Q.  So do you recognize these exhibits?

11   A.  I do.

12   Q.  What are they?

13   A.  All excerpts from the Tor chat logs that were found in the

14   defendant's computer.

15   Q.  And again, these are not full chat logs.  They're excerpts,

16   correct?

17   A.  Correct.

18   Q.  Did you participate in the creation of these exhibits?

19   A.  Yes.

20   Q.  Are they true and accurate excerpts of the entire log

21   files?

22   A.  They are, yes.

23   Q.  Does each also contain the file name of the full log file

24   at the top like Government Exhibit 222B?

25   A.  Yes.

Flldulb7                    Kiernan – direct

1.

Q.  Are all the pages in this exhibit various screenshots of

files found within that directory used for website files?

A.  Yes.

Q.  What is the name of the file that's depicted on the first

page?

A.  About.php.

Q.  Could you focus on the bottom right-hand corner.

A.  I can, yes.

        MR. HOWARD:  Ms. Rosen, why don't we just focus on

maybe the top of this.  We will see it a little bigger.

Q.  So, Mr. Kiernan, there is also -- there is this text here

that's inside little brackets.

A.  Yes.

Q.  What does that represent?  What is that?

A.  That's actually code within the file.  It doesn't get

rendered correctly in this viewer.

Q.  Are you familiar with that kind of code?

A.  Yes.

Q.  Can you describe -- can you read or point to on the screen

if this file was loaded in a browser, what is the text that

would appear?

A.  Sure.

Q.  Read it, please.

A.  "Greetings and welcome to Silk Road."  That would be one of

F1MGULB1                          Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          14 Cr. 68 (KBF)

5    ROSS WILLIAM ULBRICHT,

6                   Defendant.

7    ------------------------------x

8                                          New York, N.Y.
                                           January 22, 2015
9                                          9:10 a.m.

10
     Before:
11
                        HON. KATHERINE B. FORREST,
12
                                           District Judge
13

14                              APPEARANCES

15
     PREET BHARARA,
16        United States Attorney for the
          Southern District of New York
17   BY:  SERRIN A. TURNER
          TIMOTHY HOWARD
18             Assistant United States Attorneys

19   JOSHUA LEWIS DRATEL
     LINDSAY LEWIS
20   JOSHUA HOROWITZ
          Attorneys for Defendant
21
               – also present –
22
     Special Agent Vincent D'Agostino
23   Molly Rosen, Government Paralegal
     Nicholas Evert, Government Paralegal
24   Sharon Kim, Legal Intern

25

F1mdulb2                          Kiernan - cross

 1              (Jury and witness not present)

 2              THE COURT:  All right.  Ladies and gentlemen, let's

 3      all be seated.

 4              I want to find out where you're going, Mr. Dratel,

 5      because what you can't do with this witness is -- I've allowed,

 6      in response to the government's objection about going beyond

 7      the scope, I have allowed you some room, but what you can't do

 8      is make him into a generalized computer expert for the defense.

 9      You are welcome, of course, if you have complied with the

10      appropriate disclosure requirements, to call your own expert or

11      to call a percipient witness.  But the mastermind page came in

12      through the back button series.  It was a percipient witness

13      set of testimony, as opposed to generalized how you would enter

14      the username.  The username was there, but the coding behind it

15      was not the subject of this witness' testimony.

16              MR. DRATEL:  He testified about php.  He testified

17      about the website pages.

18              This is from the laptop.  We are going to establish

19      that with him.  And it is from the laptop, and he said he

20      looked at php files.  He should just --

21              THE COURT:  You have to stay within the scope of the

22      direct.  So the direct is not just because he mentioned php,

23      every php question you can think of that might be helpful to

24      the defense, it is to go after what this witness testified

25      about.  The scope of his direct, as you know, determines the

1   parameters of the cross.  And so you are welcome to go anywhere

2   with the cross.  But his direct was actually quite narrow.  It

3   was here's what I got.  Here are the files I extracted.

4           MR. DRATEL:  He put in the entire laptop.  That is

5   fair game now.

6           THE COURT:  It is not fair game now.

7           MR. DRATEL:  He can't just ignore it by not asking the

8   witness.  He examined the entire laptop.

9           THE COURT:  You can get him, through

10  cross-examination, on any one of the files he testified about.

11  Go after that.  But you've got to tie it specifically to the

12  file in the extraction process.  The two things he did was

13  extraction, and then this file came out of this directory,

14  which had this folder in it.  That's it.

