# 15-1815-CR

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



UNITED STATES OF AMERICA,

*Appellee,*

*v.*

ROSS WILLIAM ULBRICHT, AKA DREAD PIRATE ROBERTS, AKA SILK ROAD,
AKA SEALED DEFENDANT 1, AKA DPR,

*Defendant-Appellant.*

———————————

*On Appeal from the United States District Court
for the Southern District of New York (New York City)*

## APPENDIX
## VOLUME IV OF VI
## Pages A769 to A1050

MICHAEL A. LEVY
SERRIN A. TURNER
 ASSISTANT UNITED STATES ATTORNEYS
UNITED STATES ATTORNEY'S OFFICE FOR THE
 SOUTHERN DISTRICT OF NEW YORK
*Attorneys for Appellee*
1 Saint Andrew's Plaza
New York, New York 10007
212-637-2346

JOSHUA L. DRATEL, P.C.
*Attorneys for Defendant-Appellant*
29 Broadway, Suite 1412
New York, New York 10006
212-732-0707

## **Table of Contents**

**Page**

### **Volume I**

District Court Docket Entries ................................................................. A1

Sealed Complaint, dated September 27, 2013 ...................................... A48

    Exhibit A to Complaint -
    Printout of Silk Road Anonymous Market Search ................... A81

    Exhibit B to Complaint -
    Printout of Silk Road Anonymous Market High
    Quality #4 Heroin All Rock ...................................................... A83

Indictment, entered February 4, 2014 .................................................. A87

Opinion and Order of the Honorable Katherine B. Forrest,
    dated July 9, 2014 ....................................................................... A99

Superseding Indictment, entered August 21, 2014 ............................. A150

Order of the Honorable Katherine B. Forrest,
    dated October 7, 2014 .................................................................. A167

Letter from Joshua L. Dratel to the Honorable
    Katherine B. Forrest, dated October 7, 2014 ............................. A169

Endorsed Letter from Joshua L. Dratel to the Honorable
    Katherine B. Forrest, dated October 8, 2014,
    with Handwritten Notes ............................................................... A172

Letter from Serrin Turner to the Honorable
    Katherine B. Forrest, dated October 8, 2014 ............................. A175

Opinion and Order of the Honorable Katherine B. Forrest,
    dated October 10, 2014 ................................................................ A176

Opinion and Order of the Honorable Katherine B. Forrest,
    dated October 24, 2014 ................................................................ A214

**Table of Contents**
**(Continued)**

**Page**

Excerpts from the Pre-Trial Conference,
   dated December 15, 2014 ............................................... A224

### Volume II

Opinion and Order of the Honorable Katherine B. Forrest,
   dated January 7, 2015 .................................................. A262

Letter from Serrin Turner to the Honorable
   Katherine B. Forrest, dated January 19, 2015 .............................. A307

   Exhibit A to Letter -
   Printout from Silk Road Anonymous Marketplace ................. A320

   Exhibit B to Letter -
   Email, dated March 18, 2011 .................................... A321

   Exhibit C to Letter -
   Printout from silkroadmarket.org ............................. A322

   Exhibit D to Letter -
   Printout from AccessData FTK Imager 3.0.0.1443 ............... A323

   Exhibit E to Letter -
   Various Emails ..................................................... A324

Letter from Joshua L. Dratel to the Honorable
   Katherine B. Forrest, dated January 19, 2015 .............................. A326

Endorsed Letter from Serrin Turner to the Honorable
   Katherine B. Forrest, dated January 21, 2015 .............................. A334

   Annexed to Letter -
   Highlighted Excerpts of Transcript .......................... A336

Letter from Serrin Turner to the Honorable
   Katherine B. Forrest, dated January 29, 2015 .............................. A342

**Table of Contents**
**(Continued)**

**Page**

Letter from Lindsay A. Lewis to Serrin Turner and
  Timothy T. Howard, dated January 26, 2015 ................................ A349

    Annexed to Letter -
  *Curriculum Vitae* of Andreas Antonopoulos ........................... A351

Letter from Timothy T. Howard to the Honorable
  Katherine B. Forrest, dated January 31, 2015 ................................ A354

Letter from Joshua L. Dratel to Serrin Turner and
  Timothy T. Howard, dated January 30, 2015 ................................ A360

Opinion and Order of the Honorable Katherine B. Forrest,
  dated February 1, 2015 .................................................................... A362

Letter from Joshua L. Dratel to the Honorable
  Katherine B. Forrest, dated January 31, 2015 ................................ A380

Letter from Joshua L. Dratel to the Honorable
  Katherine B. Forrest, dated February 1, 2015 ................................ A385

Opinion and Order of the Honorable Katherine B. Forrest,
  dated January 31, 2015 .................................................................... A390

Order of the Honorable Katherine B. Forrest,
  dated January 31, 2015 .................................................................... A391

Opinion and Order of the Honorable Katherine B. Forrest,
  dated January 31, 2015 .................................................................... A392

Opinion and Order of the Honorable Katherine B. Forrest,
  dated January 31, 2015 .................................................................... A394

Letter from Joshua L Dratel to the Honorable
  Katherine B. Forrest, dated February 2, 2015 ................................ A395

Letter from Serrin Turner to Joshua L. Dratel,
  dated December 29, 2014 ............................................................... A397

# Table of Contents
## (Continued)

**Page**

Annexed to Letter -
Proposed Stipulation ................................................ A399

Excerpts from Trial Transcript, dated January 14, 2015
[pages 121 and 125] ...................................... A402

Excerpts from Trial Transcript, dated January 15, 2015
[pages 347, 509, 531-537, 545-547 and 554-555] ......................... A404

Excerpts from Trial Transcript, dated January 20, 2015
[pages 562, 567-591, 594-614, 619, 642-649, 652,
656-657, 663, 669, 671, 677, 681, 684, 712, 714, 717,
719 and 723-725] ....................................... A418

Excerpts from Trial Transcript, dated January 21, 2015
[pages 780, 844, 873, 890-891, 895 and 1017] ............................ A490

Excerpts from Trial Transcript, dated January 22, 2015
[pages 1011, 1064-1068, 1071-1073, 1084 and 1089] ................. A497

Excerpts from Trial Transcript, dated January 28, 2015
[pages 1314, 1403-1404, 1435-1436 and 1449-1450] .................. A508

## Volume III

Excerpts from Trial Transcript, dated January 29, 2015
[pages 1562, 1661-1664, 1669-1677, 1680-1687, 1690-1705,
1733-1734, 1738-1740, 1743 and 1834-1836] ............................ A515

Excerpts from Trial Transcript, dated February 2, 2015
[pages 1843, 1855-1860, 1866-1873 and 1985] ........................... A562

Excerpts from Trial Transcript, dated February 3, 2015
[pages 2050, 2052-2066 and 2084-2097] ..................................... A578

Defendant's Exhibit C -
Conversation from East India Traitor on Forum ........................... A608

# Table of Contents
## (Continued)

**Page**

Defendant's Exhibit J -
    Printout from Support.php .............................................................. A624

Excerpts of Notice of Motion for a New Trial,
    dated March 6, 2015 ....................................................... A628

Memorandum of Law in Support of Motion,
    dated March 6, 2015 ....................................................... A630

Declaration of Joshua L. Dratel, in Support of Motion,
    dated March 6, 2015 (Omitted Herein)

        Exhibit 1 to Dratel Declaration -
        3500 Material Chart ............................................... A643

Letter from Serrin Turner to the Honorable
    Katherine B. Forrest, dated March 31, 2015 (Omitted Herein)

        Annexed to Letter -
        (i) Letter from Serrin Turner to the Honorable
        Katherine B. Forrest, dated November 21, 2014,
        with Attachment ........................................................ A649
        (ii) Sealed Order of the Honorable Katherine B. Forrest,
        dated December 12, 2014 ......................................... A657
        (iii) Letter from Timothy T. Howard to the Honorable
        Katherine B. Forrest, dated December 12, 2014 ..................... A659
        (iv) Endorsed Letter from Serrin Turner to the Honorable
        Katherine B. Forrest, dated December 17, 2014 ..................... A661
        (v) Letter from Timothy T. Howard to the Honorable
        Katherine B. Forrest, dated December 18, 2014 ..................... A663
        (vi) Endorsed Letter from Lindsay A. Lewis to the
        Honorable Katherine B. Forrest, dated December 18, 2014 .... A669
        (vii) Redacted Memorandum and Decision of the
        Honorable Katherine B. Forrest, dated December 22, 2014 .... A673
        (viii) Letter from Joshua L. Dratel to the Honorable
        Katherine B. Forrest, dated December 30, 2014 ..................... A701
        (ix) Endorsed Letter from Serrin Turner to the Honorable
        Katherine B. Forrest, dated December 31, 2014 ..................... A704

**Table of Contents**
**(Continued)**

**Page**

Annexed to Letter - (cont'd)
(x) Letter from Timothy T. Howard to the
Honorable Katherine B. Forrest, dated February 1, 2015,
with Exhibits ........................................................................... A707

Excerpts from Reply Memorandum of Law, dated April 16, 2015 ...... A722

**Volume IV**

Exhibit 1 to Reply Memorandum of Law -
Email from Jared DerYeghiayan to Marc Krickbaum,
dated May 29, 2013, with Attachments .................................... A769

Exhibit 2 to Reply Memorandum of Law -
Various Emails, with Attachments ........................................... A780

Exhibit 3 to Reply Memorandum of Law -
Redacted History of Anand Nathan Athavale ........................ A812

Exhibit 4 to Reply Memorandum of Law -
Immigration and Customs Enforcement (ICE)
Details of Investigation ........................................................... A823

Exhibit 5 to Reply Memorandum of Law -
Email from Jared DerYeghiayan to Phillip Osborn,
dated May 15, 2013 ................................................................. A842

Exhibit 6 to Reply Memorandum of Law -
Redacted Silk Road Investigation Report ............................... A846

Exhibit 7 to Reply Memorandum of Law -
Various Redacted Emails ......................................................... A854

Exhibit 8 to Reply Memorandum of Law -
Statement from East India Traitor on Forum .......................... A857

Exhibit 9 to Reply Memorandum of Law -
Redacted Personal History Information ................................... A874

**Table of Contents**
(Continued)

**Page**

Opinion and Order of the Honorable Katherine B. Forrest,
    dated April 27, 2015 ....................................................................... A876

Letter from Serrin Turner to the Honorable Katherine B. Forrest,
    dated April 28, 2015 ....................................................................... A901

Letter from Joshua L. Dratel to the Honorable
    Katherine B. Forrest, dated May 15, 2015 ...................................... A903

Declaration of Lindsay A. Lewis, in Support of Defendant
    Ross Ulbricht's Pre-Sentencing Submission,
    entered May 15, 2015 ..................................................................... A916

        Exhibit 11 to Lewis Declaration -
        Declaration of Tim Bingham, dated May 14, 2015 ................. A929

        Exhibit 12 to Lewis Declaration -
        Declaration of Dr. Fernando Caudevilla,
        dated May 14, 2015 ................................................................ A940

        Exhibit 13 to Lewis Declaration -
        Declaration of Dr. Monica J. Barratt,
        dated May 14, 2015 ................................................................ A946

        Exhibit 14 to Lewis Declaration -
        Declaration of Meghan Ralston, dated May 14, 2015 ............. A951

        Exhibit 15 to Lewis Declaration -
        *Curriculum Vitae* of Mark L. Taff, M.D. ............................... A956

Order of the Honorable Katherine B. Forrest,
    dated May 20, 2015 ......................................................................... A971

Letter from Joshua L. Dratel to the Honorable
    Katherine B. Forrest, dated May 22, 2015 ...................................... A973

**Table of Contents**
**(Continued)**

**Page**

**Volume V**

Exhibit 1 to Letter -
Letter from Ross Ulbricht to the Honorable
Katherine B. Forrest ............................................................ A1051

Exhibit 2 to Letter -
Letters in Support of Defendant Ross Ulbricht ..................... A1054

Exhibit 3 to Letter -
Email to Joshua Dratel, dated May 21, 2015 ........................ A1291

Exhibit 4 to Letter -
Various Photographs ............................................................ A1293

**Volume VI**

Government Sentencing Submission, dated May 26, 2015 ................ A1314

Exhibit A to Sentencing Submission -
Fake Identification of Different States ................................... A1332

Exhibit B to Sentencing Submission -
Printout from The Armory ..................................................... A1340

Exhibit C to Sentencing Submission -
Photograph of Computer Printout .......................................... A1344

Exhibit D to Sentencing Submission -
Photograph of Needle and Razor ........................................... A1346

Exhibit E to Sentencing Submission -
Photograph ........................................................................... A1347

Exhibit F to Sentencing Submission -
Photograph of Insulin Syringes .............................................. A1348

Exhibit G to Sentencing Submission -
Text Messages ....................................................................... A1349

**Table of Contents**
**(Continued)**

**Page**

Exhibit H to Sentencing Submission -
Redacted Email from Ross Ulbricht,
dated February 10, 2013 ........................................................ A1351

Exhibit I to Sentencing Submission -
Printouts of the Cost of Drugs ................................................ A1352

Exhibit J to Sentencing Submission -
Printouts of the Cost of Drugs ................................................ A1360

Letter from Serrin Turner to the Honorable
Katherine B. Forrest, dated May 26, 2015 .................................... A1362

Annexed to Letter -
(i) Redacted Letter to the Honorable
Katherine B. Forrest, dated April 20, 2015 ............................. A1363
(ii) Redacted Letter to the Honorable
Katherine B. Forrest, dated April 23, 2015 ............................. A1366
(iii) Redacted Victim Impact Statement,
dated February 2013 ................................................... A1368
(iv) Redacted Story titled "Our Perfect Life" ......................... A1372
(v) Redacted Statement of Witness, dated April 8, 2015 ........ A1379

Letter from Lindsay A. Lewis to the Honorable
Katherine B. Forrest, dated May 27, 2015 .................................... A1386

Exhibit 1 to Letter -
Weekly Report to DPR ........................................................... A1392

Exhibit 2 to Letter -
Buyer Questionnaire .............................................................. A1397

Exhibit 3 to Letter -
Vendor Questionnaire ............................................................ A1399

Exhibit 4 to Letter -
Dr. X Thread Excerpts .......................................................... A1401

**Table of Contents**
**(Continued)**

                                                                    **Page**

Letter from Joshua L. Dratel to the Honorable
    Katherine B. Forrest, dated May 28, 2015 ................................... A1414

        Exhibit 5 to Letter -
        Statement from Michael Van Praagh,
        dated May 21, 2015 ................................................... A1428

        Exhibit 6 to Letter -
        Letter from Joseph Ernst to the Honorable
        Katherine B. Forrest ................................................ A1432

Letter from Lindsay A. Lewis to the Honorable
    Katherine B. Forrest, dated May 29, 2015 ................................... A1435

        Exhibit 1 to Letter -
        Excerpt from Torchat Log gx5 ................................. A1436

        Exhibit 2 to Letter -
        Excerpts from Torchat Log tv32 ............................. A1437

Sentencing Hearing, dated May 29, 2015 ............................................. A1447

Judgment of the United States District Court, Southern District
    of New York, entered May 29, 2015, Appealed From ................. A1545

Notice of Appeal, entered June 4, 2015 ................................................. A1554

# EXHIBIT 1

**To:**          Krickbaum, Marc (USAILN) (Marc.Krickbaum2@usdoj.gov)[Marc.Krickbaum2@usdoj.gov]
**From:**        DerYeghiayan, Jared
**Sent:**        Wed 5/29/2013 3:57:51 PM
**Importance:**  Normal
**Sensitivity:** None
**Subject:**     Affdavit draft May 29, 2013
**Categories:**  II=01CE5CAF2DA9930B1C889DB344A0B14C5FE45E53EF8B;Version=Version
                 14.2 (Build 328.0), Stage=H4

**Affidavit draft SR may 29 2013.doc**

Marc,


I added two paragraphs to the affidavit at the bottom referencing the MSB charges and relations to the emails we're wanting to search.


Take a look and let me know if you need anything else.


Thanks,

Jared

**AFFIDAVIT**

I, Jared D. Der-Yeghiayan, first being duly sworn, state the following under oath:

1.      I am a Special Agent for United States Immigration and Customs Enforcement ("ICE") Homeland Security Investigations ("HSI"), and have been employed as such for approximately 2 years and 8 months.  During my time as a Special Agent I have been assigned to the HSI Chicago O'Hare International Airport office, in Des Plaines, Illinois, and to the Electronic Crimes Task Force located at Oakbrook Tower office, in Chicago, Illinois.  My responsibilities include investigating crimes relating to the United States border, including offenses involving the illegal importation of narcotics, and investigations associated to cybercrimes.  Prior to serving as a HSI Special Agent, I served for approximately seven years as a Customs and Border Protection Officer at Chicago O'Hare International Airport in Chicago, Illinois.  Since July of 2011, I have been the lead Special Agent for an HSI investigation associated to the illicit and anonymous illegal drug market website referred to as the "Silk Road."

2.      The information contained in this affidavit is based on my personal knowledge, as well as information provided to me by other law enforcement officers.  Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the attached complaint, this affidavit does not set forth each and every fact that I have learned during this investigation.

3.      In March of 2011, an anonymous black-market website named the Silk Road was established for the purpose of offering illegal items.  The illegal items include such merchandise as illegal controlled substances, weapons and false identification documents, and weapons.  The Silk Road currently consists of two individual websites, its marketplace where all the black-

market items can be purchased, and an online chat forum associated to topics related to marketplace. Both the marketplace and online forum are operated by the same administer.

4.      The Silk Road protects the physical location of the marketplace and online forum as well as its user's identities using sophisticated publicly available software referred to as The Onion Router ("TOR"). Using a complex network comprised of computers located all over the world, TOR can make it appear as if a user is located in completely different country than their current location. The software accomplishes anonymity by using this worldwide network that will encrypt and decrypt all its internet traffic to protect its user's location. The Silk Road marketplace and online forum can only be accessed using the TOR software.

5.      All payments on the Silk Road are handled using a decentralized form of electronic based currency called bitcoins. The concept of a bitcoin was first proposed by anonymous hacker sometime in 2008. According to a confidential source, in approximately 2009, bitcoins came into existence when the first bitcoin was generated using publically accessible software. A bitcoin can be created or also referred to as "mined" by using a computer's computing power to solve an algorithm. Anyone can openly buy, sell or trade bitcoins on a variety of open online markets. The value of a bitcoin fluctuates constantly, and has remained unstable since its creation. For the first time since its creation, in April of 2013, the bitcoin market volume topped over 1 billion dollars. Bitcoins popularity has been mostly due to its exclusive usage on the Silk Road.

6.      Once a user is able to access the Silk Road marketplace they can set up a free buyers account. Once logged into the website they can navigate through a variety of categories such as Drugs, Apparel, Erotica, Forgeries, Money and Services for example. In the Drugs

2

category items are further broken down by sections for Cannabis, Dissociates, Ecstasy, Opioids, Other, Precursors, Prescription, Psychedelics and Stimulants. The administrators of the Silk Road openly advertise that the only things that are not allowed on the marketplace are counterfeit currencies, child pornography, and most weapons including weapons of mass destruction.

7.    For a small fee any user can become a vendor on the Silk Road. HSI has identified vendors who advertise their shipping location in over 40 countries. Most of the products being listed on the Silk Road are controlled substances. Most of the quantities being offered for sale are small and are considered personal use in size. As the marketplace has expanded the number of vendors offering larger quantities have increased substantially, and multiple vendors offer bulk quantities of controlled substances.

8.    The Silk Road administrators provide the infrastructure and base that supports all the illegal transactions. The administrators also provide guidance and direction to the vendors on how they should handle their transactions, from the method and means of shipping their products, to the steps they should take to avoid detection by law enforcement. In general, a computer administrator can control all aspects of a website to include all of its content, functionality, usage, imagery and accessibility.

9.    The Silk Road administrators have publically advertised on their marketplace and on their online forum that they take a percentage from every transaction that occurs on the marketplace. The commission schedule includes percentages of 8-15% based upon the total value of the transaction. The higher the transaction is, the lower the commission rate. In September of 2012, HSI was able to verify that a commission rate exists on the Silk Road by using a Silk Road vendor account and setting a price on a product for sale on the Silk Road

3

A774

marketplace.  HSI then logged in to the Silk Road using a different account and observed the same product offered for sale at a higher price than what was set by the vendor.  The difference in price matched the advertised commission rates from the Silk Road administrator.

10.     Since November of 2011, HSI has made over 70 individual purchases of controlled substances that came from various vendors on the Silk Road.   The orders have varied from various Schedule I and II drugs, such as Ecstasy, cocaine, heroin, LSD and others.  As of April of 2013, 54 of the 56 samples that have been tested and returned by a laboratory have resulted in high purity levels of drug being advertised on the Silk Road.  Two of the samples showed no controlled substance.  These purchases were made from vendors located in over 10 different countries including the United States.

11.      The Silk Road first became known through an online user by the name of "Silkroad" who created an account on February 28, 2011, on an online bitcoin talk forum. On June 11, 2011, there was an article written on trefor.net (http://www.trefor.net/2011/06/13/psst-wanna-buy-a-racehorse-silkroad-bitcoin-torproject/) that user posted a message on those forums introducing the website and looking for feedback from other users on how the website should be handled.  That user identified themselves at the end of the message as "Silk Road staff" and provided www.silkroadmarket.org as their website in their profile.

12.     On June 01, 2011, on the Silk Road forums, the administrator under the username "Silkroad" posted a message stating the following,

*"Hey gang,*

*Really sorry for the dead time there.  Hopefully most of you got the message on the bitcoin forum*

4

*or at silkroadmarket.org.  The only major change is this forum.  We have it running on a separate server with it's own url so if the main site ever goes down again, first check here for updates. Unfortunately this means we have separate logins for the main site and the forum.*

*As we mentioned before, everything was backed up and totally restored, but if for some reason a deposit didn't make it in to your account or something like that, just let us know and we'll track it down and credit you.  Also, we're giving everyone a 4 day grace period on taking orders to the resolution center before they are auto-resolved, so sellers, you may see some orders past due for a few days.*

*Thanks everyone for hanging in there with us.  This work is scary and exciting all at the same time, and I'm really very happy to be on this journey with all of you.*

*Cheers,*

*Silk Road staff"*

13.     In order to redirect users who might be searching for the Silk Road marketplace without knowing about TOR, the Silk Road administrators created www.silkroadmarket.org on the open internet that provided specific instructions on how to access the marketplace.  From the website archive.org that crawls/ captures websites March 04, 2011, the following message was posted on the silkroadmarket.org,

*"This is not the Silk Road, but you are close...*

*The Silk Road is an anonymous online market. Current offerings include Marijuana, Hash, Shrooms, LSD, Ecstacy, DMT, Mescaline, and more. The site uses the Tor anonymity network, which anonymizes all traffic to and from the site, so no one can find out who you are or who runs*

5

*Silk Road. For money, we use Bitcoin, an anonymous digital currency.*

*Accessing the site is easy:*

*Download and install the Tor browser bundle (Click here for instructions and non-windows users)*

*Open your new Tor browser*

*Go to: http://ianxz6zefk72ulzz.onion*

*Once inside, you will find a homepage that looks something like this:*

*\* it takes about a minute for you to make the initial anonymous connection to the site, but*

*afterward you should be able to browse more quickly.*

*So what are you waiting for? Get Tor and get to Silk Road! We'll see you inside :)*

*-Silk Road staff "*

The website was visually identical to the TOR based Silk Road marketplace except no products were advertised for sale there.  The website was mainly used to redirect users to the actual marketplace and to provide updates to users when the marketplace went down for service.  Eventually the Silk Road administrators created another website on TOR that was set up as an online forum to provide a more secure venue for their users to view updates and discussions associated to the marketplace.

14.     According to the website domaintools.com the  www.silkroadmarket.org was created on March 01, 2011, and all of its public WHOIS information registered with non-existent user information. The name, address, telephone number, and email address on the public registered information did not exist in open source or law enforcement databases.  WHOIS is an internet directory service that records public records for owners of servers as well as owners of domain names, and Internet Protocol ("IP") addresses.

15.     An IP address is a unique series of numbers that identifies the network location of

6

a computer.  These addresses allow computers to locate and connect to one another.

According to domaintools.com historical hosting history the domain www.silkroadmarket.org was maintained at the domain name server XTA.net from March 01, 2011 through April 13, 2012.  Domaintools.com's historical server records also showed that the IP address for the silkroadmarket.org as 174.120.185.75.  The IP was registered at that address from March 01, 2011 through March 30, 2011.

16.      A domain name server is what translates the domain name and redirects the user to the IP address.  When using the internet a computer can only find a website using a specific numerical location that is identified by the IP address. Without a domain name server, the domain name in and of itself would not direct a user to the desired website.

17.      According to Domaintools.com, on January 13, 2010, the domain name and server XTA.net was registered to the company Mutum Sigillum LLC, and the administrative and technical contact for the domain was Mark Karpeles (hereafter known as KARPELES).  The email address associated to the account and KARPELES at the time of acquisition was magicaltux@gmail.com. According to records from Google the owner of the email address is KARPELES.  According to Domaintools.com's Historical WHOIS records for XTA.net, KARPELES has maintained administrative control over the website since he acquired it in 2010.

18.      Subpoena records returned from the Internet Service Provider ("ISP") for the IP address 174.120.185.75 shows it was owned by KARPELES from December 18, 2009 through April 01, 2011.  KARPELES provided the email address of mark@tibanne.com in his profile for the account. According to records from Google, KARPELES is the registered owner of mark@tibanne.com since September 10, 2011.  As of April 05, 2013, Google records show the

7

email account is active and over 234 logins on April 04, 2013.  Google records also showed that

KARPELES is the registered owner of magicaltux@gmail.com since September 09, 2004.  As of

April 05, 2013, Google records show the email account is active and over 211 logins on April 04,

2013.

19.     Additional research into KARPELES shows that in February of 2011, he

purchased the bitcoin marketplace Mt. Gox.  As of April of 2013, the Mt. Gox bitcoin market is

largest bitcoin marketplace on the internet, and advertises that they handle over 80% of all

bitcoin trade.  KARPELES also owns and operates and administers hundreds of online websites

and is a self-proclaimed computer hacker.

20.     In May of 2013, the Department of Homeland Security seized over 5 million US

dollars from a Wells Fargo bank account and an online Dwolla account belonging to

KARPELES.  The funds were seized as a violation of operating as an unlicensed money service

business, a violation of Title 18, USC section 1960.  According to FinCen database records,

KARPELES has never registered any of the companies he owns as a money service business.

21.     In an email dated May 29, 2012, sent and signed by KARPELES to Dwolla from

his email address mark@tibanne.com he states, "Whilst Mt. Gox K.K. is not currently licensed as

a Money Service Business, it is regulated in several jurisdictions internationally as a corporation

providing Bitcoin exchange services and the possibility of needing to be regulated under FinCEN

and various state-level authorities is being investigated jointly by our legal team and financial

regulation authorities."

22.     Based on the above information, I believe there is probable cause that the email

address magicaltux@gmail.com and the email address mark@tibanne.com will contain

3505-00021

information and evidence related to the distribution can of controlled substances and conspiracy to distribute a controlled substance as well as additional evidence of KARPELES operating as an unlicensed money service business.  Based on my training and experience I am aware that people use their email address when registering with other companies.  Also based on my training and experience internet provider companies that register websites will usually send email receipts to their customers notifying them of purchases they made.  Based on my training and experience I am also aware that when someone uses one email to register with an internet company they will more than likely use the same address to register with other internet companies.  I believe since KARPELES has used his magicaltux@gmail.com and mark@tibanne.com email address to register with a few internet companies that he may have received record of registering, paying for or owning certain aspects of the www.silkroadmarket.org website.  I also believe there may be correspondence of communications related to registering, owning and operating the website www.silkroadmarket.org.

_____

Jared D. Der-Yeghiayan, Special Agent
United States Immigration and Customs Enforcement

9

3505-00022

# EXHIBIT 2

**To:** Osborn, Phillip L[Phillip.L.Osborn@ice.dhs.gov]
**Cc:** 'Boutros, Andrew (USAILN)'[Andrew.Boutros@usdoj.gov]
**From:** DerYeghiayan, Jared
**Sent:** Thur 8/15/2013 9:18:19 AM
**Importance:** Normal
**Sensitivity:** None
**Subject:** FW: Email SW
**Categories:** vpaccept

**Karpeles Email SW - draft to J Ellis.pdf**


FYI, preparing to swear this out today.

Jared



Jared Der-Yeghiayan
Special Agent
HSI Chicago
Office- 630-574-4167
Mobile- 630-532-3253


-----Original Message-----
**From:** Turner, Serrin (USANYS) [Serrin.Turner@usdoj.gov]
**Sent:** Thursday, August 15, 2013 09:47 AM Eastern Standard Time
**To:** michael_brantley@nysd.uscourts.gov
**Cc:** DerYeghiayan, Jared; Tarbell, Christopher W. (FBI)
**Subject:** Email SW


Michael –

As discussed, please find attached an email SW application.  I can be reached at 646-660-4815 or
serrin.turner@usdoj.gov whenever the judge is ready to see us.  Thanks very much.


Serrin Turner
Assistant United States Attorney
U.S. Attorney's Office, Southern District of New York
1 St. Andrew's Plaza
New York, New York 10007
Phone: 212-637-1946
Fax: 212-637-2429
Email: serrin.turner@usdoj.gov

93 (Rev. 01/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>THE EMAIL ACCOUNTS "magicaltux@gmail.com" and<br>"mark@tibanne.com" MAINTAINED BY GOOGLE, INC. | )<br>)<br>)<br>)<br>)<br>)     Case No. _____ |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____ Northern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

THE EMAIL ACCOUNTS "magicaltux@gmail.com" and "mark@tibanne.com" MAINTAINED BY GOOGLE,
INC.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

SEE ATTACHED RIDER.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or
property.

**YOU ARE COMMANDED** to execute this warrant on or before _____ August 16, 2013 _____
                                                                                              *(not to exceed 10 days)*

☑ in the daytime 6:00 a.m. to 10 p.m.      ☐ at any time in the day or night as I find reasonable cause has been
                                                                                   established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken
to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where
the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an
inventory as required by law and promptly return this warrant and inventory to the Clerk of the Court.
☑ Upon its return, this warrant and inventory should be filed under seal by the Clerk of the Court. _____
                                                                                                                          *USMJ initials*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay
of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be
searched or seized *(check the appropriate box)* ☐ for ___ days *(not to exceed 30).*
                                                                     ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  _____                 _____
                                                                                              *Judge's signature*

City and state:   New York, NY _____                 HON. RONALD L. ELLIS
                                                                                   _____
                                                                                              *Printed name and title*

3505-00206

AO 93 (Rev. 01/09) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of:

Inventory of the property taken and name of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the Court.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of New York

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>THE EMAIL ACCOUNTS "magicaltux@gmail.com"<br>and "mark@tibanne.com" MAINTAINED BY<br>GOOGLE, INC. | )<br>)<br>)<br>)<br>)<br>) | Case No. |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____Northern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHED RIDER.

The basis for the search under Fed. R. Crim. P. 41(c) is (check one or more):

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841 & 846; 18 U.S.C. §§<br>1956, 1960, & 2 | narcotics conspiracy, money laundering, operating unlicensed<br>money transmitting business |

The application is based on these facts:

SEE ATTACHED RIDER

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jared DerYeghiayan, Special Agent, Immigration and Customs
Enforcement-Homeland Security Investigations
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____August 15, 2013_____

_____
*Judge's signature*

City and state: _____New York, NY_____

HON. RONALD L. ELLIS
_____
*Printed name and title*

3505-00208

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -   x
IN THE MATTER OF THE APPLICATION   :
OF THE UNITED STATES OF AMERICA    :   **TO BE FILED UNDER SEAL**
FOR A SEARCH WARRANT FOR THE       :
PREMISES KNOWN AND DESCRIBED AS    :   AFFIDAVIT IN SUPPORT
THE EMAIL ACCOUNTS                 :   OF A SEARCH WARRANT
"magicaltux@gmail.com" and         :
"mark@tibanne.com" MAINTAINED BY   :
GOOGLE, INC.                       x
- - - - - - - - - - - - - - - - -

SOUTHERN DISTRICT OF NEW YORK, ss.:

Jared DerYeghiayan, being duly sworn, deposes and says:

1.   I am a Special Agent at Immigration and Customs
Enforcement-Homeland Security Investigations ("ICE-HSI").   I
have been a Special Agent with ICE-HSI for over two years.   I am
presently assigned to the ICE-HSI Electronic Crimes Task Force
in Chicago, Illinois.   My responsibilities include investigating
offenses involving, among other things, narcotics trafficking
and cybercrime.

2.   I make this affidavit in support of an application for
a warrant to search the e-mail accounts "magicaltux@gmail.com"
("SUBJECT ACCOUNT-1") and "mark@tibanne.com" ("SUBJECT ACCOUNT-
2") (collectively, the "SUBJECT ACCOUNTS") maintained by Google,
Inc. (the "Provider").

3.   For the reasons detailed below, there is probable
cause to believe that the SUBJECT ACCOUNTS contain evidence,
fruits, and instrumentalities of narcotics trafficking and money

laundering, in violation of Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Sections 1956, 1960, and 2 (the "SUBJECT OFFENSES"), as described in Attachment A to this Affidavit.

4.    This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers and civilian witnesses. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

<u>BACKGROUND ON THE PROVIDER</u>

5.    Based on my training and experience, I have learned the following about the Provider:

a.    The Provider offers e-mail services available free of charge to Internet users, under the domain name "gmail.com."  The Provider also offers paid services through which users can obtain e-mail accounts that are hosted by the Provider but that can be associated with any domain name that the user controls – e.g., "johndoe@myowndomain.com."

b.   The Provider maintains electronic records pertaining to the individuals and companies for which they maintain subscriber accounts.  These records include account access information, e-mail transaction information, and account application information.

c.   Subscribers may access their accounts on servers maintained or owned by the Provider from any computer connected to the Internet located anywhere in the world.

d.   Any e-mail that is sent to or from a subscriber is stored in the subscriber's "mail box" on the Provider's servers until the subscriber deletes the e-mail or the subscriber's mailbox exceeds the storage limits preset by the Provider.  If the message is not deleted by the subscriber, the account is below the maximum limit, and the subscriber accesses the account periodically, that message can remain on the Provider's servers indefinitely.  Such stored messages can include attachments such as documents, images, and videos.

e.   Computers located at the Provider contain information and other stored electronic communications belonging to unrelated third parties.  Accordingly, this affidavit and application for search warrants seek authorization solely to search the SUBJECT ACCOUNTS, following the procedures described herein and in Attachment A.

STATUTORY PROVISIONS

6.   18 U.S.C. § 2703(b)(1)(A) allows the government to compel disclosure of all stored content and records or other information pertaining to a subscriber of an electronic communications service provider (such as the Provider) – without notice to the subscriber - pursuant to a search warrant issued using the procedures described in the Federal Rules of Criminal Procedure.  Such an order may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

THE INVESTIGATION

Background on the Silk Road Underground Website

7.   This application stems from an ongoing investigation into an underground website used to sell illegal drugs known as "Silk Road" (the "Silk Road Underground Website").  The Silk Road Underground Website provides an infrastructure similar to well-known online marketplaces such as Amazon Marketplace or eBay, allowing sellers and buyers to conduct transactions online.  However, unlike such legitimate websites, the Silk Road Underground Website is designed to facilitate illegal commerce by ensuring absolute anonymity on the part of both buyers and sellers.

8.    The primary means by which the Silk Road Underground
Website protects the anonymity of its users is by operating on
the "TOR" network.  The TOR network is a special network of
computers distributed around the world designed to conceal the
true Internet Protocol ("IP") addresses of the users of the
network.[1]  Every communication sent through the TOR network is
bounced through numerous relays within the network, and wrapped
in a layer of encryption at each relay, such that the end
recipient of the communication has no way of tracing the
communication back to its true originating IP address.  In a
similar fashion, the TOR network also enables websites to
operate on the network in a manner that conceals the true IP
address of the computer server hosting the website.

9.    Another means by which the Silk Road Underground
Website protects the anonymity of its users is by requiring all
transactions to be paid for through the use of "Bitcoins."
Bitcoins are a virtually untraceable, decentralized, peer-to-
peer form of electronic currency having no association with
banks or governments.  In order to acquire Bitcoins in the first
instance, a user typically must purchase them from a Bitcoin

---

[1] Every computer attached to the Internet is assigned a unique
numerical identifier known as an Internet protocol or "IP"
address.  A computer's IP address can be used to determine its
physical location and, in turn, to identify the user of the
computer.

"exchanger."  Bitcoin exchangers accept payments of currency in
some conventional form (cash, wire transfer, etc.) and exchange
the money for a corresponding amount of Bitcoins (based on a
fluctuating exchange rate); and, similarly, they will accept
payments of Bitcoin and exchange the Bitcoins for conventional
currency.  Once a user acquires Bitcoins from an exchanger, the
Bitcoins are kept in an anonymous "wallet" controlled by the
user, designated simply by a string of letters and numbers.  The
user can then use the Bitcoins to conduct anonymous financial
transactions by transferring Bitcoins from his or her wallet to
the wallet of another Bitcoin user.  All Bitcoin transactions
are recorded on a public ledger known as the "Blockchain";
however, the ledger only reflects the movement of funds between
anonymous wallets and therefore cannot by itself be used to
determine the identities of the persons involved in the
transactions.

10.  Those operating Silk Road charge a commission, in the
form of Bitcoins, for all sales conducted through the site.  The
commission varies between 8 to 15 percent, depending on the
total value of the transaction.  (The higher the value of the
transaction, the lower the commission.)

11.  Since November of 2011, ICE-HSI has made over 70
individual purchases of controlled substances from various

vendors on the Silk Road Underground Website.   The substances
purchased have been various Schedule I and II drugs, including
ecstasy, cocaine, heroin, LSD, and others.   As of April 2013, 56
samples of these purchases have been laboratory-tested, and, of
these, 54 have shown high purity levels of the drug the item was
advertised to be on Silk Road.   (Two of the samples tested
negative for any controlled substance.)   Based on the postal
markings on the packages in which the drugs arrived, these
purchases appear to have been filled by vendors located in over
ten different countries, including the United States.

     12.  I have traced the Bitcoins that were used in these
undercover purchases through the Blockchain, the public ledger
reflecting the transfer of Bitcoins from one Bitcoin wallet to
another.  In doing so, I have found that Silk Road Underground
Website appears to use a highly complicated system of Bitcoin
wallets to control the movement of Bitcoins in and out of the
website.  In particular, the website uses a "tumbler" that mixes
the funds from various wallets together, so as to make it very
difficult to trace the funds from a particular transaction to a
particular Bitcoin wallet.  Based on my training and experience,
this system was likely designed by someone with a high level of
technical expertise concerning the operation of Bitcoins.

Background on Mark Karpeles and
His Suspected Role in Establishing Silk Road

13.  Based on Internet searches I have conducted, the Silk
Road Underground Website appears to have been established in
early 2011.  In particular, from visiting an online discussion
forum about Bitcoins, located at bitcointalk.org, I know that on
February 28, 2011, a user account was created on the
bitcointalk.org forum under the username "silkroad."  The
postings made by this user are no longer accessible on
bitcointalk.org.  However, I have reviewed media articles from
mid-2011 which report that, on March 1, 2011, the "silkroad"
user posted the following message on the forum:

> Hi everyone, Silk Road is into its third week after launch
> and I am very pleased with the results. There are several
> sellers and buyers finding mutually agreeable prices, and
> as of today, 28 transactions have been made!
>
> For those who don't know, Silk Road is an anonymous online
> market.
>
> Of course, it is in its infant stages and I have many ideas
> about where to go with it. But I am turning to you, the
> community, to give me your input and to have a say in what
> direction it takes.
>
> What is missing? What works? What do you want to see
> created? What obstacles do you see for the future of Silk
> Road? What opportunities?
>
> The general mood of this community is that we are up to
> something big, something that can really shake things up.
> Bitcoin and Tor are revolutionary and sites like Silk Road
> are just the beginning.

I don't want to put anyone in a box with my ideas, so I
will let you take it from here ...

- Silk Road staff

14.  The "silkroad" user's account at the bitcointalk.org
forum includes a signature block, which contains a hyperlink to
the website "silkroadmarket.org."  This is not the address of
the Silk Road Underground Website, but rather is the address of
a site on the ordinary Internet.  (Websites operating on TOR
have complex domain names ending in ".onion" and can only be
accessed through TOR browser software.)  However, from reviewing
archived versions of the silkroadmarket.org website,[2] I know that
in early 2011 this website was used to publicize the Silk Road
Underground Website and to explain how it could be accessed
through TOR.  For example, an archived capture of the
silkroadmarket.org homepage from March 4, 2011 reflects that, at
the time, the website stated as follows:

> This is not the Silk Road, but you are close...
>
> The Silk Road is an anonymous online market. Current
> offerings include Marijuana, Hash, Shrooms, LSD, Ecstacy,
> DMT, Mescaline, and more. The site uses the Tor anonymity
> network, which anonymizes all traffic to and from the site,
> so no one can find out who you are or who runs Silk Road.
> For money, we use Bitcoin, an anonymous digital currency.
>
> Accessing the site is easy:

---

[2] The archived material is available at www.archive.org, a non-
profit digital library of archived websites.

1.   Download and install the Tor browser bundle
     (Click here for instructions and non-windows
     users)
2.   Open your new Tor browser
3.   Go to: http://ianxz6zefk72ulzz.onion

. . .

* it takes about a minute for you to make the initial
anonymous connection to the site, but afterward you should
be able to browse more quickly.

So what are you waiting for? Get Tor and get to Silk Road!
We'll see you inside :)

-Silk Road staff

15.  Later archived captures from the silkroadmarket.org

website reflect that the site continued to be used by the

administrators of the Silk Road Underground Website to inform

Silk Road users of service outages and otherwise to provide

updates on the status of the service.  For example:

     a.   On June 5, 2011, the silkroadmarket.org website

posted a message stating: "The Silk Road is currently closed to

new visitors.  This will be reviewed on July 1st and the site

will possibly be reopened. Sorry for the inconvenience : (."

     b.   On June 18, 2011, the silkroadmarket.org website

posted a message stating: "So the server went down unexpectedly

today. This was very unnerving because we thought it had somehow

been seized or something terrible like that.  Fortunately it was

just some kind of glitch and we were able to reboot.  Everything

has been backed up and is totally current, but we are not going

to turn the site back on for a couple of days while we work out a way to prevent such problems."

16.  Archived captures of the silkroadmarket.org website show that it ceased operating as an outlet for information about the Silk Road Underground Website in or about April 2012.

17.  Based on publicly accessible information from domaintools.com,[3] I have learned the following:

a.  The "silkroadmarket.org" domain name was registered on March 1, 2011 by a "Richard Page" at 11640 Gary Street, Garden Grove, California.  This contact information appears to be entirely fictitious, as I have been unable to find any information on a "Richard Page" associated with this address in any law-enforcement or open-source databases.  Based on my training and experience, I believe that whoever registered the "silkroadmarket.org" domain name used false identification information in order to conceal his association with the website.

b.  From March 1, 2011 through April 13, 2012, the "silkroadmarket.org" domain name was controlled through the

---

[3] Whenever a domain name or IP address is registered so that it can be accessed through the Internet, the registrant must provide certain information to Internet governance authorities, including the registrant's contact information (which is not verified, however).  This registration information is stored in what is known as the "WHOIS" database and can be searched through various websites, including domaintools.com.

domain name server "xta.net."  A domain name server is a server responsible for translating a domain name (e.g., "abc.com") to an IP address (e.g., "198.199.200.201") and redirecting users who type in the domain name to the computer with the corresponding IP address.  The "xta.net" domain name server used to control the "silkroadmarket.org" domain name has, since January 13, 2010, been registered to the company "Mutum Sigillum LLC."  The administrative and technical contact person listed for the company in the domain name registration information is Mark Karpeles ("KARPELES"), with an e-mail address of "magicaltux@gmail.com" – i.e., SUBJECT ACCOUNT-1.

c.   From March 1, 2011 through March 30, 2011, the silkroadmarket.org domain name resolved to the IP address 174.120.185.75 ("IP Address-1").  That is, traffic to the website was directed during this time, through the xta.net domain name server, to IP Address-1, where the content of the silkroadmarket.org website was hosted.  Based on records subpoenaed from a server-hosting company that maintains IP Address-1, I have learned that IP Address-1 was leased to KARPELES from December 18, 2009 through April 1, 2011.  The records list KARPELES's e-mail address as "mark@tibanne.com" – i.e., SUBJECT ACCOUNT-2.

     d.   In searching registration records for other websites hosted at IP Address-1 in 2011, I discovered that the website "tuxtelecom.com" was also hosted at IP Address-1 from March 1, 2011 through March 30, 2011.  The "tuxtelecom.com" domain name is registered to KARPELES in his own name.

     e.   The websites for both silkroadmarket.org and tuxtelecom.com were subsequently moved – repeatedly and simultaneously – to different IP addresses.  Specifically, on March 30, 2011, the IP addresses for both silkroadmarket.org and tuxtelecom.com changed to 173.224.127.76 ("IP Address-2").  Both websites remained at that address until April 21, 2011, when they were both moved to the IP address 173.224.119.60 ("IP Address-3").  I believe this evidence shows that KARPELES controlled the silkroadmarket.org website along with the tuxtelecom.com website, and that he hosted them both at IP addresses he controlled.

18.  According to KARPELES's publicly accessible page on "LinkedIn" – a professional networking site where users can post their resumes and other career information – KARPELES is an experienced computer programmer.  KARPELES's resume on LinkedIn indicates that, from 2003 to 2010, he worked as a software developer at various companies, specializing in developing e-commerce websites.  Based on my training and experience, I know

that this type of background would make KARPELES well-suited to operating an e-commerce site such as the Silk Road Underground Website.

19.  Based on media articles and Japanese incorporation records, I know that, by at least early 2011, KARPELES acquired a Bitcoin exchanger service based in Japan known as "Mt. Gox." KARPELES continues to own Mt. Gox to this day and serves as its Chief Executive Officer.  According to its website, Mt. Gox is the "world's largest and oldest Bitcoin exchange" and handles "over 80% of all Bitcoin trade."  Based on my own familiarity with the market for Bitcoins, I know that Mt. Gox is in fact one of the largest Bitcoin exchangers in operation at the present time, if not the largest.

20.  I have spoken with a confidential informant ("CI-1") who has worked for KARPELES within the past two years. According to CI-1, KARPELES operates bitcointalk.org – the same discussion forum where Silk Road was first publicized by the user "silkroad" in late February 2011.  From visiting the forum, I know that the forum operates on a software platform known as "Simple Machines."  From visiting the Silk Road Underground Website on TOR, I know that this same software platform is used to operate the discussion forums included on the Silk Road Underground Website itself.  Based on my training and

experience, the Simple Machines forum software is not widely used by forum administrators.  Thus, the fact that the software is used to operate both the discussion forum on bitcointalk.org and the discussion forum on Silk Road indicates that the forums were likely set up by the same administrator – that is, KARPELES.

21.  Similarly, from visiting the tuxtelecom.com website – publicly registered to KARPELES, as described above – I know that the website includes a webpage containing a tutorial about how to make phone calls over the Internet.  From reviewing the source code for the webpage, I know that it was constructed using "wiki" software – a type of software commonly used to create tutorials, "frequently asked questions" or "FAQ" pages, and similar content on websites.  More specifically, the source code reflects that the webpage was constructed using a specific "wiki" software called "Mediawiki," and a specific version of this software, version 1.17.[4]  From reviewing the silkroadmarket.org website and the Silk Road Underground Website, I know that these websites also contain pages constructed using "wiki" software (such as FAQ pages).  The

---

[4] Software vendors commonly update their software in order to fix bugs and to add new features.  Each version of the software is denoted by a higher version number, with larger decimal places representing more significant revisions.  (E.g., version 2.34 would be a minor revision to version 2.33, while version 3.0 would be a major revision to any version in the 2.xx series.)

source code for these pages reflects that they were constructed
using the same version of the same software used to create the
"wiki" page on the tuxtelecom.com website – Mediawiki version
1.17.  From reviewing the Mediawiki website, I know that the
Mediawiki software is regularly updated and that many versions
have been released over time.  Thus, the fact that the exact
same version of the software was used to create the "wiki" page
on tuxtelecom.com and the "wiki" pages on silkroadmarket.org and
the Silk Road Underground Website indicates, again, that the
same administrator – KARPELES – was responsible for creating all
three of these sites.

22.  Based on the foregoing, I believe that KARPELES has
been involved in establishing and operating the Silk Road
website.  In summary, the evidence shows that:

a.  KARPELES controlled the domain name server and
the IP addresses used to host the silkroadmarket.org website on
the ordinary Internet.  This website was used by the "Silk Road
Staff" to publicize the existence of the Silk Road Underground
Website on TOR and later to provide information to users about
the status of the website.

b.  Moreover, in early 2011, around the same time
that Silk Road began operating, KARPELES acquired Mt. Gox.
Given his ownership of this Bitcoin exchange business, KARPELES

had a strong motive to create a large underground marketplace where Bitcoins would be in high demand.  The Silk Road website was uniquely well suited to this purpose, as it has generated a huge source of demand for Bitcoins.  Indeed, as of April 2013, the total value of Bitcoins in circulation topped 1 billion dollars.  Because there are few legitimate vendors who accept Bitcoins as payment, it is widely believed that the rise of Bitcoins has been driven in large part by their use on Silk Road.

       c.  KARPELES has the technical expertise and experience necessary in order to establish and operate a large commercial website such as the Silk Road Underground Website. The fact that the Silk Road website utilizes the exact same forum software as bitcointalk.org and the exact same "wiki" software as tuxtelecom.com – both websites directly linked to KARPELES – provides further evidence of KARPELES's involvement in administering Silk Road.  Finally, the fact that the Silk Road Underground Website relies on a highly complex system for processing Bitcoins strongly suggests that it was designed by someone with extensive technical expertise related to Bitcoins – which KARPELES, being the owner and operator of a major Bitcoin exchange and Bitcoin discussion forum, clearly has.

23.  Accordingly, I respectfully submit there is probable
cause to believe that KARPELES has engaged in the SUBJECT
OFFENSES.  Specifically:

a.  By establishing and helping to operate Silk Road,
an underground narcotics-trafficking website, KARPELES has
participated in a conspiracy to distribute narcotics and has
aided and abetted the distribution of narcotics, in violation of
Title 21, United States Code, Sections 841 and 846 and Title 18,
United States Code, Section 2.

b.  Further, by operating a Bitcoin exchanger
service, Mt. Gox, while knowing that a large volume of its
business derives from narcotics trafficking activity conducted
through Silk Road, KARPELES has violated U.S. money-laundering
laws.  Specifically, KARPELES has violated Title 18, United
States Code, Section 1956, which prohibits, among other things,
knowingly transferring the proceeds of narcotics trafficking
activity with the intent to promote the carrying on of such
unlawful activity.  See 18 U.S.C. § 1956(a)(1)(A) & (c)(3).
KARPELES has also violated Title 18, United States Code, Section
1960, which prohibits a person from operating a money
transmitting business that involves the transmission of funds
the person knows to have been derived from a criminal offense or

are intended to be used to promote or support unlawful activity.
See 18 U.S.C. § 1960(b)(1)(C).

<u>Request to Search the Subject Accounts</u>

24.  As described above, KARPELES used SUBJECT ACCOUNT-1 to
register the domain name server used to route Internet traffic
to the silkroadmarket.org website, and he used SUBJECT ACCOUNT-2
to lease the IP address where the silkroadmarket.org website was
initially hosted.  Based on records subpoenaed from Google, I
have learned the following:

a.   Both of the SUBJECT ACCOUNTS are maintained by
Google.  The subscriber listed for both accounts is KARPELES.

b.   Both of the SUBJECT ACCOUNTS were active as of
the date of the subpoena return, April 5, 2013.  Indeed, on
April 4, 2013 alone, the Google records reflect 234 logins to
SUBJECT ACCOUNT-1 and 211 logins to SUBJECT ACCOUNT-2.

25.  Based on my training and experience, I know that, when
a user is required to provide an e-mail address to register an
account with an electronic communications service provider, the
provider typically sends the user a receipt at the e-mail
address provided.  Accordingly, I believe that, at a minimum,
the SUBJECT ACCOUNTS will contain records of KARPELES
registering the accounts associated with the domain name server
and an IP address used to host the silkroadmarket.org website.

By tying KARPELES to Silk Road, these records would provide evidence of KARPELES' involvement in the SUBJECT OFFENSES.

26.  By the same token, I believe that KARPELES has also used the SUBJECT ACCOUNTS to register other accounts he has used in connection with the SUBJECT OFFENSES.  For example, the SUBJECT ACCOUNTS likely contain communications reflecting KARPELES' registration of IP Address-2 and IP-Address-3, where the silkroadmarket.org website was moved after initially being hosted at IP-Address-1.

27.  Finally, based on my training and experience, I believe it is likely that KARPELES has worked with others in establishing and operating the Silk Road Underground Website. Indeed, the postings on the silkroadmarket.org site that KARPELES controlled are signed "The Silk Road Staff" and are written in the plural first person.  Based on my training and experience, I know that those involved in cybercrime often communicate with their co-conspirators over e-mail. Accordingly, I believe it is likely that the SUBJECT ACCOUNTS will contain communications between KARPELES and the co-conspirators involved with him in committing the SUBJECT OFFENSES.

28.  Accordingly, I respectfully submit that there is probable cause to believe that the SUBJECT ACCOUNTS will contain

evidence, fruits, and instrumentalities of the SUBJECT OFFENSES,
as described more fully in Section II of Attachment A.

### SEARCH PROCEDURE

29.  In order to ensure that agents search only the SUBJECT
ACCOUNTS, the search warrant requested herein will be
transmitted to the Provider's personnel who will be directed to
produce the information described in Section II of Attachment A.
Based on my training and experience with executing email search
warrants, I know that, for practical and logistical reasons,
service providers typically produce all stored emails associated
with an email account for which a search has been authorized.
Upon receiving a digital copy of all stored email and stored
content associated with a given email account, law enforcement
personnel will review this content information using various
techniques, including but not limited to performing keyword
searches and undertaking a cursory inspection of all information
from the SUBJECT ACCOUNTS (analogous to searching file cabinets
in an office to determine which paper evidence is subject to
seizure), to determine which information, including emails,
contains evidence or fruits of the SUBJECT OFFENSES, as
specified in Section III of Attachment A.[5]

---

[5] I know from my training and experience that keyword searches
alone are typically inadequate to detect all information subject
to seizure.  For one thing, keyword searches work only for text

<u>CONCLUSION</u>

30.  Based on the foregoing, I respectfully request that the Search Warrant sought herein issue pursuant to Rule 41 of the Federal Rules of Criminal Procedure.

Dated:    New York, New York
          August 15, 2013


                                   _____
                                   Jared DerYeghiayan
                                   Special Agent
                                   Immigration and Customs Enforcement-
                                   Homeland Security Investigations


Sworn to before me on
August 15, 2013


_____
HON. RONALD L. ELLIS
UNITED STATES MAGISTRATE JUDGE

_____

data, yet many types of files commonly associated with emails (including attachments such as images and videos) do not store data as searchable text.  Moreover, even as to text data,  there may be information properly subject to seizure but that is not captured by a keyword search merely because the information fortuitously does not contain the keywords being searched.

**Attachment A**

**Property to Be Searched**

This warrant applies to information associated with the following e-mail accounts:

**magicaltux@gmail.com**
**mark@tibanne.com**

(the "SUBJECT ACCOUNTS") stored at a premises owned, maintained, controlled, or operated by Google, Inc., which is headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043 ("the Provider").

**Particular Things to Be Seized**

**I. Search Procedure**

This warrant will be faxed or e-mailed to the Provider's personnel, who will be directed to produce the information described in Section II below. Upon receipt of the production, law enforcement personnel will review the information to locate the items described in Section III below.

**II. Information to be Produced by the Provider**

The Provider is required to disclose the following information for each of the SUBJECT ACCOUNTS, to the extent that the information is within the Provider's possession, custody, or control:

a. All stored e-mail and other stored content information presently maintained in, or on behalf of, the SUBJECT ACCOUNTS, and all existing printouts from original storage of e-mail associated with the SUBJECT ACCOUNTS, including all header information associated with such e-mails;

b. All histories, profiles, and contact lists (or "buddy" lists, "Friends" lists, or similar lists), including e-mail addresses, screen names, and user IDs, associated with the SUBJECT ACCOUNTS;

c. All transactional information concerning activity associated with the SUBJECT ACCOUNTS, including internet protocol address logs;

d.   All business records and subscriber information, in any form kept, concerning the SUBJECT ACCOUNTS, including applications, account creation date and time, all full names, screen names, and account names associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing records; and

e.   All records indicating the services available to subscribers of the SUBJECT ACCOUNTS.

## III. Information to Be Seized by the Government

The information to be seized by the Government includes all information described above in Section II that contains or constitutes evidence, fruits, and instrumentalities of narcotics trafficking and money laundering, in violation of Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Sections 1956, 1960, and 2 (the "SUBJECT OFFENSES"), including any evidence concerning the following:

a.   The identity and location of the user of the SUBJECT ACCOUNTS (the "User");

b.   Any phone numbers, e-mail accounts, computer servers, IP addresses, domain names, or other electronic communications facilities or accounts maintained or controlled by the User;

c.   The User's training, experience, and expertise concerning computers, the Internet, digital currency, the TOR network, and encryption;

d.   The User's involvement in operating a Bitcoin exchanger service;

e.   The User's involvement in narcotics trafficking;

f.   The User's intent to promote narcotics trafficking through operating a Bitcoin exchanger service or knowledge that the exchanger service is facilitating narcotics trafficking;

g.   The User's awareness of anti-money laundering laws and any efforts to comply with or evade such laws;

h.   Communications with co-conspirators;

     i.   Passwords, encryption keys, and other access devices that may be necessary to access any of the User's communications or data; and

     j.   Any other evidence of the SUBJECT OFFENSES.

**SEALING ORDER**

SERRIN TURNER affirms as follows:

1.   I am an Assistant United States Attorney in the Office of Preet Bharara, United States Attorney for the Southern District of New York, and, as such, I am familiar with this matter and the instant application for a warrant under 18 U.S.C. § 2703 to obtain certain stored electronic communications and related records kept at premises owned, maintained, controlled, or operated by Google, Inc. (the "Provider").

2.   In light of the confidential nature of this continuing criminal investigation, the Government respectfully requests that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, in order to avoid premature disclosure of the investigation which could inform potential criminal targets of law enforcement interest, resulting in the endangerment of law enforcement agents and others, except that the Government may without further Order of this Court provide copies of the warrant and affidavit as needed to personnel assisting it in the investigation and prosecution of this matter, and may disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

3.    With respect to the return of the warrant and inventory to the Clerk of Court, the Government further requests the return be sealed as the target of the present investigation has not yet been charged and public filing of the return at this time would compromise an ongoing investigation into violations of criminal law.

4.    In addition, because notification of the existence of this order will seriously jeopardize an investigation, I request that, pursuant to 18 U.S.C. Section 2705(b), the Court order the Provider not to notify any person of the existence of the warrant.

```
Dated:    New York, New York
          August 15, 2013
                              PREET BHARARA
                              United States Attorney
                              Southern District of New York


                      By:  _____
                              SERRIN TURNER
                              Assistant United States Attorney
                              Southern District of New York


SO ORDERED:


_____
HON. RONALD L. ELLIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK
```

EXHIBIT 3

<u>Anand Nathan ATHAVALE</u>
<u>Canadian citizen, DOB: ███████, 1975.</u>

Lived in New Zealand during their early teens
Education: Dropped out of College, degree in BComm
Height: 5'5"
Weight 300 Pounds

**Addresses:**

████████████████████████████
████████████████████

**Canadian PP#'s:** ████████████████
**Canadian DL's/ID's:** ██████████████████████████
**Telephone #** ██████████████████████
Email addresses: ███████@mnsi.net, ███@autodeletepro.███████@adpmods.com

**Sister:** Anita Genevieve ATHAVALE, Canadian citizen, DOB: ███████, 1978,
**Father:** Indian heritage
**Mother:** German/Czech Heritage

**Handles:**
Liberty Student (mises.org)
Dixieflatline (Twitter, Notreason.com)
Roscoe36 (pistonsforum.com)
Guerrilla (namecheap.com)

**U.S. Crossings (1997 and up)**
August 11, 2005 crossed the Ambassador Bridge
June 03, 1998 Crossed at the Sumas POE
January 11, 1997 Arrived inbound on New Zealand flight 10 from Auckland, NZ into
Honolulu, HI using Canadian Passport ████████

**Domains owned by ATHAVALE:**
adp-servers.info
adpmods.com
anitaathavale.com
ariacom.net
autodeletepro.com
badboysummercamp.com
crashevent.com
dawgswap.com
dyenchir.net
dziho.com

faafan.com
freeculturefoundation.org
griefandgrace.com
harvestreport.net
humanvictorycigar.com
ksgovernor.com
liftupthelid.com
mahcuz.com
okanaganproperty.org
oviwebportal.com
pachay.com
pistonforum.com
salmonarmproperty.com
salmonarmrealestate.org
shopgpsandsave.com
shuswapproperty.net
shuswaprealestate.org
smilequilts.com
studioprimer.com
technoarena.net
todlokey.com
tv-valjevo.com
tvi-web.com
unifyyoga.com
unifyyoga.net
unifyyoga.org
vegasjunky.com
yogafrogcaps.com
ronpauldonors.com
notreason.com
highdefinition1080i.info
highdefinition1080p.info
glitchproject.com
astroteacher.net
teenbloggersintl.org
unifiedunionworkers.org
pistonsforum.com
email4seniors.org
ceapseap.info
conficker-worm-removal.com
confickervirusremoval.com
libertyseo.com
libertyseo.net
libertyseo.org
consolegamecheater.com
reviewmobilephones.com

laptopbuyer.info
luckygenerics.info
junksilverauctions.com
tramadolhcl.info
bupropiononline.info
buyorlistat.info
diclofenacgel.info
genericcarisoprodol.info
genericphentermine.info
rimonabantonline.info
vardenafilhcl.info
clomiphenecitrate.info
libertydoubleeagle.com
laptopsforstudents.info
usedlaptopsforsale.info
survivingbraininjury.info
buspironehcl.info
buytadalafil.info
genericsildenafil.info
achatmedicament.info
achattadalafil.info
fastprescriptions.info
secureonlinerx.info
euromedsonline.info
buyoseltamivir.info
lfeusers.com
impotencehelp.org
prescriptionrefill.info
drinkmagician.com
notjustprescriptions.com
onlineinsurancedealers.com
airtechaviation.com
facilcobro.com
szetoshuiki.com
chemicalsafetybook.com
doubleolsens.com
webautomationlab.com
brainclub.net
bubblesphere.org
devbridge.org
fivebox.org
planoodle.net
blogify.org
blogtune.net
dazzlepedia.org
zhaotongok.com

connectorz.com
thyroidsupplement.net
ceapseap.info
fadeo.org
fivecast.org
fivefish.org
fivepath.org
jumpcast.org
pixotri.org
misosouprecipes.org
acetazolamide.net
clindamycin.me
cabergoline.me
clozapine.me
cyclosporine.me
minocycline.me
asthmainhalers.info
buyazithromycin.me
fluoxetinehcl.info
paroxetinehcl.info
venlafaxinehcl.info
buydoxycycline.info
cephalexinonline.info
lisinoprilhctz.info
majordepressivedisorder.info
orderamoxicillin.info
superfoodslist.info
bupropionhcl.info
swissballs.org
kettlebellweights.info
petmedsrx.info
athaananda.com
auction-market.com
atenolol.me
tramadol50mg.me
tadalafil20mg.me
sildenafil100mg.info
bupropiononline.info
buyorlistat.info
buytadalafil.info
clomiphenecitrate.info
diclofenacgel.info
genericcarisoprodol.info
genericphentermine.info
genericsildenafil.info
rimonabantonline.info

survivingbraininjury.info
vardenafilhcl.info
buspironehcl.info
crashassets.com
backlinkgarden.com
backlinkgarden.me
backlinkgarden.net
backlinkgarden.org
backlinkgarden.info
sociallinkoptimization.net
sociallinkoptimization.com
sociallinkoptimization.info
sociallinkoptimization.org
shuswaprealestate.org
salmonarmproperty.com
salmonarmrealestate.org
shuswapproperty.net
okanaganproperty.org
getinception.com
getinception.info
getinception.net
getinception.org
fortunepasseseverywhere.com
cseo.bz
communityseo.co
luckydragonconvenience.com


**Known/Current IP Addresses:**
139.142.249.112 (First used 05/04/2012, last used to log in to namecheap.com, 11/09/2012)
119.152.223.137 (used on 02/02/2012 to log into namecheap)
119.152.21.138 (used on 01/17/2012 to log into namecheap)
216.8.170.40 (used on 04/17/2012)
216.8.163.222 (used from 12/30/2010 to 04/12/2012)
96.30.11.236 (owns/administers) (multiple websites listed above in blue)
96.30.11.237 (owns/administers) (pistonsforum.com)
96.30.11.238 (owns/administers) (teenbloggersintl.org)
96.30.11.239 (owns/administers) (unifiedunionworkers.org)
184.173.203.97 (yogafrogcaps.com, ronpauldonors.com, notreason.com, highdefinition1080i.info, highdefinition1080p.info, glitchproject.com, astroteacher.net)
64.74.223.30 (used for multiple websites)

**Observations of ATHAVALE:**
-Every website has their whois information protected.  Many of which became protected in mid to late 2011
-Subject is a ghost- little to no personal information anywhere on the internet
-Never uses his own name on any of his websites
-Hasn't traveled to the U.S. since 2005
-Knowledge of linux and servers
-Has administered numerous websites including the Mises.org Forums, Pistons Forum, and his own website notreason.com.
-Stopped actively posting on Mises.org on May 11, 2011.  Last post on July 03, 2011.
-Majority of his websites are no longer active
-In March of 2011 moved from Ontario to BC and registered his address as a PO Box.


**Writing analysis (similarities between Liberty Student/ATHAVALE on Mises and Dread Pirate Roberts on Silk Road/UC chats)**
-Both use the same writing style when addressing others and when replying (condescending, Etc)
-Both spells Labor as "Labour" occasionally, and as "Labor" other times
-Both use and spell the word "real-time"
-Both use the word "lemme"
-Both end sentences with ", right?"
-Both spell route as "rout"
-Both use the term "intellectual laziness"
-Both use the term and actively discuss the concept of agorism and the "agorist"
-Both use and spell the work "counter-economics" in this manner
-Both use the term "the latter"
-Both quite often capitalize smaller words they want to emphasize
-Neither uses hyphens to space out sentences or thoughts
-Both start sentences with "And" and "But" quite often.
-Both will commonly not capitalize the first word in a sentence when replying short and quick
-Both use the term "the heart of the matter"
-Both quite often will use a backslash (/) to split words with similar meaning, and the second word never had a space after the slash.
-Both use the term "altruistic"
-Both use the term "pal"
-Both use the term "war mongering"
-Both use the term "phoney"
-Both discuss and mention the authors Rothbard and Konkin
-Both commonly end sentences with a smilie face or with the wink smilie face
-Both sometimes end sentences with the word "amigo"
-Both use the term "anarcho-capitalist"
-Both misspell the word "alot"
-Both have discussed the paleo human
-Both use the word "bullshit"

-Both use similar sayings about "hedge your bet" or "hedge our bets"
-Both use the cliché of not touching something with a "10 foot pole"
-Both commonly use the word "kinda"
-Both say they are knowledgeable and use "Ubuntu"
-Both actively have discussions on bitcoins
-Both have extremely similar political views

Immigration and Customs Enforcement (ICE) Homeland Security
Investigations (HSI) Chicago O'Hare office is conducting an investigation
into the seizures of small quantities of drugs being made at the Customs
and Border Protection (CBP) International Mail Branch (IMB) at Chicago
O'Hare Airport.  These seizures have been linked to anonymous online
marketplace called the Silk Road. This investigation is focused on
identifying and dismantling the Silk Road website as well as identifying
the sellers and recipients of the Scheduled Controlled Substances, as
well as the anabolic and synthetic drugs being sold on the website.

HSI O'Hare is respectfully requesting a collateral investigation by HSI
Vancouver on the Canadian citizen Anand ATHAVALE.


DETAILS OF INVESTIGATION:

Immigration and Customs Enforcement (ICE) Homeland Security
Investigations (HSI) Chicago O'Hare office is investigating multiple
seizures of various drugs being seized by Customs and Border Protection
(CBP) at the International Mail Branch (IMB). The investigation has led
to identifying the anonymous online market place referred to as "the Silk
Road" (SR) as the purchase location for the majority of the seized
controlled substances.

HSI O'Hare is respectfully requesting the assistance of HSI Vancouver to
coordinate a collateral investigation on the Canadian citizen Anand
Nathan ATHAVALE, date of birth (DOB) November 01, 1975.  ATHAVALE is
suspected of operating as the main administrator under the username Dread
Pirate Roberts on the SR and SR forum.

HSI O'Hare has identified ATHAVALE as the likely identity behind the SR
administrator username Dread Pirate Roberts by using the posts on the SR
Forum, and using the chat sessions recorded by HSI Baltimore.  There has
been extensive analysis of distinct writing styles, sayings, spelling
mistakes, cliches and specific nuances, which have led to determining
ATHAVALE as a highly likeable target.

The following is what identifying information is currently known about
ATHAVALE:

Anand Nathan ATHAVALE
Canadian citizen, DOB: ████████  1975.

Lived in New Zealand during their early teens
Education: Dropped out of College, degree in BComm
Height: 5'5"
Weight 300 Pounds

████████████████████████████████████
████████████████████████████

Canadian PP#'s: ███████████████████
Canadian DL's/ID ██████████████████████
Telephone # (519) ████████████████████
    addresses: ██████████.net, ██████odeletepro.com,
████@adpmods.com

Sister: Anita Genevieve ATHAVALE, Canadian citizen, DOB: ███████ 1978,
Father: Indian heritage
Mother: German/Czech Heritage

Handles:
Liberty Student (mises.org)
Dixieflatline (Twitter, Notreason.com)
Roscoe36 (pistonsforum.com)
Guerrilla (namecheap.com)

U.S. Crossings (1997 and up)
August 11, 2005 crossed the Ambassador Bridge
June 03, 1998 Crossed at the Sumas POE
January 11, 1997 Arrived inbound on New Zeala████t 10 from Auckland,
NZ into Honolulu, HI using Canadian Passport ██████████

Domains owned by ATHAVALE:
adp-servers.info, adpmods.com, anitaathavale.com, ariacom.net,
autodeletepro.com, badboysummercamp.com, crashevent.com, dawgswap.com,
dyenchir.net, dziho.com, faafan.com, freeculturefoundation.org,
griefandgrace.com, harvestreport.net, humanvictorycigar.com,
ksgovernor.com, liftupthelid.com, mahcuz.com, okanaganproperty.org,
oviwebportal.com, pachay.com, pistonforum.com, salmonarmproperty.com,
salmonarmrealestate.com, shopgpsandsave.com,
shuswapproperty.net,shuswaprealestate.org, smilequilts.com,
studioprimer.com, technoarena.net, todlokey.com, tv-valjevo.com, tvi-
web.com, unifyyoga.com, unifyyoga.net, unifyyoga.org, vegasjunky.com,
yogafrogcaps.com, ronpauldonors.com, notreason.com,
highdefinition1080i.info, highdefinition1080p.info, glitchproject.com,
astroteacher.net, teenbloggersintl.org, unifiedunionworkers.org,
pistonsforum.com, email4seniors.org, ceapseap.info, conficker-worm-
removal.com, confickervirusremoval.com, libertyseo.com, libertyseo.net,
libertyseo.org, consolegamecheater.com, reviewmobilephones.com,
laptopbuyer.info, luckygenerics.info, junksilverauctions.com,
tramadolhcl.info, bupropiononline.info, buyorlistat.info,
diclofenacgel.info, genericcarisoprodol.info, genericphentermine.info,
rimonabantonline.info, vardenafilhcl.info, clomiphenecitrate.info,
libertydoubleeagle.com, laptopsforstudents.info, usedlaptopsforsale.info,
survivingbraininjury.info, buspironehcl.info, buytadalafil.info,
genericsildenafil.info, achatmedicament.info, achattadalafil.info,
fastprescriptions.info, secureonlinerx.info, euromedsonline.info,
buyoseltamivir.info, lfeusers.com, impotencehelp.org,
prescriptionrefill.info, drinkmagician.com, notjustprescriptions.com,
onlineinsurancedealers.com, airtechaviation.com, facilcobro.com,
szetoshuiki.com, chemicalsafetybook.com, doubleolsens.com,
webautomationlab.com, brainclub.net, bubblesphere.org,
devbridge.org, fivebox.org, planoodle.net, blogify.org,
blogtune.net, dazzlepedia.org, zhaotongok.com, connectorz.com,

thyroidsupplement.net, ceapseap.info, fadeo.org, fivecast.org,
fivefish.org, fivepath.org, jumpcast.org, pixotri.org,
misosouprecipes.org, acetazolamide.net, clindamycin.me, cabergoline.me,
clozapine.me, cyclosporine.me, minocycline.me, asthmainhalers.info,
buyazithromycin.me, fluoxetinehcl.info, paroxetinehcl.info,
venlafaxinehcl.info, buydoxycycline.info, cephalexinonline.info,
lisinoprilhctz.info, majordepressivedisorder.info, orderamoxicillin.info,
superfoodslist.info, bupropionhcl.info, swissballs.info,
kettlebellweights.info, petmedsrx.info, athaananda.com, auction-
market.com, atenolol.me, tramadol50mg.me, tadalafil20mg.me,
sildenafil100mg.info, bupropiononline.info, buyorlistat.info,
buytadalafil.info, clomiphenecitrate.info, diclofenacgel.info,
genericcarisoprodol.info, genericphentermine.info,
genericsildenafil.info, rimonabantonline.info, survivingbraininjury.info,
vardenafilhcl.info, buspironehcl.info, crashassets.com,
backlinkgarden.com, backlinkgarden.me, backlinkgarden.net,
backlinkgarden.org, backlinkgarden.info, sociallinkoptimization.net,
sociallinkoptimization.com, sociallinkoptimization.info,
sociallinkoptimization.org, shuswaprealestate.org, salmonarmproperty.com,
salmonarmrealestate.org, shuswapproperty.net, okanaganproperty.org,
getinception.com, getinception.info, getinception.net,
getinception.org, fortunepasseseverywhere.com, cseo.bz, communityseo.co,
luckydragonconvenience.com,

Known/Current IP Addresses:
139.142.249.112 (First used 05/04/2012, last used to log in to
namecheap.com, 11/09/2012)
119.152.223.137 (used on 02/02/2012 to log into namecheap)
119.152.21.138 (used on 01/17/2012 to log into namecheap)
216.8.170.40 (used on 04/17/2012)
216.8.163.222 (used from 12/30/2010 to 04/12/2012)
96.30.11.236 (owns/administers) (multiple websites listed above in blue)
96.30.11.237 (owns/administers) (pistonsforum.com)
96.30.11.238 (owns/administers) (teenbloggersintl.org)
96.30.11.239 (owns/administers) (unifiedunionworkers.org)
184.173.203.97 (yogafrogcaps.com, ronpauldonors.com, notreason.com,
highdefinition1080i.info, highdefinition1080p.info, glitchproject.com,
astroteacher.net)
64.74.223.30 (used for multiple websites)


HSI O'Hare respectfully requests that HSI Vancouver open a collateral
case in order to work in conjunction with Canadian law enforcement to
pursue all available information on ATHAVALE.  This will include possible
requests for surveillance, wire taps, personal identification records,
search warrants for email, household utility records, as well as
household energy consumption, internet use, internet connection IP
records, etc.

The HSI Chicago O'Hare investigation continues.

# EXHIBIT 4

Immigration and Customs Enforcement (ICE) Homeland Security
Investigations (HSI) Chicago Electronic Crimes Task Force (ECTF) is
conducting an investigation into the seizures of small quantities of
drugs being made at the Customs and Border Protection (CBP) International
Mail Branch (IMB) at Chicago O'Hare Airport.  These seizures have been
linked to anonymous online marketplace called the Silk Road. This
investigation is focused on identifying and dismantling the Silk Road
website as well as identifying the sellers and recipients of the
Scheduled Controlled Substances, as well as the anabolic and synthetic
drugs being sold on the website.

This report contains information pertaining to Anand ATHAVALE's suspected
role as the Silk Road Administrator the Dread Pirate Roberts.


DETAILS OF INVESTIGATION:

Since September of 2011, Immigration and Customs Enforcement (ICE)
Homeland Security Investigations (HSI) Chicago Electronic Crimes Task
Force (ECTF) has been investigation the anonymous online black market
referred to as the Silk Road.  Since March of 2011, the Silk Road has
hosted users that are able to buy and sell illegal drugs, counterfeit
commercial merchandise, false identification documents and other illegal
goods from destinations all over the world.  Since early 2012, the
operator and main administrator of the Silk Road website has utilized the
screen name the "Dread Pirate Roberts"; prior to that the administrator
used the screen name "Silk Road."

Since June of 2011, the Silk Road has maintained two independent
websites.  The first is its marketplace where it sells all of the illicit
goods.  The other is an online forum where the users can openly discuss
anything related to the marketplace as well as receive updates from the
Silk Road administrators concerning outages or maintenance on the
marketplace website.

The Silk Road administrator has remained active on the Silk Road forum
since its creation by posting messages to its other members.

On June 18, 2011, the Silk Road administrator posted their first message
that stated the following.

"Hey gang,

Really sorry for the dead time there.  Hopefully most of you got the
message on the bitcoin forum or at silkroadmarket.org.  The only major
change is this forum.  We have it running on a separate server with it's
own url so if the main site ever goes down again, first check here for
updates.  Unfortunately this means we have separate logins for the main
site and the forum.

As we mentioned before, everything was backed up and totally restored,
but if for some reason a deposit didn't make it in to your account or

something like that, just let us know and we'll track it down and credit
you.  Also, we're giving everyone a 4 day grace period on taking orders
to the resolution center before they are auto-resolved, so sellers, you
may see some orders past due for a few days.

Thanks everyone for hanging in there with us.  This work is scary and
exciting all at the same time, and I'm really very happy to be on this
journey with all of you.

Cheers,
Silk Road staff"

On February 05, 2012, the Silk Road administrator changed their screen
name to the Dread Pirate Roberts (DPR) as a result of a contest held on
the forum.  The message of the change read as follows, "technically
noisebr0 was the last poster, but who is noisebr0???  Most likely a
profile made by a cheating bot!  The winner is MagicMan!!!  Congrats MM!
Thanks everyone else for playing.  I hope you like my new name )
Messages - Dread Pirate Roberts"

On March 20, 2012, DPR posted a message on the forum that gave some
insight into their motivations.  The message read as follows.

"Hey gang,

I read more than I post in the forum, and my posts are rarely of a
personal nature.  For some reason the mood struck me just now to put the
revolution down for a minute and just express a few things.  There is a
curtain of anonymity and secrecy that covers everything that goes on
behind the scenes here.  It is often fast paced and stressful behind this
curtain and I rarely lift my head long enough to take in just how amazing
all of this is.  But when I do I am filled with inspiration and hope for
the future.  Here's a little story about what inspires me:

For years I was frustrated and defeated by what seemed to be
insurmountable barriers between the world today and the world I wanted.
I searched long and hard for the truth about what is right and wrong and
good for humanity.  I argued with, learned from, and read the works of
brilliant people in search of the truth.  It's a damn hard thing to do
too with all of the misinformation and distractions in the sea of opinion
we live in.

But eventually I found something I could agree with whole heartedly.
Something that made sense, was simple, elegant and consistent in all
cases.  I'm talking about the Austrian Economic theory, voluntaryism,
anarcho-capitalism, agorism etc. espoused by the likes of Mises and
Rothbard before their deaths, and Salerno and Rockwell today.

From their works, I understood the mechanics of liberty, and the effects
of tyranny.  But such vision was a curse.  Everywhere I looked I saw the
State, and the horrible withering effects it had on the human spirit.  It
was horribly depressing.  Like waking from a restless dream to find
yourself in a cage with no way out.  But I also saw free spirits trying
to break free of their chains, doing everything they could to serve their

fellow man and provide for themselves and their loved ones.  I saw the magical and powerful wealth creating effect of the market, the way it fostered cooperation, civility and tolerance.  How it made trading partners out of strangers or even enemies.  How it coordinates the actions of every person on the planet in ways too complex for any one mind to fathom to produce an overflowing abundance of wealth, where nothing is wasted and where power and responsibility are directed to those most deserving and able.  I saw a better way, but knew of no way to get there.

I read everything I could to deepen my understanding of economics and liberty, but it was all intellectual, there was no call to action except to tell the people around me what I had learned and hopefully get them to see the light.  That was until I read "Alongside night" and the works of Samuel Edward Konkin III.

At last the missing puzzle piece!  All of the sudden it was so clear: every action you take outside the scope of government control strengthens the market and weakens the state.  I saw how the state lives parasitically off the productive people of the world, and how quickly it would crumble if it didn't have it's tax revenues.  No soldiers if you can't pay them.  No drug war without billions of dollars being siphoned off the very people you are oppressing.

For the first time I saw the drug cartels and the dealers, and every person in the whole damn supply chain in a different light.  Some, especially the cartels, are basically a defacto violent power hungry state, and surely would love nothing more than to take control of a national government, but you average joe pot dealer, who wouldn't hurt a fly, that guy became my hero.  By making his living outside the purview of the state, he was depriving it of his precious life force, the product of his efforts. He was free.  People like him, little by little, weakened the state and strengthened the market.

It wasn't long, maybe a year or two after this realization that the pieces started coming together for the Silk Road, and what a ride it has been.  No longer do I feel ANY frustration.  In fact I am at peace in the knowledge that every day I have more I can do to breath life into a truly revolutionary and free market than I have hours in the day.  I walk tall, proud and free, knowing that the actions I take eat away at the infrastructure that keeps oppression alive.

We are like a little seed in a big jungle that has just broken the surface of the forest floor.  It's a big scary jungle with lots of dangerous creatures, each honed by evolution to survive in the hostile environment known as human society.  All manner of corporation, government agency, small family businesses, anything that can gain a foothold and survive.

But the environment is rapidly changing and the jungle has never seen a species quite like the Silk Road.  You can see it, but you can't touch it.  It is elusive, yet powerful, and we are evolving at a rapid clip, experimenting, trying to find sturdy ground we can put roots down in.

Will we and others like us someday grow to be tall hardwoods?  Will we reshape the landscape of society as we know it?  What if one day we had enough power to maintain a physical presence on the globe, where we shunned the parasites and upheld the rule of law, where the right to privacy and property was unquestioned and enshrined in the very structure of society.  Where police are our servants and protectors beholden to their customers, the people.  Where our leaders earn their power and responsibility in the harsh and unforgiving furnace of the free market and not from behind a gun, where the opportunities to create and enjoy wealth are as boundless as one's imagination.

Some day, we could be a shining beacon of hope for the oppressed people of the world just as so many oppressed and violated souls have found refuge here already.  Will it happen overnight?  No.  Will it happen in a lifetime?  I don't know.  Is it worth fighting for until my last breath.  Of course.  Once you've seen what's possible, how can you do otherwise?  How can you plug yourself into the tax eating, life sucking, violent, sadistic, war mongering, oppressive machine ever again?  How can you kneel when you've felt the power of your own legs?

Felt them stretch and flex as you learn to walk and think as a free person?  I would rather live my life in rags now than in golden chains.  And now we can have both!  Now it is profitable to throw off one's chains, with amazing crypto technology reducing the risk of doing so dramatically.  How many niches have yet to be filled in the world of anonymous online markets?  The opportunity to prosper and take part in a revolution of epic proportions is at our fingertips!

I have no one to share my thoughts with in physical space.  Security does not permit it, so thanks for listening.  I hope my words can be an inspiration just as I am given so much by everyone here.

Dread Pirate Roberts"

On DPR's Silk Road forum profile page and on every post he/she creates is a signature.  Since the HSI Chicago investigation began, HSI Special Agent (SA) Jared Der-Yeghiayan has observed that DPR's signature has been modified with new quotes and links several times.  SA Der-Yeghiayan has noted that there have been several quotes similar to the beliefs posted in the message above by DPR.  SA Der-Yeghiayan also recalls that DPR's signature has consistently contained a link to various books or publications from the website mises.org.

Mises.org is a website in support of the Ludwig von Mises institute founded in 1982 in Auburn, Alabama, and is dedicated to, "the research and educational center of classical liberalism, libertarian political theory, and the Austrian School of economics."

In July of 2012, HSI SA Der-Yeghiayan began researching the Mises.org website and discovered their online forum.  SA Der-Yeghiayan then took note of multiple unusual or repetitive words/sayings made by DPR on the SR forum and began to search for them on the Mises.org forum.

While searching the Mises.org forums SA Der-Yeghiayan took note of one individual using the screen name liberty student (LS). LS was an administrator on the Mises.org forums and had made 11,343 posts as early as 2009.

In October of 2012, HSI Baltimore office provided SA Der-Yeghiayan with a file containing all of the Undercover (UC) chats made between a UC Agent and DPR.

The following is a list of the similarities in use of words or statements made by LS on the mises.org forums in comparison to messages posted by DPR on the Silk Road forums and a few from Undercover chats with DPR provided by HSI Baltimore.

-Both spells Labor as "Labour" occasionally, and as "Labor" other times

Posted by DPR on October 03, 2012:

"That work is an opportunity for them to better themselves.  Child labour regulations only hampered the development and expansion of the industries that were providing these opportunities."

Posted by LS on April 15, 2009:

"The free market supports everyone's self interest by the right to own your own property and to keep the fruits of your own labour."

-Both use and spell the word "real-time"

Posted by DPR on July 27, 2011:

"We don't do it in real-time to avoid using up alot of system resources."

Posted by LS on August 01, 2009:

"Wikipedia is about the political power of editors, not the capacity for anyone to edit information in real-time"

-Both use the word "lemme"

UC Chat by DPR:

"lemme find a good comp for ya"

Posted by LS on May 25, 2009:

"Lemme guess.  You didn't consider that when you make those statements."

-Both frequently end sentences with ", right"

Posted by DPR on July 22, 2012:

"The current sig is ok though, right?"

Posted by LS on October 23, 2010:

"And by rightful owners, you mean people who can prove title, right?"

-Both spell route as "rout"

Posted by DPR on October 01, 2012:

"It will be shut down quickly and the land put to better use leaving the two better routs to serve the demand."

Posted by LS on May 11, 2009:

"It should be a bigger rout than the takedown of Chris Peden last year."

-Both use the term "intellectual laziness"

Posted by DPR on May 03, 2012:

"To look at the hard examples, you have to abandon intellectual laziness and apply market principles to industries where the market has not been allowed to work because of government monopoly (education, transportation, utilities, security, justice, defense, charity etc)."

Posted by LS on August 04, 2009:

"If you are going to assume gaps (real or perceived) without asking in good faith for clarification (which I consider unproductive, insulting AND wasteful), I will point out that intellectual laziness as dishonesty since you're obviously too intelligent to be stupid."

-Both use the term and actively discuss the concept of agorism and utilize the uncommon use of the word "agorist."

Posted by DPR on October 04, 2012:

"I'm out to turn unconscious agorists in to conscious active ones"

Posted by LS on August 18, 2009:

"If that was so, it would not be possible to be an agorist."

-Both use, spell and hyphenate the word "counter-economics"

Posted by DPR on October 03, 2012:

"but his genius lies in his simple insights he called agorism and counter-economics."

Posted by LS on August 27, 2009"

"Agorism is new libertarian stuff.  Counter-economics.  Which is black markets, engaging in what is illegal under the state, but is not illegal

in a libertarian sense.  This means working for cash and paying no taxes,
barter economy, drugs, sex, security etc. Agorism is mostly a theoretical
concept."


-Both use the term "the latter"

Posted by DPR on October 01, 2012:

"If I had to choose a side to this question, I think it would be the
latter, which might be the first point I've disagreed with Rothbard on"

Posted by LS on March 13, 2011:

"The former is a mistake, the latter everyone has agreed with you 1000
times already Eugene."

-Both frequently capitalize words they want to emphasize

Posted by DPR on April 29, 2012:

"We are NOT beasts of burden to be taxed and controlled and regulated.
WE are free spirits!  We DEMAND respect!"

Posted by LS on May 28, 2009:

"The free market is a system where one can choose to give up their option
to compete and join a commune, but a commune INTERNALLY and BY NATURE
cannot tolerate the internal competition necessary to be "free market"."

(Agent's note: As seen by the last two excerpts both subjects began
capitalizing words of emphasis in relation to the topic of free markets.)

-Neither uses hyphens to space out sentences or thoughts

(Agent's note: Important point above since many of the other members on
the Mises.org forum do use hyphens consistently throughout their posts.
These are also member who might have also shared the one or two of the
same words or sayings that DPR has used.)

-Both start sentences with "And" and "But" quite often.

Posted by DPR on February 18, 2012:

"But yea, I think with this little tweak, you can do your lottery games
and be rewarded for your sales at a level that is more fair."

Posted by DPR on October 21, 2011:

"We are sooooo close to going live again.  And I am sooooo exhausted"

Posted by LS on March 17, 2011:

"But Misesian Utilitarians seem to use their position very often to avoid making any statement about ethical or moral values.  And I am not afraid to do that."

-Both use the saying, "the heart of the matter"

Posted by DPR on October 02, 2012:

"I think that's a tough pill to swallow for some, but really gets to the heart of the matter"

Posted by LS on January 01, 2010:

"Penetrating questions.  Right to the heart of the matter."

-Both use the term "altruistic"

Posted by DPR on August 01, 2012:

"Those ends can be altruistic if that individual wishes it."

Posted by LS on June 01, 2009:

"You are welcome to be as altruistic as you like."

-Both use the term "pal"

UC Chat by DPR:

"awww, I've missed you too pal."

Posted by LS on September 15, 2009:

"Your pal Mitt Romney was not a limited government candidate."

-Both use the term "war mongering"

Posted by DPR on March 20, 2012:

"How can you plug yourself into the tax eating, life sucking, violent, sadistic, war mongering, oppressive machine ever again?"

Posted by LS on May 23, 2009:

"Even the LP supports war mongering."

-Both use the word "phoney"

Posted by DPR on January 09, 2012:

"With this change, there are no phoney excuses whatsoever for vendors to ask for out of escrow payment."

Posted by LS on September 13, 2009:

"I thought you were making a point about phoney taste testing."

-Both discuss and debate the authors Rothbard and Konkin

-Both commonly end sentences with a smilie face or the smilie face with a wink

UC chat with DPR:

"I hope you are well :)"
"some of your charm ;)"
"too busy :)"
"I will :)"

Posted by LS on April 19, 2011:

"George, since you started posting here, you have kinda won me over, but it certainly wasn't due to your bedside manner.  :)"

Posted by LS on April 18, 2011:

"Welcome to Mises.  :)"

-Both call others "amigo"

UC Chats with DPR:

"Thanks for accommodating amigo :)

Posted by LS on May 04, 2009:

"Thank you amigo!"

-Both use the term "anarcho-capitalist"

Posted by DPR on March 20, 2012:

"I'm talking about the Austrian Economic theory, voluntaryism, anarcho-capitalism, agorism etc. espoused by the likes of Mises and Rothbard before their deaths, and Salerno and Rockwell today."

Posted by LS on April 15, 2009:

"If you don't understand a free market, or try to pigeon hole a free market by trying to replace today's institutions straight up for private institutions, then you're not going to be able to appreciate the upside of anarcho-capitalism."

-Both misspell the words "a lot" as "alot"

Posted by DPR on February 19, 2012:

"That's alot of positive responses!  Also, lots of great additional
suggestions.  We could do alot to improve the feedback system, but for
now it looks like this small change has lots of support, so we'll go
ahead with it."

Posted by LS on June 15, 2010:

"If you can't articulate your own position clearly in a paragraph or
less, then there isn't alot of value in my conversing with you."

-Both use the curse word "bullshit"

Posted by DPR on May 02, 2012:

"This isn't utopian bullshit either."

Posted by LS on May 05, 2011:

"Epistemology does get in the way of bullshit conclusions, which is why
many people abandon it."

-Both use similar sayings about "hedge your bet" or "hedge our bets"

UC Chat with DPR"

"and you can continue to do so or not once you are up and running?  Hedge
your bets"

Posted by LS on May 04, 2009:

"In order to engage in risky ventures (like driving) many of us will need
a way to hedge our bets that we won't cause damage beyond our means to
pay."

-Both use the cliche of not touching something with a "10 foot pole"

UC Chat with DPR:

"is not something I would touch with a 10 foot pole."

Posted by LS on September 18, 2010:

"This is what the OP and strangeloop will not touch with a 10 foot pole
via a clear definition for the term."

-Both commonly use the slang "kinda"

Posted by DPR on October 11, 2012:

"Kinda opens a can of worms about the state's role in national security."

Posted by LS on April 19, 2011:

"George, since you started posting here, you have kinda won me over, but it certainly wasn't due to your bedside manner.  :)"

-Both actively have discussed the topic of bitcoins

(Agent's Note:  While observing the Mises.org forums it would seem that at face value almost anyone there could easily be DPR.  Even a few dozen members had used a few of the same things mentioned above.  Yet a closer look at most of them will show that they are nothing like DPR.  Besides LS, none of them even matched more than 3 of the words/ sayings listed above. Often times they would use one of the more common words used by DPR, but they never talked about DPR's main inspirations, writers Murray Rothbard, and Samuel Konkin.

This connection was made based upon the all the important aspects of DPR's writing matching LS, to include many unusual words and sayings, which were interestingly located at the same place that both DPR and LS are affiliated to.)

HSI SA Der-Yeghiayan also searched the Mises.org forum and all of LS's posts that could reveal any specific details about LS's true identity. SA Der-Yeghiayan noticed that LS never ended any of his posts with a name, nor did it appear that any other member ever addressed LS with anything but their screen name.

SA Der-Yeghiayan did find the following information in various posts made by LS.

"I live near these landmarks.

http://www.forgottendetroit.com/mcs/index.html

http://www.forgottendetroit.com/national/history.html

http://www.forgottendetroit.com/metropolitan/history.html"

"NZ is a cool spot.  Lived there for a couple years, would take it over Canada in a second.  Quite fond of Whangarei."

"I have lived with Muslims, I have been in mosques for prayers, and I have observed Ramadan.  I have been around a madrasa, and I have spent time asking an Imam questions about his faith.  I think I have a clue or two about Islam.  I'd hazard a guess I know a hell of a lot more about Islam than you do. Not that it is relevant, but since you continue to make fallacious appeals and ignore the meat of the argument, I'll play your little authority game and raise the level of play.

Good luck finding any Muslim today who follows the Quran precisely, good luck finding more than a handful of Muslims who agree upon what the Quran says and how it should be interpreted. I'm tired of you not substantiating your claims, and continuing to assert you're right.  If the best you have are logical fallacies and denial of your own biases, then this conversation is stillborn."

"You're in luck here.  We have people who have lived, or are from Europe including England, and Canada, and the former Soviet Union, and you can find out lots of first hand experiences.  For example, I am a Canadian. And I would not wish our health care system on my enemy."

"Nice to see another Canadian waking up, and in the best way possible."

"I moved around a lot, and changed schools 8 times from Montessori to University (dropped out).  School is almost completely indoctrination.  I have made the most progress in my life, when my education was self-directed."

"I dropped out of university 3 months into a BComm."

"I also unschooled myself.  It helped having parents who were too busy to keep me in the system."

"http://faculty.msb.edu/hasnasj/GTWebSite/MythWeb.htm
I am not studying law, but it is important to point out that the law is arbitrary, and thus support for the state can only be arbitrary."

"Particularly in doing anything in IT, by the time you reach the 3rd year of your degree, a good portion of the course load may be outdated. I work online, and probably spend 15 hours a week keeping up with industry developments.  I'm pretty sure this will be the model going forward.  People having to upgrade as they work, or risk their productive advantage wiped out through obselence."

"I've started looking into bitcoin and it is pretty interesting.  Bitcoin supporters would do well not to be so defensive about it, as they are working against spreading the idea with such an approach."

The next quote was posted on April 15, 2011:

"I don't use Ubuntu on the desktop, but I have a fair bit of Linux experience with servers.  This stuff has come a long way since I bought a retail copy of Mandrake 10 years ago."

"I ran Fedora a couple years ago, but an upgrade broke it, and I couldn't be bothered to fix it because I am on a dual boot system and I can't afford to muck up my primary Windows install.
I've installed Ubuntu several times since, becoming increasingly pleased with the hardware support, but never really getting into using the system very much.
Anyone complaining about Linux h/w support now should have been around 10 years ago."

"I'm always connected.  Most people with broadband are.  When the net goes down, about once or twice a year for a couple hours, I go lay down and take a nap.  My net connectivity is usually very robust.
The benefits are that when I come to your house, I can access my data. When I travel, I can access my data without carrying a local copy with me.  I don't even need to carry a computer with me.  I only need to find

one with a net connect, and it doesn't matter what OS it is running or
what software it has installed.
There are downsides.  Security.  Redundancy.  But everything in life has
ups and downs, my point is that for most people, the downs are not as
mission critical to what they are doing.  There is a pretty good chance
Gmail and Facebook keep very good backups, dare I say, better backups
than most people keep locally"

"I run OO locally.  But you could easily use Google Documents (or any of
another number of document services) to do the very same thing online.
Your connection is slow, but 10 years ago I was also on dialup, and now I
have a 5mBit line.   In another 10 years, 24/7 broadband access
EVERYWHERE will be taken for granted.  I understand today, (as I am
surrounded by 4 PCs) the PC is still the king of the jungle, but I can
see no reason why that will be so a decade from now."

"There is one other problem with changing.  There is an investment into
learning Linux and adapting my Windows usage models.  As time goes on, I
have less and less free time (or rather time I would invest in this).
I have 4 computers at my desk.  I will have to switch one and start
playing with it to slowly get comfortable.  In fact, I think I will start
today."

"I use Open Office and Linux, and I do not have the skills to create
either.  In fact, there are 100s of thousands (if not millions) of people
in a similar situation.
Your claims about the market don't even pass the most basic evidence or a
quick test of reality.
Linux is produced under a division of labor, and true market anarchy.  It
is designed, tested and deployed in a decentralized fashion, adopting
temporary heirarchies as necessary along the way, with no prevailing
hierarchy permanently entrenched at the top."

"Speak for yourself.  I'm pretty awesome.  Then again, I am half asian."

"I am self-employed, so I am a self-owner."

The next quote was posted March 14, 2011:

"Ron Paul ain't just for young people!  I'm in my mid-30s.  :)"

The next quote was posted May 08, 2011"

"I quit smoking 3 years ago."

"I have two horror stores, mine and that of a very close family member.
The people who defend the Canadian health care scheme are typically those
who don't use it, and those who are dependent on it."

"My friend, I am a few klicks north of you.  I love Detroit.  It will not
have a small government renaissance. I admire your optimism however.
You can't starve the beast.  That doesn't actually work.  You have to
lose popular support for the government.

The people of Detroit keep looking to messiahs like Bing, or Kilpatrick, or Young for solutions.  As long as they do that, the government will simply be a parasite hibernating until there is something new to feed off."

"We should go for Coney Dogs sometime.  But first I have to get a passport so I can cross the Ambassador.  All hail the security state!"

"Ok, Auburn Hills is not Detroit, but include the Pistons and Shock too. :)"

"Perhaps.  My father was one of 7 kids.  I have about 20 cousins between both sides.  My grandparents helped raise me while my parents worked.  My parents helped maintain my grandparents when they got old.  I was expected during summer vacations to take my grandfather for walks.  I support my parents now when I can and when they need it.  As they get older, I will expect to help them further.  My sister keeps me on speed dial if she needs help.  Is it because I am male?  or because I am a useful fellow?  She's quite the feminist, but more than happy to let me lift the heavy stuff or pay a bill."

"Sell them.  My sister knows a guy who plays WOW with bots, and sells the high level characters on ebay.  He drives a sports car.  Lol"

The next quote was posted July 02, 2011:

"Also, before anyone starts any conspiracy theories, I am going to have my account here deleted.  So if this post goes missing or set to guest, it was by intention."

The next quote was posted July 03, 2011:

"I am done here.  I thought it would be deleted by now, but I might wait another day and do it myself.

I don't really write for libertarians anymore.  I was never very good at it.  If you see "DixieFlatline" around, that's me.
I intend to write about business from an Austrian perspective at some point, but it won't be ideological.
Anyone who wants to reach me, use the contact info at notreason.com
Last post. Auf wiedersehen.

(Edit: of the irony that it is broken due to the POS rich text editor.)"

"I have made a post here explaining how to get some of this functionality back.
http://notreason.com/mises-community-quote-workaround/
Let me know if pictures would be helpful.  If you have any questions, ask here.
Big thanks to Nir for helping make this happen."

Using all the information listed above SA Der-Yeghiayan was able to conclude that LS was a non-white half-Asian male in his mid-30's who resides or resided in Canada.  He grew up in New Zealand, and has a

"feminist" sister. He dropped out of college while pursuing a degree in perhaps Business Commerce. He has an advanced, self-educated knowledge of computers and networking. He possibly lives or has lived near Detroit, close to the Ambassador Bridge, and follows American sports teams such as the Detroit Pistons, and maybe without a passport.  He uses another username "dixieFlatline", and forwarded others seeking him to notreason.com.

On or around November of 2012, SA Der-Yeghiayan conducted several open database searches on notreason.com and discovered that the website was still active and was registered on July 17, 2008 through GoDaddy.  With exception of one month, all of its WHOIS information had been protected by Domains by Proxy.

The July 14, 2009 WHOIS registration remained unprotected and was filed pubilically, and showed that the registrant was Autodeletepro located at 105 - 2940 Elsmere Court, Windsor, Ontario N8X 5A9, Canada.  The administrator and technical contact was listed as Athavale, Anand, with the email address sales AT adpmods.com, Autodeletepro, which was located at 105 - 2940 Elsmere Court, Windsor, Ontario N8X 5A9, Canada and telephone number (519) 250-9021.  The servers for the website were controlled by the company Hostgator.

SA Der-Yeghiayan conducted additional research on the website and noticed that it was originally hosted at Internet Protocol (IP) address 74.53.81.66 but on May 28, 2011 it switched to IP address 184.173.203.97.

Running a reverse lookup on IP 184.173.203.97 showed 112 other websites located on that IP.  Majority of those websites WHOIS information were protected.

SA Der-Yeghiayan sent several Title 21 administrative subpoenas to companies such as GoDaddy, Hostgator and WhoisGuard for subscriber information related to the notreason.com website.

SA Der-Yeghiayan also conducted several searches in law enforcement databases and found a traveler with the name ATHAVALE, Anand Nathan, who was a Canadian Citizen, with the date of birth (DOB) November 01, 1975 who had traveled over the Ambassador bridge on August 11, 2005, and had travel as early as January 11, 1997, arriving inbound from Auckland, New Zealand into Honolulu, HI bearing Canadian Passport VD084114.

SA Der-Yeghiayan was also able to find a Canadian driver's license for ATHAVALE showing he resided at 2739 Parent Ave, Windsor, ON, CA.  SA Der-Yeghiayan also discovered a more current Canadian driver's license with the address 3733 Edgehill Dr, PO Box 87, Tappen, BC CA.

All three subpoenas returns were eventually received and showed that Anand ATHAVALE with the same addresses listed above, registered, owned, protected and administered the notreason.com website.

SA Der-Yeghiayan found a website registered and operated by ATHAVALE by the name of anitaathavale.com.  SA Der-Yeghiayan was able to identify her as Anita Genevieve Athavale, Canadian citizen, with the DOB of June

21, 1978, bearing an active Canadian passport #WK180678. ATHAVALE
maintains several websites for Anita, including a yoga website.

While conducting open database searches on Anita, SA Der-Yeghiayan found
an article that showed her as being one of Canada's most gifted singer
songwriter.  The article went on to say the following:

"Born in Windsor, Ontario, Anita Athavale was the child of entrepreneurs
and music lovers. The daughter of a mother with German/Czech heritage and
a father from India, Anita was drenched in cultural richness and
determination from the get-go. Her parent's mixed-culture marriage became
strained over time and in an effort to reconcile, the family moved to New
Zealand for a fresh start. Living abroad in her early teens, Anita found
an opportunity to pursue her secret interest in singing and performing.

Eventually her parents decided to divorce and Anita returned to Canada
with her brother and mother. Dealing with her family turmoil, Anita more
certainly felt the need to find an avenue for expression. When she turned
sixteen, Anita began performing a mix of covers and original songs on
open stages and in coffee-houses. Within months of her debut performance,
she had garnered enough attention to be offered opening slots for
Canadian major label acts."

(Agent's note: This paragraph helps fill in the gaps about LS.  His
father is from India, and mother is from German/Czech background, which
is why he calls himself half-Asian. It also fits in to see why he says he
was traveling around so much and was in an out of a lot of schools. This
also explains how he grew up partly in New Zealand.)

Based on this information SA Der-Yeghiayan placed a record on Anita to be
alerted of any travel associated to the United States.

On March 08, 2013, Anita traveled through pre-clearance at Calgary
International airport in destination of Hawaii.  Customs and Border
Protection (CBP) officers stopped Anita and conducted an enforcement
examine.  SA Der-Yeghiayan was requesting that the officers attempt to
gather any information about her association and the location of her
brother.

CBP Officers reported that Anita was on her way to a yoga retreat in
Hawaii and was traveling alone.  The officers stated that she currently
resides at 720 2nd Ave NW Apt 307, in Calgary AB T2N0E3. She is a yoga
instructor and works for Bodhi Tree yoga here in Calgary.

She provided the officers a couple of email addresses, such as
anitagenevieve AT gmail.com, tootsiewootz AT gmail.com, unifyyoga AT
gmail.com and anitaathavlemusic AT gmail.com.  They stated that her
brother Anand lives with her mom Gwen and step dad Brian KRIVASHEIN in
BC.  Their address is 3733 Edgehill DR, Tappen BC V0E2X1.  The telephone
number she had listed on her phone for her brother was 250-515-6180. Her
current Canadian passport number is QH98637.

SA Der-Yeghiayan also discovered through open database searches that
ATHAVALE administers and operates a Detroit Pistons forum under the

username Roscoe36. The website is pistonsforum.com.  On March 31, 2011,
he posted the following:

"I have been East Coast, even when I lived on the West Coast. I am now
moving to the West Coast, where I plan to be West Coast for the rest of
my life."

Another member asked him where and he responded, "4 hours give or take
north of Seattle."

(Agent's note: There are several key points to make about LS and his
activity, as well as DPR.  On the Mises.org forum he was active from 2009
up until early July of 2011. Then in May of 2011 he suddenly stops
posting until he reappeared in July to make several final posts to inform
members of his departure from the site. During his time on the Mises.org
forums he produced over 11,000 posts.  Then, all of a sudden he tells
everyone he's leaving and vanishes.

The timing is interesting in that the Silk Road began in March of 2011,
and then became enormously popular after an article broke about the
website's existence in early June of 2011.  This is around the same time
it appears he decided to leave his home in Windsor and move into his
mother's home in a remote location north of Vancouver.

It also appears as if ATHAVALE was a computer administrator for multiple
websites, yet most of them he doesn't operate anymore.  It is unknown as
to how he's sustaining himself.  The cost of the servers he owns and his
other active websites are costly and have expensive monthly bills. It is
unknown as to how ATHAVALE is supporting himself and his current
lifestyle.

Another unique observation between DPR and ATHAVALE is that they both
seem to write to the level of their reader.  Looking at the UC chats
between DPR and the UC Agent look nothing like the posting made on the SR
forum.  It shows that DPR is cognizant of his/her audience.  The posts on
the Silk Road forums are careful and time is spent to not reveal too much
about his/her identity.  The sentence structure is near perfect, and
his/her spelling is nearly without flaws.  The paragraphs and thoughts
are spaced out correctly, and grammatically it appears as if DPR
possesses a graduate level degree.  Yet, once in the UC chats he/she
appears relaxed but his/her grammar resembles that of a high school
graduate. One could think the two could never be one in the same.

The same is seen in ATHAVALE.  On the Mises.org forums his posts were
thought out, conscientious and cognizant of his audience.  ATHAVALE used
his notreason.com website to post blogs under the username dixieflatline.
There it appears he felt he was weighed more by other so his writing
skills increased to that of again graduate level education.  Yet, once
you read his posts under the username Roscoe36 on the Detroit Pistons
forum you would never think the two people could ever be the same.

ATHAVALE has demonstrated the ability to be able to play the part of
multiple identities online. His timing of activity and departure from not
only the forums he occupied for so long, but also his home correspond

very closely with the rise of the Silk Road.  He has the computer skills and knowledge to able to operate the Silk Road in the manner in which it appears DPR does.)

The HSI investigation continues.

**A842**

# EXHIBIT 5

**To:**      Osborn, Phillip L[Phillip.L.Osborn@ice.dhs.gov]
**From:**    DerYeghiayan, Jared
**Sent:**    Wed 5/15/2013 12:18:52 PM
**Importance:**   Normal
**Sensitivity:**   None
**Subject:**   Mt Gox/ KARPELES Baltimore money seizures DWOLLA and Mutum Sigillum

Phil,

Here are the facts of the most recent money made by HSI and SS Baltimore on bank accounts and Dwolla accounts belonging to the target of our HSI investigation (Mark KARPELES).

-In July of 2012, HSI Chicago identified links between the owner of the Mt. Gox bitcoin exchange (Mark KARPELES) and the Silk Road website.

-In early August of 2012, HSI Chicago notified HSI Baltimore of the connection made and stated that KARPELES was a target of HSI Chicago's investigation.

-HSI Baltimore was provided a copy of the HSI Chicago's ROI that highlighted all the facts of the connection.

-HSI Baltimore was asked not to share the connection with any other Agencies in their unofficial task force comprised of Secret Service, DEA, IRS, and potentially others.   HSI Baltimore agreed not to share the information.

-In August of 2012, HSI Chicago inputted KARPELES in DICE/SOU as a target of the investigation and OCDETF provided an intelligence product on KARPELES in return. In the intelligence product HSI Chicago found that the DEA agent in Baltimore had inputted similar information on passports and details that were identical to HSI Chicago's TECS record on KARPELES in DEA's system NADDIS.

-HSI Chicago contacted HSI Baltimore and they confirmed that they shared all of HSI Chicago's information on KARPELES with members of their task force.  HSI Chicago discovered that their IRS Agent, DEA Agent and SS Agent all inputted KARPELES into their individual investigations as a target and a potential administrator of the Silk Road based on HSI Chicago's ROI/information.

-In January of 2013, HSI Chicago opened a UC Bank account for the purpose of being able to move money through Mt. Gox and the other companies owned by KARPELES (Mutum Sigillum LLC). HSI Chicago's AUSA Marc Krickbaum was briefed on the

transaction and was in concurrence.

-On April 03, 2013, HSI Chicago initiated an UC purchase of evidence from the Silk Road using Mt. Gox/ Mutum Sigillum.  The purpose of the transaction was mainly to develop venue and provide evidence to successfully charge the 1960 violation in the Northern District of Illinois.

-On April 23, 2013, all of the transfers were complete and HSI Chicago arranged a meeting on May 16, 2013 with HSI Chicago's AUSA to discuss the 1960 charges that were developed on KARPELES through the transactions.


-In April of 2013, on several occasions, HSI Chicago briefed HSI Baltimore's case Agent Michael McFarland and the Baltimore AUSA Justin Herring (Who is the AUSA over all the agencies in the Baltimore task force) that HSI Chicago was pursuing KARPELES and his company Mutum Sigillum/ Mt. Gox with criminal 18 USC 1960 charges for operating as an unlicensed Money Service Business (MSB). Each acknowledged and stated that KARPELES was not an active target of their investigation and they did not believe he was involved in operating the Silk Road.  Their AUSA knew HSI Chicago was pursuing KARPELES/ Mt. Gox/ Mutum Sigillum and their DWOLLA account and on May 08, 2013 provided to HSI Chicago copies of records they previously subpoenaed DWOLLA for on KARPELES and contacts for Dwolla's attorneys.

-On May 09, 2013, HSI Chicago sent a Grand Jury subpoena to Dwolla for all their account activity associated to Mutum Sigillum.


-On May 10, 2013, HSI Chicago case Agent Jared Der-Yeghiayan was contacted by the HSI case agent and the Baltimore AUSA that the SS agent in their task force had issued a civil seizure warrant for Mutum Sigillum's Wells Fargo bank account.  Both the case agent and AUSA stated they were not notified by the SS agent in their task force of the seizure warrant before it was already filed.  The AUSA stated that he learned that the SS headquarters was notified that Wells Fargo had closed down Mutum Sigillum account over suspicions of 1960 violations and the money was going to be returned to KARPELES.   It is not exactly known at this time, but HSI Chicago believes that SS Headquarters notified the SS agent in Balitmroe based on his record on KARPELES and therefore he got involved in making the seizure.

-HSI Chicago was told by the Baltimore AUSA that the SS agent never contacted him or the HSI Agent in Baltimore about the money and instead went to a different AUSA in the Baltimore office to seize the money.  The Baltimore AUSA and HSI Baltimore agent only found out about the seizure after the AUSA writing the warrant contacted him.

-This is when the HSI Baltimore and the Baltimore AUSA then contacted the HSI Chicago agent to notify him of the seizure. They stated that they (meaning the SS and

the other Baltimore AUSA) were not pursuing criminal charges for the 1960 violation on KARPELES.

-The following Monday May 13, 2013, HSI Baltimore and the Baltimore AUSA Justin Herring contacted HSI Chicago to notify him that they negotiated with SS Baltimore to seize the money in KARPELES's Dwolla account using the same affidavit written by the SS. The total in the account was said to be over 3 million USD.  HSI Baltimore stated that they would add Chicago's project code for their CUC and case number to their seizure of 3 million.

-The Chicago AUSA Marc Krickbaum is aware of both seizures and has informed the AUSA Justin Herring in Baltimore that Chicago was still intending on possibly pursuing criminal charges for 1960 violations that occurred in the State of Illinois. AUSA Marc Krickbaum had no objections to the SS seizure or HSI's seizure over the accounts even though HSI Chicago felt they should be making the seizure on the Dwolla account.

-It is HSI Chicago's and HSI Baltimore's case agent position that the SS Baltimore Agent would have never been alerted by SS headquarters about KARPELES's bank account had it not been for the record they entered as a direct result of it being provided to them by HSI Chicago through HSI Baltimore.  HSI Chicago is the source of the information for HSI Baltimore's work on KARPELES as well.  HSI Chicago maintains the longest standing TECS records on KARPELES, and exclusive TECS records on Mt. Gox and Mutum Sigillum.

-Case agent Jared Der-Yeghiayan is also of the opinion that that HSI Baltimore should have offered to defer the Dwolla seizure of 3 million USD plus to HSI Chicago knowing that they had developed the charges in their district and were pursing criminal charges.

-HSI Chicago is still pursuing to educate and persuade the AUSA in Chicago to criminally charge KARPELES for 1960 violations. The meeting with the AUSA is still scheduled for tomorrow morning.

Jared

# EXHIBIT 6

-June of 2011, HSI Chicago started monitoring unusual drugs seizures  from the Mail Branch related to the Silk Road

-On October 12, 2011, HSI Baltimore reported in ROI 13 in general case number BA08NR11BA0004 that in September of 2011 an informant told them that the Silk Road existed and they sold drugs there. No further reports were filed or subsequent cases opened on the website.

-On October 13, 2011, HSI Chicago opened case Operation Dime Store to document the findings of the seizures coming into the mail branch.

-On October 18, 2011, HSI Chicago documented the first Silk Road website lookout in TECS under number X8O00659400COH.

-On December 8, 2011, HSI Headquarters prepared HSIR ID# ICE-HQINT-00431-12 titled Digital Currency Bitcoin and the Underground Website Silk Road.  In that report they list 6 HSI investigations that had mentioned the Silk Road, including HSI Chicago and HSI Baltimore. HSI Chicago's investigation was shown as actively working the website and multiple vendors.  HSI Baltimore's summary was that of only having one report from a CI mentioning the Silk Road existed.  The other 4 HSI cases had only mentioned the website from interviews conducted.

-On January 03, 2012, HSI Baltimore SA Gregory Miller opened investigation BA13CR12BA0016 and stated in ROI 001 that on December 29, 2011, their CI began telling them some details about the Silk Road website.

-On January 13, 2012, HSI Baltimore GS Veronica Ryan requested a phone call about HSI Chicago's Silk Road case.

-GS Ryan expressed interest in our investigation and wanted to meet with HSI Chicago to learn about the investigation.

-By January 13, 2012, HSI Chicago had over 19 reports, 200 seizures, identified multiple vendors/targets, coordinated POE's and case information with multiple HSI attaché offices, signed up a CI and had met with the AUSA's office to prosecute the case.

-On February 01, 2012, HSI Baltimore flew into Chicago for a meeting. In attendance from Baltimore was AUSA Justin Herring, GS Veronica Ryan, Case Agent Gregory Miller, Co-Case Agent Michael T. McFarland, Co-Case Agent Melinda LeCompte and/or Intelligence analyst Lisa Noel.  From Chicago was GS Tom Sebens, Case Agent Jared Der-Yeghiayan and SA Dave Jackson and partly there was AUSA Marc Krickbaum.

-During the meeting HSI Baltimore requested to split up our investigation so that they could work a section of it.  They requested to work all the administrators and organizers and suggested HSI Chicago only works the drugs and overseas vendors.  HSI Chicago strongly disagreed and stated that they were fully advance in the case and did not see any advantage to give up any aspect of their investigation which included the administrators and organizers.  HSI

Baltimore had all 19 of HSI Chicago's ROI's printed out and commented how useful all their reports have been to them.

-HSI Baltimore then revealed that their informant that told them about the Silk Road in September was just arrested on or around January 17, 2012 for something unrelated and admitted to them then that he was actually a Silk Road vendor.  He provided HSI Baltimore with access to his Silk Road account and HSI Baltimore suggested they would take down the site within a week or two with that information.  HSI Chicago disagreed that could be done and disagreed with the strategy they intended to take and stated they were working all aspects of the investigation and wanted to send a message with case.  HSI Baltimore stated that they would proceed by conducting multiple drug reversal deliveries across the United States.  HSI Chicago asked if they were working with DEA in order to accomplish that and they responded they were not and they had the full authority to perform those reversals without the DEA.  The meeting ended with HSI Baltimore stating that they intended on shutting down the website soon and weren't concerned with HSI Chicago's strategy but they would coordinate once they take the website down.

-In early March 2012, HSI Baltimore Case agent Gregory Miller contacted HSI Chicago Case Agent Jared Der-Yeghiayan to inform him that their case was likely to be shut down by their ASAC after he found out they were attempting multiple Domestic CD's without DEA participation.  SA Miller stated their case had nowhere else to go from there.

-In late March 2012, HSI SA Miller informed HSI SA Der-Yeghiayan that he had been pulled from the investigation and GS Ryan had reassigned the investigation to SA McFarland because they needed to transform their case by using a certified undercover agent.

-On March 27, 2012, SA McFarland opened case BA02CR12BA0026 and started by sending multiple collaterals to other offices to conduct surveillance on multiple targets associated to the account they took over from their once informant. SA McFarland also created an unofficial task force comprised of multiple agencies to include DEA, Postal Inspectors, IRS and Secret Service.

-In April of 2012, HSI Chicago developed a new informant and informed HSI Baltimore of development. HSI Baltimore requested access directly to the informant but wouldn't tell HSI Chicago why they wanted the access or what they wanted to ask the CI.  HSI Chicago offered to take any questions and directly ask the CI the questions for them, but they would not allow access to the CI without knowing any topic of questions.  HSI Baltimore expressed anger over not being allowed direct access to the CI.

-In May of 2012, HSI SA McFarland called and requested the assistance of HSI Chicago to stop 2 outgoing parcels containing drugs from surveillance they conducted on a target.  HSI Chicago located one of the two parcels and seized the drugs and then forwarded them to HSI Baltimore.

-In July of 2012, HSI Chicago developed a target (hereinafter referred to as "Target A") they associated to the creation of the Silk Road website.

On July 06, 2012, HSI Chicago inputted a TECS record on Target A.

-On July 9, 2012, SA McFarland wanted to send out a draft for HSI Headquarters notifying all HSI offices that he is the POC for all Domestic Silk Road related investigations and that HSI Chicago will be the POC for all international related investigations. HSI Chicago rewrote HSI Baltimore's Draft to state that they were

-On July 17, 2012, HSI Baltimore sent a collateral request to C3 for assistance in their Silk Road investigation to include funding and assistance coordinating all cases on the Silk Road.

-In late July, 2012, C3 contact SA Der-Yeghiayan and asked to brief them about the HSI Chicago case. After the briefing C3 stated to SA Der-Yeghiayan they were confused because HSI Baltimore visited C3 and pitched their case as the only Silk Road investigation HSI has and wanted to be a part of their undercover OP and wanted their support.  C3 then queried TECS and found out that HSI Chicago had a much longer and what appeared to be diverse investigation on the Silk Road. C3 was also briefed on Target A.

-On August 01, 2012, C3 requested that HSI Chicago travels to C3 to pitch their case and to gauge what assistance they could provide.

-On August 03, 2012, C3 informed SA Der-Yeghiayan that they believed HSI Baltimore wanted funding to travel to the foreign country to interview Target A. HSI SA Der-Yeghiayan sent an email to SA Miller and SA McFarland notifying them that Target A was more involved in the Silk Road and was a target or their investigation, and asked in the email not to share the information with the rest of their unofficial Task Force.

-On August 03, 2012, SA Miller acknowledged the email.

-On August 06, 2012, SA McFarland acknowledged the email.

-On August 09, 2012, HSI Baltimore created an unlinked to HSI Chicago's TECS record on the Silk Road.

-On August 10, 2012, HSI Chicago met with C3 and presented their case.  During that meeting C3 informed HSI Chicago that HSI Baltimore was being dropped from their CUC program because of improper use of CUC provided equipment.

-On August 23, 2012, HSI Chicago was called to a meeting at C3 to meet with HSI Baltimore and each present their cases to both SACs Operations Managers (Debra Note for Chicago).  HSI Baltimore and HSI Chicago presented each of their cases.  At the end of the presentations both HSI Baltimore and HSI Chicago's Operations Managers were discussing the confusion and odd approach to the HSI Baltimore's investigation and asked HSI Chicago if their investigative methods are interfering with HSI Chicago's case.  HSI Chicago expressed deep concern for HSI Baltimore's tactics and the lack of focus in their investigation. HSI Chicago provided Debra Note a complete list of concerns and only received a response the same day to thank HSI Chicago for the email.

-On September 18, 2012, HSI Chicago received a report from OCDETF on Target A that showed that DEA Baltimore had a record in NADDIS on Target A that mirrored exactly HSI Chicago's TECS record.  SA Der-Yeghiayan contacted SA McFarland and asked if he had shared the TECS record with their DEA Agent and the rest of their task force and he said he did.  SA Der-Yeghiayan asked why he shared it when he explicitly asked Mike not to and his response was it was his task force so he had to share it. SA Der-Yeghiayan expressed serious concern over how any information that all these agencies would acquire on the target be relayed back to HSI Chicago and Mike stated verbally that he would share anything he learned on the target.

-On September 19, 2012, HSI Chicago received an email from HSI Baltimore CUC Program Manager Steven Snyder stating that HSI Baltimore was attempting to be under HSI Baltimore's CUC program but during his routine searches in TECS he noticed the HSI investigation and saw HSI Chicago was also under a CUC program and had the same targets, but had them in the system first.  The program manager also called HSI SA Der-Yeghiayan and stated that he was not going to approve HSI Baltimore's request because it was clear to him that they were copying the HSI Chicago's case, and that there could only be one CUC program over the target website.  A few weeks later HSI Chicago found out that HSI Baltimore's case was approved under their CUC OP.

-In October of 2012, SA McFarland began asking SA Der-Yeghiayan for all his information on Target A because they were trying to work him too. SA Der-Yeghiayan informed SA McFarland to not work Target A independent of HSI Chicago.

-HSI Chicago later discovered that HSI Baltimore had disseminated Target A to all members of their task force and they had issued multiple subpoenas on the target, and actively worked him to include a type of surveillance without the knowledge of HSI Chicago.

-In early October of 2012, HSI Chicago began developing a method to identify the main administrator of the website by analyzing thousands of pages of text on various websites to make a match.  In early November of 2012, HSI Baltimore offered to provide UC Chat information with the administrator to help HSI Chicago with their development.  HSI Chicago later identified a target (hereinafter referred to as "Target B") and began issuing subpoenas to further the identification and location of Target B.   HSI Chicago informed Baltimore and shared the subpoena information with HSI Baltimore.  HSI Baltimore began issuing duplicate subpoenas on the side for Target B without HSI Chicago's knowledge.



-On November 14, 2012, HSI Chicago sent a collateral request to HSI Vancouver for assistance with Target B.

-In December of 2012, SA McFarland continued to request information on Target A and Target B from SA Der-Yeghiayan.

-In January of 2013, HSI Chicago began pursuing Target A for charges of acting as an unlicensed money service business (18 USC 1960). Over several months HSI Chicago conducted several movements of money in a UC capacity in anticipation of charging Target A with 1960 violations.

-In late April 2013, HSI Chicago notified HSI Baltimore that they had secured the necessary charges needed to pursue Target A with 1960 charges. HSI Baltimore stated that they had looked heavily on their own into Target A and don't believe that Target A is involved in the website no longer. HSI Baltimore shared a few of their subpoena returns they received in early May.

-On May 10, 2013, HASI Baltimore notified HSI Chicago that the SS agent in their Task Force went "rogue" and seized the bank account in the U.S. containing 2 million dollars from Target A. HSI Baltimore claimed to have no knowledge of the seizure until after it occurred. HSI Baltimore also admitted that they told the SS agent of the connections HSI Chicago made to the Silk Road back in August of 2012. HSI Baltimore stated that the SS agent went to a totally different AUSA in their District to file the affidavit to seize the account. HSI Baltimore stated that the AUSA was not planning on charging Target A with 1960 violations.

-On May 13, 2013, HSI Baltimore called HSI Chicago and stated that they had complained enough to the SS about the way the agent went behind their back that the SS agreed to give HSI the other account containing 3 million USD belonging to Target A. HSI Baltimore proceeded to ask HSI Chicago if they could provide any other bank accounts belonging to Target A so they could seize those accounts too. HSI Baltimore proceeded to seize the 3 million USD using the same affidavit written by the SS agent except SA McFarland substituted his name and knowing that HSI Chicago built their pending charges on those seizures.

-On May 17, 2013, a conference called occurred between SA Der-Yeghiayan, Chicago AUSA Krickbaum, Baltimore's AUSA Herring, the seizing Baltimore AUSA Richard Kay, and SA McFarland.

    -During the call AUSA Kay stated that they were trying to work on an interview with Target A with Target A's attorneys. AUSA Krickbaum asked what the purpose of the interviews was and AUSA Kay stated that they wanted to know more about Target A's money business and wanted to ask him directly about his knowledge of the Silk Road. HSI Chicago expressed serious concern over that approach and was concerned as to AUSA Kay using HSI Chicago's information developed on Target A for their own use. The outcome of the conversation resulted in AUSA Kay

stating that he would hold off for several months and "wag the dog" with Target A's attorneys while HSI Chicago prepares their indictment.  AUSA Kay agreed to check in with AUSA Krickbaum about the progress in the indictment.

-On June 19, 2013, During a joint SW conducted by HSI Chicago and HSI Baltimore based on a new target developed by HSI Chicago.  SA McFarland spoke with SA Der-Yeghiayan about the Target A and SA McFarland stated that he had complete control over AUSA Kay and he was the one to decide whether or not Target A would be interviewed.  SA McFarland stated that he would honor SA Der-Yeghiayan's request to not pursue or interview Target A.

-On July 08, 2013, according to AUSA Herring, he was notified by AUSA Kay that a face to face meeting was going to take place between him and Target A's attorneys.  AUSA Kay or AUSA Herring did not notify HSI Chicago or AUSA Krickbaum.

-On July 09, 2013, during a conference call with AUSA Herring, SA Der-Yeghiayan, HSI Chicago GS Phil Osborn, and HSI Chicago SA Sixto Luciano, SA Der-Yeghiayan specifically asked AUSA Herring if there were any developments with Target A and AUSA Kay, specifically if there were any more talks about meetings, and AUSA Herring said there was not.

-On July 11, 2013, AUSA Kay met in person with Target A's attorneys.  According to AUSA Herring, during the meeting Target A's attorney's randomly brought up the Silk Road and stated that their client was willing to tell them who Target A suspects is currently running the website in order to relieve their client of any potential charges for 1960. AUSA Kay proceeds to set up a meeting with Target A overseas.

-Later in the evening of July 11, 2013, in preparation for a coordination meeting on July 12, 2013 at SOD, GS Osborn and SA Der-Yeghiayan met with AUSA Herring and SA McFarland for a coffee. No mention of the meeting with Target A was mentioned by AUSA Herring or SA McFarland.

-On July 12, 2013, during a coordination meeting with HSI Chicago, HSI Baltimore, FBI New York and multiple DOJ attorneys and CCSIP attorneys, HSI Chicago briefed their case and mentioned Target A as their main target.  The CCSIP attorney over the meeting asked if any other office had any case on Target A, and all the Baltimore attendees (SA McFarland, SA LeCompte, AUSA Herring and AUSA Herring's Supervisor, the SS agent that went "rogue") all remained silent.  The CCISP attorney stated that since the information HSI Chicago shared was brought in good faith that no other office should attempt to pursue that target outside of HSI Chicago.

On July 16, 2013, AUSA Herring notified AUSA Krickbaum and SA Der-Yeghiayan about the meeting AUSA Kay had with Target A's attorneys.  SA Der-Yeghiayan told both AUSA Krickbaum and AUSA Herring that he did not want them to pursue the target or to continue with this meeting.  It was expressed that this would damage HSI Chicago's investigation.

-On July 22, 2013, HSI SA Der-Yeghiayan spoke with AUSA Herring who informed him that AUSA Kay has continued to negotiate with Target A's attorneys and has changed the meeting location to Guam on later on in August.  HSI Der-Yeghiayan continued to express deep concern over this meeting and its

effect on HSI Chicago's investigation against Target A. AUSA Herring did not appear concerned or willing to stop the meeting from occurring.

EXHIBIT 7

**To:**      Osborn, Phillip L[Phillip.L.Osborn@ice.dhs.gov]
**From:**    DerYeghiayan, Jared
**Sent:**    Fri 9/20/2013 10:49:44 PM
**Importance:**  Normal
**Sensitivity:**  None
**Subject:**  RE: Coordination Meeting
**Categories:**

Il=01CEB63DAF9F4F6E6175712246BAB5D68DE95977C96C00044E73
9000085A0D1600005F62B800003AE0A00000691D530001B3EA1800009B188C
;SBMID=3;S1=<C7E24005AE3DA54CA27632A74B73C6DC6262EED5@D1ASE
PRIC240.irmnet.ds2.dhs.gov>;Version=Version 14.2 (Build 328.0), Stage=H1

I think that would be a good pitch but that they can't expect to take an admin or something- they all need to be prosecuted out of the same AUSA's office under a conspiracy - NY will never agree to anything else. It's not like they can give them an admin, that makes no sense from a prosecutorial standpoint.

Baltimore can have a few vendors of our choosing- as well as the ability to say they "helped" ID some of the admins by "allowing" NY to use OUR UC account to identify some of the lower admins, and they can have sloppy seconds on DPR for their murder for hire. They can also have some info on other bitcoin companies that MK might name is shady after we get done with him.

That's the best that can be given and they should consider themselves lucky for getting anything close to that. Or we can just stall, and Baltimore gets nothing and we contributed to the other two admins getting away███████████████████ We'll get no HSI banner on the site, and will probably get no cooperation from NY with any information related to MK. If DPR names MK in the interview and we didn't help them get the other admins when we had the chance - NY will leave us out of it and tie him into their conspiracy. We will then be left dealing with HSI Baltimore's tears and them then trying to take█████████████.

I think it's important we help them have a "come to Jesus" moment otherwise our agency loses as a whole. It's a simple sell if they know the alternative is they will be left with absolutely nothing - no matter how much they whine and complain to HSI HQ, it won't stop the SDNY from prosecuting all of them without any of us.

Jared Der-Yeghiayan
Special Agent
HSI Chicago
Office- 630-574-4167
Mobile- 630-532-3253

-----Original Message-----
**From:** Osborn, Phillip L
**Sent:** Friday, September 20, 2013 11:32 PM Eastern Standard Time

**To:** DerYeghiayan, Jared
**Subject:** RE: Coordination Meeting



-----Original Message-----
**From:** DerYeghiayan, Jared
**Sent:** Friday, September 20, 2013 10:43 PM Eastern Standard Time
**To:** Osborn, Phillip L
**Subject:** RE: Coordination Meeting

I think there's room to avoid the drama by instead of dwelling on the past or trying fluff up each others cases under the false assumption that the website will be up in the next month to talking about how to try and make HSI in general walk away from this without looking like complete fools. But it has to start with HSI Baltimore conceding that they will not be identifying or prosecuting dread first or any other admin for a fact. Then realizing that they still stand a chance, if they play nice, to walk away from this with something to show from their "investigation." They can easily erase a lot of the damage they've done by cooperating with NY's almost guaranteed prosecution of the website.

The only two options are remain in denial and walk away with nothing but blame and egg on their face in the next few weeks, OR place nice and possibly take some credit for the identification and prosecution of all the admins, and reap some of the benefits by prosecuting some of the vendors our defendant is going to identify. No other way forward than that.

Jared Der-Yeghiayan
Special Agent
HSI Chicago
Office- 630-574-4167
Mobile- 630-532-3253

3505-00320

# EXHIBIT 8

Case 15-1815, Document 34, 01/22/2016, 1682742, Page101 of 293

A858

Case 1:14-cr-00068-KBF   Document 232-8   Filed 04/16/15   Page 2 of 17
/home/frosty/backup/project_references/le_counter_intel.txt

from East India Traitor on forum:

Well this obviously isn't private but i'll share jediknight is your attacker. I realize this will be treated like bullshit
as most other info that gets relayed to you, but he is the script writer over at atlantis and brags of his assualt on
your psuedo-revolution. I realize you support free market but even at the cost of attacks on your marketplace, you
may say yes in public but i know this not to be true in your pirate head. Be sure to read my sig if this helps you
otherwise
I want nothing more than for this to continue for as long as possible...soon the other markets will decentralize your
profits and
vendors and you can retire...please do not let the dea follow your btc trails as they did in the past watchin your btc pile
grow
 daily until it was obvious who the owner of the mtgox account was...i know this is a non issue now but im just saying,
they have
 a quarter million dollar bounty on your head for info and have been here since May 2011.

Attacker
SR Forum Profile: http://dkn255hz262ypmii.onion/index.php?action=profile;u=51427
---
Long story short I just did 6 months federal time in a DRAP program for SR related crimes,
 currently living in halfway house very little time to get up to the local library to talk.
DEA visited/visits me twice a month...asks me shit, then they brag about their shit.
Such as the mt gox bullshit a couple months ago, asking if SR members would go for
paid informant work, I sent them on wild goose chases just enough to get them to
 come share with me more than they could get from me.  I in no way snitched out anyone,
they are currently trying to get into your staff forum mods esp...i suggest they change usernames every month start
posts counts back at zero.
I suggest you relocate outside usa...if not already, they are foaming at the mouth which branch of the LE gets credit for
your arrest.


blah blah got to run...last person in library have an 7:30pm curfew.
---
yeah it's more detailed
also covered that jediknight info was from an unlogged set of chat sessions so i dont have
 links but the atlantis crew runs on the same server as the Silk Road IRC so to make a fake username and buddy up to
them is no problem...the younger and smarter they are the more they brag. There's definately more details on the visits
 from the different visited me...esp trying to track down ovdb vendors and admin.


Please if there's something you have questions about ask and i will tell you what i know...they are pretty forthcoming
and brag like any other ego driven personality. Like I said Im still on parole in a halfway house and visit a library to
get
this back to you so my dedication to this is obviously a great risk to my freedom again except there is no way ill get a
light 6 months federal
Residential Drug Abuse Program my second strike. So please understand I need this info I bring back to you and
convey to
be Ultra Top Secret. Burned After Reading scenario.
---
Wow i never expected that.
Well let's start with the most important issue and I dont expect you to answer this to me but think,
 "Who knows your real name in relation to Silk Road?" Admin from OVDB? Eneylsion or Envious or any of those
guys?
What about people from the Bitcoin forums?

DEFENDANT'S
EXHIBIT
C

/home/frosty/backup/project_references/le_counter_intel.txt

"Do you have the servers in your name or a staff members name?" Hopefully these servers are spread out internationally.
Again these are rhetorical questions? I dont wanna know the answers just stuff for you to protect yourself.
Again the BTC block chain is definitely being watched for large transfers or deposit to same address which I assume was solved
long ago.
They know you have multiple btc tumblers and that you dont keep but around 1/3 of SR's btc balance on any given site.
Remember the agent that i spoke with that had been on the investigation started in late april 2011...i asked him and he told me.

The postal inspector asked me shit like why do i think you tell everyone to use USPS instead of private couriers and I told him
and he was pissed and wanted to know how I knew that. Then he wanted the postal workers that use SR in the forums real names..like I have a clue to that.
They expect shit that is unrealistic but I do know there's compromised vendor accounts and looking for the highest up vendors to interrogate.
They are paerticularly hung up on Limetless...they asked me about my money laundring and I of course said I have no idea how to do that cause admitting that gets you 15 years.
They seem to think Limetless launderers for you, probably cause he has spoken about laundring in the forum opening countless times.
This isnt just a US investigation they ARE collaborating with other governments and international packages can be opened without a warrant. They simply have to have an address
on a postal list and it can be opened as part of the homeland security initative.


Sorry this is all I can cover today, I've go to spilt to get to a meeting at the halfway house...idk if i can hit the library on Friday but they let me go to there on Saturdays to "study law".
I'm trying to get some community service out of the way with the library as well so ill have more time here.

Thank you again and I'll be in touch very soon.

:)
---
ok not sure where we left off.
Let me explain my situation a little more.
See I still have contact with these agents, not in person anymore but by phone.
So guess who I talked to yesterday.
They are focusing on the forum and your admin and mods.
In particular Libertas and Samesamebutdifferent who is in my opinion your weakest link.
They dont really know anything about Libertas except he helps on the marketplace with coding...they have his tormail.
Idk what that does for them but they have ssbd's as well.
So i advise you to have them erase their emails and change tormail accounts or better yet not use tormail.
The way they got their tormail mail addresses is by importing their pgp ley and it was on there.
I have a feeling they think Libertas is scout...idk for sure but they have been asking about those three for months.
If by monday you can have them all start new usernames it is in your best interest as well as the community at large.

So you can see I have them in the perfect spot to play spy for Silk Road with the DEA.
Does this interest you?
 Let's see what else...they believe that admin fromovdb is your chief code writer or at least the very least works on your staff.
They have envious' return address in montana some how.
They seem to think he might have some connection with you pre SR days...not sure why.

/home/frosty/backup/project_references/le_counter_intel.txt

Several agents question me  on a fairly regular basis and are all doing different cases and sharing the info from interrogations.
I know there are things I'm not remembering at this very moment but when they do come to me I shall relay them to you.
If there is anything in particular you want to know if Ive heard about ask.
These guys vary in intelligence quite a bit from person to person...one cant use encryption another has been in the forum since it was on the orignal market.
They asked me if I knew anyone that bought shrooms from you and that if they had a return address for you...like that is even remotely possible to come up with.
They are looking for every little think said in the forum about personal habits or the mods/admin..you.
Yesterday they told be they believed their was at least 2 ppl using the DPR username or more, which makes sense to me.
One for the forum bs and one for the marketplace.

Is this the type of stuff you are interested in?
---
As far as I know dont know anything about the shroom sales except you sold them sometime in the first month or couple months.
Mt Gox I was given anything but generalities...such as a huge amount of btc in one account that blew up in the matter of weeks, I'm thinking
they said around the time of the original gawker article...the public invite article.
They seem to be under pressure to get someone of great impoertance toshow a win for the USA on this situation.
And from what i gathered from the dea they were [issed they couldnt login during the dos attacks, so that says they had nothing to do wirth it, like i said anyway
jediknight was in chat bragging about how he had implemented escrow on atlantis in a 24 hour period and that he had plans to divert members from Silk road to Atlantis.
It wouldnt hurt i suspect to have someone look into logging chat on the atlantis channel  that ios also non the SR IRC.
---
O just as i was about to sign out i remembered they asked me if Graham Greene was possibly a moderator or Admin.
I remembewr graham from before the arrest but ive been out of the loop for a couple of months so I really have no idea how much
he got involved in the forum...I know he was one of the more outspoken members that had the best interests of the community in mind
 but i told them i didnt know that name.
---
can you give me links to where he is bragging?

what do you know about an mtgox account?

the DEA has a $250k bounty on me?  how do you know?

¯¯¯¯¯¯¯¯¯¯¯¯¯¯¯¯¯¯¯¯
Cause i just did 6 months federal time for your revolution and they bragged about their doings too much upon interrogations.
They would visit me twice a month trying to get info from me..i would lead them on wild goose chases.
Just enough to get more out of them than they me.
They asked about offering the average member this bounty, how many would flip on you ,
they assumed 80% of the members would flip on you, but i know much better your following than them.
I also know that your current members dont have jack on you...but they are trying to talk to nelson you remember nelson right
from database days. He's still locked up.

I will also warn you that your staff is currently being targeted if not already a compromised one. Specifically the forum

/home/frosty/backup/project_references/le_counter_intel.txt

members.


They followed an mtgox account that was in excess of some outrageous number of bitcoins, an account that should have had enough
bitcoin to be it's own exchange. They did not release the account username but they are very much obtaining info in manner
possible. I'm trying to warn you. The DEA, ICE, POSTAL INSPECTOR, NSI,FBI,CIA,NSA are itching to get credit for your arrest.

I advise you to relocate yourself from the US and before that have your complete staff change usernames at least once a month and no rolling over posts.


As far as jediknight i do not log chats so I cant link you to anything but that doesnt change the fact.

Like I said I just got back out and am on parole...so to clear up the info i have on jediknight it is at least 6 months old. But he was your denial of service instigator before the members started dos themselves and he and the atlantis crew are your troublemakers
 as Im sure you've come to the conclusion yourself. I know without the exact quotes this is meaningless to you but at least I tried to make you
aware of the issues you are currently being annoyed with...and could even become your fall from grace.

Please delete all info as it is for your safety not mine. I want nothing from you and I am not trying to throw psyops at you. I've not always liked the way you ran the community
but I'm no traitor. I respect your progress on this frontier but I worry about your future. Along with the members futures.

If you don't believe me and wanna live in denial go ahead one day you will look back and wished you'd looked further in the rabbit hole.




---

scout's tormail where he is talking to mrwonderul:
username:  scoutsr
password:  b3l1am0n

Symm's tormail talking to mrwonderful:
symmetry2
bjBTrmPzUBhmN3uH

scout, forum
username: scout
pass: nlNlaGKUb1r6sqYY


StExo has discovered that Dr David Décary-Hétu is planning to do research on SR for canadian LE
    Address: Montreal, Canada
    http://ca.linkedin.com/pub/david-d%C3%A9cary-h%C3%A9tu/41/298/702
    http://jrc.sagepub.com/content/early/2011/09/20/0022427811420876

/home/frosty/backup/project_references/le_counter_intel.txt

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2119235
E-mail: david.decary-hetu@umontreal.ca

correspondence with alpacino:
silkpirate@tormail.org

This is for YOU only.

Try this (and I'll explain later why). Message your staff/moderators individually and ask "So, feeling wonderful lately?
" and then ask "Anything you want to tell me?" Make sure to use the word "wonderful".

Theres an ongoing effort to engage and coerce your staff into giving up some access/insight/internal communications.
Last I hear there IS headway on that. The key points are potential greed or intimidation. I believe it was someone @
DHS or CBP who wanted to own it, but ultimately its a DEA gig with a few cooks in the kitchen. Will absolutely
request you not ever let on about this, and I'm sure you know how to run your team (and what level of trust to repose),
but just know that absolutely there's an ongoing dialogue there with a "mr wonderful". Shocking, huh? Be smart about
that.

Know that some of your vendors have been approached for (and have provided for money) buyer information (the idea
is to purchase buyer information, which gets dumped and collated into excel). Vendors that get banned are approached
via the email addresses they provide on their pages "in the event SR is down, contact here..". Just recently a New York
based pill guy sold his entire customer list to what he thought was atlantis. Can find out his handle so you can poke
around old private messages if need be. Several uses for databases of buyer information..

Am certain there are not many techies involved. Due to the unconventional nature of this network and technology, not
much use for full time "geeks" being sourced & assigned anything more then standard workload. Unless there's some
specific technical question/explanation needed

There are a few different working "profiles" on you (can probably get into detail later on how thats culled). The most
popular is that you're East Coast , live with family, have either quit your office job or primarily do consulting/contract
work from home. Theres other stuff I'd rather not get into, but rest assured anything worthwhile/concrete usually
makes the rounds as gossip, and there's no real gossip. If that makes any sense..

There are really tons of useful nuggets that I do have to offer. And what my birdie doesn't know, he can probably find
out, but no guarantees on timeframe. Due to the nature of keeping everything properly 'insulated', birdie has to fetch
information with proper care. Also please realize the risk I run (and have run)..

Anything you want to ask?


---


I don't mind you talking my ear off asking questions.. there's a decent amount in my head, and fairly regular amount of
chatter that makes it rounds to my ears. But as said, weekends are not optimum for me to poke my nose around as you
can imagine the nature of this stuff (despite me being pretty insulated).. being casually brought up with the birdie(s) in
anything other then a casual environment could trigger a disastrous chain of events for me. Evenings and weekends are
probably when I can be more responsive.

1) That I struggled with myself, and anticipated. Well, I suppose you have no solid way of knowing. But ponder this -
I have NO intention of asking YOU anything what so ever. There is not a single thing I have any intention or need to
ask you. If this was a play to extract information/data out of you, it would be futile as there is not a single thing I want
to know. If you dig around your staff's correspondence (unless already deleted) you will notice I'm right on the money

/home/frosty/backup/project_references/le_counter_intel.txt

about "mr wonderful".I would not be privy to such if I was Joe Blow from nowhere. I can also tell you that one of
your guys claimed he's been "recycled". That is the *exact* word. I am not sure if thats some internal term or it means
he/she was in a different role and put into another one. I can assume it means a moderator or administrator was shifted
from a previous role to a similar role. If that term "recycled" means anything to you, then that should at least speak to
my legtimacy. Again, you do not have to acknowledge you know what that means. If it makes sense to you, then so be
it, and if it doesn't then I can poke around more. I'm confident if you re-examine your staffs behavior and
correspondence, it should verify my solid info. I'm not psychic, I'm not on your staff, therefore&

2)If you can come up with a method to verify I'm not, I am open to it as long as I'm able to protect myself to the
fullest. I'm hesitant to touch any data, but I can (and do) commit things to memory.
There would be no gain in feeding you false information or lying to you. It would not benefit you in any way and you
would realize your time is being wasted and that would be all she wrote. I think you are intelligent enough to parse
bullshit from fact. Feeding false information would be the goal of someone intent on disrupting your activities or
hoodwinking you. Again, something you would probably be able to verify - maybe half a year ago a guy from podunk
Virginia contacted local and was crying about being blackmailed for his personal information by 'anonymous
criminals' (Phil something). Middle aged guy who ran a travel agency. Even down to that level pops up on the radar
nearby to where the birdie hangs out. Did not take long to assemble the backstory (small time recreational buyer just
got blackmailed if you want to call it that by a crooked vendor) and dismiss as utterly irrelevant. I'm sure old private
messages or communications can be examined to verify that instance.
How on *earth* would I be privy to that? And to know hard details? These things make the rounds, believe me. I
would only provide you with things that could be of utility.

3) In short I admire you and what you've created, I don't think for a minute that helping you out time to time would
hurt anyone (might sound hypocritical but it's not), and personal gain.
I don't think you've done anything that warrants resources of the state being delegated to interfere. I call a spade a
spade, and JTFs/reports/operational/mindset are all a crock. I don't see anything wrong in what goes on here, and in
another less boring life I'd probably have wished I could have been apart of it. Granted I'm technically on the other
'side' on paper (indirectly), but that's a means to eat. I'm not Snowden by any stretch, but I admire that. I've always
tossed around the idea that how cool would it be if someone like the birdie would hook you up here and there, but the
horror of getting utterly fucked and have my freedom taken would kill any such thoughts. But as I've said.. without
being arrogant I know I'm relatively insulated enough by virtue of NOT being that close anymore. I'm a fly on the wall
in the grand scheme of things. And more importantly, personal gain. If you're in a position to potentially augment your
means & income, wouldn't you? I make a decent living, but I also have responsibilities and material desires. My
conscience is clear because I don't feel I'm harming a single living creature. I don't come for free, so theres that
motivation.

Worst case scenario I can provide you with insight and philosophy. Best case I can provide you with solid action-
items that would unequivically give you a competitive edge.

I'm not trying to sell my utility to you, I'm pretty sure thats a no brainer. But I do think I can deliver..


---


I think that works. Initial+ weekly. I'm not entirely sure myself on what's fair or not fair.

Initial retainer.. I don't know, 5k too much or is 8k too much? I'll let you decide.
Weekly do you want to do 500? Obviously some weeks there will be nothing major other then chatter, and other weeks
there might be extremely useful intel. I think we can just leave it at 500/weekly.

I made an account on your main site: "albertpacino".

Another thing, what I'm doing, despite all precautions (I've thought out all scenarios) could possibly ruin mine and my

Case 15-1815, Document 34, 01/22/2016, 1682742, Page107 of 293
**A864**

Case 1:14-cr-00068-KBF   Document 232-8   Filed 04/16/15   Page 8 of 17
/home/frosty/backup/project_references/le_counter_intel.txt

family's life if ever discovered. I implore that never utter a word to a soul, a partner, a significant other, even God (if you're religious). I know you take security seriously, and you've demonstrated that, so I know you know where I'm coming from..
And if either of us ever wants to cease communication, then that should be an option and understood as a logistical decision, with no hard feelings.

Let's operate under your terms, and I will get to work tonight on writing up as much as I can RE you'r questions, then you can dissect and pick my brain with followups, then I respond etc.
I just have to be careful to walk a fine line that won't identify me or my location, but I've made a decision and I'm fairly confident in my abilities to satisfy your purposes and cover my ass too.

The only condition I have is that nothing I ever say be used in a manner that can harm anyones safety. Even if actual information is provided for some purposes (a vendor name or location), I would hope that nobody's safety is ever seriously jeopardized. Could not live with that. What you do with information (if involves threatening or anything) is your business, but nobody can actually be harmed.
I don't think you operate that way anyways..

I do have to run to dinner, so will get you get a comprehensive writeup later tonight.

And I do respect what SR stands for. In another life I'd have loved to be part of it. Maybe this is one way to live that fantasy out.


---


I know that Eileen has a publishing deal and is writing a book around SR, and has had extensive dialogue with everyone from buyers to new vendors to old hats. She claims that she has your blessing and at some point will be (or has) interviewing you of sorts. Also you've made reference to a book or memoir at some point. No matter what, I will make a gentleman's request that a word of this isn't spoken in this lifetime. I've taken many risks and gambles in my life and mostly have been lucky.. but the magnitude of what I'm doing, if uncovered, could put my family in harms way and/or devastate them and no money in the world could justify that. So that's that.

(Some stuff might jump allover the place as it comes to me, so apologies if theres more stream-of-thought and less organization)

Byt virtue of the professional capacity of a birdie I know, I have/had access and in-office/out of office knowledge of local, state and federal initiatives that deal with work tasked to monitor, report on, and coordinate interagency initiatives dealing with

1) Domestic movement of narcotics
2) Movement of narcotics traffic through land/sea/air borders
3) Cyber crime (extortion, child porn, domestic terrorism, credit card fraud, SPAM, password trafficking, counterfeiting of currency, computer intrusion, etc)
4) Financial crimes related to narcotics trafficking/distribution,/profit laundering

Prominent on the radar is Silk Road (amongst other known sites/actors on TOR) and since late 2011 there's been a lackluster yet interagency effort to monitor, disrupt, infiltrate and/or penetrate operations.
The office of the DAAG (Deputy Assistant Attorney General) Computer Crime (at time Jason Weinstein) was the principal in spearheading. This is after Sen. Schumer & party created a hoo-ha. Weinsteins office jumped to take charge and assume oversight.
Under the auspices of the NCIJTF (National Cyber Investigative Joint Task Force which is DOJ), the following fed agencies have a presence when it comes to SR (Stateside)
1) DEA

/home/frosty/backup/project_references/le_counter_intel.txt

2) FBI
3) DHS
4) ICE
5) USPIS
6) ATF
7) CBP

That should NOT worry you, because by "presence" I only mean their are active agents and officer level involvement from who's resources are pooled and budgets are shared. On a limb I'll say this, everything having to do with Silk Road (like any other open set of investigations) is on shared drives that almost all can read+write, and there is a shared public Outlook folder where all emails/correspondence pertaining to SR are routed. Everybody (and I mean everybody) from entry level up to the heavens have "read" access. Additionally, people talk a LOT. Loose lips is an understatement and the level of immaturity and juvenile attitude is staggering. There is no such thing as "confidential", and this is a culture where people are numb. You must understand that part of why I'm so confident (in my ability to maintain this relationship) is that nothing is treated as sacred and there are probably 100 people like me who could offer the same level of access. Analysts do collate data and prepare summarizations/status sheets and CC the requisite list/group.. and majority of the time nothing happens. Little to none replies/discussion. This is not SR specific, but does include SR. For example reports related to CP sites/forums or BMR often get the same treatment.. ambivalence. Here is something that will bring a smile to your face.. it is just not in the budgets to aggressively dedicate resources to SR. The way the budgets are allocated are almost certainly political in nature, and the lions share goes to War on Terrorism or "real world" drug activity. That's the cold hard truth. That's not to say that there are no zealots who do have a harden for SR related activity, but that is more focused on suspected real world trafficking. Ironically enough, guys at USPIS do not care in the least about SR. Yes you read that right. They're broke and have no concept of tech savvy.. and frankly, they are not interested. DEA guys often initiate most chatter having to do with SR, yet follow up is minimum and they are too bogged down in pending investigations of subjects whom they have the ability to surveil and/or who's circle they can infiltrate by way of CI's (conf informants).. none of which is possible when dealing with a beast that is virtually immune to real world surveillance. It's not a question of getting warrants to ISPs.. its a question of who/where to begin looking. They're stuck.

At the analyst level, SR forums and the main site are crawled/monitored. Not more then 4 people are tasked with just crawling and mining the forums main site in an observational capacity. These 4 people are also tasked with crawling and mining many other websites and forums on TOR and clear net. So while everything is printed, you can guesstimate the scrutiny level is not extraordinary. That's not to say that others do not actively surf the forums and maintain both buyer and vendor accounts on the main site, they do. But at any given time, there are not more then a handful of people overseeing a crawl. When something deemed highly interesting or important pops up, they will CC the SR mailing list with a description and screenshot with their thoughts. Otherwise, there is a weekly status sheet that gets dumped with the most relevant/interesting/useful occurrences on the forum along with a summary on value/suggested "action items". Everything you post (along with the time stamps) is copied. You are referred to as DPR across the board. Often there is nothing interesting, and if there is there is it would be a bullet point such as "Vendor XYZ (who deals in ABC.. ) said his packaging methods consist of 123" etc.  This is so they seem like they're doing their job as often there is nothing interesting at all taking place on the forum side. When moderators quote you, that is often the bulk of what gets bullet pointed "DPR has instructed us to do such and such".
Now, there have and continue to be attempts to compromise staff accounts (on the forum and main side) by the normal methods of password guessing, but AFAIK none have been successful. There have been successful instances of cloning lookalike accounts which have all been shut down on your side. Of significant focus is attempts to impersonate you and your moderators on not only SR mainsite/forum, but on other TOR sites such as BMR or Atlantis to see if any prior correspondences can be restarted. Nothing there either.

A 'profile' is an outline of a user that contains key points/occurences/assesment regarding their activities. There is not one on every single vendor, but there are on the high volume ones. The goal is to have all user profiles searchable offsite. In vendor profiles are return addresses/packaging method/pictures of the package & contents, replication of their vendor page text, and any other relevant data.
Your profile (no idea who authored) has you as extremely intelligent with a background in IT, between 35 and 55, living on the East Coast, working from home in a contractor/consulting arrangement and living with family. An

**A866**

assessment like this would be based on your speech, patterns (such as when you log on, when you go idle on the forums), personality, expressed interests, ideology, unique mannerisms (for example your use of the word "ya" instead of "you" sometimes. As in "I'll tell ya" or "would ya believe" .. etc off the top of my head). The assumption is that you are conscious to actively remain off any kind of radar, do not take any drugs, do not live extravagantly.

If you have any partners (I'm not talking about staff), you most certainly are the assumed shot caller and are as anonymous to them as you are to everyone else. Contrary to rumors, it's not stated or assumed that you are not the original brainchild of SR or have ever not been the same person. You are the same you that started the site and have never relinquished ownership. Whether it's all you or you've farmed out responsibilities, it's unclear if the servers are all located in your physical possession or spread out. It's pretty much agreed that you have never been a vendor on the site or tied to any vendor IRL.
You're essentially a ghost. And since you are not a vendor, there is no tangible way to engage you in any compromising scenario. There have been attempts to approach you (can assume under the guise of journalists or researchers) to probably build a repertoire and study your speech, to later on analyze and compare if by some fluke there are any suspected leads on who you are IRL. As of now, I can say with utmost surety there are absolutely none whatsoever. You are as anonymous as you were 1 year ago.   There HAVE been concentrated efforts to DoS/DdoS the site and forum to assess your response time and technical acumen. I'm not too savvy regarding this, but on a horizontal scope there have been/are attempts to run exit notes and track traffic across TOR. To what end this has been aimed at SR would be something I would need to poke around about.


Since the assumption is that security of the servers and high level system are handled solely by you, you are overworked and delegate lower level duties to your staff. There is a fixation on some how penetrating or compromising your moderators into giving access. The philosophy is that you are less stoic with your team and interact with them in a more informal fashion, which would provide insight into where you are located geographically and your habits (which could be identifiers). The Mr Wonderful operation (if you want to call it that) is still in progress and revolves around bribing or threatening your team into providing access to a staff account. The benefit would be to not only get closer to you, but to be in a position of trust in the community which could potentially net high volume vendors. A few of your staff have absolutely been in touch with Mr.W and most likely have carried on correspondence with them off-site. Mr. W is being actively maintained by DEA. Nothing major has come from this AFAIK, but tidbits have made the rounds such as there is fear of you and you have or had asked for personal information in the past in order to appoint members of staff. Also that you have "recycled" staff, which is taken to mean that either Cirrus is Scout (who has communicated with Mr W) and Liberatas could be Nomad Bloodbath. SSBD has also communicated with Mr.W. To what extent exactly the nature of their correspondences are, I do not know. I could find out, but it would not be immediate as it has to be handled with tact. If there was a successful breach of any staff account, it would be known and I would tell you. There has not been. Moderators are seen as loyal but weak, susceptible to intimidation and/or bribery. If their anonymity is ever compromised, they would turn. SSBD is assumed to be in the UK, where as Cirrus is assumed to be Midwest Stateside. Inigo UK, Liberatas States.
Assumption is that you also have employees on the main site who are completely unknown who handle maintenance and upkeep. No geographic assumption on any of them. AFA your relationship with vendors it is a rule of thumb that you do not have any special relationship with high volume vendors over other vendors. No vendor is assumed or perceived to be close to you. They will keep trying to open open lines of communication with you under various guises, even as vendors yet the likelihood of you befriending any vendor (real or agent) is nil. Locating you or the servers, although would be a major coup, seems all but impossible so the focus is aimed at netting vendors.

The high-vol vendor operations such as (to just name a few) Nod, NorCalKing, RxKing are all under scrutiny. They've all been purchased from multiple times and general geographic location is assembled. For example it would be known that the Nod operation is NY, NCK is in California, RxK is Southwest US etc. There are also ongoing attempts to befriend the 'biggish' vendors through private message/forum pm/privnote/pgp and take correspondence off-site. This is where off-site deals and 'partnerships' would get cooked up and layers of anonymity be peeled away, leading to more detailed profiles.
No high volume US vendor has been surveilled. On a state level, several suspected major vendors have been surveilled, yet none have been touched as that won't happen till a multi-jurisdiction plan to move on several vendors simultaneously in a grand slam display is logistically possible let alone greenlit. AFAIK, something of that magnitude

**A867**

would not be possible currently. There have been one-off prosecutions on county and state levels. What happens is that a vendor that has confidently profiled/ascertained to be originating packages out of a certain jurisdiction, that information is shared down to local/state to put eyeballs on. A lot of that was happening in the beginning, but now there's more of a "hands off" approach. They'd want to sweep the maximum amount of vendors at once. Having the Sheriff of Mayberry hit one based on JTF intel is just not the culture/mindset. Nearly all efforts are conducted out of Jersey and Los Angeles.

All LE case reports (from county-level upwards) are indexed by a Lexus-nexus type database and can be searched for keywords. When they hit, they will hit several big vendors at once. They will parade them in front of the media and give the impression that the entire SR infrastructure was brought down (a la Farmers Market). Barring any unforeseen circumstances, there is nothing cooking at that level currently. Something of that magnitude would be seen coming well in advance and chatter would ramp up. There has never been heightened activity of that level in my birdie's time being a fly on the wall.

Posing as vendors - yes. That has happened. Although, DOJ attorneys will never ever allow drugs to 'walk' en masse. Especially after scandals such as Fast and Furious where the guns were allowed to walk.. they simply can not introduce narcotics into circulation. Vendor accounts have been bought to gain access to that side of the site and Vendor Roundtable and to establish longterm credibility, but any "purchases" would be absolutely fake and bought by their own accounts to build credible stats. I'm sure on state level there have been targeted vendor-posed operations to net bulk buyers, but those are highly controlled and short term. I have not heard of any of the top of my head. That does NOT mean that is not currently happening or will not happen in the future, but any significant bust would have made waves.

Vendors HAVE been approached off-site (most list their tormails on their pages) for customer information. This has been bought. Then collected and dumped. It has mostly been vendors who have vanished/been banned/ or slowed down. They're deemed to be the most vulnerable. This is not pursued as much due to a poor ROI. Most vendors/former vendors have not entertained such advances and those who have have demanded funds that simply are not available even in the discretitionary account(s). Like any other government effort/agency/JTF, funds are near impossible to get approved & released. Even undercover buys require paperwork and approval. There is no joint kitty of BTC available to make purchases from every vendor. It would take 2-3 days to get funds released for anything, and approvals are not that easy to obtain AFAIK. And in any case in this scenario, verifying information would be a nightmare. No guarantee that they would not just copy and paste names from the phonebook or use a name generating site. No real benefit other then to identify potential bulk buyers who would resell IRL (and this information would get kicked down to state/local).

Right now, there is a "watch and see" enviroment. I don't want to say that idea is to turn a blind eye by any means.. but until they swoop in to hit several vendors at once, there is no big fish in the cross hairs. The servers are a mystery, as is the leadership. Going after buyers would do absolutely nothing and not justify the budgets. Going after vendors one at a time also won't sit well as those get kicked down the food chain. Going after several vendors at once will be the play, bet on that. That will require compromising and turning CI's in each vendor's operation or periphery, which is not easy. Also, sustaining a DDoS against SR will not be the play either, I know this for a fact. Let me put it simple terms. You're winning. They just don't know how to tackle this beast effectively.

In all honesty I've had a very long day.. I'm kind of pooped right now. I'll have to call it a night. I know you'll have questions and I'll have answers and so on/so forth. Will hit the bed as I'll have probably have a fresher mind in the morning. Let's call it a night for right now.


---


I can only imagine. And usually the weakest link is the human element. We are all human, and all the precautions in the world don't mean a hill of beans if a slip up is made IRL. I don't want to give you a false sense of security, but you have done a thorough job of flying under the radar.

/home/frosty/backup/project_references/le_counter_intel.txt

One thing to be cognizant of, there's a lean on the domestic BTC exchanges to cooperate. There have been informal discussions in the last few months to develop working relationship with Coinbase (I know for a fact). After DHS hit Gox, even the boogeyman of a FinCEN violation is enough to mortify any of the btc guys. Anyone moving large sums of BTC will be open to scrutiny. I reference Coinbase because I know there was a series of meetings with Compliance at Coinbase. That can only mean one thing& BUT, that does not mean that the full on arm twisting by Treasury is going to be utilized to track black market vendors. They're more concerned (and justify) their desire for access due to terrorism. Most of the black market economy is essentially low hanging fruit in comparison to terror funding. But if OC activity is disrupted and theres political mileage for DoJ, the wide dragnet serves a multi faceted purpose.


1)
a) BMR is on the radar and that is ATF's baby. Politics plays a significant role in prioritization of which agency gets to own which investigations. The climate is aggressive when it comes to weapons trafficking and with the gun control hot potato has guaranteed virtually a carte blanche to ATF. And they have deep pockets as well. Because tor based weapons traffickers are almost always running guns IRL, there is synergy between federal and state. Federal approves staggering sums of money for surveillance,undercover and CI's. I don't want to say BMR is "infiltrated", but there are a lot of compromised accounts and there have been a few quiet busts. Nearly every bust has resulted in cooperation. I am not sure what the long play is, but as long as this current administration is in power the gunrunners will always be hard targets. They are intimidated with the threat of tangible charges (interstate trafficking, conspiracy, organized crime, distribution) and they ALL cooperate. The general consensus is that weapons dealers are not sophisticated and have a lot of IRL visibility, so they are ALWAYS on the radar.

"backopy" from BMR is also of significant interest because the operating assumption is that he maintains a healthy relationship with BMR vendors privately. This would have come from multiple compromised/cooperative vendors sharing their correspondence. He's thought to be a 1 man operation who's around the Las Vegas area. As to where the servers are is an unknown. The administrative structure of BMR is loosely unknown. But he's been a direct POC for cooperators and nothing I've seen or heard suggests that there are any hard leads on his location or identity. I do know that BMR/backopy is seen as a ragtag operation.

"East Coast Trade" from BMR has been discussed as a potential major middleman based on buys that have been made. This would stem from primarily quality of product and similarity to product that was interdicted at the street level.

b)HardCandy/Jailbaits are notably on the radar as they've been publicized in the media. Although these sites (and dozens other CP directories/forums) are on a permanent back burner when it comes to federal muscle. The consensus is that the hosting, content and major trafficking is foreign, so efforts should be coordinated under Interpol's umbrella. This is low priority.

c) HackBB and TCF are prominent and actively surveilled. Have not heard of any significant operations that have netted any majors, but there have been some successful prosecutions/interagency wins. HackBB especially is monitored closely. There is another counterfeit site whose name escapes me now, but there was a major sting that happened in Boston last winter which was a result of efforts focused on it. Paypal was involved and was very accommodating to SS in handing over logs.

d) Atlantis is too new to be taken seriously yet. It is not a honeypot.. it is for real. But it is being monitored and buys have been conducted. They're still figuring out where it stands and if it is fly-by-night or making a play to enroach into SR's territory. It is too early to tell and there is not significant traffic enough to justify re-allocation of resources.

2) Essentially yes. I have 'Read' permissions and can view docs.

3) Yes, a lot of people including my birdie are CC'd and have access to that email folder.

4) Both. Automated scripts primarily, and manually to a lesser extent. There have also been external (civilian) efforts to smart-crawl the site in a research capacity.

Case 15-1815, Document 34, 01/22/2016, 1682742, Page112 of 293

**A869**

Case 1:14-cr-00068-KBF   Document 232-8   Filed 04/16/15   Page 13 of 17
/home/frosty/backup/project_references/le_counter_intel.txt

5) No. There has never been any names, concrete geography, or associations. Something like that would be a big deal, and not the kind of thing that would be able to be kept mum even if it was field-level. You are too "big of a fish" for it to be able to remain on the field. That is not to say that if the full resources of the state are at their disposal that they wouldn't be able to close in. But THAT is never going to happen. You aren't Bin laden, and there is not much political mileage in justifying millions in someone that is not physically trafficking in anything. You are operating a continued criminal enterprise and violating a host of laws.. sure, but you aren't moving drugs. You are not packaging and trafficking drugs. The irony is that although this is your show, the cast is more important to target.  That is not to say that you shouldn't take precautions and your security very seriously. This entire Snowden fiasco has shed some light on what kind of impressive technology is at their disposal.  Anybody can be surveilled at any point and wide enough parameters can be set to pickup on even the slightest unique identifier.. but again I can't stress enough, it's not in the budgets. If the spooks ever wanted to find you, that could happen.. but they do not and will not.  There are no hard or soft leads on you, and I can swear on my children to that. If there ever were, I'd know about it.. and as per our arrangement, you would. But if you continue your SOP's in regards to security, you are a ghost.
It is believed that you are the same since the beginning, and that ownership/administration has never changed hands. But you can sleep knowing that you are as known today as you were 2 years ago.. unknown. The door will not be kicked in just like that. There will be a flurry of activity for weeks and months beforehand.. a flurry that no birdie would be able to not notice.
Don't take that to mean you shouldn't have several outs and exits, which I'm sure you do. This is not my place to say this, but if I can venture some advice. Walk away from this one day. You've done something remarkable that will go down in the history books. But you are human, and humans are prone to mistakes. Any kind of mistake in your position would be catastrophic.

6) Yes. I can poke around more, but in short - yes. What the end-goal was, I'm not sure. What they assessed, I'm not sure. But further attempts on the integrity of the site will be executed, be sure of that. Although I can tell you, that won't be a long term play. It can't be sustained forever.

7) Not AFAIK. I can poke around and get back on this. But does not ring any alarms in my head. I vaguely recall some back and forth about a paper that was published, but I don't recall anything coming of it. This would be something on the tech side. I will circle back with you on this.

8) Some, yes. Off the top of my head -  I know that "Costco" is a West Coast operation and theres some fair certainty that it's an Asian gang deal. There is an immigration element and tied to IRL dealing. I'm not sure what the wait is, but there's some play that probably involves state/local.
"Marlostansfield" is NYC, and the guy has a lengthy record and has been a CI in the past.
"Godofall" is NYC and they're Dominicans who are street level/wholesalers.
"DaRuthless1" has been surveilled by local in Queens and has a prior for distribution oxy.
"UndergroundSyndicate" I know was assumed to have been made, but there was some snafu with that and bickering state level.
I know there were a few California based pot guys who were being surveilled, I can circle back on vendor information. There is a vendor in Dade County, FL that was surveilled, grabbed and turned but the focus was on his IRL connects to coke wholesalers, not on mail.

I can poke around in regards to more on this topic.


---


I'm sorry if I said anything that makes you unhappy.. I would not lie to you about anything, I would not gain anything from withholding, rather you'd lose your utility for me and obviously that's counter to me even reaching out.

Please understand that it's obviously possible that I'm not privy to EVERYTHING that goes on. I work in a 9-5 environment and I'm nowhere near the field (and I'd never be). If there's something that you're 99.9% sure of is in

DPR's profile then you'd know better. If I don't know about it or have not heard/seen it, then that's a limitation of what I'm privy too. And I apologize for that sincerely, but I have no control over that.

As for #6, I can stress again that I'm not a technical person. From everything I've heard, it was the guys behind the DDoS. Thats the water cooler buzz so to speak. I said I have no idea what the goal was, if any. It's not my place to venture any opinions, but if someone else claimed to take responsibility then either they wanted to jump on the bandwagon, or they could have been trying to engage you and solicit some response. I am simply not consulted on operations.. I don't know any other way to put it. I'm a cog, not anything more.

I can stand by the profile of you that I provided. If there is more then I do not doubt it in the least, but it must be pegged as need-to-know.

RE your scenarios - I reached out to you for, as I said, personal gain. There is no card being played.. believe me I'm not in the game. To placate you into a false sense of security.. but then ask for compensation? That doesn't make sense. I see what you're saying, and I don't blame you, but if that scenario had any merit, why would I "compromise" the Wonderful deal? Do you see what I'm saying?
Scenario 2 is one that I'm whole heartedly (well, heavy heartedly) willing to accept. I do concede that I'm not an agent, I'm not operational, I'm not field. I'm a worker bee and I do feel I'm useful.. and I'm willing to prove it (while also covering my own ass). But if you feel I'm not as useful as you had hoped.. I'm pretty damned sorry and I can accept that?

I'm open to whatever you suggest..


---


Well now you have me thinking too.
It's one of two things:
Out of an abundance of caution. There could purposely be bogus OR outdated profiling (left over from a legacy report). Knowing theres various agency crosstalk (and curious eyeballs), the thinking can be to keep sensitive information off the shared drives for fear of someone going into business for themselves. The nature of btc and tor can tempt anyone to come to you (as I have) with something you'd presumptively write a blank check to get your hands on. Leaks happen all the time.. but generally they're to the press, not the subject. Could be a safeguard. Or, could simply be because your sources might be closer to the field and have first hand knowledge of updated working data.

The DDoS would certainly be NCIJTF/FBI. There would not need to be any full time geeks tasked with attacking or penetrating SR and nothing else. Could only be 2 ways:
1)They would assign a group internally, fast track the assignment approval, provide an objective and get briefed on any developments. This isn't open ended and there has to be some goal/metrics to be reported on in a specified timeframe.
2) Farmed out to a contractor. A lot security specialists are contracted out by the FBI. This is a bit murkier as they operate on their own guidelines and are just asked to deliver with minimum oversight.
But they have limited resources at their disposal unlike employees.

This is something I can dig around and find out if it was internal or outsourced. I can also find out if theres a set group that's been delegated specifically to SR. Would also be able to ascertain which office they'd be out of. Most importantly I can try to see what (if anything) has been the yield and what the priority level is. If I start getting too technical with my poking around that might raise a flag.. so it's a balancing act for me. But I can get you something RE: past IT based attacks on your infrastructure.


---

Case 15-1815, Document 34, 01/22/2016, 1682742, Page114 of 293

**A871**

Case 1:14-cr-00068-KBF   Document 232-8   Filed 04/16/15   Page 15 of 17
/home/frosty/backup/project_references/le_counter_intel.txt

I will, that is something I can do that might shed some light on the attack(s). Engaging you/intake of your response is attempted by every means. This is my opinion, but even if it was legitimate extortion does not rule out a contractor(s) sourced by LE. Anybody can see dollar symbols and see a financial opportunity even if they've been tasked by feds. Now, if it was in-house then yes, demanding payment to ceasefire would be bizarre as there would be too much oversight on the operation and if you had gone public (for example) with the fact the attacker is asking for payment.. there'd be disciplinary action at the very LEAST. But you are right in the sense that highjacking/ransoming the site for profit is not how LE operates. I'm thinking if the attacker was not LE, then they launched a separate attack with the wishful thinking that the massive onslaught would disrupt the site long enough to cause hot vendors to go back on the streets and open themselves up to catch cases.
I will look into this.

There are a few shared drives, but the lions share of SR related data is dumped to a drive titled (I'm not being humorous) "Silk". I would say SR related maybe 3 gigs? As for getting a copy of it -
this is scary. I don't know how/when/IF such a thing would be audited. Do you know? I'll research. But the thought of making a copy of all the folders onto an external from my workstation.. that really turns my stomach. What if theres a system wide audit of who copied/moved/read/wrote what folders/files and it's asked of me what I was doing copying that entire folder to a USB..we're talking Do Not Pass Go, Do Not Collect $200, straight to prison. But maybe I'm being paranoid as well, because there are so many cooks in the kitchen and people move folders/files all the time. No cameras where any of the cubes are.. so theoretically if I found an open work station, a copy *might* be possible. But I can tell you that the risks involved in this are unquantifiable. I can think this one through. Maybe copy some docs at a time, in 2 or 3 passes. Let me read up on how/what can be audited.

Every avenue is being explored by Treasury and HSI (Homeland Sec Investigations) to get claws into the Bitcoins exchanges. By claws I mean sweet talk and then flat out intimidate.The view in LE circles is that Bitcoin exchanges are shamelessly serving as money launderers and know very well that a wide chunk of the bitcoin economy is from black market transactions. Now, when Gox was hit in the spring.. that was literally over an unchecked box on some form asking "Are you a money transmitter?"! Because (the US subsidiary) of Gox failed to check the "Yes" box.. that alone was enough to get a judge to sign off on a warrant. The rest is history. LE has reached out to EVERY SINGLE DOMESTIC btc exchange and asked them to share records on vague grounds (ongoing narco-traffic investigations, Islamic charities/donations etc) and establish channels. The exchanges seem to talk to each other, and have by large put a united front and rebuffed these advances so far and have insisted their Ts are crossed and I's are dotted, which means they are not obligated to share records with any LEA on gratis. And since their paperwork is in order, LE is stuck here. They have not been enable to find cause to hit any of the other exchanges the way they hit Gox. I can tell you that LE is so used to banks bending over backwards to accommodate, they're annoyed that the exchanges have not rolled over. They have not seized servers of any domestic btc exchange. Even Mutum Sigillum's seizure was just their Dwolla account, not their servers or any stateside Gox data. Coinbase, however, is probably playing ball at some level. If you recall they scored like $5mil in a Series A round a few months ago. Few weeks after that (I'm talking June), there were meetings between there Compliance/attorneys and Treasury. This is not public knowledge. Either this was the investors insisting that they reach out to the feds and get in their good graces, or Treasury tried to squeeze them and maybe found something they thought they could use to bully them. But that's been quiet since. Have not heard anything. Gut says they probably reached some tentative agreement to pass on records in a limited capacity. Long story short, no, they are not tapped in to the exchanges (yet), aside from possibly Coinbase.


Civilian leads come in all the time to both local and federal. Sometimes its a call to one of the tip lines, and sometimes from confidential informants on the local level who are helping build cases on street dealers, and the street dealers are suspected of putting drugs in the mail or fedex, and SR is mentioned. Other civilian leads would be from academic research regarding SR/TOR (crawlers, potential bugs/flaws in the tor network etc). Or then instances of someone coming to local LE for help because they were being extorted and 'threatened to have their information released allover SR forums" etc (usually a buyer that's getting blackmailed by a vendor) have also trickled in.


---

/home/frosty/backup/project_references/le_counter_intel.txt

Yes, I'm thinking slow dump to USB, then PGP'd and sent to a tormail you provide. Will have to be slow, and ideally any chance I get to an open machine that I'm not logged into. The good thing is people don't take their workstation security serious and are pretty lazy.

What are your thoughts on this RE the weeklies and anything that comes through the pipe on Outlook. I was considering screen shots, but then the fear of an audit catching an outrageous amount of screen shots might be a problem. So, suppose I got an old iPhone or anything with a high res camera, and pulled up docs and took pictures? Then can transfer the pics later, remove exif data, crop out anything identifiable (reflections, other open work on the machine) and then send? Although crude, this would at least work in terms of getting your eyes on stuff. Fallback would be you wouldn't be able to copy paste anything. Thoughts?

About Gox: No way. Hitting Mutum Sig was a last resort and reactionary because they had approached Gox directly and were rebuffed, and then reached out to the Japanese government to no avail. Although on good relations, Japanese companies are very anal when it comes to perceived threats to their bottom line. Must not forget that Gox is fully aware that that a staggering amount of traffic is dirty money (no offense), and that makes them money. They can't fathom turning over records and data to the Americans without a crippling mass exodus of capital (if it ever came to light). Also Japanese are a proud people when it comes to their work. There are free trade agreements with Japan that have  binding clauses to provide financial information to requests from say the IRS, but something that like can't be used as a tool with the Japanese government because of limited resources and approvals on our end. It's very beauracratic and not just a matter of a few phone calls and emails. And even still the Japanese can stall and pushback. As long as Gox is operating where they are, they will guard the integrity of their records/logs/data. Gox is outside the tentacles.

---

No no, I can, I was thinking in terms of immediate data transmission. Grabbing off the drive is going to have to be done over some time. I can copy the contents of the weeklies to a file.. especially as they're sitting in Outlook. It does make my stomach turn.. but I know I've made a decision and opening emails is not out of the ordinary for me. I just have to remind myself that I'm as anonymous as can be and the financial incentive is attractive. And realistically I'm one of around 100 or more who would routinely be privy.. so I don't stick out. But Jesus this is scary. Sorry, just thinking out loud. I do appreciate you reposing trust in me and being generous with comp.

---

When I put my paranoia into perspective vis-a-vis what stress you must live under.. and see a (wo)man who's seemingly calm and collected, that does ease the burden. At the end of the day us corresponding on tor is as safe as can be. And my age/appearance is helpful in regards if ever asked why I'd be accessing SR specific docs/folders.. it's not entirely bizarre that I'd be curious in counter culture. And without getting into my position, I am tasked with a lot of gruntwork that involves being in various drives. Because of my clearance I haven't even done drugs in ages and can't.. so I've never indulged in the site. And this method of correspondence was thought out by me for weeks. I'm not on my personal machine. God forbid the day would ever come where an eyebrow would even be raised though.

I know you know how to keep an eye on your staff.. but realize that correspondence on the Wonderful situation is something you'd want to pay close attention too. Even if your guy(s) swear up and down the moon (to Mr. W) that you aren't in the know they've been talking, it will be assumed that you ARE watching and/or playing them directly. That can be a pro or a con for you, depending on how you finesse the situation. They either feed disinformation and/or take anything relayed with a grain of salt. I would not let your staff know you know they've been talking.. not only would that raise a flag, you'd lose a major opportunity to manipulate the situation. Bottom line is, assume they're

/home/frosty/backup/project_references/le_counter_intel.txt

compromised or infiltrated, and you can have the boys running on goose chases.

The more you send confusing signals via the forum and manufacture events, probably the better. For example to post that you're satisfied with the new setup/configuration of the server would be a good throwoff/distraction. Or to let speculation run about how many people are DPR/has SR changes hands and whatnot is advantageous to you (but you knew that). Or even to appear to unconsciously reveal an identifier about your habits/intentions/origins is good psychological warfare (but you knew that too).

As far as your vendors go.. that's the weakest link. You have to keep an eye on their PM's and behavior/correspondence. Keeping them off the street, encouraging they partner up to appear to be operating out of various geography, monitoring their attempts to work outside the framework and open themselves to under covers are all no brainers but imperative.

I'm going to poke around all I can on previous attacks/future plans of assault on the site.Know that paralyzing the site forever would never be an end goal of LE. That would be anticlimactic. Breaching your site security would be, and if that were to happen, they'd sit on it and watch.. with no time constraints. And still target the high volume vendors. If that were too happen, it would eventually filter back to me and thus you, and how you tackle it is obviously your call.

If the climate in regards to the BTC exchanges changes and theres heightened interaction with Treasury/HSI, I will tell you the who and when. That might help you strategize big picture. For right now they're safe. That could change.

I assume you'll want to know of street level activity or buzz that comes in via local or USPI, even if mundane. I'll get that to you too. If I can't get a vendor name, I can provide you with the geography and whatever identifiers I find. But these guys are almost always flipped and used to setup their IRL connects.

Also, do not put it past them to wiretap journos. If you (for example), interact with people like Chen or Ornsby, assume they can see it. Assume journalists are compromised/breached.

What I'll do this week is figure out how to start gleaning docs off the drives, and copying the weeklies/emails. Will need a few days to get that sorted out. I do sincerely hope that all this helps/will help you.

I guess that wraps up our initial framework. I don't know anything else off the top of my head that might be critical. But if something does come to me then I'll inform you. Give me a tormail where I'd be able to send stuff to. I'll create one as well strictly for this purpose.

If I'm not missing anything.. then I assume the first part of our initial arrangement/deal is squared away? If you could take care of the balance of my retainer tonight I'll have some peace of mind that I'm starting the week/this chapter of my life squared away.  And the weekly comp following the weekly data that comes your way? I assume that's fair?


---


Ok, got it. Thank you for that DPR, you're a man of your word as am I. Thank you for being receptive.
Most weeks there's something at least.. so "nothing new or interesting" is almost never the case unless theres a complete lull or resources are re-allocated to some pressing other business. Even if there's nothing "new" per se, I can always engage others informally and chat them up to see what the buzz is. I'll figure out the doc/files and send them encrypted to that address. Feel free to ask any questions whenever, I'll check this forum account every evening and again at night. During working hours is almost possible unless I'm working from home, in which case I'll be reachable. If there's any specific you'd want want me poke around, then just point me in the right direction and I can circle back. Sorting out what else they have that isn't in the current profile (and why/how it's omitted) as well as the what/who/where/why RE the DoS I've put on top priority. I'll get something.

# EXHIBIT 9

4/6/13 18:00   DeathFromAbove   Dread Pirate Roberts   Dread Pirate Roberts   It's not that easy Anand

4/10/13 11:54   DeathFromAbove   Dread Pirate Roberts   so   Do they have a casino there Anand?

4/16/13 5:56   DeathFromAbove   Dread Pirate Roberts   personal history

Name: Anand Athavale
DOB: November 11, 1975
POB: India
Citizenship: India
Sex: M
Brown hair, 5'6" tall, Brown eyes, 300 lbs.
Residence: 3733 Edgehill Drive, P.O. Box 87, Tappen, BC, Canada V0E 2X0
is that enough to get your attention?

So, $250,000 in U.S. cash/bank transfer and I won't give you identity to law enforcement.  Consider it punitive damages.
DeathFromAbove



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

UNITED STATES OF AMERICA

                -v-

ROSS WILLIAM ULBRICHT,

                Defendant.

------------------------------------------------------------------ X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: April 27, 2015

14-cr-68 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

Ross Ulbricht ("defendant" or "Ulbricht") was indicted on February 4, 2014. On August 21, 2014, the Government filed a superseding indictment; Ulbricht was arraigned on that indictment on September 5, 2014. The charges against Ulbricht stemmed from his alleged design, creation, and operation of Silk Road—a sprawling online marketplace for illegal narcotics, computer hacking materials, and fraudulent identification documents. The Government alleged that Ulbricht owned and operated Silk Road on the dark net under the username "Dread Pirate Roberts" ("DPR") and, as DPR, controlled every aspect of the illegal enterprise until the day of his arrest. The Superseding Indictment charged Ulbricht with seven crimes: narcotics trafficking, narcotics trafficking by means of the Internet, conspiring to commit narcotics trafficking, engaging in a continuing criminal enterprise, conspiring to commit or aid and abet computer hacking, conspiring to traffic in fraudulent identification documents, and conspiring to commit money laundering. (ECF No. 52.)

Trial was initially scheduled for November 3, 2014, but, on applications from the defense, it was adjourned to November 10, 2014 and then to January 5, 2015. On December 30, 2014, the defense made an additional application for an adjournment—which the Court denied. This matter proceeded to trial on January 13, 2015.[1]  On February 4, 2015, after just a few hours of deliberation, the jury returned guilty verdicts on all counts.

Now before this Court is Ulbricht's motion for a new trial on all counts. (ECF No. 222.)  There is no basis in fact or law to grant the motion and it is DENIED.

I.    THE TRIAL[2]

In his opening statement, Ulbricht's counsel conceded that Ulbricht had, in fact, created Silk Road. Counsel told the jury that the evidence would show that Ulbricht had ceased his involvement with Silk Road "after a few months" but had been lured back—just as law enforcement closed in—to be the fall guy. In short, he was caught red-handed but was a dupe. Counsel told the jury that Ulbricht was not the Dread Pirate Roberts.

By the time of trial, defendant had received what evidence the Government possessed; he had copies of the website, the code, the servers, the thumb drives, the photographs, the screen shots, etc. It was in the face of all this evidence that Ulbricht's counsel presented his opening statement and outlined his defense. His defense was not that the evidence would fail to show that all manner of illegal drugs

---

[1] The one-week delay in the start of trial was due to a personal matter affecting one of the attorneys for the Government.

[2] The Government has laid out the facts developed during the trial in detail in its submission on this motion. (ECF No. 230.)  The Court does not repeat all of those facts here and recites only those most pertinent to resolution of the instant motion.

2

were sold on Silk Road, that Ulbricht was not its creator, that he did not purchase several counterfeit drivers' licenses from the site, that he was not arrested with a laptop which was a standalone, independently sufficient, massive repository of incriminating evidence.  His defense was that somehow—in a manner not then explained—Ulbricht had been set up by the real criminal mastermind.

Counsel's opening suggested a developed defense—a defense supported by known evidence.  It suggested that there was evidence that Ulbricht—who concededly started Silk Road—at some point ceased his involvement with the enterprise and returned only at the very end.  It suggested that there was evidence that the mound of incriminating material on Ulbricht's laptop had been created and placed there by someone else—or by some automated process—in a technologically feasible way.

Counsel pursued this "alternative perpetrator" line of argument during cross-examination of the Government's witnesses—particularly Special Agent ("SA") Der-Yeghiayan, whom counsel questioned extensively regarding two other individuals who were investigated as possible leads on DPR.

There is a necessary disconnect between this defense theory—presented in counsel's opening and cross-examination—of what really happened, and the theory on this motion: that defendant has not had the time or information to develop any defense at all.

The evidence of Ulbricht's guilt was, in all respects, overwhelming.  It went unrebutted.  This motion for a new trial urges that Ulbricht was prejudiced by that

which he could not know in time, or at all.  But the motion does not address how any additional evidence, investigation, or time would have raised even a remote (let alone reasonable) probability that the outcome of the trial would be any different.

The trial started with the jury hearing that at the time of his arrest, Ulbricht was actively engaged in an online chat with an undercover agent posing as a Silk Road employee.  Ulbricht was at his laptop, typing, and logged in as the Dread Pirate Roberts.  The jury heard and saw evidence connecting the purchase of that laptop to Ulbricht: it was purchased using Bitcoins (converted by Ulbricht into Amazon.com gift cards) and shipped to Ulbricht's home.  (GX 312C, 312.)  A confirmation e-mail was sent to Ulbricht's e-mail account, and Ulbricht duly recorded the purchase in a spreadsheet of Silk Road-related expenses.  (GX 312C, 250.)

The jury heard that the laptop contained what can only be described as an electronic diary: a detailed description by Ulbricht of how and why he started Silk Road—and the various events that occurred over the years in relation to it— sprinkled with details from Ulbricht's private life.  (GX 240A–240D.)  The laptop also contained thousands of pages of chat logs with Silk Road employees (GX 222– 232E), a weekly to-do list for Silk Road (GX 255), copies of the Silk Road website and the Silk Road market database (GX 212, 213), spreadsheets of Silk Road– related expenses and servers (GX 250, 264), a "log" file reflecting actions that Ulbricht took in connection with the day-to-day maintenance of Silk Road (GX 241), the encryption keys used to verify the Dread Pirate Roberts's identity (GX 269, 296),

a spreadsheet listing Ulbricht's personal assets in which he valued Silk Road at $104 million (GX 251), and scanned copies of identification documents belonging to Silk Road staff members (GX 216, 256). There were also Bitcoin wallets on the laptop containing over 144,000 Bitcoins, valued at the time of Ulbricht's arrest at $16-18 million. (GX 214, Tr. 1032:21-1033:5, 1673:8-1674:6.) An analysis of those Bitcoins showed that the vast majority of them—nearly 90%—came directly from Bitcoin wallets found on Silk Road servers. (GX 620B.)

The jury also heard extensive testimony that Silk Road was a website used to buy and sell narcotics and other illicit goods and services. The jury saw printouts from the website showing advertisements for a variety of such narcotics, and heard testimony from a law enforcement agent who had seized a large volume of narcotics purchased through Silk Road. The jury heard from a former friend of Ulbricht that Ulbricht had confessed his involvement in Silk Road to him. The jury saw a variety of Silk Road transactional data demonstrating the sale of computer hacking materials, currency, and a host of fake drivers' licenses, passports, and other identification documents. The jury heard that a law enforcement agent had intercepted a package containing nine counterfeit drivers' licenses for Ulbricht himself, and that Ulbricht had mentioned Silk Road when confronted with them. The jury saw copies of papers taken from Ulbricht's garbage can shortly after his arrest which had handwritten notes of tasks associated with Silk Road. The jury also saw documents which demonstrated that the Dread Pirate Roberts attempted

to protect his interests in Silk Road by commissioning the murder of several individuals (though there is no evidence that murders resulted).

By contrast, the jury was not presented with any evidence that the laptop which Ulbricht possessed at the time of his arrest was ever out of his possession since he had purchased it (and it had been delivered to his home address). It was also not presented with any evidence that someone—or some automated process—could, much less did, populate Ulbricht's hard drive with any of the evidence described above, located in different files and in different places on the computer.

II.   DEFENSE ARGUMENTS

Defendant makes three arguments in support of his motion for a new trial. First, defendant argues that he was deprived of his Fifth Amendment right to due process and his Sixth Amendment rights to a fair trial and effective assistance of counsel. In that regard, defendant argues that the Government's production of 3500 material less than two weeks prior to trial was voluminous and contained exculpatory material that should have been produced sooner. In addition, defendant asserts that he was denied the ability to use, or have discovery into, certain information concerning the corruption investigation into former SA Carl Force and another law enforcement agent (the "Rogue Agents"). Defendant asserts that the recently unsealed criminal complaint against the Rogue Agents—who were involved in an investigation of Silk Road by the U.S. Attorney's Office for the District of Maryland ("USAO-Baltimore")—reveals that Brady material was suppressed in this case. Defendant argues that all of these failures were compounded by the Government's repeated additions and modifications to its

6

exhibit list on the eve of and during trial—which sowed confusion and inhibited effective preparation.

Second, defendant argues that 3500 material revealed that "the government was conducting warrantless TOR network surveillance on a TOR exit node" that his pre-trial suppression motion should be therefore "reopened" and granted. (Memorandum of Law in Support of Defendant Ross Ulbricht's Post-Trial Motions ("Def.'s Br.") at 15, ECF No. 224.)

Third and finally, defendant offers a "proffer" regarding the proposed testimony of Andreas M. Antonopoulos, implicitly suggesting that the Court erred in precluding Mr. Antonopoulos from testifying as an expert witness before receiving a full proffer of his testimony.

None of these arguments supports granting a new trial.[3]

III.   LEGAL STANDARDS

A.   Rule 33

Rule 33 provides that a district court may "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The ultimate question is whether manifest injustice would result if a court allows a guilty verdict to stand.  United States v. Snype, 441 F.3d 119, 140 (2d Cir. 2001).  Given the deference owed to a jury's verdict, the Second Circuit has instructed that district courts should exercise their Rule 33 authority "sparingly" and only in "the most extraordinary circumstances."  United States v. Ferguson, 246 F.3d 129, 134 (2d

---

[3] The Court notes that Ulbricht's reply papers focus exclusively on the first argument.  It is unclear whether this exclusive focus means that Ulbricht has abandoned his other arguments or whether he is content to let his opening papers address them.

Cir. 2001) (quoting <u>United States v. Sanchez</u>, 969 F.2d 1409, 1414 (2d Cir. 1992))

(internal quotation marks omitted). Such extraordinary circumstances exist, for

example, when testimony is "patently incredible or defies physical realities."

<u>United States v. Cote</u>, 544 F.3d 88, 101 (2d Cir. 2008) (quoting <u>Sanchez</u>, 969 F.2d at

1414) (internal quotation marks omitted). A motion for a new trial should not be

granted unless, upon examining the entire case and taking into account all of the

facts and circumstances, the court is left with "a real concern that an innocent

person may have been convicted." <u>Ferguson</u>, 246 F.3d at 134 (citation and internal

quotation mark omitted). After a full and thorough review of the evidence, the

Court here is left with no such concern.

     B.    <u>Discovery Obligations in Criminal Cases</u>

    "[I]n all federal criminal cases, it is Rule 16 that principally governs pre-trial

discovery." <u>United States v. Smith</u>, 985 F. Supp. 2d 506, 521 (S.D.N.Y. 2013)

(citations omitted). Rule 16(a)(1)(E) provides, in pertinent part, that a defendant is

entitled to obtain from the Government documents and objects that are "within the

government's possession, custody, or control" if they are "material to preparing the

defense" or will be used by the Government in its case-in-chief at trial. Fed. R.

Crim. P. 16(a)(1)(E).

    Evidence that the Government does not intend to use in its case-in-chief at

trial is material "if it could be used to counter the government's case or to bolster a

defense; information not meeting either of those criteria is not to be deemed

material within the meaning of the Rule." <u>United States v. Stevens</u>, 985 F.2d 1175,

1180 (2d Cir. 1993). To warrant a new trial "[t]here must be some indication that

the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." Id. (quoting United States v. Maniktala, 934 F.2d 25, 28 (2d Cir. 1991)) (internal quotation marks omitted). Even the withholding of material evidence does not warrant a new trial if the defendant cannot show that it caused him "substantial prejudice." Id. at 1181 (citation omitted). "In assessing that question, the court analyzes the nature of the evidence sought, the extent to which it bore on critical issues in the case, the reason for its nonproduction, and the strength of the government's untainted proof." Id. (citation omitted).

Rule 16(a) was never "intended to provide the defendant with access to the entirety of the government's case against him." United States v. Percevault, 490 F.2d 126, 130 (2d Cir. 1974) (citation omitted). "Discovery of evidence in criminal prosecutions is, inevitably, more restricted than discovery in civil cases." United States v. Tolliver, 569 F.2d 724, 728 (2d Cir. 1978). Rule 16 "does not entitle a criminal defendant to a 'broad and blind fishing expedition among [items] possessed by the Government on the chance that something impeaching might turn up.'" United States v. Larranga Lopez, 05 Cr. 655 (SLT), 2006 WL 1307963, at *7-8 (E.D.N.Y. May 11, 2006) (alteration in original) (citing Jencks v. United States, 353 U.S. 657, 667 (1957)).

C.    3500 Material

The Jencks Act provides that "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the

9

possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). The plain meaning of this provision does not require production of 3500 material before trial. In practice, however, courts in this district require the Government to produce 3500 material at least the Friday prior to the commencement of trial and sometimes earlier.

The Jencks Act is intended to provide the defense with prior statements of Government witnesses for purposes of impeachment. United States v. Carneglia, 403 F. App'x 581, 586 (2d Cir. 2010). The Jencks Act is not a general discovery device. See United States v. Exolon-Esk Co., No. 94-CR-17S, 1995 WL 46719, at *2 (W.D.N.Y. Jan. 19, 1995) (citing In re United States, 834 F.2d 283, 286 n.2 (2d Cir. 1987)); see also United States v. Jackson, 345 F.3d 59, 76 (2d Cir. 2003) (The Jencks Act "does not normally mandate disclosure of statements made by a person who does not testify." (citations omitted)). In instances in which the Government has failed to provide 3500 material, a defendant is only entitled to relief if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Carneglia, 403 F. App'x at 586 (quoting United States v. Nicolapolous, 30 F.3d 381, 383-84 (2d Cir. 1994)) (internal quotation marks omitted).

D.    Brady

"There is no general constitutional right to discovery in a criminal case, and Brady did not create one." Weatherford v. Bursey, 429 U.S. 545, 559 (1977); see also Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987) ("Defense counsel has no constitutional right to conduct his own search of the [Government's] files to argue

10

relevance." (citation omitted)); <u>United States v. Evanchik</u>, 413 F.2d 950, 953 (2d Cir. 1969) ("Neither [<u>Brady</u>] nor any other case requires the government to afford a criminal defendant a general right of discovery."); <u>United State v. Meregildo</u>, 920 F. Supp. 2d 434, 440 (S.D.N.Y. 2013) ("<u>Brady</u> is not a rule of discovery—it is a remedial rule." (citing <u>United States v. Coppa</u>, 267 F.3d 132, 140 (2d Cir. 2001))).

Rather, <u>Brady</u> established that the Government has a constitutional obligation to disclose favorable and material information to the defendant.  <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963).  "There are three components of a true <u>Brady</u> violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).  A defendant seeking a new trial on the basis of an alleged <u>Brady</u> violation bears the burden of demonstrating that these elements are met.  <u>United States v. Douglas</u>, 415 F. Supp. 2d 329, 336 (S.D.N.Y. 2006), <u>aff'd</u>, 525 F.3d 225 (2d Cir. 2008).

Prejudice ensues only if the suppressed evidence is material—that is, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  <u>Kyles v. Whitley</u>, 514 U.S. 419, 433 (1995) (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985)) (internal quotation marks omitted).  "A reasonable probability" means that the likelihood of a different result is sufficiently great to "undermine confidence in the outcome of the trial."  <u>Smith v. Cain</u>, 132 S. Ct. 627, 630 (2012) (quoting <u>Kyles</u>, 514

U.S. at 434) (alteration and internal quotation marks omitted).  Undisclosed information may not be material if the Government's "other evidence is strong enough to sustain confidence in the verdict."  Id. (citation omitted).  This standard is not satisfied, however, if the Government "offers a reason that the jury could have disbelieved [the undisclosed evidence], but gives us no confidence that it would have done so."  Id. (emphases in original).  Materiality is assessed in light of the trial evidence.  "Where the evidence against the defendant is ample or overwhelming, the withheld Brady material is less likely to be material than if the evidence of guilt is thin."  United States v. Gil, 297 F.3d 93, 103 (2d Cir. 2002) (citations omitted).

"Brady material that is not 'disclosed in sufficient time to afford the defense an opportunity for use' may be deemed suppressed within the meaning of the Brady doctrine."  United States v. Douglas, 525 F.3d 225, 245 (2d Cir. 2008) (alteration omitted) (quoting Leka v. Portuondo, 257 F.3d 89, 103 (2d Cir. 2001)); see also Coppa, 267 F.3d at 135 ("Brady material must be disclosed in time for its effective use at trial." (citation omitted)).  Brady material buried within "reams" of 3500 material and provided too close to trial to permit effective use may also be deemed suppressed.  See Douglas, 525 F.3d at 245 (citing Gil, 297 F.3d at 103); see also United States v. Rittweger, 524 F.3d 171, 181 n.4 (2d Cir. 2008) ("Complying with the Jencks Act . . . does not shield the government from its independent obligation to timely produce exculpatory material under Brady . . . .").

IV.     DISCUSSION

    A.     Fifth and Sixth Amendment Claims

    Ulbricht asserts that his Fifth and Sixth Amendment rights were violated as a result of the Government's belated production of 3500 material, failure to timely disclose the details of the investigation of the Rogue Agents, and repeated additions and modifications to trial exhibits.  According to Ulbricht, the Government's gamesmanship in this regard led to inadequate trial preparation, an inability to investigate whether certain evidence might be exculpatory, and, ultimately, an unfair trial.  These arguments are without merit.

        1.     3500 Material

    Ulbricht argues that he is entitled to a new trial because the Government's 3500 production contained <u>Brady</u> material concerning SA Der-Yeghiayan's investigation of Messrs. Karpeles and Athavale (the "Karpeles/Athavale Materials") which was not disclosed in time for effective use at trial.  This argument fails for three independent reasons.

    First, the Karpeles/Athavale Materials do not constitute <u>Brady</u> material because they are not exculpatory vis-à-vis Ulbricht.  Defendant argues that these materials constitute "other perpetrator" evidence, but they in fact only reflect investigative leads that SA Der-Yeghiayan explored but that ultimately turned out to be misplaced.  <u>See</u> <u>Moore v. Illinois</u>, 408 U.S. 786, 795 (1972) (noting that there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case," including any "early lead the police abandoned"); <u>United States v. Amiel</u>, 95 F.3d 135, 145 (2d Cir.

1996) ("The government has no <u>Brady</u> obligation to 'communicate preliminary,

challenged, or speculative information.'" (quoting <u>United States v. Diaz</u>, 922 F.2d

998, 1006 (2d Cir. 1990)) (internal quotation marks omitted)).

SA Der-Yeghiayan investigated Mr. Karpeles because the website

"silkroadmarket.org"—which provided instructions on how to access Silk Road on

the Tor network—was hosted on a server that was registered to Mr. Karpeles.

However, further inquiry revealed that Mr. Karpeles's connection to the server was

an innocent one: he was simply running a server-hosting company that leased

servers to others, and the server in question was in fact leased to Ulbricht.  The

Government's investigation of Mr. Karpeles thus does not exculpate Ulbricht.  <u>See</u>

<u>United States v. Sessa</u>, No. 92-CR-351 ARR, 2011 WL 256330, at *24 (E.D.N.Y. Jan.

25, 2011) (police reports concerning other suspects in a murder investigation did not

constitute <u>Brady</u> material where, <u>inter alia</u>, their fingerprints came back negative),

<u>aff'd</u>, 711 F.3d 316 (2d Cir. 2013).

As to Mr. Athavale, SA Der-Yeghiayan's suspicion was based on certain

linguistic similarities between DPR's writing and that of Mr. Athavale.  However,

these similarities are not exculpatory vis-à-vis Ulbricht because they were never

corroborated by any substantial evidence.[4]

In any event, the Karpeles/Athavale Materials were not "suppressed" within

the meaning of the <u>Brady</u> doctrine.  These materials were included in the 3500

---

[4] Even if the Karpeles/Athavale Materials somehow inculpated Messrs. Karpeles and Athavale, they would not exculpate Ulbricht or undermine the mound of evidence against him.  Rather, they would simply suggest that there might have been more than one DPR operating Silk Road in the same time period.  Whether there was one or 100 DPRs is irrelevant to the ultimate question of whether the Government met its burden of proof as to the crimes charged vis-à-vis Ulbricht.

material for SA Der-Yeghiayan—which was produced to the defense on December 31, 2014, thirteen days before trial began.  While Ulbricht asserts that the 3500 production for SA Der-Yeghiayan was voluminous (totaling 5,000 pages), he has failed to demonstrate that he had insufficient time to make effective use of any of these materials.  See Douglas, 525 F.3d at 245-46 (disclosure of 290 pages one business day before trial did not constitute suppression).  Indeed, the defense displayed great familiarity with the Karpeles/Athavale Materials and used them repeatedly during cross examination.  See Gardner v. Fisher, 556 F. Supp. 2d 183, 195 (E.D.N.Y. 2008) (finding no Brady violation based on last-minute disclosure of an exculpatory statement "since the defense made effective use of this statement at trial through extensive cross-examinations").  Notably, the defense never requested a continuance based on the late disclosure of 3500/Brady material.  See United States v. Menghi, 641 F.2d 72, 75 (2d Cir. 1981) (finding no Brady violation where, inter alia, defense counsel made no motion for a continuance to allow further investigation).

Finally, the Karpeles/Athavale Materials are not material to Ulbricht's defense.  Ulbricht does not offer any explanation as to why there is any chance that he would not have been convicted had the defense been given more time to review the Karpeles/Athavale Materials.  He does not explain how the defense would have used the additional time, much less give how this effort may have affected the outcome of the trial.  As set forth in Part I above, the Government presented overwhelming evidence of Ulbricht's guilt.  Ulbricht was caught red-handed—logged

15

in and chatting as DPR on a personal laptop, which Ulbricht unquestionably owned, filled with Silk Road files.  In the face of this mound of evidence, there is no faint possibility, much less "reasonable probability," that the jury would have reached a different verdict had the Government produced the Karpeles/Athavale Materials earlier.  See Gil, 297 F.3d at 103 ("Where the evidence against the defendant is ample or overwhelming, the withheld Brady material is less likely to be material than if the evidence of guilt is thin." (citations omitted)); Jackson, 345 F.3d at 74 (finding a lack of materiality because "[t]he jury's verdict was supported by compelling evidence" and "the undisclosed materials were of limited utility").[5]

### 2.    The Rogue Agents Issue

The vast majority of Ulbricht's reply on this motion concerns the unsealing of the criminal complaint in the Northern District of California against two individuals who held positions with law enforcement and were involved in the USAO-Baltimore investigation of Silk Road: former SAs Carl Force and Shaun Bridges.  Defendant's focus on the complaint against these investigators—and the Northern District of California's investigation of them—is misguided.  The Government's failure to reveal more regarding the investigation of either individual violated neither its discovery nor its Brady obligations.

---

[5] In passing, defendant challenges two other aspects of the Government's 3500 production.  First, defendant asserts that "[o]ther exculpatory material was included within the 3500 material for Internal Revenue Special Agent Gary Alford (which was produced January 6, 2015)."  (Def.'s Br. at 10.)  Second, defendant suggests that the Government may have redacted exculpatory information from its 3500 production.  (Id. at 10-11.)  However, there is no indication that either of these assertions is true, and defendant's unsupported conjecture in that regard is insufficient to establish a Brady violation.  See United States v. Numisgroup Int'l Corp., 128 F. Supp. 2d 136, 150 (E.D.N.Y. 2000) ("In the absence of a particularized showing by the defense that certain materials covered by Brady are being withheld, the Court accepts the Government's good faith assertion [that it has complied with its Brady obligations] as sufficient." (citations omitted)).

Despite the attention given to the Rogue Agents issue in defendant's brief, this Court remains unclear (as it always was) as to how any information relating to that investigation is material or exculpatory vis-à-vis Ulbricht.  Either the defense assumes the answer is so obvious that it need not explain, or its omission is purposeful.  For purposes of the instant motion, this Court assumes that defendant believes he was deprived of information which would have revealed that (1) the Rogue Agents' conduct may have tainted any evidence relating to the website (since they assumed identities on the site), (2) the Rogue Agents may provide a link to someone (including themselves) who may have taken over the DPR account and framed Ulbricht, and/or (3) the Rogue Agents may know the identity of the real DPR.  There is no basis in the record—including in any of what defendant has cited regarding the Rogue Agents—which supports any one of these theories.  These theories are based on no more than speculation and premised on erroneous assumptions as to the scope of discovery obligations and the meaning of exculpatory evidence.

To start, there is no basis for this Court to believe that any undisclosed materials relating to the Rogue Agents would have been remotely useful, let alone exculpatory, vis-à-vis Ulbricht.  The Rogue Agents did not participate in the USAO-SDNY's investigation of Silk Road that resulted in defendant's arrest and indictment, and none of the evidence at defendant's trial came from the USAO-Baltimore investigation in which the Rogue Agents participated.[6]  That the Rogue

---

[6] Defendant argues that the USAO-SDNY and USAO-Baltimore investigations were coordinated, and "[t]o the extent there is any question with respect to that conclusion," the Court should hold an

Agents may have exceeded the scope of their authority in the USAO-Baltimore investigation does not, in any way, suggest that Ulbricht was not the Dread Pirate Roberts.  As this Court explained in an earlier (sealed) ruling on this topic, the investigation of SA Force is, if anything, <u>in</u>culpatory as it suggests that Ulbricht, as DPR, was seeking to pay law enforcement for inside information to protect his illegal enterprise.

 Moreover, even if defendant could point to a favorable piece of evidence from the investigation of the Rogue Agents, defendant has not constructed any argument that had he had earlier disclosure, the result of the trial may have been different.  There is no reasonable probability of a different outcome here: the circumstances of defendant's arrest, and the evidence found in his own possession at the time of the arrest, are in and of themselves overwhelming evidence of his guilt.

 One of defendant's key arguments is that suppression of the Rogue Agents material prevented him from exploring potentially exculpatory avenues—that, in effect, we cannot know whether the result of the trial would have been different since we do not know what it missing.  (<u>See, e.g.</u>, Def.'s Reply at 3-4 ("[T]he complete scope of what SA's Force and Bridges were able to accomplish with the illicit access they gained to the Silk Road web site, and its impact on this case, has yet to be determined."); <u>id.</u> at 37 ("Absent the opportunity to inspect items relevant to the investigation of former SA's Force and Bridges, the full extent of potentially

---

evidentiary hearing on the issue.  (Reply Memorandum of Law in Support of Defendant Ross Ulbricht's Post-Trial Motions ("Def.'s Reply") at 38, ECF No. 232.)  There is no need for any evidentiary hearing: whether the investigations proceeded separately or intersected has no bearing on whether any undisclosed materials relating to the Rogue Agents are exculpatory as to Ulbricht.

exculpatory material cannot be determined.").)  This argument misconstrues
Brady—and attempts to turn Brady into a discovery device or to expand the
requirements of Rule 16.  The Government had an obligation to turn over favorable
material evidence to prevent injustice; it had no obligation to keep Ulbricht
continually apprised of developments in a separate investigation.  On the record
before the Court, the Government complied with its obligation: as explained above,
none of the Rogue Agents evidence is exculpatory—let alone sufficiently exculpatory
to give rise to a reasonable probability of a different outcome.

### 3.   Trial Exhibit Disclosures

Defendant argues that the Government's failure to timely disclose Brady
material was "compounded" by its late and continued production of a significant
number of exhibits throughout the trial.  (Def.'s Br. at 12.)  To start, and as
explained above, there were no Brady violations to compound.  In any event, the
Government's disclosure of exhibits was neither unusual nor unreasonable.

Prior to trial, the Court established a procedure for the Government's
disclosure of its trial exhibits.  That procedure was designed to allow the parties to
assess potential objections, discuss them, and preview evidentiary issues with the
Court.  That process occurred as ordered, but, as is frequently the case, there were
exhibits added and subtracted as trial approached and then commenced.  The Court
did not preclude these modifications—though it expected counsel to work together
in good faith in that regard.  Defense counsel remarked on this during the trial, but
specifically stated that he was not "complaining" and that "[i]t [was] not something
that's out of the realm of a trial."  (See 1/28/15 Tr. 1553:13-24, ECF No. 214; 1/29/15

Tr. 1837:2-6, ECF No. 212.)  While counsel did raise an issue with regard to one particular document—an analysis of Bitcoins found on defendant's laptop (1/28/15 Tr. 1546:2-20)—this document was added to the Government's exhibit list during the trial to address an argument defense counsel raised in his opening.

      B.    <u>Suppression Motion</u>

      Next, defendant argues that 3500 material produced by the Government just prior to trial warrants reopening and granting his pre-trial motion to suppress evidence obtained as a result of the search and seizure of a server located in Iceland.  (ECF No. 46.)  In particular, defendant points to text messages between SA Der-Yeghiayan and a confidential informant (the "CI") from August 2012 in which SA Der-Yeghiayan asks, "Are we up on the exit node yet?"  The CI confirms that they are and states, "100 percent running, logging and recording . . . with verification."  (Def.'s Br. at 16 (quoting 3505-4059–3505-4060).)  Defendant also references texts in which SA Der-Yeghiayan and the CI discuss the prospect of the Government performing a distributed denial of service ("DDOS") attack with the purpose of "listening" to the Silk Road servers.  (<u>Id.</u> (quoting 3505-4066).)  Defendant asserts that these communications provide "further evidence that the government discovered the Internet Protocol . . . address for the Iceland server ending in '.49' through warrantless TOR network surveillance" and that it may have authorized or conducted DDOS attacks.  (<u>Id.</u>)  This argument is without merit.

      Defendant's pre-trial suppression motion was denied principally on the basis that he had failed to establish a personal privacy interest in any Silk Road servers or the items thereon.  (ECF No. 89.)  That has not changed: defendant still has not

provided an affidavit attesting to his personal privacy interest in the affected servers at the relevant time.  His arguments in support of a new trial are premised on a defense that he was set up—that someone else was DPR.  Thus, despite admitting that he started Silk Road (and was logged in as DPR on the day of its demise), he nevertheless has not attested to a personal privacy interest.

In addition, none of the communications between SA Der-Yeghiayan and the CI goes to the core issue on the suppression motion, namely <u>how</u> the Icelandic server was located.  At trial, SA Der-Yeghiayan testified that he had no involvement in that aspect of the investigation.  (1/20/15 Tr. 695-98, ECF No. 202.)[7]

C.    The "Proffer" of Expert Testimony

Finally, Ulbricht's motion includes what is captioned as a "proffer from Andreas M. Antonopoulos regarding his proposed expert testimony."[8]  (Def.'s Br. at 17.)  Curiously, this proffer—which describes what Mr. Antonopoulos "would have testified" about had he been permitted to appear as an expert at trial—is unaccompanied by any request for relief.  The Court construes this portion of Ulbricht's motion as an argument that the Court erred in precluding Mr. Antonopoulos's testimony—particularly after receiving Ms. Lewis's January 31, 2015 letter indicating that Mr. Antonopoulos was traveling and thus was

---

[7] Ulbricht also assets that, "[i]n reopening Mr. Ulbricht's suppression motion, the government should be required to produce any and all pen registers not previously provided to defense counsel, such as any for Mr. Ulbricht's email accounts."  (Def.'s Br. at 17.)  The Court need not address this discovery demand given that there is no basis to reopen the suppression motion.

[8] This proffer was outlined orally for the first time on February 2, 2015, the day that the Government rested.

unavailable to make a full proffer.  This argument ignores the history that underlies the Court's decision to preclude Mr. Antonopoulos's testimony.

Long before trial began, the Government disclosed to the defense the evidence underlying its case-in-chief.  With respect to Bitcoins, the defense knew at the outset that Silk Road transactions occurred in Bitcoins, that the Silk Road servers contained Bitcoin wallets, that Ulbricht's laptop contained its own Bitcoin wallets, and that inside Ulbricht's wallets were over 144,000 Bitcoins, valued at the time of his arrest at approximately $18 million.  At that point, the defense had at its disposal all the information necessary to make a decision as to whether to call an expert on Bitcoins at trial.

In his opening statement, defense counsel referred to Bitcoins and the "Bitcoin market," and suggested to the jury that the $18 million in Bitcoins found on Ulbricht's laptop had nothing to do with Silk Road—that Ulbricht had earned this money through Bitcoin trading.  (1/13/15 Tr. 67:13-20, ECF No. 196.)  This statement logically leads to the following: (1) defendant had some evidence to support this theory already—in the form of an expert who analyzed the various Bitcoin wallets, as a leading possibility, and (2) after defendant affirmatively opened the door, it was reasonable to expect that the Government would respond to this theory in its case-in-chief (indeed, not to do so would have been irresponsible).

On January 14, 2015, the second day of trial, the Court inquired as to defense counsel's intention to call expert witnesses.  Counsel indicated that it was too early to tell, and the Government previewed that it would move to preclude any experts

unless it received the requisite notice.  Defense counsel responded that it would provide such notice "at the earliest possible rather than at the latest."  (1/14/15 Tr. 125:14-15, ECF No. 198.)

No such notice was provided for the next twelve days.  As the trial unfolded, it became increasingly clear that counsel did not want to show the defense's hand, and that his strategy was to use the Government's witnesses as his own—often through cross-examinations that went beyond the scope of the direct.

On January 26, 2015—well into the trial—the defense disclosed to the Government its intention to call Mr. Antonopoulos as an expert witness on Bitcoins. The defense's disclosure letter recited Rule 16, listed eight general subjects as to which Mr. Antonopoulos would testify, and attached Mr. Antonopoulos's curriculum vitae.  (ECF No. 165-1.)  Lacking were any expected opinions or the bases therefor, any description of analysis or methodology, and any indication that Mr. Antonopoulos has the requisite expertise.  On January 29, 2015, the Government indicated on the record that it would move to preclude Mr. Antonopoulos's testimony.  At that time, the Court requested that defense counsel provide notice to the Court immediately upon receiving the Government's motion to preclude as to when he would respond to that motion.  January 29, 2015 was a Thursday; the Government indicated that it would rest on Monday, the next trial day.

The Government promptly filed its motion to preclude after the day's proceedings on January 29, 2015, yet the Court did not hear from defense counsel that evening or the following day.  On January 31, 2015—after the Court issued an

23

order requiring the defense to respond by 2:00 p.m. that day—Ms. Lewis indicated that Mr. Antonopoulos was traveling and that religious observance prevented Mr. Dratel from complying with the court's order.  The Court then set 8:00 p.m. as the deadline to file any opposition to the Government's motion to preclude.  Shortly after that deadline, the defense filed an opposition which further set forth Mr. Antonopoulos's testimony without in fact disclosing any analysis or methodology underlying that testimony.  On February 1, 2015, the Court issued an Opinion & Order precluding Mr. Antonopoulos's testimony on the basis of the defense's plainly untimely and inadequate Rule 16 notice and the Court's inability—based on the deficient disclosures before it—to assess Mr. Antonopoulos's qualifications and the relevance and reliability of his testimony.[9]  (ECF No. 173.)

The Court's decision was amply supported.  Defense counsel had failed to timely comply with the appropriate disclosure requirements, and that failure was a tactical choice—not an oversight.  The potential utility of a defense expert on Bitcoins—particularly one who would testify as to the Bitcoins found on Ulbricht's laptop—was known very early in the case.  Defense counsel understood at the outset—upon receiving the discovery in this case—that Bitcoins were an important aspect of Silk Road, and that the origin of the Bitcoins on Ulbricht's laptop was an important issue in this case.  Indeed, defense counsel opened on a theory that Ulbricht had earned the Bitcoins through Bitcoin trading.  Nonetheless, counsel chose not to disclose his intention to call an expert witness on Bitcoins until two

---

[9] For similar reasons, the Court also precluded the testimony of another proposed defense expert, Steven Bellovin.  Defense counsel has not argued that the Court erred in precluding Mr. Bellovin's testimony.

24

weeks into the trial, and even then utterly failed to comply with the requirements of Rule 16 as to the content of the disclosure.  Counsel cannot undo this tactical choice now by offering a belated "proffer" of Mr. Antonopoulos's testimony.

V.   CONCLUSION

For the reasons set forth above, Ulbricht's motion for a new trial is DENIED. The Clerk of Court is directed to terminate the motion at ECF No. 222.

SO ORDERED.

Dated:   New York, New York
         April 27, 2015

_____
KATHERINE B. FORREST
United States District Judge



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

April 28, 2015

<u>By ECF</u>

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re:    *United States v. Ross William Ulbricht*, 14 Cr. 68 (KBF)

Dear Judge Forrest:

The Government writes in response to the defense counsel's letter, dated April 24, 2015, requesting an adjournment of sentencing, which is currently scheduled for May 15, 2015.  The Government does not object to a brief adjournment of sentencing to the extent it is based on defense counsel's representation that, due to competing demands on his schedule, he has not had sufficient time to prepare for sentencing, including reviewing and investigating certain materials produced by the Government in advance of sentencing concerning certain overdose deaths.  However, to the extent that the defendant is requesting a *Fatico* hearing concerning these overdose deaths, the Government submits that the defendant is not entitled to such a hearing.

On March 16, 2015, the Government produced to the Probation Office, as well as to the defense, materials related to three overdose deaths, including evidence that they were caused by drugs purchased from Silk Road.  On April 17, 2015, the Government produced to the Probation Office and the defense materials recently received from a foreign government, related to three additional overdose deaths linked to Silk Road.  The type and quantity of evidentiary materials vary somewhat from case to case (based on the availability of certain evidence, and the limits of what was provided by foreign authorities), but they include autopsy and toxicology reports, witness statements, and Silk Road transactional and private message data.  In addition, the Government in the process of producing to the defendant and the Court the five victim impact statements which it has received, which includes statements from the two individuals who intend to address the Court at sentencing.

The Court is fully entitled to rely on such materials at sentencing in assessing the consequences of the defendant's conduct and the seriousness of his offense – without the need for any hearing or extensive factual inquest.  A "district court is not required, by either the Due Process Clause or the federal Sentencing Guidelines, to hold a full-blown evidentiary hearing in resolving sentencing disputes.  All that is required is that the court afford the defendant some opportunity to

rebut the Government's allegations." *United States v. Phillips*, 431 F.3d 86, 93 (2d Cir. 2005). Indeed, a sentencing court's discretion is "largely unlimited either as to the kind of information [it] may consider, or the source from which it may come." *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir.1989); *see also United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005) ("Both the Supreme Court and this Court . . . have consistently held that the right of confrontation does not apply to the sentencing context and does not prohibit the consideration of hearsay testimony in sentencing proceedings."); *Williams v. Oklahoma*, 358 U.S. 576, 584, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959) ("[O]nce the guilt of the accused has been properly established, the sentencing judge, in determining the kind and extent of punishment to be imposed, is not restricted to evidence derived from the examination and cross-examination of witnesses in open court . . . .").

Moreover, the evidence of the overdose deaths in question is not being offered in support of any enhancements under the Sentencing Guidelines that would require a specific factual determination by the Court. *See, e.g., United States v. Wahl*, 563 Fed. Appx. 45, 53 (2d Cir. 2014) (district court did not abuse discretion in denying *Fatico* hearing where controversy concerning loss amount would not impact total offense level under the Guidelines). The evidence is instead simply being offered to illustrate the obvious: that drugs can cause serious harm, including death, particularly when distributed in the massive quantities they were here. The Court could take judicial notice of that fact; the Government does not need to affirmatively prove it. The Government simply intends to highlight a selection of overdose deaths at sentencing in order to provide specific examples of the harm caused by drug trafficking in the context of this case. But the Court does not need to rely on any particular overdose death in order to find that the defendant's conduct entailed these plainly foreseeable risks.

In short, the Government does not oppose a brief adjournment of sentencing to the extent that the defense needs more time to prepare. However, to the extent the defense's request is made in anticipation of pursuing a *Fatico* hearing concerning overdose deaths linked to Silk Road, the defense is not entitled to such a hearing. The Court may instead consider the evidence of the deaths presented by the Government and draw whatever conclusions it deems warranted under 18 U.S.C. § 3553(a).

Respectfully,

PREET BHARARA
United States Attorney

By: _____
SERRIN TURNER
TIMOTHY T. HOWARD
Assistant United States Attorneys
Southern District of New York

cc:    Joshua Dratel, Esq. (by electronic mail)

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

A PROFESSIONAL CORPORATION

29 B R O A D W A Y

Suite 1412

NEW YORK, NEW YORK  10006

---

TELEPHONE (212) 732-0707

FACSIMILE (212) 571-3792

E-MAIL: JDratel@JoshuaDratel.com

<table>
<tr><td>JOSHUA L. DRATEL</td><td>STEVEN WRIGHT</td></tr>
<tr><td>—</td><td><i>Office Manager</i></td></tr>
<tr><td>LINDSAY A. LEWIS</td><td></td></tr>
<tr><td>WHITNEY G. SCHLIMBACH</td><td></td></tr>
</table>

May 15, 2015

**BY ECF**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

          Re:     *United States v. Ross Ulbricht*,
                   14 Cr. 68 (KBF)

Dear Judge Forrest:

      This letter is submitted on behalf of, and in connection with, the sentencing of defendant Ross Ulbricht, and provides to the Court, as directed in its April 28, 2015, Order endorsement, the "matters as to which the hearing is requested . . . [and] any evidence in support of his position and a list of witnesses" related to the hearing sought by Mr. Ulbricht pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978).

      While this letter identifies witnesses who would testify at such a hearing, and provides the supporting evidence, upon preparing these materials the defense believes that this letter and supporting materials, including the Declaration of Lindsay A. Lewis, Esq., and the Exhibits thereto, are sufficient, and that an evidentiary hearing is not necessary, thus Mr. Ulbricht will rely on the papers and oral presentation by counsel at sentencing.

      The reasons for that conclusion are (1)  the witnesses would simply be repeating in their testimony what they have included in their Declarations (that constitute Exhibits to Ms. Lewis's Declaration);  (2)  the logistics of producing the witnesses – who are located across the globe – for a hearing next Friday that in some instances conflicts with their pre-existing schedules are impracticable, unwieldy, and inordinately costly.  Also, the government's position has been that while written submissions are appropriate, an evidentiary hearing is not necessary.  This

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 2 of 13

approach obviates the need to resolve that issue.

As a result, this letter will address two issues made relevant by the government's reliance, in the context of sentencing, on six deaths it attributes to each deceased's alleged purchase of drugs from vendors on the Silk Road web site:

(1)     in contrast to the government's portrayal of the Silk Road web site as a more dangerous version of a traditional drug marketplace, in fact the Silk Road web site was in many respects the most responsible such marketplace in history, and consciously and deliberately included recognized harm reduction measures, including access to physician counseling.  In addition, transactions on the Silk Road web site were significantly safer than traditional illegal drug purchases, and included quality control and accountability features that made purchasers substantially safer than they were when purchasing drugs in a conventional manner;  and

(2)     to the extent the six deaths are relevant at all to Mr. Ulbricht's sentencing – there being no allegation that he or any vendor ever intended the death of a purchaser, or that any of the drugs sold were adulterated or of a purity that was dangerous – the information provided by the government, and reviewed by the defense expert, Mark L. Taff, M.D., a Board-certified forensic pathologist, is utterly insufficient to attribute any of the deaths to drugs purchased from vendors on the Silk Road site.  Due Process protects Mr. Ulbricht from being sentenced on the basis of speculation, and the information provided by the government – in tandem with the information that is missing with respect to the six deaths – does not rise above that level.

Accordingly, for the reasons set forth below and in the supporting materials and exhibits, it is respectfully submitted that the six deaths should not contribute in any manner to consideration of Mr. Ulbricht's sentence.

**I.      *The Silk Road Web Site Instituted Unprecedented Harm Reduction and Quality Control Measures That Made the Purchase of Drugs from Vendors On the Site Far Safer Than Traditional "Street" Drug Transactions***

The findings by the academics and researchers, who have studied the Silk Road web site (and other on-line drug marketplaces) and subjected it to rigorous and accepted social science research protocols, demonstrate that the Silk Road web site in many respects represented a far safer environment for drug purchasing and even use, and constituted a more evolved, better-informed drug-using (or even abusing) community than any previously observed in the "street"

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 3 of 13

or elsewhere.

The Silk Road web site provided features, including physician counseling, ratings of vendors, and improved accountability and transparency, as well, conversely, an anonymous forum in which drug users and abusers could be candid about their drug use and abuse, and seek advice not only about drug use, but also about drug safety, use reduction, and even ceasing such activity altogether.

For example, as set forth in the accompanying affidavit of Tim Bingham (attached as Exhibit 11 to the Declaration of Lindsay A. Lewis, Esq.), who has worked for over 20 years in the field of addiction and mental health, and between September 2012 and August 2013 conducted research both on and surrounding the Silk Road web site regarding the user experiences of vendors and consumers on the site, which research has formed the basis for three published research papers on that topic, the cyber community on the Silk Road website fostered a "'nested support system[]' which in turn fuelled information sourcing and exchange, user connectivity, identification of trusted and reliable sourcing routes, and mutual user supports." *See* Bingham Aff., at ¶6.c.

Indeed, in interviewing site participants – who Mr. Bingham noted were not first-time users, *see* Bingham Aff., at ¶6.f. ("I did not encounter a single customer whose first drug purchase was on the Silk Road website") but instead exhibited drug use trajectories ranging from 18 months to 25 years – Mr. Bingham found that

> comments centered around a perceived sense of "belonging" in the Silk Road community.  This occurred irrespective of whether members were purchasing or only accessing the forums.  Thus, risks and harms traditionally posed by illicit open and closed drug markets were replaced by insular online communities interacting within Silk Road's built in quality of information exchange, where protected by screen pseudonyms and anonymity, members could converse freely about their drug use.  In this way Silk Road as novel technological drug subculture, potentially minimized drug-related stigma by reinforcing as sense of community[.]

*Id*., at ¶ 6.1.

Mr. Bingham also found that "along these same lines, forum postings also included member support for those requiring assistance in quitting their drug habit."  *Id*., at ¶ 6.m.  Thus, Mr. Bingham concluded, based on his study of multiple users, that "Silk Road forums . . . appeared to act as an information mechanism for the promotion of safer and more acceptable or

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 4 of 13

responsible forms of recreational drug use" and "Silk Road's member subcultures offered a viable means of enmeshing safer drug use and encouraging harm reduction amongst a very hard to reach and informed drug-using population." *Id.*, at ¶ 6.n.

The harm reduction ethos on Silk Road also extended to the vendor population, which Mr. Bingham found "from a vending perspective . . . centered on informed consumerism and responsible vending by availability of high quality products with low risk for contamination, vendor-tested products, trip reporting and feedback on the vending infrastructure. *Id.*, at ¶ 6.p.

Dr. Fernando Caudevilla, a Spanish physician specializing in drugs and addiction, who provided expert advice on drug use and abuse to Silk Road users on the site under the username "Doctor X," and has submitted an affidavit, attached to the Declaration of Lindsay A. Lewis, Esq., as Exhibit 12, was also a critical part of the harm reduction ethos of the site. As Dr. Caudevilla affirms in his accompanying affidavit,

> [b]etween April 2013 and late October 2013, [he] sent more than 450 messages to Silk Road users in response to requests for advice and assistance. [He] also spent up to two to three hours a day on the forum during that time frame providing expert advice as to drugs and health. [His] advice ranged from information as to safe dosage and administration of particular drugs as well as the risks attendant to the use of certain drugs, information as to where to find reliable and credible information about various substances on the internet, proper methods of drug administration, adverse effects, pharmacological interactions, advice as to whether particular combinations of drugs (both legal and illegal) should be avoided, advice as to how to stop use of particular drugs or drugs generally, to general medical and psychiatric advice related to drugs.

*See* Caudevilla Aff., at ¶ 5.

Dr. Caudevilla further explains that his contact with and assistance to Silk Road users was in part possible because "[t]he administrator pf the Silk Road site, Dread Pirate Roberts, was aware of [his] presence on Silk Road and was supportive of [his] role in furthering the harm reduction ethos of the site. *Id.*, at ¶6. Indeed, Dr. Caudevilla notes that he

> provided weekly reports to DPR which documented the topics [he] had discussed in [his forum] thread [entitled "Ask a Drug Expert Physician About Drugs & Health"] during the previous week.. . . .

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 5 of 13

> Dread Pirate Roberts never censored my views or advice in any
> way, even when I espoused views that Silk Road users should not
> use or buy certain drugs sold on the site . . . ., discouraged drug
> use, or helped customers to reduce or cease drug use entirely.

*Id.*, at ¶ 6.

In fact, when the demand for Dr. Caudevilla's advice became a burden because of the
time it consumed in Dr. Caudevilla's day, DPR even offered to pay Dr. Caudevilla $500 a week
to continue to provide advice to site users. *Id.*, at ¶ 7. Around the same time, "Dread Pirate
Roberts also sought to partner with [Dr. Caudevilla] to send the drugs sold on the Silk Road out
to laboratories for independent testing as an effort to ensure that only safe, non-toxic substances
were being sold on Silk Road." *Id.*, at ¶ 8. That effort was halted only by the government's
seizure and discontinuation of the site in October 2013 following Mr. Ulbricht's arrest. *Id.*

As Dr. Caudevilla attests, "as a result of his personal experiences working with customers
on the site, and monitoring the site's drug safety forums," he has

> firsthand knowledge that Silk Road provided site users with the
> tools to take drugs in a safer and more informed manner, espoused
> a harm reduction ethos which was reflected in the individual buyer-
> seller transactions on the site and in the community created on
> the site's forums, and enabled some site participants to actually reduce,
> if not entirely eliminate, their drug use. For example, some heroin
> users were drawn to Silk Road because it provided them access to
> methadone, a drug utilized in many countries, and administered by
> physicians, to enable heroin users to end their addictions. For
> many Silk Road users methadone was illegal or unavailable in their
> home countries. Accordingly, they would likely not have had
> access to the resources necessary to reduce their heroin use without
> the Silk Road.

*Id.*, at ¶ 9.

Tellingly, Dr. Caudevilla also reports that "[i]n his seven months monitoring and actively
participating in the Silk Road forums [he] never came across even a single report of a Silk Road-
related drug overdose." *Id.*, at ¶ 10. To the contrary, "on several occasions, when users provided
negative feedback about the drugs sold by a particular vendor, that vendor or the drug in question
was removed from the site" – a decision he believed "was made by the site's administrators. "
*Id.*

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 6 of 13

In analyzing the various motivations, however, for use of the Silk Road site to purchase drugs, the member forums, professional medical advice and assistance and community of Silk Road were certainly factors, but so was the contrast between the user experience of buying drugs on Silk Road versus far more dangerous and unpredictable "street-level" transactions and drug purchases, according to Mr. Bingham's research and also research conducted by Dr. Monica Barratt, who authored a research report along with co-authors Jason A. Ferris and Adam R. Winstock, entitled "Use of Silk Road, the online drug marketplace, in the United Kingdom, Australia and the United States," (*Addiction* (2013) 109, at 774-783), and which represents the first large scale survey to characterize buyers on the Silk Road.  *See* Affidavit of Dr. Monica Barratt, attached as Exhibit 13 to the Declaration of Lindsay A. Lewis.

As Mr. Bingham explains in his affidavit

> participant reasons for accessing and using Silk Road appeared centered on the site's anonymity, its member forums, the wide variety of products advertised, its transaction system supported by the dispute resolution modes and vendor feedback ratings [but] [u]sers also expressed concern for poor drug quality in their locality and fears for personal safety when buying drugs in the street.  Observational site data further revealed member comments around the avoidance of adverse health and social consequences associated with street drug sourcing when purchasing drugs on Silk Road; . . . those participants with purchasing experience on the Silk Road commented on the perceived levels of insular trust within the Silk Road member communities, which assisted them in consumer decision-making and openly contrasted with the unknowns associated with street drug-dealing.  For instance, according to one Silk Road customer who had stopped purchasing drugs elsewhere, "[t]his type of market significantly lowers the chances of a scam or buying contaminated products.  Like Amazon or eBay, I have a market of sellers to choose from and product reviews to satisfy my own requirements before I purchase.  A street market in comparison is based on a 'take it or leave it' approach which gives no rights to a buyer.  This form of regulation ensures safety and harm reduction for the buyer[.]"

*See* Bingham Aff., at ¶ 6.h.-6.i.

Likewise, as memorialized by Dr. Barratt in her research paper based on the findings of

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 7 of 13

the survey she conducted of Silk Road buyers in the United States, Australia and the United
Kingdom, and as set forth in her accompanying affidavit,

> [s]urvey respondents who had purchased drugs from Silk Road
> were asked to pinpoint their reasons for consuming drugs
> purchased on Silk Road from a list of eight possible reasons.
> Respondents across all three countries indicated that among their
> top four reasons for consuming drugs purchased on Silk Road
> were:  (1)  the drugs were of better quality than the drugs they
> could normally access, and (2)  they were more comfortable buying
> from sellers with high ratings.

Dr. Barratt Aff., at ¶ 7.

        The views of Meghan Ralston, whom, until today was the director of harm reduction for
the Drug Policy Alliance, described in its web site as "the nation's leading organization
promoting drug policies that are grounded in science, compassion, health and human rights," also
align with the position that Silk Road was unique amongst drug markets because it "created a
safe environment, free of weapons and violence during the transaction, where people could
acquire drugs."  *See* Affidavit of Meghan Ralston, attached to the Declaration of Lindsay A.
Lewis, Esq., as Exhibit 14, at ¶ 5.c.  As Ms. Ralston explained,

> [m]any reformers, myself included, have long been highlighting the
> forward-thinking benefits of Silk Road and the ways it began to
> slowly revolutionize drug sales around the world. For instance, it
> provided a platform that could allow indigenous growers and
> cultivators around the world to sell directly to the consumer,
> potentially reducing cartel participation and violence[.] . . .
> [A]ccordingly, using Silk Road could be seen as a more
> responsible approach to drug sales, a peaceable alterative to the
> often deadly violence so commonly associated with the drug war,
> and street drug transactions, in particular.  None of the transactions
> on Silk Road, for instance, resulted in women drug buyers being
> sexually assaulted or forced to trade sex for drugs, as is common in
> street-level drug transactions. Nor did any Silk Road transactions
> result in anyone having a gun pulled on them at the moment of
> purchase, also a common danger present in street-level drug
> transactions[.] . . .[M]oreover, even with all the hurdles and the
> risks, people chose to use Silk Road rather than rely exclusively on
> whatever illegal and potentially dangerous drug market existed in

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 8 of 13

> their 'real world' community. The site's success reinforced that
> people who are dependent or addicted can make rational choices,
> even if we like to imagine them as being totally irrational. Given
> the choice of quickly and easily accessing drugs in potentially
> sketchy or dangerous neighborhoods, or buying them safely on-line
> but having to wait, many users preferred privacy, security and a
> wait to the alternative[.]

*Id*., at 5.c.-5.e.

Collectively, these accounts by researchers, academics and doctors deeply familiar with
the Silk Road site and the state of drug use and abuse worldwide, provide a more accurate,
multifaceted portrayal of Silk Road – based on research and study – that is quite different than
the one-dimensional characterization the government advances.  Silk Road, like any social or
economic experiment, evolved, but it is undisputed that its operator(s) endeavored to incorporate
harm reduction measures as well as the resources for drug users and abusers to become better
informed, better protected, and, ultimately, *former* users if they so wished.

Indeed, the distinction between Silk Road and traditional drug selling is as dramatic as it
is unique.  Traditional drug sellers do not offer counseling, much less by a physician who is
empowered, without interference, to guide a user to abstinence.  Traditional drug sellers do not
provide forums for their customers to rate vendors, share experiences, ensure quality control and
reliability.  Traditional drug-selling operations do not afford customers an environment in which
they can anonymously and, as a result, candidly, absent stigma and fear, discuss their drug use
and abuse, its impact on their lives, and acquire the skills and perspective to reduce their use or
even quit altogether.

Confronted as a society with the reality of continuing drug use and abuse, and the
continuing U.S. consumer demand that perpetuates the illegal drug industry (and in many
respects the legal drug industry as well), Silk Road represented – in large part, as demonstrated
above, by design and deliberate practice – the safest incarnation of a drug marketplace to date,
made possible by its protected internet status on TOR and its use of Bitcoin for payment, and
which was the most likely to encourage users to examine their own conduct, and seek assistance
in reducing their use/abuse and stop abusing drugs before it irreparably damaged their lives.

## II.    *For Legal, Factual, and Forensic Reasons, the Six Deaths Cited By the Government Cannot Be Attributed to Purchases Made from Vendors on the Silk Road Web Site*

As detailed in the accompanying Declaration of Lindsay A. Lewis, Esq., at ¶¶ 3-37, Dr.
Taff's preliminary findings, which will be converted to a formal report, establish that the records

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 9 of 13

provided by the government – in conjunction with the records and information that are absent from that production – are insufficient to attribute any of the six deaths to drugs purchased from vendors on the Silk Road site.

As explained by Dr. Taff is his preliminary impressions and findings, the evidence presented by the government in discovery reveals gaping holes in each death investigation which would prevent Dr. Taff, or any medical examiner or forensic pathologist, including those who conducted the actual death investigations in these cases – given Dr. Taff's assessment of a proper death investigation, as set forth in ¶ 10-11 of the Lewis Aff.– from forming opinions to a reasonable degree of medical certainty as to the cause, manner, and time of death.  Indeed, for many of the deaths, the most basic of forensic documents including autopsy reports, toxicology reports and death certificates, were notably absent.

What is, however, clear from the limited discovery as to the six alleged overdose deaths is the following:

- each and every decedent had a history of chronic substance abuse as well as medical and psychiatric problems prior to death which could have caused or contributed to their death. For instance, Dr. Taff concluded that Jordan Mettee, a overweight 27-year old black man alleged to have died as a result of drugs purchased on Silk Road, may have suffered an acute brain hemorrhage consistent with a stroke, which could have been a competent cause of death and was consistent with a pre-existing condition.  *See* Lewis Aff., at ¶ 22. Jacob Lyon Green, another individual alleged to have overdosed on drugs purchased on Silk Road, had recently suffered from bronchitis and been admitted to the hospital for complications related to that condition just prior to death (and been discharged), and in fact his cause of death was found by the medical examiner in that case to be "aspiration pneumonia."  *See* Lewis Aff., at ¶ 15;

- many of the decedents sought out and ingested multiple legal and illegal drugs prior to death.  The synergism of multiple drugs, taken in varying amounts, via different routes of administration (*i.e.,* inhalation, ingestion, injection), at different times, in individuals with varying levels of drug tolerance leaves too many variables and unknowns to conclude that a particular drug caused death;

- when interpreting drug test results, physicians cannot selectively ignore one or more drugs from the drugs contributing to death in order to single out the one the government would like to be able to conclude caused death; and

- it is simply impossible for the government to prove that drugs obtained *from Silk Road* "caused" death, and in certain cases, the government cannot even establish to any degree

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 10 of 13

of certainty that *any* of the drugs ingested came from Silk Road.  Indeed, among the many unsatisfied discovery demands made of the government after their initial discovery productions was a request for "the underlying information used to create the Silk Road user summaries contained in the discovery as to Jacob Scott Lyon-Green and Scott Christopher Wilsdon, as well as any information as to who prepared the summaries, and when they were prepared."   These summaries were the only alleged evidence that drugs taken by Lyon-Green or Wilsdon were obtained from Silk Road.

Accordingly, the information provided by the government is inadequate to establish that the six deaths are attributable to drugs purchased from Silk Road vendors.

**A.**     *The Six Deaths Are Not Relevant to Mr. Ulbricht's Sentencing At All*

Another dispositive impediment to consideration of the six deaths in the context of Mr. Ulbricht's sentencing is that the information provided by the government does not sufficiently establish *as a matter of law* that the six deaths detailed below resulted from the offense conduct in this case.  Absent the appropriate evidence of causation, the deaths are not relevant to sentencing.

However, the extent or degree of causation required to conclude that death or injury was the "result" of the offense conduct has not been clearly or consistently addressed in the Second Circuit, as most cases which enhancements or upward departures are sought on the basis of uncharged injury or death, present fairly straightforward links between cause and effect.[1]

**1.**     *Proximate Causation Is Required*

When causation is not immediate and direct, the general rule is that conduct must be a proximate cause of injury in order to give rise to liability.  *See United States v. Guillette*, 547 F.2d 743, 749 (2d Cir.1976) (if defendant's conduct is not the "immediate" cause of injury or death, criminal liability is imposed only when "intervening events are foreseeable and naturally

---

[1]  For example, in *United States v. Russow*, 2015 WL 1057513, at *3 (D. Conn. Mar. 10, 2015), which addressed an upward departure pursuant to §5K2.1, the Court quickly dispensed with the causation issue because the evidence demonstrated that the heroin the victim bought from the defendant on the day the victim died was almost certainly the heroin injected hours before the victim was found dead from acute heroin toxicity.   *United States v. Russow*, 2015 WL 1057513, at *3 (D. Conn. Mar. 10, 2015);   *see also United States v. Reis*, 369 F.3d 143 (2d Cir. 2004) (Court affirmed upward departure under §5K2.1 when defendant accidentally strangled underage victim during sexual intercourse).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 11 of 13

result from . . . [the] criminal conduct").

In the criminal context, proximate cause has been defined as requiring "some direct relation between the injury asserted and the injurious conduct alleged," which cannot be "too remote," "purely contingent," or "indirec[t]." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9, 130 S. Ct. 983, 989, 175 L. Ed. 2d 943 (2010) (defining proximate cause in the RICO context), *quoting Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 268-274 (1992).

Whether the conduct is too attenuated from the injury is determined by the foreseeability of events that occur between the conduct and the injury. For instance, in the context of a health care fraud prosecution, the Sixth Circuit described intervening acts which would not break the chain of causality in a proximate cause analysis as acts or events that "involve[] reaction to the conditions created by the defendant." *United States v. Martinez*, 588 F.3d 301, 321 (6th Cir. 2009); *see also United States v. Harris*, 701 F.2d 1095, 1102 (4th Cir. 1983) (although victim, who was already ill, died from heat stroke, proximate cause was established because defendants, whose convictions stemmed from charges of involuntary servitude, were aware of the victim's illness and forced him to work anyway).

As the Court explained in *Martinez*, "the perimeters of legal cause are more closely drawn when the intervening cause was a matter of coincidence rather than response," and consequently, "an unforeseeable coincidence will break the chain of legal cause" and "a response" will do so "if it is abnormal." 588 F.3d at 321.

### 2. *"But-For" Causality, As Established By the Supreme Court In* Burrage v. United States

The recent Supreme Court decision in *Burrage v. United States*, analyzed the section of 21 U.S.C. §841(b)(1)(C), which permits an enhanced sentence when death "results from" the offense conduct, and its holding significantly narrows the doctrine of causation. *Burrage v. United States*, 134 S.Ct. 881 (2014). Although the government does not seek the specific enhancement contained in the Controlled Substances Act section, the principles of causation set forth in the *Burrage* opinion apply because the government seeks to introduce evidence of death or serious injury alleged to be a result of the defendant's offense conduct, and drug-trafficking in particular. *Burrage*, 134 S.Ct. at 887-91.

Prior to the decision in *Burrage*, facts used to establish what had been, prior to *United States v. Booker*, 543 U.S. 220 (2005), the sentencing enhancement in §841(b)(1)(C) needed to be proven only by a preponderance of the evidence, as is the case generally with respect to demonstrating uncharged conduct at sentencing. *See e.g. United States v. Chevalier*, 776 F.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 12 of 13

Supp. 853, 860 (D. Vt. 1991), *citing United States v. Madkour*, 930 F.2d 234, 237 (2d Cir.1991). However, before the Supreme Court specified a causality standard in *Burrage*, courts rarely, if ever, specified with any clarity or consistency the extent to which a victim's death or injury must be caused by the defendant's offense conduct.

After addressing the common meaning of "results from," the Supreme Court noted the various legal contexts in which language similar to that contained in §841(b)(1)(C), is read to require "but-for causality." *Id.*, at 887-88. The Supreme Court defined "but-for causality" as requiring evidence that the use of the drug distributed by the defendant was "an *independently* sufficient cause of the victim's death or serious bodily injury." *Id.*, at 892 (emphasis added).

In *Burrage*, the Court held that standard had not been met because although two expert witnesses agreed that the heroin sold by the defendant was a "contributing factor" in the victim's overdose death, neither was able to opine that the victim would not have died absent the heroin use. *Id.*, at 885-86; *see e.g. United States v. Hoey*, 2014 WL 2998523, at *4 (S.D.N.Y. July 2, 2014) (adopting the causality standard set forth in *Burrage*).

In affirming the "but-for" standard, the Supreme Court rejected the government's argument that the "distinctive problems associated with drug overdoses," primarily that overdoses very often involve the use of more than one drug, support a broader definition of causality. *Burrage*, 134 S.Ct. at 889-90. Again pointing to the traditional interpretation of language similar to that contained in §841(b)(1)(C), the Court in *Burrage* concluded that Congress made a conscious decision to limit the possibility of an enhanced sentence to those situations in which the drug distributed by the defendant was the "but-for" cause of the victim's death or injury. *Id.*, at 891.

While here the government did not include a charge under §841(b)(1)(C), any evidence of overdose deaths must still be satisfactorily connected to a defendant's conduct in order to serve the goals of punishment, particularly deterrence. The concerns and issues raised in *Burrage*, and which compelled the Supreme Court to conclude but-for causality was the appropriate standard, are equally applicable here.

As detailed **ante**, in the discussion of Dr. Taff's review of the information provided by the government, here the government has not met the requisite standard of causation with respect to *any* of the six deaths it attributes to drugs sold by vendors on the Silk Road site, and in turn to Mr. Ulbricht. In fact, in not a single instance is there proof that drugs distributed via Silk Road constituted "an *independently* sufficient cause of the victim's death or serious bodily injury." *Burrage*, 134 S.Ct. at 892.(emphasis added).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 13 of 13

### 2. *There Was No Intent to Sell "Bad" Drugs on the Silk Road Web Site*

Indeed, it is quite clear from the harm reduction analysis set forth above that the Silk Road web site, espoused an ethos of drug safety and education that was more sophisticated and evolved than anything else in existence at the time. Likewise, on the whole, the vendors of drugs on the site were some of the most well- informed, careful, and accountable drug sellers in the drug trade. In fact, as set forth **ante**, "when users provided negative feedback about the drugs sold by a particular vendor, that vendor or the drug in question was removed from the site" – a decision Dr. Caudevilla believed "was made by the site's administrators." *See* Dr. Caudevilla Aff., at ¶ 10. Thus, it is quite clear that there was never an intent by anyone associated with the Silk Road site to sell "bad" drugs. In fact, to the contrary, the site was known for selling drugs of higher, safer quality than available in ordinary "street" encounters.

### 3. *It is Not Alleged that Any of the Drugs Sold On Silk Road Were Adulterated or Were Too Pure to Be Found Safe*

Nor is there any evidence that any of the drugs sold on Silk Road were adulterated in any manner or too pure to be considered safe. In fact, as Dr. Taff explained in his preliminary findings, there were a multitude of *other* factors, such as lethal combinations of drugs, pre-existing medical and psychiatric conditions, and administration of and quantity of drugs that likely caused or contributed to cause of death in the six cases presented by the government.

### Conclusion

Accordingly, for all the reasons set forth above and in the supporting documents and materials, it is respectfully submitted that the six deaths cited by the government should not be considered in connection with Mr. Ulbricht's sentencing.

Respectfully submitted,

Joshua L. Dratel

JLD/lal

cc:   Serrin Turner
      Timothy T. Howard
      Assistant United States Attorneys

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA  :  14 Cr. 68 (KBF)

   - against -   :  **DECLARATION OF**
            **LINDSAY A. LEWIS, ESQ.**
ROSS ULBRICHT,    :  **IN SUPPORT OF DEFENDANT**
            **ROSS ULBRICHT'S PRE-**
      Defendant. :  <u>**SENTENCING SUBMISSION**</u>
-----------------------------------------------------X

   Lindsay A. Lewis, Esq., pursuant to 28 U.S.C. §1746, hereby affirms under penalty of

perjury:

   1.  I am an attorney, and I represent defendant Ross Ulbricht in the above-captioned case.

I make this Declaration in support of Mr. Ulbricht's pre-sentencing evidentiary submission in

relation to the *Fatico* hearing presently scheduled for next Friday, May 22, 2015, at 9 a.m.[1]

**I.**  ***Evidence in Support of Mr. Ulbricht's Position***

   2.  Attached as Exhibits to this Declaration, and responsive to the Court's request for

evidence in support of his position, are the following:

     (a)  article written by Hout, M.C.V., & Bingham, T., entitled "'Silk Road,' The

         Virtual Drug Marketplace: A Single Case Study of User Experiences,"

         attached as Exhibit 1;

     (b)  article written by Hout, M.C.V., & Bingham, T., entitled "'Surfing the Silk

         Road:' A Study of Users Experiences," attached as Exhibit 2;

---

  [1]  As noted in the accompanying letter from Joshua L. Dratel, Esq., the defense is no
longer requesting an evidentiary hearing but instead will rely on the written submissions
provided herewith.

(c)     article written by Hout, M.C.V., & Bingham, T., entitled "Responsible
        Vendors, Intelligent Consumers: Silk Road, the Online Revolution in Drug
        Trading," attached as Exhibit 3;

(d)     thread in the Silk Road drug safety forum started by Dr. Fernando
        Caudevilla, entitled "Ask a Drug Expert Physician About Drugs &
        Health," attached as Exhibit 4;

(e)     Private Messages from Dr. Caudevilla to Silk Road Users, attached as
        Exhibit 5;

(f)     weekly report from Dr. Caudevilla to DPR documenting topics discussed
        in his thread during the week of September 13, 2013 through September
        19, 2013, attached as Exhibit 6;

(g)     Private Messages Between Dr. X and Dread Pirate Roberts, attached as
        Exhibit 7;

(h)     research report by Dr. Monica J. Barrett, Jason A.Ferris and Adam R.
        Winstock, entitled "Use of Silk Road, the online drug marketplace, in the
        United Kingdom, Australia and the United States," attached as Exhibit 8;

(i)     article written by Meghan Ralston, entitled "The End of the Silk Road:
        Will Shutting Down the 'e-Bay for Drugs' Cause More Harm Than
        Good?" attached as Exhibit 9;

(j)     article written by Meghan Ralston, entitled "Silk Road Was a Better, Safer
        Way to Buy and Sell Drugs." attached as Exhibit 10;

(k)     declaration of Tim Bingham, attached as Exhibit 11;

2

(l)     declaration of Dr. Fernando Caudevilla, attached as Exhibit 12;

(m)     declaration of Dr. Monica J. Barratt, attached as Exhibit 13;

(n)     declaration of Meghan Ralston, attached as Exhibit 14;

(o)     curriculum vitae of Dr. Mark L. Taff, attached as Exhibit 15; and,

(p)     documentary evidence reviewed by Dr. Taff, attached as Exhibit 16.[2]

## II.     *Dr. Mark Taff's Preliminary Assessment of the Alleged Overdose Deaths*

3.  Also responsive to the Court's request for evidence in support of Mr. Ulbricht's

position, is the following account of the preliminary impressions and findings of Dr. Mark

L.Taff, whom the defense has retained in his capacity as a Board-certified forensic pathologist

and consultant, *see* Taff Curriculum Vitae (Exhibit 15), to review and analyze a selection of

documentary evidence (*see* Exhibit 16) provided to Mr. Ulbricht by the government (following

conclusion of trial) in regard to six alleged overdose deaths it claims were the result of drugs

purchased on the Silk Road web site.

4.  Due to necessarily expedited nature of Dr. Taff's review of the materials in light of the

May 15, 2015, deadline for the submission of evidence in support of Mr. Ulbricht's position, and

his other professional commitments, Dr. Taff has provided preliminary findings that are set forth

herein.  His formal report will be produced to the Court and the government before next Friday,

May 22, 2015.

---

[2]  The lion's share of these exhibits will be posted to ECF, with the exception of Exhibit 16 (the documentary evidence provided to Dr. Taff as to the various overdose deaths) which, in order to maintain the privacy of the decedents, will only be provided to the Court.  In the public filing, Exhibit 16 will be replaced by a list of the documentary evidence provided to him.   In addition, a disk containing all of the exhibits to this Declaration will be provided to the Court on Monday, May 18, 2015, in lieu of submission of exhibits by e-mail.

5.  Further findings from Dr. Taff are necessary as well because his preliminary report does not include his observations and conclusions regarding the 59-page coroner's report in regard to the death of Alejandro Nunex Avila, received from the government last night at 7:10 p.m. in an e-mail in which Assistant United States Attorney Serrin Turner wrote the government received the report "recently."

### A.      *Dr. Taff's Credentials and Publications*

6.  Dr. Taff is currently a Forensic Pathologist Consultant, and previously served as Chief Medical Examiner in Rockland County, New York, from 2008 until 2012.  He provides forensic pathology consultancy services to various private and public entities in and outside of New York state, including District Attorneys' Offices in New York and New Jersey, and Legal Aid and Public Defenders' offices throughout the Northeast.

7.  Dr. Taff obtained his medical degree from the University Bologna School of Medicine in 1978, and completed his residency in Pathology in 1984. He is board certified in Forensic and Anatomic Pathology and has medical licensure in New York, Michigan and New Jersey.  In addition to his consulting work, he has been a Clinical Associate Professor of Pathology at the Mt. Sinai School of Medicine since 1990.  He has also held various teaching and lecturing positions at universities and hospitals in New York and Michigan for more than thirty years.

8.  Throughout his career Dr. Taff has been an active member of numerous medical societies and professional organizations, including the New York Academy of Sciences, the Committee on Public Health of the Medical Society of the County of New York, the American Association of Suicidology, and the American Academy of Forensic Sciences.  He was awarded the AMA Physician's Recognition Award early in his career, and founded the New York Society

4

of Forensic Sciences at Lehman College in 1985.  He served as Co-Chairman of the National

Association of Medical Examiner's Inspection & Accreditation Committee and as Vice-President

of the Society of Medical Jurisprudence in 1997.

9.  Dr. Taff's work has been published in a broad range of medical journals, publications,

newspapers, symposium papers, and educational materials, and a comprehensive list of his

published and unpublished work is included in his *curriculum vitae*, attached hereto as Exhibit

15.

**B.**     ***Dr. Taff's Preliminary Analysis of the Alleged Overdose Deaths***

10.  According to Dr. Taff, a medical examiner death investigation is a six-stage process

consisting of (a) history;  (b) scene findings;  (c) autopsy (external and internal/invasive/

surgical exams);  (d) lab tests (including DNA, toxicology, histology, dental, anthropological, x-

rays, and others);  (e) bureaucratic processes *(i.e.*, creation and preservation of the autopsy

report, related test results and communications);  and (f) signing of the death certificate with

opinions regarding the cause, manner and time of death.

11.  The process is conducted in an orderly, sequential manner and all of the steps are

dependent upon one another.  The medical examiner/ forensic pathologist oversees the entire

investigation and is responsible for the integration and interpretation of all the scientific evidence

collected, retained, tested, and analyzed.

12.  With regard to the six deaths from different parts of the world Dr. Taff was asked to

review and analyze, he concluded that each case – based on the documentary evidence provided

by the government, which we in turn provided to Dr. Taff –  lacks information about one or more

of the six stages of a death investigation.  Therefore, Dr. Taff could provide the defense with only

impressions about the gaps in each case.  He was also consequently precluded from forming

opinions to a reasonable degree of medical certainty as to the cause, manner, and time of death.

Having provided that general overview of the deaths as a whole, Dr. Taff then outlined each

death with respect to the history, scene, autopsy, lab (toxicology results) and death certification

(cause, manner, and time of death).

>1.   *Jacob Lyon Green*

13.  As per Dr. Taff's assessment, Mr. Green was a 22-year old male based in Adelaide,

Australia, who suffered from a history of mirtazapine treatment for anxiety and depression,

polydrug abuse, and overdoses in 2010 and 2011.  Without access to Mr. Green's medical and

psychiatric records (which were not provided by the government, despite a request for them in

discovery), it remains unknown to Dr. Taff whether Mr. Green was suicidal.

14.  The autopsy performed by Dr. John G____[3] on February 15, 2015, the day after Mr.

Green was found dead, also revealed old and recent intravenous injection sites in superficial

veins of elbow creases and several portal/abdominal lymph nodes were enlarged, a condition

commonly found amongst intravenous ("I.V.") drug addicts.

15.  Most notably, however, the day before Mr. Green's death he was treated for ringing

ears, difficulty swallowing, nausea and fever after a night of drinking alcohol and taking

amphetamines and heroin.  His white blood cell count was elevated, and he received IV fluids,

anti-heartburn medication, paracetamol for pain relief and as a fever reducer, and ibuprofin for

muscle aches and fever.   Despite having recently completed a course of antibiotics for

---

[3] Dr. Taff used this format in identifying the particular physicians, and this Declaration
conforms with that methodology.

bronchitis, he was discharged from the hospital less than three hours after he was admitted.  Dr. Taff notes that Mr. Green's diagnosis with bronchitis is extremely important with respect to the stated cause of death:  "aspiration pneumonia."

16.  Indeed, according to Dr. Taff, it is unknown whether Dr. John G___, who performed the autopsy, and may or may not be board-certified in forensic pathology, knew that Mr. Green had recently been treated for bronchitis, which could have developed into pneumonia.  It is also unknown whether Dr. G___ had subpoenaed Mr. Green's medical records or reviewed his most recent chest x-rays.  It does not, however, appear that Mr. Green had a chest x-ray before death.

17.  Dr. Taff also identified several other gaps in the death investigation performed by Dr. G___.  The post-mortem drug screen showed low levels of "4 different illicit drugs" (methylamphetamine, heroin, cocaine, and 4-methylmethcathinone) and therapeutic levels of mirtazapine and metoclopramide.  Yet a cause of death due to multiple drug (narcotic, depressants, and stimulants) intoxication complicated by aspiration pneumonia was not entertained.  Dr. Taff considered this to be a very important finding that was completely omitted from the diagnosis.

18.  More importantly even, the manner of death was omitted.  It is unclear whether Mr. Green's death was natural, accident, suicide, undetermined, or homicide.  In this regard, time of death is important because there was not any information regarding when aspiration occurred with respect to a possible drug overdose (by which it would be possible for the synergistic effect of multiple illicit drugs in low doses to work together to kill to Mr. Green).  However, it is common to find some agonal or terminal aspiration in people who are intoxicated at the time of death and miscroscopic exam of the lungs shows "widespread patchy pneumonic consolidation

7

associated with some vegetable material." Such an extensive tissue reaction suggests pneumonia existed *before* agonal aspiration of food while intoxicated.

19. Dr. Taff further concludes that Mr. Green's death might represent some medical malpractice, *i.e.,* failure to diagnose and treat pneumonia/premature hospital discharge. The chronology of events also indicates that Mr. Green's death occurred within a 27½-hour time frame, during which time Mr. Green "self-medicated," and aggravated his pre-existing pneumonia which caused and/or contributed to his death.

### 2.   *Jordan Mettee*

20. As per Dr. Taff's assessment, Jordan Mettee was a 27-year old black male, weighing 260 to 265 pounds, who was found dead August 31, 2013, at approximately 11:06 p.m., at his home, which contained drugs and drug paraphernalia. The file related to his death lacks certificates with the dates and times of onset of injuries and death, and/or a signed death certificate.

21. Dr. Taff notes that Mr. Mettee had an alleged history of multiple drug-related arrests between 1992 and 2001, as well as marijuana, opiate, anti-histamine, alcohol hydrocodone, and anti-pain usage for chronic pain related to a spleen ailment. Accordingly, Dr. Taff concluded that Dr. Timothy W___, the Medical Examiner of Kings County should have subpoenaed Mr. Mettee's past medical and psychiatric records to better understand Mr. Mettee's ante-mortem issues.

22. Importantly, the autopsy performed on Mr. Mettee showed the presence of acute brain hemorrhage (bleeding) consistent with a stroke, which could have been a competent cause of death. Despite the fact that Mr. Mettee was an obese black male who may have suffered from

8

untreated hypertension, a condition that frequently causes strokes, for unknown reasons a stroke was omitted as a cause or contributing factor to his death. According to Dr. Taff, the time of onset of the brain bleed cannot be correlated with times of drug usage. The drugs were probably used prior to brain hemorrhage, which was most likely the terminal event.

23. Dr. Taff also notes other unresolved or open issues as to Mr. Mettee's death. First, while a post-mortem drug screen revealed alpazolam and diazepam (both anti-anxiety drugs) it is not indicated whether these drugs were found at the death scene. Next, the autopsy revealed that Mr. Mettee's liver was heavy and enlarged, probably due to fatty changes from overeating and alcohol use. Indeed, a microscopic exam of the liver shows "hepatocyte necrosis," which leaves open the question of whether Mr. Mettee suffered from drug-induced liver failure.

24. Moreover, the autopsy report was issued November 12, 2013, two months after the autopsy was performed. The medical examiner ruled the manner of death as an "accident." The Washington State Police Crime Lab, however, labeled the death a "controlled substance homicide." Dr. Taff questions why the medical examiner did not also refer to "homicide" in the autopsy report.

25. Dr Taff's preliminary impressions are that the autopsy report correctly attributed death to multiple/combined drug intoxication. Heroin/opiate, however, was not singled out primary cause of death, and of course, for reasons unknown, the brain hemorrhage was ignored by the authorities conducting the investigation of Mr. Mettee's death.

### 3.    *Preston Bridge*

26. As per Dr. Taff's assessment, Preston Bridge was a 16-year old male with a history of being a drug user (alcohol and marijuana). On Saturday, February 16, 2013, Mr. Bridge fell or

**A925**

jumped from a balcony at the Sunmoon Resort, in Perth, Australia, after taking a psychedelic drug reportedly purchased or obtained from vendors on the Silk Road web site.  It is assumed that Mr. Bridge sustained multiple blunt force impact bodily injuries associated with bone fractures and internal organ (*i.e.,*  brain) and blood vessel lacerations.

27.   According to Dr. Taff, the autopsy report and death certificate, which contain crucial information, are unavailable for review as they were never provided by the government, and may not exist.  Dr. Taff notes that a post-mortem drug screen was performed by the Perth Coroner.  However, the drug levels therein are useless because they cannot be placed in the context of other (absent) autopsy findings.

28.   Additionally, while testing of chest blood revealed low level of morphine (a narcotic drug) and midazolam (a benzodiazapene sedative) that raises several issues.  For instance, the date of blood collection for drug testing is unknown, and regardless, chest blood is usually contaminated and is not a reliable specimen for testing.  Moreover, while it was indicated that there were low levels of drugs in the blood, the levels may be lower than at the time of Mr. Bridge's fall due to his two-day survival and the continued metabolism and breakdown of the drugs by his body.  The introduction of fluids and blood transfusions to prevent a fall in his blood pressure may also have altered these levels.

29.   Femoral blood tested was negative for alcohol, but low for morphine, as well as for an active component of marijuana and benzodiazapines.  It is unknown whether Mr. Bridge received benzodiazapines in the hospital, or whether the marijuana was laced with any hallucinogens.

10

4.     *Scott Wilsdon*

30.  As per Dr. Taff's assessment, Scott Wilsdon was a 36-year old male, found dead (and decomposed) May 19, 2013, on the floor next to a computer in his residence in Adelaide, South Australia.  Drug paraphernalia and heroin were found at the scene.  Mr. Wilsdon had a history of deafness with cochlear implants, deep vein thrombosis (blood clots in deep veins of his legs) and heroin abuse.  An autopsy was performed by Dr. Stephen W_____ on Mr. Wilsdon four days after his death.  Dr. W_____ listed the cause of death as "multiple drug toxicity."

31.  Dr. Taff questioned several aspects of the death investigation.  For instance, he questioned whether Dr. W____ was a board-certified forensic pathologist, and why he had waited four days to conduct the autopsy.  He also questioned the manner of death, which is unknown. Noting that the toxicology screen performed on Mr. Wilsdon indicated eight different drugs (the morphine level was potentially lethal/toxic;  codeine at "therapeutic concentration;"  and doxylamine, tramadol, 7-aminoclonazepam, alrpazxolam, oxazepam, and warfarin at "non toxic/therapeutic concentration"), Dr. Taff concluded that the manner of death was most likely "accident," but noted that "multiple drugs at low levels might be some covert form of suicide." However, Dr. Taff also commented that it is bad science to extrapolate from one person to groups of people, and to make generalizations, and that each case must be evaluated on its own merits.

32.  Finally, Dr. Taff noted evidence in Mr. Wilsdon of pre-existing coronary artery disease, a pathological finding, in and of itself, sometimes associated with fatal cardiac arrhythmia (irregular heart beat) and sudden cardiac death.

#### 5.  *Bryan Barry*

33.  As per Dr. Taff's assessment, Bryan Barry was a 20-year old white male, found dead October 7, 2013, in his residence in Boston, Massachusetts.  According to the death certificate the cause of death was "acute opiate intoxication" due to substance abuse.

34.  Dr. Taff identified a number of issues with the death investigation conducted in Mr. Barry's case.  First, the date and time of injury, and the time of death, are all unknown.  The death certificate was signed by Dr. Marie ____ four months after Mr. Barry's death, and it omits information about performance of an autopsy;  nor was there an autopsy report provided in Mr. Barry's file.  It is also unknown whether Dr. Marie ____ is a board-certified forensic pathologist.

35.  While a toxicology report was prepared and indicates the presence of morphine and alcohol, as well as a blood alcohol level ("BAC") of .06% – which is the equivalent to three 12-ounce beers for the average person with a body weight of 170 pounds – neither alcohol nor morphine were listed on the death certificate.  Also, with regard to the heroin, the time and route of usage are unknown, as is the source of the heroin itself.  It is also unknown whether there was another source of heroin present at the scene.

36.  Finally, according to the Boston Police report, the "victim [was] known to [the] Commonwealth."  Dr. Taff questioned whether this language indicated, for instance, that Mr. Barry had a prior drug-related arrest record.

#### 6.  *Alejandro Nunez Avila*

37.  As per Dr. Taff's assessment, Alejandro Nunez Avila was a 16-year old Hispanic male found dead on the garage floor of his friend's house in Camino, California, on or around September 9, 2013.  Dr. Taff found that Mr. Avila had a history of wanting to buy marijauna, get

high, and party.  Based on the limited information available to Dr. Taff at the time of his

assessment (*i.e.,* without the coroner's report provided last night),[4] he found the file useless for

forensic medical evaluation.  It did not contain an autopsy report, a toxicology report, or a death

certificate.  In fact, there was no medical information whatsoever available to assess cause of

death precisely or accurately.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.  28 U.S.C. §1746.  Executed May 15, 2015.

/S/ Lindsay A. Lewis
LINDSAY A. LEWIS

---

[4]  Dr. Taff will be provided with the coroner's report for review and inclusion in his formal report.

13

# EXHIBIT 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA      :        14 Cr. 68 (KBF)

     - against -         :

                              DECLARATION
ROSS ULBRICHT,            :        OF TIM BINGHAM

                 Defendant.   :
-------------------------------------------------------X

TIM BINGHAM, pursuant to 28 U.S.C. §1746, hereby affirms under penalty of perjury:

1.  I have worked for over twenty years in the field of addiction and mental health, and currently work in a variety of settings, which include delivering workshops and training courses to community projects on a diverse range of topics such as Motivational Interviewing, Brief Interventions, Harm Reduction, and others.  I am an experienced Privileged Access Interviewer, and use these skills to reach and interview drug users for use in my own independent research and training.

2.  My published work has appeared in numerous journals and conferences, including the International Journal of Drug Policy and the International Journal of Mental Health and Addiction.  In addition, I recently co-authored a policy brief for the Global Drug Policy Observatory, addressed to the evolution and operation of hidden online markets and providing comparisons to traditional drug use frameworks.  I also lecture at University College Cork (UCC) and other universities in Ireland, on a visiting basis.

3.  I obtained a Bachelor of Arts, with Honours, in Applied Addiction Studies, from Athlone Institute of Technology in 2010, as well as Diplomas from UCC in the areas of Psychology of Criminal Behaviour and Youth and Community Work.  I am also Ireland's Sub-Regional

1

Coordinator for the European Harm Reduction Network, through my work as Coordinator of the Irish Needle Exchange Forum, and I served as an Expert Contributor for the Internet Drugs Market Trend Spotter Seminar held by the European Monitoring Centre for Drugs and Drug Addiction.

4.   Between September 2012 and August 2013 I conducted research both on and surrounding the Silk Road website regarding the user experiences of vendors and consumers on Silk Road.  In order to prepare to conduct my research I spent six months simply navigating the Silk Road site and actively participating in the Silk Road forums.  Once we were ready to formally begin data collection, I requested and received permission from the website administrator, Dread Pirate Roberts, to undertake research as to members' experiences and to upload information and recruitment threads to the site's forums.  The study was undertaken as part of a longitudinal Silk Road site monitoring exercise which involved three phases:  a holistic single case study with a Silk Road member;  an integrated study of systematic site monitoring of forum activity and online interviewing of a cohort of Silk Road customers;  and an interview study of vendor experiences of retailing on the site.

5.   My research formed the basis for the following three papers, which I co-authored with Dr. Marie Claire Van Hout, and which were published in the International Journal of Drug Policy between mid-January and late October 2013:

- Hout, M.C.V., & Bingham, T., "'Silk Road,' The Virtual Drug Marketplace: A Single Case Study of User Experiences," *International Journal of Drug Policy* (January 14, 2013), http://dx.doi.org/10.1016/j.drugpo.2013.01.005, attached as Exhibit 1 to the Declaration of Lindsay A. Lewis, Esq.;

2

- Hout, M.C.V., & Bingham, T., "'Surfing the Silk Road:' A Study of Users Experiences," *International Journal of Drug Policy* 24 (August 30, 2013) 524 -529, http://dx.doi.org/10.1016/j.drugpo.2013.08.011, attached as Exhibit 2 to the Declaration of Lindsay A. Lewis, Esq.;

- Hout, M.C.V., & Bingham, T., "Responsible Vendors, Intelligent Consumers:  Silk Road, the Online Revolution in Drug Trading," *International Journal of Drug Policy* (October 27, 2013), http://dx.doi.org/10.1016/j.drugpo.2013.10.009, attached as Exhibit 3 to the Declaration of Lindsay A. Lewis, Esq.;[1]

6.   As established by my research, and set forth in the above-cited papers, I have reached the following conclusions about the Silk Road website:

a.   the Silk Road website operated more similarly to "Ebay" than street drug markets by way of vendor and buyer ratings of drug products, and feedback on quality of transactions, speed of dispatch and profile of drug products;

b.   in contrast to street drug markets, the Silk Road site operated a professional dispute resolution mechanism to resolve disputes between buyers and sellers as well as forums dedicated to drug safety and harm reduction practices;

---

[1] I also authored other pieces, including "The Rise and Challenge of Dark Net Drug Markets," with Julia Buxton, which deal with Dark Net Drug Markets more broadly, in contrast to these papers which focused exclusively on Silk road and my research as to the user experiences of vendors and consumers on the site.  *See e.g.* Buxton, Julia & Bingham, T., "The Rise and Challenge of Dark Net Drug Markets," *Policy Brief 7, Global Drug Policy Observatory, Swansea University* (January 2015), http://www.swansea.ac.uk/media/The%20Rise%20and%20 Challenge%20of%20Dark%20Net%20Drug%20Markets.pdf.

c.   vendor authenticity and commitment to providing quality goods was controlled by the purchasing of new vendor accounts through auctions to the highest bidder;

d.   while perhaps the largest of its kind, Silk Road was not the first site which offered Internet drug sourcing.  For instance, in conducting our single case study, the findings of which were published in January 2013, our participant – a 25-year-old male in professional employment who had commenced using drugs at age 15 and whose drug use included use of cannabis, ecstasy, cocaine, and hallucinogens – recalled increased awareness of the possibilities of Internet drug sourcing in 2010 via his use of social media with various sites appearing to offer a legitimate, safe, opportunistic channel for sourcing a variety of drugs.  He described Silk Road as the only trusted place to get both information on the available drug products and in contrast to street purchasing, the opportunity to receive quality products.[2]  Overall quality of consumer experience and assistance in product and vendor decision-making was supported by visible online vendor reviews, vendor accountability, buyer-vendor negotiations and resolution modes;

e.   the single case study also led to certain observations about the cyber communities that ultimately formed on the Silk Road site.  As per my research, cyber communities appeared to provide a series of "nested support systems" which in turn fuelled information sourcing and exchange, user connectivity, identification of trusted and reliable sourcing routes, and mutual user supports.  Accordingly, the single case study

---

[2] While this user and others I have come across in my research also found that Silk Road provided them the opportunity to try drugs they would otherwise not have known to try or had access to, this adverse factor is overridden by the fact that Silk Road simultaneously provided such users the chance to source drugs from vendors located in countries renowned for producing quality forms of the drugs they sought to purchase as well as the other facets of the site's harm reduction ethos.  Moreover, even with an expanded drug horizon available for purchase, participants on the whole remained loyal to street drugs based on their customer purchase portfolios.

4

we found held some promise in illustrating Silk Road's capacity to encourage harm reduction within a very hard to reach drug using population, considering the lack of scientific knowledge around pharmacological properties and toxicity of available substances on the net;

f. following the single case study, we embarked on a case study of multiple Silk Road members which revealed additional information as to makeup of Silk Road drug users and their experiences on the site.  Observational data revealed that Silk Road users were predominantly male and in professional employment or tertiary education.   In addition, participant drug trajectories ranged from 18 months to 25 years, with popular drugs including cannabis, mephedrone, codeine, cocaine, nitrous oxide, MDMA, 2C-B, ketamine, heroin, LSD, amphetamine, NBOME, methylone, benzodiazepines, methamphetamine, morphine, PCP, 2C-I, and psilocybin.  In my many months of interacting with users on the Silk Road site, I did not encounter a single customer whose first drug purchase was on the Silk Road website.  Patterns of drug use were described as typically recreational and confined to weekend consumption.  Several participants in the study described themselves as "pyschonauts," defined as a persons who intelligently experiment with mind-altering chemicals, sometimes to the extent of taking exact measurements and keeping records of experiences.  Few participants reported daily drug use;

g. while the majority of participants reported commencing internet drug sourcing and purchasing on Silk Road and happening upon it by chance, with little prior experience of cyber drug retailing prior to 2011, several drug sites were described as popular resources for Silk Road members, *i.e.,* Erowid, Bluelight, Shroomery, Pill Reports,

Pharmacy Reviewer, Gwern and OVDBer.  These sites along with the Silk Road

forums were observed as useful in providing informative "trip reports," and assisting

individuals with questions about optimum dosage, lab testing and harm reduction

practicalities;

h.  participant reasons for accessing and using Silk Road appeared centered on the site's

anonymity, its member forums, the wide variety of products advertised, its transaction

system supported by dispute resolution modes and vendor feedback ratings.  Users

also expressed concern for poor drug quality in their locality and fears for personal

safety when buying drugs in the street.  Observational site data further revealed

member comments around the avoidance of adverse health and social consequences

associated with street drug sourcing when purchasing drugs on Silk Road;

i.  those participants with purchasing experience on the Silk Road commented on the

perceived levels of insular trust within the Silk Road member communities, which

assisted them in consumer decision-making and openly contrasted with the unknowns

associated with street drug-dealing.  For instance, according to one Silk Road

customer who had stopped purchasing drugs elsewhere, "[t]his type of market

significantly lowers the chances of a scam or buying contaminated products.  Like

Amazon or eBay, I have a market of sellers to choose from and product reviews to

satisfy my own requirements before I purchase.  A street market in comparison is

based on a 'take it or leave it' approach which gives no rights to a buyer.  This form

of regulation ensures safety and harm reduction for the buyer;"

j.  moreover, while some participants interviewed indicated that they would never go back to sourcing drugs from the street after turning to Silk Road, I also did not encounter any Silk Road user who would have stopped purchasing drugs entirely if unable to do so on Silk Road. Some Silk Road users, in fact, indicated that while Silk Road had for the most part replaced their local street dealer, a few used street and closed market (friend and peer networks) sourcing when waiting for Silk Road products to arrive;

k.  in addition, observational data as to the users on the site revealed an active forum community.  The usefulness of the Silk Road forums was emphasized in providing information, product and vendor reviews, transaction feedback, forums for harm reduction, tutorials, guides, and book/film reviews.  One participant described the site as a "great community with lots of information."  Comments were made about member education and know how, with forum participants appearing well read and well informed about drug use, with members sharing advice, stories, experiences and general chit chat;

l.  many comments centered around a perceived sense of "belonging" in the Silk Road community.  This occurred irrespective of whether members were purchasing or only accessing the forums.  Thus, risks and harms traditionally posed by illicit open and closed drug markets were replaced by insular online communities interacting within Silk Road's built in quality of information exchange, where protected by screen pseudonyms and anonymity, members could converse freely about their drug use.  In this way Silk Road as novel technological drug subculture, potentially minimized drug-related stigma by reinforcing as sense of community;

7

m. along these same lines, site forum postings also included member support for those requiring assistance in quitting their drug habit.  As one user described it, "[t]he community is awesome here.  There is a Drug Safety forum.  The whole philosophy behind the place is that if you want to put heroin in your body, go ahead.  But hey, if you want to get off that nasty drug, we're here to help you too.  It's not like real life where street dealers might coerce you into keeping your addiction;"

n. based on my study of multiple users I therefore concluded that Silk Road forums, both for purchasers and for those who had not yet purchased, appeared to act as an information mechanism for the promotion of safer and more acceptable or responsible forms of recreational drug use.  Likewise, Silk Road's member subcultures offered a viable means of enmeshing safer drug use and encouraging hard reduction amongst a very hard to reach and informed drug-using population;

o. my research revealed a similar ethos among drug vendors.  As with Silk Road buyers, participants in a study of Silk Road vendors described themselves as possessing a personal interest in the intelligent and responsible use of drugs.[3] All reported intense use of the internet to research drug information and use of sites like Erowid, Bluelight, and Topix—the same sites Silk Road buyers had frequented.  As with purchasers on Silk Road, vendors commented on the supportive safety net provided by member communication via TOR messaging and in Silk Road forums;

---

[3]  Of the ten vendors that participated in our study, nine were male.  They ranged in age from 25 to over 50.  Four participants reported being in fulltime employment, one reported part time employment, one was in tertiary education, and four participants were unemployed.  Only two out of ten participants had not sold drugs prior to becoming vendors on Silk Road.

p.  from a vending perspective, Silk Road's harm reduction ethos appeared centered on informed consumerism and responsible vending by availability of high quality products with low risk for contamination, vendor-tested products, trip reporting, and feedback on the vending infrastructure.  Quality of drug products sold was ensured by use of proper reagents, lab work and analytics, personal research and testing, freebie testing by long term customers, feedback from other vendors, and sourcing from reliable suppliers;

q.  several vendors also cited the lack of personal safety involved in street sales as a reason for vending online.  As one stated, "[t]he street market is more risky for everyone.  It doesn't have feedback or rating available for every buyer to read.  You are more likely to be involved with people who might not be concerned in your welfare,"

r.  however, for the vast majority of vendors, Silk Road's libertarian ethos and embedded online culture appealed to them in terms of its revolutionary ethos and mechanism for the responsible vending of personally tested high-quality products, informed consumerism, and controlled safe retail infrastructure;

s.  ultimately, drug markets are incredibly resilient and adaptable to changes in the environment, market driven, law enforcement, and otherwise.  Challenges do exist in disembedding drug markets, and are reliant on the complexities of relationships between vendors, markets, and communities, both online and in reality.  Operating on Silk Road appeared to present vendors and consumers with a novel way to circumvent drug market violence and create distance between vendor and buyer.  The drug trade represents a key cause of violence, particularly in urban settings, and

especially as a means for individuals and groups to secure and maintain market share. One of the more positive side of Silk Road was that it prevented such violence, in addition to its general harm reduction ethos.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  28 U.S.C. §1746.  Executed May 14, 2015.

TIM BINGHAM

**A940**

# EXHIBIT 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA                    :        14 Cr. 68 (KBF)

          - against -                       :

                                                     DECLARATION OF
ROSS ULBRICHT,                              :        DR. FERNANDO CAUDEVILLA

                              Defendant.    :
--------------------------------------------------------X

          DR. FERNANDO CAUDEVILLA, pursuant to 28 U.S.C. §1746, hereby affirms under penalty of

perjury:


          1.

I am a Spanish physician specializing in the area of drugs and addiction.  In addition to my full-

time work as a Family Physician at the National Spanish Health Care Service, in Madrid, Spain, I

provide private medical consultation in the area of recreational drug use. I have also been

working in a professional capacity on "Deep Web"- related projects since 2012 and providing

health and medical advice from a harm reduction standpoint to drug users via the Internet.  I

graduated from the Universidad Autónoma de Madrid with a degree in Medicine and Surgery in

1999, and specialized in the area of Family Practice in 2002.  Additionally, I was qualified as a

University Expert in Drug Dependence by the Universidad Complutense de Madrid in 2004.

          2.

I am involved with numerous professional organizations, including as a member of the Drug and

Alcohol Working Group of the Spanish Society of Family and Community Medicine, as a

1

coordinator of the Drug and Alcohol Working Group of the Madrilenian Society of Family and

Community Medicine, and as a technical consultant for NGO Energy Control, which works to

reduce the risks associated with drug use.

3.

My work has been published in numerous medical journals and reviews, including various

international publications such as the Journal of Psychopharmacology and Human

Pharmacology.

4.

I have also taught numerous workshops at the National Scientific Conference, and various

courses in the Continuing Medical Education Programs throughout Spain.  I am currently

participating in expert meetings organized by the European Monitoring Centre for Drug and

Drug Addiction (EMCDDA), as well as working on a report addressed to harm reduction and

cryptomarkets, including factors like drug testing or on-line advice, similar to that provided by

myself on Silk Road.

5.

Operating under the username, "DoctorX," but with complete transparency as to my real name

which I readily supplied to those who asked for it, I provided expert advice on drug use and

abuse to Silk Road users, both through a thread I started in April 2013, in the drug safety forum,

entitled "Ask a Drug Expert Physician About Drugs & Health" (*see* "Ask a Drug Expert Physician

About Drugs & Health" thread, attached to the Declaration of Lindsay A. Lewis, Esq., as Exhibit 4)

and through private messages on the forum to individual Silk Road users who reached out to me

(*see* Private Messages from Dr. Caudevilla to Silk Road Users, attached to the Declaration of

Lindsay A. Lewis, Esq., as Exhibit 5).  Between April 2013 and late October 2013, I sent more

than 450 messages to Silk Road users in response to requests for advice and assistance.  I also

spent up to two to three hours a day on the forum during that time frame providing expert

advice as to drugs and health.  My advice ranged from information as to safe dosage and

administration of particular drugs as well as the risks attendant to the use of certain drugs,

information as to where to find reliable and credible information about various substances on

the internet, proper methods of drug administration, adverse effects, pharmacological

interactions, advice as to whether particular combinations of drugs (both legal and illegal)

should be avoided, advice as to how to stop use of particular drugs or drugs generally, to

general medical and psychiatric advice related to drugs.

6.

The administrator of the Silk Road site, Dread Pirate Roberts, was aware of my presence on Silk

Road and was supportive of my role in furthering the harm reduction ethos of the site.  I

provided weekly reports to DPR which documented the topics I had discussed in my thread

during the previous week.  Attached to the Declaration of Lindsay A. Lewis, Esq., as Exhibit 6, is

one such report, prepared September 21, 2013, and containing the thread topics I covered

during the week of September 13, 2013 through September 19, 2013.  Dread Pirate Roberts

never censored my views or advice in any way, even when I espoused views that Silk Road users

should not use or buy certain drugs sold on the site (particularly *Legal High* or *Research

Chemicals*, new synthetic drugs that have not been tested in humans and that have a higher

potential for harm compared with other drugs), discouraged drug use, or helped Silk Road

customers to reduce or cease drug use entirely.

7.

I performed my role and provided expert advice on a volunteer basis from April 2013 to August 2013.  When I contacted Dread Pirate Roberts in mid-August 2013 to alert him to the fact that the time commitment required to answer all questions and keep up with the forum thread had become too great, he offered to compensate me $500 per week to continue to provide advice to users on the site.  *See* Private Messages Between Dr. X and Dread Pirate Roberts, attached to the Declaration of Lindsay A. Lewis, Esq., as Exhibit 7.  I thus continued my work on a paid basis from mid-August 2013 through October 2013, when the site was shut down.

8.

In addition to compensating me for my advice on the forums and through private messages, Dread Pirate Roberts also sought to partner with me to send the drugs sold on the Silk Road out to laboratories for independent testing as part of an effort to ensure that only safe, non-toxic substances were being sold on Silk Road.   *See* Exhibit 7 to Lewis Dec. We agreed that I would contact him to explain the process to him in detail once we had fully developed the International Service Test that would facilitate such drug testing.   *See id.*  At the time the Silk Road website was shut down by law enforcement we were still working on the project.  At present, International Drug Testing Service from Energy Control provides a drug testing service available to "Deep Web" drug users.

9.

As a result of my personal experiences working with customers on the Silk Road site, and monitoring the site's drug safety forums, I have firsthand knowledge that Silk Road provided

4

site users with the tools to take drugs in a safer and more informed manner, espoused a harm

reduction ethos which was reflected in the individual buyer-seller transactions on the site and

in the community created on the site's forums, and enabled some site participants to actually

reduce their drug use and/or use drugs in a safer way into a harm reduction perspective.   For

example, some heroin users were drawn to Silk Road because it provided them access to

methadone, a drug utilized in many countries, and administered by physicians, to enable

heroin users to end their addictions.   For some Silk Road users methadone was illegal or

unavailable in their home countries.  Accordingly, they would likely not have had access to the

resources necessary to reduce their heroin use without the Silk Road.

10.

In my seven months monitoring and actively participating in the Silk Road forums I never came

across even a single report of a Silk Road-related drug overdose.  In fact, on several occasions,

when users provided negative feedback about drugs sold by a particular vendor, that vendor

or the drug in question was removed from the site.  To my knowledge that decision was made

by the site's administrators.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.  28 U.S.C. §1746.  Executed May 14, 2015.

_____

DR. FERNANDO CAUDEVILLA

15/May/2015

# EXHIBIT 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA          :          14 Cr. 68 (KBF)

     - against -          :

                                  DECLARATION OF
ROSS ULBRICHT,          :          DR. MONICA J. BARRATT

             Defendant.          :
------------------------------------------------------X

DR. MONICA J. BARRATT, pursuant to 28 U.S.C. §1746, hereby affirms under penalty of perjury:

1.  I am Research Fellow at Australia's National Drug and Alcohol Research Centre, part of the University of New South Wales, Sydney.  My position is funded by the Australian National Health and Medical Research Council. I attained a Bachelor of Science (Honours) in psychology and a PhD in Health Sciences at Curtin University, Perth, Australia. My research concerns the social and public health implications of internet technologies for people who use illicit and emerging psychoactive drugs, and the impacts of legislative responses to drug use and drug problems. I also hold an adjunct position at the National Drug Research Institute, Curtin University, and a position as visiting fellow at the Burnet Institute.[1]

2.  During the course of 2013, I authored a research report along with co-authors Jason A. Ferris and Adam R. Winstock, entitled "Use of Silk Road, the online drug marketplace, in the United Kingdom, Australia and the United States," which was published in *Addiction* 109, at 774-783.  *See* "Use of Silk Road, the online drug marketplace, in the United

---

[1] I am acting in a personal capacity, and the views represented in this affidavit do not necessarily represent those of my affiliated institutions.

Kingdom, Australia and the United States," attached as Exhibit 8 to the Declaration of

Lindsay A. Lewis, Esq.  The paper presented the results from a quantitative analysis of

international survey data from a purposive sample of drug purchasers, derived from an

anonymous annual online survey of drug use conducted by Global Drug Survey, and for

which 22, 289 responses were received between November 15, 2012, and January 2,

2013.

3. The sample used in our paper was restricted to those who had indicated that they usually

   bought their own amphetamine,  cannabis, cocaine, MDMA, ketamine or mephedrone, or

   or who reported buying "legal highs" or "research chemicals" or any drugs online during

   the previous 12 months, bringing the sample size down to 11, 848.  The base sample was

   then further restricted to comprise only those 9, 470 respondents who resided in or used

   the currency of Australia, the United States or the United Kingdom.  Commentary on our

   paper that was published in the same issue of *Addiction* in which our paper was

   published, noted that our paper presented the first large scale survey to characterize

   buyers on Silk Road and that prior to this, no sound, large-scale study of the buyers was

   available.

4. We designed questions that were informed by ongoing digital ethnographic research of

   Silk Road that I was conducting, and which involved participating in online discussions

   and monitoring the marketplace.

5. To compare differences between drug buyers who created three outcome groups based on

   knowledge and utilization of Silk Road:  (1)  those who had never heard of Silk Road;

   (2) those who had heard of, but never consumed drugs purchased from Silk Road, and

   (3) those who had consumed drugs purchased from Silk Road.  Overall, half of the

2

sample had heard of the online drug marketplace Silk Road, but the percentage was not the same across the three countries, with the majority in the United States having heard of Silk Road (65%) compared to approximately half of Australian respondents (53%) and 40% of U.K. respondents.  Of respondents who had heard of Silk Road, approximately one-quarter of U.S. and U.K. respondents reported having consumed drugs purchased from Silk Road, while only 14% of Australian respondents reported doing so.

6.  One table in our report (Table 3) presented the top 20 drugs purchased from Silk Road by country of residence.  MDMA was the most commonly purchased drug.  More than half of respondents in each country reported purchasing it, mainly in powdered (crystal) form. Cannabis was ranked in the top four drugs across countries and lysergic acid Diethylamide (LSD) in the top five. Cocaine was ranked sixth in Australia and 18th in the U.K., but ranked outside the top 20 in the U.S.  Heroin was also outside the top 20 in all of these countries. No form of NBOMe  (including 25I-NBOMe) was ranked in the top four in the U.K., the U.S. or Australia.  Rather, it was ranked fifth in the U.S., 10th in Australia and 13th in the U.K.

7.  Survey respondents who had purchased drugs from Silk Road were asked to pinpoint their reasons for consuming drugs purchased on Silk Road from a list of eight possible reasons.  Respondents across all three countries indicated that among their top four reasons for consuming drugs purchased on Silk Road were:  (1)  the drugs were of better quality than the drugs they could normally access, and (2)  they were more comfortable buying from sellers with high ratings.  The range of drugs available and convenience were also among the top four reasons for consuming drugs purchased on Silk Road.

3

8.  Respondents who had heard of Silk Road but had not purchased drugs from the site were asked for reasons why they had not made purchases on the site.  The most common response across all countries was "I have adequate access to drugs through my own networks."  The next most common response was "I fear being caught by police/customs if drugs are sent to my own address."  Compared to respondents from the U.K., U.S. respondents were significantly more likely not to use Silk Road to purchase drugs as they found accessing Bitcoins too difficult, were concerned about being ripped off, thought the prices for drugs on Silk Road were too high and believed using the Silk Road to purchase drugs to be too much effort.  By contrast, compared to UK respondents, Australian respondents were less likely to indicate accessing Bitcoins was too difficult, less likely to consider Silk Road prices as being too high and less likely to indicate that accessing drugs via Silk Road was too much effort.

9.  In this study we found that the most commonly mentioned reasons for using Silk road to buy drugs fitted with wider e-commerce trends:  access to a wider variety and better quality of product offerings, the convenience of online shopping and access to more information about the products and the vendor/ companies selling them.

10. Since the data was collected the cryptomarket landscape has changed with the arrivals of new drug marketplaces, the fall of the original Silk Road, and the rise and fall of Silk Road 2.0.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  28 U.S.C. §1746.  Executed May 14, 2015.

DR. MONICA J. BARRATT

4

EXHIBIT 14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA          :          14 Cr. 68 (KBF)

     - against -                            :

ROSS ULBRICHT,                          :          DECLARATION
                                                            OF MEGHAN RALSTON

                Defendant.   :
-------------------------------------------------------X

MEGHAN RALSTON, pursuant to 28 U.S.C. §1746, hereby affirms under penalty of perjury:

1.  I am the former harm reduction manager for the Drug Policy Alliance (hereinafter

"DPA"), based in Los Angeles, California. I was employed full-time with DPA from October

2006 through May 15, 2015. My work included implementing over-the-counter pharmacy

syringe sales throughout Los Angeles County; organizing the first major U.S. commemoration

of International Overdose Awareness Day; and creating the first-ever Southern California Harm

Reduction Summit.  I have served as the point person on two DPA California harm reduction

bills which were successfully signed into law (AB 1535; AB 472). I have also served as co-

chair of both the Los Angeles Overdose Prevention Task Force and the Los Angeles Harm

Reduction Collaborative. I currently work as a freelance policy consultant for Drug Policy

Alliance. In 2015, I will be focusing on implementing California pharmacy access to the

overdose reversal medicine naloxone.

2.  In light of my expertise  in the areas of the U.S. overdose crisis; prescription drugs;  drug

use; harm reduction issues and U.S. drug policy generally,  my op-eds, quotes and interviews

about effective ways to reduce the harms of U.S. drug policies, including the misuse of

pharmaceutical and non-pharmaceutical drugs,  have appeared in dozens of news outlets

1

including *AP*, *Reuters*, the *UK Daily Mail*, the *Los Angeles Times*, *USA Today*, *Newsweek*, the *San Francisco Chronicle*, the *Orange County Register*, *Newsday*, the *Houston Chronicle*, the *Huffington Post* and on Time.com. My television appearances on the same subjects include Al Jazeera, RT America, HuffPost Live and Fox. I have been interviewed and featured in the *New York Times* best-selling book "Chasing the Scream" by Johann Hari as a leading expert on the prescription drug crisis. I have also appeared in the documentary film, "After EDC," which chronicles the aftermath of a suspected ecstasy-related death at a rave in Los Angeles. Additionally, I have presented on a variety of harm reduction topics at numerous conferences across the country and internationally.

3.   I graduated *summa cum laude* from Capital University in Columbus, Ohio, and my research on relationship management has appeared in a variety of academic publications. Prior to joining DPA, I created and ran Street Medicine, a volunteer-driven project to assemble and distribute first aid kits to homeless populations throughout Los Angeles County.

4.   As a result of my work with the DPA, and in the areas of harm reduction and reduction of drug-related violence, I have become familiar with the Silk Road website. I have studied the site and have also published opinion editorials  on the topic of Silk Road, in particular, including:

- *The End of the Silk Road: Will Shutting Down the 'e-Bay for Drugs' Cause More Harm Than Good?* October 3, 2013 http://www.huffingtonpost.com/meghan-ralston/silk-road-shut-down_b_4038280.html, attached as Exhibit 9 to the Declaration of Lindsay A. Lewis, Esq.; and,

- *Silk Road Was a Better, Safer Way to Buy and Sell Drugs*  February 12, 2015 http://www.alternet.org/drugs/silk-road-better-safer-way-buy-sell-drugs, attached as Exhibit 10 to the Declaration of Lindsay A. Lewis, Esq.

2

5.   Accordingly, through my analysis of the Silk Road website, and my work with the DPA in the area of harm reduction, and as set forth in the above-mentioned pieces, I have reached the following conclusions – all of which represent my personal beliefs; none of which necessarily represent the views or official positions of my employer, the DPA:

a.  at the outset, we must acknowledge the current state of drug use and the drug trade in the United States and abroad.  People use drugs. They get those drugs from someone else. In order to consume drugs, someone had to buy them, and someone had to sell them. Well-established research has also demonstrated links between violence and the illicit drug trade, in a variety of settings, including urban settings. We don't have to like it, but we do have to accept the reality of it;

b.  our entire approach to responding to that reality has thus far been a dismal disappointment. Silk Road was, in the most basic sense, a product of our failed war on drugs—a response to our woefully inadequate way of managing not only drug use, but also drug demand and drug sales;

c.  operating as an above-ground source for a variety of drugs, ranging from marijuana to heroin and virtually everything in between, Silk Road created a safe environment, free of weapons and violence during the transaction, where people could acquire drugs.  Many reformers, myself included, have long been highlighting the forward-thinking benefits of Silk Road and the ways it began to slowly revolutionize drug sales around the world.  For instance, it provided a platform that could allow indigenous growers and cultivators around the world to sell directly to the consumer, potentially reducing cartel participation and violence;

d.  accordingly, using Silk Road could be seen as a more responsible approach to drug sales, a peaceable alterative to the often deadly violence so commonly associated with the global drug war, and street drug transactions, in particular.  None of the transactions on Silk Road, for instance, resulted in women drug buyers being sexually assaulted or forced to trade sex for drugs, as remains a possibility in some street-level drug transactions. Nor did any Silk Road transactions result in anyone having a gun pulled on them at the moment of purchase, also a danger present in face-to-face street-level drug transactions;

e.  moreover, even with all the hurdles and the risks, people chose to use Silk Road rather than rely exclusively on whatever illegal and potentially dangerous drug market existed in their 'real world' community. Given the choice of quickly and easily accessing drugs in potentially sketchy or dangerous neighborhoods, or buying them safely on-line but having to wait, many users preferred privacy, security and a wait to the alternative;

f.  thus, the shutdown of Silk Road, intended to curtail organized drug use and sales, will not accomplish that goal. Silk Road is not the only website of its kind and its displaced users will likely either turn to a competitor site or seek out drugs in other ways. This approach to fighting the war on drugs has never worked and it's not likely to start working now.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  28 U.S.C. §1746.  Executed May 14, 2015.


_____

MEGHAN RALSTON

4

EXHIBIT 15

*Mark L. Taff, M.D.*

FORENSIC PATHOLOGIST

511 Hempstead Avenue, Suite 2

West Hempstead, New York 11552

OFFICE TELEPHONE: (516) 292-2300

HOME TELEPHONE: (516) 887-4691

**Citizenship**     United States

**Medical Licensure**
- State of New York, 1981 No. 148497-1
- State of Michigan, 1983, No. 004704
- State of New Jersey, 1990, No. 56900

**Board-Certification**     Forensic and Anatomic Pathology

**Professional Experience**

**1987-Present**

- **Chief Medical Examiner, Rockland County, New York** (10/01/08 - 10/31/12)
- **Forensic Pathologist Consultant**
- Coroner's Pathologist, Orange, Sullivan, Putnam & Greene Counties, New York
- Forensic Pathologist Consultant, Rockland County Medical Examiner's Office, Pomona, NY
- New York City & New Jersey Transit Authority
- Aetna Life Insurance Company, Hartford, CT
- New York, Kings, Queens Counties and Bergen County, New Jersey District Attorney's Office
- New York Law Department
- New York Attorney General's Office
- New York Housing Authority
- New York, Brooklyn & Queens Legal Aid Societies
- Connecticut, New Jersey, Dutchess County (New York), Pennsylvania & New Hampshire Public Defenders' Offices
   - Performed over 2,000 medicolegal autopsies
   - Testified in court/depositions as an expert witness in forensic pathology over 375 times

**1984-1988**     **Deputy Medical Examiner,** Nassau County Medical Examiner's Office, East Meadow, NY

**Academic Affiliations**

- Clinical Associate Professor of Pathology, Mt. Sinai School of Medicine, New York, NY, 1990-Present
- Adjunct Professor, Department of Criminal Justice, C.W. Post/Long Island University, Brookville, NY, 1998-2003
- Scientist-in-Residence, Metropolitan Forensic Anthropology Team, Department of Anthropology, Lehman College, City University of New York, 1985-2003
- Special Teaching Staff pathologist, Department of Pathology, Long Island Jewish-Hillside Medical Center, New Hyde Park, NY 1987-1993
- Assistant Professor of Forensic Pathology, School of Medicine, State University of New York at Stony Brook, NY 1985-1988
- Lecturer in Forensic Pathology, Queens Medical School at York College, City University of New York, 1987

- Instructor in Pathology, Wayne State University School of Medicine, Detroit, MI, 1983-84
- Instructor in Pathology/Clinical Assistant Pathologist, Mt. Sinai School of Medicine, New York, NY 1982-83

### Education & Training
- **1983-84** Resident in Forensic Pathology, Office of the Medical Examiner of Wayne County, Detroit, MI
- **1979-82** Resident in Pathology, Mt. Sinai School of Medicine, New York, NY
- **1978-79** Resident in Pathology (first-year), Long Island Jewish-Hillside Medical Center, New Hyde Park, NY

### Educational Experience
- **1968-72** University of Maryland, College Park, MD
  - Bachelor of Science Degree
- **1972-78** University of Bologna School of Medicine, Bologna, Italy
  - Doctor of Medicine Degree
- **1975-77** Queens Medical Center & Queens Medical Examiner's Office
  - Pathology Clinical Clerkship
  Jewish Hospital & Medical Center of Brooklyn
  - ECFMG-approved Clinical Clerkship

### Professional Activities
- AMA Physician's Recognition Award, 1981-92
- House Staff Representative, Academic Council, Mt. Sinai School of Medicine, 1981-82
- Member, Public Information Network (PIN), College of American Pathologists, 1981-84
- Chairman, "The Young Associates" of the Milton Helpern Library of Legal Medicine, 1982
- Creator, "Residents' Corner," The American Journal of Forensic Medicine and Pathology, 1982
- Feature Editor, The American Journal of Forensic Medicine and Pathology, 1982-91
- Member, Medical Board, International Boxing Writers Association, 1982-93
- Member, Governor's Task Force on Domestic Violence, State of New York, Professional School Curriculum Subcommittee, 1982-83
- Member, Governor's Commission on Domestic Violence, State of New York, 1985-89
- Member, New York City's Task Force on Acquired Immunodefiency Syndrome (AIDS), 1982-83
- Member, Committee on Public Health, New York City Medical Society, 1982-83
- Member, The Histogram, The Newsletter of the International Study Group in Forensic Sciences, 1984-85
- Editor, Inform - The International Reference Organization in Forensic Medicine, 1984-94
- President & Founder, New York Society of Forensic Sciences at Lehman College, Bronx, NY, 1985-96
- Co-Chairman, National Association of Medical Examiner's Inspection & Accreditation Committee, 1985-87

- Judge, American Institute of Science & Technology of the City of New York, 49th Queens Borough School Science Fair, John Browne High School, Flushing, NY, Mar. 13, 1987
- Fellow, American Society of Clinical Pathologists, 1988-96
- Member, Library Committee, Nassau Academy of Medicine, 1990-93
- Member, Preventive Medicine Section, Nassau Academy of Medicine, 1992-93
- Editorial Board Member, Frontiers in Bioscience, 1995-97
- Vice-President, Society of Medical Jurisprudence, New York, 1997
- Member, Advisory Board, American Foundation for Gender and Genital Medicine and Science (AFGAGMAS), Baltimore, MD, 1997
- Member, Reader Advisory Board, Mayo Clinic Proceedings, Rochester, MN, 1997-1998
- Guest Columnist, *Education Update*, New York, NY, 1997

### Memberships
- American Medical Association
- American Society of Clinical Pathologists
- Public Information Network (PIN), College of American Pathologists, 1981-82
- New York Academy of Sciences
- Committee on Public Health, Medical Society of the County of New York
- Milton Helpern Society of Legal Medicine
- American Society of Law & Medicine
- American Association of Suicidology
- Medical Society of the County of New York
- University of Maryland Alumni Association
- New England Pathology Residents' Society, 1980-83
- National Association of Medical Examiners
- The Hastings Center
- American Academy of Forensic Sciences
- Society for the Scientific Study of Sex, Inc., 1983-84
- Michigan Society of Pathologists
- Nassau County Medical Society
- Nassau County Society of Pathologists
- New York Pathological Society
- New York Society of Forensic Sciences at Lehman College, Bronx, NY
- New York Association of County Coroners & Medical Examiners
- Society of Medical Jurisprudence
- Friends of the John N. Snell Library, Inc.
- International Society of Clinical Forensic Medicine
- American Society of Forensic Odontology
- American Suicide Foundation
- American College of Sports Medicine

**Grants**     New York Society of Forensic Sciences at Lehman College, The Research Foundation of the City University of New York, 9/85-12/96

### Awards
- Editor's Choice Award for Outstanding Achievement in Poetry, The National Library of Poetry, Owings Mills, MD, 1994
- Distinguished Member, The International Society of Poets, Owings Mills, MD, 1995

- Editor's Choice Award for Outstanding Achievement in Poetry, The National Library of Poetry, Owings Mills, MD, 1995
- Editor's Choice Award for Outstanding Achievement in Poetry, The National Library of Poetry, Owings Mills, MD, 1996
- Editor's Choice Award for Outstanding Achievement in Poetry, Best Poems of the '90s, The National Library of Poetry, Owings Mills, MD, 1996
- Slogan Winner, *Education Update*, New York, NY, 1997
- Editor's Choice Award for Outstanding Achievement in Poetry, The National Library of Poetry, Owings Mills, MD, 1998
- Editor's Choice Award for Outstanding Achievement in Poetry, The National Library of Poetry, Owings Mills, MD, 1998
- Editor's Choice Award for Outstanding Achievement in Poetry, The National Library of Poetry, Owings Mills, MD, 1999
- Editor's Choice Award for Outstanding Achievement in Poetry, The National Library of Poetry, Owings Mills, MD, 1999
- Editor's Choice Award for Outstanding Achievement in Poetry, The National Library of Poetry, Owings Mills, MD, 1999
- Listed in Index of Forensic Pathology Experts In, Forensic Sciences. Vol. 5. Wecht, CH (Ed.).  Matthew Bender, 1999, p.41-69.
- Editor's Choice Award for Outstanding Achievement in Poetry, The National Library of Poetry, Owings Mills, MD, 1999

### Publications

1. *Taff, ML:* Right on target [letter]. NY Times, Dec. 13, 1981, p. S2.
2. *Taff, ML:* "Supply-Side Theory" and house-staff physicians [letter]. NEJM 1982; 306:180.
3. *Taff, ML:* Interview with Russell S. Fisher, M.D., Chief Medical Examiner, Baltimore, MD. Am J Forensic Med Pathol (Submitted for Publication).
4. *Taff, ML:* Interview with Michael M. Baden, M.D., Deputy Chief Medical Examiner, Suffolk County, NY. Am J Forensic Med Pathol (Submitted for Publication).
5. *Taff, ML:* Interview with Joseph H. Davis, M.D., Chief Medical Examiner, Dade County, FL. Am J Forensic Med Pathol (Submitted for Publication).
6. *Taff, ML,* Siegal, FP: Acquired immune deficiency syndrome. Medcom Teaching Series, New York, 1983.
7. *Taff, ML:* "The Young Associates" of the Milton Helpern Library for Legal Medicine. Am J Forensic Med Pathol (Submitted for Publication).
8. *Taff, ML:* Interview with William A. Tari, Dean, American Academy McAllister Institute of Funeral Service, New York. Am J Forensic Med Pathol (Submitted for Publication).
9. *Taff, ML,* Siegal, FP, Geller, SA: Outbreak of an acquired immunodeficiency syndrome associated with opportunistic infections and Kaposi's sarcoma in male homosexuals. An epidemic with forensic implications. Am J Forensic Med Pathol 1982; 3:259-264.
10. Perlow, LS, *Taff, ML,* Orsini, JM, Goldsmith, MA, Hruza, ZT, Gerber, MA, Geller, SA: Kaposi's sarcoma in a young homosexual man: association with angiofollicular lymphoid hyperplasia and a malignant lymphoproliferative disorder. Arch Pathol Lab Med 1983; 107:510-513.
11. Waxman, J, Subietas, A, Malowany, M, *Taff, ML:* Overwhelming mycobacteriosis in an immunodeficient homosexual. Mt Sinai J Med 1983; 50:19-21.
12. Gordon, RE, *Taff, ML,* Schwartz, IS, Kleinerman, J: Malignant retroperitoneal paraganglioma: unusual light and electron microscopic findings. Mt Sinai J Med 1983; 50:507-513.
13. Leslie, J, *Taff, ML,* Patel, I, Sternberg, A, Fernando, MM: Self-inflicted ocular injuries: a rare form of self-mutilation. Am J Forensic Med Pathol 1984; 5:83-88.
14. Unger, PD, *Taff, ML,* Song, S, Schwartz, IS: Sudden death in a patient with von Recklinghausen's neurofibromatosis. Am J Forensic Med Pathol 1984; 5:175-179.
15. Brunetti, LL, *Taff, ML:* The premenstrual syndrome. Am J Forensic Med Pathol 1984; 5:265-268.
16. Shen-Schwarz, S, *Taff, ML,* Strauss, L: Iatrogenic lesions in the fetus and newborn. Medcom Teaching Series, Garden Grove, CA, 1984.
17. *Taff, ML:* Deaths associated with products designed for use by infants and children. Mecap News 1984; 9:2.
18. *Taff, ML:* Deaths associated with products designed for use by infants and children. Mecap News May, 1984; 9:3.
19. Reich, L, *Taff, ML:* Deaths involving other products. Mecap News May, 1984; 9:3.
20. *Taff, ML:* Deaths involving other products. Mecap News June, 1984; 9:4.
21. Reich, L, *Taff, ML:* Deaths resulting from fires, thermal burns, or carbon monoxide poisonings. Mecap News June, 1984; 9:2.
22. *Taff, ML:* Deaths associated with household structures. Mecap News July, 1984; 9:5.

23. *Taff, ML:* Deaths associated with other products. Mecap News July, 1984; 9:6.
24. Reich, L, *Taff, ML:* Deaths associated with other products. Mecap News July, 1984; 9:6.
25. *Taff, ML:* Deaths associated with household structures and equipment. Mecap News Aug., 1984; 9:3.
26. *Taff, ML:* Deaths associated with products designed for use by infants and children. Mecap News Dec., 1984; 9:5.
27. *Taff, ML,* Reich, L: Deaths attributed to electrocution. Mecap News Dec., 1984; 9:5.
28. Desai, A, *Taff, ML,* Kamino, H, Siegal, FP: The acquired immunodeficiency syndrome. Medical Grand Rounds 1984; 3:196-205.
29. Danto, BL, *Taff, ML,* Mirchandani, HG: Cases of self-destructive behavior involving multiple methods during a single episode. Am J Forensic Psychiatry 1985; 6:38-45.
30. Leslie, J, *Taff, ML,* Mulvihill, M: Forensic aspects of fraternity hazing. Am J Forensic Med Pathol 1985; 6:53-67.
31. Nunez, AE, *Taff, ML:* A chemical burn simulating child abuse. Am J Forensic Med Pathol 1985; 6:181-183.
32. Lawrence, RD, Spitz, WU, *Taff, ML:* Suicidal electrocution in a bathtub. Am J Forensic Med Pathol 1985; 6:276-278.
33. Spitz, WU, *Taff, ML:* Intrapleural golf ball size loose body: an incidental finding at autopsy. Am J Forensic Med Pathol 1985; 6:329-331.
34. Hardwicke, MB, *Taff, ML,* Spitz, WU: A case of suicidal hanging in an automobile. Am J Forensic Med Pathol 1985; 6:362-364.
35. Russo, S, *Taff, ML,* Mirchandani, HG, Montforte, JR, Spitz, WU: Scald burns complicated by isopropyl alcohol intoxication: a case of fatal child abuse. Am J Forensic Med Pathol 1986; 7:81-83.
36. *Taff, ML:* Deaths resulting from fires, thermal burns, or carbon monoxide poisoning. Mecap News May, 1985; 10:3.
37. *Taff, ML:* Deaths caused by electrocution. Mecap News June, 1985; 10:5.
38. *Taff, ML:* Deaths resulting from fires, thermal burns, or carbon monoxide poisoning. Mecap News Oct., 1985; 10:4.
39. *Taff, ML:* Deaths due to other causes. Mecap News Oct., 1985; 10:7.
40. *Taff, ML:* Deaths due to other causes. Mecap News Nov., 1985; 10:5.
41. McQuillen, EN, *Taff, ML:* Forensic pathologist exchange program. Am J Forensic Med Pathol 1986; 7:90.
42. Puff, M, *Taff, ML,* Spitz, WU, Eckert, WG: Syncope and sudden death caused by mitral valve myxomas. Am J Forensic Med Pathol 1986; 7:84-86.
43. Katanick, D, *Taff, ML,* Spitz, WU: A work-related death due to a penetrating chest injury. Am J Forensic Med Pathol 1986; 7:163-164.
44. *Taff, ML:* Residents' Corner - Editor - Herman, GE, Kanluen, S, Montforte, J, Husain, M, Spitz, WU: Fatal thyrotoxic crisis: a case report. Am J Forensic Med Pathol 1986; 7:174-176.
45. *Taff, ML:* New York Society of Forensic Sciences. Am J Forensic Med Pathol 1986; 7:180.
46. Eckert, WG, Bell, JS, Stein, RJ, Tabakman, MB, *Taff, ML,* Tedeschi, LG: Clinical forensic medicine. Am J Forensic Med Pathol 1986; 7:182-185.
47. Wolodzko, AA, *Taff, ML,* Lukash, LI: Herniation of the heart: a death following intrapericardial pneumonectomy. Am J Forensic Med Pathol 1986; 7:260-262.
48. Russo, SS, *Taff, ML,* Ratanaproeska, O, Spitz, WU: Sudden death resulting from chicken bone perforation of the esophagus. Am J Forensic Med Pathol 1986; 7:263-265.

49. Wolodzko, AA, *Taff, ML,* Ratanaproeska, O, Spitz, WU: An unusual case of compression asphyxia and smothering. Am J Forensic Med Pathol 1986; 7:354-355.

50. *Taff, ML:* Deaths associated with other recreational vehicles and activities. Mecap News Feb., 1986; 11:3.

51. *Taff, ML:* Deaths resulting from fires, thermal burns, or carbon monoxide poisoning. Mecap News Feb., 1986; 11:6.

52. Yelin, G, *Taff, ML,* Sadowski, GE: Copper toxicity following massive ingestion of coins. Am J Forensic Med Pathol 1987; 8:78-85.

53. Stephens, PJ, *Taff, ML:* Rectal impaction following enema with concrete mix. Am J Forensic Med Pathol 1987; 8:179-182.

54. Boglioli, LR, *Taff, ML,* Lukash, LI: Harness racing injuries and deaths: a report of a fatal case and review of 178 cases. Am J forensic Med Pathol 1987; 8:185-207.

55. Jason, DR, Kessler, SC, *Taff, ML,* Boglioli, LR: Casino-related deaths in Atlantic City, New Jersey: 1982-86 [abstract]. Program of 1988 Annual Meeting of the American Academy of Forensic Sciences, Philadelphia, PA, Feb. 20, 1988.

56. *Taff, ML:* Libel and slander protection for the dead: another problem for medical examiners [letter]. Am J Forensic Med Pathol 1988; 9:1-4.

57. Rimarenko, S, Finkel, L, *Taff, ML,* Weiss, MF, Schwartz, IS, Federman, Q, Boglioli, LR: Fatal complications related to diagnostic barium enema. Am J Forensic Med Pathol 1988; 9:78-84.

58. Boglioli, LR, *Taff, ML,* Green, AS, Lukash, LI, Lane, R: A bizarre case of vehicular suicide. Am J Forensic Med Pathol 1988; 9:169-178.

59. Boglioli, LR, *Taff, ML:* Sudden death due to ruptured pancreaticoduodenal artery aneurysm. Am J Forensic Med Pathol 1988; 9:267-270.

60. *Taff, ML,* Boglioli, LR: Strangulation: a conceptual approach for courtroom presentation. Am J Forensic Med Pathol 1989; 10:216-220.

61. Boglioli, LR, *Taff, ML:* Religious objection to autopsy: an ethical dilemma for medical examiners. Am J Forensic Med Pathol 1990; 11:1-8.

62. Boglioli, LR, *Taff, ML:* Deaths at the workplace: accidents or homicides? Am J Forensic Med Pathol 1990; 11:66-70.

63. Jason, DR, *Taff, ML,* Boglioli, LR: Casino-related deaths in Atlantic City, New Jersey: 1982-86. Am J forensic Med Pathol 1990; 11:112-123.

64. *Taff, ML,* Wolodzko, AA, Boglioli, LR: Sudden death due to delayed rupture of hepatic subcapsular hematoma following blunt abdominal trauma. Am J Forensic Med Pathol 1990; 11:270-274.

65. *Taff, ML,* Wolodzko, AA, Lukash, LI, Kubic, TA, Bruno, CN, Boglioli, LR: M-80 fireworks explosion: a bizarre case of suicide. Am J Forensic Med Pathol (In Press).

66. Boglioli, LR, *Taff, ML,* Stephens, PJ, Money, J: A case of autoerotic asphyxia associated with multiplex paraphilia. Am J Forensic Med Pathol 1991; 12:64-73.

67. *Taff, ML,* Schwartz, IS, Boglioli, LR: Sudden asphyxial death due to prolapsed esophageal fibrolipomata. Am J Forensic Med Pathol 1991; 12:85-88.

68. *Taff, ML,* Schwartz, IS, Churg, J, Boglioli, LR: Sudden death due to thrombotic thrombocytopenic purpura [letter]. Am J Forensic Med Pathol 1991; 12:89-90.

69. *Taff, ML:* Book Review: DiMaio, DJ, DiMaio, VJM: Forensic Pathology. Elsevier Science Publishing Co., Inc., New York, NY, 1989. Am J Forensic Med Pathol 1991; 12:91-92.

70. Boglioli, LR, *Taff, ML,* Spitz, WU, Gordon, RE:  Sudden death of an elderly man with multiple malignant neoplasms.  Am J Forensic Med Pathol 1991; 12:265-271.

71. *Taff, ML,* Boglioli, LR:  Variants of the long scarf syndrome [letter].  Am J Forensic Med Pathol 1991; 12:359.

72. *Taff, ML:*  Exhumed Presidents' Society [letter].  Am J Forensic Med Pathol 1992; 13:89.

73. *Taff, ML,* Boglioli, LR, Wright, ME, Gamma, SJ:  Sudden death due to self-treatment of peripheral edema with rubberband tourniquet.  Am J Forensic Med Pathol 1992; 13:135-136.

74. *Taff, ML,* Boglioli, LR:  Homicidal traumatic asphyxia associated with pebble impaction of the upper airway.  Am J Forensic Med Pathol 1992; 13:271-274.

75. Danto, BL, *Taff, ML,* Boglioli, LR:  Graveside suicide [abstract].  Symposium Abstracts of the American Institute of Life-Threatening Illness and Loss.  Vol. 10, No. 1, Sept. 8-10, 1992.

76. Meschutt, D, *Taff, ML,* Boglioli, LR:  Life masks and death masks.  Am J Forensic Med Pathol 1992; 13:315-319.

77. Behrmann, CH, *Taff, ML,* Boglioli, LR, Micheels, PA:  NYC firefighting rose from the spectre of disaster.  Hudson Valley Fireighter, Vol. 1, Sept. 1992, pp. 21,24.

78. *Taff, ML:*  Poem: White rap.  NY Amsterdam News, Oct. 3, 1992, p. 13.

79. Behrmann, CH, *Taff, ML,* Boglioli, LR, Micheels, PA:  Fire investigations keep NYC blazes down.  Hudson Valley Fireighter, Vol. 1, Nov. 1992, p. 14.

80. *Taff, ML,* Boglioli, LR:  Long-scarf syndrome still claims lives [letter].  NY Times, Nov. 5, 1992, p. A34.

81. Behrmann, CH, *Taff, ML,* Boglioli, LR, Micheels, PA:  Past, present honored by New York City Fire Museum.  Hudson Valley Fireighter, Vol. 1, Dec. 1992, pp. 19-20.

82. *Taff, ML,* Boglioli, LR:  Discussion of "Practical approach to investigative ethics and religious objections to autopsy."  J Forensic Sci 1993; 38:234.

83. *Taff, ML,* Boglioli, LR:  Fraternity hazing revisited through a drawing by George Bellows.  JAMA 1993; 269:2113-2115.

84. *Taff, ML:*  Poem: Black on the outside/white on the inside.  Poetic Voices of America, sparrowgrass Poetry Forum, Inc., Spring, 1993, p. 12.

85. *Taff, ML,* Boglioli, LR:  Hazing remains secret and dangerous [letter].  NY Times, Feb. 9, 1993, p. A20.

86. *Taff, ML,* Boglioli, LR:  Images of death: morbid curiosity versus the law [letter].  NY Times, May 23, 1993, p. H4.

87. Danto, BL, *Taff, ML,* Boglioli, LR:  Graveside suicide [abstract].  Program of 45th Annual Meeting of American Academy of Forensic Sciences, Psychiatry & Behavioral Science Section, Feb. 18, 1993, p. 154.

88. Baker, PR, *Taff, ML:*  The murder of Stanford White [abstract].  Program of 45th Annual Meeting of American Academy of Forensic Sciences, Last Word Society, Feb. 19, 1993, pp. 182-183.

89. *Taff, ML,* Boglioli, LR:  My View: Doctors should not be involved in executions [letter].  Times Herald Record, June 26, 1993, p. 41.

90. *Taff, ML:*  George meets Marge [letter].  Newsday, July 19, 1993, p. 33.

91. *Taff, ML:*  Poem: Jazz music.  The Coming of Dawn. The National Library of Poetry, Owings Mills, MD, 1993, p. 388.

92. *Taff, ML:*  DA's can't stomach crime scenes [letter].  Sunday Record, Middletown, NY: Nov. 7, 1993, p. 65.

93. *Taff, ML,* Spitz, WU, Boglioli, LR:  A discussion of a suicide by self-decapitation [letter].  J Forensic Sci 1994; 39:304.

94. Boglioli, LR, *Taff, ML:* LA morgue goes Hollywood [letter].  J Forensic Sci 1994; 39:598-599.

95. Boglioli, LR, *Taff, ML,* Ingrassia, AJ:  The crash of an 83-year-old civilian pilot in Upstate New York.  J Am Geriatr Soc 1994; 42:670-671.

96. *Taff, ML,* Boglioli, LR:  Commentary: Pathologists as executioners.  Bull NY Acad Med, Summer, 1994; 71:1-3.

97. Danto, BL, *Taff, ML,* Boglioli, LR:  Death in the cemetery.  Am Cemetery, May, 1994; 67:28,30,36-37.

98. *Taff, ML:*  A most unusual case: no-fly zone.  Cortland Forum 1994; 7:41.

99. Boglioli, LR, *Taff, ML:*  Chapter 6:  The medicolegal investigation of autoerotic asphyxial deaths.  In, Krivacska, JJ, Money, J (Eds.):  The Handbook of Forensic Sexology: Biomedical & Criminological Perspectives.  Amherst, NY: Prometheus Books, 1994, pp. 155-165.

100. Boglioli, LR, *Taff, ML:*  Death due to late postpartum eclampsia.  Hosp Physician 1994; 30:49-51.

101. Boglioli, LR, Bahr, GS, *Taff, ML,* Kutnick, RA:  Pulmonary artery pseudoaneurysm secondary to Swan-Ganz catheterization.  Hosp Physician 1994; 30:18-22,47.

102. *Taff, ML:*  Experts for the poor [letter].  J Forensic Sci 1995; 40:4-5.

103. *Taff, ML:*  A most unusual case: Deadly rites of passage.  Cortlandt Forum 1995; 8:40.

104. Schwartz, EA, Vallaro, KE, Pool, TM, Adamo, TA, *Taff, ML,* Boglioli, LR:  Optical analyses of eyeglass lens fragments and the unexpected detection of oral sperm in a homicide case.  J Forensic Sci 1995; 40:306-309.

105. Boglioli, LR, *Taff, ML:*  Death by fraternity hazing.  Am J Forensic Med Pathol 1995; 16:42-44.

106. *Taff, ML:*  Reply to letters about 'A most unusual case: no-fly zone.'  Cortlandt Forum 1995; 8:12.

107. *Taff, ML,* Boglioli, LR:  Minister's death suggests car crash as suicide [letter].  NY Times, Apr. 6, 1995, p. A30.

108. Boglioli, LR, *Taff, ML:*  "The Santa Claus Syndrome": entrapment in chimneys.  J Forensic Sci 1995; 40:499-500.

109. *Taff, ML,* Boglioli, LR:  Autopsies prevent exhumations [letter].  Times Herald Record, June 9, 1995; 39:53.

110. *Taff, ML,* Boglioli, LR:  Elderly pilots, too, need more stringent testing [letter].  NY Times, July 19, 1995, p. A18.

111. *Taff, ML:*  Poem: Amerigun people.  In, Stevens, C, Sullivan, C (Eds.):  Best Poems of 1995.  The National Library of Poetry, Owings Mills, MD, 1995, p. 156.

112. *Taff, ML,* Boglioli, LR:  Casinos need better health care.  Times Herald Record, Aug. 26, 1995, p. 38.

113. *Taff, ML,* Boglioli, LR:  Physicians as judicial hangmen [letter].  Radiol 1995; 196:614.

114. *Taff, ML,* Boglioli, LR:  Authors' reply to Drs. Cohen et al., Rabl, and Magid [letter].  Radiol 1995; 196:616.

115. Baker, PR, *Taff, ML:*  The murder of Stanford White.  LI Historical J 1995; 8:39-55.

116. Lazoglu, AH, Boglioli, LR, *Taff, ML,* Rosenbluth, M, Macris, NT:  Serum sickness reaction following multiple insect stings [abstract].  Program of Third Lenox Hill Hospital Research Conference, New York, NY, Nov. 1, 1995, p. 99.

117. *Taff, ML:*  Caution urged when stating interval between onset of a condition and death...[letter].  N.A.M.E. News 1995 (Dec.); 3:2.

118. *Taff, ML*:  Poem: Baldness.  In, Stevens, CA, Walstrum, N (Eds.):  Beyond the Stars.  The National Library of Poetry, Owings Mills, MD, 1995, p. 135.

119. *Taff, ML*, Boglioli, LR:  Cemetery security needs update [letter].  Times Herald Record, Dec. 21, 1995; 39:52.

120. Lazoglu, AH, Boglioli, LR, *Taff, ML*, Rosenbluth, M, Macris, NT:  Serum sickness reaction following multiple insect stings.  Ann Allergy asthma Immunol 1995; 75:522-524.

121. *Taff, ML*, Boglioli, LR:  Suicide weapons of choice [letter].  Newsday, Jan. 12, 1996; 56:A35.

122. *Taff, ML*, Boglioli, LR*:  Child abuse issue complex [letter].  Times Herald Record, Jan. 22, 1996; 40:31. (*name inadvertently omitted from publication)

123. *Taff, ML*, Boglioli, LR:  Trends in shaking baby syndrome (SBS) [opinion].  NY Amsterdam News, Feb. 3, 1996; 87:13,44.

124. *Taff, ML*, Boglioli, LR:  Endoscopy is not autopsy [letter].  Am J Forensic Med Pathol 1996; 17:86-88.

125. *Taff, ML*, Boglioli, LR:  The politics of death investigation [letter].  Am J Forensic Med Pathol 1996; 17:88.

126. *Taff, ML*:  Poem: Tribute to Dr. John Money.  Institute for Advanced Study of Human Sexuality Alumni Association News 1996; 14:8-9.

127. *Taff, ML*:  Death watch [letter].  Village Voice, Apr. 17-23, 1996; 41:4,6.

128. *Taff, ML*, Boglioli, LR:  Responsible pictures [letter].  NY Times, Apr. 21, 1996, pp. H6,33.

129. *Taff, ML*:  Compensation of medical examiners for telephone calls.  Am J Forensic Med Pathol 1996; 17:174-175.

130. *Taff, ML*, Boglioli, LR:  Artist outsiders often criticized [letter].  Times Herald Record, June 11, 1996, p. 37.

131. *Taff, ML*:  Published and perished.  JAMA 1996; 275:1862.

132. *Taff, ML*:  The meaning of the O.J. Simpson verdict [letter].  J Forensic Sci 1996; 41:552.

133. *Taff, ML*:  Book Review: "An Unquiet Mind: A Memoir of Moods and Madness."  Suicide & Life-Threatening Behav 1996; 26:315-316.

134. *Taff, ML*:  Poem: Getting ready for school.  In, Stevens, CA (Ed.):  Carvings in Stone.  The National Library of Poetry, Owings Mills, MD, 1996, p. 59.

135. *Taff, ML*, Boglioli, LR:  Only doctors know how much to charge for calls [letter].  Med Economics 1996; 73:16,22.

136. *Taff, ML*, Boglioli, LR, DeFelice, JF:  Commentary on controversies in shaken baby syndrome and on Gilliland, MGF and Folberg, R., Shaken babies - some have no impact injuries (J Forensic Sci 1996 Jan; 41(1):114-16) [letter].  J Forensic Sci 1996; 41:729-730.

137. *Taff, ML*:  The business of forensic pathology [letter].  J Forensic Sci 1996; 41:1090-1091.

138. *Taff, ML*, Boglioli, LR, Danto, BL: Commentary on Meloy JR. Pseudonecrophilia following spousal homicde. J Forensic Sci 1996 Jul; 41(4):706-8 [letter].  J Forensic Sci 1996; 41:1091-1092.

139. *Taff, ML*, Boglioli, LR:  Gay violence must be studied [letter].  Times Herald Record, Nov. 15, 1996, p. 56.

140. *Taff, ML*, Boglioli, LR:  Gay homicides and 'overkill' [letter].  Am J Forensic Med Pathol 1996; 17:350-351.

141. *Taff, ML*, Boglioli, LR*:  Needed: trained hunters [letter].  Newsday, Dec. 14, 1996, p. A22.  (*name inadvertently omitted from publication)

142. *Taff, ML*, Boglioli, LR:  An accident waiting to happen [letter].  Times Herald Record, Dec. 15, 1996, p. 45.

143. Danto, BL, *Taff, ML,* Boglioli, LR:  Graveside deaths.  Omega (J Death & Dying) 1996; 33:265-278.

144. *Taff, ML:*  Poem: Winter blues.  In, Ely, H (Ed.):  Best Poems of the '90s.  The National Library of Poetry, Owings Mills, MD, 1996, p. 214.

145. *Taff, ML,* Boglioli, LR:  Cyril H. Wecht, M.D., J.D., 1996 career Achievements Award Honoree of the New York Society of Forensic Sciences at Lehman College.  J Forensic Sci 1997; 42:160-161.

146. *Taff, ML:*  Kunstler's legacy most important [letter].  Times Herald Record, Jan. 10, 1997, p. 35.

147. *Taff, ML,* Boglioli, LR:  Deaths in the workplace: looking beyond the numbers [letter].  NY Times, Jan. 26, 1997, p. F17.

148. *Taff, ML,* Boglioli, LR:  Do not try this at home [letter].  Wall St J, Jan. 28, 1997, p. A17.

149. *Taff, ML,* Boglioli, LR:  Rodeo helmets make sense [letter].  Am Med News, Feb. 24, 1997; 40:52.

150. *Taff, ML:*  Author's reply: Compensation for medical examiners for telephone calls [letter].  Am J Forensic Med Pathol 1997; 18:109.

151. *Taff, ML:*  Book Review: "The Architect of Desire: Beauty and Danger in the Stanford White Family."  LI Historical J 1997; 9:254-257.

152. *Taff, ML,* Boglioli, LR:  Harness racing is dangerous [letter].  Times Herald Record, May 10, 1997, p.42.

153. *Taff, ML,* Boglioli, LR:  Historical note and notice: The New York Society of Forensic Sciences at Lehman College, City University of New York, 1985 to 1996.  Bull NY Acad Sci 1997; 74:148-150.

154. Boglioli, LR, Gardiner, J, Gerstenblith, G, *Taff, ML,* Cameron, DE:  Carcinoid heart disease with severe hypoxia due to interatrial shunt through patent foramen ovale Tex Heart Inst J 1997; 24:125-128.

155. *Taff, ML,* Boglioli, LR:  On telephone services [letter].  Health Care Business Digest 1997; 2:15.

156. *Taff, ML,* Boglioli, LR:  Obituary: George Furst, D.D.S  Am J Forensic Med Pathol 1997; 18:319-320.

157. *Taff, ML,* Boglioli, LR*:  Dramshop laws and the death of Princess Di [letter].  Education Update 1997; 3:10.(*name inadvertently omitted).

158. *Taff, ML:*  Princess Diana's death brings to light the dangers of drinking and driving.  The Chronicle (Hofstra University) Oct. 9, 1997; Vol. 63, p.13.

159. *Taff, ML:*  Poem: The Civil War in living color.  In, Zeiger, D (Ed.):  The Isle of View.  The National Library of Poetry, Owings Mills, MD, 1997, p. 19.

160. *Taff, ML:*  Book Review: "Stanford White: Letters to His Family."  LI Historical J 1997; 10:123-125.

161. *Taff, ML,* Boglioli, LR:  Gay homicides and 'overkill' [letter].  Am J Forensic Med Pathol 1997; 18:411-412.

162. *Taff, M:*  Shaking baby syndrome.  Education Update 1998; 3:17.

163. *Taff, ML,* Boglioli, LR:  Elderly gamblers and health risks [letter].  NY Times, Feb. 22, 1998, p.LI27.

164. *Taff, ML:*  Evidence to the contrary [letter].  Newsday, March 19, 1998, p.A52.

165. *Taff, ML:*  Sprewell's misinterpretation of forensic evidence [letter].  Education Update 1998; 3:2.

166. *Taff, ML:*  Street crime: the trade-off for peace [editorial in 'Special: Violence in Youth: Part I'].  Education Update May, 1998; 3:19.

167. *Taff, ML,* Boglioli, LR, Danto, BL:  Planned complex suicide: an unusual suicide by hanging and gunshot [letter].  Am J Forensic Med Pathol 1998:19:194

168. Boglioli, LR, *Taff, ML:* Sudden asphyxial death complicating infectious mononucleosis. Am J Forensic Med Pathol 1998; 19:174-177.

169. *Taff, M*, Boglioli, L: Autopsies needed to catch serial hospital murderers [letter]. Education Update June/July 1998; 3:2.

170. *Taff, ML:* Poem: Farewell Father. In, Ely, H (Ed.): Best Poems of 1998. The National Library of Poetry, Owings Mills, MD, 1998, p. 203.

171. *Taff, M*, Boglioli, LR: Will G.E. replace the M.E.? [letter]. J Forensic Sci 1998; 43:918.

172. Boglioli, LR, *Taff, ML*, Funke, S, Mihalakis, I: Sudden death due to sarcoid heart disease. J Forensic Sci 1998; 43:1072-1073.

173. *Taff, M*, Boglioli, L, Maris, R: In appreciation: Bruce L. Danto, M.D. - a street smart forensic psychiatrist. News Link (newsletter of American Association of Suicidology) 1998; 24:4.

174. *Taff, ML*, Boglioli, LR: Autopsies needed to uncover doctor impostors and serial hospital killers [letter]. Am Med News, Vol. 41, Sept. 7, 1998, pp.31-32.

175. Boglioli, LR, *Taff, ML*, Harleman, G: Child homicide due to commotio cordis. Pediatr Cardiol 1998; 19:436-438.

176. *Taff, ML*, Boglioli, LR: Open communication helps doctors serve patients better [letter]. The Chronicle (Hofstra University) Oct. 15, 1998; Vol. 64, p.12.

177. *Taff, ML:* Poem: Poetry. In, Schaub, R (Ed.): Dawn of Silence. The National Library of Poetry, Owings Mills, MD, 1998, p. 55.

178. *Taff, ML*, Boglioli, LR: Science and politics of cutting and stabbing injuries in the USA. J Clin Forensic Med 1998; 5:80-84.

179. *Taff, ML:* Poem: Last moments of the Titanic. In, Stokes, AR, Hughes, A: Of Time and Tide. The National Library of Poetry, Owings Mills, MD, 1998. p.15.

180. *Taff, ML:* Poem: Subway over Harlem. In, Mitchell, MS: Outstanding Poets of 1998. The National Library of Poetry, Owings Mills, MD, 1998. p.235.

181. *Taff, ML:* In Memoriam: Bruce L. Danto, M.D. Omega: J Death & Dying 1998; 37:88.

182. *Taff, ML:* Poem: Hyphe-Nation. Rhymes of Greatness: Famous Poets Society. French, M (Ed). Los Angeles, CA, 1998, p.213.

183. *Taff, ML*, Boglioli, LR: Don't take a chance: don't drink and drive [letter]. Newsday, Fri. Jan. 8, 1999, Vol. 59, p.A47.

184. *Taff, ML:* Wake-up call for Libby Zion law [letter]. Education Update, Jan. 1999, Vol. 4, p.2.

185. *Taff, ML*, Boglioli, LR: Obituary: Bruce L. Danto, M.D.: A street smart forensic psychiatrist. J Forensic Sci 1999; 44:235-236.

186. Boglioli, LR, *Taff, ML:* Death during percutaneous insertion of intraaortic balloon pump. J Forensic Sci 1999; 44:425-427.

187. Boglioli, LR, *Taff, ML*, Carlucci, MA: Fatal epinephrine overdose during treatment for angioedema. J Forensic Med Toxicol 1998;15:10-11.

188. *Taff, ML:* Poem: Subway Over Harlem. In, Outstanding Poets of 1998: The National Library of Poetry. Mitchell, MS (Ed.). Owings Mills, MD, 1998, p.235.

189. *Taff, ML:* Poem: War cemeteries. In, Searching for Answers: The Poetry Guild. Troon, T: Finalist Publishing Center, Bath, Ohio, 1999, p.292.

190. *Taff, ML:* Teeth can inflict grave injuries on people [letter]. Times Union, Albany, NY, May 22, 1999.

191. *Taff, ML:* Body parts can inflict grave injuries on people [letter]. J Forensic Sci, 1999; 44:1091.

192. Boglioli, LR, *Taff, ML:* A report of two hunting-related fatalities in the State of New York. Am J Med & Sports 1999; 1:201-204.

193. *Taff, ML:*  Poem: Mirror images. In, The Dawn of Inspiration.  Mitchell, MS
(Ed.).  The National Library of Poetry, Owings Mills, MD, 1999.

194. *Taff, ML:*  Poem:  A death scene remembered. In, Through Oceans of Time.
Hughes, AC (Ed.) The International Library of Poetry.  Owings Mills, MD, 1999.

195. *Taff, ML:*  Poem: Sidewalks of salvation.  In, Journey to Infinity.  Olsen, MC
(Ed.).  The International Library of Poetry, Owings Mills, MD, p.80.

196. *Taff, ML:*  Poem: War inside a rectangle. In, The Fountain of Peace.  Olsen, MC
(Ed.).  The International Library of Poetry, Owings Mills, MD, 2000, p.250.

197. *Taff, ML:*  Poem: Martin Luther King, Jr. Day: January 18, 1999. In, The Fires of
Sunset. Sullivan, JC (Ed.).  International Library of Poetry, Owings Mills, MD,
2000, p.19.

198. *Taff, ML:*  Poem: Sunrise. In, Chorus of the Soul.  Keenan, EL (Ed.).  The
International Library of Poetry, Owings Mills, MD, 2000, p.69.

199. Boglioli, LR, *Taff, ML,* Turkel, SJ, Taylor, JV, Peterson, CD:  Unusual infant
death: dog attack or postmortem mutilation following child abuse?  Am J
Forensic Med Pathol 2000; 21:389-394.

200. *Taff, ML:*  Poem: Obituary. In, America at the Millennium: The Best Poems and
Poets of the 20th Century.  Ely, H (Ed.).  The International Library of Poetry,
Owings Mills, MD, 2000, p.41.

201. *Taff, ML:*  Poem: References. In, An Hour at Sunrise.  Petri, EW (Ed.).  The
International Library of Poetry, Owings Mills, MD, 2000, p.80.

202. *Taff, ML,* Boglioli, LR: Primo Levi's death: physicians and the ruling of suicide
[letter]. Suicide & Life-Threatening Behav 2000; 30:386-387.

203. *Taff, ML:*  Poem: Summer. In, Timeless Mysteries.  Hairfield, V (Ed.).   The
International Library of Poetry, Owings Mills, MD, 2001, p.150.

204. *Taff, ML,* Danto, BL, Boglioli, LR:  Cemetery deaths: historical, social
anthropologic & psychodynamic perspectives.  Memory, Guilt, Anger &
Depression in Bereavement (Accepted for Publication).

205. *Taff, ML:*  Poem: Poetry. The National Library of Poetry, Owings Mills, MD
(Accepted for Publication).

206. *Taff, ML:*  Death, society, and the medical examiner.  J Am Inst Life-
Threatening Ill & Loss (Accepted for Publication).

207. *Taff, ML:*  Let's get the voir dire outta here.  J Forensic Sci (Submitted for
Publication).

208. *Taff, ML:*  A case of homicide nullified by medicolegal politics and the Grand
Jury.  J Forensic Sci (Submitted for Publication).

209. *Taff, ML:* Poem: Farewell father.  Education Update (Accepted for Publication).

210. *Taff, ML:*  Poem: Poetry. The National Library of Poetry, Owings Mills, MD
(Accepted for Publication).

211. *Taff, ML:*  Poem: Asphyxiated. The International Library of Poetry, Owings Mills,
MD (Accepted for Publication).

212. *Taff, ML,* Boglioli, LR:  Autopsies needed to stop serial hospital murders [letter].
Am J Forensic Med Pathol (Submitted for Publication).

213. *Taff, ML:*  Poem: The abyss of domestic bliss. The National Library of Poetry,
Owings Mills, MD (Accepted for Publication).

214. *Taff, ML:*  Poem: Childhood memories. The National Library of Poetry, Owings
Mills, MD (Accepted for Publication).

## Acknowledgements

1. Gordon, RE:  The effects of NO2 on ionic surface charge on type I pneumocytes of hamster lungs.  Am J Pathol (In Press).
2. Eckert, WG:  Medicolegal investigation in New York City: history and activities 1918-1978.  Am J Forensic Med Pathol 1983; 4:33-54.
3. Pervez, NK:  Forensic pathology and related sciences. A model for teaching students.  Am J Forensic Med Pathol 1985; 6:293-295.
4. Eckert, WG, Noguchi, TT, Chao, TC:  Geographic forensic medicine and forensic sciences.  Am J Forensic Med Pathol 1985; 6:343-346.
5. Eckert, WG:  The Editor steps down.  Am J Forensic Med Pathol 1991; 12:277.
6. Sante, L:  Evidence.  New York: Straus & Giroux, 1992.
7. Nuwer, H:  Broken Pledges: The Deadly Rite of Hazing.  Atlanta, GA: Longstreet Press, 1990.
8. Pienciak, RT:  Deadly Masquerade: A True Story of High Living, Depravity and Murder.  New York: Dutton Book/Penguin Books, 1990.
9. Weller, S:  Marrying the Hangman.  New York: Onyx Book/Penguin Books, 1991.
10. Jones, W:  Free courses for hunters.  Newsday, Dec. 30, 1996, p. A27.
11. Connecticut Public Defender Newsletter:  Judgement for the Defense: Recent Courtroom Victories.  Discovery, Fall, 1996, p. 9.
12. Rosen, P:  Slogan contest winner!.  Education Update 1997; 3:1,2.
13. Blanco-Pampin, JM:  Planned complex suicide: Author's reply [letter].  Am J Forensic Med Pathol 1999; 20:304.

## Reprints of Articles

1. Taff, ML:  Exhumed Presidents' Society.  Reprinted with permission in Bull Muscogee County Med Soc (Columbus, GA), Aug., 1992; 39:11.

## References          Available upon request

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 20, 2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

UNITED STATES OF AMERICA                              :
                                                     :
                                                     :
            -v-                                      :        14 Cr. 68 (KBF)
                                                     :
                                                     :        <u>ORDER</u>
ROSS WILLIAM ULBRICHT,                               :
                              Defendant.             :
                                                     :
------------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

     The Court has been reviewing the mitigation materials provided by defendant

and has several questions.

1.    Can defendant provide the Court a complete copy of all of Dr. Caudevilla's

    communications with DPR (including, but not limited to, his weekly reports and

    private messages)?  Defendant has attached two excerpts at Exs. 6 and 7 to the

    Lewis Declaration; the Court would like a complete set.

2.    In the Declaration of Tim Bingham, he states, "I did not encounter a single

    customer whose first drug purchase was on the Silk Road website."  (Bingham

    Decl. ¶ 6(f).)  What is this based on?  Was there a specific question posed in this

    regard?  Please provide the Court the [form of] questionnaire.

    —Similarly, what is Bingham's conclusion in ¶ 6(j) based on?  (<u>See</u> Bingham

    Dec. ¶ 6(j) ("I also did not encounter any Silk Road user who would have stopped

    purchasing drugs entirely if unable to do so on Silk Road.").)  Please provide the

    Court the [form of] questionnaire.

—Relatedly, in footnote 2, Bingham states that certain users found that "Silk Road provided them the opportunity to try drugs they would otherwise not have known to try or had access to."  (Bingham Decl. at 4 n.2.)  Does Bingham's conclusion in ¶ 6(j) take such new/introductory usage into account?  In other words, if a user had only tried 2C after learning of it on Silk Road, did that user indicate that he/she would continue to purchase such drugs elsewhere if unable to do so on Silk Road?

3.    Bingham references violence/safety concerns expressed by respondents.  Were these concerns expressed by users or sellers or both (e.g., safety at the wholesale or retail level)?

4.    In reaching their conclusions as to Silk Road's safety, did Bingham and Ralston consider DPR's commission of murders-for-hire?  Is that relevant to their conclusions in this regard?

5.    Dr. Caudevilla states in ¶ 10 of his declaration that, during his seven months of providing advice on Silk Road, he never came across a single report of a Silk Road–related overdose.  Did he consider whether the posts of a number of users describing symptoms could have related to non-fatal overdoses (e.g., oldcactushand's post dated May 31, 2013)?

SO ORDERED.

Dated:      New York, New York
            May 20, 2015

_____
            KATHERINE B. FORREST
            United States District Judge

2

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK  10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL                                                                                    STEVEN WRIGHT
—                                                                                                                        *Office Manager*
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

May 22, 2015

**BY ECF**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:     *United States v. Ross Ulbricht*,
14 Cr. 68 (KBF)

Dear Judge Forrest:

This letter is submitted on behalf of defendant Ross Ulbricht in connection with his sentencing, scheduled for May 29, 2015, at 1 p.m., and supplements my May 15, 2015, letter, which addressed certain evidentiary issues related to information the government provided regarding sentencing, and a prospective hearing pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978).  Discussion of those issues will not be repeated herein (and are therefore respectfully incorporated herein by reference), except with respect to discrete matters not addressed in my May 15, 2015, letter, but which are relevant to sentencing generally;  rather, this letter predominantly covers other issues relevant to sentencing.

For the reasons set forth below, it is respectfully submitted that analysis and application of the sentencing factors enumerated in 18 U.S.C. §3553(a) establish that a sentence substantially below the applicable advisory Sentencing Guidelines range represents a sentence "sufficient but not greater than necessary" to achieve the goals of sentencing listed in 18 U.S.C. §3553(a)(2).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 2 of 78

As detailed below, those reasons include:

(1)     Mr. Ulbricht's personal history and background, as reflected in the scores of
letters submitted herewith on his behalf, which establish that Mr. Ulbricht is far
more multifaceted than merely the conduct for which he has been convicted,[1] has
expressed genuine remorse for his conduct related to the Silk Road web site, and
can make – and is committed to making, as his own letter attests – a positive
contribution to society after completion of a sufficient but not unnecessarily
lengthy prison term;

(2)     the nature of Mr. Ulbricht's offense conduct, and the motivation and intent
underlying that conduct;

(3)     the need, pursuant to 18 U.S.C. §3553(a)(6), to "avoid unwarranted sentence
disparities among defendants with similar records who have been found guilty of
similar conduct[;]"

(4)     that, for practical, policy, and equitable reasons, including ongoing empirical and
academic research, as well as the realities of drug trafficking and drug use
notwithstanding the severity of federal sentences for three decades, general
deterrence does not serve as a basis for enhancing Mr. Ulbricht's sentence;

(5)     the empirical and academic research has established that longer prison sentences
do not reduce recidivism, and that individuals over the age of 40 – which Mr.
Ulbricht will reach well before the mandatory minimum term of 20 years'
imprisonment would expire – present a significantly reduced threat of recidivism;

(6)     the statistical information from the United Statets Sentencing Commission, which
establishes that a sentence *below* the applicable Guidelines range is not only very
much the *norm* in the Southern District of New York (hereinafter "SDNY"), but
increasing in frequency, as 73.1% of sentences during all of Fiscal Year 2014 and
77.1% of sentences during the First Quarter of Fiscal Year 2015 in SDNY were
below the applicable Guidelines range;  and

(7)     Mr. Ulbricht has spent his 20-month confinement at the Metropolitan Detention

---

[1]  Of course, in the context of sentencing, the jury's verdict is deemed dispositive with
respect to the legal implications of Mr. Ulbricht's conduct.  However, that context does not
waive any of his rights to appeal that verdict.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 3 of 78

Center ("MDC") in Brooklyn (13 months) and the Metropolitan Correctional Center ("MCC"), facilities that have been recognized by courts as constituting harsh pretrial confinement and therefore a basis for a sentence below the applicable Guidelines range.[2]

In addition, this letter enumerates Mr. Ulbricht's corrections, additions, and/or objections to the Pre-Sentence Report, and seeks a recommendation from the Court that the U.S. Bureau of Prisons (hereinafter "BoP") waive any Public Safety Factors and/or Management Variables that might preclude designation of Mr. Ulbricht to a BoP facility commensurate with the security criteria that would otherwise apply to him.

Accordingly, for all these reasons, it is respectfully submitted that Mr. Ulbricht should be sentenced to a prison sentence substantially below the applicable advisory Guidelines range.

**I.**    ***The Principles Governing Federal Sentencing Since* United States v. Booker,** ***543 U.S. 220 (2005), Require the Court to Look Beyond the Guidelines In Order to Arrive at a Sentence Sufficient But Not Greater Than Necessary to Achieve the Purposes of Sentencing Set Forth in 18 U.S.C. §3553(a)(2)***

The PSR calculates Mr. Ulbricht's Offense Level as Level 43, with a Criminal History Category (hereinafter "CHC") of I, corresponding to an advisory Sentencing Guidelines range of life imprisonment.  Yet the Guidelines calculation merely begins the analysis.  In that context, the PSR also fails to provide any guidance in navigating and evaluating the relevant considerations under §3553(a), and arriving at a sentence "sufficient but not greater than necessary" to achieve the goals listed in §3553(a)(2).

Rather, it merely hews to a reflexive Guidelines-centric analysis without reference to any other factors listed in §3553(a), and fails to recognize that a Guidelines-only approach was constitutionally dismantled by *Booker*, and, in practical terms, has been overwhelmingly abandoned by the courts in this District in the course of their continuing sentencing practice.

---

[2]  Following his October 1, 2013, arrest in San Francisco, California, Mr. Ulbricht was confined in a pretrial facility in California for nearly four weeks before being transferred to MDC, a process that consisted of another three-to-four weeks of travel between various facilities en route.  That process, too, was grueling, as the transient nature of Mr. Ulbricht's stay at each facility along the way meant that while he was in transit he was confined in Special Housing Units and was unable to avail himself of any of the ordinary amenities otherwise accessible to inmates at each facility.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 4 of 78

In *Pepper v. United States*, 562 U.S. 476, 131 S. Ct. 1229 (2011), the Court *twice* emphasized that a sentencing judge assumes "an overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in § 3553(a)(2)." *Id.*, at 1242. *See also United States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. 2010) ("[u]nder §3553(a)'s 'parsimony clause,' it is the sentencing court's duty to 'impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth' at 18 U.S.C. §3553(a)(2)"), *quoting United States v. Samas,* 561 F.3d 108, 110 (2d Cir. 2009).

As the Second Circuit explained in *Dorvee*,

> [e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the §3553(a) sentencing factors. *See* [*United States v.*] *Cavera*, 550 F.3d [180,]189 [(2d Cir. 2008) (*en banc*)].

604 F.3d at 93. *See also Pepper*, 562 U.S. at ___, 131 S. Ct. at 1244-45 (statute – 18 U.S.C. §3742(g)(2) – precluding consideration, at re-sentencing, of post-sentence rehabilitation was invalid because it had the effect of making the Guidelines mandatory in "an entire set of cases").

Thus, as the Supreme Court declared in *Nelson v. United States*, 550 U.S. 350 (2009), "[t]he Guidelines are not only *not mandatory* on sentencing courts;  they are also not to be *presumed* reasonable." *Id.*, at 351 (emphasis in original).[3]  *See also Dorvee*, 604 F.3d at 93 ("[i]n conducting this review [of the §3553(a) sentencing factors], a district court needs to be mindful of the fact that it is 'emphatically clear' that the 'Guidelines are guidelines – that is, they are truly advisory'"), *quoting Cavera*, 550 F.3d at 189.

Indeed, in *Pepper*, Justice Sotomayor again hearkened back to *Koon v. United States*, 518 U.S. 81 (1996) – as Justice Stevens had in *Rita v. United States*, 551 U.S. 338, 364 (2007) (Stevens, J., *concurring*) – repeating that

---

[3]  While the Supreme Court's ruling in *Rita v. United States*, 551 U.S. 338 (2007), established that a within-Guidelines sentence can be presumptively reasonable, *id.* at 347, that presumption is restricted to appellate review and "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Id.* at 351 (*citing United States v. Booker*, 543 U.S. 220, 259-60 (2005)).  *See also Nelson*, 550 U.S. at 351.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 5 of 78

> "[i]t has been uniform and constant in the federal judicial tradition
> for the sentencing judge to consider every convicted person as an
> individual and every case as a unique study in the human failings
> that sometimes mitigate, sometimes magnify, the crime and the
> punishment to ensue."

562 U.S. at ___, 131 S. Ct. at 1239-40, *quoting Koon*, 518 U.S. at 113.

Therefore, while sentencing judges must still consider the Guidelines, *see* 18 U.S.C.
§3553(a)(4), nothing in the statute provides any reason to treat that calculation as more
controlling of the final sentencing decision than any of the other factors a court must consider
under §3553(a) as a whole.  *See United States v. Menyweather*, 431 F.3d 692, 701 (9th Cir.
2005);  *United States v. Lake*, 419 F.3d 111, 114 (2d Cir. 2005), *explaining United States v.
Crosby*, 397 F.3d 103, 111-13 (2d Cir. 2005).

Also, as Justice Scalia noted in his dissent from the "remedial" opinion in *United States
v. Booker,* 543 U.S. 220 (2005):

> [t]he statute provides no order of priority among all those factors,
> but since the three just mentioned [§§ 3553(a)(2)(A), (B) & (C)]
> are the fundamental criteria governing penology, the statute –
> absent the mandate of § 3553(b)(1) – authorizes the judge to apply
> his own perceptions of just punishment, deterrence, and protection
> of the public even when these differ from the perceptions of the
> Commission members who drew up the Guidelines.

543 U.S. at 304-305 (Scalia, J., *dissenting in part*).

Moreover, the Supreme Court has been vigilant in ensuring that the Guidelines are
genuinely advisory, and not merely a default sentence ratified by appellate courts by rote.  For
example, in *Nelson*, 550 U.S. at 350, the Court reiterated that "district judges, in considering
how the various statutory sentencing factors apply to an individual defendant 'may not presume
that the Guidelines range is reasonable.'"  550 U.S. at 351, *quoting Gall v. United States*, 552
U.S. 38, 50 (2007);  *see also id*. ("[o]ur cases do not allow a sentencing court to presume that a
sentence within the applicable Guidelines range is reasonable").

The broad discretion afforded district courts to determine a sentence also conforms with
18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information
concerning the background, character, and conduct of a person convicted of an offense which a
court of the United States may receive and consider for the purpose of imposing an appropriate

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 6 of 78

sentence." *See also United States v. Murillo*, 902 F.2d 1169, 1172 (5th Cir. 1990); *Jones*, 531 F.3d at 172, n. 6.

In fact, in *Pepper*, the Court cited §3661 as an important means of achieving just sentences: "[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" 562 U.S. at___, 131 S. Ct. at 1240, *quoting Wasman v. United States,* 468 U.S. 559, 564 (1984).[4]

As the Supreme Court directed in *Gall*, 552 U.S. at 49, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party."

Thus, here, in light of the analysis and application of the §3553(a) factors, the Court possesses sufficient discretion to impose a sentence below the Guidelines. A sentence premised upon analysis of the Guidelines exclusively, and an implicit but unmistakable presumption that the Guidelines, and *only* the Guidelines, prescribe a reasonable sentence, is in irreconcilable conflict with the Supreme Court's and Second Circuit's direction manifested in the series of cases discussed **ante**. Accordingly, the sentencing factors in §3553(a) provide the proper guidepost for determining for Mr. Ulbricht a sentence "sufficient, but not greater than necessary" to achieve the objectives of sentencing.

**II.** ***Application of the §3553(a) Factors Also Compels a Sentence for***
***Mr. Ulbricht Substantially Below His Applicable Sentencing Guidelines Range***

As discussed below, in applying to Mr. Ulbricht both §3553(a)'s mandate that a sentence be "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth

---

[4] Indeed, the Court's opinion in *Pepper* opened with the following statement:

> [t]his Court has long recognized that sentencing judges "exercise a wide discretion" in the types of evidence they may consider when imposing sentence and that "[h]ighly relevant-if not essential-to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."

562 U.S. at___, 131 S. Ct. at 1235, *quoting Williams v. New York,* 337 U.S. 241, 246-247 (1949).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 7 of 78

in" §3553(a)(2), and the sentencing factors set forth in §3553(a)(1)-(7), it is respectfully submitted that a sentence substantially below the applicable Guidelines range is appropriate.[5]

_____

[5] The sentencing factors enumerated in §3553(a) are:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     need for the sentence imposed –

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)      to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)      the kinds of sentences available;

(4)     the kinds of sentence and the sentencing range established for –

(A)     the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [. . .];

(5)      any pertinent policy statement [. . .];

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;  and

(7)     the need to provide restitution to any victims of the offense.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 8 of 78

In considering those prescribed sentencing factors and identified purposes of sentencing,[6] several aspects of Mr. Ulbricht's circumstances are relevant.  Either independently or in combination, they amply justify a sentence far below the Guidelines range.

### A.   *Mr. Ulbricht's Personal History, Background, and Characteristics*

Mr. Ulbricht, now 31 years old, was born and raised in Austin, Texas, by his parents Lyn and Kirk Ulbricht.  *See* PSR, at ¶ 130.  He grew up in a loving and supportive environment, along with his sister, Cally, 35, who currently resides in Sydney, Australia, and his half-brother Travis, who lives in Sacramento, California.  *Id.*

Mr. Ulbricht excelled in school, but also enjoyed nature and the outdoors, even becoming an Eagle Scout during his teen years.  *Id.*, at ¶ 134.  Upon graduating high school, Mr. Ulbricht relocated to Dallas, where he attended the University of Texas on a full academic scholarship. *Id.*, at 138.  He graduated in 2006, with a Bachelor's of Science degree in physics, and proceeded to complete a Master's Degree in material sciences at Penn State University, in 2009, specializing in the subject matters of photovoltaic cells and crystallography.  *Id.*

Although Mr. Ulbricht showed considerable promise in the field of physics and his professor had asked Mr. Ulbricht to accompany him to Cornell University, where Mr. Ulbricht had been offered a full scholarship to pursue a PhD, Mr. Ulbricht declined that opportunity in order to return to his home town of Austin and pursue more entrepreneurial and charitable endeavors.  Most notably, Mr. Ulbricht became the CEO and manager of Good Wagon Books, a company he operated from the end of 2009 until early 2011, and which solicited book donations, and upon resale donated 10% of all profits to charity.  *Id.*, at ¶ 140.  At approximately that same

---

[6]  Section 3553(a)(2) lists the following purposes of sentencing:

(2)      the need for the sentence imposed –

    (A)      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)      to afford adequate deterrence to criminal conduct;

    (C)      to protect the public from further crimes of the defendant; and

    (D)      to provide the defendant with needed educational or vocational training, medical care, or correctional treatment in the most effective manner.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 9 of 78

time, Mr. Ulbricht created the Silk Road website, which led to his involvement in the instant case.

As set forth below, and demonstrated by the 97 letters submitted on Mr. Ulbricht's behalf and appended hereto as Exhibits, Mr. Ulbricht is an individual who possesses a multitude of exemplary traits that have had a positive impact on his family, friends, professional colleagues, even acquaintances, and the world at large.  That, of course, is juxtaposed against the offenses for which he has been convicted – convictions of which those who have submitted letters acknowledge and are well aware.

Notwithstanding those offenses, those who have written on Mr. Ulbricht's behalf have not abandoned him, but instead have rallied to support him because, like all humans, Mr. Ulbricht is a composite of many characteristics – some perhaps even irreconcilable – and which, in his case, those who have written believe on balance are positive, can contribute to society in the future, and should not be forfeited to a lifetime in prison – not only for his sake, but for the sake of the promise they see in Mr. Ulbricht as a positive force in the world.

The measure of a person, even a convicted defendant, is the totality of his conduct and interaction with the world.  As detailed below, the 97 letters are unanimous in their position that if Mr. Ulbricht is released after serving a sufficient term of imprisonment, he has a unique set of skills and traits that will enable him to become a valuable asset to his community.

> 1. *Mr. Ulbricht Is Extraordinarily Devoted to His Family, to Which He Has Maintained Close Ties Despite His Incarceration and Conviction*

Pursuant to §3553(a), family ties are a relevant and important factor in determining an appropriate sentence. *See*, *e.g.*, *United States v. Nellum*, ___ F. Supp.2d ___, 2005 WL 300073, at *4 (N.D. Ind. 2005) ("under §3553(a), the history and characteristics of the defendant, including his family ties, are pertinent to crafting an appropriate sentence").  As the letters note by acclamation, Mr. Ulbricht is "deeply committed" to his family, which remains in close contact with him, even during the 20 months he has been incarcerated.  *See, e.g.,* Letter of Maureen McNamara, attached hereto as Exhibit 2, at Letter 40.

In addition, since Mr. Ulbricht's arrest and imprisonment, his parents have relocated from Austin, Texas, to New York State to be closer to their son, and Mr. Ulbricht has received multiple visits from his sister (who has flown in twice from Australia to visit him and to attend his trial), his half-brother, Travis, and his aunts, uncles and cousins, who reside all over the country and unwaveringly support and care for Mr. Ulbricht.

Indeed, the overwhelming majority of the letters on Mr. Ulbricht's behalf, whether from

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 10 of 78

family, colleagues, friends, or neighbors, refer to the extremely strong bond the Ulbrichts share, including "the family's close ties to one another and the extended family as well."  *See* Letter of Gail Gibbons,  attached hereto as Exhibit 2, at Letter 54.[7]

As Kelly Payne, "who first met Ross in 1984 when [she] became friends with his sister, Cally" explains in her letter,

> [i]t was through this friendship that I came to know Ross and both Lyn and Kirk as well.  Anyone who knows the Ulbricht family knows that it is impossible to know one of them without knowing them all.  They are an extremely close-knit family who spent their time together more than apart and who are deeply connected to one another. . . It is my experience of Ross that he is a gentle and kind man who loves his family deeply.

*See* Letter of Kelly Payne, attached hereto as Exhibit 2, at Letter 72.

Likewise, Mary Alice Spina, who is based in Costa Rica, where Mr. Ulbricht's parents operate a business, writes that the Ulbrichts "are a close and loving family, sharing vacations as well as a homelife. . . Over the years I have observed Ross as an upstanding individual and a dedicated son. . . He always remains close with his family. . . . Their love and commitment to one another is admirable."  *See* Letter of Mary Alice Spina, attached hereto as Exhibit 2, at Letter 43.

Another letter, from Loanne Snavely, the mother of Mr. Ulbricht's friends Joe and Elody Gyekis, also refers to the strong connection Mr. Ulbricht has to his family.  Ms. Snavely remarks in her letter that "[a]s a mother, I . . . appreciated [Ross's] close family relationships.  He often spoke fondly about his family while he was far from them in Pennsylvania.  At every opportunity he participated in family activities, and made special efforts to see them."  *See* Letter of Loanne Snavely, attached hereto as Exhibit 2, at Letter 77.

Karen Lasher, who has known Mr. Ulbricht since 2005, is best friends with Mr. Ulbricht's sister Cally, and "joined [Ross] and his family in San Francisco two weeks before Ross was arrested in October, 2013," remarks in her letter that "I have spent time with Ross with his family and have witnessed first hand the love and devotion that he shows to his family and friends."  *See* Letter of Karen Lasher, attached hereto as Exhibit 2, at Letter 20.

---

[7]  Attached as Exhibit 4 is a group of photographs depicting Mr. Ulbricht and a number of the persons who have written letters on his behalf (and others).

LAW OFFICES OF                          Hon. Katherine B. Forrest
**JOSHUA L. DRATEL, P.C.**               United States District Judge
                                        Southern District of New York
                                        May 22, 2015
                                        Page 11 of 78

Accordingly, throughout Mr. Ulbricht's incarceration, and if released, he will have a devoted and firmly rooted support network including his parents, sister, and brother, as well as aunts, uncles, and cousins, to rely on in rejoining society in a productive manner.

## 2.  *Mr. Ulbricht Is a Loyal and Dependable Friend*

Of the 97 letters written to the Court on Mr. Ulbricht's behalf, an impressive number are from Mr. Ulbricht's friends, many of whom have known him for decades.  However, it is clear from the letters' sincerity and effusiveness regarding Mr. Ulbricht's character and capacity as a friend in letters from friends both recent and long-term, that Mr. Ulbricht has made lifelong friends and left a lasting and positive impression on people at every juncture of his life**.**

For example, Susie Jauregui, who considers Mr. Ulbricht to be "like another brother to [her]," discusses Mr. Ulbricht's friendship with Ms. Jauregui's brother, Mark.  *See* Letter of Susie Jauregui, attached hereto as Exhibit 2, at Letter 31.  Ms. Jauregui writes that she "went to grade school with Ross Ulbricht and have known him since my middle school days.  He has been my brother Mark's best friend for as long as I can remember. . . I always envied my brother Mark for having such a close, trusting, and loyal friend growing up." *Id.*

Mr. Ulbricht's cousin, Sean Becket, who considers Mr. Ulbricht to be "a close friend and someone [he] greatly admires," notes of Mr. Ulbricht's character and nature as a friend,

> Ross deeply cares about his fellow human beings.  He is the kind of guy who remembers your name when you meet him, and he doesn't have to be reminded.  He'll ask you questions about yourself, not to be polite, but because he's genuinely interested.  Ross has a positive influence on everyone he meets.  He is always helpful, giving and ready to contribute to people, even in little ways.  He's the friend you can count on for a ride when your car breaks down, and will feed your cat when you're out of town.

*See* Letter of Sean Becket, attached hereto as Exhibit 2, at Letter 33.

Casey Nelson, a friend of Mr. Ulbricht's for more than a decade, since high school, also summarizes Mr. Ulbricht's essence as a friend, in her letter, explaining, "Ross has always been a kind and generous friend – he was a person who you could call upon if you needed to talk or reflect on any of life's big questions, or if you just wanted playful company and to have some fun.  He's a loyal person, greatly respected by his peers."  *See* Letter of Casey Nelson, attached hereto as Exhibit 2, at Letter 49.  Ms. Nelson concludes, "I have admired his compassion and

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 12 of 78

acceptance toward his friends for as long as I have known him." *Id.*

Mr. Ulbricht's childhood friend, Rene Pinnell "who has known Ross since childhood and spent a year living with him as an adult," sheds additional light on Mr. Ulbricht's compassion in his friendships in his letter:

> I consider [Ross] to be one of my oldest and closest friends.
> Growing up together I was always impressed by his kindness and
> gentle nature. . . . A few years ago Ross moved across the country
> [to San Francisco] to help me start a company that scanned family
> photos. I was also going through a painful break up of an eight-
> year relationship. Ross not only helped me get my company on
> track but more importantly he helped me get my life back on track.
> . . . He is a good person who has so much to give and contribute.
> The world would be a much poorer place without him.

*See* Letter of Rene Pinnell, attached hereto as Exhibit 2, at Letter 48.

Mr. Pinnell's mother, who "fe[lt] as though Ross were a part of [her] family" shared similar memories of her son's "cherished friend," noting that "[Ross] has a big heart and a tender loving nature and . . . is the kind of man who was there when anyone needed him. He literally would drop what he was doing to come to your aid." *See* Letter of Suzi Stern, attached hereto as Exhibit 2, at Letter 73.

Ultimately, as Michael Haney, the father of one of Mr. Ulbricht's closest friends, remarked, "[Ross] cares deeply for his friends, and they for him." *See* Letter of Michael J. Haney, attached hereto as Exhibit 2, at Letter 67.

> **3.** *Mr. Ulbricht Has Continuously and Generously*
> *Contributed His Time and Energy to Charitable Endeavors*

In addition to Mr. Ulbricht's stewardship of Good Wagon Books, which many of the letter writers remember, and which had a significant charitable component (Mr. Ulbricht donated 10% of all profits from book sales to charity, and also books to prisons), a number of letters provide insight into other charitable endeavors which Mr. Ulbricht has vigorously pursued throughout his life.

For instance, as a youth, Mr. Ulbricht was a Boy Scout and later became an Eagle Scout. Brandon Schaffner, who met Mr. Ulbricht more than 17 years ago through Mr. Ulbricht's sister, recalled that "Ross was very involved with his Boy Scout troop and through that gave back to

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 13 of 78

the community over the years." *See* Letter of Brandon Schaffner, attached hereto as Exhibit 2, at
Letter 50. Long-time family friend Karen Steib Arnold, who testified at Mr. Ulbricht's trial as a
character witness, also recalls that Mr. Ulbricht "participated enthusiastically in the Boy Scouts,
taking part in numerous community service projects on his way to becoming an Eagle Scout."
*See* Letter of Karen Steib Arnold, attached hereto as Exhibit 2, at Letter 51.

Shiloh Travis relates an anecdote about Mr. Ulbricht's gracious contribution of his time
to an event Mr. Shiloh had organized and was seeking volunteers to help run, explaining

> I first met Ross in the summer of 2010, when I was putting
> together a team of volunteers to put on an event designed to enrich
> and empower the lives of attendees. I called him up from a
> recommendation of another friend, not knowing who he was, and
> asked if he would consider volunteering his time for some of the
> event. . . . He blew me away by not only saying yes to my request,
> but offered to volunteer full time for the entire 5 day event. Of the
> 16 people that volunteered in the event, he was the only one that
> was there the whole time. . . . Ross taught me to look toward the
> service of others to find peace and happiness,. It will be a huge
> loss for our society if his positive and peaceful contribution is
> taken away.

*See* Letter of Shiloh Travis, attached hereto as Exhibit 2, at Letter 63.

Marcia Brady Yiapan, a former teacher and filmmaker who has known Mr. Ulbricht and
his family for many years, worked alongside Mr. Ulbricht on another charitable venture, Well
Aware. According to Ms. Yiapan's letter, "[a]n example of Ross's commitment to helping
people is the time and effort he spent in Austin, Texas helping to establish the non-profit water
charity Well Aware. This charitable effort, which I also worked on, raised money to dig wells
for poor villagers in Kenya." *See* Letter of Marcia Brady Yiapan, attached hereto as Exhibit 2, at
Letter 82.

In making these contributions, Mr. Ulbricht devoted his time for charity's sake alone, not
for any personal gain or reward, or in anticipation of sentencing. As his friend Brandon
Anderson attested,

> [w]hen [Ross] was in college he volunteered at charities. Not for
> resume building or to brag. He basically never mentioned it except
> for when it resulted in scheduling conflicts. His volunteer work
> was because he really wanted to help people. Ross also regularly

LAW OFFICES OF                              Hon. Katherine B. Forrest
**JOSHUA L. DRATEL, P.C.**        United States District Judge
                                            Southern District of New York
                                            May 22, 2015
                                            Page 14 of 78

> donated to charities in college, despite making a very minimal
> salary working in a lab.

*See* Letter of Brandon Anderson, attached hereto as Exhibit 2, at Letter 64.

Indeed, as Mr. Anderson concludes, "[Ross's] humility and desire to do good are a core value of his that I do not feel has diminished." *Id*.

### 4.    *Mr. Ulbricht's Remarkable Thoughtfulness and Compassion for Others*

Of the many admirable traits Mr. Ulbricht possesses, "an abundance of compassion" was one that many of the letter writers recall.  *See, e.g.*, Letter of Logan Becket, attached hereto as Exhibit 2, at Letter 10.  *See also* Letter of Clay Cook,  attached hereto as Exhibit 2, at Letter 56 ("I have seen [Ross's] caring and compassionate demeanor many times.[.] . . . He was especially protective of his grandparents, elderly friends and acquaintances");  Letter of Robert Gold, attached hereto as Exhibit 2, at Letter 75 ("[Ross is someone who would go out of his way to support a new acquaintance, not just his close friends").

The recurring mention of this particular characteristic in letters from a widely disparate group of people reflects that, as attested to by Mr. Ulbricht's sister, Cally, "Ross's qualities of empathy and compassion have extended to people throughout his life."  *See* Letter of Cally Ulbricht, attached hereto as Exhibit 2, at Letter 3.  As Cally elaborates,

> [Ross] has always accepted everyone, no matter their race, station
> in life or status. . . . That is because Ross sees people for who they
> are, not what's on the outside.  He cares about people and wants to
> help improve their lives, be it through music, philosophy
> discussions or acts of kindness.  Even as a child Ross especially
> felt for the underdogs, the kids who did not have many friends.
> His sympathetic nature reached out to them, so they felt wanted
> and part of the group.  This continued into adulthood.

*Id*.

Dr. Joel R. Meyerson*, a close friend of Mr. Ulbricht's from elementary school through college, had similar memories of Mr. Ulbricht:

> [i]n thinking back on our childhood, one particularly salient
> memory of [Ross] was as someone who would repeatedly display
> friendship to many in our school who were perceived as nerdy,

<span style="font-size:small">LAW OFFICES OF</span>
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 15 of 78

> weird or otherwise unpopular.  I always thought this was admirable
> given the often harsh social conditions among high schoolers.  This
> is a small and impressionistic recollection, but it has stayed in my
> mind for over 10 years and I think it's emblematic of the kindness
> that Ross displays so effortlessly.

*See* Letter of Dr. Joel R. Meyerson, attached hereto as Exhibit 2, at Letter 26.  *See also* Letter of
Lindsay Gunter Weeks, attached hereto as Exhibit 2, at Letter 84 ("Ross is amazing in the way
he embraces life:  loving nature for both the science and spirit, accepting all people despite the
social implications, and keeping his word even if it costs him").

Mr. Ulbricht's father, Kirk, provides in his letter a particularly moving account of an
incident during Mr. Ulbricht's time as an Eagle Scout which demonstrates Mr. Ulbricht's
compassionate nature.  He recalls,

> [t]here was an incident while he was a boy scout which illuminates
> Ross's character.  One of the kids in the troop was almost
> completely blind. . . . There were a few kids who were always
> helping out as his companion.  Ross was one of them, even though
> Ross was younger.  When our troop went to Philmont Scout Ranch
> for summer camp in the Pecos Wilderness, the blind boy, I'll call
> him Bill, went with us. . . . The boys would rotate in and out of
> being Bill's trail companion several times a day.  It meant leaving
> early, arriving late, and hiking at Bill's slow pace instead of hiking
> with the leaders of the main group, but there was a group of boys
> who did it.  Ross was one of them.  Bill never made it through a
> day without falling at least twice, but he never gave up. . . As we
> were walking into base camp on the sixth day, I walked a few
> hundred yards in front of Bill, so he couldn't hear me kicking the
> loose rocks off the trail in front of him.  Ross joined me, and we
> walked along kicking rocks aside with tears of pride and joy
> falling down our faces.  Bill was going to complete the hike with
> the rest of his buddies. . . . When the whole group stood and roared
> out their approval of Bill's accomplishment there wasn't a dry eye
> in the crowd.  Ross never got or sought any particular praise for his
> part in Bill's triumph, but that's the kind of guy he is,
> compassionate and selfless.

*See* Letter of Kirk Ulbricht, attached hereto as Exhibit 2, at Letter 2.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 16 of 78

Mr. Ulbricht's aunt, Leigh LaCava, mentions in her letter that another "example of Ross' compassion and caring occurred a few years ago when [their] family had a reunion in Cape Cod, [Massachusetts]."  *See*  Letter of Leigh LaCava, attached hereto as Exhibit 2, at Letter 9.  As Ms. LaCava recounts,

> I flew in from California with my daughter Ava, who at the time
> was 9 years old, much younger than her adult cousins.  The age
> difference caused her to feel left out, so Ava was spending most of
> her time alone in her room not participating with the others.  Ross
> became aware of this and went out of his way to spend time with
> Ava and help her feel comfortable.  He made it a point to get to
> know her.  He took her sailing and swimming and Ava was thrilled
> to have the attention.  It warmed my heart to see Ross take this
> time with his much younger cousin and make the extra effort while
> her other cousins were too busy.  Ross is known for his big heart,
> and this is just one example.  Not all young men are sensitive
> enough to take the time to make their younger cousin feel part of
> the group.  It was wonderful to see and just one of many times
> Ross has demonstrated sensitivity and compassion toward others.

*Id.*

Mr. Ulbricht's step-cousin, Catherine Becket recalls yet another family occasion during which Mr. Ulbricht demonstrated his extreme thoughtfulness and compassion for others.  As she explains,

> [t]he last time I saw Ross was at my brother's wedding in 2012.
> There was a dinner held for out-of-towners and most of the guests
> were in their 20s and 30s.  My mother and step-father, both in their
> 70s, were a bit out of their element. . . . I had a look around for my
> parents, wanting to make sure they were well situated. I needn't
> have worried, however, because there was Ross, having a chat with
> them.  I believe they were discussing World War II, one of my
> step-father's favorite topics.  Ross, a handsome and affable young
> man who could have been chatting with any of the cute girls in
> attendance, chose to take the time to join my parents who had been
> sitting by themselves.  Being thoughtful comes naturally to him.

*See* Letter of Catharine Becket, attached hereto as Exhibit 2, at Letter 19.  *See also* Letter of
Suzanne Howard, attached hereto as Exhibit 2, at Letter 74 ("[t]he last time I saw Ross in 2013, I

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 17 of 78

was struck by his demeanor and his eye contact as we spoke. . . . As a senior citizen I am invisible to many younger people, but the interest Ross demonstrated during our visit speaks volumes about his character").

Other letter writers recount a more recent story reflective of Mr. Ulbricht's compassionate nature, from his time living in San Francisco just prior to his arrest. As told by his aunt, Ann Becket,

> [o]ne of Ross's friends told me how, once, while out walking they passed a woman selling flowers. Ross stopped and bought a flower and then turned around and gave it to the flower seller. Confused, his friend asked Ross why he did such a thing. Ross replied, "People are always buying flowers *from* her, but I wonder how often someone buys a flower *for* her." That sums up perfectly the essence of my nephew.

*See* Letter of Ann Becket, attached hereto as Exhibit 2, at Letter 6. *See also* Letter of Lyn Ulbricht, attached hereto as Exhibit 2, at Letter 1.

Indeed, as JoJo Marion, a long time friend of Mr. Ulbricht's and also the younger brother of one of Mr. Ulbricht's close friends, Noah Marion, writes in his letter, "Ross' qualities of empathy, compassion and kindness, [are] qualities he is widely known for and that inspire loyalty among people who know him." *See* Letter of JoJo Marion, attached hereto as Exhibit 2, at Letter 87.

**5.      *Mr. Ulbricht Is Well-Known to Be Kind, Peaceful and Gentle In Nature***

As Mr. Ulbricht's aunt, Gale LaCava, stated in her letter, "[o]ne would be hard-pressed to find a kinder, more gentle soul that Ross. Although Ross has now been convicted of a crime, my faith in him remains as strong as when I pledged my life savings toward his bail." *See* Letter of Gale LaCava, attached hereto as Exhibit 2, at Letter 7.

Likewise, his aunt Kim LaCava, attests, "I have shared countless personal moments with Ross as well as seen him interact with others through all stages of his life. He has always been an exceptionally sweet, thoughtful and peaceful person. I can't remember seeing him lose his temper." *See* Letter of Kim LaCava, attached hereto as Exhibit 2, at Letter 5. *See also* Letter of Michael Harrison, attached hereto as Exhibit 2, at Letter 36 ("Over the years I encountered Ross on many occasions. . . . In that time I observed him to be very even tempered, with an upbeat and positive outlook. I cannot recall a single occasion where I saw him angry or annoyed"); Letter of  Kim Norman, attached hereto as Exhibit 2, at Letter 38 ("[a]ll through his life I've

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 18 of 78

known Ross to be kind, courteous, peaceful and respectful");  Letter of Andy Pruter, attached hereto as Exhibit 2, at Letter 80 ("[a]lways polite and generally reserved, Ross . . . is a peaceful person and [it] would be hard to imagine him to be a threat to anybody").

Still others who know Mr. Ulbricht well, feel the same way.  Rosy Hanby, a "long time friend of the Ulbricht family" who has "known Ross since he was just a little boy" commented in her letter, "[t]hroughout his life Ross has been caring, sweet and thoughtful.  His relationship with his parents, peers and those around him is a testament to that.  I have always known him to have a positive outlook and a peaceful disposition."  *See* Letter of Rosy Hanby, attached hereto as Exhibit 2, at Letter 21.

Similarly, Sara Dunn, whose friendship with the Ulbricht family "goes way back to the days [they] shared a South Austin babysitting co-op,"states in her letter, "[o]ver the years it was a joy to watch Ross mature and grow.  He was always a bright, conscientious person, polite and gentle."  *See* Letter of Sara Dunn, attached hereto as Exhibit 2, at Letter 35.

Daniel Davis, who testified at Mr. Ulbricht's trial and "consider[s] [Ross] to be one of [his] oldest and closest friends," remarked in his letter, "[i]n that time I have known [Ross] to be a kind, forthright, generous and caring person. . . . As a consistently peaceful and non-violent person, I feel that Ross does not pose a threat to the public, and that the likelihood of his committing any criminal acts in the future is nonexistent."  *See* Letter of Daniel Davis, attached hereto as Exhibit 2, at Letter 8.

Joe Gyekis, a good friend of Mr. Ulbricht's since they were graduate students at Penn State University, remarked in his letter that "among [his] friends, [Ross] was one of the ones that [his] wife liked best, mostly because of his general kind and respectful personality" as exemplified by a couple of anecdotes that Mr. Gyekis recalled in his letter, and which his wife "remembers to this day."  *See* Letter of Joe Gyekis, attached hereto as Exhibit 2, at Letter 27.

In particular, Mr. Gyekis referenced an occasion on which "[his] wife rather shyly invited people from [their] group to come to her singing recital, Ross was the only one to show up."  *Id.*  On another occasion, when Mrs. Gyekis's parents were in town, "despite the language barrier, [Ross] very kindly invited them to his place and treated them in the polite and thoughtful way that he does to everyone else [they] saw [Ross] around."  *Id.*

6.    *Mr. Ulbricht's Potential to Contribute to Society, Including His Support and Encouragement to Others to Make Positive Contributions to Society*

Mr. Ulbricht's impressive academic and scientific accomplishments in college and graduate school are well-known among his family and friends.  In addition, nearly all who have

LAW OFFICES OF                          Hon. Katherine B. Forrest
**JOSHUA L. DRATEL, P.C.**               United States District Judge
                                         Southern District of New York
                                         May 22, 2015
                                         Page 19 of 78

written letters on his behalf have also articulated a strong belief in Ross's ability to use his intelligence, in conjunction with his compassionate, generous nature, and inherent desire to improve on peoples lives, to contribute positively to society.

> a.    *Mr. Ulbricht's Potential for Positive Contributions to Society*

As Mr. Ulbricht's father remarks in his letter, "[d]uring his college years, Ross had developed a strong desire to use his talents to make a positive difference in the world [and] . . . rightly felt that he had the potential to do something good for mankind."  *See* Kirk Ulbricht Letter (Exhibit 2, at Letter 2).  Mr. Ulbricht's father, in turn, regards his son as "a young idealistic man who was driven to succeed and to do good work" and who, "in his early twenties, . . . was either in college doing theoretical work for the betterment of mankind or working a book-selling business with a significant charitable component."  *Id.*  Mr. Ulbricht's father also notes "the potential that Ross still has to contribute to society" and to "be a contributor to the benefit of us all" explaining "that the illegal aspects of Ross' Silk Road experiment represents a complete departure from the trajectory of his life," and adding that "[h]is desire to contribute still exists" but "[i]t is tempered with a respect for the law that this experience has added to his character." *Id.*

Kirk Ulbricht's perception of his son as a gifted young man with tremendous potential to benefit society is shared by many of his lifelong friends, relatives, his former business partner, and those others that know him best.

For instance, Mr. Ulbricht's close friend since high school, Curtis Rodgers, notes "I think Ross' experience as a material science researcher, and entrepreneur with his Good Wagon books venture illustrate his capacity to have a positive impact on our society."  *See* Letter of Curtis Rodgers, attached hereto as Exhibit 2, at Letter 17.

Mr. Ulbricht's business partner at Good Wagon Books, Donny Palmertree, writes in his letter,

> [w]e were friends and business partners, but we never argued, and
> never had any disagreements that I can remember.   This is one of
> the best things about Ross – he is as friendly, good-natured and
> easy going as a person can be. . . . I ask that he will have as short a
> sentence as possible so that he can use his infectious personality to
> do more good in the world, like he did with me at Good Wagon
> Books.

*See* Letter of Donny Palmertree, attached hereto as Exhibit 2, at Letter 32.  *See also* Letter of

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 20 of 78

Robert Reisinger,  attached hereto as Exhibit 2, at Letter 55 ("I have known Ross through his family, as a friend for about seven years.  I also had a business association with him while he was in the book-selling trade. . . . [E]very person [I spoke to about their experience with Ross and his business] gave me nothing but confidence about Ross's professional dealings and ethics.  This was also corroborated by my own experience").

J'aime Mitchell, a friend of Mr. Ulbricht's since high school, attributes "the positive impact that people like Ross can have on their communities" to "the community servitude of an Eagle Scout, and the peaceful demeanor of someone who loves the outdoors" which "are all characteristics that bring benefits to this world."  *See* Letter of J'aime Mitchell, attached hereto as Exhibit 2, at Letter 61.

Vicky Cheevers, who has known Mr. Ulbricht since January 2012, remarks in her letter that, "[h]e is highly intelligent, often using intelligence to help people and society in general, as demonstrated by his scientific ability."  *See* Letter of Vicky Cheevers, attached hereto as Exhibit 2, at Letter 12.

Dr. Meyerson, a research scientist and friend of Mr. Ulbricht's since elementary school, comments in his letter that

> in the scientific community I see firsthand on a daily basis the
> incredible feats that can be accomplished when passion, creativity
> and technical abilities combine in an individual.  This is an
> exceedingly rare combination of traits that I know Ross happens to
> possess. . . . It would be a loss for our country if someone like Ross
> were unable to have the chance to contribute positively to the
> many challenges we face now, and will in the years to come.

*See* Dr. Joel R. Meyerson Letter (Exhibit 2, at Letter 26).  *See also* Letter of Martha and Herb Ulbricht, attached hereto as Exhibit 2, at Letter 59 ("Ross could use some of his inherited traits to benefit the community with what time he has left");  Letter of Madeline Norman, attached hereto as Exhibit 2, at Letter 37 ("I have known Ross Ulbricht for almost 18 years. . .  His intellect is inspiring.  He is an amazing person with so much potential.  This . . . should not go to waste"); Letter of Melanie C. Norman, attached hereto as Exhibit 2, at Letter 39 ("[i]t would be a shame to waste such a brilliant mind and heartfelt being");  Letter of Douglas and Valencia Mills, attached hereto as Exhibit 2, at Letter 58 ("[w]e believe [Ross] still has the capacity to do something worthwhile for others.  Our great fear is that his life will be wasted");  Letter of Rick Hardy, attached hereto as Exhibit 2, at Letter 83 ("I feel strongly that [Mr. Ulbricht] should serve as an asset to our nation and not be simply warehoused. . .. The possibilities are unlimited and I feel Mr. Ulbricht can truly be a contributor when given the chance to work toward the good,

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 21 of 78

providing positive and pragmatic solutions to contemporary problems").

John Charles Miller, who has known Mr. Ulbricht and his family since the 1990s, states in his letter, "I believe that with a future out of prison, Ross could achieve many positive actions and deeds for society in general, and specifically his community." *See* Letter of John Charles Miller, attached hereto as Exhibit 2, at Letter 13.  *See also* Letter of Lyn Pierce, attached hereto as Exhibit 2, at Letter 45 ("I believe in the depths of my heart that Ross is capable of achieving great good in the world"); Letter of Noah Marion, attached hereto as Exhibit 2, at Letter 46 ("[a]s a person who has been convicted of two crimes, I know personally what it means to be able to move past terrible realities and make a truly altruistic impact on the world. . . What it comes down to is this:  Ross has the energy . . . to bring about positive change");  Letter of Linda D. Bailey, attached hereto as Exhibit 2, at Letter 52 ("[Ross is] a bright and personable young man who has a desire to do positive work for society");  Letter of Ariana Stern-Luna, attached hereto as Exhibit 2, at Letter 68 ("[n]ot only have I observed the positive impact that Ross has had among the individuals who he has personally encountered throughout the years, but I have always believed his positive impact would one day expand to benefit society as a whole"); Letter of Luis Jauregui, attached hereto as Exhibit 2, at Letter 79 ("Ross is an intellectual, a free spirit and guileless, with great potential to contribute in very positive ways to the people and world around him").

Jay Thomas, a friend of Mr. Ulbricht's since high school, believes that "Ross is the kind of person this world sorely needs more of.  He is someone who can impact this world in a positive way." *See* Letter of Jay Thomas, attached hereto as Exhibit 2, at Letter 29.  It is Mr. Thomas's "sincerest belief that when Ross is back in society again, he will use his compassion and talents to do good works and be a productive member of this community." *Id. See also* Letter of Timothy A. O'Leary, attached hereto as Exhibit 2, at Letter 60 ("I believe that these criminal activities do not represent . . . the positive things that [Ross] would be capable of achieving both for himself and for society if he were to be spared a long sentence");  Letter of Michele Desloge,  attached hereto as Exhibit 2, at Letter 65 ("[a] person such as Ross provides a positive impact on society.  We need more people like him contributing ideas and taking action to improve our communities")

Windy Smith, who has known Mr. Ulbricht since 1988 when she was eight years old, and her family moved onto Mr. Ulbricht's street, too, is "positive [that] if [Ross] is spared a long sentence, society would benefit from the impact of his good workings." *See* Letter of Windy Smith, attached hereto as Exhibit 2, at Letter 34.

Mr. Ulbricht's uncle, Jeff Crandall, concurs in his letter:  "Ross has a tremendous intellect and strong belief in his fellow man.  Given his . . . freedom, Ross will contribute to the betterment [of] our world as few others could – I have no doubt." *See* Letter of Jeff Crandall,

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 22 of 78

attached hereto as Exhibit 2, at Letter 15.

Rosalind Haney, the wife of one of Ross's closest friends, expresses a similar sentiment in her letter, asking the Court to grant Mr. Ulbricht "a second chance to use his intellect and kindness to make a positive impact on society[,]" and sharing her opinion that "of [her husband] Thomas' friends, Ross was always one of my favorites for his friendliness and desire to do something important and meaningful with his life." *See* Letter of Rosalind Haney, attached hereto as Exhibit 2, at Letter 24.

In that regard, George Reinke, who has known Mr. Ulbricht since August 2011, posits that "the time for Ross to understand the wrongfulness [of his offense conduct] must be a length that the constructive value Ross can being to society is not lost." *See* Letter of George Reinke, attached hereto as Exhibit 2, at Letter 88.   Mr. Reinke bases this conclusion on a personal connection, as his own "great grandfather was sentenced to death in 1828 for horse theft, then was not only re-sentenced to life . . . but pardoned . . . [and] [h]e became a significant contributor to the development of Sydney[, Australia]." *Id.*

Indeed, Hannah Thornton, the wife of one of Mr. Ulbricht's close childhood friends, states in her letter, "I was friends with Ross when he began Good Wagon Books, the company he founded with the intention of donating 10% of all profits to charity.  Ross was energized by this undertaking, excited by the idea that through his business he could make the lives of others better." *See* Letter of Hannah Thornton, attached hereto as Exhibit 2, at Letter 22.

An anecdote from Timothy A. Losie, who met Mr. Ulbricht several years ago when the two were selected to participate in an event at which "you pitch your idea to a small group, and then you . . . spend the next 72 hours making the best ideas a reality," also evokes Mr. Ulbricht's enthusiasm when taking on new ventures. *See* Letter of Timothy A. Losie, attached hereto as Exhibit 2, at Letter 81.  As Mr. Losie explains, "Ross's idea was one of the only ones I remember. . . . I remember Ross's idea because he was so passionate about it." *Id.*

Barbara Record Emmert-Schiller, who has "had the privilege of knowing Ross and his family since Ross and [her] son were in elementary school together," remarks in her letter that she knew Mr. Ulbricht "to be a young man busy collecting books for charitable purposes and improving solar efficiency. . . . Ross has always been adventurous and pioneering and has tried to contribute to the greater good." *See* Letter of Barbara Record Emmert-Schiller, attached hereto as Exhibit 2, at Letter 23.

Put simply by Mr. Ulbricht's cousin, Alex Becket, "I consider Ross one of those truly exceptional individuals who thinks about the greater good for all people." *See* Letter of Alex Becket, attached hereto as Exhibit 2, at Letter 18.  *See also* Letter of Susie Kim, attached hereto

<table>
<tr><td>LAW OFFICES OF<br>**JOSHUA L. DRATEL, P.C.**</td><td>Hon. Katherine B. Forrest<br>United States District Judge<br>Southern District of New York<br>May 22, 2015<br>Page 23 of 78</td></tr>
</table>

as Exhibit 2, at Letter 85 ("I have never met a person who cares about the world and humanity as truly and pragmatically as Ross does").

> **b.** ***Mr. Ulbricht's Inherent Ability and Desire to Have a Beneficial Impact On Society Have Been Manifested By His Positive and Voluntary Contributions to His Prison Community***

Even while incarcerated, Mr. Ulbricht's engine for contributing in positive fashion has been active. As Mr. Ulbricht's older brother, Travis, writes

> [w]hile it's hard to sum up a person's life, there is something I heard about Ross that really "fits" who he truly is. Ross started up a yoga group in jail, to help ease the stress of his fellow inmates, and of himself as well. . . . I believe Ross started the yoga group because it was a bit of good that he could do in his surroundings and for the people around him. That gesture of compassion is who my brother is. It is how he has been in most situations in his life. He is always looking for how he might improve the world and the lives of those around him, even if it's in a small way.

*See* Letter of Travis Ulbricht, attached hereto as part of Exhibit 2, at Letter 4.

Indeed, Mr. Ulbricht's mother, who has visited him many times during his incarceration at the MDC, and more recently the MCC, is well-aware of his day-to-day activities, and has interacted with prison staff on her visits, attests in her letter that

> [i]n prison Ross has been a great boon to his fellow inmates. Now at MCC, he's tutoring some of them in math and science. He tutored his cellmate for the GED in the evenings after trial. At MDC he led a physics class and a yoga class. His former cellmate (now released) wrote me to say what a positive influence Ross had been on him. An MDC guard took me aside and literally gushed about what a wonderful person Ross is and what an asset he was to the environment there.

*See* Letter of Lyn Ulbricht, attached hereto as Exhibit 2, at Letter 1.

Fellow inmates, too, have written letters regarding Ross's remarkable contributions to improving the prison community and individual prisoners's lives, and his good temperament while doing so. For example, Michael Satterfield, an electrical contractor, and formerly Mr.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 24 of 78

Ulbricht's cell mate at MDC, writes,

> [w]e shared a cell at MDC and spend 24 hours, 7 days a week
> [together] for several months.  During that time Ross consistently
> exhibited a peaceful and positive demeanor.  He spent his days
> sharing positive thoughts with the other inmates.  Ross also
> encouraged them to find peaceful ways to resolve their differences.
> With the permission of detention staff, he also began teaching yoga
> and meditation to the general population, inviting anyone to join
> in.  He was always respectful, compliant, and he had the foresight
> to understand and empathize with the difficult duties of the staff.

*See* Letter of Michael Satterfield, attached hereto as Exhibit 2, at Letter 97.

Davit Mirzoyan, "an inmate at MCC in the same unit as [Mr.] Ulbricht," and who has
known him now for five months, states in his letter,

> Ross is generally interested in the welfare of others.  He is well
> educated and gives freely of his time to those who wish to benefit
> from his knowledge.  He has tutored students seeking their GED,
> two others who are working on bachelor degrees by
> correspondence, and me.  When he was helping one prisoner with
> math in the common area, I mentioned that I wanted to learn
> physics some day.  He heard and told me he'd be happy to tutor
> me.  That same day, he lent me his physics text book and we had
> our first lesson.  It has been challenging to absorb the material, but
> Ross helps me fill in the gaps and patiently explains the concepts
> to me.  He is attentive and enthusiastic and makes it fun to learn.
> Every time we sit down for a lesson, I am eager to move forward
> and make productive use of my time in prison.

*See* Letter of David Mirzoyan, attached hereto as Exhibit 2, at Letter 90.

These sentiments echo the sentiments expressed by Mr. Ulbricht's friends who have
known him for many years, including, for instance, Mr. Ulbricht's high school friend, Allison
Cassel, who first met Mr. Ulbricht when they were both sixteen years old.  She recalls "[h]e is so
full of energy, life and love[.] . . . He is so intellectual, patient and articulate in explaining the
complexities of this world."  *See* Letter of Allison Cassel, attached hereto as Exhibit 2, at Letter
16.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 25 of 78

Another inmate, Scott A. Stammers, who invited Mr. Ulbricht to be his cell mate just weeks after Mr. Ulbricht's arrival at MCC, recounts that "when [Mr. Ulbricht] first came in, he struck me as a very calm and collected individual.  I knew he was facing serious charges and going to trial, yet every night when he'd come back from court, I'd see him mingling with the other inmates, getting to know them, playing [table] tennis and just being at ease."  *See* Letter of Scott A. Stammers, attached hereto as Exhibit 2, at Letter 91.  Accordingly, Mr. Stammers explains, "[i]t's easy to get overwhelmed with grief and despair, but when I see Ross, [whose] situation is so much worse, and how he remains friendly and kind to me and the others in our unit, it gives me the strength to do the same.  I know Ross would continue to set an example for how to be a strong and peaceful person if he were given his freedom back."  *Id.*

As Mr. Ulbricht's sister, Cally, notes in her letter, "[e]ven in the lowest and worst situations, my brother focuses on the positive and aims to make the environment around him a better space." *See* Cally Ulbricht Letter (Exhibit 2, at Letter 3).

Likewise, Mr. Ulbricht's college friend for the past decade, Mae Rock-Shane, explains, "[Ross is] a smart person, a kind soul and one of those people you want to be around, because just having him in your life improves it.  He has the same effect on his community, bringing energy and positive change wherever he goes."  *See* Letter of Mae-Rock Shane, attached hereto as Exhibit 2, at Letter 25.

It is not surprising then that yet another letter writer, Debbie Tindle, an occupational therapist and friend of Mr. Ulbricht's for more than 13 years, reports in her letter that "[e]ven now, in these dire circumstances, Ross is teaching inmates how to treat their own back pain with 'tennis ball massage' . . . something he learned from [Ms. Tindle] many years ago."  *See* Letter of Debbie Tindle, attached hereto as Exhibit 2, at Letter 41.

Put succinctly by his close friend Thomas Haney, "[t]he entire time I've known Ross he has been a positive and uplifting presence and influence on the people around him, and I'm sure he will continue to be so wherever he finds himself."  *See* Letter of Thomas Haney, attached hereto as Exhibit 2, at Letter 11.

   c.  *Mr. Ulbricht's Ability to Inspire and Encourage Others to Achieve Their Goals and Make Positive Contributions to Society*

Indeed, so many of Ross's close friends and relatives discuss his unique ability to inspire others to pursue and ultimately achieve their goals, even some who had doubted their own abilities to achieve personal success and happiness.          As one friend from high school, Margeaux Paschall-Kolquist, attested "[Ross] has always been a very helpful individual who wants to share his knowledge to help others better than own lives."  *See* Letter of Margeaux

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 26 of 78

Paschall-Kolquist, attached hereto as Exhibit 2, at Letter 44.

Thus, even in high school, Mr. Ulbricht was guiding and encouraging others.  As James McFarland, another friend from high school recalls, "[o]n numerous occasions his friendship and advice helped myself (and others) navigate difficult situations of high school social life."  *See* Letter of James McFarland,  attached hereto as Exhibit 2, at Letter 57.

As. Mr . Ulbricht developed, his drive to help and direct others in their personal, and professional, pursuits continued.  Mr. Ulbricht's close friend since the third grade, Alden Schiller III, states in his letter, "Ross has lived his life being very conscientious of those around him.  He took a personal interest in my well being and showed me that he deeply cared about my happiness and that I was flourishing in my environment."  *See* Letter of Alden Schiller III, attached hereto as Exhibit 2, at Letter 47.

Similarly, Jonathan Rosenberg, a close friend of Mr. Ulbricht's since middle school, recalls that "[Ross] has always been willing to share his time with anyone who wanted to chat or needed help" and that "Ross [had] deeply affected [his] path in life."  *See* Letter of Jonathan Rosenberg, attached hereto as Exhibit 2, at Letter 78.  *See also* Letter of Carla Bacelli, attached hereto as Exhibit 2, at Letter 86 ("I remember confiding my feelings in Ross at different times and him giving me advice and just listening").  When during college, Mr. Rosenberg "was considering dropping out of school, Ross was embracing full acceptance of life and inspired [Mr. Rosenberg] to stick to a goal."  *Id.*  With Ross's encouragement, Mr. Rosenberg "ended up turning [his] grades around, took a bike tour around the USA and got a BS in Computer Science at UT Austin."  *Id.*

Michael Policelli, "an aerospace propulsion engineer working in the commercial space industry and a friend of Ross Ulbricht['s] for over [eight] years," remembers that

> [w]e met my sophomore year in college while we were both
> pursuing degrees in Material Science and Engineering.  At the time
> I was pursuing my B.S. with plans to work immediately after
> graduation in the industry, but after discussions with Ross and
> attending his M.S. thesis defense about crystal grain growth, I was
> inspired by him to pursue an advanced degree and follow my
> passion in life – and I am extremely grateful for his advice to live
> up to my potential. . . . [Ross's] intelligence, talents and passion to
> help others have so much potential to bring positive change to the
> world.

*See* Letter of Michael Policelli, attached hereto as Exhibit 2, at Letter 42.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 27 of 78

Notably, Mr. Policelli's college girlfriend, Ashley Callaghan, who first met Mr. Ulbricht in college through Mr. Policelli, also comments in her letter regarding "the positive ways in which Ross has uplifted [her] life."  *See* Letter of Ashley Callaghan, attached hereto as Exhibit 2, at Letter 71.

Captain James Woodring, Mr. Ulbricht's friend from Penn State University, remarks in his letter that he "has repeatedly" been "impressed" by Mr. Ulbricht's "depth of character over the years" and describes a particular incident during which Mr. Ulbricht had helped him:

> I struggled in college and had a hard time living on my own and taking care of myself.  At that time, I looked up to Ross and was able to learn from his self-discipline, work-ethic, and personal habits.  He was always happy to include others in his own positive activities and I benefitted from the solid example he set of good study habits, yoga practice and regular outdoor exercise. . . .  Many times he invited me to spend time meditating and attending workshops to study self-empowerment, peaceful communication, and spiritual mindfulness.  I cannot thing of another person who embodies these ideals as well as Ross does.

*See* Letter of Captain James Woodring  attached hereto as Exhibit 2, at Letter 53.

Jessica Graves, an acquaintance from high school and subsequently a close friend, who also recalled Mr. Ulbricht's drive to help others succeed, states in her letter,

> I remember once, I mentioned that there was an advanced yoga pose I wanted to get good at, but that it would be impossible without months of stretching.  Ross remembered to ask me how it was going months later, long after I had forgotten it was something I had ever said I wanted to do.  He is the kind of person who wants you to succeed in your goals.  I still haven't mastered that pose, but when I think of the kindness and generosity of spirit that Ross displayed in remembering somethingI said I wanted for myself, I get motivated to get out the mat and work on it.

*See* Letter of Jessica Graves, attached hereto as Exhibit 2, at Letter 70.

Jenni Stewart Pittman who met Mr. Ulbricht during their freshman year at the University of Texas at Dallas, paints in her letter a clear portrait of Mr. Ulbricht's ability to inspire and guide others, including herself, stating

> I am continually grateful that Ross came into my life at such a

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 28 of 78

> critical age.  He was a guiding force in our peer group and offered
> the best advice and unique worldview.  I often talked to Ross
> during that time about my fear of the future and life after
> university.  I wasn't sure if I should follow my passion to become
> an artist and work in public service.  Ross counseled me to follow
> my dreams, not to worry about money, and to do the right thing for
> myself and others.  I saw him be this positive force with out other
> friends as well.  We all needed someone who believed in us at that
> time.  After college, Ross and I stayed updated on each other's
> lives through email and in person when distance and time allowed.
> His letters always encouraged me to take that next step in my own
> life and gave me confidence to move forward.  Ross encouraged
> and held us all accountable to be the best version of ourselves.

*See* Letter of Jenni Stewart Pittman, attached hereto as Exhibit 2, at Letter 76.

Ms. Pittman concludes that, "I know I would not be the person I am today without Ross Ulbricht.  And I hope that he has the chance to impact other people's lives as much as he has mine."  *Id.*

Similarly, another letter writer who identifies herself as a former "dating partner" and more recently a friend of Mr. Ulbricht's, describes in her letter, based largely on e-mail correspondence between herself and Mr. Ulbricht, that she "value[s] Ross for his willingness to provide constructive feedback[:]"

> [f]or example, on one occasion I made a tangential reference to
> downplaying my true enthusiasm for a particular subject matter, to
> which [Ross] addressed, "I encourage you to express your
> enthusiasm.  More often than not, it 'gives people permission' to
> do the same and will attract supportive people to you."

*See* Redacted Letter, attached hereto as Exhibit 2, at Letter 14.  Likewise, "[o]n another occasion when [she] explicitly asked for candid feedback [Ross] responded, '[j]ust my perspective. . . try going for what you want without over analyzing how to get there."

Mr. Ulbricht's commitment to supporting and encouraging the people in his life has not ceased with his incarceration, as demonstrated by his efforts with fellow inmates, discussed **ante**, and also as relayed by letter writers who have reached out to him for guidance since his time at the MDC, and later the MCC.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 29 of 78

Christine Reitmeyer, a friend of Ross's since high school who currently works part-time as an academic counselor at a high school and part-time as a care coordinator at a rehabilitation center for people suffering from addictions to drugs and alcohol, writes in her letter, "I wrote to [Ross in February 2015] about my life and curious about how life had been for him, with so many changes. . . . I expressed feelings of doubt in my new career and he encouraged me to keep going.  Even through this difficult time, Ross is working to remain himself: kind, optimistic and full of love."  *See* Letter of Christine Reitmeyer, attached hereto as Exhibit 2, at Letter 28.

Jenny Keto, an old friend of Mr. Ulbricht's, also relays in her letter Mr. Ulbricht's ability to support and encourage her, even during his incarceration.  As she explains,

> [a]nytime I share my own fears and struggles with my life, he is always there with a positive affirmation to boost my spirits in the midst of troubles far greater than mine.  He is the kind of man who cares to reach out to people, focus on others, and in some way help those around him, even in the confines of prison.

*See* Letter of Jenny Keto, attached hereto as Exhibit 2, at Letter 62.

There is, however, only so much Mr. Ulbricht can achieve while incarcerated.  As his aunt, Kim LaCava frankly conveys in her letter, "I am saddened by the turn Ross' life has taken, but in particular that there is so much good that will be lost to society in general, not only from him directly but the support he gives others. . . .  I know there are still many positive contributions that Ross can make."  *See* Kim LaCava Letter (Exhibit 2, at Letter 5).

Mr. Ulbricht is the quintessential example of a good person, with a lifetime of good deeds and admirable behavior, who has also now been convicted of committing a serious crime for which he must be sentenced.  This Court, however, would not be the first in this district to face the challenge of sentencing such an individual.  In fashioning an appropriate sentence under such circumstances, *i.e.*, in which a defendant's "past history was exemplary" but he committed an "egregious" offense with a Guidelines range of life imprisonment, Judge Jed. S. Rakoff remarked,

> surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 30 of 78

consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, ___ F.Supp.2d ___, 2006 WL 2008727, at *7-8 (S.D.N.Y. 2006) (providing rationale for imposing a below-Guidelines sentence of 42 months' imprisonment in case in which defendant's Guidelines range was life imprisonment, limited only by the statutory maximum sentence of 85 years available on the counts of conviction).[8]

**B.**     *The Nature of Mr. Ulbricht's Offense Conduct, and the Motivation and Intent Underlying That Conduct*

**1.**     *Mr. Ulbricht's Motivation and Intent In Creating the Silk Road Site*

Mr. Ulbricht has been convicted of seven counts, including narcotics trafficking, narcotics trafficking by means of the Internet, conspiring to commit narcotics trafficking, engaging in a continuing criminal enterprise, conspiring to commit or aid and abet computer hacking, conspiring to traffic in fraudulent identification documents, and conspiring to commit money laundering, all stemming from his alleged design, creation and operation of the Silk Road website.

Yet, as set forth in Mr. Ulbricht's own letter to the Court, and several others, including those of his parents, to whom he has confided throughout this process, Mr. Ulbricht's motivations and intent for the creation of Silk Road were drastically different from what the Silk Road website ultimately became, and which led to its eventual demise.

As Mr. Ulbricht explains in his letter to the Court,

> [m]y incarceration for the past year and a half has given me a lot of time to reflect on the actions I took which led to my arrest and conviction, and my motivations for those actions.  When I created

---

[8]  In *Adelson*, Judge Rakoff lamented the

> the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense.

2006 WL 2008727, at *6.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 31 of 78

and began to work on Silk Road I wasn't seeking financial gain.  I was, in fact, in fairly good financial shape at the time.  I was the head of a startup company, Good Wagon Books, that was growing and had potential.  I held two degrees that could land me an excellent job I could fall back on should the company fail.  I created Silk Road because I thought the idea for the website itself had value, and that bringing Silk Road into being was the right thing to do.  I believed at the time that people should have the right to buy and sell whatever they wanted to as long as they weren't hurting anyone else.   However, I've learned since then that taking immediate actions on one's beliefs, without taking the necessary time to really think them through, can have disastrous consequences. . . .

Silk Road was supposed to be about giving people the freedom to make their own choices, to pursue their own happiness, however they saw individually fit. What it turned into was, in part, a convenient way for people to satisfy their drug addictions.  I do not and never have advocated for the abuse of drugs.  I learned from Silk Road that when you give people freedom, you don't know what they'll do with it.  While I still don't think people should be denied the right to make this decision for themselves, I never sought to create a site that would provide an avenue for people to feed their addictions.  Had I been more mature, or more patient, or even more worldly then, I would have done things differently.

*See* Letter of Ross Ulbricht, attached hereto as Exhibit 1.

Mr. Ulbricht's parents' letters echo those sentiments.  As Mr. Ulbricht's mother, Lyn, states in her letter,

when [Ross] created Silk Road, [he] was a young idealist who was passionate about the concept of personal and economic freedom. He wanted to convince others of he ideas he was caught up in.  To that end he created an open, free market website with few restrictions.  This was a rebellious act and I don't justify it.  Nor would I ever defend Silk Road.  I simply ask that you consider his young age and his motivations, which I believe were political and, from his immature view, humanitarian. . . . I believe he allowed his rash, youthful idealism and zeal to take him into areas and choices

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 32 of 78

> he shouldn't have made, and normally wouldn't have, and it got
> out of hand.

*See* Lyn Ulbricht Letter (Exhibit 2, at Letter 1).

> Mr. Ulbricht's father, Kirk, too refers to his son's passion for
> economic theory and misguided idealism as the catalyst for his
> son's creation of Silk Road, stating "[Ross's] study of economic
> theory was done with the intention of using his knowledge to
> better the common condition of us all.  His idealism led him to
> implement a free market website.  His naivete and the folly of
> youth blinded him to the consequences. . . . It was a terrible
> decision.  I would give anything I have to be able to go back in
> time and have the opportunity to counsel Ross on the inevitable
> outcome of his decision.

*See* Kirk Ulbricht Letter (Exhibit 2, at Letter 2).

As Mr. Ulbricht's uncle, Peter L. Becket, bluntly put it, "[Ross's] creation of the Silk
Road website . . . turned out to be a naive, most unfortunate attempt to put his libertarian and
economic beliefs into a real world setting.  So an idealistic a dream has turned into a nightmare
for someone who had an otherwise bright future."  *See* Letter of Peter L. Becket, attached hereto
as Exhibit 2, at Letter 30.

Accordingly, to the extent that Mr. Ulbricht's actions created a site that was not what he
had initially envisioned, the criminal nature of which has resulted in his imprisonment and
inability to use his considerable intellect and many talents to make a positive contribution to
society, at least for many years to come, Mr. Ulbricht has expressed deep remorse, in his own
letter, and to many others, who in turn have reiterated that sentiment to the Court.

In Mr. Ulbricht's own words, "Silk Road turned out to be a very naive and costly idea
that I deeply regret. . . In creating Silk Road, I ruined my life and destroyed my future.  I
squandered the enviable upbringing my family provided me, all of the opportunities I had been
given, and the ones I have earned, and my talents.  I could have done so much more with my life.
I see that now, but it's too late."  *See* Ross Ulbricht Letter (Exhibit 1).

Mr. Ulbricht goes on to explain that his feeling of regret extend beyond even the
implications of the site itself, to the ramifications his creation of the Silk Road, and eventual
arrest and incarceration, have had on his family: "If I had realized the impact my creation of Silk
Road would ultimately have on the people I care about most, I never would have created Silk

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 33 of 78

Road.  I created it for what I believed at the time to be selfless reasons, but in the end it turned out to be a very selfish thing to do." *Id.*

Mr. Ulbricht then explained to the Court,

> I tell you these things because I want you to know that while I will miss the comforts and joys of freedom, the most painful loss is the loss of my ability to support the people I care about and to be a daily part of their lives, and to be a productive member of society. For these reasons, if you find that my conviction warrants a sentence that allows for my eventual release, I will not lose my love of humanity during my years of imprisonment, and upon my release I will do what I can to make up for not being there for the people I love, and to make the world a better place, but within the limits of the law.

*Id.*

Indeed, Mr. Ulbricht's own family has seen a marked change in Mr. Ulbricht since his arrest.  His sister, Calla, with whom Mr. Ulbricht is extraordinarily close, remarked in her letter, "[Ross's] mindset and ideals have drastically shifted as he had time to think about his actions in the past 19 months."  *See* Calla Ulbricht Letter (Exhibit 2, at Letter 3).  His father, Kirk, similarly expressed that

> Ross regrets the decision to launch and operate the [Silk Road] website.  He has told me that in our visits to him in prison.  I have seen a very pronounced change in his attitude toward life in general, and in particular to the law, and the consequences of breaking the law.  He is a very different person now than he was before his arrest.  The experience of a year and a half in prison has matured him more than 15 years of life on the outside would have.

*See* Kirk Ulrbricht Letter (Exhibit 2, at Letter 2).

Mr. Ulbricht's mother, too, has found that Mr. Ulbricht "now 31 and chastened by his imprisonment . . . has matured and will continue to do so. . . . This is someone who is civilized, ready to cooperate and endure what he must in the hopes of returning to society as a law abiding citizen."  *See* Lyn Ulbricht Letter (Exhibit 2, at Letter 1).  Elaborating, she states, "I know he regrets his actions very deeply, not only for the severe consequences he is suffering and the terrible grief and hardship he has caused his family, but for any harm he may have caused

<div style="display:flex; justify-content:space-between;">
<div>

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

</div>
<div>

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 34 of 78

</div>
</div>

others." *Id.*

Yet, while the Silk Road website provided a vehicle for the purchase and sale of illicit drugs, as my May 15, 2015, letter and accompanying Declarations establish, those researchers and professionals who studied the site, and/or participated in its harm reduction measures in the site's forums, and interacted with its users– *i.e.*, Tim Bingham, Dr. Monica Barratt, Dr. Fernando Caudevilla, and Meghan Ralston – attest that the site did in fact ultimately have a positive and progressive element, manifested in its ability to make the inevitable drug trade safer for all participants, both in the terms of the transactions, and the composition of the drugs themselves. *See* May 15, 2015, Letter from Joshua L. Dratel, Esq., to The Honorable Katherine B. Forrest, at 2-8 (Dkt. # 241), and Exhibits 11 to 14 to the Declaration of Lindsay A. Lewis, Esq., (Dkt. # 242).

Moreover, as those Declarants explained, by maintaining the anonymity of its users, Silk Road permitted those users to be open and honest about their drug use and abuse, in turn transforming a universe of customarily wary and inaccessible drug users into a community that provided and availed itself of access to advice that ultimately enabled a number of users to reduce their drug use, or cease use of drugs entirely. *Id.*, at Bingham Declaration (Exhibit 11 to the Lewis Dec. (Dkt. # 242).

In fact, since that letter and the accompanying Declarations were filed, I received an e-mail from a former Silk Road user who related the following:

> I can say without a doubt I [private message']d DPR and alerted him to the presence of DoctorX on the SR forum back in 2013. My first pm to him did not include a link to X's thread, DPR pm'd me and asked for that link which I sent to him right away.  Several days later I noticed a huge increase in thread views caused by DPR putting X's thread up on the same page as the products were displayed.  DoctorX went from working to keep his thread from dropping down to dead thread land, to a sticky on the main page.  Huge change due to DPR seeing his importance as a harm reduction specialist.
>
> Far as X goes, I can say he inspired me to quit drugs and follow the golden rule.  I helped him a little bit with some English translation issues.

*See* E-mail, May 21, 2015, attached hereto as Exhibit 3.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 35 of 78

Thus, while Silk Road was the largest such web site in history, it was also the most responsible drug market place in history as a result of its ingrained harm reduction ethos and the accountability and safety features integrated into the site. In addition, though there are countless other similar sites operating on the Deep Web and the Internet, by many accounts these other sites do not provide the positive aspects that Silk Road was able to. *See, e.g.*, Greenberg, Andy, "How the Dark Web's New Favorite Drug Market is Profiting From Silk Road 2.0's Demise," *Wired* (November 20, 2014) (in contrast to Silk Road's "libertarian views and bann[ing of] all but victimless contraband," the "rise [of Evolution, a successor site] . . . signals perhaps the final shift away from the political roots of the original Silk Road"); Greenberg, Andy, "Drug Market 'Agora' Replaces the Silk Road as King of the Dark Net," *Wired* (September 2, 2014) (although less permissive than its competitor "Evolution," "[Agora,] unlike Silk Road, . . . allows users to sell several categories of weapons, including powerful semi-automatic firearms").

Accordingly, Mr. Ulbricht is deeply remorseful for the negative aspects of the Silk Road site, in particular because it did not fulfill his idealist vision for it. Indeed, Mr. Ulbricht's exceedingly modest lifestyle demonstrates that his vision for Silk Road did not include personal enrichment, or that he motivated by avarice.

### 2. *The Attempted "Murder for Hire" Allegations Should Not Be Considered*

As detailed below, the attempted "murder for hire" allegations should not be considered because (1) they were not charged conduct, and were not encompassed within the jury's verdict in any respect; (2) they do not constitute elements of Counts One, Three, or any of the other counts in the Indictment; and (3) as the Stipulation embodied in Government Exhibit 805 establishes beyond dispute, there is no evidence – despite the government's comprehensive investigation – that anyone was murdered or even harmed in relation to any of the alleged "murder for hire" plots – indeed, all of the evidence, and lack of evidence, establish that the persons purportedly targeted, as well as any related activity, were fictitious and the alleged plots were not manifested in any manner, but were limited to cyberspace discussions.[9]

---

[9] The Stipulation states as follows:

1.    Canadian authorities have no record of any Canadian residents named "Blake Krokoff" or "Andrew Lawsry," or any name associated with "Friendly Chemist."

2.    Canadian law enforcement authorities do not have any record of any homicide occuring in the area of White Rock, British Columbia on or

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 36 of 78

In that context – cyberspace – there was abundant evidence at trial establishing that the Silk Road web site (and the internet as a whole) contains ample components of masquerade, code, disguise, deception, and role-playing.  That lack of transparency with respect to meaning, intent, and even identity deprives those discussions, included within Government Exhibit 936, of any firm meaning, much less that sufficient to justify enhancement of a defendant's sentence.

For example, there is no evidence establishing the identity of "redandwhite," who could have been *anybody*, including even former Drug Enforcement Administration Special Agent Carl Force or former Secret Service Special Agent Shaun Bridges, both of whom have subsequently been charged with corruption with respect to their unauthorized access to the Silk Road site, including the use of (of a non-exhaustive list of) aliases.

Nor can anyone state with the requisite certainty just what the parties to GX 936 meant in their communications, particularly since certain communications occurred by other means and have not been preserved.  It could just as easily been an elaborate means of moving money from the site for an ostensible but fabricated purpose, *i.e.*, extortion or theft.  Again, the destination of the payments supposedly related to the "murder for hire" allegations, and any persons connected to such an account, were not identified.

Indeed, the lack of *any* connection to a genuine, identifiable person – either the supposed predators or their targets – reinforces dramatically the prospect that GX 936 describes a fictitious episode with some other import or meaning that, without further evidence, cannot be ascertained. Absent that necessary grounding in reality, the attempted "murder for hire" allegations are insufficiently substantiated to be considered with respect to Mr. Ulbricht's sentencing.

In addition, the "murder for hire" allegations should not be considered in sentencing Mr. Ulbricht because (a)  the government has not offered sufficient proof of any of that conduct, and/or Mr. Ulbricht's participation therein, under any standard of proof;  (b)  due to the potential impact including such uncharged conduct would have on Mr. Ulbricht's sentence, it should be subject to a more exacting standard of proof and discounted entirely if the proof fails to satisfy that stricter standard;  and (c)  the impact of any such alleged conduct on Mr. Ulbricht's sentence

---

about March 31, 2013, or any record of any homicides occurring in the area of Surrey, British Columbia on or about April 15, 2013, or any other evidence that anyone was physically harmed as a result of the plans discussed by "Dread Pirate Roberts" and "redandwhite."

*See* Government Exhibit 805.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 37 of 78

should be ameliorated by consideration of the other sentencing factors enumerated in §3553(a).[10]

     As detailed below, even before the Supreme Court commenced its series of decisions beginning with *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and carrying through *United States v. Booker*, 543 U.S. 220 (2005) and beyond,[11] in which the Court has held that elements of an offense must be decided by a jury, beyond a reasonable doubt (and not by a judge as a "sentencing factor"), the Second Circuit acknowledged the problem inherent in evaluating Guidelines enhancements by the "preponderance of the evidence" standard rather than by a more exacting burden of proof, particularly when the enhancements can result in a substantial increase in the defendant's sentence.

     Nor is there a difference for practical purposes when, as here, the government and the PSR have cited the allegations as relevant Mr. Ulbricht's sentence not as relevant conduct under §1B1.3, or as specific Guidelines enhancements, but rather under the broader rubric of §3553(a) factors. Even in that context, though, Due Process would still apply, and require that the information be accurate and sufficiently reliable to warrant consideration.

     As a remedial measure, during the pre-*Booker* the Second Circuit established a process by which sentencing courts could ensure that dramatic increases in a defendant's offense level, imposed by either adjustments or inclusion of relevant conduct, could be alleviated by a secondary level of analysis that subjected the facts to a more demanding standard of proof and, if those facts did not meet that standard, an appropriate downward departure.

     That process has survived *Booker*, and is indeed augmented by the advisory nature of the Guidelines, and a sentencing court's capacity to balance extreme Guidelines calculations against the sentencing factors listed in §3553(a) in order to arrive at a sentence "sufficient, but not greater than necessary" to achieve the purposes of sentencing identified in §§3553(a)(2)(A)-(D).

     In addressing the burden of proof issue in the pre-*Booker* environment, the Second Circuit several times grappled with the inexorable tension between a defendant's Due Process and Sixth Amendment rights at sentencing, and the preponderance of the evidence standard. For

---

    [10] The same analysis applies to the six deaths the government seeks to attribute to the Silk Road web site and, in turn, to Mr. Ulbricht. Those deaths are discussed in detail in my May 15, 2015, letter (Docket #241).

    [11] The line of cases includes more recently *Alleyne v. United States*, ____ U.S. ____, ____, 133 S. Ct. 2151, 2155 (2013) (extending *Booker* to facts that increase a mandatory minimum sentence) and *Southern Union Co. v. United States*, ____ U.S. ____, 132 S. Ct. 2344 (2012) (extending *Booker* principles to criminal fines).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 38 of 78

example, in *United States v. Cordoba-Murgas*, 233 F.3d 704 (2d Cir. 2000), the Second Circuit
clarified its various opinions on the issue, explaining that

> the enhancement of a sentence based upon a defendant's "relevant
> conduct," if done without regard to the weight of the evidence
> proving the relevant conduct, may result in a total term of
> incarceration which is excessive, inappropriate, and unintended
> under Sentencing Guidelines.

233 F.3d at 708.

The Court in *Cordoba-Murgas* cited and quoted from *United States v. Gigante*, 94 F.3d
53 (2d Cir. 1996), which included adjustments within that framework:

> the preponderance standard is no more than a threshold basis for
> adjustments and departures, and the weight of the evidence, at
> some point along a continuum of sentence severity, should be
> considered with regard to both upward adjustments and upward
> departures.  With regard to upward adjustments, a sentencing judge
> should require that the weight of the factual record justify a
> sentence within the adjusted Guidelines range.

94 F.3d at 56.  *See also United States v. Concepcion*, 983 F.2d 369, 390 (2d Cir. 1992) and 983
F.2d at 393-95 (Newman, J., *concurring*).

Under such circumstances, the Court in *Gigante* instructed that in making its
determination,

> the Court may examine whether the conduct underlying multiple
> upward adjustments was proven by a standard greater than that of
> preponderance, such as clear and convincing or even beyond a
> reasonable doubt where appropriate.

94 F.3d at 56.

The Court in *Gigante* added, "[w]here a higher standard, appropriate to a substantially
enhanced sentence range, is not met, the court should depart downwardly."  *Id.*  In *Cordoba-
Murgas*, the Court similarly declared that "the factual finding by a preponderance of the
evidence is a preliminary step susceptible to adjustment."  233 F.3d at 709.  The Court in
*Cordoba-Murgas* also authorized downward departures when the appropriate standard of proof

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 39 of 78

was not satisfied, 233 F.3d at 708, and provided the following direction to sentencing courts after finding such enhancements or relevant conduct by a preponderance of the evidence:

> under the combination of circumstances that may be present here, including (i) an enormous upward adjustment (ii) for uncharged conduct (iii) not proved at trial and (iv) found only a preponderance of the evidence, (v) where the court has substantial doubts as to the accuracy of the finding, the Court would be authorized to depart downward from the scheduled adjustment by reason of the extraordinary combination of circumstances.

233 F.3d at 708, *citing United States v. Concepcion*, 983 F.2d at 389. *See also United States v. Allen*, 644 F. Supp.2d 422, 435 (S.D.N.Y. 2009) (footnote omitted).

Since *Booker*, that doctrine has not been disturbed. For example, in *United States v. Vaughn*, 430 F.3d 518 (2d Cir. 2005), in addressing whether acquitted conduct can be used in calculating a Guidelines range (and deciding it can), then-Judge Sotomayor, writing for the panel, considered it important to remind courts that

> [w]e restate, however, that while district courts may take into account acquitted conduct in calculating a defendant's Guidelines range, they are not required to do so. Rather, district courts should consider the jury's acquittal when assessing the weight and quality of the evidence presented by the prosecution and determining a reasonable sentence. *See Cordoba-Murgas,* 233 F.3d at 708 (acknowledging that enhancements based on relevant conduct may be excessive when imposed "without regard to the weight of the evidence proving the relevant conduct") (citation omitted); *United States v. Gigante,* 94 F.3d 53, 56 (2d Cir.1996) (holding that, for sentencing purposes, "the preponderance standard is no more than a *threshold* basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered") (emphasis in original).

430 F.3d at 527. *See also United States v. Juwa*, 508 F.3d 694 (2d Cir. 2007) (*citing Cordoba-Murgas* in the context of holding that the allegations in an indictment were by themselves insufficient to justify an enhanced sentence).

Indeed, the *Cordoba-Murgas* doctrine was applied in *United States v. Allen*, 644 F. Supp.2d 422 (S.D.N.Y. 2009), in which the Court found certain relevant conduct by the

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 40 of 78

preponderance standard, yet noted that "the Guidelines are not mandatory[,]" *id.*, at 434 (footnote omitted), and that "were defendants to be sentenced in accordance with the Guidelines, a downward departure might be appropriate." *Id.*, at 435.

In examining the conduct – which the Court concluded it had "no doubt that [it] in fact occurred," although adding that it was equally "skeptical that any rational jury could make this finding beyond a reasonable doubt" *id.* (footnote omitted) – the Court in *Allen* remarked that "[t]he situation in *Cordoba–Murgas* exactly parallels that of these defendants" because "[t]he related conduct increases their sentencing exposure *at least five-fold* for conduct proven only by a preponderance of the evidence." *Id.*, at 435 (emphasis in original) (footnote omitted).

In addition, the Court in *Allen* reasoned that "[w]ere the Guidelines mandatory, and no downward departure available, this situation would present serious constitutional problems. Due process of law has little meaning if it does not protect citizens from such arbitrary exercises of power." *Id.*, at 434.

The discretion *Cordoba-Murgas* and its successors in the post-*Booker* environment afford sentencing courts for the purpose of ameliorating disproportionate enhancements and/or relevant conduct has been amplified since *Booker* by the Guidelines' status as merely advisory, and the added consideration of §3553(a)'s sentencing factors that are balanced against the Guidelines' severity. *See, e.g., United States v. Jones*, 531 F.3d 163, 176 (2d Cir. 2008) (noting that question of standard of proof is less compelling because *Booker* makes *all* Guidelines findings "in the end, only advisory") (other citations omitted), *citing Vaughn*, 430 F.3d at 525; *United States v. Salazar*, 489 F.3d 555, 558 (2d Cir. 2007) ("the discretion afforded district judges by *Booker* applies only to their consideration of a Guidelines range as one of the §3553(a) factors *after* that range has been calculated").[12]

_____

[12] The panel's statement in *Jones* that "[i]n light of this Court's continual application of the preponderance of the evidence standard, it is incorrect to construe the [] language [in *United States v. Shonubi*, 103 F.3d 1085, 1089 (2d Cir. 1997)] as authorizing the use of a higher standard of proof[,]" 531 F.3d at 176, *citing Cordoba-Murgas*, 233 F.3d at 708, and *United States v. Bennett*, 252 F.3d 559, 565 (2d Cir. 2001) (reiterating that *Shonubi* remark was *dictum*), which would appear to deprive the Court of discretion to follow *Cordoba-Murgas* and *Gigante*, and apply a higher standard of proof, are at best confusing and inconsistent. Neither *Cordoba-Murgas* nor *Gigante* have ever been overruled; indeed, the cases that reassert the preponderance standard – *i.e.*, *Vaughn*, and even *Jones* itself – all cite *Cordoba-Murgas* as authority while inexplicably ignoring the remainder of *Cordoba-Murgas*'s instruction to the District Court: that, as set forth **ante**, at 38-42, it at least permissible, and even appropriate, to calibrate the burden of proof proportionately with the effect a particular adjustment or set of facts exerts on a

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 41 of 78

Consequently, it is respectfully submitted that the process set forth in *Cordoba-Murgas* should be implemented to determine whether any conduct constitutes relevant conduct.[13]  Such a potential increase in Mr. Ulbricht's sentence requires attendant safeguards, with respect to both the quality of information relied upon, *i.e.*, whether the evidence is competent and/or admissible under the Federal Rules of Evidence.

While the Federal Rules of Evidence do not limit the type of information a Court can consider at sentencing, *see* 18 U.S.C. §3661 (*see also* **ante**, at 6), certainly the integrity and reliability of certain information is a factor in determining whether such information can legitimately form the basis for increasing the length of a sentence – and to what extent if permissible at all.  Indeed, Due Process places constraints on the impact information can have on sentence relative to that information's provenance.  *See United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978).  Due Process and the Sixth Amendment do not permit any less.

Accordingly, under any standard of proof, the attempted "murder for hire" allegations are legally and factually insupportable in this case, and consequently do not qualify as competent for

---

defendant's Guidelines level, and depart downward accordingly.  In addition, the comment in *Jones* that the language in *Shonubi* was merely *dictum*, 531 F.3d at 176, is perplexing because the relevant passage in *Shonubi* declares "though the Sentencing Commission has favored the preponderance-of-the-evidence standard for resolving all disputed fact issues at sentencing, U.S.S.G. § 6A1.3., p.s., comment., *we have ruled that a more rigorous standard should be used* in determining disputed aspects of relevant conduct where such conduct, if proven, will significantly enhance a sentence."  103 F.3d at 1085 (emphasis supplied), *citing United States v. Gigante*, 94 F.3d 53, 56-57 (2d Cir.1996) (denying petition for rehearing).

[13]  Nor does the opinion in *United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008), alter the analysis.  In *Yannotti*, the jury convicted the defendant of RICO conspiracy, but deadlocked on the substantive RICO count.  *Id.*, at 118.  The jury also deadlocked on an alleged kidnaping conspiracy, *id.*, at 119, and the Court made the unremarkable determination that it "could be factored into Yannotti's sentence as relevant conduct pursuant to §1B1.3."  *Id.*, at 128.  The Court did not address *Cordoba-Murgas*, or *Gigante*, or whether the effect of the relevant conduct could be moderated by imposition of a higher burden of proof and a downward departure, as those cases authorize.

Interestingly, too, in *Yannotti*, while the jury had marked on the verdict sheet "not proven" with respect to murders and attempted murders, *id.*, at 118-19, apparently that conduct was *not* included in the Guidelines calculation or sentence as relevant conduct (but only the kidnaping conspiracy was in dispute).  *Id.*, at 127-28.

LAW OFFICES OF                          Hon. Katherine B. Forrest
**JOSHUA L. DRATEL, P.C.**              United States District Judge
                                        Southern District of New York
                                        May 22, 2015
                                        Page 42 of 78

the Court to consider.[14]  Moreover, even if they did, it is respectfully submitted that the Court should ameliorate their impact on Mr. Ulbricht's sentence by balancing them against consideration and application of §3553(a)'s sentencing factors.

> ### 3. Mr. Ulbricht's Offense Conduct Most Closely Resembles A Violation of 21 U.S.C. §856, Proscribing "Maintaining Drug-Involved Premises"

Also, as set forth in Mr. Ulbricht's initial pretrial motions (Docket # 19-21), his offense conduct more closely resembles a violation of 21 U.S.C. §856, "Maintaining Drug-Involved Premises, than it does either 21 U.S.C. §§841, 846, or 848.  Section 856 makes it unlawful to "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance;" §856(a)(1), and/or "manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance."  §856(a)(2).

Designed in particular to eliminate "crack houses," the text of and legislative history for §856 make it clear that it imposes criminal liability only on persons whose premises are operated for the purpose of manufacturing, storing, distributing or using a controlled substance.  *See* H 5484, 99th Cong, 2d Sess (Sept 8, 1986), in 132 Cong Rec S 26473, 26474 (Sept 26, 1986) (purpose of §856 was to "[o]utlaw operation of houses or buildings, so-called 'crack-houses,' where 'crack,' cocaine and other drugs are manufactured or used");  *see also* Historical and Statutory Notes to 21 U.S.C. §856.[15]

_____

[14]  As noted **ante**, at n. 10, these principles and the same result should obtain with respect to the six deaths the government seeks to attribute to the Silk Road web site and Mr. Ulbricht, which are addressed in my May 15, 2015, letter to the Court (Docket # 241).

[15]  Consistent with Congress's express purpose in enacting §856, it has been primarily applied to punish those individuals involved in operating drug manufacturing or distributing operations out of crackhouses, warehouses, or large drug manufacturing and storage facilities. *See United States v. Wicker*, 848 F.2d 1059 (10th Cir.1988) (methamphetamine lab); *United States v. Martinez–Zyas*, 857 F.2d 122 (3rd Cir.1988) (cocaine warehouse and packaging facility);  *United States v. Bethancurt*, 692 F.Supp. 1427 (D.C. Dist.Ct.1988) (crack house); *United States v. Restrepo*, 698 F.Supp. 563 (E.D.Pa.1988) (cocaine warehouse).  *But see United States v. Tamez*, 941 F.2d 770, 773-74 (9th Cir. 1991) (owner of used car dealership who was aware of large-scale drug distribution activities emanating from his dealership, and allowed them to continue, was guilty of violating §856(a)(2));  *United States v. Chen*, 913 F.2d 183, 185, 191 (5th Cir. 1990) (same re: motel owner who was aware of and/or willfully blind to the fact that her

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 43 of 78

Plainly, §856 was intended to cover a gap in the criminal code and create a vehicle for holding criminally liable those whose premises were used, with their knowledge and intent, for the particular criminal activity described in §856.  That is exactly what Mr. Ulbricht's conduct manifested, albeit in the more modern form of a web site.

Yet, §856, which describes Mr. Ulbricht's offense conduct with precision, carries a maximum penalty of 20 years' imprisonment.  As a result, it is respectfully submitted that Mr. Ulbricht's sentence should reflect significant consideration of the appropriate sentence, and limitations thereon, for the specific type of offense conduct for which Mr. Ulbricht has been convicted.

> **C.**    ***Sentencing Mr. Ulbricht to a Prison Term Substantially Below
> the Applicable Guidelines Range Would, As Required by
> §3553(a)(6), Avoid Creating an Unwarranted Sentencing Disparity***

In sentencing a defendant the Court is required to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. §3553(a)(6).  Here, a sentence of life imprisonment or the functional equivalent would create just such an "unwarranted sentence disparit[y]" in contravention of §3553(a)(6)'s mandate.

As noted **ante**, Mr. Ulbricht's offense conduct was more analogous to a violation of §856, which carries a maximum prison sentence of 20 years.  Yet here he faces substantially more prison time due to the broader nature of the charges (and their corresponding lengthier statutory maximum penalties), and because the applicable Sentencing Guidelines level – a base offense level of 36 – is predominantly a function of the quantity of drugs involved.

In that context, as a threshold matter, the Second Circuit's decision in *Dorvee*, in which the Court addressed essentially automatic but severe Guidelines enhancements in child pornography cases that placed Guidelines ranges at or near the statutory maximum(s), is particularly pertinent here, too.

In *Dorvee*, addressing enhancements relating to possession of child pornography (§2G2.2), the Circuit noted that "the district court was working with a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to

---

motel was occupied by drug dealers who sold drugs in the rooms and on the premises, and who also stored drugs at her motel).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 44 of 78

unreasonable sentences that are inconsistent with what §3553 requires." 616 F.3d at 184.[16]

The Circuit also explained in *Dorvee* that §2G2.2 is different from most Guidelines in that it is not based on empirical data. 616 F.3d at 186. Indeed, that was a defect in the crack-cocaine Guidelines at issue in *Kimbrough v. United States*, 552 U.S. 85 (2007). The same is true with respect to the drug quantity enhancements as well: they represent merely a point in space chosen arbitrarily, and are not the result of the Sentencing Commission's core function, *i.e.*, assigning Guidelines levels that conform with conclusions based on data compiled from a statistically significant number of cases.

The drug quantity Guidelines were developed by the Sentencing Commission pursuant to a directive from Congress, as part of the Sentencing Reform Act of 1984 that the Commission set Guideline ranges for drug offenders. In formulating this Guideline the Commission's task was to engage in a developmental process that included examination of pre- Guideline sentences to ensure that the Guideline sentences would not be, on average, materially different from actual time spent in prison by then-current offenders. *See* 28 U.S.C. §994(m).

Also, the Commission was to review periodically the implementation of those Guidelines by considering feedback from the judiciary and other components of the criminal justice system. *See* 28 U.S.C. §§994(o), (p) & (x). In addition, Congress directed the Commission to conduct extensive empirical research by collecting data and studying the relationship of the sentences imposed to the sentencing goals enumerated in 18 U.S..C. §3553(a)(2). *See* 28 U.S.C. §§995(a)(12)-(16).

Yet, since their promulgation, neither the original Guidelines nor the amendments expanding the class of the offenders has ever been the subject of, or supported by, empirical evidence or reason. As noted **ante**, the Supreme Court has advised in a number of cases including *Rita v. United States*, *Kimbrough v. United States*, and *Pepper v. United States*, district courts can consider whether a particular Guideline itself can be disregarded (or discounted) because it was based merely on Congressional or Commission fiat, and *not* on empirical evidence. *See also Dorvee*, 616 F.3d at 184-88.

---

[16] *See also United States v. Tutty*, 612 F.3d 128, 130-33 (2d Cir. 2010) (applying *Dorvee*); *United States v. Bonilla*, 618 F.3d 102, at 110 (2d Cir. 2010) (extending *Dorvee* doctrine to the 16-point enhancement related to illegal reentry conviction); *United States v. Hernandez*, 2010 WL 2522417, at *1 (E.D.N.Y. May 28, 2010) (acknowledging *Dorvee*, but noting that §3553(a) analysis would not alter sentence because defendant received the mandatory minimum term of five years).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 45 of 78

    In *Dorvee*, the Court further examined the extent to which a sentencing court owes deference to the Guidelines when a particular enhancement is not the product of empirical evidence, explaining that the ordinary

> deference to the Guidelines is not absolute or even controlling; rather, like our review of many agency determinations, "[t]he weight of such a judgment in a particular case will depend upon the
>  thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 [] (1944); *see Kimbrough,* 552 U.S. at 109 [] (citing the crack cocaine Guidelines as an example of Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional role").

616 F.3d at 188.

    As a result, the Court in *Dorvee* recognized that under such circumstances

> adherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories.

616 F.3d at 187.

    Confronted with that situation in *Dorvee*, the Court concluded that "[t]his result is fundamentally incompatible with § 3553(a)[,]" because "[b]y concentrating all offenders at or near the statutory maximum, §2G2.2 eviscerates the fundamental statutory requirement in §3553(a) that district courts consider 'the nature and circumstances of the offense and the history and characteristics of the defendant[.]'" *Id.*

    The Court in *Dorvee* added that mechanical application of such Guidelines enhancements

> violates the principle, reinforced in *Gall,* that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct. *See Gall,* 552

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 46 of 78

      U.S. at 55 [] (affirming a sentence where "it is perfectly clear that the District Judge considered the need to avoid unwarranted disparities, but also considered the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated" (emphasis in original)).

*Id.*[17]

      Thus, as the Court in *Dorvee* lamented with respect to §2G2.2, "sentencing enhancements cobbled together through this process routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases." 616 F.3d at 186. Yet, as the Court cautioned, "[i]n all events, even a statutory maximum sentence must be analyzed using the §3553(a) factors." 616 F.3d at 184.[18]

      Ultimately, the Court in *Dorvee* reminded that

> [d]istrict judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under §2G2.2 – ones that can range from non-custodial sentences to the statutory maximum-bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results.

616 F.3d at 188.

      That "broad discretion" exists here as well, even in the context of Mr. Ulbricht's conduct, which essentially facilitated the sale of drugs. As the Court concluded in *Dorvee*, "[w]hile we

---

    [17] In *Dorvee*, the Court offered an example of how Guidelines like §2G2.2 create – via automatic substantial enhancements applied across a broad spectrum of a specific offense conduct – unwarranted *similarities* among dissimilar defendants: "[e]ven with no criminal history, this [defendant's] total offense level of 23 would result in a Guidelines sentence of 46 to 57 months. This is the same Guidelines sentence as that for an individual with prior criminal convictions placing him in a criminal history category of II, who has been convicted of an aggravated assault with a firearm that resulted in bodily injury.[]" 616 F.3d at 187 (footnote omitted).

    [18] *See also United States v. Adelson*, (certain customary offense-specific enhancements "represent[] . . the kind of 'piling-on' of points for which the guidelines have frequently been criticized"). 2006 WL 2008727, at *5.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 47 of 78

recognize that enforcing federal prohibitions on child pornography is of the utmost importance, it would be manifestly unjust to let Dorvee's sentence stand." *Id.*

Here, as in *Dorvee*, "adherence to the Guidelines results in virtually no distinction between sentences for the most dangerous offenders," 616 F.3d at 187, and someone like Mr. Ulbricht, who, as the scores of letters on his behalf attest, should not be categorized among them. As a result, sentencing Mr. Ulbricht at or close to the applicable advisory Guidelines range would result in a sentence that is "fundamentally incompatible with § 3553(a)." *Id.*

In amending the drug quantity table in 2014, the Sentencing Commission expressly acknowledged that the focus on drug quantity skewed sentences in the wrong direction. As the Commission noted in explaining its 2014 amendments,

> [t]hese numerous adjustments, both increasing and decreasing offense levels based on specific conduct, reduce the need to rely on drug quantity in setting the guideline penalties for drug trafficking offenders as a proxy for culpability, and the amendment permits these adjustments to differentiate among offenders more effectively.

Amendments to the Sentencing Guidelines (April 30, 2014), at 23 (hereinafter "2014 Amendments"), <available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20140430_RF_Amendments.pdf>.

Moreover, the Commission noted that "[t]he amendment was also motived by the significant overcapacity and costs of the Federal Bureau of Prisons." *Id.* As the Commission reported,

> [i]n response to these concerns, the Commission considered the amendment an appropriate step toward alleviating the overcapacity of the federal prisons. Based on an analysis of the 24,968 offenders sentenced under §2D1.1 in fiscal year 2012, the Commission estimates the amendment will affect the sentences of 17,457 – or 69.9 percent – of drug trafficking offenders sentenced under §2D1.1, and their average sentence will be reduced by 11 months – or 17.7 percent – from 62 months to 51 months. The Commission estimates these sentence reductions will correspond to a reduction in the federal prison population of approximately 6,500 inmates within five years after its effective date.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 48 of 78

*Id.*

In that context, the Commission

> the Commission received testimony from several stakeholders that
> the amendment would permit resources otherwise dedicated to
> housing prisoners to be used to reduce overcrowding, enhance
> programming designed to reduce the risk of recidivism, and to
> increase law enforcement and crime prevention efforts, thereby
> enhancing public safety.

*Id.*, at 24.  *See also* Sari Horwitz, "Holder Calls for Reduced Sentences for Low-Level Drug
Offenders," *The Washington Post*, March 13, 2014, available at
<http://www.washingtonpost.com/world/national-security/holder-will-call-for-reduced-sentences
-for-low-level-drug-offenders/2014/03/12/625ed9e6-aa12-11e3-8599-ce7295b6851c_story.html
> (quoting Attorney General Eric H. Holder, Jr. testifying before the Sentencing Commission
with respect to the Amendment to §2D1.1, as stating that "[c]ertain types of cases result in too
many Americans going to prison for far too long, and at times for no truly good public safety
reason . . .  Although the United States comprises just five percent of the world's population, we
incarcerate almost a quarter of the world's prisoners").

The Sentencing Commission, in explaining its pending amendment to §2D1.1, and its
conclusion that "the amendment should not jeopardize public safety[,]" also cited the absence of
any reduction in recidivism resulting from increased sentences:

> the Commission was informed by its studies that compared the
> recidivism rates for offenders who were released early as a result
> of retroactive application of the Commission's 2007 crack cocaine
> amendment with a control group of offenders who served their full
> terms of imprisonment.  *See* USSG App. C, Amendment 713
> (effective March 3, 2008).  The Commission detected no
> statistically significant difference in the rates of recidivism for the
> two groups of offenders after two years, and again after five years.
> This study suggests that modest reductions in drug penalties such
> as those provided by the amendment will not increase the risk of
> recidivism.

2014 Amendments, at 23-24.

Accordingly, the disproportionate impact drug quantity exerts on sentencing has been

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 49 of 78

recognized by the Sentencing Commission as a factor that needs to be recognized and rectified. Here, the distorting effect of drug quantity is magnified in the context of Mr. Ulbricht's offense conduct, which did not involve the sale of controlled substances, but rather the construction and operation of an internet vehicle that permitted others to do so, activity that in the brick-and-mortar world would be most akin to a violation of §856 and subject to a maximum punishment of 20 years' imprisonment.

>  **D.**   *The Prevailing Academic and Other Research Establishes That General Deterrence Is Not a Valid Basis for Enhancing Mr. Ulbricht's Sentence*
>
>  **1.**   *Specific Deterrence for Mr. Ulbricht Will Be More Than Amply Accomplished By the Mandatory Minimum 20-Year Prison Term*

Among sentencing's principal purposes is deterrence, both general and specific. *See* §§3553(a)(2)(B) & (C). The issue of *specific* deterrence – relating solely to deterring Mr. Ulbricht from future criminal conduct – is addressed in depth **ante** in section II(A) of this letter, and, it is respectfully submitted should not be a factor beyond the 20-year mandatory minimum Mr. Ulbricht faces as a result of his conviction on Count Four.

This case represents Mr. Ulbricht's first interaction with the criminal justice system, and his first conviction. In *United States v. Mishoe*, 241 F.3d 214 (2d Cir. 2001), in the context of the Career Offender Guidelines, the Court pointed out that "[t]he Commission has explained that the escalating sentence ranges prescribed by the CHCs are intended to achieve the purpose of deterrence[.]" *Id.*, at 220, *citing* U.S.S.G. Ch. 4, Pt. A, intro. comment.

Yet, as courts have concluded, for defendants who have not yet experienced extended incarceration, the deterrent purpose is satisfied by a sentence far shorter than a particular Guidelines range (including even those pursuant to the Career Offender Guidelines) would provide. For example, in *Mishoe*, explaining its reasoning in the Career Offender context, the Second Circuit remarked that

> [o]bviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences, particularly the times served, for the prior offenses. If, for example, a defendant twice served five or six years and thereafter committed another serious offense, a current sentence might not have an adequate deterrent effect unless it was substantial, perhaps fifteen

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 50 of 78

> or twenty years.  *Conversely, if a defendant served no time or only*
> *a few months for the prior offenses, a sentence of even three or five*
> *years for the current offense might be expected to have the*
> *requisite deterrent effect.*

241 F.3d at 220 (emphasis added).

Consequently, the Court in *Mishoe* concluded the District Court "would be entitled on remand to consider whether to make a departure based on an individualized consideration of factors relevant to the assessment whether CHC VI 'significantly over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes.'"  *Id.* at 219, *citing* U.S.S.G. §4A1.3.

Here, of course, Mr. Ulbricht is in Criminal History Category I, yet faces the possibility of a life sentence.  Yet the Second Circuit's rationale in *Mishoe* applies with equal if not greater force here:  that a sentence of that length, or even approaching that length, is not necessary to achieve a deterrent effect.

## 2.  *General Deterrence Should Not Be a Factor In Mr. Ulbricht's Sentence*

Regarding general deterrence, while it is an express component of so many sentences, there is not any research or clinical evidence that justifies enhancing a particular defendant's sentence based on the prospect, entirely speculative and inchoate, of influencing some putative future wrongdoer, unidentified in any fashion, who has yet to commit, and perhaps even contemplate, a crime.  Such a person's knowledge, motivation, and compelling factors that would lead to criminal conduct are simply unknown.  Defendants should receive the sentence *they* deserve, and not have as a component of their sentence what some other, future, unknown defendant deserves.[19]

Indeed, strict and in many instances Draconian mandatory minimum sentences for federal drug offenses have been in place for three decades now, and there remains no shortage of

---

[19]  *See* Michael J. Lynch, *Beating a dead horse:  Is there any basic empirical evidence for the deterrent effect of punishment?*, 31 Crime, Law & Social Change 347 (1999) (hereinafter "*Beating a dead horse*"), at 355 ("[m]ost assuredly, the assumption that a lesser increase in the rate of incarceration would have caused an inflated rate of offending *is just that* – an *assumption* or assertion *which cannot be demonstrated* except with data that make a great many assumptions about how individuals *might* behave given some set of *hypothetical* circumstances") (emphasis in original).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 51 of 78

persons willing to engage in the illegal activity that puts them in jeopardy of such punishment. Consumer demand for illicit drugs in the U.S., and not prudential behavior, is what drives this market, the profits, and the consequent willingness of individuals to risk their freedom for what for many is a lifestyle they fully expect will be short-lived before they are apprehended or become a casualty of drug violence.

As detailed below, in the context of Silk Road, internet drug markets will not be affected by the sentence in this case. Whether due to the anonymity TOR provides, or the global nature of the marketplace, those who build and operate such markets will not be discouraged by the sentence in this case any more than the street drug trade wants for steerers, sellers, distributors, and suppliers notwithstanding thirty years of a well-advertised severe regime of pretrial detention, sentencing, and forfeiture in the federal system (and/or in the states that implemented such systems since the 1970's).

a. *Harsh Penalties Are Not Effective In Deterring Drug Activity*

For decades, law makers and courts have implemented various methods addressed to reducing drug crime, with varied focus and limited success. Drug policy in the United States is currently dominated by a concentration on increasing the cost of drug crime to participants, primarily through heavy punitive measures, in an effort to reduce the supply of and demand for drugs. The underlying theory is that the threat of a heavy penalty is incorporated into the cost of participating in drug activity, ideally resulting in higher prices and lower quality drugs, and thus, decreased demand. *See* Echegaray, Margarita Mercado, *Drug Prohibition in America: Federal Drug Policy and Its Consequences*, 75 Rev. Jur. U.P.R. 1215, 1246-47 (2006) (hereinafter "*Echegaray*").[20]

---

[20] Also, according to a criminologist, there

> is a widespread belief that in order for society to "get revenge" against those who transgress the law, criminal penalties must be stiffened so that they are much graver than the crimes criminals commit (the punishment must outweight the rewards of crime). This interpretation of the connection between revenge and punishment, while popular, misses one of the central premises of retributive philosophy: namely, that the crime and punishment should be near equivalents [ ]. From the perspective of retributive theory, the excessive punishments which characterize the U.S. penal system do not fall within the parameters of retributive philosophy, and does not facilitate meetings the goals of

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 52 of 78

However, current and historical trends demonstrate that an enforcement policy grounded in deterrence does not account for the various, and possibly unique, motivations driving participation in drug crimes.  Since harsher penalties, including mandatory minimums, were instituted, and despite focusing billions on disrupting the supply of drugs, the rate of drug use has remained fairly constant, new drugs continue to emerge, drug purity has in fact improved, and drug prices have fallen.  *See The Price and Purity of Illicit Drugs:  1981 Through the Second Quarter of 2003*, Executive Office of the President, Office of National Drug Control Policy, November 2004 (hereinafter "*Price and Purity 1981-2003*"), at v-vii, available at <https://www.ncjrs.gov/ondcppubs/publications/pdf/price_purity.pdf>; *see also* Fries, Arthur et al., *The Price and Purity of Illicit Drugs: 1981-2007*, Institute for Defense Analyses, October 2008, at VII-1 - 3, available at <https://www.whitehouse.gov/sites/default/files/ondcp/policy-and-research/bullet_1.pdf>.

Comprehensive surveys examining the impact of increased sentences on drug activity have repeatedly concluded that attempting to deter drug dealers and users with heavy sentences is too blunt an approach to make any significant impact on actual participation in drug crime.  Mascharka, Christopher, *Mandatory Minimum Sentences: Exemplifying the Law of Unintended Consequences*, 28 Fla. St. U. L. Rev. 935, 947-49 (Summer 2001) (hereinafter "*Mascharka*"), *citing* Jonathan P. Caulkins et al., Rand Drug Policy Research Center, *Mandatory Minimum Drug Sentences: Throwing Away the Key or the Taxpayers' Money?* (1997) (hereinafter "*Rand Analysis*"), and Barbara S. Vincent & Paul J. Hofer, Federal Judiciary Center, *The Consequences of Mandatory Minimum Prison Terms:  A Summary of Recent Findings*, 1 (1994).  *See also* Tonry, Michael, *The Mostly Unintended Effects of Mandatory Penalties: Two Centuries of Consistent Findings*, 38 Crime & Just. 65 (2009).

> **b.**     ***Drug Supply Is Not Reduced***
> ***Through Imposition of Harsh Penalties***

As the *Rand Analysis* explains, the efficacy of deterrence and incapacitation in the context of black market criminal activity is substantially diluted by the consensual nature of the crime.  *See Rand Analysis*, at 13.  Indeed, even adopting the hypothesis underlying general deterrence as a crime-reducing mechanism (challenged by the research discussed **post**, at 60-66),

---------------------------

punishment.

*Beating a dead horse*, at 348 (citations omitted).

Yet, as Mr. Lynch added, "[i]In theory, however, there is no necessary connection between tough, retributive punishments and deterring criminals.  *Id.* (citation omitted).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 53 of 78

the commerce in controlled substances defies the operative rationale.[21]

For example, while an increased penalty for burglary would (theoretically) weigh firmly against committing the burglary and would therefore deter that crime, a drug seller can compensate for the possibility of a severe sentence by charging more money for his product. *Id.* However, in a black market framework, a deterrent effect exists only when a drug seller has determined that he cannot charge enough money for his product to offset the risk of an extended prison sentence. Rasmussen, David W. & Benson, Bruce L., *Rationalizing Drug Policy Under Federalism*, 30 Fla. St. U. L. Rev. 679, 697 (Summer 2003) ("the effect of law enforcement focused in one direction can be completely mitigated by drug market entrepreneurs within a short period of time").

Consequently, rather than deterring drug activity, imposing lengthy sentences on drug dealers will select for individuals "who attach high value to money and low value to the risk of lengthy incarceration." *Rand Analysis*, at 13. *See also Price and Purity 1981-2003*, at 18 ("[p]erhaps the most striking observation about illicit drug prices is simply that they are still extraordinarily high per unit weight, even though prices have declined over the past 20 years").[22]

Similarly with respect to incapacitation, the incarceration of drug dealers for an extended period does not exert any impact the amount of drugs sold because, unlike other kinds of criminal activity, there is demand for drugs unaffected by removing suppliers from the market. *See Rand Analysis*, at 14-15. As the *Rand Analysis* notes, "[t]he common pessimism is not too far from the truth: 'If you arrest one dealer, someone else will take his or her place.'" *Id.*

---

[21] As Michael Lynch explains, "[t]he deterrence hypothesis states that rational people, calculating the costs and rewards of their behavior, will be deterred from selecting negative (criminal) behaviors when the costs (punishment, arrest, etc.) of such behavior are greater than the rewards. *Beating a dead horse*, at 352, *citing* Becker, Gary S., *Crime and Punishment: An Economic Approach*, 76 Journal of Political Economy 169-217 (1968).

[22] The individuals the 1997 *Rand Analysis* predicted would be least discouraged by severe penalties, and would thus flock to the high yield, high risk field of drug dealing, are in fact a large portion of today's drug vendors – "young, impoverished, inner-city . . . [people] who perceive few legitimate alternatives as compared to the large, immediate returns from dealing." *Mascharka*, 28 Fla. St. U. L. Rev. at 949, *citing* Vincent & Hofer; *see also* Little, Michelle & Steinberg, Laurence, *Psychosocial Correlates of Adolescent Drug Dealing in the Inner City: Potential Roles of Opportunity, Conventional Commitments and Maturity*, J. Res. Crime Delinq. at 3-4, 10, 12-13 (2006) (discussing the role of social and financial incentive in adolescent drug trafficking among inner city youth), available at <http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2792760/>.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 54 of 78

On a broader scale, increased sentences also mean offenders remain incarcerated well beyond the ten or fifteen years of the average criminal career. *See Rand Analysis*, at 15. Lengthier sentences mean allocating resources to the continued incapacitation of individuals who are statistically much less likely to commit crimes, instead of to the prosecution and incarceration of the next generation of offenders, which only expands the pool of individuals available to take the place of arrested dealers. *Id.*

> **c.** *Drug Demand Is Not Reduced By Imposition of Harsh Penalties*

The primary, and most obvious, aspect of drug culture which inhibits the deterrent effect of harsh punishments is demand, and even addiction, among drug users. The power of deterrence is nullified when the process of balancing the costs and benefits of committing a drug crime is so heavily influenced by the perceived benefit of satisfying an addiction. *See Mascharka*, 28 Fla. St. U. L. Rev. at 948. In that respect, addicts as a group are willing to assume any number of irrational risks which are objectively more hazardous than a lengthy prison term, in order to sustain their addictions. *Id.*

Yet even dependence short of addiction, or simply desire, can override rational considerations and evaluation of risk. Thus, deterrence is equally ineffective with respect to first time or casual drug users. While addiction is an irrational motivator that upsets the process of balancing the cost and benefit of drug activity, most first time and casual drug users cannot be relied upon to consider seriously or sufficiently the possibility of a lengthy prison term when deciding whether to commit a drug crime. *See* Johnston, Lloyd et al., *2014 Overview: Key Findings on Adolescent Drug Use*, Monitoring the Future: National Survey Results on Drug Use, 1975-2014, February 2015, available at <http://www.monitoringthefuture.org/pubs/monographs/mtf-overview2014.pdf>. *See also* Johnston, Lloyd et al., *2013 Volume 2: College Students and Adults Ages 19-55*, Monitoring the Future: National Survey Results on Drug Use, 1975-2014, August 2014, available at <http://www.monitoringthefuture.org/pubs/monographs/mtf-vol2_2013.pdf>.

Also, the impact of publicized harsh sentences apparently overrated. As Michael J. Lynch of the Department of Criminology at the University of South Florida wrote in a 1999 article, "[e]xisting research suggests, however, that there is little media effect, and that people derive their information about probabilities of arrest from personal encounters with others." Michael J. Lynch, *Beating a dead horse: Is there any basic empirical evidence for the deterrent effect of punishment?*, 31 Crime, Law & Social Change 347 (1999) (hereinafter "*Beating a dead horse*"), at 361 n. 3, *citing* Tyler, T., & Cook, F., *The mass media and judgments of risk: Distinguishing impact on personal and societal level judgments*, 47 Journal of Personality and Social Psychology, 693-708 (1984) (other citations omitted).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 55 of 78

    Drug interdiction policies grounded in deterrence fail to address at all the massive demand for drugs.  As a result, law enforcement is faced with the monumental task of stemming the staggering flow of illegal narcotics without any corresponding reduction in the financial incentive to sell drugs.  *See Echegaray,* at 1258-66.

<div align="center">

d.      *The Failure of Steep Sentences to Deter Drug Illegal Drug Selling and Use Is Apparent From the Number of Hidden Websites That Have Already Replaced, and Surpassed, Silk Road*

</div>

    The most obvious proof that harsh sentences do not deter drug activity is the continued, and expanding, presence of hidden web sites selling illegal drugs on what has been denominated the "Dark Net."  Despite Mr. Ulbricht's arrest and conviction, as well as the arrests of numerous other individuals alleged to be involved in Silk Road or similar enterprises, the Digital Citizens Alliance reported in its April 2014 report – six months after Mr. Ulbricht's arrest – *Busted, But Not Broken – The State of Silk Road and the Darknet Marketplaces*, Digital Citizens Alliance Investigative Report, April 2014 (hereinafter "*Busted, But Not Broken*"), available at <https://media.gractions.com/314A5A5A9ABBBBC5E3BD824CF47C46EF4B9D3A76/5f8d4168-c36a-4f78-b048-f5d48b18dc0a.pdf>, that while shortly before Mr. Ulbricht's arrest there existed 13,000 listings for drugs on Silk Road, six months later that total had increased to 13,648 listings on Silk Road 2.0.  *Id.,* at 1.

    Moreover, while the total Dark Net drug listings at the time of the closure of the Silk Road site (October 2, 2013) was 18,174, *id.,* at 22, by April 2014, the listings had nearly *doubled* to 32,029.  *Id.*  As *Busted, Not Broken* recognized, Silk Road's closure simply prompted "significantly more competition[,]" as competitors arose to fill the void left by the absence of what had previously constituted the largest site.  *Id.,* at 1.

    Indeed, within the six months after the closure of Silk Road, *Busted, Not Broken* had identified six new sites offering controlled substances.  *Id.,* at 22.  Thus, while Silk Road's drug listings had increased by only 5% in the six months following Mr. Ulbricht's arrest, at that same point in time "the Darknet drug economy as a whole contain[ed] 75% more listings for drugs." *Id.,* at 1.  As a result, as *Busted, Not Broken* concluded, Silk Road "and other Darknet marketplaces continue to do steady business despite the arrests of additional alleged operators who authorities say worked for Ulbricht."  *Id.*

    In the year following the October 2013 seizure and shuttering of Silk Road, "the Dark Net economy [grew] to more than double its original size."  Ingraham, Christopher, "The FBI promises a perpetual, futile drug war as it shuts down Silk Road 2.0," *The Washington Post* (November 6, 2014), available at <http://www.washingtonpost.com/blogs/ wonkblog/wp/ 2014/11/06/ the-fbi-promises-a-perpetual-futile-drug-war-as-it-shuts-down-silk -road-2-0/>.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 56 of 78

The Digital Citizens Alliance's 2015 updates have confirmed that trend.  For example, the most recent update, *Darknet Marketplace Watch – Monitoring Sales of Illegal Drugs on the Darknet (Q1)*, Digital Citizens Alliance, April 24, 2015, available at <http://www.digitalcitizensalliance.org/cac/alliance/content.aspx?page=Darknet>, documented that between March 17, 2015, and April 21, 2015, drugs listings on Dark Net sites had increased from 41,934 (already a 31% increase from the year before, and six weeks after Mr. Ulbricht's conviction at trial) to 43,622.  *Id*., at 1.  *See also* Greenberg, Andy, "Global Web Crackdown Arrests 17, Seizes Hundreds of Dark Net Domains," *Wired* (Nov. 7, 2014), available at <http://www.wired.com/2014/11/ operation-onymous-dark -web-arrests/>.

That *Darknet Marketplace Watch* update noted the extraordinary resiliency of the market because the increase occurred despite the disappearance of the largest site, Evolution (which in March 2015 hosted 47% of those drug listings), in the intervening period in what was generally regarded as a scam on its customers (as the site appeared to abscond with its customers' Bitcoin). *Darknet Marketplace Watch*, at 1.

Also, the *Darknet Marketplace Watch* update reflected on the reaction of the marketplace to Evolution's absence:  "[i]nstead of a large amount of growth concentrated among two or three central players like we have seen in the past, our research shows that the wealth is being spread. We've seen 7-8 sites experience significant growth over the last month." *Id*.  In that context, the update reported that "8 out of the 12 sites we were tracking when Evolution went down have doubled in size in the past month." *Id*.

The growth of Dark Net web sites has been exponential, and the speed with which they have multiplied demonstrates the futility and even disutility (in terms of resources devoted to punitive, rather than rehabilitative, sollutions) of pitting the threat of heavy prison sentences against the financial benefit of supplying even a small piece of the overwhelming demand for drugs in this country and across the globe.  *See e.g.* Jones, Ben, "The Amazons of the dark net," The Economist (Nov. 1, 2014), available at < http://www.economist.com/news/international/21629417-business-thriving-anonymous-internet-despite-efforts-law-enforcers>.  *See also Darknet Marketplace Watch*, at 2 (noting that such sites are proliferating globally).

Just as surely, the notion that deterrence will somehow curb illegal drug sales on the internet, and over the TOR network in particular, is fanciful.  We might as well try to stop the world from spinning forward to the future, which has already arrived in the context of internet penetration generally, and as a vehicle for criminal conduct.  Mr. Ulbricht did not create that world, and his sentence should not be enhanced as part of Phyrric effort to stem its continued evolution.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 57 of 78

Accordingly, the notion of general deterrence in the context of drug crimes is illusory, and increasing the length of one defendant's sentence in an attempt to deter the general population from participating in similar drug activity – either selling or purchasing – is indisputably ineffectual and inconsequential and, therefore, would be inappropriate.

### e.   The Literature Is In Agreement That Deterrence Through Longer Sentences Is Illusory

Practical experience alone does not teach this lesson.  Rather, it is also the conclusion of the research.  Academic literature and clinical research concur that no greater degree of deterrence would be attained by a sentence within the advisory Guidelines range compared with a sentence well below that range.  Research has consistently established that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).[23]

---

[23]   In that context, the current research simply confirms the theses proposed by the influential 18th Century Italian philosopher and criminologist Cesare Beccaria, whose analysis was praised and quoted with favor by such varied readers as Voltaire, Jeremy Bentham, and John Adams, and who provided three incontestable reasons why proportionality in punishment represents an essential component of any justice system:

(1)     punishment should be only that severe enough necessary to deter crime, and any penalty in excess of that objective constitutes an abuse of power by the state;

(2)     the lack of any distinction between punishments for crimes of inequal kind or degree creates a dangerous and counterproductive equation:  an offender contemplating two offenses, a greater and a lesser, that are punished alike is presented no disincentive to forego the greater for the lesser.  If the punishments are identical, there is no greater risk in attempting the greater;  and

(3)     the punishment should fit the crime, *i.e.*, those who defraud the public should build public works.

Cesare Beccaria, *On Crimes and Punishments* (1764), translated from the French edition by Edward D. Ingraham (Seven Treasures Publications:  Lexington, Kentucky 2009), at 70-71, 97. *See also United States v. Canova,* 412 F. 3d 331, 351 (2d Cir. 2005) (citing *Booker*, 541 U.S. at 263, for the proposition "that post-*Booker* sentencing contemplates consideration of Guidelines to serve goals of 'avoiding unwarranted sentencing disparities' and 'proportionality'").

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 58 of 78

As Michael J. Lynch has noted, "[d]espite the paucity of evidence favoring a connection betweeen punishment and deterrence, there is, it seems, a desire or hope that deterrence works[.]" *Beating a dead horse*, at 348-49. Yet, as his article demonstrates, "[a]n examination of the incarceration and crime data from 1972-1993 reveals *no evidence of deterrence* at the aggregate level for the U.S. Additional analysis of cross-sectional crime and imprisonment trends for 1980 through 1991 also failed to provide any basic support for the deterrence hypothesis." *Id.*, at 359 (emphasis in original). *See also id.* ("[c]onservatively, we can say that imprisonment does not appear to deter most criminals").

In fact, "[t]hree National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id. See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("certainty of punishment is empirically known to be a far better deterrent than its severity").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF (hereinafter "Cambridge Report").

The Cambridge Report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id.* at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While there existed significant correlations between the *certainty* of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id.* at 2.

As a result, the Cambridge Report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1. *See also Beating a dead horse*, at 354 ("[f]rom these data, it appears that over the long run, imprisonment has no suppression effect on the rate of criminal offending in the aggregate. The implication of this finding is that criminal offending has much less to do with levels of imprisonment than with other independent variables or causal processes related to criminal offending").[24] Consequently, here, a life or equivalent sentence for Mr. Ulbricht, in

_____

[24] In evaluating the data discussed in *Beating a dead horse*, Mr. Lynch calculated a "series of additional correlation coefficients" to "address the question of a time lag effect between rising rates of incarceration and decreases in criminal offending – the idea that increased

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 59 of 78

contrast with one substantially lower, likely would not achieve any additional general deterrence.

Similarly, an extensive report issued earlier this year by the Brennan Center for Justice (at New York University School of Law) concluded that, controlling for other variables, incarceration rates have increased to such an extent in the United States that they have not played a role in crime reduction for many years. *See* Dr. Oliver Roeder, Lauren-Brooke Eisen & Julia Bowling, *What Caused the Crime Decline?*, Brennan Center for Justice, at 7 (February 12, 2015) (hereinafter "*Brennan Report*") ("the current exorbitant level of incarceration has reached a point where diminishing returns have rendered the crime reduction effect of incarceration so small, it has become nil"). Synthesizing data from the past few decades with recently collected data, the *Brennan Report* determined that "incarceration has been decreasing as a crime fighting tactic since at least 1980 . . . [and s]ince approximately 1990, the effectiveness of increased incarceration on bringing down crime has been essentially zero." *Id.*, at 23.[25]

This lack of correlation between crime reduction and heightened incarceration rates is apparent from the simultaneous declines in state prison populations and crime rates in those states. *See Brennan Report*, at 27 (imprisonment and crime decreased by more than 15% in New York, California, Maryland, New Jersey, and Texas, which account for "more than 30 percent of the US population"). The *Brennan Report* cites the overestimation of the deterrent effect of heavy penalties as one possible factor in the ineffectiveness of incarceration as a crime reduction tool. *See id.*, at 26 (relying in part on the National Academy of Sciences report, discussed below, that concluded that "insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects").

While the *Brennan Report* explored the various factors contributing to the conclusion that heavy incarceration (and accompanying lengthy sentences) has minimal impact on crime reduction, the 2014 report by the National Academy of Sciences (hereinafter "NAS") provided an even more in-depth treatment of the issue, focusing on the law enforcement policies that have resulted in the current state of mass, prolonged incarceration, and how those policies have diluted the effectiveness of incarceration as a crime-fighting tool. *See The Growth of Incarceration in the United States: Exploring Causes and Consequences*, National Research Council (hereinafter "*NAS Report*"), 2014, available at

---

rates of incarceration have a positive effect on knowledge of the increased tendency to send people to prison, which in turn decreases criminal offending . . ." *Id.*, at 357 (citation omitted). However, "none of the three cross-sectional correlation tests provided support for the deterrence argument." *Id.*, at 359.

[25] The *Brennan Report* is available at <www.brennancenter.org/sites/default/files/analysis/What_Caused_The_Crime_Decline.pdf>.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 60 of 78

<http://www.nap.edu/download.php?record_id=18613>, at 130-156.  In particular, the *NAS Report* examined the diminution of deterrence as sentence length increased across various crimes, including those imposed on low level offenders.  *See id.*, at 155-56.

Summarizing the findings of several studies[26] focused on determining whether there is an appreciable improvement in deterrence as sentence length increases, the NAS report concluded that the "deterrent effect of sentence length may be subject to decreasing returns."  *NAS Report*, at 154.  As sentences grow longer and thus, more costly, the deterrent effect decreases to the point of irrelevance to crime rates, and becomes especially inefficient when sentences are so lengthy that individuals age past the point of any significant risk of recidivism, simultaneously mooting the achievement of crime reduction through incapacitation of those individuals, and draining resources better aimed at crime prevention.  *See id.*, at 155-56.

Nor has the inefficacy of longer terms of imprisonment been lost on national public officials.  Only last month, Supreme Court Justices Anthony Kennedy and Stephen Breyer appeared before Congress.  In response to a question from Rep. Steve Womack (R-AR) regarding whether the United States possessed the "capacity to deal with people with our current prison and jail overcrowding," Justice Kennedy testified, with respect to the corrections system, that "[i]n many respects, I think it's broken."  *See, e.g.,* Jess Bravin, "Two Supreme Court Justices Say Criminal-Justice System Isn't Working," *The Wall Street Journal*, March 24, 2015, available at <http://www.wsj.com/article_email/two-supreme-court-justices-say-criminal-justice-system-isnt-working-1427197613-lMyQjAxMTA1NTIzNDUyNTQyWj>.  *See also* <sentencing.typepad.com/sentencing_law_and_policy/2015/03/justices-kennedy-and-breyer-urge-congress-to-reform-broken-federal-criminal-justice-system.html>.  Video of the Justices' testimony is available from C-SPAN at <www.c-span.org/video/?324970-1/supreme-court-budget-fiscal-year-2016>.

Justice Kennedy added that "[a]nd this idea of total incarceration just isn't working, and

---

[26]  One such study, which reviewed California's "Three Strikes" laws, scrutinized whether there was a different recidivism rate between offenders with two "strikes" and those with one "strike" who had been tried for a "strike" offense but convicted of an ineligible offense.  *See NAS Report*, at 137.  The study found a lower arrest rate among the first group (one "strike" closer to the 25-year mandatory minimum under "Three Strikes" legislation), but the authors also concluded that "the crime-saving benefits are so small relative to the increased costs of incarceration that the lengthy prison sentences mandated by the third-strike provision cannot be justified on the basis of their effectiveness in preventing crime."  *Id.*, at 138.

<table>
<tr><td>LAW OFFICES OF<br>**JOSHUA L. DRATEL, P.C.**</td><td>Hon. Katherine B. Forrest<br>United States District Judge<br>Southern District of New York<br>May 22, 2015<br>Page 61 of 78</td></tr>
</table>

it's not humane." *Id*.[27]  Similarly, then-U.S. Attorney General Eric Holder, Jr., has stated that "too many Americans go to too many prisons for far too long, and for no truly good law enforcement reason."  *See* Editorial, "Smarter Sentencing," *The New York Times*, August 14, 2013, available at <http://www.nytimes.com/2013/08/14/opinion/smarter-sentencing.html>. What *The Times* editorial described as a "harsher-is-better mind-set" characterized by "widespread incarceration" is, according to AG Holder, "both ineffective and unsustainable."[28]

The underlying empirical reality recognized by Justices Kennedy and Breyer and AG Holder is that, as the *NAS Report* states, at 2, "[i]n 2012, close to 25 percent of the world's prisoners were held in American prisons, although the United States accounts for about 5 percent of the world's population.  The U.S. rate of incarceration, with nearly 1 of every 100 adults in prison or jail, is 5 to 10 times higher than rates in Western Europe and other democracies."  *See also Brennan Report*, at 20;  *Beating a dead horse*, at 353 (U.S. has the "highest average sentence lengths in the world") (footnote omitted).

As a result, "[t]here are five times as many people incarcerated today than there were in 1970."  *Brennan Report*, at 3 (footnote omitted).  As *The New York Times* noted in a 2011 editorial, "[i]n the past generation, the imprisonment rate per capita in this country has multiplied by five[,]" and "[s]pending on prisons has reached $77 billion a year[.]"  Editorial, "Falling Crime, Teeming Prisons," *The New York Times*, October 29, 2011, available at

---

[27]  A different approach to corrections, practiced in Norway, was profiled in a recent *New York Times Magazine*.  *See* Jessica Benko, "The Radical Humaneness of Norway's Halden Prison," *New York Times Magazine*, March 29, 2015, available at <mobile.nytimes.com/2015/03/29/magazine/the-radical-humaneness-of-norways-halden-prison.html?from=promo>.

[28]  AG Holder, appearing in the Eastern District of New York to support and encourage that District's alternatives-to-incarceration programs that he described as "'emblematic' of the sort of specialized programs that the nation needs in order to address overincarceration within the federal criminal justice system[,]" told the audience that "[w]e will never as a nation be able to incarcerate ourselves to better outcomes, a stronger nation or brighter futures.  Instead we need to make smart choices and smart investments that will help individuals get on the right path and stay out of the criminal justice system."  *See* Andrew Keshner, "Holder Endorses Eastern District Alternatives to Prison," *New York Law Journal*, October 31, 2014, available at <www.newyorklawjournal.com/printerfriendly/id=1202675146471>.  *See also Beating a dead horse*, at 349 ("[o]ver the past two decades it is clear that this view has been at least partially responsible for what [Irwin, John and James Austin, *It's About Time:  America's Imprisonment Binge*, (Belmont, CA:  Wadsworth 1997) call[s] the 'imprisonment binge' – or America's rapidly expanding prison population").

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 62 of 78

<http://www.nytimes.com/2011/10/30/opinion/sunday/falling-crime-teeming-prisons.html>.

Observing these figures, the *NAS Report* concluded, at 2, that "[t]he growth in incarceration rates in the United States over the past 40 years is historically unprecedented and internationally unique." *See also Brennan Report*, at 3 ("[f]or the past 40 years, the United States has been engaged in a vast, costly social experiment. It has incarcerated a higher percentage of its people, and for a longer period, than any other democracy").

Yet, as discussed **ante**, the results of mass, prolonged incarceration have not exerted an impact on crime rates. Jeremy Travis, President of John Jay College of Criminal Justice in New York and co-editor of the *NAS Report*, told *The New York Times* earlier this year "[t]he policy decisions to make long sentences longer and to impose mandatory minimums have had minimal effect on crime. . . . The research on this is quite clear." Erik Eckholm, "In a Safer Age, U.S. Rethinks Its 'Tough on Crime' System," *The New York Times*, January 13, 2015, available at <http://www.nytimes.com/2015/01/14/us/with -crime-down-us-faces-legacy-of-a-violent-age-.html>. *See also Beating a dead horse*, at 356 (data "also provides evidence that a consistently increasing rate of incarceration appears to have little or no effect on the amount of crime in the U.S. from 1972-1993").

Consequently, one of the *Brennan Report*'s three central findings was that "Increased incarceration at today's levels has a negligible crime control benefit[.]" *Brennan Report*, at 4. Elaborating, the *Brennan Report* observed that

> [i]ncarceration has been declining in effectiveness as a crime control tactic since before 1980. Since 2000, the effect on the crime rate of increasing incarceration, in other words, adding individuals to the prison population, has been essentially zero. Increased incarceration accounted for approximately 6 percent of the reduction in property crime in the 1990s (this could vary statistically from 0 to 12 percent), and accounted for *less than 1 percent* of the decline in property crime this century. Increased incarceration has had little effect on the drop in violent crime in the past 24 years. In fact, large states such as California, Michigan, New Jersey, New York, and Texas have all reduced their prison populations while crime has continued to fall.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 63 of 78

*Id.*[29]

In that context, a sentence for Mr. Ulbricht substantially below the advisory Guidelines range, would also be fully consistent with 18 U.S.C. §3553(a)(2)'s sentencing purposes.[30]   The Second Circuit and Southern District of New York figures since *Booker*, discussed **post**, at 72-

_____

[29]   The *Brennan Report* notes, at 13, that it did not include federal inmates in its analysis. However, the *Report* also explained why adding federal inmates would likely only amplify the findings:

> [t]o study the incarceration variable the authors first sought to include the total incarceration rate, including federal prisons, state prisons, and local jails.  As explained further in Appendix B, federal prison data and local jail data were not available for all the years analyzed and for all states.  For that reason, the authors used state imprisonment data (the number of state prisoners incarcerated in public or private prisons, and the number of *state prisoners* held in local jails).  It does not include individuals in the overall jail population (those held pretrial or serving short sentences), juvenile facilities, or immigration detention centers.  The use of this subset of incarceration is in line with other research in the field.  The exclusion of federal prisoners, juvenile detainees, and the majority of the jail population does not affect the core findings of this report.  If that data were included, the rate of incarceration would be even higher than that in the authors' regression.  A higher incarceration rate would likely show more dramatic diminishing returns on crime reduction.  Accordingly, this report's empirical findings are likely conservative compared to what a more inclusive definition of "incarceration" would produce.

*See also Beating a dead horse*, at 351 (also not including federal inmate in the study's data set, but noting that "the exclusion of the federal data will not have a significant impact on the analysis since most crimes and most inmates are under state jurisdiction.  For example, in 1994 federal inmates made up 5.8 percent of all persons incarcerated at the state and federal level in the U.S. [ ] . . .  This figure is relatively stable over time") (citations omitted).

[30]   Also, 18 U.S.C. §3582(a) requires that a sentencing court "recognize [that] imprisonment is not an appropriate means of promoting correction or rehabilitation." Regardless, as the letters on Mr. Ulbricht's behalf, as well as his background, attest, the mandatory minimum 20-year prison term will suffice for "correction or rehabilitation."

LAW OFFICES OF                          Hon. Katherine B. Forrest
**JOSHUA L. DRATEL, P.C.**              United States District Judge
                                        Southern District of New York
                                        May 22, 2015
                                        Page 64 of 78

78, reflect that reality, as well as the reality that prison overcrowding as a result of reflexively
long Guidelines sentences needs to be addressed.

### E.    *Longer Terms of Imprisonment Do Not Reduce Recidivism*

Nor, according to "the best available evidence" does imprisonment "reduce recidivism
more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism:
The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). *See also* Gary Kleck, et
al, *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005); Michael Tonry,
*The Mostly Unintended Effects of Mandatory Penalties: Two Centuries of Consistent Findings*,
38 Crime and Justice: A Review of Research 102 (2009).

Again, Justice Kennedy concurred during his Congressional testimony last week, as *The
Wall Street Journal* reported that "[i]n many instances, [Justice Kennedy] said, it would be wiser
to assign offenders to probation and other supervised release programs." Jess Bravin, "Two
Supreme Court Justices Say Criminal-Justice System Isn't Working," *The Wall Street Journal*,
March 24, 2015, available at <http://www.wsj.com/article_email/two-supreme-court-justices-
say-criminal-justice-system-isnt-working-1427197613-lMyQjAxMTA1NTIzNDUyNTQyWj>.

Quoting Justice Kennedy directly, the article added, "'This is cost-effective,' he said,
even 'without reference to the human factor' involved in incarceration. 'We have a very low
recidivism rate for those who are on release.'" *Id.* Of course, here Mr. Ulbricht faces a
mandatory minimum of 20 years in prison, which only augments the policy revisions expressed
by Justice Kennedy and others because the threshold question of whether incarceration at all is
appropriate is moot. Rather, the question is at what *length* does Mr. Ulbricht's sentence become
not only unnecessary for the purposes of sentencing, but also a future burden on the federal penal
system, which is correctly concerned about the aging nature of its population.

Indeed, the impracticality of diverting resources to lengthy prison terms is further
emphasized by the Department of Justice Office of Inspector General's report, issued earlier this
month, documenting the exceedingly high cost of housing and caring for an aging inmate
population. *See The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*,
Office of the Inspector General, Department of Justice (May 2015) (hereinafter "*Aging Inmate
Population*"), available at <https://oig.justice.gov/reports/2015/e1505.pdf#page=1>. In addition
to the fact that the inmate population over 50 years is more expensive, the risk of recidivism
among individuals over 50 is greatly reduced, and the incidence of misconduct while
incarcerated is extremely low, and generally limited to low-level and/or non-serious infractions.
*See id.*, at 37-39 (Table 7).

Furthermore, the cost of the aging inmate population will only increase. As the *Aging*

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 65 of 78

*Inmate Population* report notes, the number of aging inmates is not only "increasing at a faster rate in older age groups," but the underlying factors ("elimination of parole, use of mandatory minimum sentences, increases in average sentence length . . ., and an increase in white collar . . . and sex offenders") which contributed to this growth have also resulted in a "9 percent increase in the number of younger inmates who will be age 50 and older when they are ultimately released." *Id.*, at 1-3.

Again in the context of the Career Offender Guidelines, which have been a proving ground for the efficacy – or, more accurately, the lack thereof – of long sentences as a means of reducing recidivism, the Sentencing Commissions's report entitled *Fifteen Years of Guideline Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 133-34 (2004) (hereinafter "*Fifteen Year Report*"),[31] also repudiated any argument that the long sentences imposed pursuant to the Career Offender Guidelines are justifiable based on recidivism issues:

> [m]ost importantly, preliminary analysis of the recidivism rates of drug trafficking offenders sentenced under the career offender guideline based on prior drug convictions shows that their rates are much lower than other offenders who are assigned to criminal history category VI. The overall rate of recidivism for category VI offenders two years after release from prison is 55 percent (USSC, 2004). The rate for offenders qualifying for the career criminal guideline based on one or more violent offenses is about 52 percent. But the rate for offenders qualifying only on the basis of prior drug offenses is only 27 percent.

*Id.*

As a result, the *Fifteen Year Report* concluded,

> [t]he recidivism rate for career offenders more closely resembles the rates for offenders in the lower criminal history categories in which they *would be* placed under the normal criminal history scoring rules in Chapter Four of the *Guidelines Manual*. The career offender guideline thus makes the criminal history category

---

[31] The *Fifteen Year Report* is available at
<http://www.ussc.gov/Research/Research_Projects/Miscellaneous/15_Year_Study/15_year_study_full.pdf>.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 66 of 78

> a *less* perfect measure of recidivism risk than it would be without the inclusion of offenders qualifying only because of prior drug offenses.

*Id.* (emphasis in original). *Cf. United States v. Wilken*, 498 F.3d 1160 (10th Cir. 2007) (rejecting further reduction than afforded by the District Court – to CHC V – while noting defendant's reliance on the *Fifteen Year Report*'s findings that Career Offenders classified as such based only on prior drug offenses have lower recidivism rates than career offenders whose prior crimes were violent).

Moreover, in the context of recidivism, defendants over 40 years of age present a dramatically reduced danger of recidivism.  Mr. Ulbricht is presently 31 years old, which puts the peak years of potential recidivism behind him.  *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12 ("[r]ecidivism rates decline relatively consistently as age increases," from 35.5% for those under age 21 to 9.5% for those over age 50) (available at <http://www.ussc.gov/publicat/Recidivism_General.pdf>.  *See also United States v. Nellum,* 2005 WL 300073, at *3 (N.D. Ind. 2005);  Daniel Glaser, *Effectiveness of A Prison and Parole System*, 36-37 (1964);  P.B. Hoffman & J.L. Beck, *Burnout – age at release from prison and recidivism,*" 12 J. Crim.Just. 617 (1984); *United States v. Clark*, 289 Fed.Appx. 44, 48 (5th Cir. 2008) (unpublished opinion).[32]  Moreover, the 20-year mandatory minimum prison term would by itself put Mr. Ulbricht well past the 40-year old threshold by the time of his release.

As a *New York Times* editorial commented last month,

> the persistent fantasy that locking up more people leads to less crime continues to be debunked.  States from California to New York to Texas have reduced prison populations and crime rates at the same time.  A report released last week by the Brennan Center for Justice found that since 2000 putting more people behind bars has had essentially no effect on the national crime rate.

Editorial, "The Roadblock to Sentencing Reform," *The New York Times*, February 17, 2015,

---

[32]  According to a recent News Analysis in *The New York Times*'s *Sunday Review* section,  "[n]euroscience suggests that the parts of the brain that govern risk and reward are fully developed until age 25, after which lawbreaking drops off."  Dana Goldstein, "Too Old to Commit Crime?" *The New York Times*, March 20, 2015, available at <www.nytimes.com/2015/03/22/sunday-review/too-old-to-commit-crime.html>.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 67 of 78

available at <http://www.nytimes.com/2015/02/17/opinion/the-roadblock-to-sentencing
-reform.html?gwh=58092C4DB7605498FC0E7490098282A6&gwt=pay&assetType=opinion>.

According to a June 2012 study by the Pew Center on the States, entitled *Time Served –
The High Cost, Low Return of Longer Prison Terms* (hereinafter "*Pew Report*"),[33] which
analyzed state data reported to the federal government between 1990 and 2009, "offenders
released in 2009 served an average of almost three years in custody, nine months or 36 percent
longer than offenders released in 1990.  The cost of that extra nine months totals an average of
$23,300 per offender."  *Id.*, at 2.

Also, the *Pew Report* found that "for offenders released in 2009 after serving prison
sentences for drug crimes:  2.2 years in prison, up from 1.6 years in 1990 (a 36% increase)."  *Id.*,
at 3.  Nor, with respect to many offenders, was there a correlation between the longer
imprisonment and improved public safety.  As the *Pew Report* concluded,

> [d]espite the strong pattern of increasing length of stay, the
> relationship between time served in prison and public safety has
> proven to be complicated.  For a substantial number of offenders,
> there is little or no evidence that keeping them locked up longer
> prevents additional crime.

*Id.*, at 4.  *See also id.* ("[a] new Pew analysis conducted by external researchers using data from
three states – Florida, Maryland, and Michigan – found that a significant proportion of
nonviolent offenders who were released in 2004 could have served shorter prison terms without
impacting public safety").[34]

The above-discussed empirical and social science research demonstrates that a sentence
dramatically below the applicable advisory Guidelines range would be sufficient to achieve the
sentencing goal of specific deterrence with respect to Mr. Ulbricht, and more than adequately
address the issue of recidivism.

As discussed **ante,** as the Second Circuit has recognized in *Mishoe,* for someone like Mr.

---

[33]  The *Pew Report* is available at
http://www.pewstates.org/uploadedFiles/PCS_Assets/2012/Prison_Time_Served.pdf.

[34]  And legislatures, too, are becoming aware.  As the *Pew Report* states, "a 2006
legislative analysis in Washington State found that while incarcerating violent offenders
provides a net public benefit by saving the state more than it costs, imprisonment of property and
drug offenders leads to negative returns.[]" *Pew Report*, at 8 (footnote omitted).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 68 of 78

Ulbricht, who has not previously served any prison sentence, shorter sentences can protect against recidivism as effectively as longer terms: "if a defendant served no time or only a few months for the prior offenses, a sentence of even three or five years for the current offense might be expected to have the requisite deterrent effect." 241 F.3d at 220. *See also* Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) ("[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame"); Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) (according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions").[35]

### F.   *The Sentencing Commission's Most Recent Sentencing Statistics*

The United States Sentencing Commission (hereinafter "the Sentencing Commission") publishes each quarter an abstract of federal sentencing statistics entitled *U.S. Sentencing Commission Preliminary Quarterly Data Report* (hereinafter "*Quarterly Data Report 2014*").[36] The figures in the most recent version, the *4th Quarter Release, Preliminary Fiscal Year 2014 Data, Through September 30, 2014*, which covers sentences imposed from October 1, 2013 through September 30, 2014, demonstrate that the Guidelines no longer constitute the predominant factor in a decisive majority of sentences in the Southern District of New York (or the Eastern District of New York, either).

For example, the *Quarterly Data Report* reveals that in Fiscal Year 2014 within the Second Circuit, a clear majority of sentences, 69.6%, were *not* within the calculated Guidelines range. *See Quarterly Data Report 2014*, at 2.[37] In SDNY, 73.1% of sentences were outside the Guidelines range (along with 74.5% in the Eastern District of New York). *Id.* Those numbers

---

[35]  *See also* Gary Kleck, et al, *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005); Michael Tonry, *The Mostly Unintended Effects of Mandatory Penalties: Two Centuries of Consistent Findings*, 38 Crime and Justice: A Review of Research 102 (2009).

[36]  The *Quarterly Data Report* is available at <http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2014-4th-Quarterly-Report.pdf>.  Prior *Quarterly Data Reports* are also available on the Sentencing Commission's web site, www.ussc.gov.

[37]  Nationally, for Fiscal Year 2014, only 53.3% of sentences were *within* the Guidelines range (down from 54.8% in Fiscal Year 2013).  *Quarterly Data Report 2014*, at 1.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 69 of 78

represent a continuing trend since *Booker* was decided January 12, 2005: in the first quarter of 2005, 70.5% of sentences nationally were within the Guidelines range. *Sourcebook of Federal Sentencing Statistics*, U.S. Sentencing Commission, Section 2, Fig. G & Section 3, Fig. G (2005), available at <http://www.ussc.gov/research-and-publications/annual-reports-sourcebooks/2005/sourcebook-2005>. That number initially decreased to 61.8% by the first quarter of 2006, then remained essentially steady (60.7% for first quarter 2007, and 60.0% for first quarter 2008), before resuming its decline in 2009 and thereafter. *Id.*

In addition, only a minute fraction – 1.5% – of all SDNY sentences were *above* the Guidelines range, while 71.7% were *below* the range. In addition, the reasons for sentences below the Guidelines have evolved as well. Also, in SDNY, in Fiscal Year 2014 only 20.9% of sentences[38] were attributable to government-sponsored motions,[39] while §3553(a) factors, Guidelines downward departures, and/or a combination thereof were responsible for 50.8% of sentences (all of which were *below* the Guidelines range). *Quarterly Data Report 2014*, at 3.[40]

The proportion of sentences in SDNY in Fiscal Year 2014 below the Guidelines, and attributable exclusively to "below range w/ *Booker*" – 45.1% – represents by a wide margin the highest percentage in that category among *all* districts (with the Northern District of Illinois second at 40.6%). *See Quarterly Data Report 2014*, at 3, 5. Also, the proportion of §3553(a)-based below-Guidelines sentences relative to government-sponsored below-Guidelines has increased dramatically since *Booker*. *Compare*, *U.S. Sentencing Commission Preliminary Quarterly Data Report*, 3rd Quarter Release, Preliminary Fiscal Year 2006 Data, Through July 30, 2006, at 3.[41]

---

[38] The percentages are of *all* sentences within the District, as that is how the figures are presented in the *Quarterly Data Report*.

[39] Of those, 17.0% were the result of motions pursuant to §5K1.1, and the remaining 3.9% were composed of "§5K3.1 Early Disposition" (1.3%) and "Other Government Sponsored" (2.6%). *Quarterly Data Report 2014*, at 3.

[40] The components of below-Guidelines sentences in SDNY (other than government-sponsored) were classified as follows: (1) downward departures alone: 2.9%; (2) "downward departure w/ *Booker*": 1.9%; (3) "below range w/ *Booker*": 45.1%; and (4) "remaining below range": 0.9%. *Quarterly Data Report 2014*, at 3.

[41] In the Second Circuit as a whole, only 30.4% of sentences were within the Guidelines, with 1.4% above the Guidelines range and 61.8% below. 20.1% of sentences were attributable to motions pursuant to §5K1.1, and another 8.2% to other government-sponsored downward

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 70 of 78

Those figures are reinforced by those for the First Quarter of Fiscal Year 2015, published in the Sentencing Commission's *Preliminary Quarterly Data Report*, 1st Quarter Release, Preliminary Fiscal Year 2015 Data October 1, 2014, Through December 31, 2014 (hereinafter "*Quarterly Data Report 2015*"), available at <http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2015_1st_Quarterly_Report.pdf>.

In fact, the proportion of sentences within the applicable advisory Guidelines range continues to decline. Thus, for the First Quarter of FY 2015, within the Second Circuit 72.1% of sentences were outside the Guidelines range, with 71.6% *below* the range (and 0.5% above the range). *See Quarterly Data Report 2015*, at 2-3.[42]

In the Southern District, the numbers are even more dramatic, as 77.1% of sentences were outside the range, with 0.7% above the range and 76.4% – more than three-quarters of all sentences imposed during the period – *below* the applicable range. *Id.*[43] Of that 76.4% below the Guidelines range, 21.7% were attributable to government-sponsored downward departures,[44] while 54.6% were independent of any government support.[45]

----

departures. 40.1% of sentences were below the Guidelines range without any government sponsorship (via 5K1.1 or otherwise), with *"below range w/ Booker"* alone responsible for 34.4% of sentences. *See Quarterly Data Report 2014*, at 2-3.

[42] Nationally, the proportion of sentences within the Guidelines range dropped for the first time below 50%, to 46.5%. *See Quarterly Data Report 2015*, at 1.

[43] The only districts with a lower percentage for First Quarter FY 2015 were Delaware, at 20% (but which had only a statistically small sample of 25 cases compared with 432 in SDNY), and the Southern District of California, for which its national low 14.6% total is attributable to a whopping 61.3% of its sentences including §5K3.1 Early Disposition downward departures (sponsored by the government), due to its voluminous immigration-related criminal docket, with only 6.8% attributable to *Booker* alone. *See Quarterly Report 2015*, at 2-3, 6-7.

[44] Of those, 18.5% were the result of motions pursuant to §5K1.1, and the remaining 3.2% were composed of "§5K3.1 Early Disposition" (1.6%) and "Other Government Sponsored" (1.6%). *Quarterly Data Report 2015*, at 3.

[45] The components of below-Guidelines sentences in SDNY (other than government-sponsored) for the First Quarter FY 2015 were classified as follows: (1) downward departures alone: 1.4%; (2) "downward departure w/ *Booker*": 1.4%; (3) "below range w/ *Booker*":

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 71 of 78

In addition, a *majority* of sentences in SDNY during First Quarter FY 2015 – 50.9% – were, for the first time, below the advisory Guidelines range based on *Booker alone*. *See Quarterly Data Report 2015*, at 3.[46]  Thus, in SDNY, a sentence *below* the Guidelines range is the overriding *norm*, and *not* the exception.  Even excluding cases involving §5K1.1 (or other government-sponsored) motions, the incidence in SDNY of a below-Guidelines sentence based on §3553(a) factors and/or Guidelines downward departures (50.8% of all sentences for FY 2014;  54.6% for 1st Quarter 2015) was nearly double the number of within-Guidelines sentences (26.9% of all sentences in 2014;  22.9% for First Quarter FY 2015).

For drug trafficking offenses (which are not distinguished any further with respect to type of drug or quantity), the data – which are provided in the *Quarterly Data Report* only on a national level – are also instructive.  Only 27.5% of drug-trafficking sentences nationally for FY 2014 were within the Guidelines range (down from 38.8% in Fiscal Year 2013).  *Quarterly Data Report 2014*, at 8.  Only 0.8% of all drug-trafficking sentences were *above* the Guidelines, while 71.7% were below the Guidelines.  *Id.*, at 8-9.

The *Quarterly Report* for the first quarter of FY 2015 establishes that for drug-trafficking generally, nationally only 31.0% of sentences were within the Guidelines.  The 68.2% that were below the Guidelines were composed of 24.9% due to §5K1.1 motions, 18.7% due to other government-sponsored downward departures, 1.5% on downward departure grounds, 1.0% as a result of downward departure and *Booker*, and 21.5% based on *Booker* alone (with 0.6% uncategorized "remaining below range").  *See Quarterly Data Report 2015*, at 8-9.[47]

---

50.9%;  and (4)  "remaining below range":  0.9%.  *Quarterly Data Report 2015*, at 3.

[46]  The District of Delaware, at 48% (with only 25 cases) is the only district close to that percentage.  *See Quarterly Data Report 2015*, at 2.

[47]  Nationally for FY 2014, the distribution for drug-trafficking defendants sentenced below the applicable advisory Guidelines range was as follows:

Attributable to:

| | | |
|---|---|---|
| §5K1.1 motion: | 26.2% | |
| §5K3.1 departure: | 6.9% | |
| Other government sponsored: | 14.0% | |
| Downward departure: | | 1.5% |
| Downward departure with *Booker*: | 1.6% | |
| Below range with *Booker*: | 21.3% | |
| Remaining below range: | 0.3% | |

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 72 of 78

For SDNY in particular, for FY 2014, 82.3% of drug-trafficking sentences were *below* the Guidelines (with 0.2% above the range), with 20.5% attributable to §5K1.1 motions by the government, 5.5% the result of other government-sponsored downward departures, 2.2% due to downward departures alone, 1.8% because of a combination of downward departure(s) and *Booker*, and 52.0% a consequence of *Booker* exclusively (with 0.3% "remaining below range" but uncategorized). *See U.S. Sentencing Commission, Statistical Information Packet*, Fiscal Year 2014, Southern District of New York (hereinafter "*SDNY Packet 2014*", at 19, available at <http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2014/nys14.pdf>.

The mean sentence for the 19,974 defendants sentenced for drug-trafficking during FY 2014 was 73. *See Id.*, at 10 (Table 7, "Length of Imprisonment By Primary Offense Category"). The median sentence for that class of defendants in FY 2014 was 57 months. *Id.* In SDNY, the mean was 62 months and the median 46 months (for the 522 defendants sentenced for drug-trafficking during FY 2014). *Id.* For the 4,834 defendants sentenced for drug-trafficking during the first quarter of FY 2015, the mean sentence was 65 months, and the median 48 months. *See Quarterly Data Report 2015*, at 31 (Table 19, "Sentence Length In Each Primary Offense Category").

Moreover, of the 4,336 sentences meted out for drug trafficking nationally during Fiscal Year 2014, and in which the sentence was below the Guidelines based on §3553(a) factors alone, the *median* sentence was 46 months, representing a 29.8% "*median* percent decrease from Guideline minimum." *Quarterly Data Report 2014*, at 24 (emphasis added). That, of course, refers to a median percentage decrease from the Guidelines for the drug offense, and not the Career Offender Guidelines (which would likely show a greater percentage decrease from the Guidelines minimum).

Also, of the 298 drug trafficking sentences imposed during the data period, and in which the sentence was below the Guidelines based on a downward departure and §3553(a) factor(s), the median sentence was 37.6% below the Guidelines minimum. *Id.*, at 23. In addition, as Figure H, at p. 37 of the *Quarterly Data Report 2014* establishes, since Fiscal Year 2009 all federal drug sentences have remained on average approximately at least 20% below the applicable Guidelines (as the average sentence has decreased along with the Guidelines range),

───────────────────

*See U.S. Sentencing Commission, Statistical Information Packet*, Fiscal Year 2014, Southern District of New York, at 19 (Table 10), available at <http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2014/nys14.pdf>.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 73 of 78

with that gap widening through Fiscal Years 2013 and 2014.[48]

For the first quarter of FY 2015, the *Quarterly Data Report 2015*, again at Table 11 (p. 23), the median sentence for the subset consisting of "downward departures with *Booker*/3553s" was 51 months' imprisonment, representing a 33-month median decrease from the applicable Guidelines range minimum (and a 40.5% median decrease from that Guidelines range minimum). For "*Booker*/3553" only, the median was 44 months, representing an 18-month median (corresponding to a 28.6%) decrease from the Guidelines range minimum. *Id.*, at 24 (Table 12).[49]

Moreover, even if the attempted "murder for hire" allegations are considered, a sentence substantially below the advisory Guidelines range would still be consistent with the statistical record both in SDNY and nationally. For instance, for FY 2014, the mean sentence for murder was 273 months nationally, and 240 months in SDNY. *See SDNY Packet 2014*, at 10 (Table 7). In SDNY, the mean sentence was 172 months, and the median 162 months. *Id.* For the first quarter of FY 2015, the national mean was 297 months, and a 330-month median. *See Quarterly Data Report 2015*, at 31 (Table 19).

Thus, any support for a Guidelines sentence pursuant to the applicable advisory range for Mr. Ulbricht in this case not only ignores all §3553(a) factors other than the Guidelines (and particularly as they relate to him), but also defies empirical reality in this district and in this Circuit. As a result, the Guidelines simply no longer reflect a sentence "sufficient but not greater than necessary," and Mr. Ulbricht's circumstances present a compelling example why they do not.

The Second Circuit and SDNY figures since *Booker* reflect the reality of reflexively long Guidelines sentences. As The Honorable John Gleeson has noted in his academic writing, "the federal prison population has exploded under the Guidelines, and the average sentence lengths

---

[48] Even when a sentence for drug-trafficking is within the Guidelines, courts have moderated those sentences. For example, for the first quarter of FY 2015, of the 1,269 cases, 64% of the sentences were at the Guidelines range minimum, 14.2% within the lower half of that range, 7.0% at the midpoint, 6.3% within the upper half of the range, and 8.5% at the Guidelines range maximum. *See Quarterly Report 2015*, at 39 (Table 20).

[49] For the much smaller proportion of defendants sentenced during the first quarter of FY 2015 for drug-trafficking, and who received below Guidelines sentences for "all remaining below Guideline range cases," the median sentence was 60 months, constituting a 15-month and 28/6% decrease from the applicable advisory Guidelines range minimum. *Quarterly Data Report 2015*, at 25 (Table 13).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 74 of 78

have increased dramatically."  Hon. John Gleeson, *The Sentencing Commission and Prosecutorial Discretion:  The Role of the Courts in Policing Sentencing Bargains*, 36 Hofstra L. Rev. 639, 657 (2008).

As a result, the Guidelines do not represent a sentence "sufficient, but not greater than necessary" to accomplish the objectives of sentencing with respect to Mr. Ulbricht.  Instead, a prison term substantially shorter than the advisory Guidelines range more than adequately serves that purpose.

> **G.** *Mr. Ulbricht Has Endured Pretrial Confinement for Nearly
> 20 Months Under Harsh Conditions at Both MDC and MCC*

Mr. Ulbricht spent approximately 13 months at MDC while on pretrial confinement, and another five months at MCC during trial and awaiting sentencing in this case.  The harsh conditions at these two pretrial facilities – including lack of ample programming, limited family visits, and lack of exposure to sunlight and the outside – are well known to the courts.  *See, e.g., Bell v. Wolfish*, 441 U.S. 520 (1979);  *United States v. Gallo*, 653 F.Supp. 320, 336 (E.D.N.Y. 1986).

Thus, even prior to *Booker*, courts held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departure."  *See United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001).  *See also United States v. Farouil*, 124 F.3d 838, 847 (7th Cir.1997) (harsh conditions of confinement constitute valid ground for departure);  *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n. 2 (2d Cir. 1996) (remanding for reasons for downward departure due to "harsher incarceration" due to unavailability of programs);  *United States v. Brinton*, 139 F.3d 718, 725 (9th Cir. 1998);  *United States v. Mateo*, 299 F. Supp.2d 201 (S.D.N.Y. 2004); *United States v. Francis,* 129 F. Supp.2d 612, 616 (S.D.N.Y. 2001), *citing United States v. Sutton*, 973 F. Supp. 488, 491-495 (D.N.J. 1997).

The harsh conditions at MCC have been observed by several courts.  *See, e.g., United States v. Behr*, 2006 WL 1586563 (S.D.N.Y. 2006).  *See also Bell v. Wolfish*, 441 U.S. 520 (1979);  *United States v. Gallo*, 653 F.Supp. 320, 336 (E.D.N.Y. 1986).  In *Behr*, the court noted that a judge had "reduced an individual's sentence by one third based upon the harsh conditions in Unit 11-South at MCC[.]" 2006 WL 1586563, at *5.  In light of the harsh conditions at MCC, the defendant in *Behr* was sentenced to a non-Guidelines sentence.  *Id. See also* Ken Strutin, "Cognitive Sentencing and the Eighth Amendment," *New York Law Journal*, March 24, 2015, available at
<http://www.newyorklawjournal.com/expert-analysis/id=1202721348619/Cognitive-Sentencing-and-the-Eighth-Amendment?mcode=1380566174563&curindex=11>.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 75 of 78

Accordingly, it is respectfully submitted that an adjustment below the Guidelines is appropriate to account for Mr. Ulbricht's extended pretrial custody at MDC.

III.    *Mr. Ulbricht's Objections, Corrections, and Additions to the Pre-Sentence Report*

Mr. Ulbricht's objections, corrections, and additions to the PSR are as follows:

(1)    at ¶ 2, "a/k/a Dead Pirate Roberts" should be corrected to "Dread Pirate Roberts;

(2)    at ¶ 10, with respect to the citation issued to Mr. Ulbricht on December 18, 2014, "for being insolent" which resulted in a suspended sanction of 30 days loss of phone privileges and visitation, the PSR should be amended to include the following:  the incident arose from the failure of MDC staff to abide by the Court's Order permitting Mr. Ulbricht to review discovery in the visiting area of the MDC on his designated laptop during the time frame appointed in the Court's Order.  Ultimately, Mr. Ulbricht was informed by his counselor that because Mr. Ulbricht had been correct, despite his having disobeyed an order he would not be punished if he did not commit another infraction for 30 days, a condition which Mr. Ulbricht satisfied;

(3)    at ¶ 49, with respect to Mr. Ulbricht's alleged "willingness to use violence to protect interests in Silk Road," and the description of Mr. Ulbricht's alleged participation in "an attempt to solicit the murders for hire of five people" as having been "established at trial[,]" Mr. Ulbricht objects to that language, which should be deleted from the PSR, because those allegations were not charged, and were not established by any cognizable standard of proof;

(4)    at ¶ 60(A)(e), with respect to the conclusion that Mr. Ulbricht "used violence" and "paid approximately $650,000 for five attempted murders for hire, which he commissioned to protect his interests in Silk Road," Mr. Ulbricht objects to that language and conclusion, which should be deleted from the PSR for the same reasons set forth **ante** in ¶ (3) above;

(5)    at ¶ 60(B)(1), with respect to the conclusion that Mr. Ulbricht "assumed a leadership role" in the Conspiracy to Commit and Aid and Abet Computer Hacking, Mr. Ulbricht objects to that language and conclusion, which should be deleted from the PSR because there was not any evidence of such leadership role;

(6)    at ¶¶ 61-86, with respect to the alleged overdose deaths, Mr. Ulbricht objects to their inclusion in the PSR (and they should be deleted therefrom) because the

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 76 of 78

information provided by the government, including the available forensic evidence, has not established that these deaths are attributable to drugs obtained from vendors on the Silk Road site, or in turn to Mr. Ulbricht;

(7)    at ¶ 87, with respect to victim impact, Mr. Ulbricht objects to that paragraph, which should be deleted from the PSR for the same reasons set forth **ante** in ¶ (6) above.;

(8)    at ¶ 94, with respect to the calculation of Mr. Ulbricht's base offense level, he objects to the the two-level enhancement based on "credible threats of directed violence," which should be deleted from the PSR because (a)  the allegations constitute uncharged conduct and are therefore not appropriately part of the *base* offense level;  and (b) for the reasons set forth **ante** in ¶ 3 above;

(9)    at ¶ 146, the PSR should be corrected to reflect that Mr. Ulbricht no longer owns the residence at 111 South Coral Street in State College, Pennsylvania, and has not owned it for several years;

(10)   at ¶ 147, the PSR should be corrected to reflect that Mr. Ulbricht no longer owns the referenced vehicles and has not since well before his arrest in this case;

(11)   at ¶ 150, with respect to the minimum terms of imprisonment for Counts One through Three, and Count Four, Mr. Ulbricht objects to the characterization that each mandatory minimum term should be imposed separately.  Counts One, Two, and Three are lesser included offenses of Count Four, and therefore merge for purposes of sentencing.  Therefore sentences on Counts One, Two, and Three cannot be imposed independent of Count Four, much less consecutively.  The PSR should be amended to include the following language:  "Counts One, Two, and Three merge with Count Four.  As a result, the sentence on Count Four, carrying mandatory minimum term of imprisonment of 20 years, encompasses the potential sentences for Counts One, Two, and Three;  and

(12)   at p. 38 of the "Justification" for the recommended sentence, Mr. Ulbricht objects to the statement (which should be deleted from the PSR) that "a site like Silk Road can entice people who are maybe uncomfortable with the face-to-face aspect of traditional drug deals to go into drugs[.]"  As set forth in my May 15, 2015, letter, and the Declarations submitted therewith, the Silk Road site did not entice first-time users, and in fact helped individuals reduce and even eliminate their drug use.  Mr. Ulbricht also objects, for the same reasons set forth **ante**, at ¶ (6) above, in his objection to ¶¶ 61-86 of the PSR, to the claim (which should be

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 77 of 78

deleted from the PSR) that "Silk Road represents a grave threat to public health," and to the contention (which should be deleted from the PSR) that "we've seen six individuals die from drugs purchased on Silk Road."

**IV.     *Recommendation for BoP Waiver, and Motion Pursuant to Rule 38, Fed.R.Crim.P.***

Mr. Ulbricht's lack of any criminal history, or history of violence or escape, would, despite the severity of his offense level, result in him scoring favorably with respect to his security classification by BoP, which in turn would affect, if not control, the options for designation to a particular BoP facility.

However, BoP Public Safety Factors (hereinafter "PSF's") and/or Management Variables (hereinafter "MV's"), which take into account generic factors such as sentence length and greatest severity level of offense (which Mr. Ulbricht's offense will be categorized as), could override a low security score. Consequently, Mr. Ulbricht could be confined in a facility at a higher security level than his security score would otherwise require or dictate.

Accordingly, it is respectfully requested that the Court recommend, on the record and in the Judgment, that BoP waive its application of any sentence length/greater security PSF or MV with respect to Mr. Ulbricht. There are several reasons why, it is respectfully submitted, such a recommendation, which would enable designation to one of three facilities, the Federal Correctional Complex (hereinafter "FCC") at Coleman (Sumterville, Florida), FCC Allenwood (White Deer, Pennsylvania), or FCC Tucson (Tucson, Arizona), would be appropriate:

(1)     those three facilities are regarded as significantly safer than other BoP penitentiaries. Mr. Ulbricht's background would otherwise make him vulnerable in a more dangerous facility;

(2)     those facilities would enable Mr. Ulbricht's family to continue visiting him on a regular basis;

(3)     those facilities provide more appropriate programming opportunities for someone of Mr. Ulbricht's education level;  and

(4)     those facilities would be more consistent with Mr. Ulbricht's security classification scoring absent consideration of PSF's and MV's.

In addition, after sentencing Mr. Ulbricht will be filing a motion, pursuant to Rule 38, Fed.R.Crim.P., for a recommendation by the Court that he be confined locally (at MCC or MDC) during the pendency of his appeal. Mr. Ulbricht's lack of e-mail access, as well as the nature

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 78 of 78

and volume of the digital discovery and evidence in this case make access to him during the appellate process a priority for counsel.[50]

### Conclusion

Accordingly, for all the reasons set forth above, either independently or combination, and in the supporting documents and materials, it is respectfully submitted that Mr. Ulbricht be sentenced to a term of imprisonment substantially below the applicable advisory Guidelines range.

Respectfully submitted,

Joshua L. Dratel

JLD/
Encls.

cc:   Serrin Turner
      Timothy T. Howard
      Assistant United States Attorneys

---

[50] Rule 38(b)(2) reads:

> If the defendant is not released pending appeal, the court may recommend to the Attorney General that the defendant be confined near the place of the trial or appeal for a period reasonably necessary to permit the defendant to assist in preparing the appeal.