# 15-1815

*To Be Argued By*:
EUN YOUNG CHOI

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 15-1815

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

ROSS WILLIAM ULBRICHT,
also known as Dread Pirate Roberts, also known as Silk Road,
also known as Sealed Defendant 1, also known as DPR,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

PREET BHARARA,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*

EUN YOUNG CHOI,
MICHAEL D. NEFF,
TIMOTHY T. HOWARD,
ADAM S. HICKEY,
   *Assistant United States Attorneys,
     Of Counsel.*

One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

## TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    A.  The Government's Case at Trial . . . . . . . . .  4

        1.  Overview of the Silk Road Website . . .  4

            a.  The Tor Network . . . . . . . . . . . . . . .  5

            b.  The Silk Road User Interface . . . . .  6

            c.  "Dread Pirate Roberts" Controlled Silk Road . . . . . . . . . . . . . . . . . . . .  8

        2.  Illegal Goods and Services Sold on the Silk Road Website . . . . . . . . . .  10

            a.  Illegal Narcotics . . . . . . . . . . . . . .  10

            b.  Fraudulent Identification Documents . . . . . . . . . . . . . . . . . . .  11

            c.  Computer Hacking Tools and Services . . . . . . . . . . . . . . . . . .  12

            d.  Money Laundering Services . . . . .  13

        3.  Ross Ulbricht's Creation and Operation of the Silk Road Website . . . . . . . . . . .  14

            a.  Ulbricht Creates and Launches Silk Road . . . . . . . . . . . . . . . . . . . .  14

ii

PAGE

        b.  Ulbricht's Willingness to Use
            Violence to Protect His Interests
            in Silk Road . . . . . . . . . . . . . . . . . .  18

        c.  Ulbricht Orders Fraudulent
            Identification Documents
            from Silk Road. . . . . . . . . . . . . . .  20

        d.  Ulbricht's Arrest and His
            Electronic Media . . . . . . . . . . . . .  21

    4.  The Volume of Illegal Transactions
        on Silk Road . . . . . . . . . . . . . . . . . . . . .  25

  B.  The Defense Case . . . . . . . . . . . . . . . . . . . .  27

  C.  The Verdict and Sentencing. . . . . . . . . . .  29

ARGUMENT:

POINT I—There Was No Discovery Violation . . . . .  30

  A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .  30

    1.  The Maryland Investigation
        of Silk Road . . . . . . . . . . . . . . . . . . . . .  30

    2.  The Government's Pretrial Disclosure
        of the Investigation of Carl Force . . . .  32

    3.  The District Court Denies
        Ulbricht's Motion . . . . . . . . . . . . . . . . .  35

iii

PAGE

4. The Defense's Attempts to Introduce Evidence Relating to the Force Investigation During Trial . . . . . . . . .   37

5. Ulbricht Moves for a New Trial While the San Francisco USAO Charges Carl Force and Shaun Bridges . . . . . .   38

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . . .   42

1. The Government's Discovery Obligations . . . . . . . . . . . . . . . . . . . . . .   42

    a. Rule 16 . . . . . . . . . . . . . . . . . . . . . .   42

    b. The Jencks Act . . . . . . . . . . . . . .   43

    c. *Brady* v. *Maryland* . . . . . . . . . . . .   43

2. Rule 17(c) . . . . . . . . . . . . . . . . . . . . . .   45

3. Standards of Review . . . . . . . . . . . . . .   46

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .   47

1. There Was No *Brady* Violation . . . . . .   48

2. The District Court Did Not Abuse Its Discretion in Denying Ulbricht's Discovery Requests . . . . . . . . . . . . . . .   55

3. There Was No Abuse of Discretion in Denying an Adjournment . . . . . . . .   56

iv

PAGE

    4.  The Government Produced Jencks Act
       Material in a Timely Fashion . . . . . . . 57

    5.  The District Court Properly Precluded
       Cross-Examination Using Force's
       Hearsay Statements . . . . . . . . . . . . . . 59

POINT II—The District Court's Limitations on Cross-
Examination Were Proper . . . . . . . . . . . . . . . . . 61

  A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 61

    1.  Agent Der-Yeghiayan's Testimony
       About Mark Karpeles . . . . . . . . . . . . 61

    2.  Thomas Kiernan's Testimony
       About Ulbricht's Computer . . . . . . . . 65

  B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . 66

    1.  The Confrontation Clause . . . . . . . . . 66

    2.  Alternative Perpetrator Evidence . . . . 68

    3.  Opinions of Law Enforcement
       Agents . . . . . . . . . . . . . . . . . . . . . . . . 69

  C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 70

    1.  Agent Der-Yeghiayan's Testimony
       Was Properly Limited to Facts . . . . . . 70

    2.  The District Court Properly Excluded the
       Fourth-Hand Hearsay of Karpeles . . . 75

v

3. The District Court Reasonably Limited Cross-Examination of Kiernan to the Scope of His Direct Testimony . . . . . . 77

POINT III—The District Court Properly Precluded Expert Testimony that Was Proffered Without Adequate Disclosure . . . . . . . . . . . . . . . . . . . . . . 81

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 81

    1. Pretrial Proceedings . . . . . . . . . . . . . . 81

    2. The Trial Begins . . . . . . . . . . . . . . . . . 82

    3. The Defense's Expert Notice . . . . . . . . 84

    4. The District Court's Preclusion Order . . . . . . . . . . . . . . . . . 85

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . . 86

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 89

POINT IV—The District Court Properly Excluded a Co-Conspirator's Hearsay Statement . . . . . . . 96

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 96

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . . 98

    1. The "Against Interest" Exception . . . . 98

    2. The Residual Exception and Nested Hearsay . . . . . . . . . . . . . 100

vi

PAGE

3. Standard of Review . . . . . . . . . . . . . 100

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . 101

POINT V—The Cumulative Error Doctrine
Does Not Warrant Reversal . . . . . . . . . . . . . . 104

POINT VI—The District Court Properly Denied
Ulbricht's Suppression Motions . . . . . . . . . . 105

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . 105

    1. The Pen Register and Trap-and-Trace
Orders . . . . . . . . . . . . . . . . . . . . . . . . . 105

    2. The Warrant for Ulbricht's Laptop . . 107

    3. The Warrants for Ulbricht's Facebook
and Google Accounts . . . . . . . . . . . . . 109

    4. Ulbricht's Suppression Motions . . . . 112

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . 114

    1. The Fourth Amendment
and Particularity . . . . . . . . . . . . . . . . 114

    2. The Good Faith Exception
to the Exclusionary Rule . . . . . . . . . . 116

    3. Severance . . . . . . . . . . . . . . . . . . . . . . 118

    4. The Pen/Trap Act . . . . . . . . . . . . . . . . 119

vii

PAGE

    5.    Standard of Review . . . . . . . . . . . . . .  120

  C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . .  121

    1.    The Warrants Were Particular . . . . .  121

    2.    Suppression Would Not Be an
        Appropriate Remedy . . . . . . . . . . . . .  126

    3.    The Pen/Trap Orders Were Valid . . .  127

POINT VII—Ulbricht's Sentence
  Was Reasonable. . . . . . . . . . . . . . . . . . . . . . . .  130

  A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . .  130

    1.    The Presentence Report . . . . . . . . . .  130

    *2.*    The Overdose Deaths. . . . . . . . . . . . .  132

    3.    The Parties' Sentencing
        Submissions . . . . . . . . . . . . . . . . . . . .  135

    4.    Ulbricht's Sentencing . . . . . . . . . . . .  138

  B.  Applicable Law . . . . . . . . . . . . . . . . . . . . .  141

  C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . .  143

    1.    The District Court Did Not Make a
        Procedural Error . . . . . . . . . . . . . . . .  143

    2.    A Life Sentence Was Justified . . . . .  150

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  159

# TABLE OF AUTHORITIES

PAGE

*Cases*:

*Alvarez* v. *Ercole,*
    763 F.3d 223 (2d Cir. 2014) . . . . . . . . . . . . . . . . . 74

*Amorgianos* v. *Romano Enters.,*
    303 F.3d 256 (2d Cir. 2002) . . . . . . . . . . . . . . . . . 88

*Andresen* v. *Maryland,*
    427 U.S. 463 (1976). . . . . . . . . .   115, 122, 123, 125

*Boucher* v. *U.S. Suzuki Motor Corp.,*
    73 F.3d 18 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . 86

*Bowman Dairy Co.* v. *United States,*
    341 U.S. 214 (1951). . . . . . . . . . . . . . . . . . . . . 46, 56

*Brady* v. *Maryland,*
    373 U.S. 83 (1963). . . . . . . . . . . . . . . . .   30, 33, 43

*Burrage* v. *United States,*
    134 S. Ct. 881 (2014). . . . . . . . . . . . . . . . . . . . . . 146

*Canales* v. *Stephens,*
    765 F.3d 551 (5th Cir. 2014) . . . . . . . . . . . . . . . . 59

*Chambers* v. *Mississippi,*
    410 U.S. 284 (1973). . . . . . . . . . . . . . . . . .   89, 105

*Coolidge* v. *New Hampshire,*
    403 U.S. 443 (1971). . . . . . . . . . . . . . . . . . . . . . 114

*Cotto* v. *Herbert,*
    331 F.3d 217 (2d Cir. 2003) . . . . . . . . . . . . . 68, 75

*Daubert* v. *Merrell Dow Pharmaceuticals,*
    509 U.S. 579 (1993). . . . . . . . . . . . . . . . .   86, 88, 89

ix

PAGE

*Davis* v. *United States,*
  564 U.S. 229 (2011) . . . . . . . . . . . . . . . . . . . . . . 117

*Delaware* v. *Van Arsdall,*
  475 U.S. 673 (1986) . . . . . . . . . . . . . . . . . . . . 67, 68

*DiBenedetto* v. *Hall,*
  272 F.3d 1 (1st Cir. 2001) . . . . . . . . . . . . . . . 68, 69

*Gall* v. *United States,*
  552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . 141

*Giglio* v. *United States,*
  405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . 43

*Hamling* v. *United States,*
  418 U.S. 87 (1974) . . . . . . . . . . . . . . . . . . . . . . . 86

*Hammond* v. *Hall,*
  586 F.3d 1289 (11th Cir. 2009) . . . . . . . . . . . . . 59

*Herring* v. *United States,*
  555 U.S. 135 (2009) . . . . . . . . . . . . . . . . . . . . . . 116

*Howard* v. *Walker,*
  406 F.3d 114 (2d Cir. 2005) . . . . . . . . . . . . . . . 95

*Hutchinson* v. *Groskin,*
  927 F.2d 722 (2d Cir. 1991) . . . . . . . . . . . . . . . 71

*Illinois* v. *Krull,*
  480 U.S. 340 (1987) . . . . . . . . . . . . . . . . . 117, 130

*Kumho Tire Co.* v. *Carmichael,*
  526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . 86

x

PAGE

*Kyles* v. *Whitley,*
514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . 44, 75

*Marron* v. *United States,*
275 U.S. 192 (1927) . . . . . . . . . . . . . . . . . . . . . . 114

*Moore* v. *Illinois,*
408 U.S. 786 (1972) . . . . . . . . . . . . . . . . . . . . . . 58

*Nat'l City Trading Corp.* v. *United States,*
635 F.2d 1020 (2d Cir. 1980) . . . . . . . . . . 116, 122

*Network Prot. Scis., LLC* v. *Fortinet, Inc.,*
No. C 12-01106 WHA, 2013 WL 146033
(N.D. Cal. Jan. 14, 2013) . . . . . . . . . . . . . . . . . . 79

*Paroline* v. *United States,*
134 S. Ct. 1710 (2014) . . . . . . . . . . . . . . . . . . . . 146

*Parsons* v. *Honeywell, Inc.,*
929 F.2d 901 (2d Cir. 1991) . . . . . . . . . . . 76, 100

*Pennsylvania* v. *Ritchie,*
480 U.S. 39 (1987) . . . . . . . . . . . . . . . . . . . . . . . 51

*People of Territory of Guam* v. *Ignacio,*
10 F.3d 608 (9th Cir. 1993) . . . . . . . . . . . . . . . . 68

*Pinkerton* v. *United States,*
328 U.S. 640 (1946) . . . . . . . . . . . . . . . . . . . . . . 149

*Rita* v. *United States,*
551 U.S. 338 (2007) . . . . . . . . . . . . . . . . . . 141, 153

*Rock* v. *Arkansas,*
483 U.S. 44 (1987) . . . . . . . . . . . . . . . . . . . . . . . 89

xi

PAGE

*Sims* v. *Blot*,
534 F.3d 117 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 47

*Smith* v. *Maryland*,
442 U.S. 735 (1979). . . . . . . . . .   113, 119, 128, 129

*Strickler* v. *Greene*,
527 U.S. 263 (1999). . . . . . . . . . . . . . . . . . . . . . . 44

*Taylor* v. *Illinois*,
484 U.S. 400 (1988). . . . . . . . . . . . . . . . . . . . . 61, 89

*Townsend* v. *Burke*,
334 U.S. 736 (1948). . . . . . . . . . . . . . . . . . . . . . 147

*United States* v. *Abu-Jihaad*,
630 F.3d 102 (2d Cir. 2010) . . . . . . . . . . . . . . . . 46

*United States* v. *Achiekwelu*,
112 F.3d 747 (4th Cir. 1997) . . . . . . . . . . . . . . . 72

*United States* v. *Agurs*,
427 U.S. 97 (1976). . . . . . . . . . . . . . . . . . . . . . 52, 53

*United States* v. *Aiello*,
864 F.2d 257 (2d Cir. 1988) . . . . . . . . . . . . . . . 154

*United States* v. *Al-Moayad*,
545 F.3d 139 (2d Cir. 2008) . . . . . . . . . . . . . . . 104

*United States* v. *Amiel*,
95 F.3d 135 (2d Cir. 1996) . . . . . . . . . . . . . . . . 58

*United States* v. *Awadallah*,
436 F.3d 125 (2d Cir. 2006) . . . . . . . . . . . . . . . 158

xii

PAGE

*United States* v. *Ayala-Vazquez,*
    751 F.3d 1 (1st Cir. 2014) . . . . . . . . . . . . . . . . . . 154

*United States* v. *Bagley,*
    473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . 44, 55

*United States* v. *Banks,*
    761 F.3d 1163 . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*United States* v. *Bradley,*
    812 F.2d 774 (2d Cir. 1987) . . . . . . . . . . . . . . . 158

*United States* v. *Broxmeyer,*
    699 F.3d 265 (2d Cir. 2012) . . . . . . . . . . . 141, 142

*United States* v. *Buck,*
    813 F.2d 588 (2d Cir. 1987) . . . . . . . . . . . . . . . 117

*United States* v. *Cavera,*
    550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . . . . *passim*

*United States* v. *Chalmers,*
    410 F. Supp. 2d 278 (S.D.N.Y. 2006) . . . . . . . . . 52

*United States* v. *Check,*
    582 F.2d 668 (2d Cir. 1978) . . . . . . . . . . . . . . . . 72

*United States* v. *Christie,*
    624 F.3d 558 (3d Cir. 2010) . . . . . . . . . . . 120, 128

*United States* v. *Christine,*
    687 F.2d 749 (3d Cir. 1982) . . . . . . . . . . . . . . . 118

*United States* v. *Clark,*
    638 F.3d 89 (2d Cir. 2011) . . . . . . . . . . . . 117, 126

xiii

PAGE

*United States* v. *Comprehensive Drug Testing, Inc.*,
  621 F.3d 1162 (9th Cir. 2010) . . . . . . . . . . . . . 125

*United States* v. *Concessi*,
  38 F. App'x 866 (4th Cir. 2002) . . . . . . . . . . . . . 92

*United States* v. *Cook*,
  657 F.2d 730 (5th Cir. 1981) . . . . . . . . . . . . . . 118

*United States* v. *Coppa*,
  267 F.3d 132 (2d Cir. 2001) . . . . . . .  43, 45, 52, 55

*United States* v. *Cortez-Diaz*,
  565 F. App'x 741 (10th Cir. 2014) . . . . . . . . . . . 154

*United States* v. *Crowley*,
  318 F.3d 401 (2d Cir. 2003) . . . . . . . . . . . . . . . 67

*United States* v. *Cruz*,
  363 F.3d 187 (2d Cir. 2004) . . . . . . . . . . . . . . . 86

*United States* v. *Cruz*,
  981 F.2d 659 (2d Cir. 1992) . . . . . . . . . . . . . . . 88

*United States* v. *Curry*,
  977 F.2d 1042 (7th Cir. 1992) . . . . . . . . . . . . . . 93

*United States* v. *Day*,
  524 F.3d 1361 (D.C. Cir. 2008). . . . . . . . . . . . . . 92

*United States* v. *DeVillio*,
  983 F.2d 1185 (2d Cir. 1993) . . . . . . . . . . . *passim*

*United States* v. *Devin*,
  918 F.2d 280 (1st Cir. 1990). . . . . . . . . . . . 57, 58

xiv

PAGE

*United States* v. *Diallo,*
40 F.3d 32 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . 94

*United States* v. *DiDomenico,*
985 F.2d 1159 (2d Cir. 1993) . . . . . . . . . . . . . . . 86

*United States* v. *Douglas,*
525 F.3d 225 (2d Cir. 2008) . . . . . . . . . . 44, 46, 57

*United States* v. *Doyle,*
130 F.3d 523 (2d Cir. 1997) . . . . 99, 100, 101, 102

*United States* v. *Dwyer,*
539 F.2d 924 (2d Cir. 1976) . . . . . . . . . . . . . . . . 95

*United States* v. *Eberhard,*
525 F.3d 175 (2d Cir. 2008) . . . . . . . . . . . . . . . 154

*United States* v. *Evanchik,*
413 F.2d 950 (2d Cir. 1969) . . . . . . . . . . . . . . . . 51

*United States* v. *Faulkner,*
636 F.3d 1009 (8th Cir. 2011) . . . . . . . . . . . . . 149

*United States* v. *Fernandez,*
443 F.3d 19 (2d Cir. 2006) . . . . . . . . . . . . 142, 156

*United States* v. *Figueroa,*
548 F.3d 222 (2d Cir. 2008) . . . . . . . . . . . . . . . . 66

*United States* v. *Forrester,*
512 F.3d 500 (9th Cir. 2008) . . . . . . 119, 120, 128

*United States* v. *Galpin,*
720 F.3d 436 (2d Cir. 2013) . . . . . . . . . . . . *passim*

xv

PAGE

*United States* v. *Ganias*, — F.3d —,
No. 12-240-cr, 2016 WL 3031285
(2d Cir. May 27, 2016) . . . . . . .  117, 120, 124, 126

*United States* v. *Garcia*,
413 F.3d 201 (2d Cir. 2005) . . . . . . . . . . . . . . 70, 71

*United States* v. *George,*
975 F.2d 72 (2d Cir. 1992) . . . . . . . . . . . . . . *passim*

*United States* v. *Ghailani*,
733 F.3d 29 (2d Cir. 2009) . . . . . . . . . . . . . . . . 157

*United States* v. *Gil*,
297 F.3d 93 (2d Cir. 2002) . . . . . . . . . . . . . . . . 46

*United States* v. *Gomez*,
580 F.3d 94 (2d Cir. 2009) . . . . . . . . . . .  147, 152

*United States* v. *Gotti*,
42 F. Supp. 2d 252 (S.D.N.Y. 1999) . . . . . . . . . 116

*United States* v. *Graham*, — F.3d. —,
Nos. 12-4659, 12-4825, 2016 WL 3068018
(4th Cir. May 31, 2016). . . . . . . . . . .  119, 120, 128

*United States* v. *Grinage*,
390 F.3d 746 (2d Cir. 2004) . . . . . . . . . . . . . . . . 70

*United States* v. *Gupta*,
747 F.3d 111 (2d Cir. 2014) . . . . . . . . . . . . . . . . 95

*United States* v. *Hoffecker*,
530 F.3d 137 (3d Cir. 2008) . . . . . . . . . . . . . 92, 94

xvi

PAGE

*United States* v. *Holmes*,
670 F.3d 586 (4th Cir. 2012) . . . . . . . . . . . . . . . . 92

*United States* v. *Howard*,
454 F.3d 700 (7th Cir. 2006) . . . . . . . . . . . . . . 148

*United States* v. *Hurtado*,
47 F.3d 577 (2d Cir. 1995) . . . . . . . . . . . . . . . . 104

*United States* v. *Jackson*,
345 F.3d 59 (2d Cir. 2003) . . . . . . . . . . . . . . . . 43

*United States* v. *Johnson*,
529 F.3d 493 (2d Cir. 2008) . . . . . . . . . . . . . . . . 69

*United States* v. *Jones*,
460 F.3d 191 (2d Cir. 2006) . . . . . . . . . . .   142, 157

*United States* v. *Kearney*,
672 F.3d 81 (1st Cir. 2012) . . . . . . . . . . . . . . . 145

*United States* v. *Kulick*,
629 F.3d 165 (3d Cir. 2010) . . . . . . . . . . . . . . 144

*United States* v. *Lee*,
818 F.2d 1052 (2d Cir. 1987) . . . . . . . . . . . . . . 147

*United States* v. *Leon*,
468 U.S. 897 (1984) . . . . . . . . . . . . . . . .   117, 126

*United States* v. *LeRoy*,
687 F.2d 610 (2d Cir. 1982) . . . . . . . . . . . . . . . . 54

*United States* v. *Lewis*,
386 F.3d 475 (2d Cir. 2004) . . . . . . . . . . . . . . . 120

xvii

PAGE

*United States* v. *Lopez*,
   577 F.3d 1053 (9th Cir. 2009) . . . . . . . . . . . . . . 50

*United States* v. *Lumkin*,
   192 F.3d 280 (2d Cir. 1999) . . . . . . . . . . . . . . . 86

*United States* v. *Lundy*,
   676 F.3d 444 (5th Cir. 2012) . . . . . . . . . . . . . . 92

*United States* v. *Maniktala*,
   934 F.2d 25 (2d Cir. 1991) . . . . . . . . . .   42, 52, 56

*United States* v. *Marquez*,
   462 F.2d 893 (2d Cir. 1972) . . . . . . . . . . . . . . 101

*United States* v. *McBride*,
   786 F.2d 45 (2d Cir. 1986) . . . . . . . . . . . . . . . 95

*United States* v. *McCullough*,
   523 F. App'x 82 (2d Cir. 2013) . . . . . . . . . . . . 117

*United States* v. *McVeigh*,
   153 F.3d 1166 (10th Cir. 1998) . . . . . . . . . . 69, 74

*United States* v. *Menghi*,
   641 F.2d 72 (2d Cir. 1981) . . . . . . . . . . . . . . . 57

*United States* v. *Meregildo*,
   920 F. Supp. 2d 434 (S.D.N.Y. 2013) . . . . . . . . . 52

*United States* v. *Middlemiss*,
   217 F.3d 112 (2d Cir. 2000) . . . . . . . . . . . . . . 44

*United States* v. *Millan-Colon*,
   836 F. Supp. 1007 (S.D.N.Y. 1993) . . . . . . . . . . 50

xviii

PAGE

*United States* v. *Molina*,
106 F.3d 1118 (2d Cir. 1997) . . . . . . . . . . . . . . 144

*United States* v. *Moore*,
968 F.2d 216 (2d Cir. 1992) . . . . . . . . . . . . . . . 126

*United States* v. *Moskowitz*,
888 F.2d 223 (2d Cir. 1989) . . . . . . . . . . . . . . . 145

*United States* v. *Nicolapolous*,
30 F.3d 381 (2d Cir. 1994) . . . . . . . . . . . . . . . . 58

*United States* v. *Nixon*,
418 U.S. 683 (1974). . . . . . . . . . . . . . . . . . . . 45, 46

*United States* v. *O'Connor*,
650 F.3d 839 (2d Cir. 2011) . . . . . . . . . . . . . 47, 56

*United States* v. *Onumonu*,
967 F.2d 782 (2d Cir. 1992) . . . . . . . . . . . . . 94, 95

*United States* v. *Ortiz*,
394 F. App'x 722 (2d Cir. 2010) . . . . . . . . . . . . 154

*United States* v. *Owen*,
500 F.3d 83 (2d Cir. 2007) . . . . . . . . . . . . . . . . 46

*United States* v. *Pacheco*,
489 F.3d 40 (1st Cir. 2007). . . . . . . . . . . . 148, 149

*United States* v. *Paulino*,
445 F.3d 211 (2d Cir. 2006) . . . . . . . . . . . . . . . 45

*United States* v. *Payne*,
63 F.3d 1200 (2d Cir. 1995) . . . . . . . . . . . . . . . 44

xix

PAGE

*United States* v. *Petrie,*
    302 F.3d 1280 (11th Cir. 2002) . . . . . . . . . . . . . . 93

*United States* v. *Pipola,*
    83 F.3d 556 (2d Cir. 1996) . . . . . . . . . . . . . . . . . 67

*United States* v. *Pisani,*
    773 F.2d 397 (2d Cir. 1985) . . . . . . . . . . . . . . . . 72

*United States* v. *Polowichak,*
    783 F.2d 410 (4th Cir. 1986) . . . . . . . . . . . . . . . 51

*United States* v. *Pope,*
    554 F.3d 240 (2d Cir. 2009) . . . . . . . . . . . . . . . 143

*United States* v. *Pujana-Mena,*
    949 F.2d 24 (2d Cir. 1991) . . . . . . . . . . . . . . . . . 72

*United States* v. *Rea,*
    958 F.2d 1206 (1992) . . . . . . . . . . . . . . . . . . . . . 88

*United States* v. *Regan,*
    706 F. Supp. 1102 (S.D.N.Y. 1989) . . . . . . . . . . 116

*United States* v. *Reingold,*
    731 F.3d 204 (2d Cir. 2013) . . . . . . . . . . . . . . . 141

*United States* v. *Reyes,*
    18 F.3d 65 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . 69

*United States* v. *Rigas,*
    490 F.3d 208 (2d Cir. 2007) . . . . . . . . . . . . . . . 142

*United States* v. *Rigas,*
    583 F.3d 108 (2d Cir. 2009) . . . . . . . . . . . . 46, 143

xx

PAGE

*United States* v. *Riggs,*
690 F.2d 298 (1st Cir. 1982) . . . . . . . . . . . . . . . 118

*United States* v. *Riley,*
906 F.2d 841 (2d Cir. 1990) . . . . . . . . . . . . . . . 115

*United States* v. *Rivas,*
377 F.3d 195 (2d Cir. 2004) . . . . . . . . . . . . . . . 44

*United States* v. *Rivera,*
900 F.2d 1462 (10th Cir. 1990) . . . . . . . . . . . . 104

*United States* v. *Rizzo,*
491 F.2d 215 (2d Cir. 1974) . . . . . . . . . . . . . . . 114

*United States* v. *Rodriguez,*
706 F.2d 31 (2d Cir. 1983) . . . . . . . . . . . . . . . . 102

*United States* v. *Rodriguez-Rivera,*
473 F.3d 21 (1st Cir. 2007) . . . . . . . . . . . . . . . . 57

*United States* v. *Rosa,*
626 F.3d 56 (2d Cir. 2010) . . . . . . . . . . . . 121, 124

*United States* v. *Rutledge,*
517 U.S. 292 (1996) . . . . . . . . . . . . . . . . . . . . . . 29

*United States* v. *Saget,*
377 F.3d 223 (2d Cir. 2004) . . . . . . . . . . . 99, 102

*United States* v. *Salvador,*
820 F.2d 558 (2d Cir. 1987) . . . . . . . . . . . . . . . 99

*United States* v. *Schesso,*
730 F.3d 1040 (9th Cir. 2013) . . . . . . . . . . . . . 125

xxi

*United States* v. *Sessa*,
711 F.3d 316 (2d Cir. 2013) . . . . . . . . . . . . . 45, 58

*United States* v. *Singer*, — F.3d —, No. 15-2169,
2016 WL 3244869 (10th Cir. June 13, 2016) . . 144

*United States* v. *Spinelli*,
551 F.3d 159 (2d Cir. 2008) . . . . . . . . . . . . . . . 44

*United States* v. *Stevens*,
985 F.2d 1175 (2d Cir. 1993) . . . . . . . . . . . . . . 42

*United States* v. *Stokes*,
733 F.3d 438 (2d Cir. 2013) . . . . . . . . . . . . . . 116

*United States* v. *Swackhammer*,
400 F. App'x 615 (2d Cir. 2010) . . . . . . . . . . . 155

*United States* v. *Tanner*,
628 F.3d 890 (7th Cir. 2010) . . . . . . . . . . . . . . 154

*United States* v. *Thomas*,
62 F.3d 1332 (11th Cir. 1995) . . . . . . . . . . . . . 103

*United States* v. *Thomas*,
757 F.2d 1359 (2d Cir. 1985) . . . . . . . . . . . . . 117

*United States* v. *Tin Yat Chin*,
476 F.3d 144 (2d Cir. 2007) . . . . . . . . . . . . . . . 94

*United States* v. *Todisco*,
667 F.2d 255 (2d Cir. 1981) . . . . . . . . . . . . . . 129

*United States* v. *Warme*,
572 F.2d 57 (2d Cir. 1978) . . . . . . . . . . . . . . . . 50

xxii

PAGE

*United States* v. *Watson,*
　423 U.S. 411 (1976). . . . . . . . . . . . . . . . . . . . . . . 130

*United States* v. *Westry,*
　524 F.3d 1198 (11th Cir. 2008) . . . . . . . . . . . . 150

*United States* v. *Wexler,*
　522 F.3d 194 (2d Cir. 2008) . . . . . . . . . . . . . . 88, 98

*United States* v. *White,*
　692 F.3d 235 (2d Cir. 2012) . . . . . . . . . . . . . . . 100

*United States* v. *Wilkerson,*
　361 F.3d 717 (2d Cir. 2004) . . . . . . . . . . . . . . . . 66

