# 15-1815

## IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

---

UNITED STATES OF AMERICA,

*Appellee,*

v.

ROSS WILLIAM ULBRICHT, AKA Dread Pirate Roberts,
AKA Silk Road, AKA Sealed Defendant 1, AKA DPR,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK - NEW YORK CITY

---

**REPLY BRIEF OF APPELLANT
ROSS WILLIAM ULBRICHT**

---

JOSHUA L. DRATEL, P.C.
Suite 1412
29 Broadway
New York, NY 10006
(212) 732-0707

*Counsel for Defendant-Appellant*

---

**LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477**
**A Division of Lantagne Duplicating Services**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................iv

INTRODUCTION .......................................................................1

ARGUMENT

POINT I
THE COURT ABUSED ITS DISCRETION AND DENIED ULBRICHT HIS
FIFTH AND SIXTH AMENDMENT RIGHTS TO DUE PROCESS, THE
RIGHT TO PRESENT A DEFENSE, AND A FAIR TRIAL BY (A)
PRECLUDING THE DEFENSE FROM USING AT TRIAL THE EVIDENCE
RELATING TO DEA SPECIAL AGENT CARL FORCE'S CORRUPTION;
(B) REFUSING TO ORDER THE GOVERNMENT TO PROVIDE
ADDITIONAL DISCOVERY AND BRADY MATERIAL REGARDING
CORRUPTION; AND (C) DENYING ULBRICHT'S MOTION FOR A NEW
TRIAL BASED ON ADDITIONAL POST-TRIAL DISCLOSURES
REGARDING FORCE AND ANOTHER CORRUPT LAW ENFORCEMENT
AGENT INVOLVED IN THE SILK ROAD INVESTIGATION ...........................2

   A.  The Corruption by Force and Bridges Was Directly Connected
      to and Therefore Relevant to the Defense In This Case ..............................3

      1.  Information That Has Since Been Disclosed and Discovered ..............3

         a.   The United States Marshals Service Intake Form .......................3

         b.   Revelations During the Prosecution of Force and Bridges ..........4

      2.  The Government's Arguments Fail to Undermine the Relevance of
         the Two Former SA's Corruption ......................................................12

   B.  The Government's Non-Disclosure and the District Court's Preclusion
      Prevented the Defense from Making Any Use of the Material,
      Exculpatory Information Available ............................................................17

   C.  The Errors Were Not Harmless..................................................................22

i

POINT II

THE COURT ABUSED ITS DISCRETION BY CURTAILING CROSS-EXAMINATION AND THE DEFENSE THEORY AT TRIAL ...........................23

    A.   HSI SA Jared Der Yeghiayan ....................................................23

    B.   FBI Computer Specialist Thomas Kiernan ..................................25

    C.   The Errors Were Not Harmless...................................................28

POINT III

THE COURT ABUSED ITS DISCRETION IN PRECLUDING TWO DEFENSE EXPERTS ............................................................................29

POINT IV

THE COURT ABUSED ITS DISCRETION IN PRECLUDING ADMISSION OF ANDREW JONES'S STATEMENT AGAINST PENAL INTEREST PURSUANT TO RULE 804(3)(b), FED.R.EVID., AND/OR RULE 807, FED.R.EVID..............................................................................................34

POINT V

THE COURT'S ERRONEOUS EVIDENTIARY RULINGS CONSTITUTED CUMULATIVE ERROR THAT DEPRIVED ULBRICHT OF DUE PROCESS AND A FAIR TRIAL ............................................................................37

POINT VI

THE UNLIMITED SEARCHES AND SEIZURE OF ULBRICHT'S ENTIRE LAPTOP AND GMAIL AND FACEBOOK ACCOUNTS VIOLATED THE FOURTH AMENDMENT BECAUSE THEY CONSTITUTED THE FRUIT OF (A) A WARRANT THAT LACKED ANY PARTICULARITY; AND (B) UNLAWFUL AND WARRANTLESS PEN REGISTER AND TRAP AND TRACE ORDERS....................................................................................38

    A.   The Warrants' Violation of the Fourth Amendment's Particularity Requirement ...........................................................................38

        1.   The Warrants Lacked Particularity In Application and Execution.....38

        2.   The "Good Faith Exception" to the Warrant Requirement Does Not Apply .........................................................................42

B.  The Pen Register and Trap and Trace Orders Were Unlawful and Violated the Fourth Amendment Because They Required a Warrant and Also Failed to Adhere to Statutory Limitations ...........................................44

POINT VII
THE LIFE SENTENCE IMPOSED ON ULBRICHT WAS PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE .......................................................47

A.  The Life Sentence Was Procedurally Unreasonable...................................49

1.  The District Court Failed to Employ A Cognizable Legal Standard to Evaluate Whether the Alleged Overdose Deaths Should Have Been Considered At Ulbricht's Sentencing ........................................50

2.  The District Court's Finding of Sufficient Connection Between Silk Road Drugs and the Alleged Overdose Deaths Was Materially Inaccurate ..........................................................................................52

B.  The District Court's Sentence Is Substantively Unreasonable ...................54

C.  Ulbricht's Sentence Should Be Vacated and Assigned to a Different District Judge for Resentencing ..................................................................62

CONCLUSION ........................................................................................................64

CERTIFICATE OF COMPLIANCE .......................................................................65

CERTIFICATE OF SERVICE ...............................................................................66

iii

# TABLE OF AUTHORITIES

## CASES

*ACLU v. Clapper,*
    785 F.3d 787 (2d Cir. 2015) ....................................................................41, 46

*Amorgianos v. National R.R. Passenger Corp.,*
    303 F.3d 256 (2d Cir. 2002) ..............................................................................32

*Brady v. Maryland,*
    373 U.S. 83 (1963)................................................................................................2

*Canales v. Stephens,*
    765 F.3d 551 (5th Cir. 2014) ............................................................................18

*Chambers v. Mississippi,*
    410 U.S. 284 (1973)............................................................................................30

*Chapman v. California,*
    386 U.S. 18 (1967)..............................................................................................22

*Crawford v. Washington,*
    541 U.S. 36 (2004)..............................................................................................35

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    526 U.S. 579 (1993)............................................................................................32

*DiBenedetto v. Hall,*
    272 F.3d 1 (1st Cir. 2001)..................................................................................24

*Garrison v. Louisiana,*
    379 U.S. 64 (1964)..............................................................................................49

*Giglio v. United States,*
    450 U.S. 150 (1972)............................................................................................20

*Jones v. United States,*
    —U.S.—, 135 S. Ct. 8 (2014) ............................................................................6

*Kampshoff v. Smith*,
    698 F.2d 581 (2d Cir. 1983) ...........................................................22

*Kyles v. Whitley*,
    514 U.S. 419 (1995).........................................................................15

*Kyllo v. United States*,
    533 U.S. 27 (2001)...........................................................................46

*Marlowe v. United States*,
    555 U.S. 963 (2008).........................................................................60

*People of Territory of Guam v. Ignacio*,
    10 F.3d 608 (9th Cir. 1993) ............................................................25

*Rita v. United States*,
    551 U.S. 338 (2007).........................................................................61

*Stanford v. Texas*,
    379 U.S. 476 (1965).........................................................................41

*Steagald v. United States*,
    451 U.S. 204 (1981).........................................................................41

*Thornhill v. Alabama*,
    310 U.S. 88 (1940)...........................................................................49

*United States v. Bell*,
    808 F.3d 926 (D.C. Cir. 2015)........................................................61

*United States v. Brown*,
    — F. 3d—, 2016 WL 3254735 (2d Cir. June 14, 2016) .................... 49-50, 53

*United States v. Broxmeyer*,
    699 F.3d 265 (2d. Cir. 2012) ..................................................... 61-62

*United States v. Buck*,
    813 F.2d 588 (2d Cir. 1987) ...........................................................44

*United States v. Ciak*,
    102 F.3d 38 (2d Cir. 1996) ...............................................................22

*United States v. Coppa*,
    267 F.3d 132 (2d Cir. 2001) .............................................................21

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013) .............................................................53

*United States v. Cossey*,
    632 F.3d 82 (2d Cir.2011) ...............................................................53

*United States v. Cruz*,
    981 F.2d 659 (2d Cir. 1992) .............................................................33

*United States v. Davis*,
754 F.3d 1205, 1208 (11th Cir.), *reh'g en banc granted*, *opinion vacated*, 573
F. App'x 925 (11th Cir. 2014), *and on reh'g en banc in part*, 785 F.3d 498
(11th Cir. 2015), *cert. denied*, 136 S. Ct. 479, 193 L. Ed. 2d 349 (2015)..............46

*United States v. DeMott*,
    513 F.2d 55 (2d Cir. 2008) ...............................................................63

*United States v. DeVillio*,
    983 F.2d 1185 (2d Cir. 1993) ...........................................................36

*United States v. Devin*,
    918 F.2d 280 (1st Cir. 1990)............................................................20

*United States v. Douglas*,
    336 F. App'x 11 (2d Cir. 2009).........................................................32

*United States v. Douglas*,
    525 F.3d 225 (2d Cir. 2008) .............................................................20

*United States v. Doyle*,
    130 F.3d 523 (2d Cir. 1997) .............................................................36

*United States v. Ganias*,
    — F.3d —, 2016 WL 3031285 (2d Cir. 2016) .............................38, 39, 42, 43

*United States v. George*,
975 F.2d 72 (2d Cir. 1992) .............................................................................44

*United States v. Ghailani*,
733 F.3d 29 (2d Cir. 2009) ............................................................................58

*United States v. Graham*, 796 F.3d 332, 344-45 (4th Cir.), *reh'g en banc granted*,
624 F. App'x 75 (4th Cir. 2015), *and adhered to in part on reh'g en banc*,
No. 12 4659, 2016 WL 3068018 (4th Cir. May 31, 2016) ...............................45, 46

*United States v. Hebert*,
813 F.3d 551 (5th Cir. 2015) .........................................................................60

*United States v. Hernandez*,
604 F.3d 48 (2d Cir. 2010) ......................................................................62, 63

*United States v. Jones*,
490 F.3d 191 (2d Cir. 2006) ..........................................................................54

*United States v. Juwa*,
508 F.3d 694 (2d Cir.2007) ...........................................................................53

*United States v. Karo*,
468 U.S. 705 (1984) ......................................................................................47

*United States v. Lambis*,
— F. Supp.3d —, 2016 WL 3870940 (S.D.N.Y. July 12, 2016) .............46, 47

*United States v. Leon*,
468 U.S. 897(1984) .......................................................................................44

*United States v. Mangone*,
— Fed.App'x. —, 2016 WL 3391280 (2d Cir. 2016) ....................................63

*United States v. Marquez*,
462 F.2d 893 (2d Cir. 1972) ..........................................................................36

*United States v. Mavashev*,
No. 08 CR 902 (DLI) (MDG), 2010 WL 234773
(E.D.N.Y. Jan. 14, 2010) ......................................................................... 33-34

*United States v. McVeigh*,
   153 F.3d 1166 (10th Cir. 1998) ......................................................25

*United States v. Millan*,
   817 F. Supp. 1072 (S.D.N.Y.), *modified sub nom. United States v. Millan-Colon*, 836 F. Supp. 1007 (S.D.N.Y. 1993) .......................................17

*United States v. Millan-Colon*,
   836 F. Supp. 1007 (S.D.N.Y. 1993) ..............................................16

*United States v. Moussaoui*,
   382 F.3d 453 (4th Cir. 2004) .........................................................35

*United States v. Paulino*,
   445 F.3d 211 (2d Cir. 2006) ...........................................................21

*United States v. Rea*,
   958 F.2d 1206 (2d Cir. 1992) .........................................................33

*United States v. Reilly*,
   76 F.3d 1271 (2d Cir.), *aff'd and amended*, 91 F.3d 331 (2d Cir.1996) .........43

