UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
Docket No. 15-1815

---------------------------------------------------X

UNITED STATES OF AMERICA,

     Appellee,     PETITION OF ROSS
                ULBRICHT
                FOR PANEL REHEARING
                OR REHEARING *EN BANC*

     - v -

ROSS WILLIAM ULBRICHT, AKA DREAD PIRATE ROBERTS,
AKA SILK ROAD, AKA SEALED DEFENDANT 1, AKA DPR,

   Defendant-Appellant.

---------------------------------------------------X

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Paul Grant
Law Office of Paul Grant
19501 E. Mainstreet, #200
Parker CO 80134
303-909-6133
Counsel for Mr. Ulbricht

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT    1

ARGUMENT

I.    **Mr. Ulbricht Was Sentenced In Violation of His First Amendment Rights**    1

II.    **The Laptop Warrant Failed to Minimize Intrusions on Privacy**    13

III.    **The Pen/Trap Orders Violated the Fourth Amendment**    18

CONCLUSION    25

# TABLE OF AUTHORITIES

*Cases:*

*Andresen v. Maryland*,    15, 17
   427 U.S. 463 (1976)

*Baker v. Dorfman*,    5
   239 F.3d 415 (2nd. Cir. 2000)

*Bose Corp. v. Consumers Union of U.S., Inc.*,    6
   466 U.S. 485 (1984)

*Frank v. United States,*    5
   78 F.3d 815 (2d Cir. 1996)

*Jones v. United States*,    12
   135 S. Ct. 8 (2014)

i

*Katz v. United States*,                                   22
   389 U.S. 347 (1967)

*Meyer v. Grant*,                                        3
   486 U.S. 414 (1988)

*NAACP v. Claiborne Hardware, Co.*,                 6
   458 U.S. 886 (1982)

*New York Times Co. v. Sullivan*,                     6
   376 U.S. 254 (1964)

*Payton v. New York*,                             14
   445 U.S. 573 (1980)

*Riley v. California*,                             23
   134 S. Ct. 2473 (2014)

*Smith v. Maryland*,                          18, 20
   442 U.S. 735 (1979)

*Terminiello v. City of Chicago*,                     3
   337 U.S. 1 (1949)

*Thomas v. Collins*,                              3
   323 U.S. 516 (1945)

*United States v. Galpin*,                       16
   720 F.3d 436 (2d Cir. 2013)

*United States v. Ganias*,                      16
   824 F.3d 199 (2d Cir. 2016)

*United States v. George*,                     16
   975 F.2d 72 (2d Cir. 1992)

*United States v. Kaba*,                                                                 6, 13
   480 F.3d 152 (2nd Cir. 2007)

*United States v. Loaiza-Sanchez*,                                                3
   622 F.3d 939 (8th Cir. 2010)

*United States v. Otero*,                                                             16
   563 F.3d 1127 (10th Cir. 2009)

*Constitutional Provisions :*

U.S. Const. amend. IV.                                                              14

*Statutes, Rules & Other Authorities:*

18 U.S.C. §§ 3121 - 3127                                                        19

18 U.S.C. § 3553(a)(2)                                                             4

18 U.S.C. 3553 (a)(2)(c)                                                         4, 6

28 U.S.C. § 994(d)                                                                 4

U.S.S.G. § 5H1.10                                                                  4

## Preliminary Statement

Mr. Ulbricht respectfully submits his PETITION FOR REHEARING OR FOR REHEARING *en banc*, pursuant to F.R.A.P. 35 and 40. Mr. Ulbricht presents three points for consideration:

1. The case involves the exceptionally important question whether a district court can, consistent with First Amendment protections, impose punishment - a life sentence - based on its view of the defendant's political views, which the district court described as "deeply troubling, terribly misguided, and very dangerous."

2. The panel decision conflicts with decisions of this court ( *United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013)) and of the United States Supreme Court in *Andresen v. Maryland*, 427 U.S. 463, 482 (1976) (a warrant must assure that searches *are conducted in a manner that minimizes unwarranted intrusions upon privacy*), where the laptop warrant authorized searches that specified procedures well-suited, if not designed, to facilitate unwarranted intrusions upon privacy.