15          MR. DRATEL:  No, but there is more.  He puts in a

16  whole document, essentially.  If someone puts in a 30-page

17  document and he only testifies about page 2, that doesn't put

18  the other 29 off limits, I mean, on cross if they are part of

19  the same document.

20          THE COURT:  Sometimes it does.  It depends.  And so

21  just because he's got a laptop that he's authenticated doesn't

22  mean he can be your laptop expert.

23          Now, to be clear -- to be clear, if you want to call

24  somebody to talk about php, the laptop more generally,

25  BitTorrent more generally, that's the defense case, but this

F1mdulb2                    Kiernan - cross

 1   witness is not your generalized computer witness.

 2              MR. DRATEL:  He is not an expert.  I'm not making him

 3   an expert.  He testified, number one, about the mastermind page

 4   yesterday.  And he testified about the mastermind file on the

 5   laptop in the php directories.  That makes him fair game for --

 6              THE COURT:  That does not make him --

 7              MR. DRATEL:  I can't be limited to just -- then I have

 8   no cross if all I can do is just talk about what they've talked

 9   about.  Cross is much further than that.

10              THE COURT:  No.  What you can do is talk about whether

11   or not in fact the file that he looked at on the computer was

12   not a php file, it was really something else, whether or not

13   his definition of php was inaccurate.  You go dig into anything

14   that he testified about.  Whether when he pushed the back

15   button it somehow corrupted the file, changed the file, whether

16   or not he's reading the directory and the file paths correctly.

17              Let me hear from the government, but I am concerned

18   that this is going to go on far longer than it needs to go

19   because you are trying to make him into a different witness.

20              MR. DRATEL:  He answered the question, no, he can.  I

21   just want to now establish that it's in the laptop --

22              THE COURT:  I know, but we are going to be coming back

23   to the same problem again and again.

24              MR. DRATEL:  I don't think so.

25              THE COURT:  Let me hear from the government about your

Flmdulb2                    Kiernan - cross

1   view.

2          MR. HOWARD:  Your Honor, I think the Court has it

3   absolutely right.  That is why we are objecting as to the scope

4   of the cross-examination.

5          Mr. Kiernan simply testified to the extraction of

6   files from certain locations on the laptop.  He did not testify

7   about how the scripts worked, how they operated, or anything of

8   that sort.  And it is apparent that Mr. Dratel is trying to go

9   further than the scope of Mr. Kiernan's direct, which was just

10  simply about locating and extracting files from the digital

11  evidence.

12         MR. DRATEL:  He didn't.  He went further.  He talked

13  yesterday about the purpose of php and --

14         THE COURT:  You can go after -- if his definition of

15  php was wrong and you want to undermine his credibility in

16  terms of his expertise by asking him whether the definition is

17  correct, that is fair game.  Absolutely.  No doubt about it.

18  That is absolutely impeachment material.

19         If, however, by merely mentioning the word "php" you

20  are now going to find other kinds of php material which would

21  be helpful to the defense, he's not your witness.  You need a

22  different witness, either that the government may later call

23  where you can use it or where you yourself call.  But we are

24  going to stay within the scope of the direct or this is going

25  to become a detour and frolic.  You need to call a witness to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Flmdulb2                         Kiernan - cross

1    make the points you want to make if it is beyond the scope.  I

2    am not going to allow it to be very far afield.

3            You know what's within the scope of the direct.

4            MR. DRATEL:  I disagree, your Honor.  OK.  So --

5            THE COURT:  Well, stay within the scope of the direct.

6    And if you are able to stay within the scope of the direct,

7    then it will be clear to us both that you understand what I'm

8    saying.  If you continue to go outside the scope of the direct,

9    I will sustain the government's objections.

10           The government should continue to object if it

11   believes it is outside the scope of the direct.  I wanted to

12   see where this was going.  It's going outside the scope.  I

13   want to say, for the fifth time I think now, I am by no means

14   suggesting that the defense can't put on evidence it believes

15   is appropriate as to these very topics, as to these very

16   documents, as to these very files, but it's for the defense to

17   do if it's not for the purposes of directly going into the

18   scope of the direct of this witness.