*United States* v. *Williams,*
　441 F. App'x 52 (2d Cir. 2011) . . . . . . . . . . . . . 155

*United States* v. *Williams,*
　506 F.3d 151 (2d Cir. 2007) . . . . . . . . . . . . . . . . 99

*United States* v. *Young,*
　745 F.2d 733 (2d Cir. 1984) . . . .  88, 114, 115, 123

*United States* v. *Yousef,*
　327 F.3d 56 (2d Cir. 2003) . . . . . . . . . . . . . . . 87, 94

*United States* v. *Zackson,*
　6 F.3d 911 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . 54

*United States* v. *Zagari,*
　111 F.3d 307 (2d Cir.1997). . . . . . . . . . . . . . . . . 52

*United States Postal Ser*v. v. *CEC Servs.,*
　869 F.2d 184 (2d Cir. 1989) . . . . . . . . . . . . . . . 116

xxiii

PAGE

*VMWare, Inc.* v. *Connectix Corp.*, No. C 02-3705 CW,
    2005 WL 6220090 (N.D. Cal. Mar. 25, 2005) . . . 79

*Wade* v. *Mantello*,
    333 F.3d 51 (2d Cir. 2003) . . . . . . . . 60, 68, 69, 73

*Weatherford* v. *Bursey*,
    429 U.S. 545 (1977) . . . . . . . . . . . . . . . . . . . . . . . . 51

*Williamson* v. *United States*,
    512 U.S. 594 (1994) . . . . . . . . . . . . . . . . . . . . . . . . 99

*Zuchowicz* v. *United States*,
    140 F.3d 381 (2d Cir. 1998) . . . . . . . . . . . . . . . 145

*Statutes, Rules & Other Authorities*

U.S. Const. amend. IV . . . . . . . . . . . . . . . . . . . . . . . 114

18 U.S.C. § 2510(8) . . . . . . . . . . . . . . . . . . . . . . . . . 107

18 U.S.C. § 2703 . . . . . . . . . . . . . . . . . . . . . . 109, 129

18 U.S.C. §§ 3121-26 . . . . . . . . . . . . . . . . . . . 105, 129

18 U.S.C. § 3122 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

18 U.S.C. § 3127 . . . . . . . . . . . . . . . . . . 119, 128, 129

18 U.S.C. § 3500 . . . . . . . . . . . . . . . . . . . . . . . . 43, 57

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . 144, 148, 155

18 U.S.C. § 3661 . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

Fed. R. Crim. P. 6(e)(3)(E) . . . . . . . . . . . . . . . . . . . . 33

Fed. R. Crim. P. 16(a)(1)(E) . . . . . . . . . . . . 36, 42, 55

xxiv

PAGE

Fed. R. Crim. P. 16(b)(1)(B) . . . . . . . . . . . . . . . . . . . . 82

Fed. R. Crim. P. 16(b)(1)(C) . . . . . . . . . . 82, 86, 87, 90

Fed. R. Crim. P. 16(d)(2) . . . . . . . . . . . . . . . . . . . . . . 87

Fed. R. Crim. P. 16 adv. committee's note . . . . 87, 90

Fed. R. Crim. P. 17(c) . . . . . . . . . . . . . . . . . . . . . . . . . 45

Fed. R. Crim. P. 32(d)(2)(B) . . . . . . . . . . . . . . . . . . . 144

Fed. R. Crim. P.33 . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Fed. R. Crim. P. 52(a) . . . . . . . . . . . . . . . . . . . . . . . . . 67

Fed. R. Evid. 103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Fed. R. Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Fed. R. Evid. 402 . . . . . . . . . . . . . . . . . . . . . . . 69, 71

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . 50, 67, 88

Fed. R. Evid. 611(a) . . . . . . . . . . . . . . . . . . . . . 66, 80

Fed. R. Evid. 611(b) . . . . . . . . . . . . . . . . . 67, 79, 93

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . 87, 90

Fed. R. Evid. 801(c)(2) . . . . . . . . . . . . . . . . . . . . . . . 75

Fed. R. Evid. 804(a)(1) . . . . . . . . . . . . . . . . . . . . . . . 102

Fed. R. Evid. 804(b)(3) . . . . . . . . . . . . . . . . . . . 77, 98

Fed. R. Evid. 805 . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

xxv

PAGE

Fed. R. Evid. 807 . . . . . . . . . . . . . . . .   63, 76, 77, 103

U.S.S.G. § 1B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . 144

U.S.S.G. § 2D1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . 131

U.S.S.G. § 2D1.5 . . . . . . . . . . . . . . . . . . . . . . . . . . 131

U.S.S.G. § 2S1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . 131

147 Cong. Rec. S11,006-07 (Oct. 25, 2001)
    (statement of Sen. Leahy) . . . . . . . . . . . . . . . . 128

147 Cong. Rec. H7,197 (Oct. 23, 2001)
    (statement of Rep. Conyers) . . . . . . . . . . . . . . . 128

*Restatement (Third) of Torts: Phys.*
    *& Emot. Harm* (2010) . . . . . . . . . . . . . . . . . . . . . 145

Charles Alan Wright & Kenneth W. Graham, Jr.,
    *Fed. Prac. & Pro.* (2d ed. 2005) . . . . . . . . . . . . . 72

Keeton et al., *Prosser and Keeton on Torts* (5th ed.
    1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 15-1815

———

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ROSS WILLIAM ULBRICHT,
also known as Dread Pirate Roberts, also known as
Silk Road, also known as Sealed Defendant 1,
also known as DPR,

*Defendant-Appellant.*

———

## BRIEF FOR THE UNITED STATES OF AMERICA

———

### Preliminary Statement

Defendant Ross Ulbricht appeals from a judgment of conviction entered on June 1, 2015, in the United States District Court for the Southern District of New York, following an eleven-day jury trial before the Honorable Katherine B. Forrest, United States District Judge.

Superseding Indictment S1 14 Cr. 68 (KBF) (the "Indictment") was filed on August 21, 2014, charging the defendant in seven counts. Count One charged Ulbricht with distributing and aiding and abetting

2

the distribution of narcotics, in violation of Title 21, United States Code, Sections 841(a), 841(b)(1)(A) and 2; Count Two charged him with doing so by means of the Internet, in violation of Title 21, United States Code, Section 841(h) & 841(b)(1)(A); Count Three charged him with conspiring to distribute narcotics, in violation of Title 21, United States Code, Section 846; Count Four charged Ulbricht with engaging in a continuing criminal enterprise, in violation of Title 21, United States Code, Section 848; Count Five charged him with conspiring to obtain unauthorized access to a computer, for purposes of commercial advantage and private financial gain and in furtherance of other criminal and tortious acts, in violation of Title 18, United States Code, Section 1030(a)(2) & 1030(b); Count Six charged him with conspiring to traffic in fraudulent identification documents, in violation of Title 18, United States Code, Section 1028(f); and Count Seven charged him with conspiring to launder money, in violation of Title 18, United States Code, Section 1956(h).

Trial commenced on January 13, 2015 and ended on February 4, 2015, when the jury found Ulbricht guilty on all counts. On May 29, 2015, the District Court sentenced the defendant to a term of life imprisonment, ordered forfeiture in the amount of $183,961,921, and imposed a $500 special assessment.

Ulbricht is currently serving his sentence.

3

## Statement of Facts

From early 2011 through October 1, 2013, Ross Ulbricht owned and operated a vast online black market, known as "Silk Road," through which thousands of vendors sold approximately $183 million dollars of illegal drugs, as well as a variety of other goods and services. The defendant designed and created Silk Road to facilitate illegal transactions anonymously and beyond the reach of law enforcement, including by hosting the site on the Onion Router (or "Tor") network, which hides the identities of its users and their IP addresses, and by requiring vendors and customers to do business in Bitcoin, a virtual currency designed to be as anonymous as cash. During its operation, Ulbricht oversaw and managed all aspects of Silk Road, including maintaining the computer infrastructure, determining vendor and customer policies, deciding what could be sold on the site, managing a staff of online administrators and computer programmers, and controlling the profits, from which he personally earned millions of dollars.

The evidence at trial consisted of testimony by law enforcement agents who spent years investigating the operation of Silk Road through undercover purchases and online communications with the man who administered it using the alias "Dread Pirate Roberts" (or "DPR"). Despite "DPR"'s efforts to mask the location of Silk Road through Tor, law enforcement agents ultimately identified the servers hosting Silk Road (and seized the trove of data they contained, documenting thousands of transactions and communications through the site and its associated forums). Ulbricht

was initially identified as "DPR" through connections between his personal email account and online posts about Silk Road. After identifying him, agents were able to catch Ulbricht red-handed, arresting him in a public library while he was logged into Silk Road from his laptop as "DPR," administering the site and talking online as "DPR" with an undercover agent. That laptop, in turn, contained journals describing how Ulbricht created and operated the site (corroborated by testimony from one of Ulbricht's college friends), records related to Silk Road's operation, and Bitcoin "wallets" containing millions of dollars' worth of Bitcoins.

## A. The Government's Case at Trial

### 1. Overview of the Silk Road Website

Silk Road was an extensive and sophisticated online criminal marketplace that sought to make conducting illegal transactions on the Internet as easy and frictionless as shopping online at mainstream e-commerce websites. (Tr. 87-88).[1] The web-

---

[1] "PSR" and "Presentence Report" refer to the Presentence Investigation Report prepared by the United States Probation Office (the "Probation Office") in connection with Ulbricht's sentencing; "Br." refers to the defendant's brief on appeal; "A." refers to the appendix filed with that brief; "S." refers to the sealed appendix filed with that brief; "SA" refers to the Government's supplemental appendix, filed with this brief; "NACDL Br." refers to the *Amicus Curiae*

5

site offered a sales platform that allowed users to conduct transactions online, and the basic user inter-face resembled those of well-known online market-places. (Tr. 87-88).

### a. The Tor Network

Unlike mainstream commerce websites, however, Silk Road was accessible only through the Tor net-work. (Tr. 99). The Tor network is a special network of computers on the Internet, distributed around the world, that is designed to conceal the true Internet Protocol (or "IP addresses")[2] of the computers on the network, and, thereby, the identities of the network's users. (Tr. 98-110, 135). Every communication sent through Tor is bounced through relays within the network, and wrapped in layers of encryption, such that it is practically impossible to trace the communi-

———————

Brief of the National Association of Criminal Defense Lawyers in support of Ulbricht's appeal; "DPA Br." refers to the *Amici Curiae* Brief of the Drug Policy Alliance, Law Enforcement Against Prohibition, Jus-tLeadershipUSA, and Nancy Gertner in support of Ulbricht's appeal; "Docket Entry" refers to an entry on the District Court's docket for this case; and "Tr." refers to the corrected and final trial transcript. With respect to the last item, the Government notes that the Appendix contains portions of the transcript that were later corrected.

[2] *See infra* n.26.

6

cation back to its true, originating IP address. (Tr. 136-38).

Tor also allows websites that operate on the network, referred to as "hidden services," to conceal the true IP addresses of the computer servers that host them. (Tr. 137-38). Hidden services like Silk Road have complex web addresses ending in ".onion,"[3] which can only be accessed using specialized Tor web browser software (which is freely available on the Internet). (Tr. 98-99).

### b. The Silk Road User Interface

Upon arriving at the Silk Road website, users could create a new account and access the site simply by creating a unique username and password. (Tr. 140-41).

The website's homepage contained its logo, "Silk Road anonymous market," and listed various categories of illegal items for sale on the site, including, most prominently, "Drugs." (Tr. 141-46; SA 1, 9, 70). The homepage also included links permitting users to access: (1) a private message system, which allowed users to send messages to each other through the website, similar to emails (Tr. 192); (2) online forums, where users could post messages to "discussion threads" concerning various topics related to the website (Tr. 196-200); (3) a "wiki" that contained a collection of frequently asked questions, and other

─────────

[3] Silk Road's address was silkroadvb5piz3r.onion. (Tr. 98).

7

forms of guidance for users (Tr. 211-13; SA 4); and (4) a "support" section, where users could get assistance from the Silk Road administrative staff. (Tr. 236).

When a user clicked on any of the links to items for sale, the website would bring up a page containing the details of the listing, including a description of the item, its price and product reviews, and the username of the vendor selling it. (Tr. 148-51; SA 3). To purchase an item, the user would simply click on a link to add the item to an electronic "shopping cart." (Tr. 164-65). The user would later be prompted to supply a shipping address and to confirm the placement of the order. (Tr. 165). Once the order was placed, it would be processed through Silk Road's Bitcoin-based payment system.[4] (Tr. 150-51, 165-67).

—————

[4] Bitcoins are an anonymous, decentralized form of electronic currency, existing entirely on the Internet and without any physical form. (Tr. 151, 159-60). The currency is not issued by any government, bank, or company, but rather is generated and controlled automatically through computer software operating on a decentralized network of computers (the "Bitcoin network"). (Tr. 159-60). Although there exists a public record of Bitcoin transactions (known as the "Blockchain"), which prevents individuals from spending the same Bitcoin twice, Bitcoins are exchanged by sending them from one anonymous Bitcoin address (analogous to a bank account number) to another, and without independent information tying an individual to their address, so the transactions are effectively untraceable. (Tr. 159-64). Bitcoin

8

Silk Road would collect a commission on each sale. (Tr. 170-72).

### c. "Dread Pirate Roberts" Controlled Silk Road

In or about June 2011, a Silk Road user emerged on the Silk Road forum who held himself out as the lead administrator and person in charge of Silk Road, who posted information about rules and policies of the site, and signed messages as "Silk Road staff." (Tr. 242-45). On January 31, 2012, the administrator announced that he was adopting the name "Dread Pirate Roberts" (or "DPR") but continued to operate as the lead administrator of both the Silk Road marketplace and the Silk Road forums. (Tr. 243, 245-46). "Dread Pirate Roberts" used a particular electronic signature—known as a "PGP" signature, short for "Pretty Good Privacy"—to encrypt and digitally sign his communications to allow users to authenticate that messages from "DPR" had in fact been sent by "DPR," and "DPR" alone.[5] (Tr. 246-49). "Dread Pirate

_____

holders can convert that currency into a national currency (like dollars) through various exchange services. (Tr. 152-53, 170-71).

[5] PGP software creates a unique "public key," which can be shared by the message sender with others. (Tr. 247). When the message sender uses a "private key" to digitally sign messages, the recipients of the message can use the PGP program to validate that the message sent was from a particular sender and had not been altered. (Tr. 247-49, 370-83). Dur-

9

Roberts" would post various messages to the Silk Road community, including rules and regulations regarding the marketplace, commissions that would be charged, issues related to site maintenance, and the "State of the Road" address, outlining his plans for Silk Road. (Tr. 250-64).

"Dread Pirate Roberts" ran the site with the aid of support staff. (Tr. 264). In furtherance of the Government's investigation, in July 2013, one undercover agent lawfully assumed control of the accounts of "cirrus," a support staff member, on both the Silk Road forums and the marketplace. (Tr. 264-65). As "cirrus," the agent served as a moderator for the Silk Road forums, which allowed him to access certain features of Silk Road that general users could not, such as search capabilities and the ability to edit, delete, and move threads and posts on the forum. (Tr. 268-70, 273). While using the "cirrus" accounts, the agent frequently communicated with "DPR," as well as other staff support administrators, through Silk Road's built-in messaging systems on both the Silk Road marketplace and forum, as well as through a Silk Road "staff chat," a private messaging platform that "DPR" had set up (separate from the Silk Road website) which "DPR" used to communicate with his

_____

ing the operation of Silk Road, "Dread Pirate Robert"'s public PGP key—which validated messages sent from "DPR"—did not change, and thus "DPR"'s private key had not changed during that time. (Tr. 368-84).

employees in real time. (Tr. 272-77, 290-310).[6] Those communications confirmed that "Dread Pirate Roberts" served as the ultimate decision maker for the staff, paid the staff members a salary, and had the capacity to grant new administrative powers to "cirrus" and other staff members. (Tr. 272-74, 290).

## 2. Illegal Goods and Services Sold on the Silk Road Website

The illegal nature of the items sold on Silk Road was readily apparent to any user browsing through its offerings, and included the following.

### a.     Illegal Narcotics

The vast majority of the goods for sale were illegal drugs of nearly every variety, which were openly advertised on the site as such. (Tr. 88, 142-43). As of the takedown of the Silk Road website on October 2, 2013, there were nearly 13,802 listings for controlled substances on the website, listed under the categories "Cannabis," "Dissociatives," "Ecstasy," "Intoxicants," "Opioids," "Precursors," "Prescription," "Psychedelics," and "Stimulants," among others. (Tr. 1756-57;

──────────

6   The instructions that were provided by "Dread Pirate Roberts" to "cirrus" on July 20, 2013 on how to log onto Silk Road staff chat and communicate with him (as well as other Silk Road staff), including "DPR"'s dread@pi5mmj2ronhutyxv.onion address, were found in a text file on Ulbricht's computer. (Tr. 991-94).

11

SA 70). As of the same date, among other illegal nar-
cotics, there were at least 643 different listings for
cocaine products, which included listings for cocaine
base (commonly known as "crack" cocaine), 205 dif-
ferent listings for heroin products, at least 305 differ-
ent listings for LSD products, and 261 different list-
ings for methamphetamine products. (Tr. 1759-63;
SA 71-82).

During the course of the investigation, law en-
forcement seized a wide variety of controlled sub-
stances obtained through undercover purchases made
on the Silk Road website, including cocaine, crack,
heroin, MDMA (commonly known as "ecstasy"), LSD,
and oxycodone. (Tr. 88-96, 98, 149-52, 154-68, 176-83,
1388-90; SA 68-69).

### b.   Fraudulent Identification Documents

Silk Road also offered for sale counterfeit and
fraudulent identity documents, which included,
among other things, counterfeit United States and
foreign passports and driver's licenses and social se-
curity cards. (Tr. 1764-68; SA 83-99). As of October 2,
2013, there were approximately 156 different listings
for forged identity documents in the "Forgeries" sec-
tion of the Silk Road website. (SA 83).

During the course of the investigation, law en-
forcement seized counterfeit identity documents that
had been ordered through the Silk Road website,
which included nine counterfeit U.S. and foreign
driver's licenses that had been ordered by the defend-
ant. (Tr. 1467-76; SA 64).

12

### c.  Computer Hacking Tools and Services

Silk Road offered a wide variety of computer hacking tools as well as the services of computer hackers. (Tr. 1768-71). As of the takedown of the Silk Road website on October 2, 2013, the following computer hacking goods and services were available on the site, among others:

- Account password hacking tools and services, which included tools for compromising the usernames and passwords of online accounts, including email accounts, Facebook accounts, and other social media accounts. (Tr. 1769-70; SA 102-07).

- Remote Access Tools, commonly known as "RATs," which allow users to obtain unauthorized remote access to a compromised computer. (Tr. 1769-70, SA 100-01). Once a RAT is installed, a hacker can use such a tool to view the user's activity, view the user's webcam activity, and execute programs remotely, among other things. (Tr. 1769-70; SA 101).

- Keyloggers, which allow a user to monitor keystrokes inputted by a victim into his or her computer and are used to steal confidential

13

information, including usernames, passwords, and account information. (SA 108-09).

- Distributed Denial of Service ("DDoS") services, which involve disabling websites or other publicly available services on the Internet by using large networks of compromised computers to flood victim systems with malicious Internet traffic. (SA 110-11).

During the course of the investigation, law enforcement purchased a computer hacking pack from a Silk Road vendor that contained a variety of 50 different computer hacking tools, including RATs, keyloggers, and other computer viruses. (Tr. 1390-95). The FBI tested a selection of the tools that were purchased from the computer hacking pack, and verified that they operated as advertised to compromise victim computer systems. (Tr. 1613-33).

### d. Money Laundering Services

Silk Road offered a variety of money laundering services to its users, many of which were directly marketed to vendors who sold illegal goods and services on the website as a means to convert proceeds of illegal transactions (obtained in Bitcoins, the required means of payment on the Silk Road website) into other forms of currency. (Tr. 1771-74; SA 112-14). Vendors in this category offered, among other things, the sale of United States currency, anonymous debit cards preloaded with currency, and other

14

prepaid payment systems, including Moneypak cards. (Tr. 1771-74; SA 115-26).

### 3. Ross Ulbricht's Creation and Operation of the Silk Road Website

Ulbricht conceived of Silk Road during 2009 and 2010, worked to launch it in early 2011, and oversaw every aspect of its operation from then until his arrest on October 1, 2013.

### a. Ulbricht Creates and Launches Silk Road

Ulbricht conceived of Silk Road in late 2009 as an "online storefront that couldn't be traced back to me." (Tr. 989-91). As described in a personal journal entry, he wanted "to create a website where people could buy anything anonymously, with no trail whatsoever that could lead back to them." (Tr. 898-900; SA 27). Ulbricht researched the technologies, including Tor and digital currencies, to promote anonymity for himself and users of the site. (Tr. 898-900, 989-91; SA 27). By mid-2010, he was growing illegal, hallucinogenic mushrooms "so that [he] could list them on the site for cheap to get people interested." (Tr. 898-900; SA 27). During the same time period, in late 2010, "[o]n the website side, [Ulbricht] was struggling to figure out on [his] own how to set it up." (SA 27).

Ulbricht solicited computer programming help from a college friend, Richard Bates, as he built the site. (Tr. 1114-16, 1120-24). Bates testified that, for a number of months initially, when he would ask Ulbricht what type of site he was working on, Ulbricht

would reply only that it was "top secret." (Tr. 1123-24). However, after Bates refused to provide further programming help unless Ulbricht disclosed the nature of his project, Ulbricht confided that he was running an online marketplace for illegal drugs, which he showed to Bates—the Silk Road website. (Tr. 1124-38).[7]

In early 2011, Ulbricht launched an early version of the website (Tr. 900-04; SA 30). Ulbricht attempted to attract users to Silk Road by marketing it on various online forums, including forums frequented by

—————

[7] On November 11, 2011, Ulbricht told Bates that he had "sold" Silk Road to someone else. (Tr. 1157-59). But chats dated December 9, 2011 between Ulbricht and a co-conspirator named "Variety Jones," or "vj," recovered from Ulbricht's laptop, made clear that this was a lie Ulbricht had told to Bates and his ex-girlfriend, both of whom he feared knew too much about his involvement in Silk Road. (Tr. 1211). And about a month thereafter, on January 15, 2012, the same co-conspirator, "vj," suggested to Ulbricht that he change his name from "Admin" to "Dread Pirate Roberts" on Silk Road, to "[c]lear your trail." (Tr. 1211-12). The name—an allusion to the protagonist of the cult classic film "The Princess Bride"—was deliberately adopted by Ulbricht so as to falsely suggest that multiple people ran Silk Road, when in fact Ulbricht alone controlled it from inception to end. (Tr. 367-68; 1211-12).

16

Bitcoin users. (Tr. 900-04, 1252-68; SA 30).[8] Those efforts were successful enough to enable Ulbricht to

_____

[8]   Law enforcement was able to trace those online forum posts to an email address, rossul-bricht@gmail.com, controlled by Ulbricht. (Tr. 1266-67). A review of the contents of that email account confirmed his connection to "altoid," the name used to publicize Silk Road on online forums. (Tr. 1271-75).

The contents of Ulbricht's email account and his related Facebook account also included various additional pieces of information that confirmed Ulbricht's identity as "Dread Pirate Roberts" and his involvement as chief administrator of the Silk Road website. For example, Ulbricht's personal email account contained discussions of a rental property in Bastrop, Texas, and receipts for various lab-related materials from 2010, which matched a journal entry from Ulbricht's laptop that referred to setting up a "lab in a cabin out near Bastrop [Texas] off the grid" to grow hallucinogenic mushrooms, and a Silk Road expense spreadsheet listing the materials purchased for the lab. (Tr. 1275-81). Emails containing airline reservations for both international and domestic trips in Ulbricht's account, as well as Facebook messages from Ulbricht's account noting travel during the same time, matched Silk Road staff chats from Ulbricht's computer, discussing "DPR"'s travel plans at the same time. (Tr. 1291-1301, 1366-74). These include, for example, chats from "DPR" about a trip from Australia to Thailand at the end of January 2012 and messages and pictures on Ulbricht's Facebook page of

sell approximately 10 pounds of his hallucinogenic mushrooms through the website. (Tr. 900-01; SA 30).

According to Ulbricht's journal, user traffic to the website increased dramatically following an article posted on the Gawker website in June 2011, which described Silk Road. (Tr. 436, 900-04; SA 30). Sales spiked (with Ulbricht recording monthly revenues of approximately $20,000 to $25,000 in United States currency), and based on the growth, Ulbricht decided to hire staff to help with the site. (Tr. 902-04; SA 31-32).

The defendant oversaw every aspect of the operation of the Silk Road website until his arrest in October 2013. Among other things, Ulbricht was responsible for setting the commission rate for transactions

—————————

the defendant in Thailand during January and February of 2012. (Tr. 1296-1301). Documents from Ulbricht's laptop, including a chat from March 2012 in which "DPR" and a co-conspirator discussed getting foreign passports (such as from the Caribbean nation of Dominica), as well as application materials for citizenship in Dominica, containing the defendant's identifying information, were complemented by emails from Ulbricht's email account dated May 2012, discussing the defendant's application for citizenship to Dominica. (Tr. 997-1003, 1357-63). And finally, Ulbricht's email account contained emails in which others referred to him as "Frosty," the name of both Ulbricht's laptop computer, and the sole username for that computer. (Tr. 864-65, 1309, 1752-54).

that occurred over Silk Road. (Tr. 256-61). He was responsible for determining what goods were allowed to be sold on Silk Road. (Tr. 254-55). He enforced the rules of the site, including the ban against offline sales directly between vendors and customers, designed to avoid Silk Road commissions. (Tr. 220-21, 229-30, 261-63, 939-47, 1609-11, 1789-91). Ulbricht maintained and managed the computer servers and code used to operate and run Silk Road. (Tr. 250-54, 900-04, 960-67, 974-87, 1378, 1637-48). And he managed the day-to-day operations of the site, with the help of his staff of employees whom he hired, supervised, and paid. (Tr. 266-68, 270-74, 904-05, 924-25, 935-37, 939-43, 947-48, 953-56).

### b.     Ulbricht's Willingness to Use Violence to Protect His Interests in Silk Road

Communications seized from the Silk Road server also revealed that Ulbricht was willing to use violence to protect his interests in Silk Road, paying a total of approximately $650,000 in United States currency to solicit the murders-for-hire of five people.

Beginning in or about March 13, 2013, a vendor by the name "FriendlyChemist" threatened to release the identities of other vendors and customers, unless Ulbricht paid him approximately $500,000 in United States currency. (Tr. 1802-24, 1876-79). "FriendlyChemist" predicted that the release of the information would expose those individuals to law enforcement and threaten the future of Silk Road:

19

> what do u . . . think will happen if thou-
> sands of usernames, ordr amounts, ad-
> dresses get leaked? all those people will
> leave sr and be scared to use it again.
> those vendors will all be busted and all
> there customers will be exposed too and
> never go back to sr

(Tr. 1806-07). He also provided a sample of the user
information that he claimed to have stolen. (Tr. 1807-
08).

In response, on March 27, 2013, Ulbricht contact-
ed the man he understood to be a supplier for
"FriendlyChemist" (who went by the moniker
"redandwhite") and indicated that he wished to have
"FriendlyChemist" executed. (Tr. 1819-22). Ulbricht
provided identifying information for "Friendly-
Chemist" and negotiated to pay "redandwhite" ap-
proximately 1,670 Bitcoins (roughly $150,000 in
United States currency at the time). (Tr. 1822, 1883-
85). "Redandwhite" later confirmed that he received
the payment and, about a day later, told the defend-
ant that the murder had been carried out. (Tr. 1886-
87). At Ulbricht's request, "redandwhite" sent a pho-
tograph purporting to be of the victim, with a code
chosen by the defendant visible in the picture.
(Tr. 1891-92). On April 5, 2014, the defendant re-
plied, "I've received the picture and deleted it. Thank
you again for your swift action." (Tr. 1892).

Ulbricht remained concerned that associates of
"FriendlyChemist" were involved with the extortion
attempt and might still pose a threat, however.
(Tr. 1887-1896, 1905-08). After negotiating with

20

"redandwhite," Ulbricht sent another $500,000 to as-
sassinate those four associates, with the understand-
ing that if "redandwhite" recovered any drugs or
money from the scene of the crime, they would split it
equally. (Tr. 1896-99).[9]

### c.  Ulbricht Orders Fraudulent Identification Documents from Silk Road

Communications seized from the Silk Road server
and a controlled delivery revealed that Ulbricht used
the Silk Road account "shefoundme" to order nine
fraudulent identity documents from Silk Road.

In June 2013, "shefoundme" made arrangements
to purchase the documents from a vendor on the Silk
Road website for approximately $1,650 in United
States currency. (Tr. 1794-1802). "Shefoundme"
asked if the documentation would be good enough to
"pass airport security for a domestic flight" or to "get
through being pulled over by a cop," and the vendor
confirmed that the identity documents were shipped
in early July 2013. (Tr. 1794-95, 1800).

—————

[9]  Blockchain records confirm that the payments
for the five attempted murders for hire were made
from Bitcoin addresses associated with Bitcoin wallet
files (defined below, *see infra* n.11), found on Ul-
bricht's laptop computer (Tr. 1729-32, 1884-86, 1899-
1900; SA. 66-67). The murders-for-hire do not appear
to have been carried out, however, as the Govern-
ment stipulated at trial. (Tr. 1908-09).