*United States v. Rigas*,
   583 F.3d 108 (2d Cir. 2009) ...........................................................54

*United States v. Riley*,
   906 F.2d 841 (2d Cir. 1990) ...........................................................42

*United States v. Robin*,
   553 F.2d 8 (2d Cir. 1977) ..............................................................62

*United States v. Saget*,
   377 F.3d 223 (2d Cir. 2004) ...........................................................36

*United States v. Simels*,
   2009 WL 1924746 (E.D.N.Y. July 2, 2009) ...................................42

*United States v. Sindima*,
   488 F.3d 81 (2d Cir. 2007) ............................................................50

*United States v. Thomas*,
    757 F.2d 1359 (2d Cir. 1985) ..........................................................43

*United States v. Tin Yat Chin*,
    476 F.3d 144 (2d Cir.2004) ...................................................31, 34

*United States v. White*,
    551 F.3d 381 (6th Cir. 2008) ........................................................61

*United States v. Young*,
    745 F.2d 733 (2d Cir. 1984) .........................................................42

*United States v. Yousef*,
    327 F.3d 56 (2d Cir. 2003) ...........................................................32

*Zuchowicz v.U.S.*,
    140 F.3d 381 (2nd Cir. 1998) ......................................................51

## STATUTES

18 U.S.C. § 3500 ....................................................................................20
18 U.S.C. § 3553(a)(6) ..........................................................................57

## CONSTITUTIONAL AMENDMENTS

U.S. Const. amend. IV ......................................................... *Passim*
U.S. Const. amend. V .....................................................................2
U.S. Const. amend. VI ....................................................25, 26, 35, 61

## RULES

Fed. R. Crim. P. 49.1 ..........................................................................4
Fed. R. Evid.  611(a) ...........................................................................26
Fed. R. Evid. 701 .................................................................................33
Fed. R. Evid. 804(b)(3) ........................................................................34
Fed. R. Evid. 807 .................................................................................34
Fed. R. Evid. 807(A)(4) .......................................................................35

**UNITED STATES SENTENCING GUIDELINES**

U.S.S.G. §5H1.10.................................................................................................49

U.S.S.G. §5K1.1...................................................................................................8

## Introduction

This Reply Brief is submitted on behalf of Defendant-Appellant Ross Ulbricht. It is not necessary rebut point-by-point the government's 159-page Brief since much of it does not require rejoinder, as it either covers undisputed territory in the form of basic legal principles, or presents arguments sufficiently anticipated and addressed in Ulbricht's Initial Brief.

Indeed, the length of Ulbricht's Initial Brief reduces the need to reiterate what is contained therein. As a result, this Reply will concentrate on illustrating the weakness of the government's response through specific examples, and through identifying the critical issues the government has *not* addressed *at all* in its Brief – including its failure to confront its deliberate and calculated non-disclosure of the corruption of a second law enforcement agent, Shawn Bridges, in the investigation of this case.

Accordingly, for the reasons set forth below, and in Ulbricht's Initial Brief, it is respectfully submitted that his convictions should be vacated, and a new trial ordered, or that he be re-sentenced before a different district judge.

**ARGUMENT**

**POINT I**

**THE COURT ABUSED ITS DISCRETION AND DENIED ULBRICHT HIS FIFTH AND SIXTH AMENDMENT RIGHTS TO DUE PROCESS, THE RIGHT TO PRESENT A DEFENSE, AND A FAIR TRIAL BY (A) PRECLUDING THE DEFENSE FROM USING AT TRIAL THE EVIDENCE RELATING TO DEA SPECIAL AGENT CARL FORCE'S CORRUPTION; (B) REFUSING TO ORDER THE GOVERNMENT TO PROVIDE ADDITIONAL DISCOVERY AND *BRADY* MATERIAL REGARDING CORRUPTION; AND (C) DENYING ULBRICHT'S MOTION FOR A NEW TRIAL BASED ON ADDITIONAL POST-TRIAL DISCLOSURES REGARDING FORCE AND ANOTHER CORRUPT LAW ENFORCEMENT <u>AGENT INVOLVED IN THE SILK ROAD INVESTIGATION</u>**

The government's response to Ulbricht's claim that the preclusion evidence of corruption by former DEA Special Agent Carl Force IV, and the complete failure to disclose the corruption of another law enforcement officer, former Treasury Special Agent Shawn Bridges, both of whom were deeply involved in the investigation of Silk Road, denied him a fair trial and constituted a violation of the Fifth Amendment and *Brady v. Maryland*, 373 U.S. 83 (1963), is deficient in many respects – none more so than its abject failure to confront *at all* the government's failure to disclose Bridges' corruption. *See* Initial Brief, at 18, 21-23, 30-49, 60.

While Ulbricht's Initial Brief anticipated many of the government's arguments, the following illustrate that the government's opposition is untenable.

2

**A.** ***The Corruption by Force and Bridges Was Directly Connected to and Therefore Relevant to the Defense In This Case***

    **1.** ***Information That Has Since Been Disclosed and Discovered***

Since Ulbricht filed his Initial Brief, other information has been released, collected, or discovered that vitiates any government argument that somehow Force's and Bridges's participation in the investigation of Silk Road can be separated from this case.

    **a.** ***The United States Marshals Service Intake Form***

The United States Marshals' Intake Form for Ulbricht, completed upon his arrest October 2, 2013, lists under the "Arrested or Received Information" section, as the *only* law enforcement officer, "Carl Force," of "DEA . . . Baltimore, MD, US."[1]  That entry, made prior to discovery of Force's corruption, and therefore at a time the government was not conscious of contriving "independence" among the components of the Silk Road investigation, puts to rest any contention by the government that its investigation of Silk Road and arrest of Ulbricht were not fully integrated and interconnected, and/or that Force (or Bridges) can be airbrushed out of this case.

---

[1]  Another law enforcement officer is listed in the "Booking Information" section elsewhere on the form.  Appellant's Supplemental Appendix (hereinafter "ASA") -4.

As noted in the accompanying Motion to Supplement the Record, the Intake Form was provided in discovery to counsel in *redacted* form – with Force's name blacked out. However, an unredacted Intake Form was produced separately in discovery on a hard drive provided directly to the defendant in custody. It is that unredacted version that was discovered subsequent to filing Ulbricht's Initial Brief.[2]

### b. *Revelations During the Prosecution of Force and Bridges*

The prosecution of Force and Bridges in the Northern District of California has also yielded additional information that the government failed to disclose at all, much less pretrial or in a timely manner.

For example, in *United States v. Shawn Bridges*, 15 Cr. 319 (RS) (N.D. Cal.), the Government's Motion for Immediate Remand and Arrest Warrant (Docket #71) (filed under seal October 6, 2015) notes that "[w]hile at the Secret Service [Bridges] specialized in, among other things, *use of the Dark Net and identity theft*." *Id*., at 3-4 (emphasis added).

Also, at Bridges's sentencing, the government described his misconduct as a "sophisticated scheme." *Bridges* Transcript, January 14, 2016 (Docket #109), at

---

[2] In the Intake Form(s) included in the A.S.A, Ulbricht's pedigree information is redacted pursuant to Rule 49.1, Fed.R.Crim.P.

6-7. *See also* Government Sentencing Memorandum (*Bridges*), Docket #94, at 8 (Bridges "committed crimes over the course of many months (if not years). . . . [and] "was an extremely calculated effort, designed to avoid detection for as long as possible, ironically using the very skills (*e.g.*, computer skills) that he learned on the job and at the public's expense").[3]

That sentencing proceeding, and other case documents, also revealed the following previously undisclosed aspects of Bridges's corruption in the Silk Road investigation:

- "On January 27, 2013, Bridges, acting as an undercover persona on Silk Road, 'Number 13,' communicated with [Dread Pirate Roberts, a/k/a "DPR," the operator of Silk Road] in an effort to falsely and fraudulently prevent [DPR] from learning who had committed the theft from Silk Road. Bridges communicated that he [masquerading as 'Number 13'] had been the victim of the theft, rather than its perpetrator, and that he wanted his bitcoin returned to him." (Citation omitted). Docket #94, at 9; and

---

[3] Bridges attended the "Secret Service Electronic Crimes Special Agent Program, which trains agents in computer forensics and electronic crimes investigations[,]" in which he "excelled." *Bridges* Sentencing Transcript, at 38.

- Bridges used " his official position to illegally run FINCEN checks to determine whether any Suspicious Activity Reports (SARs) had been filed by Fidelity regarding his wire transfers into his Quantum account all while employed as a federal agent." *Id*., at 6.

The Bridges prosecution also provided additional detail of his corrupt conduct. As the government explained in its Sentencing Memorandum, "Bridges stole bitcoins from various Silk Road accounts using the log-in credentials from one of the website's customer support representatives – a target whom they had arrested – and transferred the bitcoins to Mt. Gox, an offshore bitcoin exchange company in Japan [owned and operated by Mark Karpeles, whom the defense identified as DPR]." *Id*., at 3; **post**, at 6, 18-19.

Also, "just days after using Mt. Gox to accomplish his scheme, Bridges served as the affiant on a seizure warrant for Mt. Gox in which millions of dollars were seized by U.S. authorities." *Id*., at 5.

In addition, and particularly relevant to the defense here, Bridges took deliberate affirmative steps to deflect blame from himself onto others, regardless of potential consequences for them. Thus, Bridges sought to "lay the blame for that theft on a cooperating witness [Curtis Green, a/k/a "Flush"]." *Bridges* Sentencing, at 8-9; *Bridges* Sentencing Transcript, at 22 (Bridges "set [Curtis

6

Green] up entirely to take the fall").

After attending Green's debriefing, during which Green described his administrator status and functions, Bridges "later that day[] accessed Silk Road through a computer utilizing [Green's] administrator access. Bridges reset the passwords and pins of various accounts on Silk Road and moved bitcoin from those accounts into a 'wallet' he controlled." Sentencing Memo, at 8. Bridges "transferred [the bitcoins] to Curtis Green's account. And the reason why . . . is because he wanted to have a suspect." *Bridges* Sentencing, at 23.[4]

In his Victim Impact Statement at Bridges's sentencing, *id.*, at 25-30, Green pointed out that "when [Bridges] moved the bitcoins he moved them into my account so it really looked like I did it. I mean, anybody looking into it would – it would be a no-brainer, saying, 'Oh, obviously he did it.'" *Id.*, at 26. Green added that Bridges "was very calculated. It was very well thought out, in my opinion." *Id*.

Of course, that placed Green in a precarious situation. As the government's Sentencing Memo pointed out, at 6-7,

---

[4] Bridges's penchant for framing others is obviously deep-seated. The AUSA noted at sentencing that Bridges claimed "he didn't make the first two transfers out of [Green's] account and that someone else did those. And he blamed another individual for those." *Id.*, at 64.

7

> Bridges did nothing to prevent [DPR's] belief – and the
> belief of the other agents and the AUSAs – that [Green]
> was the actual thief.  The AUSAs announced they would
> not provide [Green] with a [§5K1.1 of the Sentencing
> Guidelines] recommendation due to their belief that he
> had stolen from Silk Road while promising to be a
> cooperator. [Green] protested, but the agents and AUSAs
> did not believe that one of their own could have been
> responsible for the theft and did not believe [Green].

Also, Force informed Green that "'You'll be – you'll be receiving a call

from Shaun Bridges.  Tell him whatever he needs to know.'" *Bridges* Sentencing,

at 28.  Green "I begged them for a lie detector test. . . .  Force[] kiboshed[ that]

every time[.]"  *Id*., at 29.

At Bridges's sentencing the government also described how Bridges's

corruption had affected investigations in which he had participated:

> [t]he number of cases that Mr. Bridges contaminated, not
> just existing criminal cases, but also investigations
> across the country that his conduct has let to have to be
> shut down, is truly staggering.

> We start here – there was a criminal investigation that
> another district had into Mt. Gox that's had to since be
> shut down.