3. This case presents the exceptionally important issue whether reasonable expectations of privacy and pen/trap technology have evolved since *Smith v. Maryland*, 442 U.S. 735 (1979), making that case inapposite.

On May 31, 2017, this Court issued its opinion in this matter (Newman, Lynch, and Droney, C.JJ.) (the "Panel"), affirming Mr. Ulbricht's conviction and

1

sentence in all respects, denying his challenge to the district court's denial of his motions to suppress evidence gathered in violation of his Fourth Amendment rights, and denying his challenge to the procedural or substantive reasonableness of his sentence to incarceration for life without the possibility of parole.

## I. Mr. Ulbricht Was Sentenced In Violation of His First Amendment Rights

The district court found Mr. Ulbricht's political views to be deeply troubling, terribly misguided, and very dangerous, then sentenced him to life without the possibility of parole, a sentence prohibited by the First Amendment.

When discussing Mr. Ulbricht's character, the trial judge displayed extreme disapproval of political and philosophical views that were expressed in Silk Road online posts, posts which the court attributed to Mr. Ulbricht. The district court said "there are posts which discuss the laws as the oppressor and that each transaction is a victory over the oppressor. This is deeply troubling and terribly misguided and also very dangerous." A 1516.[1]  In addressing Mr. Ulbricht before pronouncing his sentence to lifetime imprisonment, the district court stated that *"the reasons that you started Silk Road were philosophical and I don't know that it is a philosophy left behind."*  A 1534. The clear implication of those words

---

[1]  A refers to the Appendix; SA to the Sealed Appendix; Op to the Panel Opinion attached to this petition.

2

spoken just before the court announced the sentence, is that the court may have spared Mr. Ulbricht from a life sentence, had he been able to convince the court that he had abandoned his "dangerous" ideas.

The district court may have found Mr. Ulbricht's views misguided and dangerous, but his freedom of expression *"is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest."* *Terminiello v. City of Chicago*, 337 U.S. 1, 4-5 (1949). The right to free speech embraces the liberty to discuss matters of public concern without prior restraint or fear of subsequent punishment. *Thornhill v. Alabama*, 310 U.S. 88, 101-102 (1940). The priority given to liberties protected by the First Amendment gives them a sanctity and a sanction not permitting dubious intrusions. *Thomas v. Collins*, 323 U.S. 516, 529 (1945). The burden which must be overcome to justify criminal punishment for an expression of political views is "well nigh insurmountable." *See Meyer v. Grant*, 486 U.S. 414, 425 (1988).

The statutes and guidelines applicable to sentencing provide that the court "may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." *United States v. Loaiza-Sanchez*, 622 F.3d 939, 940-41 (8th Cir. 2010), quoting

3

U.S.S.G. § 1B1.4; see 18 U.S.C. § 3661. Sentencing based on "race, sex, national origin, creed, and socioeconomic status of offenders" is prohibited. 28 U.S.C. § 994(d); U.S.S.G. § 5H1.10. Among these prohibited factors, it is only a person's "creed" that is entitled to First Amendment protection.

Congress required that the Sentencing Commission adopt guidelines and policy statements that prohibit sentencing based on "race, sex, national origin, creed, and socioeconomic status of offenders. That same prohibition must be applied to a judge's determination of a sentence to meet the purposes of sentencing as set out in another statute, 18 U.S.C. § 3553(a)(2). Neither the guidelines, the statutes, or, more importantly, the First Amendment, permit a person's creed, *i.e.*, their personal religious or political or philosophical views, to be considered at sentencing.

The Panel's opinion has sanctioned and permitted dubious intrusions on Mr. Ulbricht's rights to free speech. The Panel took the view that the district court properly considered Mr. Ulbricht's political views, because consideration of his view "that he believes he is entitled to break the laws that prohibit certain substances, is relevant to his likelihood of recidivism, a mandated sentencing consideration," referring to 18 U.S.C. 3553 (a)(2)(c). Op. 121. The Panel then stated "the district court did not sentence Mr. Ulbricht based on any prohibited

4

characteristic - <u>nor did the court place more weight on that factor than the facts warranted</u>." *Id*. (Emphasis added). This statement by the Panel denied that the district court was prohibited from considering Mr. Ulbricht's political beliefs in determining his sentence, but then acknowledged that the district court did consider Mr. Ulbricht's political beliefs - and concluded that was not a problem. The First Amendment did not permit the district court to place any weight at all on its opinion of Mr. Ulbricht's philosophy.