19           Let's take our own break and then we'll come back.

20           THE CLERK:  All rise.

21           (Recess)

22           THE COURT:  All right.  Let's bring out the jury.

23           (Continued on next page)

24

25

Flmdulb2                         Kiernan - cross

1    A.  Yes.

2    Q.  It is available for free on the Internet, right?

3    A.  Yes.

4    Q.  And both Linux and Ubuntu are perhaps not as popular as

5    Windows but they're popular, right?

6                MR. HOWARD:  Objection.

7                THE COURT:  Sustained.

8    Q.  The Linux kernel is essentially the glue that holds the

9    software and the hardware together, right, for Linux?

10               MR. HOWARD:  The same objection.

11               THE COURT:  Sustained.  Stay within the scope of the

12   direct.

13               MR. DRATEL:  Your Honor, this is within the scope.

14               THE COURT:  Sustained.

15               MR. DRATEL:  Can I have another sidebar, please?

16               THE COURT:  No.  Move on to your next line of

17   questioning.

18   BY MR. DRATEL:

19   Q.  So you don't know if the kernel that Mr. Ulbricht had --

20               THE COURT:  Leave "the kernel."

21   Q.  You used a Tor chat -- withdrawn.

22               You downloaded Tor chat through something called the

23   Debian package, correct, D-e-b-i-a-n?

24   A.  And AppGet, yes.

25   Q.  I missed that last one.

Flmdulb2                          Kiernan - cross

1    A.   The install command is AppGet.

2    Q.   Oh, OK.   But that's a preconfigured package that has all of

3    the Tor chat elements in it and you just put it right in on the

4    machine, right?

5    A.   Yes.

6    Q.   OK.   But it can also be done in sort of a DIY, do it

7    yourself, where a user can take code and put it in separately.

8    They don't even have to buy the package as a bundle.   They can

9    do it on their own with the various components, correct?

10            MR. HOWARD:   Objection.   Beyond the scope and

11    foundation.

12            THE COURT:   Sustained.

13            MR. DRATEL:   Your Honor, it's not beyond the scope.

14            THE COURT:   Sustained.

15            MR. DRATEL:   May I be heard?

16            THE COURT:   No.   You can be heard on this at the next

17    break.   Go on to your next line of questioning.

18    BY MR. DRATEL:

19    Q.   So in the experiment that you described yesterday, you

20    don't know that the way that you installed Tor chat on your

21    computer and the version of Tor chat was the same as that on

22    Mr. Ulbricht's computer, right?

23    A.   That's right.

24            (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Flmgulb3                          Kiernan - cross

1    BY MR. DRATEL:

2    Q.  So, the experiment that you ran -- withdrawn.

3         The purpose of a scientific experiment is to try to

4    replicate as much as possible - and frankly completely - all of

5    the elements of one set of events so that you can match them to

6    a second set, right?

7              MR. HOWARD:  Objection.

8              THE COURT:  Sustained.

9    Q.  If an experiment doesn't have the same elements in it to

10   get to a result, it's not a valid experiment, is it?

11             THE COURT:  Why don't you ask it in terms of the

12   experiment he did.

13             MR. DRATEL:  Yes.  That's what I'm trying to do.

14             THE COURT:  No.  You're saying "if an experiment."

15   Not any generalized experiment.  Talk to him about the

16   experiment he did.

17             MR. DRATEL:  That's what I was doing before.  That's

18   exactly what I was doing before.

19             THE COURT:  Try again.

20   Q.  In your experiment, Tor chat is an essential element of

21   your experiment, correct?

22   A.  Not essential, but it's -- the download was important to

23   get, yes.

24   Q.  Could you have done it without Tor chat?

25   A.  I needed Tor chat to run -- it wasn't an experiment.  I

Flmgulb3                         Kiernan - cross

1            MR. HOWARD:  Objection; foundation.

2            THE COURT:  Overruled.  Why don't you just reask the

3    question attached to this.

4            MR. DRATEL:  Sure.

5    Q.  IRL to your knowledge is in real life?

6    A.  In real life; yes.

7    Q.  And in this chat, DA asks Dread Pirate Roberts "IRL or

8    online," right?

9    A.  Yes.

10   Q.  Distinguishing the two things, right?

11   A.  Yes.

12   Q.  Real life from online?

13           THE COURT:  Hold on.  He can't testify as to what was

14   meant by these people, but he can say what the word "IRL" means

15   to him.

16   Q.  And Dread Pirate Roberts answers no, just online.  My

17   concern is that LE, and that's law enforcement, right?

18           THE COURT:  Hold on.  He's not going to interpret what

19   the writers meant.  He didn't do it yesterday.  He's not going

20   to do it today.  You can put somebody else on the stand to do

21   that.