21

On July 10, 2013, U.S. Customs and Border Protection intercepted a package inbound from Canada, containing nine counterfeit driver's licenses from six different U.S. states and three countries (matching the list of jurisdictions requested in the order made by "shefoundme"), each of which bore Ulbricht's photograph and date of birth, but different names. (Tr. 1467-71; SA 64). On July 26, 2013, Homeland Security agents performed a controlled delivery of those documents to Ulbricht in San Francisco, California. (Tr. 1471-72). During the encounter, when asked about the source of the fraudulent identification documents, Ulbricht said, "[H]ypothetically an individual could purchase anything they wanted—fake IDs, drugs, or generally anything illegal on the Tor browser, using the Tor browser to access the Silk Road website." (Tr. 1475).

### d.  Ulbricht's Arrest and His Electronic Media

On October 1, 2013, Ulbricht was arrested while he was logged into Silk Road and acting as "Dread Pirate Roberts." As law enforcement agents surveilled him, Ulbricht began using his computer at a public library in San Francisco, California. (Tr. 323-27, 847-54). Moments after Ulbricht entered the library, an undercover agent who had been masquerading as "cirrus," a trusted member of "Dread Pirate Robert"'s Silk Road's customer support staff, began chatting with "Dread Pirate Roberts" and asked him to check a specific message on the Silk Road web site. (Tr. 327-35, 384-86). After the undercover agent confirmed that "Dread Pirate Roberts" was online and

22

using his account, other agents arrested Ulbricht and seized his laptop computer. (Tr. 333-35, 386-88, 854-56). At the time of the defendant's arrest, he was logged into the Silk Road website under the username "Dread Pirate Roberts," and he was logged into an online chat client, engaged in the conversation with the undercover agent. (Tr. 388-94, 859-71; SA 11-24).[10]

Subsequent examination of the defendant's computer revealed voluminous evidence tying the defendant to the creation, ownership, and operation of Silk Road for the length of its existence. This included, among other things:

- Thousands of pages of chat logs with his employees (Tr. 890-97, 904-09, 911-12, 918-22, 924-27, 935-49, 960-67, 980-87, 1062, 1152-54, 1211-12, 1296-98, 1301-05, 1357-61, 1366-67, 1369-73, 1459-66, 1609-11, 1905-08, 1917-21, 2000-01);

_____

[10] At the time he was arrested, Ulbricht was accessing the Silk Road "Mastermind" webpage, the top-level administrative page for Silk Road that, forensic analysis of the Silk Road server showed, could only be accessed using "Dread Pirate Roberts"'s account on the server, and could not be accessed by any of the other Silk Road staff employees. (Tr. 399-400, 1775-76).

23

- Journal entries describing his ownership and operation of the Silk Road website (Tr. 897-904, 909-11, 922-24, 1050-52; SA 26-43);

- A weekly "to do" list regarding Silk Road-related tasks (Tr. 947-48; SA 57-58);

- A copy of the Silk Road website (Tr. 1006-11; SA 62-63);

- A copy of the Silk Road website's database (which included information about Silk Road's users and their transactions) (Tr. 1053-55);

- A spreadsheet listing information regarding the servers used to operate Silk Road (Tr. 975-79, 1637-49);

- The private PGP encryption key "Dread Pirate Roberts" used to authenticate and encrypt his messages (Tr. 1010-15);

- An expense report spreadsheet, listing expenses and profits related to Silk Road (Tr. 950-52; SA 44-51);

- A spreadsheet listing Ulbricht's assets, which included a reference to Silk Road being an asset valued

24

at approximately $104 million as
of June 2012 (Tr. 957-60; SA 53);
and

- Scanned copies of identification
  documents belonging to Silk Road
  staff members (Tr. 932-34; SA 60).

From a Bitcoin wallet file recovered from the de-
fendant's computer, FBI agents seized approximately
144,341 Bitcoins, then worth approximately $18 mil-
lion. (Tr. 1052-53, 1673-78).[11] A review of Blockchain
records regarding Bitcoin addresses associated with
the Silk Road servers and Ulbricht's laptop computer
demonstrated a huge flow of Bitcoins from the Silk
Road servers to the files maintained on the defend-
ant's computer. (Tr. 1682-99, 1723-27). Nearly 90
percent of all the Bitcoins ever transferred into the
wallets on Ulbricht's laptop came directly from the
wallets found on Silk Road, and those transfers were
made over many months. (Tr. 1695-99; SA 65).[12]

———————

[11] Bitcoin wallets are electronic files which con-
tain Bitcoin addresses and the private keys required
to control the funds associated with the Bitcoin ad-
dresses within the file. (Tr. 1668-70).

[12] These transfers were consistent with Ulbricht
using his laptop as a "cold storage" location for Silk
Road proceeds—*i.e.*, a storage location that was not
vulnerable to hacks or crashes that might affect the
Silk Road servers. (Tr. 1677-78, 1737-39). Indeed, a
"log" file found on Ulbricht's computer contained an
entry dated April 7, 2013, which said, "moved storage

25

On the day of Ulbricht's arrest, law enforcement agents also executed a search warrant on Ulbricht's residence. During that search, they recovered, among other things, a thumb drive containing versions of Silk Road-related documents recovered from Ulbricht's computer. (Tr. 1038-52, 1111-13). In addition, agents seized handwritten notes from Ulbricht's trash bin which contained details about the revamped Silk Road vendor rating system that "Dread Pirate Roberts" had recently announced on the Silk Road forums. (Tr. 406-08, 414-18).

## 4. The Volume of Illegal Transactions on Silk Road

In the course of its investigation, the FBI seized computer servers located in Iceland and the United States that were used to operate and back up the Silk Road marketplace. (Tr. 1637-59). Those servers included records of transactions occurring on Silk Road throughout its operation. (Tr. 1739-52, 1783-84, 1909-12, 1921-26). The records included detailed information about each transaction, including but not limited to the category of product that was sold, the purchase price (in Bitcoins and U.S. dollars), and the commission taken by the website. (Tr. 1909-12, 1921-26). According to that data, between February 2, 2011

_____

wallet to local machine," and metadata associated with the primary wallet file on the laptop indicated that the file had been moved to the laptop on the same date, April 7, 2013. (Tr. 1052-53, 1673, 2155; SA. 25, 39).

26

and October 2, 2013, approximately 1.5 million transactions occurred over Silk Road, with a total value of approximately $213.9 million in United States currency, which generated a total of approximately $13.2 million in commissions for Silk Road, based on Bitcoin exchange rates at the time that the transactions occurred. (Tr. 1942-44; SA 130).

The vast majority of sales, approximately $183 million dollars' worth, were for illegal narcotics (Tr. 1929-32; SA 127), including heroin, cocaine, methamphetamine, and LSD:

| Drug | Total No. of Sales | Total Sales Revenue |
|---|---|---|
| Heroin | 53,649 | $8,930,657 |
| Cocaine | 82,582 | $17,386,917 |
| Methamphetamine | 34,689 | $8,110,453 |
| LSD | 54,567 | $7,073,838 |

(Tr. 1935-37; SA 131).

Thousands of fraudulent identification documents were sold through the site:

| Type | Total No. of Sales | Total Sales Revenue |
|---|---|---|
| Fake IDs | 3,642 | $699,053 |
| Forgeries | 3,487 | $197,291 |
| Passports | 103 | $105,292 |

(Tr. 1933-34; SA 128).

And millions of dollars' worth of currency and valuable metals were laundered using services available through the site:

| Type | Total No. of Sales | Total Sales Revenue |
|---|---|---|
| Money | 14,345 | $2,846,025 |
| Digital Currencies | 18,134 | $177,167 |
| Gold | 81 | $159,944 |
| Bullion | 122 | $80,952 |
| Silver | 138 | $9,746 |

(Tr. 1934-35; SA 129).

The database also included information regarding the number of vendors and users on the Silk Road website. Between approximately January 2011 and October 2013, there were approximately 3,748 different registered vendor accounts and approximately 115,391 registered buyer accounts that had engaged in at least one transaction on the website (Tr. 1942-44; SA 130), for users who were located around the world (Tr. 1939-42; SA 132-33).

## B.  The Defense Case

In its opening statement, the defense admitted that Ulbricht conceived of and "created" Silk Road, but "after a few months," he "handed it off to others," because running the site had become "too stressful for him and [had] got[ten] out of hand." (Tr. 60-61).

The defense argued that ultimately, it was the unidentified buyers of the site who, after believing they were under investigation, lured Ulbricht back to Silk Road, some two-and-a-half years later, so that Ul-

28

bricht could "take the fall" for them. (Tr. 61). In support of this theory, defense counsel argued that no one as technically-sophisticated and security-conscious as "Dread Pirate Roberts" would have made the mistakes of, for example, leaving notes about Silk Road in his waste basket at home, or using his laptop and file sharing programs on a public Wi-Fi network. (Tr. 62-63). As for the evidence on Ulbricht's laptop, the defense's theory was that the real "DPR" had planted it, so "when the FBI arrived," the day of his arrest, Ulbricht "would be left holding the bag." (Tr. 65).

The defense pursued this theory through its cross-examination of the Government's witnesses, particularly Special Agent Jared Der-Yeghiayan, who had investigated other individuals before another agent brought his attention to Ulbricht in September 2013. (Tr. 489-509, 527-30, 651-55, 659-79). One of those individuals was Mark Karpeles, who owned the company that hosted a website on the open Internet ("silkroadmarket.org") that provided information on how to access the real Silk Road through Tor. (Tr. 528-29, 660-61). Evidence later recovered from Ulbricht's laptop revealed that Ulbricht was the customer who leased the space on Karpeles's server, however. (Tr. 809-11; 1003-06). The other individual was Anand Athavale, who posted on a libertarian website ("mises.org") that "Dread Pirate Roberts" referred to in his online profile. (Tr. 813-14). Agent Der-Yeghiayan noted similarities between the language "DPR" used on the Silk Road forums and postings on mises.org by Athavale. (Tr. 813-19).

29

The defense also called three character witnesses and authenticated a document obtained from Ulbricht's laptop that contained a task list. (Tr. 2001-22, 2098-112). As described in more detail below, *see infra* Point III.A, the defense proffered testimony by two witnesses as experts, but upon the Government's motion, the Court precluded testimony from both witnesses because the defense did not provide timely or sufficient notice of their testimony. (A. 362-79).

## C. The Verdict and Sentencing

After closing arguments, the jury returned with a verdict after three-and-a-half hours of deliberation. Ulbricht was found guilty on all counts. (Tr. 2334-38).

At the beginning of the sentencing hearing on May 29, 2015, Judge Forrest vacated Ulbricht's convictions on Counts One and Three of the Indictment, finding that they were lesser included offenses, and therefore duplicative, of other counts of conviction, pursuant to *United States* v. *Rutledge*, 517 U.S. 292 (1996). (A. 1459-62).

As described in more detail below, *see infra* Point VII.A, Judge Forrest sentenced Ulbricht principally to life imprisonment, ordered forfeiture in the amount of $183,961,921, and imposed a $500 special assessment. (A. 1539-41).

30

# **A R G U M E N T**

## **POINT I**

### **There Was No Discovery Violation**

Confronted with overwhelming proof (the sufficiency of which he does not challenge on appeal), Ulbricht claims that his rights were violated, because he was not given unfettered access to the Government's criminal investigation of two law enforcement agents for behaving corruptly in connection with their roles in a parallel investigation of Silk Road, and because he was precluded from introducing evidence of that investigation at trial. (Br. 20-62). But nowhere, either below or here, has Ulbricht explained, other than in the most conclusory way, how the corruption of two agents—who neither testified at his trial nor generated the evidence against him— tended to disprove that he was running Silk Road from his laptop. As the District Court found in vetting this challenge both before and after trial, neither *Brady* v. *Maryland*, 373 U.S. 83 (1963), nor any recognized principle of criminal discovery justified the relief Ulbricht sought or a basis to overturn his conviction.

## **A.   Relevant Facts**

### **1.   The Maryland Investigation of Silk Road**

In 2013, the United States Attorney's Office for the District of Maryland ("Baltimore USAO") indicted Ulbricht for conspiring to distribute narcotics, witness tampering, and murder for hire, *see United*

31

*States* v. *Ross William Ulbricht,* No. CCB-13-0222 (D. Md.), as a result of an undercover investigation led by a group of federal agents based in Baltimore (the "Baltimore Task Force"), including then-Special Agent Carl Force of the Drug Enforcement Administration ("DEA"). (A. 649).

The Baltimore undercover investigation stemmed from the arrest of one Silk Road employee, Curtis Green, a/k/a "Flush," on narcotics charges in early 2013. (A. 664). Green quickly cooperated and provided Force with access to his "Flush" account on Silk Road, to use for undercover purposes. (A. 664). Force also used Green to communicate with "DPR" during this period. (A. 664). About a week later, another Silk Road employee (named "Inigo") advised "DPR" that approximately $350,000 worth of Bitcoins had been stolen from Silk Road user accounts, possibly by the user named "Flush," and that he had locked "Flush" out of his account. (A. 665). "DPR" then reached out to "nob"—an undercover account that then-Agent Force had been using to communicate with "DPR," posing as a large-scale drug dealer—and paid him $80,000 to torture and murder Green. (A. 652, 664).[13]

──────────

[13] Although the Government indicated during pretrial proceedings that it would seek to admit Ulbricht's communications concerning this murder for hire (A. 664), at trial, the Government did not seek to admit any aspect of either this attempted murder or Ulbricht's communications about it, including with Force.

32

The Government (meaning, this Office) produced these facts to Ulbricht in the ordinary course of discovery, through Force's investigative reports and documents (including chat conversations between Ulbricht and "nob") recovered from Ulbricht's computer. (A. 664-65).

### 2. The Government's Pretrial Disclosure of the Investigation of Carl Force

On November 21, 2014 (two months before trial), the Government sought leave from the District Court to disclose to the defense that a grand jury in San Francisco was investigating Force for selling information about the Silk Road investigation to Ulbricht and for stealing proceeds from Silk Road website users. (A. 649-54).

As the Government explained, the San Francisco U.S. Attorney's Office (the "San Francisco USAO") began investigating Force after learning that he exchanged hundreds of thousands of dollars' worth of Bitcoins into dollars over some period of time, which he transferred to his personal accounts; and that during that time (as described above) Ulbricht had learned that "Flush" had stolen approximately $350,000 worth of Bitcoins from Silk Road users. (A. 650). This Office assisted that investigation by sharing evidence it had collected in the course of its own investigation (like copies of digital media), and communications recovered from that media suggested that Force might have used other Silk Road accounts (besides his authorized undercover account, "nob") to offer (and potentially sell) information about the

33

DEA's investigation of "Dread Pirate Roberts." (A. 650-51).

Because the foregoing matters related to a non-public, ongoing grand jury proceeding, the Government moved the District Court under Federal Rule of Criminal Procedure 6(e)(3)(E) for leave to disclose the foregoing facts to Ulbricht's defense counsel, subject to a protective order, so that the defense would have the opportunity to challenge the Government's conclusion that the information in question was neither exculpatory nor otherwise discoverable. (A. 653-54).

In response, Ulbricht moved *in limine* to unseal the Government's November 21, 2014 disclosure letter and to admit the facts described therein at trial, citing *Brady* v. *Maryland*, 373 U.S. 83. (Docket Entry 227-1, at 15-20). The District Court granted the Government's requested protective order, scheduled a conference, and asked the Government to respond in writing to certain follow-up questions (largely related to the need for ongoing secrecy), which it did. (A. 656-60).

In a sealed pretrial conference held on December 15, 2014, the District Court indicated that it had also received an *ex parte* submission from the defense and, perhaps based thereon, explored whether the investigation of Force was exculpatory insofar as it raised the possibility that Force had the opportunity to fabricate evidence against Ulbricht through his access to the "Flush" account on Silk Road. (A. 225-26, 228-31, 240-41; *see also* Docket Entries 281, 283). As the Government explained then and in a subsequent written submission, Force's access to "Flush"'s account cre-

34

dentials would have given him a limited amount of administrator access (such as the power to reset user passwords, which, conceivably, could have enabled him to make unauthorized withdrawals), but it was not the kind of core, root-level access that "DPR" had, nor did it include access to Ulbricht's laptop or to chat facilities outside the Silk Road website. (A. 228-31, 240-41, 242-43, 256, 663, 666-67). Nevertheless, the Government agreed that the defense was free to investigate Force or to otherwise explore the theory that evidence against Ulbricht had been manufactured, short of revealing to anyone that Force was the subject of a grand jury investigation. (A. 249-50).

The defense then sought to unseal the information contained in the Government's letter and requested extensive discovery into the ongoing Force investigation, including, but not limited to, "any and all" records of Force's bank accounts, other assets, phone records, email messages and chat communications, tax records, and the fruits of any legal process or computer forensic examination. (A. 669-72). After consulting with the San Francisco USAO, the Government urged the District Court not to approve subpoenas with respect to the defense discovery requests, but it affirmed its obligation to provide any exculpatory material stemming from the Force investigation, to the extent it learned of it. (Docket Entry 227-1, at 67-72).

### 3. The District Court Denies Ulbricht's Motion

The District Court denied Ulbricht's motion to unseal information about the Force investigation and for discovery by written decision issued December 22, 2014. (A. 673-700). In light of the presumption of secrecy attaching to matters occurring before a grand jury, and the Government's specific representations that public disclosure of the Force grand jury investigation could have adverse consequences, the District Court rejected the defense's motion to unseal, finding that the defense "has failed to make a showing of 'particularized need' sufficient to overcome the presumption of secrecy." (A. 696). In so doing, the District Court found that the information in the Government's disclosure was, if anything, "*in*culpatory" (A. 690 n.13 (emphasis original)), and that, while there was "persuasive evidence that no . . . fabrication" of evidence occurred (A. 691), the defense was free to pursue that theory through technical examination of the Silk Road evidence produced in discovery (A. 694). The Government's commitment to produce any such information, pursuant to its *Brady* obligations, should it come to light, combined with the fact that it would not use any evidence obtained from the Baltimore USAO's investigation (such as any communication between Ulbricht and Force), "mitigate[d] the (virtually non-existent) risk of 'possible injustice' from maintaining" the disclosure under seal. (A. 694).

Consistent with these conclusions, the District Court also denied the defendant's requests for additional discovery, noting that (1) the defendant had

36

failed to "meet the threshold of materiality" required to compel disclosure under Federal Rule of Criminal Procedure 16(a)(1)(E) (A. 696); (2) the scope of the discovery demands constituted an "unreasonable or oppressive" "fishing expedition" disallowed by Rule 17 (A. 699); and (3) the defendant had failed to "articulate[ ] a coherent or particular reason why" either the fact of the Force investigation, Force's leaking of information regarding the Silk Road investigation, or Force's conversion and/or theft of bitcoins, would either "counter the government's case" or "bolster the defense." (A. 697). It also noted that the Government's continuing *Brady* obligation to produce any exculpatory material discovered through the Force investigation was not, itself, an affirmative vehicle for the defense to compel discovery. (A. 699).

On December 30, 2014, Ulbricht requested a third adjournment of trial "until the government completes its grand jury investigation" of former Agent Force, again citing the possibility that the investigation might yield exculpatory evidence. (A. 701-03).[14] The Government opposed (A. 704-06), and the next day, the District Court denied the request for the adjournment, citing its prior ruling (A. 706; Tr. 118-19).

───────────

[14] Although trial was initially scheduled for November 3, 2014, on applications by Ulbricht, the Court adjourned the trial to November 10, 2014 and then to January 5, 2015. (A. 877; Docket Entries 58, 78, 90).

37

### 4. The Defense's Attempts to Introduce Evidence Relating to the Force Investigation During Trial

During trial, Ulbricht attempted to introduce evidence that was tangentially related to the investigation of Force. (Tr. 594-614, 1440-42, 2084-97).

More specifically, Ulbricht sought to introduce chat messages sent to "DPR" by a Silk Road user named "DeathFromAbove," in which "Death-FromAbove" intimated that he knew "DPR"'s true identity was that of an individual named Anand Athavale, and he threatened to leak this name to law enforcement unless "DPR" paid him $250,000. (Tr. 594-614, 1440-42; A. 712). The Government opposed admitting those messages, on the ground that they constituted hearsay statements, which the defense sought to introduce in support of an alternative perpetrator theory. (A. 707-18).

As it turned out, Force controlled the "Death-FromAbove" account, and was using it to extort money from "DPR," based on information he learned from his access to the reports of Agent Der-Yeghiayan (who, as described above, had initially suspected that Athavale was "DPR," based on some common patterns in their writing, *see supra* page 28). (Tr. 1440; A. 710-11). In any event, "DPR" responded to "Death-FromAbove" by telling him to "[s]top messaging me and go find something else to do," and he wrote in a "log" file that "DeathFromAbove"'s threats to expose him were "bogus." (A. 708-10).

38

The District Court ultimately precluded the messages, finding that they were hearsay that the defense was improperly seeking to introduce for their truth, and that they were more prejudicial than probative, since they were not substantial evidence of an "alternative perpetrator." (Tr. 1872-73).

### 5. Ulbricht Moves for a New Trial While the San Francisco USAO Charges Carl Force and Shaun Bridges

On March 6, 2015, Ulbricht filed post-trial motions, pursuant to Federal Rule of Criminal Procedure 33, in which, among other things, he argued that the Government violated its disclosure obligations under *Brady* because (1) Force "himself was obligated to disclose any misconduct he committed during the course of or related to his investigation of the Silk Road website," and Force's "knowledge in that regard is imputed to the prosecution as a whole"; and (2) the Government's February 1, 2015 letter regarding Force's control of "DeathFromAbove" (A. 707-10) constituted additional exculpatory material that the Government had failed to disclose in a timely manner. (A. 719-21; Docket Entry 224, at 10 n.2).[15]

_____

[15] Ulbricht also contended that the timing and manner in which Agent Der-Yeghiayan's 3500 material was produced (to the extent it reflected his initial theories of who might have been responsible for Silk Road) and the Government's changes to its trial exhibits amounted to a *Brady* violation. (Docket Entry 224, at 10-15).

39

On March 30, 2015 (after the defendant had filed his Rule 33 motion, but before the Government filed its opposition), the San Francisco USAO unsealed a criminal complaint charging both Carl Force and Shaun Bridges, a former United States Secret Service Special Agent who had previously served with Force on the Baltimore Task Force. (SA 134-228 (the "Force Complaint"); Docket Entry 226). The Force Complaint alleged theft of government property, in violation of Title 18, United States Code, Section 641; wire fraud, in violation of Title 18, United States Code, Section 1343; money laundering, in violation of Title 18, United States Code, Section 1956(h); and criminal conflict of interest, in violation of Title 18, United States Code, Section 208. (SA 134, 140-41).

As related to the Silk Road investigation, the Force Complaint alleged that (i) Force converted the Bitcoins that Ulbricht had sent to "nob" (Force's official undercover identity) to his own personal use; and (ii) Force used other unauthorized online personas to extort Ulbricht by seeking money in exchange for information related to the investigation of Silk Road. (SA 145-60). It further alleged that (iii) Bridges used the Baltimore Task Force's access to their informant Curtis Green's "Flush" account (as well as another account under Bridge's control) to steal approximately $350,000 dollars' worth of Bitcoins from the Silk Road marketplace.[16] (SA 175-80 & n.26).

---------

[16] On or about July 1, 2015, Force pled guilty to an information charging him with money laundering,

40

In response, Ulbricht argued that the Force Complaint undermined the Government's justification for keeping the investigation secret, and that he was entitled to materials related to the Force investigation, based on certain revelations in the Force Complaint. (Docket Entry 232).

The Government opposed Ulbricht's motion, because "Force played no role in the investigation of Silk Road conducted by this Office; he was never contemplated as a witness at trial; and none of the trial evidence otherwise came from the USAO-Baltimore

———————

in violation of 18 U.S.C. § 1956(a)(1)(A) and (B) (Count One); obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2) (Count Two); and extortion under color of official right, in violation of 18 U.S.C. § 1951 (Count Three). (*United States* v. *Force*, No. 15 Cr. 319, Docket Entries 38, 47 (N.D. Cal.) (hereinafter "*Force*" Docket Entries). On or about October 19, 2015, Force was sentenced principally to 78 months' imprisonment. (*Force* Docket Entries 81, 88).

On or about August 31, 2015, Bridges pled guilty to an information charging him with money laundering, in violation of 18 U.S.C. § 1957 (Count One); and obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2) (Count Two) (*Force* Docket Entries 36, 65). On or about December 7, 2015, Bridges was sentenced principally to 71 months' imprisonment. (*Force* Docket Entries 97, 100). The San Francisco USAO continues to investigate Bridges. (*See Force* Docket Entry 116, at 3).

41

investigation in which he was involved," and because the USAO-San Francisco investigation never yielded any information that was exculpatory as to Ulbricht, "not before trial, not during trial, and not since." (Docket Entry 230, at 22, 25).

On April 27, 2015, the District Court denied the defendant's motion in its entirety. (A. 876-900). The District Court set forth the evidence at trial, calling it "overwhelming" and "unrebutted," and noted that Ulbricht's motion "does not address how any additional evidence, investigation, or time would have raised even a remote (let alone reasonable) probability that the outcome of the trial would be any different." (A. 878-79; *see also* A. 893).

With respect to the investigation of Force and Bridges, the District Court found that it "remains unclear (as it always was) as to how any information relating to that investigation is material or exculpatory vis-à-vis Ulbricht." (A. 892). Even after assuming, for the sake of argument, what the defense *might* have argued the omitted information *could* have revealed, the District Court rejected those possible defense theories as having "no basis in the record," and amounting to "no more than speculation and premised on erroneous assumptions as to the scope of discovery obligations and the meaning of exculpatory evidence." (A. 892). Finally, the District Court rejected Ulbricht's assertion that he was prevented from "exploring potentially exculpatory avenues," because although the Government "had an obligation to turn over favorable material evidence to prevent injustice; it had no obligation to keep Ulbricht continually ap-

42

prised of developments in a separate investigation."
(A. 893-94).

## B. Applicable Law

### 1. The Government's Discovery Obligations

#### a. Rule 16

The Government's discovery obligations in criminal cases begin with Federal Rule of Criminal Procedure 16(a)(1)(E), which provides, in pertinent part, that the Government must disclose to the defense documents and objects that are "within the government's possession, custody, or control" if they are "material to preparing the defense" or will be used by the Government in its case-in-chief at trial. Evidence is material to the defense "if it could be used to counter the government's case or to bolster a defense," but "information not meeting either of those criteria is not to be deemed material within the meaning of" Rule 16. *United States* v. *Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993) (interpreting the Rule's predecessor, Fed. R. Crim. P. 16(a)(1)(C)).

"Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case. There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *United States* v. *Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991) (internal quotation marks omitted).

43

### b. The Jencks Act

The Jencks Act provides that "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b).

The purpose of the statute is not to serve as a general vehicle for discovery, but rather to provide the defense with prior statements of Government witnesses for purposes of impeachment. *See United States* v. *Jackson*, 345 F.3d 59, 76 (2d Cir. 2003) (noting that the Jencks Act "does not normally mandate disclosure of statements made by a person who does not testify").

### c. *Brady v. Maryland*

The Government has an obligation under the Due Process Clause to disclose to the defendant material exculpatory and impeaching evidence. *See Brady* v. *Maryland*, 373 U.S. 83 (1963); *Giglio* v. *United States*, 405 U.S. 150 (1972). To warrant a new trial based on a violation of this obligation, "a defendant must show that: (1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *United States* v. *Coppa*, 267 F.3d 132, 140 (2d Cir. 2001). Thus, it is not enough to show that the Government failed to turn over any favorable evidence. A *Brady* or *Giglio* violation will result in a new trial only "if the

44

undisclosed information is 'material,' within the exacting standard of materiality established by the governing case law." *United States* v. *Spinelli*, 551 F.3d 159, 164 (2d Cir. 2008); *accord United States* v. *Rivas*, 377 F.3d 195, 199 (2d Cir. 2004); *United States* v. *Middlemiss*, 217 F.3d 112, 123 (2d Cir. 2000).

Where a new trial is sought based on a proffered *Brady* violation, the Supreme Court has said that the "touchstone of materiality is a reasonable probability of a different result," that is, whether "the government's evidentiary suppression undermines confidence in the outcome of the trial." *Kyles* v. *Whitley*, 514 U.S. 419, 434 (1995) (internal quotation marks omitted); *accord United States* v. *Bagley*, 473 U.S. 667, 682 (1985) (suppressed evidence is "material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"); *Strickler* v. *Greene*, 527 U.S. 263, 281 (1999) ("[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."); *United States* v. *Douglas*, 525 F.3d 225, 244-45 (2d Cir. 2008); *United States* v. *Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995) ("[U]ndisclosed evidence will be deemed material only if it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" (quoting *Kyles* v. *Whitley*, 514 U.S. at 435)). "While the trial judge's factual conclusions as to the effect of nondisclosure are ordinarily entitled to great weight, this Court conducts its own independent examination of the record in determining whether the

45

suppressed evidence is material." *United States* v. *Sessa*, 711 F.3d 316, 321 (2d Cir. 2013) (internal quotation marks omitted).

Moreover, "evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *United States* v. *Paulino*, 445 F.3d 211, 225 (2d Cir. 2006) (internal quotation marks omitted). There can be no "suppression" for *Brady* purposes when the defense actually possessed the information in time for effective use at trial or to otherwise investigate the information, even if the evidence was produced after trial had begun. *See United States* v. *Coppa*, 267 F.3d at 144 ("[A]s long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner.").

## 2. Rule 17(c)

Rule 17(c) grants to criminal defendants and the Government the right to subpoena documents and objects to be introduced as evidence *at trial*, and further states that a court "may direct the witness to produce the designated items in court *before trial* or before they are to be offered in evidence." Fed. R. Crim. P. 17(c) (emphasis added). However, the rule "was not intended to provide a means of discovery for criminal cases." *United States* v. *Nixon*, 418 U.S. 683, 698 (1974). Although Rule 17(c) may be used to pro-

cure "evidentiary" materials in anticipation of trial, pretrial subpoenas "merely [constituting] a fishing expedition to see what may turn up" are not authorized by Rule 17(c) and should be quashed. *Bowman Dairy Co.* v. *United States*, 341 U.S. 214, 221 (1951). "It was not intended by Rule 16 to give a limited right of discovery, and then by Rule 17 to give a right of discovery in the broadest terms." *Id.* at 220. Accordingly, a pretrial Rule 17(c) subpoena should not issue unless it meets three criteria: "(1) relevancy; (2) admissibility; (3) specificity." *United States* v. *Nixon*, 418 U.S. at 700.