*Id*., at 20-21.

After listing the Karpeles/Mt. Gox investigation specifically as one the

government could not pursue, the AUSA added:

> [b]ut that's just one example. I can tell you from my own knowledge that in this district a number of investigations have had to be shut down directly – directly, a hundred percent, because of Bridges.

*Id.*, at 21-22.

Nor were the investigations that Bridges infected limited to those in which he had participated directly. As the AUSA explained,

> [a]nd that's because in his role as a digital currency expert he would fly across the country and consult in different jurisdictions out on the West Coast, up in Oregon, back on the East Coast. He flew all over offering his help and advice to other Secret Service agents and other federal agents.

*Id.*, at 22.[5]

The AUSA elaborated that "[a]s a result of his name now being on those investigations, they have had to be shut down." Yet *here*, in which Bridges was

---

[5] Regarding the District of Oregon case, in which "Bridges' only involvement was that he received two encrypted USB storage devices from Hagen's home, but couldn't open them[,] . . . When [the AUSA's] presented their sentencing recommendations to the judge, they acknowledged that because of the taint of corruption from the Baltimore agents – and in the spirit of fairness and an abundance of caution – they were recommending a reduced punishment." Bryan Denson, "Global Meth Dealer from Vancouver Gets Lighter Sentence Because of U.S. Agents' 'Silk Road' Corruption," *The Oregonian/Oregon Live*, November 5, 2015, available at <http://www.oregonlive.com/pacific-northwest-news/index.ssf/2015/11/global_silk_road_meth_dealer_f.html#incart_story_package>. As a result, the defendant in that case was sentenced to the 37 months recommended by the government instead of six years. *Id*.

actively and directly corrupt with respect to the website under investigation, in which he operated corruptly *inside* the web site, manipulating its data and access protocols, communicating surreptitiously with its operator (DPR), and profited from it, somehow, according to the government, that is not sufficient connection to be relevant, or have an effect on the case.

Indeed, the government acknowledged at Bridges's sentencing that the extent of his criminality and intrusion remain unknown. As the AUSA informed the Court, "in some of these cases, [the government has] no indication of where those currencies have gone, the extent of those seized, and so forth. There are a lot of unanswered questions." *Id.*, at 16.[6]

Regarding Force, at his sentencing, in *United States v. Carl Mark Force IV*, 15 Cr. 319 (RS) (N.D. Cal.) (Docket #91), the government reiterated that his

---

[6] Filings throughout the case, recently unsealed, detail Bridges's post-arrest, and even post-plea and post-sentence, conduct that strongly suggests he had not been forthright in his account of his unlawful conduct, or with respect to assets he had concealed overseas. *See, e.g.*, Motion to Terminate Defendant's Motion for Self-Surrender and Motion to Unseal Arrest Warrant (Docket #116), January 28, 2016; *Bridges* Sentencing, at 14 ("attempts to change names and Social Security numbers"); Motion to Unseal Renewed Emergency Motion for Defendant's Immediate Remand and Arrest (Docket #137), June 30, 2016, at 2 (Bridges subject of "an ongoing investigation into a new series of bitcoin thefts – and laundering of proceeds . . ."). In fact, even after his guilty plea, Bridges was able to steal approximately $700,000 in Bitcoin from under the very nose of the Treasury Department. *Id.*, at Docket 137-1, at 3.

offense conduct, too, "really did extend over time. We're not talking about a single lapse of judgment, but something that extended over months, and, indeed, years." *Id*., at 8.

Earlier, in (successfully) seeking pretrial detention, the government told the Court that Force, a CPA, *id*., at 19, had "amassed certain special skills through his work as an undercover DEA agent operating on the dark web and has the knowledge and ability to obtain false identification." *See* Second Supplemental Filing in Support of Pretrial Detention, May 1, 2015 (Docket #26), at 2.

That filing also provided further information about Force's illegal conduct that had not previously been disclosed. For instance, the government stated, *id*., at 3, "[i]t appears that [Force's ill-gotten] funds were subsequently moved to Eastern Europe where they are now beyond the reach of United States law enforcement." Also, Force had multiple overseas digital currency accounts (in Slovenia and Panama). *Id*.

In addition, in direct relation to this case and the communications between Force – as "Death From Above" – and DPR, the government sought "passwords or PGP encryption keys and was advised [by Force's counsel] that Force had none

11

and did not memorialize any." *Id*. *See* Initial Brief, at 28-33.[7]

Moreover, as with Bridges, the government conceded that it lacks complete knowledge of Force's illegal activity and proceeds. As it stated in moving for detention,

> the real possibility of additional funds that have not yet been discovered by the government; his expert knowledge of undetectable or hard-to-detect methods of communication; his expert knowledge of false identities and procuring the same; his communications about a "get out of town" plan; the fact that when arrested and knowing of the government's case he was caught with a "go bag" of blank money orders totaling $5,000, a loaded weapon, and an expired passport.

Docket #26, at 4.

### 2. The Government's Arguments Fail to Undermine the Relevance of the Two Former SA's Corruption

In its Brief (hereinafter "GB"), the government makes three grossly, and materially, inaccurate assertions:

(1)     Ulbricht "has not identified any suppressed, exculpatory information." GB, at 47. Yet, incredibly, that ignores the government's complete failure to disclose Bridges's corruption in the

---

[7] At Force's sentencing, at 7, it was revealed that Force had returned to undercover work, including a pivotal role in the Silk Road investigation, despite an incidence of "psychiatric breakdown" that required hospitalization in 2008 (before he was permitted to return to undercover duties in 2010).

Silk Road investigation, or to address it in its Brief;

(2)     "Force played no role in the investigation of Silk Road conducted by this Office."  GB, at 40.  Yet, the Marshals Intake Form, the information set forth above, as well as the facts set forth in Ulbricht's Initial Brief, at 20-22, 24-25, 40-42, 44-47, dispositively refute that claim;

(3)     Force "was never contemplated as a witness at trial." GB, at 40.  Yet, in its Brief, at 31 n.13, the government concedes otherwise: "[a]lthough the Government indicated during pretrial proceedings that it would seek to admit Ulbricht's communications concerning this murder for hire (A. 664), at trial, the Government did not seek to admit any aspect of either this attempted murder or Ulbricht's communications about it, including with Force."  Notwithstanding the government's strategic choices, it cannot deprive Force and his corruption (or Bridges's) of relevance by that evidentiary sleight of hand.

Simply eliminating evidence of Force's chats did not solve the problem for two reasons:  (1)  it ignored that the Baltimore investigation was part of a multi-district, multi-agency coordinated investigation that was intertwined;  and (2)  it

13

did not address the question whether Force's (and, at the time unknown to the defense and the District Court, Bridges's) corruption had affected (a) DPR's awareness of the investigation and the need to develop an exit strategy; and/or (b) the integrity of the financial, transactional, and communications infrastructure of the Silk Road site.[8]

In its Brief, at 48, the government would limit *Brady* material to whether there was direct evidence that Force, Bridges, or anyone else had planted or altered evidence. That is decidedly too narrow – the government does not get to define the contours of a defense – but even still that is exactly what was suppressed – including not permitting the defense to conduct any investigation to exploit the limited information provided by the government pretrial. *See* Initial Brief, at 25-27.

Indeed, post-trial disclosures – not to the defense herein, but rather in the context of the prosecutions of Force and Bridges – have demonstrated just how limited a disclosure the government made to the defense and the District Court

---

[8] Regarding the latter, while the government, in its Brief, at 34, claims that Silk Road administrator Curtis Green (whose accounts were hijacked by Force and Bridges) had only a "limited amount of administrator access[,]" and "not the kind of core, root-level access that 'DPR' had," the government could not say that conclusively, and still does not know what access Flush, or Bridges and/or Force had with respect to the Silk Road site.

14

prior to trial. Thus, the government plainly and affirmatively misled both with respect to the scope and relevance of the misconduct of its agents.

As a result, the government's contention, at 48, that "the fact that two agents sold information to Ulbricht, attempted to extort him, and stole money from his customers' accounts through the Silk Road website, itself did nothing to undermine the reliability of the evidence found outside that website that demonstrated that Ulbricht was 'Dread Pirate Roberts,'" is absurd on its face – *the case was about the Silk Road web site and DPR.*

The government also advances a spurious argument – that if exculpatory evidence undermines only some of the government's evidence, but not *all* of it, it is not material. The government does not proffer any cases supporting the position that Brady material must address *all* the government's evidence. Indeed, the materiality determination is not a "sufficiency test." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Also, the government offered substantial evidence and exhibits from and testimony regarding the Silk Road site, including chats, forum posts, transactions, access protocols as well as witnesses (Jared Der Yeghiayan, Ilhwan Yum, and Brian Shaw). Thus, undermining that evidence was an important element of the defense even if it did not implicate the laptop. However, it affected the evidence

15

from the laptop as well, because the communications between Force – whether as Nob, Death From Above or some other identity – and DPR provided DPR knowledge about the investigation and motive and opportunity to inculpate another person as part of an escape plan.

The government also misstates the facts of *United States* v. *Millan-Colon*, 836 F. Supp. 1007, 1013 (S.D.N.Y. 1993), which it cites at 50. In *Millan-Colon*, the decision to which the government refers followed the government's motion to dismiss four counts involving undercover buys carried out by an officer targeted by a corruption investigation, and the government's indication that it would not "elicit testimony from *any* of its witnesses concerning those undercover purchases," nor "offer at trial *any* evidence seized during a search or arrest performed" by any of the officers targeted by the corruption investigation. 836 F.Supp. 1007, 1011 (emphasis added).

Also, importantly, in a co-defendant's previous trial, the Court *did* allow cross-examination "with the following provisos: (1) questioning as to the alleged misconduct of [the corrupt officers] shall be limited to the period of time involving the *Millan* investigation; (2) questioning regarding the arrests of the three agents shall be limited to the witnesses' personal knowledge," although only one of the corrupt officers was mentioned in the government's opening statement, and the

16

government argued that the misconduct of all three occurred "long after the conclusion of the *Millan* investigation." *United States v. Millan*, 817 F. Supp. 1072, 1083-84 (S.D.N.Y.), *modified sub nom. United States v. Millan-Colon*, 836 F. Supp. 1007 (S.D.N.Y. 1993) (emphasis added).

Here, Ulbricht was not afforded any of those opportunities with respect to Force's corruption (or Bridges's which was not even disclosed). Thus, the government's conclusory assertion, at 52 n.18, that "the investigations were independent" lacks any explanation or detail, and is controverted by the facts.

**B.** ***The Government's Non-Disclosure and the District Court's Preclusion Prevented the Defense from Making* Any *Use of the Material, Exculpatory Information Available***

As noted in Ulbricht's Initial Brief, at 50, the District Court's conclusions must be viewed in the context of the government's calculated concealment of the second agent's – Bridges's – misconduct, as well as other information about Force. The District Court's conclusion that the information provided was not exculpatory was therefore based on only a small fraction of the information the government possessed.

Moreover, the government continues to proffer the same discredited excuses for its position. For example, the government, at 33, insists that the defense should not be permitted either to use or even investigate Force's corruption

17

because it was "related to a non-public, ongoing grand jury proceeding." Yet the targets of that investigation were fully aware of it, having been interviewed already. *See* Initial Brief, at 39-40.

Also, the government's attempts, at 59, to downplay the evidence against Karpeles as an alternative perpetrator – as DPR and the financier and operator of Silk Road – are completely eviscerated by the multiple warrants, including in *the Southern District of New York, signed by the prosecutor in this very case*, attesting that the evidence established *probable cause* that Karpeles – formally denominated a target of the investigation – was the operator and proprietor of the Silk Road website. *See* Initial Brief, at 42-44.