Although the Panel rejected Mr. Ulbricht's argument[2] that he was punished

---

[2] The Panel noted in its opinion that Mr. Ulbricht did not raise his First Amendment challenge to the sentencing until he included it in his Reply Brief, but the Panel then did address the issue. Op. 121, fn 65. This important issue was properly raised in response to the government's argument that the district court committed no procedural error in sentencing Mr. Ulbricht and that the sentence was substantively reasonable, (Gov. Br. 140-141), and in response to the government argument that "the record reveals that Judge Forrest carefully weighed Ulbricht's arguments, but found them wanting in light of his conduct, and she imposed a sentence within the reasonable exercise of her broad discretion and with due regard for Section 3553(a)'s parsimony clause." (Gov. Br. 150-151). Mr. Ulbricht asserts that his sentence was both procedurally and substantively unreasonable. The First Amendment argument was addressed by the Panel and should be addressed again now to avoid manifest and substantial injustice and because of the importance of the issue. *See Baker v. Dorfman*, 239 F.3d 415, 420 (2nd. Cir. 2000); *Frank v. United States,* 78 F.3d 815, 833 (2d Cir. 1996), *vacated on other grounds,* 521 U.S. 1114 (1997); (appellate court can exercise its discretion to consider issue raised for the first time on appeal or in a reply brief, to avoid manifest injustice). The Panel decision should be revised or replaced to correct the manifest injustice that Mr. Ulbricht appears to have been sentenced to life imprisonment, without the possibility of parole, at least in part because of his political views.

for his political views and suggested that the district court had considered his philosophy in relation to the possibility he might re-offend, (Op. 121), the record does not support the suggestion. Neither the district court nor the Panel discussed or even mentioned the considerable evidence in the record supporting the conclusion that Mr. Ulbricht is not a danger to re-offend.

When a First Amendment challenge is raised, an appellate court has an obligation to examine the trial record to ensure "that the judgment does not constitute a forbidden intrusion on the field of free expression." *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984) (*citing New York Times Co. v. Sullivan*, 376 U.S. 254, 284-286 (1964); *NAACP v. Claiborne Hardware, Co.*, 458 U.S. 886, 933-934 (1982). Determining whether the district court improperly considered the defendant's political views is a question of law, and must be reviewed *de novo*. See *United States of America v. Kaba* 480 F.3d 152, 156-157 (2nd Cir. 2007).

In determining an appropriate sentence, the district court could properly have considered whether Mr. Ulbricht might re-offend. See 18 U.S.C. 3553 (a)(2)(c). Had the district court exercised its discretion in that regard, the court would not have commented on how dangerous the court thought his philosophy to

be. It would have focused its reasoning on proper concerns, such as concerns about his future behavior. That did not happen.

Mr. Ulbricht's apparent opposition to the laws prohibiting certain controlled substances, is a view shared by many Americans, and is often described as the "libertarian view." A 2015 Gallup Poll estimates that 27% of the American electorate consider themselves libertarian.

https://www.cato.org/blog/gallup-finds-more-libertarians-electorate

The fact that libertarians and others oppose the drug laws, doesn't mean that all libertarians are drug traffickers. Even the Panel acknowledges in its opinion that reasonable people oppose harsh sentences for drug crimes, and that many reasonable people disagree with "criminal prohibition of their sale and use at all." Op 120. One cannot assume that they, or Mr. Ulbricht, will be uncontrollably driven by philosophy to violate the drug laws. Most people who oppose the drug laws understand that different consequences are likely to result from violating a law, as opposed to simply expressing opposition to a law. Mr. Ulbricht does.

The district court's views contrast with the views of America's Founders, who eloquently expressed their hostility towards oppressive government in the Declaration of Independence. Americans still fear an oppressive government: In a 2015 Gallup Poll, 49% of Americans said the federal government poses "an

7

immediate threat to the rights and freedoms of ordinary citizens."

http://www.gallup.com/poll/185720/half-continue-say-gov-immediate-threat.aspx

The opinion that governments are to be viewed as the oppressor is not dangerous; these are the ideas that gave birth to our liberty, and which guard it still.