22   Q.  "My concern is that LE will see that DA is a player at Silk

23   Road by your forum presence and then track down who you bought

24   from, and sold to under that name and then find you irl."

25           Now, that application for the Island of Dominica that

F1mgu1b3                        Kiernan - recross

1   computer, either that day or some other day when he was

2   downloading something else?

3   A.   Not from the whole time period.

4   Q.   Right.

5   A.   But that's a BitTorrent --

6   Q.   But that's a BitTorrent, but the port is open and it gives

7   access to the computer, correct?

8   A.   It gives access to the BitTorrent client.

9   Q.   Right.  But people who -- and that means those seven users

10  out there who have it, right, who are connected?

11  A.   That's right.

12  Q.   And as we said before, it could contain all sorts -- that

13  anything you download, can contain all sorts of malware, right,

14  malicious --

15  A.   Possible.

16  Q.   -- malicious software that can be used against the person

17  who is operating the computer, right?

18          MR. HOWARD:   Objection.

19          THE COURT:   Sustained.

20          MR. DRATEL:   I have nothing further.

21          THE COURT:   Thank you.

22          Anything further, Mr. Howard, like one question?

23          MR. HOWARD:   Yes.  It is one question -- two

24  questions, but start with one.

25  REDIRECT EXAMINATION

F1sdulb1                          Trial

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                              14 Cr. 68 (KBF)

 5    ROSS WILLIAM ULBRICHT,

 6                    Defendant.

 7    ------------------------------x

 8                                          New York, N.Y.
                                            January 28, 2015
 9                                          9:35 a.m.

10
      Before:
11
                         HON. KATHERINE B. FORREST,
12
                                            District Judge
13

14                            APPEARANCES

15
      PREET BHARARA,
16         United States Attorney for the
           Southern District of New York
17    BY:  SERRIN A. TURNER
           TIMOTHY HOWARD
18             Assistant United States Attorneys

19    JOSHUA LEWIS DRATEL
      LINDSAY LEWIS
20    JOSHUA HOROWITZ
           Attorneys for Defendant
21
              – also present –
22
      Special Agent Vincent D'Agostino
23    Molly Rosen, Government Paralegal
      Nicholas Evert, Government Paralegal
24

25
```

Case 15-1815, Document 32, 01/13/2016, 1682740, Page260 of 265

F1sdulb3                              Alford - cross

```
 1             THE COURT:  Let me ask the government.

 2             MR. TURNER:  Your Honor is exactly right.  We have

 3   been over this territory before.  If they want to use evidence

 4   in their affirmative case that their LinkedIn page, first of

 5   all, is not hearsay and it is properly authenticated and it is

 6   somehow relevant to the defendant's case, they can do that.

 7   They don't get to do that through this witness.

 8             THE COURT:  All right.  My ruling stands.  OK?  So

 9   stay within the investigation, stay within the areas of search.

10   But if there are things where you are wondering if they are

11   within that you haven't yet covered, you can ask a question and

12   I will sustain an objection but --

13             MR. DRATEL:  Yes.  I need to make a record.

14             THE COURT:  You can make a record at the break.  That

15   we can do at the break.

16             MR. DRATEL:  I need to ask the questions.

17             THE COURT:  We can make a record as to various things

18   at the break.  But if you want to cover certain things which

19   you think are in a gray area right now, I am not going to

20   preclude you from doing that.  But if there are things that you

21   can do other than what you know is going to be objectionable,

22   then let's go ahead and do them now.