### 3.   Standards of Review

Where a defendant's *Brady* claim is raised in a motion for a new trial, the denial of that claim is reviewed on appeal for abuse of discretion, *United States* v. *Douglas*, 525 F.3d 225, 245 (2d Cir. 2008); *United States* v. *Gil*, 297 F.3d 93, 101 (2d Cir. 2002), like motions for a new trial, generally, *United States* v. *Rigas*, 583 F.3d 108, 125 (2d Cir. 2009); *United States* v. *Owen*, 500 F.3d 83, 87 (2d Cir. 2007).

Similarly, review of a district court's discovery rulings, including rulings on motions to compel or to issue pretrial subpoenas, are also reviewed under the abuse of discretion standard. *See Nixon*, 418 U.S. at 702; *United States* v. *Abu-Jihaad*, 630 F.3d 102, 142 (2d Cir. 2010); *United States* v. *Rigas*, 583 F.3d at 125. Abuse of discretion occurs if a district court "based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the

47

range of permissible decisions." *Sims* v. *Blot*, 534 F.3d 117, 132 (2d Cir. 2008) (alteration, citations, and internal quotation marks omitted)).

Finally, "the decision whether to grant a continuance is a matter traditionally within the discretion of the trial judge." *United States* v. *O'Connor*, 650 F.3d 839, 854 (2d Cir. 2011) (internal quotation marks omitted). This Court "review[s] an order denying a continuance for abuse of discretion, and . . . will find no such abuse unless the denial was an arbitrary action that substantially impaired the defense." *Id.* (internal quotation marks omitted).

## C. Discussion

Ulbricht's appeal based on the corruption of two Baltimore agents fails for the simple reason that, even now, Ulbricht has not explained how the information he sought to compel or admit was exculpatory. As the District Court remarked, "[e]ither the defense assumes the answer is so obvious that it need not explain, or its omission is purposeful." (A. 892). Because Ulbricht has not identified any suppressed, exculpatory information, much less demonstrated that it could have impacted the verdict, his *Brady* claim should be rejected. That being the case, Ulbricht's collateral claims, concerning his statutory discovery demands, limitations on his cross-examination, and his request for an adjournment, should likewise be rejected.

48

### 1.  There Was No *Brady* Violation

As the District Court held, and the Government acknowledged, the prosecution team was under a continuing obligation to turn exculpatory information over to the defense, including any information that tended to show that evidence on either Ulbricht's laptop or the Silk Road servers was fabricated or compromised. (A. 694, 699; Docket Entry 227-1, at 70). Were there any evidence that Force, Bridges, or anyone else had planted or altered evidence, or that the Government's exhibits were otherwise unreliable, the Government would have been obligated to produce that information to the defense.

But the fact that two agents sold information to Ulbricht, attempted to extort him, and stole money from his customers' accounts through the Silk Road website, itself did nothing to undermine the reliability of the evidence found outside that website that demonstrated that Ulbricht was "Dread Pirate Roberts," including:

- A wide variety of documentary evidence on his laptop, created over many years, ranging from chat logs and journal entries; to Silk Road financial and employee records, a to-do list, and the very PGP key that "DPR" used to authenticate his messages; and $18 million dollars' worth of Bitcoins, most of which were previously stored on the Silk Road servers (s*upra* pages 22-25);

49

- The overlap between Ulbricht's personal email and Facebook accounts and chat logs recovered from his laptop (*supra* note 8); and

- The fact that Ulbricht was acting as *the* Silk Road administrator "Dread Pirate Roberts" at the moment he was arrested (*supra* pages 21-22).

Neither has Ulbricht explained how Force or Bridges, even with unauthorized Silk Road user accounts and the limited ability to reset other users' passwords (using the "Flush" account), could have manipulated the data that *was* admitted from the Silk Road servers (principally records establishing the type and volume of transactions conducted through the Silk Road website and private messages with and posts from "DPR" that demonstrated how that individual, whoever he was, ran Silk Road (Tr. 192-203, 207-64, 1783-1803)). Indeed, the Government offered the District Court "persuasive evidence that no such fabrication occurred." (A. 240-41, 691 (citing A. 666-67); *cf.* Tr. 273-74 (Agent Der-Yeghiayan's administrator account had limited privileges)).

Nowhere does Ulbricht explain how Force's and Bridge's crimes impeach the Government's "overwhelming" proof. (A. 878). If anything, Force's attempts to sell information to "DPR" or otherwise extort him were "*in*culpatory as [they] suggest[ed] that Ulbricht, as 'DPR,' was seeking to pay law enforce-

50

ment for inside information to protect his illegal en-
terprise." (A. 893). And to the extent Ulbricht as-
sumes that he should have been permitted to inform
the jury that some of the agents who targeted him
were corrupt, even though they neither testified nor
developed the evidence against him, he is mistaken.
Such a line of argument, without even the slightest
nexus to the proof at trial, would have been far more
prejudicial than probative and properly excluded on
that basis. *See* Fed. R. Evid. 403; *United States* v.
*Millan-Colon*, 836 F. Supp. 1007, 1013 (S.D.N.Y.
1993) ("[A]s the Government indicates that it will not
offer evidence seized by any officer implicated in the
corruption investigation and that those officers will
not be in the chain of custody, any testimony regard-
ing their misdeeds would be substantially more prej-
udicial than probative."); *cf. United States* v. *Warme*,
572 F.2d 57, 62 n.6 (2d Cir. 1978) (deferring to dis-
trict court's decision not to order prosecution to turn
over 3500 material concerning the investigation of
defendant's associates, which "was not relevant to
any issue at trial"); *United States* v. *Lopez*, 577 F.3d
1053, 1057-58, 1067 (9th Cir. 2009) (undisclosed as-
sessment that testifying informant was not reliable
was not material under *Brady*, in part because his
testimony "did not directly inculpate" defendant).[17]

_____

[17] Ulbricht asserts throughout his brief that he
was precluded from admitting evidence of Force's and
Bridge's misconduct (Br. 37), but in fact, the District
Court indicated that it would, "over the course of the
trial, entertain specific requests to use information

51

Ulbricht's appeal rests on the unspoken assumption that, once the Government identified a pocket of corruption in sweeping law enforcement investigations of him, he was entitled to conduct his own independent inquiry, to ensure no exculpatory material existed anywhere in the federal government's holdings. But that is not the law. "There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford* v. *Bursey*, 429 U.S. 545, 559 (1977); *see also United States* v. *Polowichak*, 783 F.2d 410, 414 (4th Cir. 1986) ("*Brady* did not create a criminal right analogous to discovery in a civil case."); *United States* v. *Evanchik*, 413 F.2d 950, 953 (2d Cir. 1969) ("Neither [*Brady*] nor any other case requires the government to afford a criminal defendant a general right of discovery."). Nor does the defense have a "constitutional right to conduct his own search of the [Government's] files to argue relevance." *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 59 (1987). "Unlike Rule 16 and the Jencks Act . . . *Brady* is not a discovery rule, but a rule of fairness and min-

_____

from [the Government's disclosures] on cross-examination," and if the Government "open[ed] the door to specific information or facts develop which render particularized disclosure of facts or documents relevant, the Court will entertain a renewed application at that time" (A. 700). Ulbricht never sought to question any witnesses about the agents' corruption or to proffer such evidence at trial, however, aside from the statements by "DeathFromAbove," discussed below, *infra* Point I.C.5.

imum prosecutorial obligation . . . ." *United States* v. *Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991) (internal quotation marks omitted); *see also United States* v. *Meregildo*, 920 F. Supp. 2d 434, 440 (S.D.N.Y. 2013) ("*Brady* is not a rule of discovery—it is a remedial rule." (citing *Coppa*, 267 F.3d at 140)). It was the prosecution team's duty to evaluate whether exculpatory information existed within its holdings. *See United States* v. *Agurs*, 427 U.S. 97, 109 (1976) ("If everything that might influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice. . . . [T]he Constitution surely does not demand that much."). Having concluded that it did not, however, the Government was entitled to protect the ongoing investigation of Force and Bridges from exposure, and to try Ulbricht with independently derived evidence.[18]

––––––––––

[18] Ulbricht challenges the independence of this Office's investigation from the investigations in Baltimore and San Francisco. (Br. 40-46). As previously discussed, the investigations were independent, as the agents involved in the Baltimore investigation played no role in the New York investigation, and none of the trial evidence came from the Baltimore investigation (*supra* page 40). In any event, whether those different prosecutors were part of the same prosecution team might bear on this Office's duty to search for exculpatory material, *see United States* v. *Zagari*, 111 F.3d 307, 320 n.13 (2d Cir.1997); *United*

53

The fact that the Government disclosed the ongoing investigation "in an abundance of caution" (A. 649) was neither remarkable nor a concession that the existence of the Force investigation was actually exculpatory. (*Contra* Br. 38-39). The Government's decision to go *beyond* what it perceived its *Brady* obligations to be, so that the defense would have the opportunity to litigate the question, was simply prudent practice, common in this District. *Cf. United States v. Agurs*, 427 U.S. at 108 ("The prudent prosecutor will resolve doubtful questions in favor of disclosure."); A. 225 (Government's practice of disclosing "in an abundance of caution" occurs "with relative frequency"). As the Government intended, the District Court encouraged the defense to alert the prosecutors to its theories, to help the Government ensure that it was complying with *Brady* in its continuing reviews (although the defense declined the offer). (A. 700).

Moreover, Ulbricht knew that $350,000 had been stolen, apparently by a Silk Road employee, and potentially by "Flush," a user whose account Force, Bridges, and the Baltimore Task Force controlled.

—————

*States* v. *Chalmers*, 410 F. Supp. 2d 278, 289-90 (S.D.N.Y. 2006), but, as the District Court found, "whether the investigations proceeded separately or intersected has no bearing on whether any undisclosed materials relating to the Rogue Agents are exculpatory as to Ulbricht." (A. 892 n.6).

54

(A. 664-65, 690-91). To the extent Ulbricht suspected that Force (or anyone else) had planted evidence on his laptop or elsewhere, the defense was free to examine those media forensically for signs of tampering. In other words, regardless of whether a law enforcement agent was responsible, knowledge that *someone* exploited a Silk Road administrator's credentials to steal money was enough information to lead the defense to investigate the authenticity of the Government's exhibits (assuming, of course, there was any connection between the two, which the Government disclaims). "Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *United States* v. *Zackson*, 6 F.3d 911, 918 (2d Cir. 1993). This is because "[t]he rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist in the preparation of the defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." *United States* v. *LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982); *see also United States* v. *Zackson*, 6 F.3d at 918 (same). Since the defense was in the same position as the Government (insofar as the Government was unaware of any evidence tending to impeach the authenticity of its poof, but the defense was able to explore that possibility through forensic analysis), nothing was "suppressed" from the defense.

In seeking a new trial based on the suppression of exculpatory material, Ulbricht's burden is to point out information that calls into question the verdict

55

against him. *See United States* v. *Bagley*, 473 U.S. at 682; *Coppa*, 267 F.3d at 140. Since the fact of a collateral corruption investigation alone was inadmissible, and because "there is no basis . . . to believe that any undisclosed materials" relating to that investigation "would have been remotely useful, let alone exculpatory, vis-à-vis Ulbricht" (A. 892), he has failed to carry that burden.

### 2. The District Court Did Not Abuse Its Discretion in Denying Ulbricht's Discovery Requests

The District Court also properly denied Ulbricht's sweeping demand for discovery with respect to the Force investigation. (A. 669-72).

As the District Court found, the 28 requests for "any and all" information related to the investigation amounted to a "speculative fishing expedition" well-beyond Rule 16's limitation to items "material to preparing the defense." (A. 680 & n.9, 696-97). Fed. R. Crim. Pro. 16(a)(1)(E). For the same reasons that information about Force's corruption was not itself exculpatory, "[d]efendant has not articulated a coherent and particular reason why the fact of SA Force's investigation, or that fruits of that investigation, could themselves counter the government's case or bolster a defense." (A. 697 (internal quotation marks omitted)). "Such broad and speculative requests are inappropriate under Rule 16." (A. 697). Since Ulbricht did not demonstrate how fulfilling his blunderbuss requests for information about Force "would have enabled [him] significantly to alter the quantum of *proof* in

56

his favor," *Maniktala*, 934 F.2d at 28 (emphasis added), it was no abuse of discretion for the District Court to deny them under Rule 16. And for the same reason, it would have been inappropriate to approve pretrial subpoenas under Rule 17. *See Bowman Dairy Co.* v. *United States*, 341 U.S. at 221.

### 3. There Was No Abuse of Discretion in Denying an Adjournment

Based on the District Court's denial of his discovery motion and the subsequent charges against Force and Bridges, Ulbricht argues he was entitled to an adjournment of trial until after the corruption investigation was complete. (Br. 37). But the defense's adjournment request was based on a desire to wait until the "full nature of [Force's] alleged misconduct is known, and available to [the] defense." (A. 701). And as the District Court found, Ulbricht never "made a showing that either the fact of the Force Investigation or the information learned during that investigation is 'needed to avoid a possible injustice.'" (A. 690).

In light of the defendant's continued inability to posit how any information from that investigation would tend to exculpate Ulbricht, even now that Force and Bridges have been charged (and in light of the defendant's two prior requests for adjournments (A. 877; Docket Entries 58, 78, 90)), it cannot be said that the denial was either "arbitrary" or that it "substantially impaired the defense," so as to amount to an abuse of discretion. *United States* v. *O'Connor*, 650 F.3d at 854 (internal quotation marks omitted).

### 4. The Government Produced Jencks Act Material in a Timely Fashion

Ulbricht also argues that the manner in which the Government produced Agent Der-Yeghiayan's prior statements pursuant to the Jencks Act, 18 U.S.C. § 3500, violated *Brady*, because he lacked a sufficient opportunity to use the material to support his "alternative perpetrator" theory. (Br. 61-63).

Although Ulbricht asserts that 70 documents in the 3500 material "contained exculpatory material and information that was not provided to the defense at a time in which it could be used effectively at trial," the only defense they are proffered to support was the "alternative perpetrator" theory. (Br. 61 (citing A. 643-48)). But the materials in question were produced to Ulbricht on December 31, 2014, 13 days before trial (A. 889-90), and Ulbricht's counsel requested no adjournment *at that time* on that ground (A. 890). *See Douglas*, 525 F.3d at 245-46 (disclosure of 290 pages one day before trial does not constitute suppression); *see also United States* v. *Menghi*, 641 F.2d 72, 75 (2d Cir. 1981) (no *Brady* violation where, *inter alia*, defense counsel made no motion for a continuance to allow for further investigation); *United States* v. *Devin*, 918 F.2d 280, 290 (1st Cir. 1990) ("[T]he five day interval provided an adequate period within which to digest the substance of the materials and prepare for cross-examination."). Instead, as the District Court noted, counsel "displayed great familiarity with the Karpeles/Athavale Materials and used them repeatedly during cross examination." (A. 890). *See United States* v. *Rodriguez-Rivera*, 473 F.3d 21,

58

26 (1st Cir. 2007) (finding no *Brady* violation where "nothing within the . . . files was necessary to develop [the] theory" that defendant successfully explored through cross-examination and argued to the jury). Here, as below, "Ulbricht does not offer any explanation as to why there is a chance that he would not have been convicted had the defense been given more time to review the Karpeles/Athavale Materials." (A. 890). "A defendant who claims that his hand was prematurely forced by delayed disclosure cannot rely on wholly conclusory assertions but must bear the burden of producing, at the very least, a *prima facie* showing of a plausible strategic option which the delay foreclosed." *United States* v. *Devin*, 918 F.2d at 290. Here, there is "no reasonable probability that, had the evidence been disclosed to the defense" earlier, "the result of the proceeding would have been different." *United States* v. *Nicolapolous*, 30 F.3d 381, 383-84 (2d Cir. 1994) (discussing materiality in the 3500 context).

Moreover, the fact that Agent Der-Yeghiayan pursued multiple leads in the course of his investigation, but rejected them conclusively, is not exculpatory. There is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case," including an "early lead the police abandoned." *See Moore* v. *Illinois*, 408 U.S. 786, 795 (1972); *see also United States* v. *Sessa*, 711 F.3d 316, 322 (2d Cir. 2013) ("[T]he fact that the authorities diligently pursued other leads but found no evidence implicating any other person [does not] tend to exculpate [the defendant]."); *United States* v. *Amiel*, 95 F.3d 135, 145

59

(2d Cir. 1996) ("The government has no *Brady* obliga-
tion to communicate preliminary, challenged, or
speculative information." (internal quotation marks
omitted)); *Canales* v. *Stephens*, 765 F.3d 551, 576 (5th
Cir. 2014) ("[T]here is not a *Brady* violation every
time the government does not disclose an alternative
suspect, especially when the other suspect was not a
particularly plausible one."); *Hammond* v. *Hall*, 586
F.3d 1289 (11th Cir. 2009) (ruling that non-disclosed
"evidence casting suspicion on" another murder sus-
pect was not *Brady* material because it "d[id] not
amount to much," whereas "[o]verwhelming evidence"
connected defendant to the crime). As described
above, *see supra* page 28, Agent Der-Yeghiayan sus-
pected Karpeles because he owned the servers that
hosted a website related to Silk Road, and he sus-
pected Athavale for even less reason (namely, some
linguistic similarities between his writing and
"DPR"'s). In the face of the overwhelming evidence
establishing that Ulbricht was "DPR," and the *lack* of
evidence that either Karpeles or Athavale were, even
if (counterfactually) the Government had not dis-
closed those leads, they would not have qualified as
material *Brady* information in the context of this
case.

## 5. The District Court Properly Precluded Cross-Examination Using Force's Hearsay Statements

Finally, Ulbricht challenges the District Court's
decision to preclude his cross-examination using
statements by a Silk Road user, "DeathFromAbove,"

60

who threatened to expose "Dread Pirate Roberts" as Anand Athavale. (Br. 27-29, 37).

Although Ulbricht includes this issue in the section of his brief devoted to *Brady*, the prosecutors did not learn that "DeathFromAbove" was controlled by Force until *after* the defense proffered the relevant exhibit (A. 707, 710-11), and at trial, Ulbricht appeared to be offering the chat messages from "Death-FromAbove" in order to shore up his theory that "Dread Pirate Roberts" was Athavale (not Ulbricht), and not to delve into the Force investigation. (Tr. 672-79, 682, 813-19, 840; A. 712). The District Court correctly concluded that "DeathFromAbove"'s statements were hearsay that the defense was improperly seeking to introduce for the truth, and that in any event, the messages were more prejudicial than probative, since they were not substantial evidence of an "alternative perpetrator." (Tr. 1871-73). *See Wade* v. *Mantello*, 333 F.3d 51, 61-62 (2d Cir. 2003) ("Although . . . a defendant has a right to attempt to establish his innocence by showing that someone else did the crime, a defendant still must show that his proffered evidence on the alleged alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the asserted 'alternative perpetrator.'"). This would be so, regardless of who "DeathFromAbove" was, but the fact that it was Force (whose "knowledge" can be traced to Agent Der-Yeghiayan's initial investigation of Athavale) reduces the marginal probative value of this chat conversation to zero, because it merely recycles the basis for Agent Der-Yeghiayan's cross-

61

examination through the misleading impression that a second source believed that Athavale was "DPR." Because no defendant has "an unfettered right to offer testimony that is incompetent . . . or otherwise inadmissible under standard rules of evidence," *Taylor* v. *Illinois*, 484 U.S. 400, 410 (1988), the District Court did not abuse its discretion in denying the defendant's effort to introduce this chat conversation.

To the extent that Ulbricht sought to use this exhibit to reveal that a law enforcement agent (namely Force) was attempting to extort Ulbricht, that would have introduced the very same prejudicial, and irrelevant, argument that the District Court had denied Ulbricht discovery to develop. As described above, the fact that Force behaved corruptly in attempting to extort Ulbricht has no bearing on the independent evidence admitted against Ulbricht.

## POINT II

### The District Court's Limitations on Cross-Examination Were Proper

#### A. Relevant Facts

##### 1. Agent Der-Yeghiayan's Testimony About Mark Karpeles

During cross-examination of Agent Der-Yeghiayan, defense counsel sought to advance its theory that the owner and operator of Silk Road was actually Mark Karpeles (who owned a Bitcoin exchange known as "Mt. Gox"), based on Agent Der-Yeghiayan's earlier investigation of him. (Tr. 490-91,

494-96, 502-03; *see also* Tr. 541-47). For example, the defense elicited Agent Der-Yeghiayan's statements, in an application for a warrant to search Karpeles's email account, that there was probable cause to believe that Karpeles engaged in narcotics trafficking and money laundering and controlled the open Internet site, "silkroadmarket.org." (Tr. 527-30). When counsel sought to elicit what an informant had told Agent Der-Yeghiayan about Karpeles, however, the Government objected on hearsay grounds. (Tr. 530, 537). The Government also objected more generally to eliciting Agent Der-Yeghiayan's beliefs, rather than merely the facts he learned from investigating Karpeles (which might themselves be admissible). (Tr. 548-51). Judge Forrest indicated her tentative view that the defense was entitled to elicit that Agent Der-Yeghiayan investigated Karpeles, and how he did so, but she also invited briefing on the issue over the weekend and made clear that she had yet to reach a conclusion. (Tr. 537-38, 541, 552-57).

The defense also sought to elicit that Agent Der-Yeghiayan learned from federal prosecutors in Baltimore that Karpeles's attorney had told one of them that his client was willing to "tell the government who was behind Silk Road if he would not be prosecuted," which, he contended, demonstrated that Karpeles was trying to "set up Mr. Ulbricht." (Tr. 506-08, 512; *see also* A. 310-11). The Government objected, both on hearsay grounds and for lack of notice. (Tr. 514). Judge Forrest indicated that she was inclined to admit the fact that Karpeles's attorney made a proffer, but not for its truth (*i.e.*, that Karpeles actually knew anything about who was running

63

Silk Road), and she offered counsel the opportunity to
brief that issue as well. (Tr. 522-23).

Over the weekend, the Government moved to
strike testimony elicited from Agent Der-Yeghiayan
concerning his initial beliefs about Karpeles's in-
volvement, because a law enforcement officer's opin-
ion about guilt is not probative, admissible evidence.
(A. 312-15, 319). The Government also sought to pre-
clude testimony concerning the hearsay statements of
Karpeles's lawyer to Baltimore prosecutors, because
those statements did not satisfy the requirements of
Federal Rule of Evidence 807. (A. 315-17). Finally,
the Government urged the District Court to reject ev-
idence of an "alternative perpetrator" unless the de-
fense established, through competent evidence, a
"substantial" nexus between that perpetrator and the
crime, as case law requires. (A. 317-18). In response,
the defense argued Agent Der-Yeghiayan himself had
established the requisite nexus between Karpeles and
the crimes charged; that Karpeles's attorney's state-
ments were not themselves hearsay (and that the
repetition of those statements to Agent Der-
Yeghiayan satisfied Rule 807); and that any objection
was untimely. (A. 326-33).

In ruling, the District Court acknowledged the de-
fense's right to pursue an "alternative perpetrator"
theory and admit "competent . . . evidence" in favor of
it, but that would not include the "thoughts and be-
liefs" of Agent Der-Yeghiayan, which, it ruled, were
"irrelevant." (Tr. 575, 577). In providing examples of
proper questions, the District Court made clear that
Agent Der-Yeghiayan's firsthand knowledge of facts,

64

based on his investigation of Karpeles, could be admitted, but his suspicions or instincts could not be. (Tr. 579-80). As to Karpeles's attorney's proffer, the District Court found that the offer to provide information was not, itself, probative of any disputed issue of fact, and to the extent it invited the jury to speculate (contrary to fact) that Karpeles had inside knowledge about who was responsible for Silk Road (which, as it turns out, he did not), his lawyer's proffer was more prejudicial than probative. (Tr. 580-81).

The District Court invited the Government to propose specific portions of the testimony that should be struck, based on its ruling (Tr. 583-84, 589), which the Government did (A. 334-41), and which the District Court adopted (Tr. 646, 647). To avoid drawing extra attention to that testimony, the District Court did not point out to the jury the particular questions and answers that were struck and instead instructed it generally to disregard any testimony from Agent Der-Yeghiayan concerning his "personal beliefs or suspicions he may have had about particular individuals at various points during his investigation." (Tr. 646-47, 974). The jury did not request Agent Der-Yeghiayan's testimony during its deliberations and never saw it redacted. (Tr. 2329-38).

The defense then continued its cross-examination of Agent Der-Yeghiayan, which included many questions about Karpeles, most of which were proper. (Tr. 651-54, 659-72, 681-82). Over the course of cross-examination, defense counsel established that (1) Karpeles owned Mt. Gox, a large Bitcoin exchange (Tr. 490, 494); (2) Karpeles is a computer developer

65

systems administrator and a self-proclaimed hacker (Tr. 495); (3) Agent Der-Yeghiayan investigated Karpeles (Tr. 491-92, 672); (4) as did the Department of Homeland Security, which seized several million dollars from a Karpeles company in May 2013 (Tr. 497-98); (5) the website "silkroadmarket.org"—the website on the regular Internet that provided instructions on how to access Silk Road on Tor—was registered to Karpeles's company (Tr. 500-01); and (6) websites run by Karpeles had software features in common with Silk Road (Tr. 659-61, 663).

On redirect, the Government elicited testimony from Agent Der-Yeghiayan to clarify that the software used by Karpeles's websites and Silk Road was freely available and widely used (Tr. 742-45), that the silkroadmarket.org website was merely one of many websites hosted by a company that Karpeles controlled (Tr. 751-53), and that it was registered using an alias found on Ulbricht's laptop (Tr. 809-11).

## 2. Thomas Kiernan's Testimony About Ulbricht's Computer

During his direct examination, FBI Computer Scientist Thomas Kiernan testified as a percipient lay witness to the seizure and review of Ulbricht's laptop. (Tr. 852-71). His testimony was limited to (1) what he saw on Ulbricht's laptop on the day of the arrest (*e.g.*, Tr. 859-71); (2) what he later found when reviewing a copy of Ulbricht's laptop's hard drive (*e.g.*, 872, 880-81, 886-87); and (3) what certain documents from Ulbricht's laptop said (*e.g.*, Tr. 898-904, 921-22).

66

On cross-examination, the District Court preclud-ed, as beyond the scope of direct examination, three lines of questioning concerning: (1) whether the FBI permitted Kiernan to run BitTorrent (a file sharing software that Ulbricht was using at the time of his arrest) on his work computer, in light of the security hazards it presented (Tr. 1072-74); (2) whether Kiernan could interpret certain computer code (ob-tained from Ulbricht's laptop), to determine whether someone who logged onto the Silk Road website using "DPR"'s username and password would automatically be directed to the "Mastermind" page, from which "DPR" administered Silk Road (Tr. 1081, 1084-88); and (3) and the Linux "kernel," including whether Kiernan's version of TorChat (one of the programs "DPR" used to communicate with Silk Road staff) ran on the same version of Linux that Ulbricht had in-stalled on his computer (Tr. 1089-94).

## B.  Applicable Law

### 1.  The Confrontation Clause

While the Confrontation Clause of the Sixth Amendment guarantees a defendant the right to cross-examine witnesses and present a defense, the scope and extent of cross-examination are committed to the sound discretion of the trial judge. *See United States* v. *Figueroa*, 548 F.3d 222, 227 (2d Cir. 2008); *United States* v. *Wilkerson*, 361 F.3d 717, 734 (2d Cir. 2004). District courts are responsible for supervising the "mode . . . of examining witnesses" so as to make the presentation effective for "determining the truth" and to "avoid wasting time." Fed. R. Evid. 611(a).

67

In carrying out this responsibility, the district judge has "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware* v. *Van Arsdall*, 475 U.S. 673, 679 (1986); *see also United States* v. *Crowley*, 318 F.3d 401, 417 (2d Cir. 2003); Fed. R. Evid. 403. Additionally, "[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility." Fed. R. Evid. 611(b). Only upon showing that the district court abused its "broad discretion" to "restrict cross-examination" is a defendant entitled to relief on appeal. *United States* v. *Crowley*, 318 F.3d at 417. "To find such an abuse, [this Court] must be persuaded that the trial judge ruled in an arbitrary and irrational fashion." *United States* v. *Pipola*, 83 F.3d 556, 566 (2d Cir. 1996).

An error in limiting cross-examination should be disregarded if the error is harmless. *See* Fed. R. Crim. P. 52(a). "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Delaware* v. *Van Arsdall*, 475 U.S. at 684. The principal factors to be considered in assessing the effect of the confrontation error are (1) the importance of the witness's testimony, (2) whether that testimony was cumulative, (3) the presence of contradictory evidence on material points, (4) the extent of cross-examination otherwise permit-

ted, and (5) the strength of the evidence against the defendant. *Id*.; *accord Cotto* v. *Herbert*, 331 F.3d 217, 254 (2d Cir. 2003).

## 2. Alternative Perpetrator Evidence

Although "a defendant has a right to attempt to establish his innocence by showing that someone else did the crime," he "must show that his proffered evidence on the alleged alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the asserted 'alternative perpetrator.'" *Wade* v. *Mantello*, 333 F.3d at 61-62 (internal quotation marks omitted). "[U]nsupported speculation that another person may have done the crime" will not suffice, because "[s]uch speculative blaming intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice." *Id.* at 62 (internal quotation marks omitted); *see also DiBenedetto* v. *Hall*, 272 F.3d 1, 8 (1st Cir. 2001) ("Evidence that tends to prove a person other than the defendant committed a crime is relevant, but there must be evidence that there is a connection between the other perpetrators and the crime, not mere speculation on the part of the defendant."); *People of Territory of Guam* v. *Ignacio*, 10 F.3d 608, 615 (9th Cir. 1993) (requiring "substantial evidence tending to directly connect that person with the actual commission of the offense" (internal quotation marks omitted)).