Nor was that merely a fleeting assertion; rather, the warrants averring probable cause spanned more than a year, even until August 2013, just six weeks before Ulbricht's arrest (which halted the pursuit of Karpeles entirely). *Id*. Thus, the circumstances in *Canales v. Stephens*, 765 F.3d 551 (5th Cir. 2014), cited by the government in its Brief, at 59, and in which the failure to disclose an alternative suspect did not constitute a *Brady* violation because the government's disclosure obligation does not extend to situations in which "the other suspect was not a particularly plausible one[,]" *id*., at 576, are inapposite, as here *it was the government itself that manifested through its repeated attestation of probable*

18

*cause the plausibility of Karpeles's involvement in Silk Road*.

In addition, the government's claim, at 33, that it provided the information about Force – but none about Bridges – to the District Court "so that the defense would have the opportunity to challenge the Government's conclusion that the information in question was neither exculpatory nor otherwise discoverable[,]" constitutes linguistic gymnastics: the government invariably tells the district courts that the government is aware of its *Brady* obligations and will disclose if it possesses any. It does not ask the court for advice, and Courts routinely leave that decision to the government. *See, e.g.,* A.694; A.699 (District Court concluding that government's continuing *Brady* obligation not an affirmative vehicle for defense to compel discovery).

Even more obtuse is the government's assertion, at 34, that it "agreed that the defense was free to investigate Force or to otherwise explore the theory that evidence against Ulbricht had been manufactured, short of revealing to anyone that Force was the subject of a grand jury investigation. (A.249-50)."

Yet even the District Court agreed with the defense that such "freedom" was illusory, and amounted to nothing at all. A.248. *See* Initial Brief, at 25-28. As the government acknowledges, at 34, it sought successfully to deprive the defense of the ability to subpoena Force or other documents or persons related to the

investigation.

As a result, the government's position was for practical purposes categorical in its preclusion of the defense's ability to investigate Force's corruption, and/or to use it at trial. Any "agreement" suggesting otherwise was mere lip service and pretense.

Also, while according to the government's Brief, at 34, "it affirmed its obligation to provide any exculpatory material stemming from the Force investigation, to the extent it learned of it. (Docket Entry 227-1, at 67-72)[,]" it all the while was concealing such information, including mention of a *second* corrupt agent, Bridges, altogether.[9]

---

[9] Regarding its *Brady* obligations, the government, at 57, attempts to convert its late disclosure of *Brady* material into a question of the timing of production pursuant to 18 U.S.C. §3500. That is emblematic of the problem in the first place: the government's practice of withholding *Giglio v. United States*, 450 U.S. 150 (1972), impeachment material until producing it as 3500 material on the eve of trial. In addition, the government's citation to *United States v. Douglas*, 525 F.3d 225, 245-46 (2d Cir. 2008) in an effort to downplay the impact of the volume of 3500 material is frivolous. In *Douglas*, the 3500 material totaled 290 pages and the documents related to the two witnesses at issue amounted to approximately 19 pages. Here, the 3500 material for only the government's first witness exceeded *5,000* pages, and the associated documents and exhibits numbered thousands of pages. Similarly, in *United States v. Devin*, 918 F.2d 280, 290 (1st Cir. 1990), also cited by the government, after the defendant learned of a witness's "psychiatric history" during his first full day of testimony, "the judge adjourned the trial for the rest of the week ["nearly four full days"], affording defense counsel ready access to the witness and his medical records," and "afforded counsel great liberty in questioning [the witness] about his psychiatric

Even more astonishing is the government's resort *twice*, at 45, 54, to the doctrine that "evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *Id.*, *citing United States* v. *Paulino*, 445 F.3d 211, 225 (2d Cir. 2006) (internal quotation marks omitted), and *United States v. Coppa,* 267 F.3d 132, 144 (2d Cir. 2001).

Given the government's vigorous, affirmative resistance to and preclusion of any investigation and/or use of the information, its resistance to subpoenas, and its knowing, deliberate concealment of the corruption of another agent concurrently under investigation, that argument is as inexplicable as it is meritless.

The government would tie both hands behind the defense's back – including, in addition to the above, resisting discovery and precluding cross-examination and defense experts – and then criticize the defense for not being able to catch a large object hurled at it.[10]

---

treatment and counsel exploited that opportunity to the hilt."

[10]  Regarding Ulbricht's requests for discovery regarding Force (which would have forced revelation of Bridges's unlawful activity as well), discussed by the government at 55-56, the District Court should have addressed the discovery requests *individually*, and not as a single indivisible whole.  Thus, if any particular request represented a "fishing expedition," that conclusion should not have

21

**C.**     *The Errors Were Not Harmless*

Nor, for the reasons set forth above (and in Ulbricht's Initial Brief), were the errors harmless.  In order to find that they were "harmless," a court "must be able to declare a belief that it was harmless beyond a reasonable doubt." *Kampshoff v. Smith*, 698 F.2d 581, 584 (2d Cir. 1983), *quoting Chapman v. California*, 386 U.S. 18, 24 (1967).

Here, it is impossible to conclude that the preclusion of the evidence (and even the investigation) of Force's (and Bridges's) corruption "did not contribute to [Ulbricht's] conviction," and, consequently, the error was not harmless.  *Id*.; *see also United States v. Ciak*, 102 F.3d 38, 42 (2d Cir. 1996) (harmless error requires the conclusion "that there was no reasonable possibility that the evidence complained of might have contributed to the conviction").

--------

precluded compelling the government to provide discovery with respect to other, more targeted requests among the 28 the defense submitted.  Instead, the District Court failed to examine each separately, and simply lumped them all together in a manner that ignored the valid demands.  *See* Initial Brief, at 12, 26-27.

## POINT II

## THE COURT ABUSED ITS DISCRETION BY CURTAILING CROSS-EXAMINATION AND THE DEFENSE THEORY AT TRIAL

The government's response regarding the curtailment of cross-examination is predominantly covered in Ulbricht's Initial Brief, at 63. However, the few points discussed below illustrate the fallacies and failings of the government's arguments.

### A.    *HSI SA Jared Der Yeghiayan*

While the government repeatedly professes not to understand how the elements of the cross-examination Homeland Security Investigation Special Agent Jared Der Yeghiayan that were precluded were relevant and material to the defense that an alternate perpetrator – and specifically, Karpeles – was "Dread Pirate Roberts" and responsible for framing Ulbricht, it does so by ignoring not only the abundant evidence implicating Karpeles, *see* Initial Brief, at 14, 42-44, but also the *government's own investigation*.

Indeed, the government's Brief is entirely devoid of any recognition that, as pointed out **ante**, at 18, Der Yeghiayan, in concert with SDNY prosecutors (among others), gathered sufficient evidence to establish *probable cause for multiple warrants over a 15-month period* that Karpeles was DPR and operating

23

Silk Road.

Thus, the government's claim, in its Brief at 73, that "[t]he only objective link between Karpeles and Silk Road was the fact that Karpeles ran a webhosting company that hosted, among other websites, one that provided directions on how to reach Silk Road through Tor (Tr. 379)[,]" is fatally contradicted by the *government's own investigation*.

In addition, in attacking the reliability of the statements associated with the meeting between the government and Karpeles's lawyers, *see* GB, at 75-76, which the defense sought to elicit from Der Yeghiayan, the government conveniently ignores the fact that the declarant was *an Assistant United States Attorney* who participated in the meeting. *See* Initial Brief, at 71. As a result, the government's opposition to admission pursuant to Rule 807 ring hollow in the extreme.

The government also cites cases that are easily distinguishable. For example, in *DiBenedetto v. Hall*, 272 F.3d 1, 8-9 (1ˢᵗ Cir. 2001), the evidence was too speculative because the alternate perpetrators were "the murky figures of unnamed mob killers, whose existence in the shadows could possibly, but not likely, be inferred from" a prior murder. Here, there was evidence directly tying specific persons, Karpeles and Anand Athavale, to the offense conduct in *this* case.

24

Also, in *People of Territory of Guam v. Ignacio*, 10 F.3d 608, 615 (9th Cir. 1993), the Court concluded that the following was not "substantial evidence" of third party culpability: "[the third party] committed suicide three months after the molestation occurred; he was the victim's mother's boyfriend and occasionally spent the night at the household; and he urged the victim's mother to pursue the incident with the police." Again, that does not resemble the circumstances of this case in the slightest.[11]

In addition, the cases cited by the government in its Brief at 69-70, involved protecting a *defendant*'s Sixth Amendment and Due Process rights from law enforcement witness opinions. *See* Initial Brief, at 66. Conversely, the government fails to address the cases discussed in Ulbricht's Initial Brief, at 66, regarding the requisite "nexus between the crime charged and the asserted 'alternative perpetrator.'" GB, at 68.

## B.    *FBI Computer Specialist Thomas Kiernan*

The government's gross mischaracterization of the proceedings below is pervasive and extends to its discussion of the testimony from FBI Computer

---

[11] The government's reference, in its Brief at 74, to *United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998), is a *non sequitor*, as the defense's point here was not that others were contemplating the same conduct, but rather that others were the perpetrators of *this* offense.

Specialist Thomas Kiernan. For example, the government's case at trial relied heavily on chat logs from a computer program called "Torchat" that were recovered from Ulbricht's laptop, which was introduced in evidence (along with many of the TorChats themselves) during Kiernan's testimony. *See* Initial Brief, at 75.

In its Brief, at 80, the government cites Fed.R.Evid. 611(a) for the proposition that the District Court properly precluded the defense from cross-examining Kiernan on questions related to TorChat to "avoid wasting time." Yet that flawed reasoning fails to consider the weight of Kiernan's direct testimony elicited by the government at trial in an attempt to establish that the reference to "myself" in the Torchat logs was the person at the computer (*i.e.*, allegedly Ulbricht).

The government's contention that the defense had, "made the basic point[,]" *id.*, falls well-short of the Sixth Amendment right to confrontation, as discussed more fully in Ulbricht's Initial Brief at 76. Ulbricht was improperly precluded from probing that conclusion on cross-examination of Kiernan at trial beyond the most cursory preliminary inquiry, a limitation aggravated by the technically complex nature of the subject matter, which required greater depth and detail to explain its import to the jury.

The cross-examination of Kiernan regarding the Linux operating system "kernel," and whether that which Kiernan used matched that on Ulbricht's laptop was similarly directed at whether the computer simulation that Kiernan performed was congruent with the systems on the laptop – an essential element of reliability of Kiernan's testimony. *See* GB, at 79; Initial Brief, at 76.

The same was true with respect to the District Court's refusal to permit cross-examination with respect to the security implications of Ulbricht's laptop having open (at the time of his arrest) a peer-to-peer file-sharing program such as BitTorrent – essentially an open door on the Internet through which any competent hacker could launch an intrusion. *See* GB, at 66, 78.

That cross-examination was precipitated by Kiernan's evasive answers about how BitTorrent made a computer extraordinarily vulnerable to hacking, and were directly related to Ulbricht's defense that attacked the integrity of the material recovered from the laptop. T. 1048-54. *See* Initial Brief, at 76.[12]

---

[12] The ease and speed with which digital evidence – including metadata – can be manipulated or even fabricated has recently been the subject of recent political news. *See, e.g.,* "Russian Hackers Altered Emails Before Release to Wikileaks," *dailykos.com*, July 26,. 2016, available at <http://www.dailykos.com/story/2016/7/26/1552616/-Russian-Hackers-Altered-Emails-Before-Release-to-Wikileaks>; David A. Graham, "The Muscovite Candidate?" *The Atlantic*, July 25, 2016, available at <http://www.theatlantic.com/politics/archive/2016/07/the-muscovite-candidate/492884/>.