Mr. Ulbricht told the court during allocution that he understands the difference between holding philosophical ideas and violating the laws, that he values his freedom, and that when he is released, he will not break the law again:

> I would like to share with you what a second chance would mean for me personally. I do love freedom. . . . I also want you to know that it is just in me to want to have a positive impact on our broader community and my attempt at that with Silk Road ended in ruin, but if I ever get the chance again I will be incredibly cautious and I will make sure that anything I do, large or small, will only have positive effects on those around me and *will absolutely be within the confines of the law*.
> A 1508 (emphasis added).

Mr. Ulbricht expressed similar thoughts in his letter to the court:

> [I]f you find that my conviction warrants a sentence that allows for my eventual release, I will not lose my love for humanity during my years of imprisonment, and upon my release I will do what I can to make up for not being there for the people I love, and to make the world a better place, *but within the limits of the law*. . . .
>
> If I do make it out of prison, decades from now . . . *I will know firsthand the heavy price of breaking the law and will know better than anyone that it is not worth it*. Even now I understand what a terrible mistake I made.

8

A 1053 (emphasis added).

If the district court were going to consider that Mr. Ulbricht might re-offend when released (a legitimate consideration), the court should have acknowledged what he said, and should have commented on whether what he said mattered. The district court ignored his statements and the many similar statements included in nearly all of the 100 letters from his supporters, friends, and family members. The lengthy transcript (97 pages) of the sentencing hearing contains no mention by the court of this substantial evidence that Mr. Ulbricht would not present a danger to the public would not likely re-offend. The court did not address the issue.

The district court chose to ignore the messages from 100 people who know Ross Ulbricht, messages telling the court that he would not re-offend when released. What the district court did say about the letters is:

> These are letters written by a vast, broad array of people which are a statement that is extraordinary for you because they are, as I said earlier, from every phase of your life . . . . They reveal a man who was loved, who has built enduring and significant relationships over a lifetime and maintained them. The letters reveal you as intelligent, that you displayed great kindness to many people that people believed in you when you were younger and believe in you still . . . .
> A 1534.

The district court was confused by the letters which showed Mr. Ulbricht to be a different man than the one she thought him to be:

9

> Frankly, I can't make a judgment about which of you to
> know, which of you to rely on, and which of you to
> believe.
> A 1533.
>
> I have thought about them [the letters] and read them
> over and tried to reconcile them with the facts I know
> about this case. There is no reason to make a choice
> between these two people that I see that are on display -
> the Ulbricht who is the leader of the criminal enterprise
> and the Ulbricht who is known and loved."
> A 1535.

If the district court was unable to make a judgment as to who Mr. Ulbricht

is, she could not have assessed whether he was likely to re-offend. The district

court could not decide what to do with the fact that 100 different people, from all

walks of life, each of whom knew Mr. Ulbricht, told the court, in their own way,

that Mr. Ulbricht should receive the shortest possible sentence; that he posed no

danger to the public; that he was loved and loving, caring, thoughtful, intelligent;

that he would not re-offend; and that he would make many positive contributions

to the world when released.

The 100 letters are powerful, moving, and revealing testaments to the

character of Mr. Ulbricht, and the district court ignored them all because the

district court couldn't reconcile what the people who know Mr. Ulbricht told the

court, with what the court thought. Among the most poignant and moving letters

submitted to the district court, telling the court that Mr. Ulbricht was not a danger

10

to the public and not likely to re-offend, are the letters numbered 1, 2, 3, 4, 5, 8, 9, 10, 20, 22, 23, 25, 27, 28, 29, 32, 33, 36, 42, 45, 46, 47, 48, 49, 51, 52, 53, 54, 57, 58, 59, 60, 61, 62, 63, 64, 67, 68, 70, 72, 74, 77, 78, 79, 82, 84, 85, 86, 87, 88, 89, 92, 94, and 96.  A 1054 - 1290.