23             MR. DRATEL:  I don't know what is objectionable.  In

24   my experience, I have in never been so curtailed with

25   cross-examination of an agent who has done a wholesale
```

Case 15-1815, Document 32, 01/13/2016, 1682740, Page261 of 265

F1sdulb3                           Alford - cross

1   investigation of the defendant and then to be only limited to

2   the things that the government wants to put in is just, to me,

3   I will have to get through this and see where we are.

4           THE COURT:  I am comfortable with my rulings despite

5   your experience.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1sgulb4                         Alford - cross

1    Q.  Don't read it.  Read it to yourself.  I apologize.

2    A.  Okay.  Okay.

3    Q.  Does that refresh your recollection that you, in December

4    of 2013, December 30th, 2013, referred to Mr. Ulbricht as the

5    original DPR?

6              MR. TURNER:  Objection; agent belief.

7              THE COURT:  He's asking whether or not he made that

8    statement.  You may answer.

9    A.  Yes.  I was referring to --

10   Q.  Just "yes" is fine.  Thank you.

11   A.  Yes.

12   Q.  And when you did all the -- when you looked for comparisons

13   of things that were happening online versus returns on

14   subpoenas and other things that you could find online such as

15   Google and other -- withdrawn.

16             When looking at Mr. Ulbricht, you were trying to

17   compare time frames with various things that were going on,

18   either on Google or Facebook -- Gmail, rather, or Facebook and

19   versus other things like chats and things like that, right?

20   A.   Information that was found on the laptop versus information

21   we found from outside.

22   Q.  And you did that a little bit with respect to Richard Bates

23   as well, correct?

24             MR. TURNER:  Objection; beyond the scope.

25             THE COURT:  Sustained.

Case 15-1815, Document 32, 01/13/2016, 1682740, Page263 of 265

F1sgulb4                         Alford – cross

1    Q.  Did you at one point find evidence that someone who worked

2    at eBay or PayPal was Dread Pirate Roberts?

3              MR. TURNER:  Objection; agent belief.

4              THE COURT:  Sustained.

5    Q.  One of the other purposes of your investigation was about

6    looking at bitcoins, correct?

7    A.  At bitcoins?

8    Q.  Trying to find bitcoin wallets and Silk Road bitcoin?

9              MR. TURNER:  Objection; form and beyond the scope.

10             THE COURT:  Well, I don't understand how it's within

11   the scope.  Sustained.

12   Q.  You had access to the Silk Road servers at some point, too,

13   correct?

14             MR. TURNER:  Objection; beyond the scope.

15             THE COURT:  I don't know where this is going.  I don't

16   find it within the scope.  I can't conceive how it's within the

17   scope.  Sustained.

18   Q.  Well, you talked about Government Exhibit 241, correct, on

19   your direct?

20   A.  Can you refresh.

21   Q.  The log?

22   A.  The log.

23   Q.  Yes.  In fact, there were other documents –– withdrawn.

24   You had access to the private messages, right, you reviewed

25   private messages on the Silk Road server?

Case 15-1815, Document 32, 01/22/2016, 1682740, Page264 of 265
F1sdulb5                          Alford - cross

1              The Task Force began its investigation as a result of

2      an open letter from two United States senators, Chuck Schumer,

3      and another senator asking that Silk Road be shut down,

4      correct?

5              MR. TURNER:  Objection.

6              THE COURT:  Sustained.

7              MR. DRATEL:  Your Honor, this goes to --

8              THE COURT:  It is beyond the scope of this witness'

9      testimony.

10             MR. DRATEL:  It goes to a fundamental part --

11             THE COURT:  It is beyond the scope of this witness'

12     testimony.

13     BY MR. DRATEL:

14     Q.  You pulled out all the stops on this investigation,

15     correct?

16             MR. TURNER:  Objection.  Form and relevance.

17             THE COURT:  Overruled.

18     Q.  This is a high-priority investigation, correct?

19     A.  It was a high-priority investigation, yes.

20     Q.  And one of the things you did was to time it so that when

21     the arrest of Mr. Ulbricht occurred you would be able to also,

22     within a very short frame of time, speak to people who you'd

23     identified as people who knew him, correct?

24             MR. TURNER:  Objection.  Beyond the scope.

25             THE COURT:  Sustained.

F1sdulb5                          Alford - cross

1   Q.  Now, almost every agency of federal law enforcement was

2   involved in this investigation, correct?

3   A.  That is correct.

4   Q.  And that caused some friction between agencies, right?

5           MR. TURNER:  Objection.  Relevancy.

6           THE COURT:  Sustained.

7   Q.  Everybody wanted -- every agency wanted to get credit for

8   this arrest, correct?

9           MR. TURNER:  Objection.

10          THE COURT:  Sustained.

11  Q.  I want to go back to -- so 333A is -- you can put it up for

12  everybody -- that's something that was provided by Google about

13  logins, correct?

14  A.  That is correct.

15  Q.  Now, that was part of a larger subpoena production by

16  Google, correct?

17  A.  This?

18  Q.  Yes.

19  A.  Yes.

20  Q.  And that showed all the login times during a longer period,

21  correct?

22  A.  Yes.

23  Q.  And so you reviewed that, correct?

24  A.  Yes, I did.

25  Q.  And, in fact, there are gaps between login times in certain