In light of this principle, courts have excluded such evidence where, for example, there was evidence

69

that a third-party had the motive to murder a victim but not the opportunity, *see Wade*, 333 F.3d at 60, and where an undercover informant had information about other extremists in the area who shared the defendant's political views, but no evidence tied them to the crime at issue, *United States* v. *McVeigh*, 153 F.3d 1166, 1188-92 (10th Cir. 1998), and where the only concretely identified third parties "could not possibly have been" responsible for the crime, *DiBenedetto* v. *Hall*, 272 F.3d at 9.

### 3. Opinions of Law Enforcement Agents

Evidence must be relevant to be admissible. Fed. R. Evid. 402. Evidence is relevant when "it has any tendency to make a fact [of consequence] more or less probable." Fed. R. Evid. 401. But as this Court has made clear, "[t]he agent's state of mind as the investigation progressed is ordinarily of little or no relevance to the question of the defendant's guilt." *United States* v. *Johnson*, 529 F.3d 493, 501 (2d Cir. 2008); *accord United States* v. *Reyes*, 18 F.3d 65, 70-72 (2d Cir. 1994); *see also* Fed. R. Evid. 701 (limiting lay opinion to that which is "rationally based on the witness's perception").

Nor is such testimony made relevant if the agent attempts to explain the basis for his belief by summarizing, even at a general level, what led him to his conclusion. It only makes matters worse for an agent to give, for example, the "imprecise assurance that his belief is based on information from other people, actual physical evidence, and verification through interviewing the people who are involved." *United*

70

*States* v. *Johnson*, 529 F.3d at 499 (internal quotation marks omitted); *see also United States* v. *Garcia*, 413 F.3d 201, 211 (2d Cir. 2005) (finding it was "error to allow law enforcement witnesses to express opinions as to the defendant's culpability based on the totality of information gathered in the course of their investigations"); *United States* v. *Grinage*, 390 F.3d 746, 750-51 (2d Cir. 2004) (rejecting opinion testimony from law enforcement agent who had listened to the contents of a wiretap). This is because, when an agent evaluates an individual's guilt based on the "'entirety' or 'totality' of information gathered in an investigation," "he is not presenting the jury with the unique insights of an eyewitness's personal perceptions," as Rule 701 requires. *United States* v. *Garcia*, 413 F.3d at 211.

## C. Discussion

### 1. Agent Der-Yeghiayan's Testimony Was Properly Limited to Facts

The District Court properly instructed the jury not to consider Agent Der-Yeghiayan's "personal beliefs or suspicions he may have had about particular individuals at various points during his investigation." (Tr. 974). Ulbricht does not dispute that instruction was accurate, nor does he identify relevant, admissible evidence that was excluded under this rule or otherwise demonstrate, specifically, how it prejudiced him. Contrary to the suggestion of his brief on appeal, Ulbricht was free to pursue his alternative perpetrator theory (*contra* Br. 63-71), and the District Court's

rulings limiting him to competent evidence were no abuse of discretion.

Ulbricht does not really dispute that a law enforcement agent's opinion about the guilt of an individual is inadmissible, because it is irrelevant, *see Garcia*, 413 F.3d at 211, other than to imply without support that the rule simply does not apply when it is the defendant who seeks to admit the agent's opinion, as opposed to the Government. (Br. 66 (distinguishing cases based on whether they "protect[ ]" the defendant's rights)). But the Rules of Evidence do not distinguish between inculpatory and exculpatory evidence: "Relevant evidence is admissible. . . . Irrelevant evidence is not admissible." Fed. R. Evid. 402. And Agent Der-Yeghiayan's belief, early in the investigation, that Karpeles and one of his employees might be responsible for Silk Road, was clearly irrelevant to Ulbricht's guilt. (A. 336-37). The District Court's decision to strike those portions of testimony that elicited Agent Der-Yeghiayan's "beliefs," "theories," and "conclusions" was clearly correct. (A. 336-41 (highlighting stricken testimony)).[19]

––––––––––

[19] Although Ulbricht contends otherwise, the Government's objections were timely. (*Contra* Br. 70-71). Rule 103 of the Federal Rules of Evidence requires a "timely" objection or motion to strike, but it does not define timeliness. Although an objection should generally be interposed "after the question has been asked but before an answer has been given, this rule is not inflexible." *Hutchinson* v. *Groskin*, 927

72

_____

F.2d 722, 725 (2d Cir. 1991). Courts do "not necessarily find an objection affirmatively waived because it might have been interposed a few questions earlier in the midst of a hotly-contested trial, particularly where the grounds for the objection are not immediately apparent." *United States* v. *Pujana-Mena*, 949 F.2d 24, 33 (2d Cir. 1991). And where, as here, "it became increasingly apparent exactly what the [defense] was attempting to accomplish through" its cross-examination, courts have allowed greater flexibility and have not insisted upon immediate, fully fleshed out objections. *United States* v. *Check*, 582 F.2d 668, 676 (2d Cir. 1978). Here, the Government repeatedly objected after the purpose and extent of defense counsel's questioning became more clear. (*E.g.*, Tr. 509, 530).

And even if the Government's objection was untimely, the District Court, which could have stricken the testimony *sua sponte*, *see United States* v. *Pisani*, 773 F.2d 397, 402 (2d Cir. 1985), had the discretion to grant the Government's request for relief, *see United States* v. *Achiekwelu*, 112 F.3d 747, 754 (4th Cir. 1997) (explaining that Rule 103 "provide[s] that a party must object timely *in order to preserve the issue for appellate review*" and "do[es] not address the power of a district court to exclude evidence in the first instance after a late objection" (emphasis added)); 21 Charles Alan Wright & Kenneth W. Graham, Jr., *Fed. Prac. & Pro.* § 5037.1 (2d ed. 2005) ("[T]he trial judge has discretion to sustain an objection even though it was untimely.").

73

Moreover, nothing in that ruling precluded Ulbricht from pursuing his alternative perpetrator theory, based on the evidence that Agent Der-Yeghiayan gathered (and which he was competent to sponsor), for example, that Karpeles was a self-described hacker who ran a major Bitcoin exchange, who was targeted by law enforcement, and had connections (albeit superficial ones) to Silk Road. *See supra* pages 64-65. Indeed, Ulbricht argued that very theory to the jury in summation. (Tr. 2205, 2007-09).[20]

Even if the District Court erred in striking any of Agent Der-Yeghiayan's responses, there was no prejudice to Ulbricht, because he failed entirely to demonstrate a sufficient "nexus between the crime charged and the asserted 'alternative perpetrator'" to justify admitting *any* of the evidence against Karpeles. *Wade*, 333 F.3d at 61-62. The only objective link between Karpeles and Silk Road was the fact that Karpeles ran a webhosting company that hosted, among other websites, one that provided directions

––––––––––

[20] Nor was Ulbricht prejudiced by the District Court's rejection of his request for an adjournment to digest its ruling. (Br. 64). As the District Court noted, once the Government raised the issue, defense counsel had a long weekend to prepare to properly elicit any facts that had been admitted based on improper questioning (Tr. 648-49), and the stricken testimony was hardly so voluminous as to preclude such preparation by one of the defendant's three trial lawyers, even on the morning of the ruling (A. 334-341).

74

on how to reach Silk Road through Tor (Tr. 379), which, by itself, provided no basis for a rational jury to conclude that Karpeles was "Dread Pirate Roberts" (especially given the evidence that it was Ulbricht who registered that website (Tr. 809-11)). The facts that Karpeles owned a Bitcoin exchange and that websites associated with him used publicly available software also used by the Silk Road website (Tr. 502-03, 742-45), are no more probative than the fact that extremists in Oklahoma besides Timothy McVeigh considered attacking the Murrah Federal Building (a fact that was excluded from McVeigh's trial). *See United States* v. *McVeigh*, 153 F.3d at 1188-92. Ulbricht's only response is that Agent Der-Yeghiayan "provided the requisite nexus between the alternate perpetrator and specific offenses here" (Br. 69), by which he must mean that Agent Der-Yeghiayan's decision to investigate Karpeles was itself sufficient. Not so: Agent Der-Yeghiayan's hunch, instinct, opinion, or the like was not competent to satisfy *Wade*. Accordingly, the District Court would have been justified in excluding more than it did.

This case is easily distinguished from those relied upon by the defense (Br. 69-70), where an alternate suspect had been identified, who lived near the crime, whose first name, physical characteristics, and automobile's color and appearance "were consistent with the descriptions given to the police by eyewitnesses to the shooting," but whom the NYPD never pursued, *Alvarez* v. *Ercole*, 763 F.3d 223, 230-32 (2d Cir. 2014); where the defense was entirely precluded from cross-examining a witness, the "only living person" to identify the defendant as a shooter, on his hearsay identi-

75

fication, *Cotto* v. *Herbert*, 331 F.3d at 223-24, 249; or where the crux of the error was a failure to disclose *Brady* material to the defense, *Kyles*, 514 U.S. at 432-41, 453.

Finally, even if the District Court erred (and it did not), any error was harmless, in light of "the extent of cross-examination otherwise permitted," *Cotto*, 331 F.3d at 254 (internal quotation marks omitted), the fact that the jury never asked to read Agent Der-Yeghiayan's testimony during deliberations, and "the overall strength of the prosecution's case," *id.* (internal quotation marks omitted), which was overwhelming.

## 2. The District Court Properly Excluded the Fourth-Hand Hearsay of Karpeles

It was also entirely proper to strike (and preclude) testimony that Agent Der-Yeghiayan had heard from one federal prosecutor, who heard from another federal prosecutor, who heard from Karpeles's lawyer, that Karpeles was willing to share who he thought was running Silk Road in exchange for immunity. (Tr. 580-81; A. 340-41).

Each of those nested statements was itself hearsay, offered for the purpose of showing that each declarant in the chain had been told "the truth of the matter asserted." Fed. R. Evid. 801(c)(2). Although Ulbricht maintained that he was not offering Karpeles's statement for its truth (Tr. 584-85), Karpeles's offer was irrelevant *unless* one believed that he actually had information to give. Indeed, Ulbricht's counsel sought to admit Karpeles's offer so as to imply

that Karpeles was a Silk Road insider (to support counsel's stated theory that Karpeles was actually responsible for Silk Road). (Tr. 586).

There was no basis to admit this compound hearsay. Although the so-called "residual exception" permits admission of hearsay not specifically covered by an exception, the statement must have "equivalent circumstantial guarantees of trustworthiness," be "evidence of a material fact," and be more probative than any other evidence the proponent can obtain through "reasonable efforts." Fed. R. Evid. 807. As this Court has repeatedly noted, the residual hearsay exception is meant to "be used very rarely, and only in exceptional circumstances." *Parsons* v. *Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) (citation omitted); *see also United States* v. *DeVillio*, 983 F.2d 1185, 1190 (2d Cir. 1993) (residual hearsay exception is "applied in the rarest of cases").

Even assuming "exceptional circumstances" justified application of the exception in the "interests of justice," Fed. R. Evid. 807(a)(4), and that it would have been unreasonable to expect Ulbricht to seek testimony directly from Karpeles's lawyer (it was not), Ulbricht has not satisfied the other requirements of the rule. First and foremost, the record reveals that Karpeles's information concerned a suspicious account at Mt. Gox that, he believed, was associated with Silk Road. (A.310-12). Eliciting *only* the offer to provide information, but not his basis of belief, would have falsely (and unfairly) implied that Karpeles was himself criminally responsible for Silk Road (which, of course, was the defense's goal). The

77

statement was not, therefore, "evidence of a material fact," or at least, not the fact that the defense sought to prove. Fed. R. Evid. 807(a)(2).

Second, Karpeles's statement lacked "circumstantial guarantees of truthfulness" that are "equivalent" to existing hearsay exceptions. Fed. R. Evid. 807(a)(1). Knowing that he was the target of a criminal investigation (Tr. 507-08), Karpeles had the incentive to exaggerate his knowledge in order to appear valuable enough to law enforcement to obtain a meeting with them. Indeed, conditioning his offer on immunity, and conveying it through counsel, distinguishes his statement from one that might have been admitted, under different circumstances, as an admission against penal interest. *See* Fed. R. Evid. 804(b)(3)(A). That Karpeles's statement lacks "equivalent" guarantees of trustworthiness counseled against admitting it. Fed. R. Evid. 807(a)(1).

Finally, although the District Court struck this testimony as a formal matter (A. 340-41), since the jury heard it, and nothing about the District Court's curative instruction addressed it (Tr. 974), Ulbricht probably received an unjustified benefit from this testimony, notwithstanding the fact the District Court granted the Government's motion. He certainly was not unfairly prejudiced.

### 3. The District Court Reasonably Limited Cross-Examination of Kiernan to the Scope of His Direct Testimony

Finally, as to Kiernan, Ulbricht argues that the District Judge abused her discretion by excluding a

few questions as irrelevant or beyond the scope of the Government's direct examination. (Br. 75-76). To the contrary, the District Court's limitations were sensible ones, in light of the scope of Kiernan's direct testimony, and in any event, the defense made the points it sought to before the jury.

First, the defense sought to establish that the software program BitTorrent, which Ulbricht was running at the moment he was arrested, was not secure. (Br. 76). It did so by asking Kiernan a slew of questions about the security of BitTorrent (Tr. 1068-72, 1108-09), establishing, among other things, that seven other computers were connected to Ulbricht's computer at the time he was arrested (Tr. 1069-70), that running BitTorrent required an open port to the Internet on Ulbricht's laptop, exposing him to hackers (Tr. 1070-72), and that file sharing of that type could have exposed Ulbricht's laptop to malware (Tr. 1071). The only question the District Court *sua sponte* precluded was whether the *FBI* permitted *Kiernan* to run BitTorrent at work (Tr. 1072), because it was "irrelevant" and "beyond the scope" of Kiernan's testimony on direct examination (Tr. 1073-74). This ruling was proper, because the FBI's network security practices were "far afield" from any issues in the case and would be based on a variety of factors beyond the scope of this case. (Tr. 1073).

Second, although Kiernan remembered that Ulbricht had been logged into the "Mastermind" page of the Silk Road website (Tr. 864-70), he could not tell, from reviewing the purported code for that webpage, whether a user who logged into Silk Road using

79

"DPR"'s username and password would automatically be directed to that page (Tr. 1081). During the break at that point in the testimony, the District Court admonished the defense to remain within the scope of direct examination, which was "quite narrow," and not attempt to turn Kiernan into a "generalized computer expert." (Tr. 1084-88). Defense counsel protested that Kiernan could be questioned with respect to any aspect of the laptop he sponsored, but the District Court disagreed. (Tr. 1085). This was a reasonable limitation, *see* Fed. R. Evid. 611(b), and in any event, the defense has not identified what testimony was excluded that Kiernan was competent to provide.

Finally, the District Court precluded the defense from asking Kiernan a few questions about the Linux "kernel,"[21] including whether, when Kiernan tested TorChat, he was running it on the same version of Linux (or "kernel") that Ulbricht had installed on his laptop. (Br. 76). Even if that particular question were within the scope of Kiernan's direct (and it was not, since Kiernan offered only high-level descriptions of how his copy of TorChat worked (Tr. 887-90)), any error was harmless, because defense counsel elicited the limits of Kiernan's knowledge about the operation

––––––––––––

[21] The "kernel" refers to the core of an operating system, like Linux. *See Network Prot. Scis., LLC* v. *Fortinet, Inc.*, No. C 12-01106 WHA, 2013 WL 146033, at *5 (N.D. Cal. Jan. 14, 2013); *VMWare, Inc.* v. *Connectix Corp.*, No. C 02-3705 CW, 2005 WL 6220090, at *14 (N.D. Cal. Mar. 25, 2005).

80

of TorChat on *Ulbricht's* computer, such as whether the chats stored on Ulbricht's computer could have been altered (Tr. 1075-76, 1097), or whether they were necessarily created on Ulbricht's laptop at all (Tr. 1077). Defense counsel also elicited possible differences in the operation of TorChat on Kiernan's computer and on Ulbricht's laptop, as Kiernan did not know what version of TorChat Ulbricht used, whether Kiernan had used the same version, and whether Kiernan had installed TorChat in the same way Ulbricht had, nor did Kiernan test TorChat on Ulbricht's laptop (Tr. 1092-95). Having made the basic point, the District Court had the discretion to limit defense counsel's cross-examination to "avoid wasting time," Fed. R. Evid. 611(a).

In all respects, then, the District Court reasonably limited defense counsel's cross-examination to matters within the scope of Kiernan's direct examination, and the defense has not shown that it was prejudiced by those limits.

81

# POINT III

## The District Court Properly Precluded Expert Testimony that Was Proffered Without Adequate Disclosure

### A. Relevant Facts

#### 1. Pretrial Proceedings

The Indictment in this case charged Ulbricht with designing, owning, and operating an online marketplace that used "a Bitcoin-based payment system" to facilitate illegal commerce, including by concealing the identities and locations of its users. (A. 150-51, 161). The criminal complaint on which Ulbricht was arrested (the "Complaint") explained in more detail how Ulbricht used that payment system to construct "the most sophisticated and extensive criminal marketplace" then on the Internet. (A. 53, 59-61). It also summarized data extracted from the Silk Road servers, including the value of Bitcoin transactions conducted through the site. (A. 61-62).

In March 2014, 10 months before trial, the Government produced in discovery copies of the Silk Road servers (including evidence of Bitcoin transactions), a copy of Ulbricht's laptop (including the Bitcoin wallets thereon), and evidence of what Ulbricht was doing on his laptop at the time of his arrest. (Docket Entry 70-1; A. 363).

Five weeks before trial, on December 3, 2014, the Government produced most of its proposed trial ex-

82

hibits, including those derived from the Silk Road servers and Ulbricht's laptop. (Docket Entry 96).

On December 29, 2014, the Government "reiterate[d] its requests for reciprocal discovery from the defense," including, pursuant to Federal Rule of Criminal Procedure 16(b)(1)(B), the "disclosure of any results or reports of any scientific text or experiment that the defense intends to use . . . or that relates to the testimony of any witness that the defense intends to call who prepared any such report," and, pursuant to Rule 16(b)(1)(C), the "disclosure of a written summary of any expert testimony the defendant intends to use at trial." (A. 397).

As of the start of trial, on January 13, 2015, the defense had not provided any expert disclosure.

## 2.   The Trial Begins

In its opening statement, the Government summarized the evidence it intended to introduce, including the fact that Ulbricht's laptop "contained the defendant's enormous profits" from running Silk Road, in the form of "[B]itcoins worth approximately $18 million at the time of his arrest." (Tr. 55).

During its opening, the defense countered with its theory that, although the defendant had created Silk Road, the "real DPR" had framed Ulbricht by planting files on his computer, and that because Ulbricht was the originator of the site and a Bitcoin investor, he was the perfect "fall guy" when law enforcement closed in on Silk Road. (Tr. 61-65).

83

On the second day of trial, January 14, 2015, the District Court asked defense counsel to estimate the length of any defense case, including "whether or not [he] had a computer expert in [his] pocket who [he] w[as] thinking of having on the stand for a week." (Tr. 124-25). The Government noted that it had received no expert notice and would object to an untimely notice. (Tr. 125). The District Court said it had assumed that "all the required notices" were being given, and the defense responded that "as soon as [it had] a firm intention to call a witness, [it would] provide it," "at the earliest possible rather than the latest." (Tr. 125).

As discussed above, *see supra* page 66, during cross-examination of Kiernan, the District Court sustained various objections that the defense's questions were outside the scope of direct, but it reminded the defense that, if it "complied with the appropriate disclosure requirements," it could call its own witnesses, including an expert. (Tr. 1084; *see also* Tr. 670-71 (sustaining objection on basis that SA Der-Yeghiayan is "not an expert witness to talk about the evidence of hacking"), 1073-74 (sustaining objection on basis that defense was "trying to make [Kiernan] into a general expert on BitTorrent" which was "far afield" of his testimony), 1084-88 (limiting scope of Kiernan cross to scope of direct).

In addition, in response to the defense's opening statement, the Government called a former FBI Special Agent, Ilhwan Yum, to preempt the claim that the defendant had earned the approximately $18 million worth of Bitcoins recovered from his laptop

84

through innocent investing and trading. (*See* Tr. 1637-58, 1661-67, 1673-75, 1683-97).

### 3. The Defense's Expert Notice

On January 26, 2015, the defense notified the Government that it intended to call Andreas M. Antonopolous as an expert witness on Bitcoin. (A. 349-50). The notice listed eight "subjects" of "expert opinion testimony," such as "the origins of Bitcoin" and their "purposes and uses," the "value of Bitcoin over time," and the "ability to tie Bitcoins from Silk Road to Mr. Ulbricht," although it did not describe the substance of the testimony or any opinions it would include. (A. 349-50). The Government moved to preclude Antonopolous's testimony, arguing that the anticipated topics of his testimony, to the extent the Government discerned them, were either not relevant to the case or not the proper basis for expert testimony. (A. 342-48).

On January 30, 2015, the defense notified the Government that it intended to call another witness, Steven M. Bellovin, to provide expert testimony on six subjects, including "[g]eneral principles" of "internet security," "public-key cryptography," and other technical matters, and to explain certain computer code produced in discovery. (A. 360). The Government likewise moved to preclude his testimony, on the ground that the notice was insufficient. (A. 354-59).

The defense opposed the Government's motions on January 31 and February 1, 2015. (A. 380-84; 385-89).

### 4.   The District Court's Preclusion Order

On February 1, 2015, the District Court issued an opinion granting the Government's motions to preclude both expert witnesses. (A. 362-79). After reciting the relevant procedural history of the case, illustrating the length of time during which defense counsel had the opportunity to develop its defense (A. 362-66), the District Court first observed that the disclosure letters for both experts were lacking (1) "any expected opinions," (2) "the bases for such opinions," (3) "any description of analysis or methodology," and, (4) in the case of Antonopoulos, "any indication that [he] has any expertise in the areas in which he seeks to testify." (A. 366).

The District Court found that this "tactical choice" not to comply with Rule 16 (A. 367), which the defense failed to cure in its response to the Government's motions to preclude (A. 373), left it "unable to determine what Antonopoulos'[s] and Bellovin's opinions are," whether their views are relevant, whether their methods are reliable, and whether they are even qualified. (A. 376). Nor could the District Court weigh the probative value of their testimony against its potential for prejudice, as required by Rule 403. (A. 378).

Finally, the District Court evaluated remedies short of preclusion. Finding that the Government would be "at a plain and unfair disadvantage in countering such testimony" (A. 378), given that it was resting the next day, and the witnesses were "on deck" (A. 369), the District Court declined to continue the trial, because doing so could lead to the potential

86

dismissal of one or two jurors who had "timing issues" (A. 369). Accordingly, the District Court declined to order a continuance and granted the Government's motions to preclude. (A. 369).

## B. Applicable Law

In light of district courts' established "gatekeeping" role with regard to expert testimony based on scientific, technical, or "other specialized" knowledge, *see Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 141 (1999); *Daubert* v. *Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993), the admission or exclusion of expert testimony is committed to the broad discretion of the trial court, *see Hamling* v. *United States*, 418 U.S. 87, 108 (1974); *Boucher* v. *U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996); *United States* v. *DiDomenico*, 985 F.2d 1159, 1163 (2d Cir. 1993). Accordingly, this Court reviews a district court's decision to admit or exclude expert testimony for abuse of discretion, *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137 at 158, and "a decision to exclude expert testimony . . . shall be sustained unless manifestly erroneous," *United States* v. *Lumkin*, 192 F.3d 280, 289 (2d Cir. 1999) (internal quotation marks omitted); *United States* v. *Cruz*, 363 F.3d 187, 192 (2d Cir. 2004).

Federal Rule of Criminal Procedure 16(b)(1)(C) provides, in relevant part:

> The defendant must, at the government's request, give to the government a written summary of any testimony that a defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of

87

> Evidence as evidence at trial . . . . This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed R. Crim. P. 16(b)(1)(C); *see also United States* v. *Yousef*, 327 F.3d 56, 148 (2d Cir. 2003) (noting that Rule 16 "requires" a defendant to provide such material at the Government's request) (citing Rule 16(b)(1)(C)).

The purpose of this rule is to "minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16, advisory committee's note (1993). A party who fails to comply with its discovery obligations may be precluded from introducing evidence not disclosed. Fed. R. Crim. P. 16(d)(2).

Compliance with Rule 16 is necessary to enable a district court to make several determinations required by the Federal Rules of Evidence. Rule 702 provides that, where "specialized knowledge will help the trier of fact," a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" may testify if: "[1] the testimony is based on sufficient facts or data; [2] the testimony is the product of reliable principles and methods; and [3] the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. District courts are responsible for ensuring that expert testi-

88

mony "rests on a reliable foundation and is relevant
to the task at hand," *Amorgianos* v. *Romano Enters.*,
303 F.3d 256, 265 (2d Cir. 2002) (citation and inter-
nal quotation marks omitted), and would assist the
jury by "shed[ding] light on activities not within the
common knowledge of the average juror," *see United
States* v. *Wexler*, 522 F.3d 194, 204 (2d Cir. 2008) (ci-
tation and internal quotation marks omitted); *United
States* v. *Cruz*, 981 F.2d 659, 663-64 (2d Cir. 1992);
*see also United States* v. *Rea*, 958 F.2d 1206, 1216-17
(1992) ("[W]hether the witness's opinion will be 'help-
ful' . . . [is] a legal matter that must be determined by
the court before it may allow the opinion to be heard
by the jury."). Thus, compliance with Rule 16 facili-
tates the district court's assessment of whether ex-
pertise is helpful, whether the expert is qualified, and
whether his testimony is relevant and reliable.

Even if expert testimony would otherwise be ad-
missible, it may be excluded under Rule 403 if its
probative value is substantially outweighed by the
danger of unfair prejudice, confusion of the issues, or
misleading the jury. Fed. R. Evid. 403; *Daubert* v.
*Merrell Dow Pharm., Inc.*, 509 U.S. at 595. As the
Supreme Court noted in *Daubert*, "Expert evidence
can be both powerful and quite misleading because of
the difficulty in evaluating it." 509 U.S. at 595 (inter-
nal quotation marks omitted); *see also United States*
v. *Young*, 745 F.2d 733, 766 (2d Cir. 1984) (danger of
confusion stems from the "aura of special reliability
and trustworthiness surrounding expert testimony"
(internal quotation marks omitted)).

Finally, as the Supreme Court has explained, "[t]he principle that undergirds the defendant's right to present exculpatory evidence is also the source of essential limitations on the right," *Taylor* v. *Illinois*, 484 U.S. at 410, and therefore it "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process," *Rock* v. *Arkansas*, 483 U.S. 44, 55 (1987) (quoting *Chambers* v. *Mississippi*, 410 U.S. 284, 295 (1973)). Thus, a defendant's failure to follow "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence," *Chambers* v. *Mississippi*, 410 U.S. at 302, may prompt the court to correspondingly curtail the defendant's right to present evidence. *See, e.g.*, *Taylor*, 484 U.S. at 412 ("The court's preclusion sanction was an entirely proper method of assuring compliance with its order." (citation omitted)).

## C.  Discussion

The defendant's expert notice left the District Court unable to perform the "gatekeeping" function assigned to it, *Daubert*, 509 U.S. at 597, and reflected a tactical choice of "trial by ambush" (A. 368). Accordingly, it was neither an abuse of discretion to preclude the defense's proffered witnesses, nor even now has the defense shown that exclusion was prejudicial.

The defense's initial disclosures were clearly inadequate. Listing the "subjects" of testimony, as the defense did (A. 349-50, 360), is not the same as providing "a written summary of" that testimony, including any "opinions" and the "bases and reasons for" those

90

opinions, as Rule 16(b)(1)(C) requires. *See also* Fed. R. Crim. P. 16 advisory committee's note (1993) ("[T]he requesting party is entitled to a summary of the expected testimony. . . . For example, this should inform the requesting party whether the expert will be providing only background information on a particular issue or whether the witness will actually offer an opinion."). Because the defense did not describe what the witnesses would actually *say*, by reference to the evidence in the case and the defense's theories, there was no way for the District Court to assess whether the testimony would "help the trier of fact to understand the evidence or to determine a fact in issue," whether the witness was qualified to offer such testimony, or whether the testimony was based on sufficient information and otherwise reliable. Fed. R. Evid. 702.

For example, presumably Antonopoulos was being called to rebut Yum's testimony, tracing the Bitcoins on Ulbricht's laptop to the Silk Road servers (A. 350), but other than referring generally to "the ability to tie Bitcoins from Silk Road to Mr. Ulbricht" (A. 350) the defense did not give the witness's opinion on the matter (if he had one), much less the "bases and reasons" for it, Fed. R. Crim. P. 16(b)(1)(C). In responding to the Government's objection, the defense explained in more detail why Antonopoulos's testimony concerning Bitcoin might have been *relevant*, as a topical matter, but it still did not explain *how* Antonopoulos would have countered the evidence connecting Ulbricht's Bitcoins to Silk Road. (A. 380-84). The closest he came was a proffer that, based on "market forces," it would have been difficult for Ulbricht to

91

sell large amounts of Bitcoins that were transferred to his laptop but not recovered there (A. 381), but that is too vague to satisfy Rule 16, and still lacks the "bases" for Antonopoulos's conclusions about those "market forces" (much less his qualifications to opine about them) (A. 373).