**C.**     ***The Errors Were Not Harmless***

Given those restrictions, it is not surprising that the government can argue in its Brief that its evidence was in many respects unrebutted (*see, e.g.,* GB, at 67) – *because the opportunity to do so was foreclosed by the District Court's evidentiary rulings*.  Thus, the government's assertion, in its Brief, at 22, that "[s]ubsequent examination of the defendant's computer revealed voluminous evidence tying the defendant to the creation, ownership, and operation of Silk Road for the length of its existence[,]" was dependent entirely on the  evidentiary rulings that prevented the defense from challenging the integrity and reliability of that digital evidence, for which there was not *any* firsthand or direct testimony establishing that Ulbricht created the documents on the laptop, or that they were created at the time of the claimed computer time stamp (which testimony acknowledged could be changed. T. 1076).

Likewise, with respect to Der Yeghiayan, the preclusion of critical cross-examination deprived the defense of its right to present its theory – based on facts that Der Yeghiayan was competent to provide – to the jury.

Accordingly, the restrictions on cross-examination were not harmless beyond a reasonable doubt.

28

## POINT III

## THE COURT ABUSED ITS DISCRETION IN
## PRECLUDING TWO  DEFENSE EXPERTS

Adopting the District Court's parlance, the government's claim that the defense conducted "trial by ambush" – *see* GB, at 89, 96 – is a perfect example of the adage that "the best defense is a good offense."  Indeed, as detailed in Ulbricht's Initial Brief, at 78-89, it was the government that repeatedly victimized the defense with late production of 3500 material, new and materially changed exhibits, and extremely short notice to prepare for former FBI Special Agent Ilhwan Yum's complex testimony involving Bitcoin forensics and a 63-page spreadsheet exhibit (GX 620) cataloguing thousands of separate Bitcoin transactions – for which the District Court refused to grant even an afternoon adjournment (amounting to a two-hour difference before the weekend break) to prepare that cross.  *See* Initial Brief, at 83.

Indeed, the government's Brief evades entirely the woefully late notice and production of GX 620, which was responsible for the defense's need for an expert regarding Bitcoin.  *Id*., at 78-79.  Also, the government's claim that GX 620 and Yum's corresponding testimony were "in response to the defense's opening statement[,]" GB, at 83, is unavailing – as if the government did not bear the

burden of proof, and should have long prior to trial anticipated that its inability to trace the Bitcoins attributed to Silk Road transactions would be an issue. That there was a glaring gap in the government's initial exhibit list, and had to be supplemented by mid-trial scrambling, cannot be attributed to the defense.

Also, in its Brief at 93, the government adds, that "although Ulbricht contends that he was only responding to Yum's testimony tying Ulbricht's Bitcoins to the Silk Road servers, which he could not have anticipated (Br. 81-83), it was, in fact, the defense that opened on the theory that the Bitcoins on Ulbricht's laptop resulted from innocent trades, and which necessitated the Government's 11th hour scramble for Yum's testimony (A.373-74)."

Yet raising the issue did not mean that when the government finally reacted – mid-trial – the defense could properly be precluded from meeting that newly-presented evidence on "timeliness" grounds. Also, by attempting to describe it as "testimony" conveniently ignores the more important aspect of notice with respect to former SA Yum: the 63-page GX 620.

Accordingly, the government's reference, at 87 of its Brief, to Rule 16's purpose of "minimiz[ing] surprise" is supremely ironic when it was the defense that suffered from the surprise. Even more ironic is the government's citation, *id*., at 89, to *Chambers v. Mississippi* 410 U.S. 284 (1973), as a basis for *constraining*

30

the ability of a defendant to introduce relevant evidence.

While the government complains of notice of the defense expert "between one and three days before the Government rested[,]" GB, at 92 – that protest is laughable considering that was more time than the defense had with respect to notice of the voluminous Yum exhibit. *See* Initial Brief, at 81-82.

In addition, the government's claim that the defense expert testimony in response to Yum's testimony went "to the heart of the Government's case[,]" GB, at 94, defies credulity. How could Yum's testimony be the heart of the government's case if it had not even anticipated it and the accompanying Exhibit until after the defense's opening statement? Moreover, that it went to the heart of the government's case defeats *any* claim that its preclusion constituted harmless error.

Nor would the defense expert testimony – which would most likely have been completed within a day – have lengthened the trial unduly. As a result, the playing field was not level, and the government's arguments only reinforce that conclusion.

Nor do the cases cited by the government support its claims; in fact, they demonstrate that the District Court's preclusion was an unnecessarily drastic (and unfair) remedy. For example, in *United States v. Tin Yat Chin*, 476 F.3d 144 (2d

31

Cir. 2007) (cited by the government at 94), this Court concluded that a brief

adjournment resolved any problem with arguably late expert notice: "the

Government's nondisclosure, though regrettable, did not rise to a due process

violation" because the Court granted the defendant a one-day continuance. *Id*., at

146. *See also id*. ("although overruling [the defendant']s objection to the

Government's calling [an expert witness] on rebuttal, [the Court] then gave

defense counsel what he needed: time to prepare to cross-examine"). *See also

United States v. Douglas*, 336 F. App'x 11, 13–14 (2d Cir. 2009) ("[t]he district

court, however, averted the possibility of a due process violation by giving

defense counsel additional time to review the 2006 study and to prepare for the

cross-examination of [the government's expert]").

Other cases cited by the government (in its Brief, at 87-88) are not apposite,

either. For example, in *United States v. Yousef*, 327 F.3d 56, 148 (2d Cir. 2003),

the issue was whether a pretrial hearing pursuant to *Daubert v. Merrell Dow

Pharmaceuticals, Inc.*, 526 U.S. 579 (1993), shifted the burden of proving

reliability to the defense and improperly provided the government advance notice

of defense strategy. Neither issue is present here.

Similarly, in *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266-

67 (2d Cir. 2002), the issue was not timing, but rather the District Court's

32

responsibility with respect to expert testimony, which is not governed by "a definitive checklist or test," but "[r]ather, the inquiry envisioned by Rule 702 is . . . a flexible one . . . and the gatekeeping inquiry must be tied to the facts of a particular case." Here, conversely, that "flexibility" was decidedly absent.

Also, in *United States v. Cruz*, 981 F.2d 659, 662 (2d Cir. 1992), this Court reversed a conviction because the government's expert testimony "explaining that drug wholesalers often use intermediaries and make deliveries away from the actual locus of the drugs as means of avoiding identification and arrest" a/k/a "the role of a broker" was "simply not an issue that the parties disputed" and in any event, even if "the jury would . . . find [the defendant's] alleged role [as a broker in a drug transaction] confusing . . . [t]he testimony . . . went into matters beyond explaining the role of a broker and had another use that was both impermissible and prejudicial," which was "to bolster [a government witness'] version of events." Again, those issues were not present in this case. *See also United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992) (addressing admissibility of *lay opinion testimony* under Fed.R.Evid. 701).

Also, the sufficiency of the defense experts' proffers, discussed in the Initial Brief, at 78-81, was manifest, and consistent with traditional disclosure. *See, e.g., United States v. Mavashev*, No. 08 CR 902 (DLI) (MDG), 2010 WL 234773, at

*1–2 (E.D.N.Y. Jan. 14, 2010) (allowing government expert to testify, stating that "the failure to disclose must generally be complete before a court will preclude an expert witness from testifying[,]" citing *Tin Yat Chin*, and noting that "[e]ven if the disclosure provides a sufficient summary of any opinions to be offered by the witness, it *may* be excluded if [there was] no attempt at all to describe the bases and reasons for those opinions") (emphasis in original).

Accordingly, the District Court abused its discretion in precluding the two defense experts, especially when their testimony was rendered necessary by the government's late notice as well as the limitations the District Court imposed on cross-examination of government witnesses.

## POINT IV

**THE COURT ABUSED ITS DISCRETION IN PRECLUDING ADMISSION OF ANDREW JONES'S STATEMENT AGAINST PENAL INTEREST PURSUANT TO RULE 804(3)(b), FED.R.EVID., AND/OR RULE 807, FED.R.EVID.**

The government's arguments with respect to the preclusion of the statement by Andrew Jones were anticipated in Ulbricht's Initial Brief, at 90, but some of the government's comments merit mention. For example, in its Brief, at 97, the government states it informed the defense that it would not be calling Jones as a witness "about two weeks later[,]" but fails to note that was already *mid-trial*.

34

Also, contrary to government's contention, in its Brief at 103, "the defense sought to distort the record by admitting *only* that portion of Jones's statement that he deemed helpful," citing Fed. R. Evid. 807(a)(4), the defense's objection to including *inculpatory* aspects of the statement was proper.

In *United States v. Moussaoui*, 382 F.3d 453 (4th Cir. 2004), the Court ruled that only those portions of the interviews of witnesses [to whom the government had denied the defense access] the defense wished to use could be admitted, as introduction of inculpatory or aggravating portions would violate the defendant's Sixth Amendment confrontation rights. *Id.*, at 481-82, *citing Crawford v. Washington*, 541 U.S. 36 (2004).

Here, the government could have *compelled* Jones's testimony at trial – repleted with the constitutionally required cross-examination – pursuant to Jones's cooperation agreement. Having foregone that option, the government cannot complain that the statement should have included inculpatory portions for which Ulbricht would have been denied his Sixth Amendment right to confrontation.

Ultimately, too, the defense acceded to the Stipulation as proposed by the government, T. 2066, but the government even then reneged on its prior agreement to Stipulate.

In addition, the government's cases, cited in its Brief at 101-02, are again

35

far wide of the mark, and inapplicable here. For instance, in *United States v. Marquez*, 462 F.2d 893, 895 (2d Cir. 1972), this Court found one part of the statement was against penal interest, but rejected another because it "merely sought to exculpate [the witness'] friends" – clearly not the situation here.

Similarly, in *United States v. Doyle*, 130 F.3d 523, 544 (2d Cir. 1997), this Court agreed that the statement by a cooperator was properly excluded because his "inconsistent stories suggest a similar risk of fabrication[,]" and because, again, the witness was likely simply trying to exculpate friends. *See also United States v. DeVillio*, 983 F.2d 1185, 1190 (2d Cir. 1993) (witness' statement not against penal interest because he was recording the conversations under the F.B.I.'s supervision; therefore, his statements did not "subject him to criminal liability").

In fact, one case cited by the government proves the defense's point. In *United States v. Saget*, 377 F.3d 223, 231 (2d Cir.), *supplemented*, 108 F. App'x 667 (2d Cir. 2004), statements made by a co-conspirator to get a Confidential Informant ("CI") to join in a conspiracy were admissible as against penal interest because the "statements reflected [the witness]'s attempt to give the CI examples of how he and [the defendant] operated and why their scheme worked." That is precisely the nature of Jones's statement herein.

36

## POINT V

**THE COURT'S ERRONEOUS EVIDENTIARY RULINGS
CONSTITUTED CUMULATIVE ERROR THAT DEPRIVED
ULBRICHT OF DUE PROCESS AND A FAIR TRIAL**

The doctrine of cumulative error, set forth in the Initial Brief, at 97, attains enhanced importance here because of the government's persistent attempts to isolate each issue in performing "harmless error" analysis. While, as discussed **ante** in each respective Point, the individual errors were not harmless beyond a reasonable doubt, when aggregated they represent a complete evisceration of the ability to present a defense, and are patently not harmless.

The evidentiary errors created a one-sided trial in which the defense was precluded from even investigating, much less using, material exculpatory evidence (POINT I), unduly restricted in pursuing cross-examination with respect to several witnesses (POINT II), precluded from responding to the government's case – including testimony and voluminous exhibits provided only mid-trial – with relevant and admissible expert testimony (POINT III), and precluded from introducing admissible, credible evidence that supported the heart of the defense theory (POINT IV).

## POINT VI

### THE UNLIMITED SEARCHES AND SEIZURE OF ULBRICHT'S ENTIRE LAPTOP AND GMAIL AND FACEBOOK ACCOUNTS VIOLATED THE FOURTH AMENDMENT BECAUSE THEY CONSTITUTED THE FRUIT OF (A) A WARRANT THAT LACKED ANY PARTICULARITY; AND (B) UNLAWFUL AND WARRANTLESS PEN REGISTER AND TRAP AND TRACE ORDERS

Much of the government's response with respect to the suppression issues were addressed in the comprehensive treatment of the issues in Ulbricht's Initial Brief. However, there have been subsequent developments in the case law that warrant discussion.