The district court should not be given any benefit of the doubt as to whether Mr. Ulbricht was sentenced (at least in part) because of his political and philosophical views.  There is nothing in the district court's sentencing statement which indicates the court considered the distinction between Mr. Ulbricht's philosophy, and the question (which the court did not address) whether he would conform his future behavior to the requirements of the law.  In fact, the evidence is to the contrary.  Just before pronouncing the sentence, the district court told Mr. Ulbricht:  "It is also notable that the reasons that you started Silk Road were philosophical and I don't know that it is a philosophy left behind."  A 1534.

The question whether Mr. Ulbricht had abandoned his philosophy, was not a proper matter of concern for the court.  The district court should have concerned itself with whether Mr. Ulbricht would obey the drug laws and other laws when released. It is not clear what Mr. Ulbricht would have had to do to convince the court he had abandoned his philosophy. The law does not require that a defendant take an oath of abjuration, like Galileo, renouncing his prior views, in order to

11

avoid the harshest penalty the law allows.

The failure of the district court to separate (or even mention) legitimate concerns over Mr. Ulbricht's future behavior from its concern about his philosophical beliefs, gives every appearance that the district court determined to sentence him to life imprisonment because, at least in part, the court was concerned about his "dangerous" philosophical views. The failure of the district court to recognize Mr. Ulbricht's right to hold his views without being punished for them, refutes any notion that its concern about his "deeply troubling and very dangerous" views did not drive the sentence.

The record indicates that the district court sentenced Mr. Ulbricht to life imprisonment because of his political views, in violation of the First Amendment.[3] The sentence must be vacated and the case remanded for re-sentencing by a

---

[3] Ulbricht's sentence must also be vacated because the Sixth Amendment is violated when judicial factfinding appears to render reasonable an otherwise substantively unreasonable sentence. The district court's decision to find several enhancements and instances of uncharged conduct substantially affected Ulbricht's range under the Guidelines. The panel considered this argument on the merits, but erroneously concluded there was no support for this position in existing law. Op. at 137 n.72. Yet the very opinions to which Ulbricht and the Court cited note the issue is an open question meriting serious consideration. *See, e.g.*, *Jones v. United States*, 135 S. Ct. 8, 9 (2014) (Scalia, J., dissenting from denial of certiorari) (noting the Court "left for another day" this Sixth Amendment issue, but that courts' continued use of judicial factfinding under these circumstances "has gone on long enough.").

different judge. [4]

## II. The Laptop Warrant Failed to Minimize Intrusions on Privacy

The Panel erred by overlooking what the Laptop Warrant authorized in

Attachments A, B, and C. Those attachments authorized the investigator to seize

and examine all communications and writings of Mr. Ulbricht located on the

laptop, and to seize and examine all evidence related to his travel, and *the warrant*

*expressly allowed the investigator to sufficiently examine the contents of any file*

*he or she opened in order to determine the precise contents of that file*.

This unlimited, general warrant, authorized the investigator to examine

every file in the laptop without regard to its relevance to the crimes being

investigated, based on the assumption that all files were relevant, and did not

require the investigator to return what was seized or even to curtail detailed

examination of files if it was determined after cursory review that files examined

were not relevant to the investigation. An unlimited search, with *no protection*

---

[4] "When a sentencing judge has . . . appeared impermissibly to base a sentencing determination on [an impermissible factor]. . . , that appearance is not easily effaced. If the same judge were to give the same or a higher sentence on remand, it would be difficult to avoid the impression that he or she was continuing to base the defendant's sentence on the [impermissible factor] . . . ., at least to some extent." "[T]he better course is to remand to a different judge for re-sentencing as a matter of course, irrespective of whether there was actual bias . . ." *See Kaba,* 480 F.3d at 157 (2nd Cir. 2007).

*from unwarranted intrusions on privacy*, is forbidden by the Fourth Amendment.

The Fourth Amendment requires that warrants must be based on probable cause and must "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "[I]ndiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment." *Payton v. New York*, 445 U.S. 573, 583 (1980).