Similarly, with respect to the other witness, Bellovin, the defense sought "an opportunity . . . to provide further specifics as [to] the opinions Dr. Bellovin plans to offer and the bases for those opinions," but then failed to offer them. (A. 385). For example, Bellovin would testify to "the security implications" of using file sharing software, BitTorrent, but not what those "implications" were (or the bases for Bellovin's conclusions). (A. 386). Even when given the opportunity to cure, defense counsel proffered the *topics* of testimony, not a "summary" of it, much less the "bases and reasons" for any opinions. (A. 387 (defense will elicit testimony "with respect to" the creation time for certain files; or "whether an individual [using "DPR"'s account] would automatically be directed to the Mastermind page"), 388 (the "varying methods of software installation" and how it can "change the way a computer program operates").

"The proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible." *United States* v. *Banks*, 761 F.3d 1163, 1200 (10th Cir.) (internal quotation marks omitted), *cert. denied*, 135 S. Ct. 308 (2014) (affirming preclusion). Ulbricht's "generalized explanations do not provide us with any real information about what these experts would have said at trial," making it im-

92

possible for the District Court (much less this Court) to assess admissibility. *United States* v. *Hoffecker*, 530 F.3d 137, 187 (3d Cir. 2008) (affirming preclusion because defense notice "did not include the experts' opinions and the bases and reasons for those opinions"); *see also United States* v. *Day*, 524 F.3d 1361, 1371-72 (D.C. Cir. 2008) (affirming preclusion where a doctor listed the tests he had performed but "failed to state what [he] had concluded"); *United States* v. *Concessi*, 38 F. App'x 866, 868 (4th Cir. 2002) (expert designations properly excluded where they "included only the general topics concerning which each proposed expert would testify" but "failed to describe the witnesses opinions or provide the bases and reasons for the witnesses' opinions"). To be sure, the general topic areas of testimony overlapped with the subject matter of the case, but "undoubted relevance does not trump the need to provide opinions and, particularly here, analytical or methodological bases." (A. 378). The District Court's conclusion that the defense's notice was entirely "[l]acking" was entirely correct. (A. 366).

Moreover, the untimely nature of the defense's notices, coming, as they did, after the 7th and 10th days of trial, and between one and three days before the Government rested, respectively, would itself justify exclusion. Case law is legion that untimely disclosure justifies preclusion, especially where, as here, the defense knew of the subject matter of expert testimony much earlier. *See United States* v. *Lundy*, 676 F.3d 444, 452 (5th Cir. 2012); *United States* v. *Holmes*, 670 F.3d 586, 597-99 (4th Cir. 2012); *United States* v. *Hoffecker*, 530 F.3d at 184-87; *United States* v. *Day*, 524

93

F.3d at 1371-72; *United States* v. *Petrie*, 302 F.3d 1280, 1288 (11th Cir. 2002); *United States* v. *Curry*, 977 F.2d 1042, 1052 (7th Cir. 1992). As the District Court noted, the electronic evidence on which the Government's case was based had been disclosed to the defense "long" before trial. (A. 363). And although Ulbricht contends that he was only responding to Yum's testimony tying Ulbricht's Bitcoins to the Silk Road servers, which he could not have anticipated (Br. 81-83), it was, in fact, the defense that opened on the theory that the Bitcoins on Ulbricht's laptop resulted from innocent trades, and which necessitated the Government's 11th hour scramble for Yum's testimony (A. 373-74).[22]

——————

[22] Likewise, this Court should reject the defense's complaint that it required experts only because it was not permitted to cross-examine the Government's witnesses beyond the scope of their direct testimony. (Br. 80-81). That argument "defies credulity" and is "without a scintilla of merit." (A. 374). In fact, defense counsel was able to question Government fact witnesses about many of the topics listed in the defective notice as to Bellovin. *See, e.g.*, Tr. 628 (PGP encryption); 1070-72 (potential computer vulnerabilities); 1095 (operation of time stamps in UNIX-based operating systems); 1243-50 (forensic memory analysis and potential computer vulnerabilities). And in any event, the District Court's decision to enforce the Rules of Evidence, *see* Fed. R. Evid. 611(b), does not excuse the defense from complying with its discovery obligations.

94

This Court should credit the District Court's finding that the defense's "substantially inadequate notices" reflected a "tactical choice" (A. 367; *see also* A. 373-74) and the kind of "sharp practice" and "ambush" that "might well violate due process," *United States* v. *Tin Yat Chin*, 476 F.3d 144, 146 (2d Cir. 2007), for which preclusion is an appropriate sanction. In *Chin*, a one-day continuance was sufficient to avoid reversal, in part because that was all defense counsel requested. *Id*. Here, however, allowing the proffered testimony would have been all the more unfair, given that it appeared to go to the heart of the Government case (A. 378), the Government could not reasonably be expected to respond immediately (A. 369), and any continuance to address the unfairness could impact the jurors to the point of causing a mistrial (A. 369).

Finally, even now, Ulbricht has "failed to establish prejudice" from excluding the witnesses, *United States* v. *Yousef*, 327 F.3d 56, 148 (2d Cir. 2003), by explaining "why their testimony would have altered the outcome of the trial," *Hoffecker*, 530 F.3d at 187 (internal quotation marks omitted); *see also United States* v. *Onumonu*, 967 F.2d 782, 788 (2d Cir. 1992) ("[T]he district court's erroneous exclusion of testimony is subjected to harmless-error analysis."). Ulbricht merely repeats the topics of testimony, not *how, specifically,* that testimony would have "countered" the Government's case. (Br. 78-79, 85). Unlike cases cited by the defense (Br. 86-89), where the relevance of the expert's testimony to disputed issues of fact was clear, *see United States* v. *Diallo*, 40 F.3d 32, 33-34 (2d Cir. 1994); *United States* v. *Onumonu*, 967

95

F.2d at 784; *United States* v. *McBride*, 786 F.2d 45, 49-50 (2d Cir. 1986); *United States* v. *Dwyer*, 539 F.2d 924, 927 (2d Cir. 1976), it is impossible to know what either defense witness would have said, with any degree of specificity, much less how it would have impacted the jury.[23] In the face of the overwhelming proof against Ulbricht, *see supra* pages 14-25, any error in excluding general, educational testimony about technical matters (which is all the defense has proffered) was harmless. *See generally United States* v. *Gupta*, 747 F.3d 111, 133-34 (2d Cir. 2014) (listing factors this Court considers in evaluating whether improper exclusion of evidence amounts to reversible error, including "the overall strength of the prosecution's case"), *cert. denied*, 135 S. Ct. 1841 (2015); *Howard* v. *Walker*, 406 F.3d 114, 132 (2d Cir. 2005) (considering "strength of the prosecution's case as a whole").

Having chosen "trial by ambush" (A. 368, 363), Ulbricht's challenge to the preclusion of his proffered experts should be rejected.

—————

[23] These cases are also distinguishable for the additional reason that those district courts, unlike Judge Forrest, provided either improper justifications or no justification at all for excluding the experts. *See, e.g.*, *Onumonu*, 967 F.2d at 788; *United States* v. *Dwyer*, 539 F.2d at 927; *United States* v. *McBride*, 786 F.2d at 50-51.

96

## POINT IV

### The District Court Properly Excluded a
### Co-Conspirator's Hearsay Statement

#### A. Relevant Facts

About two weeks before trial, on December 29, 2014, the Government disclosed to the defense the substance of certain statements by a cooperating witness, Andrew Michael Jones, a/k/a "Inigo," who had been an administrator on Silk Road and who plead guilty to various offenses pursuant to a cooperation agreement with the Government. (A. 398).

According to Jones, in or about October 2012, Jones and "Dread Pirate Roberts" agreed upon a verbal "handshake" to verify each other's identity during online chat conversations, in which Jones would mention a certain prompt and "Dread Pirate Roberts" would provide an agreed-upon response. (A. 398). In or about August or September 2013, Jones tried to confirm that he was speaking with the same individual and "provided what he believed to be the designated prompt," but "'Dread Pirate Roberts' was unable to provide the response Jones thought they had agreed on." (A. 398). However, later in the conversation, Jones asked "Dread Pirate Roberts" to demonstrate his identity by specifying the first job that "Dread Pirate Roberts" had ever assigned to him (running the "DPR Book Club"), which "Dread Pirate Roberts" was able to do. (A. 398).

The Government further disclosed that an October 2012 chat between Ulbricht and Jones (previously

97

produced in discovery) discussed a "handshake," but the Government had not located any record of the 2013 conversation. (A. 398).

About two weeks later, the Government advised the defense that it would not be calling Jones as a witness as planned, during its case in chief. (A. 563, 584-85). When Ulbricht's counsel then explored the possibility of calling Jones to the stand, Jones's defense counsel advised that Jones would assert his Fifth Amendment privilege. (A. 564, 585).

Although the Government was amenable to stipulating to the sum and substance of the disclosure, the defense would not agree to stipulate that, when Jones used a second prompt, he believed he was successful in validating "Dread Pirate Roberts"'s identity. (A. 395-96, 399-400, 563-64, 566, 568). In the defense's view, doing so would "compromise Mr. Ulbricht's Sixth Amendment confrontation rights" and give the Government a benefit it should only obtain by calling Jones to the stand. (A. 396; *see also* A. 587 ("They could have called the witness if they wanted balance.")).

When the parties could not agree (A. 579-81), the defense moved the District Court to admit the Government's disclosure as if it were Jones's own statement, as a statement against interest, pursuant to Federal Rule of Evidence 804(b)(3), or under the "residual" exception, pursuant to Rule 807. (A. 395-96). In the alternative, Ulbricht argued that he had a Due Process right under the Fifth Amendment to admit the statement, and he urged the District Court to grant Jones immunity so that he could testify.

98

(A. 395). Ulbricht also sought a missing witness instruction from the District Court. (Tr. 1863).

The District Court denied the defense's application, concluding that the statements were not made against penal interest, because they were made while Jones was cooperating with the Government, they were not sufficiently corroborated, and they did not possess sufficient indicia of trustworthiness. (A. 583-84, 589-90). The District Court also denied the defense's request for a missing witness charge, because the record did not support the inference that Jones's testimony would have been unfavorable to the Government, so as to justify the instruction, given that "Dread Pirate Roberts" was able to identify himself in response to the second prompt. (A. 590-92).

## B. Applicable Law

### 1. The "Against Interest" Exception

The Federal Rules of Evidence provide an exception to the hearsay rule for statements by an unavailable declarant that were "against interest." Fed. R. Evid. 804(b)(3). "To satisfy [this] exception the proponent must show (1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States* v. *Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (internal quotation marks omitted).

99

At bottom, a statement qualifies as such only if "a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest." *United States* v. *Saget*, 377 F.3d 223, 231 (2d Cir. 2004). "[N]on-self-inculpatory statements . . . made within a broader narrative that is generally self-inculpatory" are not admissible as statements against penal interest, *Williamson* v. *United States*, 512 U.S. 594, 600-01 (1994), and neither are proffer statements of non-testifying witnesses, which are made under the condition they cannot be used against the declarant if he tells the truth, *United States* v. *Doyle*, 130 F.3d 523, 543 n.16 (2d Cir. 1997). "Whether a challenged statement is sufficiently self-inculpatory can only be answered by viewing it in context," *United States* v. *Williams*, 506 F.3d 151, 155 (2d Cir. 2007) (reasoning that hearsay is more reliable under Rule 804(b)(3) where the declarant "was not attempting to minimize his own culpability, shift blame onto [the defendant], or curry favor with the authorities").

With regard to the requisite corroboration to establish trustworthiness, such corroboration is "not an insignificant hurdle," *DeVillio*, 983 F.2d at 1190, and "must be strong, not merely allowable," *United States* v. *Salvador*, 820 F.2d 558, 561 (2d Cir. 1987) (requirement "demonstrates the obvious suspicion with which the drafters of the Rule regarded a statement exposing the declarant to criminal liability but exculpating the accused" (internal quotation marks omitted)).

100

### 2. The Residual Exception and Nested Hearsay

Meanwhile, the residual hearsay exception of Rule 807 allows a statement not covered by another exception to the hearsay rule to be admitted only if: "(1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will serve the purposes of these rules and the interests of justice." As this Court has noted, the residual hearsay exception is meant to "be used very rarely, and only in exceptional circumstances." *Parsons* v. *Honeywell, Inc.*, 929 F.2d at 907 (internal quotation marks omitted); *see also, e.g.*, *DeVillio*, 983 F.2d at 1190 (residual hearsay exception is "applied in the rarest of cases").

Additionally, "[h]earsay within hearsay" may be admitted only if "each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805.

### 3. Standard of Review

The District Court's evidentiary rulings are reviewed for abuse of discretion. *See, e.g., United States* v. *Doyle*, 130 F.3d at 544 (Rule 804(b)(3)). To find an abuse of discretion, this Court "must conclude that the trial judge's evidentiary rulings were arbitrary and irrational." *United States* v. *White*, 692 F.3d 235, 244 (2d Cir. 2012), *as amended* (Sept. 28, 2012) (internal quotation marks omitted).

### C. Discussion

On appeal, Ulbricht challenges only the District Court's decision not to admit Jones's statement under an exception to the hearsay rule. (Br. 90-96). But Jones's statement to the Government while he was cooperating, and after he had pled guilty to essentially the same offenses Ulbricht was charged with, was not the kind that could have exposed him to additional criminal liability at that point, and, therefore, it failed to satisfy Rule 804(b)(3).

When a declarant is in a cooperative posture with the Government, his statements may not tend to expose him to "more serious charges or more severe punishment," *United States* v. *Marquez*, 462 F.2d 893, 895 (2d Cir. 1972), and, as a result, are not against his penal interest. For this reason, this Court has approved the exclusion of statements made pursuant to the protections of a proffer agreement, *Doyle*, 130 F.3d at 543 n.16, or while the declarant was actively cooperating with the Government and wearing a wire, *DeVillio*, 983 F.2d at 1190.

By December 2013, when Jones made the statements in question, he had pled guilty to a four-count information charging him with essentially the same criminal activity that Ulbricht was on trial for, including narcotics trafficking, computer hacking, identification fraud, and money laundering through the Silk Road website from October 2012 to October 2013. (SA 229-30). In exchange for his guilty plea and his commitment to provide truthful information (SA 230), the Government agreed that Jones "will not be further prosecuted criminally by this Office for any

102

crimes . . . related to" that activity (SA 231).[24] As a result, Jones's statements that he attempted to authenticate "Dread Pirate Roberts"'s identity with a handshake in 2013, and succeed on the second attempt, were not the kind that "a reasonable person in the declarant's shoes would perceive. . . as detrimental to his or her own penal interest." *United States* v. *Saget*, 377 F.3d at 231. He had "already accepted responsibility" for his crimes, and those statements "did not add much additional weight to his confession." *Doyle*, 130 F.3d at 543 n.16.[25] Accord-

─────────────

[24] The Government also agreed not to prosecute Jones for his personal involvement in selling narcotics, on and off Silk Road, and his work as a Silk Road forum moderator after October 2013. (SA. 231).

[25] The record does not reveal why defense counsel for Jones advised that his client would have invoked his Fifth Amendment right, but, on this record, Ulbricht must assume that he would have done so legitimately, as only the proper invocation of that privilege would have rendered Jones "unavailable," as required by the rule. *See* Fed. R. Evid. 804(a)(1); *United States* v. *Rodriguez*, 706 F.2d 31, 40 (2d Cir. 1983). And because "[t]he 'against penal interest' requirement of Rule 804(b)(3) is more narrow than the Fifth Amendment's declaration that no person 'shall be compelled in any criminal case to be a witness against himself,'" proper invocation of the privilege against self-incrimination does not necessarily mean that the statement fell within the exception to the

103

ingly, admission under Rule 804(b)(3) would have been improper.

Rule 807, which applies in only the "rarest of cases," *DeVillio*, 983 F.2d at 1190, was also not satisfied, for a number of reasons. Even assuming the statement had "circumstantial guarantees of trustworthiness" "equivalent" to those of the hearsay exceptions in Rules 803 or 804, because Jones was obligated to tell the truth by the terms of his cooperation agreement, Ulbricht's counsel did not demonstrate "reasonable efforts" to ensure Jones's was available at trial, *see* Fed. R. Evid. 807(a)(3), by, for example, giving the Government sufficient notice, prior to the eve of the defense case, that Jones's testimony was crucial enough to ensure his availability (including immunization, if required). (A. 584 (Government counsel: "He's under our control and we would not have resisted allowing him to testify.")). *See also* Fed. R. Evid. 807(b).

But most significantly, the defense sought to distort the record by admitting *only* that portion of Jones's statement that he deemed helpful, which would not "serve the purposes of these rules and the interests of justice." Fed. R. Evid. 807(a)(4). (A. 400 (defense counsel's redline to proposed stipulation, depriving Government of a fair reading of Jones's statements)). As the District Court found, "the only reasonable inference to be drawn" from the fact that

———————

hearsay rule. *United States* v. *Thomas*, 62 F.3d 1332, 1338 (11th Cir. 1995).

104

"Dread Pirate Roberts" answered a second question correctly was that "the DPR identification was completed," and as a result, Jones's statements, when taken in their entirety, lacked the exculpatory flavor counsel sought to wring from them. (A. 592).

There was no abuse of discretion in the District Court's decision to exclude the nested hearsay statements of the defendant's co-conspirator, and no injustice in that ruling, where the defense refused a "balance[d]" stipulation that would have admitted the facts he sought. (A. 587).

## POINT V

### The Cumulative Error Doctrine Does Not Warrant Reversal

Ulbricht is correct that a series of errors that are harmless individually might, when aggregated, yield a "cumulative unfairness" that deprives a defendant of a fair trial. *See United States* v. *Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008). However, "a cumulative-error analysis aggregates only actual errors to determine their cumulative effect." *United States* v. *Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990). Ulbricht cannot establish cumulative error by stitching together a series of correct, but adverse, rulings by the District Court. *See United States* v. *Hurtado*, 47 F.3d 577, 586 (2d Cir. 1995).

Whether it was the decision not to identify how alleged corruption might have affected the integrity of the physical evidence against him, *supra* Point I, or not to investigate alternate perpetrators, *supra* Point

II, or provide timely and complete expert notice, *supra* Points II & III, or ensure that a purportedly key witness was available at trial, *supra* Point IV, the thread running through the errors urged on appeal was the defense's tactical decision to share as little information as possible with the Government and the Court, thereby flouting the "established rules of procedure and evidence [that are] designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers*, 410 U.S. at 302. That tactical choice, while perhaps a reasonable defense strategy, does not, in hindsight, transform the proper exercise of discretion by the District Court into reversible error when it fails. There was no error in the District Court's rulings, much less cumulative error sufficient to overwhelm the evidence that Ulbricht was "Dread Pirate Roberts."

## POINT VI

## The District Court Properly Denied Ulbricht's Suppression Motions

### A. Relevant Facts

#### 1. The Pen Register and Trap-and-Trace Orders

By September 2013, Ulbricht was the FBI's leading suspect in the investigation of "Dread Pirate Roberts." (Docket Entry 57, Decl. of Christopher Tarbell ¶ 19 ("Tarbell Decl.")). To further the investigation, the Government obtained five pen register and trap-and-trace orders (the "pen/trap orders"), pursuant to

106

18 U.S.C. §§ 3121-26 (the "Pen/Trap Act"), authorizing the FBI to collect routing data about the Internet traffic to and from the IP address[26] assigned to Ulbricht's residence by his Internet service provider ("ISP"), the wireless router at that residence, and certain devices that were determined to be regularly connecting to that router. (Tarbell Decl. ¶ 19; S. 67-78, 80-91, 93-99, 125-32, 134-41).

The pen/trap orders authorized the Government to receive the source and destination IP addresses for all Internet traffic to and from, respectively, each of the foregoing facilities, along with the dates, times, durations, and other routing information associated with those connections. (*See* S. 69, 80, 93, 125, 134; *see also* Tarbell ¶ 19). In each application, the Government expressly noted that it was "not requesting, and d[id] not seek to obtain, the contents of any communications," and that the information sought did not "encompass the 'contents' of a communication" nor "'information concerning the substance, purport, or meaning of that communication.'" (S. 75,

───────────

[26] Every device on the Internet is identified by a unique number called an Internet Protocol ("IP") address. This number is used to route information between devices, for example, between two computers. To send information from one computer to another over the Internet, the data is split into discrete "packets," each of which carries the IP addresses of the device that sent it and of the of the device to which it is destined. (S. 73-74).

88, 98, 130, 139 (quoting 18 U.S.C. § 2510(8)). None of the applications requested, nor did the orders authorize, collection of location data regarding any of the devices in question. (Tarbell Decl. ¶ 21).

## 2. The Warrant for Ulbricht's Laptop

On the morning of October 1, 2013, hours before arresting Ulbricht, the Government applied for a warrant to search a silver Samsung laptop with a certain unique identifier (known as a "MAC address"), believed to be his personal laptop. (S. 202-03 (the "Laptop Warrant")).

In its application, the Government alleged probable cause to believe that Ulbricht was committing enumerated federal crimes, namely, narcotics trafficking, computer hacking, money laundering, and murder-for-hire, in violation of, 21 U.S.C. § 846 and 18 U.S.C. §§ 1030, 1956 & 1958, respectively, which it defined as the "Subject Offenses." (S. 207). After describing the design and operation of the Silk Road website (S. 209-21) and "Dread Pirate Roberts'"s role as owner and operator (S. 221-31), the affidavit identified the bases for believing Ulbricht was "DPR," including common attributes between Ulbricht's public statements on social networking sites and statements by "DPR" (S. 231-32, 234-35), Internet posts related to Silk Road made under pseudonyms linked to Ulbricht (S. 232-34, 239-41), administrator-level security measures on the Silk Road website that used Ulbricht's pseudonym (S. 241-42), IP logs and other information suggesting that "DPR" accessed the Silk Road website from a cafe near Ulbricht's home (S.

108

235-37), and that "DPR" was seeking to purchase fraudulent identification at or about the same time that Ulbricht ordered and received some through Silk Road (S. 237-39). There was also evidence that "DPR" and Ulbricht were using the same type of computer, and logged on and off the same websites at or about the same times. (S. 242-46).

The application went on to explain the evidence agents expected to find on the laptop, including, as pertains to this appeal, "evidence relevant to corroborating the identification of Ulbricht as the Silk Road user 'Dread Pirate Roberts,'" including, but not limited to, "writings by Ulbricht, which may reflect linguistic patterns or idiosyncracies associated with 'Dread Pirate Roberts,' or political/economic views associated with him"; evidence of Ulbricht's travel or patterns of movement, "to allow comparison with patterns of online activity of 'Dread Pirate Roberts' and any information known about his location at particular times"; and "other evidence implicating Ulbricht in the Subject Offenses." (S. 248-49).

A federal magistrate judge in the Northern District of California issued the Laptop Warrant, authorizing the FBI to seize Ulbricht's laptop and to search the laptop for "evidence, contraband, fruits or instrumentalities" of the Subject Offenses that fit two categories. (S. 206, 252-53). The first, not challenged on appeal, was "[a]ny evidence relating in any way to the Silk Road website, including but not limited to" six types of data related to Silk Road or Tor. (S. 252).

Second, the Laptop Warrant authorized the seizure of "[a]ny evidence concerning Ross William Ul-

109

bricht relevant to the investigation of the Subject Offenses, including but not limited to" (a) "any communications or writings by Ulbricht"; and "any evidence concerning" (b) "any computer equipment, software, or usernames used by Ulbricht"; (c) "Ulbricht's travel or patterns of movement"; (d) "Ulbricht's technical expertise concerning Tor, Bitcoins, computer programming, website administration, encryption, or any other area of [relevant] technical expertise . . ."; (e) "any efforts by Ulbricht to obtain fake identification documents"; (f) "any aliases used by Ulbricht"; and (g) "any effort to evade law enforcement." (S. 252-53 (capitalization standardized)).

Finally, the Laptop Warrant specified the procedure agents should employ in executing the warrant, including seizing it, making a forensic copy, and reviewing the computer off-site. (S. 253-55).

### 3. The Warrants for Ulbricht's Facebook and Google Accounts

On October 8, 2013, the Government sought two warrants authorizing the FBI to obtain the contents of Ulbricht's Facebook and Google accounts (the "Facebook Warrant" and the "Google Warrant," respectively), pursuant to the Stored Communications Act, 18 U.S.C. § 2703. (S. 312-18, 376-82). Just as with the Laptop Warrant, the applications for these warrants set forth probable cause to search those accounts for evidence, fruits or instrumentalities of specific offenses, namely, conspiracy to commit narcotics trafficking, computer hacking, and money laundering, in violation of Title 21, United States Code, Section 846,

110

and Title 18, United States Code, Sections 1030 and 1956. (S. 320-21, 384-85). Each warrant incorporated the Complaint by reference, which, like the Laptop Warrant, described the Silk Road website, "Dread Pirate Robert'"s role in operating it, and the evidence that Ulbricht was "DPR." (S. 336-74, 395-443). The Facebook and Google Warrant applications alleged that, "Given the parallels that law enforcement has been able to draw between Ulbricht and 'DPR' based on Ulbricht's public online footprint, . . . examination of Ulbricht's communications contained in [those accounts] will reveal additional parallels between Ulbricht and 'DPR' that will further corroborate the identification of Ulbricht as 'DPR,'" such as "linguistic patterns or idiosyncracies" and "travel or patterns of movement." (S. 328-29, 386-87).

After reviewing both applications, Magistrate Judge Gabriel W. Gorenstein issued both warrants, which ordered Facebook and Google to produce copies of Ulbricht's Facebook and Google accounts to the Government (S. 312, 333-34, 376, 392-393), and authorized the Government to search their contents for "evidence, fruits, and instrumentalities" of the specified offenses, including:

> 1. Any evidence concerning Ross William Ulbricht relevant to the investigation of the Subject Offenses, including but not limited to:
>
>> a. any communications or writings by Ulbricht;

111

b. any evidence concerning any computer equipment, software, or usernames used by Ulbricht;

c. any evidence concerning Ulbricht's travel or patterns of movement;

d. any evidence concerning Ulbricht's technical expertise concerning Tor, Bitcoins, computer programming, website administration, encryption, or any other area of technical expertise relevant to administering the Silk Road website;

e. any evidence concerning any efforts by Ulbricht to obtain fake identification documents; and

f. any evidence concerning any aliases used by Ulbricht or other means of evading law enforcement.

2. Any communications with co-conspirators, aiders, abettors, or anyone else involved in any way with the Subject Offenses, including but not limited to any communications seeking to recruit such individuals.

3. Any evidence concerning Bitcoin exchangers or bank accounts used by Ulbricht, or any other evidence relevant to

112

locating the proceeds of the Subject Of-
fenses.

4. Any evidence concerning the Silk
Road website or otherwise concerning
narcotics trafficking.

5. Any evidence concerning the use of
Bitcoins to move criminal proceeds or
otherwise concerning money laundering.

6. Any other evidence of the Subject Of-
fenses.

(S. 334-35, 393-94 (capitalization standardized)).

### 4.  Ulbricht's Suppression Motions

On August 1, 2014, Ulbricht moved to suppress
the majority of electronic evidence in the investiga-
tion, including, as pertains to this appeal, evidence
obtained pursuant to the Laptop, Facebook, and
Google Warrants, on the grounds that they lacked the
particularity required by the Fourth Amendment,
and were unlawful fruits of the pen/trap orders.
(Docket Entries 46-48). The Government opposed Ul-
bricht's motions. (Docket Entries 56-57).

On October 10, 2014, the District Court denied
Ulbricht's suppression motions. (A. 176-213). First,
the District Court suggested that Ulbricht had not
adequately established his personal expectation of
privacy in any of the searched materials, because he
did not submit a sworn statement establishing as

much. (A. 198-203).[27] Moving to the merits, the District Court disagreed that these were "general warrants," because they were "specific" both "as to the items to be seized" and "as to what type of evidence should be searched for." (A. 204). The District Court specifically noted that, in a case where "the use of idiosyncratic linguistic patterns" was a "key issue[ ]" relevant to attribution, it was appropriate for the Government to review "any [of the] communications or writings" in the subject email account. (A. 207 n.12). The District Court further concluded that even if the warrants were overbroad, the exclusionary rule should not apply, because the agents were entitled to rely in good faith upon the warrants, as the applications therefor were neither so lacking in probable cause nor so facially deficient as to render that reliance unreasonable. (A. 207 n.12). Finally, the District Court rejected Ulbricht's argument that the pen/trap orders violated the Fourth Amendment, concluding that "[t]he law is clear—and there is truly no room for debate—that the type of information sought in [the pen/trap orders] was entirely appropriate for that type of order." (*See* A. 208-09 (citing *Smith* v. *Mary-*

———————

[27] As to the searches challenged on appeal, however, the Government indicated that it was willing to stipulate to his standing, because his privacy interest in at least the laptop and Google and Facebook accounts "seems clear" (A. 175), and the District Court considered challenges to those searches on the merits (A. 183).

114

*land*, 442 U.S. 735 (1979); *United States* v. *Rizzo*, 491 F.2d 215, 216 n.3 (2d Cir. 1974)).

## B. Applicable Law

### 1. The Fourth Amendment and Particularity

The Fourth Amendment requires that warrants "particularly describ[e] . . . the person or things to be seized." U.S. Const. amend. IV. The particularity requirement "makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another," *Marron* v. *United States*, 275 U.S. 192, 196 (1927), by foreclosing a "general, exploratory rummaging in a person's belongings," *Coolidge* v. *New Hampshire*, 403 U.S. 443, 467 (1971). To satisfy the particularity requirement, warrants must specify (1) the offenses for which probable cause has been established; (2) the place to be searched; and (3) the items to be seized relating to the specified offenses. *United States* v. *Galpin,* 720 F.3d 436, 445-46 (2d Cir. 2013).