### A. *The Warrants' Violation of the Fourth Amendment's Particularity Requirement*

#### 1. *The Warrants Lacked Particularity In Application and Execution*

Since Ulbricht's Initial Brief was filed, this Court issued its *en banc* decision in *United States v. Ganias*, ___ F.3d ___, 2016 WL 3031285 (2d Cir. 2016) (*en banc*), which case, at the panel level, addressed the Fourth Amendment's particularity requirement in the context of a search and retention (and subsequent second search) of computer hard drives. *See* Initial Brief, at 101.

However, in *Ganias*, this Court did not address the merits, but rather grounded its decision reversing the panel's suppression on the "good faith

exception" – discussed **post**, at 42-44 – to the Fourth Amendment's warrant

requirement, concluding that it "should not decide this question on the present

record, which does not permit a full assessment of the complex and rapidly

evolving technological issues, and the significant privacy concerns, relevant to its

consideration."  2016 WL 3031285, at *16 (footnote omitted).

    Nevertheless, this Court emphasized that

> though we offer no opinion on the existence of a Fourth
> Amendment violation in this case, we make some
> observations bearing on the reasonableness of the
> agents' actions, both to illustrate the complexity of the
> questions in this significant Fourth Amendment context
> and to highlight the importance of careful consideration
> of the technological contours of digital search and
> seizure for future cases.

*Id*., at *6.

    In that context, this Court elaborated that it wanted to "highlight the

complexity of the relevant questions for future cases and to underscore the

importance, in answering such questions, of engaging with the technological

specifics."  *Id*., at *13 (footnote omitted).  This Court added that

> [i]n emphasizing such specifics, we reiterate that we do
> not mean to thereby minimize or ignore the privacy
> concerns implicated when a hard drive or forensic mirror
> is retained, even pursuant to a warrant.  The seizure of a
> computer hard drive, and its subsequent retention by the
> government, can give the government possession of a

39

> vast trove of personal information about the person to
> whom the drive belongs, much of which may be entirely
> irrelevant to the criminal investigation that led to the
> seizure.  Indeed, another weakness of the file cabinet
> analogy is that no file cabinet has the capacity to contain
> as much information as the typical computer hard drive.

*Id.*, at *14.  *See also* Andrew Guthrie Ferguson, Professor of Law, UDC David A.

Clarke School of Law (Reporter), *The Fourth Amendment in the Digital Age*,

National Association of Criminal Defense Lawyers Symposium,

<https://www.nacdl.org/FourthAmendmentInTheDigitalAge/>;  Peter A. Crusco,

"Email Account Seizures and Retention of Large Digital Records," *New York Law

Journal*, June 28, 2016, available at

<http://www.newyorkjournal.com/printerfriendly/id=12022761021800> ("[t]he

issue of voluminous digital searches calls into question the particularity doctrine

of the Fourth Amendment").

     In addition, the government posits two extraordinary concepts that would

eliminate the particularity requirement altogether.  For example, in its Brief, at

122, the government maintains that Ulbricht's electronic data was seized *en masse*

"justifiably [], because even innocent communications or travel records might

contain details overlapping with 'DPR's (innocent) statements, shoring up the

proof against Ulbricht."

That construction, however, would dispense with particularity in *any* and *every* investigation because *anything* could be relevant to *everything* – thereby obliterating the essence of particularity.  In *ACLU v. Clapper*, 785 F.3d 787, 815-18 (2d Cir. 2015), this Court noted that a definition of prospective relevance that was so elastic it defied limitation was no definition at all.  Here, the same is true with respect to the warrants' lack of any narrowing principle that would conform with the particularity requirement – infecting both the applications for and execution of the warrants.

The government also advances the proposition that a warrant can be justified by the fruits of the search and seizure, commenting in its Brief, at 122-23 (record citations omitted), that "[a]nd, as the application foreshadowed, the warrant yielded additional evidence of this type establishing Ulbricht's identity beyond a reasonable doubt at trial."

Yet that *post hoc* rationale was soundly rejected in *Steagald v. United States*, 451 U.S. 204, 220 (1981), *citing Stanford v. Texas*, 379 U.S. 476, 481–485 (1965).  Nor should the government be rewarded for an unlawful warrant simply because a more tailored warrant would have passed constitutional muster.  *See* GB, at 127.  Otherwise, the government would be encouraged *always* to engage in unlawful search and seizure confident that only the unlawfully seized items would

41

be suppressed. *See, e.g., United States v. Simels*, 2009 WL 1924746 (E.D.N.Y. July 2, 2009).

Moreover, two cases cited by the government at 115 of its Brief assist Ulbricht, and not the government. For example, in *United States v. Riley*, 906 F.2d 841, 844-45 (2d Cir. 1990), this Court pointed out that "the warrant supplied sufficient examples of the type of records that could be seized – bank records, business records, and safety deposit box records," a limiting principle not present in the warrants at issue herein.

Similarly, in *United States v. Young*, 745 F.2d 733, 759-60 (2d Cir. 1984), this Court noted that "the boilerplate language challenged by" the defendant "followed a list of more specific items to be seized, and could be construed only in conjunction with that list." Again, here such specificity was absent.

### 2. *The "Good Faith Exception" to the Warrant Requirement Does Not Apply*

Unsurprisingly, in its Brief, at 116-18, 126-27, the government resorts to the "good faith exception" in an attempt to validate the warrants. As noted **ante**, at 38-39, this Court *en banc* in *Ganias* applied the "good faith exception" to the warrants and searches in that case.

In its analysis, this Court discussed, at*17-18, two prior decisions, *United*

42

States v. Reilly, 76 F.3d 1271 (2d Cir.), *aff'd and amended*, 91 F.3d 331 (2d Cir. 1996) (per curiam), and *United States v. Thomas*, 757 F.2d 1359 (2d Cir. 1985). In *Ganias*, this Court noted that *Reilly*, in discussing *Thomas*, noted that "the agent [in *Thomas*] 'did not have any significant reason to believe that what he had done [conducting the canine sniff] was unconstitutional.'" 2016 WL 3031285, at *18, *quoting Reilly*, 76 F.3d at 1281; *see also id.* ("until *Thomas* was decided, no court in this Circuit had held that canine sniffs violated the Fourth Amendment."), *quoting Reilly*, 76 F.3d at 1281.

Thus, the question in those cases, as well as in *Ganias*, was "whether the officers' reliance on the warrant was reasonable." *Id.*, at *18. In *Ganias*, this Court explained that "[a]t the time of the retention, no court in this Circuit had held that retention of a mirrored hard drive during the pendency of an investigation could violate the Fourth Amendment, . . ." *Id.*, at *19.

Yet, in *Ganias* the initial warrants were issued in 2003, and the subsequent search was performed in 2006. *Id.*, at *1. Here, the agents applying for and executing the warrants at issue are bereft of that defense; the limits imposed by the particularity requirement have been apparent since the enactment of the Bill of Rights. Consequently, the agents could not have considered their reliance on the warrants to be "reasonable."

43

As this Court explained in *United States v. George*, 975 F.2d 72 (2d Cir. 1992), general warrants, which authorize impermissibly unlimited searches and seizures, are facially deficient, and therefore, cannot be saved by the good faith exception in *United States v. Leon*, 468 U.S. 897, 923 (1984).

The opinion in *George* specifically addressed warrants that do not sufficiently articulate the crime or criminal activity to which the seizable evidence relates, but the Court also pointed out that it had "cautioned" in *United States v. Buck*, 813 F.2d 588, 593, n. 2 (2d Cir. 1987), that after *Buck* "police officers may no longer invoke the reasonable-reliance exception to the exclusionary rule when they attempt to introduce as evidence the fruits of searches undertaken on the basis of warrants containing only a catch-all description of the property to be seized."

**B.**    ***The Pen Register and Trap and Trace Orders Were Unlawful and Violated the Fourth Amendment Because They Required a Warrant and Also Failed to Adhere to Statutory Limitations***

Two aspects of the government's Brief deserve response with respect to whether the Pen Register and Trap and Trace Order were unlawful because they required a warrant and/or failed to adhere to statutory limitations.

First, the notion that Internet Protocol ("IP") addressed do not provide *content* is incorrect. Once an investigator has an IP address, the very same *content* of that website that the subject of the surveillance observed is equally available to

44

the investigator. Thus, the circumstances are not like those of a telephone pen register, in which an investigator has only the telephone numbers of the caller and receiving party, but not the *content* of those calls. Unlike that situation, the IP addresses provide a clear and complete window on the content of a subject's internet activity.

Second, the "third-party" doctrine upon which the government relies to deny IP addresses and "similar Internet routing information" Fourth Amendment protection, *see* GB, at 119-120, has been the subject of much discussion recently in the Supreme Court and Circuits. *See* Initial Brief, at 111.

Since Ulbricht's Initial Brief was filed, the *en banc* Fourth Circuit, in *United States v. Graham*, 796 F.3d 332, 344-45 (4th Cir.), *reh'g en banc granted*, 624 F. App'x 75 (4th Cir. 2015), *and adhered to in part on reh'g en banc*, No. 12 4659, 2016 WL 3068018 (4th Cir. May 31, 2016), reversed a panel decision that had determined that cell-site location information required a warrant, and held that such data was not protected by the Fourth Amendment because of the "third-party" doctrine.

That generated a dissent by three Judges, who, responding to the majority's position that both "logic" and Supreme Court precedent compelled the result, noted that "those contentions are difficult to square with the array of concurring

and dissenting opinions that have already been issued by federal appellate judges

on this matter." 2016 WL 3068018, at \*15. S*ee also United States v. Davis*, 754

F.3d 1205, 1208 (11th Cir.), *reh'g en banc granted*, *opinion vacated*, 573 F. App'x

925 (11th Cir. 2014), *and on reh'g en banc in part*, 785 F.3d 498 (11th Cir. 2015),

*cert. denied*, 136 S. Ct. 479, 193 L. Ed. 2d 349 (2015).[13]

    Just two weeks ago, in *United States v. Lambis*, ___ F. Supp.3d ___, 2016

WL 3870940 (S.D.N.Y. July 12, 2016), a District Court suppressed evidence

obtained via a cell-site simulator (also called a "Stingray" device) that prompts

cell phones to provide their location, finding that acquisition of such data requires

a warrant.

    In so doing, the Court in *Lambis* concluded the Drug Enforcement

Administration's "use of the cell-site simulator revealed 'details of the home that

would previously have been unknowable without physical intrusion," [], namely,

that the target cell phone was located within [the defendant's] apartment." *Id*., at

\*2, *quoting Kyllo v. United States*, 533 U.S. 27, 40 (2001).

---

    [13] This Court, albeit in a different context, expressed reservations about a
categorical denial of privacy protection to digital communications data simply
because it is conveyed to a third-party provider. *See ACLU v. Clapper*, 785 F.3d
787, 824 (2d Cir. 2015) ("the bulk collection of data as to essentially the entire
population of the United States, something inconceivable before the advent of
high-speed computers, permits the development of a government database with a
potential for invasions of privacy unimaginable in the past").

Here, Ulbricht makes that same argument with respect to the Pen Register and Internet routing information obtained absent a warrant. *See* Initial Brief, at 119. As the Court in *Lambis* declared – after analyzing *Kyllo* and *United States v. Karo*, 468 U.S. 705 (1984) – "the Government may not turn a citizen's cell phone into a tracking device." 2016 WL 3870940, at *3. Here, the same is true with respect to functionally indistinguishable means of geo-locating Ulbricht's laptop computer. *See* Initial Brief, at 118-120.