Attachments A, B, and C to the laptop warrant describe what the Warrant authorized the investigator to seize and search - everything on the laptop - and set out the planned search procedures. SA 252-255. Attachment A: the warrant authorized the search for and seizure of "Any evidence concerning ROSS WILLIAM ULBRICHT relevant to the investigation of the SUBJECT OFFENSES," including but not limited to: "any communications or writings by ULBRICHT." SA 252. The Panel overlooked that *the structure of this language authorized the seizure and examination of all communications or writings by Mr. Ulbricht, based on the predetermination that all communications or writings by Mr. Ulbricht were relevant to the investigation of the Subject Offenses*. The warrant was fatally overbroad in this regard.

The warrant did not limit what could be seized to what was relevant

14

precisely because it dispensed with the need to determine relevance after cursory examination of items seized, and because it authorized the search for, seizure and thorough examination of all communications and writings by Mr. Ulbricht. The laptop warrant similarly authorized the seizure of "any [meaning all] evidence concerning ULBRICHT'S travel or patterns of movement." SA 252-253.

A general warrant permitted a "general, exploratory rummaging in a person's belongings," *Andresen v. Maryland*, 427 U.S. 463, 480 (1976) (internal quotation marks omitted). That is what the laptop warrant expressly permitted, in Attachment B (SA 253), where the warrant authorized a computer search procedure which included: "surveying various file directories and the individual files they contain," and opening or cursorily *"reading the first few pages of such files [that were opened]* **in order to determine their precise contents**." Determining the precise contents of a file is incompatible with the requirement of the cursory examination of a file to determine if it contains relevant evidence.

Authorization to determine *the precise contents* of any file the investigator opened destroyed any limitation that might have been implied by the words "reading the first few pages of such file . . . " This procedure provided no protection against unwarranted intrusions on Mr. Ulbricht's privacy. If a file was opened and a cursory examination showed that it did not contain relevant

15

evidence, examination of that file should have ended at that point.

'A failure to describe the items to be seized with as much particularity as the circumstances reasonably allow offends the Fourth Amendment because there is no assurance that the permitted invasion of a suspect's privacy and property are no more than absolutely necessary.' *United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013), *quoting United States v. George,* 975 F.2d 72, 76 (2d Cir. 1992).

A warrant authorizing seizure of "any and all information and/or data" fails the particularity requirement. *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009). The "seizure of a computer hard drive, and its subsequent retention by the government, can give the government possession of a vast trove of personal information about the person to whom the drive belongs, much of which may be entirely irrelevant to the criminal investigation that led to the seizure." *United States v. Ganias*, 824 F.3d 199, 217 (2d Cir. 2016) (en banc). The purpose of the particularity requirement "is to minimize the discretion of the executing officer . ." *Galpin*, 720 F.3d at 446 n.5.

When search warrants authorize the seizure of documents, *"responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy*." *Andresen*, 427 U.S. at 482 (1976) (emphasis added).

16

Mr. Ulbricht has no quarrel with the Panel's statement that "traditional searches for paper records, like searches for electronic records, have always entailed the exposure of records that are not the objects of the search to at least superficial examination in order to identify and seize those records that are." Op. 49. Where the Panel erred was in not noting that this warrant authorized the seizure of all of Mr. Ulbricht's communications and writings, and the seizure of all evidence of Mr. Ulbricht's travel, and that the search procedure authorized by the warrant provided no protection against the seizure of irrelevant information, thus provided no protection against unwarranted intrusions on privacy.

That overbroad language could easily have been cured. For example, the language would not have been overbroad had the warrant "authorized the seizure of all relevant evidence, including any relevant communications and writings of ULBRICHT, and any relevant evidence concerning *ULBRICHT'S travel or patterns of movement*."

Most importantly, the Panel overlooked that the reviewing magistrate did not take care to assure that the searches were conducted in a manner that *minimized unwarranted intrusions upon Mr. Ulbricht's privacy*. In fact, the warrant expressly authorized unwarranted intrusions on Mr. Ulbricht's privacy because it authorized the investigator to seize and open all files on the laptop, and

17

because it authorized the unrestrained rummaging through any and every file the investigator opened. This warrant violated Ulbricht's Fourth Amendment rights.

That violation requires the suppression of all evidence resulting from the search and seizure of Mr. Ulbricht's laptop computer, and of all evidence which was the fruit of that unlawful search. The convictions heavily relied on the laptop-derived evidence and must be reversed.