Although "nothing [should be] left to the discretion of the officer executing the warrant," *Marron* v. *United States*, 275 U.S. at 196, "[c]ourts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant." *United States* v. *Young*, 745 F.2d 733, 759 (2d Cir. 1984) (upholding warrant that concluded a list of specific items

115

to be seized with "other evidence of a conspiracy" to distribute narcotics).

Accordingly, "broadly worded categories of items available for seizure" do not necessarily render a warrant deficient: "Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category." *United States* v. *Riley*, 906 F.2d 841, 843-45 (2d Cir. 1990) (upholding warrant that authorized a search for "records and other items that constitute evidence of the offenses of conspiracy to distribute controlled substances and distribution of the same"). "It is true that a warrant authorizing seizure of records of criminal activity permits officers to examine many papers in a suspect's possession to determine if they are within the described category. But allowing some latitude in this regard simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'" *Id.* at 845; *see also Andresen* v. *Maryland*, 427 U.S. 463, 480-82 & n.10 (1976) (upholding warrant that authorized the seizure of "other fruits, instrumentalities, and evidence of crime at this [time] unknown," when limited to a real estate fraud relating to a particular parcel of land); *United States* v. *Young*, 745 F.2d at 759-60 ("[U]se of the term 'other evidence' following the term 'money' was sufficient to permit the agents to seize such manifestations of wealth as furs, jewelry, and expensive automobiles."); *United States* v. *George,*

116

975 F.2d 72, 76 (2d Cir. 1992) (collecting similar cases).

And "where a particularly complex scheme is alleged to exist, it may be appropriate to use more generic terms to describe what is to be seized." *United States* v. *Gotti*, 42 F. Supp. 2d 252, 274 (S.D.N.Y. 1999) (Parker, J.) (citing *United States* v. *Regan*, 706 F. Supp. 1102, 1113 (S.D.N.Y. 1989) ("The degree to which a warrant must state its terms with particularity varies inversely with the complexity of the criminal activity investigated.")). For example, where there is probable cause to believe that a business is "permeated with fraud," "the agents could properly seize all of the business records." *Nat'l City Trading Corp.* v. *United States*, 635 F.2d 1020, 1026 (2d Cir. 1980); *accord United States Postal Ser*v. v. *CEC Servs.*, 869 F.2d 184, 187 (2d Cir. 1989).

## 2. The Good Faith Exception to the Exclusionary Rule

Although the exclusionary rule "requir[es] the exclusion of evidence [w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights," *United States* v. *Stokes*, 733 F.3d 438, 443 (2d Cir. 2013) (internal quotation marks omitted, alteration in original), the rule "is not an individual right and applies only where it result[s] in appreciable deterrence," *Herring* v. *United States*, 555 U.S. 135, 141 (2009) (internal quotation marks omitted, alteration original). Accordingly, in *United States* v. *Leon*, the Supreme Court held that evidence should not be suppressed where the authorities act in

117

"objective good faith" and "reasonable reliance" on a warrant, even if the warrant is later found to be invalid. 468 U.S. 897, 920, 922 (1984); *see United States* v. *Ganias*, — F.3d —, No. 12-240-cr, 2016 WL 3031285, at \*17 (2d Cir. May 27, 2016) (*en banc*). "[M]ost searches conducted pursuant to a warrant would likely fall within [*Leon*'s] protection," *United States* v. *Clark*, 638 F.3d 89, 99 (2d Cir. 2011), because a law enforcement agent is not "required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested," *United States* v. *Buck*, 813 F.2d 588, 592 (2d Cir. 1987); *see also United States* v. *Thomas*, 757 F.2d 1359, 1368 (2d Cir. 1985) (finding good faith reliance on warrant that was predicated unwittingly on a constitutional violation).

The Supreme Court later extended that principle to include actions taken by an officer "acting in objectively reasonable reliance on a statute," unless the statute was "clearly unconstitutional" at the time the officer obtained the evidence, *Illinois* v. *Krull*, 480 U.S. 340, 349 (1987); *see United States* v. *McCullough*, 523 F. App'x 82, 83 (2d Cir. 2013) (applying principle in the context of cellphone location records obtained under Section 2703), as well as to "searches conducted in objectively reasonable reliance on binding appellate precedent," *Davis* v. *United States*, 564 U.S. 229, 231 (2011).

118

### 3. Severance

Finally, even where a warrant is facially invalid, suppression can be narrowly tailored to remedy only the constitutionally infirm portion of a search warrant. In *United States* v. *George*, this Court adopted the doctrine of severance, *i.e.*, the separation of any constitutionally infirm portion of a warrant from the rest of the warrant, thereby permitting the admission of evidence pursuant to the valid portion of the warrant. 975 F.2d 72, 79 (2d Cir. 1992) ("Fourth Amendment guarantees are adequately protected by suppressing only those items whose seizure is justified solely on the basis of the constitutionally infirm portion of the warrant, which no reasonably well-trained officer could presume to be valid." (citing *United States* v. *Riggs*, 690 F.2d 298, 300 (1st Cir. 1982); *United States* v. *Christine*, 687 F.2d 749, 754 (3d Cir. 1982); *United States* v. *Cook*, 657 F.2d 730, 735 (5th Cir. 1981)).

For this remedy to apply, "the court must be able to excise from the warrant those clauses that fail the particularity or probable cause requirements in a manner that leaves behind a coherent, constitutionally compliant redacted warrant." *United States* v. *Galpin*, 720 F.3d at 448-49. Severance "is not available where no part of the warrant is sufficiently particularized, where no portion of the warrant may be meaningfully severed, or where the sufficiently particularized portions make up only an insignificant or tangential part of the warrant." *United States* v. *George,* 975 F.2d at 79-80 (citations omitted).

119

### 4. The Pen/Trap Act

The Pen/Trap Act authorizes installation of a "pen register" to record or capture, prospectively, "dialing, routing, addressing, or signaling information" that is "transmitted by an instrument or facility from which a wire or electronic communication is transmitted," and a "trap and trace" device to "identify the originating number or . . . source of a wire or electronic communication," 18 U.S.C. § 3127(3) & (4). To install either device, the Government must certify that the information likely to be collected is relevant to an ongoing criminal investigation, but it is not required to establish probable cause or obtain a warrant. 18 U.S.C. § 3122.

The Supreme Court has held, in the context of telephones, that the use of a pen register does not constitute a "search" under the Fourth Amendment, for which a warrant is ordinarily required, because "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties," such as the dialing instructions he conveys to telephone companies when he makes a call. *Smith*, 442 U.S. at 743-44.

This same principle behind the "third party doctrine" applies when a pen register is used to collect the data, like IP addresses, used to route electronic communications over the Internet, which is "constitutionally indistinguishable from the use of a pen register that the Court approved in *Smith*." *United States* v. *Forrester*, 512 F.3d 500, 510 (9th Cir. 2008); *accord United States* v. *Graham*, — F.3d. —, Nos. 12-4659, 12-4825, 2016 WL 3068018, at *7-8 (4th Cir. May 31,

120

2016); *United States* v. *Christie*, 624 F.3d 558, 574 (3d Cir. 2010). Just like telephone users, Internet users "rely on third-party equipment in order to engage in communication" and "have no expectation of privacy in . . . the IP addresses of the websites they visit, because they should know that this information is provided to and used by Internet service providers for the specific purpose of directing the routing of information." *United States* v. *Forrester*, 512 F.3d at 510; *accord Graham*, 2016 WL 3068018, at *7. Accordingly, IP addresses and similar Internet routing information are not protected by the Fourth Amendment and can be collected without a warrant under the Pen/Trap Act. *Id.*

## 5. Standard of Review

"The factual findings on which the district court's suppression ruling was based are reviewed for clear error, viewing the evidence in the light most favorable to the government; the legal conclusions on which this ruling was based are reviewed *de novo*." *United States* v. *Lewis*, 386 F.3d 475, 480 (2d Cir. 2004); *see also United States* v. *George*, 975 F.2d at 75, 77 (whether search warrant is sufficiently particular, or good faith exception applies, are questions of law reviewed *de novo*). Additionally, this Court "may uphold the validity of a judgment on any ground that finds support in the record." *United States* v. *Ganias*, 2016 WL 3031285, at *6 (internal quotation marks omitted).

121

## C. Discussion

### 1. The Warrants Were Particular

Ulbricht's argument that the Laptop, Facebook, and Google Warrants "lacked *any* particularity," and thus violated the Fourth Amendment (Br. 98), is unavailing, because the applications recited sufficient probable cause to justify the scope of the Warrants, which themselves listed particular items and offenses that, in turn, limited other general language therein.

To satisfy the particularity requirement, a warrant must specify: (1) the offenses for which probable cause has been established; (2) the place to be searched; and (3) the items to be seized relating to the specified offenses. *Galpin*, 720 F.3d at 445-46. Ulbricht contends that "the terms of the warrants imposed no limitation at all on the parameters of the searches" that law enforcement were authorized to undertake (Br. 104), but in fact, the Warrants enumerated categories of communications and other information that were relevant to establishing Ulbricht's identity as "DPR," through parallels in their language and behavior. (S. 252-53, 334-35, 393-94). The Warrants and their applications explicitly "link[ed] the items to be searched and seized to the suspected criminal activity." *United States* v. *Rosa*, 626 F.3d 56, 62 (2d Cir. 2010). For example, even the clauses that authorized the seizure of "any communications or writings by Ulbricht" and "any evidence concerning Ulbricht's travel or patterns of movement" (highlighted by Ulbricht and *amicus curiae* National Association of Criminal Defense Lawyers (Br. 99;

122

NACDL Br. 10-11)), were phrased to "identify with reasonable certainty those items that the magistrate has authorized [the agents] to seize." *George*, 975 F.2d at 75.

Moreover, those categories of evidence, while broad, were explicitly justified by the Warrant applications, which described "the items to be seized with as much particularity as the circumstances reasonably allow[ed]." *George*, 975 F.2d at 76. Ulbricht's communications and travels were highly relevant to the goal of the Government's investigation at this stage: "corroborating the identification of Ulbricht as the Silk Road user 'Dread Pirate Roberts.'" (S. 248; *see also* S. 328, 387). It was the parallels between the online persona "DPR" and Ulbricht's attributable statements and conduct—his online habits, where he lived and traveled, and even his tone, spelling, syntax, and viewpoints—that led the Government to develop probable cause to believe Ulbricht was "DPR." (S. 231-35, 248, 327-29, 359-68, 386-88, 418-27). All "communications" and "travel" records are broad categories, but, like business records of an enterprise "permeated with fraud," *Nat'l City Trading Corp.* v. *United States*, 635 F.2d at 1026, they were justifiably seized, because even innocent communications or travel records might contain details overlapping with "DPR"'s (innocent) statements, shoring up the proof against Ulbricht. *See also Andresen* v. *Maryland*, 427 U.S. at 481 n.10 (acknowledging that to uncover a complex scheme, a warrant may seek a broader range of evidence). And, as the application foreshadowed, the warrant yielded additional evidence of this type establishing Ulbricht's identity beyond a reasonable

123

doubt at trial. (*See, e.g.,* Tr. 1298-1301, 2143 (statements made by "DPR" coupled with pictures and posts from Facebook and information about Ulbricht's whereabouts gleaned from Google used to establish identity, including that both "DPR" and Ulbricht were likely in Thailand at same time)).[28]

*Amicus* NACDL also challenges references to "any other evidence" implicating Ulbricht in the subject crimes (NACDL Br. 11 (referring to S. 248-49, 252-53)). But while a warrant that authorizes the seizure of "any other evidence relating to the commission of *a crime,*" *George*, 975 F.2d at 75 (emphasis added), or "violations of . . . federal statutes" generally, *Galpin*, 720 F.3d at 447, is invalid, a warrant that lists specific offenses, and specific items that may be seized as evidence (or fruits or instrumentalities) of those offenses, will not be invalidated by reference to "other evidence" of those identified offenses, because the specific terms are naturally read to limit the general ones. *See Andresen*, 427 U.S. at 480-82 & n.10; *Young*, 745 F.2d at 759-60.

Ulbricht and NADCL's principal contention sounds less in the doctrine of particularity than it faults the Warrants for permitting the Government to

---

[28] For this reason, *amicus* NACDL's suggestion (NACDL Br. 24-26) that this Court limit warrants by the information the Government already has at that stage of the investigation is misguided, because it would defeat the point of an investigative technique designed to gather *new* information.

124

search the data it obtained to find the identified cate-
gories of information, *i.e.,* that the Warrants allowed
"a detailed review of every piece of digital infor-
mation," instead of prescribing search protocols.
(Br. 102; NACDL Br. 12-23). But as this Court recent-
ly acknowledged *en banc,* comprehensive review of
digital media is often necessary, because although "to
a user a hard drive may seem like a file cabinet, a
digital forensic expert reasonably perceives the hard
drive simply as a coherent physical storage medium
for digital data—data which is interspersed *through-
out* the medium, which itself must be maintained and
accessed with care, lest this data be altered or de-
stroyed." *Ganias*, 2016 WL 3031285, at *10 (emphasis
original); *see also id.* (noting files "are not as discrete
as they may appear to a user," and "[t]heir intersper-
sion through a digital storage medium . . . may affect
the degree to which it is feasible . . . to fully extract
and segregate responsive data from non-responsive
data"). Although a warrant that authorizes the
search of electronic devices without specifying what
data thereon may be seized will be invalid, *see United
States* v. *Rosa*, 626 F.3d at 58-59, 62, this Court has
recognized that "the size or other outwardly visible
characteristics of a file may disclose nothing about its
contents," which is why, "by necessity, government
efforts to locate particular files will require examin-
ing a great many other files to exclude the possibility
that the sought-after data are concealed there," *Gal-
pin*, 720 F.3d at 447 (internal quotation marks omit-
ted). This practical reality of digital media "demands
a heightened sensitivity to the particularity require-
ment in the context of digital searches," *id.*, but it

125

does not impeach the *procedure* used here to execute the warrants. *Cf. Andresen*, 427 U.S. at 482 n.11 ("[I]t is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized.").[29]

_____

[29] The NACDL urges this Court to reject the search procedures laid out on the warrants (S. 253-55, 331-32, 390-91) and to adopt the procedures set forth by Judge Kozinski in his concurrence in *United States* v. *Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1177 (9th Cir. 2010) (*en banc*) (*per curiam*) ("*CDT III*"). (NACDL Br. 13-19). But the Second Circuit has expressly declined to adopt Judge Kozinski's suggested protocols as required under the Fourth Amendment. *See Galpin*, 720 F.3d at 451 (citing *CDT III* and noting "[u]nlike the Ninth Circuit, we have not required specific search protocols or minimization undertakings as basic predicates for upholding digital search warrants, and we do not impose any rigid requirements in that regard at this juncture"). Even the Ninth Circuit has noted the limited precedential value of *CDT III. See United States* v. *Schesso*, 730 F.3d 1040, 1049-50 (9th Cir. 2013) (describing search procedures in *CDT* as "no longer binding circuit precedent" and emphasizing no "clear-cut rule" because, "[u]ltimately, the proper balance between the government's interest in law enforcement and the right of individuals to be free from unreasonable searches and seizures of electronic data must be determined on a case-by-case basis"). To date, no other federal Court

126

### 2. Suppression Would Not Be an Appropriate Remedy

Even if some portions of the Warrants were overbroad, suppression would have been inappropriate, for two reasons.

First, as the District Court found, "the law enforcement agents who executed the searches and seizures at issue were entitled to rely in good faith upon the magistrates judges'" decision to issue the Warrants. (A. 207 n.12). That reliance was "objectively reasonable," *United States* v. *Leon*, 468 U.S. 897, 921-22 (1984); *see also United States* v. *Moore*, 968 F.2d 216, 222 (2d Cir. 1992), and neither Ulbricht nor *amicus* contends otherwise. There is no evidence investigators "sought evidence beyond the scope of the [crimes] that [were] particularized in the warrant application[s] and for which the application[s] supplied probable cause," *Galpin*, 720 F.3d at 453, nor do the Warrants contain "*only* a catch-all description of the property to be seized," so as to render them "facially invalid" and incapable of supporting good faith reliance, *George*, 975 F.2d at 77-78 (internal quotation marks omitted). Put simply, "[t]here is nothing more the officer could have or should have done under these circumstances to be sure his search would be legal." *United States* v. *Ganias*, 2016 WL 3031285, at *18 (internal quotation marks omitted); *see also United States* v. *Clark*, 638 F.3d at 105 ("[W]here the need

_____

of Appeals has required *CDT III*'s procedures in every case involving a search of electronic evidence.

127

for specificity in a warrant or warrant affidavit on a particular point was not yet settled or was otherwise ambiguous, we have declined to find a well-trained officer could not reasonably rely on a warrant issued in the absence of such specificity.").

Second, even if the magistrate judges erred in approving the Warrants, *and* the agents were deemed to have acted unreasonably in relying on them, wholesale suppression of their fruits would be inappropriate. "[A] search conducted pursuant to a warrant held unconstitutional in part does not invalidate the entire search." *George*, 975 F.2d at 79. Rather, the exclusionary rule requires "suppressing only those items whose seizure is justified solely on the basis of the constitutionally infirm portion of the warrant." *Id.* As long as the warrant's "valid parts are distinguishable from the nonvalid parts," and the valid parts do not "make up 'only an insignificant or tangential part of the warrant,'" severance is appropriate. *Galpin*, 720 F.3d at 448-49 (*quoting George*, 975 F.2d at 80). Accordingly, because the evidence admitted at trial fell into specific categories of the Warrant, nothing would have been suppressed, even if the Warrant's more general provisions (referring to "other evidence") were struck.

### 3. The Pen/Trap Orders Were Valid

Ulbricht's challenge to the pen/trap orders has no support in either statutory or case law and should be rejected.

The Government may obtain dialing information prospectively and without a warrant, because there is

128

no reasonable expectation of privacy in non-content information used to route communications, *Smith*, 442 U.S. at 743-44, and the use of a pen register to collect basic Internet routing data is "constitutionally indistinguishable" from the use of a pen register to collect dialing instructions, *Forrester*, 512 F.3d at 510; *see also Graham*, — F.3d. — , Nos. 12-4659, 12-4825, 2016 WL 3068018, at *7-8; *United States* v. *Christie*, 624 F.3d at 574. The data collected by the Government here (namely, source and destination IP addresses, and associated dates and times of communication) are analogous to the dialed numbers in *Smith* and plainly covered by the Pen/Trap Act. 18 U.S.C. § 3127(3) & (4).[30]

Ulbricht argues that the pen/trap orders were invalid, because they monitored Internet traffic in and out of his home, thus revealing activity in a special locus of constitutional privacy protection. (Br. 118-

──────────

[30]  Congress amended the Pen/Trap Act in 2001 to explicitly include non-content addressing information for Internet communications, in addition to telephone toll records. 18 U.S.C. § 3127(3); *see also* 147 Cong. Rec. S11,006-07 (Oct. 25, 2001) (statement of Sen. Leahy) (describing amendment as a way to "ensure[ ] that the pen register and trap and trace provisions apply to facilities other than telephone lines (e.g., the Internet)"); 147 Cong. Rec. H7,197 (Oct. 23, 2001) (statement of Rep. Conyers) (same).

129

20).[31] But that argument proves too much, as today's telephone pen registers likewise reveal when someone is home, when they answer the phone or place a call. *See Smith*, 442 U.S. at 743 ("The fact that [petitioner] dialed the number on his home phone rather than on some other phone could make no conceivable difference, nor could any subscriber rationally think that it would."); *see also United States* v. *Todisco*, 667

------

[31] Ulbricht also mischaracterizes the pen/trap orders as "hybrids," procured through both 18 U.S.C. § 3127 and 18 U.S.C. § 2703(d), and akin to cell-site location orders (Br. 122), but in fact, the pen/trap orders were sought and issued only pursuant to the Pen/Trap Act, 18 U.S.C. §§ 3121-27. (*See*, *e.g.*, S. 67-78). Accordingly, the authorities addressing location data under the Stored Communications Act are irrelevant. (*Contra* Br. 122-24).

Nor did the pen/trap orders authorize the collection of content. (Tarbell Decl. ¶ 19). The Government did not collect the URLs for websites Ulbricht viewed or the searches he typed into Google. (*Contra* Br. 113-14). Nor did it collect geolocation data. (Tarbell Decl. ¶ 21). Rather, the Government sought and obtained only routing information that revealed when someone using the specified facilities connected to the Internet and the IP addresses of the computers he was communicating with, just as a pen register on a home phone would reveal when an occupant was using the phone and what numbers he dialed.

F.2d 255, 258 (2d Cir. 1981) (installing a pen register on a home telephone is not a Fourth Amendment search, even if it is installed by police without the assistance of a telephone company).

Even if this Court were to be the first to conclude that use of the Pen/Trap Act to collect Internet routing information violates the Fourth Amendment, contrary to the "strong presumption of constitutionality due to an Act of Congress," *United States* v. *Watson*, 423 U.S. 411, 416 (1976) (internal quotation marks omitted), agents were entitled to rely in good faith on orders issued under the Pen/Trap Act, and suppression of their fruits would be unjustified, *see Illinois* v. *Krull*, 480 U.S. at 349.

Accordingly, the District Court properly denied Ulbricht's motions to suppress.

## POINT VII

## Ulbricht's Sentence Was Reasonable

### A.   Relevant Facts

#### 1.   The Presentence Report

In advance of the defendant's sentencing, the Probation Office prepared a Presentence Report, which calculated that the Total Offense Level was 43, that the defendant's Criminal History Category was I, and that the recommended sentence under the Guidelines was life imprisonment. (PSR at 36).

Section 2D1.1 drove the Guidelines calculation. Based on a "conservative" estimate of drug weight,

131

derived from the Silk Road website's transactions database, Ulbricht was accountable for more than 82 kilograms of cocaine, more than 26 kilograms of heroin, and more than 8 kilograms of methamphetamine (PSR ¶¶ 60, 94), for a base offense level of 36 (PSR ¶ 94 & n.2), which was increased by 4 levels, for operating a continuing criminal enterprise (U.S.S.G. § 2D1.5; PSR ¶ 94). The Probation Office increased that offense level of 40 by three enhancements of two levels each, for directing the use of violence (U.S.S.G. § 2D1.1(b)(2)), distributing a controlled substance through mass-marketing by means of an interactive computer service (U.S.S.G. § 2D1.1(b)(7)), and maintaining a premises for the purpose of manufacturing or distributing a controlled substance (U.S.S.G. § 2D1.1(b)(12)). (PSR ¶ 94).[32] The Probation Office increased that offense level by two levels for money laundering, pursuant to Section 2S1.1(b)(2)(B) (PSR ¶ 95), and arrived at a total offense level of 50. (PSR ¶ 99). After conducting a grouping analysis that did not impact that offense level (PSR ¶¶ 100-20), the Probation Office reduced the offense level to the maximum under the Guidelines, 43, pursuant to Section 5A, comment. (n.2).

---

[32] Accordingly, the base offense level should have been 46, not 48, as the Probation Office calculated, although as described below, the mistake was not material, because the maximum offense level under the Guidelines is 43.

132

The Probation Office recommended that Ulbricht be sentenced to life imprisonment. (PSR at 36). Such a sentence was warranted in part because Silk Road was "unprecedented" in its ability to entice people who would not otherwise have engaged in "traditional drug deals." (PSR at 38). In light of Silk Road imitators that were quick to populate the dark web after Ulbricht's arrest, "a severe sentence is needed to provide general deterrence." (PSR at 38).

## 2. The Overdose Deaths

Although it did not impact the Guidelines calculation, the Government urged the District Court to consider the overdose deaths of six individuals that were linked to drugs purchased from Silk Road. Those deaths were relevant, the Government argued, because they "illustrate the obvious: that drugs can cause serious harm, including death, particularly when distributed in the massive quantities they were here." (A. 902). The individuals who died were:

**Jordan M.**: On August 29, 2013, first responders found Jordan M. unconscious, slumped in a chair next to his laptop computer in his bedroom, in Bellevue, Washington. (PSR ¶ 62). A black belt with a looped end was lying near his feet, and a hypodermic needle, a bag containing 1.7 grams of powdered heroin, and a torn open express mail package were strewn around the room. (PSR ¶ 63). Jordan's computer was open to his private message inbox on Silk Road, which included messages from a Silk Road vendor about a package of heroin and Xanax due to arrive that morning, with a tracking number that matched

133

the package in his room; another browser window showed tracking information for the package from the Postal Service. (PSR ¶ 64). Jordan M. was transferred to a hospital where he died two days later. (PSR ¶ 62). An autopsy determined the cause of death to be acute intoxication from heroin, Xanax, and valium, all drugs he had ordered on Silk Road. (PSR ¶¶ 62, 65, 68).

**Preston B.**: On February 15, 2013, during a post-prom party at a hotel, Preston B., a 16-year old boy from Perth, Australia, took two doses of 25i-NBOMe (known as "N-bomb"), a powerful synthetic drug designed to mimic LSD, which one of Preston's friends purchased from Silk Road. (PSR ¶¶ 77-78). Preston began acting erratically, muttering incoherently with aggressive outbursts and random, destructive behavior, seemingly "at war with himself." (PSR ¶ 79). When Preston's friends went to get help, Preston screamed loudly, then jumped off the room's balcony to the pool deck below. (PSR ¶ 80). He died two days later. (PSR ¶ 77).

**Bryan B.**: On October 7, 2013, Boston police found Bryan B., age 25, dead in his apartment, with a belt in his left hand and a small plastic bag of brown heroin and a syringe next to him. (PSR ¶ 69). Opiates were found in his system and were listed as the cause of death on his death certificate. (PSR ¶ 69). Only days before law enforcement shuttered Silk Road, Bryan used the website to purchase a pack of syringes and one gram of heroin (approximately 5 to 10 doses' worth), which arrived on October 1. (PSR ¶¶ 70-72).

**Alejandro N.**: On September 10, 2012, Alejandro N., age 16, took four doses of N-bomb that had been purchased from a dealer on Silk Road. (PSR ¶¶ 73-76). Alejandro acted "goofy" at first, then became increasingly incoherent and aggressive before he fell on his face, had a seizure, and died on the floor of a friend's garage in California. (PSR ¶ 74).

**Scott W.**: On May 19, 2013, Scott W., a 36-year old man from Australia, was found dead at his home, hunched over his desk, with his sleeve rolled up and a used syringe and a plastic bag of cream-colored powder nearby. (PSR ¶ 85). An autopsy found toxic levels of morphine in Scott's system that were "almost certainly derived from heroin," as well as depressants with the potential to increase the drug's harmful effects. (PSR ¶ 85). The cause of death was determined to be "multiple drug toxicity." (A. 926, 1322). Scott had used Silk Road to place nearly 70 orders between January and May 2013, including 9 orders for heroin and 19 orders for depressants, all of which were shipped to him at the address where he was found dead. (PSR ¶ 86).

**Jacob L.**: On February 14, 2013, the mother of 22-year-old Jacob L. found him dead at their home in Australia. (PSR ¶ 81). Jacob was recently treated for bronchitis, and the autopsy listed the cause of death as pneumonia, although heroin, cocaine, and other drugs were found in his system, which "may have blunted the deceased's perception of the severity of his illness." (PSR ¶¶ 82-83). A Silk Road account named "Needheroin" was used to place more than 30 orders for various drugs between early 2012 and ear-

135

ly 2013, including heroin, "speed," "meth," and "crack," which were shipped to Jacob under his true name at the address where he was found dead. (PSR ¶ 84).

These were, the Government argued, "specific examples of the harm caused by drug trafficking in the context of this case," which resulted from risks that were "plainly foreseeable" to the defendant. (A. 902).

### 3. The Parties' Sentencing Submissions

Through its first of several submissions, on May 15, 2015, the defense made two principal arguments to mitigate offense conduct. First, the defense contended that Silk Road made drug dealing and using safer, through a variety of measures like "access to physician counseling," "quality control," and vendor "ratings." (A. 904-05). It invoked academic studies of Silk Road that found that anonymity allowed members to "converse freely about their drug use," "minimized drug-related stigma by reinforcing a[ ] sense of community," and, in some cases, made it easier to get information about how to quit using. (A. 905-06 (internal quotation marks omitted)).

Second, relying on review of the relevant records by a forensic pathologist, Dr. Mark Taff (S. 437-47), the defense argued that the evidence was "utterly insufficient to attribute any of the deaths to drugs purchased from vendors on the Silk Road site," and that they should not be included in the Presentence Report. (A. 904, 1047-48). According to the defense, deficiencies in the death investigations would prevent any medical examiner from opining "to a reasonable

degree of medical certainty as to the cause, manner, and time of death," in a manner that would qualify for statutory, criminal liability. (A. 911, 913-14). For example, Jordan M.'s death might have been caused by hemorrhaging in his brain after he took the heroin and other drugs that were in his system. (A. 923-24). Dr. Taff also pointed to gaps in the paperwork associated with various cases. (*E.g.*, A. 927).

The defense specifically disclaimed the need for a hearing to settle any factual disputes, however, encouraging the District Court to rely on the papers. (A. 903-04).[33]

In a second submission, on May 22, 2015, the defense sought a sentence "substantially below the applicable advisory" Guidelines sentence, based on the defendant's history and characteristics and other factors. (A. 973-75). After a lengthy recitation of Ulbricht's personal history, Ulbricht argued that he created Silk Road because he was a "young idealist" who wanted people to have "the freedom to make their own choices, to pursue their own happiness," and that he "never sought to create a site that would provide an avenue for people to feed their addictions" or because he was interested in "financial gain." (A. 1003 (internal quotation marks omitted)). The defense also urged the District Court to disregard the attempted murder-for-hire allegations, and objected

---

[33] The District Court ordered the defense to respond to several questions in response to its initial filing (A. 971-72), and it did so (A. 1386-1413).