The Court in *Lambis* also held that the limitations of the "third-party doctrine" did not apply. 2016 WL 3870940, at *6-7. Although distinguishing a cell-site simulator from a traditional pen register, *id.*, here the pen register and trap and trace devices, combining the location of the router with the activity of Ulbricht's laptop while he used it at home, operated in the same manner.

## POINT VII

## THE LIFE SENTENCE IMPOSED ON ULBRICHT WAS PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE

The government executes a series of contortions to justify the District Court's imposition of a procedurally and substantively unreasonable life sentence. In an unavailing attempt to recast the District Court's untethered analysis as a standard based on established precedent or some procedural rule, the government

47

lists numerous legal standards the District Court did *not* use when it found that

alleged overdose deaths the government attributed to Ulbricht at sentencing were

"in some way, related to Silk Road."

Nor does the government ever afford more than lip service to the threshold

key flaw in the District Court's attribution of the overdose deaths to Ulbricht: that

the evidence was utterly insufficient to attribute the deaths to drugs purchased

from Silk Road vendors.

Similarly, the government grasps at straws, such as ephemeral general

deterrence, the "unprecedented" nature of the case (*i.e.*, the District Court's

dubious distinction that "[w]hat [Ulbricht] did was unprecedented and in breaking

that ground as the first person . . . having to pay the consequences for that"

(A.1533)), and the District Court's own perceptions of and conclusions about

Ulbricht's political views,[14] to portray Ulbricht's life sentence as substantively

_____

[14]  The government is correct that the District Court ascribed to Ulbricht and relied on at his sentencing a political philosophy which the District Court believed "led him to start Silk Road in the first place" – that "the laws a[re] the oppressor and that each transaction is a victory over the oppressor" (A. 1516) –  and which the District Court "expressed doubt that the defendant had abandoned." GB, at 153; A.1534 ("I don't know that it is a philosophy left behind").  At sentencing, the District Court stated "it is . . . notable that the reasons you started Silk Road were philosophical," and found the philosophy it attributed to Ulbricht to be "deeply troubling and terribly misguided and also very dangerous." (A.1534).  The government, however, in its struggle to provide any possible justification for the life sentence the District Court imposed, fails to acknowledge that the District

reasonable – conceding on one hand that the standard by which to evaluate such a sentence is whether it is "shockingly high," but then resting on a District Court's (by no means limitless) discretion in sentencing to avoid addressing that the District Court's imposition of a life sentence here defies reason and shocks the conscience.

**A.**    ***The Life Sentence Was Procedurally Unreasonable***

This Court recently reaffirmed that it "will not uphold a sentence as substantively unreasonable unless [it] can first conclude that the district court adhered to . . . procedural requirements."  *United States v. Brown*, ___ F. 3d ___ ,

---

Court's reliance at sentencing on what it perceived to be Ulbricht's political philosophy constituted reliance on an expressly prohibited factor.  *See* U.S.S.G. §5H1.10 ("Race, Sex, National Origin, Creed, Religion, and Socio-Economic Status (Policy Statement)).

Even more critically, the District Court's punishment of Ulbricht for his political views violates freedom of speech guaranteed by the First Amendment to the United States Constitution, and cannot provide the basis for a lawful or reasonable sentence.  *See Thornhill v. Alabama*, 310 U. S. 88, 101-102, 310 U. S. 95 (1940) ("[t]he freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment");  *see also Garrison v. Louisiana*, 379 U.S. 64, 66 (1964) ("speech concerning public affairs . . . is the essence of self-government"). Perhaps even more objectionable is that the District Court suggested it would have been willing to disregard Ulbricht's "deeply troubling and terribly misguided and also very dangerous" political views had it been sure that he had abandoned them – thus, suggesting Ulbricht could have avoided greater punishment if he had abandoned his First Amendment protected beliefs.

49

2016 WL 3254735, at *7 (2d Cir. June 14, 2016), *citing United States v. Sindima*, 488 F.3d 81, 85 (2d Cir. 2007).  Here, Ulbricht's sentence was procedurally unreasonable.

**1.**     ***The District Court Failed to Employ A Cognizable Legal Standard to Evaluate Whether the Alleged Overdose Deaths Should Have Been Considered At Ulbricht's Sentencing***

As set forth **ante**, in an attempt to defend the District Court's use of a criterion not based on any established or cited precedent or procedural rule to shoehorn into Ulbricht's sentence a series of alleged overdose deaths which cannot be established were caused by drugs purchased on the Silk Road website, the government refers to various legal standards in an attempt to find one, or some combination of standards, that could encompass the District Court's analysis.

Nevertheless, the government cannot save the District Court's vague and subjective analysis by cobbling together a new standard from a series of established standards, all of which the District Court failed to employ.

Plainly, the District Court evaluated the evidence of the alleged overdose deaths based on a flawed measure of its own creation:  "whether the Court finds, by a preponderance of the evidence that the deaths, in some way, related to Silk Road."  A.1472.  Thus, contrary to the government's characterization, at 143, of Ulbricht's position, Ulbricht does not claim the District Court "relied on the wrong

50

legal standard." Rather, the District Court did not rely on any legal standard at all.

Indeed, the government acknowledges as much in its Response, at 144-148 & n.36, when it cycles through standard after standard. If the District Court had applied a single, cognizable, proper standard there would not have been any need to devote nearly five pages, including a nearly three-page footnote, to discussing various standards upon which the District Court might have relied. Moreover, that footnote – which devolves into a lengthy and convoluted discussion of tort law[15]

---

[15] The government's argument is further mired by its discussion of tort law, at 144-46, n.36. The government tries to support the District Court's consideration of the alleged overdose deaths by referring this court to civil cases brought under the Federal Tort Claims Act, when state law provides the applicable standards for tort liability – seemingly suggesting that civil tort standards of liability could be applied, presumably in the absence of any other cognizable standard.

Moreover, while the government cites, *Zuchowicz v. U.S.*, 140 F.3d 381 (2nd Cir. 1998),to support its contention that "in the context of common law torts," and assuming several other factors in the government's favor, Ulbricht could somehow be found to have, through his negligence, caused the harm to the decedents, the government omits the discussion of causation that is set out in *Zuchowicz*, and which undermines the District Court's position at sentencing that "the question is not the but-for causation which was addressed in the defense submissions" (A.1472), and that"[t]he Court is not asking whether the but for cause of death is drugs purchased on the Silk Road. It doesn't have to be but-for. The Court's question is whether there is a connection between the purchase of drugs on Silk Road and death and whether the drugs were ingested." (A.1476).

In *Zuchowicz,* this Court made clear that the "plaintiff must generally show . . . (a) that the defendant's . . . act or omission was a but for cause of the injury, (b) that the negligence was causally linked to the harm, and that the defendant's . .

51

standards – serves only to undermine further the District Court's analysis.

> **2.     *The District Court's Finding of Sufficient Connection Between Silk Road Drugs and the Alleged Overdose Deaths Was Materially Inaccurate***

The procedural unreasonableness of the District Court's invented standard for reviewing the alleged drug overdose deaths is further compounded by the District Court's failure to assess properly the underlying information regarding these deaths – even under its faulty, invented standard.

The government argues, at 149, that "although Dr. Taff may not have rendered an opinion on the causes of death in most cases, he did not dispute that illegal drugs played a role in each death." Yet, the government entirely misses the mark. Whether illegal drugs played a role is *not* the critical issue. The critical question is whether illegal drugs *purchased on Silk Road* played a role in each death, and the evidence doe not establish *either* that drugs were the cause of death, or, more importantly, that the illegal drugs allegedly involved in each death were

---

. act or omission was proximate to the resulting injury." *Id.*, at 388-389. Indeed, not only does this undermine the District Court's reasoning regarding the proper standard for evaluating the drug overdoses, but it also highlights the government's argument, in its Brief, at 145, that "[t]he focus on the defendant's conduct and state of mind, and the reasonable foreseeability of consequences flowing therefrom (*i.e.*, proximate cause), as opposed to but for causation, is appropriate at sentencing," thereby encouraging this Court to ratify a standard in this criminal case that is even lower than that applied in civil tort actions.

purchased on the Silk Road website. *See* Initial Brief, at 130-31; A.1476.

Recently, in *Brown*, 2016 WL 3254735, at *7, this Court "conclude[d] that it is appropriate to remand for resentencing to ensure that [a] sentence is not based on a clearly erroneous understanding of the facts" and remanded a case in which a producer of child pornography had received a 60-year sentence, for just that critical purpose. *See also United States v. Corsey*, 723 F.3d 366, 376 (2d Cir. 2013 (remanding for resentencing because record was ambiguous as to whether district court improperly treated the statutory maximum as the only reasonable sentence); *United States v. Cossey*, 632 F.3d 82, 88–89 (2d Cir.2011) (remanding for resentencing where unclear whether district court sentenced defendant based on an appropriate or inappropriate consideration); *United States v. Juwa*, 508 F.3d 694, 699 (2d Cir.2007) (remanding for resentencing where there was "uncertainty from both the sentencing transcript and the written order surrounding whether and to what extent the district judge based his sentencing enhancement on the assumption that Juwa had engaged in multiple instances of sexual abuse, as opposed to the single instance to which Juwa had anticipated pleading guilty in state court" (emphasis omitted)).[16]

---

[16] These parantheticals are taken verbatim from this Court's parenthetical descriptions in *Brown*.

Accordingly, here, too, the District Court's erroneous finding that there was "a connection between the purchase of the drugs on Silk Road and the death[s]" and that "ingestion of those drugs may be reasonably associated with those deaths[]" (A.1476) is itself grounds for vacating and remanding the matter for re-sentencing.

**B.** ***The District Court's Sentence Is Substantively Unreasonable***

As the government concedes, at 142-143 of its Brief, relying on the well-established law of this Court, a sentence is substantively unreasonable when it is "shockingly high." Also, the discretion of a sentencing judge "to take into consideration his or her 'own sense of what is a fair and just sentence under all of the circumstances'" remains "subject to the *reviewing* court's ultimate authority to reject any sentence that exceeds the bounds of reasonableness." *Id.*, *quoting United States v. Rigas*, 583 F. 3d 108, 123 (2d Cir. 2009); *United States v. Jones*, 490 F.3d 191, 195 (2d Cir. 2006) (emphasis added).

Indeed, under this Circuit's standard, the life sentence imposed here is "shockingly high," exceeds the bounds of reasonableness, and is therefore substantively unreasonable because it (1) imposes upon Ulbricht, who the District

54

Court alleges to have been the "first" to commit such an offense (A.1533),[17] an

unquantifiable and uncalibrated general deterrence penalty that objective facts

have demonstrated was unwarranted and altogether ineffective;  (2)  dwarfs the

sentences imposed on other key players, including the top drug sellers on the Silk

Road site and other administrators;  (3)  far exceeds even the sentence requested

by the government – "a lengthy sentence, one substantially above the mandatory

minimum" of 20 years's imprisonment (A.1315), but *not* a life sentence;  and (4)

cannot be saved by the District Court's fact-finding that Ulbricht was somehow

responsible for the overdose deaths of six people, or for soliciting murders for

hire, *even if* the District Court had properly concluded that the deaths could be

attributed to Ulbricht (which, as set forth **ante**, it did not), or even if the alleged

murders for hire had actually taken place (which they did not, nor did the

purported victims even exist).