## III. The Pen/Trap Orders Violated the Fourth Amendment

The Panel limited its comments on the pen/trap orders to the authorization of the use of pen-trap devices to collect IP address information (Op. 6-7), and analogized that use to the use of pen registers to capture phone numbers called and to capture phone numbers from which calls were received, a use which the Supreme Court had said was reasonable because a "person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." Op 39-40, quoting *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979).

The Panel overlooked that the Pen/Trap orders in this case authorized use of pen registers and trap and trace devices to gather far more information than had been considered reasonable (or even possible) in *Smith* - information on routers, IP addresses, and MAC addresses to collect "dialing, routing, addressing, and signaling information associated with each communication to or from the Target

18

Account, including the date, time, duration, and port of transmission of the communication, without geographic limit, and the IP addresses associated with the communication, without geographic limit." SA 75-76. The Pen-Trap orders also provided that *the pen register and trap and trace devices were to be used to trace the communications to their true source, if possible, without geographic limit*. SA 83. (Emphasis added.) This authorization to determine if communications were established between mobile or between mobile and fixed devices, and to track the time and duration of communications, and to track communications to their true source goes far beyond what the Supreme Court had considered reasonable in *Smith*, and beyond what the Pen/Trap statute authorizes.

The Panel overlooked that the Pen/Trap statute (18 U.S.C. §§ 3121 - 3127) does not authorize the use of trap and trace devices to determine whether a wire or electronic communication is actually established and the duration that the wire or electronic communication is maintained. The Panel failed to note that the statute does not authorize the use of trap and trace devices to track a person's (or their computer's or their smartphone's) location. See Op. 36-37. The pen registers and trap and trace devices used in the investigation of Mr. Ulbricht were authorized for use in determining if communications were established, and the duration that communications were maintained, and in locating Mr. Ulbricht and his computer

19

and the devices with which his computer communicated, as he traveled.  SA 83.

That is not the kind of information which a person knowingly and voluntarily discloses to the public or to a third party when using their laptop computer for communication.  People in the digital era do demand and do have a reasonable expectation of privacy such that neither their location or the location or identification of persons or devices with whom they are communicating, or the fact of their communication, or the times and durations of their communications, are being willingly disclosed through their use of a laptop computer (or their use of a smartphone) to a privacy-breaching third party, or to the government.

In *Smith v. Maryland*, 442 U.S. 735 (1979), in the time before laptop computers and smartphones became the primary tools for communication and for storing personal information, the Court held that a telephone subscriber did not have a reasonable expectation of privacy in the numbers he or she dials because the subscriber knows that the telephone company keeps records of that information. Sure, and people once had to deal with the fact that telephone operators often assisted in placing calls, and with party lines, in fairly common use in America from the early 20th Century through the 1980's, where other subscribers could listen in on a person's conversations over the shared lines. https://en.wikipedia.org/wiki/Party_line_(telephony).  Justices of the *Smith Court*

20

would have been quite familiar - from personal experience - with party lines and

with the fact that it was not unusual for telephone customers to require operator

assistance to place certain types of calls.  So it is unsurprising that the 1979 Court

did not find a Fourth Amendment violation for warrantless tracking of the

numbers dialed from a telephone, and tracking of the phone numbers incoming to

a telephone.  Privacy expectations have evolved since 1979, accompanied by

advances in communications and in privacy-protecting technology.

In the modern digital world, digital service and digital equipment providers

have recognized their *duty to protect customer privacy and* they are responding to

*customer demands to protect that privacy*:

> "Apple lets you NSA-proof your iCloud keychain, encrypts
> Messages and FaceTime calls end-to-end, protects an employee's
> personal information from his or her employer when using Mobile
> Device Management, and has designed the iPhone without
> law-enforcement back doors.
> But in the most telling recent news of all, it appears that Apple
> will randomize the Wi-Fi hardware address of iOS devices to frustrate
> location and advertising trackers who use this address to know who
> you are when you move around in public. This is a subtle feature that
> the vast majority of iOS users won't ever realize exists, even as it
> protects them.  With every iteration of OS X, iOS, and iCloud, we see
> Apple increasing the privacy protections it provides its users. It has
> consistently enabled customers to protect their personal information
> from advertisers, governments, third-party developers, and even
> Apple itself.
> This is a company that destroys the keys to its encryption

21

hardware after setting them up in the data center, just in case an employee decides to sneak in a back door or hand the keys off to a government agency. It designed systems like iMessages that a government could technically force them to sniff, but only with a fundamental change to the system architecture.