137

to an enhancement based on that conduct, because the plots were "fictitious" and "limited to cyberspace." (A. 1007, 1047-48). The defense argued that Ulbricht's conduct was more analogous to running a so-called crack house, in violation of Title 18, United States Code, Section 856, than being a member of a drug distribution conspiracy. (A. 1014). As such, it would be unfair to sentence him as if he were one of "the most dangerous offenders" (A. 1019 (internal quotation marks omitted)), and it would not be justified by concerns about deterrence. (A. 1021-46).[34]

For its part, the Government sought "a lengthy sentence, one substantially above the mandatory minimum" of 20 years' imprisonment. (A. 1315). In the Government's view, Ulbricht was the kingpin of a global drug-trafficking enterprise who was responsible for all of the foreseeable consequences of his actions, including the multiple deaths tied to drug sales on Silk Road. (A. 1316-24). Ulbricht knew, and sometimes mocked the fact, that his customers were often addicts struggling to quit, and he took their money, all the same. (A. 1327). The proliferation of "dark markets" in the wake of Silk Road's founding underscored the need for general deterrence. (A. 1327-28).

---

[34] The defense made three additional submissions regarding the profits, safety, transactions, and customers of Silk Road; attaching additional letters in support of Ulbricht; and including a final report from Dr. Taff regarding the six overdose deaths. (A. 1386-1413, 1414-34, 1435-46).

138

And notwithstanding positive aspects of Ulbricht's personal history, he "consciously chose to operate a criminal enterprise for several years, motivated in substantial part by greed and vanity." (A. 1328). The Government also submitted five victim impact statements from relatives of the individuals whose drug-related deaths were described above. (A. 1362-85).

### 4. Ulbricht's Sentencing

Judge Forrest sentenced Ulbricht on May 29, 2015. (A. 1447-1544). After noting that she had read "the entirety of every piece of paper submitted to [her] in this proceeding" (A. 1451), the District Court turned to the Guidelines calculation and the Presentence Report. (A. 1458). In a decision not challenged on appeal, the District Court found "ample and unambiguous evidence that Ulbricht commissioned five murders as part of his efforts to protect his criminal enterprise and that he paid for these murders." (A. 1464-66). Consistent with the Probation Office, the District Court found that the defendant's offense level was 43 and that his Criminal History Category was I. (A. 1470).

The District Court also denied Ulbricht's request to strike references in the Presentence Report to the six overdose deaths tied to drugs purchased from Silk Road. (A. 1471-72). The District Court acknowledged Dr. Taff's report, but found that the standard he applied (whether he could "render opinions to a reasonable degree of medical certainty as to the cause" of death) was inapplicable here, because the District Court was not attempting to determine whether the

139

drugs purchased on Silk Road were a "but-for" cause of death. (A. 1476). Instead, the relevant question was whether "there is a connection between" those drugs and death, that is, "whether the drugs . . . purchased on Silk Road were ingested and whether the ingestion of those drugs may be reasonably associated with those deaths." (A. 1476). The District Court found, by a preponderance of the evidence, a "direct tie" between Silk Road and "each of the decedents and to the purchase of the drugs in proximate—very proximate relation to their death." (A. 1473-74). That evidence was "strong and even more than sufficient circumstantial evidence," which the District Court recounted in part. (A. 1476-80). The District Court then adopted the PSR's factual findings. (A. 1481).

After hearing from the parents of two of those decedents, Bryan B. and Preston B. (A. 1482-96), the Government, and the defense (A. 1496-1508), the District Court pronounced sentence. Judge Forrest said she "spent well over 100 hours on this sentence contemplating it, walking and being silent and thinking about it, and running over and over and over it in my mind from every angle I could think of." (A. 1509). The District Court emphasized that the "biggest part of the sentencing" is "thinking about each and every fact and consideration and provision of law that [it is] required to look at." (A. 1510). The District Court noted that while the Guidelines recommended a life sentence, she arrived at her sentence only after independently considering the factors set forth in Section 3553(a). (A. 1510). Citing extensively to the record, the District Court analyzed those factors while rejecting a number of Ulbricht's arguments, including

140

that (1) Silk Road was started by a naïve and impulsive young man; (2) Silk Road was merely an economic experiment; (3) Silk Road did not expand the market for drugs; (4) the sale of drugs imposes no costs on society; (4) Ulbricht's murder-for-hire schemes should be ignored; (5) the negative effects of Silk Road were mitigated by its "harm reduction" features; (6) general deterrence, through sentencing, is illusory; (7) personal deterrence is unnecessary in this case; and (8) the recent sentencing of a Silk Road moderator to time-served provided a meaningful benchmark. (A. 1514-36).

After reiterating that it had "examined each potential year of incarceration carefully," the District Court sentenced Ulbricht to life imprisonment on both Counts Two and Four and to 5, 15, and 20 years' imprisonment on Counts Five, Six, and Seven, respectively, to be served concurrently. (A. 1539-40).[35] The District Court also ordered Ulbricht to forfeit $183,961,921 (A. 1536) and imposed a $500 special assessment (A. 1541).

The District Court found, "after deep contemplation and much searching . . . that this sentence and no other is sufficient but not greater than necessary to meet the factors under 3553(a)." (A. 1541).

_____

[35] At the beginning of sentencing, the District Court vacated the convictions on Counts One and Three, as lesser included offenses of Counts Two and Four, respectively (and therefore duplicative). (A. 1459-61; Docket Entries 258, 259).

141

## B. Applicable Law

Appellate review of a district court's sentence "encompasses two components: procedural review and substantive review." *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*). An appellate court "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the Section 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall* v. *United States*, 552 U.S. 38, 51 (2007). In that regard, a district court's findings of fact are reviewed for clear error, *United States* v. *Broxmeyer*, 699 F.3d 265, 281 (2d Cir. 2012), and application of the Guidelines based on those factual findings is reviewed *de novo*, *United States* v. *Reingold*, 731 F.3d 204, 222 (2d Cir. 2013). Procedural error also occurs if the sentencing judge fails to provide an adequate explanation for the sentence imposed, which requires showing that "it has 'considered the parties' arguments' and that it has a 'reasoned basis for exercising [its] own legal decisionmaking authority.'" *United States* v. *Cavera*, 550 F.3d at 193 (quoting *Rita* v. *United States*, 551 U.S. 338, 356 (2007)).

If the Court determines that there was no procedural error, it "should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall* v. *United States*,

142

552 U.S. at 51. Defendants challenging the substantive reasonableness of their sentences bear a "heavy burden[,] because [this Court's] review of a sentence for substantive reasonableness is particularly deferential." *United States* v. *Broxmeyer*, 699 F.3d at 289. In conducting such review, this Court must "take into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts." *Cavera*, 550 F.3d at 190. This Court cannot "substitute [its] own judgment for the district court's on the question of what is sufficient to meet the § 3553(a) considerations in any particular case," and should "set aside a district court's substantive determination only in exceptional cases where the trial court's decision 'cannot be located within the range of permissible decisions.'" *Id*. at 189 (quoting *United States* v. *Rigas*, 490 F.3d 208, 238 (2d Cir. 2007)); *see also United States* v. *Fernandez*, 443 F.3d 19, 26-27 (2d Cir. 2006).

When applying the applicable, deferential standard of review, this Court will also bear in mind that a sentencing judge may take into consideration his or her "own sense of what is a fair and just sentence under all of the circumstances." *United States* v. *Jones*, 460 F.3d 191, 195 (2d Cir. 2006). "That is the historic role of sentencing judges, and it may continue to be exercised, subject to the reviewing court's ultimate authority to reject any sentence that exceeds the bounds of reasonableness." *Id.* "The particular weight to be afforded aggravating and mitigating factors is a matter firmly committed to the discretion of the sentencing judge," *Broxmeyer*, 699 F.3d at 289 (internal

quotation marks omitted), and it need not be the weight that this Court would give each factor, so long as "the factor, as explained by the district court, can bear the weight assigned it under the totality of circumstances in the case." *Cavera*, 550 F.3d at 191; *accord United States* v. *Pope,* 554 F.3d 240, 246-47 (2d Cir. 2009).

Review for substantive reasonableness is comparable to considering whether a jury's verdict constitutes "manifest injustice" or whether state actors have engaged in conduct that "shocks the conscience." *United States* v. *Rigas*, 583 F.3d at 122-23. At bottom, the substantive reasonableness standard "provide[s] a backstop for those few cases that, although procedurally correct, would nonetheless damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law." *Id.* at 123.

## C. Discussion

### 1. The District Court Did Not Make a Procedural Error

Ulbricht argues that the District Court committed procedural error by considering the six overdose deaths in imposing sentence, because its factual finding that those deaths related to Silk Road was "clearly erroneous" and relied on the wrong legal standard. (Br. 125). To the contrary, the District Court was entitled to consider deaths linked to Silk Road in sentencing Ulbricht, and its factual finding that those six overdoses qualified was not clearly erroneous.

144

In fashioning a sentence, the District Court was obligated to consider "the nature and circumstances of the offense" and "the seriousness of the offense." 18 U.S.C. § 3553(a)(1) & (a)(2)(A). For these purposes, the term "offense" is broad and includes more than merely the conduct that justifies specific enhancements under the Guidelines. *See United States* v. *Kulick*, 629 F.3d 165, 174 n.7 (3d Cir. 2010) ("[C]onduct that is in some way 'related' to the offense conduct need not be technically covered by the definition of relevant conduct in order to be considered in a § 3553(a) analysis." (internal quotation marks omitted)). This provision contains no causation requirement itself, and encompasses harm to victims broadly, even indirect victims who lack the "nexus or proximity to the offense" required by the Guidelines. *United States* v. *Singer*, — F.3d —, No. 15-2169, 2016 WL 3244869, at *7 (10th Cir. June 13, 2016) (internal quotation marks omitted); *see also* Fed. R. Crim. P. 32(d)(2)(B) (requiring presentence reports to contain "information that assesses any financial, social, psychological, and medical impact on *any victim*" (emphasis added)).[36] Ulbricht faults the District Court for

--------

[36] Even under the Guidelines, which look to the "harm that resulted from" jointly undertaken criminal activity, U.S.S.G. § 1B1.3(a)(3), this Court has taken an expansive view of consequences relevant to sentencing. What matters, under that provision, is whether the defendant "knowingly risked" the lives of others by "put[ting] into motion a chain of events that contained an inevitable tragic result." *United States*

145

_____

v. *Molina*, 106 F.3d 1118, 1124 (2d Cir. 1997) (wounding of a bystander by a security guard "resulted from" the defendants' robbery attempt) (internal quotation marks omitted). Even where a defendant's conduct merely "contributed to the danger" directly caused by others, he is properly punished for it. *United States* v. *Moskowitz*, 888 F.2d 223, 227 (2d Cir. 1989). The focus on the defendant's conduct and state of mind, and the reasonable foreseeability of consequences flowing therefrom (*i.e.*, proximate cause), as opposed to but for causation, is appropriate at sentencing.

This Court has recognized, in the context of common law torts, that, although it can be difficult to determine whether one among several factors "caused" injury, "if (a) a negligent act was deemed wrongful *because* that act increased the chances that a particular type of accident would occur, and (b) a mishap of that very sort did happen, this was enough to support a finding by the trier of fact that the negligent behavior caused the harm." *Zuchowicz* v. *United States*, 140 F.3d 381, 390 (2d Cir. 1998); *see also United States* v. *Kearney*, 672 F.3d 81, 98 (1st Cir. 2012) ("'When the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to each of them individually would absolve all of them, the conduct of each is a cause in fact of the event.'" (quoting Keeton et al., *Prosser and Keeton on Torts* § 41 at 268 (5th ed. 1984))); *Restatement (Third) of Torts: Phys. & Emot. Harm* § 27, cmt. n.g (2010) ("[S]ome or all of the person's exposures [to a toxic

146

evaluating whether the deaths were "related to Silk Road" (Br. 128), but that was the right standard for

—————————

agent] may not have been but-for causes of the disease. Nevertheless, each of the exposures prior to the person's contracting the disease . . . is a factual cause of the person's disease . . . . Whether there are some exposures that are sufficiently *de minimis* that the actor should not be held liable is a matter not of factual causation, but rather of policy . . . ."). While that rule may not suffice to support a conviction beyond a reasonable doubt, "given the need for clarity and certainty in the criminal law," *Burrage* v. *United States*, 134 S. Ct. 881, 890-92 (2014), it is appropriate in the context of sentencing, where "less demanding causal standards are necessary . . . to vindicate the law's purposes," *Paroline* v. *United States*, 134 S. Ct. 1710, 1724 (2014) (applying principles of "aggregate causation" to determine fair restitution to a victim of child pornography, where many offenders besides the defendant viewed images of the victim).

Not even the defense's expert suggested that the decedents would have died *without* ingesting the drugs obtained from Silk Road. (*E.g.*, S. 445 ("Based on my review of [Alejandro A.'s] records, it is my opinion . . . that [his] cause of death was due to multiple drug (25I-NBOMe, marijuana and Prozac) intoxication.")). Accordingly, the District Court's conclusion that the drugs from Silk Road "caused" harm to the decedents was justified, even if they were not a "but for" cause. (A. 1473).

147

the District Court to use in evaluating the scope of "the offense." Whether "ingestion of those drugs [purchased on Silk Road] may be reasonably associated with those deaths" (A. 1476) was an entirely reasonable basis for measuring the consequences of Ulbricht's actions under Section 3553(a).

Moreover, the District Court's factual findings that those deaths were "connect[ed]" to Silk Road were amply supported by the record, and certainly not clearly erroneous. (A. 1476-77). In making its findings, the District Court was free to consider information from any source without "limitation," 18 U.S.C. § 3661; *see United States* v. *Gomez*, 580 F.3d 94, 105 (2d Cir. 2009) (sentencing court may consider, for example, "evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal in determining sentence" (internal quotation marks omitted)); *United States* v. *Lee*, 818 F.2d 1052, 1055 (2d Cir. 1987) ("Any circumstance that aids the sentencing court in deriving a more complete and true picture regarding the convicted person's . . . behavior is properly considered."). That information must, of course, be "reliable and accurate," as opposed to "'untrue'" or "'misinformation,'" but a district court's factual findings may be supported by a preponderance of the evidence, not just evidence beyond a reasonable doubt. *United States* v. *Lee*, 818 F.2d at 1055, 1057 (quoting *Townsend* v. *Burke*, 334 U.S. 736, 741 (1948)).

The evidence recounted above (and in more detail in paragraphs 62-86 of the Presentence Report) amply supported the District Court's finding that there

was "more than sufficient circumstantial evidence to show the connection" between Silk Road and those deaths. (A. 1476-77). The defense did not dispute the evidence proffered by the Government that each victim purchased illegal drugs (of the type that caused his death) either directly from Silk Road or from others who did, nor did the defense dispute that consuming those drugs contributed in some way to their death. Those facts were a sufficient basis for the District Court to consider those deaths in fashioning a sentence under Section 3553(a). *See United States* v. *Pacheco*, 489 F.3d 40, 45 (1st Cir. 2007) (affirming district court's conclusion that defendant's drugs caused victim's death where, among other things, the record contained no evidence that victim had other sources for narcotics); *United States* v. *Howard*, 454 F.3d 700, 702-03 (7th Cir. 2006) (affirming district court's conclusion that defendant was "responsible for" an overdose victim's death, and took that fact into account under Section 3553(a), where the weight of evidence suggested decedent had bought the heroin in question from defendant).

Ulbricht's principal argument, below and on appeal, is that gaps in the documentation relating to the overdose deaths, as well as evidence that some of the victims suffered from other health issues (or used other drugs), precluded the District Court from drawing any conclusions about the legal cause of their death. (Br. 130-33). But Dr. Taff, whose opinion Ulbricht relied on, addressed an irrelevant standard when he concluded that he could not draw conclusions about the causes of death "to a reasonable degree of forensic medical certainty." (S. 445). Whether

149

some of the victims might have deliberately over-
dosed or suffered from other health problems, or
whether their deaths were the result of a combination
of drugs, which were the questions he focused on (S.
438-39, 445-46), were all beside the point, for these
purposes. A drug dealer takes his customers as he
finds them. *See United States* v. *Pacheco*, 489 F.3d at
48 n.5 ("[W]hile [defendant] could not have anticipat-
ed the exact sequence of events that unfolded here, he
could (and should) have foreseen the possibility of the
kind of serious harm that in fact occurred."). And al-
though Dr. Taff may not have rendered an opinion on
the causes of death in most cases, he did not dispute
that illegal drugs played a role in each death. (*E.g.*, S.
440 (Jordan M.: "Autopsy report correctly attributed
death to multiple/combined drug intoxication."))[37]

_____

[37] *Amici* argue that the association between the
six overdose deaths and Silk Road is "specious," be-
cause the causes of overdose are "incredibly complex,"
and typically the "result of societal failings rather
than the drug use alone." (DPA Br. 9). Regardless of
whether more could be done as a matter of social poli-
cy to prevent those deaths, drugs themselves still
"cause" them, in any meaningful legal, moral, and
scientific sense of that word; they are also likely to do
so, and those who sell them are properly held ac-
countable for the "necessary or natural conse-
quence[s]" of their actions. *Pinkerton* v. *United States*,
328 U.S. 640, 648 (1946); *see also United States* v.
*Faulkner*, 636 F.3d 1009, 1022 (8th Cir. 2011) ("While
[the defendant] may not have played a direct role in

The District Court found there was "no factual doubt that[,] based on the evidence before the Court, the sale of the drugs through Silk Road caused harm to the decedents" (A. 1473), and that it would have been "pure speculation" to believe that any decedent would have died absent the drugs he obtained from Silk Road. (A. 1477-80). Those findings, which were not clearly erroneous, were relevant to Ulbricht's sentence and properly considered by the District Court under Section 3553(a).

## 2. A Life Sentence Was Justified

In challenging the substantive reasonableness of his sentence, Ulbricht implies that a life sentence is *per se* unreasonable (Br. 134), accuses the District Court of "ignor[ing]" his arguments (Br. 135), and contends that, because prison does not deter criminals, deterrence should not have factored into his sentence (Br. 138-39). To the contrary, the record reveals that Judge Forrest carefully weighed Ulbricht's arguments, but found them wanting in light of his conduct, and she imposed a sentence within the rea-

----------

manufacturing or distributing the heroin that caused [the victim's] death, he was part of the conspiracy that distributed the heroin."); *United States* v. *Westry*, 524 F.3d 1198, 1219 (11th Cir. 2008) ("Where a conspirator is involved in distributing drugs to addicts, . . . it is a reasonably foreseeable consequence that one or more of those addicts may overdose and die.").

151

sonable exercise of her broad discretion and with due regard for Section 3553(a)'s parsimony clause.

"Silk Road was a worldwide criminal drug enterprise with a massive geographic scope," which, the District Court found, "posed serious danger to public health and to our communities." (A. 1512). Approximately 1.5 million transactions, having a value of nearly $214 million, were conducted over Silk Road, the vast majority of which involved illegal drugs. (PSR ¶ 59). Silk Road became what it was, not because Ulbricht was "an impulsive or naïve young man," but because he viewed himself as "above the law," and consequently set out to "run[ ] a multi-million dollar criminal enterprise." (A. 1513-15). Ulbricht's own words, such as when he joked about a heroin addict who relapsed, or allowed cyanide to be sold on the site, were "the words of a man who knows precisely what he is doing and . . . who is callous as to the consequences or the harm and suffering that it may cause others." (A. 1521).

The District Court rejected the defense's arguments that Silk Road mitigated the harm of drug dealing by providing a safer forum to obtain narcotics. (A. 904-10). By making illegal drugs of every variety available over the Internet, the site "[brought] drugs to communities that previously may have had no access to such drugs or in such quantities." (A. 1522; *see also* A. 1487, 1492 (statements from deceased victims' relatives)). It greatly eased access to drugs for "first-time users or those trying different drugs for the first time." (A. 1522). As a result, the District Court found, there was "no doubt" that Silk

152

Road was "market expanding" and left "a tr[ai]l of drug users and drug dealers in its wake." (A. 1521-22). After summarizing the social costs of narcotics distribution and use, the District Court called the defense's harm reduction arguments "fantasy." (A. 1529).[38]

The District Court also cited the defendant's efforts to murder "five people to protect [his] drug enterprise." (A. 1528). While recognizing that there was no evidence the murders were actually carried out, the District Court found "no doubt" that the defendant intended to solicit them. (A. 1528-29).[39] As it noted, the defendant commissioned the murders, and paid for them—using $650,000 in Bitcoins—after receiving photographs purporting to be of the dead bodies, sent to him as confirmation that they were carried out. (A. 1471, 1529; PSR ¶¶ 49, 60).

Finally, the District Court emphasized the need for deterrence—both general and specific. As to general deterrence, the District Court found that what the defendant did "was unprecedented" in terms of the vast online criminal enterprise he created, and

—————————

[38] The District Court called a physician who advised Silk Road users on their drug use, sight-unseen, "particularly despicable" and "breathtakingly irresponsible." (A. 1529-30).

[39] *Amici* are mistaken to suggest such conduct needed to be proven to a jury beyond a reasonable doubt to be considered at sentencing. (DPA Br. 15). *See United States* v. *Gomez*, 580 F.3d at 105.

153

that the outcome of the case was being closely followed by the public. (A. 1533). Under the circumstances, the District Court found general deterrence interests to be particularly salient, commenting to the defendant: "For those considering stepping into your shoes, carrying some flag, some misguided flag, or doing something similar, they need to understand very clearly and without equivocation that if you break the law this way there will be very, very severe consequences." (A. 1533).

As to specific deterrence, the District Court found that the defendant could not be trusted to live a law-abiding life upon release from prison—despite his assurances to the court to that effect. It noted that the defendant had lived a double life for several years and had made substantial plans to flee and obtain citizenship in a Caribbean country. (A. 1533-34). The District Court also expressed doubt that the defendant had abandoned the beliefs that led him to start Silk Road in the first place. (A. 1534).

Based on the foregoing, meticulous response to the defense's arguments and dispassionate review of the evidence, the District Court's decision to impose a Guidelines sentence of life imprisonment was entirely reasonable. To be clear, the District Court noted that it arrived at its sentence independent of the Guidelines, but the fact that the Guidelines called for a life sentence (as did the Probation Office in its recommendation) further underscored that the sentence appropriately reflected the relevant Section 3553(a) factors and was not substantively unreasonable. *Rita* v. *United States*, 551 U.S. at 355 ("[W]here [the sen-

154

tencing] judge and [the Sentencing] Commission *both* determine that the Guidelines sentence is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors."); *United States* v. *Eberhard*, 525 F.3d 175, 179 (2d Cir. 2008) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances.").

None of Ulbricht's arguments on appeal provide a basis to disturb the District Court's sentence. Ulbricht argues that life sentences are "extremely rare in the federal system." (Br. 134). But life sentences are hardly unprecedented for defendants who held leadership roles in large-scale drug conspiracies, especially when they used the threat of violence to maintain their organization. *See United States* v. *Ortiz*, 394 F. App'x 722, 726 (2d Cir. 2010); *United States* v. *Aiello*, 864 F.2d 257, 265 (2d Cir. 1988); *see also United States* v. *Ayala-Vazquez*, 751 F.3d 1, 34-35 (1st Cir. 2014); *United States* v. *Cortez-Diaz*, 565 F. App'x 741, 745, 751 (10th Cir. 2014); *United States* v. *Tanner*, 628 F.3d 890, 908-09 (7th Cir. 2010). Far from establishing that Ulbricht's sentence was an outlier, a study by the United States Sentencing Commission (cited by the defense and *amici*) demonstrates that Ulbricht's sentence is comparable to others who were similarly situated. (Br. 134, DPA Br. 5 & n.10-12) (citing Glenn R. Schmitt & Hyun J. Konfrst, *Life Sentences in the Federal System*, United States Sentencing Commission (February 2015), *available at* http://go.usa.gov/chzRj) ("USSC Study"). Drug trafficking was the most common basis for a life

155

sentence in 2013, and the median drug quantities in those cases were dwarfed by the quantities Ulbricht facilitated through Silk Road. *See* USSC Study, at 4, 7 (38.8kg for powder cocaine, 1 kg for heroin, and 4.8kg for methamphetamine convictions).

Nor did the District Court "ignore[ ]" Ulbricht's arguments. (Br. 135). Judge Forrest discussed each one, concluding, for example, that the letters submitted on Ulbricht's behalf did not outweigh the defendant's conduct (A. 1535), that the defense's "harm reduction" arguments were "misguided in many respects" (A. 1523), that "'highly publicized'" punishments, in a closely watched case like this one, may deter in ways other sentences do not (A. 1532 (quoting a study relied upon by the defense)),[40] and (as

––––––––––––

[40] *Amici* argue that general deterrence theory does not provide a basis for imposing sentence in drug cases, "because there is no evidence that long sentences have a general deterrent effect," or more of one than shorter sentences do. (DPA Br. 15-21). They ignore, however, the statutory mandate that courts "shall consider" the "need for the sentence . . . to afford adequate deterrence." 18 U.S.C. § 3553(a)(2)(B); *see also United States* v. *Williams*, 441 F. App'x 52, 56 (2d Cir. 2011) (rejecting contention that district court was obligated to cite "social science studies or other empirical evidence to show that [defendant's] sentence would have a deterrent effect in the community"); *United States* v. *Swackhammer*, 400 F. App'x 615, 616 (2d Cir. 2010) ("To reverse simply because the District Court did not conduct an empirical anal-

156

discussed above), why Dr. Taff's affidavit was off-point (A. 1476). The District Court was not required even to *address* each of these arguments in the first place, much less accept them. *See United States* v. *Fernandez*, 443 F.3d at 30 (district court is not required to "expressly parse or address every argument relating to [sentencing] factors that the defendant advanced").

Although Ulbricht likens himself to the "landlord" who lets his tenants sell drugs (Br. 138), in fact he was a kingpin, the "captain of th[e] ship," (Tr. 258), in his words, who was "lead[ing] an international narcotics organization" from "[b]ehind [his] wall of anonymity," (Tr. 264, 283). The drug dealers who sold through Silk Road were his "business partners" (Tr. 1793), not mere tenants, and unlike a landlord, Ulbricht received a commission on each and every sale that Silk Road facilitated. Ulbricht generally did not sell drugs himself,[41] *because he did not have to*; like any other kingpin, he had an entire network of individuals operating under his umbrella who did the work for him, including individuals he paid to kill others (Tr. 272-77, 290-310, 1802-24, 1876-79, 1883-87, 1891-92).

─────────

ysis of the statistical support underlying the Sentencing Guidelines would reach far beyond the scope of our substantive reasonableness review.").

[41] Ulbricht did sell several kilograms of hallucinogenic mushrooms through Silk Road, when he first launched the site, to attract traffic. (PSR ¶¶ 45-46).

157

Nor was Ulbricht comparable to Peter Nash, a Silk Road staff member who worked for him as a forum "moderator." (A. 1535). As the District Court remarked, Nash "was a very, very different person" from Ulbricht, who was "way up on top of the hierarchy," while Nash was "way down." (A. 1535-36). And in any event, while a district court is permitted to consider disparities between co-defendants (or co-conspirators), it is not required to do so. *See United States* v. *Ghailani*, 733 F.3d 29, 55 (2d Cir. 2009).

At bottom, the District Court rejected Ulbricht argument that Silk Road was different from any other multi-million dollar narcotics enterprise, because it sold drugs online as a form of morally ambiguous protest against authority: "No drug dealer from the Bronx selling meth or heroin or crack has ever made these kinds of arguments to the Court. It is a privileged argument, it is an argument from one of privilege." (A. 1523).

The District Court had broad discretion to weigh the applicable factors under Section 3553(a), and this Court has declined to "substitute [its] own judgment for the district court's on the question of what is sufficient to meet the § 3553(a) considerations in any particular case." *Cavera*, 550 F.3d at 189. Judge Forrest was not obligated, as Ulbricht suggests, to justify "each potential increment of time" in prison (although she did consider it (A. 1539)). "Selection of an appropriate amount of punishment inevitably involves some degree of subjectivity that often cannot be precisely explained." *United States* v. *Jones*, 460 F.3d at 195. In light of the vast scope of the defendant's crim-

158

inal enterprise, its deadly social impact, the precedent he set for other criminals, and his willingness to kill, the District Court's sentence was clearly the product of a "reasoned exercise of discretion" that should be affirmed. *Cavera*, 550 F.3d at 193.[42]

--------

[42]   Even if this Court finds that the District Court erred in sentencing Ulbricht, it should not assign the matter to a different judge on remand, as Ulbricht requests. (Br. 139). "Remanding a case to a different judge is a serious request rarely made and rarely granted." *United States* v. *Awadallah*, 436 F.3d 125, 135 (2d Cir. 2006). It is appropriate "only in the rare instance in which the judge's fairness or the appearance of the judge's fairness is seriously in doubt." *United States* v. *Bradley*, 812 F.2d 774, 782 n.9 (2d Cir. 1987). Ulbricht asserts that resentencing before a different judge is required "to avoid the irremediable taint from the improper factors the [District] Court considered" (Br. 139), but even Ulbricht's brief alleges only that Judge Forrest gave too much weight to some factors and too little weight to others, and he does not contend that she was biased or otherwise unfair. (Br. 133-39). Accordingly, reassignment would not be appropriate, particularly in light of the District Court's familiarity with an extensive trial record.

159

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:      New York, New York
            June 17, 2016

                    Respectfully submitted,

                    PREET BHARARA,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                    *of America.*

EUN YOUNG CHOI,
MICHAEL D. NEFF,
TIMOTHY T. HOWARD,
ADAM S. HICKEY,
    *Assistant United States Attorneys,*
            *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the Court's June 7, 2016 order permitting the Government leave to file an oversized brief of up to 40,000 words. As measured by the word processing system used to prepare this brief, there are 37,016 words in this brief.

PREET BHARARA,
*United States Attorney for the*
*Southern District of New York*

By: ADAM S. HICKEY,
*Assistant United States Attorney*