   While the government argued at sentencing, and again it its Brief that "[t]he

proliferation of 'dark markets' in the wake of Silk Road's founding underscored

the need for general deterrence" (GB, at 137, A.1327-28), the continued growth

---

[17]  In defending the sentence, the government, at 132, claims it "was
warranted in part because Silk Road was 'unprecedented' in its ability to entice
people who would not otherwise have engaged in 'traditional drug deals.' (PSR at
38).  Yet there is not any proof in the record supporting such a statement.

and emergence of new "dark markets," even after Ulbricht's life sentence was

imposed May 29, 2015, demonstrates that general deterrence, especially in this

instance, is entirely illusory and a component of sentencing that defies

measurement and comparison, and therefore guarantees disparity. *See*, *e.g.,*

"Shedding Light on the Dark Web," *The Economist*, July 16, 2016, available at

http://www.economist.com/news/international/21702176-drug-trade-moving-stree

t-online-cryptomarkets-forced-compete ("[t]hough online markets still account for

a small share of illicit drug sales, they are growing fast – and changing

drug-dealing as they grow.  Sellers are competing on price and quality, and

seeking to build reputable brands.  Turnover has risen from an estimated

$15m-17m in 2012 to $150m-180m in 2015.  And the share of American

drug-takers who have got high with the help of a website jumped from 8% in 2014

to 15% this year, according to the Global Drug Survey, an online study);  *see*

Initial Brief at 138-39.

 Since Ulbricht's sentencing, at least ten *new* dark net markets have

established themselves on Tor, and are thriving.  Others, such as Silk Road 3.0,

created well after Ulbricht's arrest, continue to operate despite Ulbricht's life

sentence.  *See* https://www.deepdotweb.com/dark-net-market-comparison-chart/.

 As Kyle Soska and Nicholas Christin of *Carnegie Mellon University* state in

their recent paper measuring the evolution of online anonymous marketplaces,

"[f]ar from causing the demise of this novel form of commerce . . . the Silk Road
take-down spawned an entire, dynamic, online anonymous marketplace ecosystem,

which has continued to evolve to this day" with today's market sales volumes

"stable around $300,000-$500,000 per day" and some days reaching as high as

$650,000 in sales. *See* Kyle Soska and Nicholas Christin, "Measuring the

Longitudinal Evolution of the Online Anonymous Marketplace Ecosystem,"

presented at the *24th USENIX Security Symposium*, at 33, 47 (August 12-14, 2015),

available at

<https://www.usenix.org/conference/usenixsecurity15/technical-sessions/presentat
ion/soska>.

Consequently, here "general deterrence" is the illusory tail wagging the very

real dog – the life sentence. Despite the objective evidence – both academic and

clinical – that longer sentences do not deter, the District Court rejected that

conclusion without citation to *any* contrary authority. A.1523-33; A.1533,

A.1027-29. *See* Initial Brief at 138-139; DPA Brief at 15-21.

The government also summarily dismisses Ulbricht's discussion of 18

U.S.C. §3553(a)(6), and the staggering disparity between Ulbricht's sentence and

that imposed on his alleged co-conspirator, Peter Nash, who worked as a

moderator and administrator on the Silk Road site, on the grounds that "while a district court is permitted to consider disparities between co-defendants (or co-conspirators) it is not required to do so. *See* GB, at 157, *citing United States v. Ghailani*, 733 F.3d 29, 55 (2d Cir. 2009); *see* Initial Brief, at 136-138.

Even more egregiously, the government does not address at all the other, far shorter, sentences imposed on individuals involved in Silk Road with similar levels of culpability, including those defendants who sold large quantities of drugs on the Silk Road website.

They include Steven Sadler, Silk Road's largest heroin and cocaine seller, who received a sentence of five years' imprisonment, and Cornelis Jan Slomp, the leading Silk Road drug seller, who received a sentence of 10 years' imprisonment. *See* Brief, at 137, n.24. *See* Judgment, *United States v. Steven Lloyd Sadler*, 13 Cr. 321 (RSM) (W.D. Wash.) (Dkt #64); Judgment, *United States v. Cornelis Jan Slomp*, 13 Cr. 689 (N.D. Ill.) (MFK) (Dkt #44).

Nor does the government account for the recent sentence of Brian Farrell, a top level administrator on Silk Road 2.0, who received an eight-year prison sentence, or even the sentences imposed upon Force and Bridges, who received sentences of 78 months and 71 months' imprisonment, respectively. *See* Judgment, *United States v. Brian Farrell*, 15 Cr. 29 (RAJ) (W.D. Wash.) (Dkt

58

#74); Amended Judgment, *United States v. Carl Mark Force*, 15 Cr. 319 (RS)

(N.D. Ca.) (Dkt #88);  Judgment, *United States v. Shaun W. Bridges*, 15 Cr. 319

(RS) (N.D. Ca.) (Dkt  #97).

These sentences demonstrate that Ulbricht's life sentence is *shockingly high*

by comparison, and that there cannot be any rationale, including relative

culpability,[18] that could justify the dramatic deviation in the punishment imposed.

Indeed, even the government perceived the wide range of possible, albeit

"lengthy," sentences that exist between the mandatory minimum sentence of 20

years' imprisonment and a life sentence on a man who was barely 30 years old at

the time of his sentencing.  Perhaps that is why, *even the government* did not ask

for a life sentence, but rather one of those many other possible sentences that

would be "substantially above the mandatory minimum sentence," but *not* life.

---

[18]  Slomp was described as "the Pablo Escobar of Silk Road[,]" and received approximately $170 million in Bitcoin for his Silk Road sales, "higher than any other seller on Silk Road."  James Cook, "The Biggest Drug Dealer on Silk Road Has Been Sentenced to 10 Years In Prison," *Business Insider*, May 29, 2015, available at <http://www.businessinsider.com/silk-road-drug-dealer-supertrips-sentenced-to-10-years-in-prison-2015-5>.  Upon his arrest, Farrell, described by an HSI agent as "one of the key masterminds and coordinator of the Silk Road [2.0] criminal marketplace," told investigators, "You're not going to find a bigger fish than me." Allison DeAngelis, "Bellevue Man Sentenced to 8 Years for Silk Road Role," *HeraldNet*, June 7, 2016, available at <http://www.heraldnet.com/article20160607/NEWS03/160609397>.

59

The government also cannot rely on the District Court's factfinding that there was "no doubt . . . that [Ulbricht] wanted to and paid for the murders of five people to protect [his] drug enterprise" to justify the District Court's sentence -- even putting aside that the government notes in its Brief, at 152, that the District Court "recogniz[ed] that there was no evidence that the murders were actually carried out." A.1528.

Nor can the government rely on the alleged overdose deaths that the District Court found "by a preponderance of the evidence" could be attributed to Silk Road, and thus to Ulbricht at sentencing, to establish that the District Court's sentence was reasonable – even if the District Court had *not* erred, as Dr. Taff had concluded, by making factual findings that were incomplete, unreliable and inaccurate. A.1476; S437; *see* Initial Brief, at 130-133.

As Circuit judges across the country, including in the Second Circuit, have recognized, "concurrences from Supreme Court opinions and dissents from denials of certiorari suggest[] that judicial factfinding violates a defendant's constitutional right to a jury trial where the factfinding renders reasonable an otherwise substantively unreasonable sentence." *United States v. Hebert*, 813 F.3d 551, 563-64 (5th Cir. 2015), *citing Jones v. United States*, ___ U.S. ___ , 135 S. Ct. 8 (2014) (Scalia, J., dissenting from denial of *certiorari*); *Marlowe v. United States*, 555

U.S. 963 (2008) (Scalia, J., dissenting from denial of *certiorari*);  *Rita v. United States*, 551 U.S. 338, 374 (2007) (Scalia, J., concurring) ("[t]here will inevitably be *some* constitutional violations under a system of substantive unreasonableness review, because there will be some sentences that will be upheld as reasonable only because of the existence of judge-found facts").

As Sixth Circuit Judge Merritt, writing for six dissenters, explained in *United States v. White*, 551 F.3d 381, 386-87 (6th Cir. 2008), when "the reasonableness – and thus the legality – of [the defendant's] sentence depends entirely on the presence of facts that were found by a judge, not a jury" that sentence "is in contravention of the Sixth Amendment."

This concern expressed by various Circuit judges and Supreme Court justices, that a long sentence, such as a life sentence, based solely on judicial fact-finding regarding "uncharged conduct . . . seems a dubious infringement of the rights to due process and to a jury trial" is directly applicable here, as the District Court reached factual conclusions as to uncharged conduct, including murder for hire allegations and alleged overdose deaths, and used these facts to justify the life sentence it imposed.  *See United States v. Bell*, 808 F.3d 926, 928 (D.C. Cir. 2015) (Kavanaugh, J., concurring).

Indeed, as then-Chief Judge Jacobs wrote in dissent in *United States v.*

61

*Broxmeyer*, 699 F.3d 265, 298 (2d. Cir. 2012), "the offense of federal conviction [should not] become just a peg on which to hang a comprehensive moral accounting" such that a District Court's sentence is "upheld as reasonable" on the basis of judicial findings that the defendant had committed other, "egregious" crimes that did not form the basis for conviction.

**C.** **Ulbricht's Sentence Should Be Vacated and Assigned to a Different District Judge for Resentencing**

As noted in *United States v. Hernandez*, 604 F.3d 48, 55-56 (2d Cir. 2010), "[t]his court has considerable discretion in re-assigning a case for re-sentencing" once it has made the determination that a sentence should be vacated, as the Court should find here given the District Court's imposition of a procedurally and substantively unreasonable life sentence.

In determining whether a case should be remanded for resentencing before a different judge, this Court takes into account "three considerations listed in *United States v. Robin*, 553 F.2d 8, 10 (1977)," to wit:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous[,] . . . (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Hernandez*, 604 F.3d at 55-56, *quoting United States v. DeMott*, 513 F.3d 55, 59

(2d Cir. 2008).[19]

Thus, it is clear that this case should be remanded for resentencing before a

different judge.

---

[19] Unlike the situation in *United States v. Mangone*, ___ Fed.App'x. ___, 2016 WL 3391280 (2d Cir. 2016), here the District Court's comments – including its completely unsupported assertion that Ulbricht's arguments were one of "privilege," A.1523 – are not "best taken as a rhetorically emphatic way of expressing a legitimate negative view of his conduct, and they do not show that the court harbored any personal bias against [the defendant.]" *Id*., at *3. Instead, they constituted the type of "'visceral judgment' about a party that might make it difficult for the judge to assess the case dispassionately." *Id*., at *2.

## Conclusion

Accordingly, for all the reasons set forth above, as well as those in Ulbricht's Initial Brief, it is respectfully submitted that his convictions should be reversed, and a new trial ordered, and/or that certain evidence be suppressed, and/or that the case be remanded for re-sentencing before a different district judge.

Dated:  1 August 2016
        New York, New York

                                        Respectfully submitted,

                                         /S/ Joshua L. Dratel
                                        JOSHUA L. DRATEL
                                        JOSHUA L. DRATEL, P.C.
                                        29 Broadway, Suite 1412
                                        New York, New York 10006
                                        (212) 732-0707

                                        *Attorneys for Defendant Ross Ulbricht*

– Of Counsel –

Joshua L. Dratel
Lindsay A. Lewis
Whitney G. Schlimbach
Joshua J. Horowitz

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing Reply Brief of Appellant contains 13,961 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and that this Reply Brief of Appellant complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it  has been prepared in a proportionally spaced typeface using WordPerfect 12  in 14pts New Times Roman.

/s/ Joshua L. Dratel
JOSHUA L. DRATEL

## CERTIFICATE OF SERVICE

I hereby certify that I have this August 1ˢᵗ, 2016, electronically filed the

Reply Brief of Appellant using the Court's CM/ECF system which will send

notification of such filing to the counsel of Record:

Margaret M. Garnett
Eun Young Choi
Timothy Turner Howard
Michael Neff
United States Attorney's Office
for the Southern District of New York
1 St. Andrew's Plaza
New York, NY 10007

Adam Sean Hickey
United States Attorney's Office
950 Pennsylvania Avenue, NW
Washington, DC 20530

*/s/ Joshua L. Dratel*
Joshua L. Dratel
JOSHUA L. DRATEL, P.C.
29 Broadway, Suite 1412
New York, New York 10006
(212) 732-0707

66