Apple likely sees a competitive advantage in privacy, especially when its biggest direct competition comes from advertising giant Google and the enterprise-friendly Microsoft. Apple believes consumers not only desire privacy, but will increasingly value privacy as a factor in their buying decisions."

http://www.macworld.com/article/2366921/why-apple-really-cares-about-your-privacy.html

In order for a defendant to claim that a government action constituted a "search" under the Fourth Amendment, he must demonstrate that he had a reasonable expectation of privacy in which (1) the individual has "exhibited an actual (subjective) expectation of privacy" and (2) whether the subjective expectation of privacy is "one that society is prepared to recognize as reasonable." *Katz v. United States*, 389 U.S. 347, 361 (1967).

The Panel erred in not finding that Mr. Ulbricht has a subjective expectation of privacy, one that society does recognize as reasonable, with respect to the information gathered pursuant to the pen/trap orders. Because *Smith* dealt with what the Court considered *reasonable privacy expectations of the time*, and because *Smith* dealt with the relatively primitive technology available in 1979 to track phone numbers assigned to telephones at fixed locations, *Smith* is simply not

22

applicable to the facts of this case, facts which involve evolved expectations of and demands for privacy, and which involve advanced technologies (including mobile phones, mobile computers, routers, the internet, and new pen register and track and trace technology, none of which were publicly available in 1979).

The Panel said that the recording of IP address information and similar routing data in this case, "are precisely analogous to the capture of telephone numbers at issue in *Smith*." Op. 41. The Panel's effort to equate the pen/trap orders and technology in this case with the orders and technology considered in *Smith*, is "like saying a ride on horseback is materially indistinguishable from a flight to the moon. Both are ways of getting from point A to point B, but little else justifies lumping them together." *Riley v. California*, 134 S. Ct. 2473, 2488-2489 (2014) (Court response to argument that searches of all data stored on a cell phone was equivalent to searches for physical items).

The Panel overlooked Mr. Ulbricht's argument (Ulbricht's Br. 112, 121-122) that issues related to searches that involve tracking a person's physical (movements and) location with pen registers or trap and trace devices, were presented in this case. Op. 43, fn 29. The Panel saw no difference between monitoring fixed location telephone dialing information, and monitoring IP address routing data of a mobile laptop computer, coordinating that with

23

observation of a suspect's location, and monitoring both the location of his laptop and the internet activity from his laptop, and with *tracing the communications to their true source, if possible, without geographic limit*. Op. 45.

The court-authorized use of pen register and trap and trace devices in this case went far beyond what the Court considered in *Smith* and far beyond what the Pen/Trap statute authorizes, by authorizing use of the devices to track the location of Mr. Ulbricht and of his laptop, and to trace communications to their true source, without geographic limit, by verifying which communications occurred, and by recording the time and duration of such communications. That difference, and the differences between reasonable expectations of privacy in 1979 and today, transform use of the pen register and trap and trace devices into an unreasonable invasion of privacy and into a warrantless and illegal search, in violation of the Fourth Amendment.

The motion to suppress the evidence gathered pursuant to the Pen/Trap orders should have been granted and evidence resulting from those orders must be suppressed. Denial of the motion to suppress was not harmless, let alone harmless beyond a reasonable doubt. The convictions should be reversed.

## CONCLUSION

The Petition should be granted.

Dated:       Denver, Colorado
              July 31, 2017

                           Respectfully submitted,


                           /s/ Paul Grant
                           Paul Grant
                           Counsel for Mr. Ulbricht

## CERTIFICATE OF COMPLIANCE

      Undersigned counsel hereby certifies that this petition exceeds the page limits set out in Rules 35(b)(2) and 40(b) of the Federal Rules of Appellate Procedure, but is within the 25 page limit for which Mr. Ulbricht is seeking permission in a motion being filed simultaneously with this petition.


                           /s/ Paul Grant
                           Paul Grant

**OPINION**